

2016 FEB -3 P 5: 32

U.S. DISTRICT C...
...

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| | ) |
| MARK HAZELWOOD, | ) |
| SCOTT WOMBOLD, also known as "Scooter," | ) |
| JOHN FREEMAN, also known as "Stick," | ) |
| VICKI BORDEN, JOHN SPIEWAK, | ) |
| KATY BIBEE, HEATHER JONES, | ) |
| and KAREN MANN. | ) |
| | ) |
| Defendants. | ) |

Case No. 3:16 cr 20

Judge Varlan / Guyton

## INDICTMENT

The Grand Jury charges that:

## COUNT ONE
### (Conspiracy to Commit Mail Fraud and Wire Fraud)

### Introduction

At all times relevant to Count One of this Indictment, unless otherwise indicated:

1.    Interstate trucking companies require diesel fuel to operate their trucks. Pilot

Travel Centers LLC ("Pilot"), headquartered in Knoxville, Tennessee, sells billions of gallons of

diesel fuel to those companies each year from its truck stops across the country. By the end of

2008, Pilot operated more than 300 truck stops and, in 2008, sold more than 3 billion gallons of

diesel fuel. In 2010, Pilot began using the trade name "Pilot Flying J." By the end of 2012, Pilot

was operating more than 500 truck stops, and, in 2012, sold more than 5 billion gallons of diesel

fuel.

2.     Pilot has competed with other truck stop chains, including but not limited to, Love's, Travel Plazas of America (often referred to as "TA"), and historically, Flying J.

3.     Pilot's Direct Sales division ("Direct Sales") was responsible for marketing the sale of Pilot's diesel fuel to the interstate trucking industry. For the purpose of inducing interstate trucking companies to purchase their diesel fuel from Pilot instead of Pilot's competitors, Direct Sales division employees offered per-gallon diesel fuel price discounts to those trucking companies.

4.     MARK HAZELWOOD (HAZELWOOD) was named Pilot's Vice President of Sales and Development in 1988. HAZELWOOD was promoted to Executive Vice President of the company in 1998. HAZELWOOD was promoted to President of Pilot in 2012. From no later than 2004 through April 2013, HAZELWOOD oversaw Pilot's Direct Sales division. In April 2013, HAZELWOOD approved the following biographical description for himself: "a lead visionary and strategist for Pilot Flying J in the areas of sales, real estate, development, mergers and acquisitions, and facility revenue." HAZELWOOD managed the Direct Sales division by, among other things, traveling with Pilot sales employees to trucking company customer meetings, and requiring the submission of weekly trip reports that summarized Direct Sales division employee meetings with customers. The following conspirators were among those who directly reported to HAZELWOOD at relevant times: SCOTT WOMBOLD, JOHN FREEMAN, VICKI BORDEN, Arnie Ralenkotter, and Brian Mosher.

5.     SCOTT WOMBOLD (WOMBOLD) was employed in Pilot's Direct Sales division from no later than 2010 through April 2013 and held the title and supervisory position of vice president. WOMBOLD marketed, and supervised the marketing of, Pilot's diesel fuel to

interstate trucking companies. At relevant times, Brian Mosher reported directly to WOMBOLD. Some Pilot employees referred to WOMBOLD as "Scooter."

6. JOHN FREEMAN (FREEMAN) was employed in Pilot's Direct Sales division from no later than 2008 through April 2013 and held the titles and supervisory positions of director and vice president. FREEMAN marketed, and supervised the marketing of, Pilot's diesel fuel to interstate trucking companies. At relevant times, Chris Andrews, Jay Stinnett, and Arnie Ralenkotter directly reported to FREEMAN. FREEMAN also received assistance and customer support services from KATY BIBEE. Some Pilot employees referred to FREEMAN as "Stick."

7. VICKI BORDEN (BORDEN) was employed in Pilot's Direct Sales division from no later than 2008 through April 2013 and held the title and supervisory position of director. At relevant times during that period, BORDEN supervised KATY BIBEE, HEATHER JONES, KAREN MANN, Janet Welch, Holly Radford, and Lexie Holden.

8. JOHN SPIEWAK (SPIEWAK) was employed in Pilot's Direct Sales division as a regional sales manager. SPIEWAK marketed Pilot's diesel fuel to interstate trucking companies in his sales region. SPIEWAK did not work out of Pilot's corporate headquarters in Knoxville, Tennessee, but worked remotely from a home office in Ohio and reported to Arnie Ralenkotter.

9. KATY BIBEE (BIBEE) was employed in Pilot's Direct Sales division as a regional account representative and worked at Pilot's corporate headquarters in Knoxville, Tennessee. Because BIBEE worked at Pilot's corporate headquarters, she was often referred to as an "inside representative." BIBEE supported FREEMAN and Chris Andrews, among others, in marketing the sale of diesel fuel to interstate trucking companies.

10.    HEATHER JONES (JONES) was employed in Pilot's Direct Sales division as a regional account representative and worked at Pilot's corporate headquarters in Knoxville, Tennessee. Because JONES worked at Pilot's corporate headquarters, she was often referred to as an "inside representative." JONES supported Brian Mosher, among others, in marketing the sale of diesel fuel to interstate trucking companies.

11.    KAREN MANN (MANN) was employed in Pilot's Direct Sales division as a regional account representative and worked at Pilot's corporate headquarters in Knoxville, Tennessee. Because MANN worked at Pilot's corporate headquarters, she was often referred to as an "inside representative." MANN supported Arnie Ralenkotter, among others, in marketing the sale of diesel fuel to interstate trucking companies.

12.    HAZELWOOD, WOMBOLD, FREEMAN, BORDEN, SPIEWAK, BIBEE, JONES, and MANN, had numerous conspirators, both known and unknown to the grand jury, including, but not limited to, the following individuals who are referenced in this Indictment:

        a.    Brian Mosher (Mosher). Mosher, not indicted herein, was employed in Pilot's Direct Sales division from no later than 2008 through April 2013 and held the title and supervisory position of director. Mosher marketed, and supervised the marketing of, Pilot's diesel fuel to interstate trucking companies in his sales region. Mosher did not work out of Pilot's corporate headquarters in Knoxville, Tennessee, but worked remotely from a home office in Iowa.

        b.    Arnie Ralenkotter (Ralenkotter). Ralenkotter, not indicted herein, was employed in Pilot's Direct Sales division from no later than 2008 through April 2013 and held the title and supervisory position of director. Ralenkotter marketed, and supervised the marketing of, Pilot's diesel fuel to interstate trucking companies in his sales region. Ralenkotter

did not work out of Pilot's corporate headquarters in Knoxville, Tennessee, but worked remotely from a home office in Kentucky.

      c.    <u>Jay Stinnett (Stinnett)</u>. Stinnett, not indicted herein, was employed in, or otherwise worked in conjunction with, Pilot's Direct Sales division from no later than 2008 through April 2013 in various roles, including regional sales manager. At relevant times, Stinnett marketed Pilot's diesel fuel to interstate trucking companies in his sales region.

      d.    <u>Chris Andrews (Andrews)</u>. Andrews, not indicted herein, was employed in Pilot's Direct Sales division from no later than 2010 through April 2013 as a regional sales manager. Andrews marketed Pilot's diesel fuel to interstate trucking companies in his sales region. Andrews did not work out of Pilot's corporate headquarters in Knoxville, Tennessee, but worked remotely, at different times, from a home office in Georgia, Florida, or Texas.

      e.    <u>Kevin Clark (Clark)</u>. Clark, not indicted herein, was employed in Pilot's Direct Sales division from no later than 2008 through April 2013 as a regional sales manager. Clark marketed Pilot's diesel fuel to interstate trucking companies in his sales region. Clark did not work out of Pilot's corporate headquarters in Knoxville, Tennessee, but worked remotely from a home office in Missouri.

      f.    <u>Janet Welch (Welch), Holly Radford (Radford), and Lexie Holden (Holden)</u>. Welch, Radford, and Holden, who are not indicted herein, were employed, at relevant times, in Pilot's Direct Sales division as regional account representatives and worked at Pilot's corporate headquarters in Knoxville, Tennessee. Because Welch, Radford, and Holden worked at Pilot's corporate headquarters, they were also referred to as "inside representatives."

13.    <u>Pilot's Email System</u>. All emails sent from, or received by, a Pilot employee's Pilot email account passed through Pilot's email server that was located in the Eastern District of

Tennessee in Knoxville, Tennessee. Pilot issued portable electronic communication devices to HAZELWOOD, WOMBOLD, FREEMAN, Mosher, and Ralenkotter, among others, so that those individuals could receive and send emails from and through their Pilot email accounts while away from their respective offices. Pilot's email policy, which was set forth in Pilot's Code of Ethics and Business Conduct and acknowledged by HAZELWOOD, WOMBOLD, FREEMAN, BORDEN, SPIEWAK, BIBEE, JONES, and MANN, stated that Pilot's "email system (which includes the Internet access and Outlook/Microsoft Exchange Servers) is the property of [Pilot]. [Pilot] reserves the right to review, audit, intercept, access, disclose, or handle accordingly all messages composed, sent, and received on the e-mail system at any time for any purpose."

14. Trip Reports. To facilitate HAZELWOOD's supervision of the Direct Sales division, HAZELWOOD required Direct Sales division employees to submit weekly trip reports that summarized, for HAZELWOOD's review, meetings that sales personnel had with trucking company customers during the preceding week. HAZELWOOD's trip-report requirement began no later than 2006, and continued thereafter, as the following Pilot emails to and from the following persons show in pertinent part:

| Email Date (M/D/Y) | Email From/To | Pertinent Excerpt from Email |
|---|---|---|
| 12/11/2006 | From HAZELWOOD to FREEMAN, Ralenkotter, Mosher and others | "Subject: Sales Teams & Goals" "As a reminder, I also want to see all trip reports every week, received by Vicki [Borden] and [Pilot Employee 1] before noon on Friday. We have to be seeing more customers per week than ever before and I will be monitoring this weekly. It is your responsibility to have your team complete these reports." |

| 8/26/2010 | From Pilot Employee 1 to FREEMAN, WOMBOLD, SPIEWAK, Ralenkotter, Mosher, Clark, Andrews, Stinnett, and others, and cc-copy to BORDEN | "Subject: Trip Reports" "Just a reminder that trip reports are due by 12:00 pm eastern every Friday. I am sending last weeks and this weeks to Mark to review while in Italy. Thanks." |
|-----------|------------------------------------------------|------------------------------------------------|
| 7/5/2011 | From HAZELWOOD to "Direct Sales Field" and "Direct Sales" distribution lists | "Subject: RE: Weekly Report for Mark" "Good news please use this", which was a reply-all email in response to a BORDEN email of the same date that said in pertinent part, "Sales Force is ready for you to start using for your weekly report. . . . At the latest, the report due to Mark on Friday 8/5 will need to be generated from Sales Force." |

15. Diesel Fuel Discounts. Pilot's Direct Sales Manual ("Pilot-DSM") has been described as "a guideline" for the Direct Sales division "designed to increase Pilot's market share in the increasingly competitive truck stop/travel center business." The Pilot-DSM stated that "fuel is a trucking company's largest variable cost" and that "[a]n effective way for us to sell fuel is through discounts to trucking companies." Confirming that fuel discounts have consistently been important, and material, to any trucking company's fuel-buying decision-making, the Pilot-DSM further stated that "[d]iscounts on fuel gives the trucking company an incentive to buy fuel at Pilot because it helps them save money on their fuel purchases." The Pilot-DSM also explained that offering fuel discounts to trucking companies would be instrumental to expanding Pilot's market share in the truck stop business: "With our network of travel centers and low pump prices, discounts will play a major role in building gallons for Pilot." But the Pilot-DSM cautioned, "[r]emember that discounts affect our profitability negatively. . . . Discounts ultimately affect the P & L [Profit and Loss] on the customer, which in turn affects your commission."

