**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | **No. 3:16-CR-20** |
| | ) | **JUDGES COLLIER / GUYTON** |
| MARK HAZELWOOD, | ) | |
| SCOTT WOMBOLD, | ) | |
| HEATHER JONES, | ) | |
| and KAREN MANN, | ) | |
| | ) | |
| DEFENDANTS. | ) | |

**DEFENDANT MARK HAZELWOOD'S MOTION TO RECONSIDER**
**ADMISSION OF GOVERNMENT EXHIBITS 529, 530 AND 531**

Defendant Mark Hazelwood respectfully asks the Court to reconsider its December 7, 2017

ruling, concluding that three tape recordings offered by the Government constitute admissible

evidence. Mr. Hazelwood requests, for reasons not previously litigated, that the recordings be

excluded from evidence as they are collateral to the issues the jury must decide and bear no

relevance to the charges faced by Mr. Hazelwood.

**I.      Background and Procedure.**

The Government sought the Court's permission to rebut Mr. Hazelwood's purported offer

of character evidence allegedly elicited through the cross-examination of Janet Welch and Brian

Mosher. The Government asked the Court for permission to play three highly-inflammatory tape

recordings to refute the purported elicitation of Mr. Hazelwood's "sound business judgment" and

"authentic humanitarian good will toward the entire community of truck drivers." Govt. Sealed

Mot. to Introduce Char. Evid. p. 7-10 ("Govt. Mot."). Mr. Hazelwood objected, and submitted a

response addressing the Government's request to introduce the character evidence under Rules

401, 403, 404(a), and 405 of the Federal Rules of Evidence. Hazelwood Sealed Resp. (D.E. 366, 373).

This Court then ruled in open court that the tape recordings would themselves be admissible, but on an entirely different basis than was argued by the Government—as evidence of contradiction of a material fact:

> [T]he Court does not agree that the government's efforts here are to show that Mr. Hazelwood is a racist. The evidence, to the contrary, tends to suggest Mr. Hazelwood has in fact engaged in and approved conduct that runs the risk of bringing down everything if discovered. So this would be pure contradiction.

Nov. 30, 2017 Tr. at 185:3-8. This ruling and rationale was never anticipated nor addressed by the Government, Mr. Hazelwood, or any other defendants. Mr. Hazelwood, therefore, requests the opportunity to explain why he objects to the admission of Exhibits 529, 530 and 531 as "contradiction" evidence and asks that the Court reconsider its initial ruling.

The Federal Rules of Criminal Procedure do not include a rule devoted to reconsideration motions. *United States v. Ogden*, No. 06-20033, 2008 WL 2704539, *1 (W.D. Tenn. 2008). But district courts have the inherent power to reconsider interlocutory orders and reopen any part of a case before entry of a final judgment. *Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991) (citing to *Marconi Wireless Telegraph Co. v. United States,* 320 U.S. 1, 47–48 (1943)). And, a district court may modify, or even rescind, interlocutory orders. *Id*. at 1282 (citing to *Simmons Co. v. Grier Brothers Co.,* 258 U.S. 82, 88, 42 S.Ct. 196, 198 (1922)). In fact, this Court has already recognized as much in a previous ruling concerning another subject in this trial. Mem. & Order (D.E. 228) at 6. Under this framework, Mr. Hazelwood seeks the Court's consideration of

Mr. Hazelwood's new objections to the Government's proffered recordings and requests that the tapes be excluded from evidence.[1]

## II. Evidentiary rules prohibit admission of the Government's tapes because such extrinsic evidence relates to a collateral issue and involve matters irrelevant to the indictment.

The "specific contradiction" rule states that "a witness may not be impeached by extrinsic evidence (contradiction by another witness or evidence) on a collateral issue." *United States v. Pugh*, 436 F.2d 222, 225 (D.C. Cir. 1970). The purpose of this rule is "to avoid confusion of the issues and undue extension of the trial. This is essentially a matter of administrative policy and concentration of attention." *Ewing v. United States*, 135 F.2d 633, 643 (D.C. Cir. 1942). The old English common-law rule was justified as a consequence of our not having a thousand-year life span. *See* 3A WIGMORE, EVIDENCE Sec. 1002 (Chadbourn rev. 1970) (citing *Attorney–General v. Hitchcock*, 1 Exch. 91, 104 (1847)). The "specific contradiction" rule is a particular instance of the trial court's general power under Federal Rule of Evidence 403 to exclude evidence "if its probative value is substantially outweighed . . . by considerations of undue delay, [or] waste of time." *See* 3 WEINSTEIN, EVIDENCE ¶ 607[05] at 83.

The commonly used test for collateral matters asks: "Could the fact, as to which error is predicated, have been shown in evidence for any purpose independently of the contradiction?" 3A WIGMORE, EVIDENCE Sec. 1003. Put another way: Could the party seeking to introduce the evidence "for purposes of contradiction" be "entitled to prove it as a part of his case?" *United States v. Lambert*, 463 F.2d 552, 557 (7th Cir. 1972). If the answer is no, the evidence should be excluded. *Id*. at 557; *see also, United States v. Tarantino*, 846 F.2d 1384, 1410 (D.C. Cir. 1988);

---

[1] Mr. Hazelwood adopts by reference arguments put forth by his co-defendants in their motion for reconsideration. (D.E. 393). Specifically, Mr. Hazelwood adopts and joins arguments in Sections I, II, III, and IV of the reconsideration motion filed by Defendants Jones, Wombold, and Mann.

