# IN THE UNITED STATES DISTRICT COURT
## THE EASTERN DISTRICT OF TENNESSEE
## AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:16-CR-020 |
| | ) | (Judges Collier/Guyton) |
| MARK HAZELWOOD, | ) | |
| SCOTT WOMBOLD, | ) | |
| HEATHER JONES, and | ) | |
| KAREN MANN, | ) | |
| | ) | |
| Defendants. | ) | |

---

## NOTICE OF DEFENDANTS HEATHER JONES' AND KAREN MANN'S OPPOSITION TO THE RELEASE OF SPECIFIC GOVERNMENT AUDIO RECORDINGS TO THE MEDIA BEFORE THE CONCLUSION OF TRIAL

---

For the following reasons, Defendants Heather Jones and Karen Mann hereby provide notice to the Court and parties that they object to the release of Government Exhibits 529, 530, and 531, audio recordings which this Court has described as containing "vile, despicable, [and] inflammatory" racist language, to the media. Ms. Jones and Ms. Mann also object to the release of the accompanying transcripts 529-A, 530-A, and 531-A.

### BACKGROUND

On November 17, 2017, counsel for the Defendants and the United States received, via e-mail, notice from the Court that, "The Clerk of Court has received a request from WATE in Knoxville for a copy of the recordings that have been played in court to date." The Court requested that the parties confer and advise the Court of their respective or joint positions on the media request.

On November 22, 2017, after having conferred with counsel for the Defendants, counsel for the United States responded to the Court that, "no party to this trial proceeding objects to the provision to the requesting media outlet of a copy of the audio recordings that have been admitted as trial exhibits and played in court during trial to date."

Ms. Jones and Ms. Mann understand that, to date, the Court has released to the media the following recordings played in court: Government Exhibits 514, 517, 518, 519, 521, 522, 523, and 524.

On December 7, 2017, the Court, upon motion by the United States, and following an *in camera* hearing, agreed, over objection by counsel for all four Defendants, to the admission of three audio recordings[1] purporting to contain conversations between Defendant Mark Hazelwood and other former Pilot employees, which included what the Court described as "vile, despicable, inflammatory, and offensive racial epithets against African-Americans . . . ." Bench Opinion [Doc. 374] at 189: 11-13.

Subsequent to this Court's admitting these recordings over Defendants' objections, Defendants filed sealed motions [Sealed Docs. 400 and 411] for the Court to reconsider its ruling.

On January 8, 2018, the Court denied Defendants' motions to reconsider its ruling and the United States entered the three exhibits into evidence in open court through two law enforcement agents. Subsequently, members of the press have specifically requested this Court release copies of these recordings and their transcripts to them.

## ARGUMENT

A Court faced with the admission of inflammatory, confidential, or otherwise sensitive recordings at trial has four options. Listed from most to least extreme, they are:

1. Close the entire trial to the public;

---

[1] Government Exhibits 529, 530, and 531.

2. Close the portions of the trial where the sensitive information will be discussed;

3. Seal the record of those recordings so as to prevent copying and dissemination; and

4. Seal the record of those recordings until the jury has reached its verdict so as to prevent copying and dissemination prior to the end of trial.

Here, the Court is being asked to consider only the fourth, and least extreme, of these alternatives. Specifically, the Court is being asked to refrain from releasing to the media until after trial the three highly inflammatory tape recordings that have been admitted into evidence into open court and their corresponding transcripts. Ms. Jones and Ms. Mann request additionally that decline from releasing transcripts of these recordings to the press, transcripts that are not exhibits and which may not be used by the jury during their deliberations. As things currently stand, whether these recordings and transcripts will be released to the press is before this court pending arguments by legal counsel representing various media organizations.

To be clear, the parties have no objection to the playing of these tapes in open court, nor to accurate and timely reporting of the contents of those tapes by the press. Instead, the concern here is a narrow one: namely, the press be prevented from broadcasting copies of these tape recordings on-air and on-line, thereby inflaming public sentiment against the defendants and endangering the fairness of the trial process.

