```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF TENNESSEE

 3                          AT KNOXVILLE
       ----------------------------------------------------------
 4                                   :
       UNITED STATES OF AMERICA      :
 5                                   :
               Plaintiff,            :
 6                                   :
       v.                            :          3:16-CR-20
 7                                   :
       MARK HAZELWOOD,               :
 8     SCOTT WOMBOLD,                :
       HEATHER JONES, and            :
 9     KAREN MANN,                   :
                                     :
10             Defendants.           :
       ----------------------------------------------------------
11                                   Chattanooga, Tennessee
                                     January 11, 2018
12

13          BEFORE:  THE HONORABLE CURTIS L. COLLIER
                     UNITED STATES DISTRICT JUDGE
14

15

16     APPEARANCES:

17                    FOR THE PLAINTIFF:

18                    F. M. HAMILTON, III
                      DAVID P. LEWEN, JR.
19                    Assistant United States Attorneys
                      U. S. Department of Justice
20                    Office of the United States Attorney
                      800 Market Street, Suite 211
21                    Knoxville, Tennessee  37902

22

23

24                         JURY TRIAL
                      FIFTEENTH DAY OF TRIAL
25
```

1    APPEARANCES:   (Continuing)

2

3                          FOR DEFENDANT MARK HAZELWOOD:

4                          RUSSELL HARDIN, JR.
                           ANTHONY DOUGLAS DRUMHELLER
5                          JENNIFER E. BREVORKA
                           Rusty Hardin & Associates LLP
6                          1401 McKinney Street, Suite 2250
                           Houston, Texas  77010

7

8

9                          FOR DEFENDANT SCOTT WOMBOLD:

10                         JOHN E. KELLY
                           ROBERT K. PLATT
11                         Bass, Berry & Sims PLC
                           1201 Pennsylvania Avenue NW
12                         Suite 300
                           Washington, D. C.  20004

13
                           ELI J. RICHARDSON
14                         DAVID RIVERA
                           Bass, Berry & Sims PLC
15                         The Pinnacle at Symphony Place
                           150 3rd Avenue South
16                         Suite 2800
                           Nashville, Tennessee  37201

17
                           ANNIE TAUER CHRISTOFF
18                         Bass, Berry & Sims PLC
                           100 Peabody Place
19                         Suite 1300
                           Memphis, Tennessee  38103

20

21

22

23

24

25

```
1   APPEARANCES:  (Continuing)

2

3                  FOR DEFENDANT HEATHER JONES:

4                  BENJAMIN J. VERNIA
                   ANDREW K. MURRAY
5                  The Vernia Law Firm
                   1455 Pennsylvania Avenue NW
6                  Suite 400
                   Washington, D. C.  20004
7
                   CULLEN MICHAEL WOJCIK
8                  Law Office of Cullen M. Wojcik
                   422 S. Gay Street
9                  Suite 302
                   Knoxville, Tennessee  37902
10

11

12                 FOR DEFENDANT KAREN MANN:

13                 JONATHAN D. COOPER
                   Whitt, Cooper, Trant & Hedrick
14                 607 Market Street
                   Suite 1100
15                 Knoxville, Tennessee  37902

16                 SARA E. COMPHER-RICE
                   Oberman & Rice
17                 550 West Main Avenue
                   NationsBank Building
18                 Suite 950
                   Knoxville, Tennessee  37902-2567
19

20

21

22

23

24

25
```

1                         INDEX OF PROCEEDINGS

2    BOB MASSENGILL
     Cross-Examination by Mr. Cooper. . . . . . . . . . .      7
3
     CLAUDEANE WHALEY
4    Direct Examination by Mr. Hamilton . . . . . . . . .     15
     Cross-Examination by Mr. Hardin. . . . . . . . . . .     49
5    Cross-Examination by Mr. Rivera. . . . . . . . . . .     72
     Cross-Examination by Mr. Murray. . . . . . . . . . .    134
6    Cross-Examination by Mr. Cooper. . . . . . . . . . .    143
     Redirect Examination by Mr. Hamilton . . . . . . . .    164
7
     JENNIFER DALMIDA
8    Direct Examination by Mr. Hamilton . . . . . . . . .    172
     Cross-Examination by Ms. Brevorka. . . . . . . . . .    180
9    Cross-Examination by Mr. Platt . . . . . . . . . . .    181

10   DARREN MATTHEW SEAY
     Direct Examination by Mr. Hamilton . . . . . . . . .    182

11

12                        GOVERNMENT'S EXHIBITS

13   NUMBER    DESCRIPTION                                RECEIVED

14    401      Mark Hazelwood Deferred Compensation          16
               Agreement
15
      402A     Mark Hazelwood Compensation Summary Backup    17
16
      403A     Scott Wombold Compensation Summary Backup     23
17
      403      J. Scott Wombold Compensation (2008-2012)     23
18
      404A     Heather Jones Compensation Summary Backup     25
19
      404      Heather L. Jones Compensation (2008-2012)     25
20             (ID only)

21    405A     Karen Mann Compensation Summary Backup        28

22    405      Karen R. Mann Compensation (2008-2012)        28

23    409      Scott Wombold Commission Breakdown Reports    30

24    410      Heather Jones Commission Breakdown Reports    43

25    411      Karen Mann Commission Breakdown Reports       46

```
 1              GOVERNMENT'S EXHIBITS (Continuing)

 2   1901      Sherry Blake June 2014 Verizon (865) 805-7148   172

 3   1901A     Highlighted Calls                               173

 4   1902      Scott Wombold April 2013 Cellco                 179
               (865) 207-3211
 5
     1902A     Highlighted Calls                               179
 6
     727A      Queen Transportation Off Invoice on             230
 7             Comparison Summary

 8   810A      BP Express Rebate Payment Comparison            230
               Summary (ID Only)
 9
     1522A     JTL Rebate Payment Comparison Summary           230
10             (ID Only)

11   1613A     Amerifreight Rebate Payment Comparison          230
               Summary (ID Only)
12
     1712A     Halvor Rebate Payment Comparison Summary        230
13             (ID Only)

14   1826A     Ryder Rebate Payment Comparison Summary         230
               (ID Only)
15

16                   JOINT DEFENSE EXHIBITS

17   NUMBER    DESCRIPTION                                RECEIVED

18   13035     Signed Commission Breakdown Report              85
               from Various Months from June 2010
19
     13004     Signed Commission Breakdown Report              86
20             from Various Months from March 2010

21   13002     Signed Commission Breakdown Report              87
               from Various Months from July 2010
22
     13003     Signed Commission Breakdown Report              91
23             from Various Months from Various Months
               in 2011
24

25
```

```
 1              JOINT DEFENSE EXHIBITS (Continuing)

 2     NUMBER    DESCRIPTION                                  RECEIVED

 3     342       8-24-17 Declaration of Claudeane Whaley          92
                 Re:  Commission Breakdowns
 4
       322       5-24-2011 E-mail from Borden to Freeman          114
 5               Re:  Book2.xls

 6     324       3-29-2010 E-mail from Jones to Borden           120
                 Re:  Question about Rest. P&L
 7
       338       E-mail from Vicki Borden to Heather Jones       120
 8               and others

 9     326       4-8-2013 E-mail between Borden and Spiewak       120
                 Re:  Help
10
       327       10-15-2010 E-mail from Jones to Borden          120
11               Re:  Rebates

12     329       6-2-2009 E-mail fro Ryding to Borden            120
                 Re:  US Food
13
       330       1-18-2013 E-mail from Welch to Borden           120
14               Re:  Just Make up His Commission

15     331       8-18-2010 E-mail from Borden to Direct Sales    120
                 Re:  Commission
16
       332       2-8-2010 E-mail from between Borden and Jones   120
17               Re:  Commission Percent

18     333       3-23-2010 E-mail from Borden to Mosher          120
                 Re:  They Have Gotten So Complicated
19
       335       2-21-2011 E-mail from Carter to Borden          120
20               and Carter

21     336       5-19-2009 E-mail from Fenwick to Borden         120
                 Re:  Commission Question
22
       337       11-9-2009 E-mail from Careter to Borden         120
23               Re:  Mistakes Can Happen

24     339       7-22-2008 E-mail from Stooksbury to Borden      120
                 Re:  Commissions
25
```

```
 1                JOINT DEFENSE EXHIBITS (Continuing)

 2     NUMBER    DESCRIPTION                              RECEIVED

 3      340      8-20-2009 E-mail from Welch to Borden        120
                 Re:  Interactive Logistics
 4
        341      6-5-2012 E-mail from Greco to Borden         120
 5               and Crutchman, Re: APEX and Westar

 6      325      10-13-2008 E-mail from Hamilton to Borden    120
                 Re: Holly's New House
 7
       1473      Mann Salary History 2004-September 2014      160
 8

 9                              - - -

10               THE COURT:  You may proceed.

11               MR. COOPER:  Thank you, Your Honor.

12                       CROSS-EXAMINATION

13     BY MR. COOPER:

14     Q         Good morning, Mr. Massengill.

15     A         Good morning.

16     Q         My name is Jonathan Cooper.  I represent Karen Mann.

17     Do you know Karen?

18     A         Not really, no.

19     Q         Okay.  Well, yesterday the government was asking you

20     questions about a particular exhibit, and I'd like to call

21     that up, please.  It's Government Exhibit 2249, and if we

22     could go to the very bottom of the second page on that.  Do

23     you recall being asked questions about that -- about this?

24     A         I do.

25     Q         I think --
```

1      MR. COOPER:  At the bottom of the second page,

2 please, Stacey.  To the first part, the body of that first

3 e-mail.  Thank you.

4 BY MR. COOPER:

5 Q      So government attorneys showed you this exhibit and

6 had you read it to the jury.  Do you recall that?

7 A      I do.

8 Q      And this is an e-mail between Ron Carter and Karen

9 Mann.  Is that right?

10 A      Correct.

11 Q      And you were not a party to this e-mail

12 conversation?

13 A      Correct.

14 Q      And you did not bring this e-mail to the attention

15 of the government.  Is that right?

16 A      Correct.

17 Q      They brought it to you --

18 A      Correct.

19 Q      -- to review?  And they asked you, sir, to testify

20 that this was in fact an e-mail exchange between two Pilot

21 employees.  Is that right?

22 A      Yes.

23 Q      And they just wanted you to be able to say that this

24 was a thread of e-mail messages between Ron Carter and Karen

25 Mann, correct?

1   A        That went through the Pilot e-mail system.

2   Q        Yes, that went through the Pilot e-mail system.

3   A        Correct.

4   Q        And were you aware that Karen Mann was the inside

5   sales representative for Ron Carter?

6   A        Yes.

7   Q        And do you know what territory they were covering?

8   A        No.

9   Q        Okay.  Now, what is -- what is the subject of this

10  e-mail thread?

11  A        Fleet E-X.

12  Q        Or --

13  A        Fleetex.

14  Q        So you don't know if it's Fleet E-X or Fleetex?

15  A        I don't.

16  Q        All right.  So you're not familiar with this company

17  then?

18  A        I am not.

19  Q        You don't know if they were direct bill or

20  restricted?

21  A        I do not.

22  Q        You don't know what their credit history was at the

23  time?

24  A        I do not.

25  Q        You don't know what their purchasing history was at

1   the time?

2   A        Correct.  I do not.

3   Q        You don't know how many trucks that they ran?

4   A        I do not.

5   Q        And you don't know if they had a seasonal business?

6   A        I do not.

7   Q        Let's look at the body of this e-mail.  And this is

8   from Karen Mann.  Is that right?

9   A        Yes.

10  Q        And she says, "Their manual rebate is CP .04.  Can I

11  change it to CP .05 across the board?"  Is that what it says?

12  A        Yes.

13  Q        What's the date of this e-mail?

14  A        September 12th, 2011.

15  Q        Okay.  Does that date have any significance to you,

16  sir?

17  A        No, sir.

18  Q        Okay.  And do you know what Karen Mann means when

19  she tells her supervisor that the customer's manual rebate is

20  CP .04?

21  A        Cost plus.

22  Q        Okay.  All right.  And when she asked to change it

23  to cost plus .05, quote, "across the board," do you know what

24  that means?

25  A        No, sir.

1    Q        Okay.  Now, you do not know the history of this
2    customer?
3    A        I do not.
4    Q        Don't know what the customer's discount was?
5    A        I do not.
6    Q        Do not know what Ron Carter negotiated with the
7    representative of Fleetex?
8    A        I do not.
9    Q        Do not know what Ron Carter offered the customer?
10   A        I do not.
11   Q        You don't know if this customer signed a contract
12   with Pilot?
13   A        I do not.
14   Q        Do not know if Ron Carter put this deal in writing?
15   A        I do not.
16   Q        And are you aware that there can be many different
17   arrangements for a cost-plus discount?
18   A        Yes.
19   Q        All right.  For example, Ron Carter may have
20   promised this company an average dollar amount for a rebate or
21   discount each month.  Is that right?
22   A        I would have no way to know that.
23   Q        And that's my point.  But it's possible, then, that
24   he could --
25            MR. HAMILTON:  Objection.  Objection, Your Honor.

1          MR. COOPER:  I'll rephrase.

2    BY MR. COOPER:

3    Q        It was the practice within Pilot, are you aware,

4    sir, that a company could be offered not a cost plus .02 or

5    cost plus .03 or cost plus .04 specifically tied to a cents,

6    but simply a general cost-plus discount?

7    A        Yes.

8          MR. HAMILTON:  Objection.  Beyond the scope.

9          THE COURT:  It's already been answered.

10          Go on, Counsel.

11   BY MR. COOPER:

12   Q        And they could have been promised simply an average

13   rebate amount each month without being promised a particular

14   cost -- being told a particular cost-plus number?

15          MR. HAMILTON:  Objection.  Beyond the scope.

16          THE COURT:  Sustained.

17          MR. COOPER:  Your Honor, please, if I may be allowed

18   to reply to that?

19          THE COURT:  I think this person's testimony is, he's

20   a computer infrastructure or technology infrastructure person.

21   And his testimony was that based upon his knowledge of the

22   infrastructure of Pilot, he could testify that these e-mails

23   and text messages and iPad messages either were generated from

24   the Pilot system or came into the Pilot system.  I think there

25   has been testimony there were about, what, 2000 Pilot

1    employees.  So to assume that this person would have any

2    knowledge at all of the substance of all those communications

3    and what would be involved, I think, would be asking the

4    extraordinary.  He's a technology person.

5                THE WITNESS:  (Moving head up and down.)

6                THE COURT:  If you'd like to ask him about coding and

7    technology, I think that would be fair game.  But asking him

8    about the substance of a particular message and what that --

9    might flow from it, I think his answer is going to be, he has

10   no idea, he has no way of knowing.  It would be like asking him

11   who built the Empire State Building.

12               MR. COOPER:  Well, I hope --

13               THE COURT:  He would be more knowledgeable about who

14   built the Empire State Building than he would be about the

15   subject of any of these e-mails.

16               MR. COOPER:  Well --

17               THE WITNESS:  (Moving head up and down.)

18               THE COURT:  You see he's nodding his head.  He's in

19   agreement with that.  He has absolutely no idea of any of this

20   stuff that you're asking him about.

21               MR. COOPER:  And the Court is picking up on the point

22   of these questions, and I hope everyone else in the courtroom

23   has picked up on it.  Let me see if I understand the Court's

24   ruling from yesterday about the admissibility of this exhibit.

25   Is this Court saying that this --

1          THE COURT:  The Court is not saying anything.  What

2    the Court is doing is ruling on an objection based on the rules

3    of evidence.

4          MR. COOPER:  Okay.

5          THE COURT:  There is an objection this exceeds the

6    scope of direct examination.

7          MR. COOPER:  And that's --

8          THE COURT:  And the Court has ruled upon that and

9    also commented that this witness was called to the stand to

10   testify in his area of knowledge.  His area of knowledge is

11   computers and infrastructure and these things that go through

12   space, these electromagnetic waves that go through space that

13   allows us to understand things.  And what you're asking him

14   about is the substance of something he has no knowledge -- no

15   knowledge of that.

16         MR. COOPER:  I will -- I will skip over the next set

17   of questions.

18         THE COURT:  I think your point is clear that he has

19   absolutely no idea about any of these things in the messages at

20   all.

21   BY MR. COOPER:

22   Q        With that in mind, Mr. Massengill, I will jump to

23   what I hope to be my last question.  You have no reason to

24   believe this customer was paid less than owed for their

25   discount?

```
 1              MR. HAMILTON:  Objection.  Beyond the scope.

 2              THE COURT:  Sustained.

 3              MR. COOPER:  Very well.  Thank you, Your Honor.

 4              Thank you, Mr. Massengill.

 5              THE WITNESS:  You're welcome.

 6              (Brief pause.)

 7              MR. HAMILTON:  Your Honor, the United States has no

 8    redirect for this witness.  May he be excused?

 9              THE COURT:  Thank you, sir.  You may step down.

10              (Witness excused.)

11              THE COURT:  Call your next witness.

12              MR. HAMILTON:  The United States calls Claudine

13    Whaley.

14              (Brief pause.)

15                        CLAUDEANE WHALEY,

16    called as a witness at the instance of the government, having

17    been first duly sworn, was examined, and testified as follows:

18                        DIRECT EXAMINATION

19    BY MR. HAMILTON:

20    Q       Will you introduce yourself for the jury, please.

21    A       Hi.  I'm Claudeane Whaley.  I am the senior manager

22    of payroll for Pilot Flying J.

23    Q       How long have you worked at Pilot?

24    A       It will be 16 years in March.

25    Q       And in your 16 years, what jobs have you held at
```

1    Pilot?

2    A        I came there as a payroll supervisor, then was

3    promoted to payroll manager, then to senior manager, payroll.

4    Q        And what are your responsibilities as the senior

5    manager of payroll at Pilot?

6    A        I supervise a staff of 13 people responsible for

7    producing and processing a weekly payroll in U. S. and Canada

8    for 28,000 people, and any off-cycle -- any other activities

9    associated with payroll.

10   Q        When you say 28,000 people, who are those people?

11   A        They're all across both countries, Pilot employees

12   at our field locations, our stores, our shops, our truck

13   drivers, and our support center.

14   Q        So does Pilot have approximately 28,000 employees?

15   A        Total, yes.

16   Q        Let me direct your attention, please, to Government

17   Exhibit 401.  Are you familiar with this document?

18   A        I am.

19   Q        And what is this document?

20   A        This is a deferred compensation agreement between

21   Mark Hazelwood and Pilot Corporation.

22   Q        Does your department maintain a copy of this

23   document?

24   A        Yes, we do.

25   Q        Does your -- was your department responsible for

1    Mr. Hazelwood's salary payments while he was employed there?

2    A        Yes, we were.

3    Q        Was Mr. Hazelwood's compensation based on this

4    agreement while he worked there?

5    A        Yes, it was.

6    Q        Looking at the paragraph that's highlighted on the

7    screen here, what compensation was Mr. Hazelwood entitled to

8    during the years 2008 through 2018?

9    A        Three and a half percent of the after-tax net

10   earnings of Pilot Travel Centers, LLC.

11   Q        Looking at the first line, where it says, "Hazelwood

12   shall be entitled to deferred compensation each year," even

13   though that line says "deferred compensation," based on your

14   work in the payroll department, what amounts of this three and

15   a half percent of Pilot's net after-tax earnings could

16   Mr. Hazelwood elect to receive each year?

17   A        He could elect to receive all of it.

18   Q        And, typically, during the course of Mr. Hazelwood's

19   employment, approximately what did he elect to receive during

20   each calendar year?

21   A        100 percent.

22   Q        Is Mr. Hazelwood still employed at Pilot?

23   A        He is not.

24   Q        Let me direct your attention first to--  We're now

25   going to turn to what's been marked as 402A.  Could you open

1  up your binder there, please, and turn to a copy of 402A.  The

2  first page of it is on the screen.  And is Government's

3  Exhibit 402A a multi-page document?

4  A      It is.

5  Q      Would you please tell the jury what the documents

6  are that are -- that make up 402A?

7  A      Yes.  There is a wage analysis, basically just like

8  a payroll register, for an individual, and it's a canned

9  report in the payroll system, and we put parameters in for the

10 dates and the employees that we want, and it pulls -- this

11 one, for instance, is for 1/1/'8 to 12/31/'8.

12 Q      Ms. Whaley, when you say "it pulls," what is "it"?

13 A      "It" is the system.

14 Q      And what is the system?

15 A      It was Lawson payroll system.

16 Q      And then you used the term, I think, "canned

17 report"?

18 A      Yes.  That's a report that's delivered by Lawson.

19 We don't have to create it.  We only have to put in

20 parameters, and it determines the data.  The PR260, to us,

21 means a wage analysis.

22 Q      A PR260 is what?

23 A      That's the name of the report.

24 Q      And what years are reflected in Documents 4- -- in

25 Document 402A?  Government Exhibit 402A.  Excuse me.

1  A        It is 1/1 of 2008 through 12/31 of 2012.

2  Q        Is there a report run for each year?

3  A        Yes, there is.

4  Q        And approximately how many pages are in Government

5  Exhibit 402A?

6  A        There would be two pages for each year.

7  Q        And do all of the pages look like this, that we see

8  on the screen?

9  A        That's the first page, which is the parameter page.

10 And the second page is a summary of the earnings and

11 deductions.

12 Q        Let's go to that page, please, on the screen, the

13 second page of this exhibit.  And so do -- we're looking at

14 the second page of Government Exhibit 402A.  And is this the

15 way in which the data is reported and presented after the

16 canned report is run through the Lawson payroll system?

17 A        Yes.  This is the summary page.

18 Q        Let me direct your attention now to Government

19 Exhibit 402.  And does Government Exhibit 402 relate to what

20 we just looked at, part of 402A?

21 A        Yes.  This is an annual summary, by year, of the

22 total compensation.

23 Q        All right.  And does 402, what's on the screen right

24 now, summarize the canned reports that make up 402A?

25 A        Yes, it does.

1    Q        Did you supervise the creation of this summary?

2    A        Yes, I did.

3    Q        And does it summarize accurately all of the

4    information contained in 402A?

5    A        Yes, it does.

6    Q        And will the use of this summary assist you in

7    explaining Mr. Hazelwood's compensation from 2008 to 2012?

8    A        Yes.

9    Q        All right.

10            MR. HAMILTON:  The United States -- again, I know

11   this exhibit has been numbered, but just for the record, the

12   United States is offering this as a secondary evidence summary

13   pursuant to *United States vs. Kerley*.

14   BY MR. HAMILTON:

15   Q        Ms. Whaley, looking at the year -- year ending 2008,

16   would you please tell the jury how much the summary shows that

17   Mr. Hazelwood made in total compensation that year?

18   A        13,992,392.81.

19   Q        And does part of that figure include a category

20   called Growth Partner bonus?

21   A        Yes, it does.

22   Q        And how, if in any way, does the Growth Partner

23   bonus relate to the deferred expense agreement, Exhibit 401?

24   A        It's included in that pay code.

25   Q        Let's look at the next year, please.  So for the

1  year ending 2009 -- and I'm saying "year ending," and let me

2  just make a record of this.  Do you see the letters Y-E?

3  A        Yes.

4  Q        Does that stand for "year ending"?

5  A        It does.

6  Q        So looking at year ending 2009, what is the amount

7  of Growth Partner bonus compensation that Mr. Hazelwood

8  received?

9  A        11,453,881.80.

10  Q        What was his total compensation for 2009?

11  A        15,076,119.33.

12  Q        Let's move to 2010.  And for the year ending 2010,

13  what was his Growth Partner bonus amount?

14  A        Seven million two -- seven two four four seven

15  ninety.

16  Q        Is it $7,002,447.90?

17  A        Yes.

18  Q        And what is the total compensation for the year

19  2010?

20  A        12,246,315.03.

21  Q        And turning to year ending 2011, what is his

22  Growth -- what was his Growth Partner bonus for 2011?

23  A        9,163,438.95.

24  Q        And the grand total?

25  A        11,275,375.53.

1  Q          And, last, looking at 2012, what was the Growth

2  Partner bonus for 2012?

3  A          14,049,757.54.

4  Q          And his total compensation for 2012?

5  A          Was 26,938,529.33.

6             THE COURT:  Mr. Hamilton, let me make a comment to

7  the jury.

8             Ladies and gentlemen, you heard Mr. Hamilton, in

9  reference to this particular exhibit, indicate that it was a

10 summary exhibit.  The rules of evidence allow the parties to

11 use summaries.  So what you're seeing here is not something

12 that would have been created at the time.  What this witness

13 did was to take a lot of other documents and take information

14 from those documents and put them on this document for ease of

15 understanding and ease of use.

16            Because it is a summary document and it's not the

17 source document, the summary document will not go back to you

18 when you start deliberating, unlike the other exhibits.  This

19 is an exhibit to help you understand things and help you see

20 things.  If, when you start deliberating, you'd like to see it

21 again, just let the Court know, we'll bring you back in court,

22 and you can see it.  But it is different from the other

23 exhibits.  So if you start deliberating and you start looking

24 for this and you don't see it, that's the reason why.

25 Exhibits that are introduced merely for explanation or summary

1   purposes are different from other exhibits that you will

2   always see.

3   BY MR. HAMILTON:

4   Q        Let me direct your attention now to Exhibit 403A.

5   And can you tell us what Exhibit 403A is?

6   A        It is the same canned report, PR260, for Scott

7   Wombold.

8   Q        And when you say "same canned report," what do you

9   mean?

10  A        The PR260 summary report of the wages for -- this

11  one is for 2008.

12  Q        And which years are included in Government

13  Exhibit 403A?

14  A        1/1/2008 through 12/31/2012.

15  Q        And like Exhibit 402A before it, is 403A a

16  multi-page document?

17  A        Yes, it is.

18  Q        And are -- do the canned reports present in a

19  similar fashion as what we see on the screen here --

20  A        Yes, they do.

21  Q        -- and what we saw when we looked at the first two

22  pages of 402A?

23  A        Yes.

24  Q        Please direct your attention to Government

25  Exhibit 403.  And are you familiar with Government

1    Exhibit 403?

2    A        Yes, I am.

3    Q        Did you supervise the creation of this document?

4    A        I did.

5    Q        Does it accurately summarize the information that's

6    in the multi-page document, 403A?

7    A        Yes, it does.

8    Q        Will referencing it help you explain Mr. Wombold's

9    compensation during the years 2008 through 2012 at Pilot?

10   A        Yes, it will.

11            MR. HAMILTON:  Again, for the record, the United

12   States offers this as secondary evidence pursuant to *United*

13   *States vs. Kerley*.

14   BY MR. HAMILTON:

15   Q        Turning to the first column, 2008, do you see a line

16   that says Commissions -- it's highlighted for Commissions,

17   Current Year?

18   A        Yes, I do.

19   Q        And for the year ending 2008, what were

20   Mr. Wombold's Commissions Current Year?

21   A        129,996.

22   Q        And what was his total for that year?

23   A        522,887.48.

24   Q        Looking at Exhibit -- excuse me.  Looking at column

25   two thousand -- for 2009, excuse me, what is stated as the

1    Commissions Current Year amount for 2009?

2    A         169,500.

3    Q         And what is the grand total compensation for

4    Mr. Wombold in 2009?

5    A         722,468.81.

6    Q         Moving to year ending 2010, what is the Commissions

7    Current Year amount for 2010?

8    A         212,500.

9    Q         And how about the grand total?

10   A         611,809.55.

11   Q         And looking at the year ending 2011, what is the

12   commissions amount for the year 2011 for Mr. Wombold?

13   A         284,140.10.

14   Q         And how about the grand total?

15   A         720,744.33.

16   Q         And, last, the year ending 2012?

17   A         357,130.58.

18   Q         And that's the amount for --

19   A         The commissions.

20   Q         -- Commissions Current Year?

21   A         Yes.

22   Q         And what is the grand total amount for 2012?

23   A         1,156,344.62.

24   Q         Let's now turn to Government Exhibit 404A.  And what

25   is Exhibit 404A?

1   A        It is the canned report, the PR260, summary of wages

2   for Heather Jones.

3   Q        And was this report generated in the same way that

4   you described 402A?

5   A        Yes.

6   Q        And what years are covered in 404A?

7   A        2008 through 2012.

8   Q        And for which employee?

9   A        This is Heather Jones.

10  Q        Is this also a multi-page document?

11  A        Yes, it is.

12  Q        And do the pages in this document present themselves

13  in a similar way as 402A and 403A?

14  A        Yes.

15  Q        Will you direct your attention to Exhibit 404.  And

16  what is Exhibit 404?

17  A        This is the summary of all the compensation for each

18  year, 2008 through 2012.

19  Q        And does it accurately summarize the information

20  that is provided in the multi-page document of 404A?

21  A        Yes, it does.

22  Q        And did you supervise the preparation of 404?

23  A        Yes, I did.

24  Q        Does it accurately summarize the information in

25  404A?

1  A          Yes, it does.

2  Q          And will it assist you in describing to the jury

3  Ms. Jones' compensation during the years of 2008 to 2012?

4  A          Yes, it will.

5             MR. HAMILTON:  United States offers this also as

6  secondary evidence pursuant to *United States vs. Kerley*.

7  BY MR. HAMILTON:

8  Q          Looking at year end 2008, what is the commissions

9  amount for 2008 for Ms. Jones?

10 A          22,924.54.

11 Q          And what was Ms. Jones' total compensation for 2008?

12 A          68,325.86.

13 Q          And turning to year 2009?

14 A          25,575.15 for commissions.

15 Q          What was that amount?  That amount was for what?

16 A          Commissions.

17 Q          And the grand total?

18 A          Was 71,980.27.

19 Q          And that was total compensation for the year 2009?

20 A          Yes.

21 Q          All right.  And looking at year ending 2010, what is

22 the Commissions Current Year for 2010 for Ms. Jones?

23 A          39,465.20.

24 Q          And what is the total compensation to her that year?

25 A          91,848.76.

1  Q        And moving to the year end 2011.

2  A        Commissions, 54,666.51.

3  Q        And the total for that year?

4  A        106,610.94.

5  Q        And then moving to 2012, what's the commission

6  amount for 2012?

7  A        61,283.15.

8  Q        And the total for 2012?

9  A        115,348.02.

10 Q        Please direct your attention to Exhibit 405A.  And

11 what is Exhibit 405A?

12 A        It is the same summary report, the PR260, for Karen

13 Mann for periods of 2008 through 2012.

14 Q        And is this the same kind of canned report, that

15 term that you used earlier?

16 A        Yes.

17 Q        And turn to -- let's now pull up Exhibit 405.  And

18 are you familiar with Exhibit 405?

19 A        I am.

20 Q        And is it a summary that relates to Exhibit 405A?

21 A        Yes, it is.

22 Q        Did you supervise the preparation of this summary?

23 A        Yes, I did.

24 Q        Does it accurately summarize the data that's in

25 405A?

1    A         Yes, it does.

2    Q         Will it help you in explaining to the jury

3    Ms. Mann's compensation during the years 2008 through 2012?

4    A         Yes, it will.

5              MR. HAMILTON:   The United States also offers this as

6    secondary evidence under *United States v. Kerley*.

7    BY MR. HAMILTON:

8    Q         Turning to government -- turning to the column for

9    year ending 2008, what is the Commissions Current Year amount

10   for Ms. Mann in 2008?

11   A         49,520.66.

12   Q         And what's the total amount for Ms. Mann in 2008?

13   A         92,076.62.

14   Q         Going to year ending 2009?

15   A         Commissions, 41,207.50.

16   Q         And what's the total amount for 2009?

17   A         87,754.56.

18   Q         And turning to 2010, what's the commissions amount

19   for Ms. Mann in 2010?

20   A         53,177.31.

21   Q         And the total compensation?

22   A         98,981.35.

23   Q         And turning to 2011, what's the commissions amount

24   for Ms. Mann in 2011?

25   A         47,160.77.

1    Q        And what is the total amount for 2011?

2    A        98,493.96.

3    Q        And, last, 2012, what is the commission amount for

4    the year ending 2012?

5    A        67,790.12.

6    Q        And the total amount for 2012 for Ms. Mann?

7    A        117,373.53.

8    Q        Now we're going to turn to some other documents.

9    Are you familiar with a document called a commission breakdown

10   report?

11   A        Yes, I am.

12   Q        As I'm turning to those documents I asked you about

13   Mr.-- whether Mr. Hazelwood was still employed there.  Let me

14   ask you, is Mr. Wombold still employed with Pilot?

15   A        He is not.

16   Q        Is Ms. Mann still employed with Pilot?

17   A        No, she isn't.

18   Q        Is Ms. Jones still employed with Pilot?

19   A        No.

20   Q        Let's pull up Government Exhibit 409, please.

21            Let me switch to the document camera, please.

22            THE COURTROOM DEPUTY:  Yes.

23            (Brief pause.)

24   BY MR. HAMILTON:

25   Q        All right.  So what is Exhibit 409, that I just --

1  an example of?

2  A        This is the commission breakdown that was sent down

3  to payroll to pay.

4  Q        To pay what?

5  A        To pay the total pay at the bottom, the column Total

6  To Pay.

7  Q        And on this commission breakdown report, who is the

8  employee that it relates to?

9  A        This is Scott Wombold.

10 Q        And let's just describe what Exhibit 409 is before

11 we start talking about some of these documents.  Is

12 Exhibit 409 a multi-page document?

13 A        It is not.

14 Q        Well, if you look at your binder, this is the first

15 page of it --

16 A        Oh, yes.

17 Q        -- if you look and see.

18 A        Yes.  The multiple view, yes.

19 Q        And are there -- so will you describe Exhibit 409 to

20 the jury, what it contains, looking through your binder, that

21 you've got a printout of it there.

22 A        Okay.  I have a printout of monthly commissions sent

23 down to pay from July 2011 through -- the last one is

24 November 2012.

25 Q        So approximately how many months does that time

1 frame cover for Mr. Wombold?

2 A        Seventeen, I think.

3 Q        All right.  And was it the regular course of

4 business at Pilot for your department to have a role in how

5 these documents were used at Pilot?

