```
1              IN THE UNITED STATES DISTRICT COURT

2               EASTERN DISTRICT OF TENNESSEE

3                      AT KNOXVILLE
     ------------------------------------------------------------
4                                    :
   UNITED STATES OF AMERICA          :
5                                    :
            Plaintiff,               :
6                                    :
   v.                                :        3:16-CR-20
7                                    :
   MARK HAZELWOOD,                   :
8  SCOTT WOMBOLD,                    :
   HEATHER JONES, and               :
9  KAREN MANN,                       :
                                     :
10          Defendants.              :
     ------------------------------------------------------------
11                             Chattanooga, Tennessee
                               January 12, 2018
12

13          BEFORE:  THE HONORABLE CURTIS L. COLLIER
                     UNITED STATES DISTRICT JUDGE
14

15

16  APPEARANCES:

17                     FOR THE PLAINTIFF:

18                     F. M. HAMILTON, III
                       DAVID P. LEWEN, JR.
19                     Assistant United States Attorneys
                       U. S. Department of Justice
20                     Office of the United States Attorney
                       800 Market Street, Suite 211
21                     Knoxville, Tennessee  37902

22

23

24                        JURY TRIAL
                       SIXTEENTH DAY OF TRIAL
25
```

APPEARANCES:  (Continuing)


                    FOR DEFENDANT MARK HAZELWOOD:

                    RUSSELL HARDIN, JR.
                    JENNIFER E. BREVORKA
                    Rusty Hardin & Associates LLP
                    1401 McKinney Street, Suite 2250
                    Houston, Texas  77010



                    FOR DEFENDANT SCOTT WOMBOLD:

                    JOHN E. KELLY
                    ROBERT K. PLATT
                    Bass, Berry & Sims PLC
                    1201 Pennsylvania Avenue NW
                    Suite 300
                    Washington, D. C.  20004

                    ELI J. RICHARDSON
                    DAVID RIVERA
                    Bass, Berry & Sims PLC
                    The Pinnacle at Symphony Place
                    150 3rd Avenue South
                    Suite 2800
                    Nashville, Tennessee  37201

                    ANNIE TAUER CHRISTOFF
                    Bass, Berry & Sims PLC
                    100 Peabody Place
                    Suite 1300
                    Memphis, Tennessee  38103

1    APPEARANCES:   (Continuing)

2

3                        FOR DEFENDANT HEATHER JONES:

4                        BENJAMIN J. VERNIA
                         ANDREW K. MURRAY
5                        The Vernia Law Firm
                         1455 Pennsylvania Avenue NW
6                        Suite 400
                         Washington, D. C.  20004
7
                         CULLEN MICHAEL WOJCIK
8                        Law Office of Cullen M. Wojcik
                         422 S. Gay Street
9                        Suite 302
                         Knoxville, Tennessee  37902
10

11

12                       FOR DEFENDANT KAREN MANN:

13                       JONATHAN D. COOPER
                         Whitt, Cooper, Trant & Hedrick
14                       607 Market Street
                         Suite 1100
15                       Knoxville, Tennessee  37902

16                       SARA E. COMPHER-RICE
                         Oberman & Rice
17                       550 West Main Avenue
                         NationsBank Building
18                       Suite 950
                         Knoxville, Tennessee  37902-2567
19

20

21

22

23

24

25

1                    INDEX OF PROCEEDINGS

2

DARREN MATTHEW SEAY
3    Voir Dire Examination by Mr. Vernia. . . . . . . . . .    16
     Voir Dire Examination by Ms. Christoff . . . . . . . .    40
4    Voir Dire Examination by Ms. Brevorka. . . . . . . . .    67
     Direct Examination by Mr. Hamilton (cont.) . . . . . .   111
5    Voir Dire Examination by Ms. Christoff . . . . . . . .   117
     Direct Examination by Mr. Hamilton (cont.) . . . . . .   157
6    Voir Dire Examination by Ms. Christoff . . . . . . . .   177
     Direct Examination by Mr. Hamilton (cont.) . . . . . .   189

7

8

9                    GOVERNMENT'S EXHIBITS

10   NUMBER    DESCRIPTION                          RECEIVED

11   4001      Disclosure of Darren Seay (For ID only)    112

12   4002      E-mail chain related to production of      143
               Pilot Ascend and Lawson databases
13             (For ID only)

14   3503      Declaration of John Lowery Concerning      167
               Off-Invoice Comparison Summary
15             (For ID only)

16   810C      BP Express Profit and Loss Summary         170

17   1522C     JTL Profit Loss Summary                    170

18   1613C     Amerifreight PFJ Net Profit Summary        170

19   1712C     Halvor PFJ Net Profit Summary              170

20   1826C     Ryder PFJ Net Profit Summary               170

21   727B      Queen PFJ Net Profit Summary               170

22   4003      Collective Profit and Loss Summaries       191
               for Amerifreight, Halvor Lines, BP Express,
23             JTL Carriers, Ryder Truck Rental, and
               Queen Transportation (For ID only)

24

25

```
 1                (The proceedings were held outside the presence of
 2                the jury, as follows:)
 3           THE COURT:  Before we get started, let me take care
 4    of a housekeeping matter.  On yesterday I indicated that with
 5    the expected length of the trial and the possibility that we
 6    might be going into March, I wanted the jurors to examine their
 7    calendars to see about their availability, and I commented that
 8    one juror needs to be off from the 20th to the 27th.  And I did
 9    discuss that with the attorneys yesterday, and it turns out
10    that one of the attorneys has a problem with that Monday of
11    that week and another attorney has a problem with Thursday that
12    week.  So they'd like to have that entire week off, also.  So
13    that will take care of it.  So we will be taking off the week
14    of January 20 through the 27th.  And I think the week actually
15    starts on the 22nd, so -- not on the 20th.  So that means that
16    that juror's mind can be relaxed and the juror can attend that.
17           Now, there is another issue I need to bring up with
18    the attorneys concerning a juror.  And I should have asked to
19    have the jury wait to come in until I do that.  Let me have
20    the jury step out for just a bit.
21                (The jury exited the courtroom, and the proceedings
22                continued as follows:)
23           THE COURT:  Please be seated.  This is more for
24    information and to see if anybody would like any further
25    inquiry.  As a result of my informing the jury yesterday that
```

1 I'd like to go forward with the trial, to the extent that we

2 could, and I suggested one juror examine her travel schedule to

3 see if that conflict could be resolved, I was informed about,

4 oh, I guess 6:00 or so yesterday that juror wanted to contact

5 someone in the clerk's office to talk about her obligations.

6 And instead of talking to someone in the clerk's office, she

7 actually talked to one of the clerical people in the U. S.

8 Attorney's Office, unbeknownst. And that person directed her

9 to speak to someone in the clerk's office. So there was a

10 contact between a juror and someone on the prosecution team

11 yesterday afternoon.

12 That juror was Ms. -- is it McKrystal? The one

13 who's going to be off the week of the 20th through the 29th,

14 that was the juror. So I've not talked to her at all, and I'm

15 passing on to you what I was informed by the clerk's office.

16 Mr. Hamilton?

17 MR. HAMILTON: I'm trying to gather information about

18 it at this moment myself. What --

19 (Off-the-record discussion between government

20 counsel.)

21 MR. HAMILTON: Okay. I'm trying to establish what

22 occurred, Your Honor. My understanding-- I need to find

23 Ms. Russell. Can we just take a moment so I can-- At this

24 point all that I understand-- First I heard about this is when

25 you just advised the parties of this situation. What I'm

1  hearing——we're going to go see if we can find Ms. Russell

2  herself——is that it was more -- it was directional, I believe,

3  as in an encounter in the hallway.  But we need to talk to

4  Ms. Russell about it.  I don't -- based on what I'm hearing, I

5  don't see any issue there.

6          THE COURT:  And I was mistaken.  It was not the one

7  who has a conflict with the week of the 20th.  It was actually

8  Ms. Sellers, the one who is relocating to Knoxville.  So her

9  name is also Krista.  So I was confused as to which Krista it

10 was.

11         MR. HAMILTON:  So it's Ms. Sellers, then --

12         THE COURT:  It's Ms. Sellers.

13         MR. HAMILTON:  -- who is probably going to be --

14         THE COURT:  Yes.

15         MR. HAMILTON:  -- leaving anyway?  Well, I certainly

16 want to get to the bottom of it, whether she's leaving or not,

17 but...

18         Ms. Russell, of course, as the Court knows, is a

19 witness coordinator, who is often in the hallway coordinating

20 witnesses.  And so I could see how something like this could

21 happen.  Would you like for me -- would you like for us to

22 carry on?  Would you like for us to find her so --

23         THE COURT:  I wanted to let you know.  I wanted to

24 let the parties know about it, since there was a contact.  From

25 what was told to me, it appeared to be innocent, but I have not

1  investigated it at all.

2          MR. HAMILTON:  Sure.

3          THE COURT:  I know nothing more than what was related

4  to me by our division manager here.

5          MR. HAMILTON:  So I guess -- may I ask the Court

6  to --

7          (Off-the-record discussion between government

8          Counsel.)

9          MR. HAMILTON:  Your Honor, I think it might be best

10 to hear it directly from Ms. Russell, if the parties would like

11 to hear it.  That's really where we are on it, so...

12         THE COURT:  I'll leave it to up the parties.  I have

13 reported it.  If anybody would like further inquiry, that's

14 fine.  If you'd like to investigate it, that's fine.  But I

15 just wanted to let everybody know what I had been informed.

16         MR. HARDIN:  I think it would be helpful if we heard

17 from her what she knows about it, if the Court's --

18         THE COURT:  Very well.

19         MR. HAMILTON:  Well, so should we -- I'll ask the

20 Court to ask the parties, do you want to put her under oath and

21 ask her the questions?

22         THE COURT:  It's up to the parties.  It's up to you.

23         MR. HAMILTON:  I don't think that's necessary, but

24 it's not -- again, I want to defer to defense counsel on this

25 situation.

1          MR. HARDIN:  I don't require it from our standpoint.

2     I can't speak--  I'm not that concerned about the oath.  I just

3     would simply like to--  I, quite frankly, have encountered this

4     lady before, and I trust she's going to tell the truth.  So I'm

5     not so interested in the oath.  It's just to tell us what

6     happened.

7          THE COURT:  Why don't you have her stand, then, and

8     recount what happened.

9          MS. RUSSELL:  On the stand?

10          THE COURT:  No, you can do it from there.  Just speak

11     loudly.

12          MS. RUSSELL:  I was out in the hallway escorting our

13     witnesses up the stairs.  I had come back down.  The juror was

14     standing outside the clerk's office.  Of course it was after

15     5:00.  The door was locked.  She said, "I need to get to

16     Barbara."

17          I said, "Barbara is still in the courtroom, but I

18     can call Russ Eslinger," who I know is over the clerk of the

19     court, the administrative section, I believe.  I called him

20     immediately on my cell phone.  He came immediately out of his

21     office.  I walked away.  That was the only transaction I had

22     with her.

23          MR. HARDIN:  That satisfies Mr. Hazelwood, Your

24     Honor.

25          THE COURT:  Okay.

```
 1                  MR. VERNIA:  And Ms. Jones, Your Honor.
 2                  MR. COOPER:  Thank you, Your Honor.  That's all.
 3                  MR. RICHARDSON:  That's fine from Mr. Wombold's
 4      perspective.
 5                  MR. HAMILTON:  Your Honor, I'm going to ask
 6      Ms. Russell just to tell everyone approximately when it
 7      happened.
 8                  MS. RUSSELL:  It was approximately 5:15.
 9                  MR. HAMILTON:  What day?
10                  MS. RUSSELL:  Yesterday.  The 11th.  January 11th.
11                  MR. VERNIA:  Thank you.
12                  THE COURT:  And I was informed -- I thought it was
13      closer to 6:00.  It may have been earlier than that.  My
14      assumption would be Mr. Eslinger spent some time talking to her
15      and at some point came up to my chambers and reported to me.
16      So I was in my chambers having discussions with staff.
17                  MS. RUSSELL:  I immediately passed her off to Russell
18      Eslinger.  So I don't know if that was the confusion, since my
19      last name is Russell.  But that was my only conversation with
20      her, was to contact him.
21                  THE COURT:  Thank you.
22                  MR. VERNIA:  Your Honor, I have a couple of small
23      matters to raise before the jury's brought back in.  First,
24      there is the media hearing at 1:15.  Is it acceptable if our
25      clients are absent for that?  I don't think there is going to
```

1   be any evidence taken.

2         THE COURT:  Yeah, I don't think there is any

3   requirement.  There won't be any evidence presented.  It will

4   just be arguments about facts already in and law.  I think I'm

5   going to depend upon counsel to put the facts on the record.

6         The attorney representing the media, unless that

7   attorney has read the transcript very carefully, really will

8   not have much idea of what the facts are.  And that attorney

9   will likely be well-versed in the law, but we have to apply

10  law to facts.  So I think counsel will be very helpful in

11  making sure that we have a solid factual foundation in the

12  record that will support whatever decision is made.

13        MR. VERNIA:  Thank you, Your Honor.  The other thing

14  that I wanted to raise, and I apologize that it occurred to me,

15  as a lot of things do, too late in the day yesterday, but I

16  have some more voir dire for Mr. Seay.  And under Rule 104(c),

17  the jury need not be present for that.

18        And I apologize for not asking the Judge about this

19  last night, because the jury may have been able to come in a

20  little bit late this morning.  But I'm satisfied with

21  proceeding with the jury still out.  I think it actually may

22  expedite the process a little bit, because -- well, hopefully,

23  if there's objections that Mr. Hamilton has, simply because he

24  doesn't want the jury to hear something, that he may be able

25  to forgo some of that, but I don't want to promise too much.

1          MR. HAMILTON:  The government has no objection with

2     proceeding with this outside the presence of the jury if that

3     will expedite it.

4          THE COURT:  You know, I really don't like having the

5     jury here and not making the best use of their time.  I'm

6     pulling out Rule 104, and I'm going down 104(c), and 104(c)

7     states that the Court must conduct any hearing on a preliminary

8     question so that the jury cannot hear it if (1) the hearing

9     involves the admissibility of a confession.  I don't think a

10    confession is at issue here, so I'm assuming that does not

11    apply.  (2) the defendant in a criminal case is a witness and

12    so requests it.  And I don't think that applies.  And third is,

13    if justice so requires.  Now, obviously, that's pretty broad.

14    It doesn't give the Court much guidance.  I'm assuming that's

15    the one that we are talking about.

16          MR. VERNIA:  Yes, sir.

17          THE COURT:  So why don't you tell me why justice

18    requires an out-of-court hearing.

19          MR. VERNIA:  Well, Your Honor, I think that it's in

20    the interest of everyone, including the jury, that we move

21    along as quickly as possible.  I think that the jury may find

22    some of this testimony confusing, since it goes to very

23    technical issues of admissibility.  And that process may, in

24    fact, distract the jury from the genuine substance of

25    Mr. Seay's testimony on direct and cross-examination.

```
1          So I agree that it is somewhat of a borderline case,
2   but I think that a strong argument nevertheless exists that
3   the entire trial would be better served by proceeding outside
4   the presence of the jury.
5          THE COURT:  Well, I think you counsel have been
6   involved in so much that you've become normalized to this
7   evidence, but I think I do and I think the jury will probably
8   find that much of the evidence in this case has been very
9   technical and confusing.
10         I've learned about diesel fuel markets and discounts
11  and rebates and whatnot, cell phone technology, computer
12  infrastructure.  And I can't imagine that there's going to be
13  too much in the -- this witness's testimony that's not going
14  to be as confusing and complicated as what they've already
15  heard.
16         MR. VERNIA:  Your Honor, but most of that other
17  testimony does in some way relate to the merits of the case.  I
18  think, in this case, many of the questions that I have really
19  relate to the grounds of admissibility, whether this
20  information is reliable and trustworthy, whether it can be used
21  in a court of law in the manner that the government is
22  intending to do.  It's not going to be ultimately -- the jury's
23  not going to ultimately need to know those underlying facts to
24  assess Mr. Seay's testimony on the merits.
25         So I do agree that the case has involved some
```

1  confusing evidence before, but I think that this genuinely

2  falls under the preliminary questions issue that the jury is

3  not really going to need to hear.

4          THE COURT:  Well, all foundational issues are

5  preliminary, but part of the reason that we have a foundation

6  laid is so that the jury can have some basis for determining

7  how much weight to give particular testimony.  And especially

8  when there is an opinion being offered, the jury should be

9  given some information as to whether they should or should not

10 give weight, and, if so, how much weight to give the particular

11 witness.  So that's some of what we're doing here.  And I think

12 it would be beneficial for the jury to hear it, even if much of

13 the testimony is going to be very technical and very confusing.

14          Assuming that the witness is allowed to offer that

15 testimony, the parties should be able to argue to the jury

16 that this testimony should be credited or should be

17 discredited.  And some of the basis for the jury's decision

18 ought to be the foundation that was -- that was presented.

19          So the Court is going to overrule the objection.

20 The Court looked at Rule 104.  The Court has heard the

21 arguments presented in favor of having the witness testify

22 outside the presence of the jury.  The Court has already

23 indicated that its preference is to make as much use of the

24 jury's time as possible.  So the Court will have the jury come

25 back in, and we'll proceed.

```
1              MR. VERNIA:  Thank you, Your Honor.

2              MS. BREVORKA:  Your Honor, if I may.

3              THE COURT:  You may.

4              MS. BREVORKA:  Just a point of clarification, given

5    the Court's breaking of the testimony into direct about

6    foundation and cross about foundation, Mr. --

7              THE COURT:  At the request of counsel.

8              MS. BREVORKA:  Yes.  My request is, Mr. Hazelwood has

9    a few foundational questions after Mr. Vernia, and I just

10   wanted to make sure procedurally if we may follow.

11             THE COURT:  The Court assumed that any of the

12   defendants who wanted to also conduct voir dire would have that

13   right.  Mr. Vernia, he just asked initially, and I think he

14   took advantage of the opportunity to go first.  But the Court

15   was always operating under the assumption that was a right

16   available to all counsel.

17             MS. BREVORKA:  Thank you, Your Honor.

18             MR. VERNIA:  Your Honor, we had discussed the order

19   in which we would go.

20             THE COURT:  And I think I've said at some point that

21   the Court's going to leave it up to counsel to determine the

22   order, and if they could not agree, we'd go in the order of the

23   indictment.  I believe that I said that maybe at the pretrial

24   or some point?

25             MR. VERNIA:  Yes, sir.
```

1          MR. HARDIN:  Yes, sir.

2          THE COURT:  So are we ready for the jury?

3          MR. VERNIA:  Yes, sir.  Thank you.

4          (The jury entered the courtroom, and the proceedings

5          continued as follows:)

6          THE COURT:  Please be seated.

7          You may proceed, Counsel.

8          MR. VERNIA:  Thank you, Your Honor.

9                      VOIR DIRE EXAMINATION

10   BY MR. VERNIA:

11   Q       Good morning, Mr. Seay.  How are you?

12   A       Good.  Thank you.

13   Q       All right.  I want to discuss with you the Power

14   Pivot Manual Rebate Tool.  And like Mr. Hamilton, I'll refer

15   to it probably as the manual rebate tool.

16   A       Okay.

17   Q       All right.  Thank you, sir.  And I want to discuss

18   the data sources of that and a little bit about the structure.

19   And I'm going to show you -- I'm going to show you a chart.

20   And we'll talk about the components of it.  But along the top,

21   on either side of the letter A, you'll see there's written

22   "PC9 PROD/STORETRAN"—and I'm going to have to spell this for

23   the court reporter later—as well as "PRS" and "Price Fetch,"

24   and then there is "Ascend" and "Lawson" all the way across the

25   top.  Do you see those?

1   A          (Moving head up and down.)

2   Q          Are those four data sources that were used in the

3   manual rebate tool?

4   A          The ones on the left, yes, the STORETRAN database,

5   PRS, and Price Fetch --

6   Q          Okay.  What is --

7   A          -- were.

8   Q          Excuse me.

9   A          Excuse me.  Price Fetch is where the data was

10  retrieved from, but PRS was the ultimate source.

11  Q          Okay.  What is the STORETRAN database?

12  A          The STORETRAN database is -- so this is what we

13  discussed yesterday in our Lawson.  So PC9 PROD is the server

14  that contains the STORETRAN database.  It's a database within

15  our Lawson environment.  Lawson, again, is a software,

16  third-party software, that contains a variety of what I refer

17  to as modules, so our general ledger financial system, we also

18  have an accounts payable system, HR, we have payroll

19  functionality in there as well.

20          And in this case we have a internally developed user

21  interface -- well, the user interface we leverage from Lawson

22  system, and so we internally developed these user interfaces

23  that would facilitate our business process.

24          In this case the retail pricing team utilizes a user

25  interface out of our Lawson system, which the database behind

```
1   that user interface which contains the retail pricing that we
2   utilize for the tool is entitled STORETRAN.
3   Q        All right.  And was that in use prior to the search?
4   A        Yes.
5   Q        So the retail pricing information was routinely
6   stored in STORETRAN prior to the search?
7   A        Yes.
8   Q        Was that information ever revised?
9   A        Not to my knowledge.
10  Q        Was it ever audited for accuracy?
11  A        I wouldn't have been involved, so I can't attest to
12  that.
13  Q        Do you know whether there was an audit trail
14  associated with that data?
15  A        I assume so.  I did not support the system, so that
16  was not my responsibility.
17  Q        Do you know what an audit -- can you explain what an
18  audit trail is, to your understanding.
19  A        I'm assuming you're referring to either log files or
20  some way of capturing any changes that were made to that
21  database.
22  Q        Yeah, that's what I'm talking about.
23  A        Okay.
24  Q        So I'll probably use that going forward, and we can
25  understand each other on that.
```

1    A        Okay.

2    Q        Was the version of STORETRAN that you used, was that

3    the version that existed prior to the search, or were you

4    using it during the audit process from the live STORETRAN

5    database at Pilot?

6    A        I believe we captured a copy of that database at the

7    time of our process.  So it would have been subsequent to the

8    raids, but it would have been at a definitive time, and it was

9    not live.

10   Q        Do you know whether that's the case, or are you just

11   assuming that's the case?

12   A        I think that's the case, but I'm not a hundred

13   percent certain, so...

14   Q        All right.  How did you get the data out of

15   STORETRAN?

16   A        It was provided to us by another department that

17   retrieved it for us and supported the system.

18   Q        What department was that?

19   A        I believe it was IT, so...

20   Q        Is STORETRAN a SQL-based database; do you know?

21   A        It's Oracle.

22   Q        It's Oracle?

23   A        Oracle.

24   Q        And does Oracle use a specialized language for

25   querying the database?

```
 1   A          Yes, it does.

 2   Q          Are you familiar with that language?

 3   A          I am.

 4   Q          Did you write the queries that pulled the database

 5   or the data in question out of STORETRAN?

 6   A          I reviewed them, but I did not write them, no.

 7   Q          Who wrote them?

 8   A          IT.

 9   Q          Was this part of the information on Lawson that was

10   provided to the defendants?

11   A          Yes.

12   Q          All right.  Let's move on to the next box, PRS

13   and -- well, two boxes, I suppose, PRS and Price Fetch.

14   A          Uh-huh.

15   Q          You said that the PRS data, you pulled the

16   information out of Price Fetch, but it was coming originally

17   from PRS.  Is that right?

18   A          Correct.  PRS would supply us with the data files.

19   Those files would be loaded into the Price Fetch system.

20   Q          Okay.  And we're not talking about the audit

21   process.  We're talking about on a routine basis that

22   happened.

23   A          Correct.  That's the normal course of business.

24   That's what is performed.

25   Q          Okay.  PRS is not part of Pilot Travel Centers, is
```

1    it?

2    A         No.  It's a third party.

3    Q         You can't testify that PRS data was created at or

4    near the time of the activity -- or you can't personally

5    testify that that's the case, right?

6    A         No.

7    Q         And, likewise, you can't testify that it was made in

8    the course of a regularly conducted business activity of Pilot

9    Travel Centers, right?

10   A         I believe it was.

11   Q         Well, did PRS create it for Pilot Travel Centers?

12   A         Well, no.  They would provide those data files to

13   all their clients, customers.

14   Q         All right.  But you don't personally know that that

15   was happening prior to the search, right?

16   A         I was familiar with the process, but not at the

17   depth, of course, I became after the audit.

18   Q         Well, who told you that this was how the process

19   worked?

20   A         We worked with both our IT department and the

21   accounting team that utilized the system as well.

22   Q         And did you learn that before, or after, the search?

23   A         Most -- I mean, again, my -- I was familiar with it

24   prior to April 2013; however, yes, the intricacies of the

25   process I learned subsequently.

1   Q        Okay.  And, I'm sorry, you maybe answered this

2   question, but who -- where did you -- how did you learn that,

3   the intricacies?

4   A        Just working within Pilot, obviously, I had a

5   familiarity with some of the data sources that were available,

6   just due to working in proximity to and working on other

7   projects.  I was aware of the Price Fetch system, I was aware

8   of the data that was contained in there, but we wouldn't -- we

9   did not use it as normal daily business, but I was aware.

10  Q        And -- I'm sorry, I was asking you, though,

11  specifically about the intricacies.  Did you answer that?

12  A        I'm sorry.  Can you repeat the question?

13  Q        How did you learn about the intricacies?  I think

14  you said that after the search you learned the intricacies of

15  it.

16  A        Correct.  So after the search, you know, as a

17  technical lead on the project for the audit, I met with the

18  various IT departments that supported these systems, also the

19  business partners that utilized these systems, to help develop

20  a better understanding of what the process was and the data

21  that was represented.

22  Q        And who specifically did you talk to about Price

23  Fetch?

24  A        Other members of the audit team that had worked

25  gathering the insight.  I believe -- I know I've spoken to

1  Nass- -- Nasser Hishmeh was our primary contact within the IT

2  organization.  And then -- well, Cory Shupp as well.  He

3  was -- he was in accounts receivable at the time, I believe.

4  And he was knowledgeable as well, so...

5  Q        Let me move on to Price Fetch itself.  What is Price

6  Fetch?

7  A        So Price Fetch was developed -- internally developed

8  software that helped with the scheduling and the distribution

9  of the summarization of the customer data that was originated

10 from PRS.

11 Q        Is it a database system?

12 A        Yes.

13 Q        What's the -- what is the technology on which it's

14 based?

15 A        I believe that one is SQL.

16 Q        So like a SQL server?

17 A        Microsoft SQL server, yes.

18 Q        And so that's using SQL --

19 A        Correct.

20 Q        -- queries?

21 A        Uh-huh.  Yes.

22 Q        I'm sorry.  I may have talked to you about this

23 before, but I'll try to not start talking before you finish

24 answering, and vice versa.  That --

25 A        Okay.

```
 1   Q        -- would be good.  Thanks.

 2            So you got the information -- or your team got the

 3   information out of Price Fetch using SQL queries.

 4   A        Correct.

 5   Q        Were you --

 6   A        Well, actually it was provided by IT, was the one

 7   that provided us the information out of Price Fetch, utilizing

 8   SQL queries.  We did not query directly.

 9   Q        Did you write the SQL queries?

10   A        No, I did not.

11   Q        Who did?

12   A        A member within the IT organization.

13   Q        Is Price Fetch -- is it -- is that -- I think -- let

14   me ask you first:  Were you working with an archived version

15   of Price Fetch, or were you working with an active version of

16   Price Fetch?

17   A        I believe it was active.

18   Q        And you understand what I mean by the difference

19   there?

20   A        Correct.  I do.

21   Q        Maybe -- could you explain your understanding of

22   that?

23   A        So we would refer to what you mentioned as active as

24   production, so -- or a live system used in the normal course

25   of business.  An archive would be a copy of a production or
```

1    live system that would be held and ideally unchanged.

2    Q        Okay.  So you--  I'm sorry.  I needed more coffee

3    this morning.  Did you say you were working with the archive,

4    or production, system?

5    A        I believe it was the production system.

6    Q        Okay.

7    A        It was a snapshot.  We captured a one-time pull, I

8    believe, of the data.  So, in essence, we were working with a

9    copy of it, but it was obtained from the live system at the

10   time.

11   Q        Before, or after, the search?

12   A        It was after the search.

13   Q        How long after the search?

14   A        Sometime within -- I would assume it would be within

15   a month or two after the search.

16   Q        But you don't know?

17   A        I -- we were -- I believe it was probably four or

18   five weeks, at a minimum.  I joined the audit team probably

19   two weeks subsequent to the event.  So within a very short

20   period of time it was -- I believe is when it was captured.

21   So I'm guessing four to five weeks.

22   Q        Is Price Fetch -- does that -- does that particular

23   system have an audit trail function?

24   A        I'm assuming we have log files, yes, but I -- again,

25   I don't support that system, so I'm not aware for sure.

1  Q        So you don't know -- you can't testify whether that
2  data has been changed in any way?
3  A        I cannot, not prior to our capturing it.
4  Q        In the course of your audit, did you learn that in
5  fact Price Fetch data was changed?
6  A        Not to my knowledge, no.
7  Q        Okay.  Was Price Fetch data audited for accuracy?
8  A        Yes.  I think that was--  In part of our normal
9  course of business, we have accounts receivable teams that
10 would validate our store transactions versus the transactions
11 we received.  I know there was a full audit on the Ascend
12 data, I believe there was as well on Price Fetch data, so...
13 Q        Do you know whether Price Fetch data was provided to
14 the defendants in discovery?
15 A        Do I know when it was?
16 Q        Was it, at all?
17          MR. HAMILTON:  Objection, Your Honor.  How does this
18 relate to foundation, what was provided to the defense in
19 discovery from this witness?
20          THE COURT:  Counsel?
21          MR. VERNIA:  It goes to, Your Honor, whether the
22 defendants have had adequate chance to assess the integrity of
23 the results.
24          MR. HAMILTON:  Well, Your Honor, I can represent on
25 behalf of the United States what was provided to the defense in

1   discovery.

