IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

AT KNOXVILLE

```
------------------------------------------------------------
                                  :
UNITED STATES OF AMERICA          :
                                  :
          Plaintiff,              :
                                  :
v.                                :        3:16-CR-20
                                  :
MARK HAZELWOOD,                   :
SCOTT WOMBOLD,                    :
HEATHER JONES, and                :
KAREN MANN,                       :
                                  :
          Defendants.             :
------------------------------------------------------------
```

Chattanooga, Tennessee
January 29, 2018

BEFORE:  THE HONORABLE CURTIS L. COLLIER
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

<u>FOR THE PLAINTIFF</u>:

F. M. HAMILTON, III
DAVID P. LEWEN, JR.
Assistant United States Attorneys
U. S. Department of Justice
Office of the United States Attorney
800 Market Street, Suite 211
Knoxville, Tennessee  37902

JURY TRIAL
<u>EIGHTEENTH DAY OF TRIAL</u>

1    <u>APPEARANCES</u>:  (Continuing)

2

3                    <u>FOR DEFENDANT MARK HAZELWOOD</u>:

4                    RUSSELL HARDIN, JR.
                     ANTHONY DOUGLAS DRUMHELLER
5                    JENNIFER E. BREVORKA
                     Rusty Hardin & Associates LLP
6                    1401 McKinney Street, Suite 2250
                     Houston, Texas  77010

7

8

9                    <u>FOR DEFENDANT SCOTT WOMBOLD</u>:

10                   JOHN E. KELLY
                     ROBERT K. PLATT
11                   Bass, Berry & Sims PLC
                     1201 Pennsylvania Avenue NW
12                   Suite 300
                     Washington, D. C.  20004

13
                     ELI J. RICHARDSON
14                   DAVID RIVERA
                     Bass, Berry & Sims PLC
15                   The Pinnacle at Symphony Place
                     150 3rd Avenue South
16                   Suite 2800
                     Nashville, Tennessee  37201

17
                     ANNIE TAUER CHRISTOFF
18                   Bass, Berry & Sims PLC
                     100 Peabody Place
19                   Suite 1300
                     Memphis, Tennessee  38103

20

21

22

23

24

25

APPEARANCES:  (Continuing)


                    FOR DEFENDANT HEATHER JONES:

                    BENJAMIN J. VERNIA
                    ANDREW K. MURRAY
                    The Vernia Law Firm
                    1455 Pennsylvania Avenue NW
                    Suite 400
                    Washington, D. C.  20004

                    CULLEN MICHAEL WOJCIK
                    Law Office of Cullen M. Wojcik
                    422 S. Gay Street
                    Suite 302
                    Knoxville, Tennessee  37902


                    FOR DEFENDANT KAREN MANN:

                    JONATHAN D. COOPER
                    Whitt, Cooper, Trant & Hedrick
                    607 Market Street
                    Suite 1100
                    Knoxville, Tennessee  37902

                    SARA E. COMPHER-RICE
                    Oberman & Rice
                    550 West Main Avenue
                    NationsBank Building
                    Suite 950
                    Knoxville, Tennessee  37902-2567

1                          INDEX OF PROCEEDINGS

2

3    ANDREW FISHER
     Direct Examination by Mr. Hamilton. . . . . . . . . .     6
4    Cross-Examination by Mr. Richardson . . . . . . . . .    15
     Cross-Examination by Mr. Hardin . . . . . . . . . . .    96
5    Redirect Examination by Mr. Hamilton. . . . . . . . .   118

6    SHERRY BLAKE
     Direct Examination by Mr. Hamilton. . . . . . . . . .   140
7    Cross-Examination by Mr. Hardin . . . . . . . . . . .   170
     Redirect Examination by Mr. Hamilton. . . . . . . . .   264

8

9                          GOVERNMENT'S EXHIBITS

10   NUMBER     DESCRIPTION                              RECEIVED

11   106A       Photograph of Wombold's office                 9

12   250        Wombold Interview Memorandum FBI 302          55
                and interview notes
13              (For ID only)

14   212        Photograph of Sherry Blake                   141

15   2196       4-27-12 e-mail chain between between         151
                Hazelwood, Wombold, and Greco
16
     606A       6-18-10 e-mail chain between Hazelwood       152
17              and Stinnett

18   606B       August 12-16, 2010, e-mail chain between     152
                Hazelwood and Freeman, Borden, Blake,
19              Stinnett, and Radford

20   606D       12-17-10 e-mail chain between Hazelwood      154
                and Blake
21
     606H       4-20-12 e-mail chain between Hazelwood       156
22              and Blake, Radford, Freeman, Borden,
                Stinnett, and Johnson
23
     618        2004 Blake goals containing trip reports     156
24
     619        2005 Blake goals and review containing       157
25              trip reports outstanding

GOVERNMENT'S EXHIBITS (Continuing)

| NUMBER | DESCRIPTION | RECEIVED |
|--------|-------------|----------|
| 620 | 2006 Blake review and 2007 goals containing trip reports due by noon EST on Friday | 158 |
| 603A | 1-25-08 e-mail chain between Black and Freeman, Bibee, Hanscomb, and Radford | 159 |
| 603B | 5-30-08 e-mail chain between Blake, Borden, and Direct Sales | 159 |
| 603C | 8-26-10 e-mail chain between Blake and Direct Sales | 160 |
| 2229 | 4-15-13 e-mail chain between Haslam and Hazelwood, Freeman, and others | 267 |

JOINT DEFENSE EXHIBITS

| NUMBER | DESCRIPTION | RECEIVED |
|--------|-------------|----------|
| 195 | Memorandum regarding DOJ policy (For ID only) | 114 |
| 2388 | Travel itineraries for Mark Hazelwood | 244 |
| 2389 | Travel itineraries for Mark Hazelwood | 244 |
| 198A | List of travel itineraries for Mark Hazelwood | 245 |
| 2419 | Travel itinerary for Mark Hazelwood from July 2008 | 249 |
| 2832 | Travel itinerary for Mark Hazelwood from 2011 | 250 |
| 189 | Happy Anniversary text from Sherry Blake to Hazelwoods | 257 |
| 190 | Text to Hazelwoods from Sherry Blake | 262 |

1          THE COURT:  Please call your next witness.

2          MR. HAMILTON:  United States calls Andrew Fisher.

3          (Brief pause.)

4                    <u>ANDREW FISHER</u>,

5    called as a witness at the instance of the government,

6    having been first duly sworn, was examined, and testified as

7    follows:

8                    <u>DIRECT EXAMINATION</u>

9    BY MR. HAMILTON:

10   Q          Would you introduce yourself to the jury, please.

11   A          Yes.  My name is Andrew Fisher.

12   Q          And where do you work?

13   A          At the Federal Bureau of Investigation.

14   Q          And what is your position there?

15   A          I'm a special agent.

16   Q          How long have you been a special agent?

17   A          Approximately 21 years.

18   Q          And what division are you assigned to?

19   A          I'm assigned to the FBI's Knoxville division.

20   Q          And what is -- what are the kinds of cases that you

21   investigate there?

22   A          Primarily, over the 21 years I've been there, I've

23   investigated white-collar crime cases, and that includes

24   health care fraud, corporate fraud, civil rights

25   investigations, public corruption.  I've also done

1    counterintelligence investigations.

2    Q        Have you spent all 21 years in the Knoxville

3    division?

4    A        I have.

5    Q        Based on your 21 years of experience in the

6    Knoxville, Tennessee, FBI office, is Knoxville, Tennessee, in

7    the Eastern District of Tennessee?

8    A        It is.

9    Q        Is Rockwood, Tennessee, in the Eastern District of

10   Tennessee?

11   A        It is.

12   Q        I'm going to direct your attention now to

13   Exhibit 101A, which is already in evidence.  And what is --

14   what is on the screen right now, Agent Fisher?

15   A        That is a photograph of the headquarters building of

16   Pilot Flying J.

17   Q        Now let me direct your attention to the date

18   April 15th of 2013.  Do you know what happened at that

19   building on April 15th of 2013?

20   A        Yes.  On that day the Federal Bureau of

21   Investigation -- the FBI and the IRS executed a search warrant

22   at that location.

23   Q        Was that search warrant obtained from a judge?

24   A        It was.

25   Q        And was the search team that was executing that

1    search warrant searching for evidence related to the potential

2    violation of federal criminal statutes?

3    A        It was.

4    Q        And what federal criminal statutes were being

5    investigated pursuant to that search warrant?

6    A        United States Code, Sections 371, 1341, 1343, and

7    1349.

8    Q        And, generally speaking, what are those federal

9    criminal statutes that you just listed?

10   A        Those include wire fraud, mail fraud, and conspiracy

11   to commit wire fraud and mail fraud.

12   Q        And on April 15th of 2013, was the investigation of

13   those federal criminal statutes within the jurisdiction of the

14   Federal Bureau of Investigation?

15   A        It was.

16   Q        Based on your 21 years of experience with the FBI,

17   do you know whether or not the FBI is within the executive

18   branch of the federal government?

19   A        It is.

20   Q        On April 15th of 2013, did you interview anyone at

21   Pilot headquarters?

22   A        I did.

23   Q        And who did you interview?

24   A        I interviewed Mr. Wombold.

25   Q        And was your interview at Pilot headquarters on

1    April 15th of 2013 in connection with the investigation for

2    which the search warrant had been issued?

3    A        It was.

4    Q        Where did you interview Mr. Wombold?

5    A        We interviewed him in his office.

6    Q        And where was his office located?

7    A        It was located on the third floor of that building

8    on the east wing -- east wing of that building.

9    Q        And when you say "that building," are you talking

10   about the building that is depicted in Government

11   Exhibit 101A?

12   A        I am.

13   Q        Let me now direct your attention to Government

14   Exhibit 106A.  And what is Government Exhibit 106A?

15   A        That is an image taken of Mr. Wombold's office.

16   Q        And based on your recollection, is that how it

17   appeared on the day of the interview?

18   A        It was.

19   Q        Was that image obtained on the day of the interview?

20   A        It was.

21   Q        And does -- can you tell us where you -- tell us how

22   the interview began in this -- in this office, please.

23   A        All right.  We followed Mr. Wombold into his office.

24   He sat in his chair, which is on the left side of that

25   photograph, and Agent Masterson and myself sat in the two

1  chairs that were placed on the -- on the opposite side of his

2  desk.

3  Q        Now, who is Agent Masterson?

4  A        He's the IRS Special Agent that I was paired up with

5  to conduct the interview of Mr. Wombold.

6  Q        Before you began the interview of Agent -- excuse

7  me, of Mr. Wombold with Agent Masterson in Mr. Wombold's

8  office there, what, if anything, did you tell Mr. Wombold?

9  A        We told him that his participation in the interview

10  was completely voluntary and it was up to him whether or not

11  he wanted to participate in the interview.  We told him that

12  he was free to leave at any point during the interview if he

13  chose to do so.  We told him that he was not under arrest and

14  that he was not going to be arrested that day.  And we also

15  told him that the interview could occur at any location of his

16  choosing, whether that be in an off-site location or -- or in

17  his office.  And he indicated he preferred to speak to us in

18  his office.

19  Q        Did he in any way indicate to you that he didn't

20  understand any of the -- the statements that you just told us

21  about today?

22  A        He did not.

23  Q        After Mr. Wombold told you that he preferred to stay

24  in his office for the interview, how did you begin your

25  interview of him?

1    A        We began by asking him general questions, to include

2    what –– what his responsibilities were at Pilot.

3    Q        And did he tell you what his responsibilities were

4    at Pilot?

5    A        He did.

6    Q        What did he say?

7    A        He indicated that he supervised the national

8    accounts in their diesel business, and that that represented

9    approximately the top 120 diesel customers that they had, or

10   35 percent of their diesel business.

11   Q        Did you ask him any questions about who Mr. Wombold

12   himself supervised?

13   A        I did.

14   Q        What did you ask him about that?

15   A        I asked him how many individuals that he supervised.

16   Q        And what did he tell you?

17   A        He said five.

18   Q        Did he tell you who he supervised?

19   A        He did.

20   Q        Who did he tell you he supervised?

21   A        He said he supervised Brian Mosher, Kevin Herman,

22   Andy Schimmel, Wendy Hamilton, and Lexie Holden.

23   Q        Did you ask Mr. Wombold how long he had been

24   supervising Mr. Mosher?

25   A        I did.

1   Q      What did he tell you?

2   A      He said two years.

3   Q      What, if any, question did you ask Mr. Wombold about

4  who supervised him?

5   A      I asked him who he reported to.

6   Q      And what did he tell you?

7   A      He said he reported to Mr. Hazelwood.

8   Q      Is that the defendant Mark Hazelwood?

9   A      It is.

10  Q      At any time during the interview, did you ask any

11  questions about the topic of manual rebates?

12  A      I did.

13  Q      And what, if anything, did he tell you about whether

14  he personally had any manual rebate customers?

15  A      He said he did not have any customers who received

16  manual rebates.

17  Q      What, if anything, did he tell you about whether

18  Brian Mosher had any manual rebate customers?

19  A      He said Brian Mosher had one or two customers that

20  received manual rebates.

21  Q      During the course of your interview, what, if any,

22  questions did you ask Mr. Wombold about the subject of

23  customer rebate reductions at Pilot?

24  A      I first asked him if he was aware of any customers

25  whose rebates were reduced.

1    Q        And what did he tell you?

2    A        He said he was aware of one customer, and that was

3    Star Transport.

4    Q        Did you ask another question about customer rebate

5    reductions at Pilot?

6    A        I did.  I asked another question in follow-up to

7    that, and that was whether or not he was aware of any

8    customers whose rebates were reduced without their knowledge.

9    Q        And what did he tell you about that?

10   A        He said he was not.

11   Q        He was not what?

12   A        Not aware that any customers' rebates were reduced

13   without their knowledge.

14   Q        Did you ask any other questions about the subject of

15   customer rebate reductions at Pilot?

16   A        I did.

17   Q        What did you ask him?

18   A        I asked him if -- whether or not reducing customers'

19   rebates without their knowledge was something that was ever

20   discussed in sales meetings.

21   Q        And what did he say in response to that?

22   A        He said no, it was not ever discussed, and that that

23   was something that would not be discussed in sales meetings.

24   Q        During the course of your interview with Mr. Wombold

25   on April 15th of 2013, what, if anything, did you ask

1  Mr. Wombold about whether he was aware of any terms that might

2  be used at Pilot to refer to manual rebate practices?

3  A       I asked him if he was aware of any terms being used

4  to describe the practice of reducing customers' rebates

5  without their knowledge.

6  Q       And what did he say?

7  A       He said he was not aware of any term used to

8  describe that practice.

9  Q       Did you ask any -- did you ask any other question

10  about that subject?

11  A       I did.

12  Q       And what did you ask him?

13  A       I asked him specifically if he was -- if he had ever

14  heard the term "Manuel" or "Manny" used to describe the

15  practice of reducing customers' rebates without their

16  knowledge.

17  Q       And what did he say?

18  A       He had said no, he had not heard of those terms.

19  Q       At any time during your interview of Mr. Wombold,

20  did he in any way convey to you that he did not understand

21  your questions?

22  A       No, he did not.

23          MR. HAMILTON:  May I have just a moment, Your Honor?

24          (Off-the-record discussion between government

25          counsel.)

1    MR. HAMILTON:  No further questions at this time,

2    Your Honor.

3         (Brief pause.)

4                    CROSS-EXAMINATION

5    BY MR. RICHARDSON:

6    Q       Agent Fisher, I'd like to start by asking you some

7    questions related to the investigation that Mr. Hamilton had

8    asked you a few questions regarding.

9    A       Okay.

10   Q       And I take it from your testimony to Mr. Hamilton

11   that you're familiar with some aspects of the investigation,

12   correct?

13   A       Yes.

14   Q       And in this investigation, the FBI, through its

15   informants, taped and collected many hours of recordings.  Is

16   that correct?

17   A       Correct.

18   Q       Fair to say that before these recordings were made,

19   the FBI had authorized and enabled those recordings to occur?

20   A       Correct.

21   Q       And the FBI provided the recording equipment.  Is

22   that correct?

23   A       Yes.

24   Q       Now, the FBI could have recorded, likewise, the

25   interview with Scott Wombold.  Is that correct?

1    A          We could have.

2    Q          Yeah.  But the FBI chose not to do so.  Is that

3    correct?

4    A          It was not policy to record interviews at that time.

5    Q          Well, let me -- let me ask you this:  Fair to say

6    that under FBI policy you could have requested, through, you

7    know, supervisory approval, the ability to record the

8    interview with Scott Wombold, correct?

9    A          We could have.

10   Q          But in this case the decision was made not to

11   request that approval.  Is that correct?

12   A          Yeah.  That approval is generally requested in

13   special circumstances, such as when an agent is conducting an

14   interview and doesn't have another agent available to assist

15   him with that.

16   Q          So is it your testimony that this interview wasn't

17   special enough to seek approval to record the interview?

18   A          No, it didn't have anything to do with being special

19   or not.  It had to do with -- in this case we had two

20   individual -- two agents that were available to talk to him,

21   so it wasn't necessary.

22   Q          Okay.  Now, your testimony just now was that it

23   wasn't necessary, correct?

24   A          Yes.

25   Q          All right.  But would you agree with me that as we

1    sit here today, it might have been preferable that that

2    conversation had been recorded?

3    A        It was against policy at that time to record

4    interviews absent that special approval.

5    Q        Right.  But would you agree that it might be nice,

6    as we're in here today, for permission to have been obtained

7    and for that conversation with Mr. Wombold to have been

8    recorded?

9    A        No, that permission was not designed for a

10   circumstance like that.

11   Q        Is your testimony that it's FBI policy not to have

12   recordings of interviews that are the subject of testimony

13   before juries in federal court?

14   A        Can you please repeat the question?

15   Q        I mean, is it your testimony that it's FBI policy to

16   make sure that we don't have recordings of interviews that are

17   the subject of testimony in federal court?

18   A        No, it's not that policy.  The policy has since

19   changed, about approximately a year later, where custodial

20   interviews are to be recorded.  But at that time, that policy

21   was not in effect.

22   Q        Okay.  And just one more question on this, and I'm

23   going to move on.  But the policy was also that permission by

24   agents working the case could have been sought from FBI

25   supervisors, correct?

1    A        It could have, but it wasn't -- that wasn't the

2    situation where that would have occurred.

3    Q        Okay.  In your judgment, correct?

4    A        Sure.

5    Q        Okay.  Now, fair to say that on that day at that

6    location, April 15, 2013, that the FBI did do some recordings

7    of certain things, correct?

8    A        We -- we videotaped some of the -- some of the

9    office locations.

10   Q        Exactly.  And, in fact, the FBI took video of Scott

11   Wombold's office, correct?

12   A        That is correct.

13   Q        But it so happens that the video of Scott Wombold's

14   office was taken when Scott Wombold was not in it, correct?

15   A        Correct.

16   Q        So there was video taken of his office but not of --

17   not in his office at the time of the interview, correct?

18   A        Correct.

19   Q        All right.  Now, I take it, then, that the FBI had

20   video recording equipment available at that time.  That's how

21   it was able to make the video recording.  Right?

22   A        Correct.

23   Q        The FBI could have had audio recording equipment

24   available if it had chosen to do so, correct?

25   A        Correct.  Going back to the policy, though, that was

1     not the policy.

2     Q      Right.  And -- and since you brought up the policy,

3     the policy was that permission could have been requested to

4     record the interview with Scott Wombold, correct?

5     A      Right, but that permission was designed for other

6     circumstances.

7     Q      All right.  I'm going to ask you this:  The -- I

8     want to turn our attention a little bit to sort of the

9     consequences of not recording the interview.  Okay?

10     A      (Moving head up and down.)

11     Q      Now, I want to ask you, would you agree that because

12     the conversation with Scott Wombold was not recorded, we don't

13     know here today exactly what Scott Wombold said.  Is that

14     correct?

15     A      I know what he said.

16     Q      Okay.  And are you able to recite verbatim his exact

17     words, for example?

18     A      No.

19     Q      Okay.  Would you agree with me that part of the

20     problem with not having a recording is that you're not able to

21     produce a verbatim transcript of the interview with Scott

22     Wombold, correct?

23     A      That's not the intent of memorializing an interview.

24     That's not the intent, to have a verbatim transcript of an

25     interview.

1    Q        That's correct.

2    A        It's a summary of the interview.

3    Q        Right.  So -- and we'll talk a little bit later, but

4    for clarification purposes now, you did prepare a report of

5    the interview of Mr. Wombold called a 302, correct?

6    A        I did.  And it's not a verbatim transcript.

7    Q        Exactly.  And we don't have a verbatim transcript of

8    that conversation, correct?

9    A        Correct.

10   Q        Okay.  Now, fair to say that this interview with

11   Mr. Wombold was, by now, close to five years ago, correct?

12   A        It was in 2013.

13   Q        Yeah.  And so we'd be coming up on five years

14   April 15th, correct?

15   A        That's correct.

16   Q        The interview took a fair amount of time, correct?

17   A        It took approximately an hour and 45 minutes.

18   Q        Okay.  And in an hour and 45 minutes, folks can say

19   a lot of things in a discussion, correct?

20   A        Of course.

21   Q        Okay.  And you asked a lot of questions, right?

22   A        That's correct.

23   Q        And Scott Wombold said a lot of different things,

24   correct?

25   A        He did.

1    Q        All right.  And when folks say a lot of things,

2    would you agree with me that perhaps five years later there

3    may be some challenges in recalling exactly what someone said?

4    A        There could be, but I recall that conversation very

5    clearly.

6    Q        Okay.  That's your testimony.  Now, I want to ask

7    you this:  Would you agree that in a case like this where

8    someone stands charged with violating a federal statute

9    prohibiting false statements, that it may be desirable to know

10   the exact words that were asked of someone and the exact words

11   in response?

12   A        Again, the 302 is not a verbatim document that

13   quotes exact words.

14   Q        Right.  And we will get to that, but would you

15   agree, though, that one of the consequences of what happened

16   here is, we don't know the questions asked of Mr. Wombold, but

17   we don't know the answers given to Mr. Wombold to all these

18   questions asked of him during this hour-and-45-minute

19   interview?

20   A        No, that's incorrect.

21   Q        Okay.  You know -- you know all the words of the

22   questions asked of Mr. Wombold?

23   A        Not the exact words, but I know the questions that

24   were asked of him.

25   Q        Okay.  Do you know all the questions that were asked

1  of him during this hour-and-45-minute interview?

2  A        I don't recall all of the questions.

3  Q        Okay.  You had testified here today to, I think,

4  three different -- well, three or more different questions

5  that you had put to Mr. Wombold, correct?

6  A        Yes.

7  Q        Okay.  And you were able to answer Mr. Hamilton what

8  those questions were, correct?

9  A        Correct.

10  Q        And is it your testimony that you -- I understand

11  it's your testimony that you specifically recall the

12  particular questions asked in these instances, the particular

13  ones that Mr. Hamilton asked?

14  A        I do, as well as others.

15  Q        Okay.  And I may get to some other questions a

16  little bit later.  All right.  So your testimony is you

17  specifically recall these questions and these answers.  Okay.

18  Now --

19  A        In addition to other questions that I asked him.

20  Q        Okay.  And we'll -- we'll get to those, as I say.

21  A        Okay.

22  Q        So I appreciate that, Agent Fisher.

23          Now, would you agree with me that, absent a

24  recording, you need to rely upon your notes and your memory to

25  testify here today, correct?

1    A        Absolutely.  Primarily my memory.

2    Q        Okay.  But -- primarily your memory, but, to an

3    extent, your notes, correct?

4    A        Of course.  That reinforces my memory.

5    Q        Okay.  And your 302, I take it, is something that

6    you used to refresh your memory before testifying here today,

7    correct?

8    A        Yes.

9    Q        Okay.  Now, I want to back up a little bit and talk

10   somewhat about the circumstances that existed at the time of

11   this execution of the search warrant.

12   A        Okay.

13   Q        Do you recall that Mr. Hamilton -- see if you

14   agree -- that he kind of started his questions about your

15   interview of Scott Wombold kind of by asking how you went into

16   Mr. Wombold's office, correct?

17   A        Correct.

18   Q        Something like that?

19   A        Yeah.

20   Q        Okay.  Now, the reality is, though, that that's

21   hardly the story of where the FBI's entry into the building

22   began, right?

23   A        Correct.

24   Q        So, what we had, in fact, in this particular case,

25   was the execution of a major search warrant in this building,

1   right?

2   A       Yes.

3   Q       And if I recall -- would you agree with me that

4   there were over 50 FBI and IRS agents present on-site?

5   A       There were.

6   Q       Okay.  And they arrived completely unannounced,

7   right?

8   A       Correct.

9   Q       Okay.  Now, when the FBI executes a search warrant

10  like this, I take it that the premises have to be tightly

11  controlled during the execution of a search warrant, right?

12  A       Yes.  The premises need to be secured.

13  Q       And why is that?

14  A       Well, that's for a number of reasons.  The primary

15  reason is to ensure the safety of everyone that's present, to

16  include the employees and the agents executing the search

17  warrant.  Another reason is to ensure that employees don't

18  have the ability to alter any evidence or destroy any

19  evidence.  Another issue is, we need to ensure that none of

20  the employees have access to any weapons of any type.

21  Q       And because of these needs, fair to say that the

22  agents on-site got to keep pretty tight control of the

23  employees that are there, right?

24  A       We need to locate and identify all the employees.

25  Q       And would you agree that it's your responsibility to

1    control the employees that are present on-site?

2    A        Absolutely.  They need to be identified and located,

3    yes.

4    Q        And because it's the execution of a federal search

5    warrant, the agents have authority over these persons in their

6    presence, right?

7    A        Yes.

8    Q        Okay.  And would it be fair to say that during the

9    execution of the search warrant, for these reasons, the agents

10   ordered Pilot employees around on the facilities that day?

11   A        No.  Again, we needed to ensure that we had secured

12   the premises.  We did direct employees to -- to, for example,

13   show us their hands so that we knew that they weren't able to

14   destroy evidence, but we did it in a professional, respectful

15   manner.

16   Q        All right.  Let me, then, back up.  Fair to say that

17   at some point a group of agents comes to the third floor where

18   the direct sales group is located, correct?

19   A        Yes.

20   Q        And that's where Scott Wombold's office is located,

21   right?

22   A        That's correct.

23   Q        Would you agree that upon arriving there on the

24   third floor, agents told employees on the premises where they

25   could go and where they couldn't go?

1    A         Correct.

2    Q         Okay.  They told them what they could and could not

3    touch, right?

4    A         Of course.

5    Q         Okay.  And they directed them where to place their

6    hands, correct?

7    A         Yes.  We needed to be sure that we saw their hands.

8    Q         Okay.  Now, would you also agree with me that, in

9    terms of controlling the premises, there were fire engines

10   blocking the exit to Pilot headquarters that day?

11   A         I'm not aware of that.

12   Q         Okay.  Now, I want to talk a little bit about how

13   the agents were outfitted when they arrived on the third floor

14   where Scott Wombold's office was located.

15   A         Yes.

16   Q         First thing, would it be fair to say that agents

17   were wearing jackets identifying their investigating agency,

18   correct?

19   A         Yes.  We were in professional attire, meaning suits

20   and ties, and then we had an agency-identifying jacket over

21   that.

22   Q         And the agents were wearing body armor, correct?

23   A         That's correct.

24   Q         And they were armed with duty-issued sidearms,

25   correct?

1    A         Absolutely.

2    Q         And if I understand--  Nothing strange about that,

3    right?  Agents typically are always armed with pistols while

4    on duty, correct?

5    A         That's policy.

6    Q         Yeah.  And that was the case during the execution of

7    the search warrant, correct?

8    A         Correct.

9    Q         Okay.  Now, do you recall that up on the third floor

10   there were approximately 25 agents that descended -- or arose

11   into the area where the direct sales group is located?

12   A         That's right.

13   Q         Okay.  This wing where you went contained cubicles

14   of direct sales division personnel, correct?

15   A         Correct.

16   Q         And contained Scott Wombold's office as well, right?

17   A         Yes.

18   Q         Okay.  And upon arrival, would you agree that the

19   agents told, upon arrival, in a firm voice, employees to stand

20   up and step away from their computers?

21   A         Yes.

22   Q         Okay.  Agents also had the employees place their

23   hands in the air where the agents could see them, correct?

24   A         Yes.  We had to make sure that we saw all the

25   employees' hands until we became comfortable with the

1   situation.

2   Q        Yeah.  And that was a pretty firm command, right?

3   This isn't a matter of requesting this, right?

4   A        That's correct.

5   Q        Okay.  Now, did agents make it clear that what they

6   were doing was executing a federal search warrant on-site?

7   A        We did, yes.

8   Q        Okay.  The agents also told employees not to touch

9   their computers and not to touch any firearms if any were

10  present, right?

11  A        Correct.

12  Q        That was part of it?  Okay.

13           Now, is it fair to say that during the execution of

14  the search warrant the FBI collected millions of electronic

15  and paper documents?

16  A        I'm not sure if it was in the millions −− I'm not

17  sure of the quantity.  It was a significant amount.

18  Q        Significant quantity.  Okay.

19           Are you familiar enough with the investigation to −−

20  to say whether the FBI has reviewed a great deal of the

21  information that was collected that day at the execution of

22  the search warrant?

23  A        That's my understanding from speaking with other

24  agents.

25  Q        Okay.  Fair to say that during the course of this

1    investigation the FBI has interviewed hundreds of folks?

2    A        I'm not sure of the number of interviews that have

3    been conducted.  I'm not aware that it was in the hundreds.

4    Q        Okay.  Gotcha.  Okay.  Now, would you agree that

5    many dozens of folks were interviewed during the course of the

6    investigation?

7    A        I'm only directly aware of the -- that there were

8    interviews conducted during the search warrant.

9    Q        Okay.  If you don't know, that's fine.  So, now I

10   want to talk a little bit about the initial approach in

11   contacting Scott Wombold and the events leading up to that.

12            So, if I understand correctly, there were two agents

13   assigned to interview Scott Wombold, correct?

14   A        Correct.

15   Q        One was you, right?

16   A        Yes.

17   Q        The other was Special Agent Robert Masterson,

18   correct?

19   A        Yes, with the IRS.

20   Q        Okay.  IRS-Criminal Investigation Division, correct?

21   A        That's correct.

22   Q        Okay.  And so -- now, the plan was for there to be

23   two interviewing agents to one interviewee, correct?

24   A        That's correct --

25   Q        And so -- and the person being interviewed -- and

1    I'll call him the interviewee.

2    A        Uh-huh.

3    Q        And I'm not saying there's anything wrong with it,

4    but it's going to be two on one, correct?

5    A        Yeah, correct.

6    Q        Okay.  Now, if I understand correctly, when you were

7    up on the third floor, you recognized Scott Wombold from

8    photographs, and you approached him, correct?

9    A        I'm sorry.  Could you repeat that.

10   Q        You recognized Scott Wombold from photographs and

11   you approached him?

12   A        Yes, correct.

13   Q        Yes.  And, if I understand correctly, what you did

14   then was identify yourself and then you went into the office,

15   correct?

16   A        Yeah.  I asked him to confirm whether or not he was

17   Mr. Wombold, which he did.  And I asked him if he would mind

18   spending some -- some time with us to talk to us, because we

19   thought he might have some information that could help us with

20   our investigation.

21   Q        And during this -- okay.  And during this time

22   period, if I understand correctly, there was a delay before

23   actually going into his office, correct?

24   A        Yes, correct.

25   Q        Okay.  How long was that delay?

1   A        We encountered him at approximately 1:55, and we

2   went into his office approximately ten minutes later.

3   Q        And during that time period, he's able to see the

4   circumstances going on around him all around the floor there

5   on the third floor, right?

6   A        Yes.

7   Q        He can see employees with their hands in the air,

8   correct?

9   A        Correct.

10  Q        And he can see the quantity of agents there on-site,

11  correct?

12  A        He would have been able to see the agents that were

13  in his line of sight, which would have been the agents

14  interacting with the direct salespeople.

15  Q        And these agents are, you know, pretty tightly

16  controlled on what's going on up there on that floor, correct?

17  A        Correct.  They're securing the area.

18  Q        Yup.  Okay.  Would you agree that, from your

19  experience in encountering interviewees, someone like

20  Mr. Wombold could be very unsettled by all this activity,

21  right?

22          MR. HAMILTON:  Objection, Your Honor.

23          THE COURT:  Overruled.

24  A        It's possible.  I don't-- I can't get into

25  somebody's head, though.

1    Q        Right.  Right.  So you don't know for sure, but

2    would you say, based on your experience, you know, that you

3    have seen subjects be a little bit unsettled by this kind of

4    investigatory activity in their presence, right?

5    A        It's possible.  I've also seen others that were not

6    unsettled.

7    Q        Okay.  Got you.  Now, during the time period when

8    you were waiting in the hallway before going in with Scott

9    Wombold, agents went into his office and did some kind of

10   search, correct?

11   A        Correct.  There was a peripheral search done of all

12   the offices, to look for any weapons that would have been

13   readily available.

14   Q        And Mr. Wombold didn't have any of those, right?

15   A        Correct.

16   Q        Right.  And I'm not saying there's anything wrong

17   with it, but fair to say that agents went into his office

18   without his permission, right?

19   A        They didn't need his permission, because they were

20   executing a federal search warrant.

21   Q        That's right.  Right.  And that's my point, right?

22   So it's not like Mr. Wombold invites the agents into his

23   office, correct?

24   A        Correct.

25   Q        He doesn't invite the agents in, right?  Instead,

1  right in front of him, agents come into his office without

2  asking and do the search that you described.

3  A        Correct.

4  Q        Okay.  Now, when Mr. Wombold entered the office, did

5  he sit behind his desk?

6  A        He did.

7  Q        Okay.  And you and Mr. Masterson sat on the other

8  side of the desk, right?

9  A        That's correct.

10  Q        You sat closer to the door than did Mr. Wombold,

11  correct?

12  A        I sat in the chair that was closest to the door.

13  Q        All right.  Would you agree with me that if

14  Mr. Wombold wanted to kick you out of his office during this

15  interview, he wouldn't have had the ability to do so, correct?

16  A        That's correct.  We told him that he could leave,

17  but, yes, we were not going to leave, no.

18  Q        Okay.  And, in fact, during the execution of the

19  search warrant, neither Scott Wombold nor anyone else could

20  have ejected agents from any portion of the premises, right?

21  A        That's correct.  We were executing a search warrant.

22  Q        Exactly.  And you would agree that Scott Wombold

23  could not have gone anywhere he wanted in the building without

24  an agent with him, correct?

25  A        Correct.  And that's to ensure that no -- no one has

1    the ability to alter or destroy any evidence.

2    Q        Exactly.  And for those reasons, Scott Wombold, on

3    that day, simply cannot go where he wants without an agent,

4    right?

5    A        Correct.  He would have needed to have been

6    accompanied.

7    Q        Okay.  Now, during the interview of Scott Wombold,

8    the door to his office was cracked open about 6 inches, right?

9    A        That's correct.

10   Q        And would you agree that his vantage point, with the

11   door being cracked, was that someone sitting where he was

12   could have seen into the hallway and seen the activity going

13   on out there, right?

14   A        It's possible.

15   Q        Okay.

16   A        The decision was made to crack the door, though, to

17   actually provide him more comfort.  Normally we would prefer

18   to close the door.

19   Q        Yeah.  But the intent -- and I'm not disputing

20   this -- the intent was for you to provide him comfort, but an

21   effect could have been for him to be unsettled by very

22   significant law enforcement presence right outside his door,

23   right?

24   A        He might have been able to see activity outside.

25   Q        Okay.  And would you agree that someone in his

1  position would also have been in a position to hear the

2  commotion going on from outside his office?

3  A        There was -- I'm not sure that there were any loud

4  noises that were loud enough for him to specifically hear.

5  Q        All right.  You're -- it's possible; you're just not

6  sure.  Is that right?

7  A        Repeat the question, please.

8  Q        So the question was -- let me ask it this way:  It

9  is -- would you agree that it's possible that he could have

10 heard commotion from the execution of this search warrant

11 taking place outside his door?

12 A        Sure.

13 Q        Okay.  Now, the next thing I want to do is ask about

14 something that I want to see if it happened while the view was

15 ongoing.

16 A        Okay.

17 Q        And the -- I want to ask you, do you recall an

18 incident where you went behind Scott Wombold's desk without

19 his permission?