16. Cost-Plus Discount. According to the Pilot-DSM, "Cost Plus is a pricing format where the trucking company pays an industry determined wholesale 'index' price plus a

pumping fee" – hereinafter referred to as a Cost-Plus Discount. The Pilot-DSM further stated that a Cost-Plus Discount "is an alternative pricing strategy that may be necessary for competitive reasons."

      a.    "Cost." According to the Pilot-DSM, the "[t]ruck stop industry standard for 'cost' in cost plus programs" is the "OPIS contract average of the rack that supplies a predetermined truck stop." The Pilot-DSM further stated that "OPIS" is the "Oil Price Information Service," which is "a company that collects posted wholesale fuel prices at each rack and provides this service to the trucking/truck stop industry." According to the Pilot-DSM, a "rack" is "the wholesale distribution point for petroleum products."

      b.    "Plus." According to the Pilot-DSM, the "pumping fee" or "pump fee" (hereinafter "Pump Fee") is "the 'plus' in the cost plus" and is the "amount added by the truck stop chain, presumably as margin to the cost plus equation." The Pump Fee is expressed as cents, such as $.04 (four cents), and, according to the Pilot-DSM, "can range from Standard Cost Plus $.02 to Cost Plus $.08." A Cost-Plus Discount was typically expressed in an abbreviated form, such as "CP .0_" or "cp .0_." The higher the Pump Fee, the lower, or comparatively worse, the Cost-Plus Discount becomes. For example, a CP .06 is a comparatively worse Cost-Plus Discount than a CP. 03 by three cents ($.03) per gallon. For some customers, typically those customers to whom Pilot was required to offer a substantial per gallon discount to prevent the customer from purchasing diesel fuel from a Pilot competitor, the Pump Fee could even be expressed as "Minus," that is, cost *minus* a specified Pump Fee amount, such as Cost-Minus .03.

      c.    "Cost" varied by OPIS rack market. There was not a single OPIS daily contract average that generated a single "cost" to be applied uniformly to every gallon of diesel fuel sold at every Pilot truck stop across the country on the same day. Instead, the hundreds of

Case 3:16-cr-00020-CLC-HBG   Document 3   Filed 02/03/16   Page 8 of 58   PageID #: 12

Pilot truck stops across the country often have been tied to different OPIS rack markets, referred to as "racks" in the Pilot-DSM, each of which generated its own daily OPIS Contract Average that was used, as stated in the Pilot-DSM, as the industry standard for "cost" in the Cost-Plus Discounts to be applied at each "predetermined truck stop."

17. As the Pilot-DSM further noted, "[a] total Cost Plus network is not a good deal for Pilot. When you place a customer on Cost Plus, you have capped your profit margin at a low level at all Pilot locations. Pilot buys diesel very well, we cannot take full advantage of this on Cost Plus."

18. Cost-Plus Discount Application. Cost-Plus Discounts represented to trucking company customers were typically applied in the following two ways – Off-Invoice or Rebate.

a. Cost-Plus Discount Application to Off-Invoice Customer. "Off-Invoice" customers were those trucking company customers who received their Cost-Plus Discounts for diesel fuel purchased from Pilot when Pilot billed those customers, through an invoice, for diesel fuel purchased from Pilot during the billing period. Off-Invoice customers did not pay Pilot's retail price for diesel fuel at the pump at the time of sale. Rather, Off-Invoice customers were not required to pay Pilot for their diesel fuel purchases until they received Pilot's invoice, on which the "Invoice Total" was presented as including whatever discount that had been represented to induce diesel fuel purchases from Pilot, by the invoice's stating both a "Retail Total" and an "Invoice Total." As the Pilot-DSM put it:

> "Off invoice billing consists of billing the customer net of discounts earned. The cost plus invoice represents the gallons purchased at the re-priced amount, which reflects the customer's cost plus deal."

b. Cost-Plus Discount Application to Rebate Customer. "Rebate" customers were those trucking company customers who received their Cost-Plus Discounts for diesel fuel

Page 9 of 58

purchased from Pilot when Pilot sent those customers a rebate amount, by way of check or Automated Clearing House (ACH) electronic payment, which typically was sent monthly. Rebate customers paid Pilot's retail price for diesel fuel at the pump at the time of sale. Rebate customers did not obtain the Cost-Plus Discount that was represented to induce diesel fuel purchasing from Pilot until Pilot provided those customers with their monthly rebate amounts calculated by Pilot personnel.

19. Commission-Based and Profit-Driven Compensation. Pilot's Direct Sales division employees earned commission-based compensation that was driven by the profitability of their trucking company accounts. By offering a discount and persuading a trucking company to purchase diesel fuel from Pilot, a Direct Sales division employee created the potential for both profit to Pilot and commission-based compensation to the employee. However, offering a Cost-Plus Discount, whether applied off-invoice or through a rebate, could lower the profitability of a trucking company's diesel fuel purchases from Pilot, and thereby could lower commission-based compensation from those purchases.

20. The profitability of diesel fuel sales from a single Direct Sales division trucking company account created the potential for commission-based compensation not only for the account manager with day-to-day responsibility for the account, but also for multiple Direct Sales division employees at different organizational levels within the Direct Sales division. For example, WOMBOLD, as a supervisor, could earn commission-based compensation from the profitability of his subordinate Mosher's customer accounts, and FREEMAN could earn commission-based compensation from the profitability of his subordinates Ralenkotter's, Stinnett's, and Andrews's customer accounts. Similarly, BIBEE, in her supporting role, could earn commission-based compensation from the profitability of FREEMAN's and Andrews's

accounts, and JONES, in her supporting role, could earn commission-based compensation from the profitability of Mosher's accounts.

21.     Additionally, BORDEN's compensation was structured so that she could earn commission-based compensation from the profitability of trucking company accounts managed and overseen by WOMBOLD, FREEMAN, Ralenkotter, Mosher, and others in the Direct Sales division.

22.     HAZELWOOD's compensation was also tied to the profitability of diesel fuel sales to all of the trucking company accounts managed by Pilot's Direct Sales division, because Hazelwood's "Deferred Compensation Agreement" entitled him:

> "to deferred compensation each year for the years 2008 through 2018, so long as Hazelwood remains employed by Pilot, in an amount calculated as three and one-half percent (3-1/2%) of the after tax net earnings of Pilot Travel Centers LLC ("PTC"), less any amounts paid to Hazelwood by PTC's Growth Partners' Plan."

23.     Pilot Code of Ethics and Business Conduct. HAZELWOOD, WOMBOLD,

FREEMAN, BORDEN, SPIEWAK, BIBEE, JONES, and MANN each acknowledged Pilot's

Code of Ethics and Business Conduct, which in pertinent part stated:

> "One of the most important assets of [Pilot] is the trust and confidence of our Customers, Team Members, and of the general public. [Pilot] expects and demands honesty, integrity, discretion and professionalism in both business and personal conduct from all its Team Members. We must apply these standards in both letter and spirit of our everyday activities. Where the letter of the *Code* is not specific, the spirit should prevail."

And, further stated:

> "Each of us must live by our *Code of Business Conduct*. Violators of the *Code* are subject to appropriate discipline, up to and including dismissal from [Pilot] and prosecution under the law."

And, further stated:

"If you have questions about policies, practices or our *Code of Business Conduct*, talk to your immediate supervisor or manager. If for some reason you are uncomfortable speaking with your immediate supervisor, please talk to another member of management. Don't put it off. Time may be of the essence in avoiding a bigger problem."

. . .

"The Alertline is an additional resource for anonymous advice or discussion on workplace behavior and ethics. . . . (Callers may call anonymously.) . . . The Alertline also enables Team Members to report unethical or illegal acts, or suspicions of unethical or illegal acts."

## The Conspiracy and its Criminal Objects

24.     Between on or about February 1, 2008, and in or about April 2013, within the Eastern District of Tennessee, and elsewhere, HAZELWOOD, WOMBOLD, FREEMAN, BORDEN, SPIEWAK, BIBEE, JONES, and MANN, did knowingly and willfully conspire, combine, confederate and agree with each other and with others, known and unknown to the grand jury,

a.     to commit wire fraud, an offense against the United States, that is, with the intent to defraud, to knowingly and willfully devise and intend to devise, and to participate in, a scheme and artifice to defraud certain interstate trucking companies and for obtaining money from certain interstate trucking companies by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, cause to be transmitted by means of wire in interstate commerce, writings, signs, and signals, in violation of Title 18, United States Code, Section 1343; and

b.     to commit mail fraud, an offense against the United States, that is, with the intent to defraud, to knowingly and willfully devise and intend to devise, and to participate in, a scheme and artifice to defraud certain interstate trucking companies and for obtaining money from certain interstate trucking companies by means of materially false and fraudulent pretenses,

representations, and promises, and for the purpose of executing such scheme and artifice, to knowingly cause matters and things to be sent and delivered by mail and commercial interstate carrier according to the direction thereon, in violation of Title 18, United States Code, Section 1341.

## Goals of the Conspiracy

25.    Through the manner and means alleged in Paragraphs 26, 27, 28, and 29 of this Indictment, the conspiracy's goals were:

      a.    to increase Pilot's market share of diesel fuel sales over its competitors;

      b.    to maximize Pilot's profit for each gallon of diesel fuel sold to trucking companies targeted by the conspiracy;

      c.    to maximize the conspirators' potential for profit- and commission-based compensation from trucking companies targeted by the conspiracy; and

      d.    to compete with and achieve recognition among each other, placing Pilot's market-share expansion and profit growth above honesty and fair dealing in disregard of the Pilot Code of Ethics and Business Conduct.

## Manner and Means of the Conspiracy

26.    The conspiracy's goals and its criminal objects were achieved by perpetrating a scheme to defraud certain interstate trucking companies, as alleged in more detail below, by:

      a.    identifying trucking companies from Pilot's pool of existing and prospective customers perceived to be unlikely to detect false pretenses, promises, and representations regarding Cost-Plus Discounts;

      b.    inducing, and attempting to induce, such identified trucking companies to choose to purchase, and to continue to purchase Pilot's diesel fuel by falsely and fraudulently

promising and representing Cost-Plus Discounts, with such false and fraudulent pretenses, promises, and representations being made orally to some victim customers, in writing to other victim customers, and to some victim customers both orally and in writing;

    c.    lulling, and attempting to lull, targeted trucking companies into believing that Pilot was honestly and accurately applying represented Cost-Plus Discounts by mailing, emailing, transmitting, and otherwise sending fraudulently-generated invoices, rebate amounts, and rebate checks that maintained the false pretense that Pilot was honestly and accurately applying represented Cost-Plus Discounts, and thereby also facilitated the concealment of the conspiracy and scheme;

    d.    inducing, and attempting to induce, such identified trucking companies to continue to purchase Pilot's diesel fuel by mailing, emailing, and otherwise sending fraudulently-generated documentation that purported to show, and thereby maintain the false pretense and attempt to lull targeted trucking companies into believing, that Pilot had been honestly and accurately applying represented Cost-Plus Discounts, and thereby also, facilitate the concealment of the conspiracy and scheme; and

    e.    providing false and fraudulent explanations, often by email and telephone, to targeted trucking companies when such companies questioned the application of the represented Cost-Plus Discounts to their diesel fuel purchases from Pilot.

27.    After a targeted customer was identified, in addition to the manner and means described in Paragraph 26 of this Indictment, the execution and attempted execution of the conspiracy's scheme to defraud continued through one or both of the following methods, which this Indictment will refer to as "Off-Invoice Fraud" and "Rebate Fraud."

a.    Off-Invoice Fraud. For customers whose falsely and fraudulently represented Cost-Plus Discounts were to be included in the "Invoice Total" amount that was stated on Pilot's regularly billed and sent invoices, the conspirators executed and attempted to execute the scheme to defraud by deliberately and fraudulently not submitting the represented Cost-Plus Discounts to Pilot's billing system for Off-Invoice customer billing.

b.    Rebate Fraud. For customers whose falsely and fraudulently represented Cost-Plus Discounts were to be provided to the customer in the form of a monthly rebate check, the conspirators executed and attempted to execute the scheme to defraud by deliberately and fraudulently withholding, by various ways, the full rebate amount due to those customers derived from the represented Cost-Plus Discounts. At times, the conspirators referred to the Rebate Fraud means of executing the conspiracy and scheme to defraud as "Manuel", "the Manual Stuff", "Manwell", and "Manual Rebate", among other ways of referring to Rebate Fraud.

28.    On or about the following dates, as representative of the manner and means of the conspiracy, and in furtherance and execution and attempted execution of the conspiracy, the following conspirators took the following actions with respect to the following trucking companies, which were among the interstate trucking companies targeted by the conspiracy's scheme to defraud:

a.    With respect to Queen Transportation, located in North Carolina:

(1)    On or about January 15, 2010, BIBEE, from her Pilot email account, sent FREEMAN an email that said:

> "Do you remember our buddy [Queen representative] from Queen Transportation one of [Pilot Employee 2]'s accounts that we had an extremely long conversation with a while back. He would like to speak with you but I don't advise it, told him I'd talk to you. He is begging for his additional .01 back on the CP side that we took away a while back..... He won't be able to renew his LOC with us

he says without the extra penny. This guy thinks we took him
from Cp. 03 to CP .04 but really he is getting CP .08 right now.
Let me know if you are ok with me taking it to CP .07 or if you
want me to call back and tell him no. Their gallons have basically
gone from 16k to 22k since they started with us."

    (2)    On or about January 15, 2010, FREEMAN, from his Pilot email account,

replied to BIBEE in an email that said: "Tell him I said the extra .01 is fine to renew the loc.