*United States v. Roulette*, 75 F.3d 418, 423 (8th Cir. 1996) ("A prior inconsistent statement contains collateral matter and is therefore inadmissible if the facts referred to in the statement could not be shown in evidence for any purpose independent of the contradiction."); *United States v. Beauchamp*, 986 F.2d 1, 4 (1st Cir. 1993) ("A matter is considered collateral if the matter itself is not relevant in the litigation to establish a fact of consequence, i.e., not relevant for a purpose other than mere contradiction of the in-court testimony of the witness."); *United States v. Libby*, 475 F. Supp. 2d 73, 99-100 (D.C. Cir. 2007) (witness's prior statements were inadmissible; statements were collateral because they did not go to the heart of witness's testimony but were related only to his knowledge of the criminal justice process, and they had little probative value).

As explained in *United States v. Perez-Perez*, 72 F.3d 224, 227 (1st Cir. 1995),

> Impeachment by contradiction is a recognized mode of impeachment not governed by Rule 608(b), but by common-law principles. But, again largely for reasons of efficiency, extrinsic evidence to impeach is only admissible for contradiction where the prior testimony being contradicted was itself material to the case at hand.

Thus, when a witness testifies to a collateral matter, the examiner "must take [the] answer," and the examiner may not disprove it by extrinsic evidence. *Id.; see, e.g., United States v. Martz*, 964 F.2d 787, 789 (8th Cir. 1992); *Beauchamp*, 986 F.2d at 3-4.

The specific tapes the Government seeks to introduce contain no content about customers, lying to customers, cheating customers, manual rebates, manual rebate fraud, a scheme to defraud, or knowledge about fraudulent business activity at Pilot. Instead, as the Court characterized them, the tapes predominantly include racial, misogynistic, and xenophobic slurs. Such tapes cannot be offered by the Government as having independent relevance in this case: Racial epithets are collateral to any material issue in a federal conspiracy and mail/wire fraud case.[2]

---

[2] Mr. Hazelwood also faces a charge of witness tampering, another matter for which the tapes serve as collateral evidence.

**A.** **These tapes do not contradict Brian Mosher's testimony and should, therefore, be excluded.**

Specific contradiction is a mode of impeaching a witness. FED. R. EVID. 607. The witness states a fact, the cross-examiner then confronts the witness with evidence of a contradictory fact, offered to show that the witness cannot be believed on the first fact that he testified to and therefore should not be believed on other facts as well.[3]

Here, Brian Mosher agreed with the cross-examiner, Mr. Hazelwood's counsel, that it would be dumb "to take a small portion of your business and be lying to customers and taking the chance of everything coming down[.]" Nov. 30, 2017 Tr. at 104:16-18. Mr. Mosher then agreed that "[f]or the most part," both Jimmy Haslam and Mark Hazelwood were good businessmen. *Id.*

---

[3] The present situation is distinguishable from that in *United States v. Moore*, 604 Fed. App'x 458 (6th Cir. 2015). In that case, the defendant called his grandmother as a witness in a drug trafficking and firearms trial. She said that she and Moore "always prayed" before leaving home, and before Moore got out of his car, and that she never saw Moore with a gun. Her motto was "God is my gun." *Id.* at *460. The government argued that the defense had introduced "good" character evidence, so the trial court permitted the government to cross-examine her about the defendant's prior convictions. *Id.* This "character evidence" impeachment was intended to show that the grandmother did not really know her grandson's character for "law-abidingness." *Id.* at 462. Therefore, she should not be believed on other matters either. Furthermore, any error was harmless as the jury had already heard other evidence of the defendant's prior criminal history which was independently relevant because he was charged with being a felon in possession of a firearm. *Id.* at 463.

In the present case, the Government called Mr. Mosher and introduced implicit "bad" character evidence concerning Mr. Hazelwood by four times asking its own witness about Hazelwood's "management style." (Nov. 27, 2017 Tr. at 149:18; 162:25; 163:23; 175:4). The Government's questions focused on two exhibits: (1) Mr. Hazelwood's recounting of a trip he had just taken with Pilot's new CEO, John Compton, and (2) an email in which Mr. Hazelwood encouraged other employees to make aggressive discount offers to compete with two former Pilot employees. Both Government exhibits showed Mr. Hazelwood using profanity. In response to the prosecutor's questions, Mr. Mosher drew a distinction between Mr. Hazelwood's management style with "directors and above" and with "the lower level meetings." (Nov. 27, 2017 Tr. at 149:18-24).

Here, the defense legitimately rebutted the "bad management" testimony of the government's witness on cross-examination. The government cannot bootstrap its proffer of "bad management" evidence on direct examination and the defendant's rebuttal of that evidence on cross-examination to justify further allegedly "bad management" evidence of racial epithets offered to contradict the cross-examination. The Government offers the tapes and transcripts to bolster its original "bad management" evidence with private conversations which are, in fact, wholly irrelevant to business management abilities. *See infra*, section 2.

at 105:2-5.   Finally, Mr. Mosher agreed that "if [he] knew that this was going on, allowing it would be a bad business decision." *Id*. at 105:6-8.