The law clearly places the decision of whether to permit copying and distributing of these recordings squarely within the discretion of the trial court. On the one hand, the First Amendment guarantees the media's right to attend criminal trials. *See, e.g.*, *Globe Newspaper Co. v. Super. Ct.*, 457 U.S. 596 (1982); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980). But, of critical importance to the request being made in this case, the First Amendment provides the press with no right to access tape-recordings admitted into evidence. *See, e.g.*, *Nixon v. Warner Comms., Inc.*, 435 U.S. 589 (1978). Nor does the refusal to distribute to the press audio recordings admitted into evidence

infringe on anyone's right to a public trial. *Id.* On the contrary, while the media does have a right to copy tapes admitted into evidence, that right "come[s] from a source other than the Constitution"—specifically, the common law. *United States v. Beckham*, 789 F.2d 401, 409 (6th Cir. 1986).

And, unsurprisingly, this common law right is subject to much less deference than the press's rights under the First Amendment. As the Supreme Court has explained, "the right to inspect and copy judicial records is not absolute." *Nixon*, 435 U.S. at 598. Accordingly, "[e]very court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes." *Id.*

Applying these principles, courts throughout the country have repeatedly refused to permit the media to broadcast copies of tapes played in open court. In *United States v. Beckham*, for example, the Sixth Circuit affirmed a district court order denying media requests to copy tape recordings played at trial because publication of those recordings was likely to inflame the passions of the community, thereby affecting the impaneled jurors and destroying the "orderly, fair administration of criminal justice." 789 F.2d at 415. In making this decision, the Sixth Circuit expressly rejected the media's argument that "only the most extraordinary reasons justify a restriction on the common-law right." *Id.* at 414. Instead, district courts are to be giving "far more discretion in balancing the factors" where, as here, the public and press had an opportunity to hear the tapes in question and inspect the documentary exhibits. *Id.* at 415. Given the risk that the empaneled jury would be tainted, balanced against the fact that these recordings added almost nothing to public knowledge of the case, the Sixth Circuit held that the district court properly prevented copying of those recordings during trial. *Id.*

The Northern District of Ohio was recently faced with a similar dilemma in *United States v. Dimora*, 862 F. Supp. 2d 697 (N.D. Ohio 2012). In that case, a former county commissioner was charged with public corruption. Among other exhibits presented at trial were various recordings

and transcripts obtained by government wire-taps. *Id.* at 713. In addressing the defendant's motion to prevent copying of those recordings by the media, the district court gave special attention to the possibility that a re-trial may occur. *Id.* at 706-07 ("Release of certain exhibits might prejudice Dimora's rights in the event of a retiral."). Many of these conversations "contain[ed] vulgar language and deal with inappropriate, sometimes disturbing, topics." *Id.* at 713. As the court explained, the very things that makes recordings effective as evidence—namely, things such "as the tone of voice, cadence, and other 'live' effects" that make "the contents of the recording particularly inflammatory or memorable"—also increase the likelihood that the recordings will "taint the jury pool and create due process concerns." *Id.* at 714. Given the content of these tapes, the court found that "[t]here is a very real concern that repeated airings of these recordings on television, on the radio, or on the internet will contaminate future jury pools and hinder the Court's efforts to ensure that parties to future prosecutions [several of which were pending, in addition to the possible retrial] receive fair trials." *Id.*

Similarly, in *Low v. Trump University, LLC*, the Southern District of California denied the media's request to be permitted to make copies of videotaped depositions to be used as evidence at trial. 2016 WL 4098195 (S.D. Cal. Aug. 2, 2016). The Court there gave special attention to the fact that audio or video is "subject to a higher degree of potential abuse than written transcripts." *Id.* The medium itself justified a finding of particularized harm from its disclosure, which outweighed the public's common law right to know. *Id.* This was true even though the case involved an incredibly public figure—Donald Trump, then the Republican candidate for president. *Id.*

In sum, then, the press's right to sensationalize recorded evidence at trial is far from unfettered, and certainly not constitutional. Because that evidence has been played in open court and can be reported by any press in the audience, release of the tapes themselves adds little to public

understanding of the case. On the other hand, the malleable nature of this evidence, which can be spliced and edited, poses a great threat for abuse. Moreover, the fact that the press distributes these tapes so eagerly is a testament to their ability to affect the opinions of listeners. The effectiveness of recordings on public opinion poses a grave threat to the impartiality of a jury or jury pool. Accordingly, courts are well within their rights to find, on the right facts, that the media will not be permitted to make copies of recordings presented in evidence at trial.