6 A        How they were used?

7 Q        Yes.

8 A        Yes.

9 Q        And tell us what that is.

10 A        When the documents came to the payroll department,

11 we looked at the Total To Pay, and we added that to the next

12 paycheck.

13 Q        Do you see the name -- or the entry for "Brian's

14 team" on this commission breakdown report?

15 A        Yes, I do.

16 Q        And do you understand who Brian is here?

17 A        Brian Mosher.

18 Q        And looking over here at the column that says

19 Commissions, do you see the column -- do you see that column?

20 A        Yes.

21 Q        And what is the amount there for "Brian's team"?

22 A        That's 8311.69.

23 Q        And how, if in any way, did that relate to

24 Mr. Wombold's commission calculation?

25 A        It's included in the total we paid.

1    Q          And do you recognize the signature on the Approval

2    line here?

3    A          Yes.  It's Mark Hazelwood.

4    Q          Do you see that there is a -- there is an entry in

5    the Description column that's called cap amount for

6    compensation?  Do you see that?  It's highlighted there.

7    A          Yes, I see that.

8    Q          And what is the cap amount -- excuse me -- cap

9    amount for Commission.  Do you see that?

10   A          Yes.  It's 36- -- 35,000.

11   Q          35,000 even?

12   A          Yes.

13   Q          And for this month, is the Total To Pay under, or

14   above, the cap amount for commission?

15   A          It's under.

16   Q          Before I turn to the next month, what is the -- what

17   is the year and month of this page from Exhibit 409?

18   A          This is July 2011.

19   Q          Now, directing your attention to the second page of

20   Exhibit 409.  And what is this document?

21   A          It is the commission breakdown for August 2011 for

22   Scott Wombold.

23   Q          And in the Description column do you see an entry

24   there for "Brian's team"?

25   A          Yes, I do.

1    Q        And who is that?

2    A        Brian Mosher.

3    Q        And are we going to see "Brian's team" in a number

4    of these documents?

5    A        Yes, we are.

6    Q        And every time we see it, do you know who that Brian

7    is?

8    A        Brian Mosher.

9    Q        Do you see, again, there is cap amount for

10   commission in the Description line?

11   A        Yes.

12   Q        And what is that amount?

13   A        35,000.

14   Q        How much?

15   A        Sorry.  35,000.

16   Q        And how, if in any way, does the "Brian's team"

17   amount affect Mr. Wombold's total commission, Total To Pay

18   amount?

19   A        It's included in the total payment.

20   Q        And every time we see a "Brian's team" amount in the

21   Commission column, is that true for all of these documents?

22   A        Yes, it is.

23   Q        And whose signature do you recognize that to be on

24   the Approval line?

25   A        Mark Hazelwood.

1   Q       And what is the total amount to pay for August of

2   2011 for Mr. Wombold?

3   A       34,127.47.

4   Q       Turning to the next page of Government Exhibit 409.

5   What is this document?

6   A       This is the September 2011 commission breakdown for

7   Scott Wombold.

8   Q       And, again, do we see "Brian's team" there in the

9   description?

10   A       Yes.

11   Q       And a commission amount associated with that?

12   A       Yes.

13   Q       And what is the cap amount for Mr. Wombold's

14   commission this month?

15   A       35,000.

16   Q       And what is the total that he is paid?

17   A       32,813.36.

18   Q       And who is the signature, do you see, on the

19   Approval line?

20   A       Mark Hazelwood.

21   Q       Turning to the next page of Government Exhibit 409,

22   what is this document?

23   A       This is the October 2011 commission breakdown for

24   Scott Wombold.

25   Q       And is "Brian's team" in the Description column?

1    A        Yes, it is.

2    Q        Is there a commission amount associated with that

3    "Brian's team"?

4    A        Yes, there is.

5    Q        What is Mr. Wombold's commission cap amount this

6    month?

7    A        35,000.

8    Q        And what is the Total To Pay?

9    A        32,469.19.

10   Q        And do you see the Approval line there?

11   A        Yes.

12   Q        Can you just read what that says?

13   A        Yes.   It's Mark Hazelwood's name, signed by Vicki

14   Borden.

15   Q        What does it say there?  What is written there?

16   A        It's written, "Mark Hazelwood."

17   Q        And what is below that?

18   A        "By VB."

19   Q        And who do you understand VB to be?

20   A        Vicki Borden.

21   Q        All right.  Before a commission amount could be paid

22   as monthly compensation, was there an approval process that

23   was required?

24   A        Yes, there was.

25   Q        And were there certain people who could approve

1    this -- this form?

2    A        Yes.

3    Q        And was Mark Hazelwood one of them?

4    A        Yes, he was.

5    Q        Turning to the next page of Government Exhibit 409,

6    what is this document?

7    A        This is the November 2011 commission breakdown for

8    Scott Wombold.

9    Q        And is "Brian's team" in the Description column?

10   A        Yes, it is.

11   Q        And is there a commission amount?

12   A        Yes, there is.

13   Q        What is the cap amount for Mr. Wombold's commission

14   in November of 2011?

15   A        35,000.

16   Q        And what is the total to pay him that month?

17   A        25,591.58.

18   Q        And at the Approval line, what signature -- what is

19   written there, that you can read?

20   A        "Mark Hazelwood."

21   Q        And do you see any initials below the line there?

22   A        Yes, "VB."

23   Q        And who do you understand that to stand for?

24   A        Vicki Borden.

25   Q        Turning to the next page of Government Exhibit 409.

1    And, again, who is this commission breakdown report for?

2    A        This is the December 2011 for Scott Wombold.

3    Q        Do you see in the Description column "Brian's team"

4    again?

5    A        Yes.

6    Q        Is there a commission amount in the Commission

7    column associated with "Brian's team"?

8    A        Yes, there is.

9    Q        And what is Mr. Wombold's cap amount for commission

10   this month?

11   A        35,000.

12   Q        And what amount is -- what's the total amount paid

13   to Mr. Wombold this month?

14   A        32,315.59.

15   Q        And in the Approval line, what do we see written

16   there?

17   A        Mark Hazelwood.

18   Q        And any initials below the line?

19   A        "VB."

20   Q        And who is that?

21   A        Vicki Borden.

22   Q        The next page of Government 20- -- of Government

23   409, what is this document?

24   A        This is the January 2012 commission breakdown for

25   Scott Wombold.

1    Q        Is "Brian's team" in the Description column?

2    A        Yes, it.

3    Q        Is there a commission amount associated with

4    "Brian's team"?

5    A        Yes, there is.

6    Q        What is the cap amount for Mr. Wombold's commission

7    for January of 2012?

8    A        35,000.

9    Q        And what is the Total To Pay amount?

10   A        31,728.38.

11   Q        And do you recognize the signature on the Approval

12   line?

13   A        Yes.  That's "Mark Hazelwood."

14   Q        Turning to the next page of Government Exhibit 409,

15   what is this document?

16   A        This is the February 2012 commission breakdown for

17   Scott Wombold.

18   Q        And is there an entry in the description for

19   "Brian's team"?

20   A        Yes, there is.

21   Q        And is there a commission amount associated with

22   that?

23   A        Yes, there is.

24   Q        What is the cap amount for Mr. Wombold's commission

25   in February of 2012?

1    A        35,000.

2    Q        What is the total amount to pay Mr. Wombold for

3    commissions in February of 2012?

4    A        21,301.39.

5    Q        And do you recognize the signature there?

6    A        Yes.  It's "Mark Hazelwood."

7    Q        This is not the next page.  I'm going to skip over a

8    few months, in Government Exhibit 409, to June of 2012.  Would

9    you tell the jury what this document is.

10   A        This is the June 2012 commission breakdown for Scott

11   Wombold.

12   Q        On a number of these documents we've seen the number

13   59.  Do you know what that number means?

14   A        That's Scott Wombold's employee number.

15   Q        Do you see the Description column on this document?

16   A        Yes.

17   Q        And do you see an entry for "Brian's team"?

18   A        Yes, I do.

19   Q        And is there a commission amount associated with

20   "Brian's team" here?

21   A        Yes, there is.

22   Q        For the month of June 2012, what was Mr. Wombold's

23   cap amount for commission?

24   A        35,000.

25   Q        And what is the original Total To Pay amount that's

1    stated on this form?

2    A        29,409.11.

3    Q        Does this document indicate whether or not that

4    original amount was adjusted?

5    A        Yes, it does.

6    Q        And to what was it adjusted?

7    A        30,000.

8    Q        All right.  And do you recognize the signatures

9    approving that?

10   A        Yes.  It's "Mark Hazelwood."

11   Q        For all of the months that are included in

12   Government Exhibit 409, was Brian Mosher's team a description

13   item in Mr. Wombold's commission breakdown reports?

14   A        Yes, it was.

15   Q        And for all of the commission breakdown reports that

16   make up Government Exhibit 409, was there a commission amount

17   that was associated with Brian Mosher's team?

18   A        Yes, there was.

19   Q        And in those instances, how did that factor in, if

20   at all, with Mr. Wombold's total compensation?

21   A        It was included.

22   Q        I'm going to return to a document.  I don't believe

23   I heard something correctly when you said it, and I want to go

24   back over it.  I realize that these letters and these digits

25   are small.  Would you take a look again at -- it's Page -- it

1    has what's called a Bates number on the bottom left-hand

2    corner that is identified as Trial_3152.  You can also see

3    "Page 20" in the center of it.  And it's part of Government

4    Exhibit 409.  I'm placing it back on the document camera.

5    A        Okay.

6    Q        And I want you to focus your attention again to the

7    Total To Pay amount.  Do you see the Total To Pay amount?  I'm

8    going to--  Would you look at that--  That figure, and by

9    looking at the -- look at the figure that's marked through.

10   A        Uh-huh.

11   Q        And I ask you to do that, to look at the figure

12   that's three entries above it.

13   A        Okay.

14   Q        And do you see that that -- what is the figure

15   that's three entries above that?

16   A        Yes.  It's 20,489.11.

17   Q        And just so that the jury can see what the

18   Description entry is, is that adjusted for percent as --

19   adjusted for percent time to quota?  Do you see that?

20   A        Yes, I do.  Yes.

21   Q        And that amount is, again, what?

22   A        It's 20,489.11.

23   Q        So what was the Total To Pay amount for this -- this

24   commission breakdown report?

25   A        Before the adjustment?

1    Q        Yes.

2    A        It was 20,489.11.

3    Q        So was it $20,489.11?

4    A        Yes.

5    Q        And did you previously say that it was approximately

6    29,000?

7    A        Yes, because that line is drawn right through the

8    middle of the zero and I thought it was an eight.

9    Q        So it was -- so, again, just to make a -- so we can

10   have a complete paragraph about this --

11   A        Okay.

12   Q        -- what was the $20,489.11 amount adjusted to on

13   this form?

14   A        30,000.

15   Q        And who made the adjustment?

16   A        Mark Hazelwood.

17   Q        Let me direct your attention now to Government

18   Exhibit 410.  And like Exhibit 409, is Government Exhibit 410

19   a multi-page document?

20   A        Yes, it is.

21   Q        And what does Exhibit 410 consist of?

22   A        This is the commission breakdown report, monthly

23   report for Heather Jones.

24   Q        And can you give us the time frame of commission

25   breakdown reports that are included in Government Exhibit 410?

1    A        Yes.  It's February 2008 through November -- no,

2    through June of 2012.

3    Q        So approximately how many -- approximately how many

4    commission breakdown reports are included in Government

5    Exhibit 410?

6    A        Fifty-one.

7    Q        We're not going to go through all 51.

8    A        Yeah.  Okay.  Good.

9    Q        Let me show you--  We're going to look at one as an

10   example.

11   A        Okay.

12   Q        And let me pull that one up, which is -- this is one

13   of the commission breakdown reports that is within Government

14   Exhibit 410.

15          MR. HAMILTON:  Could we switch back to the laptop,

16   please?

17          THE COURTROOM DEPUTY:  Sure.

18   BY MR. HAMILTON:

19   Q        And on the screen can you -- do you see, behind what

20   has been highlighted, what the month and year is?

21   A        December 2008.

22   Q        And this page is Trial 3168 within Government

23   Exhibit 410.  Do you see, in the Description column, Brian's

24   direct bill, Brian's restricted network, Brian's wholesale?

25   A        Yes, I do.

1    Q        And do you see -- and who do you understand in

2    this -- for this description the "Brian" to be?

3    A        Brian Mosher.

4    Q        Do you see whether or not there are any commissions

5    associated with those Brian Mosher-related descriptions?

6    A        Yes, there are.

7    Q        How, if in any way, did those Brian Mosher-related

8    commissions relate to the total commission that's paid to

9    Heather -- that's paid to Heather Jones this month?

10   A        They're included in that total.

11   Q        And in each of the -- I believe you identified

12   approximately 51 commission breakdown reports?

13   A        (Moving head up and down.)

14   Q        And have you reviewed all 51 before your testimony

15   today?

16   A        Yes, I have.

17   Q        In each of the 51 commission breakdown reports, is

18   there a description that relates to Brian Mosher's commissions

19   in each one of those commission breakdown reports?

20   A        Yes.

21   Q        And each of the commission breakdown reports where

22   Brian Mosher's -- where there is a description related to

23   Brian Mosher, how, if in any way, do the commissions related

24   to the Brian Mosher description relate to Ms. Jones' total

25   compensation in each of those 51 commission breakdown reports?

1    A        It's included in each of those payments.

2    Q        Let's now turn to Government Exhibit 411.  Will you

3    please tell the jury what Government Exhibit 411 is.

4    A        Commission breakdown sheets for Karen Mann.

5    Q        And would you tell us what months for Karen Mann are

6    included in Government Exhibit 411?

7    A        Yes.  November 2008 through December of 2011.

8    Q        Would you look at that -- let me ask you to look at

9    Exhibit 411 again, and would you look at the first page of it,

10   which is -- it's marked as Trial 3209, and can you tell us

11   what the first month is there?

12   A        November 2008.

13   Q        Then go forward to what's marked as Trial 3216.

14   A        That...

15   Q        And --

16   A        June 2009.

17   Q        So let's focus on -- on these pages first.

18   A        Okay.

19   Q        And we'll pull up an example from that range.  So

20   this range is November of 2008 through June of 2009.  That's

21   what I want to focus on first.

22   A        Okay.

23   Q        So right now on the screen we have zoomed in on a

24   portion of the November 2008 Karen Mann commission breakdown

25   report.  Is that right?

1    A        Yes.

2    Q        And do you see a Description entry related to "Tim

3    Prins direct bill, Tim Prins restricted, Tim Prins wholesale"?

4    A        Yes, I do.

5    Q        And is there a commission amount associated with

6    those Tim Prins-related entries?

7    A        Yes, there is.

8    Q        How, if in any way, did the commissions related to

9    Tim Prins' entries relate to Ms. Mann's total compensation

10   that month?

11   A        It's included in the total payment.

12   Q        And during the period November -- if you could look

13   at the documents that we are focusing on that are part of 411,

14   during the period November of 2008 through June of 2009, do

15   you see a description in each of those related to Tim Prins?

16   A        Yes.

17   Q        And do each of those Tim Prins descriptions in this

18   series of documents have a commission amount associated with

19   them?

20   A        Yes, they do.

21   Q        And how did those Tim Prins commission amounts in

22   each of those commission breakdown reports relate to

23   Ms. Mann's total compensation?

24   A        They were included in each of the total payments.

25   Q        All right.  Now, I want to direct your attention to

1  additional pages in Government Exhibit 411.  And looking at

2  Page -- starts with Trial 30- -- 3217, do you see that?

3  A        Yes, I do.

4  Q        And it continues through Trial 3223.  Do you see

5  that?

6  A        Yes.

7  Q        And what is the time frame that's covered by these

8  commission breakdown reports?

9  A        It's June 2011 through December of 2011.

10  Q        Let's pull an example up of those.  So what we're

11  looking at here is the commission breakdown report for

12  Ms. Mann from June of 2011.  Do you see that?

13  A        Yes, I do.

14  Q        And this one that we're focusing on is Trial -- is

15  Page Trial 3217?

16  A        Yes.

17  Q        Do you see a description in this commission

18  breakdown report that relates -- descriptions that relate to a

19  J-O-N, Jon, and has an apostrophe S.

20  A        Yes, I do.

21  Q        So it says J-O-N-apostrophe-S, Jon's.  Do you

22  understand who that is?

23  A        Jon Sigurdson.

24  Q        What was the last name?

25  A        Sigurdson.

1  Q        And for each of the description entries related to

2  Jon Sigurdson, is there a commission amount associated with

3  that?

4  A        Yes, there is.

5  Q        And is there a Jon Sigurdson, Sigurdson, commission

6  amount that's in each of the commission breakdown reports from

7  the period June of 2011 through December of 2011?

8  A        Yes, there is.

9  Q        And for each one of those Jon Sigurdson

10 commission-related entries, how, if at all, did that affect

11 Karen Mann's total compensation for those months?

12 A        They're included in the total payment for each of

13 those months.

14          MR. HAMILTON:  May I have just one moment, Your

15 Honor?

16          THE COURT:  You may.

17          (Off-the-record discussion between government

18          counsel.)

19          MR. HAMILTON:  No further questions, Your Honor.

20          THE COURT:  Cross-examination?

21                     CROSS-EXAMINATION

22 BY MR. HARDIN:

23 Q        Good morning.

24 A        Good morning.

25 Q        I don't think we've met before, have we?

| | | |
|---|---|---|
| 1 | A | No, we haven't. |
| 2 | Q | My name's Rusty Hardin.  How are you? |
| 3 | A | I'm good, Rusty.  How are you? |
| 4 | Q | I'm good.  I have just a few questions for you. |
| 5 | A | Okay. |
| 6 | Q | These charts that we've gone over, can you help me |

7    separate out what you have been testifying about that you

8    prepared as opposed to what may have already existed in the

9    form the jury is seeing?

10   A        The PR --

11   Q        Do you understand my question?

12   A        Yes, I think I do.

13   Q        Okay.  Help me out.

14   A        The PR260, that comes out of the payroll system in

15   that form.  We enter parameters in a report, like a query, and

16   it spits out in the exact form you saw.

17   Q        Okay.  All right.  So -- and you didn't have these

18   form breakdowns for Mr. Hazelwood.  Is that right?

19   A        That's correct.

20   Q        Okay.  So if we start with Government Exhibit 409.

21            Could we have that, please.  And, Stacey, can we

22   concentrate on where -- first up at the top.

23            So this would be, like, July sales, this would be a

24   document that is kept in this form by Pilot, is it?

25   A        Yes, it is.

1    Q        Okay.  And then you have, over here on the left,

2    "Brian's team" and "Vince's team."  Is that correct?

3    A        That is correct.

4    Q        And that would be because both of those teams came

5    under Mr. Wombold's supervision at that time.  Is that

6    correct --

7    A        That --

8    Q        -- or is that something you would know one way or

9    the other?

10   A        I would not know that from memory.  I would have to

11   look back and see.  But I do know that he got commission based

12   off of them.

13   Q        Okay.  And so would it be a fair assumption on your

14   part and our part that that's because those people -- those

15   teams were under the supervision of Mr. Wombold at that time?

16   A        I could assume that, but I don't know it for a fact.

17   Q        Well, let's assume for a second that in July of 2012

18   or around that time, if I move forward to--

19            Let's do next -- let's do June 2012, which would be

20   this page number down at the bottom, Stacey, 3152 that the

21   government showed.

22   A        Yes.

23   Q        Do you remember this?  You remember going over this

24   document, correct?

25   A        Yes, I do.  Yes.

1    Q        You notice, do you not, that as of June 2012,

2    Brian's team and Vince's time, together, are still listed

3    under Mr. Wombold?  Would you agree?

4    A        Yes.  Yes.

5    Q        All right.  Then if we go to the very next one,

6    3153, representing July 2012 sales, do you see now it's only

7    listing Mr. Mosher under Mr. Wombold?

8    A        Yes, I see that.

9    Q        Would it be a fair conclusion, based on your looking

10   at these records, that that would indicate that Mr. Greco was

11   no longer under the supervision of Mr. Wombold?

12   A        I could only conclude factually that he didn't get

13   commissions based on Greco.

14   Q        I guess that's a fair way to put it for your

15   testimony.

16   A        Yes.

17   Q        As far as the extent of your knowledge is, all you

18   know is, is that as of July 2012 Mr. Wombold was not receiving

19   anything based on the commissions due Mr. Greco?

20   A        Yes, that is correct.

21   Q        Okay.  That's the only thing you're really

22   comfortable with?

23   A        Yes.

24   Q        All right.  Now, I want you, though, to look off of

25   these numbers the government asked you for, and let's start at

1    the first page.  I'll go kind of quickly with you, but let's

2    go -- still on 409, the first page, which would be 3141.

3    Thank you.

4            If we look at these figures on "Brian's team," I'm

5    going to have you just try to remember with me these numbers

6    and see if this works.  I'm not going to ask you the specific

7    ones with the occasions.  And here's what I mean.  On as of

8    July 2011 sales, would you agree with me that reflects Vince

9    Greco's team was more -- responsible for more profit than

10   Mr. Mosher's team?

11   A       Yes.

12   Q       All right.  So that's going to be Number 1 time, as

13   we count.  I'm going to count the number of times Mr. Greco --

14   through you, if we can, that Mr. Greco's team was responsible

15   for more profit—are you with me?—than Mr. Mosher's team.  So

16   all you're going to have to remember is the number of times

17   that's true.

18   A       Yes.  Okay.

19   Q       All right.  So that's one.  Let's go, please, then,

20   if we can, to August of 2011 sales, the next one.  You see

21   here, do you not, again, Mr. Greco's team is responsible for

22   more profit than Mr. Mosher's?  Is that a fair statement?

23   A       Yes, I do.

24   Q       Go to the next page, please, which would be

25   September.  So that's two times.  September 2011, again,

1  though it's not that great much, still Mr. Greco's team is

2  responsible for more profit than Mr. Mosher's?

3  A        That is correct.

4  Q        That's Number 3.  Go to October 2011.  Is it true

5  again that Mr. Greco's team's responsible for more?

6  A        That is correct.

7  Q        That's four times.  Go to November.  Again,

8  Mr. Greco's team is responsible for more profit.  Can you see?

9  A        Yes, I see that.

10 Q        All right.  That's five, I believe, isn't it?  Now,

11 if we go to December of 2011, this is the first time, is it

12 not, that Mr. Greco's team is a little bit less -- not much,

13 but a little bit less than Mr. Mosher's, correct?

14 A        In these documents, yes.

15 Q        All right.  So I guess we're five to one so far,

16 right?  And then if we go to January 2012, the next page,

17 Mr. Mosher's team is responsible for more profit there,

18 correct?

19 A        Uh-huh.  Yes.

20 Q        Five to two.  Let's go to February.  Mr. Mosher's

21 team is responsible for a little bit more profit, correct?

22 A        That is correct.

23 Q        Five to three.  Let's go to -- let's go to March.

24 Now it's back up.  Mr. Greco's team, in March of 2012, is

25 responsible for more profit, right?

```
 1   A         Yes.

 2   Q         Six to three.

 3   A         Six to three.

 4   Q         April, Mr. Greco's team, again, responsible.  Seven

 5   to three, correct?

 6   A         Yes.

 7   Q         May, Mr. Greco's team responsible for more, right?

 8   A         Yes.

 9   Q         Eight to three.  June, Mr. Greco's team responsible

10   for more.  Nine to three.  Is that right?

11   A         Yes.

12   Q         July, we no longer can make the comparison, can we,

13   because Mr. Greco is not listed as somebody whose commissions

14   would affect Mr. Wombold's commissions?

15   A         That is correct.

16   Q         All right.  So how did we end up there, nine to

17   three or ten to three?

18   A         Nine, I think.  Nine to three.

19   Q         All right.  Now, there's one other area that I want

20   to -- one other area that I want to mention with you.

21             (Brief pause.)

22             MR. HARDIN:  May I have just a moment, Your Honor?

23   I'm sorry.

24             THE COURT:  Yes.

25             (Brief pause.)
```

1   BY MR. HARDIN:

2   Q        When you were getting together, are these -- is this

3   document that you and I just went over -- was that already in

4   creation when the government asked you to do this, in this

5   form?

6   A        Yes.  That was stored in our systems.

7   Q        All right.  So what's -- now, but I'm trying to

8   figure out, did you make this chart based on figures stored in

9   the system, or did you go in and it existed just as it appears

10  before us?

11  A        As we received these documents and paid them, we

12  scanned them into our document management system.  So it was

13  retrieved from that document management in its form that we

14  received.

15  Q        And this is the form you received it in --

16  A        It is.

17  Q        -- from the document?

18  A        It is.

19  Q        This is not something you created?

20  A        No, it is not.

21  Q        All right.  And you never checked these figures for

22  accuracy, I take it.

23  A        I have checked all of the payments for accuracy.

24  Q        Pardon me?

25  A        I have checked every payment for accuracy.

1   Q        Okay.  So did you check payments for accuracy for

2   what they were entitled to, or what they were paid?

3   A        I wouldn't know what they were entitled to.

4   Q        All right.  That's what I mean.  So you didn't go

5   back and do any check to see if these figures were correct on

6   here?

7   A        No.

8   Q        What you did is check to see if these figures

9   reflected what people were paid?

10   A        Yes, if we paid what the document told us to pay.

11   Q        All right.  And -- but you don't have any idea and

12   no -- I take it you have no knowledge of an audit to see if

13   these figures -- the underlying basis for these figures is

14   correct?

15   A        Of the calculations themselves?

16   Q        Yes.

17   A        No, I do not.

18   Q        Okay.  Fine.  Thank you.  I want to go now to the

19   exhibit we did with Mr. Hazelwood.

20            Can I have Government Exhibit 402, please?

21            Now, is this a document you created?

22   A        Yes.

23   Q        All right.  And this was created at the government's

24   request.  Is that correct?

25   A        Yes.

1    Q        How many people did you create these figures for, or

2    these charts for?

3    A        I created it for everyone on the list.  So I'm not

4    sure exactly how many.

5    Q        All right.  So was it more than the four people that

6    you have gone over with here today?

7    A        I really can't say unless I go back and look at all

8    the documents that we created.

9    Q        Would you remember any of the names --

10   A        As far as what we've created --

11   Q        -- for this kind of chart?

12   A        I really -- the only ones I remember are these four,

13   because they've been the most recent.

14   Q        The most recent request?

15   A        Yes.

16   Q        All right.  So if we go back, do you recall what

17   year -- I believe you said you started 2002?

18   A        Yes, I did.

19   Q        What year do you recall you first got a request from

20   the government to create the kind of chart that exists in

21   Government 402?

22   A        I really don't recall because there was multiple

23   requests.

24   Q        Can you give me an idea of how many requests?

25   A        I really can't.  I would have to be at my desk where

1    everything is stored.

2    Q        All right.  Can we do it this way:  Was it more than

3    five?

4    A        More than five requests?

5    Q        Yes.

6    A        Do you mean individual requests, or --

7    Q        Yes.

8    A        -- collective?

9    Q        Collective people.

10   A        I would -- I hate to speculate something that I

11   really don't remember.

12   Q        All right.  Was it considerably more than these four

13   that you've been asked to do this for?

14            MR. HAMILTON:  Objection.  Asked and answered.

15            THE COURT:  Overruled.

16   BY MR. HARDIN:

17   Q        Was it?

18   A        I would not say considerably.

19   Q        I'm sorry.  I didn't --

20   A        I would not say considerably, but I really don't

21   remember.

22   Q        Okay.  All right.  Were you ever asked to do it for

23   Vincent Greco?

24   A        I don't recall if I was.

25   Q        Would it be a fair statement that you don't have any

1  memory that you were, you're just not comfortable absolutely

2  saying for sure, though?

3  A        I don't have a memory, and I'm not comfortable

4  saying something I don't remember.

5  Q        All right.  That's fair enough.  But you sit there

6  now and have no memory of being asked to do it for Mr. Greco?

7              MR. HAMILTON:  Objection.  Asked and answered.

8              MR. HARDIN:  No, it is not.

9              THE COURT:  Sustained.

10             MR. HARDIN:  In all due respect, Judge-- Did the

11 Court sustain?

12             THE COURT:  Yes.

13 BY MR. HARDIN:

14 Q        Have you ever researched the kinds of figures that

15 you were presenting here for Mr. Hazelwood with Mr. Greco?

16 A        Not in my recollection.

17 Q        Okay.  Now, if in fact we look at Mr. Hazelwood's

18 compensation, I believe it began, your testimony, did it not,

19 with you -- with them introducing through you his agreement

20 that he had.  Do you recall that?

21 A        Yes, I do.

22 Q        And had you -- did you -- when you -- did you go

23 over that agreement yourself?

24             I'm looking at Exhibit 401, please, Stacey,

25 Government 401.

1          Do you recall being asked about this exhibit?

2    A          I do.

3    Q          And the date on this exhibit is what?

4    A          It is the 6th of March, 2008, with February marked

5    through.

6    Q          And do you recall on this -- when you looked at this

7    exhibit, did you go back and look at previous agreements of

8    this?

9    A          I have several agreements, but I only recall looking

10   at this one.

11   Q          Are you aware that he started with the company in

12   1985?

13   A          Yes.

14   Q          All right.  And through your research did you notice

15   that his first agreement like this was back in 1988?

16   A          I would not have had a copy of that one because I

17   wasn't there at the time.

18   Q          Okay.  Well, did you -- wouldn't -- the company

19   would have had such a copy?

20   A          Right.  Yes.

21   Q          You just didn't have any need to go back and look

22   for it?

23   A          Correct.

24   Q          All right.  You could have recovered it if you were

25   asked to?

1    A        If I needed to, I could have.

2    Q        And were you asked -- what was the nature of the

3    request that led you to re- -- look at and recover this

4    particular agreement?  What were you asked to do?

5    A        The last time I was asked to pull this agreement, or

6    the first time, I guess, in recent history, was to make sure

7    the payments were being made.  So that would have been when

8    Mr. Hazelwood was still employed.

9    Q        Okay.  Now, were you aware that these agreements

10   began in 1988?  You said yes?

11   A        In 1988?  I knew that he had agreements.  I have not

12   seen them.

13   Q        Okay.

14   A        And I only knew that from hearsay.

15   Q        Okay.  Do you have any idea what the net profit was

16   in 1988 when these agreements began?

17   A        No, I do not.

18   Q        Would you agree with me that this agreement gives

19   him a percentage of the net profits of the company?

20   A        Yes, of the after-tax.

21   Q        After-tax.  After-tax net profits of the company?

22   A        Yes.

23   Q        And are you aware of other agreements with

24   executives, any executives, that exist similar to that, not

25   necessarily the percentages, but that -- the concept,

1    namely -- namely, that the employee gets a percentage of the

2    company's net profits?

3    A        I am not.

4    Q        All right.  Now, let me make sure I understand.

5    When you say you're not, does that mean you think there are

6    not, or you just don't know one way or the other?

7    A        I just don't know.

8    Q        Okay.  Fair enough.  And you weren't asked to look

9    at whether anybody else -- or the government -- in preparation

10   of your testimony, did the government ask you to look and see

11   if anybody else had a -- an agreement that gave them a

12   percentage of the net profits?

13   A        I don't recall being asked.

14   Q        All right.  Do you have any knowledge one way or the

15   other as to whether Mr. Parent, the present president, has

16   such an agreement?

17            MR. HAMILTON:  Objection.  Relevance.

18            THE COURT:  What's the relevance?

19            MR. HARDIN:  The government has, in previous

20   situations, contended this was unique to Mr. Hazelwood, not

21   before this witness, but I just simply want to address it with

22   this witness.  I don't know who else.  I guess we could call

23   people later, but --

24            THE COURT:  So it would be rebuttal.  I don't recall

25   that.

1          Mr. Hamilton, did the government put on evidence

2    that this type of agreement was unique with Mr. Hazelwood?

3          MR. HARDIN:  I stand--  Excuse me.  I stand to be

4    corrected by the government.  I just don't have it in front of

5    me.  I seem to have a memory that the government made such a

6    suggestion in their opening statement.  I could be wrong.

7          THE COURT:  I'm asking Mr. Hamilton now.  If

8    Mr. Hamilton says that they have, then I think it's

9    appropriate.  I just don't recall that.  The trial's gone on

10   for a long time.  There have been a lot of witnesses and a lot

11   of evidence, so I'm not able to keep track of every single

12   thing that's gone on.

13         Mr. Hamilton?

14         MR. HAMILTON:  Your Honor, I think that the best

15   thing for us to do -- I can't quote the entire transcript in my

16   head at one time, either.  I'm going to withdraw the objection.

17         THE COURT:  Very well.  So the question was about

18   Mr. Parent, whether Mr. Parent has such an agreement.

19         THE WITNESS:  I am not aware of any.

20   BY MR. HARDIN:

21   Q          And does that mean -- again, I want to make sure

22   we're clear.  Does that mean you just don't know, or that you

23   don't think he does?

24   A          I'm not aware of it, so I haven't received it or had

25   to pay anything on it.

1  Q        You haven't seen anything on it?

2  A        Right.

3  Q        Okay.  Fair enough.

4           Could I have back up, please, that agreement, which

5  was 402 -- excuse me, 401.

6           Now, if the company -- would you agree with me that

7  if these -- this kind of an agreement began in 1988, it would

8  be at a time, based on your looking at records in the past --

9  I realize you weren't there, but having looked at records over

10 time, it was at a time when the company was making nowhere

11 near as much money as it's been making in recent years.  Would

12 you agree?

13          MR. HAMILTON:  Objection, Your Honor.  Lack of

14 foundation.

15          THE COURT:  I think that's a matter of common sense.

16 Overruled.

17 A        I would guess -- I would only have to guess that the

18 fact the company was not as large.

19 Q        Well, not only that, when you joined in 2002, by

20 2010, in the records that you were responsible for in

21 reviewing, would you agree that the net profit of the company

22 considerably increased from the years that you joined the

23 company until you were asked to start doing these charts?