2           MR. VERNIA:  Your Honor, there's a difference,

3   though, between--  I'm not -- I'm certainly not challenging

4   Mr. Hamilton's integrity on this.  I'm simply saying it appears

5   that, unlike a lot of other data sources, that the Price Fetch

6   data was not even essentially captured for purposes of

7   Mr. Seay's work until weeks after the search; I think -- and it

8   has never been provided to the defendants.

9           Now, certainly Mr. Seay and his team, and I suppose

10  the IT team, he's just testified, could have pulled the

11  correct data, but we simply have no way of knowing that.  We

12  have no way of verifying it.  We did get copies of the Lawson

13  and Ascend databases, but we have had no access to this

14  information apart from --

15          MR. HAMILTON:  Your Honor, I'm going to object to

16  this, because this is not appropriate for this context.  This

17  was never asked for by the -- to the United States.  The proper

18  disclosure was made for this witness under Rule 1006, and this

19  has been litigated, and this has never been raised.

20          MR. VERNIA:  Your Honor, we raised it --

21          THE COURT:  I think what we should focus on is

22  whether the witness's testimony is rationally based upon the

23  witness's perception, and whether the witness's testimony would

24  be helpful to the jury.  Even assuming this witness had some

25  obligation to supply discovery to the parties, which obviously

1  he did not and does not, I'm not sure how his failure to do so

2  could affect his perception and the determination of whether it

3  was rationally based or whether his testimony would be helpful

4  to the jury.

5          MR. VERNIA:  Thank you, Your Honor.  I'll move on.

6          THE COURT:  I think those are two key factors that

7  the Court must decide here, isn't it, whether his testimony is

8  rationally based and whether it would be helpful to the jury?

9          MR. VERNIA:  Your Honor, I think you're right, and I

10 will withdraw the question and move on.

11         MR. HAMILTON:  And will the United States have an

12 opportunity to provide representations about what was provided

13 with respect to this witness, based on what Mr. Vernia has said

14 here?

15         THE COURT:  I, sometimes speaking to young lawyers

16 just starting out and learning about trial work, tell them that

17 it's good to compare a trial to a football game.  And the

18 object of a football game is to advance the ball down the

19 field.  You want to get it across the goal line.  The object of

20 the game is not to buy popcorn, to engage in discussions with

21 spectators, or do other things.  So let's keep our focus on

22 what we're trying to do.

23         What we're trying to do is to question this witness

24 and see whether he has the proper knowledge and whether he has

25 the ability to give helpful testimony to the jury.  And these

1    other things, we're looking at pretty people in the stands.

2    Let's focus on the ball and getting the ball down the field.

3            MR. HAMILTON:  Thank you, Your Honor.

4            MR. VERNIA:  Thank you, Your Honor.

5    BY MR. VERNIA:

6    Q        Mr. Seay, I'll move on.  I believe I asked you a few

7    moments ago whether data in Price Fetch could be changed by

8    users at Pilot.

9    A        Not to my knowledge.  Well, the discounts,

10   potentially, but not the source billing service data that was

11   received from PRS.

12   Q        All right.  Who had access to the Price Fetch

13   database?

14   A        From the raw -- what I refer to as the raw data

15   within the database, that would be IT.

16   Q        And do you know whether there were -- whether there

17   were settings in the data that would prevent someone from

18   changing information?

19   A        I'm not aware.  I did not support that system.

20   Q        All right.  Let's move on to Ascend.  And you've --

21   which was also -- I think it was referred to yesterday as

22   Ascend/PMIS?

23   A        Correct.

24   Q        And you said that that was another database?

25   A        Another SQL server database --

1  Q        Another --

2  A        -- yes.

3  Q        Sorry.  And how did you get the data -- how did your

4  team get the data out of Ascend/PMIS?

5  A        We were provided a query written by IT, which was

6  the team that was supporting the Ascend system, which we

7  utilized for the audit.

8  Q        So you did not -- you and your team did not write

9  your own query for that?

10 A        No.  We reviewed the query for relevance, but, no,

11 we did not write the query.

12 Q        Do you know whether the Ascend/PMIS data was ever

13 revised?

14 A        Not my knowledge.

15 Q        Was it capable of being revised?

16 A        I assume so, but I don't know what controls the IT

17 department put in place for that, so...

18 Q        Was it audited for accuracy?

19 A        Yes.  I believe it was.

20 Q        How do you know?

21 A        It definitely--  Well, I met with the accounts

22 receivable department extensively on their audit -- their

23 reconciliation process.  They would perform--  So we have our

24 point-of-sale system, which contains the transactions that

25 occur at our retail locations.  Obviously there's dollar

1    amounts associated with that, and volume, or gallons in this

2    case.  They would perform--  They're responsible for making

3    sure that Pilot pays what they owe and only what they owe.  So

4    they would reconcile the point-of-sale transactions so that

5    the monies we received or the -- obviously the credit card

6    transactions, and in this case what we refer to as billing

7    service transactions, were accurate.

8            We would then compare those transactions with the

9    transactions that were loaded into the Ascend system, and then

10   they would reconcile to make sure that all transactions in one

11   system were matched to the other system, to ensure that both

12   were reflecting the accurate truth.

13   Q        So that -- so it was audited for accuracy in the

14   course of your audit?

15   A        We -- yes, we audited their process to make sure

16   that we could rely on that data, yes.

17   Q        All right.  Was the version of Ascend that you were

18   using, Ascend -- excuse me -- Ascend/PMIS that you were using,

19   was that a archive, or a production?

20   A        I believe it was a production system.

21   Q        All right.  So if there were changes that were made

22   to the data, assuming that there were changes made to the

23   data, that system would differ from the one that the

24   defendants possess, correct?

25   A        Well, we -- at this current time -- it's possible,

1    yes.

2    Q        Okay.  Let's move on to the final one, which is

3    Lawson, which I think you referred to as the enterprise

4    tool --

5    A        Um-hmm.

6    Q        And that's an Oracle --

7    A        Correct.

8    Q        -- product?  And that's -- when we were discussing

9    STORETRAN, that was part of that, right?

10   A        Yes.  That's a -- yeah, Lawson and STORETRAN, in

11   this case, would be synonymous.  That's the same system.

12   Q        Okay.  And how did you get the data out of the

13   enterprise tool, the one we talked about?

14   A        The Lawson information that was utilized was the

15   same in both scenarios that we've already discussed.

16   Q        Was it using the Oracle queries?

17   A        Correct, yeah.

18   Q        Did you personally design those queries?

19   A        No.

20   Q        Who did?

21   A        The IT department.

22   Q        How do you know that the Lawson data is reliable?

23   A        During the course of fuel accounting, my initial

24   employment with Pilot, we would commonly -- well, that was the

25   same source of data that we would use commonly for the fuel

1    margin reporting that we did daily and monthly.  So we did

2    extensive research whenever there was questions that were

3    raised based on a store's profitability.  In that case, we

4    would go back if -- if we were able to determine that the

5    retail price was -- needed investigation, we commonly would

6    review how that data would align with the actual transactions

7    occurring at the store.  And I have high confidence in that

8    system, so...

9    Q          And was it -- was it routinely audited for accuracy

10   as a normal part of the business operations of Pilot?

11   A          I would assume so, but I was not involved, so...

12   Q          All right.

13   A          We validated it when we -- during the audit, when we

14   used it as a source --

15   Q          During the audit.

16   A          -- yes.

17   Q          All right.  Let's talk a little bit about Power

18   Pivot.  But I think I first want to clarify, the manual rebate

19   tool and the off-invoice tool, did you personally create

20   those?

21   A          So my role, I technically supervised the role.  I

22   had an employee on my team--  There was two primary people

23   that would -- that did the development.  One of them was on my

24   team, had extensive knowledge in Power Pivot and the language

25   it used.  So he was -- would have -- be able to create it much

1  more efficiently than me.  So when it came time to construct

2  the application, it's something I probably could have done,

3  but it would have taken me a lot longer, and it probably

4  wouldn't have been as efficient.  So we relied on someone who

5  had that expertise in Power Pivot.

6  Q        And who is that?

7  A        Austin -- Austin Wendell on my team.  He reports --

8  Q        Okay.

9  A        -- to the business intelligence department.

10 Q        I'm sorry, I interrupted you.  Were you going to

11 continue?

12 A        So, my -- just to clarify my role.  So I would help

13 Austin as -- during his development, I was helping supply the

14 business rules and calculations to implement to make sure that

15 it was accurate, and I also validated the results of the tool

16 extensively along the way.

17 Q        And how was the tool tested for reliability and

18 accuracy?

19 A        So, specifically with the off-invoice data, the

20 discounts that were applied historically remained in the

21 system.  So we had effective dates and discount terms

22 historically for virtually all the accounts within Ascend.

23         So what we initially did as we were developing the

24 tool is, we would then take some of our larger accounts that

25 had transactions at the majority of our locations, we

1    would what we refer to as reprice, so we would calculate the

2    discount for that -- those customers based on what was

3    historically applied in the system, to make sure the output of

4    the tool matched what the customers originally were

5    discounted.

6           We commonly, as well, when we were to go to reprice

7    an account during the audit as well, part of the training

8    exercise or process that we documented was to initially

9    reprice -- you know, bring in the information, and before you

10   enter in the discount terms that were identified during the

11   audit, to go ahead and reprice the account at the original

12   discount terms that were identified in the system, just to

13   make sure that we did not see any material differences in the

14   output of the original invoice in the tool.  Then we would go

15   to apply the actual discounts that were identified during the

16   audit, to determine an amount due.  So that was -- and I was

17   not the only one performing that.  That was common amongst

18   anyone that was operating the tool.

19   Q       Okay.  I think you described Power Pivot as under --

20   as being an add-in for Microsoft Excel?

21   A       Correct.  It's now -- it's now -- the newer

22   versions -- the ones we used at the time were add-ins, but now

23   it's actually a foundational component of Excel Office that

24   you can buy today, so...

25   Q       Okay.  If you look at my little diagram here, the

Seay – Voir Dire Examination

1    rounded box with the C on the inside --

2    A        Yes.

3    Q        -- the lower box, where it says spreadsheet, that

4    would be what the user would see when they open up the Excel

5    document?

6    A        Correct.

7    Q        But underlying that is a data model.  Is that right?

8    A        Correct.

9    Q        And the data model consisted of a number of tables

10   and relationships amongst those tables?

11   A        Correct.

12   Q        And then the spreadsheet itself queries the data

13   model.  Is that how that works?

14   A        Yes.

15   Q        How did you learn to use Power Pivot?

16   A        We were -- we had licensing for Microsoft products

17   within our organization, so we had access to that tool.  We --

18   as -- my department, Business Intelligence, even prior to my

19   transitioning to that role, had been utilizing that tool to

20   help construct data models in this case, to be able to solve

21   business scenarios.  So it was a tool we had already been

22   using.

23   Q        Have you ever had any classes in this product?

24   A        I've taken some on-line tutorials and training items

25   on it, but...

1    Q          Do you have any certifications in its use?

2    A          I do not, no.

3    Q          Do you belong to any professional organizations that

4    deal with this product?

5    A          We had -- it wasn't a professional organization, but

6    we commonly would partner with Microsoft themselves, to help

7    beta test their products, give them feedback.  They would

8    then, in turn, help us with additional trainings and

9    opportunities to see additional products and such, but...

10   Q          Is there a special program in your database language

11   that's used in Power Pivot?

12   A          There's DAX, D-A-X.

13   Q          Can you spell that?  D-A-X?

14   A          D-A-X.

15   Q          DAX.  Have you learned DAX?

16   A          Yes.

17   Q          So it's fair to say that Power Pivot is a

18   specialized area, isn't it?

19   A          It's a specialized tool, yes.

20   Q          It's not something that a typical Excel user would

21   understand?

22   A          Not without training, no.  They could utilize a

23   created tool fairly efficiently, but not to develop one

24   themselves.

25   Q          If you look at the drawing, I think you can see that

1    it represents data flowing from the various sources we

2    discussed into the -- into the Power Pivot Manual Rebate Tool.

3    And I think that you've discussed before that -- in talking to

4    Mr. Hamilton, that some of the information was coming from --

5    from real source -- from outside sources.  Correct me if I'm

6    wrong, but it's true, isn't it, that you could have an Excel

7    Power Pivot tool in which all the data essentially resides in

8    that document?

9    A        That's correct.

10   Q        And you could also have one in which some of the

11   tables that we were talking about in the data model are

12   pulling information from on -- from sources over a network of

13   some sort?

14   A        Correct.

15   Q        Or from another program running on the same device?

16   A        Correct.

17   Q        Okay.  In the case of the tools that you -- that

18   you're talking about that underlie your testimony today, were

19   those static, were they -- everything embedded in the

20   document, or were they interconnected with other programs or

21   devices?

22   A        A combination.  We utilized both.

23   Q        Do you know whether the ones that were provided to

24   the defense are the same way?  Are they static, or are they

25   interconnected?

1    A        The Power Pivots themselves?

2    Q        Yes.

3    A        Yeah, they were -- well, with the Power Pivot, if it

4    does go out to retrieve data from a separate application or

5    database, when you execute or run the query, it then goes and

6    retrieves that data and stores it within the Power Pivot

7    itself, that is then summarized on the spreadsheet.

8            So although it pulled from a source application, the

9    results of that pull become static after the query is executed

10   and leveraged across the tool.  So what was provided would

11   have had a static version of the retrievals of our production

12   system.

13   Q        Well, has the -- is there a possibility that --

14            MR. HAMILTON:  Objection.

15            THE COURT:  I think he's saying you're asking the

16   witness to speculate by including "possibility" in your

17   question.

18            MR. VERNIA:  I'm sorry, Your Honor.

19   BY MR. VERNIA:

20   Q        Let me come back to that because I'm not sure how to

21   get around that issue.

22            Were these tools -- these were tools that Pilot used

23   in its audit, correct?

24   A        Correct.

25   Q        Were they designed for use in a criminal trial?

1    A          No.

2    Q          Have they been tailored for use in a criminal trial

3    in any way?

4    A          The summaries have been-- The data itself, no.

5    Calculations itself, no.  So all the data that's represented

6    is accurate and pulling from the same tools.  As to -- the

7    only thing that we would have changed would have been the

8    actual presentation, so the summarization of the data.  But

9    the actual data represented would be the same.

10   Q          Do you know for a fact that the testimony you will

11   be giving today about the tools we're talking about and the

12   summaries that are derived from those is related to the very

13   same data that was provided to the defendants?

14   A          I can only assume so.  I didn't provide it, so...

15              MR. VERNIA:  Thank you.  Your Honor, if I could have

16   just a moment.

17              THE COURT:  You may.

18              MR. VERNIA:  Thank you.

19              (Brief pause.)

20              MR. VERNIA:  Your Honor, I would pass the witness to

21   other defense counsel.  Thank you.

22              THE COURT:  Okay.  Who is next?

23                          VOIR DIRE EXAMINATION

24   BY MS. CHRISTOFF:

25   Q          Good morning, Mr. Seay.

1    A          Good morning.

2    Q          My name is Annie Christoff.  I represent

3    Mr. Wombold.  You might have to bear with me for a minute as I

4    sort through information, because I don't want to retread any

5    ground that Mr. Vernia covered.

6               We talked a little bit about your background.

7    Before you began working at Pilot, you were an accountant at a

8    private accounting firm.  Is that right?

9    A          Correct.

10   Q          And in your various jobs at Pilot, you were never

11   part of the direct sales team, right?

12   A          No, I was not.

13   Q          And you were -- your current position of manager of

14   the business intelligence and decision sciences team, you

15   were -- you received that promotion in January of 2012.  Is

16   that right?

17   A          Correct.

18   Q          And you got that promotion because of your financial

19   and technological expertise, right?

20   A          Correct.

21   Q          And I believe that we've discussed that these Power

22   Pivot tools that you supervised the creation of, I think you

23   said they leverage database functionality within Excel, right?

24   A          Correct.

25   Q          So the reliability of those tools is only as good as

1  the reliability of the data going into the tools, right?

2  A       That would be correct.

3  Q       And I think you said as part of the audit team, that

4  you-all audited all of the customer accounts after the FBI

5  raid at Pilot, right?

6  A       Correct.  We--  Yes.

7  Q       So that would include the customer accounts that

8  you're here to testify about today?

9  A       Correct.  Although I did not participate on the

10 audit, I believe, of any of the -- the accounts being

11 summarized, with my work being presented.

12 Q       That work that you did on the audit, you don't do

13 that anymore, do you?

14 A       I work with the data that -- same data that we used

15 during the audit, from a reporting and performance

16 perspective, but, no, I'm not auditing customer accounts in

17 that fashion.

18 Q       And I believe you testified that you worked with

19 outside auditors during the audit.  Is that right?

20 A       Correct.

21 Q       Who were those?

22 A       So the outside auditors -- basically the labor

23 available within Pilot was not large enough to be able to

24 complete the work in a timely fashion that we had desired, so

25 we commissioned additional accounting firms that were

1    either -- predominantly in Knoxville and Nashville, to help us

2    with dedicated employees.

3    Q          Which firms were those?

4    A          I did not handle the employee side of the people

5    working there.  I know LBMC was one.  I couldn't -- I'm not

6    prepared to name them all here, but I could definitely find

7    out.

8    Q          Can you think of any others while you're sitting

9    here today?

10   A          No, I can't, so...

11   Q          And you testified yesterday that at the -- the time

12   of the actual transactions that we're talking about, Pilot did

13   not have a data processing tool like the ones you supervised

14   the creation of.  Is that right?

15   A          Correct.

16   Q          So there was no manual rebate tool at the time of

17   these transactions, right?

18   A          It -- well, Price Fetch could function as something

19   similar, but from an accuracy and the different types of

20   discounts, it wouldn't apply for all.

21   Q          So how were manual rebates calculated at the time?

22   A          With -- with the Price Fetch system.

23   Q          Can you explain that a little more, please?

24   A          Sure.  I mean, similar process, that they would

25   receive the data from the PRS third party, it would then apply

1  discounts that were entered into the system, to then calculate

2  the discount for a particular customer based on their fuel

3  purchases.

4  Q        And when -- in supervising the creation of the Power

5  Pivot tools, what exactly does that mean, to supervise their

6  creation?

7  A        So it was a tier -- or a two -- well, primarily

8  myself and Austin were the ones that were taking the lead in

9  the actual development of the tool.

10 Q        I'm sorry.  Yourself and who?

11 A        Austin Wendell, who I mentioned earlier.

12 Q        Okay.

13 A        So Austin was the one with the technical expertise

14 to efficiently develop the product.  I would help him in the

15 logic that needed to be applied to be able to calculate the

16 discounts correctly based on what was occurring in the normal

17 course of business.  And so, along the way, as he would

18 develop the tool, I helped him in that translation, and then

19 subsequently I participated in the review of the accuracy of

20 the tool as described.  In the accuracy review we also

21 included other members of the audit team as well, to help

22 participate in that.

23 Q        You said these -- these tools are still being used

24 at Pilot today?

25 A        Not in the same fashion, but yes.

1    Q        What are they used for?

2    A        So, commonly, as the -- the manual rebate tool is

3    not used much, but occasionally, but, yes, the other -- the

4    off-invoice Power Pivot tool is used regularly.  So if a

5    customer was entering into our direct bill program and they

6    were supposed to have gone live on the 1st, but for some

7    reason someone didn't set them up on time, they may have gone

8    a few days without receiving a discount, you could use the

9    tool to calculate what the discount would have been for those

10   days where the customer could then be reimbursed for discounts

11   that were not due -- were not paid in the normal course of

12   business.

13           Similarly, if there ever was -- we've used it as

14   well for -- we had one example where the OPIS price for a

15   given terminal was not set up to come into our system, so we

16   had -- we were missing -- basically we were missing a cost

17   plus for a wholesale terminal, which would only have applied

18   to one customer.  So in this case, once that was discovered,

19   we -- obviously that was in historical transactions, where a

20   customer was owed a discounted amount, so we would use the

21   tool to calculate what that discount would be.

22   Q        And you said that the manual rebate tool is not used

23   frequently but sometimes?

24   A        Sometimes it is.  So the data -- the off-invoice

25   tool is obviously for off-invoice data.  If the data was

1    received via PRS, the off-invoice tool was not created to pull

2    from that data source, so we could leverage the manual rebate

3    tool if we wanted to apply any discounts to a -- what we refer

4    to as a restricted customer account.

5    Q        So you're using the manual rebate tool to verify

6    rebates paid in these restricted accounts?

7    A        Verify is what we did during the audit.  Today, if

8    there was ever a discount that we felt was -- needs to be

9    repriced or was not put in place at the time and they wanted

10   to go back historically to give a customer any amounts that

11   were due, we would use that tool as well.

12   Q        So to correct a rebate, then?

13   A        Correct, yes.  But in the case -- one reason the

14   manual rebate tool is not used quite as much is because most

15   of our discounts, obviously, the manual rebates, we're doing

16   far fewer of those today, if any at all, so...

17   Q        But they do still exist, manual rebates.

18   A        I can't attest.  I know -- I know last I was

19   informed, it was very few were -- remained.

20   Q        Very few did exist.

21   A        I'm sorry?

22   Q        Very few did exist.

23   A        Correct.

24   Q        So we talked a little bit about PMIS and Ascend and

25   the databases associated with those --

1    A        Uh-huh.

2    Q        -- which is where the gallons of the historical

3    purchases are stored, right --

4    A        Correct.

5    Q        -- that information is stored?

6    A        Yes.

7    Q        And -- you may have already testified about this, I

8    apologize, but how -- how does that information get entered

9    into PMIS and then later Ascend?

10   A        So I'm not sure if the jury has heard about billing

11   services yet, but billing services are similar to credit

12   cards.  So our customer would come to our location, swipe

13   their billing service card, which there is an authorization

14   process, and then that data is compiled by our various billing

15   services.  Those billing services then remit the transactional

16   data to us, containing the gallons, the store the product was

17   purchased at, the original rebate -- or, excuse me, the

18   original sale amount, et cetera.  That data is loaded into

19   those systems.

20   Q        That it is what?  I'm sorry.

21   A        Loaded into those systems, so...

22   Q        How is it loaded?

23   A        As part of that reconciliation process I mentioned

24   earlier about the accounts receivable department, once they

25   bring in the source data, it enters into a reconciliation

1    tool, which they then match up against our point-of-sale data,

2    to make sure, you know, the transactions in both systems are

3    correct, and then they would then -- the matched transactions,

4    so the ones that they reconciled, is correct, they would then

5    load into the Ascend system.

6    Q        And, similarly, then, for the manual rebate

7    customers, the gallons were -- that information was located in

8    the data received from PRS that's maintained in the Price

9    Fetch database?

10   A        Correct.

11   Q        Is that right?

12   A        Yes.

13   Q        Okay.  And how does -- how does Pilot receive that

14   data from PRS?

15   A        It's the same billing services that are providing us

16   that data.  They would send us one file for what we refer to

17   as our restricted business, which is what's loaded -- which is

18   what subsequently gets loaded into the Price Fetch system.

19   They send us the direct bill data in a separate file that we

20   load into the Ascend system.  So the source is the same

21   billing services, but...

22   Q        So -- make sure I understand.  A digital data

23   file --

24   A        Um-hmm.

25   Q        -- containing this information is transmitted,

1   mailed, to Pilot?

2   A          Well, it's over the Internet, obviously.  It's FTP,

3   I believe, so...

4   Q          Okay.  FTP-sent.  And then it is uploaded into the

5   system?

6   A          Yes, right.

7   Q          And it's -- that's coming from a third-party entity,

8   not Pilot?

9   A          Correct.

10  Q          And how do you know that information?

11  A          Obviously I talk to the people that are involved

12  with either supporting the systems or the business partners

13  that utilize the systems, so...

14  Q          Are you aware that PRS did not always historically

15  report the correct gallons information to Pilot?

16  A          During what time period?

17  Q          I believe the time period that you said you looked

18  at for the audit was 2005 to 2013.  Is that right?

19  A          Uh-huh.  I know when -- I know when we have found

20  times that data was either incomplete or missing, they would

21  commonly correct the source system, so...

22  Q          Okay.  Sorry.  Let's unpack that a little bit.  So

23  PRS would send data to Pilot that was occasionally incorrect

24  or there was missing data?

25  A          Potentially, yes.  That reconciliation process I

1    mentioned, sometimes you would have -- I mean, they're

2    computer systems, so there may be a duplicated transaction, or

3    a file transfer failed and never made it into the -- you know,

4    we didn't receive a file for the day, so that may be

5    discovered a day or two late, so -- but when it was

6    discovered, they would contact PRS and then would get a

7    revised file that was sent in.

8    Q        So, as far as you know, that all happened through

9    the reconciliation process in billing services?  Is that what

10   you're saying?

11   A        I know the off-invoice data was thoroughly

12   reconciled, but as for the PMI -- or, excuse me, the PRS data,

13   I know it was reviewed, but I don't know -- it's not the same

14   tool that they used for that, so -- but it was -- I know they

15   looked at it and compared it to our sales.

16   Q        "They" being?

17   A        It was in accounting, so...

18   Q        But you don't know for sure who looked at it?

19   A        No.  No.

20   Q        Okay.  Are you aware that the direct sales employees

21   were often the ones that realized that PRS had sent incorrect

22   data or that data was missing from what PRS should have sent?

23   A        I'm assuming if they were looking at reporting and

24   other data outputs, they could definitely be in a position to

25   identify that, yes, but...

1    Q        But you don't know for sure?

2    A        I did not have contact with the sales team much

3    during the audit, so -- but, yeah, I know today that is a

4    fact, they do that.  A lot of -- if there was files that were

5    not received, that need to be loaded, yes, the sales team

6    would commonly be the ones to first notice that, yes.

7    Q        But during the time period that we're talking about,

8    the transactions at issue, you don't know because you weren't

9    involved, right?

10   A        Right.  Well, at least with sales -- especially with

11   the sales department, we're not, so...

12   Q        Do you know who Jean Matilla is?

13   A        Who?

14   Q        Jean Matilla?

15   A        No.

16   Q        Have you ever heard of direct sales employees going

17   on scavenger hunts to try and find their data?

18            MR. HAMILTON:  Objection, Your Honor.  We're going

19   well beyond what the basis for his opinion is, the foundation

20   for his opinion is.

21            THE COURT:  Counsel?

22            MS. CHRISTOFF:  Your Honor, this goes not only to the

23   witness's foundation for being able to testify about the

24   transactions at issue that he was not involved in but it also

25   goes to the admissibility of the evidence under Rules 1006 and

1    803(6).

2            These are business records, and they have not --

3            THE COURT:  We're not dealing with admissibility at

4    this point, are we?  We're only dealing with whether this

5    witness has the requisite background to be able to testify in a

6    manner that would be helpful to the jury and in a manner that's

7    based upon his own perception.  We're not dealing with

8    admissibility at this point, are we?

9            MS. CHRISTOFF:  Well, Your Honor, I believe that

10    Mr. Hamilton submitted the documents for admissibility under

11    Rule 1006 when he tendered the witness for voir dire.

12            THE COURT:  Okay.  And the Court has not ruled on it

13    yet, has it?

14            MS. CHRISTOFF:  No, Your Honor.  That's exactly why

15    I'm trying to lay the foundation that the witness cannot

16    satisfy --

17            THE COURT:  Why don't we wait, then, until the Court

18    is ready to discuss that, consider that.  I think I mentioned

19    to you guys weeks ago that your minds are a lot more agile than

20    my mind is and you can do several things at one time.  I

21    cannot.  I can only do one thing at a time.  So why don't we

22    just focus on the witness's qualifications to offer the opinion

23    that the government seeks to elicit from him.

24            MS. CHRISTOFF:  Thank you, Your Honor.  So just so I

25    understand, you'd like me to reserve any questions that have to

1  do with the reliability of the underlying --

2          THE COURT:  Admissibility.  Let's separate

3  admissibility from foundation.

4          MS. CHRISTOFF:  I believe that the trustworthiness of

5  the documents is an element of admissibility under Rule 803(6),

6  Your Honor.

7          THE COURT:  Well, what we're talking about is his

8  opinion and whether he has-- Sometimes I bake.  And if I do a

9  good job, out of the oven comes some product.  But that product

10  is the combination of eggs and sugar and flour and milk and

11  some labor on my part.  What we're talking about now is the

12  milk and the sugar and the flour and the pan and the oil and

13  other things that this witness has.  His opinion is the final

14  product.  And the final product, that's where we discuss the

15  admissibility or not.  And whether his opinion is accurate or

16  not goes to that.  So let's focus on the ingredients that go

17  into the cooking.

18          MS. CHRISTOFF:  Yes, Your Honor.

19  BY MS. CHRISTOFF:

20  Q       Mr. Seay, I believe that you testified a moment ago

21  that the information in the Lawson database was -- that you

22  were confident in the accuracy of that information because it

23  was audited by Accounts Receivable, I believe you said?

24  A       No.  That was the off-invoice customer purchase

25  data.  In the case of the Lawson system, that's the retail

1  price information.  We commonly encountered researching that

2  data as part of the work with the fuel accounting team, and,

3  as such, we came to rely on it as being good.

4  Q        So -- and would you say that's true for both of

5  those databases, that you relied on it, you thought it was

6  good information?

7  A        Correct.

8  Q        Because there were other business units at Pilot

9  that were reviewing the accuracy of the information?