20 A        I do.

21 Q        Okay.  Explain to us what happened at that time.

22 A        At that point in time, we were in the middle of

23 talking with him, and at that point his hands went to a

24 position where I couldn't see them; they went below his desk.

25 I told him that I needed to see his hands.

1    Q        Okay.  And you told him in a pretty firm voice,

2    right?

3    A        I told him that I needed to see his hands.

4    Q        Yeah.  Did you say it in a firm voice?

5    A        I was respectful and professional, but I told him I

6    needed to see his hands.  It was firm.

7    Q        Okay.  It was firm.  Yes.

8             And so -- and, again, not saying anything's wrong

9    with it, but I do want to nail down what happened.

10   A        Okay.

11   Q        So you're an armed FBI agent.  You go around his

12   desk and -- without his permission, and look for a weapon, I

13   guess, right?

14   A        Absolutely.  That's for our safety.

15   Q        Exactly, right?

16   A        I didn't know if he had a weapon back there.

17   Q        Yeah.  And so -- so, again, what you do is, you take

18   that action because you feel you need to take it?

19   A        Yes.

20   Q        And you take it without his permission, though,

21   right?

22   A        Correct.

23   Q        And fair to say that what we have here, though, is

24   an armed FBI agent kind of invading Mr. Wombold's personal

25   space?

1  A        We were concerned for our safety.  That's why I did

2  that.

3  Q        Right.  Right.  But you would agree -- again, not

4  questioning the motive --

5  A        And our safety was overruling his personal comfort

6  at that point.

7  Q        Right.  Right.  I'm sorry, Agent Fisher.  That

8  wasn't my question.

9  A        Okay.

10 Q        I'm saying, would you agree with me that what

11 happened -- setting aside why it happened and whether, you

12 know, it was reasonable and so forth, would you agree with me

13 that what happened was, an armed FBI agent kind of invaded

14 Mr. Wombold's bodily space at this time?

15 A        Yes.

16 Q        Okay.  Now, the interview took place, and I'm going

17 to have some questions of you about the interview, but for

18 right now I did want to ask you, would you agree that at the

19 conclusion of the interview Scott Wombold wasn't allowed to

20 leave the office on his own, right?

21 A        We escorted him.

22 Q        Uh-huh.  And you escorted him all the way to the

23 exit of the whole building, correct?

24 A        That's correct.

25 Q        Okay.  And during this whole time the interview was

1   taking place, right, the FBI was maintaining control over all

2   the occupants in the building, right?

3   A        Correct.  We maintained security of the building.

4   Q        Okay.  Now, I want to ask you a couple of things

5   related to what are known as *Miranda* warnings.  And fair to

6   say that your understanding is you weren't required -- you

7   weren't required to provide *Miranda* warnings in this

8   situation, right?

9   A        Right.  It was a noncustodial interview.

10  Q        Okay.  Now, having gotten that out of the way, I do

11  want to talk a little bit about *Miranda* warnings.  And you

12  were not required to provide them, and, in fact, you did not

13  provide them, correct?

14  A        Correct.

15  Q        And you could have provided them had you chosen to

16  do so, right?

17  A        It was not policy to do that.

18  Q        Okay.  But you could have, for example -- well, let

19  me ask you:  Fair to say that you know what *Miranda* warnings

20  are, right?

21  A        Correct.

22  Q        All right.  And you've been trained in the use of

23  *Miranda* warnings, right?

24  A        Yes.

25  Q        And would you agree that *Miranda* warnings are an

1    advice of rights sometimes given to folks by law enforcement

2    officials when those folks are being interviewed when they're

3    in custody?

4    A        When they're in custody, yes, it's required.

5    Q        That's right.  Now, in this -- but when someone's

6    not in custody, you still could provide them *Miranda* warnings,

7    correct?

8    A        That's not policy.

9    Q        Okay.  But would you agree with me -- do you recall

10   testifying at a hearing earlier in this case, and do you

11   recall that you said you could have provided *Miranda* warnings

12   to Mr. Wombold had you chosen to do so?

13   A        Sure, you could have, but it would not be policy.

14   Q        Okay.  All right.  You could have done so, though.

15   Okay.  All right.  And, again, I'm not saying they're

16   required, but just a question of whether you could have done

17   so.

18   A        Okay.

19   Q        Okay?  All right.  Now, would you agree, based on

20   your perception, that when Mr. Wombold's interview started, we

21   had kind of a stressful and chaotic situation up there on the

22   third floor?

23   A        No.  I'd say it was very controlled.

24   Q        Well, would you -- would you say it might -- would

25   you agree with me, you know, having experienced a lot of

1    subjects of interviews over the years, right, it might be

2    stressful for the subject?

3    A          It could be.

4    Q          Okay.  Now, I want to talk a little bit about the

5    process whereby the FBI went about getting the interview of

6    Scott Wombold a little bit.  All right?  And if I take it and

7    understand it correctly, you've been an FBI agent for about

8    21 years, right?

9    A          Correct.

10   Q          And you've participated in a large number of search

11   warrant executions, right?

12   A          Correct.

13   Q          You have conducted hundreds and hundreds of

14   interviews of interviewees over the course of your career,

15   right?

16   A          Yes.

17   Q          And some of these interviews were interviews like

18   this one, interviews of employees of a business where a search

19   warrant was being executed, right?

20   A          Correct.

21   Q          And the FBI routinely, if it's going to be executing

22   a search warrant at a business, plans to interview employees

23   that are on-site, right?

24   A          It depends on the circumstances.  Not always.

25   Q          Okay.  But many times, right?

1    A        Sure.

2    Q        And you yourself have done that many times, right?

3    A        Yes.

4    Q        Okay.  And I gather, based on that experience, you

5    have an idea about how the FBI goes about getting these kinds

6    of interviews during the execution of a search warrant at a

7    business, right?

8    A        Yes.

9    Q        Okay.  And would you say that you have an

10   understanding about why the FBI goes about getting the

11   interviews?

12   A        Of course.

13   Q        Okay.  Now, so I want to ask a couple of questions

14   about that.  Would you agree with me that if the FBI's going

15   to be executing a search warrant at a location that's a

16   business, would you agree with me that the FBI doesn't want

17   the folks at the business knowing the FBI's coming to execute

18   a search warrant, right?

19   A        Correct.

20   Q        And for that reason, if you're going to be doing any

21   interviews, you don't want the folks to be interviewed to know

22   that you're coming, either, right?

23   A        Correct.

24   Q        And, for that reason, you don't want any advance

25   notice for the interviewee in these situations, correct?

1    A        Correct.

2    Q        And that makes sense because, if folks know in

3    advance, it could jeopardize the FBI's investigation.  We can

4    agree on that, right?

5    A        Correct.

6    Q        All right.  Now, in this particular situation, you

7    knew pretty far in advance of the execution of the search

8    warrant that you wanted to interview Scott Wombold, right?

9    A        Yes.

10   Q        Okay.  And the plan here was not to let Scott

11   Wombold know that you were going to come to interview him,

12   right?

13   A        Correct.  He had no advance warning from us.

14   Q        Exactly.  And, again, I think you and I could

15   probably agree that that makes perfect sense for law

16   enforcement to catch someone like Scott Wombold unawares that

17   you're coming, right?

18   A        Yeah.  Generally we don't want people to know we're

19   coming.  We don't want them to have the opportunity to get

20   their stories straight, so to speak.

21   Q        That's assuming that people may be interested in

22   getting their stories straight, right?

23   A        Sure.

24   Q        Okay.  Now, would you agree with me, though, that

25   for purposes of gathering the most accurate and complete

1  information possible from interviewees, there is a downside to

2  catching them unaware?

3  A        I don't agree with that.

4  Q        You don't?

5  A        No.

6  Q        Okay.  All right.  Well, let's explore that a little

7  bit.  Would you agree that if you catch someone unaware at the

8  time of an interview, they're going to be unprepared for the

9  interview, right?

10 A        Correct.  I also find they're going to be more

11 candid with us.

12 Q        Okay.  Now, let me ask you this:  Would you agree

13 that if you catch them unaware, it's not like the interviewee

14 would have been able to take some time to refresh their memory

15 before speaking with the FBI, right?

16 A        Correct.  We've don't want that to happen.

17 Q        Exactly.  And you don't want them to, let's say,

18 search paper files relevant to what you're going to be asking

19 about, right?

20 A        Absolutely.

21 Q        And you don't want them to review any electronic

22 documents before you interview them, right?

23 A        Correct.

24 Q        And you don't want them to refresh their memory with

25 any e-mails before you interview them, right?

1  A        Correct.

2  Q        And wouldn't you agree, though, that, because of

3  that, the interviewee will not have had an opportunity to do

4  many things that would have helped the interviewee provide the

5  most complete and thorough information possible?

6  A        That's not our goal.  Our goal is to get an

7  interviewee's candid responses without having to have thought

8  about it beforehand.

9  Q        So, if I understand correctly, the goal is not to

10 put the interviewee in a position to refresh their memory

11 about what you're going to ask them about, right?

12 A        It depends on the nature of the interview.

13 Q        Okay.  Would you agree with me that -- and, again,

14 not questioning the law enforcement validity of this, would

15 you agree with me, though, that, based on what we just went

16 over, an interviewee that's caught unaware is going to be not

17 in a position to gather all the information they might have to

18 give the most fulsome answer possible in response to your

19 question?

20 A        In my experience, it's -- you get better answers

21 when they're unprepared.  We had -- I had specific questions

22 that I wanted to ask him, and I would not have wanted him to

23 have researched his answers to those questions before I asked

24 him those questions.

25 Q        And, from your perspective, that makes perfect

1   sense, right?

2   A        Yes.

3   Q        But doesn't that hinder Scott Wombold's ability to

4   provide the most thorough information to the questions that

5   you're asking him?

6   A        Again, the goal wasn't to get as thorough an answer

7   as we could get.  I wanted answers to specific questions that

8   would not have required him to do any research.

9   Q        Okay.  Would you agree, then, your goal was also,

10  sounds like, to make sure that his memory wasn't refreshed for

11  this interview?

12  A        Can you rephrase that, please?

13  Q        Would you agree with me, though, it sounds like,

14  what you're saying, that part of your goal was to make sure

15  his memory was not refreshed in order to answer your

16  questions?

17  A        No.  Our goal was to get candid responses to

18  questions that we knew beforehand that we wanted to ask him.

19  Q        And by doing that, though, you did prevent him from

20  refreshing his memory, right?

21  A        He did not know we were coming.

22  Q        Correct.  Okay.  All right.  So the answer to that

23  would be yes, right?  You prevented -- through your

24  techniques, he did not have an opportunity to prepare himself

25  and refresh his memory to answer your questions?

1   A        The questions we asked him did not require him to do

2   any research.

3   Q        Well, let me -- let me explore that a little bit.

4   Fair to say that during the interview, though, you asked him

5   not only about his own affairs, correct, you asked him about

6   the affairs of other Pilot employees?

7   A        Could you be more specific?

8   Q        For example, didn't you ask him a little bit about

9   John Freeman's business?

10  A        We did.

11  Q        Okay.  Did you ask him about, for example, the

12  breakdown of the percentages of John Freeman's customers,

13  right?

14  A        Yes.

15  Q        Okay.  And, for example, you asked him about -- you

16  asked Scott Wombold about certain customers, correct?

17  A        Yes.

18  Q        Okay.  You asked him about the employment status of

19  various individuals, correct?

20  A        Correct.

21  Q        Okay.  Would you agree with me that to answer some

22  of these kinds of questions, actually, perhaps Mr. Wombold

23  could be aided by the opportunity to have his memory refreshed

24  before answering these questions?

25  A        The questions we asked him were high-level questions

1    that he should have known about, given his position at the

2    company.

3    Q        Well, I heard you say there were things that he

4    should have known about.  Is it your testimony that he should

5    have known, for example, the breakdown of John Freeman's

6    customers, funded versus direct bill, that he should have

7    known that without refreshing his memory?

8    A        He did know that.

9    Q        Okay.  He did know that, yeah.  But let me ask you

10   this:  Like, on what are you basing your assessment of what

11   Scott Wombold should have known?

12   A        The questions we asked him related to situations

13   where we knew that he was present when certain things were

14   discussed and he would have been able to recollect that.

15   Q        But, now, your 302, right, it contains a lot of

16   information about what you say Scott Wombold was conveying to

17   you, right?

18   A        Yes.

19   Q        Doesn't it contain a lot of information that falls

20   outside the category that you just mentioned?

21   A        Can you be more specific, please?

22   Q        In other words, you said, "We asked him just about

23   various situations where he was present."  Actually the scope

24   of the interview covered a great deal of stuff well outside --

25   A        Sure, yes.

1  Q        Right.  Okay.  All right.  Now, one additional thing

2  that I want to ask about on this topic, and then I'm going to

3  move on.  And I'm going to say it again, not saying there's

4  anything wrong with it, but fair to say that when you catch

5  someone like Scott Wombold, an interviewee, unaware, they

6  wouldn't have an opportunity to consult with an attorney

7  before encountering you, correct?

8  A        They would if they brought it up while they --

9  during our encounter.

10  Q        Okay.  Right.  But if you encounter them, they would

11  not, before encountering you, have been able to speak with an

12  attorney in response to your approach?

13  A        No, the -- assuming that they did not know we were

14  coming, they would not, obviously, have been able to do that.

15  Q        Okay.  Is it your experience that -- that sometimes

16  interviewees are able to provide more -- more complete and

17  accurate information after going over their information with

18  an attorney?

19  A        In our situation, we wanted to get candid responses

20  without him having thought about it beforehand.

21  Q        All right.  And when you ask people questions

22  without them having an opportunity to think about it

23  beforehand, you are at risk of someone providing less than

24  complete or accurate information even if they're acting in

25  perfectly good faith, right?

1    A        Again, we're looking for candid responses, and

2    that's the technique we've been trained to use to obtain

3    those.

4    Q        Right.  Right.  But my question is just this,

5    because you had said, "We don't want them to think about it

6    beforehand."  I totally understand.  But I'm saying, when you

7    do that, there's a risk that even people who want to be

8    truthful, acting in good faith, may not provide the most

9    accurate information possible, correct?

10   A        That's possible.

11   Q        Okay.  All right.  Now, I wanted to talk a little

12   bit about the written report of this interview that you had

13   referred to.  And, again, as I understand it, it's called a

14   302 in the jargon of the FBI, correct?

15   A        Correct.

16   Q        All right.  The 302 is a report that is your

17   description of what Scott Wombold told you, correct?

18   A        It's a summary of -- of the interview.

19   Q        Yeah.  And would you agree that what it does is, it

20   sets forth what you say Scott Wombold said?

21   A        It documents what the interviewee told us during the

22   interview.

23   Q        Yeah.  So in kind of its form, what it does is set

24   out one -- kind of one sentence after another that you say

25   Mr. Wombold said, correct?

1   A       It summarizes what -- what the interviewee said.

2   Q       Okay.  Would you agree that it's really just your

3  paraphrasing of what you say Scott Wombold said?

4   A       Correct.  It's not verbatim.

5   Q       Exactly.  Okay.  We could say it's, yeah, it's not

6  verbatim, it's your impression of what he said, right?

7   A       It's a summary of what he said.

8   Q       Okay.  Based on your impressions from being in the

9  interview with him, right?

10  A       Based on what he told us.

11  Q       Okay.  And, again, though, in this particular case

12  at least, you don't claim that it sets forth exactly what

13  Scott Wombold said or that it even quotes anything he said

14  except for a few specific examples, right?

15  A       Right, it's not -- not verbatim --

16  Q       Yeah.

17  A       -- not a transcript.

18  Q       Okay.  Now, regarding the 302, Scott Wombold never

19  confirmed that your understanding of what he said in the 302

20  was correct, right?

21  A       We did not show it to him after it was written.

22  Q       Yeah.  Okay.  And the 302 that you wrote based on

23  the interview, it's not something that you wrote immediately

24  after the interview, right?

25  A       I wrote it beginning the next day.

1  Q        Beginning the next day.  Yeah.  And we can agree

2  that that's not a huge lapse of time, right?

3  A        Well, we didn't leave the premises until

4  approximately 2:30 in the morning --

5  Q        That's right.

6  A        -- subsequent to that interview.

7  Q        Yeah.  So you didn't waste a whole lot of time, but

8  there was an overnight between the interview and your writing

9  the 302?

10 A        Not even an overnight.

11 Q        Well, maybe you didn't sleep, but the clock -- it

12 was the next calendar day, if I understand?

13 A        It was actually the same calendar -- well, yeah, it

14 would have been, yes.  Search warrant continued into the next

15 calendar day.

16 Q        Okay.  Now, the 302, would you agree with me that

17 what it does is set out about three pages of text that

18 paraphrases what you say Scott Wombold said?

19 A        Did you say -- three pages of what?

20 Q        Three pages of text, what -- what -- it contains

21 about three pages of text of what you say Scott Wombold said.

22 A        It documents what he told us.

23 Q        Okay.  But -- and I used the term "paraphrase,"

24 right?  So would you agree it paraphrases, right?

25 A        Sure.

1    Q        About three pages' worth of text about what Scott

2    Wombold said, correct?

3    A        Yes.

4    Q        And would you agree with me maybe that's not a whole

5    lot of -- of words on the page for an interview that took an

6    hour and 45 minutes?  Would you agree with that?

7    A        No, I wouldn't agree with that.  Not everything that

8    was discussed during the interview was -- was meant to be

9    documented in the 302.

10   Q        That's right.  So you are the one to decide what

11   gets included and what doesn't, right?

12   A        Correct.

13   Q        All right.  And you decide how to paraphrase what

14   you say Scott Wombold said, right?

15   A        I have to if I'm writing it.

16   Q        Now, if you had gotten permission to record the

17   interview, though, you wouldn't be in that situation, would

18   you?

19   A        It was not policy to record the interview.  That's

20   the way all interviews were conducted.  They weren't recorded.

21   They're summarized based on our recollection of the interview

22   and supported by our notes that are taken during the

23   interview.

24   Q        The policy, though, allowed you to request

25   permission to record Scott Wombold's interview, though, right?

1   A        It could have, but it wasn't designed for a

2   circumstance like that.

3   Q        It -- is your testimony that the interview with

4   Scott Wombold wasn't important enough to record?

5   A        No.  It-- No, not at all.  It was a situation that

6   was different from the intention of obtaining a special

7   permission to record an interview.

8   Q        Okay.  I'm going to -- I'm going to move on from

9   that.  I'm going to ask you this:  Fair to say that your 302

10  report does not contain any reference to a single question

11  that you put to Scott Wombold?

12  A        No, I don't list the questions that are asked in

13  there.  That is a summary of what his statements are.

14  Q        Okay.  Would you agree that in interpreting Scott

15  Wombold's statements, what he was saying to you, it would be

16  helpful to know what question he was responding to?

17  A        Which I knew.

18  Q        Okay.  Which you knew.  But don't you think that it

19  might be helpful for someone trying to figure out what Scott

20  Wombold was asked and what he was actually saying in response,

21  it would be helpful to know what the questions were?

22  A        I did know what the questions were.  I'm the one

23  that asked them.

24  Q        Right.  But -- okay, but wouldn't you agree, though,

25  that for folks five years later, really, really need to

 1   determine what Scott Wombold was saying, it would be helpful

 2   to know the questions that were asked.

 3   A          Sure.  That's why I'm here.

 4   Q          Okay.  Now, would you agree, though, that your

 5   memory cannot be refreshed by the report as to what you asked;

 6   you're relying solely on your memory?

 7   A          On my memory and certain of the notes that were in

 8   my notes.

 9   Q          Okay.  Well, since you brought up the notes, I did

10   want to ask you a little bit about the notes.

11   A          Okay.

12   Q          And the notes you took during the interview, I take

13   it these were things that you relied on in drafting your 302,

14   right?

15   A          They -- they assisted my recollection, my memory of

16   what was discussed.

17   Q          Yeah.  And the fact is that also Special Agent

18   Masterson himself took his own notes, correct?

19   A          Correct.

20   Q          Okay.  Now, Special Agent Masterson, his notes and

21   your notes -- didn't you review those notes together right

22   after the interview took place?

23   A          Right.  Immediately after Mr. Wombold left the

24   premises, we returned to his office and went through our notes

25   together.

Q And you -- would it be fair to say that you relied on Special Agent Masterson's notes in drafting the 302 report?
A I relied on both of our notes and both of our recollections.
Q Okay. And in that sense, you don't dispute Special Agent Masterson's notes, right?
A Correct.
Q Okay. Fair to say that you adopted them for purposes of writing your report?
A I relied on both sets of notes.
Q Okay. Now, I want to take a look in a moment at the notes, but the first thing I want to do before getting into some detail about them is, maybe what we can do -- and at this point I'm not going to show this document to you, Agent Fisher, but I do think that with the Court's permission we would have this document marked Government Exhibit Number 250 handed to the witness.
MR. HAMILTON: It's for ID only, right?
MR. RICHARDSON: That's right, yes, identification only.
THE WITNESS: Thank you.
BY MR. RICHARDSON:
Q And if you could just take a look at that, and when you've generally familiarized yourself with what's in there, please do let me know.

1   A        (Witness complying.)  I'm familiar with it.

2   Q        Okay.  Fair to say that what we see here is three

3   different things?  One is the 302, correct?

4   A        Correct.

5   Q        One is the set of notes that you took?

6   A        Yes.

7   Q        And one is the set of notes that Agent Masterson

8   took, right?

9   A        Yes.

10  Q        Okay.  Now, why do you take notes during an

11  interview?

12  A        They help refresh my own recollections and memories

13  of -- of what took place during the interview.

14  Q        And the idea is to take down things said that are

15  significant, right?

16  A        Correct.

17  Q        Okay.  And as with the 302, Scott Wombold never

18  confirmed the accuracy of your notes or looked at them in any

19  way, right?

20  A        Correct.

21  Q        Okay.  Now, I'm just going to just show briefly

22  here -- I'm just going to show just the first page.

23           (Off-the-record discussion between opposing

24           counsel.)

25           MR. RICHARDSON:  Okay.  Maybe if we could take down

1    the jurors' screen for now.  Thanks.

2            THE COURTROOM DEPUTY:  Okay.

3    BY MR. RICHARDSON:

4    Q       In fact, I'm going to move on here, for the time

5    being, to a slightly different subject.  And I'm going to ask

6    you a little bit about some issues and see whether you agree

7    that there may be some problems with relying on a 302 or notes

8    if you were going to testify after having reviewed those

9    documents.  Okay?

10   A       What's your question?

11   Q       Okay.  I'm just -- I'm just identifying the subject

12   that we're going into.  Okay?

13   A       Okay.

14   Q       So the first thing I want to ask you is:  Would you

15   agree with me -- and let me clarify the subject here a little

16   bit more.  I'm going to ask some questions about kind of how

17   302s and notes work, and then maybe ask some questions about

18   whether a recording might be a good idea, in light of the

19   things we're going to address.

20   A       Okay.

21   Q       Okay.  So I'm going to start out by asking, would

22   you agree with me that sometimes agents, simply being humans,

23   right -- and I mean that in a good way, agents, right?  We're

24   all human beings, right?  Sometimes you may just hear

25   something incorrectly, right?

1   A          In this case I did not hear anything incorrectly.

2   Q          Okay.  Well, okay, but you would agree that

3   Agent Masterson did, right?

4   A          I need to--  Can you provide more specifics, please?

5   Q          Yeah.  Like, for example, if you would take a look

6   at Page 2 of his notes.  All right?  Agent Masterson's notes,

7   Page 2.

8   A          Okay.

9   Q          And this is an example.  And it's not meant to give

10  Agent Masterson a hard time, just an example.  I want to see

11  if you agree with me that he might have heard something wrong.

12  Okay?

13          Do you see on Page 2 where he has written down that

14  Scott Wombold said that his prior employer was "Common Data."

15  "Common Data."

16  A          Comdata.

17  Q          Do you see where it says "Common Data" on Page 2?

18  A          Yes.

19  Q          Okay.  Right.  Small mistake, right?  But he just

20  happened to have heard it wrong.  Would you agree with me that

21  actually Scott Wombold said that his employer formerly was

22  Comdata?

23  A          Sure.

24  Q          Okay.  So a small mistake, but an example of how an

25  agent --

1   A        Yeah, I wouldn't call it a mistake.  When you're

2   taking notes in the middle of an interview, you're not going

3   to get everything perfect, you're not going to get it

4   verbatim, you're not going to get it exact --

5   Q        Exactly.  Isn't that correct, Agent Fisher?

6   A        Sure.

7   Q        Right?  And, again, I'm not -- not criticizing

8   someone, but you're -- I believe you said when you're writing

9   it down, you may not get it perfect, you may not get it

10  verbatim, right?

11  A        That doesn't necessarily mean that your memory isn't

12  going to be correct, though.

13  Q        Right.  But, as you said, you used your notes to

14  refresh your memory, right?

15  A        Yes.

16  Q        So to the extent that there's a problem with the

17  notes, that could present a problem for your recollection,

18  right?

19  A        But, again, it's primarily written based on our

20  memory and recollection.  It's only supported by the notes.

21  Q        Yeah.  But I do take it -- one of the reasons you

22  write down the notes is that it helps you remember what to

23  even put in your report, right?

24  A        Sure.

25  Q        Yeah.  Okay.  Now, would you agree that because an

1    agent, acting in perfectly good faith, just may hear something

2    wrong, it might be a good idea to have a recording in a

3    situation like we're faced with here today?

4    A        No, it -- in this situation, it was -- again, it was

5    not policy to record an interview like that.  And based on

6    both my recollection and Agent Masterson's recollection, and

7    us being able to square those at the end of the interview, in

8    addition to our notes, we -- we got things accurately.

9    Q        Okay.  But I don't -- I don't think that was my

10   question, though.  But -- so let me rephrase it.

11            Would you agree, though, that because agents can

12   hear things wrong, even if they compare notes later, right,

13   because agents could hear something wrong, it would be helpful

14   to have a recording in here today?

15            MR. HAMILTON:  Objection, Your Honor.  This is

16   cumulative, it's been asked and answered, it's --

17            THE COURT:  Mr. Richardson?

18            MR. RICHARDSON:  I think that the way I phrased

19   this -- this question, I don't believe it's been asked in that

20   way.  And I was also juxtaposing it with a particular problem

21   that I'm asking about with respect to the taking of notes on

22   which this agent relied in providing his testimony.

23            MR. HAMILTON:  May I respond to that, Your Honor?

24            THE COURT:  You may.

25            MR. HAMILTON:  That he's pointed to a reference where

1    another agent wrote down "Common Data," which isn't anything

2    that was talked about on direct exam.  There were three subject

3    areas that were talked -- three series of questions that were

4    talked about on direct exam that relate to the allegations in

5    the indictment.  I've been -- I haven't made a beyond the scope

6    objection, but we are just -- it's just cumulative, Your Honor.

7    And the point which he's making is beyond what we even asked

8    about in direct.

9         THE COURT:  Mr. Richardson, your ultimate question

10   is, in this witness's opinion, wouldn't it be better to have

11   some type of audio recording as opposed to the witness relying

12   upon his own recollection.  And haven't you asked that several

13   times, and hasn't his answer been the same each time?

14        MR. RICHARDSON:  I think it's different.  And, as I

15   say, I'm happy to move on, Your Honor.  I think it's different,

16   though, because I was bringing up a particular issue, in light

17   of -- of something that I was asking about, would that -- you

18   know, would he provide a different answer.  And I do think,

19   Your Honor, that I'm entitled to inquire into the accuracy of

20   the notes that he asked about.  And then, to the extent that I

21   have testimony about that, I do think it's fair to say, Would

22   you agree, based on the fact that this is what can happen with

23   notes, that a recording would be better?

24        MR. HAMILTON:  May I respond to that, Your Honor?

25        THE COURT:  You may.

1      MR. HAMILTON:  So my response here is what I just

2  said, which was that he's talking about a portion of the notes

3  that has nothing to do with the direct exam questions that we

4  asked.  There are plenty of -- there are aspects of the notes

5  that do respect -- that do relate to the questions -- subject

6  matter he was asked about, and the United States suggests that

7  those should be the focus, not on things that were not asked

8  about on direct examination.

9      THE COURT:  Well, I think this is another in a series

10  of questions as to whether -- in this witness's opinion,

11  whether audio recordings are superior to a person's

12  recollection.  I think Mr. Richardson indicated that this is

13  going to be his last question in this area, so the Court will

14  permit it.

15      MR. RICHARDSON:  All right.  Thank you, Your Honor.

16  BY MR. RICHARDSON:

17  Q      So the question being——I'm just going to ask this

18  one more time——would you agree that because agents can take

19  down -- or can hear things incorrectly sometimes, it would be

20  helpful to have an audio recording in this courtroom today?

21  A      I'm confident that based on my recollection and

22  Agent Masterson's recollection, and us being able to talk

23  about things and talk through things at the end of the

24  interview, and us having access to both sets of notes, walking

25  through both sets of notes, comparing, making sure I

1   understand what's in his notes, that I can read his notes, I

2   think by having that conversation, I'm very confident that the

3   302 is accurate.

4   Q        Okay.  But, again, just trying to get the answer so

5   I can move on, is it your testimony that it would not be

6   helpful to have a recording here in this courtroom instead of

7   just a 302?

8            MR. HAMILTON:  Objection, Your Honor.  Asked and

9   answered.  And his opinion is not relevant to this.  This is --

10            MR. RICHARDSON:  Your Honor --

11            THE COURT:  Mr. Richardson.

12            MR. RICHARDSON:  -- I would say he didn't answer it.

13  The other thing, I think it's relevant for just asking this one

14  more time.  I think -- I think the jury's entitled to know,

15  does -- is the agent saying that this -- that his memory, his

16  302, is as good as an audio recording, because if he says that,

17  I think that I'm allowed to certainly further challenge, which

18  I think I'm allowed to do anyway, his recollection and the

19  notes on which he relied.

20            THE COURT:  I think, again, he says this will be his

21  last question.  This is his second last question.

22            Okay.  Go on.

23  BY MR. RICHARDSON:

24  Q        Okay.  So would you agree that it would be helpful

25  to have an audio recording in this courtroom today?

1    A          You could complete a verbatim transcript if you had

2    that, yes.

3    Q          Okay.  So it would be helpful, yes.  Okay.

4               All right, now, I wanted to ask whether--  What

5    happened in this case is that we had two sets of notes which

6    were at least somewhat inconsistent with each other on

7    particular points in this interview.  Would you agree with

8    that?

9    A          Can you provide me with a specific?

10   Q          Yes, be happy to.  All right.  So, for example, take

11   a look, if you would -- I'm going --

12              Your Honor, may I have one moment to ask one

13   question of Mr. Hamilton?

14              THE COURT:  You may.

15              MR. RICHARDSON:  Thank you.

16              (Off-the-record discussion between opposing

17              counsel.)

18              MR. RICHARDSON:  Okay.  Thank you, Your Honor.  Just

19   a point of order with Mr. Hamilton.

20   BY MR. RICHARDSON:

21   Q          So one thing I want to have you do is take a look at

22   the -- I'm going to ask you about the notes, and then I may

23   ask you about the 302 about a particular issue.  Okay?

24   A          Okay.

25   Q          If you look at Page 3 of your notes and

1  Agent Fisher's notes -- or, excuse me, Agent Masterson's

2  notes, I want you to take a look at the part that relates to

3  Western Express and how many months.  Okay?

4  A       Okay.

5  Q       All right.  Would you agree with me that what we

6  have there is a notation about Western Express, all right?

7  And one set of notes says eight months and the other set of

8  notes says ten months.

9  A       That's correct.

10  Q       Okay.  And do you know what the 302 says on that

11  particular point?

12  A       I do.

13  Q       And what does it say?

14  A       It gives a range of eight to ten months.

15  Q       Okay.  So would you agree with me, then, that we

16  have notes that conflict on the issue of how many months we're

17  talk about with respect to this issue concerning Western

18  Express?

19  A       Absolutely not.  That happen -- that can happen

20  during an interview when, for example, the interviewee might

21  begin with, for example, in this case, a range -- or a period

22  of eight months, and during the course of the interview he may

23  expand that or make it a range, and it may become ten months,

24  eight to ten months.  So that -- that can happen during an

25  interview.

1    Q        Okay.  You don't know that that's what happened

2    here, right?

3    A        I do.

4    Q        Isn't it true that what you said during your

5    testimony in the earlier hearing on this is that you

6    speculated that this may have been the explanation, and you

7    said "may" a couple of different times, right?

8    A        I recall that that's what happened in that

9    situation.

10   Q        Okay.  Your testimony, though, in the suppression

11   hearing, though, it was to the effect that this may be an

12   explanation, right?

13   A        It was.

14   Q        Okay.  Now, would you agree with me that what you

15   were saying now is that Scott Wombold said somewhere between

16   eight to ten months, but neither set of notes says that he

17   said between eight to ten months, right?

18   A        Correct.

19   Q        Okay.  And what exactly did Scott Wombold say?  How

20   did he put that particular version of events?

21   A        He was talking about he had to pull back the Western

22   Express account from Mr. Freeman --

23   Q        Well, let me--  I'm sorry.  I want to focus you more

24   fully.

25            Do you recall what he said about the number of

1    months in which he was handling an account, that account?

2    A        He would have started off by saying that it was

3    pulled back approximately eight months, and then he later

4    expanded to say it might have been eight to ten months.

5    Q        Okay.  But neither set of notes says that, right?

6    A        Correct.

7    Q        Okay.

8    A        Agent Masterson might have picked up on the end part

9    of that range, and I picked up on the beginning part of that

10   range.

11   Q        Okay.

12   A        So, again, the notes are not a verbatim transcript

13   of what's said during the interview.

14   Q        But different agents can pick up different things

15   from what an interviewee's saying, right?

16   A        Sure.

17   Q        Okay.  Now, would you agree, for example, that, if

18   you look at Page -- another example of where your notes are

19   not consistent, do you see on Page 2 of each set of notes, the

20   figures for percentages of funded companies for John Freeman?

21   A        Yes.

22   Q        Okay.  Now, would you agree with me that what we

23   have here in this particular case, right, is one set of

24   notes -- one set of notes is talking about 20 percent, and the

25   other set of notes is -- gives a different percentage figure?

1    A       20 to 30.

2    Q       20 to 30, right?

3    A       Yeah.

4    Q       So which did Scott Wombold say?

5    A       He would have said the 20 to 30, because in that

6    case Agent Masterson was taking more complete notes than I was

7    at that point.

8    Q       So your notes weren't complete?

9    A       They were -- they're not a verbatim transcript of

10   everything, every word that's said during the interview.

11   Q       Right.  Right.  Yeah.  I understand your testimony

12   on that.  But your -- your notes were less complete than

13   Agent Masterson's, right?

14   A       No, they were -- they were complete.  They're -- the

15   taking of notes can ebb and flow as the interview goes on.

16   Some -- there might be some occasions where I'm asking more

17   questions and Agent Masterson might be taking more notes, and

18   it might have vice versa as well.

19   Q       Now, would you agree that thus far we've just run by

20   a couple of examples where the notes say something different

21   about a particular subject matter?

22   A       Correct.

23   Q       Okay.  Would you disagree with me -- if I said that

24   there were several other examples where the same thing

25   happens, would you agree with me?

1    A         I'd need an example.

2    Q         Okay.  I'll just give you one more, and then we'll

3    move on.

4    A         Okay.

5    Q         Okay.  If -- if you're not aware that this happened

6    more times, I'm just going to give you one more example.

7              For example, let's say the -- if we could look at

8    Page 3 of each set of notes, where there's a reference to

9    cost.

10   A         Okay.

11   Q         Okay?  Now, would you agree that the references in

12   the notes to cost are a little bit different?

13   A         The same exact words are not in both sets of notes,

14   correct.

15   Q         That's right.  So they describe the discussion,

16   there, right?  If we look at what it says about cost, one of

17   them describes cost one way and one describes cost a little

18   bit differently, in terms of what Scott Wombold was telling

19   you about cost?

20   A         I don't see any inconsistencies.

21   Q         Well, one -- would you agree that one says cost has

22   about six definitions?

23   A         Correct.

24   Q         And the other says cost has six different ways to

25   calculate it --

1    A         Correct.

2    Q         -- right?  So -- and I'm not saying it's the biggest

3    deal in the world, but I'm saying to say that cost is six

4    definitions is something different from saying that there are

5    six different ways to calculate cost.  Those are different

6    things?