Don't change his deal[,]" to which BIBEE that same day reply-emailed "ok, will do".

    (3)    On or about January 15, 2010, BIBEE, from her Pilot email account, then

sent an email to the representative of Queen Transportation that said:

"Hi [Queen representative],
I spoke with John and he is good with giving you the additional
penny back on your discount This will be effective Monday.
Have a good weekend!!"

    (4)    On or about June 30, 2010, FREEMAN, from his Pilot email account, sent

Stinnett and Radford an email that said:

"Did we respond [to Queen representative] at Queen? If so, what two
cards does he carry? I know him from dealing with him and don't mind
calling him. He's crazy and thinks he is getting a deal that he's not.
Careful[.]"

    (5)    On or about June 30, 2010, FREEMAN, from his Pilot email account, sent

Stinnett and Radford another email related to Queen Transportation that said in pertinent part:

"Again, careful with the deal. He's not getting what he thinks."

    (6)    On or about June 30, 2010, Stinnett, from his Pilot email account, sent

Radford an email regarding Queen Transportation that said FREEMAN "was saying he's not

getting what he thinks he is, we just need to sing from the same hymn book."

(7)    On or about July 20, 2012, Pilot Employee 3 prepared and emailed

FREEMAN, through his Pilot email account, a trip report that documented his sales call meeting

with Queen Transportation during the previous business week and stated:

> "My first F Up! This guy [Queen representative] can talk forever and
> during the conversation he started asking about his discount...I looked at
> the P&L and said "oh your at a CP 7...He said well I was told that I had
> CP4 ... Oh Crap! He was going to have knee surgery on Wednesday so
> I'm going to hold off on the back track."

(8)    From on or about January 19, 2010, through October 2012, FREEMAN,

BIBEE, and their conspirators, caused fraudulently calculated invoices to be delivered to Queen

Transportation by means of wire transmission in interstate commerce, namely by way of email

from Pilot's email server in Knoxville, Tennessee to Queen Transportation in North Carolina,

using an email address with the domain name of "@queentransportation.com."

(9)    On or about February 6, 2013, FREEMAN described the following

scenario to Andrews and Pilot Employee 4, which was similar to the circumstances surrounding

Queen Transportation, as an example of what can go wrong with the execution of the conspiracy

and scheme when conspirators do not sufficiently communicate with each other about what Cost-

Plus Discount misrepresentations have been made to the conspiracy's victim trucking companies,

so that the conspirators, as FREEMAN said, can "understand how to keep playin' the same

game." Referring to a Pilot customer that he identified as a "f**king blowhard" and "an account

over in North Carolina," FREEMAN told Andrews and Pilot Employee 4,

> "Yeah. So [Pilot Employee 3] walks in one day, after Jay [Stinnett] had
> specifically sat down with him and said, 'this guy thinks he's gettin' a
> cost-plus 3, he's gettin' a cost-plus 8. Pay attention here.'"

But, FREEMAN said that "[Pilot Employee 3] wasn't paying attention[,]" and:

> "sits in front of the customer, and [the customer] says, 'Now listen, I'm at
> a cost-plus-3 now, I'm fixin' to grow by 20 trucks, I want to go to a cost-

plus-2.' [Pilot Employee 3] flips open his P&L, and says 'No, you're at a cost-plus-8.'"

FREEMAN then explained how Stinnett lied to that North Carolina customer for the purpose of covering up Pilot Employee 3's mistaken honesty:

> "Jay [Stinnett] called [the customer] and said, 'Oh, no, no, [Pilot Employee 3] doesn't know how to read the P&L, that was an 8-cent tax. You're gettin' a cost-plus-3.'"

      b.    With respect to BP Express Inc., located in Tennessee:

      (1)    In or about December 2008, FREEMAN falsely and fraudulently orally represented to BP Express a Cost-Plus Discount of Cost-Plus .00 per gallon for diesel fuel purchases at Pilot truck stops, to be provided through a monthly rebate check.

      (2)    On or about December 9, 2008, FREEMAN, from his Pilot email account, sent BIBEE an email with the subject of "BP Express" that stated, in pertinent part:

> "Effective Dec 31, we will eliminate discounts within our system and the reflection with CDN. Going forward we will do price fetch at CP .02/(.05) manual. Customer does not need to know #'s. We will send check to [BP Express representative]. Pls make a note in your calendar to talk to me the week before Christmas and New Year to confirm completion. BP will electronically lock out all but Pilot and Pilot should get 130k plus."

      (3)    On or about December 10, 2008, BIBEE sent Pilot Employee 5 an email with the subject of "BP Express" that stated, in pertinent part:

> "Please take out their rebate Effective Jan 1st. I will be doing this manually. Please send email to Comdata requesting them to remove the reflection effective Dec 31st. Thanks so much!"

      (4)    On or about June 3, 2011, BIBEE, from her Pilot email account, sent FREEMAN an email with the subject "rebates" that said, "Just a taste of this month's rebates ..... BP Express went from $22k to $50k," to which FREEMAN reply-emailed BIBEE on the same date, "Wow. We will see."

(5)     On or about June 9, 2011, BIBEE, from her Pilot email account, sent an email to FREEMAN with the subject "rebates" that stated in pertinent part, "BP Express $50,083 on 180,938 gallons CPG .2768."

(6)     On or about June 10, 2011, BIBEE, from her Pilot email account, sent an email to FREEMAN with the subject "FW: rebates" that attached a rebate calculation for BP Express for the month of May 2011 and asked, "Did you have a chance to look at these?", to which FREEMAN reply-emailed BIBEE on the same date, "Take them all to the .25 and change range." On the same date, BIBEE reply-emailed FREEMAN, "ok, gotcha".

(7)     On or about June 19, 2011, FREEMAN and BIBEE knowingly caused to be delivered by mail according to the direction thereon, namely 816 Russell Road, Rockford, Tennessee, an envelope containing a fraudulently-calculated rebate check from Pilot to BP Express in the amount of $46,465.11, for the purpose of maintaining the false pretense, and lulling BP Express into believing, that Pilot was honestly and accurately applying the Cost-Plus Discount represented to BP Express.

(8)     Previously, on or about June 10, 2011, BIBEE, from her Pilot email account, emailed representatives of BP Express a document entitled "BP Express[,] Monthly Gallons Report[,] 5/1/2011 to 5/31/2011" that included a "Cost Plus Avg." column and stated a "Savings" amount equal to the mailed $46,465.11 rebate check, for the purpose of maintaining the false pretense, and lulling BP Express into believing, that the amount on the mailed $46,465.11 rebate check had been honestly and accurately calculated by applying the Cost-Plus Discount that FREEMAN had represented to BP Express for diesel fuel purchased by BP Express during the month of May 2011, all the while knowing that the calculation stated on the

emailed document had been fraudulently fabricated to reach the stated rebate amount of $46,465.11.

(9) From on or about February 2009 through June 2011, FREEMAN and BIBEE knowingly caused to be delivered by mail according to the direction thereon, namely 816 Russell Road, Rockford, Tennessee, numerous envelopes containing fraudulently-calculated rebate checks for the purpose of maintaining the false pretense, and lulling BP Express into believing, that Pilot was honestly and accurately applying the Cost-Plus Discount that FREEMAN had represented to BP Express.

    c.    <u>With respect to Koleaseco, Inc., located in Michigan:</u>

(1) On or about Friday, February 15, 2008, Welch, from her Pilot email account, forwarded to HAZELWOOD an email thread of communications between SPIEWAK, Ralenkotter, and Welch, and sought HAZELWOOD's approval as follows:

> "Mark, Arnie [Ralenkotter] has approved a better of deal for John [SPIEWAK] to offer Koleaseco. Is this okay with you? He has offered cp .015 / retail minus .045 but we are setting it up as cp .025 / retail minus .045. Please let me know."

The email thread of communications between SPIEWAK, Ralenkotter, and Welch that Welch forwarded to HAZELWOOD included the following pertinent statement from Ralenkotter that Welch referenced in her email to HAZELWOOD:

> "Ok but put it in the billing system as cost plus .025 retail minus .045 unless you think they have a way to track the cost. Do not reflect pricing."

(2) On or about the following Monday, February 18, 2008, HAZELWOOD, from his Pilot email account, responded to Welch's question, with only the question, "How many gallons[?]" Later that day, Welch reply-emailed, "100,000 to start with 60,000 more coming from Simons." Later during the same day, in reply-email, HAZELWOOD stated, "ok".

d. With respect to PI&I Motor Express, located in Ohio:

(1) On or about July 11, 2008, Ralenkotter emailed a "Weekly Call Sheet", also known as a "trip report," to HAZELWOOD's assistant (Pilot Employee 1) and BORDEN, whom HAZELWOOD had tasked with delivering trip reports to HAZELWOOD for his review, as alleged in Paragraph 14 of this Indictment. In that trip report, Ralenkotter advised that he had made a sales call on PI&I Motor Express, and provided the following summary of that meeting in pertinent part:

> "TA recently in and of course offered 'better of' pricing[.] I will need to do the same[.] [T]oo bad since this was a .045 discount and we made a bunch of money. I will tell them cp .03 and put it in as .04 with a .04 discount."

(2) On or about July 11, 2008, Ralenkotter, from his Pilot email account, emailed PI&I Motor Express a letter that represented that on July 14, 2008, Pilot would implement a discount of "'Better of' Cost plus \$.02 or Retail minus \$.04 all Pilot locations[.]" Shortly after emailing that letter, Ralenkotter, from his Pilot email account, on the same date emailed Welch and stated, "PI&I put them in as cp .04 rm .04" and "Do not reflect PI&I unless he asks[;] If he does put his legit pricing in."

e. With respect to Smith Transport, located in Pennsylvania:

(1) On or about July 1, 2008, Ralenkotter, through his Pilot email account, directed Pilot Employee 6 to fraudulently maintain the false pretense to Smith Transport that Pilot would apply a Cost-Plus Discount of Cost-Minus .02 per gallon of diesel fuel, but "[p]ut the actual deal in pilot billing as cost plus 2 see if he notices." On or about July 2, 2008, Pilot Employee 6 forwarded, through his Pilot email account, that direction to MANN.

(2) On or about October 10, 2008, after Smith Transport detected that it had not been receiving the Cost-Minus .02 discount represented by Pilot's sales employee on July 1,

2008, Ralenkotter sent an email to Pilot Employee 6 and Pilot Employee 14, and cc-copied HAZELWOOD, BORDEN, and MANN and others, that stated in part:

> "Karen [MANN],
>
> Do what is necessary to rebate the difference between what they thought they got and what we 'mistakenly' were charging for the 3 month period."

      f.     With respect to LTI Trucking Company (LTI), located in Missouri:

      (1)     On or about August 1, 2008, Ralenkotter, from his Pilot email account, sent an email to LTI, with a cc-copy to Welch, that falsely and fraudulently represented that LTI would receive a Cost-Plus Discount of "cp .02 at all locations except IL, effective 8-4-08." On the same day, approximately two minutes later, Ralenkotter, from his Pilot email account, sent an email to Welch regarding LTI that stated, "Put it on the price fetch at .02 our billing at .04," which would cause LTI to receive pricing information from Pilot that was based on Cost-Plus .02 pricing, but would cause LTI to be billed Cost-Plus .04, which was $.02 higher per gallon than the represented Cost-Plus Discount.

      (2)     On or about August 4, 2008, Welch sent an email to Ralenkotter that asked, "Since he [the LTI representative] is asking so many questions do you still want" LTI's Cost-Plus Discount to be "set up" in Pilot's billing as Cost-Plus .04? In response, Ralenkotter directed Welch to put LTI's Cost-Plus Discount in Pilot's billing system as "cp .02" which was the Cost-Plus Discount actually represented to LTI before LTI began "asking so many questions."

      g.     With respect to Honey Transport, located in Florida:

      (1)     During or about the week ending June 10, 2011, Andrews orally maintained the false pretense and falsely and fraudulently represented to Honey Transport that Pilot was applying a Cost-Plus Discount of Cost-Plus .02 per gallon of diesel to calculate Honey

Transport's monthly rebate check, all the while knowing that Honey Transport's monthly rebate check had been calculated, and would continue to be calculated, by applying a Cost-Plus Discount of Cost-Plus .05, or worse discount.