Evidence that specifically contradicted Mr. Mosher's testimony on that point would be evidence that it was, in fact, a good business decision to lie to customers.   The Government is not offering such evidence.   Instead, the Government has offered evidence that shows Mr. Hazelwood made racial slurs with friends while drinking and watching a football game in a private home at night. The Government asserted this evidence shows Mr. Hazelwood is not a good manager, makes poor business decisions, and does not have the character trait of "authentic humanitarian good will toward the entire community of truck drivers." Govt. Mot. at 7-10.

These tapes fail to contradict Brian Mosher's testimony concerning Mr. Hazelwood's business judgment toward customers.    Nor do they contradict the questions or elicited answers about the wisdom of lying to customers.    Because of this, such "otherwise inadmissible evidence may not be put before the jury in the guise of impeachment." *Dennis v. United States*, 625 F.2d 782, 795-96 (8th Cir. 1980).

**B.      These tapes must be excluded because they are irrelevant to the indictment's material issues and constitute excludable collateral evidence.**

In admitting the tapes, this Court stated,

> The question asked of the witnesses was whether Mr. Hazelwood would, as a good manager, good businessman, excellent CEO and president, have engaged in conduct that, if it became known, would bring the entire company down.  So the question necessarily contemplated actions or conduct of such a magnitude that the company would be at risk of -- if discovered.

Nov. 30, 2017 Tr. at 187:25-188:7. But that is not what the defense asked the witness.   The defense specifically inquired whether "lying to the customers" was a "good approach . . . when it represented such a small percentage of your overall business?"  *Id*. at 104:4-7.   And then counsel asked, "would you agree with me that it is incredibly stupid and dumb, from a business standpoint,

to take a small portion of your business and be lying to customers and taking the chance of everything coming down?"  *Id*. at 104:12-18.  The questions focused solely on "lying to customers" in "taking the chance of everything coming down" "from a business standpoint."

Any contradiction (or character) evidence is, thus, confined to "lying in business" or "fraud in dealing with customers."  Those are material issues in a prosecution for conspiracy to commit mail or wire fraud, for which a conviction, in this case, requires that defendants knowingly and intentionally lied to customers to defraud them.  *See* 18 U.S.C. §§ 1343, 1349.  The Government's tapes do not contain such proof.

Evidence concerning racial epithets and misogynist sentiments, made while drinking with friends in a private home at night, is also irrelevant to any issue in this fraud prosecution.  *See Tarantino*, 846 F.2d at1410; *Beauchamp*, 986 F.2d at 4; *Pugh*, 436 F.2d at 225.  The Government has not posited any legal or factual theory under which these tapes would be probative of whether Mr. Hazelwood committed mail/wire fraud or tampered with a witness.  In fact, in its own proposed jury instructions, the Government conceded this very point, stating: "[T]his evidence does not prove any of the elements of the offenses with which Mr. Hazelwood is charged in the Indictment.  You cannot and must not use this evidence to decide that Mr. Hazelwood is guilty of the offenses charged in the Indictment."  United States Sealed Proposed Limiting Instructions to Jury at 2-3 (D.E. 380).

The Government has also not offered a scintilla of evidence that logically connects professional "bad business judgment" with the personal conduct of making slurs in a private home after work.  There is also no proof in the record that suggests how public knowledge of Mr. Hazelwood's racial epithets would "bring down" Pilot.

Because the after-hours drinking discussions on the Government tapes are irrelevant to a fraud prosecution, the evidence is collateral. It cannot be proved with extrinsic evidence as it would not be admissible in the Government's case-in-chief. *Lambert*, 463 F.2d at 557; *Tarantino*, 846 F.2d at 1410. The tapes, therefore, must be excluded.

### C. Rule 404(b) governs evidence of a defendant's prior bad acts, and therefore, the public's discourse about Donald Sterling and Marge Schott cannot serve as the basis for permitting introduction of the Government's tapes.

In admitting the Government's proffered evidence, the Court compared the present situation to that of Donald Sterling and Marge Schott whose racially charged statements, once made public, led to their resignation as sports team owners. Nov. 30, 2017 Tr. at 185:21-186:17. But the situations are not comparable on two important factual bases and one crucial legal basis. First, as owners, Donald Sterling was "the face" of the L.A. Clippers and Marge Schott was "the face" of the Cincinnati Reds. They personified their teams. Mark Hazelwood does not personify Pilot or the Cleveland Browns. Rather, Jimmy Haslam, is "the face" of Pilot, the company his family owns, and the Browns, the team he owns. Second, Mr. Sterling's and Ms. Schott's racially insensitive remarks did not bring down their sports franchises. Such statements reflected upon their personal character, not their professional competence or their companies.