Here Ms. Jones' and Ms. Mann's concerns regarding the release of these recordings to the media while this trial is ongoing are therefore two-fold.

First is the concern for the effect that the release of these audio recordings to the media could have on the jury. This Court has repeatedly and firmly admonished this jury against watching, listening to, reading, or otherwise engaging in any news coverage of this trial. It is clear, however, that the incendiary nature of this evidence already has and will continue to draw increased media coverage and scrutiny.[2]

Even several weeks after this Court's ruling, media anticipation of these recordings continues. In a news article published on January 7, 2018, three days before this trial is scheduled to resume, Cleveland.com reminded its readers that, "[w]hen the fraud trial of four former Pilot Flying J employees resumes this week in Chattanooga, Tennessee, prosecutors are expected to play audiotapes of a senior executive using racially offensive language that blasts the city of Cleveland and the Cleveland Browns."[3] Additionally, on January 9, 2018, the Knoxville News-Sentinel

---

[2] For a brief discussion of the media coverage in the wake of this Court's ruling, see Defendant Mark Hazelwood's Motion to Reconsider Admission of Government Exhibits 529, 530, and 531. Sealed Doc. 411 at 13.

[3] http://www.cleveland.com/metro/index.ssf/2018/01/racist_offensive_tapes_aimed_a.html (last visited January 9, 2018).

published online an article titled "Defense in Pilot Flying J fraud trial: Judge, don't play those racist tapes" in anticipation of this evidence when trial reconvenes on January 10.[4]

In the few days since these recordings were admitted into evidence and played in open court, this story has stretched across the county. It has been covered in both the print and online versions of the Chattanooga Free Times Press and the Knoxville News Sentinel.[5] Other print/online media outlets that have covered the story include Cleveland's The Plain Dealer, The Memphis Daily News, and Business Insider. The story's spread across social media is significantly greater. A brief search of Twitter for "Pilot Flying J" turns up literally hundreds of retweeting links to various articles. Former professional quarterback Colin Kaepernick who has over a million and a half followers on Twitter has posted a link to the Knoxville News Sentinel's coverage. And Twitter user @ShaunKing who has over 900,000 followers not only posted links to coverage of the stories, but has included pictures of Ms. Jones and Ms. Mann wrongly asserting their involvement in this conduct. *See* Exhibit B, December 11, 2018 screenshot of @Shaunking's Twitter page.

Even the most conscientious jurors on this panel no doubt have friends and family members who by this point are aware of the trial on which they are serving. The inflammatory and divisive nature of these recordings may cause jurors' friends and family members to attempt to discuss the nature of these recording with them or even attempt to influence their thoughts and perceptions of this trial. As this Court has made clear, conduct like that contained in these recordings can lead to

---

[4] http://www.knoxnews.com/story/news/crime/2018/01/09/pilot-flying-j-fraud-trial-judge-dont-play-those-racist-tapes/1011870001/ (last visited January 9, 2018).
[5] http://www.timesfreepress.com/news/breakingnews/story/2018/jan/11/recording-racial-epithet-played-pilot-flying-j-trial/461052/ (last visited Jan. 11, 2018);
https://www.knoxnews.com/story/news/crime/2018/01/10/pilot-flying-j-ex-president-heard-secret-recordings-using-racial-epithets/1022474001/ (last visited Jan. 11, 2018); Jamie Satterfied, *Pilot Flying J Trial: Recordings of ex-president using epithets played*, Chattanooga Free Times Press (Jan. 11, 2018), attached as Exhibit A.

boycotts and protests. Surely it is conceivable that people who know these jurors might be so angered by hearing the recordings that they would seek to talk to and potentially influence them.