24 A        I would say that the company's profits increased,

25 yes.

1    Q        Right.  So three and a half percent in 1988 might be

2    a very much smaller figure compared to 2012.  Would you agree?

3    A        I could assume so, based intellectually on the

4    finances.

5    Q        Were you trained to be an accountant?

6    A        No.  I'm a marketing major.

7    Q        Are you really?  So how did you -- how did they get

8    you into this part of it?

9    A        Just--  I don't know.

10   Q        All right.  Well, now, do you happen to know from

11   looking through records that actually there were four of these

12   agreements, like, every ten years Mr. Hazelwood and

13   management, with Mr. Haslam, would sign a new agreement?

14   A        I wouldn't know that unless it was time for me to

15   make a payment on it.

16   Q        Okay.  So -- but you joined in 2002 --

17   A        Uh-huh.

18   Q        -- and there would have been an agreement from --

19   well, I guess every ten years there would be one, in '98,

20   right?  2006?  Do you recall having to make a payment in

21   2006 --

22   A        Well, some --

23   Q        -- or during those years?

24   A        I can't recall every payment ever made.  But as far

25   as me getting the agreement, I may or may not have gotten part

1    of the agreement.  I may have just gotten a payment to make.

2    Q       All right.  So let's do it this way:  Would you

3    agree with me that before this agreement of 2008, you had been

4    making payments to Mr. Hazelwood on an annual basis based on

5    net profits of the company?

6    A       Yes.

7    Q       Fair enough.  You just are not comfortable with

8    which years the previous agreements were?

9    A       I just don't want to say something I don't factually

10   know myself.

11   Q       I think that is apparent to us all.  Okay?  Now, I

12   want to go, please, to 402.  There is--  Would you agree with

13   me that the bulk of his compensation is from -- during this

14   period of time is what's called the Growth Partner bonus?

15   A       Yes.

16   Q       Would you agree?

17   A       Yes.

18   Q       And then the second would be right under that.  So

19   if you could highlight those two for me.  Well, actually

20   highlight the first six entries here, if you would, and let's

21   stop at Growth Partner dividend payout.  All right.  There you

22   go.

23           Now, we're going to get, are we not, if we step

24   down, that in 2012 that was more than double what his

25   previous -- even at its height -- he had a big year in '09,

1    but almost double that, even that other previous year, in

2    2012, and in 2012 it was more than double than it had been for

3    2011.  Is that a fair statement?

4    A       Yes.

5    Q       All right.  Now, when we look at --

6            And then, Stacey, if you could add to those, as you

7    highlight it, exactly that.  Thank you.

8            So his gross pay was almost 26 1/2 million, wasn't

9    it?

10   A       In 2012, yes.

11   Q       A whole bunch of money, would you agree?

12   A       Yes.

13   Q       All right.  And do you happen to remember -- well,

14   let me -- let's look at this.  Growth Partner bonus, that says

15   a distribution that is dictated by either the board or

16   Mr. Haslam, was it not?

17   A       Yes.

18   Q       And do you recall, did everybody that had anything

19   to do with the profits of the company got a pretty big bonus

20   that year, 2012?

21   A       Well, that would be a broad statement, but

22   intellectually, again, I would have to say, if I had Growth

23   Partner points granted--

24   Q       And the reason for that was, was it not, was that

25   there was, like, a 750 million bonus declared, or

1    distribution, connected with Mr. Haslam buying the Cleveland

2    Browns?  Do you recall that?

3    A          I would not be aware of that.

4    Q          Were you aware of that when he did, one way or the

5    other?

6    A          I know he did, but I don't remember the year.

7    Q          All right.  But would you agree with me that what

8    that reflects, that Growth Partner bonus of $14 million,

9    that's straight ordinary income that was reflected in a bonus

10   that Mr. Hazelwood got because of his entitlement to three and

11   a half percent?

12   A          That's included in that, yes.

13   Q          All right.  And so that's why you have this

14   extraordinary jump, is it not, is because that really large,

15   large distribution for which he would get a certain percentage

16   of?

17   A          What I -- from what I know, what I would say is it

18   jumped because the net profit jumped.

19   Q          Pardon me?

20   A          He would get an increase of the net profit, because

21   of the three and a half percent.

22   Q          Right.  Okay.  Now, through all of this, do you

23   know -- when you joined in 2002, do you know what

24   Mr. Hazelwood's position was?

25   A          I really don't.

1   Q        All right.  Is it a safe assumption on my part that

2   if I were to ask you what the successive years of net profits

3   were, or for even, like, every four or five years or every ten

4   years, that is not a figure that you would know?

5   A        That's right.  I would not know.

6            MR. HARDIN:  Okay.  May have I just a second, Your

7   Honor?  I think I'm just about through.

8            THE COURT:  You may.

9            (Off-the-record discussion between defense counsel.)

10           MR. HARDIN:  Your Honor, I want to tender to the

11  government, if I may, Joint Defense Exhibit 181 and 182, which

12  are in the production by the government in this matter, but

13  it's not been listed as an exhibit, and it has to do with the

14  payouts of Mr. Greco over a certain period of time, in 2013.

15  Before I say any more about the exhibits, may I have the

16  Court's permission to give copies to the government and let

17  them look to see if they have an objection?

18           THE COURT:  Yes.

19           (Brief pause.)

20           MR. HAMILTON:  The United States objects to the

21  relevance of these commission breakdown reports.  My first

22  objection is, it goes beyond the scope of direct examination.

23  The commission breakdown reports here are for a person that was

24  not discussed on direct examination, Number 1.  And Number 2,

25  they're not relevant.

1          THE COURT:  Looks like there's an objection to the

2    documents then.  I don't recall on direct examination the

3    witness discussing Mr. Greco.  My memory may be mistaken, but I

4    don't --

5          MR. HARDIN:  I think your memory -- I think your

6    memory is correct.

7          THE COURT:  That means, then, the Court is sustaining

8    the objection.

9          MR. HARDIN:  Thank you, Your Honor.

10          Thank you, ma'am.

11          THE WITNESS:  Thank you.

12    BY MR. HARDIN:

13    Q      Oh, by the way, would there be anyone else -- would

14    you be the logical person, if the Court were to allow it under

15    other circumstances, to discuss Mr. Greco's compensation?

16    Would you be the logical person to be able to do that?

17    A      I would be the one to pull the data out of the

18    system.

19          MR. HARDIN:  Thank you very much.

20          THE COURT:  And before he sits down, will you be

21    available for the next month or six weeks or so in case someone

22    needs you?  You won't be taking a vacation or out of the

23    country or anything like that, will you?

24          THE WITNESS:  No.  The only thing I have is, February

25    the 21st, a trip for the company, but otherwise I'll be...

```
1                  THE COURT:  (Moving head up and down.)

2                  MR. HARDIN:  Thank you, Judge.  That's all I have.

3                  MR. RIVERA:  Your Honor, do -- I see the Court

4       looking at the clock.  Do you want to take a break at this

5       point?

6                  THE COURT:  Why don't we go ahead and get started.

7                         CROSS-EXAMINATION

8       BY MR. RIVERA:

9       Q       Good morning, Ms. Whaley.

10      A       Good morning.

11      Q       My name's David Rivera, and I'm counsel for Scott

12      Wombold.

13      A       Okay.

14      Q       How are you?

15      A       I'm good.  How are you?

16      Q       Good.  Thank you.  Ms. Whaley, this might be a point

17      of clarification for the Court.  I do want to ask you some

18      questions about Vince Greco.  I anticipate an objection from

19      the government.

20                  MR. HAMILTON:  Objection--  Should I wait?

21                  THE COURT:  There's nothing to object to yet.  He

22      hasn't asked the question.  He just made a statement.

23                  MR. HAMILTON:  I thought it was invited, Your Honor.

24                  MR. RIVERA:  It was.  It was.

25      BY MR. RIVERA:
```

1    Q        Ms. Whaley, I want to show you Government's

2    Exhibit 409.

3    A        Yes.

4    Q        I'm going to improve that a little bit.  Do you see

5    on this document that's been introduced by the government as a

6    commission breakdown report -- do you see that?

7    A        Yes, I do.

8    Q        And in this document the government highlighted

9    certain sections.  And clearly in this document the name

10   "Vince's team" is referenced in this document.  Do you see

11   that?

12   A        I do.

13   Q        And in the succeeding several pages on this

14   document -- and here it's referenced July of 2011, do you see

15   that?

16   A        I do.

17   Q        And if you flip to the next document, which is

18   referenced August of 2011, "Vince's team" also appears.

19   A        Correct.

20   Q        Is that correct?  And if you continue -- and I won't

21   go through all of them, but is it safe to say that Vince's

22   team is referenced in all of the documents from July of 2011

23   to May of 2011?  Vince's team is referenced on this document.

24   Do you see that?

25   A        Yes, I do.

1    Q        All right.  Do you know who Vince is?  Do you know

2    his last name?

3    A        I would assume.

4    Q        Vince Greco?

5    A        Yes.  I haven't looked it up, which, the way I

6    determine who it is is by looking in the payroll system and

7    matching.

8    Q        Okay.  Are you aware--  Withdrawn.  Is it fair to

9    say, as it relates to these commission breakdowns, that

10   supervisors would receive commissions that were paid to teams

11   that they supervised?

12   A        I can't make that correlation just by looking at

13   this document.  I would have to be looking in the payroll

14   system to see at that time who supervised who.  All I know is

15   what it says on this document, because that's all we received.

16   Q        Okay.  Maybe my question wasn't very clear.  So let

17   me see if I can rephrase that.  Here it's clear that Scott

18   Wombold is receiving a commission that is based on the

19   commission that was received by the two teams that he

20   supervised.  Is that correct?  Here, did Brian's team receive

21   a commission of approximately 8,166?

22   A        Uh-huh.

23   Q        And that's carried over to a commission to Scott

24   Wombold.  Is that correct?

25   A        It's correct he's receiving those commissions.  I

1    just can't remember if he was supervising them at that time.

2    Q       Okay.  Do you know of any other reason why Scott

3    Wombold would receive a commission from Brian's team and

4    Vince's team if he wasn't supervising them?

5    A       I don't know that, because it comes down to us to

6    pay the total.  We don't do any of the calculations up above

7    it.

8    Q       So you're not familiar with the preparation of this

9    document or -- or what -- why these numbers are even here.  Is

10   that fair?

11   A       I know they're part of the calculation in the total

12   payment of the commissions for Mr. Wombold.

13   Q       All right.  So it's -- it's fair to say that your

14   only role in payroll, and the role of the people that you

15   supervise, is to receive this commission breakdown and pay

16   what is reflected in the Total To Pay line.  Is that fair?

17   A       We also have to determine the right approval is on

18   it.

19   Q       And right approval, you would determine that by

20   looking at a signature?

21   A       Well, we have a two-up hierarchy.  So in this case

22   it would be Mark Hazelwood.

23   Q       All right.  And how would you determine that?  By

24   his signature?

25   A       By his signature being on it.  And by knowing that

1    that group reported up to him.

2    Q        Okay.  So you would check that the group reported to

3    him?

4    A        Yes.

5    Q        And then would you check to see if his signature is

6    on the report?

7    A        Correct.

8    Q        And that's the two things that you would do with

9    this report before you would pay out the amount that's on the

10   To Pay column?

11   A        That's right.

12   Q        And there is nothing else that you would do in going

13   back to check the accuracy of this document?

14   A        No.  We would only make sure that the Total Payment

15   column matched.

16   Q        Okay.  Now, Ms. Whaley, you're aware that Vicki

17   Borden is the person who prepares these commission breakdowns.

18   Is that correct?

19   A        Yes.

20   Q        All right.  And are you aware of anyone else in --

21   during the period of 2008 to 2013 that would prepare these --

22   well, strike that.  Are you aware of anyone who would check

23   her work, or is that not something that you --

24   A        I wouldn't know.

25   Q        -- would know?  Okay.  And Vicki Borden prepared the

1    commission breakdowns for the employees that were in the

2    direct sales department.  Is that correct?

3    A        Yes.

4    Q        And approximately how many people between the period

5    of 2008 and 2013 worked in the direct sales division?

6    A        I wouldn't know that off the top of my head.

7    Q        Would -- would it -- would it -- would the number 40

8    seem right?

9    A        I don't have a basis of comparison right now.

10   Q        All right.  Can you -- can you give me a more-than

11   number?  More than 30?  More than 40?  More than 50?

12   A        Not even that close.  I just know the departments

13   change numbers all the time.

14   Q        Okay.  All right.  I want to direct your attention

15   to a reference that the government or a -- one of these

16   commission breakdowns that the government directed your

17   attention to and asked you several questions about.  And I am

18   looking at the commission breakdown for -- Government's

19   Exhibit 409, commission breakdown for June of 2012 for Scott

20   Wombold.  Do you see that?

21   A        Yes.

22   Q        Okay.  And the government referred you--  Forgive me

23   for my--  All right.  The government referred you to this

24   bottom figure here and this notation that was made where

25   the -- on the To Pay line the $20,489.11 was crossed out and a

1  figure -- a handwritten figure of 30,000 was added to this.

2  Do you see that?

3  A       I do.

4  Q       And you made the assumption that that was done by

5  Mark Hazelwood --

6  A       That's correct.

7  Q       -- did you not?  And you made that assumption

8  because of what?

9  A       His signature under that "30,000."

10 Q       So you recognize Mark Hazelwood's signature?

11 A       I do.

12 Q       Okay.  And the government didn't direct you to this,

13 but I will.  In the previous -- in the previous commission

14 breakdown, dated May 2012, there's another notation where the

15 To Pay of $23,142.18 is crossed out.  Do you see that?

16 A       I do.

17 Q       And the amount of 30,000 has been inserted.  Do you

18 see that?

19 A       Yes.

20 Q       And here the -- I'm going to read what I think it

21 says.  It says -- it appears to say, "Mark Hazelwood, by VB,

22 per voice mail"?

23 A       Yes.

24 Q       All right.  Now, this is something that you would

25 have seen?

1   A        Yes.

2   Q        And what would that indicate to you?

3   A        That Mark approved it through voice mail, and Vicki

4   wrote it in there as the documentation.

5   Q        Okay.  And VB would be Vicki Borden?

6   A        That's correct.

7   Q        And do you recognize her handwriting?

8   A        I do.

9   Q        Okay.  And for approximately how many years did you

10  work when Vicki Borden was there with you?

11  A        I think Vicki was there when I came.

12  Q        2002, she was already there?

13  A        (Moving head up and down.)

14  Q        Until the time --

15  A        That's my thinking.  I would have to verify it in

16  the system.

17  Q        All right.  That's fair.  All right.  Now, with

18  regard to these notations, I want to also show you -- the

19  government didn't show this to you, but I will, on

20  Government's Exhibit 410 that were shown to you by the

21  government -- and they are the commission breakdowns for

22  Heather Jones?

23  A        Uh-huh.  (Moving head up and down.)

24  Q        All right.  And I want you -- I would ask you to

25  flip over to the date of October the 8th of -- October of

1  2008, commission breakdown report for Heather Jones.  Do you

2  see that?

3  A        I do.

4  Q        Okay.  And on the very bottom there appears to be --

5  on the To Pay line, a pay of 1000 -- I think that's $969.67.

6  Do you see that?

7  A        I do.

8  Q        And there appears to be a line drawn through it and

9  another figure --

10  A        Yes.

11  Q        -- of $2700?

12  A        Yes.

13  Q        And that signature you recognize to be whose?

14  A        Mark Hazelwood.

15  Q        So it appears that Mark Hazelwood added some money

16  to Heather Jones.  Is that correct?

17  A        Yes.

18  Q        And that's a round number, that 2700.  Is that

19  correct?

20  A        It is.

21  Q        All right.  Do you know what that's based on?  Do

22  you know what Mark Hazelwood based on -- based that on?

23  A        I don't.

24  Q        Okay.  And if you look at the date of August of

25  2009, it appears there that Mark Hazelwood -- or strike

1   that -- that the person who signed this -- you believe to be

2   Mark Hazelwood.  Is that correct?

3   A        I do.

4   Q        -- also added a certain amount here and increased it

5   from $2317.69 to $2800.17 -- 17 and 69 cents.  Do you see

6   that?

7   A        I do.

8   Q        Can you do the quick math and tell me how much

9   that's increased by?

10  A        Don't make me do math.

11  Q        I can do it for you, but I thought I'd make you look

12  good.

13  A        I can't see the marked through number.  Did you say

14  that's a 5?

15  Q        Yeah.  It's 2317.69.  I think it's $500.

16  A        Five-- 300.

17  Q        From -- from 2317 to two thousand --

18  A        Oh, to five.  Yes, you're right.  500, yes.

19  Q        Okay.

20  A        I'm still seeing that as a --

21  Q        We're in trouble if I'm better at math than you are.

22  A        No.  I'm still seeing that as a 5, but it...

23  Q        All right.  But it's a round number.  It's either

24  300 or 500.  Right?

25  A        Yes.

1  Q        All right.  We can move on.  That's --

2  A        Okay.

3  Q        I think the point is made there, that this change

4  was made and you don't know why this change was made.  Is that

5  correct?

6  A        That's correct.

7  Q        And it appears to be a round number.  It's either an

8  increase of $300 or an increase --

9  A        Or 500.

10 Q        -- of $500?

11 A        Right.

12 Q        And then, if you would -- we determined that the

13 previous month of October 2008 was a round number of 2700.  Is

14 that correct?

15 A        That is correct.

16 Q        Okay.  And then I won't do all of them, because

17 there are several, but if we could skip over to June of 2010,

18 on Heather Jones.

19 A        Okay.

20 Q        Do you see there it appears that it's signed "Mark

21 Hazelwood" and has "VB" underneath, which I think you've

22 indicated previously that would be an indication to you that

23 Vicki Borden did that for Mark Hazelwood?

24 A        Yes.

25 Q        And you would accept that for payment, right?

Whaley – Cross-Examination

1    A        Yes.

2    Q        And it's an increase of a whole number of $500?

3    A        Yes.

4    Q        And once again, you don't know why Mark Hazelwood or

5    Vicki Borden did that?

6    A        No.  There's no indication.

7    Q        And there's also no indication that that's based on

8    any calculation that you're aware of here, right?

9    A        That's correct.

10   Q        Okay.  And then if you flip over to July of 2010

11   there's a -- there appears to be two interlineations of

12   numbers on this July 2010 commission breakdown for Heather

13   Jones.  Do you see that?

14   A        I do.

15   Q        And on the line that corresponds to adjustment for

16   percent of quota, the figure of $3652.64 has been crossed out

17   and a whole number of 7000 has been inserted.  Do you see

18   that?

19   A        I do.

20   Q        And it appears that if you carry that number down,

21   the To Pay line would change from approximately $3920.75 to

22   $7188.11.  Do you see that?

23   A        I see it.

24   Q        Okay.  I'm just going to, for the point of -- for

25   the purpose of making this point, show that in September of

1  2010 Mark Hazelwood, by Vicki Borden, also changed that

2  figure.  Is that correct?

3  A        That is correct.

4  Q        And then, lastly, if you will flip over to February

5  of 2012 -- I apologize, as you're looking for it --

6  A        Okay.

7  Q        -- it appears that that is also changed --

8  A        Yes.

9  Q        -- to 4800.  And then the very last one that I'll

10 show you on here is May of 2012, where there also seems to be

11 a change in the figure and an increase of 5500.  Is that

12 correct?

13 A        That is correct.

14 Q        Now, it's fair to say that in all these examples

15 that I showed you and the government showed you these were

16 increases to the commissions?

17 A        Yes.

18 Q        Is that your memory?  Now, you've reviewed a number

19 of these --

20 A        Yes.

21 Q        -- for the purpose of paying them.  And do you

22 recall-- Well, let me -- let me show you something.  I want

23 to show you-- Do you know who -- well, strike that.

24          Are you aware that Mark Hazelwood changed the

25 commission breakdowns for -- well, strike that.  Do you recall

1    that Mark Hazelwood changed the commission -- the -- on the

2    commission breakdown forms, that he changed the To Pay amounts

3    for other employees, not just the three individuals that are

4    sitting here?

5    A        I would not know that for a fact.  I could look back

6    and determine.

7    Q        All right.  So let me help you with that.

8    A        Okay.

9    Q        I'm showing you Joint Defense Exhibit 13035, and

10   this a commission breakdown of Wendy Hamilton.  Is that good

11   enough for you to see?

12   A        Yes, I see it.

13   Q        Okay.  You see this is a commission breakdown for

14   Wendy Hamilton?

15   A        Yes.

16   Q        For the date of June 2010.  Is that correct?

17   A        Yes.

18   Q        And I just want to direct your attention to the To

19   Pay line.  Do you see that?

20   A        I do.

21   Q        And is it correct that it appears that $5000 were

22   added to her commission?

23   A        It's 500.

24   Q        500.  I'm sorry.  $500, that increased her pay from

25   $8247 to approximately $8747.  Do you see that?

1    A        That's correct.

2    Q        And that's also signed "Mark Hazelwood, by Vicki

3    Borden."

4    A        Yes.

5    Q        Okay.  Do you know who Wendy Hamilton is?

6    A        I do.

7    Q        Do you understand that she is still an employee --

8    A        She is.

9    Q        -- at Pilot?  Okay.  And I'm showing you Joint

10   Defense Exhibit 13004.  And this is the commission breakdown

11   of Dan Peyton.  Do you see that?

12   A        I do.

13   Q        Okay.  And Dan Peyton -- it appears on the To Pay

14   line that his original pay was crossed out from $12,835 to a

15   round number of $15,000.  Do you see that?

16   A        I do.

17   Q        Okay.  And, again, it appears that it is signed

18   "Mark Hazelwood by Vicki Borden."  Do you see that?

19   A        Yes, I do.

20   Q        Okay.  Dan Peyton, you'll recall, was an employee at

21   Pilot?

22   A        I don't know.  I don't remember him.

23   Q        Oh, is that prior to you?

24   A        I don't --

25   Q        He wasn't there with you in 2002?

1    A        I don't know.  We have 28,000 employees.  I don't

2    remember all of them.

3    Q        Well, yeah, but he was a supervisor at the time when

4    he was there, so -- but you don't remember that?

5    A        I don't remember him.

6    Q        Okay.  All right.  This is someone you will

7    remember, Karen -- I think you'll remember -- Karen Crutchman?

8    A        Yes.

9    Q        Okay.  And do you see on her commission

10   breakdown—scroll to the bottom here—that her To Pay was also

11   increased fairly significantly on the Adjust for Percentage to

12   Quota, from $2500 to $7500.  Do you see that?

13   A        I do.

14   Q        Which increased her Total To Pay from $3231.70 to

15   $8231.69?

16   A        I see that.

17   Q        And that is also a "Mark Hazelwood by Vicki Borden"?

18   A        Yes.

19            THE COURTROOM DEPUTY:  What number -- what exhibit

20   number is that?

21            MR. RIVERA:  I'm sorry.  This is Joint Defense

22   Exhibit 13002.

23   BY MR. RIVERA:

24   Q        I just have a couple more.  Again, another

25   commission breakdown report by -- pertaining to Wendy

```
 1   Hamilton --
 2   A        Uh-huh.
 3   Q        -- for the date of August of 2010.  And once again,
 4   her To Pay is increased from $4486 to $9032.21.  Do you see
 5   that?
 6   A        I do.
 7   Q        All right.  So my point in showing you this is,
 8   would you agree with me -- well, let me -- let me say this:
 9   Are you aware that Wendy Hamilton, Karen Crutchman, and Dan
10   Peyton were not charged as defendants in this case?  Are you
11   aware of that?
12            MR. HAMILTON:  Objection, Your Honor.  This is so out
13   of bounds that --
14            THE COURT:  We don't -- we don't need any commentary.
15   You made an objection.
16            MR. HAMILTON:  Yes, sir.
17            MR. RIVERA:  May I respond, Your Honor?
18            THE COURT:  Give Mr. Kelly a chance to respond.  .
19            Mr. Kelly?
20            MR. RIVERA:  Your Honor, the government has shown
21   these commission breakdowns of these three defendants, and has
22   only shown that Mark Hazelwood increased commissions on one of
23   these defendants, Mr. Wombold, giving the impression that
24   Mr. Hazelwood, for some reason—and it appears to be a
25   nefarious reason—only chose to give a commission -- an
```

1    increase in commission to Mr. Wombold, when in fact he gave

2    these commissions to employees throughout the sales division,

3    and the government -- and the defense has shown that.  By -- by

4    showing that he gave these commissions to people who were not

5    charged in this case it undermines the government's inference

6    that he was only giving commissions or increases in commissions

7    to people who were engaged in some type of criminal activity.

8            MR. HAMILTON:  May I respond to that, Your Honor?

9            THE COURT:  I don't think there is any need to

10   respond.  I'm not going to state what may be in the

11   government's mind or what inferences the jury can draw from the

12   evidence.  But asking this witness whether somebody else was

13   charged or not, I think it calls for speculation.  You probably

14   know this, but grand juries oftentimes indict people and the

15   indictments are sealed.  In fact, I think in this district the

16   standard is that every indictment is sealed until the

17   government unseals it for some reason.  For all we know, every

18   single person that's mentioned has been indicted.  This witness

19   would have no way of knowing that.  And if she did know it and

20   she said it in public, she could be put in jail for contempt of

21   court because that information is secret.  So that's one --

22   that's one problem with it.  She would have no way of knowing

23   whether someone has been charged or not.

24           And the second is, assuming that somebody is guilty

25   of a crime, the government doesn't have to charge everybody

1    that's guilty of a crime.  You're not from Chattanooga, but if
2    you venture to travel on our highways you'll see people
3    breaking the law every day on the interstate.  And the great
4    majority of those people are not arrested or charged with
5    anything.  And that's true of many crimes.  The government
6    exercises all kinds of discretion in who to charge and who not
7    to charge.  That discretion may be good discretion or may be
8    bad discretion.  But I don't know that we can draw inferences
9    from the fact the government's chosen to charge someone and
10   not charge somebody else.  It may be they think some people
11   are more handsome than other people, or it may be that they
12   think some people are Alabama fans and not Georgia fans.  But
13   they have that right to determine who to charge, as long as
14   it's not on some unconstitutional basis, right?
15          MR. RIVERA:  I agree with Your Honor.
16          THE COURT:  Yeah.  So the fact--  Let's assume that
17   somebody has done something awful and the government has chosen
18   not to charge them.  That does not have anything to do with the
19   jury's determination of whether people on trial have committed
20   a crime or not, right?
21          MR. RIVERA:  I don't disagree with Your Honor.
22          THE COURT:  Very good.
23          THE COURTROOM DEPUTY:  What was the number of the
24   last exhibit?  I just want to keep up with them, sir,
25   Mr. Rivera.

```
 1              MR. RIVERA:  The last exhibit?

 2              THE COURTROOM DEPUTY:  Yes.

 3              MR. RIVERA:  It was joint Exhibit 13003.  I can

 4    withdraw and proceed, Your Honor.

 5              THE COURT:  Very well.

 6    BY MR. RIVERA:

 7    Q         Did you testify earlier that Wendy Hamilton is still

 8    an employee at Pilot?

 9    A         Yes.

10    Q         And it's clear from the documents that I showed you

11    that Mr. Hazelwood, either directly or through Vicki Borden,

12    increased the commissions to people other than the three

13    individuals who are charged here today——Mr. Wombold,

14    Ms. Jones, and Ms. Mann?

15    A         Yes, that's what you showed me.

16    Q         Okay.  Now, Ms. Whaley, you previously, on August

17    the 24th of 2017, signed a document that you attested to under

18    penalty of perjury, entitled "Declaration of Claudine Whaley

19    Concerning Commission Breakdowns."  Do you recall that?

20    A         I do.

21    Q         And your -- in that declaration you referenced

22    certain commission breakdowns.  Do you recall that, that

23    you -- in the document itself, you -- I'm about to show it to

24    you --

25    A         Okay.
```

1    Q        -- but just for your memory, you indicated that --

2    you referenced within it commission breakdowns?

3    A        Yes.

4    Q        Okay.  And the commission breakdowns that you

5    referenced in this declaration involved the three individuals

6    that are on trial here——Scott Wombold, Karen Mann, and Heather

7    Jones.  Is that correct?

8    A        Yes.

9    Q        Let me show you Joint Defense Exhibit 3- --

10            MR. HAMILTON:  Objection, Your Honor.

11            MR. RIVERA:  -- 342.

12            THE COURTROOM DEPUTY:  Did you say 342?

13            MR. RIVERA:  Yes.

14            THE COURT:  What's the objection?

15            MR. HAMILTON:  The declaration at this point is

16    hearsay.  The declaration was a -- it was an authenticity

17    declaration.  I don't dispute that it's an authentic document

18    itself, but it's unclear as to what the purpose is.  If he's

19    trying to impeach the witness, it's unclear what the

20    inconsistent statement is that he's trying to impeach with.

21    Laying down a document that's an out-of-court statement, this

22    is not proper procedure.  So the objection is that the

23    declaration is hearsay at this point.

24            THE COURT:  He hasn't offered it into evidence yet,

25    either, as a whole or by asking the witness to adopt anything

```
 1   in it.  I think you're correct that it is hearsay, but let's
 2   see what the -- what the question is.
 3   BY MR. RIVERA:
 4   Q      Let me -- let me go about this a little bit
 5   differently.  Were you asked to prepare a -- were you asked to
 6   sign a declaration that included references to certain
 7   commission breakdowns?
 8   A      I remember being asked to sign a declaration that I
 9   had to attest to some documentation I pulled, yes.
10   Q      All right.  So without explaining to the jury, I'm
11   going to show you what's been marked Joint Defense Exhibit 342
12   and ask the clerk to hand it to you.
13          THE COURT:  You can put it on the display.
14          THE COURTROOM DEPUTY:  I turned --
15          THE COURT:  Ms. Lewis anticipated you, so she's
16   turned the monitors.  So only you and the witness can see it.
17          MR. RIVERA:  Thank you, Your Honor.
18          THE COURT:  And the lawyers throughout -- the lawyers
19   can also see it.  So the jury's in the dark right now.
20          MR. RIVERA:  Thank you, Your Honor.
21   BY MR. RIVERA:
22   Q      Ms. Whaley, do you see this document?
23   A      I do.
24   Q      Do you see the title of this document, who it
25   references here?  This is called -- in legal terms it's called
```

1    a style.

2    A        Yes.

3    Q        And it involves Mark Hazelwood, Scott Wombold.  It

4    includes other people, but it also includes Karen Mann and

5    Heather Jones.  Do you see that?

6    A        I do.

7    Q        And it's entitled "Declaration of Claudine Whaley

8    Concerning Commission Breakdowns."  All right?  Would you take

9    a moment and -- I'll bring that up here so that you can read

10   that to yourself so I can ask you about this document.

11   A        (Witness complying.)  Okay.

12   Q        All right.  And I'll flip over to the next page.

13   A        Yes.

14   Q        That's your signature, right?

15   A        It is.

16   Q        And you signed it on the 24th of August of 2017.  Is

17   that correct?

18   A        It is.

19   Q        Now, when I asked you earlier --

20            MR. HAMILTON:  Your Honor, before the question is

21   asked about it, could she show -- could she see the attachment

22   to that document, to the declaration as well?

23            THE COURT:  That's up to Mr. Kelly.

24            Mr. Kelly?

25            MR. HAMILTON:  To the declaration itself.  There's a

1    third page.

2              MR. RIVERA:  Well, Your Honor, the -- the United

3    States doesn't have a third page.  It's not interested in

4    moving a third page.  I'm only interested in showing her this

5    declaration.

6              THE COURT:  You're in control of your examination.

7    So proceed.

8              MR. RIVERA:  Thank you.

9    BY MR. RIVERA:

10   Q        Ms. Whaley, I asked you earlier whether you had

11   referenced certain commission breakdowns in this document.

12   All right?  And what I was referring to was, if you would look

13   to the Paragraph 2 here where it indicates -- if you'll read

14   it to yourself --

15   A        Uh-huh.

16   Q        -- to try to keep from reading it out loud here.

17   A        Uh-huh.

18   Q        But it does indicate certain breakdowns of these

19   three individuals.

20   A        Right.

21   Q        And then it references these Bates stamp -- what

22   they call Bates stamp numbers, Bates-labeled numbers.  All

23   right?  Do you see that?

24   A        I do.

25   Q        PFJ beginning with 2019 and ending with 282?

```
1    A        Yes.

2    Q        And the next one is referenced 320 to 384?

3    A        Yes.

4    Q        And there's a final one there as well.  Do you see

5    that?

6    A        I do.

7    Q        And these pertain to commission breakdowns, as you

8    state in this document, to Heather Jones, Karen Mann, and

9    Scott Wombold.  Is that correct?

10   A        That's correct.

11   Q        So that refreshes your recollection --

12   A        It does, yes.

13   Q        -- that you executed this document, and -- including

14   these documents?

15   A        Yes.

16   Q        Now, I want to show you...

17            Your Honor, these are extensive.  Would it be easier

18   to summarily hand these to the witness and have her review the

19   Bates stamps so she can attest that they are --

20            THE COURT:  Give them to Ms. Lewis.

21            (Brief pause.)

22            THE WITNESS:  Thank you.

23   BY MR. RIVERA:

24   Q        If you look on the bottom lower right-hand side, you

25   see that there is a -- a number?
```

1   A          Yes.

2   Q          And would you check and see that those numbers are a

3   subsection of these numbers here?  (Indicating.)  I think

4   probably the best way to do that is, if you first look at

5   Heather Jones, it would correspond to the 219 to 282.  Do you

6   see that?

7   A          I do.

8   Q          And the next group would correspond to Karen Mann,

9   which would be the 320 to 384?

10  A          Yes.

11  Q          And then the last one is Scott Wombold?

12  A          Yes.

13  Q          Okay.  And then in just looking at these documents,

14  do you recall that these documents are an earlier version -- a

15  unfinished or unfinalized version of the documents that were

16  just introduced into evidence?