10 A        Yes, and utilizing it, and would hopefully notice

11 discrepancies as well, yes.

12 Q        "Would hopefully notice discrepancies."  Is that

13 what you said?

14 A        Yes.

15 Q        But they didn't notice the fraud that occurred in

16 this case, right?

17 A        Well, in that case it's not a question of the

18 accuracy of the data, because it's the accuracy of the

19 discounts that were put into the system, so it was the manual

20 entry piece.  But the actual calculations and the

21 summarizations that came out of that system were accurate.

22 Q        So, as far as you know, the only information that

23 was manipulated was the discount put into the system?

24 A        I would-- Yes.

25 Q        You testified about the OPIS price index being

1    another one of the four sources of information that go -- that

2    feed into the tools, right?

3    A         Correct.

4    Q         And where is the -- where does Pilot get the OPIS

5    price index information?

6    A         It's similar to data transfer, data file we receive

7    from OPIS on a daily basis.

8    Q         Directly from OPIS?

9    A         Correct.

10   Q         A data file is uploaded into the -- and which

11   database is that?

12   A         Ascend system is what we used for that audit, yes.

13   Q         Thank you.  Ascend system.  And which business unit

14   is responsible for that?

15   A         IT handles the automation of that process.

16   Q         The receipt of the information from OPIS and the

17   uploading of it?

18   A         Correct.

19   Q         And you -- I believe you testified that the

20   government asked you to utilize the Power Pivot tools to

21   perform some calculations regarding discount savings that

22   should have been paid to customers, right?

23   A         I'm not--  Well, they asked me to apply specific

24   discount terms to a particular customer over a particular

25   period of time.

1    Q        Thank you.  So you didn't look at every customer,

2    only the ones that the government asked you to look at, right?

3    A        Correct.

4    Q        And you didn't choose which time periods to look at.

5    The government told you which time periods to look at, right?

6    A        Correct.

7    Q        And in some cases you -- the government told you to

8    look at a certain time period, and then later they came back

9    and asked you to look at a different time period, right?

10   A        Well, we -- I guess when you say "look at," we --

11   our process was systematic.  So, yes, we would take the date

12   range received from the U. S. Attorney's Office, and if it

13   changed -- if they asked for a different date range, we would

14   apply it, so...

15   Q        Specifically, you prepared declarations and summary

16   reports using a particular date range, and then later, this

17   past fall, the government asked you -- came back and asked you

18   to run that process for a different date range, right?

19   A        I believe that's correct, yeah.

20   Q        And you don't know why the government asked you to

21   run that second date range?

22   A        No.

23            MR. HAMILTON:  Objection.  Why is this-- Objection.

24   Relevance.

25            THE COURT:  Counsel?

1      MS. CHRISTOFF:  Your Honor, this -- these are the

2 opinions that he's about to offer.  I'm just asking him about

3 the basis for those opinions.

4      THE COURT:  Overruled.

5 BY MS. CHRISTOFF:

6 Q      And you didn't -- the government told you which rate

7 to assume in running those calculations, right?  You didn't

8 choose the discount rate to use?

9 A      No.  They were provided.

10 Q      And, in fact, for one of the customers, the

11 government told you to use three different discount rates.  Is

12 that right?

13 A      Correct.

14 Q      Do you know why?

15 A      No.

16 Q      Setting aside this work that you did based on the

17 parameters provided by the government for a second, you -- as

18 we've just discussed, you've talked about how you-all

19 performed audits on all of the customers, right, including the

20 ones that the government asked you to run in the fall?

21 A      Correct.

22 Q      So, you had actually performed an audit of these

23 customer accounts before the government asked you to do it,

24 right?

25 A      I personally did not.  I participated in the audit

```
 1   team, and I reviewed the work of the auditors for certain

 2   accounts.  I reviewed my notes, and found that I did not

 3   review any of the accounts that I was asked to produce

 4   summaries on.

 5   Q        But Pilot had already performed a review and an

 6   audit of those particular discounts at issue --

 7   A        Correct.

 8   Q        -- right?

 9   A        Yes.

10   Q        So you didn't just pull the work you'd already done.

11   Instead, you reran -- and by "you," I mean your team reran the

12   calculations using the parameters provided by the government,

13   right?

14   A        Correct.

15   Q        Why is that?

16   A        I didn't ask.  I didn't...

17   Q        Did you tell the government you'd already done the

18   work?

19   A        I assume they were aware, but --

20            MR. HAMILTON:  Objection, Your Honor.  This is

21   inappropriate.  This is irrelevant.  There is a rule of

22   evidence that governs actually why the government might be

23   making the request in the way it made the request and not ask

24   for their particular audit results, and have our own run.

25   Asking this witness this question is irrelevant.
```

1          THE COURT:  Counsel?

2          MS. CHRISTOFF:  Your Honor, these are foundational

3     questions going to the admissibility of Mr. Seay's opinions and

4     the documents that he relied on.  Of course the Court is not

5     bound, under Rule 104(a), by the rules of evidence in making

6     these admissibility determinations.

7          MR. HAMILTON:  Well, Your Honor, may I respond?  The

8     rule of evidence I'm talking about is the one that bars offers

9     of compromise, which the purpose of the audit was.  And we were

10    not going to seek an offer of compromise that the company was

11    working out with those customers.  We were going to have this

12    witness run his own or have personal knowledge for the

13    transactions at issue, so he could testify based on his

14    personal knowledge.

15         THE COURT:  Objection sustained.

16         MS. CHRISTOFF:  Thank you, Your Honor.

17    BY MS. CHRISTOFF:

18    Q         When you were performing the audit, how did you know

19    which discount rate to apply for each customer?  How did you

20    know what the deal was?

21    A         So we would review source documentation that was

22    contained, commonly e-mails.  We would also have network files

23    that were obtained that would contain either spreadsheets or

24    documents.  We also had data from our SalesForce system, which

25    would catalog sales comments, or comments that were added by

1    the sales team maybe -- typically involving, you know, either

2    customer visits or conversations, and obviously archived

3    reporting and -- such as customer P&Ls, and other sources as

4    well.  So it was pretty extensive.

5    Q        Well, the archived reporting on the customer P&Ls,

6    if you are looking at an account that was -- with a rebate or

7    a discount that was fraudulently reduced, those would reflect

8    the fraudulent numbers, right?

9    A        Correct.  We would not necessarily use -- utilize

10   those reports for validation of a discount.  That primarily

11   came out of, ideally, communications via e-mail, SalesForce

12   comments, et cetera.

13   Q        So communication between a direct sales team member

14   and the customer?

15   A        It could -- it could be customer to our sales team.

16   It could be a sales rep to our internal team.  SalesForce

17   comments obviously would just be keyed, and would contain

18   pretty much anything.  A lot of times they would contain

19   summaries of customer calls, where they could go either have a

20   conversation with -- in person or on the phone with a customer

21   and they would document their discussion.

22   Q        So sometimes it wasn't in writing, right?

23   A        Yes.  True.  I know early on there was some

24   communication with the sales team as well, with the audit

25   team.  Occasionally we would actually discuss -- have

1    conversations with the customers, for their clarification on

2    their side.  I think those were the exception.  I don't think

3    we did--  I only participated, I think, on two of those.  So

4    that was not common, but it did occur as well.

5    Q        Okay.  So taking those two particular examples that

6    you just gave, you're saying that in order to determine what

7    the deal was, you would have gone back to the direct sales

8    team member and asked them?

9    A        I believe there were some discussions like that.  I

10   only participated, I think, in a few, but...

11   Q        And so those instances included instances in which

12   you determined that a customer was underpaid on an account,

13   right?

14   A        Yeah.  And, commonly, if we had to specifically

15   especially talk to a customer, we would have identified maybe

16   multiple discounts that could have been in play, could have

17   minor differentiations.  We wouldn't just ask the customer,

18   "What was your deal?"  We would normally -- or I guess we

19   probably would.  We wouldn't go and say--  We would then

20   compare any -- ask customers what they thought their deal was

21   for a particular period in time.  We'd then compare that to

22   the options or things we'd identified, to then determine.  If

23   they agreed with one without sharing it, then we'd have

24   confidence that that was the one that was correct.  Um...

25   Q        Um, and I wanted to ask you about, in one of the

1    summary exhibits that has been previewed, as will be

2    introduced, there was -- correct me if I'm wrong, but it

3    appeared that there was a fifth bucket of information included

4    on it, and that was invoice e-mail addresses, I believe, on

5    the off-invoice summary.  Is that right?

6    A        Correct.

7    Q        Where did that information come from?

8    A        That came from -- initially I believe it was sourced

9    out of -- I guess the data resides -- the database is within

10   the AR Portal database, which we haven't talked about yet but

11   I'd be glad to, and it comes out of program called Data

12   Distributor that you usually utilize for distributing

13   invoices.

14   Q        Do you know who pulled that information?

15   A        IT.

16   Q        Specifically?

17   A        Nasser Hishmeh.

18   Q        Are you aware that a gentleman named John Lowery

19   prepared a declaration stating that those addresses were

20   queried from the Price Fetch Oracle database?

21   A        Okay.  That sounds correct, yes.  Yes, that sounds

22   correct.  I'm --

23   Q        So is that different from what you --

24   A        It is.

25   Q        -- just testified?

1   A        Yes, it is.

2   Q        So is he right, or are you right?

3   A        I believe he was right.

4   Q        He's right?

5   A        Correct.

6   Q        Okay.  In regards to the testimony you just gave

7   about going back to customers and trying to flesh out what

8   they thought their deal was --

9   A        Uh-huh.

10  Q        -- were conversations had about whether there were

11  gallon requirements as part of the deals?

12           MR. HAMILTON:  Objection, Your Honor.

13           THE COURT:  The objection is that this does not go to

14  foundation?

15           MR. HAMILTON:  It doesn't go to foundation, Your

16  Honor.  We've gotten really far astray from the tool that was

17  overseen by this witness and talking about what he learned --

18  what -- really it's become --

19           THE COURT:  We're talking about how the cake is

20  decorated instead of the quality of the eggs that went into it?

21           MS. CHRISTOFF:  Your Honor, the -- I believe the

22  precise opinion that Mr. Seay is going to be asked to offer is,

23  what the discount or rebate should have been.  And in his work

24  on the audit team, the way that he determined that is by -- one

25  of the ways he's determined that is by asking the customer what

1    the deal was, so that they knew what the deal should have been.

2                THE COURT:  Doesn't that go to his opinion, though?

3                MS. CHRISTOFF:  I'm sorry?

4                THE COURT:  Doesn't that go to his opinion?  I think

5    the foundational question would be, what effort was made to

6    find out.  And I think that would -- that would be

7    foundational.  The accuracy of the information, I think, goes

8    to the opinion, doesn't it?

9                MS. CHRISTOFF:  Your Honor, I'm not asking about the

10   accuracy of the information.  I'm asking how the information

11   was collected.

12               MR. HAMILTON:  May I respond, Your Honor?  I'd like

13   to use the baking analogy, a metaphor.

14               THE COURT:  I appreciate that counsel thinks that's a

15   good analogy.  Go on.

16               MR. HAMILTON:  Yes, because I was trying to make sure

17   the metaphor was going to work with the decorating, but I

18   wanted the Court to consider this, because I tried to describe

19   it as a calculator, but I think baking is a good metaphor for

20   it.

21               So what Mr. Seay has described is that they have

22   gathered all the ingredients to bake a lot of cakes and they

23   have all of the ingredients together from all of these data

24   sources and it's automated, and all the ingredients are there

25   to be pulled from for each baking exercise that needs to be

1  done.

2        What she is talking about is the extra flavoring

3  that could go in for each different cake.  And that flavoring

4  is going to be determined by the relationship between Pilot

5  and the customer in each instance.  For example, did the

6  customer have a cost plus .05 and a 300,000-gallon

7  requirement, that's a specific ingredient for that customer;

8  it has nothing to do with the automated ingredients that are

9  already set up in the data sources.

10        So then what she's doing is, she's trying to attack

11  the audit itself and how they gathered those extra flavor

12  ingredients, rather than the basis for the set ingredients

13  that go into every cake.

14        MS. CHRISTOFF:  Your Honor --

15        THE COURT:  Do you want to use this name analogy, or

16  do you want to use a different one?

17        MS. CHRISTOFF:  If we would like to really extend

18  this analogy, Your Honor, I believe that the government has

19  asked Mr. Seay to create metaphorical cakes, and I'm asking him

20  about the ones that he actually baked, so that we can see if

21  the hypothetical cakes are similar to the real cakes.  That's

22  what I want to know about.

23        THE COURT:  Well, I think by saying that, though, you

24  are conceding that you're not concerned with eggs and the flour

25  and the butter and the other ingredients.  Again, we're looking

 1    at the end product.

 2              MS. CHRISTOFF:  No, Your Honor.  I am -- I'm asking

 3    about those precise ingredients, I'm just asking about the

 4    actual ones as opposed to the hypothetical ones, so that we can

 5    compare the two and see if the hypothetical opinion that he's

 6    going to offer has any value to this Court.

 7              THE COURT:  Well, if the witness has the requisite

 8    background and the opinion would be helpful to the jury, it's

 9    not required that the opinion be correct.  It's up to the jury

10    to accept or reject the opinion.

11              A mechanic knows an awful lot about automobile

12    repairs.  And oftentimes I receive opinions from automobile

13    mechanics on what's wrong with my car, and I give them an

14    awful lot of money, and they do the work, and the same problem

15    is there.  That does not mean that the mechanic does not have

16    a good basis for his opinion.  It just means his opinion was

17    wrong.

18              And what we're talking about now is whether the

19    mechanic has worked on enough cars, whether he's studied the

20    books, whether he's looked under the hood of cars.  That's

21    what we're talking about.  We're not talking about the

22    ultimate opinion and whether the opinion might be correct or

23    incorrect.  That's later on.  What we're dealing with now is

24    the eggs, the butter, the other ingredients.  So the objection

25    is sustained.

```
 1              MS. CHRISTOFF:  Thank you, Your Honor.
 2              THE COURT:  And just for appeal, sometimes the courts
 3    of appeal are very literal, and I would like them to know that
 4    we actually don't have any butter, we don't have any flour in
 5    the courtroom; this is merely an analogy for the lawyers to use
 6    in making their arguments.
 7              MS. CHRISTOFF:  I'm just making sure I've asked all
 8    my questions, Your Honor.  If I could have a minute.
 9              (Brief pause.)
10              MS. CHRISTOFF:  Pass the witness.
11              THE COURT:  Okay.  Why don't we take our morning
12    break now.  It's about 20 minutes until the hour.  Let's return
13    at 11:00, 11:00.
14              (Brief recess.)
15              THE COURT:  You may proceed.
16                      VOIR DIRE EXAMINATION
17    BY MS. BREVORKA:
18    Q       Good morning, Mr. Seay.  My name is Jenny Brevorka,
19    and I represent Mark Hazelwood.
20    A       Good morning.
21    Q       Good morning.  I wanted to start with a few
22    questions that Mr. Vernia touched upon by asking you about the
23    databases from which you pulled data to help build your manual
24    rebate tool.
25    A       (Moving head up and down.)
```

1    Q        You testified earlier that the databases from which

2    you pulled information were snapshots or copies of production

3    or what you called live versions of these databases, correct?

4    A        Correct.

5    Q        Are you aware that OPIS issues corrections to OPIS

6    pricing that was previously distributed?

7    A        Yes.

8    Q        How, if at all, did your subsequent tool that

9    captured or copied point-in-time data correct for any OPIS

10   corrections to pricing that were distributed?

11   A        During the normal course of business, the IT

12   department, if there are any data corrections that were

13   required, they're responsible for correcting those in the

14   source application data systems.

15           Since the query -- you know, the queries we used

16   obviously would have captured any changes that were made

17   prior, there potentially could have been a subsequent change

18   made after the data was captured, if there were no correction

19   after that.  I'm not aware if there was or not, though.

20   Q        So let me make sure I understand this correctly.  So

21   the tools you worked off of, there could have been corrections

22   made by OPIS to the pricing, but because that took a snapshot

23   at a certain point in time, they would not have incorporated

24   that correction to OPIS pricing?

25   A        Yes.  Normally those corrections are made as soon as

1   they're known.  So it would be doubtful if there would have

2   been -- since that copy was taken far enough subsequent to

3   April of 2013, that it should have been accounted for.  But

4   there's also a possibility that there was one much more prior,

5   which would have been nontraditional or nonstandard.

6   Q        So you said it would have been doubtful, but you

7   can't be certain, correct?

8   A        I cannot, no.

9   Q        Okay.  I'd like to turn to something you talked a

10  little bit about yesterday with Mr. Hamilton and Mr. Vernia,

11  the purpose and genesis of the audit from which you later

12  built your manual rebate tool.

13  A        Um-hmm.

14  Q        Do you recall testifying that -- in response to

15  Mr. Hamilton's question, that "Initially after the raid we

16  tried to understand the breadth of the alleged fraud that

17  occurred, we then tried to determine what was owed to any

18  customer, and then, of course, we tried to get them paid back

19  as soon as possible"?

20  A        (Moving head up and down.)  Yeah.

21  Q        Do you recall testifying that?

22  A        I do, yes.

23  Q        Okay.  Can we talk a little bit as far as the last

24  part of that, we tried to get them paid back as possible.

25  A        Um-hmm.

1    Q        Do you recall -- so Pilot paid -- as -- in the

2    course of this audit, repaid any customer that Pilot believed

3    lost money due to fraud, correct?

4    A        That's my understanding, yes.

5    Q        And, in total, Pilot paid more than 56 million back

6    to customers they thought lost money due to fraud, correct?

7    A        I believe that's correct, yes.

8    Q        Pilot also went so far as to pay customers who may

9    have lost money due to innocent mistakes, correct?  A clerical

10   error, or just a mistake?

11   A        Yes.

12   Q        So even in instances where fraud was not

13   conclusively found, Pilot said, "We're still going to pay this

14   customer, because we think they should have received more,"

15   right?

16   A        Can you -- can you restate that question?

17   Q        Sure.  So there were cases or certain customers

18   where sometimes the audit team may have found a mistake but

19   they couldn't determine whether it was fraudulent or benign,

20   correct?

21   A        Yes.

22   Q        And in those instances, Pilot said, "We will still

23   pay the customer the money -- the money they should have been

24   paid originally," correct?

25   A        There was a reasonableness judgment, but, yes, that

```
 1   was -- commonly if it was a borderline scenario, we would err

 2   in the customer's favor, so...

 3   Q        Let's go back.  You mentioned "borderline scenario."

 4   Can we go back for a second?  Were there ever borderline

 5   scenarios as to what was owed to a customer in instances where

 6   the Pilot audit team thought fraud had occurred?

 7            MR. HAMILTON:  Objection, Your Honor.  We've moved

 8   beyond--  We're talking about the audit, and not about his

 9   opinion.  A number of questions have been asked about the

10   audit, 56 million in fraud determined, some -- maybe more in

11   addition to that that wasn't fraud.  But what's the purpose of

12   it?  It's irrelevant.  What's relevant about this as it relates

13   to his opinion?

14            MS. BREVORKA:  If I may, Your Honor?

15            THE COURT:  You may.

16            MS. BREVORKA:  One of the bases the defense seeks to

17   attack, the manual rebate tool that Mr. Seay is offering --

18   going to offer summary opinions through, is that we believe it

19   was created in anticipation for litigation.  We believe the

20   scope of Pilot's --

21            THE COURT:  Let's assume that you're correct, that it

22   was anticipated -- it was created in anticipation of

23   litigation.  Does that affect this witness's opinion?

24            MS. BREVORKA:  I think it does, Your Honor.  We

25   believe --
```

1          THE COURT:  Does it affect this witness's opinion, or

2   does it affect this Court's decision on admitting it or not?

3   Those are two different questions.

4          MS. BREVORKA:  Yes, Your Honor.  I think ultimately

5   it would go to the Court's decision about admitting it.  And I

6   think I'd like to lay the foundation that -- that this tool

7   that --

8          THE COURT:  Well, let's do that, then, outside of the

9   witness, then.  Let's focus on the witness's qualifications.

10  Let's see if he used the right eggs; let's see if he got

11  quality butter, if he got the appropriate type of wheat, if he

12  mixed the batter properly and he kept it in the oven the right

13  length of time.

14  BY MS. BREVORKA:

15  Q          Turning to your culinary skills now, Mr. Seay, if I

16  may.  Prior to your work in the audit, did you ever work

17  directly with the direct sales department?

18  A          Not -- not in the regular course of business, no,

19  so...

20  Q          Okay.  And so also as -- just to be clear, in your

21  position as the manager of business intelligence, did you ever

22  create computer programs or help the direct sales department

23  reach specified goals?

24  A          We've done extensive work subsequent to April 2013

25  with the sales team, yes.

1    Q        All right.  Good point.  And let me clarify.  Prior

2    to April 15th, 2013, had you -- as the manager of the business

3    intelligence department, had you any direct exposure to direct

4    sales or their computer programs that they specifically use?

5    A        There would be some.  Obviously my work within the

6    field accounting department, we were estimating discounts

7    throughout the month, producing accurate fuel margins.  So,

8    again, that was more accounting focused, but we did have some

9    familiarity there.  Obviously we were familiar with the

10   systems that were generating the accounting.  Um...

11   Q        You said there--  And I'm sorry to speak over you.

12   You said there were some.  Please elaborate.  What do you mean

13   by that?

14   A        So part of business intelligence, we try to create

15   reporting and insights from a data perspective on -- for our

16   business partners.  There was--  We did some work within the

17   loyalty space, which I mentioned prior.

18            So in this case we had cents-per-gallon loyalty

19   discounts for our customers, which were more driver-centric.

20   That was a benefit that the driver received, not the fuel

21   customer.  However, a customer could negotiate to have

22   additional loyalty discounts applied to their drivers.  As

23   such, we did do some work with the sales team on that.  That

24   didn't -- that was not cost plus/retail minus

25   discount-related, but it was customer-centric.

1  Q        Okay.  So prior to April 15th, 2013, your personal

2  interactions with the direct sales team about manual rebates

3  or deals with customers, can you explain those to the jury?

4  What, if any, did you have?

5  A        There were not many, other than just the accounting

6  side of being familiar with how the systems accounted for

7  data.  When we got report--  I'm assuming there was some

8  involvement with the sales team on defining the scope of the

9  requirements, but not from a customer specifics perspective,

10 no.

11 Q        I'm sorry.  Could-- You spoke a little fast.  I

12 apologize.

13 A        I'm sorry.  I'll slow down.

14 Q        Yeah.  If you could go back.  So you say, "not

15 many."  Could you expand on that?

16 A        Yeah.  I think most of our work with my current

17 role, prior to April 2013, was weighted more towards our

18 loyalty aspects of our business, which did involve some

19 customer data, but it was not commonly related to either

20 manual rebates or the -- the off-invoice discounts.

21 Q        And, in fact, the loyalty program is not actually

22 part of the direct sales department, correct?

23 A        No, it is.  So -- well, the loyalty is -- in a

24 sense, is managed by a separate team.  The sales department

25 has the latitude to leverage loyalty to provide a loyalty

1    incentive for their drivers.  Again, it's -- in this case,

2    I'll do the scenario.  So our loyalty program is similar to --

3    we have a loyalty card similar to what you would have, you

4    know, with Kroger's or other retailers.  At the time of a fuel

5    transaction, you can swipe your loyalty card.  And the

6    standard discount for our diesel customers is one cent per

7    gallon.  So for every gallon of fuel you purchase, you get one

8    cent loaded onto your loyalty card, which then can be utilized

9    to redeem against purchases inside our stores, so

10   non-fuel-related purchases, so on Snickers bars, or food, et

11   cetera.

12          The sales team has a discount mechanism that they

13   can apply called special points, where they can give -- they

14   call it a point multiplier to a loyalty program for their

15   drivers.  So in that case, that is customer-specific, but,

16   again, it's not a manual rebate discount, it's not an

17   off-invoice discount, it's a discount that would be received

18   as loyalty points loaded on their drivers' loyalty accounts.

19   So we did do some work on that prior to April 2013.

20   Q       Okay.  And your personal exposure, as far as it went

21   to -- your personal exposure to direct sales personnel, as far

22   as it went to manual rebate deals or customer-specific diesel

23   deals, you had no exposure in that sense prior to April 15th,

24   2013, correct?

25   A       Again, only surrounding the accounting of discounts,

1  which may have involved the direct sales team from a

2  conversation perspective, typically the sales analyst team,

3  but not for customer-level off-invoice or manual rebate

4  discounts, so...

5  Q       Okay.  And you mentioned you may have had some

6  conversations.  Do you recall how many?

7  A       No, I don't.  I mean...

8  Q       Less than five?

9  A       It was probably more than five, but...

10  Q      Probably more?  Less than ten?

11  A      I can't recall.  I mean --

12  Q      Okay.

13  A      -- it's hard to differentiate, especially the work

14  that was not related to customer discounts.  This is a role

15  I've had for six years.  What occurred before and after that

16  date is -- I can't recall, from the -- from the loyalty

17  aspects and things I've talked about.

18  Q      But your primary knowledge of manual rebates and

19  those type of deals came from your work on the audit team

20  after April 15th, 2013, correct?

21  A      Primarily, yes.  Again, I was knowledgeable about

22  the accounting prior, and what went into the accounting for

23  our customer discounts, but diving into the actual source

24  systems or the granularity that was required was predominantly

25  done during the audit period, yes.

1  Q        Okay.  So in your role as the supervisor of the

2  audit team, I'm curious, what specifically did you do to

3  review the work of those that were underneath you?

4  A        So it was not a reporting structure.  It was a team

5  that was put together to -- at least my title did not

6  represent some type of managerial or supervisoral duties.

7  Another person on the audit was coordinating the people

8  aspects of the audit.

9        So my role, from a review perspective, was on the

10 work product of the audit team.  So the auditors were

11 responsible -- they'd be assigned accounts.  The audit team

12 would then review any evidence they would have to help

13 determine an opinion about if any payments were due and, if

14 so, what discounts should have been in place.  They would

15 meticulously document their findings, source any evidence that

16 they had to support their conclusion.

17        So we typically had a threshold that was applied,

18 from a dollars perspective, that would necessitate a

19 senior-level review.  So the audit team could always bring us

20 in for an opinion, so if they're working on a case, no matter

21 the monetary outcome, we would be able to then help them with

22 their process, or if there was anything over a certain amount

23 threshold, then we would be required to have senior manager

24 approval on any recommendation.

25 Q        In reviewing the work product, do you mean that you

1    ultimately reviewed the conclusion that was made by another

2    person as to what sort of money Pilot should pay a customer?

3    A        What discount applied, which would then, of course,

4    translate into any monetary amounts due, yes.

5    Q        Okay.  What human beings, if any at all, did you

6    speak with about the audits that were being conducted?  As far

7    as when you reviewed a work product, what human beings were

8    you speaking with about the underlying knowledge -- underlying

9    documents?

10   A        Obviously the audit team themselves, if there was --

11   you know, we had access to accounting and IT groups as well,

12   from some of the information, if it was data-related.  We did

13   have access -- there were some employees on the sales team

14   that would participate in conversations, and occasionally

15   there would be a -- a customer would be contacted as well.

16   Q        Let's go -- you mentioned two sources outside of the

17   audit and accounting teams—employees in the sales department,

18   and occasionally a customer?

19   A        Um-hmm.

20   Q        Which employees in the sales department did you or

21   your team speak with?

22   A        I joined the audit team probably two, three weeks

23   into the audit.  So within the initial period, there were some

24   salespeople that were participating in conversations.  By the

25   time I joined the audit, there were very few.  So I did not

1  have much personal interaction with the sales team.

2  Q        And so did any of your knowledge of specific deals

3  come from conversations with those in the direct sales

4  department?

5  A        Not commonly, no.

6  Q        So, no, none of your -- none of your knowledge about

7  specific deals came from speaking with the salespeople or

8  their managers themselves, correct?

9  A        I believe that's the case.  I know I had the

10  opportunity to interview Brian Mosher.  That was the one

11  scenario for me.  We did ask him account-level-specific

12  questions, but most of the questions he did not respond to.

13  So I do not believe he influenced the outcome of any of those

14  audits.  But there was a conversation that did occur, so...

15  Q        Okay.  And you also mentioned talking to a few

16  customers.  What customers did you speak with?

17  A        I remember speaking with Halvor, I believe -- not

18  Halvor -- I can't recall.  There was only -- that's only one

19  conversation I remember, and I can't recall, so...

20  Q        So you had, at most, one conversation with one

21  customer about the manual rebate --

22  A        It was the off- -- it was the off-invoice tool in

23  this case.  I know it was a direct bill -- large-volume direct

24  bill customer, is the one I spoke with, not manual rebate.

25  Q        So help me break that down a bit.

```
 1    A         Um-hmm.

 2    Q         So you spoke with one customer who was not a direct

 3    bill customer --

 4    A         No, who was a direct bill customer.

 5    Q         -- oh, who was a direct bill customer, about their

 6    contract, their diesel sale contract?

 7    A         Correct.

 8    Q         Okay.  What about the audit teams that you

 9    supervised, are you aware of how many conversations they had

10    with customers?

11    A         I'm not.  I --

12              MR. HAMILTON:  Objection.  Objection to relevance,

13    again, Your Honor.  Again, we have now moved into the category,

14    as I tried to identify, of the flavorings that went into the

15    cake and the conversation --

16              THE COURT:  No.  I think --

17              MS. BREVORKA:  Your Honor --

18              THE COURT:  I think we are more talking about whether

19    the milk came from contented cows or discontented cows.

20              MR. HAMILTON:  Well...

21              MS. BREVORKA:  Your Honor, may I respond?

22              THE COURT:  You may.

23              MS. BREVORKA:  Thank you.  One, I object to

24    Mr. Hamilton's continued use of speaking objections.  Second,

25    the relevance is direct.  Mr. Seay's knowledge, as far as
```

1  manual rebates, comes largely from secondary sources, and the

2  teams he supervised, largely secondary sources.  What I'm

3  trying to ascertain and help the jury understand is his

4  personal knowledge, his one-on-one conversations, or the teams

5  that he supervised, that he later gathered information from to

6  build this tool the prosecution wants to use, whether they had

7  specific personal interactions, primary source material, into

8  crafting this audit, which later evolved into helping build

9  this tool.