7    A         As a person takes notes, again, it's not necessarily

8    the exact words that are used.  As someone takes notes, you

9    document words that come to mind as someone's talking.  So

10   they're not only always going to match up word for word.

11   Q         That's right.  And for your purposes, that's okay,

12   right, because it's just a summary and a paraphrasing of your

13   understanding of what Mr. Wombold said, right?

14   A         No.  It's -- it's critically important that I get it

15   right.

16   Q         Okay.  So would you agree with me that when one set

17   of notes has him describing cost one way and another set of

18   notes has him describing cost a different way, we may have

19   some doubts about what exactly he said on this important

20   issue?

21   A         We -- again, at the end of the interview, we

22   reconcile the notes by going through both sets of notes

23   together.

24   Q         All right.  I'm going to move on to a different

25   issue, and I want to see if you would agree with this.

1          The 302 itself that you write as an agent, it

2  doesn't always match what's in the agent's notes, right?

3  A          What do you mean by that?

4  Q          Sometimes if we were to look at the 302 and then

5  check back to what the notes said on that same point, they say

6  something different, right?

7  A          Correct.

8  Q          Okay.  And, in fact, that happened numerous times in

9  this particular case, right?

10  A          The 302 is a summary of what was discussed during

11  the interview, and it is not designed to match word for word

12  what's in the notes.

13  Q          Right.  And so sometimes you have a 302 that is not

14  real easy to square with the notes themselves, right?

15  A          Should be very easy to square with the notes.

16  Q          All right.  Well, let me ask you if you would agree

17  with me on a couple of issues.

18          Okay.  Do you recall questions from Mr. Hamilton

19  about what Scott Wombold said about whether he had customers

20  that received manual rebates, right?

21  A          Correct.

22  Q          And you answered that question, right?

23  A          Yes.

24  Q          And what was your answer?

25  A          I answered that he said he was aware of one customer

1  that used --

2  Q        Oh, I'm sorry.

3  A        Oh.

4  Q        Yeah.  Different question.  So I'm asking what

5  Mr. Hamilton asked you.  Does Scott Wombold have --

6  A        Oh.

7  Q        Yeah.  What does Scott Wombold say about whether he

8  has customers that have manual rebates?

9  A        He said -- he said he did not have any customers.

10  Q        Okay.  Right.  And that's what your 302 says, right?

11  A        Correct.

12  Q        But Agent Masterson's notes say something a little

13  bit different on that point, don't they?  If you would take a

14  look.  And I'll direct your attention to--  Bear with me one

15  moment.

16  A        Sure.

17  Q        If you look at Page Number 2 of Mr. Masterson's

18  notes --

19  A        Okay.

20  Q        -- do you see where it says, "SW doesn't think he

21  has even one rebate customer"?  Right?

22  A        Yes.

23  Q        Okay.  So to say that Scott Wombold said, "I have no

24  manual rebate customers" is a little different from saying

25  that Scott Wombold said, "I don't think I have any manual

```
 1    rebate customers," right?  It's a little bit different?

 2    A        A little bit.

 3    Q        Okay.  So which did Scott Wombold say?

 4    A        He said that he does not have any customers that

 5    have manual rebates.

 6    Q        So Agent Masterson got it wrong?

 7    A        It's not wrong.  Again, when you're in the process

 8    of taking notes, people take notes differently.  At the end of

 9    the interview, that's when you have a chance to reconcile the

10    notes and ensure that both people's memories are correct.

11    Q        But -- and I'm just trying to figure this out.  Is

12    your testimony that it's correct to say that Scott Wombold

13    said, "I have no manual rebate customers" and that

14    Agent Masterson was also correct in saying that Scott Wombold

15    said, "I don't think" --

16    A        Well, sure.  There could have been two different

17    statements that occurred during the course of the interview.

18    He might have started off saying he didn't think he had any

19    customers who received manual rebates, and then he might have

20    become more firm in his response --

21    Q        But we don't know --

22    A        -- which he did.

23    Q        But we don't really know what he said in that regard

24    as we sit here today.

25    A        He said he had no customers that received manual
```

1    rebates.

2    Q        Did he ever say -- did he ever put it the other way,

3    "I don't think I have any customers"?

4    A        He may have started off saying it that way.

5    Q        He may have started off, but you don't know because

6    we don't have a recording, right?

7    A        I know from my recollection.

8    Q        So your testimony now is that you recall that Scott

9    Wombold started off by saying he thinks?  Is that -- is your

10   testimony now that you recall him saying, "I think I have

11   no" --

12   A        Correct.

13   Q        Was that your testimony a moment ago, that you

14   recalled him using the word "think"?

15   A        I said that he may have -- he started off -- he may

16   have started off saying that he didn't think he had any

17   customers that had received manual rebates, and then may have

18   become more firm in his response.  Yes, I did say that.

19   Q        Okay.  May, but --

20   A        Yes.

21   Q        But is it a may now, or is it a definitely that's

22   what happened?

23   A        It's a may.

24   Q        Okay.  All right.  I appreciate that.

25            Let me -- let me ask if you would agree with me that

1    maybe the 302 doesn't agree with the notes on this particular

2    point.  Do you see in the 302 -- I'm going to direct your

3    attention to the first full paragraph on Page 2.

4    A        Okay.

5    Q        Do you see where it says, "The Coca-Cola and UPS

6    accounts being handled with an experimental billing method"?

7    Do you see where it says that?

8    A        Yes.

9    Q        And, please, by all means, take your time to take a

10   look at the notes to review this if you need to, but I wonder

11   if you'd agree that only one of the two sets of notes even

12   addresses that point, and that is Agent Masterson's notes at

13   Page 2 of his notes.

14   A        Okay.  (Witness complying.)  Yes, I see that.

15   Q        Okay.  Would you agree that the 302 really

16   doesn't -- really doesn't say the same thing as

17   Agent Masterson's notes on this point?

18   A        His notes say, "Coca-Cola and UPS are being handled

19   with a new experimental deal."

20   Q        Yeah.

21   A        Yeah.

22   Q        And the 302 says "experimental billing method,"

23   right?

24   A        Yes.

25   Q        Okay.  You'd agree with me, though, that an

1  experimental deal is something different from an experimental

2  billing method, right?

3  A        I'd say it's pretty close.  Again, you're not --

4  when you're taking notes, you're not documenting the exact

5  words that are mentioned during the interview.

6  Q        Right.  Right.  Right.  But would you agree that a

7  deal could be, for example, a pricing -- pricing offer to a

8  customer?  Isn't that what we typically talk about when we say

9  "deal"?  And -- would you agree with that?

10  A        Repeat the question, please.

11  Q        Would you agree with me, when we talk about a

12  deal -- so "Coca-Cola and UPS now experimental deal."  "Deal,"

13  when you're talking with sales folks like Scott Wombold,

14  right, wouldn't you be talking about pricing offered to the

15  customer?

16  A        In this case it -- the deal can also refer to type

17  of a billing method.

18  Q        Is it your testimony that those are -- billing

19  method and a deal are the same thing?

20  A        No, but they could be --

21  Q        They could be.

22  A        -- close to the same thing.

23  Q        Which term did Scott Wombold himself actually use?

24  A        Based on our reconciliation of the notes, he used

25  the term "billing method."

1    Q        Then do you know why Special Agent Masterson's notes

2    say "deal"?

3    A        Again, he may not have been documenting the exact

4    words that were used.

5    Q        Okay.  All right.  I'm going to move on to a

6    somewhat different point here.

7             And would you say that maybe sometimes an

8    interviewee will say something that the agents don't quite

9    catch because, as you say, you're working hard and writing

10   stuff down?

11   A        (Moving head up and down.)

12   Q        Would you agree with me that sometimes an

13   interviewee may say something that agents just don't catch

14   during the course of the interview?

15            MR. HAMILTON:  Objection.  Relevance, Your Honor.

16            MR. RICHARDSON:  Your Honor, if I understand

17   correctly, this whole charge to which this testimony relates,

18   relates and is determined by the accuracy of the agent's

19   recollection, and that he has prepared an interview report

20   related to this, took notes of the interview.  And I am

21   entitled to explore the fact that, as I believe I can

22   demonstrate with just one example, maybe they didn't hear

23   everything.  And I think it's directly relevant to the accuracy

24   of the witness's testimony.

25            THE COURT:  I think your question, though, asked him

1    if sometimes during an interview people do not hear something

2    that someone -- someone said.  That is not specific to anything

3    here.  It's just a general question, isn't it?

4            MR. RICHARDSON:  Your Honor, I'll confine it to ask

5    the questions in terms of this specific interview, then.

6            THE COURT:  Very well.  The question is withdrawn.

7            MR. RICHARDSON:  Question is withdrawn.  Thank you,

8    Your Honor.

9    BY MR. RICHARDSON:

10   Q        So, for example, if you would, take a look, please,

11   Agent Fisher at the 302.  And I'd direct your attention to

12   Page 3.  And do you see the sentence where it says -- just

13   read the first phrase -- "Wombold indicated he and PFJ analyst

14   Roger LNU."  "Wombold indicated he and PFJ analyst Roger" --

15   A        Yes.  Okay.  I see that.

16   Q        You see that?

17   A        Yes.

18   Q        And then LNU is in all capital letters, right?

19   A        Yes.

20   Q        Okay.  What does LNU stand for?

21   A        Stands for "Last Name Unknown."

22   Q        Okay.  So would you agree that what you're saying

23   here is Wombold indicated he and PFJ analyst --

24           MR. HAMILTON:  I'm going to object.  I'm going to

25   object here to -- we're about -- to hearsay and outside the

1    scope.  And the line of questioning about this effort at

2    consistencies and such, I understand that.  But we start

3    reading directly from the 302 about matters that didn't go --

4    that we didn't go into in direct, it's hearsay and beyond the

5    scope of direct examination.

6         MR. RICHARDSON:  If I may respond.  It's not hearsay

7    because, reading that phrase, there's no -- when I stop at

8    "LNU," there's no assertion.  No one can even tell what we're

9    talking about.  It's certainly not introduced to prove the

10   truth of the matter asserted.

11        The purpose is to show that this is an example where

12   the agents clearly did not say something -- hear something

13   Scott Wombold said.  So that's the point of the examination,

14   and not to prove the truth of any matter asserted, of which

15   there is none in the sentence fragment that I indicated.

16        MR. HAMILTON:  Your Honor, if I may.  If the focus of

17   the question is just on the choice of the word "indicated,"

18   then I'll withdraw it.  I just didn't know when Mr. Richardson

19   was going stop reading.  So that's all.

20        MR. RICHARDSON:  Oh, thank you.

21   BY MR. RICHARDSON:

22   Q       Yeah, so I don't want to go beyond that phrase.

23   "Wombold indicated that he and PFJ analyst Roger last name

24   unknown," right?

25   A       Yes.

1  Q        Is -- you would agree with me that when you indicate

2  last name unknown, it's not Scott Wombold who indicated that

3  the last name was unknown to him, right?

4  A        Correct.

5  Q        Right.  What you're saying is, you and

6  Agent Masterson didn't happen to catch it when he said it?

7  A        I'll have to go back to the notes and see if he

8  actually said that he didn't recall his last name; but if he

9  did, we would have put it in there.

10  Q        I mean -- and, again, if you don't know the answer

11  to this based on your knowledge of the case, that's fine.  But

12  you're not contending that Scott Wombold would not have known

13  the name of this coworker that -- at Pilot that he dealt with,

14  right?

15  A        He may not have -- he may not have said the last

16  name, that's correct.

17  Q        Okay.

18  A        Yeah.

19  Q        And it -- so -- but he might have said it and you

20  just didn't hear it and so you had to write "Last Name

21  Unknown" even though maybe he said it, right?

22          MR. HAMILTON:  Objection.

23          THE COURT:  Sustained.

24  BY MR. RICHARDSON:

25  Q        All right.  So I want to ask you this, then.  In

 1    drafting a 302, sometimes you have to make choices about what

 2    you include and what you don't include, right?

 3    A        Correct.

 4    Q        And for that reason, sometimes the 302 admits --

 5    omits things that are in the notes, right?

 6    A        Correct.

 7    Q        And that happened quite a bit in this case, right?

 8    A        I need an example.

 9    Q        Okay.  Well, let's see about an example.  Hold on

10    one moment.

11             For example, if you could look at your notes,

12    Page 1, and Agent Masterson's notes, Page 2, do you see

13    generally the references to "retail, cost plus, or whichever

14    better," generally those are the subject of those notes?

15    A        Yes.

16    Q        Okay.  Would you agree with me that those notes --

17    you're taking down what you understand Scott Wombold to be

18    saying about something, and that's not reflected in the 302,

19    right?

20    A        Correct.  Yes.

21    Q        Okay.  Fair to say that, as the drafter of the 302,

22    then, you are in control, naturally, of what goes in the 302,

23    right?

24    A        Yes.  Yes.

25    Q        All right.  Would you agree with me that sometimes

1    the 302 includes things that are not referred to at all in the

2    rough notes?

3    A        Correct.

4    Q        Okay.  And in that situation, when you do draft the

5    302, you don't even have notes to rely on, you're relying

6    solely on your memory, right?

7    A        In some occasions, yes.

8    Q        Okay.  And would you agree that in this particular

9    case there were a variety of things reflected -- discussed in

10   the 302 that weren't in the notes at all?

11   A        I'd need an example, please.

12   Q        Okay.  All righty.  Let's say a look, then.  For

13   example, if we could have you take a look at the 302.  Do you

14   see where, at the bottom of Page 1, it says, "The majority of

15   the funded customers receive manual rebates via manual rebate

16   checks, and the direct billed customers are generally the more

17   sophisticated customers"?

18   A        Yes.

19   Q        And I'm not asking about whether that's true or

20   anything like that.

21   A        Sure.

22   Q        All I'm asking -- so all I'm asking you about is,

23   would you agree that those topics are not addressed anywhere

24   in your notes or Agent Masterson's notes?  And, please, feel

25   free to take your time.

1    A        Okay.

2    Q        It's only fair.

3    A        Okay.  (Witness complying.)  Okay.  I don't see it

4    in my notes.

5    Q        Okay.  So you'd agree that in this particular case

6    there were things included in the 302, discussed in the 302,

7    that weren't reflected in either set of agents' note, right?

8    A         In certain circumstances, the 302 –- the 302 is

9    designed to pull together the salient points that are

10   discussed in an interview.  Again, it's generated on the

11   recollection of the interviewers, and it's only supported by

12   the notes.

13   Q        Yeah.  Or, in this particular case, not supported by

14   the notes, right?

15   A        Everything that's said in the interview may not be

16   necessarily documented in notes, correct, yes.

17   Q        All right.  So here we had those two sentences

18   addressing topics on which you couldn't rely on notes to draft

19   the 302 on, right?

20   A        Correct.

21   Q        All right.

22           Your Honor, this might be a good time for a morning

23   break, if it's convenient for the Court.

24           THE COURT:  After we take the break, does that mean

25   that we may be done?

1          MR. RICHARDSON:  Well, it's certainly possible, Your

2   Honor.  That's one of the advantages of a break, as Mr. Kelly

3   once famously said.

4          THE COURT:  We'll take our morning break, then.

5   Let's see if we can return at five minutes after the hour.

6          (Brief recess.)

7          THE COURT:  Proceed.

8          MR. RICHARDSON:  Thank you, Your Honor.

9   BY MR. RICHARDSON:

10  Q       Agent Fisher, a few more things to go over, but

11  we're done with the bulk of the cross-examination.

12          And I wanted to move on to the particular statements

13  that Scott Wombold is charged with making in violation of

14  federal law.  And I want to start by seeing if I understood

15  your testimony on direct examination as to the first of these

16  statements correctly.  All right?

17  A       All right.

18  Q       If I understand correctly, Mr. Wombold was asked by

19  you whether he was aware of customers whose rebates were

20  reduced.  Was that your first question?

21  A       Correct?

22  Q       And his answer was?

23  A       He was aware of one customer.

24  Q       And that customer was?

25  A       Star Transport.

1    Q         And then you got more specific in your questioning,

2    right?

3    A         Yes.

4    Q         And you asked him whether he was aware of any

5    customers whose rebates were reduced without their knowledge,

6    right?

7    A         Correct.  Correct.

8    Q         And that's a different -- that's a different

9    question, right?

10   A         Yes.

11   Q         Because one is talking about customers whose rebates

12   were reduced, and the second one is asking about customers

13   whose rebates were reduced without their knowledge, correct?

14   A         Correct.

15   Q         Okay.  Now, I trust that you are aware that Scott

16   Wombold is charged with saying the following:  Scott Wombold--

17   Well, let me frame it this way:  Scott Wombold is charged with

18   saying the following:  That he, quote, "was not aware of any

19   specific customers other than Star Transport whose rebates

20   were reduced by Pilot employees without the customer's

21   knowledge or approval."

22             You're aware that that's that one statement that

23   he's charged with making illegally?

24   A         Yes.

25   Q         And from what we just went over, in fact, Scott

1  Wombold didn't say it like that, did he?

2  A       No, it wasn't phrased like that exactly.

3  Q       Right.  And, in fact, it sounds to me like this

4  phrasing is a little bit off, is it not?

5  A       What happened was, later in the conversation, after

6  he'd discussed that Star Transport's rebates were reduced, I

7  wanted to get -- ask him more specifically if he was aware of

8  any customers whose rebates were reduced without their

9  knowledge, and so to clarify that question, I said, "Setting

10 aside Star Transport, are you aware of any customers whose

11 rebates were reduced without their knowledge?"

12 Q       Okay.  Then it sounds like this statement that he's

13 charged with making, is it sort of -- is it sort of patching

14 together your questions and some things he said?  Is that what

15 it is?

16 A       That's how Star Transport got into that.  Later on,

17 just to be clear with my question, I made it specifically -- I

18 said, "Set aside Star Transport, which you had already

19 discussed.  Tell me if you know of any other customers -- any

20 customers whose rebates were reduced without their knowledge."

21 Q       Okay.  So you're saying your question went that way,

22 and, what, Scott Wombold said, "No, I don't"?

23 A       Correct.

24 Q       Okay.  But you're not contending that he said

25 something like, "I am not aware of any specific customers

1    other than Star Transport whose rebates were reduced by Pilot

2    employees without the customers' knowledge or approval."

3              You're not claiming that?

4    A        That's how Star Transport would have gotten in that

5    sentence.

6    Q        Okay.  Now, I want to ask you whether you would

7    agree that Special Agent Masterson's notes don't reflect that

8    kind of statement in any way, shape, or form?

9    A        Correct.

10   Q        Okay.  Do you know why Agent Masterson didn't bother

11   to include a notation to list this particular topic?

12   A        Again, when someone's taking notes, it's not a

13   verbatim transcript of what's being said.  People take notes

14   in different fashions, and not everything that's said ends up

15   in one or both sets of notes.

16   Q        Okay.  Now, in his particular case, you don't know.

17   Is that fair to say?  I mean, you're not inside his head,

18   right, and you don't know.  Is that fair to say?

19   A        Correct.

20   Q        Okay.  But the fact is, it's not reflected in his

21   notes, for whatever reason.

22   A        Correct.

23   Q        Okay.  All right.  Would you agree, though, that,

24   you know, in a lengthy interview of about two hours, perhaps

25   you would want to take down notations about significant things

1    that are said, right?

2    A        If they're significant things, yes.  At the time we

3    don't necessarily know what's significant and what's not

4    significant.  And, again, different people would document

5    different things differently as the note-taking process goes

6    on.

7    Q        All right.  I'm going to move on to the next

8    statement that Scott Wombold is charged with making, "Reducing

9    rebates without the customers' knowledge was not discussed

10   during sales meetings."

11   A        Yes.

12   Q        All right.  And I'll repeat that again one more

13   time, just to help make sure that we all hear it.

14   A        Sure.

15   Q        "Reducing rebates without customers' knowledge was

16   not discussed during sales meetings."  And if I understand it,

17   Scott Wombold didn't say it; it's that you asked the question,

18   and his answer was no.  Is that kind of how that went?

19   A        Yeah, he expanded his answer to say that that was

20   not something that would be discussed in sales meetings.

21   Q        Okay.  Now, would you agree that your notes, though,

22   you know, they don't say that Scott Wombold said reducing

23   rebates without the customers' knowledge was not discussed

24   during sales meetings?

25   A        Correct.  I can't write fast enough to capture every

1   word that's said.

2   Q        Yeah.  Yeah.  And so for that reason, it's not like

3   you have anywhere close to the full statement, right, in your

4   notes?

5   A        Again, I write the 302 based primarily on my

6   recollection, not my notes.  The notes are just supporting my

7   recollection.

8   Q        All right.  And Agent Masterson didn't even write

9   anything at all in his notes related to this particular

10  statement, did he?

11  A        He didn't, no.

12  Q        Okay.  Now, I want to go to the third statement that

13  Scott Wombold is charged with stating in violation of federal

14  law, that he has never heard the term -- and I'm going to put

15  it up on a document camera.

16          THE COURTROOM DEPUTY:  Are you still wanting it not--

17  You're still wanting the jury not to see it.  Is that correct?

18          MR. RICHARDSON:  This one the jury can see, I think,

19  yeah.  It's just one word to explain the witness's testimony.

20  BY MR. RICHARDSON:

21  Q        Right?  So you would agree that Scott Wombold is

22  charged as follows:  He has never heard the term "Manuel"

23  spelled like this -- or I don't even want to pronounce it, but

24  he has never heard the term, this word up on the screen, used

25  to refer to reducing customers' manual rebates without their

1  knowledge.  You're aware that Scott Wombold is charged with

2  making that statement, correct?

3  A       Yes.

4  Q       Okay.  And, again, it's not like he said that,

5  right?  It was a question and answer that resulted in the

6  paraphrasing of that statement, right?

7  A       I asked him if he was aware of any terms that were

8  used to describe the practice for reducing customers' rebates

9  without their knowledge.  He said no, he was not.  I followed

10 up with a more specific question.  I asked him if he had heard

11 that term used to describe the process of reducing customers'

12 rebates without their knowledge, and he said no, he had never

13 heard that term.

14 Q       Okay.  All right.  Now, I want to ask you this,

15 then.  And thank you for clarifying how that -- that statement

16 came about as alleged against Scott Wombold.

17         This particular word, when you said the word in the

18 interview, how did you pronounce it?  (Indicating.)

19 A       I said "Man-well."

20 Q       "Man-well"?

21 A       Yeah.

22 Q       Fair to say that earlier in your testimony, actually

23 just today, you pronounced it more like "manual," "Manuel,"

24 rather than "Man-well"?

25 A       Yeah.  There -- I was aware from reading the

1  affidavit in support of the search warrant that the term

2  "Manuel" had been used in sales conferences to describe their

3  practice of customers' rebates being reduced without their

4  knowledge.

5  Q       Would you agree with me that that term, as written,

6  can be pronounced different ways?  Would you agree with that?

7  A       That word is pronounced "Man-well."

8  Q       Earlier in your testimony, though, you, yourself,

9  pronounced it "Man-u-el," didn't you?

10  A       With a different spelling.

11  Q       Pardon me?

12  A       With a different spelling.  I pronounced it

13  "Man-well."

14  Q       Right.  I'm just saying like--  And I'm focusing on

15  the pronunciation for a particular reason.  It sounded like,

16  just now, you said that you asked him with the -- the way it

17  sounded was "Man-well," right?

18  A       Right.

19  Q       Okay.  Earlier in your testimony, you described the

20  term used as, if I heard you correctly, "Man-u-el."  Is that

21  right?

22  A       I don't recall if I said "Manuel" or "Man-well."

23  Q       And would you agree that some people might pronounce

24  that word "manual," the way it's spelled at least, "Manuel"?

25  A       I don't know how some people might pronounce that.

1    Q        Okay.  How did you use the term when you asked the

2    question of Mr. Wombold?

3    A        I asked the question if he was ever aware of the

4    term "Manuel" being used to describe that practice.

5    Q        Okay.  So it's "Manuel."  Would you agree with me

6    that someone could hear a question about Manuel and it might

7    mean something different to them than the term manual?

8             MR. HAMILTON:  Objection.

9             THE COURT:  Sustained.

10   BY MR. RICHARDSON:

11   Q        All right.  That's one you don't have to answer.

12            So my question to you next is this:  Fair to say

13   that Agent Masterson's notes don't say anything at all about

14   this particular topic, do they?

15   A        I can't recall.

16   Q        Okay.  Would you mind taking a look and see if you

17   would agree?

18   A        Sure.  (Witness complying.)  I don't see it in

19   there.

20   Q        Okay.  Thank you, Agent Fisher.

21            Now, would it be fair to say when you asked the

22   question -- do you recall when you were asking about this term

23   -- "Hey, have you -- have you ever heard it being used?" that

24   was your question, right?

25   A        I asked him if he was ever aware of a term "Manuel"

1    or "Manny" being used to describe that practice.

2    Q        And would you agree with me that that's a question

3    that could call for him to answer based on his knowledge going

4    back as far as necessary, right?

5    A        Sure.

6    Q        Okay.  How about the question about whether he had

7    ever heard reducing rebates without customers' knowledge ever

8    being discussed in sales meeting?

9    A        Yes.

10   Q        Would it be fair to say that that question you were

11   also asking him to provide an answer based on any information

12   that he had going back through his entire period of employment

13   at Pilot?

14   A        Correct.  I didn't specify a certain time period.

15   Q        Okay.  Would you agree that your statement about

16   whether he was aware of any specific customers whose rebates

17   were cut without the customers' knowledge, that question,

18   likewise, calls for him to answer based on his knowledge going

19   back for his entire employment history at Pilot?

20   A        I didn't specify a certain time period.

21   Q        All right.  So would you agree that these were

22   questions that challenged the interviewee to search their

23   memory?

24   A        Yes; although, I knew from reading the affidavit

25   that it had recently been discussed in sales meetings --

1   Q        All right.

2   A        -- the practice of reducing customers' rebates

3   without their knowledge and the term "Manuel" or "Manny" being

4   used.

5   Q        All right.  So based on the affidavit, you have an

6   idea of what was discussed, right?  But you're not in Scott

7   Wombold's head, right?

8   A        That's correct.

9   Q        Okay.  Now, I want to finish up here by asking you

10  about your preparation for testifying here today.

11  A        Sure.

12  Q        Would you agree that, as an FBI agent, you want to

13  come into federal court and provide the most truthful and

14  accurate information possible, right?

15  A        Sure.

16  Q        And to do so, you prepare for your testimony, right?

17  A        Yes.

18  Q        And you prepared for your testimony, right?

19  A        Yes.

20  Q        Reviewed some documents, right?

21  A        Yes.

22  Q        Had discussions with an attorney for the government,

23  right?

24  A        Correct.

25  Q        You find that by preparing in this manner you can

1    provide the most truthful and complete information possible,

2    right?

3    A        Yes.

4    Q        Wouldn't the same have been true for Scott Wombold,

5    Agent Fisher?

6    A        No.  We--  It was different -- it was a different

7    situation.  In that situation we wanted to get his candid

8    impressions, his candid answer, without him having had the

9    opportunity to refresh his recollection.

10   Q        So you're telling this jury that you did not want

11   him to be able to provide candid and truthful information?

12   A        No, I just said we did want him to provide candid

13   and truthful information --

14   Q        You wanted him --

15   A        -- but we didn't want to give him the opportunity to

16   prepare in advance.

17   Q        Yeah.  And as you just indicated, by preparing,

18   you're in a position to provide the most truthful, accurate

19   information possible, right?

20   A        Right.  This is a different situation, though.

21   Q        And you didn't want to afford Scott Wombold that

22   opportunity, correct?

23   A        We wanted to get his off-the-cuff response to those

24   questions without him having had the opportunity to know the

25   questions in advance that we were going to ask him.

1    Q        So is that a "no" to my question?

2    A        Can you please repeat the question?

3    Q        I believe that it was:  You did not want him to have

4    an opportunity to be prepared to provide the most complete and

5    truthful information possible.

6    A        We didn't want him to have an opportunity to prepare

7    to provide information, no.

8             MR. RICHARDSON:  All right.  No further questions.

9    Thank you, Your Honor.

10                        CROSS-EXAMINATION

11   BY MR. HARDIN:

12   Q        Good morning.

13   A        Good morning.

14   Q        I don't believe we've met, have we, Agent Fisher?

15   A        No, sir.

16   Q        Did I understand from your testimony with the

17   government here that you began 21 years ago with the FBI?

18   A        Approximately.

19   Q        And did you say that you've always been assigned to

20   the Knoxville office?

21   A        I did.

22   Q        So from the beginning -- were you in any type of

23   state law enforcement before you joined the FBI?

24   A        No.

25   Q        Was the FBI your first law enforcement position,

1  then?

2  A      That's correct.

3  Q      So how old were you when you became an FBI agent?

4  A      I'm sorry?

5  Q      How old were you?

6  A      I was 26 years old.

7  Q      All right.  And when you began to work for the FBI

8  in Knoxville, how long after you started there did you meet

9  Mr. Hamilton here?

10 A      I would estimate ten years, approximately.

11 Q      All right.  So would it be a fair -- and

12 Mr. Hamilton, of course, is assigned to the U.S. Attorney's

13 Office in Knoxville?

14 A      That's correct.

15 Q      And this investigation was a -- of course, a

16 Knoxville investigation, correct?

17 A      Correct.

18 Q      Did you know Mr. Lewen before this case?

19 A      I did.

20 Q      All right.  How long had you known him?

21 A      Not as long.  Maybe a couple of years.

22 Q      Okay.  So you're testifying, are you not -- and

23 certainly nothing wrong with it, but you're testifying in a

24 case on behalf of two prosecutors, one of whom you've known

25 for over ten years and one you've known a couple of years

1    before this case, or just two years, period?

2    A        Two years, period.

3    Q        Okay.  So you met Mr. Lewen after this case was

4    ongoing.  Was it even after the indictment?

5    A        I'm sorry, it was -- it would have been

6    approximately two years after the case, I guess.

7    Q        After the case started.  Let's say -- let's say --

8    Mr. Greco, you know from the case, began wearing a wire, like,

9    the first week of October 2012, correct?

10   A        Right.

11   Q        All right.  And the investigation had been going on

12   before that with another man who now wants to be paid,

13   correct?  Mr. Verble?

14            MR. HAMILTON:  Objection.  Beyond the scope.

15   A        I wasn't involved in that part of the investigation.

16   Q        All right.  Let me ask you this:  In this particular

17   case, had you -- how much involved in the case were you before

18   April 15th of 2013?

19   A        My involvement including -- included preparing the

20   operations plan for the execution of the search warrant.

21   Q        All right.  Were you the senior agent on this

22   particular deal?

23   A        No, I was not the case agent.

24   Q        Right.  But were you senior to the one who was?

25   A        Yes.

1    Q        Was there an Agent Root that had been primarily

2    responsible for drawing up the affidavit?

3    A        That's correct.

4    Q        So the jury understands, and perhaps in this day of

5    TV.  They all -- they all know, but what you folks did was

6    prepare up a search warrant based on the information you had

7    at the time, right?

8    A        Correct.

9    Q        And so when you -- when Mr. Hamilton asked you if

10   you were executing a search warrant issued by a federal judge,

11   the answer to that, of course, was yes, right?

12   A        Yes.

13   Q        But the federal judge is deciding whether to issue a

14   search warrant or not based on what you and the other agents

15   say in the search warrant.  Is that a fair statement?

16   A        Based on what was in the affidavit?  Is that --

17   Q        Yes.  That's actually a very good point.

18            Search warrant is issued, that's the order of the

19   court to go out and search, correct?

20   A        Correct.

21   Q        But it's based on an affidavit that you FBI agents

22   submit?

23   A        Correct.

24   Q        So would it be a fair statement that a federal

25   magistrate or a federal judge is making a decision as to

 1    whether to issue a search warrant based on what you folks

 2    said?

 3    A         Correct.

 4    Q         So if what the agents say in their affidavit is

 5    accurate, that's great, right?

 6    A         That's as it should be.

 7    Q         Yes.  And the judge has to rely on the accuracy and

 8    truthfulness of what you're saying --

 9              MR. HAMILTON:  Objection, Your Honor --

10    BY MR. HARDIN:

11    Q         -- in order to make the decision, correct?

12              THE COURT:  What's the objection?

13              MR. HAMILTON:  The objection is relevance.  Beyond

14    the scope.  The discussions in the abstract of how search

15    warrants are obtained just is irrelevant.

16              MR. HARDIN:  I believe the question I'm responding

17    and following up from, where you --

18              MR. HAMILTON:  The United States asked the question

19    whether or not there was a search warrant being executed, that

20    is true.  But we're talking about search warrants in general

21    and how they're generally created, we're not talking about this

22    particular search warrant.

23              MR. HARDIN:  The clear --

24              THE COURT:  Let me hear from Mr. Hardin.

25              Mr. Hardin?

1          MR. HARDIN:  Thank you, Your Honor.

2          The clear implication of the question is that this

3     is extra-reliable for the jury to be concerned on -- to be

4     relying on what happened because it was issued by a federal

5     magistrate.  And I am -- I think I'm entitled to show how that

6     happens, in order for them to put it in the proper context,

7     that's all.

8          THE COURT:  I'm not sure I understand.  What is it

9     that the jury is being asked to rely upon?

10          MR. HARDIN:  I think anytime when a witness is asked,

11     "Were you there to issue a search warrant issued by a federal

12     magistrate?" the clear implication is there that gives what

13     they were doing an extra level of reliability --

14          THE COURT:  Why?

15          MR. HARDIN:  -- because it's been endorsed by someone

16     such as yourself.

17          THE COURT:  Why?  Why?

18          MR. HARDIN:  Well, if the Court wants to take the

19     position that the jury doesn't have any special opinion of

20     federal judges, then maybe I'm wrong, but I think most people

21     would say that you occupy an honorable position with an

22     honorable reputation, and if you've endorsed something, that

23     must make it extra good.  And I think I'm entitled to show

24     where you would be getting your information from when you did

25     that.

1        THE COURT:  I think there are people in high

2  positions who may take a contrary view of that, Mr. Hardin.

3        MR. HARDIN:  Well, and I wouldn't argue with that, I

4  mean, but -- but I think the Court is being unduly modest, and

5  therefore that's the reason I asked the question.

6        MR. HAMILTON:  Your Honor, if I may respond.  May I?

7        (Brief pause.)

8        MR. HAMILTON:  The government's response to that is

9  that the discussion of obtaining search warrants in the

10  abstract is not relevant.  If Mr. Hardin wants to ask about how

11  Mr. Root walked over to the magistrate judge, got a warrant

12  issued so he could go to Pilot and execute a warrant, then that

13  seems limited to the direct examination.  But the way in which

14  search warrants -- and somewhat of a civics lesson about how

15  they're obtained doesn't seem relevant to the discussion today.

16        MR. HARDIN:  I might point out, if I may, Judge, that

17  I believe the agent volunteered that he knew certain things --

18  as he was being questioned about his question for Mr. Wombold,

19  he knew certain things because he had relied on the search

20  warrant.

21        MR. HAMILTON:  On that particular affidavit that he

22  read in preparation.

23        MR. HARDIN:  Yes.

24        THE COURT:  Well, let's not belabor the point.  I

25  will allow counsel to question the witness about general search

1   warrant procedure.

2           MR. HARDIN:  And that's really all I'm after.

3   BY MR. HARDIN:

4   Q        So you would agree with me that a federal

5   magistrate, in deciding whether or not to issue a search

6   warrant, has to rely on the accuracy and truthfulness of the

7   agents that are presenting the affidavit to them, correct?

8   A        Yes.

9   Q        Now, in this particular case, are we to understand

10  that you reviewed the affidavit drafted by another agent?  Is

11  that correct?

12  A        Yes.  Correct.

13  Q        Before you execut- -- before you participated in it?

14  A        Correct.

15  Q        And your involvement was also to draw up -- I think

16  you said an execution plan?  What did you call it?

17  A        An operations order.

18  Q        An operations plan.  And so were you a senior agent

19  to Mr. Root?

20  A        No.

21  Q        And Mr. Root, was he the case agent on the case?

22  A        He was at the time.

23  Q        Did you read the entire affidavit?

24  A        I did.

25  Q        All right.  And did you read any other documents,

1    any other reports concerning previous interviews with

2    Mr. Greco and what he'd been telling people?

3    A        I recall reading some transcripts of some

4    conversations he participated in.

5    Q        All right, sir.  And so -- transcripts of some tape

6    recordings?