(2) On or about February 23, 2012, after Honey Transport confronted Andrews and BIBEE about a possible discrepancy in the rebate amount from Pilot to Honey Transport for diesel fuel purchases made during the month of January 2012, Andrews and BIBEE, for the purpose of lulling Honey Transport into believing that the shortfall in Honey's rebate check for January 2012 was (i) not intentional and (ii) isolated to a brief period of time, caused the following false representation to be sent from BIBEE's Pilot email account to Honey Transport's representative in Florida:

> "Hi [Honey Transport Representative],
>
> I have done my research and it seems your pricing was inadvertently changed in our system on the 19th of December. Again, we are sincerely sorry for this mishap and assure you that this error has been corrected and that your February rebate will be accurate. With that being said, we would like to send you a check for the amount due to you. Your January gallons were 143,240.54 x .05=$7,162.03. For Dec 19th - 31st, you fueled 57,985.79 gallons X .05=$2,899.29. This would bring the total amount due to Honey $10,031.32. Again, thanks so much for talking through this with us on Tuesday and for communicating these concerns to us so that we can make this right. We value your partnership and will always strive to provide you with the best service possible. Please let me know if you are in agreement on this amount and I will get the check to you asap!"

(3) In furtherance of the conspiracy, on or about February 21, 2012, after over-hearing Andrews's telephone conversation regarding the January 2012 rebate discrepancy with Honey Transport, FREEMAN, who was traveling with Andrews that day, told Andrews, it sounded like Andrews had just gotten "busted."

(4) On or about February 27, 2012, BIBEE caused an ACH payment in the amount of $10,031.32 to be transmitted to Honey Transport's bank account by means of wire in

interstate commerce, namely the transmission of an ACH payment in the amount of $10,031.32 from Regions Bank, which was located in Alabama, to United Southern Bank, which was located in Florida, for the purpose of lulling Honey Transport into believing that the $10,031.32 amount represented the total amount owed by Pilot to Honey arising from a "mishap," all the while knowing that no "mishap" had occurred and that the execution of the conspiracy had cost Honey far more than $10,031.32.

h.    With respect to JTL, located in Wisconsin:

(1)    In or about April 2008, Mosher falsely and fraudulently orally represented to JTL a Cost-Plus Discount of the better of Cost-Plus .02 or Retail-Minus .04 per gallon for diesel fuel purchases at Pilot truck stops, to be provided through a monthly rebate check.

(2)    On or about May 16, 2008, Mosher, from his Pilot email account, sent JONES the following email:

> "We are going to give JTL Trailers... Cost Plus .04 / .04 off retail. They will think it is Cost Plus .02 / .04 off retail. Anyway. Go ahead and get a check out to them for their April gallons."

JONES then reply-emailed Mosher:

> "OK. I will get [] to download the file to pricefetch for the April rebate."

(3)    On or about October 19, 2009, after a representative of JTL asked JONES by email, "Can you please start sending me our daily pricing at all locations? Brian [Mosher] said you would be able to do this for us[,]" JONES, through her Pilot email account, asked Mosher, "What pricing do you want me to send [] JTL?", to which Mosher replied from his Pilot email account, "He thinks it will be cp .02/ r-. 04. But send cp.04/r-.04". JONES then replied to Mosher from her Pilot email account, "will do-thanks!"

Case 3:16-cr-00020-CLC-HBG   Document 3   Filed 02/03/16   Page 24 of 58   PageID #: 28

(4)     To facilitate additional fraudulent rebate reductions to JTL's monthly rebate amounts, JONES and Mosher, using their respective Pilot email accounts, also emailed each other monthly spreadsheets.

(5)     For example, on or about November 12, 2008, JONES, from her Pilot email account, emailed Mosher a spreadsheet entitled "Approval Sheet Manual Rebates for Oct 2008.xls", that stated a rebate amount for JTL of "$17,593.23" for "October Gallons" with a "Discount Used" of "R-.045/CP.04."

(6)     Then, on or about November 13, 2008, Mosher, from his Pilot email account, emailed JONES a revised spreadsheet with the same title that added the number "9000" in the column next to JTL's "Oct-08" amount of "$17,593.23," which JONES knew to be a direction from Mosher to further fraudulently reduce JTL's rebate for the month of October 2008 from $17,593.23 to approximately $9,000.

(7)     Then, on or about November 13, 2008, after JONES received that revised spreadsheet from Mosher, JONES, from her Pilot email account, sent BORDEN an email with the subject "FW: BM-CS Manual rebates" that attached the revised spreadsheet from Mosher, and stated to BORDEN:

> "Brian did send me this spreadsheet to work from. I was not able to get the final numbers together for commissions, but wanted to send it to you in case you want to estimate."

The spreadsheet that JONES attached to, and referenced in, her email to BORDEN provided the following information for JTL:

| Discount Used | October Gallons | October-08: | |
|---|---|---|---|
| R -.045/CP.04 | 49,074.92 | $17,593.23 | 9000 |

(8)     On or about November 17, 2008, JONES presented a "Check Request" to BORDEN for her approval of the issuance of a "Rebate for October 2008" to JTL for $9,005.12. On or about November 17, 2008, BORDEN approved that check request.

(9)     On or about November 20, 2008, a fraudulently calculated rebate check in the amount of $9,005.12 was sent to JTL in Wisconsin by way of interstate commercial carrier, namely FedEx.

(10)     From in or about June 2008 through in or about February 2012, JONES, with the assistance of her conspirators, caused numerous fraudulently-calculated rebate checks to be sent from Pilot to JTL in Wisconsin, for the purpose of maintaining the false pretense, and lulling JTL into believing, that Pilot was honestly and accurately applying the Cost-Plus Discount that Mosher had represented to JTL. For example:

(i)     On or about June 9, 2011, JONES emailed Mosher a spreadsheet entitled "Approval Sheet Manual Rebate MAY 2011.xls", that stated a rebate amount for JTL of "$7,941.63" for "May Gallons" with a "Discount Used" of "R-.045/CP.04." Then, on or about June 10, 2011, Mosher emailed JONES a revised spreadsheet with the same title that added the number "5000" in the column entitled "Brian" next to the "May-11" amount of "$7,941.63," which JONES knew to be a direction from Mosher to further fraudulently reduce JTL's rebate for the month of May 2011 from $7,941.63 to approximately $5,000. On or about June 19, 2011, JONES, with the assistance of her conspirators, including BORDEN, caused a fraudulently calculated rebate check in the amount of $5,087.07 to be sent to JTL in Wisconsin, for the purpose of maintaining the false pretense, and lulling JTL into believing, that Pilot was honestly and accurately applying the Cost-Plus Discount represented to JTL.

Case 3:16-cr-00020-CLC-HBG   Document 3   Filed 02/03/16   Page 26 of 58   PageID #: 30

(ii) On or about January 11, 2012, JONES emailed Mosher, who was working in Nebraska, a spreadsheet entitled "Approval Sheet Manual Rebate DEC 2011.xls", that stated a rebate amount for JTL of "$11,721.37" for "Dec Gallons" with a "Discount Used" of "R-.045/CP.04." Then, on or about January 13, 2012, Mosher, who was working in Iowa, emailed JONES a revised spreadsheet with the same title that added the number "$7,500.00" in the column entitled "Brian" next to the "Dec-11" amount of "$11,721.37," which JONES knew to be a direction from Mosher to further fraudulently reduce JTL's rebate for the month of December 2011 from $11,721.37 to approximately $7,500. On or about January 20, 2012, JONES, with the assistance of her conspirators, including BORDEN, caused a fraudulently calculated rebate check in the amount of $7,577.94 to be sent to JTL in Wisconsin, for the purpose of maintaining the false pretense, and lulling JTL into believing, that Pilot was honestly and accurately applying the Cost-Plus Discount represented to JTL.

i. With respect to Amerifreight, located in Illinois:

(1) On or about February 11, 2011, JONES, using her Pilot email account, sent an email to WOMBOLD, with a cc-copy to Mosher, who was working in Iowa, that requested the following approval regarding Amerifreight,:

"Hi Scott,

Will you please approve the new discount for [Pilot Employee 7]'s account, Amerifreight of Cost Minus .03 across the network? It is a manual rebate. Per the attached message, they have locked down their network to Pilot Flying J."

(2) On or about February 11, 2011, WOMBOLD, using his Pilot email account, replied to JONES, and cc-copied Mosher, who was working in Iowa:

"Cost minus 3....? How big is this account?"

(3) On or about February 11, 2011, for the purpose of communicating to WOMBOLD and JONES that Amerifreight had been identified as a customer to target for inclusion in the conspiracy and scheme, Mosher, who was working in Iowa, using his Pilot email account, replied with only two words to WOMBOLD, and cc-copied JONES, who was working in Knoxville, Tennessee:

"Manual Rebate."

(4) On or about February 11, 2011, WOMBOLD, from his Pilot email account, replied to Mosher, who was still working in Iowa, and JONES:

"Approved....still pretty aggressive..."

(5) On or about February 11, 2011, Mosher replied to WOMBOLD and JONES:

"Should I have let them go to Love's?"

(6) On or about February 11, 2011, WOMBOLD, from his Pilot email account, then replied to Mosher:

"ASSSSSSSHOOOLLLEEEEE"

(7) On or about March 11, 2011, JONES, from her Pilot email account, sent Mosher, who was working in California, an email that stated "Brian, Here is the sheet for your review" and attached a spreadsheet entitled "Approval Sheet Manual Rebates FEB 2011.xls" that stated for "Customer" "Amerifreight" an amount of "$53,445.01" for "Feb-11" from a "Discount Used" of "CM .03/R-.02".

(8) Then, on or about March 17, 2011, Mosher, who was working in Iowa, emailed, from his Pilot email account, JONES a revised spreadsheet that added the number "46000" in the column entitled "Brian" next to the "Feb-11" amount of "$53,445.01," which

Page 28 of 58

JONES knew to be a direction from Mosher, with WOMBOLD's approval from February 11, 2011, to fraudulently reduce Amerifreight's rebate for the month of February 2011 from $53,445.01 to approximately $46,000.

(9)     On or about March 23, 2011, JONES, at the direction of Mosher, and with WOMBOLD's approval from February 11, 2011, caused a fraudulently calculated rebate amount of $46,392.84 to be transmitted to Amerifreight's bank account by means of wire in interstate commerce, namely the transmission of an ACH payment in the amount of $46,392.84 from Regions Bank, which was located in Alabama, to Associated Bank which was located in Wisconsin, for the purpose of maintaining the false pretense, and lulling Amerifreight into believing, that Pilot was honestly and accurately applying the Cost-Plus Discount represented to Amerifreight.

(10)    On or about March 29, 2011, JONES, from her Pilot email account, emailed a representative of Amerifreight a document entitled "Amerifreight Monthly, Monthly Gallons Report, 2/1/2011 to 2/28/2011" that included a "Cost Plus Avg." column and stated a "Savings" amount equal to Pilot's March 23, 2011, ACH payment to Amerifreight in the amount of $46,392.84, for the purpose of maintaining the false pretense, and lulling Amerifreight into believing, that the March 23, 2011, ACH payment amount of $46,392.84 to Amerifreight had been honestly and accurately calculated by applying the Cost-Plus Discount that had been represented to Amerifreight for diesel fuel purchased by Amerifreight during the month of February 2011, all the while knowing that the calculation stated on the emailed document had been fraudulently fabricated to reach the stated rebate amount of $46,392.84.

j.      With respect to Halvor Lines, Inc. (Halvor), located in Wisconsin:

(1)      On or about June 1, 2011, WOMBOLD, using his Pilot email account, sent an email to JONES and Mosher approving the use of a "monthly manual rebate" as the means by which Halvor would receive its represented Cost-Plus Discount.

(2)      On or about September 27, 2011, a representative of Halvor sent Mosher an email that expressed Halvor's understanding of its Cost-Plus Discount from Pilot: "Current pricing in our system. Illinois is Retail minus .15 or cost minus .17[.] The rest of the Pilot FJ network is at Retail minus .09 or cost minus .05[.]"

(3)      On or about September 27, 2011, using his Pilot email account, Mosher, for the purpose of fraudulently maintaining the false pretense that Halvor was in fact receiving that Cost-Plus Discount, replied to Halvor, "Perfect. I show the same[,]" all the while knowing that Halvor's discount amount was being fraudulently calculated based on a worse discount.

(4)      From during or about July 2011 through during or about May 2012, JONES and Mosher, using their respective Pilot email accounts, emailed each other monthly spreadsheets that facilitated their fraudulent reductions to Halvor's monthly rebate amounts.

(5)      From during or about July 2011 through during or about May 2012, JONES and Mosher, with the assistance of their conspirators, caused fraudulently-calculated rebate checks to be mailed from Pilot to Halvor in Wisconsin, for the purpose of maintaining the false pretense, and lulling Halvor into believing, that Pilot was honestly and accurately applying the Cost-Plus Discount that had been represented to Halvor. For example:

(i)      On or about November 11, 2011, JONES emailed Mosher a spreadsheet that stated for Halvor a rebate amount of "$50,094.26" for "Oct Gallons." Then, on or about November 14, 2011, Mosher emailed JONES a revised spreadsheet that added the

number "45000" in the "Brian" column next to the "Oct-11" amount of "$50,094.26," which JONES knew to be a direction from Mosher to fraudulently reduce Halvor's rebate for the month of October 2011 from $50,094.26 to approximately $45,000. On or about November 18, 2011, JONES, with the assistance of her conspirators, including BORDEN, caused to be sent from Pilot and delivered by mail according to the direction thereon, namely 217 Grand Avenue, Superior, Wisconsin, an envelope containing a fraudulently-calculated rebate check from Pilot to Halvor in the amount of $45,125.24, for the purpose of maintaining the false pretense, and lulling Halvor into believing, that Pilot was honestly and accurately applying the Cost-Plus Discount represented to Halvor.