The public at large appeared to agree that both Mr. Sterling and Ms. Schott personally deserved punishment, but not their teams.[4] The public distinguishes between the personal and

---

[4] Donald Sterling was forced to sell the L.A. Clippers basketball team in 2014 when a secretly recorded tape of racial remarks he made to his young girlfriend were publicized. He sold it for $2 billion (considerably more than its 2015 valuation of $1.5 billion) to Steve Ballmer, Microsoft's CEO. He was personally fined $2 million by the NBA. http://www.espn.com/nba/story/_/id/18082462/former-los-angeles-clippers-owner-donald-sterling-settles-nba-disputed -sale-team (last visited Dec. 19, 2017).

The Clippers remained intact, with revenue that went from $146 million in 2013-2014 to $176 million 2014-2015, and $185 million in 2015-2016. https://www.statista.com/statistics/196720/revenue-of-the-los-angeles-clippers-since-2006/ (last visited Dec. 19, 2017).

the professional.[5]  And so does the law.  Trials must be conducted according to the Rules of

Evidence.  And, under these regulations, Rule 404(b) explicitly bars the admission of prior bad

acts offered to show bad character, from which the trier of fact should deduce that the defendant

is therefore more likely to commit crimes in general and this crime in particular.

Most importantly, the revelations about Mr. Sterling and Ms. Schott were not made during

an unrelated criminal trial and offered against them as defendants.  Mr. Sterling and Ms. Schott

were tried in the court of public opinion.  Mr. Hazelwood, however, is being tried in a court of law

with evidentiary rules, which the Government's tapes cannot meet because they detail prior bad

acts only offered to damage the jury's view of Mr. Hazelwood's character.

---

Marge Schott owned the Cincinnati Reds baseball team from 1984 to 1999.  She displayed equal-opportunity prejudice and was said to have kept a Nazi swastika armband at home and had called two outfielders "my million-dollar niggers" along with making other slurs.  William Raspberry, *What's Fit for Marge Schott?*, WASHINGTON POST (Dec. 11, 1992), https://www.washingtonpost.com/archive/opinions/1992/12/11/whats-fit-for-marge-schott/7fb5f74e-093d-4db2-96a0bc5c333eaaed/?utm_term=.bfa2f877fbfa.

After a 1993 baseball commission investigation, the league fined Ms. Schott $250,000 and banned her from day-to-day operations for the 1993 season.  The Reds lost money in both 1992 ($11.8 million) and 1993 ($5 million), but lost less in 1993 after the publicity of her racial remarks, the investigation, and fine.  https://books.google.com/books?id=DxTZdZ2xc2EC&pg=PA980&lpg=PA980&dq=Cincinnati+reds+revenue+1993&source=bl&ots=_QA9h0j2iY&sig=XWDbWu_elk8HyJ8oWERePC8MZqs&hl=en&sa=X&ved=0ahUKEwj6zab4t4rYAhUT4WMKHazIC_4Q6AEIbDAL#v=onepage&q=Cincinnati%20reds%20revenue%201993&f=false (last visited Dec. 19, 2017).

[5]     A current example of the public making that distinction is the plethora of sexual harassment scandals hitting the entertainment, arts, political, and news reporting worlds.  These allegations involve vile words *and* vile conduct.  Yet, Fox News lost neither viewers nor revenues when its "face" – Roger Ailes–and its number one commentator–Bill O'Reilly–were (along with another Fox News host, Eric Boling, and employees Bill Shine, Charles Payne, and Jesse Waters) credibly accused of sexual harassment in the workplace during one nine-month period.  http://www.newsweek.com/new-allegations-emerge-heres-rundown-fox-news-sex-and-harassment-scandals-646950 (last visited Dec. 19, 2017).

Fox News terminated these individuals (as was Mark Hazelwood when these tapes were shown to Jimmy Haslam, *see* Ex. 4 to Govt. Mot. (D.E. 363-5), but the Fox News company continued apace.  Although its revenues have dipped somewhat in 2017, that is largely attributable to other factors, and Fox is still the single most watched cable news channel and "commands the highest per unit cost" for advertisers.  https://www.salon.com/2017/ 10/27/fox-news-ad-revenue/ (last visited Dec. 19, 2017).

**III.    Even if this evidence had relevance, its admission would be unfairly prejudicial to a trial on the merits of whether Mr. Hazelwood committed mail/wire fraud.**

Federal Rule of Evidence 403 excludes evidence that is calculated to create unfair prejudice against a criminal defendant.   Rule 403 reads:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Rule 403 is "interpreted and applied in conjunction with the overall purposes of the Federal Rules of Evidence in Rule 102," to administer every trial "fairly, eliminate unjustifiable expense and delay, and promote the development of evidence law, to the end of ascertaining the truth and securing a just determination." *See Dennis*, 625 F.2d at 795-96.   The rule "contemplates a flexible scheme of discretionary judgments by trial courts designed to minimize the evidentiary costs of protecting parties from undue prejudice."   *Id*.   That is, the trial judge is obligated to maximize probative value evidence and minimize the

"'Unfair prejudice' means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Old Chief v. United States*, 519 U.S. 172, 180 (1997) (quoting FED. R. EVID. 403, advisory committee note).   For example, evidence that "unduly inflames the passions of the jury" and causes them to ignore the evidence should be excluded under Rule 403.   *United States v. Thomas*, 49 F.3d 253, 258-59 (6th Cir. 1995) (trial judge erred in admitting evidence of drug defendant's possession of a shotgun because it was inflammatory, not "neutral," evidence; harmless because government presented "overwhelming evidence" of guilt); *United States v. Clay*,  No. 95-6310, 173 F.3d 430, *2 (6th Cir. Dec. 23, 1999) (evidence of guns and marijuana growing materials taken from defendant's trailer offered to "inflame the jury" and were unfairly prejudicial under Rule 403, but harmless because of overwhelming evidence of guilt).