Second is the concern for the undue effect the playing of these recordings on local and likely national television and radio might have on Ms. Jones' and Ms. Mann's reputations. As the Court is aware, neither Ms. Jones nor Ms. Mann were present when these recordings were made. Nor is there evidence or even the suggestion that they were ever present for such conduct. Due to the admonition[6] against media contact this Court gave the parties at the final pretrial conference on October 16, 2017, counsel for Ms. Jones and Ms. Mann would be unable to refute any erroneous or unfairly vague reporting that might connect her to this highly objectionable conduct. Critically, such false connections have already begun. *See* Exhibit B.

Now that the United States has permitted to play these recordings in open court, there is, of course, no stopping the press from reporting on their contents. Members of the press were, in fact, present in the courtroom when the recordings were admitted into evidence and played over the Court's loudspeakers. Ms. Jones' and Ms. Mann's legitimate concerns arise from the significant difference between reading about what was said and actually hearing the recordings. Allowing these recordings to be played across the airwaves during trial will only be adding oxygen to the fire these facts will surely ignite. By not releasing these recordings to the media, this Court will neither deny the press and the public access to this trial nor will it prevent the press from reporting the facts of this case. Rather, by refusing to release these highly inflammatory recordings to the media, the Court will hopefully reduce the risks that members of this jury will be influenced by extrajudicial information and that Ms. Jones and Ms. Mann will be further unfairly tarnished by conduct to which they have no connection.

---

[6] *See* Local Rule 83.2(c).

## CONCLUSION

For the foregoing reasons, Ms. Jones and Ms. Mann respectfully object to release of the

recordings contained in Government Exhibits 529, 530, and 531 and their associated transcripts

until after the conclusion of this trial.

Respectfully submitted on January 11, 2018,

By:   /s/  *Cullen M. Wojcik*

THE VERNIA LAW FIRM
Ben Vernia (Pro Hac Vice)
Andrew K. Murray (TN BPR #035423)
1455 Pennsylvania Avenue, N.W., Suite 400
Washington, D.C. 20004
Telephone: (202) 349-4053
Facsimile: (866) 572-6728
bvernia@vernialaw.com

LAW OFFICE OF CULLEN M. WOJCIK
Cullen M. Wojcik (TN BPR #030564)
422 South Gay Street #302
Knoxville, Tennessee 37902
Telephone: (865) 255-6818
Facsimile: (865) 522-9945
wojciklaw@gmail.com

**Attorneys for Defendant Heather Jones**

/s/ *Jonathan D. Cooper* [by permission]
WHITT, COOPER, TRANT & HEDRICK
Jonathan D. Cooper (TN BPR #016041)
607 Market Street, Suite 1100
Knoxville, TN 37902
(865) 524-8106 – Telephone
(865) 546-6637 -- facsimile
cooper@knoxdefense.com

Case 3:16-cr-00020-CLC-HBG   Document 428   Filed 01/11/18   Page 9 of 15   PageID #: 10654

Sara E. Compher-Rice
OBERMAN & RICE
550 West Main Avenue
Suite 730
Knoxville, TN 37902-2567
sara@tndui.com

***Attorneys for Defendant Karen Mann***

**CERTIFICATE OF SERVICE**

Undersigned counsel hereby certifies that on January 11, 2018, the foregoing was filed electronically.  Notice of this filing was sent by operation of the court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

By:  _/s/  Cullen M. Wojcik_____
Cullen M. Wojcik

# EXHIBIT A

# Recordings of ex-president using epithets played

BY JAMIE SATTERFIELD
USA TODAY NETWORK - TENNESSEE

The then-president of truck stop giant Pilot Flying J made derogatory comments about his boss' NFL football team and its fans and used racial epithets, including requesting his subordinates play a racist country song, during a meeting of executives, testimony showed Wednesday.

"Where's our greasy [racial epithet] song?" former Pilot Flying J President Mark Hazelwood said as he and former Pilot Flying J sales executives were gathered for a meeting in October 2012.