17  A          Yes.  They don't have the signatures.

18  Q          Okay.  And they also don't have the handwritten

19  additions on the -- on the -- that were made, presumably, by

20  Mark Hazelwood?

21  A          Yes.  I don't see those.

22  Q          All right.  So -- so in this document, you indicated

23  that these -- the documents that are in your hand were the

24  documents that were used by the payroll department as the

25  basis for payment of commission to those employees?

1    A        Those would be the commission breakdowns, yes.

2    Q        Right.  But you would agree with me that in fact

3    those are not the commission breakdowns that were used,

4    because they're not finalized, right?  They don't have --

5    A        Without the signature, yes.

6    Q        Right.  They don't have the signature.  And they

7    also don't have the increases that were made to Scott Wombold,

8    and they don't have the increases that were made to Heather

9    Jones.  Is that correct?

10   A        I don't see those.  You're right.

11   Q        Right.  So -- so in fact, the -- these were not the

12   commission breakdowns that were used by Payroll to pay these

13   individuals, but the ones that the government introduced, that

14   were finalized with the signatures, are the ones --

15   A        Uh-huh.

16   Q        -- that were used to pay these individuals.  Is that

17   correct?

18   A        That is correct.

19   Q        All right.  So is it fair to say that --

20            MR. RIVERA:  Well, Your Honor, at this time I would

21   like to move this document into evidence and publish it to the

22   jury.

23            THE COURT:  Any objection?

24            MR. HAMILTON:  No, Your Honor.

25            THE COURT:  Okay.  It's admitted.  And it may be

1   published.

2           MR. RIVERA:  Thank you.

3           THE COURTROOM DEPUTY:  And this is?

4           MR. RIVERA:  This is Joint Defense Exhibit 342.

5           MR. HAMILTON:  Objection, Your Honor.  Actually

6   this -- the case heading on this is not appropriate for -- it

7   has a -- it identifies people who are not on trial in this

8   particular case, because it has a case caption --

9           THE COURT:  It's just the first page--  I think

10  you're pointing out some discrepancies between her present

11  testimony and the document and this earlier version.  I think

12  that's what's important.  Is there anything in the first page

13  that would cover that?

14          MR. RIVERA:  Your Honor, if I could respond.

15  There -- although that's the case, there is no prejudice here,

16  in that the persons that are referenced are individuals who --

17  who --

18          MR. HAMILTON:  Well, Your Honor, before he goes on...

19          THE COURT:  The question, is there anything on the

20  first page that really points out the discrepancy?

21          MR. RIVERA:  There is, Your Honor.  The -- not just

22  the -- not just the Bates-stamped numbers, but beginning

23  paragraphs, including the fact --

24          THE COURT:  The jury -- the jury will have no idea

25  what "Bates stamp numbers" means.  That's all Greek to them.

1          MR. RIVERA:  Your Honor, if I may, I can redact the

2    portions that the government is objecting to, the names on the

3    style.

4          THE COURT:  That's fine.  I was just going to suggest

5    putting everything except the first page.  But if you think you

6    can redact the first page, that's fine.  So what counsel will

7    do, then, is to redact the one part of the document as to which

8    there is an objection.  Otherwise, it's admitted, and it may be

9    published.

10          So if you want to publish it now, why don't you just

11   go ahead and do the second page through the end of it.  I

12   don't think you wanted to ask the witness anything on the

13   first page, did you, other than the Bates number?  And as I

14   said, I don't think the term Bates number means anything to

15   nonlawyers.  When they hear "Bates," they probably think of

16   that horror movie.  What was it?  Motel?  Hotel?

17          MR. RIVERA:  Your Honor, I also have a low-tech way

18   of doing this as well.  I can fold over the page.

19          THE COURT:  Excellent.

20          MR. RIVERA:  Great.  Thank you.

21          THE COURTROOM DEPUTY:  So we're publishing it?

22          MR. RIVERA:  Yeah.  This is Joint Defense

23   Exhibit 342.  After years of trial experience.

24   BY MR. RIVERA:

25   Q        All right.  Ms. Whaley, I'm showing you a portion of

1    this -- of your declaration.

2    A       Yes.

3    Q       All right.  And I will come back to this -- to this

4    first page here, but as I was referring earlier, you indicated

5    these Bates stamp numbers -- here are the -- you reference

6    your position, you also reference that these commission

7    breakdowns referenced in this declaration is the Bates stamp

8    numbers that we talked about earlier, right?  Just doing that

9    for the benefit of the jury.  And then you state here that the

10   commission breakdowns were prepared to identify commissions

11   payable to employees on direct sales team.  And then you

12   further state that during the time period --

13           Your Honor, I -- I misspoke earlier.  There is a

14   third page, and I have no objection to that coming in as well.

15   I'll even display it to the -- to the witness.  And it is a

16   third page, and it's the commission breakdown of Heather

17   Jones.

18           THE COURTROOM DEPUTY:  Are you publishing it?

19           MR. RIVERA:  Yes, I am publishing it.  Thank you.

20   BY MR. RIVERA:

21   Q       And it's a commission breakdown of Heather Jones

22   that I believe was used as an example in the -- in the

23   declaration itself.  All right?

24           So turning now to the second page of your

25   declaration, it begins from the first page, it says, "During

1    the time period" -- it goes on to say, "covered by the

2    above-referenced commission breakdowns, the payroll department

3    used the commission breakdowns as the basis for the payment of

4    commissions to those employees."

5            Now, when it says "covered by the above-referenced

6    commission breakdowns," it's referring to the ones that we

7    looked at, that you're looking at there, that are blank?

8    A       Uh-huh.

9    Q       Is that correct?

10   A       Yes.

11   Q       Okay.  But, in fact, those weren't the ones that

12   were used, as you just indicated.  It was the finalized

13   versions that were used by the government?

14   A       Well, at the time this was being prepared --

15   Q       Uh-huh.

16   A       -- this is what I had.

17   Q       Right.  So we're going to get to that, but I am

18   right, that now, looking at it now --

19   A       Uh-huh.

20   Q       -- you realize that it wasn't these that were used,

21   it's the final ones of the government's that were used?

22   A       It was only with signatures, yes.

23   Q       Okay.  So this is not correct.  Is that right?

24   A       I'm not sure exactly how to answer that, because

25   it's correct that this is the type of commission breakdowns we

1  used, and it's correct that this is an example of exactly what

2  those are.

3  Q        Right.

4  A        But it is also correct that they don't have the

5  signature on them, so they were not the final documents.

6  Q        But it's incorrect because it says, right, that the

7  ones that are referenced here for these individuals, "The

8  commission breakdowns were prepared to identify commissions

9  payable to the employees of the direct sales group during the

10 time period -- during the time period covered by the

11 above-referenced commission breakdowns," which are the ones

12 that you have there.  The payroll department used the

13 commission breakdowns as the basis for the payment of

14 commission to those employees, right?

15 A        Yes.  And during that time period we did use the

16 commission breakdowns.

17 Q        Right.  You used the commission breakdowns but not

18 those commission breakdowns.  Is that right?

19 A        Used the commission breakdowns.  Some of these

20 didn't change.  Some might have had that adjustment.  But none

21 of them had the signature.

22 Q        Okay.  So the commission -- the ones that were

23 adjusted or changed were not the ones that were used.  Is that

24 correct?

25 A        The changes, yes, that's right.

1    Q        Okay.  Now I'll ask you—and you started to

2    volunteer this information earlier—where did you get these

3    commission breakdowns, these blank ones?

4    A        Those were -- I think those were in a binder shown

5    to me.

6    Q        By?

7    A        I think it was by the government.

8    Q        Okay.

9    A        Not by the government necessarily, but by our

10   attorneys.

11   Q        Okay.  Would -- do you have information to know that

12   it was by your attorneys at the request of the government?

13   A        I don't know that.

14   Q        All right.  What about this declaration?  Did you

15   type this declaration yourself?

16   A        I did not.

17   Q        Who prepared this declaration?

18   A        It was -- it was, I think, by our attorneys, by

19   someone there, because it was sent to me to sign.

20   Q        Okay.  And do you --

21   A        And these were as examples of the commission

22   breakdowns.

23   Q        All right.  Did you know at the time that this was

24   going to be used in a courtroom?

25   A        If I sign a declaration, I could assume it would be,

1    yes.

2    Q        Okay.  And you -- but you reviewed these, didn't

3    you?

4    A        I looked at these to see that they're the type of

5    commission breakdown sheets we used, yes.

6    Q        All right.  And they weren't signed, were they?

7    A        They were not.

8    Q        And you learned later on that some of them had

9    changed?

10   A        Yes.  When I reviewed them to pull the signed

11   documents, yes.

12   Q        Okay.  Now, you testified that--  The ones that the

13   government has put in evidence now, are those the ones that

14   were used to pay the commissions?

15   A        The ones with the signatures.  (Moving head up and

16   down.)

17   Q        All right.  The ones that were also adjusted or

18   additional amounts were added?

19   A        On some of them, yes.

20   Q        Okay.  Are you sure there isn't yet another version

21   that may have been used?

22   A        Not for payroll, because when we pay it, we scan it

23   into the document management.  And I pulled those out of the

24   document management system.  I compared them to the payroll

25   system, as far as what payments were made.

1  Q      Okay.  All right.  So you're saying that you checked

2  the second version that you just got?

3  A      Yes.

4  Q      All right.  The handwritten notations that we've --

5  that I've shown you and you've discussed, those handwritten

6  notations, you testified you don't know what they're based on?

7  A      I don't.

8  Q      Okay.  You don't know -- you don't know whether

9  they're based on -- you don't know -- strike that.  You don't

10 know whether Mark Hazelwood thought, "This is a good month.

11 Let me give everybody an increase"?  You don't know if that

12 was the case?

13 A      I don't know that.

14 Q      All right.  But you can't testify that those numbers

15 are based on any profit calculation by Pilot, right?

16 A      Correct.

17 Q      Now, you testified that these documents, these

18 commission breakdowns, were prepared -- you testified that

19 these commission breakdowns were prepared by Vicki Borden, and

20 that neither you nor anyone in your department went back to

21 determine the accuracy of her calculations or the input of her

22 information.  Is that fair?

23 A      That is correct.

24 Q      So putting back on the screen Government's

25 Exhibit 410, you did not go back to check to see if when Vicki

1   Borden wrote in for Brian's direct bill on the February 2008

2   commission breakdown 336,665.09, whether that's really Brian's

3   direct bill, right?  You didn't go back and check that?

4   A       No, no.

5   Q       So if she, for example——and I'm just picking

6   something here——this 6 that I'm pointing to here, if that was

7   originally a five and she made it a six, you wouldn't know

8   that?

9   A       I would not know that.

10  Q       Okay.  And you would agree with me that any changes

11  that Vicki Borden would make——this is sort of a math

12  question——to some of these figures here would have an effect

13  on the total commission and ultimately the Total To Pay?

14  A       Yes.

15  Q       Okay.  All right.  So let's talk about the person

16  who prepared these documents that you testified about.  You

17  rely on the accuracy of this To Pay number in order to pay the

18  employee their commission?

19  A       Yes.

20  Q       Right.  And if -- if this is wrong, then the

21  employee would be paid incorrectly.  Is that right?

22  A       That is correct.

23  Q       So there's a lot weighing on this being correct?

24  A       Yes.

25  Q       And you've put -- you and your department put

1    reliance on that.  Is that correct?

2    A        Exactly.

3    Q        Okay.  Are you aware that the person who prepared

4    these commission breakdowns, Vicki Borden, is now a convicted

5    felon?

6             MR. HAMILTON:  Objection, Your Honor.

7             THE COURT:  Is that impeachment, Counsel?

8             MR. RIVERA:  Yes, it is.

9             THE COURT:  Do the rules allow impeachment of someone

10   who has not testified as a witness?

11            MR. RIVERA:  Well, Your Honor, let me -- let me

12   rephrase that.  What the -- what the defense is doing with

13   respect to this line of questioning is showing that -- and I

14   think may -- the following questions will illustrate that the

15   person who prepared this document was preparing them under

16   circumstances that make these documents unreliable.

17            THE COURT:  And they're unreliable because the person

18   is a felon?

19            MR. RIVERA:  Your Honor, I can -- I can move on from

20   that particular question.

21            THE COURT:  Isn't that impeachment, though?  Isn't

22   that the definition of impeachment?  You're calling into

23   question someone's credibility, that is, whether you can rely

24   upon what they say in court because they are a felon?

25            MR. RIVERA:  I think it is.

1          THE COURT:  Okay.  And the rules do not permit

2    impeachment of witnesses who have not testified, do they?

3          MR. RIVERA:  Well, Your Honor, I'm not impeaching --

4    I'm not impeaching that witness.

5          THE COURT:  Nonwitness.

6          MR. RIVERA:  That--  I'm sorry.  I'm not impeaching

7    that nonwitness.  What I am doing is showing the unreliability

8    of the document based on --

9          THE COURT:  What does impeachment mean?  When you

10   impeach a person, what does that mean?

11         MR. RIVERA:  You undermine their credibility.  And

12   I'm undermining the credibility of that witness, but for a

13   different reason, for that individual, that nonwitness, to show

14   --

15         THE COURT:  Why does the reason make a difference, as

16   long as what you're doing is impeaching?

17         MR. RIVERA:  Because --

18         THE COURT:  I don't know that the rules make any

19   distinction.  If you impeach someone, it's impeachment, and I

20   don't know that it makes any difference, the reason, does it?

21         MR. RIVERA:  Well, let me withdraw that particular

22   question --

23         THE COURT:  Very well.

24         MR. RIVERA:  -- and see if I draw fire on the

25   following questions.

1   BY MR. RIVERA:

2   Q        You're aware that Vicki Borden was preparing these

3   documents -- or you reviewed -- strike that.  You reviewed

4   documents that Vicki Borden prepared, commission breakdown

5   reports, some between the years of 2008 and 2012?

6   A        Yes.

7   Q        Okay.  And during that period of time are you aware

8   that Vicki Borden was engaged in fraudulent activity that may

9   have been related to these commission breakdowns?

10  A        I'm not aware personally of anything about that.

11  Q        Okay.  If you learned--  I'm speaking about the

12  reliability and the reliance that you placed on these

13  documents.

14  A        Yes.

15  Q        If you learned that Vicki Borden was engaged in

16  fraudulent activity at the same period of time that she was

17  protect -- preparing these documents --

18  A        Yes.

19  Q        -- would that make these documents and your reliance

20  on them -- would they make them less reliable?

21           MR. HAMILTON:  Objection, Your Honor.

22           THE COURT:  Sustained.

23           (Brief pause.)

24  BY MR. RIVERA:

25  Q        Is Vicki Borden an employee of Pilot right now?

1    A        She is not.

2    Q        Do you understand that Vicki Borden has been fired

3    from Pilot?

4    A        Yes.

5    Q        And do you understand that she was fired for

6    committing fraud while in employment -- an employee at Pilot?

7             MR. HAMILTON:  Objection, Your Honor.

8             THE COURT:  Sustained.

9    BY MR. RIVERA:

10   Q        Are you aware of -- are you aware that Vicki Borden

11   prepared these documents, these commission breakdowns, on

12   behalf of or for colleagues who worked for -- with her?

13   A        What I am aware of is that Vicki put these

14   spreadsheets together and got them approved by Mark and then

15   sent them to us to pay.

16   Q        All right.  She prepared these commission breakdowns

17   for individuals that were, I think you testified earlier, in

18   the sales -- direct sales department.  Is that correct?

19   A        Yes.

20   Q        And she was also in the direct sales division?

21   A        She was.

22   Q        And so there were other people in this direct sales

23   division that she worked with that she prepared these

24   documents --

25   A        Yes.

1  Q        -- for?  And are you aware that she also prepared

2  the commission breakdown for her own supervisor?

3  A        For--  I don't know who her--  I thought Mark was

4  her supervisor.

5  Q        Okay.  He wasn't, but -- but you're not aware of

6  that?

7  A        Right.  I'm not.

8  Q        Are you aware whether she prepared her own

9  commission breakdown?

10  A        She did not.

11  Q        Okay.  And are you aware that she prepared

12  commission breakdowns for individuals that she's known for

13  many years?

14  A        Yes.

15  Q        Okay.  And you would agree that if she entered --

16  that if she favored any of these individuals, that she can

17  manipulate the numbers on these commission breakdowns to

18  increase their commissions?

19  A        That would be a reasonable assumption.

20  Q        Okay.  Now, Ms. Whaley, if you learned that Vicki

21  Borden admitted that she made up some of the figures on these

22  commission breakdowns, would that make them less reliable?

23  A        If I had learned it during that time?  Is that what

24  you're asking?

25  Q        No.  If you learned it now.

1   A        Well, they were still approved.  So as long as that
2   approval is on there, I'm relying on them.
3   Q        I understand that.  But would you be relying on them
4   incorrectly?  Would they be unreliable if she falsified
5   information on these documents?
6   A        Are you asking me if in hindsight --
7   Q        Sure.
8   A        -- I would say they're unreliable?
9   Q        Sure.
10  A        I couldn't judge that.
11           MR. HAMILTON:  I'm going to object, Your Honor.  May
12  I state why?
13           THE COURT:  There is no need.  It assumes a fact not
14  in evidence.  That's a violation of Rule 611.  You were
15  assuming that something has happened, and there's been no
16  evidence at all presented to the jury that that event has
17  happened.  And that would be asking the witness to assume that
18  that's the case and what would be the result.  So it calls for
19  speculation on the part of the witness, and therefore the
20  objection is sustained.
21  BY MR. RIVERA:
22  Q        All right.  Ms. Whaley, I want to show you certain
23  documents.
24           THE COURTROOM DEPUTY:  Do you want them just to show
25  her?

1    MR. RIVERA:  No.  I'm going to publish these and

2  admit them.

3  BY MR. RIVERA:

4  Q       Joint Defense Exhibit 322.  Ms. Whaley, I want to

5  show you these exhibits and ask you if you have seen these and

6  if these documents would make the commission breakdowns report

7  less reliable.  These were prepared -- these e-mails are in

8  relation to the preparation of the commission breakdowns, and

9  you'll see that here.  And on the bottom there, if you can

10  see, there is an e-mail from John Freeman, starting at the

11  bottom --

12  A       Uh-huh.

13  Q       -- on May the 24th of 2011, to Vicki Borden, and it

14  reads, "Part of me wants to ask to increase his manual rebate

15  and points section to decrease his commission by about a

16  thousand dollars."

17  A       Uh-huh.

18  Q       And if you look below that, it begins on May

19  the 24th of 2011, by Vicki Borden, with the relationship --

20  with relation to Tim Hampton's commission calculation.  Do

21  you --

22  A       I can't see that part.

23  Q       -- see that?  Oh, I'm sorry.  You're absolutely

24  right.  I apologize.  Thank you for correcting me.

25  A       Okay.  Okay.  I see that.

1    Q        All right.  So it's relating to Tim Hampton's

2    commission calculations.  You see that?

3    A        Yes.

4    Q        And John Freeman says, "Part of me wants to ask you

5    to increase his manual rebate and points section to

6    increase -- to decrease his commission by a thousand."  Right?

7    See that?

8    A        Yes, I do.

9    Q        And then Vicki Borden responds to John Freeman, "He

10   watches the numbers, but let me know if you want me to

11   adjust."

12   A        I see that.

13   Q        Okay.  So would you agree that Vicki Borden here

14   appears to be willing to manipulate a salesperson's commission

15   at the request of John Freeman?  Do you see that?

16   A        I see --

17            MR. HAMILTON:  Objection.

18            THE COURT:  What's the objection?

19            MR. HAMILTON:  It's speculation, and it's also

20   hearsay, but we're beyond that.

21            THE COURT:  Okay.  The question was whether she saw

22   something, and I think the witness answered that she's seen it.

23   So she's already answered the question.

24   A        I see the e-mail, but I don't understand --

25            THE COURT:  Ma'am, ma'am, you've already answered.

1    You don't need to go any further.

2            THE WITNESS:  Okay.  Okay.

3    BY MR. RIVERA:

4    Q       Do you agree that this e-mail from John Freeman

5    relates to the commissions of Tim Hampton?

6    A       That is the subject, yes.

7    Q       Okay.  Do you agree that John Freeman is requesting

8    to decrease the commission of Tim Hampton by a thousand

9    dollars?

10   A       That is what the e-mail says.

11   Q       And do you agree that Vicki Borden indicates that

12   "He watches, but let me know if you want me to adjust"?  Do

13   you see that?

14   A       Yes, I see that.

15   Q       All right.  I want to show you Joint Defense

16   Exhibit 323.  I'm going to scan this back, Ms. Whaley.  You

17   tell me if this becomes too small for you to see.  I'll try to

18   capture as much as I can on this.

19           MR. HAMILTON:  Your Honor, objection to these

20   documents as hearsay.  I know I can't make an objection until I

21   actually hear a question, but he's just laying documents down

22   on the camera that are hearsay, and the United States makes an

23   objection to this document and to any other emails that he's

24   about to lay down that are hearsay.

25           THE COURT:  Well, let's make sure the jury cannot see

1    them.  So there is something that counsel has put on the

2    evidence presenter, and the government makes an objection to

3    it.  So let's see what the question is with respect to the

4    document, and if there's still an objection, the Court will

5    take up the objection then.

6              MR. RIVERA:  Your Honor, may I have one moment,

7    please?

8              THE COURT:  You may.

9              (Off-the-record discussion between defense counsel.)

10             MR. RIVERA:  So, Your Honor, let me -- point of

11   clarification with respect to whether this is hearsay or not.

12   The defense is not offering these documents for the truth of

13   the matter asserted.

14             THE COURT:  Are you offering the documents at all?  I

15   mean, I don't know where you're going.  Do you plan-- You can

16   do many things with documents, and among those things is offer

17   them into evidence.  So are you planning to offer them into

18   evidence?

19             MR. RIVERA:  Firstly, I am planning on offering them

20   into evidence, not for the truth of the matter asserted, but to

21   show that it was said.  The --

22             THE COURT:  Well, let's take this.  Are you willing,

23   then, to instruct the jury that they should disbelieve

24   everything in the document, they should assume everything in

25   the document to be not true?

1          MR. RIVERA:  Well, not to disbelieve, Your Honor, but

2    that they're not being offered for the truth.

3          THE COURT:  Well, if you will stipulate that the jury

4    should consider everything in the document to be untrue, then I

5    think we can go ahead and let you use them.  If, though, there

6    is a possibility the jury might assume that anything in the

7    documents are true, I think we do have a hearsay problem.

8          MR. RIVERA:  Your Honor, I'd be willing to stipulate

9    to that.

10         THE COURT:  Very well.  Do we have a number for this

11   exhibit?

12         MR. RIVERA:  Yes, we do, Your Honor.  And that -- I

13   have several exhibits that I intend to show under this same

14   condition.

15         THE COURT:  All right.

16         MR. HAMILTON:  So the United States --

17         THE COURT:  You look confused, Mr. Hamilton.

18         MR. HAMILTON:  Well, I would have to say that, based

19   on what I'm seeing, then, the United States -- if nothing in

20   these e-mails -- if they're not being offered because any of it

21   is true and in fact he's stipulating that it's all false, or

22   not true, then it is not relevant.

23         THE COURT:  Well, we don't know what he's going to do

24   with them.  But once we get the documents identified, I'll tell

25   the jury that "You are being presented with certain documents.

1    You've heard counsel say that they're not being offered for the

2    truthfulness of the matter asserted.  So you can never, ever

3    under any circumstances assume that anything at all in the

4    documents is true.  In fact, you must assume the exact

5    opposite, that every line, every word, every letter in the

6    document is false."  Okay?

7                MR. RIVERA:  And, Your Honor, in terms of

8    relevance -- and I know we haven't reached that, but in terms

9    of relevance, this witness --

10               THE COURT:  Well, there has not been an objection to

11   relevance.  And once you concede that everything in the exhibit

12   is false, I'm not sure what we do with the relevance.  I think

13   we only attach relevance if there is some assumption something

14   in it is true.

15               MR. RIVERA:  Very well.

16               THE COURTROOM DEPUTY:  So it's 323?

17               MR. RIVERA:  323.

18               THE COURT:  323.  So it's Joint Exhibit 323, ladies

19   and gentlemen.  Everything in this document, you should assume,

20   is false.

21               MR. RIVERA:  And, Your Honor, I led with 322.

22               THE COURT:  I'm sorry, 322.

23               MR. RIVERA:  And should I just list --

24               THE COURT:  That's also the case for the witness.

25   The witness should also assume that everything you're being

1    presented with now is false.

2              THE WITNESS:  Okay.

3              MR. RIVERA:  Your Honor, and I can list the exhibits

4    that I intend to show, so that...

5              THE COURT:  Very well.

6              MR. RIVERA:  It will be 322, 323, 324, 338, 326, 327,

7    329, 330, 331, 332, 333, 335, 336, 337, 339, 340, 341, and 325.

8    BY MR. RIVERA:

9    Q        Now, Ms. Whaley, I'm showing you Joint Defense

10   Exhibit 323.

11   A        Okay.

12   Q        Begin reading from the beginning.  It's from Arnie

13   Ralenkotter to Vicki Borden, and here Arnie Ralenkotter is

14   asking for "Summary commission statements for August for the

15   individuals on my team."  Do you see that?

16             THE COURT:  Well, I think we should assume that

17   Mr. Ralenkotter actually doesn't say that.  That is what the

18   document says, but I think that since we're stipulating that

19   the jury cannot assume anything is true, that we should not

20   assume that Mr. Ralenkotter actually said that or that that was

21   actually his -- an email from him.

22             MR. RIVERA:  All right.  With that instruction --

23   BY MR. RIVERA:

24   Q        And the response from Vicki Borden to Arnie

25   Ralenkotter is, "I will look up -- look those up.  The numbers

1    are all incorrect on the details.  I just changed the bottom

2    number to be their cap."  Do you see that?

3    A        I see those words.

4    Q        Okay.  That's all it is, it's words, right?

5    A        Uh-huh.

6    Q        All right.  And then, on the bottom, continuing on,

7    from Arnie Ralenkotter, back to Vicki Borden, "I just want to

8    track their total commissions for the month.  If you can just

9    send me what we paid out, that would be enough."

10           And from Vicki Borden to Arnie Ralenkotter, "Sure,

11   sorry about that.  They are so made up right now, it's almost

12   scary."

13           Do you see -- do you see that from Vicki Borden?

14   A        I see those words on the paper.

15   Q        All right.  When you say "I see those words," what

16   do you mean?

17   A        We're assuming it's not from Vicki Borden, right?

18           (Laughter.)

19           THE WITNESS:  This--  I'm just--  This has nothing to

20   do with what I do.

21           THE COURT:  You're absolutely correct, ma'am.  That's

22   the assumption that you must make.

23           MR. RIVERA:  This is not your fault, Ms. Whaley.

24           THE WITNESS:  It's not anything in my job, to look at

25   this.  So I just -- I'm trying to be cooperative.

1    BY MR. RIVERA:

2    Q        All right.  You see these words?

3    A        I see those words.

4    Q        From Vicki Borden, "Sure, sorry about that.  They

5    are so made up right now, it's almost scary."

6             The response from Arnie Ralenkotter.  "It's ok."  Do

7    you see that?

8    A        I see those words.

9    Q        Okay.  I'm showing you Joint Defense Exhibit 324.

10            THE COURT:  And the same rule operates for this

11   document.

12   BY MR. RIVERA:

13   Q        And this document, an e-mail from Heather Jones,

14   Question about Rest., R-E-S-T, P&L.  And I won't read the

15   entirety.  It starts with, "I hope you feel better."  The

16   first sentence says, "I noticed that Brian's commission as

17   seen on his Rest. P&L is quite a bit lower than what is showed

18   for January due to the rate change.  Cathy's stayed the same.

19   I just wanted to make sure that is correct.  I assume it's due

20   to changes you had to make to the calculation.  Let me know if

21   you want me to bring them in there for you to look at."

22            And the response from Vicki Borden that states, "I

23   think Lori had input Brian's wrong last month, and I adjust on

24   his commission sheet.  I will look at all of them before we

25   pay commissions.  I have a hidden percentage in the file that

1   I will need to proof their sheets against."

2           Let me ask you a question.  Are you aware --

3   separate and apart from this particular e-mail, are you aware

4   if in the calculations of commission breakdowns a hidden

5   percentage should be used?

6   A       I'm not aware of what is used.

7   Q       Okay.  When you do payroll, do you have hidden

8   percentages that you use?

9   A       No, I do not.

10          MR. COOPER:  If Your Honor please, I'm sorry, I know

11  it's close to 12:00.  And Ms. Mann has done the best she can,

12  but she's floating.

13          THE COURT:  Lunch break?  Very well.  It is slightly

14  after noon.  Why don't we take our lunch break now.  We will

15  return at 1:30.  Remember my earlier admonitions regarding

16  looking at anything or reading anything or discussing anything

17  at all about this trial.

18          Ms. Lewis.

19          (Luncheon recess.)

20          THE COURT:  You may resume.

21          MR. RIVERA:  Thank you, Your Honor.

22               CROSS-EXAMINATION (Continuing)

23  BY MR. RIVERA:

24  Q       Good afternoon, Ms. Whaley.

25  A       Good afternoon.

1    Q        Ms. Whaley, we left off with Joint Defense

2    Exhibit 338, I'm showing you here.  And this document is --

3    purports to be an e-mail from Vicki Borden to Heather Jones

4    and others.  And for expediency, I won't always read the

5    entire e-mail --

6    A        Okay.

7    Q        -- but you feel free to.

8             "Okay.  Here it is.  The P&L's are correct but

9    incorrect.  There was a huge entry made to the general ledger

10   for October that makes the cost-plus profits negative.  This

11   entry really offsets some incorrect numbers accumulated from

12   prior months.  Since it is impossible to know how much of the

13   incorrect numbers everyone was paid too much on in the prior

14   months, to offset the underpayment this month, Mark and I are

15   going to get together after everything is calculated and

16   adjust to what we think is fair.  So go ahead with the P&L's,

17   but we definitely won't want to use these for much analysis on

18   profits because a lot of the cost plus will be incorrect."

19            Do you see that?

20   A        I do.

21   Q        Okay.

22            MR. HAMILTON:  I'm sorry.  I missed that exhibit

23   number.  What was that?

24            MR. RIVERA:  Which is JDX 338.

25            MR. HAMILTON:  338?

1  BY MR. RIVERA:

2  Q        I'm showing you Joint Defense Exhibit 326.  And I'm

3  reading from the bottom that purports to be -- begin from John

4  Spiewak to Vicki Borden.  It says, "Vicki, my mortgage

5  biweekly pay program pulled twice the proper amount that they

6  were supposed to twice in a row.  They admitted the mistake;

7  however, they cannot guarantee that the funds will hit my

8  account, reverse the funds, for two weeks.  With the

9  15th coming, it's going to be tight.  Is there any way I can

10 get $2500 net this pay period and deduct it from my next

11 commission?  I hate to ask, but my mortgage company has not

12 been helpful."

13        It appears that Vicki Borden responds on April

14 the 8th, 2013, "I don't know your withholding, so can you give

15 me an idea of what gross number I need to submit to get around

16 the 2500 net?"

17        And the response from John Spiewak is, "3500 should

18 be plenty."

19 A        I can't see that part.

20 Q        Oh, I'm sorry.

21 A        Yes, I see that.

22 Q        Looking at Joint Defense Exhibit 33- -- 327, it

23 begins on the bottom, purports to be from Heather Jones, on

24 October 15th, 2010, to Vicki Borden, states, "What is the

25 deadline we need to use for having our rebates done?  Are you

1    using them for commissions this month?  Just checking.  Brian

2    wants to use the P&L's and make his adjustments, and we are

3    going -- and we are just trying to coordinate."

4            It appears that Vicki Borden responds on October

5    the 15th, 2010, to Heather Jones, "I meet with Mark at 3:30,

6    and my first question is, what do we do about commissions this

7    month?  I really won't have an answer until then.  If we use

8    real numbers, we will need to have them printed and turned in

9    by Wednesday."

10           Do you see that e-mail?

11   A       I see that.

12   Q       Okay.  Turning to Joint Defense Exhibit 329, this

13   purports to be an e-mail from Vicki Borden, sent on Tuesday,

14   June the 2nd, 2009, to Steve Ryding.  It says, "On U.S. Food

15   hedges, does this sound fair to you?  My list shows our total

16   profit on hedges, not including the contract done today, of

17   $1,000,231- -- 231,816.  The 'at time of contract' commission

18   on those for you would be $12,318.16.  I don't want to throw

19   up a flag with this type of payment.  Are you okay with me

20   adding 3000 to your commission for the next four months in

21   addition to paying you for any more contracts as they are put

22   on?"

23           And it continues to read further, with the response

24   from Steve Ryding to Vicki Borden states, "You have always

25   treated me more than fair.  That just proves again that you're

1    treating me more than fair again.  Thanks for everything.  I'm

2    trying hard not to sound like a suck-up."

3          See that?

4    A       Yes, sir.

5    Q       Okay.  Now, turning to Joint Defense Exhibit 330.

6    Starts from the bottom.  Sent to -- sent from Janet Welch to

7    Vicki Borden.  "Kevin is supposed to complete his this

8    morning.  We will get it to you as soon as possible" -- I'm

9    sorry, it starts out with Vicki Borden writing to Ryding, "I

10   need the spreadsheet from the inside group.  Trying to finish

11   up the commission this morning," to which Ms. Welch responds,

12   "Kevin is supposed to complete his this morning.  We will get

13   it to you as soon as possible."

14         And then Vicki Borden appears to respond, "Kevin has

15   no accounts left to calculate from.  I assumed we would just

16   make up his commission."  See that?

17   A       I do.

18   Q       And then——I'm almost done here——Joint Defense

19   Exhibit 331.  This is -- purports to be an e-mail to the

20   direct sales field from Vicki Borden, regarding commissions.

21   The subject is commissions.  And I'm reading, "Mark and I had

22   a discussion about commissions to be paid this month.  The

23   P&Ls are iffy as to whether they are correct.  The restricted

24   bases are not correct.  Many other factors are not proofed.