10     THE COURT:  Is that a requirement for a lay person to

11  give an opinion?

12     MS. BREVORKA:  It's not, but I think it goes to the

13  foundation of his personal knowledge, as opposed to his

14  secondary-hand knowledge.

15     THE COURT:  There was a movie, I've forgotten the

16  name of it, but there was a scene that people found quite

17  comical involving a young woman.  It was a trial in

18  Mississippi.  And the issue was whether an automobile was an

19  automobile that was described.  And this young woman was put on

20  the stand, and she did not appear to be someone who knew much

21  about automobiles, and then she gave an elaborate and very

22  impressive description about -- I think it was tires on a

23  particular type of automobile for a particular year.  I doubt

24  that this young woman ever spent much time in a automobile tire

25  manufacturing plant.  So it's unlikely she had much personal

1    knowledge of this.  But the knowledge that the rule requires,

2    does it absolutely require the person have firsthand personal

3    knowledge of all of the aspects of what they're talking about?

4            MS. BREVORKA:  It does not, Your Honor, but the

5    defense seeks to elicit through Mr. Seay a better understanding

6    of his -- the knowledge actually gained through his work

7    experience—he's being put on under 701 as a lay witness—so

8    the basis for his opinions, whether they're largely based on

9    secondhand knowledge or personal firsthand knowledge.

10           THE COURT:  And I think he's described his personal

11   involvement in the construction of some of these tools, his

12   overseeing of people that worked.  To some extent, that's

13   personal knowledge, isn't it?

14           MS. BREVORKA:  It is, Your Honor.

15           THE COURT:  Okay.  Well, I'll do this.  I'll let you

16   explore this some.  But let's not belabor it.  I think personal

17   knowledge is a requirement, but I don't think that the cook has

18   to go out to every farm and see how the chickens are being

19   tended, see how the cows are being done, to see how the wheat

20   is being reaped and prepared for flour.

21           MS. BREVORKA:  I appreciate the Court's baking

22   analogies, as a baker myself.  But, indeed, as a fellow baker,

23   you can attest that one's foundation is only as good as perhaps

24   the training or the skills they bring to when they mix the

25   ingredients.  And that's what I think I seek to ask.  I really

```
1    only have one or two questions left, and I appreciate the
2    Court's indulgence on this.
3              THE COURT:  Well, we don't we stay in the kitchen,
4    then.
5              MS. BREVORKA:  Yeah, let's do that.
6              THE COURT:  Let's stay in the kitchen and not venture
7    out into the farm.
8              MS. BREVORKA:  Sure.
9    BY MS. BREVORKA:
10   Q         Do you have any knowledge about the number of
11   customers that those that you supervised actually spoke with
12   in the audit team?
13   A         Again, I did not supervise any auditors doing the
14   work from a managerial or supervisory perspective.  It was
15   accountants that I reviewed their work product.  And -- but I
16   could not recall any -- the number of conversations they may
17   or may not have had with the customer directly.
18   Q         So you -- just for clarification, you do not recall,
19   as in you don't think any conversations occurred, or you just
20   can't remember how many may have occurred, if any at all?
21   A         I cannot remember any at all.
22             MS. BREVORKA:  Okay.  Your Honor, if I may have a
23   moment.
24             (Off-the-record discussion between defense counsel.)
25   BY MS. BREVORKA:
```

1    Q        Just a few more questions, Mr. Seay.  In reviewing

2    the work product of the audit team, did you personally review

3    work product that contained evidence of customer -- deals with

4    customers?

5    A        Yes.

6    Q        And if you had to -- approximately, how many of

7    those deals did you review?

8    A        I mean, it was hundreds, but I'm not sure the total

9    number.

10   Q        Of those hundreds of deals, an estimate, what

11   percentage of those deals were in writing, as opposed to oral

12   deals with customers?

13            MR. HAMILTON:  Objection to relevance.

14            THE COURT:  Counsel?

15            MS. BREVORKA:  I think it goes to his understanding

16   of the manual rebates and the workings of the direct sales

17   team, which ultimately the prosecution seeks to lay as the

18   basis for his personal knowledge, which then led to the

19   building of this tool.

20            THE COURT:  Overruled.

21   A        So most of the evidence that I remember for these

22   accounts was files and -- that were obtained for usage.  They

23   did involve e-mail communications from the customers.  So we

24   may not -- there were -- it was not common to call a customer

25   to get -- to receive their input; however, we would utilize

1    the e-mails that was their correspondence, typically with our

2    sales team, to help support any opinions being made.

3    Q        So -- but those after-the-fact e-mails, they didn't

4    specify, this deal was oral, or this deal was written,

5    correct?

6    A        They could.

7    Q        But did they?

8    A        So when you say "oral," like, from a sales team

9    conversation?

10   Q        Sure.

11   A        Well, all of them were in a conversation, typically,

12   but then they would substantiate their conversation in an

13   e-mail, was common.

14   Q        Good point.  And the distinction I'm trying to draw

15   to help understand the basis of your knowledge is, the work

16   product you reviewed, could you provide an estimate of how

17   many deals appeared to be an oral handshake, "Let's do this

18   deal," versus, "Mr. Jones, here is your contract.  Please

19   review it and let me know if there are any errors"?

20   A        I couldn't give an exact percentage now.  Even the

21   ones that were verbal contracts, there were subsequent either

22   comments within the SalesForce system or the sales reps were

23   logging in their notes of their conversations.  There were

24   also substantial e-mails as well, communicating with the

25   inside sales team as well, on either the conversation or

1    instruction on any discounts to apply, so...

2    Q        Let me go back to something you just said.  Even --

3    you mentioned, even in instances where there were -- appeared

4    to be oral deals, there was after-the-fact documentation.  So

5    let's reverse this and see --

6    A        Um-hmm.

7    Q        -- if you can provide an estimate for the jury.  How

8    many of the audits that you reviewed, in the hundreds --

9    A        Um-hmm.

10   Q        -- appeared to have written contracts that commenced

11   the deal, as opposed to what you've described as frequently

12   seeing after-the-fact documentation of an oral conversation?

13   A        Can you define "written contract"?

14   Q        Sure.  A letter, or an e-mail to this customer

15   saying, "Your deal is X."

16   A        I couldn't give a percent.  I mean, there -- it was

17   definitely -- I would definitely say it was common.  We would

18   encounter it commonly, but from a percentage perspective...

19   Q        And was it common to see deals that didn't appear to

20   have this either letter or e-mail specifically saying, "Your

21   deal was X"?

22   A        Yes.

23            MS. BREVORKA:  Okay.  Thank you very much.

24            MS. CHRISTOFF:  Your Honor, at this time I'd like to

25   renew the defendants' objection to this witness's opinions

1   under Rule 701 for the following reasons:  As the Court knows,

2   a foundational requirement under Rule 701 is that the testi- --

3   the opinions not be based on scientific, technical, or other

4   specialized knowledge that are within the scope of expert

5   testimony.  This witness has provided a mountain of information

6   and evidence about how technical and specialized his -- the

7   basis of his opinions are.

8           He described his work as involving complex

9   calculations, which he said were obviously complex

10  calculations.  He said his job requires expertise and

11  technical skills in computer science and math.  He's taken

12  classes to learn how to use the tools that he helped supervise

13  the development of.  And he said that it's a specialized tool

14  that a typical user would not understand.  So this is the kind

15  of testimony that's not at all the type of everyday life

16  experience that's properly subject to Rule 701.

17          In addition, the witness has made clear that he does

18  not have particularized knowledge gained from his daily work

19  at Pilot, he was not at all familiar with the employees or the

20  work at issue at the time.  He's confirmed that he doesn't

21  have any knowledge of how these -- the data was used at the

22  time of the transactions at issue, his only understanding of

23  this information came after the FBI raid at Pilot.  So he

24  lacks that -- that particularized knowledge.

25          And then, of course, Your Honor, the first

1  requirement under Rule 701 is that the opinions are based --

2  rationally based on the witness's own perceptions.  And

3  Mr. Seay has made clear that he was not involved in these

4  transactions at the time of the facts of the alleged

5  conspiracy.  He has no firsthand knowledge.  The only

6  knowledge he gained was after the fact, after the FBI raid, in

7  anticipation of litigation.  And he has no rational basis for

8  his opinions.  A lot of the information that he would purport

9  to offer was pulled from -- from people that he worked with or

10 worked above, that he did not verify, and were not done under

11 his direction.

12         So, Your Honor, this witness is not properly--

13 There's no proper foundation for admitting this witness's

14 opinions under Rule 701.

15         THE COURT:  Thank you.  That was a very tight

16 argument.

17         Mr. Vernia?

18         MR. VERNIA:  Your Honor, I'm --

19         THE COURT:  I take it, you'd like to adopt everything

20 she said.  Is that correct?

21         MR. VERNIA:  Absolutely.  And particularly the way

22 that she said it, Your Honor.

23         I rise only to point out -- to make one point, Your

24 Honor, and that is, in Your Honor's order back in October, you

25 specifically distinguished *United States vs. Ganier*,

1    G-A-N-I-E-R, on the grounds that in that case the witness in

2    question had -- was working for the government as a

3    government -- as an IRS forensic -- computer forensic agent.

4    And I would simply ask that in light of the testimony that

5    Mr. Seay has offered today, which -- and yesterday, which has

6    demonstrated that he in fact did not work on these issues

7    prior to the time of the search, I would respectfully submit,

8    sir, that this case is governed by *United States vs. Ganier* as

9    well as *United States vs. White*.

10        And if I could read a brief portion of *United States

11   vs. White*'s description of *Ganier*.  The court said, "There the

12   government argued that the computer specialist would offer,

13   quote, 'lay testimony available by running commercially

14   available software, obtaining results, and reciting them.'"

15   And that was *Ganier* at 925.

16        And the *White* court continued, "We rejected this

17   claim, finding that, quote 'such an interpretation would

18   require the witness to apply knowledge and familiarity with

19   computers and the particular forensic software well beyond

20   that of the average lay person.'"

21        I submit, Your Honor, that the evidence today

22   establishes that this case falls clearly within *Ganier*.  I

23   would also point out, Your Honor, that the alternative that

24   was considered in *Ganier*, which was admission of the testimony

25   under Rule 702, is not available in this case because the

1  government specifically has withdrawn its option of offering

2  Mr. Seay's testimony as an expert witness.  Thank you, Your

3  Honor.

4          MS. BREVORKA:  Just one point, Your Honor, I'd like

5  to add to what Ms. Christoff said.  We believe that Mr. Seay

6  should be precluded from testifying about the manual rebate

7  tool, because we believe that it was developed in anticipation

8  of litigation.  The scope of this audit that eventually led to

9  the creation of this tool that the prosecution wants to use in

10 these summary exhibits was unparalleled in Pilot's history.

11 Pilot -- Mr. Haslam held a press conference about the audit a

12 week after the raid.  The company went so far as to pay

13 interest on the audit.  The company went so far as to make sure

14 trucking companies personally knew about the audit, sending

15 direct sales personnel on the road to talk to them about the

16 audit.

17         We believe these are all indicia and signs that this

18 audit was done in anticipation of litigation, and that the

19 tools as a result of it were also done in anticipation of

20 litigation, and that therefore the product should not be

21 allowed to be used in lay witness testimony.

22         THE COURT:  Thank you.

23         MR. COOPER:  Your Honor, to the extent you need to

24 hear from Ms. Mann, we would join what's been said by our

25 colleagues.

1          THE COURT:  Thank you.  Let me have Ms. Christoff

2  stand.

3          Ms. Christoff, as I said, I was very impressed with

4  your tight argument.

5          MS. CHRISTOFF:  Thank you, Your Honor.

6          THE COURT:  Let me see if I can explore some of the

7  issues that you raised.  One of the issues was that this

8  witness has testified to an awful lot of specialized knowledge.

9  I take it in your experience you probably concede that doctors

10  have specialized knowledge?

11          MS. CHRISTOFF:  Yes, Your Honor.

12          THE COURT:  A typical medical doctor goes to

13  college -- goes to -- graduates from high school, goes to

14  college for four years, goes to medical school for four to

15  seven years, depending upon the specialty.  Is that right?

16          MS. CHRISTOFF:  Yes, Your Honor.

17          THE COURT:  And they have to undergo yearly

18  professional education to keep -- to keep current.  Is that

19  right?

20          MS. CHRISTOFF:  Yes.  Yes.

21          THE COURT:  There is a case called *Williams vs. Mast*

22  *Biosurgery USA*, found at 644 F.3d 1320 -- 1312, a 2011

23  Eleventh Circuit case.  And a treating physician -- and since

24  he's a physician, I'm assuming this is someone who has gone to

25  school all that time that we talked about, who keeps up with

1    the profession, and he was allowed to testify about a patient's

2    problems as a lay witness.  And the court said so long as he

3    was not basing his testimony upon a hypothesis, but, rather,

4    relating just what he observed and what he saw and what he

5    concluded and what his opinions were, he was actually a lay

6    person and not -- not an expert.

7         It would appear to me that there's not too much

8    difference from that, this physician who was accepted as a lay

9    expert there, who was using a foundation of knowledge that the

10   typical person would not possess, but he was -- he was limited

11   to talking about the observations he had of the patient, the

12   decisions he made about the patient, his opinions about the

13   patient, and whatnot.  Wouldn't that somewhat suggest, then,

14   that someone who does have some knowledge of accounting and

15   computers and a lot of other knowledge and information that

16   the typical person does not have can still be a lay witness?

17        MS. CHRISTOFF:  Your Honor, I believe the case that

18   you cited was an Eleventh Circuit case.  In the Sixth Circuit,

19   there is a well-established line of cases that say that

20   treating physicians may not testify as lay witnesses if their

21   knowledge was gained in anticipation of litigation.  So, for

22   example, Your Honor, *Fielding vs.* --

23        THE COURT:  Well, now, you've added something to it,

24   that last part there, "if -- if in anticipation of litigation."

25   My assumption is that in the Eleventh Circuit, this doctor was

1    just a regular doctor who had a regular business, and this
2    patient comes in, he treats the patient, then later on, for
3    some reason, he's called to testify.
4            MS. CHRISTOFF:  Yes, Your Honor.  And so in this case
5    I would believe that the analogy here would be Mr. Seay's work
6    before he --
7            THE COURT:  Well, let's take up -- so you would not
8    have any disagreement, then, that the Eleventh Circuit was
9    correct in treating this physician with specialized knowledge
10   as a lay witness?
11           MS. CHRISTOFF:  Your Honor, if I could just clarify.
12   To quote Sixth Circuit case law, it says that the --
13           THE COURT:  Ms. Christoff, I think you're avoiding
14   the question now.
15           MS. CHRISTOFF:  I'm just clarifying the exact
16   applicable law, Your Honor.  The Sixth Circuit has held that a
17   treating physician may testify as a lay witness --
18           THE COURT:  So our circuit, the circuit that governs
19   us, agrees with the Eleventh Circuit that a person with an
20   awful lot of medical knowledge, who's gone to school, who's
21   gotten credentials, who's been licensed, can still be a lay
22   witness?
23           MS. CHRISTOFF:  Only on testimony learned through the
24   actual treatment and from the records reviewed during that
25   treatment.

1          THE COURT:  So the fact that there is specialized

2    knowledge involved does not disqualify the person.

3          MS. CHRISTOFF:  Not in and of itself, Your Honor.

4          THE COURT:  Okay.  There is another case, and I'm

5    quite sure you're familiar with this, since you were familiar

6    with *Williams*.  And I commend you on that.  I really like it

7    when I cite a case at random and counsel knows about the case

8    and can talk about the case.

9          This other case I'm pulling at random is *Ryan*

10   *Development Company vs. Indiana Lumbermens Mutual Insurance*

11   *Company*.  That's a Tenth Circuit case.  And there there was an

12   accountant who was accepted as a lay witness.  And this

13   accountant had prepared the insured's claim of loss for

14   submission to the insurance company.  Now, I don't know

15   because I haven't examined the case in detail, but I'm

16   assuming that since this accountant prepared the insured's

17   claim of loss, the loss had already happened.  So we have

18   someone coming in after the fact, and this person takes

19   information that's there and they prepare something using

20   their accounting skills and knowledge and experience to

21   prepare a claim.  There would be specialized knowledge there,

22   also, wouldn't there?  An accountant?

23          MS. CHRISTOFF:  Yes, Your Honor.  And I have to

24   confess, I'm not familiar with that case.  However, there is

25   significant contrary authority that I could cite on that point,

1   particularly in the insurance context.  For example, the

2   *Sinkovich* case, which we've cited in our brief, involved a boat

3   accident and a marine inspector who went to inspect the site of

4   the accident and gained his knowledge of the underlying facts

5   that way.  And he was not permitted to testify as a lay

6   witness.

7           THE COURT:  A marine inspector.  So he -- what he's

8   doing is preparing a report on something; whereas, the

9   accountant was preparing the claim for action by the insurance

10  company, he was acting on behalf of the client, of the loss, of

11  the insured.

12          MS. CHRISTOFF:  Well, Your Honor, there are also

13  cases that involve accountants that are brought in after the

14  fact.  For example, the *JGR* case, which I believe is a Sixth

15  Circuit case -- yes, it is, Your Honor, a Sixth Circuit case

16  from 2004, in which an accountant was brought in to review a

17  company's books, but because that accountant lacked firsthand

18  knowledge of the underlying facts, he was not permitted to

19  testify as a lay witness under Rule 701, Your Honor, and he was

20  an expert witness under 702.

21          THE COURT:  And I think one of your colleagues

22  brought up the prohibition against accepting opinion testimony

23  if it was only prepared in preparation for litigation.  Is that

24  in Rule 702 only, or is that in Rule 701, also?

25          MS. CHRISTOFF:  Well, I believe under Rule 702

         1   typically an expert would have gained their knowledge during

         2   litigation, Your Honor.  So I don't think --

         3           THE COURT:  Or in anticipation of litigation.

         4           MS. CHRISTOFF:  In--  Exactly.  I believe that rule

         5   would only apply to Rule 701, which is the rule we're operating

         6   under here.

         7           THE COURT:  So that would distinguish the young woman

         8   in the movie who talked about the automobile tires --

         9           MS. CHRISTOFF:  Your Honor --

        10           THE COURT:  -- she acquired that knowledge not in

        11   anticipation of litigation.

        12           MS. CHRISTOFF:  I apologize, Your Honor, for

        13   interrupting you.  I believe the name of the movie is *My Cousin

        14   Vinny*.  It's one of my favorites.  And Marisa Tomei played that

        15   character, Your Honor, and she was qualified as an expert.

        16           THE COURT:  Oh, she was qualified as an expert?

        17           MS. CHRISTOFF:  Yes, she was, Your Honor.  Yes, she

        18   was.

        19           (Laughter.)

        20           MS. CHRISTOFF:  I am so glad I got the opportunity to

        21   make the record clear on that point.

        22           THE COURT:  I think that was a Mississippi state

        23   court judge.  So they probably did it wrong, didn't they?

        24           (Laughter.)

        25           MS. CHRISTOFF:  It was Alabama, Your Honor.  It was

1  an Alabama state court judge.

2          THE COURT:  I'm sorry, an Alabama state court judge.

3          MS. CHRISTOFF:  And the defense attorney was

4  permitted to voir dire the witness, in which he established her

5  expert qualifications.

6          THE COURT:  It's amazing how much you can learn in

7  these trials.  Anything further?

8          MS. CHRISTOFF:  No, Your Honor.

9          THE COURT:  Okay.  Let me hear from the government,

10  then.

11         MR. HAMILTON:  Yes, Your Honor.  So what controls the

12  decision here, Your Honor, is actually the advisory committee

13  notes to Rule 701, which specifically excerpts out this kind of

14  testimony.

15         The Court will recall that yesterday Mr. Seay

16  testified that all of his testimony is going to be based

17  upon -- exclusively based upon particularized knowledge that

18  he gained from his employment at Pilot.  That takes us out of

19  702, and it is part of the carve-out for 701, which means that

20  even if it's of a technical nature, if he gained it strictly

21  from his particularized knowledge that he gained from his

22  employment, then it's admissible under 701.

23         And really the controlling authority for this

24  *United States vs. Kerley*.  In that case there were two, two,

25  underwriting -- underwriting employees, one from Citizen's

1    Bank and another one from SunTrust Bank.  Citizen's Bank, her

2    name was Barb DeMichele.  And SunTrust Bank, her name was Ro

3    Owens.  They came in, and the government in that case asked

4    them to provide an opinion about whether or not -- if SunTrust

5    and Citizens Bank had been aware of misrepresentations at the

6    closing table, whether or not they would have closed those

7    loans.  Two key points:  It was after the fact.  Those

8    underwriting witnesses had not reviewed the loan files at

9    issue in that case.  Second, it was in anticipation of

10   litigation, because the United States Attorney's Office for

11   the Eastern District of Tennessee actually asked those

12   witnesses to review the loan files for the case after the case

13   had been indicted.

14          And the Sixth Circuit expanded *Clear Channel*, and

15   held that that testimony was admissible.  The Sixth Circuit,

16   in expanding *Clear Channel*, in ruling on *Kerley*, they relied

17   on the *Rigas* decision and the *Valencia* decision, both of which

18   involved account- -- both of which involved testimony similar

19   to this.  Let's look at *Rigas*.  *Rigas* was a Second Circuit

20   case.  In *Rigas*, the Adelphia Communications fraud case, there

21   was an accountant who was brought in to examine any

22   restatements that needed to be made after the company was --

23   after the defendants were indicted.  So it certainly was in

24   anticipation of litigation.

25          And the United States has briefed this, and the

1    Court has also put an order down, but because of the extensive

2    argument in Court, I'm just going to quickly go through those

3    cases.

4         The Second Circuit in that case found that even

5    though the accountant's testimony was of particular

6    specialized knowledge, because he had been brought in to work

7    at Adelphia, to review the data at issue and the accounting

8    issues at issue, the Second Circuit held that that witness

9    fits in within Rule 701, and did not exclude it.

10        Looking at *Dynegy*, which is a Fifth Circuit case, in

11   that Fifth Circuit case there was an issue about fuel pricing

12   manipulation in that particular case, and there was a risk

13   officer who actually had left the company before he had

14   completed his analysis.  And the government asked -- the

15   United States Attorney's Office in that district asked that

16   chief risk officer employee to come back and complete analysis

17   that he had not completed.  And the Fifth Circuit, in that

18   case, said that that also fit within 701 because it was based

19   on -- on his personal observations from the records that he

20   reviewed in completing that analysis.

21        So as the United States stated in its brief, that

22   when you look at all of the precedents together, you look at

23   the Sixth Circuit precedent, which was *Kerley*, and you look at

24   the cases that *Kerley* relied upon in reaching its decision,

25   what you find is that proper testimony under Rule 701 includes

1   analysis by a current or even former employee.  Mr. Seay is a

2   current employee.  He's not even the former employee that --

3   like existed in the *Dynegy* case, which was the *Valencia* case

4   from the Sixth Circuit, regarding an assumed course of

5   conduct's effect on a business.  That -- the assumed course of

6   conduct effect on a business, in this instance that would be

7   what effect would a cost plus .05 discount have on a customer

8   who actually received a cost plus .07 discount, regardless of

9   whether the employee was involved in the transaction at issue,

10  so long as the analysis is grounded in the employee's

11  particularized knowledge obtained from the employee's position

12  with the business and is based on the employee's personal

13  review and perception of the materials relevant to the

14  analysis.

15          Mr. Seay has testified that he oversaw the gathering

16  of the data that was used to create the tools.  He has

17  explained that those tools were used during the audit process

18  to pay customers back.  In fact, I think during his testimony

19  he said during the audit they identified 56 million dollars of

20  fraud during this process, and it was these tools that were

21  used to -- to determine that.

22          The United States asked him to testify -- asked him

23  whether or not those tools were created at the request of the

24  United States, and he explained that they were not.  That

25  actually separates us out from -- to some extent, from *Dynegy*,

1    because in the *Dynegy* case that chief risk officer was asked

2    to come back and complete analysis.  The tools were already in

3    existence before the United States asked Mr. Seay to -- to add

4    this element to the tools, which is, for example, when you get

5    to BP Express, assume that a cost plus zero was given to BP

6    Express; when we get to Halvor, assume that a cost minus .05

7    was given to Halvor.

8         All that the United States is asking Mr. Seay -- is

9    going to be asking him to do is to say, if Halvor have been

10   given a cost plus .05 -- excuse me, a cost minus .05 during a

11   particular time, what rebate would they have been due -- what

12   additional rebate would they have been due?  We're asking him

13   to take that cost minus .05 discount and just feed it into the

14   machine called the manual rebate pivot table and the

15   off-invoice pivot table.

16        So while we need to talk about this under 701

17   because it's based on his particularized knowledge that he

18   gained while he was an employee, at the end of the day what

19   we're talking about, his use of a -- operation of a machine,

20   just to use a simple metaphor, it's a pivot table, but it's a

21   machine where he is just adding one more -- adding a variable

22   to it in the same way in which they did during the audit.

23        As he's described, during the audit they would take

24   the cost plus discount that was determined to be in existence

25   for that customer, feed it into the machine, called the Power

```
1   Pivot table for manual rebate or the Power Pivot table for
2   off-invoice.  That's all the United States has asked him to
3   do.  And as a result, he's really no different from the
4   underwriting witnesses in Kerley who, after the fact, were
5   asked to say, who did not participate in the loans in
6   question, "SunTrust, if you had been aware that this was
7   fraud, would you have given the loan in question, using your
8   knowledge about SunTrust underwriting practices?"
9           Kerley controls this.  The advisory committee note
10  in Rule 701 controls this.  This is a very straight-forward
11  decision under controlling Sixth Circuit precedent.
12          MS. CHRISTOFF:  Your Honor --
13          THE COURT:  Ms. Christoff?
14          MS. CHRISTOFF:  Thank you.  I agree that Kerley
15  controls, and I agree that this is straightforward.  Obviously
16  I agree with the result of the application of that law.
17          If I could read directly from Kerley.  The loan
18  officers at issue there "had personal knowledge of their
19  respective employers' underwriting and lending guidelines,
20  policies, and procedures that were in place during 2005 and
21  2006, but also had experience in applying those guidelines and
22  policies to mortgage loans during that time," Your Honor.
23          The fact that the witness is or is not an employee
24  or gained their knowledge while they were an employee is not
25  determinative of the issue.  The question is whether the
```

1    witness had percipient knowledge at the time of the relevant

2    facts that would give them that particularized knowledge.

3            In this case Mr. Seay's knowledge comes only after

4    the FBI raid.  So the FBI raids Pilot's headquarters, and

5    multiple lawsuits are filed within days.

6            THE COURT:  I've heard that term bandied around a

7    lot, a "raid."

8            MS. CHRISTOFF:  A search, Your Honor.

9            THE COURT:  It was an execution of a search warrant?

10           MS. CHRISTOFF:  An execution of a search warrant in

11   which property was seized from Pilot headquarters by a number

12   of federal agents, I believe.  So -- and within days multiple

13   lawsuits were filed.  All of the work that Pilot did on this

14   audit was in anticipation of litigation, Your Honor.  The

15   definition of anticipation --

16           THE COURT:  Has anybody said that?  Has any witness

17   said that?

18           MS. CHRISTOFF:  No, Your Honor, but the government's

19   burden is -- the burden is on the government to establish this

20   witness is competent to testify under Rule 701.

21           THE COURT:  I think during one of the

22   cross-examinations the witness was asked for the reasons why

23   this was done, and I think the attorney brought out that it was

24   done in an effort to maintain good relations with customers and

25   to retain those customers.

1          MS. CHRISTOFF:  Customers that had sued Pilot, Your

2     Honor.  They were in an active lawsuit with those customers.

3          THE COURT:  Was the answer limited to that, to just

4     customers who had filed suit?

5          MS. CHRISTOFF:  No, Your Honor, but the law doesn't

6     require that the actions be limited to only dealing with

7     litigation.  The fact is that the work was done with the

8     reasonable expectation that litigation would occur, because it

9     already had occurred, Your Honor.

10          THE COURT:  And why is that a requirement?  Why is

11     the Court's concern with whether someone is doing something in

12     anticipation of litigation?  Why is that?

13          MS. CHRISTOFF:  I think that's important, Your Honor.

14     The fundamental interest here is the reliability of the

15     information.

16          THE COURT:  So the suggestion is, if you are

17     contemplating litigation, you might skew your opinion to help

18     the side of the battle that you're on?

19          MS. CHRISTOFF:  That's exactly right, Your Honor.

20     Where -- where a witness gains knowledge through their normal

21     everyday activities as part of their job, there is a lower

22     likelihood that that knowledge would be tainted or impacted by

23     the reason in which the knowledge was acquired, and so it has a

24     higher degree of reliability, and that's why we allow lay

25     witnesses to offer opinions on --

1          THE COURT:  And how do you separate that from someone

2    who just wants to maintain good relations with their customers?