7    A        Yes.

8    Q        And what I want to follow up on and see if you would

9    agree.  You go into an interview with different goals, do you

10   not, at different times, depending on the facts and

11   circumstances, correct?

12   A        Sure.

13   Q        So if you're knocking on somebody's door in the

14   course of an investigation and you want to find out some

15   information, you might ask much more open-ended questions,

16   correct, than you would if you're interviewing somebody you

17   already believe has committed a crime?

18   A        Correct.

19   Q        And the truth is, when you-all went out there on

20   April 15th, 2013, this was an investigation that had been

21   going on since at least 2011, wasn't it?

22   A        Correct.

23   Q        So you are there with a search warrant, executing

24   with 25 law enforcement people, already having believed that

25   people there had committed crimes, correct?

1    A        Based on reading what was in the affidavit, we had

2    reason to believe that Mr. Wombold was present when statements

3    were made.

4    Q        Was believing what another agent has written as to

5    his views of the evidence, and where things showed so far, you

6    had formed an opinion, had you not?

7    A        Yes.

8    Q        All right.  So now the interview's going to be a

9    little bit different, isn't it?

10   A        What do you mean?

11   Q        Well, let's take a couple of examples.  You knew

12   there were people that said, before you went there, did you

13   not, and you -- that had -- that some manual rebates had been

14   reduced without the customers' knowledge, correct?

15   A        Correct.

16   Q        So you had an opinion about that before you ever

17   asked a question, didn't you?

18   A        Correct.

19   Q        And you knew that some people were saying that

20   "Manuel," or, as you have said today, "Man-u-el," was supposed

21   to be a code word for supposedly something improper, correct?

22   A        Correct.

23   Q        You knew, did you not, that there were allegations

24   that people were sometimes giving the customer a different

25   deal than they originally told the customer they were, right?

1    A        Correct.

2    Q        You knew there were allegations -- or you knew there

3    were tape recordings about a meeting back in November of 2012,

4    right?

5    A        Correct.

6    Q        So -- and we could go on with a series of things.

7    Would you agree with me that you arrived with a mission to

8    interview how many people?

9    A        One.

10   Q        Just one?

11   A        Correct.

12   Q        And he was a very senior man in the company, wasn't

13   he?

14   A        He was.

15   Q        And you already believed you knew something wrong

16   was going on, right?

17   A        Based on reading the -- some of the transcripts that

18   were included in the affidavit, I had an opinion formed, yes.

19   Q        Isn't it true, Agent, that as one tries to assess

20   the accuracy, the recall, and the certainty of your perception

21   of what happened that day, you were looking into it -- at it

22   through the lens of a man trying to make a case against the

23   man you were talking to?  Isn't that true?

24   A        I relied on the affidavit, which included

25   transcripts of comments that were made in sales meetings.

1    Q        The purpose of that search warrant, was it not, was

2    to gather as much in the records and everything as you can to

3    help fulfill a perception that you already had when you got

4    there?

5    A        No, that's not correct.

6    Q        And isn't it true that when you go upon a

7    business -- you weren't expecting there -- anyone there to be

8    violent, were you?

9    A        We knew that two employees that we anticipated

10   interviewing had handgun carry permits, so we made plans to be

11   prepared for that.

12   Q        That wasn't my question, was it?

13   A        Please repeat the question.

14   Q        Did you have any reason to believe anyone at that

15   place was violent?

16   A        No.

17   Q        Did you have any indication in your investigation

18   over the two and a half years that anyone that was going to be

19   in that building was violent?

20   A        No.

21   Q        Was it a building of an organization that was

22   perhaps one of -- the most or one of the most prominent

23   organizations and businesses in the city of Knoxville?

24   A        It was.

25   Q        When you arrived with 25 officers, is everybody

1    armed?

2    A        Correct.

3    Q        How many are in uniforms?

4    A        No uniforms.

5    Q        No uniformed backup officers?

6    A        There were some local officers that were posted down

7    at the front gate --

8    Q        And --

9    A        -- that did not enter the building.

10   Q        And when you arrived, was there any shouting?

11   A        There was direct commands made to individuals so

12   that hands could be seen.

13   Q        Yes, sir.  And was there any panic on behalf of the

14   people there?

15   A        The goal was to secure the building and to ensure

16   the safety of everyone there, and that's how we planned and

17   conducted the search warrant.

18   Q        Yes, sir.

19   A        We also made specific plans to ensure that the

20   business was able to continue operating while the search

21   warrant was being conducted.

22   Q        I think my question was, was there any panic on

23   behalf of people.

24   A        I can't answer that question.

25   Q        Did people act nervous and scared?

1   A        Sure.

2   Q        All right.  That would be a reasonable reaction,

3   wouldn't it?

4   A        Sure.

5   Q        And my question doesn't suggest that you were there

6   to try to do anything wrong, but you would agree, would you

7   not, that if you're a regular citizen of this country and 25

8   federal agents show up armed to execute search warrants, and

9   yell at everybody, "Get your hands up," "I want to see your

10  hands," and everything, there might be a level of fear and

11  panic on behalf of the recipients, correct?

12          MR. HAMILTON:  I'm going to object to the form of the

13  question because it assumes facts not in evidence.  There has

14  been no testimony that there was any, quote, "yelling" that was

15  occurring.

16          MR. HARDIN:  Well, I will ask.

17  BY MR. HARDIN:

18  Q        Was there any yelling?

19  A        No, not that I heard.

20  Q        You don't want them really to believe, do you,

21  Agent, that when you folks arrived, you walked in simply,

22  "Okay.  Everybody put your hands up.  Everybody get their --"

23  A        No.  But there's a difference between that and a

24  yell.

25  Q        All right.  So you just don't like the word "yell."

1    How about raised voices?

2    A        Sure.

3    Q        All right.  So would you agree with me that if 25

4    armed agents show up in a normal business and with raised

5    voices are saying to "Get your hands up," "I need to see all

6    your hands," and everything, that, when people have no warning

7    they're coming, there might be an element of alarm?

8    A        There may be.  But that was designed to ensure the

9    safety of them as well as us.

10   Q        I -- I understand the commercial for law

11   enforcement, but I'm simply asking you a simple question that

12   can be yes or no.

13           What I want to know, then, is, when you do the

14   interviews -- and did I understand you to testify in questions

15   from Mr. Wombold's counsel that you were -- you didn't want to

16   give people the opportunity to get their stories straight?

17   A        Correct.

18   Q        And you wanted candid responses?

19   A        Yes.

20   Q        Well, "candid responses" means somebody--  What does

21   "candid" mean to you?  Let me ask you that.

22   A        Truthful responses.

23   Q        All right.  But truthful responses might be more

24   truthful if one had an opportunity to think about it and look

25   at things and be sure that they haven't -- there are not

1  things they've forgotten.  That could also be a truthful

2  response, too, wouldn't it?

3  A        It could be, but we wanted to get his immediate

4  impressions.

5  Q        Right.  Isn't it true that, as a normal law

6  enforcement tactic, you will want to spring questions on

7  somebody you think has committed a crime, in the hope they

8  will screw up before they have time to think about it, right?

9  I mean, that's your --

10 A        The goal is to get an honest answer.

11 Q        But isn't that your mind-set?

12 A        The mind-set is to obtain and procure an honest

13 answer from the person being interviewed.

14 Q        Well, if you decide somebody committed a crime, the

15 goal is to get an answer that helps you make your case, isn't

16 it?

17 A        No, that's not true.  It's to get to the truth.

18 Q        All right, sir.  And by the way, when you talk about

19 the FBI not recording -- and you said the rule changed about a

20 year after this?

21 A        Correct.

22 Q        Be about 2014?

23 A        Correct.

24 Q        And the FBI policy was to never, before that, to

25 record any interviews, correct?

1    A          Correct.

2    Q          And then you said that changed to custodial,

3    correct?

4    A          Yes.

5    Q          That now the FBI's policy is, if you are

6    interviewing a believed attendant, somebody in custody --

7    right?

8    A          Yes.

9    Q          Not free to go?

10   A          Correct.

11   Q          -- that now the instructions are to tape it,

12   correct?

13   A          Correct.

14   Q          But, as we established earlier, that was not the

15   case, of course, on 2013 April 15, correct?

16   A          Correct.  And it wouldn't have made a difference,

17   because the interview was ruled noncustodial.

18   Q          Well, that's interesting.  And I'm almost through

19   here, but isn't it true that the very rule that changed it to

20   custodial also recommended -- made it discretionary now, but

21   recommends that you tape noncustodial interviews?

22   A          No, I don't -- I'm not aware of that.

23   Q          Is that your testimony?

24   A          Yes.

25   Q          Not aware of that?

1    A        I'm not.

2    Q        All right.  And would you tell the jury why, as a

3    law enforcement officer, you today would not want to

4    tape-record an interview such as Mr. Wombold's when he

5    wasn't -- you've said he wasn't in custody, he was free to go,

6    so it's not going to -- I'm just curious.  Explain to us what

7    would be the harm of making sure you had the most accurate

8    record of what he said?

9            MR. HAMILTON:  Objection, Your Honor.

10           THE COURT:  I think the problem is with the last

11   statement.  If you want to ask him why he thinks not using a

12   mechanical recording is not superior--  I don't know, though,

13   that saying that's the most accurate--  There are some

14   scientific studies that would suggest they're -- they're not

15   more accurate.

16           MR. HARDIN:  Let me try this.  Thank you, Judge.

17   BY MR. HARDIN:

18   Q        Did you ever see the custodial -- the memoranda from

19   the Department of Justice in May of 2014 establishing the new

20   rule?

21   A        I have not read it.

22   Q        Were you aware of it?

23   A        Yes.

24   Q        Okay.

25           MR. HARDIN:  May I have just for identification

1    purposes, Your Honor, Exhibit Number --

2               (Off-the-record discussion between opposing

3               counsel.)

4               MS. JARES:  195.

5    BY MR. HARDIN:

6    Q       I'm going to --

7               MR. HARDIN:  May I show this up to the witness, Your

8    Honor?

9               THE COURT:  You may.

10   BY MR. HARDIN:

11   Q       I'm going to ask you just to look.  And there's some

12   underlining here.

13   A       Okay.

14   Q       I'm not going to show it to the jury.  I'm going to

15   ask you if this would help you with the conversation we were

16   just having.

17              THE COURT:  It may be better if the parties can just

18   stipulate to it.  The witness said he's never seen it before.

19   So what you're asking him is to read what's in there.

20              MR. HARDIN:  Only to himself, Your Honor.

21              THE COURT:  I know, but I'm assuming you want him to

22   testify as to what's in a document he's never seen before,

23   right?

24              MR. HARDIN:  I want to see if it helps him understand

25   his previous answer, from the document.

1          THE COURT:  He's never seen it before, so it cannot

2    refresh recollection.  Why don't you and the government just

3    stipulate to it.  I'm assuming there's not going to be any

4    dispute about what's in the document, right?

5          MR. HARDIN:  Right.

6          THE COURT:  Mr. Hamilton, will you stipulate?

7          MR. HAMILTON:  Looks like he's holding a DOJ

8    document.  I don't know what he's holding.  I don't know if

9    there are any alterations to it.  I'm not suggesting there

10   would be.  I just need a chance to take a look at it.  And

11   after that, if it is a DOJ document, we could stipulate to

12   that, after having a chance to compare it to other DOJ

13   documents.  But the -- but the United States agrees that he

14   hasn't -- if he hasn't read the policy, it's not going to

15   refresh his recollection about it.

16         THE COURT:  Is there any dispute, though, that that

17   is the present position of the FBI on recording interviews?

18         MR. HAMILTON:  This appears to be a policy memorandum

19   from the Executive Office of the United States Attorneys to the

20   United States Attorneys, First Assistants, and Criminal Chiefs,

21   and Appellate Chiefs.  This document-- That's the cover

22   document.

23         I mean, I'm sorry to take the Court's time in

24   looking at this.  It does appear to be the current policy of

25   the Department of Justice, which, frankly, Your Honor, the

1    current policy of the Department of Justice was not in effect

2    in April of 2013, so it's irrelevant.

3         THE COURT:  So why don't you stipulate to it, then.

4         MR. HAMILTON:  We'll stipulate to -- if, subject to

5    our further confirmation, it is indeed an authentic copy of

6    that, then we'll stipulate this is a policy of the Department

7    of Justice.

8         THE COURT:  And the policy is that the FBI can, in

9    noncustodial situations, record interviews?

10         MR. HARDIN:  May I actually compare --

11         MR. HAMILTON:  Well, let me -- before I -- mind my

12    P's and Q's here on behalf of the Department of Justice.  I'm

13    not authorized to speak on behalf of the Department of Justice

14    on this issue.  I will say that I'm looking at this document,

15    and it does appear to be a Department of Justice document.

16         I will tell you that it's my understanding, on

17    behalf of the United States Attorney's Office, that the

18    current policy of the FBI and the Department of Justice is to

19    record custodial interviews, that is the current policy, and

20    that there is a policy that we're -- at this time that

21    recording noncustodial interviews is a -- would be a

22    discretion.  And there may be some -- I'm going to have to add

23    this, that there may be some approvals that are still required

24    for that.  But that is a layered policy issue within the

25    department, one on which I would be uncomfortable speaking

 1    about with absolute certainty without looking at the policy.

 2              MR. HARDIN:  I think he should be able to agree that

 3    the Department of Justice has encouraged law -- in addition to

 4    saying the interviews in custodial interrogation should be

 5    recorded, that it encourages law enforcement officers to

 6    consider -- let me put the exact words --

 7              THE COURT:  I thought I was going to save some time.

 8              MR. HARDIN:  I thought so, too, but apparently not.

 9              THE COURT:  It's apparent to me this witness was not

10    going to be able to get where you wanted to go.  And I thought

11    it was a simple matter of just you and the government

12    stipulating as to what the policy is, since it's something in

13    black and white.  Maybe you-all can do it in lunch or

14    something.  Just look at it, see what's in the paper, and

15    stipulate to what's in writing.

16              MR. HARDIN:  Thank you, Your Honor.

17              THE COURT:  This witness says he's never seen it

18    before.  So he's not going to be in a position to offer any

19    help at all.

20              MR. HARDIN:  Thank you.

21    BY MR. HARDIN:

22    Q         Now, have you been receiving -- you have continuing

23    training, do you not, that you --

24    A         Correct.

25    Q         And after the Department of Justice, in May of '14,

1   changed the policy about custodial, have you received training

2   in which you're encouraged to consider doing it in

3   noncustodial interviews?

4   A        No.

5   Q        All right.  And so you don't ever do it, yourself,

6   in noncustodial interviews?

7   A        I have not.

8   Q        And you haven't been encouraged to do that?

9   A        No.

10  Q        Do you think the record might be more accurate if

11  you did?

12  A        I think that 302, again, is accurate based on the

13  recollection we have of the interview.

14          MR. HARDIN:  That's all I have, Judge.  Thank you.

15          MR. WOJCIK:  Nothing for Ms. Jones, Your Honor.

16          MS. COMPHER-RICE:  No questions on behalf of

17  Ms. Mann, Your Honor.

18          THE COURT:  Redirect.

19          MR. HAMILTON:  Yes, Your Honor.

20                      REDIRECT EXAMINATION

21  BY MR. HAMILTON:

22  Q        So, Agent Fisher, during the two cross-examinations,

23  there was a question about 25 agents.  Do you recall that?

24  A        I do.

25  Q        And I believe there was another question about

1    approximately 50 agents.  Do you recall that?

2    A        I do.

3    Q        Could you help us reconcile that?  How many agents

4    arrived at Pilot headquarters on April 15th, 2013, to execute

5    the search warrant?

6    A        54.

7    Q        All right.  And prior to the execution of the search

8    warrant, did you participate in the operations planning for

9    that?

10   A        I did.

11   Q        Did you -- in preparing for that, did you find any

12   open-source material about the building?

13            Can we pull up Exhibit 101A, please.  There we go.

14            So is Exhibit 101A on the screen right now?

15   A        Yes.

16   Q        And what is depicted in Exhibit 101A?

17   A        It's a photograph of the front entrance of the Pilot

18   headquarter building.

19   Q        All right.  Prior to the execution of the warrant

20   and during your operations planning, what, if any, open-source

21   material did you find available about this document -- about

22   this building?

23   A        We were able to locate a video that was taken by

24   company employees that walked through the entrance floor and

25   the first floor, the floor below the entrance floor.

1   Q        All right.  So I used a term that I probably should

2   have clarified, "open source."  Could you tell the jury what

3   that means?

4   A        Based on something that's available to the public on

5   the -- in this case, on the Internet.

6   Q        And is this a video of that building?

7   A        Correct.

8   Q        And could you describe what that video showed?

9   A        The video showed employees within the building

10  dancing to a song, a pop song.  And it walked through the

11  entry level, which was the second floor, and then it proceeded

12  down to the first floor, and it showed an outline of how the

13  office was -- was structured.

14  Q        And based on the viewing of the video, were you able

15  to get a sense of approximately how many employees were on the

16  second floor and the basement of that Pilot building right

17  there?

18  A        Yeah.  There were dozens in the video.

19  Q        And did the video, from what you could tell, go up

20  to the third floor?

21  A        It did not.

22  Q        And as far as the interior structure, design, office

23  space, cubicles, et cetera, did the video give you any

24  information about that?

25  A        It did.  It gave us a rough idea of how the office

1    was set up on those floors.

2    Q        So based on your participation in the operations

3    planning, why was the number of 54 chosen to secure the Pilot

4    building?

5    A        Well, for -- to begin with, we knew that there were

6    going to be dozens of employees, based on that video, that we

7    needed to be able to locate and identify.  We needed to make

8    sure that the participants in the search warrant, the agents

9    and the employees, were safe.  We needed to ensure, also, that

10   the taint measures were taken.  Seven agents were designated

11   for that responsibility.  We also needed to ensure that

12   employees were located that would be able to ensure that the

13   company was able to continue operating while we conducted the

14   search warrant.

15   Q        With respect to the -- you said the word "taint."

16   Could you please describe that?

17   A        That's a process where, if we expect to find

18   privileged legal documents, we designate what are called taint

19   agents to locate those documents, and they keep them separate

20   from the rest of the investigation.

21   Q        And how many agents were identified to do that

22   function?

23   A        Seven.

24   Q        So is that seven of the 54?

25   A        That's correct.

1  Q        So then that takes us down to 47 who are

2  participating in securing the building?

3  A        Correct.

4  Q        And of the 47, approximately how many went up to the

5  third floor?

6  A        Approximately 25.

7  Q        And when you got to the third floor——let me ask you

8  to compare this number——the number of agents who were present

9  versus the number of office spaces that were on the third

10 floor, including cubicles, how did they compare, the number of

11 agents, approximately 25 --

12 A        Correct.

13 Q        -- with the number of offices and cubicles that were

14 up there that needed to be secured?

15 A        It turned out to be less than the number of

16 cubicles.

17 Q        What turned out to be less?

18 A        The number of agents.

19 Q        And what about the number of offices?

20 A        Combined with the cubicles, it -- there were more

21 offices and cubicles than there were agents.

22 Q        There's also been a reference to the fact that

23 agents were armed.

24 A        Yes.

25 Q        Were any weapons ever unholstered during this

1  search?

2  A      No.

3  Q      And there's also a reference to a jacket, right?

4  Did you hear --

5  A      Correct.

6  Q      And did this--  I'm holding up--  Was this what it

7  would look like?  Holding up a blue jacket.  (Indicating.)

8  A      Yes, it is.

9  Q      And it's like a windbreaker, nylon material?

10  A      Yes.

11  Q      You'd get this at maybe the White House gift shop,

12  almost, possibly?

13  A      Possibly.

14  Q      But, in any event, you all had jackets on that

15  identified you as agents.  Is that right?

16  A      Correct.

17  Q      What was the purpose of that?

18  A      That's, again, to ensure the safety of everyone

19  there.  We had agents that came in from Kentucky, different

20  locations, that had never -- that we had never met.  And so

21  that's to make sure that all the law enforcement officers are

22  known and identified to the other law enforcement officers,

23  and also so that the employees are aware of who the law

24  enforcement officers are.

25  Q      When you made contact with Mr. Wombold, would you

1    please describe that initial contact with Mr. Wombold?

2    A        When we arrived, we located him standing outside of

3    one of the offices in the hallway on the third floor.

4    Q        And would you describe that -- that initial

5    encounter with Mr. Wombold, what you said to him.

6    A        Yeah.  I was with Agent Masterson, and I recognized

7    him from a photograph.  I walked up to him, and I asked him if

8    he was Mr. Wombold.  He confirmed he was.  And I asked him if

9    he wouldn't mind taking some time to speak with us, because he

10   had some information that we thought could help us with our

11   investigation.

12   Q        And what did he say in response to that?

13   A        He said he would agree to talk to us.

14   Q        And approximately where was that?

15   A        That was approximately two offices down from his

16   office.

17   Q        At some point did you go to his office?

18   A        We did.

19   Q        Can you tell us how that -- how it is that you made

20   it from where you initially met him to the office?

21   A        After the area was secure, we followed him to his

22   office and followed him into his office, he sat down, and then

23   we sat down.

24   Q        All right.  And what, if any, steps did you take to

25   begin a voluntary interview?

1   A        At that point we made it clear that his

2   participation was voluntary, that he could choose not to

3   participate in the interview, that he was free to leave at any

4   point that he wanted to, that we would walk him out of the

5   building, and that he was not going to be arrested, he was not

6   under arrest.

7            And, you know, again, I offered him an opportunity

8   to conduct the interview off-site.  I offered, for example, to

9   suggest we could go to a restaurant and we would follow him

10  there, and we could meet inside the restaurant and talk if

11  that would be more comfortable for him.  He indicated he would

12  prefer to stay in his office.

13  Q        So we'll talk more about the recording piece of

14  this, but in your effort to -- what's the purpose of -- what

15  would be the purpose of you asking him if he wanted to go

16  somewhere else?

17  A        To put him at ease, to ensure his comfort, and also

18  to make it clear to him that it was a voluntary interview.

19  Q        All right.  So what, if any, logistical -- let's say

20  Mr. Wombold said, "Yes, Agent Fisher, I'd be happy to meet

21  with you-all, but I would like to go to Applebee's to do this,

22  because I'd like to eat there."  And in that situation, if he

23  did -- if he had made the request to go to Applebee's to have

24  the interview, would you have agreed to go there?

25  A        Yes, of course.

1  Q        And if he had agreed -- if you had gone to

2  Applebee's to have this interview with him, would there be

3  some logistical difficulties about setting up a recording

4  device there, to have this interview with him in Applebee's?

5  A        There would be.

6  Q        And could that also have affected the dynamic of

7  that situation with you and Mr. Wombold --

8  A        Yes.

9  Q        -- if that interview were happening at Applebee's?

10 A        Correct.

11 Q        During the interview, was there any other occasion

12 when you asked him if he wanted to go somewhere else?

13 A        There was.

14 Q        All right.  And do you still have Exhibit 250 up

15 there?

16 A        I do.

17 Q        All right.  Would you please turn to Page -- you

18 will see at the top of it, it says Page 8 of 14, which I

19 believe is the fourth page of some notes.

20          And are you at Page 4 -- Page 8 of 14?

21 A        I am.

22 Q        All right.  And does this -- whose notes are these

23 that we're looking at?

24 A        These are my notes.

25 Q        And do you see a 4 in the top right-hand corner of

1  that?

2  A        I do.

3           MR. HAMILTON:  And could I switch to the document

4  camera, please?  And this is just for the witness only.

5  BY MR. HAMILTON:

6  Q        Do you see the portion that's highlighted there at

7  the top of your notes?

8  A        I do.

9  Q        Could you please read that?

10  A        It says, "At approximately 2:55 offered, again, can

11  go elsewhere."

12  Q        And so what does that -- tell us -- is that a note

13  that you wrote?

14  A        That's a note that I documented when, at that time,

15  I again offered to him that we could leave here and go to

16  another location that he chose.

17  Q        So just to walk us through the time line again, what

18  time did the search begin, approximately?

19  A        Approximately 1:48.

20  Q        Approximately what time did you meet Mr. Wombold --

21  encounter Mr. Wombold?

22  A        Approximately 1:55.

23  Q        And then approximately what time were you in his

24  office?

25  A        Approximately 2:05.

Fisher - Redirect Examination

1    Q        All right.  So -- and at some point between -- at
2    2:05 you're in his office.  And then after that, going to his
3    office, is that the first time you offered him to go somewhere
4    else?
5    A        We first offered it out in the hallway.
6    Q        Okay.  And so then sometime between whenever you
7    were in the hallway and getting to his office, and then the
8    time that goes by at 2:55, so approximately how much time goes
9    by before you offer him again to go somewhere else?
10   A        Approximately 50 minutes.
11   Q        Okay.  Let me direct your attention now to the
12   statements that I asked you about on direct examination.  And
13   during cross-examination there was references to a number of
14   places in the notes and in the 302 that I didn't ask you
15   about.  I'm going to focus on the statements that are at issue
16   in this case.  All right?
17   A        Okay.
18   Q        So I'm going to direct -- we're going to stay on the
19   same page of the document that's been identified as Government
20   Exhibit 250.  And, again, is this page your notes?
21   A        It is.
22   Q        And I'm also going to direct your attention to
23   your -- so if you can look at your 302 --
24   A        Uh-huh.
25   Q        -- while the notes are on the screen.

1  A        Okay.

2  Q        Would you please look at the Page 2 of your 302, the

3  bottom of it.

4  A        Yes.

5  Q        And do you see the -- where it says, "Wombold is not

6  aware"?

7  A        Yes.

8  Q        Would you please read that?

9  A        "Wombold is not aware of any specific customers

10  other than Star Transport whose rebates were reduced by PFJ

11  employees without the customers' knowledge or approval."

12  Q        So I'm going -- I'm putting my pen here where some

13  words are highlighted.  Would you please read those words?

14  A        It says, "Star --"

15       MR. RICHARDSON:  Your Honor, if I may object at this

16  point.  I'm not sure what the purpose is.  It may be an

17  allegedly prior consistent statement.  And, if so, that would

18  be okay if it was to rebut an express or implied claim of

19  recent fabrication, which we don't have here.  So to the extent

20  this is offered to prove the truth of the matter asserted that

21  Scott Wombold said this or that, I think it's inadmissible

22  hearsay.

23       MR. HAMILTON:  May I respond, Your Honor?  You know,

24  we spent an hour on cross-examination going through and trying

25  to pick apart this 302 with allegedly inconsistent notes.  And

1  the whole purpose of this exercise is to show exactly how the

2  notes are consistent with the statements that are at issue in

3  the 302 and in the indictment.

4          THE COURT:  Overruled.

5  BY MR. HAMILTON:

6  Q       Agent Fisher --

7  A       Sir.

8  Q       -- back to your notes.

9  A       Yes.

10  Q      So would you -- you had just read -- I want this to

11  stay together.  All right?  So would you please read the

12  sentence "Wombold is not aware" again?

13  A       "Wombold is not aware of any specific customers

14  other than Star Transport whose rebates were reduced by PFJ

15  employees without the customers' knowledge or approval."

16  Q      Would you please read the portion of your notes on

17  Page 8 of Government Exhibit 250.  You had just said the word

18  "Star."  I want you to read what your notes say, please.

19  A       "Star, no other specific customers where rebates

20  were reduced without customers' knowledge."

21  Q      All right.  So you say "reduced."  And it says,

22  "where rebates."  And would you please describe -- and, in

23  fact, would you please describe what this -- is there a symbol

24  there?

25  A       There is a downward arrow.

1    Q        After the word "rebates"?

2    A        Correct.

3    Q        So would you read the next sentence of your 302 at

4    the top of Page 3, beginning with "reducing"?

5             Go to the 302.

6    A        "Reducing rebates without customers' knowledge was

7    not discussed during sales meetings, and it is something that

8    would not be discussed during a sales meeting."

9             MR. RICHARDSON:  Your Honor, I have to object again.

10   It is consistent with my prior objection.  I just don't see

11   that this testimony is offered to explain how the notes were

12   constructed, whatever.  It is intended to prove the truth of

13   the matter asserted that Scott Wombold allegedly said this.  I

14   have to make the same objection.

15            MR. HAMILTON:  Your Honor, if I can respond again?

16            THE COURT:  You may.

17            MR. HAMILTON:  So the way I interpreted

18   cross-examination, the point being made was that you can't

19   really -- that there are issues with Agent Fisher's testimony

20   because his notes don't line up in all instances with his 302

21   on these various other matters.  And the United States is

22   responding to that by saying that the statements that are

23   issued in the indictment line up --

24            MR. HARDIN:  Excuse me, Judge.  Pardon me.

25            MR. HAMILTON:  -- well with the --

1          MR. HARDIN:  Pardon me.

2          Your Honor, I've been patient through this trial,

3    but this man gives these speeches to the audience, and I

4    object to it.  Surely he can give a basis for why he wants to

5    ask something without getting his whole final argument in

6    every time he's asked by the Court for a response.  And I

7    strenuously object to doing it this way.

8          THE COURT:  Are we getting a preview of your final

9    argument, Mr. Hamilton?

10         MR. HAMILTON:  I think there will be more to it.

11         THE COURT:  There will be more to it?

12         MR. HAMILTON:  Yes, sir.

13         THE COURT:  Okay.

14         MR. HAMILTON:  But I would say if the -- if the

15   attack during their argument is that we can't rely on it, then

16   that's why we want -- because of the inconsistency in the

17   notes, we certainly would want to have the record so that I

18   could argue in a rebuttal situation that in fact actually --

19         THE COURT:  Well, why don't we stick to

20   Mr. Richardson's objection, then.  That's what's -- that's

21   what's on the floor.

22         MR. HAMILTON:  Yes.

23         THE COURT:  Mr. Richardson objects that by going

24   through the notes, you're trying to introduce the contents of

25   the note for the truthfulness of the matter asserted.  And

1   Mr. Richardson says that he did not do anything on

2   cross-examination that should warrant that.

3           MR. HAMILTON:  Well, and so the reason why he did

4   that -- the reason why cross-examination warrants this kind of

5   response on redirect is because he, and for a lengthy amount of

6   time, pointed out different parts of the notes in the 302, and

7   was attempting to get Mr. Fisher to say that those were not

8   consistent.  And it came across to me that the object of that

9   was to undermine the reliability of Mr. Fisher's testimony

10  because there are problems with the notes in the 302.

11          He then also went to -- he pointed out -- he talked

12  about the fact that notes related to the statements in the

13  indictment are not in Mr. Masterson's set of notes.  And I

14  should be -- the United States should be entitled to respond

15  to that by showing that they -- that language very similar to

16  what's in the 302 is actually in his set of notes.

17          THE COURT:  So this is more in the line of a prior

18  consistent statement, then?

19          MR. HAMILTON:  I think that that's fair to say, that

20  it's a prior consistent statement, and certainly with the line

21  of cross-examination that Mr. Hardin asked Mr. Fisher, which

22  was that -- along the lines of that he is here because he's

23  worked with Mr. Lewen and me for some time and that he has got

24  a case he wants to win, and that sort of thing, and this

25  testimony today, that we ought to be able to put in his

 1  statements as the notes that were made at the time before the

 2  302 was written.

 3          THE COURT:  I'm not sure I understand that last part,

 4  though.  I do think that this would be a fair response to the

 5  questions that Mr. Richardson raised.  I'm not quite sure I

 6  understand the allusion to Mr. Hardin's questions, though.

 7          MR. HAMILTON:  Well, it was about the --

 8          THE COURT:  (Indicating.)  Go on and ask your

 9  question.

10          MR. HAMILTON:  Yes, sir.

11  BY MR. HAMILTON:

12  Q       Would you please read, starting with "Reducing

13  rebates"?

14  A       "Reducing rebates without customers' knowledge was

15  not discussed during sales meetings, and it is something that

16  would not be discussed during a sales meeting."

17  Q       And would you please -- I'm pointing you to a

18  portion of your notes that are highlighted, and would you

19  please start again with the "Star" line and read that portion

20  of the highlighted notes all the way through.

21  A       "Star, no other specific customers where rebates,

22  down arrow, without customer knowledge.  Wouldn't talk about

23  it, the sign for at, sales meetings."

24  Q       And so how did those notes that you just read

25  verbatim relate to the statements that are in the 302 that you

1    just read?

2    A        The statements in the 302 are supported by those

3    notes.

4    Q        And did you take those notes at the time you were

5    interviewing Mr. Wombold?

6    A        I did.  I took them contemporaneously with the

7    interview.

8    Q        All right.  And was that when you were in his

9    office?

10   A        It was.

11   Q        When you were sitting in the chair across from him?

12   A        Yes.

13   Q        Now, let me direct your attention to another portion

14   of your 302, and would you -- looking down at the bottom of

15   Page 3 of your 302 where it says, "Wombold has never."  Do you

16   see that part?

17   A        Yes.

18   Q        Would you please read that?

19   A        "Wombold has never heard the term 'Manuel' --

20            MR. RICHARDSON:  Your Honor, for the record, if

21   nothing else, I definitely have to interpose the same

22   objection.  Reading a statement from a 302 that's -- this is

23   rank hearsay, allegedly a prior consistent statement with this

24   testimony as to what Scott Wombold said.  And it's -- I did not

25   make a claim of recent fabrication, and so it's inadmissible

1    hearsay.

2           THE COURT:  If it's a statement allegedly of

3    Mr. Wombold's, how is that hearsay?

4           MR. RICHARDSON:  Because, Your Honor, this is

5    actually not -- in my view, what we have in the 302, as I

6    believe Your Honor has pointed out in court, really what the

7    302 -- it's not -- it is -- the 302 itself is a prior statement

8    of -- of the witness about what Mr. Wombold said.  So he can

9    testify to what Mr. Wombold said, notwithstanding the rule

10   against hearsay, on the witness stand.  Here is an out-of-court

11   statement that previously Agent Fisher said that Scott Wombold

12   said this.  So therefore it's a statement of Agent Fisher that

13   we're talking about, his statement about what Scott Wombold

14   said, rather than, really, the statement of Scott Wombold.

15          THE COURT:  Mr. Hamilton?

16          MR. HAMILTON:  I'd like to ask another question and

17   then possibly come back to this one maybe -- maybe address the

18   concerns.  So may I just withdraw that for now, withdraw the

19   reading of the 302 at this moment?  I may come back to it.

20   BY MR. HAMILTON:

21   Q       Mr. Fisher, with respect to when you were

22   interviewing Mr. Wombold, what, if anything, did you ask him

23   about the use of the terms "Man-well" or "Manny" at Pilot as

24   those terms related to manual rebates?

25   A       I asked him if he was aware of whether those terms

1    had been used to describe the practice of reducing customers'

2    rebates without their knowledge.

3    Q        And what did he say?

4    A        He said he had not heard of those terms.

5    Q        And did you put that in your 302?

6    A        I did.

7    Q        And looking at the notes over here on the document

8    camera -- and this is Page 4 of Government Exhibit -- excuse

9    me, Page 8 of Government Exhibit 250 marked for ID only, can

10   you read the portion of your notes that relate to that, or

11   your testimony as well as what was in the 302?

12   A        Says, "Never heard of 'Manuel' or 'Manny.'"

13   Q        And did you write those notes during your -- at the

14   time you were interviewing Mr. Wombold?

15   A        I did.

16   Q        And how, if in any way, does that support your

17   testimony as well as what's in the 302?

18            MR. RICHARDSON:  Your Honor, I'm going to object one

19   more time.  This reference to what's in the 302, again, it's a

20   reference to this witness's prior alleged inconsistent

21   statement.  It's a reference to hearsay.

22            MR. HAMILTON:  Well, may I respond, though?

23            THE COURT:  Mr. Hamilton?

24            MR. HAMILTON:  This is why I wanted to have the

25   record structured so I could respond to it.  So the testimony

1   was, Mr. -- Agent Fisher said what Mr. Wombold said.  That was

2   done on direct examination.  On cross-examination there was an

3   effort to attack Agent Fisher's direct exam testimony by

4   pointing to inconsistencies unrelated to these statements but

5   inconsistencies that were alleged to exist with other

6   statements by Mr. Wombold in the 302.  And we are simply -- the

7   United States is simply here pointing out the consistency

8   between the notes, the 302, and the testimony that has been

9   attacked on cross-examination.

10          THE COURT:  So the point of it is not so much to show

11  the accuracy of the 302 but to show the accuracy of the

12  witness's testimony here in front of the jury?