(ii)    On or about February 10, 2012, JONES emailed Mosher a spreadsheet that stated for Halvor a rebate amount of "$66,757.05" for "January Gallons." Then, between on or about February 10, 2012, and on or about February 17, 2012, Mosher communicated the amount "48000" for Halvor for "Jan-12" that JONES knew to be a direction from Mosher to fraudulently reduce Halvor's rebate for the month of January 2012 from $66,757.05 to approximately $48,000. On or about February 17, 2012, JONES, with the assistance of her conspirators, including BORDEN, caused to be sent from Pilot and delivered by mail according to the direction thereon, namely 217 Grand Avenue, Superior, Wisconsin, an envelope containing a fraudulently-calculated rebate check from Pilot to Halvor in the amount of $48,108.73, for the purpose of maintaining the false pretense, and lulling Halvor into believing, that Pilot was honestly and accurately applying the Cost-Plus Discount represented to Halvor.

(iii)    On or about March 12, 2012, JONES emailed Mosher a spreadsheet that stated for Halvor a rebate amount of "$52,386.28" for "February Gallons." Then, between on or about March 12, 2012, and on or about March 15, 2012, Mosher

communicated the amount "36000" for Halvor for "Feb-12" that JONES knew to be a direction from Mosher to fraudulently reduce Halvor's rebate for the month of February 2012 from $52,386.28 to approximately $36,000. On or about March 16, 2012, JONES, with the assistance of her conspirators, including BORDEN, caused to be sent from Pilot and delivered by mail according to the direction thereon, namely 217 Grand Avenue, Superior, Wisconsin, an envelope containing a fraudulently-calculated rebate check from Pilot to Halvor in the amount of $36,219.22, for the purpose of maintaining the false pretense, and lulling Halvor into believing, that Pilot was honestly and accurately applying the Cost-Plus Discount represented to Halvor.

        k.       With respect to Ryder, located in Florida:

        (1)     In or about August 2012, with WOMBOLD's approval, Mosher falsely and fraudulently orally represented to Ryder a Cost-Plus Discount of Cost-Plus .05 per gallon for diesel fuel purchases at Pilot truck stops, to be provided through a monthly rebate check when Ryder purchased at least 800,000 gallons of diesel fuel from Pilot during the month.

        (2)     On or about August 17, 2012, WOMBOLD, using his Pilot email account, sent an email to his subordinate Pilot Employee 8, with a cc-copy to Mosher and Holden, stating that Ryder's diesel discount would be paid through "a rebate [that] Brian will be figuring."

        (3)     On or about October 12, 2012, WOMBOLD, using his Pilot email account, sent an email to his subordinate, Pilot Employee 8, asking her to confirm that Ryder had been set up "as retail ... then manual rebate to cost plus..[.]" Following WOMBOLD's directive, Pilot Employee 8, using her Pilot email account, sent the following email to Mosher, with a cc-copy to WOMBOLD:

> "Brian, I think you and Lexie [Holden] worked through the deal for Ryder? I can't find anything on what we are giving them on a discount except for the attached letter that was sent from Scott [WOMBOLD] in

Feb 2011, is this what you stuck with o[r] did you do something different?"

The attached February 2011 letter "from Scott" represented to Ryder a Cost-Plus .05 discount "deal" for months in which Ryder purchased between 800,000 and 1,000,000 gallons from Pilot.

(4)     On or about October 12, 2012, Mosher, using his Pilot email, sent a reply to Pilot Employee 8, with a cc-copy to WOMBOLD, that referenced the February 11, 2011 letter, and stated "This is what we are going by. But, it is on a monthly rebate ...[.]" Then, on the same date, Pilot Employee 8, using her Pilot email account, sent an email to WOMBOLD, with a cc-copy to Mosher, that stated, "Thanks. Scott does that help or do you need additional information?", to which WOMBOLD, from his Pilot email account, replied, with a cc-copy to Mosher, "Nope . . . . this is all I need ..[.]"

(5)     Previously, on or about July 16, 2012, in an email in which WOMBOLD explained to his subordinate Pilot Employee 8 that Ryder would be set up as a Pilot direct bill customer "with No discount" and would be "rebated back" its discount, WOMBOLD told Pilot Employee 8 that Ryder "will be a great account for Brian.. :-0".

(6)     From October 2012 through November 2012, Mosher and Holden, with WOMBOLD's approval, caused fraudulently-calculated rebate checks to be mailed from Pilot to Ryder in Florida, for the purpose of maintaining the false pretense, and lulling Ryder into believing, that Pilot was honestly and accurately applying the Cost-Plus Discount that had been represented to Ryder.

(7)     From October 2012 through November 2012, Holden, using her Pilot email account, emailed fraudulently-fabricated documents to Ryder, with a cc-copy to Mosher, that maintained the false pretense that the amounts on the rebate checks that had been mailed to Ryder during those months had been honestly and accurately calculated by applying the Cost-

Plus Discount represented to Ryder, for the purpose of lulling Ryder into believing that Pilot was in fact honestly and accurately applying the Cost-Plus Discount represented to Ryder, all the while knowing that calculations stated on the emailed documents had been fraudulently fabricated to reach the stated rebate amount.

      29.     On or about the following dates, as representative of the manner and means of the conspiracy, and in furtherance and execution and attempted execution of the conspiracy, the following conspirators took the following actions to approve, promote participation in, facilitate, protect, conceal, and expand the conspiracy:

      a.     On or about March 6, 2008, FREEMAN, using his Pilot email account, had the following email communications with his subordinate, Pilot Employee 15, regarding trucking company Allied:

| Pilot Employee 15 to FREEMAN | "Allied's rebate detail just came from price fetch but has the CP.02 or RM .05......does this need to be changed to the pricing that was in the letter . . .?" |
|---|---|
| FREEMAN to Pilot Employee 15 | "How many gallons did they buy in Feb?" |
| Pilot Employee 15 to FREEMAN | "377,886 in Feb. up from 338,983 in Jan." |
| FREEMAN to Pilot Employee 15 | "Leave the price fetch as is. [Allied representative] thinks he's getting this deal but hasn't performed from a gallons standpoint therefore I haven't enhanced his pricing. If he asks, he's getting the better deal." |

      b.     On or about July 11, 2008, Ralenkotter emailed a trip report to HAZELWOOD's assistant (Pilot Employee 1) and BORDEN, whom HAZELWOOD had tasked with delivering trip reports to HAZELWOOD for his review, as alleged in Paragraph 14 of this Indictment. In that trip report, Ralenkotter advised that he had a sales call meeting with trucking company Falcon Transport and provided the following summary of that meeting:

"Comments: Fuel optimizer not real bright, just met the newest bulbs they seem slightly smarter. I will work up some aggressive prices to move TA gallons. Good thing is I don't actually need to change our billing they do not reconcile with fuel dispatch ...imagine that?"

c. On or about June 17, 2008, FREEMAN, using his Pilot email account,

emailed his subordinate (Pilot Employee 9) and Radford, and offered the following guidance

about how to deal with a Pilot customer's diesel discount:

". . . I might recommend taking him all off invoice. No more checks, but he can certainly see his discount on each weeks invoice. I still wouldn't reflect. If you had to do some more cp, w/o reflection you would have some wiggle room. Say one thing, do another. See Jay [Stinnett] for example. You should be able to overcome this rash with some smooth talking and a little change."

d. On or about November 13 and 14, 2008, FREEMAN, BORDEN, Stinnett,

and Radford, using their respective Pilot email accounts, had the following email

communications:

(1) Radford sent an email to Stinnett that attached a spreadsheet entitled

"Jay's Monthly Savings.xls" that contained the following column headings: "Account",

"Original", "Sent", and "Savings." For example, the following information was stated on the

spreadsheet for Pilot trucking company customer RWH:

| Account | Original | Sent | Savings |
|---------|----------|------|---------|
| RWH | $64,521.62 | $32,540.79 | $31,980.83 |

The difference between the "Original" amount and the "Sent" amount derived the so-called

"Savings" amount attributed to RWH, which was added to the so-called "Savings" amounts

attributed to other customers listed on the same spreadsheet to total in the aggregate

"$115,525.35." Stinnett then forwarded that spreadsheet entitled "Jay's Monthly Savings.xls" to

FREEMAN and BORDEN with the message:

"Good number . . . . 115,000 dollar 'screw'"

and, in doing so, referred to the $115,525.35 not as a "savings" amount, but as a "screw"

amount.

      (2)     BORDEN's reply email to Stinnett's "115,000 dollar 'screw'" email,

which also cc-copied FREEMAN, stated: "You are the best!"

      (3)     Then, in response to Stinnett's "Good number . . . . 115,000 dollar

'screw'" email, which attached the spreadsheet entitled "Jay's Monthly Savings.xls",

FREEMAN and Stinnett had the following email communications:

| FREEMAN to Stinnett | "Did you or Holly [Radford] produce this list? I'm hesitant to ask the girls to do it. Never know what might come of this info." |
|---|---|
| Stinnett to FREEMAN | "I know exactly what you mean, but hell she does them, and knows. I had her run them at the regular discount, then jacked up the cost plus number and re ran them." |
| FREEMAN to Stinnett | "Agree. Katy [BIBEE] too. I'm more concerned with compiling a list than the actual deed. That's crazy isn't it." |
| Stinnett to FREEMAN | "yep" |

      e.     On or about November 26, 2008, BORDEN and Ralenkotter, using their

respective Pilot email accounts, had the following email communications:

| BORDEN to Ralenkotter | "I have a check request for DMS Express for October rebates of $10,265.02. I am not used to [Pilot Employee 10] having requests this large and just wanted to double check with you and make sure it is ok to pay." |
|---|---|
| Ralenkotter to BORDEN | "Actually, it is part of a larger company he is working with [Pilot Employee 6] on. We are transferring it over Jan 1. I cut that from the original amount of around 17k. But yes it is ok." |
| BORDEN to Ralenkotter | "Good deal. It is approved." |

      f.     On or about January 15, 2009, MANN and Ralenkotter, using their

respective Pilot email accounts, had the following email communications regarding Pilot

trucking company customer DMS:

| MANN to Ralenkotter | "This manual rebate was [Pilot Employee 10]'s. It's the sister |
|---|---|

|  | company to Dynamic Express. I added CP .12 to their original CP .03 rebate (same as Dynamic Express). Original Rebate: 13,024.79 Added CP .12) = 8,967.18" |
| --- | --- |
| Ralenkotter to MANN | "Good initiative. That's what I like to see. It's more fun for you anyway isn't it?" |
| MANN to Ralenkotter | "Yes it is! I've been doing this a lot more and love it! Thanks Arnie!" |
| Ralenkotter to MANN | "Grab that bull by the horns." |

g. On or about April 3, 2009, BORDEN and Ralenkotter, using their

respective Pilot email accounts, had the following email communications, which in pertinent part

said:

| Ralenkotter to BORDEN | "I know you have a lot on your plate. When the time is right I want to talk with you about having [Pilot Employee 11]'s area do the monthly manual rebates. Janet [Welch] says it take[s] a bunch of her time each month. Frankly we are paying our sales people way too much to be doing jobs that should be done by [Pilot Employee 11]'s group. I know we like for our people to do the manual cp rebates so we can work the discounts but we can do that by having our people approve what [Pilot Employee 11]'s group calculates." |
| --- | --- |
| BORDEN to Ralenkotter | "I agree, but every time I have mentioned it the inside group has no confidence in [Pilot Employee 11]'s group getting it right. I'll call you this afternoon." |
| Ralenkotter to BORDEN | "ok" |
| BORDEN to Ralenkotter | "Can we talk next week? I am still trying to figure out what corporate accounting did to our budget for March." |
| Ralenkotter to BORDEN | "Sure, I'm on spring break with my family the middle of which I will be at the Masters but call me any time. [...]" |
| BORDEN to Ralenkotter | "Let me try to come up with a plan on rebates. I don't think we can trust [Pilot Employee 11]'s group. If [Pilot Employee 11] knew how we do them, [Pilot's Chief Financial Officer] would know too. Maybe we just need a rebate queen. Only problem is that they all need to be done at the same time. Let me think on it." |
| Ralenkotter to BORDEN | "Ok I feel like [Pilot Employee 11]'s group could do and send to us for approval." |
| BORDEN to Ralenkotter | "But I don't want [Pilot's Chief Financial Officer] to know what happens after that..." |

| Ralenkotter to BORDEN | "I understand. . . ." |
|---|---|

h. On or about December 18, 2009, SPIEWAK emailed a trip report to

HAZELWOOD's administrative assistant (Pilot Employee 1) and BORDEN, who had been

tasked with delivering trip reports to HAZELWOOD for his review, as alleged in Paragraph 14

of this Indictment. In that trip report, SPIEWAK advised that he had a sales call meeting with

One World Logistics, a trucking company in Ohio, and provided the following summary of that

meeting:

> "Comments: TA was in and had offered a coast [sic] plus .005 retail
> minus .005. I told him that I would match their deal. He did not even
> know their current discount so I am going to tell him that I will change
> their discount and make no changes."

i. On or about December 19, 2011, MANN, along with Ralenkotter, Welch,

and Holden, had the following email communications. Holden emailed Ralenkotter, wanting to

know whether she could inform a Pilot employee, whom she perceived to be new to the Pilot

Direct Sales division, about the Rebate Fraud aspect of the conspiracy, and asked: "Am I ok to

explain manual rebates to [Pilot Employee 13]? With the lists going around I am concerned he

will be blind sighted [sic] by John [FREEMAN] or Mark [HAZELWOOD] if asked directly

about some of these." Ralenkotter then reply-emailed to Holden, with cc-copies to Welch and

MANN, and stated, "Ask Janet about 'Janet manual'. we should do Lexie manual and K[a]ren

manual also[.]" Welch then reply-emailed to Ralenkotter and Holden, and cc-copied MANN

with the statement: "The 3 of us have spoken about this and we are all on the same page."