The evidence offered by the Government in this case is hair-raising and calculated to inflame the passions of the jury against Mr. Hazelwood. As this Court admitted:

> The Court notes that the jury is composed of 15 members. Only one of the members is African-American. One would expect that that one juror would be the most affected and offended by the evidence; although, in today's age, the Court would expect that the great majority of the jurors would be offended by it.

Nov. 30, 2017 Tr. at 190:12-17.

The Sixth Circuit used similar reasoning to exclude comparable evidence in *United States v. Ebens*. 800 F.2d 1422, 1433-34 (6th Cir. 1986), *abrogated on other grounds by Huddleston v. United States*, 485 U.S. 681 (1988). In that case, the Sixth Circuit reversed the verdict, finding the trial court had erred by admitting testimony concerning racial slurs allegedly cast at a government witness by the defendant in a prosecution for interference with civil rights. *Ebens*, 800 F.2d at 1432-34, 1442. The appellate court held the evidence should have been excluded because:

> It does not take much imagination to understand how such grossly biased comments would be viewed by the jury. We need not know the racial composition of the jury, for nearly all citizens find themselves repelled by such blatantly racist remarks and resentful of the person than have enlightened it concerning any real predisposition or specific intent on the part of the defendant.

*Id*. at 1434.

Admission of the tape recordings here would require all four of the defendants to offer more essentially irrelevant evidence to meet, explain, and rebut the significance of the statements on the tapes. Yet another reason Rule 403 requires exclusion of this prejudicial evidence. *See Smithfield Foods v. United Food & Commercial Workers Intern. Union*, 2008 WL 4610305 (E.D. Va. Oct. 14, 2008) (unpublished); *United States v. Garden Homes Mgmt., Corp.*, 2001 U.S. Dist. LEXIS 16585, at *24 (D. N.J. May 18, 2001) (unpublished) (evidence excludable under Rule 403 when it would "create a series of mini-trials").

The most unfairly prejudicial and dangerous evidence in a trial is that of racial bias and prejudice. In *United States v. Doe*, 903 F.2d 16 (D.C. Cir. 1990), the circuit court held that it was reversible error, under Rule 403, to admit expert testimony from a police detective that "Jamaicans" had taken over local drug market. Any probative value of that evidence on the modus operandi of drug dealers was substantially outweighed by the risk of racial bias in a drug prosecution involving the defendants, two of whom were of Jamaican descent. *Id*. at 24-25. A limiting instruction was not sufficient to protect the defendants from unfair prejudice and an appeal to juror bias. The circuit court noted that the Supreme Court has held that racial bias in any form is pernicious, especially when offered against a criminal defendant:

> "Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice." And, the Court tells us, because of the risk that the factor of race may enter the criminal justice process, we have engaged in "unceasing efforts" to eradicate racial prejudice from our criminal justice system. Our efforts have been guided by our recognition that "the inestimable privilege, of trial by jury ... is a vital principle underlying the whole administration of criminal justice...." Thus, it is the jury that is a criminal defendant's fundamental "protection of life and liberty against race or color prejudice."

> It is much too late in the day to treat lightly the risk that racial bias may influence a jury's verdict in a criminal case. We refuse to quibble, as does the Government, over whether the remarks about Jamaicans during [detective's] testimony referred strictly to race, for it simply does not matter. In legal theory, distinctions based upon ancestry are as "odious" and "suspect" as those predicated on race; in practical terms, appeals to either threaten the fairness of a trial.

*Id*. (quoting, *inter alia, Rose v. Mitchell*, 443 U.S. 545, 555 (1979); *Batson v. Kentucky*, 476 U.S. 79, 85 (1986); *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 123 (1866); *McCleskey v. Kemp*, 481 U.S. 279, 309 (1987)).

The *Doe* court noted the obvious when it stated that "[a]ppeals to racial passion can distort the search from truth and drastically affect a juror's impartiality. *Id.* at 25; *see also United States v. Cabrera*, 222 F.3d 590, 594 (9th Cir. 2000) (appeals to racial, ethnic, or religious prejudice during the course of a trial violate a defendant's Fifth Amendment right to a fair trial; "[i]t is

evident under clearly established federal law that this very kind of conduct by a prosecutor (to the extent that it involves either race or ethnicity) violates a criminal defendant's due process and equal protection rights.").