A song by country artist David Allan Coe with a two-word title consisting of a racial epithet and a profanity that describes a white man being upset

See TRIAL › B5



CONTACT

Alex Chambliss
ASSISTANT NEWS EDITOR
Phone 423-757-6306
Email newstips@timesfreepress.com
Delivery Hours 423-757-6262

TIMESFREEPRESS.COM/LOCAL
THURSDAY, JANUARY 11, 2018

REGION

# Trial

› CONTINUED FROM B1

his girlfriend had dumped him for a black man could then be heard, with Hazelwood and his subordinates singing along.

## 'IT'S ENOUGH TO MAKE A MAN THROW UP'

Assistant U.S. Attorney Trey Hamilton played for jurors in U.S. District Court in Chattanooga on Wednesday snippets from secret recordings made by former Pilot Flying J sales executive Vincent Greco, who was a secret mole for the FBI and IRS Criminal Investigation Division, that included the song and other racial and derogatory commentary by Hazelwood and other executives gathered at a lake house in Rockwood in October 2012 for a meeting.

Hamilton highlighted for jurors a lyric from the Coe song that reads, "It's enough to make a man throw up. Sure is hard to figure how any decent girl could ever [expletive] a greasy [racial epithet]."

Hazelwood, former Pilot Flying J vice president Scott "Scooter" Wombold and former account representatives Heather Jones and Karen Mann have been standing trial since November on wire and mail fraud conspiracy charges in connection with a five-year scheme to rip off small trucking companies by promising them big discounts on diesel fuel in return for loyalty to the truck stop giant but paying them far less.

Fourteen former Pilot Flying J executives and account representatives have pleaded guilty. Two others, including Greco, were granted immunity. Pilot Flying J's board of directors has admitted criminal responsibility. Chief Executive Officer Jimmy Haslam, who owns the Cleveland Browns, is not charged and denies knowledge of the fraud scheme.

## MORE RECORDINGS REMAIN SEALED

The recordings played for jurors Wednesday did not represent the entirety of the secret audio that U.S. District Judge Curtis Collier has called "vile" and "despicable." Hamilton said the government opted to scale back just how much of the racist chatter to play for jurors.

But USA Today Network - Tennessee on Wednesday asked Collier to unseal transcripts of the entirety of the recordings Hamilton had indicated he wanted to play.

Collier set a hearing Friday on the news organization's request. He turned aside a request by USA Today Network - Tennessee for transcripts given to jurors of the snippets played in court, saying the transcripts were not entered into the record as evidence. The audio of the recordings played in court was inaudible to courtroom spectators at times, and it was not always clear who was speaking.

But Hamilton flashed onto a computer screen the portion of the transcript showing Hazelwood requesting the Coe song. That transcript showed Hazelwood's song request was greeted by former sales executive Arnie Ralenkotter with the words, "How's that sensitivity training coming?"

The recordings revealed racist and derogatory comments by Hazelwood and his subordinates about the Browns, the team's losing record and its fans. Hazelwood and his subordinates mocked the Browns' most avid fans, who call themselves "Dawgs" and sit in a section of the Browns' stadium known as the "Dawg Pound."

Hazelwood and his subordinates repeatedly used racial epithets and mocked the residents of Cleveland and the city of Oakland, Calif., which is home to the Oakland Raiders.

Hazelwood could also be heard criticizing Pilot's board of directors, naming two members in particular — FedEx CEO Fred Smith and former Walmart CEO Lee Scott. He called them a profane name in the recordings.

## 'DISTURBED AND APPALLED'

Pilot Flying J issued a statement Wednesday saying the firm was "very disturbed and appalled by the extremely offensive and deplorable comments recorded over five years ago involving a small group of [now] former sales employees. This kind of behavior is reprehensible, not tolerated, nor reflective of the guiding principles of Pilot Flying J ... No current team member of Pilot Flying J was present or participated in this incident."

Prosecutors Hamilton and David Lewen sought to play the recordings after Hazelwood's attorney, Rusty Hardin, began through his cross-examination of witnesses to advance a defense theory that Hazelwood was too savvy a busi-

# EXHIBIT B