25   So for this month Mark will pay you your capped amount if you

1    have one or your highest month received for this year as your

2    commission if you do not have a cap.  He knows everyone has

3    been working extremely hard and thinks this is fair.  I think

4    this is fair also and will also enable us to pay commissions

5    on time."  You see that?

6    A       I do.

7    Q       Looking at Joint Defense Exhibit 332, it begins at

8    the bottom with Vicki Borden referencing commissions

9    percentage, and it just reads briefly, "As Mark discussed

10   briefly during our sales meeting call, due to a new

11   transaction fee schedule and a reduction in interest charged

12   for direct bill receivables, the commission percentages have

13   been adjusted slightly to keep our commissions at a neutral

14   amount."  Skip that last sentence.

15          Heather Jones responds, "Speaking of pay, do you

16   have me down for a review?  Just wondering."

17          And Vicki Borden responds, "Yes, I have actually

18   worked on it a little, then I got sidetracked trying to change

19   all these commissions correctly.  It worries me when I have to

20   adjust these that I might do something wrong."  You see that?

21   A       I do.

22   Q       Turning to Joint Defense Exhibit 333, and it begins

23   with Vicki Borden, at the very bottom, to Brian Mosher, "Mark

24   wanted me to calculate the percent of commissions so that the

25   percent of the national and regionals were the same.  For you,

1    instead of a .0090 and .0040, the calculation comes to .0065

2    for both.  You will see that .0065 on your commission this

3    month."

4          And Brian Mosher responds to Vicki Borden -- or to

5    Vicki Borden, "Shouldn't that number be higher since regionals

6    are or have been more of my commission historically?  Like

7    .007?"

8          And Vicki Borden responds with certain percentages,

9    and writes in the last sentence, "These will all change again

10   when the merger happens.  I have no idea what we can do then

11   that will be fair."

12         And Brian Mosher responds, "Sounds good," and

13   indicates some other things.

14         And then in the highlighted portion, where Vicki

15   Borden responds back to him, starts with, "I understand.  Not

16   difficult at all.  I would prefer everyone know exactly how

17   their commission is calculated and communicate any concerns.

18   It would be very easy for me to calculate it incorrectly.

19   They have gotten so complicated.  Watch it for a month or two

20   and let me know if it does not seem equal.  We can always

21   revisit."  Do you see that?

22   A       I do.

23   Q       Looking at Joint Defense Exhibit 335, it is from

24   Vicki Borden -- strike that, from Ron Carter to Vicki Borden.

25   And he states, "You were correct about the Canadian wholesale

1    not being on your commission.  I had it in the input file but

2    it was not reading over to your commission.  I have made" --

3    and this is from Vicki Borden.  "I have made an adjustment of

4    6,610 for July-December on this month's commission.  Sorry for

5    the mistake."  You see that?

6    A        I do.

7    Q        Durning to Joint Defense Exhibit 336, and it begins

8    on the bottom -- sorry.  That's-- This is from Scott Fenwick

9    to Vicki Borden, on May the 18th of 2009, and it is a

10   commission question.  And it says, "Vicki and Vince, I was

11   reviewing March commission statement and have a question about

12   Bosselman/Town Pump gallons for national accounts.  I see the

13   Bosselman/Town Pump commission at .01 per gallon," and it goes

14   on and describes what his concern is.  The last sentence is,

15   "Not a huge amount of money, but with cap in place every

16   dollar matters."

17           And Vicki Borden responds to Scott Fenwick and Vince

18   Greco, "You are correct.  I adjusted the commission that Mark

19   is signing today for April's business."

20           And then Scott Fenwick responds to Vicki Borden,

21   "Ok.  Thanks for fixing March.  I found same situation in

22   January-February, but dollars are nothing to get fired up

23   about and anyway it's my responsibility to catch these errors.

24   In my mind it's a wash."  Do you see that?

25   A        I do.

1    Q        The next one, turning to Joint Defense Exhibit 337,

2    purports to be an e-mail from Vicki Borden to Ron Carter, and

3    it begins -- and it's on November the 9th, 2009, states, "I am

4    added a correction to your commission this month of $818."  It

5    goes to explain the reason, "The formula was wrong and your

6    restricted profit was not feeding over to your commission

7    sheet since July of 2008."

8            This e-mail is November 9th, 2009.  "For all of 2008

9    and the first four months of this year you were capped, so it

10   did not affect your pay.  It did not [sic] short pay you since

11   May.  I calculated all the months, including the exchange fee

12   for that month, and came up with $818.82.  Don't hesitate to

13   ask me about anything that does not look right on your

14   commission.  They are done in such a short time frame that

15   mistakes can happen."  Do you see that?

16   A        Yes, I do.

17   Q        Looking at Joint Defense Exhibit 339.  It states,

18   from Vicki Borden, on July 22nd, 2008, to Linda Stooksbury and

19   Janet Welch, regarding commissions, "In my rush to get

20   commissions finished so Mark could sign, I failed to pay the

21   manual commission on Keyboard, England, and CJM.  I will pay

22   those next month.  Sorry."  Do you see that, Ms. Whaley?

23   A        I do.

24   Q        Turning to Joint Defense Exhibit 340, starting on

25   the very bottom.  It's from Vicki Borden to Arnie Ralenkotter,

1    on August the 20th, 2009, and it reads, "I realized yesterday

2    that I adjusted your percentage to quota for the gallons that

3    were funded for Interactive Logistics, but I did not pay

4    commissions on these gallons.  I will add them next month."

5    Mr. Ralenkotter -- well, strike that.  Janet Welch responds to

6    Vicki.  "Thank you, we need all the help we can get."  Do you

7    see that?

8    A        I do.

9    Q        I think we have a couple more here, two more.  This

10   is Joint Defense Exhibit 341, purports to be from Vince Greco

11   to Karen Crutchman, regarding Apex and Westar Customer List.

12   "Can you tell me again where this shows up on my restricted?

13   Wasn't on info we reviewed in Nashville last week."

14            To that, it appears Karen Crutchman forwards an

15   e-mail, at the very bottom there, to -- or responds to Vince

16   Greco, and says, "The conglomerates don't show up on the P&Ls,

17   just on the PRS reports and restricted tracking."

18            And it appears that Vince Greco responds to Karen

19   Crutchman, "I realize that, but I didn't see it on my

20   restricted."

21            And Karen Crutchman reaches out to Vicki Borden on

22   June the 4th and she writes, "If not on P&Ls, do you manually

23   adjust these each month for our commission?" to which Vicki

24   Borden responds, on June the 5th, 2012, "Because it will not

25   show up on the P&L, it is calculated and added to your

1    commission.  Apex, CUSA, and Transam are on the manual

2    calculation for April.  In looking at the calculation I do see

3    that the discount was not subtracted before the commission was

4    calculated.  We will fix that going forward."

5            And, lastly, looking at Joint Defense Exhibit 325,

6    it is from Vicki Borden to Wendy Hamilton, "I am paying Holly

7    and Katy on this commission for the hedges they have done in

8    October.  Don't usually do that, but because of Holly's new

9    house I offered and they took me up on it.  Is it okay if I go

10   ahead and pay you for ABF or would you prefer that I wait?"

11           And the response is, "Sure thing."  This is October

12   the 13th, 2008.

13           All right.  Those are the e-mails I wanted to review

14   with you.  And here is the question I have with regard to

15   those e-mails:  Were you aware of these e-mail exchanges

16   between Vicki Borden and these other individuals at the time

17   when you received her commission breakdowns and processed them

18   for payment to the employees?

19   A       No, I was not.

20           THE COURT:  Are we still operating under the

21   presumption that everything contained in these documents is not

22   true and the witness should presume that they're not true?

23           MR. RIVERA:  Yes, Your Honor.

24           THE COURT:  So she is to assume that Vicki Borden did

25   not correspond, those people did not correspond, and the

1    information in the e-mails is not true?  She's to assume that?

2         MR. RIVERA:  Yes, sir, as I understand Your Honor's

3    instruction, that she's to assume that the assertions that are

4    made within the e-mails are incorrect or not true.

5         THE COURT:  I thought that it was your intention,

6    that's why you wanted her to be able to see them, that no one

7    was to take anything in the e-mails as being true; that would

8    include the dates, the names, the contents, the words.  Nothing

9    at all was to be assumed to be true.  The jury cannot take it

10   to be true.  Counsel cannot argue that anything in the

11   information is true, and I think that would include who the

12   e-mails are from and who they are to, wouldn't it?

13        MR. RIVERA:  Yes, Your Honor.

14        THE COURT:  So would you like to ask the question

15   again to the witness, then?

16        MR. RIVERA:  Well, the question that I asked was,

17   Your Honor, if she was aware of these e-mails at the time when

18   she received the commission breakdowns and processed them for

19   payment to the employees.

20   A         I was not aware of any e-mails, whether they sent

21   them or not.

22        MR. RIVERA:  Those are my questions, Your Honor.

23                      CROSS-EXAMINATION

24   BY MR. MURRAY:

25   Q         Good evening, Ms. Whaley.

1    A        Good evening.

2    Q        How are you?

3    A        I'm good.  How are you?

4    Q        Doing well.

5             MR. MURRAY:  Ms. Lewis, could we get access to the

6    computer?

7             THE COURTROOM DEPUTY:  It's on.  Thank you.

8    BY MR. MURRAY:

9    Q        Just briefly, Ms. Whaley, can you remind me of when

10   you started working at Pilot?

11   A        March 2002.

12   Q        And as a Pilot employee, your job is primarily

13   concerned with payroll matters.  Is that correct?

14   A        That is correct.

15   Q        So you didn't bargain with customers on behalf of

16   Pilot, right?

17   A        I did not.

18   Q        And, more specifically, you never negotiated pricing

19   arrangements or --

20   A        (Moves head from side to side.)

21   Q        -- discount arrangements?

22   A        No, I did not.

23   Q        Okay.  And based on your experience at Pilot in a

24   payroll position, a payroll manager really doesn't need to

25   know all of the details associated with Pilot's deals with its

1    customers, right?

2    A        That's right.

3    Q        In fact, a payroll manager at Pilot likely wouldn't

4    know those details, right?

5    A        That's correct.

6    Q        I mean, after all, your primary concern was simply

7    compensating Pilot's employees?

8    A        Yes.

9    Q        Thank you.  I'd like to turn to some questions that

10   are specific to Ms. Jones.  So after being directed to

11   Government's Exhibit 410, you testified that a portion of

12   Heather Jones' compensation was based on commission.  Do I

13   have that correctly?

14   A        Yes.

15   Q        And now I'd like to look at the first page of that

16   document with you again.  Just let me know when you've got it.

17   A        I have it.

18   Q        Okay.  So Government's Exhibit 410 is the commission

19   breakdown for Heather Jones.  What month are we concerned

20   with?

21   A        It's February 2008.

22   Q        And if you would, just look at the first five or so

23   rows on that page with me.  Looking at those rows, we can see

24   how Brian Mosher's accounts impacted the company's profit.  Is

25   that correct?

1    A       Yes.

2    Q       Now, I'd like to focus more specifically on that

3    fourth row.  Do you see where it says, "Profit ADJ for manual

4    rebates"?

5    A       I do.

6    Q       Are we safe in assuming that "ADJ" means <u>adjustment</u>?

7    A       That would be the logical assumption.

8    Q       Would it be correct to say that all the manual

9    rebates paid to Brian Mosher's customers for this month

10   reduced company profit by $54,443.76?

11   A       That would seem to be what it indicates.

12   Q       Okay.  So this entry appears to be removing money or

13   at least subtracting money that was paid back to customers

14   from the profit calculation.  Is that fair?

15   A       On the surface of this document, that's what it

16   looks like, but I don't really know the details behind it.

17   Q       I understand.  But you would agree that company --

18   it really isn't company profit if it's paid back to the

19   customer, right?

20   A       I don't know if it's paid back to the customer.

21   Q       Okay.  Well, based on the information provided in

22   that row, can you tell me what the impact of those payments

23   totaling well over $50,000 in this particular month had on

24   Heather Jones' February compensation?

25   A       Those would be negative amounts in the total

1    calculation of the payment.

2    Q        Okay.  So that's roughly $40, then, right?

3    A        Yes.

4    Q        All right.  So when the company paid out more than

5    $54,000 to rebate customers, we see that Ms. Jones' commission

6    was reduced by roughly $40, right?

7    A        Yes.

8    Q        Now, I'd like to make sure that I understand these

9    proportions correctly, so I'd like to give you a hypothetical.

10   If, for whatever reason, we learn that Pilot actually owed

11   rebate customers twice that amount, so roughly $109,000, then

12   Ms. Jones' commission would have been cut by, what,

13   approximately $80, if we looked at the proportions provided

14   here?

15   A        Based on the proportion you're seeing here.  I would

16   have to--  I really don't know what's behind all of these.  If

17   you're asking if I see a negative number here, I do.

18   Q        Right.  Well, let's consider the opposite scenario,

19   then.  If Pilot didn't pay out a single penny, if this $54,443

20   entry said zero, would it be fair to say that the total

21   commission amount on that line would probably also say zero?

22   A        Correct.

23   Q        Okay.  So, in that instance, Ms. Jones would have

24   kept the entire $40, right, or at least that $40 would not

25   have been reduced from her compensation for that month?

1    A        If that was a zero -- is that what you're saying?

2    Q        Yes, ma'am.

3    A        -- then her commissions would not have had anything

4    in it, from that line.

5    Q        Yes.  I understand.  And can you tell us what the

6    ultimate payment for Ms. Jones was that month, as far as

7    commissions?

8    A        I'm sorry, what the what?

9    Q        What her ultimate commission amount paid for this

10   month was.

11   A        The commission was $1200.58.

12   Q        Okay.  So keeping what we've discussed in mind,

13   would it be accurate to say that manual rebates and the amount

14   of manual rebates paid out had relatively small effect on

15   Ms. Jones' commission when we consider the other entries on

16   the document?

17   A        What I can say is that adding this column, the Total

18   Commission column --

19   Q        Uh-huh.

20   A        -- I see all of those lines play into that total.

21   Q        Okay.  And so that amount, the $40, is relatively

22   small when we consider the larger compensation amount of 1200.

23   Is that fair?

24   A        Yes.

25   Q        Okay.  Now, I'd like to turn your attention to the

1    very last page of this document, staying within Government

2    Exhibit 410.  So I'd like to compare the February 2008

3    breakdown that we just finished discussing with the document

4    that you see in front of you now.  Does that make sense?

5    A        Yes.

6    Q        So this new page that we're looking at, it's also a

7    commission breakdown for Heather Jones, right?

8    A        Yes.

9    Q        And what time period does this page concern?

10   A        This is June 2012.

11   Q        So here, four years later, we see that Ms. Jones

12   received a significantly larger commission amount.  Is that

13   fair?

14   A        Yes.

15   Q        So I'd like to ask you to help me figure out the

16   reason why the commissions increased so much from 2008 to

17   2012.  Is it fair to say that this breakdown is a bit more

18   complicated or at least includes a lot more information when

19   we compare it to the February 2008 breakdown on the left?

20   A        It has more components.

21   Q        Yes.  For one thing, it looks like the company's

22   revenue from Mr. Mosher, for example, from Mr. Mosher's direct

23   bill customers, has more than tripled, right?

24   A        It has increased significantly, yes.

25   Q        We also see some entries that are stemming from

1  profits in Canada.  Is that correct?

2  A       Yes.

3  Q       And, now, by this time, in 2012, Pilot had, itself,

4  grown as a company, right?

5  A       Yes.

6  Q       I believe the merger had already occurred, right?

7  A       Are you talking about the Flying J merger?

8  Q       Yes, ma'am.

9  A       Yes.

10 Q       So it had also increased the number of locations or

11 Travel Centers situated across North America?

12 A       Yes.

13 Q       And following the merger, Pilot likely acquired

14 customers that had previously been fueling with Flying J,

15 right?

16 A       They would still probably be fueling with Flying J.

17 That's hard to say, because the Flying J brand stayed.

18 Q       Right, because Pilot had acquired that brand, safe

19 to say anyone fueling there would also now be --

20 A       Yes.

21 Q       -- technically fueling with Pilot Flying J, right?

22 A       Yes.

23 Q       Would it be accurate, then, to simply say that the

24 company was just bigger?

25 A       Was what?

Whaley – Cross–Examination

1   Q        Just bigger?

2   A        It was bigger, yes.

3   Q        Okay.  Referencing back to the June 2012 breakdown,

4   would it be accurate to say that Ms. Jones is now working for

5   three sales reps in 2012?  We see Brian's direct bill, Rob's

6   direct bill, and Jonathan's direct bill, for example.

7   A        That is what I see.

8   Q        When we compare that to the breakdown from

9   February 2008, how many individuals do you see Ms. Jones

10  generating commissions from?

11  A        Two.

12  Q        Two.  All right.  And, then, one last factor that

13  appears different is the Rate column.  Do you see that, the

14  third column on either page?

15  A        Yes.

16  Q        So for the majority of entries in the 2008

17  breakdown, it appears that Ms. Jones earned at a rate of

18  .00075.  Would you agree?

19  A        Yes.

20  Q        And for the 2012 breakdown, she appears to have

21  earned at a rate largely of .00105?

22  A        Yes.

23  Q        And I'm sure you're better at math than I am, but

24  that's what, roughly?  A 40 percent increase?

25  A        Yes.

1   Q        Along those lines?  So over a period of more than

2   four years, Ms. Jones earned her commissions at a larger rate?

3   A        Looking at this, yes.

4   Q        So since we found several reasons for the increase

5   in Ms. Jones' commission, I'd just like for you to confirm

6   that I've identified these reasons correctly.

7            So, Reason 1, revenue from Brian Mosher's direct

8   bill customers had tripled, correct?

9   A        Close to that, yes.

10  Q        Reason Number 2, as we've stated, the whole company

11  itself had experienced enormous growth during that time?

12  A        Yes.

13  Q        Three, Ms. Jones was working for at least one more

14  sales rep?

15  A        Yes.

16  Q        And, finally, Ms. Jones' commission rate had

17  increased over her tenure at Pilot?

18  A        Yes.

19           MR. MURRAY:  Okay.  Thank you very much for your

20  time, Ms. Whaley.

21           THE WITNESS:  Thank you.

22           MR. MURRAY:  No more questions, Your Honor.

23                          CROSS-EXAMINATION

24  BY MR. COOPER:

25  Q        Good afternoon, Ms. Whaley.

```
1    A         Good afternoon.

2    Q         I'm Jonathan Cooper.  I represent Karen Mann.

3    A         Nice to meet you.

4    Q         Do you remember Karen?

5    A         I do remember Karen.

6    Q         I'm going to ask you some questions about the

7    exhibits the government showed you in your testimony.  Let's

8    first, if we could, pull up Government Exhibit 405.  Do you

9    recognize this summary?

10   A         Yes, I do.

11   Q         And I believe you testified that you had prepared

12   this summary?

13   A         Yes.

14   Q         I want to go over some of the figures on this and,

15   if we could, Ms. Whaley, highlight the row for hourly pay at

16   the very top, first row.

17             And -- actually, leave that there, that's fine.

18             Let me ask you some basic things about this.  What

19   you've done on this summary, Ms. Whaley, if I'm understanding

20   this, is that for the years from 2008 to 2012 you have

21   provided the numbers for Ms. Mann's annual pay.  Is that

22   right?

23   A         Correct.

24   Q         And those are broken down into various components?

25   A         Yes.
```

1    Q        And so she received different amounts of money for

2    different types of compensation?

3    A        She did.

4    Q        And the row that we have highlighted here is her

5    hourly pay --

6    A        Yes.

7    Q        -- right?  So she was an hourly employee?

8    A        Yes, she was.

9    Q        She clocked in and clocked out?

10   A        Yes.

11   Q        And it looks like -- and so her hourly pay would be

12   essentially her annual salary, so to speak.  Is that a fair

13   way of saying it?

14   A        Yes, it would equate to that.

15   Q        And it looks like her salary in 2008 was 32,500,

16   roughly.  Is that right?

17   A        Yes.

18   Q        In 2008?

19   A        Correct.

20   Q        And it was virtually the same in 2009.  Is that

21   right?

22   A        Essentially, yes.

23   Q        It goes up in -- a little bit in 2010, and goes up

24   again in 2011, and a little bit more in 2012.  Is that right?

25   A        Correct.

1    Q       But from 2008 to 2012, she's paid essentially the

2    same hourly pay, right?

3    A       Dependent on how many hours she worked each of those

4    components, but, yes, it's essentially --

5    Q       Well -- well, we're going to see -- see if I'm right

6    about this.  That's based on a 40-hour workweek, right?

7    A       If she worked 40 hours.

8    Q       I see.  Okay.  So it's possible that if she worked

9    less than that, then --

10   A       That's right.  Anyone who is hourly can work up to

11   or over 40 hours.  So it could vary.

12   Q       I see.  All right.  But -- but it would appear from

13   this -- and you prepared this.  This would appear that her

14   salary -- she never got a raise of any significance during

15   this four-year period?

16   A       Looking at that surfacely, on that one line, I would

17   say yes.

18   Q       Okay.  Now -- and $32,000 is -- it seems like an

19   amount you would pay your clerical staff at Pilot.  Is that

20   right?

21   A       In 2008 it might not have been that high, but it

22   would be roughly, yes.

23   Q       Okay.  All right.  Now, let's look at -- there is a

24   line for overtime.

25   A       Yes.

1    Q         So that would be -- and she worked -- she was

2    paid --

3    A         Yes.

4    Q         -- for overtime hours every single year?

5    A         Yes, every year.

6    Q         And that would indicate that at least on some of the

7    weeks she worked more than 40 hours?

8    A         Yes.

9    Q         Is that a fair amount for overtime?  Is that a

10   pretty significant amount of hours to be working?

11   A         For an annual amount, if you break it down, it --

12   probably 2011 was more significant than the others, but, yes.

13   Q         Okay.  But she was -- it would indicate that she was

14   working overtime more than, you know, one week a year?

15   A         Yes, it would.

16   Q         Okay.  All right.  Now, let's look at Commissions

17   Current Year, if we can look at that row.  And we see here

18   that her commissions are actually more than what she was

19   getting paid for her salary.

20   A         Yes.

21   Q         And let's -- these commissions, I would say -- we're

22   going to go into this a little bit more, but preliminarily,

23   her commissions were based on diesel sales.  Is that right?

24   A         I'd have to look at her sheet to see.

25   Q         We're going to get into that a little bit more in a

1    minute.

2    A        Okay.  Okay.

3    Q        But commissions are -- they're tied to sales?

4    A        Yes.  Yes.

5    Q        And we see here that in 2008 her commissions were a

6    little north of $49,000.  Is that right?

7    A        That's right.

8    Q        And in 2009, 41,000.  And they go up to a high in

9    2012 of 67,000?

10   A        Correct.

11   Q        Now, you are aware that the conspiracy in this case

12   is alleged to have begun at least in 2008.  Is that right?

13   A        I'm not sure when it was alleged to begin, but that

14   is what I pulled, so...

15   Q        And you were asked to pull these numbers at the

16   request of these lawyers here --

17   A        Yes.

18   Q        -- for the government?

19   A        Not from the government.  From our lawyers, yes.

20   Q        Oh, okay.  But they asked you to pull the figures

21   beginning with 2008?

22   A        That's correct.

23   Q        Now, if you look -- let's look at the commissions --

24   and we can just leave it right where it is.  If we look at the

25   commissions from 2008 and 2009, am I reading this right, that

1    her -- the commissions that she earned in 2009 were actually

2    less than what she earned in 2008?

3    A        The commissions that were paid in the current year,

4    yes, that's correct.

5    Q        Okay.  Well, okay, let's now turn to Government

6    Exhibit 411.  And if we can just look at the first page of

7    that exhibit for now.  I think by now we're familiar with what

8    this document is.  You've testified about this for two other

9    individuals, and now we're going to look at Karen Mann's.

10   This is for November 2008, right?

11   A        That's correct.

12   Q        And I want to just appreciate exactly the scope of

13   what you're able to testify about today.  When we look at --

14   we look at the last line, the Total To Pay, if we could

15   highlight that, and we see for this particular month, November

16   of 2008, we see a value of $5,881.96, correct?

17   A        Correct.

18   Q        Is that right?

19   A        Yes.

20   Q        And you have verified that that is in fact the

21   commission Karen Mann was paid for November of 2008?

22   A        That is correct.

23   Q        And when -- and so you would have cut it -- would

24   you have cut a check, or was it direct?

25   A        It would have been on her direct deposit.

1    Q        Direct deposit.  So we would expect to see a direct

2    deposit of this exact amount in her bank account.

3    A        In December, because it would be the following month

4    that it's cut.

5    Q        I got you.  Okay.  So -- right.  I'm glad you

6    pointed that out.  So November 2008 sales is for diesel fuel

7    sold in November of 2008.

8    A        That's right.

9    Q        But it's not -- the commissions aren't calculated

10   until the next month?

11   A        At the end of the month, right.

12   Q        Okay.  Thank you for reminding me of that.  Now --

13   but as far as this goes, that -- in December of 2008 --

14   A        Yes.

15   Q        -- when you received this commission breakdown, your

16   department's focus was on this $5881?

17   A        That is correct.

18   Q        I assume, then, that you -- your department didn't

19   go back and verify the accuracy of any of the other numbers on

20   the commission, correct?

21   A        No.  We only verified the total amount paid.

22   Q        Okay.  And would you even add the column that the

23   Total To Pay was?

24   A        No, we would not.

25   Q        Okay.  All right.  But you testified a few minutes

1    ago for Mr. Rivera, I believe, that when you got these, you

2    trust that had they were accurate?

3    A        That is right.

4    Q        And a copy of this would have been given to Karen?

5    A        I don't know that.

6    Q        Okay.  You don't know that.  All right.  Now, we're

7    looking here for November of 2008, and you can see that she

8    was getting commission based on the company profit for two

9    individuals?

10   A        Yes.

11   Q        Those are Tim Prins and then someone named Ron?

12   A        Yes.

13   Q        Do you remember Tim Prins?

14   A        I do.

15   Q        Do you remember -- do you know who that Ron is?

16   A        Ron Carter.

17   Q        All right.  Very good.  So -- and do you know, then,

18   that Karen Mann was supporting Tim Prins and Ron Carter as

19   their regional account representative?

20   A        Yes.

21   Q        And would it be fair to say, too, that there's

22   actually a small, tiny amount for a third representative,

23   outside sales representative?  Do you see a -- on this last

24   line, under Tim, there is a direct bill and then, in

25   parentheses, "Sturdevan"?

```
 1  A          I see that, but I don't know who that is.

 2  Q          Do you remember Danny Sturdevan?

 3  A          No.

 4  Q          Okay.  All right.  Now, I think you said that you --

 5  did you say you knew that Karen Mann was the inside account

 6  representative for these two men?

 7  A          Yes.

 8  Q          And do you know which territory she was supporting

 9  at this time?

10  A          I don't.

11  Q          That's fine.  It's fair to say that Arnie

12  Ralenkotter -- what -- any profit that he made, Karen received

13  no commission on Arnie Ralenkotter's customers?

14  A          I don't see that on the sheets I pulled.

15  Q          Right.  You didn't see them on any of the sheets

16  that you pulled.  Is that fair?

17  A          On these that I've been looking at and studying a

18  lot.

19  Q          Right.  Just the ones in the courtroom today?

20  A          Yes, that's correct.

21  Q          All right.  You've testified about this, so this is

22  not going to be any tricky question for you, but if we look at

23  the Rate column, if we could highlight that Rate column, it

24  appears that this rate has an impact on the total commission

25  that's in the far right column.  Is that fair -- is that a
```

1   fair statement?

2   A       Yes.

3   Q       And can you please testify as to -- for Tim Prins'

4   entries, what his rate was on -- on those amounts?

5   A       On the direct bill and restricted, it's 225, but on

6   the wholesale it was just .2.

7   Q       Well, let's --

8   A       002.

9   Q       That -- those decimals make a pretty big difference,

10  don't they?

11  A       Yes, they do.

12  Q       And so what is .00225?

13  A       That's 2.25.

14  Q       Is that --

15  A       Is that what you're asking?

16  Q       Is that -- I'm relying on you here.  So if I'm

17  wrong, tell me.  But isn't .00225 -- point -- well, I'm not --

18  I'm terrible at this.  It's less than one percent, isn't it?

19  A       Yes, it is.

20  Q       Okay.  Thank you.  And I've used this before.  So

21  see if this is right.  If you took a penny and you cut it into

22  four pieces, one piece of that penny is .00225?

23  A       Yes.

24  Q       Okay.  And then for Ron's it's .002?

25  A       Correct.

1  Q        And which is higher, .00225, or .002?

2  A        2.

3  Q        The .002?

4  A        (Moving head up and down.)

5  Q        Okay.  Now, if we could go to Page 9 of this

6  exhibit, which is Trial Number 3217.  A, yes.  June of 2011.

7  And I want to, if we could, highlight the rate column again.

8  And here we have a little bit different people that she was

9  supporting.  One is John, and one is Ron?

10 A        Yes.

11 Q        And what is the rate there that Karen was getting on

12 those commissions?

13 A        On John, looks like on everything of his she got

14 0015.

15 Q        And for Ron?

16 A        I believe the same, except for his wholesale.

17 Q        Right.  So do you remember what she was getting paid

18 for -- let's look at -- let's leave it here, but do you

19 remember what her rate was for Tim Prins?  .00225?

20 A        Yes.

21 Q        All right.  Which is higher, .0015 or .00225?

22 A        .0015 or .0025, is that what you're asking?

23 Q        Yeah.

24 A        0015 or 0025?

25 Q        Uh-huh.  Which one is higher?

1   A        25 is higher.

2   Q        So it would appear here that her rate was actually

3   cut?

4   A        Yes.

5   Q        I next want to turn to Government Exhibit 405A.  And

6   if we could just start with Page 1.  You recognize this,

7   right?

8   A        I do.

9   Q        All right.  This is -- you call this a form PR260?

10  A        Yes.

11  Q        And this is, I believe -- correct me if I'm wrong.

12  There is something you called the parameters page?

13  A        Yes.

14  Q        And there is for Karen Mann?

15  A        Yes.

16  Q        I'm curious, how do you know it's for Karen Mann?

17  Because of the 3085?

18  A        Yes.  That's her employee number.

19  Q        Okay.

20  A        Not that I know everybody, but that's right.

21  Q        Okay.  You know Karen's?  Do you know --

22  A        I know it because I can look at the next page and

23  see whose name is on it.

24  Q        Okay.  All right.  Let's look at the next page.

25  And -- can you see that okay?

1   A        I can.

2   Q        Now, tell us what this is.

3   A        In the left-hand column, it's showing the earnings

4   codes.

5   Q        Well, let -- let's back up from that.  This is the

6   detail listing for Karen Mann, right?

7   A        Right.

8   Q        And this is the entire year of 2008.

9   A        This is the summary at the end of the year.

10  Q        Right.  So from January of 2008 to December of 2008?

11  A        Correct.

12  Q        And, now, look at -- what's the gross pay there?

13  A        The gross pay is 92,076.52.

14  Q        And can we --

15           MR. COOPER:  Ms. Manela, can we bring up 405 for

16  comparison?  Can we stack those some way?

17  BY MR. COOPER:

18  Q        And I think you testified to this on direct so I

19  apologize if I'm being overly elementary, but I think you said

20  that you used 405A to get 405.  Is that right?  You used the

21  numbers from 405A?

22  A        Yes.  We pulled it out of the same system.

23  Q        Okay.  So let me just show you here, the gross pay

24  for -- and the detail listing is 92 -- or 9 -- yeah, 92,076,

25  and that corresponds with your summary on four -- on

1  Government Exhibit 405?

2  A      Yes.

3  Q      They're the same.  Okay?

4  A      Yes.

5  Q      So it's fair to say that we're -- you're using the

6  same numbers --

7  A      Yes.

8  Q      -- to arrive at the summary?

9  A      Yes.

10 Q      All right.  If we could go back to looking at the

11 top document, the 405A, please.  Now, if we look at 2008, her

12 gross pay was $92,000?

13 A      Correct.

14 Q      And that's -- that's a pretty high number, isn't it?

15 A      It is.

16 Q      But let's look at some of the other numbers on this

17 detail.  It looks like for the entire year she had tax

18 deductions of 23,000.  Is that right?

19 A      Yes.  That's her federal, Social Security, and

20 Medicare combined.

21 Q      All right.  And then the next column over is other

22 deductions of $9,591.29?

23 A      Yes.

24 Q      And then there are company deductions of $11,289.01?

25 A      Right.  She didn't have those deducted.  That's just

1    the company.

2    Q        Okay.  So her take-home pay was in fact 59,000 for

3    the year of 2008?

4    A        That was the net pay, yes.

5    Q        The net pay.  That's -- that was her take-home pay,

6    right?

7    A        Take-home pay.

8    Q        All right.  Now, let's go to Page 4, please.  And

9    we're going to do the same thing.  This is 2009; is that

10   right?

11   A        Yes.

12   Q        And her gross pay actually went down to 87,000 for

13   2009?

14   A        Yes.

15   Q        And she had tax deductions of $21,000, other

16   deductions of $10,482, and then company deductions of $10,954,

17   leaving her with a take-home pay of $56,000?

18   A        Yes.

19   Q        Okay.  If we go to Page 6.  This is 2010, right?

20   A        Yes, it is.

21   Q        And her gross pay went up this year, to $98,000.  Is

22   that right?

23   A        It is.

24   Q        But she had tax deductions, other deductions, and

25   company deductions, leaving her net pay of only $62,000?

1    A       Yes, but can I clarify?  Company deductions are not
2    deducted from the employee.

3    Q       Okay.  Okay.  So that would be, like...

4    A       The Social Security and Medicare, the company has to
5    pay the same portion.

6    Q       Okay.  Okay.  So that's -- so is that just -- I'm
7    glad you corrected me.  So that's not -- that's not deducted
8    from the 98,000?