3          MS. CHRISTOFF:  Well, Your Honor, they --

4          THE COURT:  We're talking -- the problem is that you

5    may skew your opinion.  So let's say I have an opinion that at

6    noontime there is going to be an eclipse and if there is an

7    eclipse that's good for my customers.  I'm also anticipating a

8    lawsuit that I'm causing the eclipse.

9          MS. CHRISTOFF:  From--  You are involved in

10   litigation with your customers over whether there is an

11   eclipse?

12         THE COURT:  As you know, in the United States you can

13   file a lawsuit for any reason.  You may not keep it in court,

14   but you can file it for any reason.

15         MS. CHRISTOFF:  Yes, Your Honor.  I believe that in

16   that case the customer -- the pending customer lawsuit against

17   you about whether or not there is an eclipse would be highly

18   relevant to your efforts to keep the customer happy about --

19         THE COURT:  Would that likely skew my opinion,

20   though?

21         MS. CHRISTOFF:  Yes, Your Honor, I believe it was,

22   and I believe the Sixth Circuit precedent is established on

23   that point, that --

24         THE COURT:  Would it skew my opinion any more than my

25   desire to retain customers?

1          MS. CHRISTOFF:  Yes, Your Honor.  Yes, Your Honor, it

2    would, because this is not your normal daily business.  This is

3    not how you normally interact with your customers.  You're not

4    usually in a lawsuit with your customers.  The concept of

5    documents being prepared in anticipation of litigation being

6    less reliable is an established concept in many contexts, Your

7    Honor.

8          THE COURT:  If I'm trying to retain customers,

9    perhaps some of the motivation is, I'm trying to prevent future

10   lawsuits.

11         MS. CHRISTOFF:  Well, that's a different issue, Your

12   Honor.

13         THE COURT:  That's a different issue.

14         MS. CHRISTOFF:  Yes.

15         THE COURT:  Okay.  It's not related to this first

16   issue.

17         MS. CHRISTOFF:  No.  It's --

18         THE COURT:  Completely separate.

19         MS. CHRISTOFF:  It's a different analysis that's not

20   applicable here, because there were lawsuits with these

21   customers.  They were already -- they had already been sued.

22         THE COURT:  And, of course, this is counter-factual.

23   Were there lawsuits that were not filed?

24         MS. CHRISTOFF:  I'm sure that there are a lot of

25   lawsuits that have not been filed, in the world.

 1          THE COURT:  And could some of those lawsuits have not

 2    been filed because they were happy with whatever efforts Pilot

 3    made?

 4          MS. CHRISTOFF:  Your Honor, I don't know the answer

 5    to that question.  But, again, it's the government's burden to

 6    establish the competency of this witness.

 7          THE COURT:  Okay.

 8          MR. VERNIA:  Your Honor --

 9          THE COURT:  Yes.

10          MS. CHRISTOFF:  And if I could, Your Honor, just

11    quickly address the other cases --

12          THE COURT:  Take as much time as you want.  You don't

13    have to be quick.

14          MS. CHRISTOFF:  Thank you, Your Honor.  The other

15    cases cited by the government are similar, in that the

16    witness -- the *Valencia* case, I believe, in particular,

17    Mr. Hamilton referred to, that witness was -- though he had

18    left the company, he was a prior employee and was actively,

19    hands-on involved day to day in the types of -- actually, in

20    that case, in the very subject matter of his testimony.

21          And, again, under the *Kerley* case, the two loan

22    officers at issue, though they may not have had experience

23    with these particular loans, that's what their job was at the

24    time that those loans were approved, was to review files and

25    approve them.

1        So, for example, an analogy here, Your Honor, would

2   be, if Mr. Seay was part of the direct sales team and

3   regularly participated in calculating manual rebates at the

4   time, he just didn't happen to work on these particular

5   customers, perhaps then it would be appropriate.

6        THE COURT:  But then he wouldn't -- then he wouldn't

7   have the computer knowledge, though, to offer the opinion that

8   the government wants.

9        MS. CHRISTOFF:  I apologize, Your Honor.  Can you

10  repeat that?

11       THE COURT:  He would not have the computer knowledge

12  to offer the opinion that the government is seeking elicit,

13  though.

14       MS. CHRISTOFF:  Right.  And that's exactly the point,

15  Your Honor.  Mr. Hamilton indicated -- implied that the -- all

16  the witness would be asked to do is plug something in and get

17  something out.  But, again, Your Honor, what he is plugging it

18  into is a highly complicated tool that he would not have been

19  able to create, understand, or even conceive of if he didn't

20  have his specialized technical training.  And that tool was

21  created in anticipation of litigation.

22       The only reason -- this -- his work on the audit was

23  not his day-to-take activity at Pilot, either before the

24  position that he had on business intelligence, or since.  He

25  testified today that he does not do this audit work anymore.

1   This was a special project.  It was not his normal business

2   duty.  And as part of that special project that was directed

3   towards determining whether customers were defrauded,

4   customers that had already sued Pilot, saying they were, that

5   is when the tool was developed, and that is when all of the

6   relevant knowledge that Mr. Seay has testified about so far

7   was acquired.

8               THE COURT:  Thank you.

9               Mr. Vernia?

10              MR. VERNIA:  Your Honor, just very briefly.  I just

11  want to respond to the inference that I drew from

12  Mr. Hamilton's description of *Kerley*.  To the extent that he

13  was implying or I was inferring that *Kerley* overrode *United*

14  *States vs. White* or *United States vs. Ganier*, I think that is

15  clearly not the case.  In fact, *Kerley* itself harmonized its

16  finding with *United States vs. White*.  I think the proper

17  interpretation of *Kerley* is as Ms. Christoff suggests, and that

18  under Sixth Circuit case law, *White* and *Ganier*, Mr. Seay's

19  testimony is inadmissible.  Thank you.

20              THE COURT:  Thank you.

21              The governing rule, as everyone has cited, is

22  Rule 701.  And Rule 701 allows a lay witness to testify in the

23  form of an opinion or inference when the -- when the opinion

24  or inference, Number 1, is rationally based on the witness's

25  perception, and (2) would help the fact-finder to understand

1    clearly the testimony or determine a fact in issue.

2            The Court has heard the testimony of Mr. Seay, both

3    in response to questions put to him by the government and in

4    questions put to him by the defense.  Based upon the Court's

5    questions of the attorneys, the testimony of the witness, and

6    the arguments of counsel, the Court will deny the objections

7    to this witness's being permitted to offer his opinion.

8            The Court notes that the witness indicated that this

9    work was done in an effort to maintain good relations with

10   their customers and to retain those customers.  Obviously

11   there have been some weaknesses shown in the witness's

12   background, and perhaps even with respect to his work, but the

13   Court concludes that those weaknesses go to the weight to be

14   given to the witness's opinion and not to whether the opinion

15   itself is admissible.  So the witness will be allowed to

16   testify.

17           As the Court said yesterday, the Court is going to

18   perform a wedding at 12 noon.  I've seen a young woman dressed

19   in white flitting back and forth in front of the window

20   outside, so I think that they might be there.  So why don't we

21   take our lunch break now.

22           We have a hearing on the media's request for certain

23   records at 1:15.  So the lawyers should come back at 1:15.

24   And the jury should expect to come back -- I'd say 1:45 or so.

25   We'll stand in recess.

1          (Luncheon recess.)

2          (Brief recess.)

3          THE COURT:  Please proceed, counsel.  Proceed.

4                    DIRECT EXAMINATION (Continuing)

5     BY MR. HAMILTON:

6     Q          Mr. Seay, we will continue now, and I'd like to

7     direct your attention to Government Exhibits 810A, 1522A,

8     1613A, 1712A, and 1826A.  Let me know once you've had an

9     opportunity to look at those again.

10    A          I have.

11    Q          And, generally speaking, what are those documents?

12    A          These are dis- -- the customer discount comparison

13    summaries.

14    Q          And did you prepare those documents?

15    A          I did.

16    Q          Is the data that you used to prepare those documents

17    voluminous in nature?

18    A          It is.

19    Q          How were the documents, the exhibits that I just

20    named, prepared?

21    A          They were generated out of a manual rebate Power

22    Pivot tool.

23    Q          And were those -- in preparing those documents, did

24    you rely exclusively upon particularized knowledge that you

25    gained during your employment at Pilot?

1    A        I did.

2    Q        Is the data that those documents summarize kept and

3    maintained or integrated in the ordinary course of Pilot

4    business?

5    A        Yes.

6    Q        And is it the ordinary course of Pilot business to

7    rely on the data -- the voluminous data that is summarized in

8    the exhibits that I numbered?

9    A        It is.

10            MR. HAMILTON:  May I have the document camera,

11   please, for the witness only, please.  This is a document that

12   the United States is marking at this time for identification

13   only.  This document is marked for identification as Exhibit

14   4001, Government Exhibit 4001.  And, also for the record, this

15   is part of the -- the Court's record at Exhibit 1 to Document

16   Number 234 in the clerk's office.

17   BY MR. HAMILTON:

18   Q        And can you tell us what this document is?  Do you

19   see the first page of it?

20   A        I do.

21   Q        And just so I make a complete record, the document's

22   been marked as 4001.  Can you see me holding it right now?

23   A        I do.

24   Q        And is it a multi-page document?

25   A        It is.

1    Q          And I'm turning to the -- I'm turning to Page 8 of

2    4001.  And is it a document that's dated March 24 of 2017?

3    A          Yes.

4    Q          And can you tell us what that document is.  Let me

5    flip to the--  Do you recognize this document?

6    A          I do.  Commission breakdown summary.

7    Q          Well, looking at the--

8               May I pass it to the witness, please.

9    A          (Witness complying.)

10              MR. HAMILTON:  May I have it back.

11              (Brief pause.)

12   BY MR. HAMILTON:

13   Q          Is this a document that you prepared with the

14   assistance of counsel for the company?

15   A          It is.

16   Q          Was it to be prepared to be submitted to the United

17   States Attorney's office?

18   A          Yes.

19   Q          And in this document, are the locations for the data

20   that supports the summaries that you just identified as the --

21   the electronic folder location of that data described in

22   detail as to where to find it?

23   A          Yes.

24   Q          And is it described that the -- that the data that

25   is traveling -- where that data could be found and electronic

1  folders that are traveling with the cost comparisons that you

2  made?

3  A       Yes.

4  Q       And if the data that was in the folder -- the

5  electronic folders that you provided with the summaries that

6  you prepared, if that data was provided to the opposing

7  parties, would that constitute the backup data for the

8  summaries that you prepared?

9  A       Yes.

10  Q       And is -- are the summaries that we just listed by

11  exhibit number, are those accurate -- accurate summaries of

12  the voluminous data that was identified in 4001 in all those

13  electronic folders?

14  A       Yes.

15          MR. HAMILTON:  The United States moves Government's

16  Exhibits 810A, 1522A, 1613A, 1712A, and 1826A into evidence as

17  Rule 1006 voluminous record summaries.

18          MS. CHRISTOFF:  Objection, Your Honor.  The

19  defendants object to the admission of these exhibits under

20  Rule 1006.

21          THE COURT:  And are the reasons the same as were

22  advanced earlier?

23          MS. CHRISTOFF:  They are not, Your Honor.  There is a

24  five-step test under *United States vs. Bray*, and we believe the

25  government has failed to establish its burden under each

1    element.  I'm prepared to go through them if you'd like.

2          THE COURT:  Okay.  Why don't we do that.

3          MS. CHRISTOFF:  Thank you, Your Honor.  The first

4    requirement is that the documents being summarized are so

5    voluminous that the documents could not be conveniently

6    examined in court.  As to two of these --

7          THE COURT:  Do you take issue with that?

8          MS. CHRISTOFF:  I do, Your Honor, as to two of the

9    exhibits.  The exhibits summarizing the Ryder documents, I

10   believe, summarize only two rebates, two.  And the document

11   summarizing the Amerifreight rebates is only one rebate, Your

12   Honor.  So that's hardly a voluminous amount of documents.  The

13   second --

14         THE COURT:  Mr. Hamilton, how voluminous are the

15   documents?

16         MR. HAMILTON:  Well, I think it would be helpful--  I

17   can make a proffer.  It might be helpful to turn to Mr. Seay

18   about it.  My understanding is that although there is one month

19   for Amerifreight, it doesn't change the fact that that month

20   requires, to generate that calculation, data pulls from the

21   different sources.  That is -- that was a manual rebate

22   customer, so the components that he described in the first part

23   of his testimony, the data that would be required to generate

24   that one month, can't be conveniently brought into the court,

25   first, because it's coming from multiple sources, but, also,

1   the way -- this is electronically maintained data that could

2   really only be queried that way.  It would not be convenient

3   under 1006 to bring that data into court.

4           THE COURT:  Would you just ask that one question,

5   then?

6           MR. HAMILTON:  Yes.

7           THE COURT:  And ask it in such a way that he can

8   answer it yes or no?

9           MR. HAMILTON:  Yes, sir.

10  BY MR. HAMILTON:

11  Q       With respect to Amerifreight cost comparison, 1613A,

12  can that -- the data that underlay that report, can it be

13  conveniently brought into court and examined outside of that

14  summary?

15  A       I would say no.

16  Q       And turning to Ryder, which is Government

17  Exhibit 1826A, can that -- the data that underlay that report,

18  that summary, can it be conveniently brought into court and

19  examined?

20  A       I'd say no.

21          MS. CHRISTOFF:  Your Honor, may I briefly voir dire

22  the witness on that issue?

23          THE COURT:  You want to ask him questions about the

24  inconvenience or the volume of the underlying records?

25          MS. CHRISTOFF:  The volume, in particular.

1          THE COURT:  I think that under this test the Court is

2    also supposed to consider the matter of convenience, whether it

3    would be convenient to bring the records in.

4          MS. CHRISTOFF:  Yes, Your Honor.  Actually that

5    feeds into my argument on the second element.

6          THE COURT:  Okay.  Why don't you ask your question

7    from there.  And can you do it in one question, or do you need

8    more than one?

9          MS. CHRISTOFF:  I can try to do it in one question,

10   Your Honor.

11         THE COURT:  Let's see where we go.

12         MS. CHRISTOFF:  Thank you.

13                        VOIR DIRE EXAMINATION

14   BY MS. CHRISTOFF:

15   Q       Mr. Seay, what is the volume of documents that we're

16   talking about?

17   A       Well, we -- obviously it's going through -- you

18   know, the way the tool operates, the cost plus information, we

19   would utilize the source data, which would be, you know,

20   thousands and thousands of records for that.

21         Also, the customer transaction files, I'm not sure

22   the magnitude of those, but the ones that were sourced from

23   PRS would be quite a number of records as well.

24   Q       So you don't know the volume?

25         THE COURT:  He said "thousands and thousands."

1    BY MS. CHRISTOFF:

2    Q        That were searched through, but not that are being

3    summarized here, correct?

4    A        But the source is -- the way the data is acquired,

5    is --

6             THE COURT:  It's underlying data, though, isn't it?

7             MS. CHRISTOFF:  Well, Mr. Seay's probably better to

8    answer that question, Your Honor, but I believe it is

9    electronic data that is electronically stored in the database.

10            THE COURT:  Right.  And, conceivably, you could bring

11   in each bit of electronic data into court and display it.

12            MS. CHRISTOFF:  Well, Your Honor, I believe that

13   there are records underlying each transaction that's being

14   summarized here.

15            THE COURT:  Well, I thought he said "thousands and

16   thousands."  That seems like a lot to me.

17            MS. CHRISTOFF:  I believe "thousands and thousands"

18   is the volume of available data from which the specific data

19   being summarized here would have to be selected.

20            THE COURT:  Why don't you clarify that, then.

21   BY MS. CHRISTOFF:

22   Q        Is that the case, Mr. Seay?  You're talking about

23   thousands and thousands of documents that exist within the

24   database, correct?

25   A        Correct.  But in the case of a customer's fuel

1  purchases over a given month, just given the OPIS data alone,

2  you would have one OPIS valuation per product per store per

3  day.  Of course of the travel center's a cost organization.

4  You know, you have 30 days in the month, plus, you know,

5  500-plus travel centers.  Now we're talking about 1500 records

6  for a single month, for just the cost plus information.

7  Q       Well, but you don't know that, for example,

8  Amerifreight made a purchase at all 500 travel centers on that

9  day?

10 A       I do not know that.

11 Q       So it could be one purchase per day, for a total of

12 30, correct?

13 A       It would definitely be more than that, but it would

14 be fewer than the total, yes.

15 Q       And you don't know, do you?

16 A       No.

17         MS. CHRISTOFF:  So, Your Honor, we have not

18 established that --

19         THE COURT:  Do you think 30 would be -- oh, what's

20 the language -- voluminous?

21         MS. CHRISTOFF:  I do not think 30 is voluminous, no,

22 Your Honor, particularly when we're talking about a comparison

23 to thousands of documents.  I believe the standard in the case

24 law is for scores of documents, not 30 documents.  And

25 regardless--  And, again, Your Honor, it's the government's

1   burden to establish that they're voluminous.  And the witness

2   has established he doesn't know the volume.

3           THE COURT:  And what's the next factor?

4           MS. CHRISTOFF:  The next factor is whether the

5   documents being summarized were made available to the

6   defendants.  And I believe we established in the prior court

7   hearing, Your Honor, that --

8           THE COURT:  I don't know if he's in a position to

9   answer that.  I think Mr. Hamilton would answer that.

10          MR. HAMILTON:  That's why the--  If I may speak, Your

11  Honor.  That's why the United States marked Government Exhibit

12  4001 and had the witness establish that -- and may I pass that

13  to the Court, Your Honor?  4001?  Or do I just make --

14          THE COURT:  As long as counsel knows what you're

15  talking about, there's no need for the Court to see it.

16          MS. CHRISTOFF:  I do know what he's talking about,

17  Your Honor, and I believe that in particular my argument is

18  directed at the Price Fetch database, which is not addressed in

19  the document that Mr. Hamilton is referring to, and which the

20  witness testified was a primary source of information using the

21  summaries, was never provided to the defendants.

22          In addition, Your Honor, we're not just talking

23  about the databases themselves but also the queries that the

24  witness testified are essential to extract the information

25  from the databases.  Those queries were never provided to the

1    defendant.  So in that case, even if the raw data that Your

2    Honor just noted would be little pieces of information stored

3    in a database, even if that hard drive were provided to the

4    defendants, it would be useless without the queries that

5    counsel for Pilot ran to provide to the government to identify

6    this information, because the defendants would have no way to

7    verify whether those queries were properly drafted and then to

8    run them themselves to determine whether the results of the

9    queries were accurately reflected in -- again, in this

10   summary.

11        MR. HAMILTON:  May I respond?

12        THE COURT:  So even if you were given the -- I think

13   in computerese, it's the ones and zeros.  So if you had all the

14   ones and zeros, you could not intelligently interpret those

15   without some type of other tool.

16        MS. CHRISTOFF:  That is exactly accurate, Your Honor.

17   And there is also a third aspect to this that the witness

18   established during voir dire, that the versions of the

19   documents that were given to defendants are not necessarily the

20   same versions that were queried, for example, when searches

21   were run this past fall in preparing these summaries.  The

22   defendant --

23        THE COURT:  Does the rule require that the documents

24   be given to the other side?

25        MS. CHRISTOFF:  Be made available, Your Honor.

1      THE COURT:  Just be made available, not given.

2      MS. CHRISTOFF:  That's correct.  And that did not

3  occur in this case.

4      MR. HAMILTON:  May I address the Court on this, Your

5  Honor?  So before Ms. Christoff made her objection, I -- the

6  Court, I'm sure, heard Mr. Seay explain the document that is

7  part of Government's Exhibit 4001, which is a 11-page letter

8  that Mr. Seay -- in a letter format, where Mr. Seay

9  meticulously, paragraph by paragraph, goes through the column

10  for each -- for each summary, goes through each column of data

11  and states precisely where that data can be found in an

12  electronic folder that is traveling with this letter that he

13  has put together.

14      THE COURT:  Excuse me for my ignorance, but what is

15  an electronic folder?

16      MR. HAMILTON:  The way in which the United States --

17  the way in which this data needed to be produced is

18  electronically because it was so voluminous in nature.  And

19  what the United States asked counsel for Pilot to do was to

20  place this data into very well-organized electronic folders,

21  organized by topics, and in a very workmanlike, meticulous

22  fashion.  You can look in this letter and see how in each

23  paragraph the electronic folder in which the data is housed is

24  clearly identified and shows what supports what summary and

25  what column, and that -- that traveled with a March 29th, 2017

1    letter, which is marked at Exhibit 4001 to defense counsel.

2            And so that's what Mr. -- I had Mr. Seay confirm

3    that the electronic data that traveled with his report, if

4    that were produced to defense counsel, then they would have

5    the data that underlay his reports, and he confirmed that.

6    And now I am representing to the Court that this -- I don't

7    believe that it will be disputed that the March 29th, 2017,

8    letter was produced to counsel, along with his letter, along

9    with all of the electronic folders that are referenced in the

10   letter.  I certainly didn't hear that anyone didn't get an

11   electronic folder that was identified in that.

12           My next point, Your Honor, is that I have -- this is

13   part of the record.  It's Exhibit 7, Document Number 234,

14   which is part of the United States' response to a motion

15   practice, is that one of the counsel for the defense group

16   represented to the United States that it understood that with

17   respect to the Ascend -- Pilot Ascend databases, that it would

18   have to go directly to the company, and that it represented to

19   the United States that it would work with counsel for the

20   company, Neal & Harwell, to obtain access to that data, to the

21   Lawson/Ascend database.

22           And, finally, responding to the Price Fetch

23   argument, that -- that is a red herring, Your Honor.  The data

24   that -- all the data that underlays, as Mr. Seay just

25   testified, the -- his summaries, was included in the

1  electronic folders that traveled with his letter.  The fact

2  that they do not have access to a Price Fetch database——which,

3  by the way, the United States did not seize a Price Fetch

4  database, so therefore did not have it to disclose to the

5  defense——and the defense, you know, had company counsel's

6  number, and knows how to reach them, that they could have made

7  request -- made a request for that and sought some cooperation

8  there.  That is outside the control of the United States.  The

9  United States has produced, in compliance with Rule 1006, the

10  data that underlaid the summary, and the witness confirmed it,

11  and I'm representing to the Court that this 4001 letter was

12  produced to counsel.

13          MS. CHRISTOFF:  Your Honor, the documents that

14  Mr. Hamilton refers to as being provided to the defendants were

15  themselves summaries of the information in the databases.  They

16  were the results of these queries, the SQL searches that we

17  asked the witness about.  Providing the results of a search

18  that we have no ability to verify does not give defendants

19  access to this underlying information.

20          And according to *Bray*, the purpose of this

21  requirement is to provide the opposing parties who decide

22  to -- to attack the authenticity or accuracy of a chart

23  summary or calculation with an opportunity to prepare for

24  cross-examination.  That is not what we were provided in this

25  case, Your Honor.  We were provided with the results that the

1    government requested, through Neal & Harwell, of Pilot to

2    prepare.

3              THE COURT:  The databases that contain the ones and

4    zeros, they were not in these electronic folders?

5              MS. CHRISTOFF:  They were not, no, Your Honor.

6              THE COURT:  Okay.  Based upon the information

7    provided by the government, did you know where the ones and

8    zeros were located?

9              MS. CHRISTOFF:  I apologize, Your Honor.  Can you

10   repeat that, please?

11             THE COURT:  Based upon the communication from the

12   government, did you know where the ones and zeros were -- or

13   the databases that contained the ones and zeros were located?

14             MS. CHRISTOFF:  Yes, Your Honor.  They are located at

15   Pilot.  And I believe that efforts were made to work with

16   counsel for Pilot, and those efforts were unsuccessful.  We

17   were not granted access to the databases.

18             THE COURT:  Did you exercise any rights under federal

19   law to get the materials?

20             MS. CHRISTOFF:  I do not believe that any efforts

21   were taken once the government referred us to counsel for

22   Near and -- Neal & Harwell, counsel for Pilot, and that request

23   was rejected.

24             MR. HAMILTON:  May I --

25             THE COURT:  And the rule requires that the

1    information be available to the other side.  Did the government

2    have any greater right to obtain the materials than the defense

3    did?

4              MS. CHRISTOFF:  Yes, Your Honor.  The --

5              THE COURT:  And where does that right come from?

6              MS. CHRISTOFF:  Well, Pilot is under an obligation to

7    comply and assist the government.  And the government is the

8    proponent of this evidence, and therefore it is the

9    government's burden to -- as the proponent, to make it

10   available.

11             MR. HAMILTON:  Your Honor, may I respond?

12             THE COURT:  Is that what the rule says?

13             MS. CHRISTOFF:  *Bray* says, Your Honor, "The proponent

14   of the summary must also have made the documents available for

15   examination or copying, or both, by other parties at a

16   reasonable time and place."

17             The rule does not say, "Ask somebody else."

18             THE COURT:  Well, one of the cases -- it's *Air*

19   *Safety, Incorporated, vs. Roman Catholic Archbishop of Boston*.

20   Have you heard of that case?

21             MS. CHRISTOFF:  No, Your Honor.

22             THE COURT:  It says that to satisfy the making

23   available requirement, a party seeking to use a summary under

24   Rule 106 [sic] must identify its exhibits as such, that is,

25   they must be listed as exhibits, provide a list or description

1   of the documents supporting the exhibit, and state when and

2   where they may be reviewed.

3           So if Mr. Hamilton said, "You can get them from

4   Pilot," and Pilot did not comply, I think that, as a defendant

5   in a criminal case, there's some authority that the federal

6   court would provide which would ensure that you would have

7   those records, wouldn't you?

8           MS. CHRISTOFF:  Well, Your Honor, based on the style

9   of the case that you gave, *Archdiocese of Boston*, I am guessing

10  that that is not a Sixth Circuit case; whereas, *United States*

11  *vs. Bray* is a Sixth Circuit case, and again --

12          THE COURT:  I think we had that this morning.  You

13  only like Sixth Circuit cases, huh?

14          MS. CHRISTOFF:  Unfortunately that is what we are

15  bound by, Your Honor.

16          THE COURT:  Did you clerk on the circuit?

17          MS. CHRISTOFF:  No, Your Honor.  I clerked in the

18  Western District.

19          THE COURT:  In the Western District of Tennessee?

20          MS. CHRISTOFF:  Yes.  Yes.

21          THE COURT:  Okay.  But not in the Sixth Circuit.  Oh,

22  well, that is in the Sixth Circuit, but that's not on the Sixth

23  Circuit.

24          MR. HAMILTON:  May I?

25          THE COURT:  Sometimes there are differences in the

1   circuits, on procedural rules, but not nearly as much as you

2   would think.  I would be surprised that the Sixth Circuit would

3   view this any differently.  Sometimes, in the old days——we

4   don't have it anymore——but sometimes parties would have records

5   that would take two or three railroad boxcars.  And it would

6   not be possible to take those boxcars to the opponent's office

7   and just drop them off.  So what you would do would be to say,

8   "Well, this is where the documents are, and you just go there

9   and you look at them."

10          When I was a youngster and practiced law myself, I

11   had several cases where we would have a roomful of documents,

12   and I would just tell the other side where the documents were,

13   and the other side could come and go through the documents as

14   much as they wanted.  But it would have been very difficult

15   for a lawyer in my shoes in that case to take all those

16   documents and transport them to another location and present

17   them.

18          With electronic media, it's a little bit different

19   now because we can take an awful lot of information, because

20   they're all in ones and zeros, and put them on hard disks or

21   flash drives or other things and transport those.  But the

22   original source is always going to be someplace else.  And

23   most individuals and most companies would not want to give up

24   their server or whatever the site of their ones and zeros.  So

25   I think we're always looking at either some type of access to

1    it or copies of it.

2              MS. CHRISTOFF:  I agree, Your Honor.  Yes, I think

3    that's actually exactly what we're talking about.

4              THE COURT:  So as long as you're pointed to where the

5    documents are, why is that not made available?

6              MS. CHRISTOFF:  Your Honor, the request was denied.

7    They were not available.  We were not able to obtain them.

8    Your Honor --

9              THE COURT:  They were not denied by the government,

10   right?  They were denied by the third party that held them,

11   right?

12             MS. CHRISTOFF:  That's right, Your Honor.  But the

13   government is the proponent of the information.  I believe

14   Mr. Vernia has something.

15             THE COURT:  And under federal law, you have the right

16   to subpoena.  So a subpoena could have been issued to the other

17   party, and if they failed to comply with the subpoena, they

18   would have been put in jail and held in jail until they decided

19   to give you the access that you needed, right?

20             MS. CHRISTOFF:  Yes, Your Honor.  The company here

21   had an obligation to provide these documents to the government.

22             THE COURT:  They also had an obligation to provide

23   you -- if you had sought the authority of the Court, they would

24   also have an obligation to you, to supply you with the

25   information.

1      MR. VERNIA:  Your Honor, if I could just clarify a

2   factual --

3      THE COURT:  I don't think she needs any help.  Let

4   her finish, and you can -- you can act as cleanup hitter later

5   on.  But let her finish.

6      MS. CHRISTOFF:  Your Honor, the defendants are

7   situated such that engaging in a lawsuit with the company would

8   not be in their best interest.

9      THE COURT:  Well, that wouldn't be a lawsuit.

10      MS. CHRISTOFF:  Well, it would result in a

11   miscellaneous action if it were a subpoena that were not

12   complied with.

13      THE COURT:  Well, most people, if they receive a

14   subpoena, they obey it.  I can count the times on one hand when

15   I have had to order someone to comply with a subpoena, and even

16   fewer times I've had to put somebody in jail for not complying

17   with a subpoena.

18      In this country, regardless of what -- the bad

19   feelings, or the hostility, or whatnot, once you give them

20   that federal court subpoena they become very cooperative.  And

21   there is a reason why we have this power, because we want

22   people to be able to obtain things that they need.