13          MR. HAMILTON:  That's exactly right, Your Honor.

14          THE COURT:  Okay.  On that basis, then, the Court

15  will overrule the objection.

16  BY MR. HAMILTON:

17  Q       So how -- how does -- your notes "Never heard of

18  'Manuel' or 'Manny,'" your notes there that are highlighted,

19  relate to your testimony today?

20  A       They support and reference Mr. Wombold's statements

21  that he had never heard those terms.

22  Q       This is the point at which I want to come to the

23  question that was asked about the time during the interview

24  that you stood up and walked around his desk.  And can -- do

25  you recall that part of the cross-examination?

1   A        I do.

2   Q        And can you tell the jury, at approximately what

3   point in the interview did that occur?

4   A        That occurred when the interview was becoming more

5   direct and when I -- after I began to form the opinion that he

6   wasn't being candid.

7   Q        All right.  And so at that point in the interview,

8   when Mr. Wombold put his -- what did Mr. Wombold do at that

9   point -- what did Mr. Wombold do to prompt you to get up and

10  walk over to his desk?

11  A        His hands had been on his desk, and he -- he lowered

12  his hands below his desk.

13  Q        And that was at a point when it had become more

14  direct?

15  A        Correct.

16  Q        And what gave you concern?

17  A        Our concern was that there might be some kind of a

18  weapon under there that he might be able to access.

19  Q        And you said it was at that point that you felt like

20  that he wasn't being candid with you?

21  A        Correct.

22  Q        And what gave you that impression?

23  A        He had said that he had not heard of those terms

24  being used in sales meetings.  And based on the affidavit, I

25  was aware that he had been present where those terms had been

1    used.

2           MR. HAMILTON:  No further questions, Your Honor.

3           THE COURT:  Ladies and gentlemen, it's about 25

4    minutes after the hour now.  Let's take our lunch break.  And

5    let's see if we can get back at 1:45, 1:45.

6           And let me see counsel in chambers.

7           (Luncheon recess.)

8           THE COURT:  Call your next witness.

9           MR. HAMILTON:  The United States calls Sherry Blake.

10          (Brief pause.)

11                        SHERRY BLAKE,

12   called as a witness at the instance of the government,

13   having been first duly sworn, was examined, and testified as

14   follows:

15                     DIRECT EXAMINATION

16   BY MR. HAMILTON:

17   Q      All right.  Would you please -- would you please

18   introduce yourself to the jury.

19   A      My name is Sherry Blake.

20   Q      And, Ms. Blake, what city do you live in?

21   A      Knoxville, Tennessee.

22   Q      Where do you presently work?

23   A      I work for Pilot Travel Centers.

24   Q      And how long have you worked there?

25   A      Twenty-two years.

1          MR. HAMILTON:  Okay.  Could we pull up Exhibit 101A,

2    please.

3          (Brief pause.)

4    BY MR. HAMILTON:

5    Q          Do you see Exhibit 101A?

6    A          Um.

7    Q          On the screen, Ms. Blake.

8    A          Oh.  Okay.  Yes.

9    Q          And what is -- what do you rec- -- do you recognize

10   that?

11   A          Yes.  That's Pilot's corporate office.

12   Q          And do you work in that building?

13   A          I do.

14   Q          And how long have you worked in that building?

15   A          Twenty-two years.

16   Q          Now let me ask you to take a look at another

17   photograph that you may recognize, Government Exhibit 212.

18   And who is that?

19   A          That is me.

20   Q          What is your job now at Pilot?

21   A          I am the executive assistant to our vice president

22   of real estate.

23   Q          During your time at Pilot, did you ever work with

24   Mr. Hazelwood?

25   A          Yes.

1   Q        What was your job title when you worked with

2   Mr. Hazelwood?

3   A        I was hired as his executive assistant.

4   Q        And as his executive assistant, what were the

5   responsibilities of your job?

6   A        I mainly reported -- worked with Mark on the real

7   estate side.  He did all the site selections for the travel

8   centers.  And then I handled all of his appointments,

9   scheduling, his calendar; his travel, both business and

10  personal.  Just basic secretarial tasks——expense reports,

11  checked his e-mails, or assisted with his e-mails, and things

12  like that.

13  Q        All right.  In addition to that, did you in any way

14  help him with any of this personal bills?

15  A        Yes.  Around 2003 or 2004, Mark asked me to help him

16  with some of his personal expenses, business, paying some

17  bills——utilities, insurance, mortgages, things like that.

18           THE COURT:  Counsel?

19           MR. HAMILTON:  Yes.

20           THE COURT:  Let's...

21           THE COURTROOM DEPUTY:  It's Elizabeth.  She needs

22  some equipment.

23           THE COURT:  Okay.

24           (Brief recess.)

25           THE COURT:  Mr. Hamilton, you may resume.

BY MR. HAMILTON:

Q        Ms. Blake, I believe before we had our small break there that you were talking to us about some work that you were doing for Mr. Hazelwood that began in about 2003, about assistance with personal bills.

So because we had a little bit of a break there --

MR. HARDIN:  Could you maybe get a little closer to the microphone.

MR. HAMILTON:  Yes.  Excuse me.  I'm sorry.

BY MR. HAMILTON:

Q        Would you tell us how you were helping Mr. Hazelwood with his bills.

A        Yes.  Around 2003, 2004, Mark asked me if I would start helping pay some of his personal bills——mortgage, utilities, insurance, things like that.  And then it -- he asked me if I would continue doing that for a company that he owned called Hazel Development, which at that time had just a couple of properties, but over the years the -- it grew in properties.

And then that developed into -- around 2008 he had a company and bought an airplane, and I had the same duties, paying the bills and managing that as well.  And then around 2010 or '11, he was part-owner in a sports agency.  I didn't have as many responsibilities with that, but I helped out a little bit.

1          I worked directly with his accountants, his private

2    bankers, his insurance companies.  I was a signature on his

3    checking accounts.  I was authorized agent on his credit

4    cards.  I was given power of attorney at times to sit in on

5    real estate closings for Hazel Development.

6    Q        So from the period of -- you have -- I think you

7    have explained a period that ran from 2003 to two thousand --

8    to around what time?  Let's -- let me -- actually let me put

9    an end of that period.  2013.

10   A        I was --

11   Q        Let me just say -- let me ask this question:  So

12   from approximately 2008 to 2013, other than your Pilot

13   responsibilities that you had as his executive assistant, what

14   were you helping him with outside of that, with paying bills?

15   A        Hazel Development, H&S Air, and his company A3.

16   Q        How about during the time of 2008 to 2013 -- setting

17   aside whatever businesses he had, what about his personal

18   bills?  Were you helping pay those as well?

19   A        Yes.  Yes, the personal bills as well.

20   Q        And how would you go about helping him with that,

21   with paying personal bills?

22   A        He would -- he would bring everything in to me.

23   When I first started, I was actually writing the checks

24   myself.  But as time went on, then it was -- it was growing.

25   So we -- I started sending everything -- I would review it,

1    and then I would send it to the accountants, they would

2    process the checks, they would come back to me, I would sign

3    off on them, and I would mail them out for him.

4    Q        When you say "process the checks," what checks are

5    you talking about?

6    A        Checks for expenses for Hazel Development, H&S Air.

7    Q        All right.  And whose checks were -- whose checks

8    were they?  Were they your checks?  Were these your personal

9    checks, or were they someone else's checks, is what I'm

10   asking.

11   A        No.  I was a signature on these, but these were --

12            MR. HARDIN:  Excuse me.  Your Honor, may we have a

13   proffer of relevance of this?

14            THE COURT:  I'm sorry.  What?

15            MR. HARDIN:  Of the relevance.

16            THE COURT:  "Developments"?

17            MR. HARDIN:  Relevance.

18            MR. HAMILTON:  "The relevance."  He's asking about

19   the relevance, Your Honor.

20            THE COURT:  Oh, I'm sorry.  I'm sorry.

21            MR. HAMILTON:  And I'm happy to explain that.

22            MR. HARDIN:  I would like a very succinct

23   explanation.

24            MR. HAMILTON:  Right.  And so this is a case in which

25   the United States alleges that there were fraud proceeds that

1    were obtained by Mr. Hazelwood.  And the United States is

2    laying a foundation about the significant amount of expenses

3    that Mr. Hazelwood had on a monthly basis.  And the United

4    States' position is that that would be a motive to commit the

5    crime.

6             MR. HARDIN:  Well, then, if he wants to ask her about

7    expenses, I'm not going to object.  If he's going to ask for

8    all of this that he's asking for right now, that is neither

9    relevant nor necessary.

10            THE COURT:  I think what he may be doing is laying a

11   foundation to show why she would have knowledge.

12            MR. HAMILTON:  That is what I'm trying to do.  I will

13   try to move it along quickly.

14            MR. HARDIN:  I'll be glad to let him explore the

15   relevance of it.  Thank you, Your Honor.

16            THE COURT:  Proceed, Counsel.

17   BY MR. HAMILTON:

18   Q        When you were talking about the checks, are they

19   your checks, or someone else's check?

20   A        They're someone else's checks.

21   Q        Okay.  And how about as it relates to any sort of

22   personal expenses for Mr. Hazelwood?

23   A        The personal ones were still someone else's checks,

24   his checks, his personal account.  I was a signature on that

25   as well.

1    Q        Okay.  And during the period of 2008 to 2013,

2    approximately how much in expenses were you seeing go out of

3    Mr. Hazelwood's accounts?

4    A        On a monthly basis?

5    Q        Yes, ma'am.

6    A        Upwards -- sixty, seventy thousand dollars a month.

7    Q        And did Mr. Hazelwood have a residence?

8    A        Yes.

9    Q        Did he have more than one residence?

10   A        Yes.

11   Q        How many residences did Mr. -- approximately how

12   many residences did Mr. Hazelwood have during the period of

13   2008 to 2013?

14   A        Four, I believe.

15   Q        And based on your -- your assistance that you were

16   providing, where were those residences?

17   A        There was one in Knoxville, one in Nashville, one in

18   Kiawah, South Carolina, and one in Park City, Utah.

19   Q        When were you doing this -- when were you providing

20   this kind of bill-paying assistance for Mr. Hazelwood?

21   A        During Pilot business hours.

22   Q        Did Mr. Hazelwood provide you any salary for that?

23   A        No, he didn't provide a salary.  He -- around --

24   Q        May I ask you this?  Did he ever give you any money?

25   A        Yes.  Around 2008, 2009, Mark started giving me a

1  monetary gift each year, that ran through 2014.

2  Q        And was 2014 the last time he gave you a gift?

3  A        Yes.

4  Q        In 2014 approximately when did that occur?

5  A        April 2014.

6  Q        And how much did he give you?

7  A        Mark Hazelwood gave me $10,000, and Joanne Hazelwood

8  gave me $10,000 as well.

9  Q        This is now several minutes ago.  It was actually

10  before the little break that we had.  When you were describing

11  the responsibilities that you had, did I hear you say

12  something about e-mails?

13  A        Correct.

14  Q        All right.  Could you tell the jury what your

15  responsibilities were as it related to Mr. Hazelwood's

16  e-mails?

17  A        I had access to Mark's e-mails on my computer, and I

18  would periodically throughout the day check the e-mails,

19  mainly looking for anything that was real estate-related or

20  anything for his personal businesses.  And then I tried to

21  clean up junk e-mail for him.  That was mainly what I looked

22  for unless I was directed to look for something else.

23  Q        And when you say "clean up junk e-mail," what do you

24  mean by that?

25  A        I would delete it out of his in-box.

```
 1    Q        Did you ever remove any Pilot-related e-mail from

 2    his in-box?

 3    A        Not that I'm aware of, no.

 4    Q        How did you get access to his e-mail account?

 5    A        Our -- Mark wanted me to have access to it.  Our IT

 6    department set it up so that I would have access through

 7    Outlook on my computer.

 8    Q        So far throughout your testimony you have referred

 9    to someone named Mark.  And just so I can clarify -- there's a

10    court reporter writing things down, and I just want to

11    clarify.  When you say "Mark," who do you mean?

12    A        Mark Hazelwood.

13    Q        And I asked you about an e-mail account.  And what

14    e-mail account did you have access to that you were

15    describing?

16    A        Mark Hazelwood's e-mail account.

17    Q        And was that his Pilot e-mail account?

18    A        Yes, his Pilot.

19    Q        And when you say "IT," what IT department are you

20    talking about?

21    A        Pilot Travel Centers.

22    Q        And I believe you said the word "Outlook."  Did you

23    say "Outlook"?

24    A        Outlook, yes.

25    Q        And what is Outlook?
```

1    A        It's the program that we use for contacts through

2    Windows.

3    Q        Since you had access to his e-mail, I'm going to

4    show you some e-mail for the purpose of asking you whether or

5    not you sent the e-mail.  All right?

6    A        Uh-huh.

7    Q        Exhibit 902, please.

8             Do you see the response?  This e-mail is from --

9    it's from a markhazelwood@pilottravelcenters.com?  Do you see

10   that?

11   A        Yes.

12   Q        Is this the e-mail account that you had access to?

13   A        Yes.

14   Q        And did you send the e-mail from the

15   markhazelwood@pilottravelcenters e-mail account on

16   February 18, 2008, to Janet Welch that says "Okay"?

17   A        No, I did not.

18   Q        Let me direct your attention now to Government

19   Exhibit 2194.

20            Do you see the From line at the top, the

21   markhazelwood, pilotcorp.com?

22   A        Yes.

23   Q        Did you have access to this e-mail account?

24   A        Yes.

25   Q        And did you send this e-mail that's dated March 27

1    of 2012 from the Mark Hazelwood e-mail account?

2    A          No, I did not.

3    Q          Let me direct your attention to 2196.  2196 is --

4    directing your attention to Government Exhibit 2196.  This is

5    an April 27, 2012, e-mail.

6              And did you have access to this e-mail account,

7    markhazelwood@pilottravelcenters.com?

8    A          Yes.

9    Q          Did you send this e-mail?

10   A          No, I did not.

11   Q          And thus far Exhibits 902, 2194, and 2196 are all in

12   evidence.  And the next two exhibits are also in evidence as

13   well.

14             Government Exhibit 2217.  Did you have access to the

15   Mark Hazelwood account that is at the top of this e-mail?

16   A          Yes.

17   Q          And did you send the response that's in 22- --

18   Government Exhibit 2217, "Great recap.  Let's get Cost Plus B

19   plan going ASAP.  Thanks"?

20   A          No, I did not.

21   Q          Directing your attention to Government Exhibit 2219.

22   Did you have access to the e-mail account that this e-mail

23   came from, also?

24   A          Yes.

25   Q          And did you send the e-mail "Awesome" on

1   February 20th, 2013?

2   A        No, I did not.

3   Q        Want to direct your attention to some e-mails also

4   that are -- that relate to trip reports.

5   A        (Moving head up and down.)

6   Q        Let's pull up Government Exhibit 606A.  And looking

7   at the bottom of this e-mail, see that it is from -- who is

8   that from?

9   A        It's from Jay Stinnett.

10  Q        And what's the date of that e-mail?

11  A        June 17, 2010.

12  Q        And who is it to?

13  A        Mark Hazelwood, Sherry Blake, Vicki Borden, John

14  Freeman, Holly Radford.

15  Q        And do you see the e-mail response at the top?

16  A        "Great job."

17  Q        And did you send that e-mail?

18  A        I did not.

19  Q        And is the e-mail "Great job" from the Mark

20  Hazelwood account?

21  A        Yes, it is.

22  Q        Let's go to Government Exhibit 606B.  Government

23  Exhibit 606B is on the screen, and please look at the middle

24  part of that e-mail.  Do you see it?  The middle part of the

25  screen, rather, where it says "from Jay Stinnett"?

1    A         Uh-huh.

2    Q         And what is the date of that?

3    A         August 12th, 2010.

4    Q         And who is it to?

5    A         Mark Hazelwood, Sherry Blake, John Freeman, Vicki

6    Borden, and Holly Radford.

7    Q         And what's the subject?

8    A         "Jay's week."

9    Q         And looking at the top part of the screen, do you

10   see the Mark Hazelwood e-mail account?

11   A         Yes.

12   Q         And did you have access to that e-mail?

13   A         I did.

14   Q         Did you send the e-mail "Awesome.  Great job.  Jay,

15   get 'em"?

16   A         No, I did not.

17   Q         Directing your attention now to Government

18   Exhibit 606C.  Let's look at the top part of this e-mail.

19   This is the second page of Government Exhibit 606C.

20             Do you see an e-mail from Brian Mosher dated

21   September 17th of 2010?

22   A         Yes.

23   Q         And who was that e-mail to?

24   A         Scott Wombold, Vicki Borden, Sherry Blake, Mark

25   Hazelwood, and Wendy Hamilton.

1 Q  And what is the subject?

2 A  "Weekly trip report (late)."

3 Q  All right.  Let's look at the top part of this

4 exhibit.  Do you see an e-mail from the Mark Hazelwood e-mail

5 account we've been talking about?

6 A  Yes.

7 Q  Is that the one you had access to?

8 A  Correct.

9 Q  Did you send a response "Nice" from that account?

10 A  No, I did not.

11 Q  Please direct your attention now to Government

12 Exhibit 606D.  And do you see in the middle of the screen an

13 e-mail that's dated December 17 of 2010.

14 A  Yes.

15 Q  And who is that from?

16 A  That is from me to Mark.

17 Q  And what did you write to him?

18 A  "I did not receive trip reports from the following:

19 Tim Hampton, Vince Greco, Scott Wombold, John Freeman, and

20 J.W. Johnson."

21 Q  And do you see an e-mail up at the top of the screen

22 here?

23 A  Yes.

24 Q  And is that from the Mark Hazelwood account we've

25 been talking about?

1    A       Yes.

2    Q       Did you write the response, "I got John's"?

3    A       I did not.

4    Q       Direct your attention, please, to Government

5    Exhibit 606G.  This is the second page--

6            Let's go to the second page of Government

7    Exhibit 606G.  There we are.

8            And do you see an e-mail from Brian Mosher dated

9    March 16th of 2012?

10   A       Yes.

11   Q       And who is that e-mail to?

12   A       Scott Wombold, Sherry Blake, Vicki Borden, Wendy

13   Hamilton, Heather Jones, Mark Hazelwood.

14   Q       And what is the subject?

15   A       Trip report, 3/12/12.  March 12.

16   Q       And is there an attachment that's described?

17   A       Yes.  3 --

18   Q       And what is that?

19   A       "3/12/12 Trip Report" is the attachment.

20   Q       Let's please look at the top of Government

21   Exhibit 606G.  Do you see an e-mail from the Mark Hazelwood

22   account that we've been talking about?

23   A       Yes.

24   Q       Did you have access to that account?

25   A       Yes.

1    Q        Did you write the response on March 16th, 2012,

2    "Brian great job, especially on Heartland.  The Crete tech

3    issues piss me off"?

4    A        No, I did not.

5    Q        Directing your attention to 606H.  Look at first --

6    the second page of -- well, look in the middle part -- excuse

7    me -- of 606H.  Do you see an e-mail there from Jay Stinnett?

8    A        Yes.

9    Q        What is the date of that e-mail?

10   A        April 20th, 2012.

11   Q        And who is it to?

12   A        Holly Radford, Sherry Blake, John Freeman, Mark

13   Hazelwood, Vicki Borden, and J.W. Johnson.

14   Q        And what is the subject?

15   A        "J.W. Trip Report."

16   Q        And do you see an e-mail at the top of it from Mark

17   Hazelwood's e-mail account?

18   A        Yes.

19   Q        And did you write the response that is seen there?

20   A        No, I did not.

21   Q        Let me direct your attention now to Government

22   Exhibit 618, which is a new exhibit.  And can you tell us what

23   this document is?

24   A        It's my annual review.

25   Q        From when?

1    A          "From when"?

2    Q          Yeah.  What year?

3    A          2004.

4    Q          And how would this -- can you tell the jury how this

5    document would be created?

6    A          Mark would handwrite it out, and we would meet.  And

7    then after my review, then I would type it up.

8    Q          Okay.  So looking at the portion that's highlighted,

9    it says "Sales and trip reports," what -- what did that --

10   what did you understand that to mean?

11   A          That he expected me to receive trip reports from all

12   the sales team by Friday each week, 12:00, put in a notebook,

13   and give to him for the afternoon.

14   Q          Was that something -- so could you describe that

15   process about how you would -- how would you create the

16   notebook?

17   A          Trip reports were to be e-mailed in to me every

18   Friday by 12:00 p.m. Eastern time so that it would allow me

19   enough time to print them.  And then I put them in a binder

20   like this one.  (Indicating.)  And then I would put it in

21   Mark's in-box for the afternoon, when he would have his sales

22   calls or meetings.

23   Q          Let me direct your attention to Government

24   Exhibit 619.  And what is Exhibit 619?

25   A          It is my 2005 review.

1  Q        And how was this document created?

2  A        The same.  Mark handwrote it out, and then I would

3  type it up.

4  Q        And would you meet with him about it?

5  A        Yes.

6  Q        Do you see the II and then the "A.  Calls - trip

7  reports?"  Do you see that?

8  A        Yes.

9  Q        And would you tell the jury what that relates to.

10 A        The same thing, wanting the trip reports submitted

11 each week so that we would put them in the notebook and give

12 to him.

13 Q        Please direct your attention to Government

14 Exhibit 620.  And what is this document?

15 A        It's my 2007 review.

16 Q        And how was it created?

17 A        The same.  Mark Hazelwood wrote it out.  We -- I

18 typed it up.  We met and discussed it.

19 Q        And looking at the, again, II, "Sales" is

20 highlighted, this time under D.  Do you see what's highlighted

21 there?  "Trip reports due 12:00 noon EST on Friday."  Can you

22 tell the jury what that means?

23 A        Trip reports were due from the Sales to me by e-mail

24 every Friday 12:00 p.m. Eastern so that I would have time to

25 put them -- print them, put them in the book, and put it on

1    Mark's desk for the afternoon calls.

2    Q        Now let me direct your attention to Government

3    Exhibit 603A.  And what is this document?

4    A        It's an e-mail dated January 25th, 2008.  "Mark

5    asked me to print trip reports and drop off to his house for

6    him to review this weekend.  I will be heading out in about an

7    hour."  It's to John Freeman, Kevin Hanscomb, with a copy to

8    Katy Bibee and Holly Radford, on trip reports.

9    Q        And what is the subject?  I'm sorry.

10   A        "Trip Reports."

11   Q        And at whose request did you send this e-mail?

12   A        Mark Hazelwood's.

13   Q        Please direct your attention to Government

14   Exhibit 603B.  And is this another e-mail --

15   A        Yes.

16   Q        -- with an attachment?

17   A        Yes.

18   Q        And what is the date of this e-mail?

19   A        May 30th, 2008.

20   Q        And who is the e-mail from?

21   A        It's from me.

22   Q        And who is it going to?

23   A        It's going to the entire direct sales field, with a

24   copy to Vicki Borden.

25   Q        And what is the subject?

1    A        Subject is "Trip reports."

2    Q        What is the attachment?

3    A        The attachment is an example of a form that Mark

4    wanted us to start using for the trip reports.

5    Q        And would you please tell the jury what your e-mail

6    says there?

7    A        "Going forward Mark would like all trip reports to

8    be in the format of the one shown during the sales meeting.

9    Example attached.  Several of you have already started using

10   this format.  Thank you.  Also, a trip report in this form is

11   still required even if you work out of your home office and

12   only call on customers by phone."

13   Q        And at whose request did you send this e-mail?

14   A        Mark Hazelwood's.

15   Q        Please direct your attention to Government

16   Exhibit 603C.  And who is this e-mail from?

17   A        It is from me.

18   Q        And what is the date of it?

19   A        August 26, 2010.

20   Q        And what is the subject?

21   A        "Trip reports."

22   Q        And who is it to?

23   A        It is to Brian Mosher, Cathy Sokolowski, Kim Royal,

24   Vince Greco, John Markham, Kevin Clark, Scott Fenwick, Arnie

25   Ralenkotter, John Spiewak, Tim Prins, Ron Carter, John

 1  Freeman, Jay Stinnett, Tim Hampton, Jonathan Duvall, Chris

 2  Andrews, Scott Wombold, and J.W. Johnson, and copied to Vicki

 3  Borden.

 4  Q       And what's the subject?

 5  A       "Trip reports."

 6  Q       And what does it say?

 7  A       "Just a reminder that trip reports are due by

 8  12:00 noon Eastern every Friday.  I'm sending last week's and

 9  this week's to Mark to review while in Italy.  Thanks."

10  Q       And at whose request did you send this e-mail?

11  A       Mark Hazelwood's.

12  Q       Did there come a time when the way in which trip

13  reports were collected for Mark Hazelwood changed?

14  A       Around late 2010, maybe September, October 2010, we

15  started putting the trip reports in Dropbox so that he could

16  view them on his iPad instead of having the actual notebook.

17  Q       So from January 2008, then, up until the

18  September-October 2010 time frame, how did you collect trip

19  reports for Mr. Hazelwood?

20  A       They were e-mailed in to me, I printed a hard copy,

21  put it in a notebook, put it on Mark's desk each week.

22  Q       Was this notebook that you were talking about, was

23  it in the same place every time when you came back to get it?

24  A       No.  I would -- I would put it in his in-box, and

25  the next week when I would retrieve it, sometimes it would be

1  in the out-box, sometimes it would be on the desk, sometimes

2  it would be in the floor, sometimes it would still be in the

3  in-box.

4  Q        On April 15th of 2013, were you working at Pilot?

5  A        Yes, I was.

6  Q        And do you recall what happened that day?

7  A        Yes, I do.

8  Q        What happened?

9  A        Our office -- the FBI and the IRS raided our office

10  and issued a search warrant for our office.

11  Q        Did you -- were you interviewed by the FBI?

12  A        Yes, briefly I was.

13  Q        Did you -- how did you identify yourself to the FBI?

14  A        That I was Sherry Blake, that I was Mark Hazelwood's

15  executive assistant.

16  Q        On April 15th of 2013, at some point after that

17  interview, did you talk to Mr. Hazelwood in any way about that

18  interview?

19  A        Yes.  Mark called me that evening and I -- I told

20  him that I had met with the FBI that afternoon.

21  Q        Now let me take you to June 9th of 2014.  Let me

22  direct your attention to Government Exhibit 1901A, which is

23  already in evidence.  1901A is already in evidence.  And since

24  1901A is now on the screen, do you see on the far left there

25  it says, "Mobile Directory" and then you can see capital N

1    lower case U-M, "Mobile Directory Num"?

2    A        Yes.

3    Q        "Mobile Directory Number."  All right?

4    A        Yes.

5    Q        And do you see a number there?

6    A        Yes.

7    Q        And would you please read that number?

8    A        8658057148.

9    Q        And what is that number?

10   A        That is my cell number.

11   Q        Now I'm going to direct your attention over to the

12   right side of the screen.  And do you see a column there that

13   says, "Calling Party"?

14   A        Yes.

15   Q        I want to direct your attention to a time on

16   June 9th, of 2014, at 1824, 6:24 in the evening.

17            And do you see the "Calling Party" number there?

18   A        Yes.

19   Q        And would you please read that "Calling Party"

20   number?

21   A        8656031505.

22   Q        And do you know whose number that is?

23   A        Yes.

24   Q        And whose number is that?

25   A        Joanne Hazelwood's number.

1   Q       So, you know, I have a copy of what you're looking

2   at at the lectern right now, and I'm going to -- it's an

3   enlargement of it, it's an enlargement of 1901A.

4   A       Uh-huh.

5   Q       And so that we can keep up with these numbers, and

6   so I can eventually show it to the jury and we can talk about

7   it, can I write "JH" as a representative of Joanne Hazelwood?

8   A       Yes.

9   Q       Who is Joanne Hazelwood?

10  A       She is Mark Hazelwood's wife.

11  Q       All right.  Looking at the next call, which is at

12  6:35 on June 9th of 2014, do you see the calling party there?

13  Whose number is that?

14  A       The calling party is my number.

15  Q       All right.  And what number do you call?  Do you see

16  the "Digit Dialed" number over there?  What number do you

17  call?

18  A       That is Mark Hazelwood's home phone number,

19  544-0422.

20  Q       All right.  Would it be all right if I put "MH Home"

21  for that?

22  A       Yes.

23  Q       All right.  Now let me direct your attention to the

24  next call, and that is the 80571 -- the next call is 805-7148

25  from the calling party.  Is that you?

1    A        That is me.

2    Q        And who do you call there?

3    A        The 8657425- -- excuse me, 4501 is a friend of mine.

4    Q        And may I just write "Friend" there?  Is that --

5    A        Uh-huh.  (Moving head up and down.)

6    Q        Now, then, do you see the next number there, the

7    742-4501 for 696 seconds?

8    A        Yes.

9    Q        All right.  And who is that?

10   A        That's my friend calling me back.

11   Q        Okay.  And then the next number, at 6:42, that's a

12   duration of six seconds, what number is that?

13   A        544-0422 is Mark Hazelwood's home number.

14   Q        How about the next number at 6:43 for 28 seconds?

15   A        8652667073 was the -- Mark Hazelwood's phone that we

16   called "the Italy phone."  It was an international cell phone

17   that they had.

18   Q        I'm going to describe that on this board as "MH

19   Italy."  Is that fine?

20   A        Uh-huh, yes.

21   Q        Then the next number on the "Calling Party" that

22   we're going to look at, at 6:52, whose number is that?

23   A        603-1505 is Joanne Hazelwood's cell number.

24   Q        Having identified these numbers, I want you to walk

25   us through, please, what happened on June 9th of 2014, please.

1  A        I was at a nail salon having a manicure, and my

2  phone rang, and it was Joanne Hazelwood's cell number.  I

3  couldn't answer the phone.  And when I had a free hand, I shot

4  a text and said, "I'm having a manicure.  I'll call you when I

5  finish."

6        And the response back was, "Wasn't me.  Must have

7  been Mark.  Call the house."

8  Q        Can I interrupt you there just for a moment, because

9  I'm going to hold the board up here.  This is 1901A where I

10  have made notations as you were explaining the numbers.

11        So the call at 6:24, on June 9th, 2014, where I have

12  "JH Cell" there, is that the call at the nail salon?

13  A        Yes.

14  Q        And after you got the text back from her, what

15  happened?

16  A        I -- probably about 10 minutes, 10, 15 minutes

17  later, I was finished.  And when I was in my car, I placed a

18  phone call to the house number, 544-0422.

19  Q        And why did you place the call to the house number?

20  A        That's what the text instructed me to do.

21  Q        The text from whom?

22  A        I assume it was from Joanne Hazelwood.  It was from

23  her phone.

24  Q        And that, then, is -- is that the call at 6:35 on

25  June 9th to the "MH Home," Mark Hazelwood home?

1    A        Yes.

2    Q        And did you reach anyone there?

3    A        No one answered.

4    Q        Looking at the next -- the next lengthy call,

5    June 9th at 2014 at 6:40, to the -- this is a phone call from

6    your friend.  Is that right?

7    A        Yes.  When no one answered at Mark's home, I placed

8    a call to a friend.  She didn't answer, but she immediately

9    called me back, and we had the lengthy conversation.

10   Q        And while you were talking to her, is that when you

11   received the call from the Mark Hazelwood home at June -- on

12   June 9th, 2014, at 6:42?

13   A        Yes.  A call came through from the house.  She was

14   in the middle of her conversation.  I was going to finish the

15   call and call him back, so I didn't take the call.

16   Q        And how about the call from the Mark Hazelwood Italy

17   phone?

18   A        A minute or two later, that number started calling

19   in as well.

20   Q        And was that while you were on the phone with your

21   friend?

22   A        That is correct.

23   Q        Looking at the next lengthy call, which is at

24   6:52 on June 9th of 2014, the one that's identified here as

25   "JH Cell," Joanne Hazelwood's cell --

1    A        Yes.

2    Q        -- can -- can you tell us what happened there?

3    A        So that call came through, I then finished the call

4    with my friend, and I answered the call.  Joanne Hazelwood was

5    on the phone, and we had pleasantries, "Hello, how are you?"

6    things like that, and then she said, "Here's Mark," and she

7    put Mark on the phone with me.

8    Q        And did you have a conversation with Mr. Hazelwood

9    then?

10   A        Yes.  It started out the same way, "Hey, how are

11   you?  How's Pilot?" things like that.  And then Mark said,

12   "Hey, I know you told Rusty's investigator that I read the

13   trip reports.  I just need you to know I didn't read the trip

14   reports.  I didn't have any way to respond to the trip

15   reports.  I know I was a bulldog when I asked for them, but I

16   just need you to know I didn't read them.  Do you understand?"

17   Q        And how did you react to that, Ms. Blake?

18   A        I responded yes, because I wanted the phone call to

19   be over.  I felt -- I felt like I was being used.  I felt

20   betrayed.  And I felt that everything generous that Mark had

21   done for me in the past was being called upon.  I couldn't

22   believe that he had called me.

23   Q        When Mr. Hazelwood said that he did not have a way

24   to respond to trip reports, what was your understanding of

25   whether that was true?

1  A        I didn't believe it.  I mean, he -- he had ways to

2  respond.  He could have picked up the phone, he could have

3  e-mailed, he could have met with someone face to face.  There

4  was many ways to respond to trip reports.

5  Q        Well, let's look at Exhibit 606B.  Is Exhibit 606B a

6  June e-mail from Mr. Hazelwood -- excuse me, August 16, 2010,

7  e-mail from Mr. Hazelwood, is that a response to a trip

8  report?

9  A        That is a response.

10 Q        When Mr. Hazelwood said that he never read the trip

11 reports, what was your understanding of whether that was true?

12 A        I -- I didn't believe it.

13 Q        Let me direct your attention to Government

14 Exhibit 606G.  And do you see this is a Mark Hazelwood e-mail

15 from March of 2012 to Brian Mosher?  Do you see that?

16 A        Yes.

17 Q        And do you see that there is an entry related to

18 "Crete"?

19 A        Yes.

20 Q        And is Mr. Hazelwood's -- is the response in this

21 e-mail, "Brian, great job, especially on Heartland.  The Crete

22 tech issues piss me off"?

23 A        That's his response.

24 Q        Was Mr. Hazelwood still employed by Pilot when he

25 contacted you?

1    A          No, he wasn't.

2               MR. HAMILTON:  May I have just a moment, Your Honor?

3               (Off-the-record discussion between government

4               counsel.)

5               MR. HAMILTON:  No further questions, Your Honor, at

6    this time.

7               THE COURT:  Cross-examination.

8                         CROSS-EXAMINATION

9    BY MR. HARDIN:

10   Q          Good afternoon.

11   A          Hello.

12   Q          I believe we may have met occasionally very briefly.

13   A          We did.

14   Q          Would that be a fair statement?

15   A          Yes.

16   Q          I don't believe, however, Ms. Blake -- I've never --

17   and I'll go with whatever you remember, so correct me if I'm

18   wrong.  I don't believe you and I have ever personally gone

19   over the facts of this case, have we, or --

20   A          We have not, no.

21   Q          I remember, when we were first retained, coming to

22   Pilot.  Mark was still there, correct?

23   A          That's correct.

24   Q          And we had been asked to represent him.  And I

25   remember us meeting and talking.

1          Would you think we ever talked more than five

2    minutes with each other?

3    A          You and I?  No, we didn't.

4    Q          Okay.  And then was there more than one occasion?

5    What's your memory?

6    A          Maybe twice.

7    Q          Okay.

8    A          Not -- not much.

9    Q          And then the -- there was a time at some time where

10   you were interviewed by an investigator at our firm.  Is that

11   correct?

12   A          That is correct.

13   Q          And that's Mr. Jim Yarbrough.  Does that name sound

14   familiar?

15   A          It does sound familiar, yes.

16   Q          And during that interview also an investigator for

17   Pilot, a Mr. Purser, was present.  Is that right?

18   A          Yes, that's correct.

19   Q          But I was not there?

20   A          You were not there.

21   Q          So, now, color me surprised about the last five or

22   ten minutes of your testimony.  Would you agree that you

23   sounded bitter?

24   A          Maybe.

25   Q          Okay.  I'm not quarreling with you.  You have the

1    right to have any feeling you want. I want to try to explore

2    what -- how this has evolved, if I can. Okay?

3    A      Uh-huh. (Moving head up and down.)

4    Q      At the time this all happened, would you describe --

5    when I say "all this happened," it's -- I'm always going to be

6    probably saying starting with April 15th of 2013.