*October 2012 Direct Sales Management Meeting at FREEMAN's Lake House.*

j. On or about October 25, 2012, FREEMAN led a Pilot Direct Sales

division management meeting at his lake house in Rockwood, Tennessee, which is located in the

Page 38 of 58

Eastern District of Tennessee. In attendance at this meeting, among others, were FREEMAN, WOMBOLD, Mosher, Ralenkotter, and Stinnett. HAZELWOOD arrived at FREEMAN's lake house during the evening of October 25, 2012. During the October 25, 2012 Direct Sales management meeting, before HAZELWOOD arrived, the following, among other things, occurred in furtherance of the conspiracy:

(1) FREEMAN said that those present at the management meeting were "the knowledge" and "the elder statesmen," that their "jobs" were to "create the next generation" of sales people at Pilot through "osmosis, ... windshield time, and ... just ... tell[ing] the stories," and that the following month's two-day Direct Sales division meeting at Pilot's headquarters, at which all of their subordinates would be in attendance, needed to be a "teaching meeting" in a format conducive to learning.

(2) FREEMAN, WOMBOLD, Stinnett, Mosher, and Ralenkotter, and others agreed that the November 2012 Direct Sales meeting would include "breakout" sessions in which more senior Direct Sales personnel, such as Mosher and Ralenkotter, would teach the same subject matter multiple times to multiple groups, for the purpose of, as FREEMAN said, "creat[ing] more of an open discussion and a teaching session[.]"

(3) In reaction to Stinnett's comment that Mosher would teach his "best thing" during the breakout sessions, FREEMAN interjected, "Manwell" and further added that "He [Mosher] never had to buy an airplane, so I, I had to buy an airplane one time to correct 'Manuel'."

(4) FREEMAN said to WOMBOLD, Mosher, Ralenkotter, Stinnett, and others, that "I would like Brian [Mosher] to talk about manual discounts. And understand, now Brian, I'm not tellin' you to teach people how to f**k up and buy an airplane like I did, but I

Page 39 of 58

think you gotta, I think you gotta talk about the dynamics of the manual and what it means to the

customer, and what it means to us."

(5)     At another point during the October 25, 2012 management meeting,

FREEMAN said to WOMBOLD, Mosher, Ralenkotter, Stinnett, and others:

> "So, again, just kind of going through this my next comment was, 'say
> what you do and do what you say' -- on the surface, say what you do and
> do what you say. Meaning again, I'm the biggest manual guy, well maybe
> not the biggest, but I've had the biggest blunder in manuals but I am a
> huge fan of, when you're in front of a customer and you get his fuel report
> and you say you're gonna do something, you f**king have to do it. Uh,
> you cannot have a case where you don't do what you say in that business.
> Now, again I am not talking about manual stuff. I mean, hey, it, this is a
> game. We're playin' f**kin' poker with funny money, and it's liars poker
> with funny money because of all this cost-plus stuff. So, you know, I'm
> not, I don't want to get into a moral or an ethical conversation . . . ."

(6)     FREEMAN further said to WOMBOLD, Mosher, Ralenkotter, Stinnett,

and others: "I know everybody says, 'f**k, I'm doin' it,' but just, say what you do and do what

you say." And, then, in response to Stinnett's interjection, "Don't get too cute," FREEMAN

further elaborated:

> "I mean, there's different levels of cute. Some people are tits and some
> people are ass guys and some people want their discount managed through
> the system and some people like a big check. I mean, f**k, sell it to 'em
> the way they wanna buy. And then understand that the f**ker's got the
> ability to know what the hell you're doing to 'em. Okay? Um, does
> everybody know what I'm talking about about the airplane?"

(7)     Then, FREEMAN, in keeping with his admonition to Direct Sales

management to teach by "tell[ing] the stories," offered this cautionary tale of what can happen if

a customer figures out "what the hell you're doing to 'em":

> "Western Express liked – they were not on direct-bill, they bought fuel
> from us on a cost-plus/retail-minus deal, and I manually calculated the
> discount. And for life, you know, my pencil probably wasn't as sharp
> maybe as it could've been, but in July of '8, July of '08 when crude was
> $147, on July the 6th or whatever it was, was it '08 when the market

dumped? . . . And it went from $147 to . . . by the end of the month, down to $90, and the next month down to $60. And it wasn't, you know, it dropped just dramatically. That average versus the day to day, I mean, mother f\*\*ker, it was . . . I mean it, whatever. So, everything was golden, really for the next year. Until Western, for whatever reason, contracted Knight Transportation to help them. They did a management contract ... that was the start of an acquisition. And so come in here for twelve months and helping manage my business and gettin' my operating ratios and stuff in line, blah, blah, blah. And I guess it was [ ] that discovered that during a three -- I mean, every month leading up to that and every month after that three-month strip we were pretty close to where Knight was when they got their deal managed through the system.

Anyway, that three months I, I basically cost them almost $1 million. I mean, I was playin' with 4-1/2 million gallons and there was, you know, a 13-cent spread between the, the average and the actual during that huge down turn. And it was like $300,000 a month. And I sent the f\*\*ker a $2 million check, but there was 3, I just kept the $300,000 part of that, and so, at the end of three months, you know, I owed 'em. I owed 'em a million bucks, wasn't it? It was some number. But anyway, I'm like, oh f\*\*k, you know. It crushed me and it hurt his feelings, but we got past all that.

And I said, alright, I'm gonna get you a check, and I, and he said, 'Nah, I've got this airplane over here on the books for $7 million, I owe $1 million bucks on it, why don't you just buy this airplane?' And I'm like, 'What.....' So, I bought the f\*\*kin' airplane."

FREEMAN further added about the airplane story:

> "It was so broke, it, it was so broke the mother f\*\*ker wasn't air-worthy, so we had to sell it in Nashville. But, so when I make my 'manual' comments about havin' to buy an airplane that was me."

(8)     Immediately following FREEMAN's lesson about having "to buy an

airplane one time to correct Manuel," the following verbal exchange occurred between

FREEMAN and Ralenkotter, in the presence of other conspirators:

| Ralenkotter: | "But you do have to kinda almost, though, sometimes you have to be careful. Because if you, if you set the expectation, if you have a blowout, most of 'em don't know where the numbers come from –" |
|---|---|
| FREEMAN: | "That's right." |

| Ralenkotter: | "If the guy's been getting 100,000, 100,000, 100,000, now you send him 180 and then the next month you send him 75." |
|---|---|
| FREEMAN: | "He thinks you're f**kin' 'em." |
| Ralenkotter: | "He thinks you're f**kin' 'em. So you might as well f**k 'em." |
| FREEMAN: | "See? F**k 'em early and f**k 'em often!" |

(9)     At another point during the same Direct Sales division management

meeting, FREEMAN explained to the same conspirators how he had encouraged Kevin Clark, a

subordinate Direct Sales division employee, to expand his participation in the conspiracy by

defrauding another customer. FREEMAN described:

> "He's gotta guy that does 100,000 gallons with us, he's on TCH on direct-bill. He does 20,000 gallons in Oklahoma City of his 100. Love's came in at some crazy-ass deal in Oak City, and of course the customer comes later, 'You gotta do this deal.' And I'm sayin', 'Well, Kevin, f**king -- What about the other 80,000 gallons, is there no value there? I mean, we're savin' him a bunch of money over here.' Well, Love's didn't go after the other 80, they just wanted this one truck stop and this customer wanted him to adjust."

FREEMAN then further explained:

> "I said to Kevin, I said, 'What are we doin' here?' He's on T, TCH, he's on direct-bill. I said, 'Well, you know, try to sell him on the value of the network, don't bend us over in one market. You know, and we may cost you a penny in this market but, you know, we're savin' you 10 cents over here.' And the guy was just totally unreasonable. Said, 'Sorry, you gotta give me this deal or I'm takin' these gallons away.' I said, 'Okay. Well, on the single-price file, f**kin' raise his price on the other 80,000 gallons a penny, if you've gotta give him an extra 3 cents in Oklahoma City. You, you know, you don't have to tell him. Tell him you're gonna do it, or you can tell him there's values, and if he just, if he's gonna butt-f**k us then we need to be better butt-f**kers.'"

k.     After HAZELWOOD arrived at FREEMAN's lake house during the

evening of on or about October 25, 2012, the same day of the Pilot Direct Sales division

management meeting, FREEMAN told HAZELWOOD that Direct Sales division management

"would like to propose" that during the November 2012 Direct Sales meeting at Pilot's headquarters, "each of us is gonna take a category, whatever that category is, [and] guys are gonna break out . . ." and "Brian's [Mosher] gonna talk to 'em about what a manual discount is. And, you know, facetiously, we're not going to buy any airplanes . . . ."

l. In furtherance of the conspiracy, HAZELWOOD, along with WOMBOLD and FREEMAN, each of whom was superior to Mosher in the Pilot organization, approved of Mosher encouraging participation in the conspiracy during his breakout group presentations at the Direct Sales division meeting at Pilot's headquarters planned for November 19 and 20, 2012.

*November 2012 Direct Sales Division Meeting at Pilot Headquarters.*

m. As discussed and planned during the October 25, 2012 Direct Sales division management meeting at FREEMAN's lake house, a two-day sales meeting for Pilot's entire Direct Sales division took place at Pilot's headquarters in Knoxville, Tennessee, less than a month later, on or about November 19 and 20, 2012.

n. All the while knowing that Mosher would be encouraging participation in the conspiracy during his breakout sessions, HAZELWOOD made the following opening remarks to begin the two-day sales meeting:

> "So, that's kinda my opening. Guys: Learn, Ask, Comprehend. Learn, ask, comprehend. If you will comprehend the things that are gonna go on over the next two days, we're all gonna be winners for 2013. We're all gonna be winners for 2013."

o. With the approval, encouragement and support of his conspirators, on or about November 19 and 20, 2012, Mosher led four (4) small-group breakout sessions during Pilot's sales training event at its Knoxville, Tennessee corporate headquarters, and in each session, in furtherance of the conspiracy, Mosher encouraged participation in the conspiracy, and explained, among other things, how to identify trucking companies to target for inclusion in the

conspiracy. For example, in one of those four (4) breakout sessions, with his supervisor

WOMBOLD in the audience, Mosher said:

> "So, again, my point is this: Know your customer. Know what you're
> sending him, know what his preferences are, know how sophisticated he
> is, okay? If, if the guy's sophisticated and he truly has gone out and
> gotten deals from the other competitors and he's gettin' daily prices from
> us, don't jack with his discounts, 'cause he's gonna know, okay? But the
> guy that's just sayin' 'Cost-plus, cost-plus, cost-plus, I need cost-plus.'
> 'Why do you need cost-plus and what do you know about cost-plus?
> How's cost-plus compare to retail-minus over the last three months?' 'I
> don't know, but Love's is sayin' it, so I need it.' Solution: Tell him we
> can do it. Tell him we can do it on a rebate."