Proof of the extremely inflammatory nature of Mr. Hazelwood's utterances emerged immediately after the Court's ruling. Newspaper articles quoted this Court's descriptions of the evidence. *See* Exhibit A, December 8, 2017 news article from Cleveland.com. In response, Knoxville readers referred to Mr. Hazelwood as "truly horrible", and a "POS." Cleveland commentators offered to "snap his neck" or, if Mr. Hazelwood had security, kill him with a "rifle good for 500 yards." *See* Exhibit B, Dec. 8, 2017 iPhone screenshots of Knoxville News Sentinel Twitter site and Cleveland.com comment site. Neither the Court nor the Government can offer proof that jurors will not react the same way.

Admitting these racially charged tapes in this conspiracy to commit mail/wire fraud trial will effectively end the defendants' Constitutional right to a fair trial. The situation here is much more racially inflammatory than that considered in *Doe*, in which jury instructions were held insufficient to protect the defendants' rights to a fair trial. 903 F.2d at 25. The present jury cannot be expected to give these four defendants a fair trial once it hears the totally irrelevant racial evidence regardless of how strong a limiting instruction might be.

## IV. Conclusion.

No matter how thin one slices it, the Government's basis for the tapes' admission is the same: Mr. Hazelwood cannot have good business judgment because he's really a racist or a sexist. He has a bad character, he's a bad person, and he must, therefore, be guilty of whatever he's charged with. We must be better than this. We should continue to reject that argument under

Rules 401, 402, 403, 404, and 405. Even before those rules were promulgated, Justice Jackson explained why we do not allow such evidence.

> The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.

*Michelson v. United States*, 335 U.S. 469, 476 (1948). If we do not continue to adhere to these rules and Justice Jackson's wisdom, we are not the much-vaunted American criminal justice system that we once were.

Mr. Hazelwood respectfully requests this Court to reconsider its earlier oral ruling and exclude Government's Exhibits 529, 530 and 531, and any mention of their contents.

Respectfully submitted,

**RUSTY HARDIN & ASSOCIATES LLP**

By: */s/ Russell Hardin, Jr.*
    Russell Hardin, Jr. (*Pro Hac Vice*)
    Anthony D. Drumheller (*Pro Hac Vice*)
    Jennifer E. Brevorka (*Pro Hac Vice*)
5 Houston Center
1401 McKinney Street Suite 2250
Houston, Texas 77010
Telephone: (713) 652-9000
Facsimile: (713) 652-9800
rhardin@rustyhardin.com
adrumheller@rustyhardin.com
jbrevorka@rustyhardin.com

***Attorneys for Defendant Mark Hazelwood***

## CERTIFICATE OF SERVICE

I hereby certify that on December 29, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered parties.

*/s/ Anthony D. Drumheller*
Anthony D. Drumheller

# EXHIBIT A

# Judge: Ex-president of Pilot Flying J recorded making 'vile' racial remarks about Cleveland, NFL team

**Jamie Satterfield**, USA TODAY NETWORK - Tennessee    Published 8:05 p m ET Dec  7, 2017 | Updated 9:18 a.m. ET Dec. 10, 2017



*(Photo: Michael Patrick / News Sentinel)*

CHATTANOOGA, Tenn. - The former president of the nation's largest diesel fuel retailer was captured on secret recordings making what a judge on Thursday described as "vile, despicable, inflammatory racial epithets" that disparaged "the entire population of Cleveland, Ohio," Oakland, Calif., and the football team his then-boss owns.

Not only did U.S. District Judge Curtis Collier, who is black, reveal for the first time Thursday what had been kept under seal about former Pilot Flying J President Mark Hazelwood, but he also announced that he would let jurors in the ongoing fraud conspiracy case against Hazelwood and three other ex-employees hear the recordings.

**Sign Up:**  Get breaking news headlines in your email. (https://profile.knoxnews.com/newsletters/manage/)

That bombshell came late afternoon and spurred a flurry of reaction from both prosecutors and defense attorneys in the case, including questions about whether Hazelwood's co-defendants in the trial should be forced to continue to stand trial alongside him. Because of that, Collier is keeping all documents related to those secret recordings under seal – for now - and delayed an airing of them in court until the trial resumes in January.

## 'Beyond the pale'

But Collier gave a broad description of what those recordings detailed. The recordings were made by former Pilot Flying J salesman Vincent Greco, who had turned FBI mole. Collier indicated Hazelwood's remarks were made in the presence of a team of Pilot Flying J sales executives who have since confessed defrauding trucking companies of promised discounts on diesel fuel.

"Mr. Hazelwood's utterances are beyond the pale," Collier said. "Several subordinates of Mr. Hazelwood were present. Mr. Hazelwood was in a position of authority over them."

**Buy Photo**



Fuel truck driver Dusty Fisher makes a delivery Thursday, Feb. 23, 2012 at the Strawberry Plains Pilot Travel Center. Pilot Flying J announced Nov. 22 that it will acquire Utah-based Western Petroleum LLC, a major fuel supplier to the oil drilling and hydraulic fracking industry. *(Photo: News Sentinel)*

Pilot Flying J issued a statement Thursday evening on the recordings.

"The tapes described in court today, recorded over five years ago and involving former sales representatives of Pilot Flying J, are saddening and troubling," the statement read. "This kind of behavior is not acceptable, tolerated or reflective of the values of the company. No current team member of Pilot Flying J was present or participated in these conversations."