9    A       No company deductions are.

10   Q       Okay.  All right.  But it's still true, though, that
11   from the tax deductions and other deductions it's -- her gross
12   pay is reduced from 98,000 to a take-home pay of 62,000?

13   A       Yes, that is right.

14   Q       Okay.  All right.  Thank you.  Now, this is 2010.
15   Let's go to 2011.  I'm sorry, if we can go to Page 8.  Oh,
16   we're already there.  Sorry.  So this is gross pay of 98,000.
17   Is that right?

18   A       It is.

19   Q       And this was about the same that she made in 2010?

20   A       Very close.

21   Q       Her take-home pay is $61,000?

22   A       Yes.

23   Q       Right?  And now Page 10, if we could, look at 2012.
24   And here she really goes up, right?

25   A       Yes.

1    Q       She has gross pay of 117,000?

2    A       Uh-huh.

3    Q       And her net pay still, though, is only $73,000?

4    A       Correct.

5    Q       Those taxes will kill you, won't they?

6    A       Under the other deductions there are some different

7    things that will impact that.

8    Q       Okay.  All right.  Let's turn next to Joint Defense

9    Exhibit 1473.  And if we could just have the whole thing

10   enlarged there.  Can you see that all right?

11   A       Yes.

12   Q       Now, let me ask you if you recognize this report?

13   A       Yes.

14   Q       Do you remember generating this report?

15   A       I remember it being generated in my department.

16   Q       Okay.  All right.  So let's look at this.  And,

17   again, I want to try the best we can --

18           MR. COOPER:  If we can look at -- if we can

19   highlight, please, Ms. Manela, only years 2008 through 2012.

20   I'm throwing you a little bit of a curve here.  Sorry.  2008 to

21   2012.

22   BY MR. COOPER:

23   Q       Now, does that correspond with your summary in

24   Government Exhibit 405?  If we could bring that up, 405.

25   A       Yes, it does.

1    Q        All right.  Can we go back to the full exhibit now.

2            All right.  So we have been looking at years 2008

3    through 2012.  Now, if we could look at -- would it be

4    possible to look at 2008 to 2013.

5            All right.  So this is essentially the same summary

6    that you had before, except that we've added the year 2013?

7    A        Yes.

8    Q        All right.  Let's talk about that.  Something very

9    significant happened to Pilot -- first of all, something very

10   significant happened to Pilot in 2010.  Remember what that

11   was?

12   A        Yes.  That was the Flying J merger.

13   Q        All right.  That was a good thing, wasn't it?

14   A        That was a good thing.

15   Q        Something bad happened in 2013?

16   A        Yes.

17   Q        What was that?

18   A        That was the company raid.

19   Q        April 15th, 2013, right?

20   A        Yes.

21   Q        All right.  Now, following the raid on April 15th,

22   2013, Karen Mann was not term -- once that raid happened,

23   Karen wasn't terminated from the company, correct?

24   A        Correct.

25   Q        She was employed all of 2013?

1    A        Yes.

2    Q        And we can just leave things just the way they are

3    right here.  I -- can you see that all right on your screen?

4    A        I can.  It's not lining up exactly.  It needs to

5    drop the back -- there we go.

6    Q        Well, I really want to just focus really on the

7    columns for YE2012 and YE2013.

8    A        Okay.

9    Q        And you've testified that YE means year end?

10   A        Yes.

11   Q        And when we say year end 2012 and year end 2013 that

12   means the 365 days of 2012 and the 365 days of 2013?

13   A        In payroll terms, it really means all the check

14   dates in 2012 and 2013, which may not be the 31st of December.

15   It could be the Monday of that last week --

16   Q        Okay.

17   A        -- just to make it clear.

18   Q        All right.  Ms. Mann's total salary in 2013 really

19   jumps up, doesn't it?

20   A        Yes.

21   Q        And her commissions really jump up --

22   A        Yes.

23   Q        -- in 2013?

24   A        Correct.

25   Q        Which includes how many months in 2013 after the

1    raid at Pilot?

2    A        Seven.

3    Q        Okay.  And Ms. Mann was not terminated in 2014, was

4    she?

5    A        I don't -- no, I don't think she was.  I would have

6    to look at the dates to be sure.

7    Q        Okay.  Why don't we go back to the full version of

8    this document.  And do you see a column there for YE2014?

9    A        I do.  And she was -- you're right.  She was an

10   employee.

11   Q        Okay.  And you see -- what is the top title of this

12   report?

13   A        Salary history 2014, present 9/29/14.

14   Q        And does that indicate to you that present -- that

15   at the time this report was generated, the present date was

16   September 29, 2014?

17   A        Yes, it does.

18   Q        So this is not a full calendar year for 2014 --

19   A        That's correct.  Correct.

20   Q        -- right?  And are you aware, Ms. Whaley, that

21   Ms. Mann was not terminated in 2015?

22   A        I'm not sure of her termination date.

23   Q        Okay.  If I told you that Ms. Mann continued to be

24   paid until May 15th, 2016, would that refresh your

25   recollection?

1    A         Yes.  There was a -- yes.

2    Q         So she remained employed by Pilot --

3    A         Yes.

4    Q         -- for over three years after the raid?

5    A         Correct.

6              MR. COOPER:  Nothing further.  Thank you very much.

7              THE COURT:  Is there any redirect?

8              MR. HAMILTON:  Yes, Your Honor.

9                         REDIRECT EXAMINATION

10   BY MR. HAMILTON:

11   Q         You were asked about a declaration on

12   cross-examination.  I just want to ask you a couple of

13   questions about that.  After you prepared the declaration and

14   when you were preparing for your testimony, were you asked

15   about whether or not there were signed versions of those

16   declarations -- excuse me -- of the commission breakdown

17   reports?

18   A         Yes.

19   Q         And were you asked to go gather those?

20   A         Yes, I was.

21   Q         As part of your preparation, were you also asked to

22   confirm whether or not the -- the original commission

23   breakdown reports that were part of your commission were the

24   same ones as the signed versions?

25   A         Yes.

1   Q       And did you identify that some of them were

2   different?

3   A       I did.

4   Q       And were the signed versions gathered so that they

5   could have been provided -- so they could be provided to the

6   defense?

7   A       Exactly.

8   Q       There were questions about -- that you were asked

9   about about the reliability of some of the commission

10  breakdown reports.  Do you recall that questioning?

11  A       If that's the -- are you referring to when I was

12  asked if that's what we paid?

13  Q       The e-mails that you were shown.

14  A       Oh, yes.

15  Q       When the commission breakdown report is received by

16  the payroll department --

17  A       Uh-huh.

18  Q       -- what did the payroll department, again, in your

19  capacity as a senior manager, what is the payroll department

20  looking for to approve any payment associated with a

21  commission breakdown report?

22  A       We're looking to be sure it has the total payment

23  amount and who approved it and we will not go look at the

24  columns.  We will glance to make sure that bottom number is

25  not way out of line.

1    Q        What is the significance of who approved it?

2    A        Because it has to be in the direct report up and it

3    has to be a two-up approval.  If my boss submitted one, his

4    boss had to approve it.

5             MR. HAMILTON:  Can I go to the document camera,

6    please.

7    BY MR. HAMILTON:

8    Q        This document is part of Government Exhibit 410.

9    It's Page Trial 3201 from 410, and is this a commission

10   breakdown report for Heather Jones from November of 2011?

11   A        It is.

12   Q        And who is identified as the approving authority for

13   this commission breakdown report?

14   A        Scott Wombold.

15   Q        And do you see some initials there?

16   A        VB, for Vicki Borden.

17   Q        And what does that indicate there?

18   A        That indicates to me that Vicki sent it on behalf of

19   Scott Wombold's approval.

20   Q        So did Vicki Borden not have approving authority?

21   A        She did not.

22   Q        Did Scott Wombold have approving authority?

23   A        He did.

24   Q        Directing your attention to Government Exhibit 403.

25   This is the summary related to Mr. Wombold.  And based on the

1    headings of that, what is the -- what did -- would you just

2    read the heading of this document to us.

3    A       The J. Scott Wombold Compensation 2008 through 2012.

4    Q       So what are Mr. Wombold's initials?

5    A       JSW.

6    Q       Going back to Government Exhibit 410, this document

7    is Bates numbered Pilot doc 11332 for the record.  Do you see

8    the initials JSW there?

9    A       I do.

10            MR. RIVERA:  Your Honor, I object to this.  This is

11   beyond the scope of cross-examination.

12            MR. HAMILTON:  May I respond?

13            THE COURT:  You may.

14            MR. HAMILTON:  I believe the reliability of these

15   documents was challenged by Mr. Wombold's counsel, and we are

16   just showing that Mr. Wombold approved a number of these

17   documents.

18            MR. RIVERA:  That's beyond the scope, Your Honor.  We

19   never addressed this document.  We never addressed Mr. Wombold

20   approving any documents.

21            THE COURT:  Were you suggesting only specific

22   documents may have been manipulated by -- I've forgotten the

23   lady's name -- or were you suggesting that as a whole the

24   documents that this witness had identified and sponsored into

25   evidence should not be relied upon by the jury?

1    MR. RIVERA:  I'm not sure I follow the question, Your

2 Honor.

3    THE COURT:  Okay.  I do recall there were some

4 questions directed to this witness.  I think there was some

5 conversation about whether -- is it Ms. Borders was either a

6 felon or was involved in some type of fraud, and we had a

7 discussion about what impeachment means.  And I think that

8 there was some indication that the jury could not rely upon

9 either all the documents that this witness testified about or

10 at least some specific documents.  So I was asking the

11 question, were you suggesting that all of the documents that

12 Ms. Borders had some involvement in should be questioned, or

13 were you only suggesting that a select few of those documents

14 should be questioned?

15    MR. RIVERA:  No, Your Honor.  I was -- what I was

16 suggesting and what I was showing is that Ms. Borden's

17 calculations, as they related to the preparation of these

18 breakdown reports, were unreliable, not that--

19    THE COURT:  Which documents in particular?  Which

20 ones?

21    MR. RIVERA:  All of the documents that she went

22 through.

23    THE COURT:  Okay.  I think that would stand for all

24 of the documents.

25    MR. RIVERA:  Right, Your Honor, but not the approving

1   authority.  Not Mr. Hazelwood, Mr. Wombold, but simply the

2   calculations and the thought process that Vicki Borden employed

3   when she prepared these documents.  That's the only thing I

4   challenged.

5           THE COURT:  And I think the logical assumption would

6   be that Ms. Borders either put in too much money in people's

7   pockets or she was not putting enough money in people's

8   pockets, that is, that she was either defrauding the company or

9   she was defrauding individuals.  I think what this document is

10  aimed to show by the government is that she was not the only

11  person with some responsibility for the -- for the numbers on

12  the documents.  So wouldn't that be a fair response to the

13  cross-examination?

14          MR. RIVERA:  I don't believe it is, Your Honor.

15          THE COURT:  You don't believe it is?

16          MR. RIVERA:  I don't.

17          THE COURT:  Well, the Court overrules the objection.

18  BY MR. HAMILTON:

19  Q       Whose signature is on Page 11332 of Exhibit 410?

20  A       Based on the initials, I would think it was Scott

21  Wombold, but I don't know his signature as well as I do

22  Mark's.

23  Q       Turning to Page 1133.  Again, do we see initials

24  similar to the ones we were just looking at?

25  A       Yes.  And I can see the JS on the signature.

1    Q        Indicating it's who's signature?

2    A        Wom- -- Scott's.  Scott Wombold.

3    Q        And did Mr. Wombold have approving authority for

4    commission breakdown reports?

5    A        He did.

6    Q        Staying with Government Exhibit 410, directing your

7    attention to Page Trial 30204.  Is this for February of 2012

8    for Heather Jones?

9    A        It is.

10   Q        And do you see initials there at the bottom of the

11   Total To Pay?

12   A        JSW.

13   Q        And whose initials are those?

14   A        Scott Wombold.

15   Q        Do you see an amount marked through and changed?

16   A        I do.

17   Q        And will you take a moment and take whatever time

18   you need to do this in Exhibit 410, and based on the exercise

19   that we just went through with a few of those documents, can

20   you tell us who are the people you identify as the approving

21   authority for Government Exhibit 410?

22   A        (Witness complying.)

23   Q        And as you view that, Ms. Whaley, I want to -- I

24   don't want to interrupt your train of thought, but I do want

25   to put some book ends in here.  Particularly, look at the

1    page -- start with the first page, which is 11283, and

2    continue as quickly as you can, through 11322, and tell us who

3    appears to be the approving signature up to that point?

4    A        Mark Hazelwood.

5    Q        Then starting at Page 11323 and continuing to 11333,

6    and that would be--

7    A        Continuing to where?

8    Q        Through the end.

9    A        Scott Wombold.

10   Q        And approximately how many months is that?

11   A        That is eleven.

12   Q        Eleven months from 2011 through 2012?

13   A        Correct.

14            MR. HAMILTON:  No further questions.

15            THE COURT:  Thank you, ma'am.  You are free to go.

16            THE WITNESS:  Thank you.

17            (Witness excused.)

18            THE COURT:  Call your next witness.

19            MR. HAMILTON:  Jennifer Dalmida.

20                        JENNIFER DALMIDA,

21   called as a witness at the instance of the government, having

22   been first duly sworn, was examined, and testified as follows:

23                        DIRECT EXAMINATION

24   BY MR. HAMILTON:

25   Q        Some math might be involved.  Ms. Dalmida has been

1    passed a calculator.  That's why I said that.  Ms. Dalmida,

2    would you please introduce yourself with your full name to the

3    jury.

4    A        My name is Jennifer Dalmida.  I work with Verizon

5    Wireless.

6    Q        And what's your job at Verizon?

7    A        I'm a senior analyst, who is a custodian of records

8    for the company.

9    Q        So as a custodian of records, what do you

10   principally do for the company?

11   A        Basically, I'm the keeper of all our business

12   records, so I interpret any type of cell tower information or

13   cell tower records that we produce in compliance to a search

14   warrant, court order, or a subpoena.

15   Q        Are you on the road most days of the week?

16   A        Yes.

17   Q        Testifying in proceedings like this?

18   A        Yes.

19   Q        Let me direct your attention to Government

20   Exhibit 1901.

21            MR. HAMILTON:  Could we go to the laptop, please.

22   BY MR. HAMILTON:

23   Q        Before your testimony today, did you have a chance

24   to look at Government's Exhibit 1901?

25   A        Yes.

1   Q       And have you determined whether or not it's a

2   Verizon business record?

3   A       Yes.

4   Q       And is it a Verizon business record?

5   A       Yes, it is.

6   Q       I'm going to ask you a few questions about that so

7   you can help us understand how to interpret these documents,

8   and I'd like to go to Government Exhibit 1901-A, please.

9   First of all, is Government's Exhibit 1901 a multi-page

10  document?

11  A       Yes.

12  Q       Pages and pages?

13  A       Yes.

14  Q       And have we, in 1901-A, pulled out some of the

15  information on one of the pages?

16  A       Correct.

17  Q       Can you explain to the jury what the headings are

18  for the columns in this document?

19  A       Absolutely.  The first column we have is the mobile

20  directory none.  We refer to that as the subscriber telephone

21  number for the records in which we produced.

22          The next column we have is a dialed digit number.

23  This would be the dialing pattern of our subscriber on

24  outgoing calls, and it would also indicate any type of number

25  that was used for routing.

1          The next column we have, the seizure date and time.

2   This would indicate the date and time that the call took

3   place, and this would be in military time.

4          The next column we have is the seizure duration, and

5   this would be the duration of the call in seconds.

6          And the next column we have is the calling party

7   number.  This column would indicate who initiated the call.

8   Q       So the mobile directory number, will I be using a

9   correct term if I refer to that has the subscriber number?

10  A       Yes.

11  Q       The subscriber number being the number of the cell

12  phone user whose records these are, is that correct?

13  A       Correct.

14  Q       I will refer to it as the subscriber number.

15  A       Okay.

16  Q       So I'm going to now go over to the seizure date, and

17  what does the seizure date tell us?

18  A       This would indicate the time that the call occurred.

19  Q       So is that -- and the seizure date column, is that

20  the day of the week on which it occurred?

21  A       Correct.

22  Q       Rather, the date.  We don't know whether it's

23  Monday, Tuesday or Wednesday --

24  A       The date and the time.

25  Q       Right.  And the time, you say military time, if --

1    if 1301 is military time, what would be the way in which

2    people who were not in the military would state that?

3    A        1:01 p.m.

4    Q        And do you know whether or not this time is on

5    Eastern Time or Central Time or Mountain Time?

6    A        Yes.  It's on Eastern Time.

7    Q        So the time in this record is Eastern Time?

8    A        Correct.

9    Q        And when we're looking at the duration column, what

10   does that tell us?

11   A        That would be the length of the call in seconds.

12   Q        So in order to know how many minutes what would we

13   have to divide this by?

14   A        Sixty.

15   Q        Now, let's just do some examples to make sure we

16   understand how we read this record.  Go to the calling party

17   number.  And, again, what is the calling party?

18   A        This column would indicate who initiated the call,

19   who started the call.

20   Q        Whether or not it was the subscriber or somebody

21   else?

22   A        Correct.

23   Q        So looking at the first row, the telephone number

24   that initiates the call is (865)268-0076.  Is that correct?

25   A        Yes.

1    Q        And because we know who the subscriber is, who is

2    the number ending in 0076 calling?

3    A        Our subscriber, 7148.

4    Q        Going to the next column -- excuse me, the next row,

5    which is a -- this is an opportunity to do a little math, so

6    the duration is 121.  Is that 121 seconds?

7    A        Yes.

8    Q        So how many minutes is that?

9    A        This is a little over two minutes.

10   Q        And who is the calling party?

11   A        Our subscriber.

12   Q        And how do we know that?

13   A        The telephone number, (865)805-7148, is our

14   subscriber telephone number.

15   Q        And who is our subscriber -- what number is our

16   subscriber calling?

17   A        Our subscriber is calling (865)250-5150.

18   Q        And what heading are you looking at to know what

19   number our subscriber was calling?

20   A        Under the dialed digit number.

21   Q        So we'll go to the next row and the next row.  Who

22   is the calling party?

23   A        (865)603-1505.

24   Q        And who is (865)603-1505 calling?

25   A        Our subscriber.

1    Q        And how do we know that?

2    A        Because it's an in-coming call.

3    Q        And can you tell the jury what that unusual series

4    of digits is, where it says dialed digit number and then the

5    1.0868?

6    A        So, typically, when we see that code -- the column

7    isn't open wide enough, but you'll notice this code on any

8    call that was forwarded to voice mail, because there's an

9    extra routing pattern that's used.

10   Q        So we'll go to the next row and the next row and we

11   have a calling party number of (865)805-7148.  So who is

12   initiating this call?

13   A        Our subscriber.

14   Q        And we know that because we can look over and see

15   the mobile directory number?

16   A        Correct.

17   Q        And who is our subscriber calling?  What number --

18   what number is our subscriber calling?

19   A        544-0422.

20   Q        And is this call a 29-second call?

21   A        Yes, it is.

22   Q        Going to the next -- the next row, who is the

23   calling party here?

24   A        Our subscriber.

25   Q        And what number is the subscriber calling at that

1    time?

2    A          (865)742-4501.

3    Q          And, again, just to make sure that everyone is with

4    us here, do you see a time of 1838?

5    A          Yes.

6    Q          So in Eastern Time, what time is 1838?

7    A          6:38 p.m.

8    Q          And go to the next row, please.  And just to make

9    sure that everyone understands all the information here, what

10   is the date -- we've highlighted a row here that has 696

11   seconds, and what is the date of that call?

12   A          June 9, 2014.

13   Q          And at what Eastern Time?

14   A          It would be 6:40 p.m. Eastern Time.

15   Q          And approximately how many minutes does that take?

16   A          And this one is 696 seconds, which is about 11

17   minutes.

18   Q          And who initiates this call?

19   A          (865)742-4501.

20   Q          And is that our subscriber?

21   A          No.

22   Q          So did our subscriber initiate this call?

23   A          No.

24   Q          What telephone number did (865)742-4501 call?

25   A          Our subscriber, (865)805-7148.

Dalmida – Direct Examination

1  Q        So let's skip down and go to the next longest

2  duration call on here, and that is at -- the time column says

3  1852, so please focus your attention on that.  And looking to

4  the calling party column at -- on June 9th, 2014, at 1852,

5  who -- what number initiates that call?

6  A        (865)603-1505.

7  Q        And what is the duration of that call?

8  A        It's a little over eight minutes.

9  Q        And what Eastern Time is this call made?

10 A        It's 6:52 p.m. Eastern Time.

11 Q        And the date of this call?

12 A        June 9th, 2014.

13 Q        And who -- what number is called?

14 A        Our subscriber, (865)805-7148.

15 Q        All right.  Let's please direct your attention now

16 to Government Exhibit 1902.  And before your testimony were

17 you able to confirm whether or not Exhibit 1902 is a Verizon

18 business record?

19 A        Yes.

20 Q        And is it in fact a Verizon business record?

21 A        Yes.

22 Q        Let me direct your attention to Government

23 Exhibit 1902-A.  And were you able to determine that 1902-A is

24 a page from 1902?

25 A        Yes.

1   Q        And just to make sure that I did ask this question,

2   were you able to determine, going back to 1901 -- we don't

3   need to pull it up, but were you able to determine that the

4   exhibit that we looked at, 1901-A, was indeed a page that came

5   from 1901?

6   A        Yes.

7            MR. HAMILTON:  No further questions, Your Honor.

8            THE COURT:  Cross-examination?

9            MS. BREVORKA:  Yes, Your Honor.

10                        CROSS-EXAMINATION

11  BY MS. BREVORKA:

12  Q        Good afternoon.

13  A        Good afternoon.

14  Q        My name is Jenny Brevorka, and I'm one of the

15  attorneys that represents Mr. Hazelwood.  I have one quick

16  question for you.  I noticed throughout your testimony you

17  stated that the numbers on the records here represented the

18  subscriber that dialed or received a call.  Is that correct?

19  A        Correct.

20  Q        The numbers actually represent the subscriber's cell

21  phone number actually receiving or dialing a call.  From these

22  records you cannot tell whether the subscriber themselves

23  placed or received the call.  Is that correct?

24  A        Correct.

25           MS. BREVORKA:  Thank you very much.

1          <u>CROSS-EXAMINATION</u>

2     BY MR. PLATT:

3     Q          Hi, Ms. Dalmida.

4     A          Hi.

5     Q          My name is Robert Platt.  I represent Mr. Wombold.

6     Just following up on what Ms. Brevorka just asked you, the

7     records that you referenced today, they don't have a way of

8     verifying the content of the calls?

9     A          No.

10    Q          Okay.  So if the content of the call was perfectly

11    innocent and normal, the Verizon business records would have

12    no way of reflecting that?

13    A          Correct.

14               MR. PLATT:  Okay.  Thank you.

15               MR. VERNIA:  No questions, Your Honor.

16               MS. COMPHER-RICE:  No questions, Your Honor.

17               THE COURT:  Any redirect?

18               MR. HAMILTON:  No, Your Honor.

19               THE COURT:  Thank you, ma'am.  You're free to go.

20               THE WITNESS:  Thank you.

21               THE COURT:  We appreciate you're coming.

22               (Witness excused.)

23               THE COURT:  Call your next witness.

24               MR. HAMILTON:  Darren Seay.

25               THE COURTROOM DEPUTY:  Pardon me.  What was that

1    name?

2         MR. HAMILTON:  Darren Seay.

3                        DARREN SEAY,

4    called as a witness at the instance of the government, having

5    been first duly sworn, was examined, and testified as follows:

6         MR. VERNIA:  Your Honor --

7         THE COURT:  Yes.

8         MR. VERNIA:  -- before Mr. Seay testifies, I'd just

9    like to move to voir dire the witness.  As I explained to

10   Mr. Hamilton before lunch, we believe voir dire is necessary to

11   establish some preliminary questions of fact before he's

12   allowed to testify.

13        THE COURT:  Is he an expert witness?

14        MR. HAMILTON:  No, sir.  This witness, the Court has

15   already ruled upon.  He was the subject of a pretrial motion.

16   I'm not sure how much more you want me to go into, but, no,

17   he's not an expert witness.

18        THE COURT:  Well, I asked that procedural question.

19        MR. HAMILTON:  Yes.

20        THE COURT:  Voir dire is common with experts.  And

21   after the government first questions the witness to lay what

22   they believe is the foundation for the acceptance of the

23   witness, the opposite side then has a chance to examine the

24   witness further.  We also can do that with regard to documents,

25   if an opposing party believes that the foundation for a

document has not been adequate, they can use the opportunity to

demonstrate the inadequates of it.  This witness is, what, a

fact witness, then?

MR. HAMILTON:  Yes, Your Honor.  This witness, the

Court has already ruled, can provide lay opinion testimony.

This witness is the subject of a pretrial issue that was

thoroughly briefed by the parties and the Court has already

entered a ruling on this particular witness and ruled that this

witness may offer lay opinion testimony based on his experience

as a Pilot employee.

THE COURT:  Okay.  And you'd like to voir dire him,

then, on his experience as a Pilot employee?

MR. VERNIA:  Your Honor, I think that it's -- there's

no dispute that Mr. Seay is not a percipient witness as to

anything at issue in the case prior to the search at Pilot

Flying J.

The Court's ruling in October, Docket Number 274,

was that excluding such testimony before trial was not

warranted.  We've had the opportunity to have many days of

trial.  I think that it's -- given his unusual situation as a

nonpercipient witness who is being -- whose opinions are being

offered under Rule 701, and now that he's here and can

actually respond to questions regarding the foundation that he

may or may not possess for his testimony, that it's

appropriate to voir dire him.

1        THE COURT:  And even though this witness is not an

2   expert, if he's going to offer opinions there still has to be a

3   foundation for the opinions, and I'm assuming the government

4   will attempt do that.  Would it make more since after the

5   government makes what it believes is the appropriate foundation

6   to allow the defense to examine the witness on that foundation?

7        MR. VERNIA:  Your Honor, that -- that would be

8   acceptable to us.

9        THE COURT:  Okay.  So, Mr. Hamilton, if you don't

10  mind, why don't you spend the first part of your examination

11  just on the foundations.  When you finish with the foundations,

12  then the defendants will have a chance to examine the witness.

13  And after that, we can argue the point, and assuming which way

14  the arguments, the witness may or may not be able to offer his

15  opinions.  Does that make sense?

16       MR. HAMILTON:  Yes, sir.

17       THE COURT:  You may proceed.

18                    DARREN MATTHEW SEAY,

19  called as a witness at the instance of the government, having

20  been first duly sworn, was examined, and testified as follows:

21                    DIRECT EXAMINATION

22  BY MR. HAMILTON:

23  Q        Would you please introduce yourself to the jury?

24  A        Sure.  My name is Darren Matthew Seay.

25  Q        And where do you work?

```
 1  A          I currently work at Pilot Flying J.

 2  Q          And how long you have worked there?

 3  A          Over 15 years.

 4  Q          Would you walk us through your career at Pilot,

 5  please?

 6  A          Sure.  I first entered Pilot as a fuel accountant

 7  within the fuel accounting department.  I served that role for

 8  June of 2002 through May of 2004.  In June of 2004, I was

 9  promoted to fuel accounting supervisor.  Would you like me to

10  go through my job roles as well?

11  Q          Actually, I would appreciate if I could ask you some

12  specific questions about your job as a fuel accountant.

13  A          Sure.

14  Q          And so, in your first -- is that your first two

15  years, 2002 to 2004?

16  A          (Moving head up and down.)

17  Q          What were your responsibilities as a fuel

18  accountant?

19  A          Okay.  As a fuel accountant, my primary

20  responsibility was in the research, reporting and accounting

21  into our store fuel margins.

22  Q          And what is a store fuel margin?

23  A          So a fuel margin would represent the profit or loss

24  our company makes on the sale of fuel at our retail locations.

25  Q          And from -- from an accounting standpoint, how is
```

1  profit expressed at Pilot?

2  A        So, to compare profitability across our retail

3  locations, we express it as a cents per gallon amount.

4  Q        So after a couple of years as a fuel accountant,

5  what did you do?

6  A        So I was promoted to the fuel accounting supervisor.

7  In that role I supervised the fuel margin team, which is the

8  team I previously resided within, which performed similar

9  duties.

10  Q        And in that role you were just supervising people

11  who were doing the same thing?

12  A        Correct.  Yes.

13  Q        And how long do you that?

14  A        I did that for four years.

15  Q        So when does that bring us to?

16  A        I believe that brings us to 2008, June.

17  Q        What was your next job at Pilot?

18  A        Next I was promoted to the fuel accounting manager.

19  In that role I managed both the fuel margin team I previously

20  supervised, and I also took on the additional responsibilities

21  of the fuel payables team.  That team was responsible for the

22  reconciliation and payment of all fuel-related invoices.

23  Q        And what -- could you describe the components of

24  that reconciliation process.  Generally speaking, what would

25  be required to be done as part of the reconciliation process?

1    A          Looking at historic fuel margins?

2    Q          Yes.

3    A          Commonly, as most store margins report in a cents

4    per gallon amount, if there were multiple locations in the

5    same market, you'd expect obviously the fuel margins to be

6    similar, so we commonly would receive questions regarding

7    stores that had dissimilar fuel margins.  We would then look

8    into those margins to determine was it an issue with the --

9    was there a difference in the retail price at the locations or

10   was there a difference in the cost of the product or we also,

11   in the case of what we call net fuel margin, we would look

12   into the accounting behind customer discounts.  We'd also look

13   at credit card fees, transaction fees, and any expenses

14   related to our loyalty program.

15   Q          So when you say cost of the product, what do you

16   mean?

17   A          So product cost is comprised of both the fuel cost,

18   which is the cost of the raw product we pay a few supplier.

19   Also, we would have to remit taxes and pay taxes for any fuel

20   product we sold.  And then the freight, which is the

21   transportation between the source terminal where the fuel was

22   picked up and then delivered to the retail location.

23   Q          About how long did you do that at Pilot?

24   A          Well, I -- of course, I did that either in a direct

25   hands-on experience or either as a manager and supervisor for

1    that cumulative, I guess about 12 years, so...

2    Q        How long were you a fuel accounting manager?

3    A        Four years.  Actually, three and a half.  I believe

4    it was June of 2008 through December of 2012.

5    Q        And after your -- after your job as a fuel

6    accounting manager, what did you do?

7    A        I transitioned to manage -- my role was the manager

8    of business intelligence and decision sciences.  In that role

9    the department that I managed has two primary

10   responsibilities:  One is business intelligence and one is

11   data analytics or data science.

12   Q        So could you describe to us what business

13   intelligence is?

14   A        Sure.  Business intelligence involves the access,

15   usage, and availability of data, so we would help empower the

16   organization to leverage data to make better decisions.  A

17   common example of this would be operational reporting.

18   Q        What is operational reporting?

19   A        Operational reporting would be routine reports that

20   were distributed to a business partner to help them make a

21   more informed decision.  One example of this would be, we do

22   daily, weekly, and monthly reporting for our store management

23   in the field, to help them operate their travel centers, so...

24   Q        So what sort of skill set is required to assimilate

25   data like that to make a useful product?

1  A        First, we try to develop a deep understanding within

2  the business unit we're trying to support, so understanding

3  how they're going to utilize the report or the data.  Then

4  we'd also have to have the technical still sets required to be

5  able to create and automate the distribution of the reports.

6  Q        Did that describe what we were just talking about

7  the category of business intelligence?

8  A        Correct.

9  Q        And was there another category?

10 A        So data analytics or we also refer to it as data

11 science, that team typically applies complex calculations,

12 using mathematics or statistics to Pilot-generated data to

13 help make a more informed decision.

14          An example of that would be creating a sales

15 forecast.  We would try to predict how much of a product we

16 would sell in a future period so we could either make sure we

17 purchase enough of the product or it could be labor scheduling

18 or other labor issues around the sale of the product.

19 Q        Again, what kind of data assimilation skill set is

20 required to be effective in what you just described?

21 A        So, similarly, we also develop a knowledge of the

22 business requirements and understand the business objectives

23 and how they're going to utilize the output of any product our

24 team would produce.

25          Then, again, there would have to be technical skill

1   sets and expertise typically in computer science or

2   mathematics to be able to perform the calculations required to

3   produce the models, so...

4   Q        What is your educational background?

5   A        So I received my undergraduate with a double major

6   in both mathematics and studio music and jazz, so the jazz

7   degree was a performance-based degree, so...

8   Q        Okay.  And do you have any advanced degrees beyond

9   that?

10  A        I do.  I also returned to complete a master's of

11  accountancy with a systems concentration, as well.  All

12  received from UT in Knoxville.

13  Q        During your work as a manager of business

14  intelligence and decision sciences, did you have a reason to

15  use something referred to as a Power Pivot table?

16  A        Correct.  I did -- Power Pivot's a useful tool, and

17  I -- I like to qualify it as, like, we use it a lot for

18  prototyping so we have a process.  We need to help automate

19  either a calculation or reporting and the like.  We -- that's

20  a common tool that we would utilize.

21  Q        What is a Power Pivot tool?

22  A        So Power Pivot is an add-in to Microsoft Excel.  So

23  Microsoft Excel is the foundational product.  It leverages

24  databased functionality within the Microsoft Excel platform.

25  So it's much more robust than the standard spreadsheet that

1   you'd be used to if you're familiar with Microsoft Excel,

2   so...

3   Q        Let me direct your attention to April 15th of 2013.

4   And were you at Pilot headquarters on that day?

5   A        I was.

6   Q        What building were you working in?

7   A        I was in the main building, the top of hill.

8   Q        Is that 5508?

9   A        Oh, yes.  Yeah, Lonas Drive.

10  Q        So 5508 Lonas Drive in Knoxville, Tennessee?

11  A        Correct.

12  Q        Is that where you were working on April 15th of

13  2013?

14  A        Yes.

15  Q        What happened that day?

16  A        The government raided our locations to perform a

17  search.