23      MS. CHRISTOFF:  Well, Your Honor, I agree with you.

24   I still submit, though, that the government, as the proponent

25   of the evidence, has the obligation to make it available for

1    defendants.  The -- it is not incumbent upon the defendants to

2    take those measures.  The onus is not on the defendants to seek

3    out this information.  The company is obligated to provide it

4    to the government, and the government is obligated to provide

5    it to defendants.

6         THE COURT:  Or make it in terms of the rule.

7         MR. HAMILTON:  If --

8         THE COURT:  Make it available.  Did you notify

9    Mr. Hamilton that Pilot was being recalcitrant and was not

10   allowing you access to the materials?

11        MR. HAMILTON:  (Moving head from side to side.)

12        MS. CHRISTOFF:  Your Honor, if I may, Mr. Vernia can

13   clarify the facts on that, because I was actually not involved

14   in that discussion.

15        THE COURT:  Okay.  So she does need some help now.

16        MS. CHRISTOFF:  I do, Your Honor.  Thank you.

17        MR. VERNIA:  Solely on the facts, Your Honor.

18        THE COURT:  You are the cleanup hitter.

19        MR. VERNIA:  Your Honor, I believe that this issue

20   predated Ms. Christoff's joining the case.  And because I was

21   the principal one involved in that, I do want to clarify the

22   record.  We asked the government for copies of the Ascend and

23   Lawson databases, and the government did provide those, and I

24   don't believe we have any complaints about the government's

25   compliance with discovery requests in that respect.

1        With respect to Price Fetch, that issue came up in

2   connection with the original Rule 701 motion in which we, I

3   believe, pointed out that we had not received a copy of the

4   Price Fetch nor had we been given these queries of the

5   databases.  The Court ruled on that, and that was where that

6   issue lay.  We did not receive any refusals to cooperate from

7   Pilot Travel Centers because we made no such requests with

8   respect to Price Fetch, Your Honor.  So I just want to make

9   sure that the record was clear as to that.

10       THE COURT:  So, again, going back to "made

11  available," and the case says that the government must state

12  when and where the records may be reviewed.  So the defendants

13  knew that the record -- the ones and zeros or the databases

14  that contain the ones and zeros were located at Pilot, and they

15  knew that you could obtain them from them, whether voluntarily

16  or by force of court subpoena.

17       MS. CHRISTOFF:  Your Honor, one other point of

18  clarification.  If Your Honor remembers back to the beginning

19  of the case, there was a dispute in which defendants issued

20  subpoenas to Pilot, and that did result in litigation before

21  Your Honor.

22       THE COURT:  And that was when?  That was when?

23       MS. CHRISTOFF:  At the beginning of trial, Your

24  Honor.

25       THE COURT:  That was just a few weeks ago.

1          MR. HAMILTON:  Well, the one --

2          MS. CHRISTOFF:  In November.

3          THE COURT:  I think that with a 106 [sic] -- I'm

4   sorry, 1006, that notice would have been given months ago, not

5   weeks ago, right?

6          MS. CHRISTOFF:  Yes, Your Honor.  I'm just merely

7   making the point that to assume that the company would have

8   complied with a subpoena is a demonstrably faulty assumption.

9          MR. HAMILTON:  Well, may I --

10         THE COURT:  "Demonstrably"?

11         MS. CHRISTOFF:  There are other subpoenas --

12         THE COURT:  Huh?

13         MS. CHRISTOFF:  -- that they refused to comply with.

14         MR. HAMILTON:  May I respond, Your Honor?  That

15   subpoena was withdrawn.

16         THE COURT:  Well, if -- assuming that a subpoena had

17   been issued, let's say, months ago, and there was not voluntary

18   compliance, we would have had time to litigate it, wouldn't we?

19   That's very difficult if a subpoena has been issued on the

20   verge of trial, isn't it?

21         MS. CHRISTOFF:  Yes, Your Honor.  But, again, this is

22   information that the government is obligated to provide to

23   defendants and they --

24         THE COURT:  Okay.  And what's the next factor?

25         MS. CHRISTOFF:  Oh, I apologize, Your Honor.  Thank

you.  The third element, Your Honor, is, the underlying

documents themselves are admissible.  And in this case, we

submit that the documents are not admissible, they are hearsay.

Anticipating an argument for a hearsay objection under

Rule 803(6), these documents do not qualify as business

records.  They are a bit--  The witness has established that he

does not know that all the records were kept in the ordinary

course of business, he does not know that they were created by

a person with knowledge at or near the time of the transactions

at issue, he does not know that making records was a regular

practice.

          And, most importantly, Your Honor, the -- the

sources of those -- of the information in those documents and

the method and circumstances of its preparation has a lack of

trustworthiness, and this is an essential requirement under

the rule, Your Honor.  And here I would cite a case out of the

Eastern District of Kentucky, *In re Black Diamond Mining

Company*, where the court says that business records are deemed

reliable because businesses have no reason to lie to

themselves.  And the court said, in that case, if there is a

question about whether someone within the business might have

been untruthful in the records, then there is a good

suggestion that the records have a lack of trustworthiness.

And the court clarified here that, "The court in no way means

to suggest that there is a very good chance that Ms. Shafer

1   was lying about the information in those documents, but merely

2   that the e-mail does not rise to the level of trustworthiness

3   that justifies the exception."

4           So there's no question that these are hearsay

5   documents, Your Honor, and so do they qualify for the

6   exception because they --

7           THE COURT:  And, again, how many documents are we

8   talking about?

9           MS. CHRISTOFF:  Well, in some cases, Your Honor, it's

10  thousands of documents.

11          THE COURT:  And maybe even hundreds of thousands of

12  documents?

13          MS. CHRISTOFF:  Yes, Your Honor.  And --

14          THE COURT:  And because they're in digital form,

15  they're actually ones and zeros, so you probably get millions,

16  if not billions, of ones and zeros.  Is that right?

17          MS. CHRISTOFF:  I believe that is right, Your Honor.

18          THE COURT:  Okay.  And I guess you concede that they

19  were used in the regular course of business for the company,

20  for the most part?  Some may not have been, but, for the most

21  part, some were?

22          MS. CHRISTOFF:  I don't--  I believe that there has

23  been testimony that perhaps establishes that some were, and

24  there has definitely been a lack of testimony as to whether

25  others were.

```
 1                MR. HAMILTON:  May I respond?

 2                MS. CHRISTOFF:  So, yes, Your Honor.

 3                THE COURT:  Well -- and from your earlier argument

 4     that Pilot Flying J did not allow you access, I think we can

 5     assume that these records were in the possession of Pilot

 6     Flying J?

 7                MS. CHRISTOFF:  They were in the possession, yes,

 8     Your Honor.

 9                THE COURT:  And they were in the possession of Pilot

10     Flying J because they were being used in the business of Pilot

11     Flying J?

12                MS. CHRISTOFF:  I don't believe that we heard

13     testimony on that point, as to all.

14                THE COURT:  We're not talking about testimony now.

15     We're talking about logic.  Okay?

16                MS. CHRISTOFF:  I'm not an employee of Pilot, Your

17     Honor.  I don't know how the company --

18                THE COURT:  No, but you're an intelligent person.

19     You went to college.  You graduated from college with

20     distinction.  You then went to law school.  You did extremely

21     well in law school.  You applied for a clerkship with a federal

22     judge.  You got a clerkship with a distinguished judge in

23     Memphis.  That judge relied upon you.  That judge found that

24     you had good judgment, good intellect, and helped the judge.

25     So I think you are a person with pretty good judgment, and I
```

1   think you're able to form an opinion as to whether a large

2   company——and I think I've heard testimony this is the largest

3   fuel oil distributer in the nation, with over 20,000

4   employees——has this huge database, and they've got an awful lot

5   of information on it, and I think we probably can conclude that

6   the reason they have that material there is because they want

7   it for the business.

8           MS. CHRISTOFF:  Your Honor, I believe--  I would

9   agree with you that some of the documents would likely be

10  documents Pilot would use in their business and some would be

11  documents that they created in anticipation of litigation,

12  which we've also heard testimony on.

13          THE COURT:  And I think we can tell, with respect to

14  some of the ones and zeros, when the ones and zeros were put on

15  the medium that keeps them, can't we?

16          MS. CHRISTOFF:  We can tell that the ones and zeros

17  are ones and zeros?

18          THE COURT:  No.

19          MS. CHRISTOFF:  All right.

20          THE COURT:  You can tell whether one and zero was put

21  in the record today, as to put in the record ten years ago.

22          MS. CHRISTOFF:  No, actually, Your Honor, I believe

23  the witness testified that he either was not aware or was

24  pretty sure that there was not an audit trail for some of these

25  documents.

```
1              THE COURT:  Well, we're not talking about what the

2    witness said.  We're talking about logic again.

3              MS. CHRISTOFF:  I don't believe that for some of the

4    documents you would be able to tell when it was entered into

5    the system.

6              THE COURT:  So you don't think an examination of a

7    computer system can tell whether a document was recent or

8    whether a document was ancient?  You can't tell that at all?

9              MS. CHRISTOFF:  So, Your Honor, we are actually --

10   we're talking about the ones and zeros.  It's not -- it's

11   not -- in some cases there are scans of actual documents, in

12   some there are not.  It really is just data that is imported

13   into the system, and so, no, I'm not sure you can tell that.

14             THE COURT:  Well, the ones and zeros go at a certain

15   place on a hard drive, or a disk, or whatever the medium is.

16   And there's some -- I've forgotten what it's called, but

17   there's some type of master log or calendar that assigns it to

18   a location, tells it where to go.

19             MS. CHRISTOFF:  I believe that --

20             THE COURT:  And doesn't that have some type of date

21   tag on it?

22             MS. CHRISTOFF:  Your Honor, I believe that's exactly

23   what we asked the witness about --

24             THE COURT:  Huh?

25             MS. CHRISTOFF:  -- and he was not -- he was not
```

1  positive.

2          THE COURT:  Well, see, again, we're not talking about

3  this witness's testimony.  We're talking about logic again.

4  So, yes, what you're saying is, there is a way to tell whether

5  something is old or whether something is new.

6          MS. CHRISTOFF:  Only if that document that you

7  referred to exists, Your Honor.  And --

8          THE COURT:  Well, it's not a document.  It's ones and

9  zeros.  It's not a document.

10          MS. CHRISTOFF:  No -- well, I'm sorry, Your Honor,

11  the system you referred to that enables you to track things

12  like --

13          THE COURT:  Isn't that true of all -- isn't that true

14  of all computer systems, though?

15          MS. CHRISTOFF:  I don't believe so, Your Honor, no.

16          THE COURT:  You don't think that's true of all

17  computer systems?

18          MS. CHRISTOFF:  No, I -- I'm not an expert, but -- we

19  can ask Mr. Seay, but I don't know.

20          THE COURT:  Okay.

21          MS. CHRISTOFF:  I don't think so.

22          THE COURT:  Okay.  But assuming as a matter of just

23  pure logic, now, that a company has a huge volume of materials

24  on their hard drive.  And we can conceive of some circumstances

25  where some of that material may be there for some other reason.

1  Perhaps somebody likes watching movies and they keep their

2  movies on the company's hard drive, or they like gardening and

3  they keep gardening materials there.  But most of the stuff on

4  it is going to be for the company's business, isn't it?

5          MS. CHRISTOFF:  Ostensibly.

6          MR. HAMILTON:  Your Honor, may I --

7          MS. CHRISTOFF:  Your Honor, I think --

8          THE COURT:  What's the next one?

9          MS. CHRISTOFF:  Well, Your Honor, just to clarify, my

10  argument here is not that they were somehow related -- that

11  they were not somehow related to Pilot's business; it's that

12  the numbers themselves are untrustworthy, they--  The reason

13  that we allow business records, this exception to the hearsay

14  rule, is because they tend to have an indicia of

15  trustworthiness, because if they're part of the everyday

16  business of the company, then there's no reason to suspect that

17  they would have been tampered with.

18          Here, we know for a fact that the documents and the

19  numbers have been tampered with.  And that's why they lack

20  that indicia of trustworthiness and cannot qualify under the

21  business records exception.

22          THE COURT:  Do you have any idea how many documents

23  we're talking about?

24          MS. CHRISTOFF:  I don't, Your Honor.  That goes back

25  to the first argument.

```
 1              THE COURT:  You have no idea at all?

 2              MS. CHRISTOFF:  I have no idea.

 3              THE COURT:  I don't, either, but, with Pilot, my

 4    guess would be we're talking about thousands upon thousands of

 5    documents.  Out of those thousands and thousands of documents,

 6    how many do you think might have been erroneous?

 7              MS. CHRISTOFF:  As it relates to this case?  I think

 8    the --

 9              THE COURT:  Well --

10              MS. CHRISTOFF:  -- government's had a good deal of

11    them.

12              THE COURT:  -- we're talking about the reliability of

13    the database.  So the reliability of the database doesn't have

14    anything to do with this case.

15              MS. CHRISTOFF:  No, Your Honor.  I'm talking about

16    the reliability of the data underlying -- the data that is

17    being summarized here, not the database, the data contained in

18    the database.

19              THE COURT:  Okay.  What's your next point?

20              MS. CHRISTOFF:  The fourth element is that the

21    summary is accurate and nonprejudicial, Your Honor.  This is a

22    requirement that the summary does not contain opinion testimony

23    or inference.  So this is a very simple element of the 1006

24    requirement.  This chart does indeed contain opinion and

25    inference, and therefore it is improper under 1006.
```

1          THE COURT:  Are those opinions set out in numbers?

2          MS. CHRISTOFF:  It is set out in a column, Your

3    Honor, I believe the column entitled Rebate Amount If Cost Plus

4    Zero Used.  "If."

5          THE COURT:  And generally when we have columns, we

6    have numbers under the columns?

7          MS. CHRISTOFF:  Yes, Your Honor.

8          THE COURT:  Okay.  And what's the last one?

9          MS. CHRISTOFF:  The last element?

10         THE COURT:  Yes.

11         MS. CHRISTOFF:  The last element is that the summary

12   was prepared by -- that the witness testifying about the

13   summary prepared the summary.

14         MR. HAMILTON:  That's not the --

15         MS. CHRISTOFF:  Excuse me, Mr. Hamilton?

16         MR. HAMILTON:  I'm sorry, I've looked, it's

17   "supervised its preparation," that's the --

18         MS. CHRISTOFF:  Supervised.  Thank you.

19         MR. HAMILTON:  Yeah.

20         MS. CHRISTOFF:  Supervised it's preparation.  And I

21   believe that the--

22         Thank you.

23         I believe the witness testified that he did not in

24   all cases supervise its preparation.  In fact, I asked him

25   about the source of an entire column of information on one of

1  these documents, and he thought it came from a different place

2  than it actually had.  So the witness is not competent to

3  testify on that subject, either.

4          THE COURT:  Okay.  Thank you.

5          Mr. Hamilton?

6          MR. HAMILTON:  All right.  So looking at *Bray*, the

7  first is that it's voluminous.  The United States submits that

8  it's voluminous, based on the testimony that's already been

9  submitted.

10          The second is that the documents must have been made

11  available for examination, copying, or both, by the parties at

12  a reasonable time and place.  Also that's the *Bray* second

13  factor.

14          Let me state where I understand the record is at

15  this time.  Ms. Christoff advised the Court that counsel for

16  the company had refused them access to the Price Fetch data.

17  Then counsel for Ms. Jones clarified that that was not

18  accurate, that there was no request that was made to access

19  the Price Fetch data, so therefore there was no refusal by the

20  company.  So that basis is gone.

21          Mr. Vernia, counsel for Ms. Jones, also confirmed

22  for the Court, as is represented in the document that's been

23  marked as 4002, that the government copied the Ascend/Lawson

24  database and provided it to counsel for the defense, and that

25  counsel for the defense advised the government that it was

1    going to speak with Pilot's counsel about that.  The United

2    States didn't hear anything else about it after that time, and

3    assumed that all that was going to be fine until this moment.

4    But that really is another -- is a different issue.  What

5    the -- what the record shows through the testimony of

6    Mr. Seay, which is that the data that was extracted from the

7    database has been made available to the parties through the

8    electronic folders that traveled with the letter that is part

9    of Government Exhibit 4001.

10          So this argument has been -- I understand the

11   argument and why it's being made, but I would politely say and

12   respectfully say that it is not a correct argument, it is not

13   accurate, in that the data that underlie the summaries was

14   provided to counsel for the defense.  The database from which

15   it was pulled was -- is at Pilot, and it doesn't travel well,

16   given its size and the way it works.  And the fact that there

17   is a cooperation obligation pursuant to an agreement reached

18   with the company to resolve this issue really doesn't have

19   anything to do with it.  The -- as the Court knows, compulsory

20   process was available.

21          There is one thing I just want to clarify, since

22   there was an impression that could have been made.  There was

23   a subpoena that was issued to Pilot by counsel for

24   Mr. Hazelwood, which is what I believe Ms. Christoff was

25   referencing.  That subpoena was withdrawn, leading the Court

1    to believe, I assume, that the issue with Pilot was resolved.

2           So at this point there really isn't anything in the

3    record to suggest that Pilot would not be cooperative with the

4    counsel, as far as the government is -- counsel for the

5    defense, as far as the government is concerned.  But, again,

6    that's beside the point.  The data, the electronic data that

7    underlay the reports, was provided to counsel for the defense

8    when the very lengthy discussion about the nature of his

9    conclusions was provided.

10          Turning to the underlying data must be admissible,

11   there are two categories of data that the United States has

12   provided to the Court, information about -- through this

13   testimony.  Yesterday afternoon Mr. Seay testified about data

14   that is created and maintained in the ordinary course of

15   business at Pilot.  I believe that the databases that he

16   talked about were the Pilot Ascend database, PMIS database,

17   and possibly another database.  But generally within that

18   category there were databases of financial records that Pilot

19   maintains -- creates and maintains in the ordinary course of

20   business, Category 1.

21          Category 2 would be the data that is the PRS data

22   and the OPIS data.  The United States made it clear through

23   the examination that that data does come from a third party.

24   But the United States, also through the examination, made it

25   clear that it is in ordinary course of Pilot business to

1    integrate——that's the phrase that Mr. Seay confirmed, "to

2    integrate"——those records into Pilot's business records, and

3    to rely on those in its day-to-day basis.

4            And the reason why that language is important is

5    because it's taken directly from Sixth Circuit precedent,

6    which is *Gerling & Associates, Inc. vs. Gearhouse Broadcast*,

7    625 F. App'x 289 (Sixth Circuit 2015).  "A document is

8    admissible under 803(6), even if someone else created that

9    document, so long as a witness testifies that it was

10   integrated into the company records and relied upon in the

11   company's day-to-day operations."

12           At a business like Pilot, and what Mr. Seay

13   explained, it's hard to imagine records from a third party,

14   data from a third party, that's more essential to the

15   day-to-day operation than the OPIS data pulls that Pilot is

16   receiving, as well as the PRS data that tells Pilot how many

17   gallons a customer is purchasing at one of its hundreds of

18   travel plazas around the country on an hourly basis or daily

19   basis or monthly basis.  It is very credible that that's the

20   kind -- exactly the kind of data that Pilot would need to rely

21   on in its day-to-day operations.  So that satisfies the third

22   element.

23           The fourth element, that the summary document must

24   be accurate and nonprejudicial, I'm not seeing in that element

25   from *Bray* where there is a requirement that there be no

1    opinion in it, but I accept that and can make the argument.

2    The data that is in the summary, the summary provides an

3    accurate summary of that data.  Mr. Seay can explain where all

4    of the data in each column came from, the databases that each

5    column is pulled from, and the final column that provides the

6    difference that -- what we're getting at, "the difference"

7    meaning that, say, for example in this case BP Express was

8    promised, we maintain the evidence shows, a cost plus zero

9    discount.  We maintain the evidence shows that BP Express was

10   not paid a cost plus zero discount during the time in

11   question.  And what this summary, the last column, will show

12   is just math that says that, "Here is the amount that BP was

13   paid during the relevant time for each month, and here is the

14   amount that BP should have been paid for that month," and then

15   it subtracts it.  It's just math.  And the last column does

16   the math, the difference between the two.  And at the very

17   bottom of the summary it totals it all up.

18         So there is nothing prejudicial about it because, to

19   the extent that there is any mathematical error, a calculator

20   could determine it.  Although, I believe that I can represent

21   that the mathematical calculations in there are accurate.

22         The United States--  The Court has already heard

23   that the fifth element is clearly satisfied, because Mr. Seay

24   has now, on a couple of occasions in his testimony, explained

25   that he prepared and supervised the preparation of the

1    summaries at issue.  The United States really doesn't see

2    any -- any flaw at all in the foundation of these 1006

3    summaries.

4            THE COURT:  Is the Court's assumption correct that

5    the servers or the structure which maintains the database and

6    the databases themselves would contain thousands upon thousands

7    of documents and -- well, the data, I guess; some may not be

8    documents -- of business data?

9            MR. HAMILTON:  That is a correct assumption.

10           THE COURT:  And that they were maintained by Pilot

11   for Pilot's business?

12           MR. HAMILTON:  I -- I represent that that's the

13   testimony -- that's what I understand the testimony to be from

14   Mr. Seay.

15           THE COURT:  And let's assume that someone, whether an

16   employee of Pilot or someone outside of Pilot, decided that

17   they wanted to either corrupt the data or they wanted to use

18   the databases for some improper purpose, let's say you have

19   some employee that likes child pornography and decides to store

20   child pornography on the databases.  Comparing that use with

21   the legitimate business usage by Pilot and Pilot's employees of

22   the databases, how -- what percentage would that improper usage

23   be in comparison with the proper usage?

24           MR. HAMILTON:  My expectation, at a company like

25   Pilot, that that would be a percentage that would be hard to

1   register.  It would be -- that would be my expectation with

2   respect to your example of child pornography.

3          THE COURT:  Or some employee that wants to put false

4   information into the system.

5          MR. HAMILTON:  Well, that's a different question in

6   this case, but not as it relates to the data that is at issue

7   here.  The United States certainly maintains that the evidence

8   has shown that there were a number of instances where a false

9   discount was inputted into the system to defraud a customer.

10  And it's my understanding that that really is --

11         THE COURT:  But in the grand scheme of all the data

12  in the databases, what percentage would that amount be?

13         MR. HAMILTON:  Within the -- well, within the entire

14  database?

15         THE COURT:  Yes.

16         MR. HAMILTON:  I think that that would not be a

17  significant amount in the entire database of material.  That

18  was unique to a particular decision on customer discounts.

19         THE COURT:  It would be in the nature of the child

20  pornography data.

21         MR. HAMILTON:  Well, I don't know that I would say

22  that, but...

23         THE COURT:  Well, you would have to assume that a

24  company of any size would have hundreds of employees inputting

25  legitimate information on an hourly, daily, and monthly basis.

1          MR. HAMILTON:  Absolutely.

2          THE COURT:  And that information is being stored and

3   kept and used by the company.  And if some rogue employees

4   wanted to put an awful lot of incorrect information in, then

5   that would become known fairly quickly because the company

6   could not be functioning properly.

7          MR. HAMILTON:  Well, it depends on the data.  I mean,

8   the United States' position in this case is that there were a

9   number of employees who were inputting false information.  And

10  the way in which it was put in, it wasn't -- the way in which

11  it was put into the system, which was one customer's receiving

12  a -- a customer should be getting a cost plus .02, cost plus

13  .04 is put into the system, that doesn't infect -- that does

14  not affect the integrity of Pilot's financial data.  What that

15  does --

16         THE COURT:  Yeah.  I think that's what the Court's

17  question was.

18         MR. HAMILTON:  Right.

19         THE COURT:  Let's assume that you have an employee

20  who decides that they're going to delete all of the billing

21  information --

22         MR. HAMILTON:  Right.

23         THE COURT:  -- in a company --

24         MR. HAMILTON:  Right.

25         THE COURT:  -- so the company does not know who to

```
1    bill.  That would become known pretty quickly, wouldn't it?
2             MR. HAMILTON:  That kind of thing would become known,
3    if you're talking about deleting an entire account's billing
4    information.
5             THE COURT:  And the same thing about payments, that
6    would become known pretty quickly.
7             MR. HAMILTON:  Deleting all of the payments to a
8    particular customer?
9             THE COURT:  To all customers.
10            MR. HAMILTON:  To all -- if you deleted all the
11   payments to customers, that is definitely the kind of thing
12   that would seem to me that Pilot -- a company like Pilot would
13   catch something like that.
14            THE COURT:  Well, if the company is operating in a
15   normal manner, you have employees log into the system and use
16   the information in the system all the time.
17            MR. HAMILTON:  I'm sorry, I didn't understand the
18   question.
19            THE COURT:  In a properly operating company, you'll
20   have employees logging into the databases all the time.
21            MR. HAMILTON:  Yes, sir.
22            THE COURT:  And they can compare what they're
23   receiving with what they received the last time they logged in.
24   If something radically changes, they're going to notify
25   somebody.
```

1          MR. HAMILTON:  I would say that if a user is going to

2     the same database over and over again in the ordinary course of

3     business, and that user was relying on that data to be there

4     the next time the user came back, and it either wasn't there or

5     it was materially different in a way that affected the

6     business, then, yes, that user would pick up on that, assuming

7     that the user was not the one who had done it, right?  So...

8          THE COURT:  And that's why companies have computers,

9     so the employees can rely upon what's in the databases and what

10    to use.  That's how they function.

11         MR. HAMILTON:  That's how they're supposed to

12    function, yes, Your Honor.  I'm careful to say this, because of

13    the nature of what actually happened at Pilot in the direct

14    sales division.

15         THE COURT:  Well, in this case you have -- I think

16    someone said there were 22,000 employees, 25,000 employees?

17         MR. HAMILTON:  There's been testimony that there are

18    27,000 employees.

19         THE COURT:  Twenty-seven [sic] employees.  And my

20    thought is that--  Let's see, 10 percent would be 2700,

21    1 percent would be 270 people.  My guess would be you had fewer

22    than 1 percent involved in putting improper information in the

23    computer system, by the government's estimate.

24         MR. HAMILTON:  I believe there are fewer than 270

25    people involved in the alleged fraud.

```
1                THE COURT:  So that's less than 1 percent, then,
2     right?
3                MR. HAMILTON:  Yes, sir.
4                THE COURT:  That's a small number, isn't it?
5                MR. HAMILTON:  Yes, sir.
6                THE COURT:  Okay.  If you have a significant number
7     of people putting bad data in the system, the system's not
8     going to function.  The system's like --
9                MR. HAMILTON:  Well, the --
10               THE COURT:  -- a human body.  We can function with
11    diseases.  When the diseases take over the body, we don't
12    function anymore.
13               MR. HAMILTON:  I agree with that.  And...
14               THE COURT:  And as long as the system is functioning,
15    that means that the information is substantially reliable.
16               MR. HAMILTON:  Well, and I -- if I could also add,
17    Your Honor, which is that -- from the government's perspective,
18    we are talking about apples and oranges, which is that -- the
19    oranges being the data that is being pulled to recalculate
20    discounts that should be owed, it was coming from invoices that
21    were sent to customers and financial -- other financial records
22    in Pilot, OPIS data, gallons that were purchased by customers,
23    that -- that's a data set that's entirely different from the
24    customer discount that was promised to the customer.  So that's
25    not what the database is about.  The database is to be able to
```

1   determine what actually was paid to a customer and then to

2   determine what discount was promised to the customer and to

3   make sure that those line up.

4          So the fraud that the United States has alleged to

5   have occurred, which is falsely representing discounts to

6   customers, would not affect the underlying database.  Those

7   were misrepresentations that were made to the customer, and

8   they caused, in the -- according -- in our view of the

9   evidence, fraudulently reduced rebates or fraudulently

10  calculated invoices to go out.  But the United States doesn't

11  see that as affecting the integrity of the underlying data to

12  recalculate payments.  So that--  Thank you for considering

13  that argument.

14         THE COURT:  The last argument.

15         MR. VERNIA:  Your Honor, I -- I, first of all, would

16  like to object for the record.  I think there was a lot of

17  essentially testimony from Mr. Hamilton.  I don't believe that

18  he was intending to do it, but I think he was saying what the

19  government's view of the evidence was, and I think that it is

20  improper at this time for that to be in the record.

21         I did want to raise with the Court -- we had

22  discussed the possibility of a subpoena.  And for the sake of

23  this issue and for the sake of possible future uses of

24  subpoenas in this action, I can tell you that on behalf of

25  Ms. Jones we've been guided by this Court's decision in

1  *Al-Amin.*  And it is our understanding that this Court, under

2  Rule 17(c), would not have approved the early return of this

3  evidence because it would not necessarily have been

4  admissible, and that actually the admissibility of the

5  evidence is something we're working as to right this very

6  moment.  So -- and had it been returned early, it would have

7  been maintained by the Court and not -- would not have been

8  really available in the way that Rule 1006 speaks of.

9          THE COURT:  Do you have a copy of Rule 106 [sic] in

10  front of you?

11          MR. VERNIA:  Of 106, or 1006, Judge?

12          THE COURT:  I'm sorry, I keep saying 106.  1006.

13  Thank you.  Read out loud the last sentence in Rule 106 [sic].

14          MR. VERNIA:  "The court may order the proponent to

15  produce them in court," sir.

16          THE COURT:  So assuming that the request was made

17  pursuant to Rule 106 [sic], is there any reason why the Court

18  would not have followed Rule 106 [sic] -- I'm sorry, I keep

19  saying 106 -- 1006?

20          MR. VERNIA:  No, sir.  I believe you would have

21  followed the rule.