7    A      Okay.

8    Q      All right? And did I-- I've tried to bring up here

9    some of the live feed—it's not an official record, so

10    sometimes there may be a mistake, until it's all completed—of

11    some of the testimony. So I may go back and forth to that, if

12    that's okay, to make sure I understand things.

13    A      Okay.

14    Q      Did you say that you felt betrayed in the phone

15    call?

16    A      I did.

17    Q      Okay. And I'll just -- plug that in the back of

18    your mind. We'll come back to that. All right?

19    A      Okay.

20    Q      At what age were you when you started to work for

21    Pilot?

22    A      I believe I was 26, 27.

23    Q      All right. The lady that has the role with me in my

24    office has been with me 27 1/2 years, and she was 29. You

25    were basically -- would you -- as long as no one took the

1  wrong meaning from it, you had basically become the work wife

2  of Mark Hazelwood, hadn't you?

3  A      Yes, I had.

4  Q      When he talked about Joanne Hazelwood -- that was

5  his second marriage, correct?

6  A      Correct.

7  Q      And you knew his first wife?

8  A      I did.

9  Q      You knew his children?

10  A      I did.

11  Q      You knew the daughter that was tragically killed in

12  an automobile accident?

13  A      Yes, I did.

14  Q      What year did you go to work for him, that you began

15  to work under him, under his supervision?

16  A      1996.  January of 1996.

17  Q      1996?

18  A      Uh-huh.  (Moving head up and down.)

19  Q      You were aware by that time that he had already been

20  there ten years, correct?

21  A      Yes.

22  Q      And when you went to work there, were you there

23  for -- when we talk about money and expenses, the government

24  asked for you --

25  A      Uh-huh.

1    Q        -- by the time -- how soon would you say, after you

2    went to work for him, that he began to make a bunch of money?

3            This is kind of a trip down memory lane for you,

4    isn't it?

5    A        Yeah.  Yeah.  I mean, it's always been a lot of

6    money, to me, but...

7    Q        Let me stop you there.  That's a very, very good

8    point --

9    A        Yeah.

10   Q        -- in real dollars sense.

11   A        Yeah.

12   Q        How did you grow up, by the way?  What did your

13   parents do?  Where did you grow up?

14   A        My mother was a homemaker.  My dad was a

15   construction worker.

16   Q        All right.  Did your parents have college

17   educations?

18   A        No.

19   Q        Did you?

20   A        I went to a business school.

21   Q        Okay.  So when you went to Pilot and saw the money

22   that people were starting to make there --

23   A        Uh-huh.

24   Q        -- that's not a world you grew up in, is it?

25   A        No, absolutely not.

1  Q        My town in North Carolina that I grew up in was

2  9,000.  How big was yours?

3  A        I don't know.

4  Q        All right.  But the dollars these people were

5  starting to make and the -- at least the executives -- I'm not

6  speaking of the -- of the women that were working in jobs,

7  such as we have right here, but the men, somewhere in the

8  '90s, 2000s, were beginning to make a good deal of money,

9  weren't they?

10  A        Uh-huh.  Yes.

11  Q        And that was money that the average person who came

12  from the kind of backgrounds perhaps you and I and others in

13  this room did would have to say was a lot of money?

14  A        Correct.

15  Q        And when that was happening, you knew at the time,

16  didn't you, that Mark only had a high school education?

17  A        Yes, I did.

18  Q        I believe you've told people, others, haven't you,

19  that he began with Pilot at 13 washing dishes --

20  A        Uh-huh.

21  Q        -- working in the truck stop where his mother

22  worked?

23  A        Yes.

24  Q        So this is a guy that you knew when you went to work

25  for him --

Blake - Cross-Examination

1  A        (Moving head up and down.)

2  Q        -- started out 13, with no college education, high

3  school degree, and now he's into his 30s and he's beginning to

4  make a bunch of money?

5  A        Yes.

6  Q        It wouldn't have come as any surprise to you that he

7  was spending a lot of money, would it?

8  A        No.

9  Q        Kind of think that would be the natural thing that

10  would happen, wouldn't you?

11  A        Uh-huh.  (Moving head up and down.)

12  Q        But, nevertheless, as things went on, he asked you

13  to assume more and more things in his life, didn't he?

14  A        He did.

15  Q        I couldn't tell from the tone of the government's

16  questions, but that's why I want to ask from you:  Do you

17  think there was anything wrong with him asking you to do all

18  these things for him?

19  A        Oh, no, I didn't -- whatever I could do for Mark,

20  him and his family, that's what I wanted to do.

21  Q        Okay.  So no matter what anybody else may be trying

22  to suggest, you don't for a moment think these things that he

23  was asking you to do --

24  A        I was happy to do it.

25  Q        For instance, Jimmy Haslam is the owner of the

1  Cleveland Browns, isn't he?

2  A       Yes.

3  Q       So you -- your office was how far away from his?

4  A       On the other side of the-- (Indicating.) We were

5  on the same floor.

6  Q       It would be a perfectly natural thing for him to be

7  asking the people that work for him to help him with his

8  business some, too, right?

9  A       I would guess, yes.

10 Q       And if he did, or doesn't -- we don't know whether

11 he did or not, but if he did, you would never have thought

12 there was anything wrong with that, would you?

13 A       I did not -- I would not, no.

14 Q       Pilot looked at itself as one big family, didn't it?

15 A       Yes.

16 Q       How would you describe the way you felt about the

17 company, not about anybody as an individual, I'm not asking

18 you about your opinions of any individual. But just the

19 company and the atmosphere, how did you feel about it?

20 A       That's exactly how I felt. It was one big family.

21 I loved -- I loved working for Pilot.

22 Q       So whenever you started taking over and doing bills

23 and things like that, you didn't think there was anything

24 unusual or improper about it, did you?

25 A       No, I didn't.

1  Q        When did you become aware, if you were, that -- is

2  it fair to assume that working on his finances and expenses

3  and everything you, very early on, became aware that he had an

4  agreement with the Haslam family that made him a 3 1/2 percent

5  owner of Pilot?

6  A        I don't think I knew that or understood that, so...

7  Q        Do you recall -- did you have anything to do or be

8  aware of whenever that agreement would be renewed?

9  A        Mark usually handled his contracts with them on his

10 own.  Now, he may have given me a copy of it to file for him,

11 but I wasn't involved in anything like that.

12 Q        Okay.  So you didn't know about that one way or the

13 other?

14 A        No.

15 Q        You didn't know about his partnership arrangement or

16 anything like that?

17 A        I didn't know the details of that, no.

18 Q        Fair enough.  Were you privy to his income tax

19 returns?

20 A        Yes.

21 Q        So you saw how much money he was making?

22 A        Yes.

23 Q        And am I right in assuming and gathering that you

24 would look into nothing more -- no more than you absolutely

25 had to do in connection with your job, on a personal basis?

1    A        I'm sorry, tell me that again.

2    Q        Did you still try to leave him -- are we right to

3    assume you left him some privacy?  You didn't go over his tax

4    return, in other words, did you?

5    A        Oh, no.  No, I didn't.

6    Q        You wouldn't have looked to see where all that money

7    was allocated and what it was coming from?

8    A        I didn't -- I did not do that, no.

9    Q        That was something you didn't think you needed to

10   know, correct?

11   A        Right.

12   Q        So that would be why, although you knew how much he

13   was making, you might not have known the basis of it?

14   A        Correct.

15   Q        And that's why you wouldn't have known that the

16   large portion of it had to be because he was a part owner?

17   A        Correct.

18   Q        Okay.  You knew that he was thought highly of, in

19   terms of his role in the company, by Mr. Haslam?

20   A        Yes.

21   Q        But you didn't know what arrangement they had?

22   A        No.

23   Q        Fair enough.  Now, when you were doing these

24   different matters -- let's -- let's go, if we can, to

25   April 15th.  How would you describe what that day was like

1   there, when -- I believe you called it a raid?

2   A        (Shrugging shoulders.)  Yes.

3   Q        I don't think anybody would argue that it was over

4   50 law enforcement officers.  Does that sound right?

5   A        There was quite a few law enforcement, yeah.

6   Q        During that time, did you have -- I mean, you had no

7   notice or idea that they were on the way, did you?

8   A        No.

9   Q        Do you recall what your reaction was when they

10  arrived?

11  A        Complete shock.

12  Q        And how was everybody else acting?

13  A        I was in my office, had my door closed, and I could

14  see out, and I saw the activity going on.  And when I came

15  out, then they were asking me where Mark was, if Mark was in

16  the building, and he wasn't at that time.

17  Q        Did Mark -- when Mark was -- was Mark planning to go

18  out of town that day?

19  A        Yes.

20  Q        Okay.  And so when they first arrived, he wasn't

21  there?

22  A        No.

23  Q        Have you ever-- Let me just see if I can -- I've

24  got something.  Did you ever describe that day as scary?

25  A        It wasn't scary to me.  I think, like I said, it was

1  just very surprising and -- and confusing.

2  Q        Uh-huh.  And were -- were people -- other people

3  acting scared and concerned?

4  A        The people in the sales department.  (Moving head up

5  and down.)

6  Q        Yeah.  And was there some yelling when people first

7  came in, telling them to keep their hands up, and all that?

8  A        I was in my office with the door closed.  I didn't

9  hear.

10  Q        So you didn't hear what was happening outside?

11  A        I didn't hear, no, until I just saw them passing in

12  front of my door.

13  Q        All right.  So then describe your involvement with

14  them that day.  When they came in, you're in your office with

15  the door closed?

16  A        I came out, and they were asking where Mark was,

17  because his office was next to mine.  And I told them that he

18  wasn't in the building.  And then they asked where Jimmy

19  Haslam was.  So I took them to the side of the building that

20  he's on.

21  Q        And was Mr. Haslam there?

22  A        He was in the building that day, yes.

23  Q        Okay.  So you left them there with him, or what did

24  you do next?

25  A        They took me to -- they kept me with some of the

1  other executive assistants.  And one of the agents was asking

2  me where Mark was.  And I told him that he was on his way to

3  the airport for a trip.  And they asked for his cell number,

4  and they called him and he answered.  And they told him he

5  needed to come back to the office.

6  Q      They gave him a choice, though, didn't they, or did

7  they?  Did you hear the conversation?

8  A      I was right there, but I don't remember what the

9  conversation was.

10  Q      So back -- I guess, did some people choose not to

11  come back?

12  A      I don't -- I don't know.

13  Q      Well, Mitch Steenrod, for instance, was the chief

14  financial officer --

15  A      Okay.

16  Q      -- correct?

17  A      Yes.

18  Q      He was out of the office, was he not?

19  A      I don't know.

20  Q      You don't know where he was that day?

21  A      No, I don't.

22  Q      All right.  You don't have a memory of him coming

23  back to talk to them, do you?

24  A      I don't have a memory of that, no.

25  Q      All right.  And then Mr. Hazelwood came back?

1  A        He did.

2  Q        How long after he talked to the officers would you

3  estimate it was before he got back?

4  A        Twenty minutes.  He -- he was on his way to the

5  airport.  He turned around.  He came straight to the office.

6  Q        Okay.  Now, when Mr. Hazelwood came back, did you

7  have -- I'm not going to ask you what he said to you, but did

8  you have any conversations with him before he started talking

9  to law enforcement?

10 A        No.  No.  I saw him come up the stairs with the

11 agents, and they went straight back to his office.

12 Q        Now, at any time, during that time he came back that

13 day, did he try to suggest to you in any way what you say to

14 law enforcement?

15 A        No.

16 Q        Did he ask you to talk about this or not talk about

17 that or anything like that?

18 A        No, he did not.

19 Q        Did he make any attempt that day to affect anything

20 you might tell law enforcement?

21 A        No, he did not.

22 Q        Did he at any time ask you what you had said to law

23 enforcement?

24 A        No, he did not.

25 Q        Okay.  So when he came back, did -- were you around

1    when he sat down with them?

2    A         Yes.  They took him back to his --

3    Q         Yeah.  That-- Do this.  That's right.  Do exactly

4    what you were about to do.  Kind of explain to the jury what

5    the physical situation would have been so that -- what you

6    would know and what you wouldn't know.

7    A         Okay.  I was in the stairwell area, and when Mark

8    came up, the agents took him straight back to his office.  I

9    didn't see him again for the rest of -- until the next day.

10   And then at that point, before I was allowed to leave, the

11   agents asked if they could speak with me, and we came back to

12   my office.  Mark was still in his office.

13   Q         Was he still talking to anybody?

14   A         Yes.

15   Q         How long would you estimate, just basically

16   ballpark, that you were aware he talked voluntarily to the

17   agents?

18   A         He was still in there when I left.

19   Q         So how long would that have been so far?

20   A         Less than an hour, I would guess, from the time he

21   arrived and the time that they told me I could leave.

22   Q         Now, would you say that at the time of April 15th,

23   2013, that Mark Hazelwood was probably closer to you than

24   anybody at Pilot?

25   A         I -- I don't know how to answer that.  I mean,

1   Mark -- Mark was very close -- we were very close.  Mark was

2   very good to me, as far as somebody on a supervisor level,

3   yes.

4   Q        If he wanted to secretly have somebody get in touch

5   with a lawyer, would you have been a logical person for him to

6   ask to do that?

7   A        Yes, I would guess so.

8   Q        All right.  And he didn't do that, did he?

9   A        No, he did not.

10  Q        All right.  So, in fact, is it right to assume that

11  he never even talked to you at all that day about getting him

12  a lawyer or you getting a lawyer or anything like that?

13  A        No, he did not.

14  Q        In everything you saw, did he seem to be totally

15  willing for you and him and anyone else there to fully answer

16  any questions law enforcement had?

17  A        Yes.

18  Q        Okay.

19  A        Yes.

20  Q        Now, when you left, how would you state your state

21  of mind that day when you left?

22  A        Confused.

23  Q        Okay.  Tell me what you mean.

24  A        I had no idea what was going on.  I --

25  Q        Did anybody in law enforcement during your

1  interviews indicate to you what they believed was going on

2  that was wrong and why they were there?

3  A        They didn't -- all they asked me is if I knew -- if

4  I knew anything about manual rebates.

5  Q        And stop there.  What did you say?

6  A        I said, "I've heard the term before.  I do not know

7  how manual rebates are calculated, but I've heard the term

8  many a times before."  I told them that a document had come

9  across my e-mail that morning about manual rebates that I was

10 told to get to Mark, and I did.  And I printed it, and I gave

11 it to them.

12 Q        Okay.  Now, anything else you learned about manual

13 rebates?

14 A        That's all.

15 Q        So is it a full and fair statement that at the time

16 of the raid on April 15th of 2013, what you've just stated is

17 the full extent of what -- anything you knew about manual

18 rebates?

19 A        That is it.

20 Q        You didn't know how they were computed, correct?

21 A        Correct.

22 Q        You didn't know whether they were ever changed,

23 correct?

24 A        I did not.

25 Q        You didn't know whether they were good or bad?

1    A         I did not.

2    Q         You didn't know whether people were sometimes

3    changing them or whether they even had the right to sometimes

4    change them?

5    A         I did not.

6    Q         Did you have any knowledge as to whether they were

7    tied -- a lot of these agreements to manual rebate were tied

8    to the amount of gallons the trucking company would buy?

9    A         I had no idea.

10   Q         Did you have any knowledge one way or the other as

11   to whether it was people's views that if the customer didn't

12   keep his end of the deal --

13             MR. HAMILTON:  Objection, Your Honor.

14             THE COURT:  Sustained.

15   BY MR. HARDIN:

16   Q         Did you have any idea what the government even

17   thought was supposedly wrong?

18   A         I did not know.

19   Q         All right.  And so when you left that -- so every

20   day that you worked there at that time, you -- did you ever

21   have any suspicion that anybody was doing anything wrong?

22   A         None.

23   Q         And that was sort of -- that was totally the state

24   of your knowledge, or lack of knowledge, as you went home on

25   April 15th?

1    A        Correct.

2    Q        Now, I don't want you to misunderstand this

3    question.  Nobody's going to be suggesting you were supposed

4    to be reading trip reports or anything, but you've, of course,

5    been asked to sponsor a group of them in terms of whether or

6    not -- or he's asked you about them, as to whether or not

7    you've sent them, correct?

8    A        Uh-huh.

9    Q        When did trip reports begin?

10   A        Early 2000s.  I don't -- I don't know exactly when.

11   Q        Okay.  Let's see if we can-- Okay.  The government

12   approached this with you.  I want to make sure it's clear, and

13   I've got a couple of questions about it a little bit further.

14   But let's make sure we're clear as to how this process of him

15   being given trip reports worked.

16   A        (Moving head up and down.)

17   Q        Initially, when they first came about, how did they

18   come about?  Do you recall whose idea it was to have trip

19   reports?

20   A        (Moving head from side to side.)  No.

21   Q        All right.  If you're there from '96 forward, do you

22   recall having indicated to people they started around 2000,

23   somewhere in the early 2000s?  Does that sound about right?

24   A        That sounds about right, yes.

25   Q        Do you recall whether it was Mark that came to you

1  about them?

2  A       I don't remember how the conversation -- if it was

3  during one of my reviews or what, how we decided how we were

4  going to start the book with trip reports.

5  Q       All right.  Well, how was it decided that you would?

6  And who came up with the procedure?

7  A       (Shrugging shoulders.)

8  Q       You don't know?

9  A       I can't -- I can't answer that.

10  Q       That's okay.  All right.  So it's just something

11  that sort of happened, correct?

12  A       Yes.

13  Q       All right.  Now, these trip reports were to be done

14  by each, were they not, of the salesmen?

15  A       Correct.

16  Q       So the amount of trip reports that you've talked to

17  the government about that you would be receiving would depend

18  upon how many direct salesmen were out there, right?

19  A       Yes.

20  Q       I don't know whether that was a significant moment

21  or not, but-- (Indicating.)  I didn't think it was that

22  serious a question.

23          But let me go on with you.  So at the end of the

24  day, the original process was, was it not, that each of these

25  salesmen were supposed to put in a trip report whom they

1    called on that week and a brief summary of those

2    conversations, correct?

3    A        Yes.

4    Q        And do you recall ever hearing from any of them

5    that, from the top supervisors, from Mark particularly, how

6    important it was that these people have a record of who they

7    called on, so that they would remember the next time they saw

8    them what they had talked about last time?  Do you ever recall

9    that, thinking about it one way or the other?

10   A        No.

11   Q        All right.  Did you ever think in terms of what the

12   purpose of the trip reports were?

13   A        I really didn't, no.

14   Q        Okay.  So, as you sit there now, would it be your

15   position -- you still don't know really why they were -- there

16   were trip reports?

17   A        So that Mark could be informed of what each sales

18   rep did for the week.

19   Q        All right.  Now, do you know in your own mind

20   whether Mr. Hazelwood wanted to know -- use it as a way to

21   check to make sure they were making those calls?

22   A        I don't know that.

23   Q        All right.  So do you, in your own mind -- can you

24   enlighten the jury one way or the other as to why he wanted to

25   have those available -- or have those done, rather?

1  A        I mean, he --

2  Q        All right.  Let's work through it, then, and see

3  what your conclusion is at the end.

4  A        Okay.

5  Q        You were preparing these trip reports -- or not

6  preparing them -- you were collecting them, right?

7  A        I collected them, yes.

8  Q        They're all coming you to on a Friday, by Friday

9  noon, I believe you told the government?

10 A        Correct.

11 Q        And then in the early years, until 2010 -- and I

12 believe Mr. Hamilton -- and so let's focus on that, ask you

13 about the period that the indictment talks about the

14 conspiracy.

15          Are you aware the time frame the government has said

16 this conspiracy that Mr. Hazelwood is charged with was

17 supposed to have occurred?

18 A        2008 --

19 Q        There you go.

20 A        -- to 2013.

21 Q        And his questions asked you from 2008.  Would it be

22 a fair statement that, from 2008 until September of 2010, just

23 as you had been doing before, you would have the trip reports

24 come to you?  They were to get to you by noon on Friday.  Is

25 that correct?

1    A        Yes.

2    Q        In those days we were still talking about reducing

3    them to hard copy for Mr. Hazelwood, correct?

4    A        Yes.

5    Q        So would they be e-mailed to you?

6    A        Yes.

7    Q        So each -- who was supposed to send them to you, the

8    supervisor of these different salesmen, or was each individual

9    salesman supposed to e-mail them to you?

10   A        Each individual.

11   Q        All right.  Then when they did, you would print them

12   out, correct?

13   A        Yes.

14   Q        And when you printed them out in hard copy, you

15   would put them in a book, right?

16   A        Yes.

17   Q        When you put them in that book, then you would take

18   that book, would you not, each Friday, and put it into

19   Mr. Hazelwood's in-box?

20   A        Yes.

21   Q        When he -- in-box, is it like the old days, was it

22   an actual box, or just the corner of his desk?

23   A        It was an actual box.

24   Q        And can you sort of show for the jury the size of

25   this book of trip reports that you would give him?

1    A          It was smaller than this one, probably a 1-inch

2    binder --

3    Q          All right.

4    A          -- that we put in there.

5    Q          And there was an evolution, was there not?  For

6    instance, maybe -- maybe 12 people, for instance, when you --

7    in 2008, how many salespeople would you estimate each week you

8    were to receive a trip report for?

9    A          16, 18, I guess.

10   Q          All right.  15 or 18 people.

11   A          Something.

12   Q          Average trip report, if they did it the way Mark

13   wanted, would it be two to three pages?

14   A          No.

15   Q          How many would it be?

16   A          One to two.

17   Q          Pardon me?

18   A          One to two pages.

19   Q          More than two pages?

20   A          No, one or two.

21   Q          I'm sorry.  One or two?

22   A          Uh-huh.

23   Q          I didn't hear you correctly.  That's my fault.

24   A          That's all right.

25   Q          One or two pages.  And the jury's seen some, but it

1   could be anywhere from a few sentences to six or eight

2   sentences?

3   A          Correct.

4   Q          All right.  And then when you did those, as the

5   years went on, there were more trip reports, weren't there?

6   A          Yes.

7   Q          And technology improved?

8   A          (Moving head up and down.)

9   Q          Correct?

10  A          Yes.

11  Q          Now, have you ever said that Mr. Hazelwood was

12  basically a yellow pad guy?

13  A          Correct.

14  Q          All right.  At some time around 2000 -- late 2010,

15  did he get an iPad?

16  A          He did.

17  Q          Did he have an iPhone?

18  A          He did.

19  Q          All right.  But is that your -- does that match up

20  with your memory about the time he started having those,

21  around September 2010?

22  A          He might have had those a little bit before then,

23  but --

24  Q          Before then?

25  A          The iPhone maybe, but he got the iPad about that

1    time.

2    Q        All right.  Now, then you started moving them into

3    his Dropbox, right?

4    A        Yes.

5    Q        Explain to the jury how that would be and what that

6    meant, in case there's anybody similar to me that -- that

7    hates Dropbox.

8    A        So the trip reports would still come in to me,

9    e-mail, I would save it as a pdf document, and I would just

10   pull it over into a folder in Dropbox called "Trip Reports."

11   And Mark, all he would have to do on his iPad was click on the

12   Dropbox, click on the Trip Reports, and then all the sales

13   teams would be listed, and he could click on them, and their

14   trip reports would pull up.

15   Q        And then, if he did that, that would allow him to

16   read the trip reports on his iPad?

17   A        Yes.

18   Q        Now, is one reason that you were doing that is that

19   you discovered, no matter what you did about those trip

20   reports, he didn't take them with him on trips?

21   A        He never took the book with him on a trip, no.

22   Q        All right.  So now let's get to the hours and when

23   that would happen.

24   A        Okay.

25   Q        The days he was usually in the office, was that

1  usually Monday and Friday?

2  A        Yes.

3  Q        And the rest of his time, was he traveling?

4  A        Tuesdays through Thursdays, always traveling.

5  Q        Would you tell the jury just how much -- if you

6  could describe just how much he traveled.

7  A        Extensive.  Extensive.  Every week, like I said,

8  Tuesdays through Thursdays.  And some weeks he would be gone

9  the whole week.  There would be times when he would be out on

10  the road with conferences or other things that I wouldn't see

11  him for a couple of weeks.  That wouldn't be unusual.

12  Q        And when he traveled like this -- so up until 2010,

13  if he was going to be reading the trip reports in any kind of

14  detail, he would have to do it on Friday or the weekend?

15  A        Uh-huh.  Yes.

16  Q        Is that right?

17  A        Uh-huh.  (Moving head up and down.)

18  Q        Because each Friday you would go in, would you not,

19  and remove the fourth book -- I mean, the last -- the one from

20  three weeks before?

21  A        Yes.  We kept about a month, because we had their

22  monthly P&L in it as well.  So we kept about a month of trip

23  reports in.  And then come the following month, we would -- I

24  would just dispose of them.

25  Q        All right.  So his book, would that have always four

1   weeks of trip reports?

2   A          I would think that's safe to say, yes.

3   Q          Okay.  So if he's going to look at that trip report

4   for whatever purpose of those trip reports, if he wanted to

5   glance and see if everybody was turning them in and making the

6   calls they were supposed to, it wouldn't take him that long to

7   just look and do that, would it?

8   A          No.

9   Q          He could go through -- he'd have four weeks, he'd

10  look and say, "Okay.  John Freeman, has he got trip reports?

11  Jay Stinnett, has he got trip reports?"  Right?

12  A          Right.

13  Q          He could do that.  But if he was going to go through

14  them in any kind of quantity, it would take a while, wouldn't

15  it?

16  A          Yes.

17             MR. HAMILTON:  Objection.

18  BY MR. HARDIN:

19  Q          All right.  And then, since he didn't take them with

20  him, was it -- was it your idea to maybe move them into his

21  lockbox -- or, excuse me --

22  A          The Dropbox.

23  Q          -- Dropbox?

24  A          Probably, yes, I mean, so that he would have them

25  when he was on the road.

1    Q        Right.  Now, isn't it true that -- well, let me go

2    back -- let's go back to the period from '08 to 2010 before

3    you started putting them in Dropbox.

4             You have always believed, have you not, and

5    that's -- and assumed he was reading these things, correct?

6    A        I did.

7    Q        And that's one reason you got so, you've said,

8    stunned by -- other occasions about the phone call, correct?

9    A        Correct.  Uh-huh.

10   Q        But that's been assuming because you know that

11   sometimes he responded to some, correct?

12   A        Correct.

13   Q        And you know it's because you always gave them to

14   him, correct?

15   A        Yes.

16   Q        And you knew that they were on his desk each week.

17   Each time he was there, that book was there with some trip

18   reports.  Right?

19   A        Yes.

20   Q        And whenever he was -- sometimes you'd see them on

21   the -- the book on the floor, right?

22   A        Uh-huh, yes.

23   Q        You assumed, from that, that meant he had looked at

24   it?

25   A        Yes.

1   Q        But you weren't really focusing on him -- actually

2   seeing him do it, were you?

3   A        No.

4   Q        Isn't it a fair statement that though there was

5   absolutely no doubt, and is not today, that he was looking at

6   them, you don't personally ever see him do it and know to what

7   degree he was?  Is that a fair statement?

8   A        That is a fair statement.

9   Q        So when you were talking to him on the June call

10  we're going to come back to in a few minutes --

11  A        Uh-huh.

12  Q        -- the reason you -- is it a fair statement the

13  reason you were so stunned is because it never had occurred to

14  you that he wasn't reading those things in any kind of

15  thorough manner, right?  Or what?

16  A        Him saying he never read --

17  Q        It's that word "never," isn't it?

18  A        Yes.

19  Q        All right.  Now, obviously we know never cannot be

20  right, because you know he's responded to some, right?

21  A        Yes.

22  Q        Unless, would you agree, that in his informal way of

23  talking, he was talking about after you put them -- started

24  putting them in the Dropbox?  Because you don't have any way

25  of knowing one way or the other, then, do you?

```
1                MR. HAMILTON:  Objection, Your Honor.

2                THE COURT:  Sustained.

3     BY MR. HARDIN:

4     Q         Do you have any way of knowing whether he was

5     looking --

6                THE COURT:  Sustained.

7     BY MR. HARDIN:

8     Q         -- at them once they were in the Dropbox?

9                THE COURT:  Sustained.

10               MR. HARDIN:  I'm sorry, Your Honor.

11               THE COURT:  Sustained.

12               MR. HARDIN:  Your Honor, she's been tendered as a

13    witness for the proposition that he was reading them.  I'm

14    asking if she had any way of knowing whether he was.  I don't

15    understand the objection as --

16               THE COURT:  I think what you're asking her is to get

17    into his mind and tell the jury what was in his mind when he

18    had the conversation with her.  That is what the objection was.

19    So you're asking her to speculate as to what was in the

20    defendant's mind.

21               MR. HARDIN:  No, sir.  I am not.  I don't think I

22    asked her what was in his mind.  I'm asking her does she have

23    any way of knowing whether or not when -- after they were put

24    in the Dropbox, does she have any way of knowing one way or the

25    other as to whether he was accessing the Dropbox to look at
```

1   them.

2          THE COURT:  That's the same question.  Sustained.

3          MR. HARDIN:  Your Honor, the government has tendered

4   her as a witness on that proposition.  I'm only testing how she

5   would know one way or the other at that stage.  That's all I'm

6   doing.

7          THE COURT:  Do you have another question to ask?

8          MR. HARDIN:  The Court's not going to let me inquire

9   about that?

10         THE COURT:  I think I've sustained the objection

11  several times.  Do you have another question to ask?

12         MR. HARDIN:  I do.

13  BY MR. HARDIN:

14  Q       When he -- once it was put in the Dropbox -- let me

15  ask you this:  Were you ever around him whenever he accessed

16  the Dropbox?

17  A       No.

18  Q       Were you ever -- do you have any personal knowledge

19  one way or the other as to whether he ever accessed the

20  Dropbox to review trip reports?

21  A       No.

22  Q       Okay.  Is it a fair statement that you assumed he

23  was doing so, just as you assumed he was doing so when you put

24  them in the hardbound, correct?

25  A       Yes.

1    Q        Do you know of any way that one can go into a

2    Dropbox to determine whether or not it has been -- a

3    particular matter has been opened?  Do you know?

4    A        I do not.

5    Q        Okay.  So now let's go back, if we can, to after the

6    search warrant was executed.  Would you agree that you still

7    at that time felt very close to Mark and to his family?

8    A        I did.

9    Q        And were you very concerned about him and his future

10   and the future of the company?

11   A        I was.

12   Q        Okay.  And he remained there as a sort -- in his

13   position until May of 2014, correct?

14   A        Yes.

15   Q        Now, there were different -- did you become aware of

16   different investigations going on shortly after the search

17   warrant, trying to determine what had happened, both by the

18   company and by private lawyers for the company, and

19   everything?

20   A        I knew a lot was going on, but I didn't know details

21   on anything.

22   Q        Okay.  And did you know at that time what -- who the

23   different personalities were?  Well, let me back up.  I'll get

24   to that in a second.

25            Let's, if we can, go to this:  Do you remember sort

1   of Mark being tasked with -- off on these frenzied trips after

2   April 15, 2013, to meet with different customers to try to

3   reassure them?

4   A       Yes.

5   Q       What was that atmosphere like?  How much was he on

6   the road?  And what, to your knowledge, was he doing?

7   A       It was -- it was a crazy schedule.  I mean, it was

8   constant meeting after meeting, trying to get to customer

9   after customer.  He was quite busy.

10  Q       Was he constantly on the phone about it?

11  A       Yes.

12  Q       Was he constantly in the air on it?

13  A       Yes.

14  Q       All right.  Were you preparing his agendas and his

15  trips and everything?

16  A       I was.

17  Q       When we talk about -- were you in charge of booking

18  all of his travel?

19  A       I did all of his travel.

20  Q       And how did you do it?  I mean, how did you keep

21  records of it and everything?

22  A       I would always do a typed itinerary.  Mark either

23  flew on the corporate plane or on his plane.  I would do all

24  the itineraries, the flight schedules for those.  I booked all

25  of his hotels, just -- cars, everything.

1   Q       Okay.  Was it your understanding, by the way——I know

2   this may be jumping around a little bit——that only

3   Mr. Hazelwood was getting these -- I'm going back to trip

4   reports now, rather than itineraries.

5           Who did the trip reports go to from you to Mark?  To

6   anyone else that you know of?

7   A       The only -- the only people that -- myself and Vicki

8   Borden were the only ones that were required -- that we would

9   tell the sales team where we were required to send them to.

10  But they would also copy their supervisors as well.  But Mark

11  was the only one.

12  Q       Were you aware of any of them going to Mr. Haslam?

13  A       No.

14  Q       Okay.  And now -- I mean, he wasn't at least in the

15  normal chain.  Is that correct?

16  A       No.

17  Q       Did management, from your awareness level, change

18  sort of in the fall of 2012?  Did Mr. Freeman assume a bigger

19  role?

20  A       If that's when he was promoted to vice president.

21  Q       Yes.  When he was promoted to vice president, did he

22  seem to assume a bigger role?

23  A       Yes.

24  Q       All right.  And if you were -- I'm going to bring --

25  maybe I'll do that after the break, to get that board.  I want

1    to put some dates down for us to try to have before the jury

2    in a minute, but I'll do it during the break and get it ready

3    on it.

4    A        Okay.

5    Q        Let me ask you this:  Did you, yourself -- can you

6    tell me who -- is J.W. Johnson one of those who was supposed

7    to send reports in?

8    A        Yes, he was.

9    Q        And who is J.W. Johnson?  Was he Mr. Haslam's

10   son-in-law?

11   A        That is correct.

12   Q        And do you know where he was working and under

13   whom -- was he working -- well, let me put it -- was he

14   working under Mr. Freeman?

15   A        Yes.

16   Q        Okay.  And I believe one of these e-mails that the

17   government showed you—I made a note; I'll go back on it—the

18   number of people that were submitting trip reports, okay, that

19   grew.  Let me see if my notes here -- if you'll give me a

20   second that I can go back and look all these addressees.

21            While I'm looking for that in my notes, let me ask

22   you this:  You had trouble sometimes getting people to turn

23   them in on time, right?

24   A        Correct.

25   Q        So if by -- when would you send out -- you'd send

 1   out notices to people saying, "I don't have trip reports from

 2   the following people"?

 3   A        Right.

 4   Q        On the average, was Mr. Mosher one of the biggest

 5   violators?

 6   A        Mosher and Freeman.

 7   Q        The two of them, were they the ones who were most

 8   often people that weren't getting them to you?

 9   A        Yes.  Seems like -- yeah, those were the two that

10   were the most, yeah.

11   Q        All right.

12            Yeah, could I see Government 603C, please, Stacey?

13   See if this is the one I'm thinking about.

14            MS. MANELA:  606?

15            MR. HARDIN:  Pardon me?

16            MS. MANELA:  606?

17            MR. KELLY:  No, 603.

18            MR. HARDIN:  603C.

19            (Brief pause.)

20            MR. HARDIN:  Yeah.  Can you blow that up for me?

21   BY MR. HARDIN:

22   Q        I want to ask you to count as we go.  Is this

23   supposed to -- as of August the 26th of 2010, would this,

24   Ms. Blake, be listing the salespeople that are supposed to be

25   turning them in?  If you'll look at that and see if it's

1  exclusive, or inclusive, I guess?

2  A       Yes.

3  Q       All right.  So let's see if we can count them off,

4  if we would.

5          Brian Mosher, Cathy Sokolowski, Kim Royal?

6  A       She was an inside rep.

7  Q       She's an inside rep for them?  But is--  So--  All

8  right.  I'll do this.  Let's let you do it.

9  A       I think that she was -- I --

10 Q       All right.  Do this for me.

11 A       Uh-huh.

12 Q       Look at these and count the number of salespeople

13 that as of August 26, 2010, were supposed to be sending you

14 trip reports.

15 A       Okay.

16 Q       Just take your time.  You can do it to yourself and

17 we'll come back.

18 A       (Witness complying.)  17.

19 Q       17.  And that's more than you had when you first

20 started them in the early 2000s, correct, or whenever you

21 started them, correct?

22 A       Yes, I'm assuming.

23 Q       But we're really only doing 2008 for purposes of our

24 question.  So then by the time we got to April of '13, could

25 you estimate for me how many more there might have been

1  besides -- did you say 17?

2  A        Uh-huh.

3  Q        How many more there might be?

4  A        I don't know.

5  Q        Okay.

6  A        I really don't.

7  Q        I'm just -- ballpark, would it be more than two, do

8  you think?