p.    In the same Mosher-led breakout session, with his supervisor WOMBOLD

in the audience, Mosher, in response to a question raised by a less experienced Direct Sales

division employee, explained how the use of a spreadsheet, which tracks historical monthly

rebate data by customer, can facilitate execution of the conspiracy. During that explanation, in

furtherance of the conspiracy, JONES, Radford, Ralenkotter and Welch assisted Mosher through

their active participation in the discussion:

| JONES: | "And you look at your P&L." |
|---|---|
| Mosher: | "And I look at my P&L, and my P&L says, "Huh. I'm payin' him $25,000 and we made $25,000 on it. That's not a very good deal for me." I'll probably cut this one down to like 21. This customer is not a very sophisticated buyer and he doesn't know what we've done here, right?" |
| Radford: | "Right." |
| Mosher: | "But, he is sophisticated enough to ask me to provide him a backup. That's why we have to go through this gyration, because then I send this back to Heather [JONES] and Heather [JONES] makes a backup equate to $20,996.63. And it shows all of the discounts on each location, because that's what the customer's asked for." |

| Welch: | "And you never send a backup unless you absolutely -- get hinky." |
| Mosher: | "They gotta ask ya three times, right?" |
| Welch: | "Yeah." |
| Mosher: | (Laughing.) |
| Ralenkotter: | "'Cause they have no way to go back and trace this? Most of these guys have no way of tracing." |

q. In the same Mosher-led breakout session, with Mosher's supervisor

WOMBOLD in the audience, JONES added in furtherance of the conspiracy: "And to the point

of them not knowing, I mean, on a percentage-wise, very few of 'em actually ask for backup. I

would say less than 10%."

r. In the same Mosher-led breakout session, with his supervisor WOMBOLD

in the audience, in furtherance of the conspiracy, Mosher explained the difficulty that even

customers who receive daily pricing from Pilot would encounter in detecting the execution of the

Rebate Fraud aspect of the conspiracy:

> ". . . Is there any way possible for them to take that monthly, you know, 30 days' worth of price fetch, put together an average, and, and have an average price that they should've paid for that month? No. Absolutely not. They can't weight that fuel purchase by what day they bought it on."

s. In the same Mosher-led breakout session, with his supervisor WOMBOLD

in the audience, in furtherance of the conspiracy, Mosher cautioned:

> "There's guys that I move a penny, there's guys that I move 15 cents. I mean, it's an art, it's a feel, it's do what you can. It's not do more, don't, you know, don't ever expose yourself. If our margin went from 12 cents to 37 cents, don't give the guy 14. 'Cause he's probably gonna pick up on that. 'Cause the competitors are gonna pick up on that . . . ."

t.       During the same Mosher-led breakout session, Mosher's supervisor

WOMBOLD expressed his approval and encouragement of participation in the conspiracy by, among other things, stating:

> "I said I was going to be quiet -- think of it, think of it this way -- Nastic, they do cost-plus with a cap. And let's say a guy's doing $25,000 rebate, $25,000 rebate, and all of a sudden your gross margin goes up to 75 cents because something happens and the market tanks. We're payin' that guy $25,000 this month, $25,000 that month, and all of a sudden he's gonna get a $75,000 rebate, you gotta look at that and go, 'Man, I don't know.' You take that guy to 35,000, he's gonna go, 'I feel pretty good,' we don't need to pay that guy $75,000."

In response to WOMBOLD's statement, Mosher said, "That's exactly right."

u.       On or about November 19, 2012, in another breakout session in which

Mosher encouraged participation in the conspiracy, SPIEWAK and BIBEE were present and, through their active participation in the discussion, supported Mosher in his explanation of how to participate in the conspiracy to their breakout group. During that breakout session, BIBEE offered her opinion that it was "the outside rep's job to know which customers are sophisticated enough to be" targeted by the conspiracy.

v.       In furtherance of the conspiracy, on or about November 20, 2012, during

the morning session of the second day of the Direct Sales meeting, HAZELWOOD, while addressing the entire Direct Sales division, was interrupted by Pilot Employee 12 who interjected, "– sounds like Stick's old deal with Western," and in retort, HAZELWOOD made reference to "introduc[ing] him to a guy by the name of Manuel," and in making such reference, HAZELWOOD signaled to his conspirators, including FREEMAN, his approval of participation in the conspiracy as follows:

HAZELWOOD:           ". . . We're gonna go out because what [ ] really tells 'em is its cost plus five. That's what he tells

|                    | 'em, with no idea what cost plus five is. We're going to go into the marketplace at four with a zero fee and we're gonna give you credit. You're gonna pay three times a week. That's going to be –" |
|--------------------|---|
| Pilot Employee 12: | "– sounds like Stick's old deal with Western." |
| HAZELWOOD:         | "Yeah. Well, we're gonna, we're gonna intro, we're, we're gonna introduce him to a guy by the name of Manuel." |
| Pilot Employee:    | "No planes in this deal." |
| FREEMAN:           | "Yeah, ah, some of us, rich and famous, we have our own, own planes." |

*February 2013 Direct Sales Management Meeting in Orlando, Florida.*

w.    On or about February 18, 2013, a Direct Sales division management

meeting occurred at a hotel located in Orlando, Florida. In attendance at this meeting, among

others, were HAZELWOOD, FREEMAN, WOMBOLD, Mosher, Ralenkotter, and Stinnett.

(1)    In furtherance of the conspiracy, HAZELWOOD encouraged expansion of

the conspiracy's scheme to defraud by stating, among other things, "What we're, what we're

really talkin' 'bout is two-tiered customers," and then adding, "Customer A, Customer B.

Customer A look, looks every orifice you have, Customer B doesn't even know you have an

orifice."

(2)    In furtherance of the conspiracy, during the same management meeting,

HAZELWOOD further stated:

> "So why don't we do this, so why don't we do this; why don't we figure out everybody who's not watchin' his own cost-plus and who doesn't, doesn't have and let's make sure that we've got that list, okay? And then everybody that does watch, then we got that list."

x.    Immediately after the February 18, 2013 management meeting,

HAZELWOOD, while speaking with WOMBOLD, FREEMAN, and Mosher, further

Page 47 of 58

encouraged expansion of the conspiracy's scheme to defraud through the identification of the so-called "Customer B" trucking companies, and referred to this contemplated expansion of the conspiracy's scheme to defraud as "Aunt Bea pricing." HAZELWOOD said, "Aunt Bea. That's what we'll call this, Aunt Bea pricing," and then simultaneously expressed his continued approval of the Rebate Fraud method of executing the conspiracy, by stating, among other things, "We got 'Manuel.' 'Manuel' does a hell of a job. Wonder what percentage of our volume's on Aunt Bea?"

y. In furtherance of the conspiracy, on or about February 20, 2013, in response to an email from FREEMAN that recapped the Orlando February 18, 2013 management meeting, HAZELWOOD, who at the time was traveling on Pilot business in Texas, sent an email using his Pilot email account that said, "Great recap lets get cost plus B plan going ASAP thanks." FREEMAN, using his Pilot email account, replied on the same day, "Just met with Joe. Opportunity is there[,]" to which HAZELWOOD replied by email from Texas on the same day, "Awesome[.]"

## Overt Acts in Furtherance of the Conspiracy

30. In furtherance of the conspiracy, in addition to other overt acts that were committed before February 4, 2011, the following overt acts, among others, were committed in the Eastern District of Tennessee, since February 4, 2011:

| Number | Date | Overt Act |
|--------|------|-----------|
| 1 | 2/11/2011 | WOMBOLD sent an email, through Pilot's email server in Knoxville, Tennessee, to Mosher, who was working in Iowa, and JONES that stated, "Approved ... still pretty aggressive," which was in reply to a previous 2/11/2011 email from Mosher that had answered "Manual Rebate" in reply to WOMBOLD's emailed question, "Cost minus 3....? How big is this account?" |

| 2 | 3/11/2011 | JONES sent an email, through Pilot's email server in Knoxville, Tennessee, to Mosher, who was working in California, that stated "Brian, Here is the sheet for your review. . . ." and attached a spreadsheet entitled "Approval Sheet Manual Rebates FEB 2011.xls" that stated for "Customer" "Amerifreight" an amount of "$53,445.01" for "Feb-11" from a "Discount Used" of "CM .03/R-.02" |
|---|---|---|
| 3 | 3/17/2011 | Mosher sent an email, through Pilot's email server in Knoxville, Tennessee, to JONES that attached a revised spreadsheet that added the number "46,000" in the column entitled "Brian" next to Amerifreight's "Feb-11" amount of "$53,445.01," which JONES knew to be a direction from Mosher, with WOMBOLD's approval, to fraudulently reduce Amerifreight's rebate for the month of February 2011 from $53,445.01 to approximately $46,000. |
| 4 | 3/23/2011 | JONES, from Pilot's headquarters in Knoxville, Tennessee, at the direction of Mosher, and with the approval of WOMBOLD, caused a fraudulently calculated rebate amount of $46,392.84 to be transmitted to Amerifreight's bank account by means of wire in interstate commerce, namely the transmission of an ACH payment in the amount of $46,392.84 from Regions Bank, which was located in Alabama, to Associated Bank which was located in Wisconsin, for the purpose of lulling Amerifreight into believing that Pilot was honestly and accurately applying the Cost-Plus Discount represented to Amerifreight. |
| 5 | 2/23/2012 | For the purpose of lulling Honey Transport into believing that the shortfall in Honey's rebate check for January 2012 was (i) not intentional and (ii) isolated to a brief period of time, BIBEE sent the following false email communication, through Pilot's email server in Knoxville, Tennessee, to Honey Transport:<br><br>"Hi [Honey Transport Representative], I have done my research and it seems your pricing was inadvertently changed in our system on the 19th of December. Again, we are sincerely sorry for this mishap and assure you that this error has been corrected and that your February rebate will be accurate. With that being said, we would like to send you a check for the amount due to you. Your January gallons were 143,240.54 x .05=$7,162.03. For Dec 19th - 31st, you fueled 57,985.79 gallons X .05 =$2,899.29. This would bring the total amount due to Honey $10,031.32. Again, thanks so much for talking through this with us on Tuesday and for communicating these concerns to us so that we can make this right. We value your partnership and will always strive to provide you with the best service possible. Please let me know if you are in agreement on this amount and I will get the check to you asap!" |

| 6 | 2/27/2012 | BIBEE, from Pilot's headquarters in Knoxville, Tennessee, caused an ACH payment in the amount of $10,031.32 to be transmitted to Honey Transport's bank account by means of wire in interstate commerce, namely the transmission of an ACH payment in the amount of $10,031.32 from Regions Bank, which was located in Alabama, to United Southern Bank, which was located in Florida, for the purpose of lulling Honey Transport into believing that the $10,031.32 amount represented the total amount owed by Pilot to Honey arising from a "mishap", all the while knowing that no "mishap" had occurred and that the execution of the conspiracy had cost Honey far more than $10,031.32. |
| 7 | 10/25/2012 | FREEMAN, at his lake house, located in Rockwood, Tennessee, stated to WOMBOLD, Mosher, Ralenkotter, Stinnett and others what is alleged in paragraphs 29(j)(4), 29(j)(5), 29(j)(6), 29(j)7, 29(j)(8), 29(j)(9), and 29(k) of this Indictment. |
| 9 | 11/19/2012 | During a Pilot Direct Sales division meeting at Pilot's headquarters in Knoxville, Tennessee, Mosher, with the approval of HAZELWOOD, WOMBOLD, and FREEMAN, and other conspirators, led breakout sessions during which participation in the conspiracy was explained and encouraged in the manner alleged in paragraphs 29(o), 29(p), 29(q), 29(r), 29(s), 29(t), and 29(u) of this Indictment by Mosher and his conspirators. |

All in violation of 18 U.S.C. §1349.