Collier said Hazelwood and various sales executives made racially offensive and disparaging comments about "the entire population of Cleveland, Ohio," as well as the Cleveland Browns and the city of Oakland, Calif. He did not elaborate on the specifics.

## 'Vile, despicable, inflammatory'

Pilot Flying J Chief Executive Officer Jimmy Haslam owns the Cleveland Browns. Haslam is not charged in the fraud conspiracy and has denied knowledge of it.

**Buy Photo**



Pilot Travel Centers CEO Jimmy Haslam stands in front of a map showing where each of the company's travel centers are located on Oct. 16, 2006. Pilot is planning an expansion into international markets with its first travel center near Ontario, Canada. *(Photo: News Sentinel)*

The judge said that if the recordings or the contents of those recordings had been made public while Hazelwood was still president of Pilot Flying J, black employees who had been fired "might have determined their terminations" were because of their race and sued, and customers would have been outraged.

## Join now for as low as

# $9.99/YR

Subscribe Now (http://offers.knoxnews.com/specialoffer?gps-source=BEAZdec&utm_medium=agilityzone&utm_source=bounce-exchange&utm_campaign=UWEB2017)

"If it became known the president of Pilot engaged in vile, despicable, inflammatory racial epithets against African Americans, this could lead to boycotts and protests," Collier said.

Collier said Hazelwood and his subordinates also disparaged women in the secret recordings. It is not yet clear exactly when the recordings were made or in what setting.

## Battle in secret - until now

But the recordings, Collier said, are relevant to the trial because Hazelwood's defense team has sought to portray Hazelwood as too savvy a businessman to risk "taking down" Pilot Flying J by condoning or participating in a fraud scheme.

Prosecutors Trey Hamilton and David Lewen have been seeking to play those recordings for weeks now, but all documents about that had been sealed and hearings held in chambers, so it was not clear until Thursday exactly what the prosecutors wanted jurors to hear about Hazelwood.

According to Collier, Hamilton again pressed to play the recordings this week as defense attorney Rusty Hardin, who represents Hazelwood, used his cross-examination of former Pilot Flying J director of national accounts Brian Mosher to try to paint Mosher and other sales executives who have pleaded guilty in the case as a band of renegades who engaged in fraud without Hazelwood's knowledge or blessing.



**Rusty Hardin in 2015 (photo by John Everett)** *(Photo: John Everett, John Everett)*

Collier had refused Hamilton's earlier bid to play the recordings – without any public airing of why he refused or what the recordings contained. It's not clear what changed his mind, but he said in a ruling from the bench that he now believes jurors should hear them.

He explained that Hardin has repeatedly asserted through his questioning of witnesses that Hazelwood was too skilled a businessman to ever engage in conduct that would harm Pilot Flying J's reputation or business, and that prosecutors have a right to try to contradict that notion with the secret recordings.

## Legal disarray

Defense attorney Ben Vernia, who represents regional account representative Heather Jones, told Collier he wanted time to research the law to determine if she and another account representative on trial in the case – Karen Mann – should be tried separately so as not to be painted with the same brush as Hazelwood.

Jones and Mann served as support staff for sales executives and contend they didn't intend to defraud trucking companies and instead were simply acting on the orders of their bosses.

Also on trial is former vice president Scott "Scooter" Wombold. His defense team did not address in court Thursday whether they, too, would seek a separate trial. It wasn't immediately clear if Wombold is also captured on those secret recordings.



**Scott Wombold, right, former vice president of direct sales at Pilot Flying J, leaves court Tuesday, Feb. 9, 2016.** *(Photo: Michael Patrick/USA Today Network - Tennessee)*

Hamilton told Collier that his supervisors want him and Lewen to also consider the legality and legal prudence of separating the trials of Mann and Jones from Hazelwood and Wombold. Because of that, he, too, sought a delay in playing the recordings for jurors and asked to keep all documents about the recordings under seal until that issue is addressed.

Collier had already decided to recess the trial until Jan. 10. He told jurors at day's end Thursday only that it was particularly important that they continue to avoid any media coverage or community talk about the case. He made no mention to them of the recordings.

Hazelwood and the three other defendants are accused in a $92 million fraud scheme in which trucking companies were lured to switch their business to Pilot Flying J with promises of big discounts that sales executives never intended to pay. Mosher and 13 other former staffers have pleaded guilty, and two more, including Greco, were granted immunity.

## Related:

Defense goes on offense against key witness in Pilot Flying J fraud trial (/story/news/crime/2017/12/06/defense-goes-offense-against-key-witness-pilot-flying-j-fraud-trial/918201001/)

Fraud scheme fueled by fight for gallons, former Pilot Flying J executives testify (/story/money/business/2017/12/03/fraud-scheme-fueled-fight-gallons-former-pilot-flying-j-executives-testify/913591001/)

The professional driver is the lifeblood of Pilot Flying J,' ex-president says in video (/story/news/crime/2017/11/30/pilot-flying-j-trial-mark-hazelwood/896602001/)

New Year Sale $9⁹⁹ / YR.