18  Q        After the April 15th, 2013 search warrant at Pilot

19  headquarters, internally, what, if anything, did Pilot do with

20  its trucking company accounts?

21  A        So, initially, after the raid we tried to understand

22  the breadth of the alleged fraud that had occurred.  We then

23  tried to determine what was owed to any customer, and then, of

24  course, we tried to get them paid back as soon as possible.

25  Q        Was there an audit that occurred?

1    A         Yes.  We performed an audit of all of our customer

2    accounts as a result.

3    Q         When you say "we," who do you mean?

4    A         We created an audit team within Pilot.  It was

5    comprised of our inventory audit team, also other accountants

6    serving in other roles throughout the organization.

7    Q         Did you participate in the audit?

8    A         I did.

9    Q         What role did you play in the audit?

10   A         I had two primarily roles.  My first was as a senior

11   manager on the audit team, that role.  I reviewed the work

12   product of the auditors that were performing the customer

13   audits.

14             And then my secondary role was as a technical lead.

15   So I would help -- my responsibilities were to understand the

16   source systems surrounding the customer discount process,

17   obviously the data generated, and then I would help supervise

18   any creation of any technical tools that would be required to

19   help facilitate the audit process.

20   Q         At any time did anyone from the United States

21   government ask Pilot to conduct the audit that you were

22   describing?

23   A         No.

24   Q         Was this initiated by the company on its own?

25   A         Yes.

– Direct Examination

```
 1   Q          After the raid, as you described it?

 2   A          Correct.  After April 2013, yes.

 3   Q          From your work at Pilot and particularly during the

 4   audit, did you become familiar with a customer referred to as

 5   a manual rebate customer?

 6   A          Yes.

 7   Q          And what is that?

 8   A          So manual rebate customers were customers that would

 9   receive a monthly rebate payment based on their purchases of

10   fuel at our retail locations for the prior month.

11   Q          And from your work at Pilot and during the audit did

12   you become familiar with a customer called an off-invoice

13   customer?

14   A          Yes.

15   Q          Did the audit that you participated in and

16   supervised review manual rebate customer accounts?

17   A          Yes.

18   Q          And did that audit also review off-invoice customer

19   accounts?

20   A          Yes.

21   Q          In total, adding the off-invoice and the manual

22   rebate customer accounts, approximately how many customer

23   accounts were identified as being -- as having a need for an

24   audit?

25   A          Well, we audited all accounts just to be sure.  So
```

1    we performed on audit of over 7,000 accounts in total.

2    Q         When the audit began, did Pilot have a data

3    processing tool to look back in time to accurately and

4    efficiently recalculate discount savings on the scale that

5    we're talking about?

6    A         No.  We had no tool.

7    Q         So how -- and, again, what was the total number of

8    customers that needed to be looked at?

9    A         Over 7,000.

10   Q         So as part of the -- as a supervisor in the audit

11   team, what did -- what did you -- based on that knowledge,

12   what did you-all do to tackle that infrastructure issue?

13   A         So we developed two primary tools that would help

14   the process of what we referred to as repricing our customer

15   accounts to determine any discount amount that was due.  The

16   first was the Power Pivot manual rebate tool.  And the second

17   was the off-invoice Power Pivot repricing tool.

18   Q         Did you participate in the creation of those tools?

19   A         I did.

20   Q         And did you supervise the creation of those tools?

21   A         I did, so...

22   Q         Was the integrity of those tools tested?

23   A         It was, extensively, yes.

24   Q         Did you participate in that?

25   A         Yes.  I led those efforts.

– Direct Examination

1    Q        And what does that mean?  What is testing the

2    integrity of a tool like that?

3    A        So, obviously, it's a complex calculation.  So we

4    wanted to make sure the output of any tool we utilized was

5    accurate.  So we did two types of comparisons.  One was more

6    of a manual comparison, where we actually do it by hand, so to

7    speak, based on the calculation that was being applied, to

8    make sure that the numbers coming out of the tool were

9    correct.

10            We also did -- we commonly did this for a very large

11   number of accounts, especially with the off-invoice customers.

12   The source system that was used for our customer discount

13   price has a historical record of what discounts were in place

14   over time, so we were able to use the newly-developed tool to

15   reprice our customer transactions, utilizing the deal or the

16   discount that was in place historically; thus, the output of

17   that tool would then be compared to the original invoices the

18   customer had received and make sure that they were materially

19   in line.

20   Q        I believe one of the tools you identified was the

21   Power Pivot manual rebate tool.  Is that correct?

22   A        Correct.

23   Q        Can you describe to the jury what the function of

24   that tool was?

25   A        So the Power Pivot manual rebate tool would

– Direct Examination

1   determine the original rebate amounts that were paid to our

2   customer.  It would then calculate what rebate amount should

3   have been paid to a customer based on the results of the

4   audit, the discount terms that were identified during the

5   customer audit.  It would then calculate any amount that was

6   now due to the customer.

7   Q        Did you also identify a tool you referred to as an

8   off-invoice Power Pivot repricing tool?

9   A        Yes.

10  Q        And what was the function of -- may I just refer to

11  it as the off-invoice tool and you understand what I'm talking

12  about?

13  A        (Moving head up and down.)  Okay.

14  Q        So what was the purpose, what was the function of

15  the off-invoice tool?

16  A        So the off-invoice tool would determine the original

17  invoices that were sent to our customers.  It would then

18  calculate what those invoices would have been had the

19  identified discount during our audit been applied, and thus,

20  determine any amounts owed to a customer.

21           So the scale between the two tools again, manual

22  rebate customers received a rebate payment subsequent to their

23  fuel purchases, while off-invoice customers received a reduced

24  invoiced amount to apply any discount received as a result,

25  so...

1    Q        And just for ease of reference, may I refer to the

2    first tool as the manual rebate tool?

3    A        Yes.

4    Q        So what categories of data were needed to be able to

5    perform the calculations that were set up to be performed by

6    the manual rebate tool and the off-invoice tool?

7    A        Okay.  The tools -- the first data source that we

8    would have to -- we would need would be, obviously, the

9    customer fuel purchases.  The second would be the OPIS price

10   index amounts, which would be utilized as the foundation for

11   our cost-plus and cost-minus customers.  In the case of the

12   manual rebate tool, we also had to supply the retail price at

13   our locations by day and also had a way to input -- or the

14   original rebate amounts that were paid.

15   Q        So the first category, that would -- was that how

16   much the customers purchased?

17   A        Uh-huh.  Yes.  The purchase -- the purchase volume

18   for our -- excuse me -- the purchase volume for our customers

19   by location.

20   Q        And would that be gallons?

21   A        Yes.

22   Q        Gallons by location?

23   A        Correct.

24   Q        Where did that data -- where did that data come from

25   to -- to -- to create the data needed for the Power Pivot

1   tools?

2   A          In case of the manual rebate tool, that data was

3   obtained via PRS.  In the case of the off-invoice tool, we

4   retrieved that data from the PM -- excuse me -- the PMIS

5   system and the Ascend System, so Ascend replaced PMIS during

6   the audit period.

7   Q          So starting with the -- so the off-invoice got data

8   from PMIS/Ascend?

9   A          Correct.

10  Q          And can you tell the jury what Ascend -- I'm going

11  to refer to it as Ascend/PMIS.  I'll try to be consistent.

12  A          Correct.

13  Q          So could you tell the jury what Ascend/PMIS is?

14  A          Yes.  Those tools' primary function was to help

15  facilitate the creation of the customer invoices.  Commonly,

16  it would apply a discount and the invoice amount would be --

17  would reflect a discount off their invoice; thus the term,

18  off-invoice customers, so...

19  Q          So the Ascend/PMIS, is that a database of

20  information?

21  A          Correct.

22  Q          And does that contain -- is that data data that's

23  kept in the regular course of Pilot business?

24  A          It is.

25  Q          Over a -- was it kept over years and years?

1   A        Yes, multiple.

2   Q        The second category you mentioned was PRS?

3   A        Correct.

4   Q        And what is PRS?

5   A        PRS is a third-party data aggregation customer that

6   would collect the fuel transactions by our -- for our

7   customers at our retail locations and then remit that data to

8   us.

9   Q        And what did Pilot do with the PRS information that

10  it obtained?

11  A        We would load the PRS information into our Price

12  Fetch system.

13  Q        And how long had -- so April 15th, 2013 is the date

14  that I know is memorable to the company.  Before April 15th of

15  2013, had Pilot been using PRS data for years and years?

16  A        Yes.

17  Q        And was it the regular course of Pilot -- was it the

18  regular course of Pilot business activities to integrate PRS

19  data into its business records?

20  A        Yes.

21           MR. VERNIA:  Objection.  Lack of foundation.

22           THE COURT:  Huh?

23           MR. VERNIA:  I don't think it's been shown yet that

24  this witness has any knowledge of what a -- personal knowledge

25  of what happened prior to April 15th of 2013, with respect to

1    these systems.

2              THE COURT:  Mr. Hamilton?

3              MR. HAMILTON:  Yes.  May I ask some follow-up

4    questions to make sure?  I believe the foundation has been

5    established, but may I just ask a few more questions to do

6    that?

7              THE COURT:  I think the objection was only to whether

8    the use of this particular software or package or application

9    was incorporated into the further business affairs of the

10   company.  I think the objection was that he would have had no

11   way of knowing what was going on prior to the time that he

12   conducted the audit.

13             MR. HAMILTON:  Well, my question would be during the

14   course of the audit, did you determine whether or not PRS data

15   was used.  May I ask that question, Your Honor?

16             THE COURT:  Of course.

17   BY MR. HAMILTON:

18   Q        So during the course of the audit -- and what time

19   period -- let me ask you this:  During the audit what time

20   period was audited?

21   A        So, we initially focused on 2008 through 2013.  We

22   later realized the problem was occurring prior to 2008.  So we

23   expanded the audit to look all the way back to 2005.

24   Q        So during the course of the audit, were you able to

25   determine whether Pilot made it its regular course of business

1   activity to incorporate -- to integrate PRS data as part of

2   its business records from 2005 through 2013?

3   A       Yes.

4   Q       And did it in fact do that?

5           MR. VERNIA:  Objection.  Hearsay.

6           THE COURT:  Overruled.

7   BY MR. HAMILTON:

8   Q       And did Pilot in fact integrate PRS data into its

9   business records from 2005 through 2013?

10  A       Yes.

11  Q       During -- during the audit were you able to

12  determine that Pilot relied on the PRS data in its day to day

13  business activities from 2005 through 2013?

14  A       Yes.

15  Q       And just to clarify, in case there's any doubt about

16  this at all, during the time that you were auditing these

17  customer accounts, were you a Pilot employee?

18  A       Yes.

19  Q       And did you conduct any audits during the time that

20  you were auditing it as a Pilot employee at the government's

21  request?

22  A       No.

23  Q       I believe that the second category that you

24  mentioned was -- was OPIS, and that the third category that

25  you mentioned was the average retail price -- or the retail

1    price?

2    A        Correct.

3    Q        I'd like to start with -- I'd like to go to the

4    third category before we get to OPIS.

5    A        Okay.

6    Q        We can do it out of the order in which you did.

7    Where is the data for the retail price coming from to support

8    the manual rebate and the off-invoice tool?

9    A        It's the Lawson database.  So Lawson is an

10   enterprise tool we use for a variety of things within our

11   organization, so we --

12   Q        So what does that mean?  So what is an enterprise

13   tool?

14   A        So an enterprise tool would be something we use

15   across multiple departments, serving a lot of different

16   business functions.  So Lawson is a third-party tool or -- I

17   say tool -- in this case it's a software.  So Lawson's a

18   software.  It has a database behind it.  We have modules to

19   help facilitate -- it's our financial module, so the general

20   ledger system and all the financial accounting that's done in

21   our organization is done through the Lawson system.  We also

22   have an accounts payable module to -- we help perform the

23   accounts payable duties.  We've had some payroll functionality

24   as well.  And we also have the ability to develop our own

25   customized -- we utilize the user interface of Lawson.  So

1    it's a screen that an employee would use to do their job.  We

2    can customize that to help facilitate some of our business

3    processes that are unique to Pilot.  So in this case, we have

4    pricing screens for our retail price group, which is how we

5    captured those retail prices that we used.

6    Q        So is Lawson a software program?  And to the -- to

7    the most pedestrian layperson, is Lawson a software program?

8    A        Yes.

9    Q        And is there data that that Lawson software program

10   manages?

11   A        Yes.

12   Q        Does Lawson allow access to that data?

13   A        Yes.

14   Q        And is the data that is managed and supported by the

15   Lawson system data that is kept and maintained in the ordinary

16   course of business at Pilot?

17   A        Yes.

18   Q        And was -- is that true for the data that the manual

19   rebate and the off-invoice tools were accessing to support

20   those tools?

21   A        Yes.

22   Q        And to go a little deeper, what was the data that

23   was being pulled from the Lawson database to support the

24   off-invoice and manual rebate tools?

25   A        We would obtain the retail price by store, by day,

1    by product.

2    Q         And was that data kept and maintained in the

3    ordinary course of Pilot business?

4    A         Yes.

5    Q         I'm reluctant to go backwards, but I want to make

6    sure that I clarify what Ascend/PMIS is.  Are Ascend and PMIS

7    also software programs?

8    A         Yes.

9    Q         And do they manage data in the same way conceptually

10   as Lawson?

11   A         Con- –– yes.

12   Q         All right.  The –– again, when you identified them,

13   it was the second category that you mentioned, but this will

14   now be the third category that we're going to discuss, OPIS.

15   Can you tell the jury what OPIS stands for?

16   A         Oil Price Information Service.

17   Q         And are you familiar with what OPIS is ––

18   A         Yes.

19   Q         –– and what it does?

20   A         Yes.

21   Q         All right.  And can you tell the jury from your

22   experience––  Let me ask you this:  Before you came to work at

23   Pilot, did you have any idea about OPIS?

24   A         No.

25   Q         All the information you've learned from OPIS has

1    been from your work experience at Pilot?

2    A        Yes.

3    Q        And during your work at Pilot -- when did you first

4    need to learn about OPIS and what information it provided?

5    A        When I was working within the fuel accounting

6    department, our supply and logistics team would commonly use

7    OPIS price indexes as a benchmark to determine how well they

8    purchased fuel, and the logistics team similarly used it for

9    how well they reduced costs.

10   Q        And you were doing the fuel manager -- the fuel

11   accounting, that was back in -- from 2002 through what time?

12   A        December 2012.

13   Q        During the course -- well, from your time at Pilot

14   from two thousand -- to even before the audit, did -- was it

15   Pilot's regular course of business activity to incorporate

16   data it received from OPIS into its business records?

17   A        Yes.

18   Q        And did Pilot rely on that integrated data in

19   conducting its day-to-day operations?

20   A        Yes.  I think I have a correction.  I think--  The

21   fuel accounting manager was through December of 2011.  So

22   January 2012 forward was when I served my current role.  So

23   I've been in my current role for six years, so...

24   Q        All right.  So you described the use of OPIS so

25   that, I believe, Pilot could see whether or not it was -- it

– Direct Examination

1  was making good -- I know I'm not saying it exactly how you

2  did, but so that Pilot could assess how well it's purchasing

3  fuel?

4  A       Correct.

5  Q       And so how would that -- how would that be done?

6  A       Okay.  So OPIS average represents the average

7  wholesale fuel cost for a particular market or terminal city.

8  We would then compare how well we purchased and transported

9  fuel versus that industry benchmark on -- basically

10 representing the market average cost.

11 Q       All right.  During your work at Pilot in your

12 various roles, have you ever taught other employees about how

13 OPIS -- how the OPIS contract average works and is calculated

14 and how OPIS works generally?

15 A       Yes.  I -- for my current team, we do, especially

16 over the last -- over probably three and a half years, we've

17 been very focused on our efforts around the fuel department,

18 so fuel sales, fuel pricing, supply and distribution.  So as a

19 result, from an on-boarding perspective, I conduct a training

20 course on the fuel systems and data surrounding our key

21 decision points and how we price fuel, how we purchase fuel,

22 how we transport fuel, and then how we sell fuel.

23 Q       And does that course have a name at Pilot?

24 A       No, it's just something -- I call it Fuel 101, I

25 guess, is the closest thing to a title.

1    Q        And during that course do you teach employees about

2    OPIS?

3    A        Yes, extensively.

4    Q        If I gave you a white board today, would you be able

5    to help us with a little bit of that?

6    A        I'd be glad to.

7            MR. HAMILTON:  Your Honor, may I set up a white board

8    so that Mr. Seay may do that?

9            THE COURT:  Yes.

10           MR. HARDIN:  Your Honor, may I inquire if there might

11   be a restroom break in the offing anytime soon?

12           THE COURT:  Why don't we do it now.  Why don't we try

13   to come back at ten minutes after the hour.

14           MR. HARDIN:  Thank you, Your Honor.

15           (Brief recess.)

16           THE COURT:  Mr. Hamilton, you may proceed.

17           MR. HAMILTON:  Yes, Your Honor.

18   BY MR. HAMILTON:

19   Q        Before we had our break, we were about to begin a

20   discussion of OPIS.  And before you step down to come to the

21   white board, I want to show you something on the screen.

22   Could you go to Government's Exhibit 302, please?

23           Exhibit 302 is a page of the direct sales manual.

24           MR. VERNIA:  Your Honor, I object to further

25   questions.  It appears that he's past the foundation point and

1   is moving into the assumptions and testimony.

2           MR. HAMILTON:  Your Honor, may I respond to that?

3           THE COURT:  Of course.

4           MR. HAMILTON:  Mr. Seay has testified that there were

5   two tools that he helped construct for the audit, and he is in

6   the process of explaining the data that was pulled for those

7   tools to be operational and useful in the audit.  At the end of

8   the -- at the end of this portion of the testimony, what I

9   believe that the Court is going to hear is that Mr. Seay,

10  through his knowledge and experience at Pilot, helped to

11  construct the tools that were used to determine whether or not

12  a customer had actually received an accurate discount savings

13  during the course of time in question.

14          At the end of the testimony, I believe what the

15  Court is going to find is that Mr. Seay helped -- helped to

16  create a massive calculator that could be used uniformly for

17  off-invoice customers and manual rebate customers.  And right

18  now where we are is the third category that was used to

19  construct these Power Pivot tables, which is the OPIS data.

20  And we were just going to explain how the OPIS data works and

21  why it was pertinent to the creation of the Power Pivot tools

22  for the manual rebate and off-invoice tools.  So we have

23  actually this category of data and one more category of data

24  before we get to the calculations for the customers in

25  question.

1    MR. VERNIA:  Your Honor, he's testified regarding his

2  familiarity with it.  Now he's proceeding -- as I understand

3  the question, he's going to proceed to describe the nature of

4  OPIS.  And that seems to me to be the substance of the

5  testimony.

6    THE COURT:  Does that mean, then, that you have no

7  objection -- assuming that he's qualified to offer an opinion,

8  that you have no objection to his testimony along the lines

9  that Mr. Hamilton is attempting to go into?

10    MR. VERNIA:  Well, Your Honor, there is the other

11  issue of he's been offered as an expert on OPIS --

12    THE COURT:  Not an expert.  He's going to offer an

13  opinion.  It's a lay opinion, though.  And that's what he's --

14  that's what the foundation is attempting to relay.  And that's

15  what you wanted to voir dire him on.

16    So my question was, assuming that he's accepted, not

17  as an expert but as a person who can offer this type of

18  opinion, will you waive an objection to his opinion along the

19  lines that Mr. Hamilton is trying to establish now?  If --

20  obviously if you're going -- if you're not going to object to

21  it, then the Court should sustain the objection and just limit

22  the person's qualifications where we are.  If, however, there

23  might be some objection raised to his testimony in this area,

24  then obviously the government should lay a foundation for it.

25    MR. VERNIA:  Your Honor, as I understood the Court's

1    direction earlier, Mr. Hamilton was to address foundational

2    issues first and then go into substance.  If the substance of

3    this testimony is going to be the nature of OPIS and I am still

4    allowed to voir dire him on other foundational issues, I don't

5    have an objection with proceeding.  I just -- I thought it was

6    going to be foundation, substance, and it seemed to me that

7    Mr. Hamilton was crossing that line, sir.

8          THE COURT:  Of course I'm not familiar with the

9    witness or the substance of his testimony.  So you and

10   Mr. Hamilton have the benefit of me on that.  So it's hard for

11   me to determine between what is foundation and what is

12   substance.  Mr. Hamilton says this is still foundation.  I

13   think you're of the opinion that this is substance.

14         MR. VERNIA:  Yes, sir.

15         THE COURT:  If you will concede that any testimony

16   he's going to give along these lines is just substance and does

17   not affect his qualifications, then the Court should sustain

18   your objection.  There may be a difference with Mr. -- between

19   you and Mr. Hamilton as to what is foundation and what is

20   substance, I don't know, and I should not know.  But if you are

21   conceding that assuming that the witness is qualified and

22   questions are going to be asked along these lines you will not

23   object on foundation, then the Court should sustain your

24   objection.

25         MR. VERNIA:  Well, Your Honor, in the interest of

1    time, I don't object to proceeding as long as I can address

2    other foundational questions before the substance of those is

3    gone into.  I'm -- I am satisfied with the witness's testimony

4    regarding his knowledge of OPIS to permit this to proceed.  I

5    just wanted to make sure that I wasn't waiving my ability to

6    come back on other topics.

7         THE COURT:  I think -- again, the only thing I know

8    is what you two have said and what this witness has said.  But

9    I thought his testimony was that he had developed some type of

10   application or tool or software to incorporate OPIS——so he had

11   to have some knowledge of OPIS to do that——and he used this

12   tool that he created to generate some numbers or documents.

13   That may not have been what was intended.  That may not have

14   been what he said.  But it was not my understanding that he was

15   trying to demonstrate a knowledge of OPIS in the raw; it was

16   only using OPIS for some other purpose.  But, again, I do not

17   know.  You two know a lot more about this than I do.

18        Mr. Hamilton, are you willing to accept, then,

19   Mr. Vernia's representation as to this witness?  Do you want

20   to proceed with trying to lay a foundation, or are you

21   satisfied?

22        MR. HAMILTON:  No, we're not finished with our

23   foundation, as I said, but, as I was trying to explain to the

24   Court, Mr. Seay identified four categories of information that

25   went into the building of this tool, and the United States

1  maintains that for the Court -- if they are going to object to

2  his foundation to be a lay opinion witness about how these

3  tools operate so that the cost plus pump fee could be put into

4  it to generate a savings amount for a customer, then the United

5  States wants to lay a foundation to do that.

6          And the second reason that we want to lay a

7  foundation to do that is because ultimately where we're

8  heading is the submission to the Court and to the jury of 1006

9  summaries that calculate the loss to particular customers

10 based on pump fee, cost plus pump fees, and this is part of

11 the foundation, the voluminous business record data foundation

12 for the creation of those 1006 summaries.  So -- so we would

13 like to continue with this whether they challenge his

14 foundation or not, because we're laying a separate foundation,

15 which is that there is a 1006 voluminous record basis for the

16 summaries that are at issue.

17         THE COURT:  Very well.  Objection's overruled.

18 BY MR. HAMILTON:

19 Q       Mr. Seay, we were talking about, again, the second

20 category that you identified, but it's the third category that

21 we're talking about, OPIS information, right?

22 A       Yes.

23 Q       All right.  So did you need to have OPIS information

24 to be able to build the Power Pivot tables for the manual

25 rebate and off-invoice calculations?

1    A        Yes.

2    Q        Specifically looking at what's on the screen, which

3    is a page from the Pilot direct sales manual, do you see a

4    definition of cost plus?

5    A        Yes.

6    Q        And what does it say there?

7    A        "Cost plus is a pricing format where the trucking

8    company pays an industry-determined wholesale index price plus

9    a pumping fee."

10   Q        And do you see the term "OPIS contract average"?

11   A        Yes.

12   Q        And what is the OPIS contract average?

13   A        "Truck stop industry standard for 'cost' in cost

14   plus programs."

15   Q        So if you are auditing a customer that received a

16   cost-plus discount, what would you need to have to know

17   whether or not that customer received an accurate savings

18   during a period of time?

19   A        Both the OPIS average in addition to the pump fee

20   being applied.

21   Q        But without the OPIS contract average, you've got

22   nothing to start with, right?

23   A        Correct.

24   Q        Based on your experience at Pilot, did you -- before

25   you even began the audit, have you told us that you had

1  familiarity with how the OPIS contract average is determined?

2  A        Yes.

3  Q        And was that exclusively based on your experience at

4  Pilot?

5  A        Yes.

6  Q        Would you mind stepping down here, please, and

7  explaining to the jury the way in which the OPIS contract

8  average is calculated?

9  A        Sure.  (Witness complying.)  Okay.  I'm going to use

10  Chattanooga as an example, from a market perspective.  This is

11  a scenario so there's -- definitely not as complex as the real

12  thing, but hopefully we'll get a good comparison for you guys

13  in the process.

14          So imagine Chattanooga as of course you have I-75

15  coming down and I-24 coming across.  I'm going to define a few

16  things, and I'll pause, hopefully, as I work through this.  In

17  the case of Chattanooga, there are two primary source points

18  for fuel from a terminal location.  The first is in the

19  northeast portion.  The second would be in the southwest or

20  Lookout Mountain area.

21          So, first, the definition of a terminal.  A terminal

22  is a large tank that holds fuel.  So if you see the semi

23  trucks on the interstate with the large tanks on the back,

24  commonly they would come pick up fuel at these terminal

25  locations and transport it to our retail locations.  That's

– Direct Examination

```
 1   how we get most of the fuel to our retail locations that we
 2   then sell to our customers.  First terminal, large tank of
 3   fuel.
 4          So within -- one thing OPIS does is, OPIS defines
 5   terminal markets.  So you'll hear me refer to them also as
 6   terminal city.  Basically it's a collection of terminals that
 7   will serve a greater market.  In this case, our example, we're
 8   looking at Chattanooga.  So the collective terminals located
 9   in this area and also this area combined are referred to as
10   the Chattanooga terminal city.
11   Q      Mr. Seay, may I interrupt you there for a moment?
12   A      Yes.
13   Q      And I want to point you up to the screen, which is
14   we're looking at Government's Exhibit 302.  And do you see the
15   term "Rack" there?
16   A      Yes.
17   Q      And could you read that to the jury what "Rack"
18   says?
19   A      It's the wholesale distribution point for petroleum
20   products.
21   Q      So when you say "terminal city," does that have any
22   relationship to rack?
23   A      Yes.
24   Q      Would you explain that to the jury before you go on
25   any further?
```

```
 1   A           I'll calculate what OPIS average will be for this --

 2   this example.  In this case the terminal city that it

 3   represents would be the basis for the rack assignment for a

 4   customer receiving a cost-plus or cost-minus discount based on

 5   the Chattanooga rack.

 6   Q           And is the Chattanooga rack -- does that represent

 7   the two tanks that you have shown on here?

 8   A           Correct.  There would be multiples in this location

 9   and probably multiples in this location.  But, for simplicity,

10   I've just drawn two terminals, but...

11   Q           And because the record can't take a picture of what

12   you're drawing here, do you mind if -- I'm going to try to

13   describe it, and you tell me if I get it right.

14   A           All right.

15   Q           You've got a white board up here.  Is that right?

16   A           Yes.

17   Q           And you're using a blue pen?

18   A           Yes.

19   Q           All right.  And you have drawn lines down the white

20   board, one line on this edge --

21   A           Uh-huh.

22   Q           -- another one bisecting that line.

23   A           Yes.

24   Q           And what is that intending to represent?

25   A           Interstate I-75 and Interstate I-24.
```

1  Q       Where they intersect.  And you have drawn something

2  that looks like, to me, a large can?

3  A       Yes.

4  Q       And what is that intending to represent along I-75?

5  A       A terminal.

6  Q       A terminal is a tank?

7  A       Correct.

8  Q       Large tank containing fuel.  And then down towards

9  the bottom part, below I-24, what have you drawn there?

10 A       A second tank of fuel or terminal.

11 Q       And so -- and for your model -- for your example

12 here you have one tank.  What is that intended to represent?

13 A       A fuel terminal.

14 Q       And down here below I-24?

15 A       A separate fuel terminal.

16 Q       And a fuel terminal would then be more than one of

17 these large tanks?

18 A       Typically yes.

19 Q       Go on, please.

20 A       So, for our example, fuel suppliers are companies

21 that would own the fuel within these tanks.  They would

22 publish wholesale fuel prices for their product that a truck

23 could then come pick up and then take to a location.  So I'm

24 going to draw an example where we have some fuel suppliers

25 that own products in their terminals or tanks.

1    Q        All right.  What is product?

2    A        Product in this case would be diesel fuel.  Of

3    course it would be the same scenario for the various grades of

4    gasoline, so regular gasoline, super gasoline, mid grade.

5    Q        In this example, though, we're just talking about

6    diesel fuel?

7    A        Diesel, yes, for the example.

8    Q        Go on.

9    A        So for these terminals we'll suppose there are three

10   suppliers that own fuel product; we'll say they're BP, Exxon,

11   and Valero.  For this terminal we'll assume there's two fuel

12   suppliers that own product.  One we can -- would be, for this

13   example, Marathon, and the last one would be Shell.

14   Q        Before you go on, may I ask you a question?  Why

15   haven't you used Pilot as an example of one of the suppliers?

16   A        Pilot does not sell wholesale fuel to the market.

17   Well, we do not publish wholesale fuel costs along with the

18   other suppliers.  If Pilot-- Pilot does own product in some

19   of the terminals, but where we do and when we do it it's for

20   Pilot use only or an unrelated wholesale -- a wholesale

21   business where we're selling whole loads of fuel at a time,

22   not to a retail location, not --

23   Q        So in this example, just to clarify, if you have

24   it -- if you've got a three-component distribution line, just

25   to make it simple, where does Pilot fit into that?  You've

1    got --

2    A        For our main business we would be the retail

3    location where we would sell the product to our end customer.

4    Q        And so in this example are these wholesale sellers,

5    BP, Exxon, Valero, Marathon, and Shell?

6    A        Yes.

7    Q        And Pilot is buying -- would be buying from one of

8    those entities?

9    A        Correct.

10   Q        And selling it on somewhere?

11   A        Yes.

12   Q        Go ahead.

13   A        So for this example let's assume BP posts a price of

14   $2.02 per gallon.  Exxon posts a price of $2.04 per gallon.

15   Valero posts a price of $2.06 per gallon.  Marathon posts a

16   price of $2.03 per gallon, and Shell posts a price of $2.05

17   per gallon.

18   Q        So when you say "post," what do you mean?

19   A        This is the wholesale price that was made public.

20   If you were to purchase fuel from this supplier out of this

21   terminal, this is the price that they would offer the fuel

22   for.

23   Q        All right.  Basically market price for their fuel.

24   So please go on.

25   A        So there -- so, again, terminal is a large tank that

1   contains fuel.  Fuel suppliers are the ones that own the

2   product within the tank, that they will then post or publish

3   their daily fuel price for their product.

4           So OPIS is a data aggregation company as well.

5   That's one of their services.  And they would then compile the

6   posted retail -- or, excuse me, the posted wholesale price of

7   fuel, in this case for the greater Chattanooga market.  They

8   would then basically calculate the average price of fuel for

9   this day.

10          So for OPIS -- the OPIS average for this day would

11  be $2.04 if you were to take the average of all posted prices.

12  We then subscribe to OPIS as a service, OPIS would then remit

13  a OPIS contract average price of $2.04 for the Chattanooga

14  market for this day.

15  Q       And in order to know whether or not the OPIS average

16  was accurate at Pilot, would it be required to know how to

17  deconstruct this?

18  A       Correct.  You would need to know which fuel

19  suppliers are included in the average and then of course have

20  those -- we receive most of those prices, so -- but, yes, you

21  would have them.

22  Q       And based on your experience at Pilot, did you gain

23  particularized knowledge about how to do that so you can

24  explain it to us today?

25  A       Yes.

```
 1   Q          One other thing, just to clarify, again to -- so I
 2   can make a record of what you've drawn.
 3   A          Uh-huh.
 4   Q          With the cylinder at the top of your description,
 5   you have drawn parallel lines from the bottom.  Is that
 6   correct?
 7   A          Yes.
 8   Q          And then you have a cross-section of lines in the
 9   three sections.  Is that true?
10   A          Correct.
11   Q          The thing I want to ask you is, the diesel fuel from
12   BP, Exxon, and Valero kept in separate sections?
13   A          No.  It's commingled.  So there is no
14   differentiation.  So...
15   Q          So based on this OPIS average of $2.04, that you
16   have in your example here, can you explain to the jury how
17   that relates to a term that they've seen in the direct sales
18   manual, "industry-determined wholesale index price"?
19   A          Yes.  So it's -- it would reference -- the OPIS
20   contract average in green would represent this OPIS average in
21   this scenario.
22   Q          And is index another term for average in that
23   instance?
24   A          Or benchmark.  Index is another term for benchmark.
25   Q          And would this be the wholesale index price?
```

```
 1   A        Yes.

 2   Q        This is synonymous with OPIS contract average?

 3   A        Correct, for the basis for our retail -- or, excuse

 4   me, for our cost plus and cost minus customers?

 5   Q        So approximately across the country how many rack

 6   cities like Chattanooga like you just used an example are

 7   there, I mean, approximately?

 8   A        There's hundreds.  I'd probably venture that there's

 9   thousands.  But, yes, many.

10   Q        All right.  Would you please return to the witness

11   stand.

12   A        Yes.  (Witness complying.)

13   Q        So, Mr. Seay, in constructing a rather -- and,

14   again, did you supervise the creation of the manual rebate

15   Power Pivot tool and the off-invoice Power Pivot tool?

16   A        Yes.

17   Q        And in supervising the creation of those tools, did

18   you rely on particularized knowledge about how OPIS works as

19   part of the process of constructing that?

20   A        Yes.

21   Q        And was the OPIS data that was used to support those

22   Power Pivot tables, the manual rebate and the off-invoice

23   tools, data that was kept and maintained and integrated in the

24   regular course of business at Pilot?

25   A        Yes.
```

1   Q       That brings us to our fourth category, I believe,

2   and was this, the fourth category, was the one that was

3   limited to manual rebate?