22          THE COURT:  Okay.

23          MR. VERNIA:  And, if necessary, we make the request

24  that the documents we're speaking of, the Price Fetch database

25  and the queries, actually be produced to the Court.  Thank you.

1           MS. CHRISTOFF:  Your Honor, if I may just briefly

2    read into the record the language from the criminal enforcement

3    agreement between --

4           MR. HAMILTON:  Whoa, whoa.  May I -- may I object

5    before this is done?  I mean, this is -- the criminal

6    enforcement agreement is a document that is not in evidence at

7    this time.  I'm not sure that it's appropriate for that, but...

8           MS. CHRISTOFF:  Well, Your Honor, again, this is a

9    question of admissibility.  So, under Rule 104(a), the Court is

10   not bound by the rules of evidence.  This goes directly to the

11   Court's questions about the government's control over the

12   evidence that we're talking about.

13          THE COURT:  Well, pointing the opponents to where the

14   originals or the underlying records were.

15          MS. CHRISTOFF:  I'm sorry, Your Honor?

16          THE COURT:  Is there any objection to whatever she

17   wants to read being read in open court, or would you like her

18   to just provide it to the Court?

19          MR. HAMILTON:  Not knowing what it is that she is

20   about to read from the criminal enforcement agreement, I would

21   prefer that it be presented to the Court.  I --

22          THE COURT:  Ms. Lewis, could you retrieve it?

23          THE COURTROOM DEPUTY:  Yes, Your Honor.

24          MS. CHRISTOFF:  We can just do an in camera

25   submission, perhaps, Your Honor, or read it into the record

1    after the jury is dismissed for the day.

2            THE COURT:  We can do that.  We can do that.  With

3    the reservation of this material that Ms. Christoff would like

4    to present to the Court, the Court makes a ruling pursuant to

5    Rule 1006 that the appropriate foundation has been provided.

6            We're talking about electronic records stored on a

7    business database.  The business is huge.  The witness has

8    testified that this database is occupied by employees'

9    inputting information on it.  And he used some tools and

10   software to pull data from these databases to prepare the

11   summaries that he will testify from today.  So the Court makes

12   a finding that an adequate foundation has been laid pursuant

13   to Rule 1006.

14           Proceed, Counsel.

15           DIRECT EXAMINATION (Continuing)

16   BY MR. HAMILTON:

17   Q       Let's go to--

18           May we go to the government's laptop, please.  So

19   we'll look first at Government Exhibit 810A.  And let's pull

20   up just the document first, before we go to the excerpt that

21   we're going to take a look at.

22           And you can look at it in your binder.  So can you

23   see on your screen Government Exhibit 810A?

24   A       Yes.

25   Q       And do you see some initials there?

```
 1   A         Yes.

 2   Q         And what are those initials?

 3   A         Those are my initials.

 4   Q         Okay.  Would you just read the letters, just --

 5   A         I'm sorry.  "DMS."

 6   Q         Those are your initials?

 7   A         Yes.

 8   Q         Okay.  So looking at the heading of this document,

 9   can you read that to the jury.

10   A         "BP Express, Inc., Summary."

11             THE COURTROOM DEPUTY:  Mr. Hamilton, do you want this

12   to the jury, or no?

13             MR. HAMILTON:  Yes.  Thank you.  Thank you.

14   BY MR. HAMILTON:

15   Q         All right.  So this is 810A that is now displayed to

16   the entire courtroom.  And would you read the top portion of

17   the document.

18   A         It's "BP Express, Inc., Summary."

19   Q         And just read the entire heading.

20   A         Okay.  "Comparison:  Rebate paid vs. cost plus zero.

21   Period:  January 1st, 2009, through October 31st, 2012.  Total

22   Difference:  $218,463.46."

23   Q         So tell us what that means, what this summary is

24   providing.

25   A         Okay.  This is a customer discount comparison
```

1    summary.  The comparison identified is a comparison between

2    the original rebate amount that was paid to a customer, BP

3    Express in this case, and then it compares the original rebate

4    amount paid to what that rebate would have been had cost plus

5    zero been applied, or if -- you know, if we were to apply cost

6    plus zero to their customer fuel volume, what that discount

7    would have been.

8    Q       During a particular time?

9    A       Yes, during the period identified between January

10   2009 and October 2012.

11   Q       And then the last line, the total difference?

12   A       The "Total Difference" amount reflects the

13   difference between the original rebate amount that had been

14   paid versus what that rebate would have been based on a

15   discount of cost plus zero.  That can also be referenced as

16   the subtotal of the "Difference" column in the body of the

17   exhibit.

18   Q       All right.  We're going to look at, I believe, five

19   other exhibits, and do they all have headings like this?

20   A       Yes.  The headings are very similar.  Obviously

21   there will be differences, being the customer, the discount

22   applied, and the dates.  But, yes, they would be --

23   Q       The nature of the information, the heading, the

24   information contained continue to be the same?

25   A       Yes.

1    Q        All right.  Let's walk through the columns.  So what

2    does the first -- the first column tell us?

3    A        That's "Month," so that would the month in which the

4    fuel payments were purchased or the fuel purchases occurred at

5    our retail locations, which the rebate was based.

6    Q        And how about the "Payment Number"?

7    A        "Payment Number" is the payment ID from our

8    financial system.

9    Q        How about the "Payment Method"?

10   A        "Payment Method" would indicate how the payment was

11   made, either check or ACH, also obtained from the financial

12   system.

13   Q        And the "Date" column?

14   A        The "Date" would be the date of payment.

15   Q        And how about the "Rebate Amount Paid"?

16   A        "Rebate Amount Paid" would agree with the actual

17   payment made, so the check amount or ACH amount sent to the

18   customer.

19   Q        And the "Rebate Amount If Cost Plus Zero Used"?

20   A        That comes from the manual rebate Power Pivot tool

21   calculation to determine what a rebate would have been based

22   on cost plus zero and the customer's fuel volume.

23   Q        And then the "Difference" volume?

24   A        The "Difference" column represents the difference

25   between the "Rebate Amount Paid" column and the "Rebate Amount

1    If Cost Plus Zero Used" column.

2    Q        All right.  Is that done on a monthly basis in this

3    summary?

4    A        Yes.

5    Q        And is that -- are all the summaries done providing

6    information on a monthly basis?

7    A        Yes.

8    Q        With the exception of 727 for Queen?

9    A        Correct.  That's -- yeah, that was an off-invoice

10   customer, so that one was created a little differently for the

11   period.

12   Q        All right.  We'll get to that.  I just didn't want

13   to make my effort to move things along too broad in its reach.

14   So let's go to the bottom of this document.  And do we see the

15   "Grand Total" here at the bottom?

16   A        Yes.

17   Q        And can we look at the -- I think we have a document

18   where we could look at an excerpt at the bottom and the top at

19   the same time.  Are we looking at the bottom and the top of

20   this document at the same time?

21   A        Yes.

22   Q        So what's the total rebate amount paid?

23   A        The initial rebate amount paid was $1,015,165.05.

24   Q        And if cost plus zero had been used during the time

25   in question, how much would have been paid?

Seay – Direct Examination

1   A          That amount would have been $1,233,628.51.

2   Q          And the difference there?

3   A          The difference between those two numbers was

4   $218,463.46.

5   Q          Let's go to our next exhibit, and that is Government

6   Exhibit 1522A.  And is this -- is this summary oriented in the

7   same way or presents its information in the same way as the

8   one we just looked at for BP Express?

9   A          Yes.

10  Q          Let's look at--  We have an excerpt of this.  What

11  we now have on the screen, do we not, is the top part of 1522A

12  and the bottom part of 1522A?

13  A          Correct.

14  Q          All right.  Would you tell the jury what is being --

15  what the cost comparison is for JTL Carriers in this summary?

16  A          The comparison itself?

17  Q          Yes.  What is the cost plus comparison that's going

18  on here?

19  A          It's doing a similar comparison versus -- the rebate

20  amount that was originally paid versus what that rebate amount

21  would have been based on a discount of cost plus .02.

22  Q          And what is the -- what's the time period in

23  question?

24  A          Time period is May 1st of 2008 through January 31st

25  of 2012.

1  Q        And what's the -- what's the total difference that

2  would have been paid to this customer if a cost plus .02 had

3  been actually applied during that time?

4  A        $119,222.01.

5  Q        Go to the next document, which is Government

6  Exhibit 1613A.  And let's zoom on -- zoom in on this one.  And

7  what is this document?

8  A        This is a customer discount comparison for

9  Amerifreight Systems.

10  Q        And what is the cost minus discount that's being

11  used for the comparison?

12  A        The cost minus discount would be cost minus .03.

13  Q        And what -- again, what's the comparison that's

14  being made here?

15  A        That's the original rebate amount that was paid for

16  this customer versus what that original rebate would have been

17  had cost minus .03 been applied.

18  Q        And in this instance what is the time period?

19  A        This time period is February 1st, 2011, through

20  February 28, 2011.

21  Q        And what's the -- what was the total difference

22  stated on the summary?

23  A        $7,041.97.

24  Q        Please direct your attention now to Government

25  Exhibit 1712A.  And is this summary oriented and presented in

1   the same way as the other summaries we've looked at?

2   A       Yes.

3   Q       And what -- what summary is -- what customer relates

4   to this summary?

5   A       This is Halvor Lines.

6   Q       And what is the cost minus discount that is in use

7   here?

8   A       We're applying -- we're comparing the original

9   rebate amount paid versus cost minus .05.

10  Q       During what time period?

11  A       June 1st, 2011, through April 30th, 2012.

12  Q       And what is the total difference there?

13  A       $131,188.42.

14  Q       Now, let me direct your attention to Government

15  Exhibit 1826A.  And what is 1826A?

16  A       The customer discount comparison for Ryder Truck

17  Rental.

18  Q       And what is the cost plus discount that's used for

19  the comparison here?

20  A       Cost plus .05.

21  Q       And what's the time period?

22  A       This is for September 1st, 2012, through

23  October 31st, 2012.

24  Q       And what was the difference determined to be?

25  A       $82,236.77.

1    Q       Please direct your attention now to Government
2  Exhibit 727A.  And what is this summary?
3    A       This is a customer discount comparison for the
4  off-invoice customer Queen Transportation.
5    Q       And in this summary is there a column that is
6  different from the columns that we were just looking at
7  before?
8    A       Yes.
9    Q       Okay.
10           And can we zoom in on that, please?
11           And what column is that?
12   A       In this case the customer was an off-invoice
13 customer, so the discount was applied to reduce their invoiced
14 amount, so the first three columns are named a little
15 differently.  So in this case, the first column is "Invoice
16 Date," and that would be the date of the invoice.
17   Q       All right.  And what is the second column?
18   A       "Invoice Number."
19   Q       And how about the -- what's the invoice amount?
20   A       That would be the amount of -- the invoice amount
21 would be the amount of the customer invoice, the original
22 invoice the customer was sent.
23   Q       And what is the column "Invoice Amount if Cost Plus
24 .03 Used"?  What does that mean?
25   A       That would be the invoiced amount the customer would

Seay – Direct Examination

1    have been sent had they originally applied a cost plus .03

2    discount.

3    Q        And the "Difference" column?

4    A        The "Difference" is the difference between the

5    original invoiced amount and the invoiced amount "If Cost Plus

6    .03 Used" column.

7    Q        All right.  And with the other exhibits we were

8    looking at, the recalculation was done on what time increment?

9    A        Monthly.

10   Q        And here is it driven by the date of the invoice?

11   A        Yes.

12   Q        And how frequently was this customer being invoiced?

13   A        This customer was being invoiced five days a week.

14   Q        And how many pages is this?  This is a little

15   different, so I just want to point it out.  How many pages is

16   this summary?

17   A        Twelve pages.

18   Q        And what time period is covered?

19   A        January 16th, 2010, through April 15th, 2012.

20   Q        Would you look at that last date again.

21   A        Oh, I'm sorry.  November 15th, 2012.

22   Q        So it wasn't April 15th.  It was --

23   A        November.  Excuse me.

24   Q        And what is the total difference on there?

25   A        $60,656.64.

1    Q        And the invoice e-mail address, where is -- that was

2    something that came up during the first part of your

3    testimony, and I believe that counsel pointed out a

4    declaration from a John Lowery about the source of that

5    information.

6            United States--  It's been referenced.  United

7    States would like to, just to make sure we have a complete

8    record, put that declaration into evidence as a certification

9    of the business record -- certification relating to the

10   business record of the source of the e-mail information as

11   Government Exhibit 3503.

12           MS. CHRISTOFF:  Objection.  Hearsay, Your Honor.

13           THE COURT:  Mr. Hamilton?

14           MR. HAMILTON:  902(11)--  Excuse me.  I knew it was

15   902.  I just couldn't remember what subsection.  It's 902(11),

16   "Certification of a domestic record of a regularly conducted

17   business activity."  That's why the United States is submitting

18   it pursuant to Rule 902(11).  The United States gave notice to

19   defense counsel that it would use this.

20           I also advise the court that Mr. Lowery is

21   available.  I'm just trying to move things along.  We can make

22   him available to -- to provide additional information about

23   the foundation for the invoice e-mail if counsel is unwilling

24   to accept the declaration pursuant to 902(11), which is

25   their -- they can make that -- they can take that position if

1    they'd like, but we're just trying to avoid having to call

2    Mr. Lowery for that.

3              THE COURT:  Counsel?

4              MS. CHRISTOFF:  One moment, please, Your Honor.

5    Sorry.  Your Honor, I believe that the declaration itself would

6    not be evidence.  It may be authority for the records to come

7    in.

8              MR. HAMILTON:  Your Honor, that is -- the United

9    States does not need to submit it as evidence.  We're only

10   submitting it for a Rule 104 foundation basis.

11             THE COURT:  I think, then, that the opponent accepts

12   that, and has no objection to the admission of the underlying

13   document, then.

14             MR. HAMILTON:  We'll just mark -- we'll mark this

15   declaration, 3503, as a document for identification only, but I

16   would like, since I did offer it for the -- if I may ask the

17   Court to confirm that the parties do not require the government

18   to bring Mr. Lowery in here to testify about that purely for a

19   *Crawford* issue.  That's all.

20             THE COURT:  When counsel indicates that there's no

21   necessity to file the certificate itself, that means that the

22   certificate is accepted by counsel and also there is no

23   objection to the underlying document being introduced.  And I

24   think you can infer from that there's agreement that the

25   document itself qualifies for admission pursuant to

1    Rule 803(6)(A)(C).

2              MR. HAMILTON:  Yes, sir.

3              THE COURT:  So I don't think there is a need for the

4    Court to make a finding or for the opponent to say anything

5    further.

6              MR. HAMILTON:  Yes, sir.

7    BY MR. HAMILTON:

8    Q         The "Invoice E-mail Address," what is the "Invoice

9    E-mail Address"?

10   A         In this case, the "Invoice E-mail Address" would

11   indicate the e-mail addresses that received the invoices.

12   Q         And what are those e-mail addresses?

13   A         Dqueen@queentransportation.com and

14   mqueen@queentransportation.com.

15   Q         And would that be the way in which this customer

16   received its invoice?

17   A         Yes.

18   Q         Electronically?

19   A         Correct.

20   Q         By e-mail?

21   A         Yes.

22   Q         All right.  Are you familiar with -- we're now going

23   to shift gears from the cost plus comparison summaries and

24   move to a different topic, which is Pilot customers -- Pilot

25   customer P&Ls.  Are you familiar with Pilot customer P&Ls?

Seay - Direct Examination

1    A        Yes.

2    Q        And what are those?

3    A        They're the -- P&Ls are the profit and loss

4    statements that would reflect -- that our sales department

5    used to identify customer volume and any profit and loss by

6    month.

7    Q        And how are you familiar with them?

8    A        So we became -- we used them during the audit and

9    then also subsequent to the audit.  As of January 2015

10   forward, my current team is responsible for producing both the

11   P&Ls.

12   Q        In your current position, your team has

13   responsibility for that?

14   A        Correct.  We have taken over the reporting for all

15   of our sales' profit and loss statements.

16   Q        And are Pilot customers' profit and loss statements

17   documents that are made, kept, and maintained in the ordinary

18   course of business at Pilot?

19   A        Yes.

20   Q        Will you direct your attention to Government

21   Exhibit -- and this is before I display it to the jury --

22   810C, 1522C, 1613C, 1712C, 1826C, and 727B.  Do you see those?

23   A        I do.

24   Q        And what -- did you prepare those documents?

25   A        I did.

1    Q        What are those documents?

2    A        Those are the documents containing summary

3    information from the customer P&L statements.

4    Q        And do those, the summaries for the exhibit numbers

5    that I just listed, contain information that is exclusively

6    from profit and loss statements listed on them?

7    A        Yes.

8             MS. CHRISTOFF:  Your Honor, I don't know if

9    Mr. Hamilton is finished laying the foundation, but I do have

10   objection to these documents as well.

11            THE COURT:  An objection again on hearsay?

12            MR. HAMILTON:  I haven't completed my foundation.  I

13   think I have one more question I need to ask.  That's why I was

14   checking.  If I may.

15   BY MR. HAMILTON:

16   Q        Did those summaries accurately summarize the data

17   from the -- not data, but did those summaries accurately

18   summarize the profit and loss statements that are being

19   summarized?

20   A        Yes.

21            MR. HAMILTON:  I believe I've now completed the

22   foundation required for Rule 1006.

23            THE COURT:  Objection?

24            MS. CHRISTOFF:  Objection under Rule 1006 and as

25   hearsay, Your Honor.

1          MR. HAMILTON:  May I respond, Your Honor?

2          THE COURT:  You may.

3          MR. HAMILTON:  All right.  So the first thing we

4    established was that the underlying documents were admissible

5    by establishing that they are Pilot business records.  These

6    documents are made by Pilot in Pilot's regular course of

7    business, and they are kept by Pilot in the regular course of

8    business.  They satisfy 803(6).  And the-- What was the other

9    argument?  I'm sorry.

10          THE COURT:  1006, and also not a business record,

11   hearsay.

12          MR. HAMILTON:  Oh, the hearsay response, I just made

13   the hearsay response by referring to 803(6).  So they are a

14   hearsay exception --

15          THE COURT:  So 1006, then, would be --

16          MR. HAMILTON:  Excuse me.  So the 1006 is, they are--

17   I do need to ask the witness one more question—I just realized

18   that, I'm sorry—to make a foundation.

19   BY MR. HAMILTON:

20   Q          Mr. Seay, are the records that are summarized

21   voluminous in nature?

22   A          Yes.

23   Q          Would that be convenient to bring into court?

24   A          No.

25   Q          And does the way in which they're summarized make it

1  easier for the jury to understand the data that's being

2  summarized?

3  A          Yes.

4          MR. HAMILTON:  All right.  I'm ready to make my

5  Rule 1006 argument, Your Honor, if I may.

6          MR. VERNIA:  Your Honor, if I may make a separate

7  objection to 1522C.  My understanding is that not all the JTL

8  profit and loss statements were existing, that some had to be

9  recreated, and we would object to the entry of this document on

10  the grounds that it was from recreated records rather than

11  contemporary business records.

12          THE COURT:  Excuse me.

13          Ladies and gentlemen, counsel are making arguments

14  now, and I think the arguments are going to go on for a few

15  minutes.  It's almost 5:00.  And I have not checked the

16  weather recently, but I was informed around lunchtime that

17  there is a threat of snow north of here and also west of here.

18  And I know some of you have some driving to do.  There is no

19  snow predicted for Chattanooga, but I think to be on the safe

20  side we probably should let you get on the road as quickly as

21  we can.  So we're going to quit now.

22          I was mulling over having court on Tuesday this

23  week, but the weather report for Tuesday is, it's going to get

24  up to the high of 29 degrees and we should have some flurries

25  and snow.  That may or may not be accurate, but I don't think

1    it makes any sense to have you try to come back, even with

2    that risk.

3              So we'll start again on next Wednesday, and that's

4    predicted to be a sunny day.  Again, it will be cold, it will

5    also be 29 degrees, but they show zero percent chance of

6    precipitation, so it should be safe.  So we'll reconvene next

7    Wednesday.  Monday is a holiday.  Tuesday, because of the

8    weather, we're not going to have court.  So we'll resume on

9    Wednesday.  Okay.

10             So the jury is excused.  Remember my earlier

11   admonitions regarding allowing anyone to talk to you about the

12   case, watching anything on television, listening to anything

13   on the radio, reading anything in the newspapers or on the

14   Internet about this case.  So we'll see you next week.

15             (The jury exited the courtroom, and the proceedings

16             continued as follows:)

17             THE COURT:  You may be seated.

18             MR. HAMILTON:  May I continue?

19             THE COURT:  Let's wait for Ms. Lewis to get back.

20             MR. HAMILTON:  Oh, sure.

21             THE COURT:  She maintains the record in the

22   courtroom.

23             (Brief pause.)

24             THE COURT:  You may now.

25             MR. HAMILTON:  All right.  Let me deal with -- if I

1    may.  So the Court asked me to make an argument -- I was making

2    a Rule -- about to make a Rule 1006 argument, and then counsel

3    for Ms. Jones made a specific argument about Exhibit 1522C,

4    which I think in my mind can be easily addressed and should be

5    addressed first and then go back to Rule 1006, if I may.

6          So counsel for Ms. Jones said that 1522C should not

7    be admitted because there are profit and loss statements upon

8    which that is based that had to be recreated, and I would like

9    to make a record of the fact that I do not believe that that

10   is accurate.  I believe that the P&Ls that are referenced in

11   JTL Carriers' profit and loss statement summary were in

12   existence already, were not recreated by Mr. Seay.  May I make

13   a record of that, Your Honor?

14         THE COURT:  You may.

15   BY MR. HAMILTON:

16   Q        Mr. Seay, turning to 1522C.  Do you have that in

17   your binder?

18   A        I do.

19   Q        And what period of time is covered?

20   A        January 1st of 2010 through January 31st of 2012.

21   Q        And is that for a period of time in which you were

22   able to locate JTL P&L records?

23   A        Yes.  Restricted P&Ls were systematic starting in

24   January 2010 forward.  So, yes.

25   Q        Was there an earlier draft of the summary that was

1    subject to some litigation that -- in which there were P&Ls

2    that you did -- or profit and loss statements that you did

3    recreate to cover a wider period?

4    A        Yes.

5    Q        All right.  And is that what this summary is?

6    A        No.

7    Q        Is this a summary that is based only upon P&Ls that

8    existed upon which you are -- upon which the summary is based?

9    A        Yes.

10   Q        Just so I'm clear, did you make up -- did you create

11   any of the summaries upon which 1522C is based?

12   A        No.

13            MR. HAMILTON:  Now let me turn to the Rule 1006

14   argument.  And of course, as Ms. Christoff has pointed out, the

15   leading case on that, or the controlling case in the Sixth

16   Circuit, is *United States vs. Bray*.  The first requirement is

17   that the documents must be so voluminous that they cannot be

18   easily examined in court, and Mr. Seay has stated that on the

19   record.

20            The second is that the government, the proponent,

21   must have made the documents available for examination, for

22   copying, or both.  These P&L statements have been produced in

23   discovery to the defendants.

24            Third, the proponent must establish that the

25   underlying documents are admissible in evidence.  The United

1    States has established that these documents are admissible

2    under 803(6) as business records of Pilot.

3            And the -- and fourth, the summary document must be

4    accurate and nonprejudicial.  Mr. Seay has stated on the

5    record that the summaries accurately summarize the underlying

6    profit and loss statements.

7            And Mr. Seay has satisfied -- Mr. Seay's testimony

8    has satisfied the fifth requirement of *Bray*; that is, the

9    proponent should present the testimony of the witness who

10   supervised its preparation.  And Mr. Seay has -- has testified

11   that he satisfies that requirement as well.  So the United

12   States has satisfied all five requirements for *United States*

13   *vs. Bray* for the profit and loss summaries.

14           THE COURT:  Any reply?

15           MS. CHRISTOFF:  Your Honor, my arguments as to most

16   of the elements under Rule 1006 are the same.  And the Court

17   has previously ruled.  So I would like to just preserve that

18   objection.

19           However, there -- I do have a specific argument as

20   to the trustworthiness of these documents under Rule 803(6)(E)

21   that I would like to voir dire the witness on.

22           THE COURT:  Very well.

23                    <u>VOIR DIRE EXAMINATION</u>

24   BY MS. CHRISTOFF:

25   Q       Hello again, Mr. Seay.

1   A        Uh-huh.

2   Q        So you've testified that the profit numbers on these

3   summaries come from the P&L statements produced at -- out of

4   the direct sales group.  Is that correct?

5   A        Correct.

6   Q        And you had to -- but you had to do a little bit of

7   work on those numbers to get the profits where you were

8   comfortable with them.  Isn't that right?

9   A        For this exercise, no.  This is strictly entering

10  information from the source customer P&Ls that were reports of

11  record onto these summaries.  You're referring to the previous

12  separate exercise that we did.

13  Q        Okay.  So the-- All right.  Sorry.  Give me one

14  second.  But you are aware that there were mistakes in the

15  P&Ls, correct?

16  A        In the case of these P&Ls, I was aware there are

17  months that the rebates were not reflected on these P&Ls.  The

18  exercise that I performed was to summarize the gallons and

19  profit and loss that were reported for our sales department,

20  so it was strictly an exercise of taking what was on the sales

21  customer P&L and summarizing it here.

22  Q        Right.  So I understand that you took the number

23  from the P&L --

24  A        Uh-huh.

25  Q        -- and summarized it here.  But I believe you just

1    testified that you're aware of mistakes in the documents that

2    you're pulling the numbers from, correct?

3    A          Yes.  But if you were -- but the -- how these

4    reports were utilized, I believe they were in the -- the basis

5    for commissions and other exercises for the sales team, so

6    they would have -- this is a reflection of what they had used.

7    Q          So they do not accurately reflect the profits

8    attributable to the customers?

9    A          I think there were a few customers and a few periods

10   where the -- that was not included.

11   Q          So the P&Ls were inaccurate, correct --

12   A          Um --

13   Q          -- in those instances?

14   A          -- from an accounting perspective, yes.  But from

15   what the sales department was relying upon as the basis for

16   their profitability, that's -- you know, depends on the user.

17   Q          Well, the way that the sales department relied on

18   them to determine their profitability isn't the same thing as

19   their actual profitability, correct?

20   A          In the cases where there were missing rebates, yes,

21   that's correct.

22   Q          And are you aware of other times that the employees

23   in the sales department had difficulty relying on the P&Ls?

24   A          Prior to the 2010, when the restricted P&Ls were

25   being created manually by the sales team, I believe those were

1   unreliable, which is -- but they're not included in the

2   summaries.

3   Q          Only prior to 2010?

4   A          To my knowledge, yes.

5              MS. CHRISTOFF:  Can I have the Elmo, please.

6   BY MS. CHRISTOFF:

7   Q          Do you know who Vicki Borden is?

8   A          Yes.

9   Q          Who is she?

10  A          She's the director of our wholesale and inside sales

11  team.

12  Q          Are you aware that she was primarily responsible for

13  creating the P&Ls for the direct sales team?

14  A          No -- well, the P&Ls I'm aware of came out of our IT

15  systems, but she may have produced and summarized them maybe.

16  Q          So you don't know who created the P&Ls?

17  A          Yes.  It's a systematic process that pulls the data

18  from our source databases.

19  Q          So, as far as you know, the P&Ls that the direct

20  sales team relied on came only from IT?

21  A          I believe so.

22  Q          And what's the date of this e-mail?

23  A          August of 2010.

24  Q          And do you see where Ms. Borden is e-mailing the

25  direct sales team, "Mark and I had a discussion about

1    commissions to be paid this month.  The P&Ls are iffy as to

2    whether they are correct, and the restricted basis are not

3    correct.  Many other factors are not proofed."

4    A        So what they're referring to there is, the

5    "restricted basis," I'm assuming that's for restricted based

6    gallons.  That was not included in the summarizations we

7    provided.  That is also not a determination of profitability.

8    Q        And "many other factors were not proofed," she said

9    as well, right?

10   A        I can't attest to what factors those would be.  But

11   the restricted basis referred to here would not be an

12   indicator of profitability.

13   Q        And she says, "The P&Ls are iffy," right?

14   A        She could be referring to the restricted base

15   gallons that you're discussing here.  I don't know what she is

16   referring to as "iffy," so...

17   Q        You don't know, do you?

18   A        I--  You'd have to ask her.

19   Q        Well, you're the person to ask, so I'm asking you.

20   A        Well, if she is calling out the restricted base

21   volume, that, again, is input volume from the sales department

22   that would not impact profitability.

23   Q        If she is.  But you don't know.

24   A        No.  She says "iffy," and there is no clarification.

25   Q        And that was in 2010, right?

1    A        Yes.

2    Q        And here we have an e-mail from Heather Jones to

3    Vicki Borden where she asks about Brian's commission as seen

4    on his restricted P&L?

5    A        Uh-huh.

6    Q        And Ms. Borden responds, "I think Lori had input

7    Brian's wrong last month"?

8    A        That is probably referring to commissions.

9    Q        Well, Ms. Jones is asking about what was seen on the

10   P&L, right?

11   A        Again, I don't know if it's basis gallons or -- I

12   don't know what -- the input she's referring to, so I can't

13   attest to that.

14   Q        Right.  You don't know, do you?

15   A        I can't comment as to the validity of -- of what

16   this is, because she's not clear on what they're inputting.