9  A        Probably, yeah.

10  Q        Okay.  All right.  Would you be comfortable saying

11  that by 2013 it might -- there might be 20?

12  A        Sure.  I -- I mean, yeah, that sounds reasonable.

13  Q        Okay.  All right.  In 2010, I think one of these is

14  Mr. J.W. Johnson.  Would that -- where he is on there, would

15  that probably indicate he was the most recent hire?  Is that

16  why you would have him there, or do you know?

17  A        I don't know.

18  Q        Okay.  Fair enough.  Now, so if you've got 17 of

19  those.  Now, when Mark was then traveling and trying to see

20  customers, after all this broke on April 15th, do you have any

21  idea, over that period of time, through the rest of '13 and

22  early '14, how many customers he probably talked to?

23  A        I don't.  I mean, I know probably for the -- for a

24  week, you know, if he was traveling three days of that week,

25  you know, he was hitting seven or eight customers, maybe, a

1  week.

2  Q        And was he also doing some on weekends, or do you

3  know?

4  A        He was.  He was, yes.

5  Q        And his history -- historical pattern -- when we say

6  he was in on Mondays and Fridays, but would he also travel on

7  business on weekends as well?

8  A        Business always seemed to follow Mark whenever he

9  was.

10  Q        All right.  Have you characterized him in the past

11  as a workaholic?

12  A        Yes.

13  Q        Was he--  How many years did you work for him?

14  A        Twenty.  Well, 18.

15  Q        Eighteen.  Was a workaholic that whole time?

16  A        All the time.

17  Q        And whatever he was doing, was he all-in?

18  A        Yes.

19  Q        Okay.  Now, on this, when this problem arose, then

20  did it seem, from your observations, that he was in the -- the

21  one in the company that either agreed or was tasked to try and

22  make everything okay with the customers?

23           MR. HAMILTON:  Objection.

24           THE COURT:  What's the objection?

25           MR. HAMILTON:  That it was agreed that he was the one

1  who was going to go out and make things better with customers.

2  Speculation.  Who's agreed that he's going to do this?  Is he

3  really going to do this?

4          THE COURT:  Mr. Hardin?

5          MR. HARDIN:  I meant to ask whether he was agreed or

6  tasked.  I don't think I had said it had to be one or the

7  other.  Was he the one that took on that role, is another way

8  to ask it.

9          MR. HAMILTON:  Well, then my objection would be lack

10  of foundation as to what she would know he was tasked with.

11          THE COURT:  I think the question was, did she know,

12  wasn't it?

13          MR. HARDIN:  Fair enough.

14  BY MR. HARDIN:

15  Q      Did you know one way or the other whether -- based

16  on your observations and your familiarity, that he was the one

17  assuming the primary role of trying to make it right for the

18  customers?

19  A      I don't know if he was assigned that, but he did

20  take that role.

21  Q      And that's a good way of putting it.

22  A      He did take that role.

23  Q      And I assume -- my question assumed that you didn't

24  know whether he was assigned or volunteered.

25  A      Right.

1    Q        But one way or the other, that's what his role

2    became.  Is that a fair statement?

3    A        Yes.

4    Q        Okay.  Now, during the time after -- before June 9th

5    that the government asked you about this, did your -- of 2014,

6    did your relationship with Mr. Hazelwood change?

7    A        No.

8    Q        Okay.  So as we explore your feelings as you sit

9    there today, should we assume that that occurred either at and

10   after the phone call of June 9th?

11   A        That's correct.

12   Q        Okay.  Now, during the period of time that happened

13   until he left--  Do you recall the day that he resigned from

14   Pilot?

15   A        Yes.  I was out of the country on vacation.

16   Q        Do you recall what the date was?

17   A        The 19th of May.

18   Q        And how did you find out?

19   A        Someone from work sent me a text and told me.

20   Q        And did he also contact you while you were on

21   vacation?

22   A        I -- I spoke briefly with Mark while I was on

23   vacation, yes.

24   Q        And the jury has heard some tapes that have been

25   played here.  Were you -- were you aware -- did you know

1    anything one way or the other of the basis for him leaving?

2    A        I was told by my current supervisor that Mark was

3    released from Pilot based on a racial slur --

4    Q        All right.  All right.

5    A        -- that that was one of the reasons.

6    Q        That -- whether -- and that was your understanding

7    as to why he left Pilot?

8    A        Yes.

9    Q        Is that right?

10   A        That's right.

11   Q        Okay.  Now, when you found out that he had

12   resigned -- but you were aware, if he hadn't resigned, he

13   would have been terminated?

14   A        Yes.

15   Q        All right.  Now, if you were aware that he had

16   resigned, at that time were there any charges pending against

17   him personally, at the time he left?

18   A        No.

19   Q        And at that time, in May of 2014, did you have any

20   interviews scheduled with any law enforcement people yourself?

21   A        In May?

22   Q        At the time -- at the time he left.

23   A        At the time he left, I had an interview with -- I

24   believe it was Steptoe.

25   Q        Yes.  But I said law enforcement.

1    A       Oh, law -- no --

2    Q       All right.  I have a series of questions I want to

3    ask you about that, so the jury understands and who -- and

4    what you just brought in.

5    A       Okay.

6    Q       There is a Washington, D.C., law firm or

7    headquarter——they're spread around the country——named

8    Steptoe & Johnson, correct?

9    A       Uh-huh.  (Moving head up and down.)

10   Q       Pardon?

11   A       Yes.

12   Q       She doesn't have a --

13   A       Oh.

14   Q       That's okay.

15           All right.  And Steptoe & Johnson, were you aware,

16   had been hired by Pilot to do an outside internal

17   investigation of what had happened?

18   A       Correct.

19   Q       Correct?  And you knew that they, both as lawyers

20   and investigators on their behalf, were interviewing different

21   employees at Pilot, did you not?

22   A       Yes.

23   Q       And at that time -- but at the time Mark left Pilot

24   in May of 2014, did you already have an interview set up with

25   them?

1    A       Yes.

2    Q       Okay.  And you had -- by that time did you have a

3    lawyer?

4    A       At that time Pilot was working on assigning me a

5    lawyer.

6    Q       And ultimately you retained a lawyer, did you not?

7    A       Yes.

8    Q       And the lawyer is in the courtroom today, is he not?

9    A       Yes.

10   Q       And he was retained at -- for you at the suggestion

11   of Pilot.  Is that correct?

12   A       Correct.

13   Q       And so from sometime May -- can we assume the month

14   is sometime in May or June of 2014 -- you've had your own

15   attorney?

16   A       Yes.

17   Q       All right.  Now, I want to go through a series of

18   questions here for you about the conversation we talked about.

19   A       Okay.

20   Q       But before I do that, I want to switch off back to

21   the travel issue, if I can.  Well, no, let me continue down

22   this line with you for just a minute, if you don't mind.

23           Do you recall being interviewed by lawyers of

24   Steptoe & Johnson on June the 11th of 19 -- of 2014?

25   A       Yes.

1  Q        Were you -- was your lawyer present for that

2  interview?

3  A        Yes.

4  Q        Okay.  Where was the interview?

5  A        At a--  Downtown Knoxville.  I'm not--  I think it

6  was at the Hilton.

7  Q        Okay.

8  A        In a hotel.

9  Q        But it was there -- it was there in Knoxville?

10 A        Yes.

11 Q        Okay.  Do you recall how many lawyers were present

12 for that interview?

13 A        There were two.

14 Q        Did -- was there anyone from law enforcement present

15 in that meeting?

16 A        No.

17 Q        Was the interview -- do you recall whose office it

18 was at?

19 A        It was in a conference room.

20 Q        At?

21 A        I think the Hilton Hotel.

22 Q        Okay.  All right.  When the interview was conducted

23 by the Steptoe & Johnson lawyers, were they taking notes?

24 A        Yes.

25 Q        Now, during the course of that interview, did you

1    discuss with the Steptoe lawyers your phone call with Mark

2    that you've testified to Mr. Hamilton about that had occurred

3    just two days before that?

4    A        Yes, I did.

5    Q        So your phone call that we've been talking about

6    where he went over the different numbers and the length of the

7    call?

8    A        Yes.

9    Q        That was on June 9th, was it not?

10   A        Yes.

11   Q        I want to get the map.

12            Can I have the board, please, if you don't mind.

13            So let's see if we can just get these dates

14   straight.

15            Your Honor, would this be an appropriate time, from

16   the Court's standpoint, to take the afternoon break?

17            THE COURT:  We can.  Why don't we stand in recess

18   until 4:00, 4:00.

19            (Brief recess.)

20            THE COURT:  Please resume.

21            MR. HARDIN:  I'm going to try to move this back a

22   little bit.

23            Your Honor, may I inquire at the end and at the end

24   if they can see this?

25            THE COURT:  I think all the jurors can see.  They may

1    not be able to see the handwriting.  There's nothing on it yet.

2    It's just a white blank sheet of paper.  They can all see it.

3         MR. HARDIN:  That was my question.  Thank you.

4    BY MR. HARDIN:

5    Q       Now, I want to see if I can get some dates here that

6    we can agree on what was happening at these different times.

7    And I'm going to go with you starting again on 4/15/13,

8    everybody knows.  "4/15/13," I'm going to put "SW" for search

9    warrant.  Okay?

10   A       (Moving head up and down.)

11   Q       Search warrant.  And then I'm going to put just

12   "executed."  That's -- we can agree that's an accurate

13   statement, right?

14   A       Yes.

15   Q       All right.  Then Mr. Hazelwood continues to be

16   employed, correct?

17   A       Yes.

18   Q       And you sounded like you sort of have emblazoned in

19   your memory that he left Pilot on what date?

20   A       May 19th, 2014.

21   Q       "5/19/2014," correct?

22   A       Correct.

23   Q       All right.  Now, you testified to Mr. Hamilton you

24   were interviewed fairly briefly at Pilot back on the 15th,

25   right?

1   A       Yes.

2   Q       Did you -- do you recall whether you were

3   interviewed by law enforcement any more in between April 15,

4   '13, and when Mr. Hazelwood left?

5   A       No, I wasn't.

6   Q       Okay.  So you would not have told -- would it be a

7   fair statement that you never told Mr. Hazelwood anything

8   about law enforcement talking to you or interviewing you

9   before he left on May 19th of '14?  Is that right?

10  A       Except for the evening of the 15th, April 15th, when

11  I told him that I had talked with the FBI that day.  That's

12  the only time.

13  Q       Fair enough.  That's exactly what I meant.  So, yes,

14  you talked to him on the 15th?

15  A       But other than that, no.

16  Q       And he, of course, knew about that, correct?

17  A       Correct.

18  Q       But then you would have never had any conversations

19  about law enforcement wanting to talk to you further or

20  planning to interview them or anything, correct?

21  A       No.

22  Q       That's on the 15th.  Now, you -- do you recall being

23  interviewed by Mr. Yarbrough in my firm?  Do you remember when

24  that was?

25  A       That was sometime in April of 2014.

1   Q        If I write in April the 9th of 2014, would you have

2   any disagreement with that?

3   A        No.

4   Q        Okay.  I'm going to try to make this short.  I'm

5   going to put "INT" for interview, with -- and I'm going to put

6   "JY" for Jim Yarbrough.

7   A        Okay.

8   Q        Is that fair enough?

9   A        Yes.

10  Q        Do you actually see him in the audience today?  Do

11  you recognize him?

12  A        Yes, with the yellow tie.

13  Q        Is that yellow?

14  A        Is it yellow?

15  Q        Yes, it is.  Okay.  Good.  Now -- and you knew that

16  the other man with him was an investigator working for the

17  company, Pilot, who was also investigating.  Is that fair?

18  A        That is correct.

19  Q        Do you happen to remember that man's name?

20  A        You said it earlier, but I don't remember.

21  Q        Mr. Purser, does that --

22  A        Purser, yes, that's it, yes.

23  Q        Am I right that it's P-U-R-S-E-R?  Do you know?

24  A        I do not know.

25  Q        I don't know the man.  So you don't remember,

1   either?

2   A        No.

3   Q        All right.  So I'm going to put "Pilot

4   investigator."  Would that be accurate?

5   A        Uh-huh.

6   Q        All right.  Now, do you happen to recall, in that

7   interview were most of the questions asked by Mr. Yarbrough,

8   Mr. Purser, or both of them?

9   A        Mr. Yarbrough.

10  Q        Okay.  So you were -- there was a comfort level

11  there, though, wasn't there?  You were being interviewed by an

12  investigator for us, but you had along somebody also working

13  for Pilot.  Is that a fair statement?

14  A        Yes.

15  Q        But actually you weren't intimidated by

16  Mr. Yarbrough, anyway.

17  A        Neither of them, no.

18  Q        All right.  Now, you had that interview.  In that

19  interview did you tell Mr. Yarbrough that you believed Mark

20  had read the trip reports?

21  A        I did.

22  Q        Okay.  Because that's always been your belief,

23  right?

24  A        That's correct.

25  Q        Okay.  And so that was part of that interview.  And

1    then Mr. –– and then Mr. Hazelwood leaves on May 19th, while

2    you're out of town?

3    A       Yes.

4    Q       Now, the interview that you had at –– let's go down

5    here –– on 6/11 you have, would it be fair to say, a pretty

6    extensive interview with the lawyers from Washington, D.C.,

7    from Steptoe & Johnson?

8    A       Yes, it ––

9    Q       How many hours would you estimate it was?

10   A       Probably five, six.

11   Q       All right.  Five-hour interview with Steptoe &

12   Johnson.

13   A       Yes.

14   Q       Two lawyers, right?

15   A       Yes.

16   Q       Two private lawyers and no law enforcement involved.

17   Is that true?

18   A       No law enforcement, no.

19   Q       In fact, did they inform you they were representing

20   the company in an investigation and not law enforcement or

21   anybody else?

22   A       I don't remember that.

23   Q       You don't remember?

24   A       No.

25   Q       But you knew that was the truth, that they were the

1    company's lawyers?

2    A        That's right.

3    Q        Okay.  And I assume they told you they were trying

4    to find out what you knew about anything that had happened?

5    A        Correct.

6    Q        And during that five-hour interview, did you tell

7    them about a phone call that you had received from

8    Mr. Hazelwood just two days before?

9    A        I did.

10   Q        And that's the phone call that the government has

11   done all of these exhibit numbers here and how long they

12   lasted?

13   A        That's correct.

14   Q        When I first looked at this -- surely you didn't

15   make -- you knew they were always seconds.  When I first

16   looked at it, I tried to figure out how you would have talked

17   to somebody for 696 minutes.  But, of course, it wasn't

18   minutes, was it?

19   A        Right.

20   Q        Each of these -- we can agree these are seconds and

21   that's how long -- 60 into this number is how long you talked

22   to whoever's number this was?

23   A        That's correct.

24   Q        Okay.  So then here this would be 6/9/14, and I'll

25   just say -- well, let's see.  Up here I didn't say.  "Mark

1   Hazelwood leaves Pilot" for 5/19.  That's true, isn't it?

2   A       Yes.

3   Q       And then "6/9/14," see -- can I say "SB" for Sherry

4   Blake?  Is that okay?

5   A       Yes.

6   Q       "SB talks to Mark Hazelwood."  Right?

7   A       That's correct.

8   Q       And you think that phone conversation, best you can

9   remember, lasted about how long?

10  A       For three, four, five minutes.

11  Q       Whatever -- whatever 60 seconds into 515 is, right?

12  A       Yeah.

13  Q       Okay.  Now, during this conversation, do you

14  recall -- at that time would you agree with me that back here

15  you knew that meeting you were going to have was only with

16  Steptoe & Johnson, not law enforcement, correct?

17  A       Correct.

18  Q       And at the time you had this conversation with Mark

19  Hazelwood on the 9th, you had no plans to be talking to law

20  enforcement right then unless sometime somebody contacted you

21  and wanted to, right?

22  A       That's correct.

23  Q       But there was no law enforcement interview on your

24  horizon, was there?

25  A       No.

1  Q        And, indeed, you're -- we're going to get to it in a

2  moment.  There hadn't been anything public as yet, had there,

3  by law enforcement, by announcement, that would indicate that

4  Mr. Hazelwood was going to be a suspect.  Had you read

5  anything?

6  A        I can't answer--  I don't know.

7  Q        Other than what might have been in the search

8  warrant affidavit.  I'm not after that.  What I'm after is

9  this.  Would this--  Maybe rephrase it another way.

10        At the time you have the meeting with Steptoe &

11  Johnson, did you have any plans to be being interviewed right

12  then with law enforcement?

13  A        No.

14  Q        Had law enforcement made any approach to you about

15  any upcoming interview?

16  A        No.

17  Q        Had law enforcement indicated to you in any way you

18  were going to one day be a witness in this case?

19  A        No.

20  Q        Now, at the time that you had the conversation with

21  these two Steptoe & Johnson lawyers, did you believe you were

22  simply talking to lawyers for the company and not law

23  enforcement?

24  A        Correct.

25  Q        All right.  Now, when you told them about this, did

1  you tell them in as strong of terms to the jury about your

2  reaction, or has that sort of evolved over time?

3  A        I was probably more emotional -- I believe I cried

4  that day, for sure.

5  Q        All right.  And you told them that -- you used the

6  phrase to Steptoe Johnson like you were stunned by it?

7  A        Yes.

8  Q        All right.  And part of it, is it not true, ma'am,

9  is that it never occurred to you he might not be reading these

10  things in any kind of detail, because you were giving them to

11  him all the time all these years, right?

12  A        He asked for them.

13  Q        But you did know he wasn't really a detail man,

14  didn't you?

15  A        You could say that, yes.

16  Q        All right.  And you knew also that he wasn't a guy

17  that just lived and breathed technology, was he?

18  A        No.

19  Q        He was a guy that used a yellow pad whenever he

20  could, wasn't he?

21  A        Correct.

22  Q        And the idea to move to a different format of giving

23  him these trips wasn't his idea; it was yours or someone

24  else's, for ease of getting them to him, correct?

25  A        That's safe to say, yes.

1    Q        All right.  And you had never seen him one way or

2    the other use the capability one of these iPads has to go into

3    your Dropbox, did you?

4    A        I showed him how to do it.

5    Q        I was going to get to that.  You certainly would

6    have showed him how to do it, right?

7    A        Uh-huh.  Right.

8    Q        All right.  And then after that you were out of it.

9    Would that be a fair statement?

10   A        Yes.

11   Q        Because you kept sending them to him?

12   A        Right.

13   Q        By the way, did you delete them after -- every month

14   when you changed them over?

15   A        Same procedure.

16   Q        Deleted from the -- from his iPad?

17   A        From the Dropbox.

18   Q        From the Dropbox.

19   A        Yes.

20   Q        Oh, okay.

21   A        Yes.

22   Q        So when you started doing that in September '10, you

23   would transfer them -- did you use the same procedure and

24   process you had when it was hard copy; namely, you put them in

25   one week and then you take out the one from four weeks ago or

1  three weeks ago, and then you put them in, take them out three

2  weeks ago?  Did you do the same equivalent --

3  A        Right.

4  Q        -- deletion?

5  A        Yeah.  It was the same, same procedure, yes.

6  Q        When you moved it to the Dropbox?

7  A        Right.

8  Q        So, at any time, what he would have in his iPad

9  would be four months -- four weeks, rather?

10  A        Four weeks, yes.

11  Q        All right.  But he wouldn't have any more?

12  A        I can't say if we ever skipped or forgot or did

13  anything like that.

14  Q        Sure.  And you guys didn't archive these things, did

15  you?  Did you send them -- I mean, computer experts could tell

16  us what could be recovered, but I'm not after that.  What I

17  mean is, as far as -- there was no plan, was it, to make sure

18  you had years and years back?

19  A        No.

20  Q        And no plan to make sure you had months and months

21  back, right?

22  A        No.

23  Q        Tip them over --

24  A        Once it was over, it was over.

25  Q        Okay.  There you go.

1          Now, during the time that -- during this particular

2   conversation on June 11th, do you recall the next time --

3   excuse me -- do you recall the next time -- or first time

4   after April 15th that you had your next contact with law

5   enforcement?

6          I'm going to give you a date and ask you if that

7   helps you.

8   A      Okay.

9   Q      And you correct me if there's something before that.

10  A      Okay.

11  Q      All right.  I believe -- by the way, would you have

12  been aware one way or the other that at some time in September

13  Steptoe & Johnson informed the government of the substance of

14  their, Steptoe & Johnson's, interview of you?

15  A      I'm aware of that.  How -- if it's through the news

16  or media, I'm not sure.  But I'm aware of that.

17  Q      But you were not -- excuse me.  You were not aware

18  of that at the time you had the phone conversation with

19  Mr. Hazelwood, correct?

20  A      No.

21  Q      Because at that time you hadn't had the meeting.

22  When you finished the meeting on June the 11th with Steptoe &

23  Johnson, did you know they were going to provide that to the

24  government?

25  A      No.

1    Q        Did you recall them maybe saying to you they weren't

2    going to provide it to the government, they were there for the

3    company?

4    A        I don't recall.

5    Q        All right.  But, at any rate, would it be a fair

6    statement that at neither the time of the phone call with

7    Mr. Hazelwood nor at the time of your interview with Steptoe &

8    Johnson did you think they were going to take what you were

9    saying to them and give it to the government?

10   A        I didn't know.

11   Q        All right.  Now, do you recall, if I show the next

12   thing, the first time you were with law enforcement on this

13   matter is in November of '14 on the 18th?  How does that match

14   up with your memory?

15   A        That sounds accurate.

16   Q        All right.  So 11/18/14, can we say that that will

17   be your first interview with the government after April 15,

18   2013?

19   A        Yes.

20   Q        Now, I want to make sure I've written this

21   accurately.  I've written "On 11/18/14 Sherry Blake interviews

22   with government for first time since 4/15/13."

23            Is that correct?

24   A        Yes, that's correct.

25   Q        All right.  And then, like all your interviews,

 1   you've probably, all the way through this whole process, told

 2   anybody who was interviewing you whatever they wanted to know,

 3   correct?

 4   A        That's correct.

 5   Q        So all you did here was answer their questions,

 6   correct?

 7   A        That's correct.

 8   Q        Just as you had done back on June 11th with Steptoe?

 9   A        That's correct.

10   Q        And at that time does the government question you

11   considerably about your phone conversation with Mr. Hazelwood

12   back on June 9th, '14?

13   A        Yes, they did.

14   Q        Is that the first time that you had ever relayed

15   anything yourself about that conversation to the government?

16   A        That is correct.

17   Q        Did you know at that time whether or not Steptoe

18   Johnson had relayed to the government what you told them?

19   A        I -- I think I -- I mean, I can't remember if --

20   Q        I'm going to put a date in here and see if this

21   rings any bell with you.

22   A        Okay.

23   Q        All right?  I'm going to put "9/10/14."  Around that

24   time, did you become aware that around that time Steptoe

25   Johnson had informed the government of a summary of your

1  meeting with them?

2  A        Yes.  Well, I don't know.  I mean --

3  Q        Okay.

4  A        A summary of my meeting with them?

5  Q        Yes, about your meeting.

6  A        I can't remember that.

7  Q        Okay.  All right.  At some time in September of 2014

8  did you become aware that at some date, not the specific date

9  necessarily, Steptoe Johnson had informed the government of

10  the substance of your interview back on June 11th?

11  A        I had to have because I knew when I went into the

12  interview with them that --

13  Q        They knew about it?

14  A        -- that the phone call was going to come up, yes.

15  Q        Another way to say it, then, would it be that by

16  November the 18th of 2014 you were aware that Steptoe Johnson

17  had told them what you told them because the government asked

18  you about that?

19  A        Yes.

20  Q        Okay.  Then, I'm going to put here that sometime

21  between September 10, '14 --

22  A        Okay.

23  Q        -- and "11/18/14 SB learns Steptoe Johnson has told

24  government of her interview."

25  A        Okay.

1    Q         Would that be accurate?

2    A         Yes.  Yes.

3    Q         And I'm going to -- another initial, Steptoe Johnson

4    as "SJ."  Now only somebody that can read hieroglyphics can

5    read this.  So I'm going to read this out loud to you to see

6    if it accurately states it.  Okay?

7              "So sometime between 9/10/14 and 11/18/14, Sherry

8    Blake learns that Steptoe Johnson has told the government of

9    her 6/11/14 interview."  Is that accurate?

10   A         Yes.

11   Q         Okay.  Now, then, of course, the government does it.

12   Now, what I want to ask you is a few questions again back on

13   the conversation.

14   A         Okay.

15   Q         At any time in your conversation with Mr. Hazelwood

16   that you've expressed to the jury that you were so bothered

17   by, did he ever suggest to you anything you were supposed to

18   say or not say to the government?

19   A         No.

20   Q         In your conversation with Mr. Hazelwood on June

21   the 9th of 2014, did he ever refer to the government at all?

22   A         No.

23   Q         Even given your reaction to him saying he hadn't

24   read the trip reports, did he ever tell you what to say?

25   A         He did not tell me what to say.

1  Q        Isn't what happened, Ms. Blake, is, he gave you his

2  version of what he did with trip reports, and it's a version

3  you disagreed with, right?

4  A        Correct.

5  Q        But he never told you what to say, did he?

6  A        No.

7  Q        And, in fact, he never encouraged you to say a

8  particular thing, did he?

9  A        I took it when he said, "Do you understand?"

10 Q        That's a very good point.  I want to go with words.

11 That's a very valid point.  Isn't what you're saying is, you

12 took it to mean that he hoped you would say that to somebody,

13 right?

14 A        That is correct.

15 Q        But he didn't say that, did he?

16 A        He did not.

17 Q        All right.  And one of the reasons you're so upset

18 about it now, and was then, is because of that belief then,

19 and that you took the stand today with it, that you -- you

20 took it that way, that he was saying you would hope you would

21 tell people that, correct?

22 A        Yes.

23 Q        On the other hand, if we're talking about what

24 somebody said, he never, ever said that, did he?  Namely, he

25 never suggested what you tell anyone, did he?

1  A        No.

2  Q        Now -- and more particularly, he never even

3  mentioned Steptoe Johnson, did he?

4  A        No.

5  Q        Did you understand that the instance -- or the basis

6  and the reason he called you, he informed you he understood

7  from Mr. Yarbrough that you had said, "Hey, Mark read those

8  trip reports," right?

9  A        Right.

10 Q        I want you to think carefully.  And I want you to

11 understand, whatever your answers are, I'm never going to

12 argue with you.  I'm never going to suggest you're not telling

13 what you believe to be the truth.  Okay?

14          What I want you to think hard for us, though, and

15 tell me, isn't it true that he never even indicated to you in

16 any way that he knew in just two days you were going to be

17 talking to the lawyers for the government?

18 A        He didn't say that, but he knew because I had told

19 him before the May -- before May 19th and it was on his

20 calendar.

21 Q        Let's go another thing.  When were you originally

22 scheduled to meet with Steptoe Johnson?

23 A        The June -- the 11th --

24 Q        All right.  That's a good point.

25 A        Yeah.

1  Q        What I'm really saying is, was it ever postponed?

2  In other words, did you have one set up -- meeting set and it

3  had to be changed for anything?

4  A        Not that I'm aware of.

5  Q        All right.  So he -- when do you think you would

6  have told him that you were going to be meeting with Steptoe

7  Johnson?

8  A        I told him as soon as I received the letter.

9  Q        Yes, ma'am.  When do you think that was?

10  A        In April.  And that's -- soon after that is when

11  your office asked if I would interview with them.

12  Q        Here's what I want you to help me with.  And I'm

13  sure you'll answer this in good faith.

14  A        Uh-huh.

15  Q        I want you and I to try to separate out what you are

16  certain of because of certain things versus what you've always

17  assumed.  Okay?

18  A        Uh-huh.  (Moving head up and down.)

19  Q        You -- isn't it true you've always assumed that when

20  he said that to you he knew you were going to be meeting with

21  Steptoe Johnson?  That's what you assumed, right?

22  A        That's what I assumed, yes.

23  Q        Sure.  And when he said, "Do you understand?" that

24  reinforced that in your mind, correct?

25  A        Yes.  Yes.

1  Q       Have you ever experienced assuming something that

2  seemed perfectly rational to you then, might even seem

3  perfectly rational to you later, but found or decided maybe

4  your assumption might not -- not was -- might not be right?

5          MR. HAMILTON:  Objection.

6          THE COURT:  Sustained.

7  BY MR. HARDIN:

8  Q       Well, then let's pursue that for a second.  I think

9  you know what I'm asking, don't you?

10 A       He knew I was --

11         THE COURT:  Ma'am --

12 A       -- going for that interview.

13         THE COURT:  -- ma'am, ma'am, there's -- ma'am,

14 there's no question on the floor.  Wait for the lawyer to ask

15 you a question.

16         THE WITNESS:  Okay.

17 BY MR. HARDIN:

18 Q       I know.  And you're convinced he did.  And you told

19 him in April.  Do you recall what you told him in April?

20 A       That they had scheduled an interview with me.

21 Q       All right.  And that they wanted to talk to you

22 about what you knew?

23 A       Correct.

24 Q       Did you tell him anything about what the substance

25 of the interview was going to be?

1    A         With Steptoe & Johnson?

2    Q         Yes.

3    A         I didn't know.

4    Q         Because you didn't know.

5    A         No.

6    Q         You just knew the lawyers for the company --

7    A         Right.

8    Q         -- were going to, right?

9    A         Right.

10   Q         All right.  And then you say you put it on his

11   calendar.

12   A         Yes.

13   Q         Okay.  And is the calendar entry the same time that

14   you had it?  I mean, you had the meeting on the same occasion

15   that you had put it on his calendar?

16   A         Right.

17   Q         So you believed, and believe now, is it a fair

18   statement, then, when he called you, you believe -- you just

19   even smiled and said you knew -- that he was calling you

20   because he knew you were going to be talking to Steptoe

21   Johnson?

22   A         That's what I believed.

23   Q         All right.  And you and I could talk about this

24   until the cows come home; it's not going to change your

25   opinion, is it?

1   A         No.

2   Q         All right.  Fair enough.  Now, let's assume for a

3   moment that you're right, that even though it's an assumption,

4   that you're correct that he did know that you were going to

5   talk to Steptoe Johnson, and that he did remember, and that he

6   perhaps saw it on -- did he take his calendars with him?

7   A         He had a hard-copy calendar, yes.

8   Q         Okay.  So you put all that together, and that's one

9   reason you're sure he knew you were going to talk to Steptoe,

10  right?

11  A         Right.

12  Q         Can you and I agree, then, that what that would mean

13  is, when he hears from your -- our investigator what you've

14  said about him and the deal, that he wanted to make sure you

15  understood his side of it, and he called you to tell you, and

16  you're saying in anticipation of your meeting with Steptoe

17  Johnson, correct?

18            MR. HAMILTON:  Objection.

19            THE COURT:  Sustained.

20  BY MR. HARDIN:

21  Q         Well, isn't it true that when you had that

22  conversation, he still never told you what to say, did he?

23  A         He never told me what to say.

24  Q         All right.  Do you recall at any time in the

25  conversation in any -- any of the sequence that you-all had

1   for that six to nine minutes him telling you to tell the

2   truth?

3   A          He never said tell the truth.

4   Q          Okay.  Because if he said to tell the truth, that

5   would, of course, meant for sure he knew you were about to

6   have an interview, right?

7   A          Do what, now?

8   Q          Be no reason to tell you to tell the truth if he

9   didn't know there was going to be an interview, right?

10  A          Right.

11             MR. HAMILTON:  Objection.

12             THE COURT:  Sustained.

13  BY MR. HARDIN:

14  Q          So, now, when you and he talked, as you hung up, was

15  there anything in your conversation with him then or before

16  that would have alerted him in any way that you were ever

17  going to be telling this to law enforcement?

18  A          No.

19  Q          And after the conversation was over, did you ever

20  have any other kind of correspondence with him or phone

21  conversations in which he pursued that topic with you?

22  A          No.

23  Q          So is the sum total of your testimony, ma'am--  By

24  the way, you are aware, are you not, that the government has

25  charged him with a felony for this phone conversation we're

1  talking about?

2  A        I am.

3  Q        All right.  So you know what their theory and

4  contention is, right?

5  A        Yes.

6  Q        Have they read to you, in your meetings with them,

7  the language of the statute that they say that he violated

8  here?

9  A        I -- I don't believe so.

10 Q        All right.  Have they -- did you -- in your meetings

11 with them -- did you meet with them in preparation for your

12 testimony?

13 A        Yes.

14 Q        Did they go over with you what you had previously

15 told them in the past?

16 A        We did.

17 Q        Because they wanted you to be prepared in order to

18 accurately and candidly answer all the questions they wanted

19 to go over with you and give you a chance to review what

20 you've said in the past, correct?

21 A        Correct.

22 Q        They wanted to give you a chance to ask them any

23 follow-up questions you might have, to be sure that you

24 understood the question, right?

25 A        Yes.

1    Q        They wanted to give you an idea that, when you not

2    only testified with them but that when I asked you questions

3    that you would be prepared to answer them fully,

4    knowledgeably, and candidly?

5    A        Correct.  Yes.

6    Q        And in order for you to be comfortable that you were

7    telling the truth, it was very helpful for you, wasn't it, to

8    be able to go over what you said previously?

9    A        Yes.

10   Q        All right.  And when you met with the government in

11   this interview in November, you talked to them, did you not,

12   for over five hours?

13   A        I would say we were together that length of time as

14   well, yeah.

15   Q        Well, I don't have in front.  I can check, but does

16   it sound right that you went from, like, 9:00 in the morning

17   or something --

18   A        Yes.

19   Q        -- and took an hour for lunch and didn't quit until

20   4:00 something?

21   A        Yes.

22   Q        Okay.  So the government had the opportunity to

23   fully and fairly ask you anything they could and take notes,

24   right?

25   A        Yes.

1    Q        And therefore have the ability to help you refresh

2    your memory.  When was the last time you talked to them?

3    A        Yesterday.

4    Q        Okay.  Have you always told the government that not

5    once did Mark Hazelwood ever discuss with you what you should

6    or should not say to law enforcement?  Have you told them

7    that?

8    A        We've never discussed that.

9    Q        They never wanted to know that?

10   A        I told them the exact words of the phone call.

11   Q        Yes, ma'am.  But did they tell you the statute talks

12   about corruptly persuading --

13            MR. HAMILTON:  Objection, Your Honor.

14            THE COURT:  Sustained.

15            (Brief pause.)

16   BY MR. HARDIN:

17   Q        Did Mark Hazelwood say anything to you and ask you

18   in any way to either hinder, delay, or prevent yourself in any

19   way from communicating to a federal law enforcement official

20   employed with the Federal Bureau of Investigation or the

21   Internal Revenue Service-Criminal Investigation?  Did he in

22   any way say anything to you to get you to hinder, delay, or

23   prevent you?

24   A        No.

25   Q        Did you say anything to him before or during the

1  conversation that you had any plans to or were going to be

2  interviewed by federal law enforcement?

3  A       No.

4  Q       Now, after you had that conversation with Mark

5  Hazelwood on the 9th, did you come -- continue to communicate

6  with the Hazelwoods?

7  A       We -- yes, there was a few encounters.  There was

8  still some personal business that they had questions on that I

9  had helped answer.  And I ran into them one day at lunch, and

10  Mark came over and spoke.  It was limited after that.

11  Q       I'm sorry, I didn't hear the last --

12  A       It was limited after that.

13  Q       Okay.  I want to switch over, if I can, to another

14  subject for you, ma'am.  I want to do, if I may, the travel

15  that you were involved in.

16  A       Okay.

17  Q       Were you the -- were you the person responsible for

18  maintaining these -- what do we call them, the travel

19  itineraries?

20  A       Uh-huh.

21  Q       All right.  I'd like to show you --

22          MR. HARDIN:  Let me see if I may, Your Honor, step

23  away to see what exhibit numbers they are.

24          (Brief pause.)

25  BY MR. HARDIN:

1  Q        Would you agree that it's one thing for you and I to

2  say he traveled a lot, it's quite another to start looking at

3  the actual travel arrangements you made?  Would you agree?

4  A        Tell me that again.

5  Q        Yeah.  It's one thing for you and I just to orally

6  say he traveled a lot, but it really comes home when you start

7  looking at the extent.

8  A        You're exactly right.

9  Q        All right.  I want you to look, if I can, to Joint

10 Defense Exhibit 2388 and '89.  And what I want to do here

11 is -- I've tried to gather together some travel itineraries

12 for you in representative years.  First of all, I'm going to

13 ask you, in response to government requests for discovery

14 during all this or your own company's desire to get stuff

15 together at the government's request, did you-all ultimately

16 gather Mark's itineraries and produce them to the government

17 for the years 2008 all the way to April 2013?