## COUNTS TWO THROUGH TEN
### (Wire Fraud)

31. Between on or about February 1, 2008, and in or about April 2013, within the

Eastern District of Tennessee, and elsewhere, the following defendants, aided and abetted by and

aiding and abetting each other and others known and unknown to the grand jury, did knowingly,

willfully, and with the intent to defraud, devise and participate, and attempt to devise and

participate, in a scheme to defraud and to obtain money from certain interstate trucking

companies by means of materially false and fraudulent pretenses and representations described in

paragraphs 1 through 23 and paragraphs 25 through 29 of Count One of this Indictment, the

allegations of which are incorporated by reference as if fully set forth herein, and on the

following dates, in executing and attempting to execute the scheme to defraud, did cause to be

transmitted by means of wire and radio communications in interstate commerce, the below

described writings, signs, signals, pictures, and sounds, namely the following emails transmitted

in interstate commerce, for the purpose of executing the scheme to defraud:

| Count | Date (M/D/Y) | Defendants | Wire Transmission From/To | Description |
|---|---|---|---|---|
| 2 | 2/11/2011 | WOMBOLD | Email transmitted from WOMBOLD through Pilot's email server in Knoxville, Tennessee to Mosher in Iowa and JONES | Email, with subject "RE: Amerifreight Fuel Cards – Approval," stated: "Approved ... still pretty aggressive." in reply to a previous 2/11/2011 email from Mosher that had answered "Manual Rebate" in reply to WOMBOLD's emailed question, "Cost minus 3....? How big is this account?" |
| 3 | 3/11/2011 | JONES, WOMBOLD | Email with attached spreadsheet transmitted from JONES through Pilot's email server in Knoxville, Tennessee to Mosher in California | Email stated: "Brian, Here is the sheet for your review. . . . Heather" and attached a spreadsheet entitled "Approval Sheet Manual Rebates FEB 2011.xls" that stated for "Customer" "Amerifreight" an amount of "$53,445.01" for "Feb-11" for "Discount Used" of "CM .03/R-.02" |
| 4 | 3/17/2011 | JONES, WOMBOLD | Email with attached spreadsheet transmitted from Mosher in Iowa to JONES through Pilot's email server in Knoxville, Tennessee | Email attached a spreadsheet entitled "Approval Sheet Manual Rebates FEB 2011.xls" that stated for "Customer" "Amerifreight" in the "Brian" column "46000" next to the amount of "$53,445.01" for "Feb-11" for "Discount Used" of "CM .03/R-.02" |
| 5 | 1/11/2012 | JONES | Email with attached spreadsheet transmitted from JONES through Pilot's email server in Knoxville, Tennessee to Mosher in Nebraska | Email attached a spreadsheet entitled "Approval Sheet Manual Rebate DEC 2011.xls", that stated a rebate amount for JTL of "$11,885.45" for "Dec Gallons" with a "Discount Used" of "R-.045/CP.04." |

| 6 | 1/13/2012 | JONES | Email with attached spreadsheet transmitted from Mosher in Iowa to JONES through Pilot's email server in Knoxville, Tennessee | Email attached a spreadsheet entitled "Approval Sheet Manual Rebate DEC 2011.xls" that added the number "7500" in the column entitled "Brian" next to JTL's "Dec-11" amount of "$11,885.45" for a "Discount Used" of "R-.045/CP.04." |
|---|---|---|---|---|
| 7 | 2/23/2012 | BIBEE | Email transmitted from BIBEE through Pilot's email server in Knoxville, Tennessee to trucking company Honey Transport in Florida | Email stated:<br><br>"Hi [Honey Transport Representative],<br><br>I have done my research and it seems your pricing was inadvertently changed in our system on the 19th of December. Again, we are sincerely sorry for this mishap and assure you that this error has been corrected and that your February rebate will be accurate. With that being said, we would like to send you a check for the amount due to you. Your January gallons were 143,240.54 x .05=$7,162.03. For Dec 19th-31st, you fueled 57,985.79 gallons x .05 =$2,899.29. This would bring the total amount due to Honey $10,031.32. Again, thanks so much for talking through this with us on Tuesday and for communicating these concerns to us so that we can make this right. We value your partnership and will always strive to provide you with the best service possible. Please let me know if you are in agreement on this amount and I will get the check to you asap!" |

| 8 | 2/20/2013 | HAZELWOOD | Email transmitted from HAZELWOOD in Texas to FREEMAN through Pilot's email server in Knoxville, Tennessee | Email stated: "Great recap lets get cost plus B plan going ASAP thanks." |
| 9 | 2/20/2013 | FREEMAN | Email transmitted from FREEMAN through Pilot's email server in Knoxville, Tennessee to HAZELWOOD in Texas | Email stated: "Just met with Joe. Opportunity is there" in reply to HAZELWOOD's previous 2/20/2013 email that stated: "Great recap lets get cost plus B plan going ASAP thanks." |
| 10 | 2/20/2013 | HAZELWOOD | Email transmitted from HAZELWOOD in Texas to FREEMAN through Pilot's email server in Knoxville, Tennessee | Email stated: "Awesome" in reply to FREEMAN's previous 2/20/2013 email that stated: "Just met with Joe. Opportunity is there" |

All in violation of 18 U.S.C. §1343.

## COUNTS ELEVEN THROUGH THIRTEEN
### (False Statements by WOMBOLD)

32. The allegations of paragraphs 1 through 31 are repeated and realleged as though fully set forth herein.

33. On or about April 15, 2013, while a search warrant was being executed at Pilot's corporate headquarters located on Lonas Drive in Knoxville, Tennessee, WOMBOLD, who was present at Pilot's headquarters at that time, was asked by special agents with the Federal Bureau of Investigation (FBI) and the Internal Revenue Service, Criminal Investigation (IRS-CI), if he would agree to be interviewed regarding his knowledge of Pilot's diesel rebate/discount procedures. The FBI and IRS-CI special agents advised WOMBOLD of their FBI and IRS-CI identities, and further told WOMBOLD that he was not under arrest, that any interview in which WOMBOLD agreed to participate would be voluntary, that WOMBOLD would be free to leave

at any time, and that WOMBOLD could meet the interviewing FBI and IRS-CI special agents at an offsite location of his choosing, if WOMBOLD wished. WOMBOLD agreed to be interviewed by the FBI and IRS-CI agents in his Pilot office.

34. On or about April 15, 2013, in the Eastern District of Tennessee, WOMBOLD did willfully and knowingly, and with the intent to deceive, make materially false and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the Government of the United States, that is, during an interview with special agents of the FBI and IRS-CI in his Pilot office, located in Pilot's corporate headquarters at 5508 Lonas Drive, Knoxville, Tennessee, WOMBOLD willfully and knowingly, and with the intent to deceive, made the following materially false and fraudulent statements:

| Count | Materially False and Fraudulent Statement |
|-------|-------------------------------------------|
| 11 | WOMBOLD falsely and fraudulently stated, with the intent to deceive, that he was not aware of any specific customers, other than Star Transport, whose rebates were reduced by Pilot employees without the customers' knowledge or approval, although he had heard rumors about PFJ customers not receiving correct rebates. This statement was materially false and fraudulent and made with the intent to deceive, in that WOMBOLD then and there knew that WOMBOLD had attended a Direct Sales division management meeting on October 25, 2012, during which FREEMAN, in WOMBOLD's presence, made the statements that are alleged in Paragraphs 29(j)(6) and 29(j)(7) of this Indictment. This statement was further materially false and fraudulent and made with the intent to deceive, in that WOMBOLD then and there knew that WOMBOLD had engaged in the email communications regarding Pilot customer Amerifreight that are alleged in Paragraph 28(i) of this Indictment. |
| 12 | WOMBOLD falsely and fraudulently stated, with the intent to deceive, that reducing rebates without the customers' knowledge was not discussed during sales meetings, and that is something that would not be discussed during a sales meeting. This statement was materially false and fraudulent and made with the intent to deceive, in that WOMBOLD then and there knew that WOMBOLD had attended a Direct Sales division all-staff sales meeting during which his subordinate Mosher, in WOMBOLD's presence, led a break-out session during which withholding customer rebates without customer knowledge was discussed, including the statements that are alleged in Paragraphs 29(o), 29(p), 29(q), 29(r), 29(s), and 29(t) of this Indictment. |

| 13 | WOMBOLD falsely and fraudulently stated, with the intent to deceive, that he has never heard the term "manuel" used to refer to reducing customers' manual rebate without their knowledge, and is not aware of any other terms used to describe that practice. This statement was materially false and fraudulent and made with the intent to deceive, in that WOMBOLD then and there knew that WOMBOLD had heard the term "manuel" used to refer to reducing customers' manual rebate without their knowledge including when he attended a Direct Sales division management meeting on October 25, 2012, during which FREEMAN, in WOMBOLD's presence, made the statements that are alleged in Paragraph 29(j)(3) of this Indictment. This statement was further materially false and fraudulent and made with the intent to deceive, in that WOMBOLD then and there knew that WOMBOLD had attended a Direct Sales division management meeting on February 18, 2013, and in conjunction with, and immediately following, such meeting, HAZELWOOD, in WOMBOLD's presence, made the statements that are alleged in Paragraph 29(x) of this Indictment. This statement was further materially false and fraudulent and made with the intent to deceive, in that WOMBOLD then and there knew that WOMBOLD had engaged in the email communications regarding Pilot customer Amerifreight that are alleged in Paragraph 28(i) of this Indictment. |
|---|---|

In violation of 18 U.S.C. § 1001(a)(2).

## COUNT FOURTEEN
### (Witness Tampering by HAZELWOOD)

35.     The allegations of paragraphs 1 through 31 are repeated and realleged as though fully set forth herein.

36.     On or about April 15, 2013, HAZELWOOD became aware that particular law enforcement officers of the Federal Government, namely special agents of the Federal Bureau of Investigation ("FBI") and the Internal Revenue Service, Criminal Investigation ("IRS-CI"), were investigating aspects of Pilot's diesel fuel discount practices involving some of Pilot's diesel-fuel-purchasing customers. On the same date, HAZELWOOD was advised that the FBI and the IRS-CI were executing a search warrant related to that investigation at Pilot's corporate headquarters, located on Lonas Drive in Knoxville, Tennessee. On the same date, HAZELWOOD agreed to be interviewed about aspects of Pilot's diesel fuel discount practices involving some of Pilot's diesel-fuel-purchasing customers by particular law enforcement

officers of the Federal Government, namely a special agent of the FBI and a special agent of the IRS-CI, in his office at Pilot's corporate headquarters.

37.     In or about May 2014, HAZELWOOD's employment with Pilot terminated.

38.     On or about June 9, 2014, in the Eastern District of Tennessee, HAZELWOOD, knowingly and willfully attempted to corruptly persuade his former administrative assistant, Pilot Employee 1, with the intent to hinder, delay and prevent the communication to particular law enforcement officers of the Federal Government, namely special agents of the Federal Bureau of Investigation ("FBI") and the Internal Revenue Service, Criminal Investigation ("IRS-CI"), of information relating to the possible commission of a Federal offense, namely wire fraud, in violation of 18 U.S.C. § 1343, mail fraud, in violation of 18 U.S.C. § 1341, and conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349, by HAZELWOOD first telling his former administrative assistant, Pilot Employee 1, during a phone call, that HAZELWOOD was aware that Pilot Employee 1 had told an investigator, with whom HAZELWOOD's lawyer was working, that HAZELWOOD read trip reports, and by HAZELWOOD then telling Pilot Employee 1 that Pilot Employee 1 needed to know that, although HAZELWOOD had asked for trip reports, HAZELWOOD never read trip reports, and that HAZELWOOD had no way to respond to trip reports, all the while HAZELWOOD knew that he, in fact, not only had read trip reports during his employment with Pilot, but also had the ability to respond to trip reports that he had received during his employment with Pilot, and all the while HAZELWOOD knew that particular law enforcement officers of the Federal Government, namely special agents of the FBI and the IRS-CI, were investigating Pilot's diesel fuel discount practices, and that Pilot Employee 1 was a witness in the FBI's and IRS-CI's investigation based on the allegations set forth in paragraphs 14, 28(d)(1), 29(b), and 29(h) of this Indictment.

In violation of 18 U.S.C. § 1512(b)(3).

## Forfeiture Allegations Relating to Counts 1, 8, and 10

39.     The allegations contained in Counts 1, 8, and 10 of this Indictment are repeated, realleged, and incorporated by reference as if fully set forth herein for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 982(a)(2) and Title 18, United States Code, Section 981(a)(1)(C), as incorporated by Title 28, United States Code, Section 2461.

40.     Upon conviction of the offense in violation of Title 18, United States Code, Section 1349 set forth in Count 1 of this Indictment, and upon conviction of the offenses in violation of Title 18, United States Code, Section 1343, set forth in Counts 8 and 10 of this Indictment, HAZELWOOD shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(2), and Title 18, United States Code, Section 981(a)(1)(C), as incorporated by Title 28, United States Code, Section 2461(c), any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of any such violation, including, but not limited to, a money judgment in the amount of the proceeds derived from any such violation.

41.     If any of the property described above, as a result of any act or omission of the defendant:

        a.     cannot be located upon the exercise of due diligence;

        b.     has been transferred or sold to, or deposited with, a third party;

        c.     has been placed beyond the jurisdiction of the court;

        d.     has been substantially diminished in value; or

        e.     has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

All pursuant to 18 U.S.C. §§ 981(a)(1)(C), 982(a)(2)(A), 982(b)(1); 21 U.S.C. § 853(p); 28 U.S.C. § 2461(c).

A TRUE BILL:

# SIGNATURE REDACTED

NANCY STALLARD HARR
ACTING UNITED STATES ATTORNEY

Francis M. Hamilton III
Assistant United States Attorney

David P. Lewen, Jr.
Assistant United States Attorney