SUBSCRIBE
(HTTP://OFFERS.KNOXNEWS.COM/SPECIALOFFER?
SOURCE=BENBDE&UTM_MEDIUM=NANOBAR&UTM_SOURCE=BOUNCE-
EXCHANGE&UTM_CAMPAIGN=NEWYEAR)

Defense to key witness in Pilot Flying J fraud trial: Isn't cheating 'dumb' business move? (/story/news/crime/2017/11/30/pilot-flying-j-fraud-trial-tennessee/896613001/)

I said, Jimmy, we've been caught,' former Pilot Flying J sales executive testifies (/story/news/crime/2017/11/28/jurors-get-earful-sports-analogies-pilot-flying-j-fraud-trial/896598001/)

Former Pilot Flying J trainee told to 'get your mind comfortable' with fraud (/story/news/crime/2017/11/27/former-pilot-flying-j-trainee-told-get-your-mind-fraud/892780001/)

Former Pilot Flying J sales executive: 'I cheated customers and I did it well' (/story/news/crime/2017/11/27/tennessee-pilot-flying-j-fraud-trial/896594001/)

Former Pilot Flying J staffer implicates ex-president Mark Hazelwood in fraud scheme (/story/news/crime/2017/11/21/we-were-inside-girls-former-pilot-flying-j-staffer-testifies-fraud-trial/878979001/)

Former Pilot Flying J staffer who struck plea deal resists labeling deceit, fraud a crime (/story/news/crime/2017/11/20/former-pilot-flying-j-staffer-who-struck-plea-deal-resists-labeling-deceit-fraud-crime/878967001/)

Defense lawyer uses email to point to Jimmy Haslam in Pilot Flying J trial (/story/news/crime/2017/11/13/jimmy-haslam-pilot-flying-j-trial-tennessee/860388001/)

Former Pilot Flying J executive ruled out defrauding U.S. Postal Service as too risky (/story/news/crime/2017/11/19/former-pilot-flying-j-executive-ruled-out-defrauding-u-s-postal-service-too-risky/871458001/)

Tape of subordinate accusing Haslam, Hazelwood played in Pilot Flying J trial (/story/news/crime/2017/11/14/pilot-flying-j-tennessee-fraud-trial-fuel-rebates/857963001/)

Pilot Flying J ex-president 'earned' big bucks, didn't steal them, defense says (/story/news/crime/2017/11/07/five-things-know-defense-former-pilot-flying-j-employees-fraud-trial/834787001/)

Defense attacks images of star witnesses in Pilot Flying J fraud trial (/story/news/crime/2017/11/12/defense-attacks-images-star-witnesses-pilot-flying-j-fraud-trial/852215001/)

Read or Share this story: http://knoxne.ws/2AmNo1b

# EXHIBIT B



 **Steven C Palmer**
I also make vile despicable jokes about Cleveland and mostly about the Browns, and I live here.

1h   Like   Reply         5

 **John Allen**
I'm 60 a life long Clevelander he may be right lol 😀

31m   Like   Reply         2

 **Linda Stralka**
Who cares?  1

34m   Like   Reply

 **Rick Dennison**
Let's bring him up here and drop him in the projects like they did bruce Willis

1h   Like   Reply

 **Mick Gase**
Has no one seen the **Mistakes on the Lake** FB page.....

   
    



cleveland.com's Post



**17 shares**

**Frank Ciszewski**
As a white boy with loyalty to my city, those words offend me... just give me 5 minutes alone, and I'll snap the sumbitch's neck! Just one quick upper twist of the head...end of story!

11h    Like    Reply                     4

 **Willie K. Stewart**
Do it! I didn't see a thing!

3h    Like    Reply             1

 **Danny Thompson**
That dude got more security than the POTUS, you'd never get with in 500 feet of him.

2h    Like    Reply

 **Frank Ciszewski**
Good thing I got a rifle good for 500 yards.

1

   Write a comment...                

                

　
 **Gregg Richard**
Danny Thompson I wouldn't mind that. I live in Cleveland (and love it) and I hate Ohio. It would be a healthy separation

1h   Like   Reply

 Write a reply...

 **Aj Peoples**
It's easy to talk like this down in hee haw deliverance country. But, I bet he'd think twice about coming up here and talking like that. Also, William Tecumseh Sherman sends his regards.

2h   Like   Reply

 **Jeremy Gallatori**
Get out there and kneel and hold hands with your Black players for the cameras Jimmy.... More contrived virtue signalling BS at the expense if our Police and Military

Write a comment...   

[ Log in ]    [ Sign up ]

8:16 PM · Dec 7, 2017

**46** Retweets    **28** Likes

💬    ⟲    ♡    ✉

**Gloria Johnson** @VoteGloriaJ · 14h    ⌄
Replying to @jamiescoop and @knoxnews
Truly horrible people.

💬    ⟲    ♡ 1    ✉

**Jill Cusack** @bacjkc04 · 15h    ⌄
Replying to @jamiescoop and @knoxnews
So he's a bigger POS than we already thought?

💬    ⟲    ♡ 3    ✉

**Dan Kellackey** @deeredank · 14h    ⌄
Replying to @jamiescoop and 2 others
Make the choice, #nopilotJ

💬    ⟲    ♡ 1    ✉