4   A       Correct.

5   Q       All right.  So, so far, based on the three

6   categories that we have identified, what three categories have

7   we talked about in your testimony today?

8   A       So, so far we talked about the historical customer

9   purchases, retail purchases at our locations, our fuel

10  purchases; we talked about the OPIS price index, and then we

11  also talked about the retail price at our retail locations.

12  Q       And was that the information that was needed to

13  support the off-invoice Power Pivot table?

14  A       The retail price would also be unique to the manual

15  rebate tool, because the off-invoice data that we utilized had

16  the original retail amount on the customer transactions that

17  we had access to.

18  Q       All right.  Well, then just so we can make sure that

19  our categories of information are clear, of the three

20  categories that we talked about so far, what are the only two

21  that were needed for the creation of the off-invoice tool?

22  A       Those would be the OPIS price index and the customer

23  fuel purchases.

24  Q       And so what is the third category that we've talked

25  about that would be needed for the manual rebate tool?

1    A          The retail price at our Travel Center locations.

2    Q          And do we still have one more category that we need

3    to cover for the manual rebate tool?

4    A          Correct.

5    Q          What is that?

6    A          The original rebate payments that were made to our

7    customers.

8    Q          And where did that information come from?

9    A          Our Lawson financial system.

10   Q          And what is the Lawson financial system?

11   A          That's the system we use for all of our general

12   ledger and accounting and accounting and reporting.

13   Q          What is Lawson?

14   A          Lawson is a third-party application or software.

15   Q          And is that something that Pilot would purchase?

16   A          Correct.

17   Q          And what is supported through the Lawson software

18   program?

19   A          In this case it would be the general ledger system

20   that we had used to facilitate our accounting process within

21   our organization.

22   Q          And was that data pulled to support the calculations

23   for the manual rebate pivot table?

24   A          Yes.

25   Q          And was the data that was pulled to support the

1   manual rebate Power Pivot calculations data that was kept and

2   maintained in the regular course of business of Pilot?

3   A       Yes.

4   Q       So how did these -- how did the manual rebate and

5   off-invoice data processing tools perform their function of

6   determining diesel fuel discount savings that Pilot customers

7   were owed?

8   A       First it would determine the original discount the

9   customer received.  It would then calculate what the discount

10   would have been based on the deal terms that were identified

11   during the customer audit, to then arrive at an amount due to

12   the customer.

13   Q       And were these tools complicated to use once

14   constructed?

15   A       No.  We --

16   Q       How would -- how would the tools -- let's start with

17   the manual rebate tool.

18   A       Uh-huh.

19   Q       How would the manual rebate Power Pivot tool -- once

20   it was constructed, how would that be used?

21   A       We would have the source information.  You'd

22   basically input the customer and the time period required to

23   retrieve the fuel purchases.  You would obviously, again, have

24   to input the original rebate payments that were made.  And

25   then you -- of course they would just source the other data

1    sets.  So it was very simple inputs for the user.

2    Q        And so when you say "source the other data inputs,"

3    what does that mean?

4    A        So the OPIS price index, for example, the OPIS

5    contract average, that would be required.  The tool itself

6    would then go out, based on the date range and the customer

7    fuel purchases, it would go obtain the appropriate cost plus

8    index prices to use for the calculation.

9    Q        So once the tool was constructed, again, for the

10   manual rebate -- for manual rebate recalculations --

11   A        Uh-huh.

12   Q        -- what additional information is necessary to be

13   able to make the comparison necessary?

14   A        We'd have to enter the discount terms to apply.

15   Q        And what would -- when you say "discount term," what

16   do you mean?

17   A        That would be the discount that would be applicable

18   for that customer, so you have the retail minus discount or

19   the -- and/or the pump fee related to a cost plus or cost

20   minus customer.

21   Q        So in a cost-plus discount, what is the pump fee?

22   A        What is a pump fee?

23   Q        Yes.  In the cost-plus discount, what is the pump

24   fee part of that equation?

25   A        Okay.  So a customer would commonly receive

1    typically reflected as a cents-per-gallon or

2    fraction-of-a-cents-per-gallon pumping fee.  This amount would

3    be added to the OPIS contract average to determine their final

4    price.  So cost plus .02, for example, in our scenario, if the

5    OPIS contract average was $2.04 for that day, a customer

6    receiving 2 cents pump fee would be invoiced, or in the case

7    of manual rebate, that -- their final fuel cost would be based

8    on $2.06, thus adding 2 cents to the 2.04.

9    Q        So if during the audit for a customer -- let's just

10   call it, you know, XYZ Trucking.

11   A        Uh-huh.

12   Q        XYZ Trucking was determined that it should have

13   during a period of time been receiving a cost plus .02

14   discount, it actually had been receiving a cost plus .04

15   discount.  How would the manual rebate tool operate to be able

16   to calculate the difference?  What would the operator of the

17   tool need to do?

18   A        So they'd enter in the customer and the date range,

19   and of course supply the original rebate amounts that were

20   paid.  They would then refresh the tool, which would produce a

21   summary report that would supply them with any amounts owed to

22   a customer.

23   Q        And where does the -- would the pump fee, that 2 --

24   the cost plus .02 discount, need to be entered into the system

25   as well?

1  A        We also -- yeah, we have to -- there's a place to

2  enter in all the customer discount terms, to apply the

3  discount.

4  Q        How was the difference obtained between a cost plus

5  .04 discount savings amount and a cost plus .02 discount

6  savings amount?

7  A        We reflect it as just a net dollars due.  So, again,

8  it would take -- it would calculate the total amount of the

9  rebates that were originally paid to a customer, it would then

10 calculate what those rebates should have been based on the

11 entered discount terms, and then any difference between those

12 two amounts would then result in a dollar amount that was due

13 to the customer.

14 Q        And what, if anything different, would be done to

15 calculate the difference for an off-invoice customer?

16 A        It would be -- obviously there's less input, so in

17 this case the operator would simply specify the customer, the

18 date range in question, and then any discount terms to apply

19 and refresh the tool.

20 Q        Are you familiar with a term a nontechnical user?

21 A        Yes.

22 Q        And so what does that mean to you?

23 A        Technical user would be someone that has either been

24 educated or has worked with a computer science related

25 discipline, so someone that could develop software, someone

1    that could write queries to retrieve data and help, basically,

2    with the -- writing the language of the computer software that

3    they're operating in.

4    Q        So how, if at all, were the manual rebate and the

5    off-invoice tools that you've described to us this afternoon

6    designed to be used by nontechnical users?

7    A        So with the breadth of the audit, we were repricing

8    thousands of accounts, so we needed to leverage a greater team

9    to help us with the work.  So as we constructed the tools, we

10   wanted to make sure that they could be easy -- you know,

11   simple to operate and produce the summaries that were

12   required.

13   Q        And do you feel like you effectively did that?

14   A        Yes.

15   Q        Are these tools still used by Pilot today?

16   A        Yes.

17   Q        Were you asked by the United States Attorney's

18   Office to use the manual rebate tool and the off-invoice tool

19   to calculate some discount savings that should have been paid

20   to some customers based on an assumed cost-plus discount?

21   A        Yes.

22   Q        And I'm not going to ask you questions about these

23   exhibits, but just to -- I'm near the end of what we're

24   referring to as laying a foundation.  I want to direct your

25   attention to some exhibits, just so I can ask you about them.

1    And before I ask you any questions, we're not going to display

2    them to the jury yet.  So would you take a look at what's been

3    marked and they're in your binder as Government's

4    Exhibit 810A, 1522A, 1613A, and 1712A, 1826A.  And are those

5    calculations in the order in which I named the numbers related

6    to BP Express, JTL, Amerifreight, Halvor, and Ryder?

7    A        Yes.

8    Q        And were those manual rebate customers?

9    A        Yes.

10   Q        And did you use the manual rebate tool that you've

11   described to us to generate the cost savings amount that

12   should have been made to those customers based on the

13   cost-plus discount that was provided to you by the United

14   States Attorney's Office?

15   A        Yes.

16   Q        Turning to one other exhibit, which is identified as

17   727A.  Do you see that document there?

18   A        Yes.

19   Q        And is that a -- is that a cost plus comparison for

20   another customer called Queen?

21   A        Yes.

22   Q        And what tool did you use to calculate the cost plus

23   savings for Queen?

24   A        This was the off-invoice Power Pivot repricing tool.

25   Q        So I have at this point named six numbered exhibits.

1    I'm not going to repeat them.  They're the last six numbered

2    exhibits that I referenced.  I'm going to ask you some

3    questions about those, again, from a foundation standpoint.

4    Is the data that was used to generate those cost plus

5    comparison summaries voluminous in nature?

6    A       Yes.

7    Q       Is it -- is the data that's being used coming from

8    the data sets that you've described to us that support the two

9    tools that you've described for us today?

10   A       Yes.

11   Q       Was all that data kept and maintained and integrated

12   in the ordinary course of business at Pilot?

13   A       Yes.

14   Q       Is the data on those -- on the numbered exhibits

15   that I just named accurately summarized in those documents?

16   A       Yes.

17   Q       Did you supervise the creation of those documents,

18   the numbered exhibits that I listed?

19   A       Yes.

20   Q       And is all of the work that you have done in

21   creating the cost comparison summaries for the customers that

22   I've named based exclusively upon your particularized

23   knowledge that you have gained during your employment at

24   Pilot, in all of the roles that you have described to us this

25   afternoon?

1    A        Yes.

2             MR. HAMILTON:  Your Honor, at this time not only does

3    the United States submit that an accurate foundation has been

4    laid for this witness to testify as a Rule 701 witness on lay

5    opinion based on his use of the tools but the United States

6    also submits that it has laid a proper foundation for the

7    admission of the numbered exhibits that I just listed as

8    admissible Rule 1006 summaries.

9             THE COURT:  Mr. Vernia?

10            MR. VERNIA:  Thank you, Your Honor.

11            (Brief pause.)

12                     VOIR DIRE EXAMINATION

13   BY MR. VERNIA:

14   Q        Good afternoon, Mr. Seay.

15   A        Good afternoon.

16   Q        My name is Ben Vernia.  Sorry for that sound.  I'll

17   try to do this more quietly.  I'm not sure that I'm going to

18   need this, but I want to set it up just in case.

19            Ms. Lewis, if you could switch to --

20            THE COURTROOM DEPUTY:  Yeah, you can do that up

21   there.  When you hit "VGA," that would be you.

22            MR. VERNIA:  Thank you.

23            THE COURTROOM DEPUTY:  You're welcome.  I did it.

24   It's there already.  I switched it for you.

25            MR. VERNIA:  Thank you very much.

```
1              THE COURTROOM DEPUTY:  You're welcome.

2   BY MR. VERNIA:

3   Q        Mr. Seay, when Mr. Hamilton was speaking with you,

4   you described your job in fuel accounting.

5   A        Correct.

6   Q        And as I understand it that took from 2002, in

7   various positions, to -- through December of 2011.  Is that

8   right?

9   A        That's correct.

10  Q        And yesterday Mr. Parent was here.  You know

11  Mr. Parent?

12  A        I do.

13  Q        And Mr. Parent was describing one of the goals on --

14  I don't want to summarize his testimony too much, but --

15            MR. HAMILTON:  I'm going to object to referencing --

16  objection to referencing a witness.  It's a violation of the

17  rule of sequestration, Number 1.

18            THE COURT:  Well, let's get the question out.  We

19  don't know what the question is yet, do we?

20            MR. VERNIA:  Your Honor, I can skip -- I can skip

21  over Mr. Parent's testimony.

22            THE COURT:  Very well.

23  BY MR. VERNIA:

24  Q        Have you ever heard the phrase "Buy low, sell high"?

25  A        Yes.
```

```
 1   Q         Is that -- is that a reasonable business strategy in

 2   the fuel industry?

 3   A         Yes.

 4   Q         And when you were involved in fuel accounting, is it

 5   fair to say that you were on the buying side?

 6   A         The purchase side, yes.  Yeah.

 7   Q         So in that dichotomy, buy low, sell high, you were

 8   really talking about the buying?

 9   A         Correct.  I had some experience with the accounting

10   regarding the -- well, no, we actually produced -- so let me

11   clarify.  We produced common or daily reports and then monthly

12   reports as well on the fuel margin.  So in regards to what we

13   sold the product for and what we paid for the product, our

14   team was the primary respons- -- or the primary team

15   responsible for reporting the actual what we call gross fuel

16   margin of the product in our company.  That's pre- -- gross

17   fuel margin is pre-customer discounts.  But, yes, so in this

18   case we would report on both.  We account -- we were

19   responsible for the accounting for the buy, but we would do

20   daily and monthly reporting on both, the -- the sell.

21   Q         But you were saying that was exclusive of customer

22   discounts?

23   A         For the daily reporting, yes.  Our analysis we did

24   at a monthly level once the store profit and loss statements

25   went out involved us having to research customer discounts
```

1  commonly.  So we had to have a fundamental understanding of

2  the customer discount process to do so.

3  Q        But did you work with individual customer accounts?

4  A        No, not that granularity, prior to April 2013.

5  Q        Did you try to resolve disputes between Pilot and

6  customer?  This is all -- I'm all speaking right now that

7  period from 2002 to two thousand -- the end of 2011.

8  A        Uh-huh.

9  Q        Did you have any role in resolving disputes with

10  customers over their rebates or discount terms?

11  A        Not in that period.

12  Q        What about in the period from January 2012 until the

13  day of the search?

14  A        Not customer disputes.  I got -- I started becoming

15  more involved in the customer-level data in regards to my

16  term, my team, but mostly on the point of sale sides as it

17  applies to our loyalty program, which is tied to customer

18  accounts.

19  Q        You said "loyalty program"?

20  A        Uh-huh.

21  Q        So that's, like, points for buying fuel?

22  A        Correct.  Similar, yes.

23  Q        Okay.  Did you have any role in assessing rebates or

24  off-invoice discounts during that period?

25  A        Not during that period, no.

1    Q        Okay.  So really from the -- from the beginning of

2    your employment at Pilot until the day of the search, you

3    really had no role in customer -- in manual rebates and

4    customer rebates and off-invoice discounts and that whole

5    world?

6    A        I had to have a fundamental understanding of the

7    accounting and the dollars associated with those rebates and

8    discounts, yes.  I worked with that data in my fuel accounting

9    role.  As for the customer level side, no.  But, yes, I was

10   very familiar with our discounting process.

11   Q        And after that, you got involved?

12   A        Heavily, yes.

13   Q        Okay.  So the days before April 15th were kind of

14   the good old days in some respects, right?

15   A        (Witness shrugs shoulders and nods head.)

16   Q        You nodded.  Just for the record, I'll say you

17   nodded.  When you became manager of business intelligence in

18   January 2012, was that a newly created position?

19   A        No.  I replaced someone who left the role.

20   Q        All right.  How was it that you got involved in

21   Pilot's audit of manual rebates?  Who asked you to do that?

22   A        My boss at the time was the one who first approached

23   me, David Clothier.

24   Q        Okay.  And from the beginning did you have those two

25   roles that you described earlier?

1    A          Yes.

2    Q          And I think you were senior manager and technical

3    lead?

4    A          That was for the audit.  That was the role in the

5    audit team, yes.  It wasn't an official, you know, HR title,

6    but that was my role for the work of the audit.

7    Q          I understand.  How many people were involved in the

8    audit?

9    A          A lot.  So, internally, our internal audit team, we

10   had typically, probably, I'm guessing, 10 to 15 individuals on

11   that team working on the audit at any one time.  There were

12   three of us that served in more of those senior manager lead

13   roles.  We also commissioned with accounting firms as well to

14   help us with head count, to get through all the customer

15   account audits.  So there was -- from a head count, there was

16   anywhere upwards of probably an average of 35 to 50 people

17   working on the project during the peak periods.

18   Q          And at that point you personally and Pilot

19   management knew that there was a criminal investigation?

20   A          Correct.

21   Q          Because of the search?

22   A          Yes, after the affidavit was published.

23   Q          And did you also know──I'm talking about you

24   personally──whether Pilot had been sued?

25   A          Sued when?  Like, prior, or --

1    Q       When did you learn --

2            MR. HAMILTON:  Objection, Your Honor.  This is

3    irrelevant to his foundation and whether or not he has

4    sufficient information to make the calculations.

5            MR. VERNIA:  Your Honor, this goes directly to

6    whether these tools were created for a specialized purpose,

7    including in anticipation of litigation.

8            THE COURT:  Overruled.

9    BY MR. VERNIA:

10   Q       So let me just rephrase the question a little bit.

11   You eventually learned that Pilot had been sued in civil

12   court, correct?

13   A       Yes.

14   Q       When did you learn that?

15   A       Are you referring to the class action lawsuit?

16   Q       I'm referring to any lawsuit relating to the

17   disputes involving manual rebates and discounts.

18   A       My initial familiarity were involving the class

19   action lawsuit that was resulting from the activities after

20   the raid.

21   Q       And how soon after the raid was that?

22   A       I can't recall.

23   Q       Do you know whether the audit process-- Well, let

24   me go back for a second.  Was it within days?  Within months?

25   Within weeks?

1    A         I -- from when we found out about the lawsuit?

2    Q         The class action.

3    A         I can't remember.  More than weeks, but -- my

4    familiarity, but...

5    Q         Was there discussion amongst Pilot management of the

6    need to perform the audit in anticipation of potential

7    litigation?

8              MR. HAMILTON:  Objection.  Hearsay.

9    A         No.

10             THE COURT:  He's answered the question.  He says no.

11   BY MR. VERNIA:

12   Q         Pilot was getting a lot of bad press at this time,

13   wasn't it?

14   A         Yes.

15             MR. HAMILTON:  Objection.

16             THE COURT:  What's the relevance of the bad press?

17             MR. VERNIA:  Your Honor, it relates to the likelihood

18   of litigation.

19             MR. HAMILTON:  May I respond to that, Your Honor?

20             THE COURT:  No, I think that is too far afield.

21   Sustained.

22   BY MR. VERNIA:

23   Q         During the audit process, Pilot put a lot of effort

24   into making affected customers happy and willing to do

25   business again with Pilot, right?

1    A       We treated no customer any different on the audit.

2    Q       I'm saying that Pilot put a lot of effort into

3    making all of its customers happy during the audit.

4            MR. HAMILTON:  Objection to the relevance of this

5    process.

6            MR. VERNIA:  Your Honor, Mr. Hamilton--  I'm sorry.

7    Go ahead.

8            THE COURT:  I take it that except in most unusual

9    businesses one of the goals is to make all the customers happy

10   all the time.  I don't think people stay in business long if

11   their goal is to make customers unhappy.

12           MR. VERNIA:  Your Honor, the point of this line of

13   questioning is, Pilot was facing enormous outside pressure to

14   make these --

15           THE COURT:  But your question was, "You were spending

16   effort to make the customers happy."  I'm assuming if you ask

17   anybody at Pilot at any time, "Are you spending a lot of effort

18   to make the customers happy?" the answer would be what?

19           MR. VERNIA:  It would be, "Certainly so."  But that

20   was the point --

21           THE COURT:  And wasn't there a fairly lengthy video

22   shown earlier in this case where someone was pretending to be a

23   truck driver?  And the whole point of that was what?  "How hard

24   we have to work to make the customers happy," right?

25           MR. VERNIA:  How the customers needed to be made

1    happy, yes, sir.  Your Honor, my --

2          THE COURT:  So I think at any time if you ask anybody

3    in business, "Were you making efforts to make the customer

4    happy?" the answer has to be yes.

5          MR. VERNIA:  Your Honor --

6          THE COURT:  And I'm assuming if he said no, his

7    bosses would not have him employed any longer.

8          MR. VERNIA:  Your Honor, the company had just

9    undergone a search of its entire headquarters.  And

10   Mr. Hamilton's --

11         THE COURT:  So the answer would be, what, "Yes, yes"?

12         MR. VERNIA:  I think it goes directly, Your Honor, to

13   the reason the tool was created versus what the United States

14   wants to present, which is that the tool was created to reach

15   some sort of objective fact as to what the deals were and what

16   specifically was owed to each customer.  And my line of

17   questioning is really --

18         THE COURT:  Well, let's assume you're correct that

19   this whole thing was created to make customers happy.

20         MR. VERNIA:  Yes, sir.

21         THE COURT:  Isn't that a fundamental purpose of

22   business always?

23         MR. VERNIA:  Absolutely, Your Honor.  Absolutely.

24         THE COURT:  Objection sustained.

25   BY MR. VERNIA:

1    Q        The tool was not created for the purpose of this

2    litigation, was it?

3    A        No.

4    Q        Why was it created?

5    A        I'm sorry?

6    Q        Why was it created?

7    A        The tool?

8    Q        Yes.

9    A        To help us determine, based on the results of the

10   audit, what amounts were due to any of our customers.

11   Q        During the process of the audit, isn't it true that

12   Pilot gave the benefit of the doubt to trucking companies?

13   A        That was common, but that was not always the case,

14   but when in doubt, if we had -- yes, I mean, that was common.

15   Q        So Pilot sometimes took trucking companies' word

16   when they claimed to have a certain deal in place, even if

17   there was no --

18            MR. HAMILTON:  Objection, Your Honor.  The United

19   States objects to relevance.  This is really just

20   cross-examination cloaked as something labeled as a voir dire.

21   And what I thought we were testing was whether or not he had

22   sufficient knowledge to use the tool to calculate the cost

23   savings that are at issue, not what was going on at Pilot

24   during the audit.

25            MR. VERNIA:  Your Honor, it goes directly to the

```
1   admissibility of this under 701.  This was not prepared for the
2   purposes that the government described.
3           THE COURT:  I'm not sure that I follow the logic
4   there.  We just talked about how people in business try to make
5   their customers happy.  And one of the ways that you make your
6   customers happy, is not getting into disputes with them.  For
7   example, a lot of businesses will allow you to bring things
8   back, they make a big show about that that they have a very
9   liberal return policy because customers like that.  And
10  sometimes people bring things back when they've worn them,
11  they've used them, and they have done other things, but the
12  business thinks it's better for the business as a whole to
13  generate that good public relations instead of getting involved
14  with disputes over minor things.
15          And this seems to be the same type of thing.  Yeah,
16  maybe somebody didn't lose as much as they say, or maybe the
17  garment actually fit, "but it's better for our business to
18  make the customer happy."  So isn't this the same thing?
19  They're trying to make the customer happy?
20          MR. VERNIA:  Well, Your Honor, I think that -- I
21  think you're right in terms of businesses often prioritizing
22  customer happiness even over the objective truth --
23          THE COURT:  And isn't this an example -- assuming
24  that what you're saying is correct and what the witness is
25  saying is correct, isn't this an example of that, then?
```

1          MR. VERNIA:  Yes, I think it's relevant, Your Honor,

2     and I take Mr. Hamilton's point that it may be going into

3     cross-examination, and I'm happy to move on.  I also notice

4     it's shortly after 5:00, Your Honor.  I'm happy to continue or,

5     or not.

6          THE COURT:  Well, this might be a good time to leave.

7          Ladies and gentlemen, while you're here, let me

8     bring up a point with you.  I inquired of the attorneys this

9     morning how long they thought that they were going to go, and

10    they're thinking right now it's going to go into February.

11    One of the jurors has accepted a new job, and will be leaving

12    Chattanooga.  And we're going to be losing that person on the

13    jury.  I would like, to the extent that we can, to push

14    forward as much as we can.  That's one of the reasons we're

15    having court tomorrow.  I told you at the outset we were going

16    to try to not have court on Fridays, but we are going to try

17    to set some -- not every week but some Fridays, because I

18    would like to get as much accomplished as we can.

19         One of the jurors has indicated that they have a

20    conflict for January 20 through the 27th.  And when I talked

21    to counsel this morning, they asked me about that date because

22    they're -- for the most part they're from out of town, and

23    they have to fly in and they get hotel rooms and they have

24    witnesses and things.  So they'd like to get as much notice of

25    that as possible.  And we want to be flexible with you, and we

1   don't want to lose anyone else from the jury.  So I would like

2   that particular juror to talk to our courtroom deputy or our

3   deputy clerk about that conflict, to see if there might be

4   some way that we could keep that juror on the jury and then

5   still proceed that -- that week.

6           So we're going to have court tomorrow.  We'll start

7   at 9:00.  You've heard one of the press reporters asking for a

8   hearing.  And we've set aside some time for that tomorrow.  So

9   I don't anticipate that's going to be all that long.  That

10  will take up some time tomorrow afternoon to do that.  Okay?

11  And we will be taking lunch tomorrow right at noontime because

12  I'll be performing a marriage ceremony in this courtroom while

13  you're at lunch tomorrow.  So if you'd like to stay and

14  witness it, feel free to do so.

15          Okay.  The jury is excused.

16          (The jury exited the courtroom, and the proceedings

17          continued as follows:)

18          THE COURT:  Be seated.

19          You can step down if you'd like.

20          THE WITNESS:  Okay.

21          THE COURT:  And, Ms. Lewis, would you and/or Allison

22  talk with -- I think it's Ms. McDaniel who has a conflict, to

23  see where we stand there.  And I would like to encourage her,

24  if she can, to resolve that conflict, so she can stay on the

25  jury.  We're getting pretty close to just having 12 people, and

1  we still have a long time to go.

2           THE COURTROOM DEPUTY:  I talked to her, Judge.  I've

3  talked-- I'll talk to her again.

4           THE COURT:  And I think one of the defense attorneys

5  had actually suggested I make inquiry about that, about the

6  week of the -- she has the 20th -- I guess the 22nd, is that

7  Monday?  Is what I did sufficient?

8           MR. HARDIN:  Your Honor, I'm not sure whether it

9  applies to one of the others.  May I address the Court?

10          THE COURT:  You may.

11          MR. HARDIN:  You may have noticed that this entire

12  week Mr. Drumheller has not been a part of our team.  He has a

13  long time been, for the last three or four years, a member of

14  our team most actively day to day involved in the case.  And

15  his absence this week—and we did not try to ask for any kind

16  of consideration—it has been due to the flu, which he's now a

17  third of our team that's got it.  We're crossing our fingers

18  for the rest of us.  But the reason that we would like to --

19  that week they're talking about, the 22nd, if at all possible,

20  for us to not be here so that he can continue to be part of the

21  trial team.  His -- he was the only member of our firm,

22  fortunately, that was flooded out during the Harvey floods.

23  But he had to move out of his house.  He and his family with

24  three children have been living in rented housing until they

25  can get the house done.  The house is being completed, and

```
 1    we're told that he's trying to schedule movers -- the movers.

 2    They're scheduled to move back in on Monday.

 3              THE COURT:  Monday the 22nd?

 4              MR. HARDIN:  Which would be -- I think that's the

 5    22nd.  And so we were going to ask--  First of all, I think the

 6    defense hopes the Court can make accommodations for this juror,

 7    period, that week.  I think I heard yesterday some reservations

 8    with the Court, understandably, about scheduling.  And so I

 9    think we've agreed, first and foremost, we hope the Court will

10    be able to keep that juror on.  But, secondly, whichever you

11    decided, we're asking on our behalf in order to have

12    Mr. Drumheller back, if we could perhaps, no matter what you

13    decide, at least have that Monday the 22nd off.

14              THE COURT:  Now, will he be available the rest of the

15    week?

16              MR. HARDIN:  Yes, sir.

17              THE COURT:  Okay.

18              MR. HARDIN:  But I think somebody else had the 29th,

19    though.

20              MR. VERNIA:  Your Honor, I have a whistleblower

21    client who has been trying to schedule a meeting in Washington,

22    D.C., with the Department of Justice, and they've been hoping

23    that we can set that up for the 26th.  I don't know whether

24    you're anticipating—that's a Friday—sitting on Friday or not.

25    If I can't work that out, I can possibly set up another date,
```

1   but it's been a little bit difficult --

2            THE COURT:  And I guess you need to know that soon,

3   don't you?

4            MR. VERNIA:  Yes, sir.  Thank you.

5            THE COURT:  Thank you.

6            Anyone else have issues with that week?

7            MR. HAMILTON:  We would just like to have an

8   opportunity to speak on the trial schedule when that time

9   comes.  We don't want to waive the government's right to

10  address the Court on this.  I don't have an issue with that

11  week.  We're ready to work and proceed with that week, but may

12  we speak when we're given an opportunity, please, Your Honor?

13           THE COURT:  Well, the Court is hopeful that the

14  government will be done with its case by then, so we'd be

15  looking at the defendants' time.  My first preference is to

16  have the trial that full week.  If we cannot keep the juror, if

17  she is not able to resolve the conflict, we -- the decision

18  then is to go on and let the juror go, or keep the juror on and

19  not have trial that week.  With Ms. Sellers leaving, we'll be

20  down to just two alternates.  And if we let this juror go,

21  we'll just have one alternate left.  And my expectation is

22  we're looking at, what, another four weeks, six weeks of trial?

23           MR. HARDIN:  Yes, sir.

24           THE COURT:  And just having one alternate is very,

25  very risky.

1          MR. HAMILTON:  Your Honor, I don't know--  May I

2     speak, Your Honor?  I don't -- I'm not following how we have

3     four to six more weeks of trial.  If the United States can

4     finish its case in the next few trial days, I would -- I would

5     respectfully ask the Court to inquire of the defense how long

6     their -- how many trial days they're projecting.  It's unclear

7     as to where the five- to six-week calculation is coming from.

8          THE COURT:  Out of my --

9          MR. HAMILTON:  It's not from us.

10          THE COURT:  It's my assumption the government would

11     take five to ten of those days.

12          MR. HAMILTON:  We--  Well, what has been difficult

13     for us, of course the Court has observed, I believe, is for us

14     to project the cross-examination length.  That's what makes it

15     very difficult for us.  We could put our proof on probably in

16     two days if we -- without four lawyers cross-examining for two

17     hours.

18          THE COURT:  Well, we have four defendants.  And

19     somebody decided to charge four defendants.

20          (Laughter.)

21          MR. HAMILTON:  That's fair.  And others.  But--  And

22     that's fair.  But to create a crisis over the -- over the

23     presence of jurors over something that the United States just

24     doesn't see, that's all I'm pointing out to the Court.  We

25     believe that the United States is going to finish its case

1    sooner than the defense counsel is anticipating, and that this

2    case is going to be wrapped up.  And we want to proceed.

3           We think the United States has an interest in the

4    continuity of the proof.  We had a lengthy interruption that

5    we're already having to overcome with the holiday break for

6    four or five weeks.  And we would prefer not to have any

7    more -- any more delay such as a week delay because of a juror

8    issue.

9           THE COURT:  You understand that if we let that juror

10   go, we'll just have one alternate; and if something happens

11   with two more jurors, we would not have 12 people, so we'd have

12   to try the case again.

13          MR. HAMILTON:  Well, we certainly don't want that,

14   Your Honor, and we certainly don't want to be responsible for

15   that.  However, when is the -- will the Court please remind the

16   government when our juror is leaving for Knoxville and how much

17   time we have there?

18          THE COURT:  Her job starts February -- February 8th,

19   and she'll be driving their moving truck to Knoxville on the

20   5th.  Her last day of work here is February 2.

21          MR. HAMILTON:  And I --

22          THE COURT:  So today's the 11th.  So we're looking at

23   about—what's that?—two weeks in January before we have to

24   lose her.

25          MR. HAMILTON:  I see, Your Honor.  And the other part

1  of the analysis for the government is how many trial days we're

2  going to -- the Court foresees giving us each week.

3        THE COURT:  Well, as you heard me tell the jury,

4  we're adding some Fridays now.  I had not planned to do that.

5  And my wife is very unhappy about it.  But we've added that to

6  make up some for the days we've lost, and also because the

7  trial is, frankly, taking longer than I thought it was going to

8  take.  So we have added some Fridays to the schedule.

9        MR. HAMILTON:  Well, I hear the concern that the

10  Court has expressed.  And the United States certainly doesn't

11  want to risk any problem with this trial because of not having

12  enough jurors.  Could the United States just reserve its

13  position on what it wants to do about the week of January 22nd

14  until the Court has more information from that juror?

15        THE COURT:  Okay.  Ms. Lewis, just by facial

16  expression, did not look that optimistic.  I think they've

17  talked to her before.  I'm going to ask that they talk to her

18  again.  I don't -- I do not know what the conflict is, but, you

19  know, we have human beings and they have things that go on in

20  their lives.  It may be something that she cannot avoid.

21        MR. HARDIN:  Your Honor, may I respond very briefly?

22        THE COURT:  You may.

23        MR. HARDIN:  I think each defendant, based on our

24  conversations, has got five to six witnesses.  That was before,

25  in all due deference, the government decided to start objecting

on cross to outside the scope. That was not what was happening early on. And what that preordains is that we're going to probably have to call back some of the very witnesses that they restricted. And the Court made very clear you understood that. The government understood it, and they were doing it. So their complaining now about how much longer it's going to take and how long we're going to take is somewhat like a child complaining, having killed his parents, that now he's an orphan. They're creating part of this situation by the way that they've determined to handle cross. They have the right to do that. And of course the Court has the right to make those discretionary rulings. But it does mean that it's going to stretch out the trial.

And I would suggest that they might want to rethink that if they really want to move this thing along. But, regardless, we've got like -- if each side had five witnesses, instead of all the others, you're talking about 20 witnesses from the defense. So I don't want for a moment to think that-- I understand they want it to move fast and they don't want to unduly prolong this, but we do have clients that are facing severe punishment.

THE COURT: Well, I think you heard that my estimation was that we were going to go into March.

MR. HARDIN: And I think the Court's estimate and what you were talking about while ago is pretty accurate as to

1   how this will go.

2          THE COURT:  Okay.  Is there anything further, then,

3   we need to do?  If not, we'll resume at 9:00 in the morning.

4          CHORAL RESPONSE:  Thank you, Judge.

5          (Evening recess.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25