17   I'm assuming--  Now, the way they calculate commissions is a

18   spreadsheet external of the customer P&Ls.  If she's referring

19   to, "I think Lori input Brian's wrong last month," I would

20   read that as the commissions spreadsheet, not the customer

21   P&L.

22   Q        Well, clearly it impacted the P&L, right?

23   A        No.  Apparently it impacted Brian's commissions.

24   Q        Commissions as seen on his P&L, shows up on the P&L.

25   A        Oh, well, commissions, again, that's--  Commissions

1   is a calculation on the restricted P&L; it's not a signifier

2   of profit.  So I'd have the look at the P&L in question,

3   their -- because the way the restricted P&L works, it would

4   show customer volume, it would also show the company's

5   profits.  So when you refer to profitability, that's the stuff

6   we're relying on.  There are subsequent calculations based on

7   their base volume and their commissions, the percentage -- or

8   the cents per gallon, or gallon basis, or -- that they receive

9   on commissions, to calculate the sales rep's commissions.  In

10  that case, again, that is not company profitability, that is

11  commissions calculation.

12          So anything between the profitability now that we're

13  showing for Pilot Flying J, which is represented here, and

14  that commissions amount, if there was anything flawed with the

15  base gallons or the commission calculation, that's nothing I'm

16  discussing here.  That is a manual input from the sales team.

17  That would not impact profitability of Pilot Flying J.

18  Q       Well, you're speculating as to what she's referring

19  to, right?

20  A       That's how I read this, yes.

21  Q       And fundamentally you don't know because you weren't

22  involved with the preparation of the P&Ls for the direct sales

23  team at the time, right?

24  A       I'm familiar with how the data -- the data behind

25  the customer P&Ls is calculated -- were calculated, yes, and I

1    know where they pulled the profitability numbers and the

2    customer discount information, so -- but as for the input on

3    the commissions components, no.  I'm aware of how they did it,

4    but we didn't -- we never audited that because, again, it

5    never related to the profitability of Pilot.

6    Q        So, again, the answer is, no, you don't know because

7    you weren't involved, right?

8    A        The commissions portion, no.  I was not involved in

9    the commissions portion of the P&L.

10   Q        And you don't know that Vicki Borden was the one

11   that prepared the P&Ls?

12   A        No.  I mean, if she inputted data for the P&Ls,

13   but...

14   Q        She did input data for the P&Ls?

15   A        I don't know.  I said she may been, so...

16   Q        You don't know.  Okay.

17   A        And it would have been, again, for the commissions

18   components, the basis gallons and the commissions, and not

19   necessarily for the customer profitability components.

20            MS. CHRISTOFF:  Thank you.

21            THE WITNESS:  Uh-huh.

22            MS. CHRISTOFF:  Your Honor, I believe we've just

23   established that the witness does not know how the documents

24   were prepared and he cannot comment on the individual

25   responsible for the documents, calling the documents themselves

1 into question. These documents are inherently unreliable and

2 untrustworthy. These are, in fact, some of the documents that

3 were altered that are the subject of this case, and therefore

4 they cannot constitute -- they cannot fall under the business

5 records exception under 803(6)(E), which allows the Court to

6 deny the exception if the documents have a -- do not have a --

7 they have a lack of trustworthiness.

8         THE COURT: The e-mails that you just used with this

9 witness to demonstrate the potential unreliability of the

10 documents, were they the same documents that were used -- I

11 believe it was either yesterday or day before yesterday there

12 was an objection based on hearsay, and the Court was informed

13 that the documents were not being offered for the truthfulness

14 of the matter asserted?

15         MS. CHRISTOFF: Yes, Your Honor. In this case I am

16 offering them for the truth of the matter asserted, in order to

17 determine this foundational issue of admissibility under

18 803(6), so that the Court is not bound by the hearsay rule.

19         THE COURT: Has this witness identified them to

20 permit them to be introduced?

21         MS. CHRISTOFF: I'm sorry?

22         THE COURT: What witness has identified those

23 exhibits sufficiently to allow them to be introduced as

24 evidence?

25         MS. CHRISTOFF: Your Honor, I apologize, I do not

1   intend to introduce them as evidence.

2          THE COURT:  Okay.  So --

3          MS. CHRISTOFF:  They're to aid the court in its

4   determination.

5          THE COURT:  -- the only reason they've been in court

6   thus far is because the Court was assured that they were not

7   being offered for the truthfulness of the matter asserted.

8          MS. CHRISTOFF:  Yes, Your Honor.

9          THE COURT:  Okay.  Do you think the Court was

10  entitled to rely upon that representation?

11         MS. CHRISTOFF:  Yes, Your Honor.  I'm using them for

12  a different purpose.

13         THE COURT:  So if the Court relies upon that

14  representation, then the Court should assume that everything in

15  the document is not true.  Is that right?

16         MS. CHRISTOFF:  As to Ms. Whaley's testimony, yes,

17  Your Honor, but not for this purpose.

18         THE COURT:  The only reason they're before the Court

19  is because of the representation someone made to me and in open

20  court.  They're not before the Court for any other reason.

21  This witness has not identified the document or authenticated

22  the document.  So the Court has no way of concluding that

23  anything in the document is true.  What the Court has been

24  assured by another one of your counsel was that the Court

25  should assume that everything in the document is untrue.  How

1    did the Court get from untrue to true?

2            MS. CHRISTOFF:  Your Honor, I would have used these

3    documents for this purpose regardless of what had happened

4    yesterday with Ms. Whaley.  I'm using them for an entirely

5    distinct basis.

6            THE COURT:  But to use them, though, you have to

7    introduce them into evidence.  You've not introduced them into

8    evidence.

9            MS. CHRISTOFF:  I'm not using them as evidence, Your

10   Honor.  I'm using them to establish the fundamental

11   unreliability of the documents that the government is

12   submitting under the exception to the hearsay rule, for the

13   Court's determination.

14           THE COURT:  And the Court can consider arguments of

15   counsel.  The Court can consider the law.  The Court can

16   consider the testimony of witnesses.  The Court can consider

17   exhibits.  Those documents don't appear to be -- even Sixth

18   Circuit law, they don't appear to be arguments of counsel,

19   they're not testimony in and of themselves, so they have to

20   come in for the Court to consider as exhibits.  You're not even

21   offering them as exhibits.

22           MS. CHRISTOFF:  I'm not, Your Honor.

23           THE COURT:  So I don't know how the Court can

24   consider them, then.  The only reason I was familiar with them

25   is because another one of your counsel said, "I'm not

1  introducing them for the truthfulness of the matter asserted,

2  and you can assume that everything in the documents are not

3  true."

4        So how do I get from untrue to true on something

5  that's not even an exhibit?  How do I get there?

6        MS. CHRISTOFF:  Your Honor, I'm not asking you to get

7  there.  I'm not interested in using the documents --

8        THE COURT:  So what evidence do I have to conclude

9  that this witness might be incorrect in saying that the

10 underlying information is reliable?  What do I have to make

11 that conclusion?

12       MS. CHRISTOFF:  Your Honor, there are e-mails that

13 are customer -- company documents.

14       THE COURT:  I haven't seen them.  Where are they?

15       MS. CHRISTOFF:  I just showed them.  They're not

16 evidence.  The Court, of course, is not bound by the rules of

17 evidence in making admissibility determinations in order to --

18       THE COURT:  Suppose you went out in the street and

19 you encountered a six-year-old and you had them write on a --

20 on one of these little chalk things that kids that that

21 everything that Mr. Seay wants to introduce is false and you

22 brought that in.  Could I use that?

23       MS. CHRISTOFF:  Of course the Court could, yes.

24       THE COURT:  I could use it?

25       MS. CHRISTOFF:  Absolutely.  The Court is not bound

1    the rules of evidence in making admissibility exceptions.

2              THE COURT:  We had a long speech today about the

3    history of the United States and the importance of the common

4    law and how we came.  I think when I was appointed a judge, I

5    was named to be a servant of the people, not a king.  I'm not

6    sure I can do whatever I want to do.  I think there are some

7    limits on my authority.

8              MS. CHRISTOFF:  I agree, Your Honor.  The Congress

9    has defined those limits via Rule 104(a).

10             THE COURT:  And I think the rules of evidence is one

11   source of the limitations that the Court has.  I just don't

12   think I'm free to consider anything at all.  I think the

13   circuit would have -- even the Sixth Circuit, would have a

14   great deal of difficulty if I did that.  Okay.  Anything else?

15             MS. CHRISTOFF:  No, Your Honor.

16             THE COURT:  Mr. Hamilton?

17             MR. HAMILTON:  May I follow up with a few questions

18   so that the Court has a complete record of the nature of these

19   P&L documents and really kind of the history, a little bit, of

20   the summaries, how it got in here?  May I ask the witness a

21   couple more questions?

22             THE COURT:  You may.

23                  DIRECT EXAMINATION (Continuing)

24   BY MR. HAMILTON:

25   Q        So, Mr. Seay, to follow up on the questions from

1    counsel for Mr. Wombold, when you were -- were you requested

2    by counsel for the company to look into profits that were

3    generated by certain customers based on a request from the

4    United States Attorney's Office?

5    A        Yes.

6    Q        When you were doing that, did you review profit and

7    loss statements for customers?

8    A        Yes.

9    Q        And did that review include the documents that are

10   being summarized in the summaries at issue today?

11   A        Yes.

12   Q        When you were reviewing those, did you notice that

13   there were some discrepancies in those documents?

14   A        I noticed that there were some manual rebates that

15   were not reflected in the customer P&Ls.

16   Q        Could you slow down and say that?  I'm sorry.

17   A        I'm sorry.

18   Q        Sure.

19   A        I did notice that there were a few occasions where

20   the manual rebate was not reflected on the customer P&L.

21   Q        And what does that mean?

22   A        That means the profitability was overstated for that

23   customer for those particular periods.

24   Q        Well, why -- what was the P&L used for in the direct

25   sales business -- in the direct sales unit?

1   A          Commissions, is my understanding.

2   Q          So whether or not the manual rebate amount was

3   included in the profit and loss statement, was the profit and

4   loss statement still used in the regular course of business by

5   the Pilot direct sales unit?

6   A          Yes.

7   Q          Did you also prepare another set--  We've looked at

8   one set of summaries.  Did you earlier prepare a set of

9   summaries that took that into account?

10  A          Yes.  I treated it as two separate requests.  One

11  request was to reflect the gallons and profitability as it

12  relates to the customer P&Ls that the sales team relied upon.

13  The other exercise was an accounting base from a corporate

14  level.  So I tried to correct when I noticed those

15  discrepancies.

16  Q          And the United States just marked at this time for

17  identification Collective Exhibit 4003, which is -- which is a

18  collection, in one -- in one document, summaries for

19  Amerifreight, BP, Halvor Lines, JTL Carriers, Ryder Truck, and

20  Queen Transportation.  Mr. Seay, were these -- I'm going to

21  lay them right here on the document camera.

22          MR. VERNIA:  Excuse me, Your Honor.

23          Mr. Hamilton, can you provide us with a copy?

24          MR. HAMILTON:  Yes.  I'm about to explain how these

25  were provided by asking the next question.

1  BY MR. HAMILTON:

2  Q        Mr. Seay, were these the summaries that were

3  included with the March 27 letter from you to Mr. Harwell that

4  we've already looked at in court today?

5  A        Yes.

6  Q        All right.  And were they detailed on Pages 5

7  through -- these particular summaries, were they detailed on

8  Pages 5 through 7, how -- let me point this -- you don't have

9  it in front of you.

10 A        Yeah, I don't have the page numbers in front of me,

11 but...

12 Q        So do you see a heading Customer Profit Summaries?

13 A        Yes.

14 Q        And looking down here, this is Page 5?

15 A        Yes.

16 Q        And does it go through Page 7 before we go to the

17 next category of Customer Profit Summary 2?

18 A        Correct.

19          MR. HAMILTON:  And for the record, this has been

20 marked for today's proceeding as 4001.

21          Your Honor, at this point, then, I'm going to advise

22 the Court that the defendants objected to these summaries.

23 That was the litigation surrounding Mr. Seay in September.

24 And the United States -- and the objection by the defendants

25 was that the summaries involved Mr. Seay's recalculations.

 1    And the United States just said, "Well, we think the summaries

 2    that were originally prepared do, in fact, have his

 3    recalculations in them."  But since the defendants objected to

 4    those, what the United States did was, "All right.  We'll just

 5    base it on the P&Ls, the P&Ls themselves exclusively."  And we

 6    went with a different set of summaries, which is the summaries

 7    that we're trying to admit into the evidence, which are

 8    exclusively based on the P&Ls rather than Mr. Seay's

 9    recalculations.

10         The United States is pleased to produce either one,

11    but it's the defendants who have put us in this situation.

12    And we question the fairness of that, under the circumstances.

13    In fact, the United States --

14         THE COURT:  Is there some reason why the defendants

15    should be fair?

16         MR. HAMILTON:  No.  Absolutely not.  No.  Definitely.

17    I'm not suggesting that.  What I am -- what I am suggesting is

18    that, if there is an issue with these summaries that the United

19    States has offered, that the United States just go back to the

20    original summaries that the defendants objected to, which

21    actually account for the issues that they're raising.

22    That's --

23         THE COURT:  Well, the only objection I have now

24    pertained to the matters that Ms. Christoff conducted the voir

25    dire on --

1      MR. HAMILTON:  Yes, sir.

2      THE COURT:  -- and she conceded there was really no

3  evidence at all to contradict anything that the witness had

4  said.  The e-mails that were used were allowed in court under

5  the express representation that they were not being offered for

6  the truthfulness of the matter asserted and the Court should

7  assume that everything in it was true [sic].  The Court relied

8  upon that representation, so the Court allowed the documents to

9  be displayed and used.  And in that reliance the Court assumed

10  that no counsel would use them to assist or to argue that

11  anything in them were truthful unless they were introduced

12  through some other means.  And they have not been introduced by

13  anyone else yet.  So they still stand in the same light in

14  which they were first -- first mattered.  There's been no other

15  evidence offered to the Court to suggest that the witness's

16  offer of the document is improper.  So the Court will deny that

17  specific objection.

18      On another matter that Mr. Hamilton raised, I think

19  that's an issue that he and the defense will have to work out.

20      MR. HAMILTON:  Yes, sir.

21      THE COURT:  And I think there was another matter

22  someone wanted to bring up once the jury had left?

23      MR. HAMILTON:  Your Honor, may I -- may I point just

24  one more thing out, which is --

25      THE COURT:  You may point one more thing out.

1              MR. HAMILTON:  Thank you, Your Honor.  Well, I do

2      believe that it's the government's obligation to always be

3      fair.  And one of the things that the Court asked Ms. Christoff

4      was the authenticity of that particular document.  And I

5      will represent --

6              THE COURT:  Which document?

7              MR. HAMILTON:  Excuse me?

8              THE COURT:  Which document?

9              MR. HAMILTON:  The document -- the e-mail in

10     question, and that there is no basis for authenticity.  I did

11     want to point out to the Court--  I didn't want to remain

12     silent on this.  The parties have --

13             THE COURT:  There were three.

14             MR. HAMILTON:  Yes.

15             THE COURT:  There was an objection yesterday by the

16     government --

17             MR. HAMILTON:  Yes.

18             THE COURT:  -- based on hearsay.

19             MR. HAMILTON:  Right.

20             THE COURT:  And in response to the objection, the

21     Court was told that the exhibit was not being offered for the

22     truthfulness of the matter asserted, and the Court accepted

23     that representation --

24             MR. HAMILTON:  Yes, sir.

25             THE COURT:  -- and allowed the document to be

1    displayed to the jury --

2            MR. HAMILTON:  Yes.

3            THE COURT:  -- and discussed by the witness.  So, go

4    on now.

5            MR. HAMILTON:  All I wanted to point out was, the

6    Court asked the counsel about the authenticity, and the parties

7    have stipulated to the authenticity of e-mails that were

8    disclosed.  And I felt like, out of fairness, it was -- it

9    would be appropriate to point that out to the Court.  I don't

10   want to ar- -- say anything else about it.  I just wanted to--

11   Ms. Christoff didn't mention that, and I didn't want to remain

12   silent, that we're not suggesting that it's not authentic.  We

13   have stipulated to that.  So...

14           THE COURT:  Was there something -- was there

15   something else someone wanted to bring up?

16           MS. CHRISTOFF:  Um.

17           THE COURT:  I thought earlier someone had said they

18   wanted to make a motion or an argument but they wanted to wait

19   until the jury was out at the end of the day?  No?

20           THE COURTROOM DEPUTY:  It was a document that you had

21   marked up, and then you wanted to --

22           THE COURT:  If you've forgotten about it, that's

23   fine.  We can move on.

24           MR. VERNIA:  No, Your Honor.  I did want to object on

25   relevance grounds to these documents as well.  It's not clear

1    to us exactly what use they'll be put to.

2           As to something else that may have come up earlier

3    that I asked to delay, I -- Your Honor, I just have no

4    recollection of that.  So --

5           THE COURT:  Well, it will come to you later on, and

6    we have a lot of time to get to it.

7           MR. VERNIA:  Oh, I know.

8           THE COURT:  Okay.

9           MR. VERNIA:  It wasn't actually me.  I think it was

10   the criminal enforcement agreement language that Ms. Christoff

11   would like to discuss.

12          THE COURT:  Okay.

13          MR. VERNIA:  I'm feeling better already, Your Honor.

14          MR. HAMILTON:  So should I respond to the relevance

15   argument first?

16          THE COURT:  No.  Ms. Christoff, I think she was the

17   one that actually mentioned it.  She wanted to read into the

18   record, I think, some language out of the -- what is it called,

19   enforcement --

20          MS. CHRISTOFF:  The criminal enforcement agreement

21   between Pilot Travel Centers, LLC, d/b/a, Pilot Flying J and

22   the United States, Your Honor.  This is from Page 12, the

23   section entitled "Cooperation."

24          "The company acknowledges and understands that the

25   cooperation that it, along with the special committee

1    investigation, has provided to date with the criminal

2    investigation conducted by federal law enforcement, and its

3    pledge of continuing cooperation, are important and material

4    factors underlying the government's decision to enter into

5    this agreement.  Therefore the company agrees to cooperate

6    fully and actively with the federal -- with federal law

7    enforcement in any and all matters relating to its

8    investigation of fraudulent conduct involving the sale of

9    diesel fuel.

10          "The company agrees that its cooperation shall

11   include, but is not limited to, the following:  (A) The

12   company shall truthfully and completely disclose all factual

13   information with respect to its activities and those of its

14   present and former officers and employees concerning all

15   matters related to fraudulent conduct involving the sale of

16   diesel fuel about which the company has any knowledge or about

17   which federal law enforcement may inquire.  This obligation of

18   truthful disclosure includes the obligation of the company to

19   assemble, organize, and provide in a responsive and prompt

20   fashion and upon request, on an expedited schedule, all

21   documents, records, information, and other evidence in the

22   company's possession, custody, or control, as may be requested

23   by federal law enforcement.

24          "This obligation of truthful disclosure includes the

25   obligation of the company to volunteer and provide to the

1    government any information and documents that come to the

2    company's attention that may be relevant to federal law

3    enforcement investigation and proceeding, and to provide any

4    testimony or information necessary to identify or establish

5    the location, authenticity, or other basis for admission into

6    evidence of documents or physical evidence in any criminal or

7    other proceeding, as requested by federal law enforcement.

8    This obligation of truthful disclosure also includes the

9    company's obligation to bring to federal law enforcement's

10   attention all criminal conduct by or criminal investigations

11   of the company or any of its supervisory employees and to

12   bring to federal law enforcement's attention any

13   administrative or regulatory proceeding or civil action or

14   investigation by any governmental authority that alleges fraud

15   by the company; and.

16           "(B) upon request of federal law enforcement with

17   respect to any issue relevant to its investigation, the

18   company shall designate knowledgeable employees, agents, or

19   attorneys to provide to federal law enforcement the

20   information and materials described in Paragraph 6(a) above on

21   behalf of the company.

22           "It is further understood that the company must at

23   all times provide complete, truthful, and accurate

24   information."

25           That's just a portion of Section 6.  Thank you.

1                   THE COURT:  Thank you.

2                   All right.  If you want to take up the relevance

3      issue now, you may.

4                   MR. HAMILTON:  So the United States maintains that

5      these profit and loss summaries are relevant for the following

6      reasons:  Mr. Seay has testified that the direct sales division

7      employees relied upon the profit and loss amounts -- or the

8      profit and -- I guess the profits from the customer to

9      determine the calculations in their -- for their commissions.

10                  Let me state this another way.  So the profits for

11     customers were determined, and that's the basis for the

12     commissions that the employees were paid.  So the total profit

13     that they were using, really regardless of whether or not it

14     was accurate or not -- so here -- this is why these summaries

15     are accurate, and if they want to make the other summary --

16     why these summaries are relevant, and if they want to make the

17     other summaries relevant, they could be relevant, too, but

18     this set of summaries is relevant because they identified the

19     amount of profit upon which the commissions were actually

20     based, based on my understanding of Mr. Seay's testimony.

21                  One of the narratives that's being constructed by

22     the defense is that, "Look, these employees really didn't make

23     that much money when they cheated customers."

24                  MS. BREVORKA:  Your Honor, I object to the--  The

25     witness should be out of the courtroom if they're going to make

1    arguments that talk about the defense's theories.

2            THE COURT:  Mr. Hamilton?

3            MR. HAMILTON:  I'm--  If we should excuse him, then--

4    I'm making a relevance argument, but I can -- I'll put it this

5    way --

6            THE COURT:  Is there any need for additional

7    testimony from Mr. Seay?

8            MS. BREVORKA:  Not from Mr. Hazelwood's perspective.

9            THE COURT:  Okay.  Thank you, sir.  You can step

10   down.  You can leave the courtroom.

11           THE WITNESS:  Thank you.

12           MS. CHRISTOFF:  Your Honor, we do have

13   cross-examination, but...

14           THE COURT:  It's 5:30 now.

15           MS. CHRISTOFF:  I just wanted to make sure he was not

16   excused.

17           THE COURT:  I'm assuming he'll be back on our next

18   trial date.  I don't think we're going to do much

19   cross-examination tonight, with the jury gone home.

20           MR. HAMILTON:  All right.  So what the government is

21   hearing is that one part of the defense's theory, all

22   defendants' theory -- well, mainly, I'd say, this is primarily

23   focused on Defendant Jones and Mann, whose percentage of -- who

24   had the lowest -- who had the lowest amount -- the lowest

25   multiplier against the commissions, so therefore every amount

 1   that was withheld would result in a smaller increase in the

 2   commissions.

 3           So from -- what the government understands the

 4   defense to be is that, when a customer's rebate was reduced,

 5   they really didn't make that much from it.  The government's

 6   position is, that's only one side of the coin.  And you'll

 7   recall that the government has elicited testimony, I believe

 8   from Mr. Ralenkotter as well as from Ms. Welch, which is the

 9   following, which is, "No customer, no profit at all."

10           So, really, the lens through which you should look

11   at this is not so much how much they cheated the customer and

12   thinking about how much the defendants benefited from it, but

13   if you don't get -- let's say for example, if you don't induce

14   JTL to do business with you by lying to them, then they don't

15   do business with you at all, potentially, and so therefore you

16   have no commission upon which -- you have no profit upon which

17   to base your commission.

18           So, you know, our argument to the jury is, "Look,

19   you're not just looking at the amount of money that they

20   cheated them out of.  You're looking at the total profit,

21   because you induced them to do business with Pilot on the

22   front end."

23           So that's why it's relevant, Your Honor.

24           MR. VERNIA:  Your Honor, if I may?

25           THE COURT:  You may.

1          MR. VERNIA:  Thank you, sir.  What I am trying to put

2    together is the testimony of Ms. Whaley yesterday, and

3    specifically with respect to my client, Ms. Jones, Exhibits

4    404, which is a compensation summary, and then 410, which are

5    the individual commission breakdowns.  And I would simply point

6    out that part of my confusion from this stems from the fact

7    that the total profit on a company-by-company basis does not

8    appear on either of those documents.  So in terms of how

9    Ms. Jones was paid, this is apples and oranges, Your Honor.

10          MR. HAMILTON:  May I respond to that, Your Honor?

11    The difference here is that these are the companies that are

12    alleged as the example victims in the indictment.  That's why

13    they were identified as being examples for purposes of summary.

14          If you look at the "Manner and Means" section of the

15    conspiracy where we identify example customers, which is --

16    which is customary, I believe, in an indictment of this

17    nature, where you can't identify every customer in an

18    alleged -- victimized in a conspiracy, we identified example

19    customers that -- and that's who these summaries relate to.

20    That's the difference.  And that's why these summaries are

21    relevant, and why there's a different analysis as it relates

22    to the overall compensation picture for these individuals.

23    We're now focusing on particular customers that are identified

24    in the indictment.

25          THE COURT:  I think that the indictment alleges two

1    ways that the fraud was committed.  One way was, there was a

2    scheme and artifice to defraud.  And another way, there was a

3    scheme to obtain money from others by means of false pretenses,

4    promises, and representations.

5           So looking at the indictment like that, there are

6    two ways to consider the loss.  One is the gain to a

7    defendant.  The second way is the loss to a victim.  So even

8    assuming that a defendant does not receive any financial

9    benefit at all, if there's a loss to someone else, that would

10   still qualify under the statute.  And it seems that what

11   Mr. Hamilton is saying is that the -- because the customer was

12   not receiving what the customer had been promised, the

13   customer still lost money, and this was one way of just

14   measuring that loss.  Wouldn't that make it relevant, then?

15          MR. VERNIA:  Well, Your Honor, I think the problem --

16   this may be too late in the day for my mathematical skills, but

17   I think the problem is that the profit that Pilot made or did

18   not make is not necessarily related to adjustments in rebates.

19   And if you look at the -- at 1522A, for example, for JTL

20   Carriers, there's three columns, the "Month," "Gallons," "Total

21   Profit."  It seems to be suggesting to the jury that --

22   misleadingly so, that there was a direct correlation between

23   the gallons and the profit that had -- it was irrespective of

24   any other factors having to do with the purchase of the fuel,

25   the sale of fuel, the operations of the stores, et cetera.

1          I think Mr. Seay himself has testified already that

2    there are a number of factors.  I assume that if the "Total

3    Profit" column was a negative number in there because Pilot

4    had been poorly run that month, but the -- the rebate had been

5    adjusted, Mr. Hamilton would not be making the argument that

6    that month --

7          THE COURT:  In that case, there would not have been a

8    loss to the victim, though, right?

9          MR. VERNIA:  Well, certainly there would have been --

10         THE COURT:  If there is a plus, that means there is a

11   profit to profit and a loss to the victim; if there's a minus,

12   that means there's a loss to profit and a profit to the victim,

13   right?

14         MR. VERNIA:  Your Honor, again, it may be too late in

15   the day for me to attempt the math, but I think that there are

16   a number of factors --

17         THE COURT:  In a buyer-and-seller relationship,

18   somebody gains and somebody loses, so somebody gives up money

19   to get something else in return.

20         MR. VERNIA:  Yes, sir.

21         THE COURT:  And the profit is the delta between the

22   cost of production—and that includes everything—and the sales

23   price.  And the more the sales price goes down, assuming that

24   the cost of production remains the same, you'd be selling it at

25   a loss.  If you're selling at a loss, then that means that the

```
 1   buyer is getting a profit, because he's buying something that's
 2   worth more than he can get from anybody else.
 3          MR. VERNIA:  Well -- and maybe I'm mixing up my
 4   terminology, Your Honor, but I believe that with respect to the
 5   customer, the purchase -- his or her purchase price is a cost.
 6   And whether they make a profit is, you know, subject to all the
 7   other factors in their own business, how much they pay the
 8   drivers, how much they have to pay for insurance.
 9          And then, you know, looking narrowly at the question
10   of Pilot's profit, if Pilot had -- if Mr. Seay had done a poor
11   job, or Mr. Parent had done a poor job, and they had purchased
12   fuel -- I'm going to use exaggerated numbers here -- purchased
13   fuel for $2 and had to sell it at a dollar, if Mr. Mosher had
14   defrauded the company by changing the amount of rebate for --
15   for four cents of that dollar, they would still have had a
16   loss, Pilot would still have suffered a loss.  The loss would
17   have been less, because of Mr. Jones's [sic] actions, but I
18   think to that -- in that -- again, I may not be explaining my
19   thinking on this well, but I think the "Profit" column, in
20   that case, would really bear no resemblance to -- to what
21   actually happened to that customer as a result of Mr. Mosher's
22   actions.
23          THE COURT:  Well, it still would, because the loss
24   would be a greater loss.  The example that you gave, if you
25   purchased some fuel for $2 and you're selling it at $1, then
```

1    your loss is, what, 50 percent.  And if somebody is doing

2    something improper that adds another 4 percent, then your loss

3    becomes 54 percent.

4              MR. VERNIA:  Yes, sir.

5              THE COURT:  I mean, there's still a loss there.  If

6    you did that, though, what would happen would be, everybody

7    would buy your fuel from you, including TA and -- is it Love's?

8    The competitors?

9              MR. VERNIA:  Love's, yes, sir.

10             THE COURT:  They would be buying fuel from you, also,

11   and then they would turn around and sell it because they'd know

12   you'd be bankruptcy soon, and they would have bought all your

13   fuel at a tremendous discount.

14             MR. VERNIA:  I guess my bottom-line point, Your

15   Honor, is, I think that there's a lot of factors that go into

16   that "Profit" column.  And of course Mr. Mosher's fraud is

17   going to change that amount.  But the amount of that change is

18   certainly not apparent from the raw numbers that appear in that

19   column right next to the gallons.  That's the point I was

20   trying to make.

21             THE COURT:  Okay.  Thank you.  Anything further?

22             (Brief pause.)

23             THE COURT:  Well, try to avoid the snow, then, and we

24   shall see you on Wednesday morning.

25             (Evening recess.)