18 A        I used to keep hard copies.  I had several years.  I

19 don't know how many years my hard copies went back.  And then

20 I'm sure that they pulled, from computer archives, other

21 years.

22         MR. HARDIN:  Hold on just a second.

23         (Brief pause.)

24         MR. HARDIN:  What I want to do is move to introduce--

25 May I have just a moment?

1          What is my next Joint Defense Exhibit for this page?

2   I just want to make this an "A."

3          MS. JARES:  198.

4          MR. HARDIN:  Pardon me?

5          MS. JARES:  198.

6          MR. HARDIN:  Thank you.

7   BY MR. HARDIN:

8   Q          198A is going to be a list of all the exhibits that

9   I seek to introduce now that I want to give the government

10  this page to look at.  But I am representing these are

11  itineraries produced to us by the government.

12          And what I would propose, Your Honor, for

13  Mr. Hamilton, is that rather than read off all those exhibits,

14  that I offer all the exhibits that are listed on that

15  Exhibit A.

16          MR. HAMILTON:  We have no objection to that.

17          MR. HARDIN:  If that is the case, Your Honor, I move

18  to introduce all exhibits that are in Joint Defense Exhibit --

19  in one -- that are listed in Joint Defense Exhibit 198.  I

20  understand there's no objection.

21          THE COURT:  Admitted.

22          MR. HARDIN:  Thank you.

23          (Joint Defense Exhibit 198 was received into

24          evidence.)

25  BY MR. HARDIN:

1    Q        Now, it's a lot.  I'm going to give you some samples

2    right now, just so the jury can have an idea, and we'll go

3    from there.

4             THE COURTROOM DEPUTY:  Will you be wanting the

5    document camera?

6             MR. HARDIN:  No, they're stamped.  I'm okay.  Thank

7    you very much.

8    BY MR. HARDIN:

9    Q        Joint Defense Exhibit 388.  I want to see if you

10   could -- if you look at these and you can help orient the jury

11   to what they are.  We're only going to do a few of these and

12   then I'm going to quit.  Okay?

13   A        Okay.

14   Q        But I wanted to ask you about them.

15   A        Okay.

16   Q        Are these--  All right.  Now, so is this a

17   typical -- first question:  Is this 2388, is this a typical

18   itinerary that you would prepare?

19   A        That -- yes, that is my itineraries.

20   Q        Okay.  So walk the jury for me.  You would enlist

21   the aircraft.  Is this a private aircraft of Pilot?

22   A        Yes.

23   Q        Okay.

24   A        That's Mark's.

25   Q        Pardon me?

1   A       That was Mark's airplane.

2   Q       That's what I was going to ask you.  Mr. Hazelwood

3   had a private plane, did he not?

4   A       Yes.

5   Q       And how often would he use the private, personal

6   plane of his versus the company's private plane, for these

7   trips, do you know?

8   A       It would just depend on if Pilot's planes were not

9   available or if he was going into areas where Pilot's planes

10  couldn't land, and then we would use his.  And then other

11  people from Pilot also used Mark's plane, and would lease it

12  back to Pilot.

13  Q       All right.  So on this particular one, you'd list

14  the passengers and you'll tell him all the stuff you're going

15  to do, correct?

16  A       Yes.

17  Q       So if I were to take all of these -- if I was to

18  take all of ours -- do you know whether this plane up here, by

19  the way, whose plane that is, whether that's the company or

20  Mark's?

21  A       That's 231JH, I believe that's -- that's Mark's.

22  Q       Okay.  Really doesn't matter one way or the other

23  whether that's accurate, does it, because you would do the

24  same thing for either, wouldn't you?

25  A       Yes.

1    Q        Whether he was using the company plane or the

2    personal plane?

3    A        Same, same format, yes.

4    Q        Okay.  Fine.  So, now, on this particular

5    situation -- this says it's going to be, like, a one-day trip.

6    Would this be fairly typical?  It says January 15 through 17

7    of 2008.  Would he be -- that be, like, a Tuesday through

8    Thursday?

9    A        Yes.

10   Q        All right.  And then would he go to different

11   locations?

12   A        He jumped all over the United States.

13   Q        And so if I was time challenged, challenged enough

14   to want to do it, could one take all of these reports you have

15   over these years and actually have a basis for graphing them

16   out as to where he was going and for how long, based on these

17   reports?

18   A        Yes.

19   Q        All you would have to do, would it not, is, you'd

20   have to read each one of these reports, and then you would

21   have to sort of mark beginning and end based on what Pilot's

22   own records had, correct?

23   A        Yes, that's correct.

24   Q        And you were the person responsible for keeping

25   those records, correct?

1   A          Yes.

2   Q          Okay.  Thank you.

3              Take that down.  And then let's go to -- let's just

4   pick one in 2009.  Let's do -- let's do 2419, Joint Defense

5   Exhibit 2419.

6              Up at the top, this is now in July of '08, rather,

7   all right, and same thing, and now Brad Butcher.  Do you know

8   who he was?

9   A          Okay.  231JH.  Okay.  I think I was mistaken on that

10  being --

11  Q          Well, I think you were, but I didn't want to argue

12  with you because --

13  A          Yeah, because I'm looking at the crew, and that's

14  Pilot -- that's Pilot's crew.  That was not Mark's plane on

15  that other trip, I'm sorry.

16  Q          That's okay, because the point being is, it wouldn't

17  really matter for what we're talking about.

18  A          Right.  It's the same format whether it was his or

19  with Pilot's plane.

20  Q          Right.  Because if he was using his own plane, the

21  company was going to reimburse him for it anyway, right?

22  A          Right.  Right.

23  Q          And they would, right?

24  A          Correct.

25  Q          So no matter which tail number we have up here,

1    which plane it is, it's going to be the same, is it not?

2    A        Right.  Right.

3    Q        Fine.  Now, this would be another typical -- it's

4    '08.  Let me jump ahead to 2012 for a second.  Let me do 2832.

5    This is '11 rather than '12.  It's '11.  Same thing.  Things

6    are being pretty much done the same way, are they not?

7    A        Yes.

8    Q        Once again, this is 8-9/2011.  So if we went through

9    all these for the period of the time the government is talking

10   about the conspiracy going on, we would find similar trips for

11   him weekly, wouldn't we?

12   A        Yes.

13   Q        Would you be surprised if sometimes in some years we

14   find, like, 500 different air trips in one year?

15   A        It's possible.

16   Q        I mean, obviously, that's more than 500 days, but on

17   these trips you would have him go from Point A to B, and then

18   he would go a lot of times from B to C, correct?

19   A        Yes.

20   Q        And a lot of these trips were calling on customers,

21   were they not?

22   A        Yes.

23   Q        And a lot of these trips were him doing real estate,

24   were they not?

25   A        Correct, yes.

1    Q        And when he was doing real estate -- I think you've

2    said before, haven't you, ma'am, his primary duty was fuel oil

3    and real estate.  Is that a fair statement?

4    A        Yes.

5    Q        That's what he spent most of his time on?

6    A        Yes.

7    Q        Did you notice as we started moving into 2008, '9,

8    '10, even after the Flying J merger, that he seemed to be

9    spending more and more time on locating real estate locations,

10   or did you notice one way or the other?

11   A        I didn't notice that.

12   Q        Okay.  Well, did you -- did you recognize and see

13   that picking out real estate locations was a passion of his?

14   A        Yes, it was.

15   Q        He really enjoyed it, didn't he?

16   A        Absolutely.

17   Q        And so he did a lot of it --

18   A        Yes.

19   Q        -- in addition to what he was doing in overseeing

20   about fuel sales, correct?

21   A        Yes.

22   Q        So when we see all these trips, they might be to

23   talk to customers, correct?

24   A        Uh-huh.

25   Q        They might be going on trips to call on customers

1    with some of the salesmen, correct?

2    A        Correct.

3    Q        They might be trips to go pick new locations for new

4    Pilot Flying J?

5    A        Yes.

6    Q        How much, in your own mind, Ms. Blake, did Pilot

7    grow from number of locations from when you started until the

8    time Mark left?

9    A        Hundreds.  I mean, four or five hundred locations.

10   Q        More?

11   A        Yeah.

12   Q        Yeah?

13   A        Yeah.  Mergers.

14   Q        Would you say that those years of adding locations,

15   finding places, getting them built out, all of that was a

16   booming effort for those periods of years from '08 to '13?

17   A        Yes.

18   Q        Okay.  Now, I want, if I can, to put this aside.

19            Your Honor, I'm about to move to another subject.  I

20   don't think I'm going to be able to finish today.  Would this

21   be an appropriate time to finish?

22            THE COURT:  As I explained to counsel during the

23   lunch break, a situation has arisen which makes it impossible

24   for us to have court tomorrow.  So we're going to have to take

25   an unexplained break tomorrow.  We'll reconvene on Thursday.

1              I do have some good news to share with the jury,

2    though.  This is the government's last witness.  So once this

3    witness is done, the government will be done with its case.

4              So I would like to get as much as we could done with

5    this witness as we can.  So why don't we try to go at least

6    until 5:30 this evening.

7              MR. HARDIN:  Fair enough, Judge.

8              MR. VERNIA:  Your Honor, may I ask a scheduling

9    question?  Do we have court on Wednesday?

10             THE COURT:  Yes.

11             MR. VERNIA:  Okay.  I think you said Thursday.

12             MR. HARDIN:  Yeah, you jumped ahead to Thursday,

13   Judge.

14             THE COURT:  I'm sorry.  Yes, Wednesday is the next

15   trial date.  Thursday, we'll go Thursday morning.  And then

16   we'll have trial on Friday.

17             MR. HARDIN:  May I have just a second, Your Honor?

18             (Brief pause.)

19   BY MR. HARDIN:

20   Q        All right.  During this time -- by the way, do you

21   happen to recall that in anticipation of the 2010 merger with

22   Flying J, that -- back in '09, Mr. Hazelwood going to every

23   single Flying J new spot they had?

24   A        He did.

25   Q        How many was that?

Blake - Cross-Examination

```
1    A          (Shrugging shoulders.)  I don't -- I don't remember.

2    Q          But his -- but his -- but what you were aware of

3    then was for every new truck stop spot that Pilot was taking

4    over as a result of the merger with Flying J, he went to every

5    one of those personally?

6    A          Yes.

7               MR. HARDIN:  I move to introduce --

8    BY MR. HARDIN:

9    Q          Let me ask you this:  Did you prepare, periodically,

10   bios for him, or put them together?

11   A          Yes.

12   Q          All right.

13              MR. HARDIN:  And can I -- if I may, I move to

14   introduce Defense Joint Exhibit 192.

15              THE COURT:  Any objection?

16              MR. HAMILTON:  I'm not sure what it is.

17              (Brief pause.)

18              MR. HAMILTON:  No objection.

19              THE COURT:  Received.

20              (Joint Defense Exhibit 192 was received into

21              evidence.)

22              MR. HARDIN:  May I have 192, please.

23   BY MR. HARDIN:

24   Q          So April 11th, 2013.  "Please, Brad" -- this is an

25   e-mail, is it not, from you?
```

1    A          It is.

2    Q          "Please, Judy, find Mark's -- attached Mark's bio."

3    Is that correct?

4    A          Correct.

5    Q          Then if we go to the next page, if you have it

6    there.  I'm not going to read this whole thing, but you're

7    familiar with all of this, does it not?

8    A          Yes.

9    Q          And does this accurately reflect the different

10   things that Mark was responsible for in his background?

11   A          Yes.

12   Q          Were these things that are talked about here for

13   changes, direct bill programs with trucking companies; hedging

14   strategies, trucking industry.  Down here, site/location

15   selection, merger, acquisition, strategy and negotiations,

16   site development, store layouts, national QSR strategy,

17   national full-serve restaurant program, Pilot Flying J program

18   network, industry relationships.

19              Can we go up a little bit.

20              By this time in '13, you're representing the

21   companies, through him, "The newly combined powerhouse of

22   Pilot Flying J results in a $40 billion revenue company with a

23   network of over 600 locations across the United States and

24   Canada."

25              Are you aware that's an accurate statement, are

1  you not?

2  A        Yes.

3  Q        So this, his bio, would you agree, gives a flavor --

4  you can almost track, can you not, the growth of Pilot, during

5  the time you were there, by looking at the different things

6  that were in his bio, could you not?

7  A        Yes.

8  Q        And you were part of all this, weren't you?

9  A        Yes.

10  Q        And you were proud to be part of it, were you not?

11  A        I was.

12  Q        When you -- after -- let me -- let me -- I've done

13  something on the record, let me represent to you --

14          Can I have the boxes of the trip reports?

15          (Brief pause.)

16          MR. HARDIN:  Right there, please.  Just stack them on

17  top of them.

18          (Brief pause.)

19  BY MR. HARDIN:

20  Q        If -- I represent to you, if you continue to do hard

21  copies for the years we're talking about, this is what they

22  would be.  So at the end of 2002 --

23          MR. HAMILTON:  Objection.  Objection, Your Honor.  Is

24  that testimony that he's making?

25          THE COURT:  Well, let's have him finish the question.

1    We don't have a question on the floor yet.

2    BY MR. HARDIN:

3    Q        So at the end of two thousand -- September 2010, it

4    would make a lot of sense to quit trying to do this and send

5    it to a Dropbox.  That's all I'm asking.  Right?

6    A        Yes, that's --

7    Q        And this is really part of the problem, isn't it?

8    It's not like you were keeping them, but these things would be

9    bulky and a bunch, and there was a lot of it, wasn't there?

10   A        Yes.

11   Q        And each time the government's office showed you one

12   of these, they would be showing you a trip report that was

13   among all of these, wouldn't they?  Would they not, ma'am?

14   A        Yes.

15   Q        And all of these things would be being done during

16   the time and read and looked at during the time he was doing

17   all these other things we've talked about, correct?

18   A        Yes.

19            MR. HARDIN:  I'm going to make it within your time

20   frame, Your Honor.  I only have about five or ten more minutes.

21            (Brief pause.)

22            MR. HARDIN:  Can I have Joint Defense 189, please.

23   BY MR. HARDIN:

24   Q        Do you recognize this, ma'am?

25   A        No, but is it -- is it from me, or to me, or --

1 Q        It says -- doesn't the "SB" there indicate it was

2 from -- do you not recall sending to Mark and Joanne this text

3 about Happy Anniversary?

4 A        (Shrugging shoulders.)  I don't, but obviously I

5 did.

6 Q        It doesn't surprise you?

7 A        No, no.

8 Q        It would be something you did, right?

9 A        Right.

10 Q        Be nothing wrong with it?

11 A        Right.

12 Q        But it's after that 6/9 phone call, isn't it?

13 A        Uh-huh.  (Moving head up and down.)

14 Q        When we talked about the bonuses he would give you,

15 that started about four or five years before he left, didn't

16 he?

17 A        That started around 2008 or 2009.

18 Q        Okay.  All right.  Fair enough.  It started, did it

19 not, roughly commensurate -- or would you agree it was roughly

20 commensurate with the time frame in which he was increasingly

21 asking you to do personal stuff?

22 A        That's -- well, the personal stuff started around

23 2003 or 2004 --

24 Q        Okay.

25 A        -- but it was probably growing in more demand at

1  that time, 2008, 2009.

2  Q        Yeah.  I just want to make sure there was no

3  misunderstanding.  When you talked about -- when Joanne

4  Hazelwood gave you a 10,000-dollar check, I think you said,

5  and he did in 2014 --

6  A        Yes.

7  Q        -- correct?  But that was before any of this stuff

8  happened, wasn't it?

9  A        It was in April.

10  Q        Yeah.  So it was before -- was it before, or after,

11  the search warrant?  Before, wasn't it?

12  A        It was after.

13  Q        After?

14  A        It was --

15  Q        But it's right --

16  A        Yeah, it was in 2014.

17  Q        Pardon me?

18  A        It was in 2014.

19  Q        Okay.  Obviously, then, it was way after.

20  A        Yeah.

21  Q        So you think it was, like, April of 2014, and

22  then -- but that wasn't a unique experience for you at that

23  time, other than that Mrs. Hazelwood also gave you a check,

24  correct?

25  A        Correct.

1    Q        So for about the last five or six years, before Mark

2    Hazelwood and you quit working together, had he given you a

3    personal check for $10,000?

4    A        Yes, yes.

5    Q        And he told you that was a gift, didn't he?

6    A        Yes, it was a gift.

7    Q        And he told you that was a gift and it came out of

8    his personal account, not a company account, didn't he?

9    A        Personal account, correct.

10   Q        So for the last five years before he left, then, in

11   addition to whatever you made from the company, was he giving

12   you a 10,000-dollar personal check as a gift?

13   A        The first year he gave it to me, it was more than

14   that, it was --

15   Q        How much was it the first time?

16   A        The first year it was 25,000.

17   Q        How much?

18   A        25,000.

19   Q        Forty-five?

20   A        25,000.

21   Q        Twenty-five.  I'm sorry.

22   A        And then after that, it was 10,000.

23   Q        So for that five-year period, so was the total from

24   him seventy-five or eighty thousand?

25   A        That's accurate, yes.

1    Q        And those were his personal funds?

2    A        Correct.

3    Q        And did he tell you that it was a gift because of

4    all the extra things you were helping him with?

5    A        That is--  That's what they told me.  That's what he

6    told me, yes.

7    Q        And you were so accepting and believing that it was

8    a gift, you didn't declare it as income, did you?

9    A        I didn't.  His accountants told me that it was being

10   counted on his taxes.

11   Q        Right, because --

12   A        It was a gift.

13   Q        -- if I give somebody a gift, untaxable, is your

14   understanding, is that not -- the person who receives it?

15   A        Right.

16   Q        So it was perfectly appropriate, wasn't it?

17   A        Right.

18   Q        All right.  And that's something you told the

19   government, that that's -- you know, that's a gift you took

20   and you didn't declare it income because it was a gift, and

21   that was correct, and that was on the advice of the

22   accountant, wasn't it?

23   A        That's correct.

24   Q        All right.  So my only point being, ma'am, I didn't

25   want to leave it said, the money that you were getting from

1    him as a gift came -- started happening long before the

2    government came calling, would you agree?

3    A        Yes.

4    Q        Okay.  And then when you were getting these gifts

5    and he was doing all this, even as late as September, was

6    there -- did you become aware of publicity or something that

7    called you -- caused you to send them a note in September of

8    '14 that you read that meant he was now in trouble?

9    A        I don't know.

10            MR. HARDIN:  Okay.  May I move in a Joint Defense, I

11   think, 190?

12   BY MR. HARDIN:

13   Q        Do you recall sending this?

14   A        Yes.

15   Q        Do you recall what the event was that triggered you

16   sending it?

17   A        I don't.

18   Q        "Mark and Jo, I don't really know what to say, but I

19   want you to know I'm thinking of you.  It was hard seeing is

20   the news--"  Did you probably mean to say "in" instead of "is"

21   there?

22   A        Probably.  I'm sure.

23   Q        All right.  "It was hard to see it in the news

24   yesterday.  I love you both, and I hope you can enjoy the rest

25   of your trip."

1          Do you recall the instance of this was a newspaper

2   article about him being sent a target letter by the government

3   saying that he was now suspected of having done something

4   wrong?

5   A          That sounds -- now that you've said that, that

6   sounds familiar, but I don't remember.

7   Q          There was a big flurry of publicity about it, wasn't

8   there?

9   A          Yes.

10  Q          And when you saw that, you were concerned about it,

11  correct?

12  A          I was.

13  Q          And you were concerned --

14  A          September was a hard month for Mark, and I cared

15  about him.

16  Q          And even in September of 2014, it never occurred to

17  you, did it, that you would be here as basis of the

18  government's contention that he tried to interfere with the

19  government investigation by a phone call to you before you

20  talked to private lawyers?

21  A          No.

22             MR. HARDIN:  May I have just a second, Your Honor?

23             (Brief pause.)

24             MR. HARDIN:  Ms. Blake, I know this has been very

25  difficult for you.  I thank you for your patience.

1            THE WITNESS:  Thank you.

2            MR. HARDIN:  I'll pass the witness, Your Honor.

3            MR. KELLY:  No questions, Your Honor, on behalf of

4    Mr. Wombold.

5            MR. MURRAY:  No questions, Your Honor.

6            MS. COMPHER-RICE:  No questions, Your Honor.

7            THE COURT:  Redirect.

8            MR. HARDIN:  Your Honor, if it's okay with the

9    government, we'll wait until the jury's gone to move this.  If

10   you'd rather get it out of the way --

11           MR. HAMILTON:  Oh, no.  Leave them there.

12           MR. HARDIN:  All right.  Do you want the other box?

13           MR. HAMILTON:  No.  It's all right.  I'm just going

14   to put my paper on it.

15           MR. HARDIN:  Okay.

16           (Brief pause.)

17                     REDIRECT EXAMINATION

18   BY MR. HAMILTON:

19   Q       All right.  Going back to the cell phone records

20   right now.  And cell phone records are Government

21   Exhibit 1901A.

22           Can you see that from here, or do you want to look

23   at the screen?

24           Can we pull 1901A, please?

25   A       Be better on the screen.

1  Q        All right.  All right.  So 1901A is on the screen

2  now, right?

3  A        Yes.

4  Q        All right.  And what day is that?

5  A        June 9th.

6  Q        Of what year?

7  A        Of 2014.

8  Q        All right.  So starting at 6:24, between -- let's

9  see.  At 6:24 who called you?

10 A        At 6:24 -- 6:24 Joanne Hazelwood's cell number

11 called my cell.

12 Q        All right.  And then let's look down at 6:42.  Who

13 called you?

14 A        The house.  Mark Hazelwood's house number called me.

15 Q        All right.  And then look at 6 -- is that 6:43?  Who

16 called you?

17 A        Mark Hazelwood's cell phone, the Italy cell phone.

18 Q        Then look at 6:52.  What number called you?

19 A        Joanne Hazelwood's cell number called me.

20 Q        So between -- let's see.  What is it?  In less than

21 30 minutes, how many calls did you get from Mark Hazelwood

22 and/or Joanne Hazelwood?

23 A        Four.

24 Q        Four calls?

25 A        Four calls.

1  Q        Now -- and on June 9th of 2014, were you working for

2  Mr. Hazelwood?

3  A        No, I wasn't.

4  Q        Did you -- I believe I heard on cross-examination --

5  make sure I heard this correctly -- is that he was given a

6  hard copy of his calendar before he left his employment?

7  A        (Moving head up and down.)

8  Q        Is that correct?

9  A        He-- Yes.  He always kept a hard copy of his

10 calendar in his briefcase.

11 Q        And on that hard copy, what was recorded as going to

12 happen on June 11th of 2014?

13 A        That I was going to be out of the office meeting

14 with Steptoe & Johnson.

15 Q        And Steptoe & Johnson is who, again?

16 A        The investigative team for Pilot.

17 Q        Are they a law firm?

18 A        Law firm, yes.

19 Q        And did you, in fact, meet with Steptoe & Johnson on

20 June 11th?

21 A        Yes, I did.

22 Q        And so when you met with Steptoe & Johnson on

23 June 11th, had Mr. Hazelwood already been terminated from his

24 employment with Pilot?

25 A        Yes.

1   Q        Let me direct your attention to Government

2   Exhibit 2229.  And let's enlarge the top part of this.  This

3   is an e-mail from Jimmy Haslam, April 15th of 2013?

4   A        Yes.

5   Q        And who is it to?

6   A        Mark Hazelwood, Scott Wombold, and John Freeman.

7   Q        And did this go to the Mark Hazelwood account that

8   you had access to?

9   A        Yes, it did.

10  Q        Would you read the e-mail that Jimmy Haslam sent to

11  Mr. Hazelwood?

12  A        "You may have heard--  You may have heard that our

13  company, Pilot Flying J, was informed Monday that it is the

14  subject of a federal investigation.  We are cooperating

15  appropriately with any and all external investigations, and

16  are conducting our own.  In the meantime, our business and

17  relationships with our customers will continue as usual.  Our

18  business was built on those relationships, and we value them

19  very much."

20  Q        So the top part of the e-mail--

21           Let's stay up there, please.  The top part of the

22  e-mail, where it says, "Pilot Flying J was informed Monday

23  that it is the subject of a federal investigation.  We are

24  cooperating appropriately with any and all external

25  investigations."

 1              Federal investigation, right?

 2     A        Uh-huh.  Yes.

 3     Q        And Mr. Hazelwood is sent that e-mail?

 4     A        Yes.

 5     Q        And during cross-examination, do you remember

 6     Mr. Hardin asked you about whether or not, in fact, Steptoe &

 7     Johnson attorneys informed the federal government about what

 8     you told them?

 9     A        Yes.

10     Q        So with this e-mail here, Mr. Hazelwood was aware

11     that that could happen?

12              MR. KELLY:  Objection.  Leading, Your Honor.

13              MR. HARDIN:  Objection.  Thank you.  Leading.

14              MR. HAMILTON:  May I ask another question, your

15     Honor?  I'll withdraw that one.

16              THE COURT:  He's withdrawn the question.

17     BY MR. HAMILTON:

18     Q        Did Mr. Hazelwood receive this e-mail before you had

19     the phone call with him on June 9th of 2011 [sic]?  This

20     e-mail's dated April 15th of 2013.  So is this e-mail dated

21     before the June 9, 2014, call that you had with Mr. Hazelwood?

22              MR. KELLY:  Objection, Your Honor.  Assumes facts not

23     in evidence.

24              THE COURT:  I think there's three questions there.

25     Why don't you pare it down to just one question, Mr. Hamilton.

1          MR. HAMILTON:  Yes.

2     BY MR. HAMILTON:

3     Q          What is the date of this e-mail?

4     A          April 15th, 2013.

5     Q          And, again, just so I make a complete sentence for

6     the record, what is the date of the e-mail that is Government

7     Exhibit 2229?

8     A          April 13, 2013.

9     Q          And what was the date of the phone call that you had

10    with Mr. Hazelwood that you described to us on direct

11    examination when he made his statements about trip reports to

12    you?

13    A          June 9th, 2014.

14    Q          And how many days later did you have an interview

15    with Steptoe & Johnson, who was conducting an investigation

16    for the company?

17    A          Two days later.

18    Q          And after that interview, did Steptoe & Johnson, in

19    fact, report what you said to the United States government?

20    A          Yes, they did.

21    Q          And at the time Mr. Hazelwood made the call to you

22    on June 9th of 2014, he had already been terminated from his

23    employment?

24    A          That's correct.

25    Q          Let me direct your attention now to Government --

1    excuse me –– to the Defense Exhibit 192, which was the Mark

2    Hazelwood biography.  Do you recall that?

3    A       Yes.

4    Q       I don't have a copy of it, but do you recall the

5    things that were written in that biography?

6    A       Yes.

7    Q       Did you write that biography?

8    A       I did not.

9    Q       Who wrote the biography?

10   A       Mark Hazelwood and Joanne Hazelwood wrote the bio.

11   Q       And so how do you know that?

12   A       I just do.  I mean, they gave it to me.  They told

13   me that they'd worked on it.

14   Q       Okay.  That's what I'm asking you.  Who gave it to

15   you?

16   A       Mark and Joanne.

17   Q       Was it handwritten?  Was it handwritten, or was it

18   typed?

19   A       I don't remember.

20   Q       So you didn't write it?

21   A       I did not write it.

22   Q       And it was your understanding it was something they

23   wrote about themselves –– that Mr. Hazelwood wrote about

24   himself?

25   A       Correct.

 1   Q        And then the last subject I want to talk to you

 2   about is circling back to a discussion about expenses and the

 3   amount of income that Mr. Hazelwood was able to receive from

 4   Pilot, topics that were discussed on cross-examination.

 5        My question for you is this, Ms. Blake, that despite

 6   all the money that Mr. Hazelwood was making while he was

 7   employed at Pilot, based on your experience in helping him pay

 8   for his bills, were there times when there was not enough

 9   money in his checking account to pay his expenses?

10   A        I don't remember the years, but there were times

11   when the accountants would tell me there was not enough

12   money --

13        MR. HARDIN:  Excuse me.  I'm sorry.  I'm going to

14   have to object to the hearsay, Your Honor.

15        MR. HAMILTON:  And, Your Honor, I --

16        THE COURT:  Overruled.

17   A        And the accountants would tell --

18        MR. HARDIN:  Did the Court just overrule that?  I'm

19   sorry.  I wasn't sure I heard.

20        THE COURT:  Overruled.

21        MR. HARDIN:  To what the accountant told her?

22        THE COURT:  Did you finish your answer, ma'am?

23   A        The accountants would tell me that there is not

24   enough money in the accounts to send out the checks.  And I

25   would check with Mark, and he would -- he would have me

1    contact his investment brokers to cash out stocks or to move

2    money into the accounts that way.

3    BY MR. HAMILTON:

4    Q        For what purpose?

5    A        To pay the bills.

6    Q        And on this last topic of money, when was the last

7    time that you received the gifts -- the gift payments from

8    Mr. Hazelwood?

9    A        April of 2014.

10   Q        And was there something different about the April of

11   2014 gift payments?

12   A        One check was from Mark Hazelwood, and one check was

13   from Joanne Hazelwood.

14   Q        And what -- what's unique about that?

15   A        Joanne Hazelwood had never given me anything before.

16   Q        And what -- what else had happened in April of 2014?

17   Who did you meet with in April of 2014?

18   A        I met with Rusty Hardin's investigator in April of

19   2014.

20   Q        And was it at that time that you --

21            MR. HARDIN:  Excuse me.  That's leading.

22   BY MR. HAMILTON:

23   Q        And during --

24            THE COURT:  The objection is leading.

25            MR. HAMILTON:  May I rephrase?  May I -- I hadn't

 1  completed it, but I think I was heading in that direction, and

 2  I think I should fix it, Your Honor.

 3          THE COURT:  So he's withdrawing the question.

 4  BY MR. HAMILTON:

 5  Q       Ms. Blake, during that interview with Mr. Hardin's

 6  investigator, what did you tell them about Mr. Hazelwood's

 7  review of trip reports?

 8          MR. HARDIN:  What she told them is hearsay.  That

 9  interview did not involve any coconspirator, Your Honor.

10          MR. HAMILTON:  Well, Your Honor, this is a situation

11  in which I am asking whether or not it was said.  And the

12  purpose of that, if I may argue, is to establish the potential

13  connection between that and the payments in April of 2014.

14          THE COURT:  What's the evidentiary rule?  There is an

15  objection.  So the purpose of the question, I'm not sure

16  surmounts the objection, does it?

17          MR. HAMILTON:  The nonhearsay purpose of the

18  question?  The fact that it was said to Mr. Hardin's

19  investigator is what -- is my argument, Your Honor.

20          MR. HARDIN:  He's offering it for the truth that it

21  was said to the investigator.

22          MR. HAMILTON:  No, Your Honor.  I'm offering it for

23  the fact that it was said to the investigator as it relates as

24  a follow-up question to the payments that were received from

25  the Hazelwoods in April of 2014.

1          THE COURT:  Sustained.

2    BY MR. HAMILTON:

3    Q          Did you meet with Mr. Hardin -- what month did you

4    meet with Mr. Hardin's investigator?

5    A          April.  April of 2014.

6    Q          And after the -- that meeting, at what time was the

7    Steptoe & Johnson interview scheduled?

8    A          June the 11th, 2014.

9    Q          And in what month was the Steptoe & Johnson

10   interview scheduled?

11   A          June.

12   Q          I mean in what --

13   A          Oh, April, because the Steptoe & Johnson meeting was

14   scheduled, and then that's when Rusty Hardin asked -- his

15   investigator asked to meet with me, after the Steptoe meeting

16   and being notified of it.

17   Q          So if I have my time right, the Steptoe & Johnson

18   interview is scheduled -- the scheduling happens in April of

19   2014?

20   A          Yes.

21   Q          To occur in June of 2014?

22   A          Correct.

23   Q          And then after that, that's when the interview with

24   Mr. Hardin's investigator is scheduled?

25   A          Yes.

1              MR. KELLY:  Objection.  These are leading, Your

2    Honor.

3              MR. HAMILTON:  Well, I am trying to move through it

4    faster, given the time, but I would like to rephrase the

5    question, to make--  May I rephrase the question?  May I

6    withdraw it?

7              THE COURT:  You may.

8    BY MR. HAMILTON:

9    Q         When was the -- when was Rusty Hardin's

10   investigator's interview scheduled as it relates to the

11   scheduling of the Steptoe & Johnson interview?

12   A         I was asked for that interview with Rusty Hardin's

13   investigator after the Steptoe & Johnson interview was

14   scheduled.

15   Q         And when the Steptoe & Johnson interview was

16   scheduled, would it have been placed on the calendar that you

17   have talked to us about?

18   A         I--  it was.  And I specifically told Mark that I

19   would be out of the office that day and that it was put on his

20   calendar.

21   Q         And was it put on his calendar at the time of the

22   scheduling of the Steptoe & Johnson interview?

23   A         Yes.

24   Q         And so after that, when were you -- after you placed

25   it on Mr. Hazelwood's calendar, when were you contacted by

1    Rusty Hardin's investigator?

2    A        I don't remember an exact time frame.  It was -- it

3    was soon.

4    Q        And why do you say it was soon?

5    A        Because, I mean, the request came in April, and I

6    know the interview with him was in April as well.

7    Q        Of what year?

8    A        Of 2014.

9    Q        Okay.  And what was it that Mr. Hazelwood -- what

10   did he make reference to when he talked to you on the phone on

11   June 9th of 2011?

12   A        That he did not read trip reports.

13   Q        And --

14   A        That I had told Rusty's investigator that Mark read

15   trip reports, and he told me that he did not read trip

16   reports.

17            MR. HAMILTON:  No further questions, Your Honor.

18            THE COURT:  Thank you.  You may step down.

19            (Witness excused.)

20            THE COURT:  I apparently misspoke, ladies and

21   gentlemen.  Next trial date will be on Wednesday.  Apparently I

22   said Thursday, and that was in error.  We'll have a half day on

23   Thursday and a full day on Wednesday.  So be safe.

24            MR. HARDIN:  Your Honor, may we approach real quickly

25   about the schedule, maybe the Court wants to take into

1    consideration?  Because the things that -- legal things you

2    want to hear, do you want to do that Wednesday morning, have

3    them come after that?

4             THE COURT:  I think that might be an appropriate

5    idea.

6             Why don't we have you come in, then, after lunch on

7    Wednesday, then.  How about coming in at 1:30 on Wednesday.

8             A JUROR:  1:30?

9             THE COURT:  1:30.  1:30 on Wednesday.  1:30 this

10   coming Wednesday.  Okay.

11            We can let the jury go.

12            (The jury exited the courtroom, and the proceedings

13            continued as follows:)

14            THE COURT:  Please be seated.

15            The government has not rested its case yet, but the

16   Court anticipates from what it was told earlier that this will

17   conclude the government's case-in-chief.  It can announce to

18   the jury on Wednesday that it has rested its case.

19            For purposes of procedure, though, we will assume

20   the government has done so at this point.  So Wednesday we

21   will entertain any motions that anyone would like to make in

22   view of that particular posture of the case.

23            Is that okay with everyone?

24            MR. HARDIN:  Yes, Your Honor.

25            MR. HAMILTON:  Yes.

1          MR. KELLY:  Yes.

2          THE COURT:  I think there was a little bit of

3    consternation when the Court overruled an objection as to

4    hearsay about what the accountant told the previous witness.

5    And all counsel probably have an idea that this Court kind of

6    sticks pretty tightly to the rules of evidence.  So that may

7    have caused some surprise.

8          Sometimes the Court anticipates an answer that, if

9    it comes out, would not be objectionable, although the

10   question might be.  And obviously the question that was asked

11   was objectionable as to what was said.  But what the witness

12   indicated was that the defendant had adopted the statement of

13   the accountants.  That made the accountants' statement the

14   defendant's own statement, that there was not enough money in

15   the bank, and, therefore, money had to be transferred.

16   Therefore, the statement that the witness gave was not

17   hearsay.  Now, sometimes the Court is not accurate.  But in

18   this case, luck bore out and the witness said what the Court

19   kind of thought she might -- she might say.

20          Okay?  Anything further?

21          MR. HAMILTON:  Nothing from the government.

22          MR. KELLY:  No, Your Honor.  Thank you.

23          (Evening recess.)

24

25