IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

AT KNOXVILLE

---

UNITED STATES OF AMERICA :

Plaintiff, :

v. : 3:16-CR-20

MARK HAZELWOOD,
SCOTT WOMBOLD,
HEATHER JONES, and
KAREN MANN,

Defendants. :

---

Chattanooga, Tennessee
February 5, 2018

BEFORE: THE HONORABLE CURTIS L. COLLIER
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:

F. M. HAMILTON, III
DAVID P. LEWEN, JR.
Assistant United States Attorneys
U. S. Department of Justice
Office of the United States Attorney
800 Market Street, Suite 211
Knoxville, Tennessee 37902

JURY TRIAL
TWENTY-FIRST DAY OF TRIAL


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 1 of 256 PageID #: 12635

APPEARANCES: (Continuing)

FOR DEFENDANT MARK HAZELWOOD:

RUSSELL HARDIN, JR.
ANTHONY DOUGLAS DRUMHELLER
JENNIFER E. BREVORKA
Rusty Hardin & Associates LLP
1401 McKinney Street, Suite 2250
Houston, Texas 77010

FOR DEFENDANT SCOTT WOMBOLD:

JOHN E. KELLY
ROBERT K. PLATT
Bass, Berry & Sims PLC
1201 Pennsylvania Avenue NW
Suite 300
Washington, D. C. 20004

ELI J. RICHARDSON
DAVID RIVERA
Bass, Berry & Sims PLC
The Pinnacle at Symphony Place
150 3rd Avenue South
Suite 2800
Nashville, Tennessee 37201

ANNIE TAUER CHRISTOFF
Bass, Berry & Sims PLC
100 Peabody Place
Suite 1300
Memphis, Tennessee 38103


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 2 of 256 PageID #: 12636

APPEARANCES: (Continuing)

FOR DEFENDANT HEATHER JONES:

BENJAMIN J. VERNIA
ANDREW K. MURRAY
The Vernia Law Firm
1455 Pennsylvania Avenue NW
Suite 400
Washington, D. C. 20004

CULLEN MICHAEL WOJCIK
Law Office of Cullen M. Wojcik
422 S. Gay Street
Suite 302
Knoxville, Tennessee 37902

FOR DEFENDANT KAREN MANN:

JONATHAN D. COOPER
Whitt, Cooper, Trant & Hedrick
607 Market Street
Suite 1100
Knoxville, Tennessee 37902

SARA E. COMPHER-RICE
Oberman & Rice
550 West Main Avenue
NationsBank Building
Suite 950
Knoxville, Tennessee 37902-2567

INDEX OF PROCEEDINGS

Charge Conference. . . . . . . . . . . . . . . . . . . . 4
Closing by Mr. Hamilton. . . . . . . . . . . . . . . . . 113
Closing by Mr. Vernia. . . . . . . . . . . . . . . . . . 181

THE COURT: We're convening this morning for the purpose of reviewing the charge in this case. The Court has prepared a draft of the charge, the Court has circulated that to the parties, and the Court will entertain suggestions and objections to the draft.

The procedure that we will use, we'll go in name order. So we'll start with the government, and we will go in the order of the charge. So if Mr. Lewen or Mr. Hamilton indicates that Page 20 is a page as to which they have a suggestion or objection, that means that Pages 1 through 19 are approved. So we will not be going backwards. We will only be going forward. If the government states a suggestion or an objection, we'll have the defendants respond to that.

And then when the government finishes, we will do it in the order of the defendants the same way, so we'll start with Mr. Hazelwood, then Mr. Wombold, then Ms. Jones, and Ms. Mann will finish up. And the same thing, we'll go in page order. And once they state a suggestion or objection, the government and the other defendants will have an opportunity to respond.

So, would the government like to start?

MR. HAMILTON: Your Honor, turning first to Page 22.

THE COURT: So Pages 1 through 21 are acceptable to the government.

MR. HAMILTON: Yes, Your Honor.

THE COURT: So on Page 22, that's Count 1.

MR. HAMILTON: Yes, Your Honor. We have a suggestion with the second bullet, that -- and it reads presently, "second, the defendants knowingly and voluntarily joined a conspiracy."

The United States suggests that "defendants" be made singular, because of the phrase above, that says "prove that each and every one --" excuse me, "that any one of the defendants," "if you are to find any one of the defendants guilty."

THE COURT: Any objection to taking the s off?

MS. BREVORKA: (Moving head from side to side.)

THE COURT: I don't see an objection. That is granted. And since we're on this page, Mr. Hamilton, I think on that second line there, the citation to Section 1349 is in error. Is it?

MR. HAMILTON: No, I don't believe so.

THE COURT: No? That's correct?

MR. HAMILTON: That's correct. It charges a conspiracy in violation of Section 1349.

THE COURT: What's the next page?

MR. HAMILTON: Page 29.

THE COURT: So Pages 23 through 28 are acceptable to the government.

MR. HAMILTON: Yes, sir.

THE COURT: And on Page 29, we have the substantive counts.

MR. HAMILTON: Yes, sir. The bottom -- at the bottom of the page, there is a bullet that begins with the paragraph "First," comma. After the word -- going to the last -- the very last line of the page, where it says "pretenses," comma, the United States suggests that the Court add the words representations, comma, or promises. And the United States makes that suggestion because when you go -- when you turn the page and get to the detailed instructions, the Court will -- is going to instruct the jury that a scheme to defraud -- I'm just skipping it, "by means of false or fraudulent pretenses, representations, or promises." And the term false or fraudulent pretenses, representations, or promises is another defined terms -- another defined term, so the United States suggests that to mirror that and to make a fulsome statement of the element, that the Court -- going back now to Page 29, that the Court include pretenses, representations, or promises.

THE COURT: And that's lifted directly from the statute. Any objection to that?

(Brief pause.)

THE COURT: Hearing no objection to that, it's granted.

And on the second paragraph there, I think that's an incorrect citation, isn't it?


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 6 of 256 PageID #: 12640

MR. HAMILTON: Yes, Your Honor, that is an incorrect citation.

THE COURT: Okay. We'll make that correction there, then. So that will read 1343 instead of 1347.

Next?

MR. HAMILTON: Turning to page 55.

THE COURT: So Pages 30 through 54 are acceptable to the government.

MR. HAMILTON: Excuse me, Your Honor. I'm sorry. On page-- I did skip a page. On Page 39 --

THE COURT: So Pages 30 to 38, then, are acceptable.

MR. HAMILTON: Yes, sir. On Page 39, the date should be June 11 of 2014.

THE COURT: June?

MR. HAMILTON: I'm going to double-check that, Your Honor.

No. That is not -- I did not give you the correct date. It is June 9 of 2014, not July. So it is June 9 of 2014, is what is the date that's alleged in Count 14.

THE COURT: Any objection to that change?

(Brief pause.)

THE COURT: With no objection, that change will be made. So "July" now becomes "June."

MR. HAMILTON: Now turning to Page 55.

THE COURT: Pages 40 through 54 are acceptable to the


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 7 of 256 PageID #: 12641

government.

MR. HAMILTON: Yes, sir. The United States suggests that -- and I'm on the third line of the secondary-evidence summaries instruction. The United States suggests that the phrase "and 409 to 411" be struck, because those are not summary exhibits. Those are actual commission breakdown reports, which are Pilot business records. They were not summarized.

THE COURT: Any objections?

(Brief pause.)

THE COURT: Without objection, then, that will be -- that change will be made.

MR. HAMILTON: That is the extent of the government's suggestions.

THE COURT: Okay. And before you sit down, I'd like to draw your attention to the verdict form. I believe the verdict form is now -- it lists the questions seriatim as to each defendant. I'm considering dividing this either by defendant or dividing it by count. It's actually divided by count now, so it's not broken out. So if we divide it by count, we'd have "Verdict Form. Count 1, Question 1, 2, 3, 4, then Count 2," then -- and if we did it by defendant, we'd have Defendant X, and then we would have each question as to that defendant after that, and then the next defendant after that. The Court hasn't decided which one to do yet, though.


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 8 of 256 PageID #: 12642

MR. HAMILTON: The verdict form as drafted is acceptable to the government, Your Honor.

THE COURT: Okay. Thank you.

Mr. Hardin?

I'm sorry. Ms. --

MR. HAMILTON: Your Honor, before-- I'm sorry. Before I sit down, I do want to make sure-- Yes, it is acceptable. I was just checking that date from the witness tampering count, and it's correct in the verdict form. Thank you.

(Brief pause.)

MS. BREVORKA: Good morning, Your Honor.

THE COURT: Ms. Brevorka.

MS. BREVORKA: Yes, sir. The defendants have agreed to join each other's objections where applicable. So there will be certain language that I will address in the charge and then other language earlier in the charge that counsel for Mr. Wombold or others will address that the defendants join in.

THE COURT: Very well.

MS. BREVORKA: Thank you.

THE COURT: What's your first page?

MS. BREVORKA: Sure. Page 20, the deliberate --

THE COURT: Page 20. So Pages 1 through 19 are acceptable to Mr. Hazelwood.

MS. BREVORKA: To the extent, Your Honor, that we

will join in objections that we believe counsel for Defendants Wombold, Mann, and Jones will raise about Page 7 and possibly -- I don't want to miss anything. I believe Page 7 will be discussed by other counsel. The -- Page 20 is -- relates to the "Deliberate Ignorance" charge.

THE COURT: Uh-huh.

MS. BREVORKA: We do not believe that this charge is applicable to Mr. Hazelwood. We don't think it meets the Sixth Circuit's standard for such a charge because the evidence in the record does not support such a charge. We respectfully request that this charge be struck, or, in the alternative, that the jury be instructed it is not applicable to Mr. Hazelwood.

Our second objection --

THE COURT: Well, let's -- let's clear this up first.

MS. BREVORKA: Yes, sir.

THE COURT: This is the "Deliberate Ignorance" instruction, and it talks about proving a defendant's knowledge, and it says if someone deliberately ignores the obvious, then the jury can consider that in determining knowledge. And the jury has to be convinced beyond a reasonable doubt that the defendant was aware of a high probability. And we have there "diesel fuel discount fraud was occurring, and that the defendant deliberately closed his or her eyes to what was obvious. Carelessness, or negligence, or


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 10 of 256 PageID #: 12644

foolishness on the defendant's part is not the same as knowledge, and is not enough to convict."

You indicated that it may be applicable -- it may or may not be applicable to other defendants but it's not applicable to Mr. Hazelwood because there was no proof that would suggest that he was deliberately ignorant. Is that right?

MS. BREVORKA: It is, sir. The defendant-- I believe the government's theory of the case, in part, stated in its opening argument, was that Mr. Hazelwood actually led the conspiracy and led to further expand the conspiracy. We don't see any evidence in the record that the government has put forth that Mr. Hazelwood purposely contrived to avoid knowing or learning the truth of the conspiracy. And that is the --

THE COURT: Wasn't there some evidence that he did not read any of the trip reports?

MS. BREVORKA: True, Your Honor, but that's different than purposely contriving to avoid learning the truth or what -- or -- or I guess the act in question, right? The fact that he didn't read --

THE COURT: And my assumption is that in some of those trip reports there would have been some evidence of what was taking place?

MS. BREVORKA: Perhaps. I mean, that's what the government asserts, but --


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 11 of 256 PageID #: 12645

THE COURT: And I recall at some point someone displayed to the jury about four banker's boxes full of trip reports. And I'm assuming that a trip report would be done once a week, or perhaps once a month. So that must have been a considerable number of months of trip reports. So if someone did not read those trip reports for that entire time period, wouldn't that at least allow an inference that the person was deliberately trying not to learn what was going on?

MS. BREVORKA: I think there's two reasons that inference does not apply in this case. The first would be that the government specifically elicited evidence from its witnesses that would contradict such an inference. They contended, through their testimony, that Mr. Hazelwood indeed knew of this.

But the second reason is, even if he didn't read the reports, the trip reports, there was no evidence that he purposely didn't read them to avoid learning perhaps bad facts.

I will agree with Your Honor that there is evidence in the record that Mr. Hazelwood did not read the reports. But that's because he was either traveling, he was busy, he was paying attention to other things. There is no evidence to suggest that he purposely contrived or avoided reading those reports because they contained information about bad acts. So that's the basis of our objection, Your Honor.


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 12 of 256 PageID #: 12646

THE COURT: Okay. And I think you also suggested in your filing that if it is going to be given, perhaps it should be placed someplace else, it should not be where it is now; where it is now, it follows the pattern jury instructions, but it should be placed someplace else. Where would you suggest it be placed?

MS. BREVORKA: Well, we would suggest it be removed. But if the Court feels the need to keep it, it would be after the discussion of the conspiracy, so jurors are oriented.

I think, also, our second objection goes to the other standard the Sixth Circuit has held, is that it can- -- such an instruction -- this standard cannot be used to determine whether a defendant agreed to join the conspiracy; it can go to the knowledge of the unlawful acts.

But we would not only ask that it be moved to after the conspiracy charge but that it also address the fact that jurors cannot use this to determine whether or not a defendant agreed to join the conspiracy.

THE COURT: Okay. Let me hear from Mr. Hamilton, then, on this.

MS. BREVORKA: Yes, sir.

MR. HAMILTON: The Court is -- the Court has correctly identified the portions of the record that would support the "Deliberate Ignorance" instruction as it relates to Mr. Hazelwood, Number 1.


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 13 of 256 PageID #: 12647

Number 2 is that the "Deliberate Ignorance" instruction certainly is applicable in this case because of the testimony that the Court heard related to Mr. Wombold. You heard the testimony from Lexie Holden that he -- and I'm going to paraphrase here -- that he admitted that he knew that rebates were being adjusted; that if he was guilty of anything, it was sticking his head in the sand. So Mr. Wombold definitely warrants -- his conduct warrants a "Deliberate Ignorance" instruction.

THE COURT: Well, let's focus on Mr. Hazelwood --

MR. HAMILTON: Yes.

THE COURT: -- right now.

MR. HAMILTON: Right. Well, the reason why I make the point is because the suggestion that it if didn't apply to Mr. Hazelwood -- let's assume that it didn't apply to Mr. Hazelwood. But the idea of separating out Mr. Hazelwood from the "Deliberate Ignorance" instruction would put -- potentially put more light on Mr. Wombold and potentially create an issue there.

So even if -- even if Mr. Hazelwood were correct that it didn't apply to him, which obviously the government doesn't concede, the government believes that the Court has correctly identified portions of the record that support a "Deliberate Ignorance" instruction as relates to Mr. Hazelwood. But if -- in trying to solve a perceived


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 14 of 256 PageID #: 12648

problem, they might be creating another problem by focusing attention on other defendants in the case that wouldn't otherwise get that kind of focus.

The "Deliberate Ignorance" instruction that the Court has provided is the pattern jury instruction. It is a correct statement of law. Mr. Hazelwood will not be prejudiced by the Court providing a correct statement of law.

Now, turning to the location of the "Deliberate Ignorance" instruction, where Ms. Brevorka suggests that it go would actually create more of a problem under the law of the Sixth Circuit. Right now the law -- where the Court has it is exactly where the *United States vs. Williams* says it should be. This very issue was litigated in a fraud case, in *Williams*. And in the *Williams* decision, 612 F.3d 500 (2010, 6th Circuit), the court of appeals quite clearly states that a "Deliberate Ignorance" instruction is appropriate to -- to establish the fact that a defendant deliberately ignored the unlawful aim of a conspiracy, and it -- and in the context in which the conspiracy instruction was given after the "Deliberate Ignorance" instruction.

So the way the Court has the -- the instructions organized is that the "Deliberate Ignorance" instruction precedes the substantive instructions related to the criminal counts in the indictment. So deliberate instruction -- "Deliberate Ignorance" comes, and then right after that is

"Use of the Word and in the Indictment," and then we get to Count 1. So if you move the "Deliberate Ignorance" instruction after Count 1, then you're creating potential confusion that deliberate ignorance can be used to prove joining a conspiracy, and that's exactly the risk that we want to avoid, which is why the Court has put it in the correct place.

The Court has the deliberate instruction in the place so that there's no confusion that in order to -- in order for the jury to find any of the defendants guilty of Count 1, they must find that the defendants voluntarily -- knowingly and voluntarily joined the conspiracy. As *Williams* says, you can't consciously disregard your way into a conspiracy, but what you can do is, you can deliberately ignore the unlawful aims of the conspiracy that you voluntarily join.

So the government's point is, the "Deliberate Ignorance" instruction is proper, it is in the right location, it should not be moved.

THE COURT: I think that she also suggested that the instruction cannot be used for the agreement part of the conspiracy, it can be only used for the unlawful goals or aims of the conspiracy.

MR. HAMILTON: That is -- that is correct, Your Honor. And that's my point that I was arguing about *Williams*,


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 16 of 256 PageID #: 12650

which is that that's the point that *United States vs. Williams* makes. That is the law in the Sixth Circuit. And my point in arguing *Williams* is that the *Williams* court held that by placing the "Deliberate Ignorance" instruction before the conspiracy instructions, then that avoids jury confusion. The way in which the Court has done it -- the way in which the Court has organized and set out the instructions in this case is exactly what was approved in *United States vs. Williams*.

THE COURT: Okay. And, lastly, in the motion it was suggested that the standard that we have in the instructions is too low. We have carelessness, negligence, or foolishness. But the case law apparently suggests that recklessness or something equivalent to recklessness is the standard.

MR. HAMILTON: So they're citing *Global-Tech*, I think, for that. And so here's what *Global-Tech* says, that while the courts of appeals articulate the doctrine of willful blindness in slightly different ways, all appear to agree on two basic requirements: (1) the defendant must subjectively believe that there is a high probability that a fact exists, and (2) the defendant must take deliberate actions to avoid learning of that fact.

And then here's what the Supreme Court says -- and before I say what the Supreme Court says, that's exactly what the Sixth Circuit pattern instruction is, which is that there is -- "the defendant was aware of a high probability that


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 17 of 256 PageID #: 12651

diesel fuel discount fraud was occurring and that the defendant deliberately closed his or her eyes to what was obvious." So that -- that pattern instruction which the Court is following lines up with what *Global-Tech* says, which is that the defendant must subjectively believe that there is a high probability that a fact exists, and takes deliberate actions to avoid learning that fact.

THE COURT: So I guess deliberately closing his or her eyes would surpass recklessness, then.

MR. HAMILTON: That's right, because what the Supreme Court then says is that, "We think those requirements give willful blindness an appropriately limited scope that surpasses recklessness and negligence." That's the next sentence in *Global-Tech*.

THE COURT: All right. Suppose the Court added "or even recklessness" in that next-to-last sentence.

MR. HAMILTON: The United States would have no objection to that.

THE COURT: Ms. Brevorka, would that meet some of your concerns? So it would say, "Carelessness, or negligence, or foolishness, or even recklessness on the defendant's part is not the same as knowledge, and is not enough to convict."

MS. BREVORKA: That would meet our concern as to that objection, which we assert only in the event that our -- our first objection, and one I'd like to reurge to the Court, is

that this instruction does not -- is not applicable to Mr. Hazelwood, that the Sixth Circuit standard is not met for such an instruction as to Mr. Hazelwood. And we agree with adding recklessness only in the event that the Court continues to believe that this instruction must be included for Mr. Hazelwood.

I note that in his argument Mr. Hamilton did not address the sufficient evidence that was put forth that allegedly shows that Mr. Hazelwood took deliberate steps to ignore -- or deliberately closed his eyes to the purported fraud that was occurring. And that's the basis of our primary objection. Our concern is about Mr. Hazelwood, of course. He's our client. And that is why we're urging the Court this instruction does not apply to Mr. Hazelwood.

THE COURT: Okay. Thank you.

MS. BREVORKA: Thank you.

THE COURT: What's the next page?

MS. BREVORKA: Page 29, the wire fraud.

THE COURT: So 21 through 28 --

MS. BREVORKA: I believe other counsel will address objections we have on Page 21. And, actually, I apologize, the next -- going in the order of the charge, the next objection would be to the hypotheticals that exist in the -- Page 23 and 26. We raise this objection on behalf of all defendants as to the hypotheticals that are in the agreement and the conspiracy


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 19 of 256 PageID #: 12653

charge. We ask that the Court remove the hypotheticals, as we think it could lead to confusion among the jury.

THE COURT: Well, obviously the purpose of a hypothetical is to improve comprehension. What is it about them that you thinks -- think might lead to confusion?

MS. BREVORKA: Sure. I think on Page 23, the first concern we have is, we're not certain that this hypothetical actually shows unanimity of agreement, that both parties are agreeing to the same thing, which is the crux of agreement, that you have to both agree to join the same -- same act.

THE COURT: "The person sees what is going on, and decides to cooperate with the others in the effort to fight the fire." Where is the lack of unanimity?

MS. BREVORKA: I think that assumes the others are indeed fighting the fire.

THE COURT: They're in a line, passing buckets along.

MS. BREVORKA: Yes, Your Honor. We-- I understand the Court's position. I think our position is that we respectfully disagree, and would request that it be removed.

THE COURT: Okay. Then the second one-- I think the first hypothetical there goes to just the agreement. And what you have is someone who comes upon a burning building, he sees a line of people passing buckets among themselves to the last person, who tosses the bucket of water onto the fire. So you have a concerted effort by a number of people trying to put out

a fire. If someone sees that and then decides they're going to cooperate with those people in an effort to fight the fire, so the point here is, that's the agreement, that when the person sees what's going on, thinks that the goal is laudable and something they would like to assist with, they reach an agreement, it's a mental element.

The second example goes to joining.

MS. BREVORKA: Correct.

THE COURT: And let's see. That's -- it relies upon the same fact situation. And the person -- let's see where -- it's on Page 26, is it? Must be.

MS. BREVORKA: Yes, I believe it is the top two paragraphs.

THE COURT: I must have skipped over it. Here it is. Let's see. "If the person -- if the person does nothing more than agree to help, that's not sufficient to prove that the person joined the effort." So the mental step is not enough. "The person even turned to his neighbor and said he agreed with what was going on," but that would not be enough. "But if he got in the line and passed buckets along, or encouraged them, or he went to the faucet and increased the flow of water, or he filled buckets, or took some other action that demonstrated he was joining in with the intent to help advance or achieve the objective, then he's joined -- joined the effort."

What was -- what's misleading about that or might be

misconstrued by the jury about that?

MS. BREVORKA: I don't think we -- I think we -- certainly we would not say that the Court was misleading anyone. I think what we believe is that the jury may be confused from the hypotheticals. I think in particular, on the second one, the use of "encouraged them in the line" could be conflated, mere encouragement, with something similar to agreeing to help.

And so, in particular, while we urge our objection to both hypotheticals, we'd ask that "or encouraged them in the line" to be struck. Again, I think the same as before, we're not certain that these -- we don't believe that these hypotheticals truly show unilateral action.

THE COURT: Unilateral, or concerted, action?

MS. BREVORKA: Concerted action.

THE COURT: Concerted action?

MS. BREVORKA: I'm sorry, Your Honor. Thank you.

THE COURT: Let me hear from Mr. Hamilton.

MR. HAMILTON: The United States thinks that the hypotheticals are appropriate to helping the jury understand. Lay people don't ordinarily come in and have to wade through conspiracy law. And this hypothetical helps to simplify it, and helps them to understand how to take these legal instructions and think about them in a -- in a more understandable way.

THE COURT: Thank you.

The Court will deny the objection to the examples provided in the conspiracy count. The law on mail fraud and conspiracy to commit mail fraud or conspiracy to commit wire fraud is among the most complex in the entire criminal law area. In fact, not all that many years ago every circuit had to agree upon what mail fraud meant. And then the United States Supreme Court decided, after many, many years, all the circuits had been wrong, that they had completely misunderstood and misconstrued the law.

Congress later on decided that they would add some clarity to it, and they made some changes in the statute. And the Supreme Court again decided that the circuits which had looked at that had gotten it wrong. So I think any help that we can give our lay jurors to better understand what these terms mean would be -- would be helpful. An agreement is not something that, in the sense of the mail fraud statute or the conspiracy statute, that they would face in their daily lives. And the Court has not been pointed to anything that is misleading with the two. The Court will deny the objection.

What's the next page?

MS. BREVORKA: Yes, sir. I believe it is Page -- it relates to counts -- the page entitled Counts 2 through 6, 8, and 10, and our -- the Court has already changed the statute number. Our first objection --


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 23 of 256 PageID #: 12657

THE COURT: Page 29?

MS. BREVORKA: 29 was the statute number, yes. And then Page 30 is where our first objection appears. We ask that the first element track the language of Section 1343. And rather than stating "that the defendant knowingly participated in the scheme to defraud," we request that the language reflect the verbiage in the statute, "that the defendant devised or intended to devise a scheme to defraud."

THE COURT: Do you have any case authority which says that only people who devise or intend to devise a scheme or artifice to defraud or to obtain money by means of false and fraudulent pretenses are guilty?

MS. BREVORKA: I do not, Your Honor. I understood the Court might ask such a question, and I understand that the Sixth Circuit case law does give trial courts discretion in drafting jury charges as long as they accurately state the law and the facts, but there's also Supreme Court case law that states that the language of a statute is not mere surplusage. And so we just respectfully request in this case that the language of the first element track the language of the -- of the statute.

THE COURT: And I take it, then, you are aware that there is case law, including Supreme Court case law, that indicates that in the context of mail and wire fraud, someone who participates in a scheme or artifice to defraud or to


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 24 of 256 PageID #: 12658

obtain money and property by means of false pretenses or representations, can be guilty of a crime?

MS. BREVORKA: There is. But in that case, it could be amended, could it not, to -- I mean, it's not a misstatement of the law to quote the statute. It-- We could certainly amend this to say "that the defendant devised, intended to devise, or knowingly participated in a scheme to defraud." That's still an accurate statement of the law.

THE COURT: But we have that at the beginning -- I'm sorry -- in the second paragraph, don't we? We're setting out exactly what the statute says. The statute says, "Whoever, having devised or intending to devise." We have it there.

MS. BREVORKA: Agreed. But as Your Honor just said, this is an incredibly complicated count for a jury to consider, among the most complicated in the law. And so what we would request is that the language of the statute be replicated there.

THE COURT: And was there any evidence at all adduced as to who devised or intended to devise the scheme? I think there may have been some evidence that Mr. Freeman may have been involved at some point, but I don't know there was any evidence that any one of these four defendants devised or intended to devise a scheme or artifice to defraud, was there?

MS. BREVORKA: From our perspective, we don't think the evidence shows that. I think the government would disagree

with that. In fact, I believe Mr. -- understandably, this is not evidence, it's argument, but Mr. Lewen, in his opening, said that Mr. Hazelwood led the conspiracy and he orchestrated the furtherance of it with the A-B pricing, and then they elicited testimony from Brian Mosher about that. So we believe that the evidence the government has elicited, which we vigorously contest, would permit for such language there.

THE COURT: Okay. Let me hear from Mr. Hamilton, then.

MR. HAMILTON: The government suggests that the Court should follow the instruction as presently drafted. It tracks the Sixth Circuit pattern jury instruction for the wire fraud statute. The Court has already pointed out that at the beginning of the instruction it states the language from the statute, and then it provides an easy-to-follow set of instructions that are straight from the pattern instructions that have been approved by -- that have been approved by the Sixth Circuit.

And the Court has already pointed to the authority that proof that a defendant participated, as it relates to the participation element of it, of the -- of wire fraud, proof that a defendant participated is sufficient to meet the scheme to defraud aspect, the scheme to defraud element.

But -- but with the Court's instruction, the Court is satisfying both, by having the -- by putting the language

of the statute in there and then also by having an easy-to-follow instruction which tracks the Sixth Circuit pattern instruction. I'm looking at it right here first -- the Sixth Circuit pattern instruction says that, "First, that the defendant," and it provides options, bracket, "knowingly participated in," the next option is, bracket, "devised," bracket, "intended to devise, a scheme to defraud." So the Sixth Circuit pattern instruction presents choices.

And the Court has appropriately followed, in this particular case, where you have -- particularly where you have different roles in the scheme, you have Ms. Jones and Ms. Mann who are situated differently from Mr. Wombold and Mr. Hazelwood, that this -- that this particular way in which the Court has phrased the instruction, which again tracks the Sixth Circuit pattern instruction, is the most universal to cover the conduct that the jury has heard in this trial.

THE COURT: Thank you.

The Court concludes that this is an accurate statement of the law. I don't recall there being any evidence that any of these four defendants were the ones who actually devised or intended to devise the scheme or artifice to defraud. I may be mistaken on that, but I don't recall that being the case. And the law is very, very clear that as long as someone knowingly participates in a scheme or artifice to defraud, they may be held liable. So the Court will deny that


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 27 of 256 PageID #: 12661

request. What's the next page?

MS. BREVORKA: All right. Still on Page 30, Your Honor, we object to -- in Section (A), the last sentence, regard- -- discussing "a departure from fundamental honesty, moral uprightness, fair play, and candid business dealings." We request that this line be struck. We have sort of three -- we have three bases for our request. The first is, while the Sixth Circuit, in *Frost*, certainly approved this language, it did so in the context of a jury charge that included a sentence afterwards that discussed the need and requirement for a misrepresentation or a lie. And the Sixth Circuit did not necessarily, in *Frost*, approve this sentence alone——although, that was Mr. Frost's objection——it did so in the context of the jury instructions as a whole.

Second, we know that the pattern jury instruction does not include this line, not that those are binding to the Court. They're a suggestion. But we note that those -- this line in particular, the sentence is absent from those instructions.

Our third basis for the objection is that, given the facts of this case and the government's discussion of the Pilot code of ethics in both the indictment and in the evidence at trial, we think such a sentence could lead to confusion or could allow jurors to misconstrue the law. The government has emphasized that the defendants were -- had

acknowledged the code of ethics, that the code of ethics set certain standards, and that violating the code of ethics in and of itself is not the same as violating the law, and we just don't want to permit for any confusion among the jury.

THE COURT: Thank you.

The Court was first introduced to this language in jury instructions given by Judge Edgar, who was my predecessor on the bench here in Chattanooga many, many years ago. And he habitually used this language in mail and wire fraud jury instructions. And *Frost* was actually one of his cases. Judge Edgar was not the first judge to use this, though. It's been used by district courts across the country.

As recently as 2010, the Sixth Circuit, in *United States vs. Warshak*, 631 F.3d 266, in a decision rendered by Judge Boggs, actually discussed this. And Judge Boggs says this. This is on Page -- oh, let's see, what page is it? Looks like it's Page 310 and 311. "The first element of mail fraud, the requirement of a scheme or artifice to defraud, escapes precise definition. In *United States vs. Daniel*, we held that a scheme to defraud includes any plan or course of action by which someone intends to deprive another, by deception, of money or property by means of false or fraudulent pretenses, representations, or promises. However, we have acknowledged that the scheme to defraud element required under Section 1341 is not defined according to a


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 29 of 256 PageID #: 12663

technical standard. The standard is a reflection of moral uprightness, of fundamental honesty, fair play, and right dealing in the general and business life of members of society."

And Judge Boggs does not cite to *Frost*. Rather, he cites to *United States vs. Van Dyke*, found at 605 F.2d 220, a 1979 Sixth Circuit case. And *Van Dyke* apparently quoted from *United States vs. Bruce*, found at 488 F.2d at 1224. It's a 1973 Fifth Circuit decision.

I have not counted the number of times in the Sixth Circuit this language has been approved, but I have not found any language at all in a Sixth Circuit decision disapproving it or suggesting that it not be -- not be given.

As Judge Boggs says, there is no way to give a precise definition to scheme to defraud. So this language comes directly from not just the *Frost* decision but from several Sixth Circuit decisions. So it seems to be good law.

MS. BREVORKA: I'm not arguing -- we're not arguing that it's bad law. We're arguing, given the facts and circumstances of this case, it could lead to confusion among the jurors. I agree with Your Honor, this phrase has a storied history. In fact, one of the cases I found was a Fifth Circuit case from 1958 quoting this law.

But the point here is that the government has chosen to quote from the Pilot code of ethics in the indictment, in


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 30 of 256 PageID #: 12664

several spots. They elicited evidence at trial about the Pilot code of ethics. And we think, given the emphasis on this during the trial, such a line, without further verbiage about the need for a misrepresentation or a lie, could lead to jurors misconstruing the law or confusion.

THE COURT: Let me hear from Mr. Hamilton.

MR. HAMILTON: My first response is just to -- is to emphasize the point that the Court has made that this instruction is -- is often used in this circuit. And this language is in the use notes to the pattern jury instruction. And in this -- in the use notes it says that -- it's actually citing to a *Daniel* decision from 2003 in the Sixth Circuit as further support for this language as being a correct way to define the scheme to defraud.

Turning to the issue in this case as it relates to the code of ethics. When the United States -- when this issue was litigated previously, when the defendants moved in limine to exclude it and the government responded, the government demonstrated why the evidence of the code of ethics was relevant, but the government also offered a proposed instruction, a proposed limiting instruction.

And the litigation history of that and where we are right now is that the Court will recall that after Mr. Wroblewski testified, the government sought -- requested from defense counsel whether they wanted to have a mid-trial

limiting instruction on that issue. And the United States, to make a record, asked the defendants about that, and at that time they -- they -- the Court construed my request as a motion for a mid-trial limiting instruction. The defendants then said that they didn't want one. And at that point the Court said that it would take up a request for a limiting instruction if any defendant asked for one.

So the solution to the issue that Ms. Brevorka is raising is not to take out the language, the well-accepted language in the Sixth Circuit. The solution to the code of ethics issue is the limiting instruction that the government proposed, that no defendant now has asked for. So if that is a concern of theirs, then they certainly could ask for a limiting instruction.

But at this point in the trial, I believe that other defendants -- for example, I believe that counsel for Ms. Jones has made use of the code of ethics, both during the cross-examination of Mr. Wroblewski, attempting to attack the credibility of an understood-to-be government cooperator, as well as during his Rule 29 argument, I believe.

In any event, the issue with the code of ethics can be addressed with a limiting instruction if that is a concern of the defendants, if they want one.

THE COURT: Does the government plan to argue that a violation of the code of ethics would demonstrate a violation

of the law?

MR. HAMILTON: Absolutely not. And that -- to be clear, though, the government -- it's pretty obvious that the government would argue that if a defendant didn't believe that they were doing something wrong, that signing a code of ethics that being honest with customers might put one on notice that that is a wrong thing to do. But the United States will not argue that violating the code of ethics would be a violation of the law.

Now, the reason why the United States offered a limiting instruction is because there is language in there-- So the purpose of admitting the code of ethics was knowledge, notice. The code of ethics puts Pilot employees who sign it on notice that "If you don't do the things that are required of you, certain things may happen, such as, you could be disciplined, you could be terminated," and it goes so far as to say that it could result in prosecution under the law. The government is not going to argue that violating the code of ethics means you're guilty in this case. The government may argue at some point, either in first closing or most -- or in rebuttal, that by signing the code of ethics, that defendants were on notice that they needed to be -- that they were expected to be honest with their customers, and that bad things could happen if you're not.

THE COURT: Thank you.

Ms. Brevorka, any response to that?

MS. BREVORKA: Just only in regards to the issue of the limiting instruction. The response we filed was to what the Court -- the charge the Court put out and the corrections the government offered. But I believe the defendants plan on reurging the motion in limine later this morning, to remove the language from the indictment. So such a request for a limiting instruction might be premature, given our motion that we hope to argue later this morning.

THE COURT: So right now you don't have a position on whether the Court should give a limiting instruction, then, with respect to how the jury should use the code of ethics?

MS. BREVORKA: Right now, Your Honor, no. It would be premature for us to take such a position. So I respectfully ask the Court if the defense could take such a position after we see the outcome of our reurging of the motion in limine later this morning.

THE COURT: Very well. The Court has been advised by the government that it does not intend to press upon the jury an argument that a violation of Pilot's code of ethics demonstrates -- demonstrates guilt. As the Court has indicated, this language that is objected to is a statement -- a clear statement of the law. It has a very long history in this circuit, and it has been used in other circuits, also. It's been upheld many times. And I don't recall a specific


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 34 of 256 PageID #: 12668

case, but I think that the Supreme Court has at least discussed it, if not approved it.

So since it is a correct statement of the law and the Court thinks that the government is not going to misuse it, and at least the possibility of a limiting instruction still exists, the Court will deny the objection.

MS. BREVORKA: All right. Your Honor --

THE COURT: What's the next page?

MS. BREVORKA: Yes, sir. It-- I guess we would still be in the wire fraud counts. And I can put this off until the end, or take it up now. Mr. Hazelwood, in the filing from last night, has requested additional proposed wire fraud language be included in the jury charge. I can discuss this now, or wait till the end.

THE COURT: We can do that now. Where would you like it to go? On Page what?

MS. BREVORKA: Sure. We would like the language to go after the Court -- either one of two places. The language would either go after (A) through (G), or it would go under the defense theory of the case. The main point here is that we believe, under the Sixth Circuit's standard of sufficient evidence of a defense legal theory, that we have elicited such evidence to allow for such an instruction that commercial negotiations or sharp-dealing business practices, as opposed to misrepresentations and deceptive omissions, cannot serve as the

basis for a scheme to defraud. We believe that it's --

THE COURT: This --

MS. BREVORKA: Yes, sir.

THE COURT: This is one of those areas where the wire and mail fraud law becomes extremely complicated. Up until *McNally*, all the circuits had indicated there were -- two ways of committing a violation of this statute existed. One was to devise or intend to devise a scheme or artifice to defraud, and the second was to devise or intent to devise a scheme or artifice to obtain money or property by means of false or fraudulent pretenses, representations, or promises.

And the theory was that a scheme to defraud did not require a misrepresentation or a false statement, that the fraud was the -- was the mens rea and you could defraud someone without ever lying to them. To obtain money by means of false pretenses, representations, or promises did require a misrepresentation but not necessarily an intent to defraud, because you can misrepresent someone without a mental intent to defraud the other person.

*McNally* confused things a little bit, and I think what it said was that the second prong was not intended to define a different crime, but was intended to get to future frauds; whereas the first part was meant to cover frauds already accomplished, the second part was intended to cover crimes that were not completed. I don't understand that that

really does all that much to how the two ways of committing the one crime could be committed.

In our circuit we have conflated the two and we've combined them. So that's what the instruction says. And the instructions are really kind of hard to square with the language of the statute, but that's what the instructions say.

And I think that's one point that you're making; you would like to make sure the jury understands there has to be some type of misrepresentation or some type of concealment or something. Is that right?

MS. BREVORKA: Yes, sir. And I think, also, even further than that, the third one, the third paragraph of our supplemental instruction, that Pilot had no duty to disclose the components of cost in a cost plus pricing unless Pilot had previously promised this or pledged to give it to them or something such as that.

But, yes, the main thrust of this is -- of our request is that mere deceit alone doesn't constitute wire fraud, and it's -- you know, the commercial negotiations, "This is my last and final offer," that, even if it's not your last and final offer, is not sufficient for wire fraud. And that's why we've asked for the instructions that relate to business dealings or commercial practices.

In particular, we urge, on behalf of Mr. Hazelwood-- As the Court well knows, the two wire fraud counts against him

solely relate to the A-B pricing plan, or the two-tier pricing plan, which was never implemented. And the defense has, we believe, through sufficient evidence and cross-examination, set forth a legal theory that the two-tier pricing or the cost A-B pricing plan was akin to a car dealer saying to someone, "I'm going to sell it to you for cost," and it depended on whether the buyer was really going to take that invoice and pick it apart, or just accept that the car dealer's -- "This is my cost." And so, Your Honor, we -- under those bases, we ask for these instructions.

THE COURT: Mr. Hamilton?

MR. HAMILTON: So I'm glad that I get to talk briefly about the car dealer analogy, because it has troubled me for a while. So if a car dealer tells someone, "This is my actual cost, and I'm giving it to you for my actual cost; I am representing that this is my actual cost, and I'm going to charge you $500 over my actual cost," and that is not the car dealer's actual cost, and that buyer has been misled, that is fraud, that is a violation. And assuming the other jurisdictional elements are met, that would be a fraudulent misrepresentation intended to induce that person. So that example does not help.

But I want to look at the -- at Exhibit C to Mr. Hazelwood's submission here, and particularly the second paragraph, where-- Well, let me, first of all, say this:

This is not an accurate statement of law. There is no accurate statement of law contained in this. And it's misleading on the whole.

Now, specifically looking at "Wire fraud does not criminalize deceptive misstatements or omissions about a buyer or seller's negotiating positions." That is coming out of a recent decision which they cite, a fairly novel decision coming out of the Seventh Circuit, *United States vs. Weimert*. But that-- This is an April 2016 decision that we've been monitoring as well. But that -- that case is completely different from the facts in this case. So the *Weimert* decision, distilled to its essence——and I'm going to use the language of this case——would be the following. Let's say that a Pilot representative offered -- let's say that a Pilot representative offered ABC Trucking cost plus .04.

ABC Trucking says, "I'm not going to do business with you unless you give me cost plus .03."

Meanwhile the Pilot person is saying -- says, "The best I can do is cost plus .04."

But the Pilot person knows that he actually would be willing to go to cost plus .03, but doesn't tell this trucking company person. So this is a negotiation, and the Pilot person knows that his ultimate position is that he'd be willing to go to cost plus .03, but he doesn't tell the other person he'd be willing to go to cost plus .03. Somehow there


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 39 of 256 PageID #: 12673

ultimately is a meeting of the minds, and they agree on cost plus .03, even though the Pilot person had said, in the front -- in the beginning, you know, "My bosses aren't going to -- the back office isn't going to let me do a cost plus .03," but he knows that they would.

Now, that is a completely different situation from what we have in this case where let's say we get to the point where you have the same negotiation where the Pilot person says, "I can't go to a cost plus .03." Pilot person knows that he can go to -- has the authority to go to a cost plus .03. He then represents a cost plus .03 that the customer asks for, but he knows he's not going to give him the cost plus .03 as promised. That's what this case is about.

This case is not about concealing negotiating positions. This case is about fraudulent misrepresentations to induce a customer to do business. So when the Pilot person says, "I am going to give you a cost plus .03" for the purpose of inducing that customer to do business with Pilot, knowing that that person -- that he's not going to give them a cost plus .03, that's what fraud is, and that's when it becomes the car dealer who is telling the buyer, "This is my actual cost. This really is my actual cost." They're both lies intended to induce a reaction, and that is -- that is fraud.

The -- so the statement that they want to give the jury, that wire fraud does not criminalize deceptive

misstatements or omissions about a buyer or seller's negotiating positions is irrelevant to this case and is not necessarily the law in the Sixth Circuit at this time. The Seventh Circuit has decided that, but it's not necessarily law in the Sixth Circuit, but it's not relevant anyway.

Then telling them -- telling the jury, either in a wire instruction or as a theory of defense, that Pilot had no duty to -- here is the language that they want, "Pilot had no duty to disclose the components of cost or pricing in a cost plus deal to a customer unless Pilot or a Pilot sales representative had previously promised such information to a customer."

A statement of a duty to disclose has no place in -- it undermines the materiality instructions that the jury is being given. And the point that the government makes in response to that is that the materiality and the requirements of false statements and the requirements of fraudulent misrepresentations all cover this -- the issue that they're trying to raise. And the discussion of duties to disclose would undermine the material concealment instruction that the Court is giving, and create unnecessary confusion.

Furthermore, the language "a scheme to offer customers who closely inspect invoices one cost and then to offer customers who did not inspect invoices another cost is not sufficient to convict Mr. Hazelwood of wire fraud," that


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 41 of 256 PageID #: 12675

also is misleading, because it actually would be sufficient to convict him if the purpose of giving different invoices and giving -- telling a customer one thing and doing another and taking advantage of that because of their lack of sophistication certainly would be a basis or at least a part of the evidence to convict Mr. Hazelwood.

In sum, Your Honor, this -- this is not an appropriate statement -- this is not an accurate statement of the law, what's set forth in Exhibit C. And if Mr. Hazelwood wanted to submit something that actually read like a theory of defense rather than a statement of law, that's certainly his prerogative for the Court to consider. But, as written, this is not stated as a theory of defense of conduct. This is -- these are statements of law that Mr. Hazelwood wants the jury to follow, and they're not accurate statements of law.

THE COURT: Okay. Thank you.

Ms. Brevorka, I'll give you a chance to respond.

MS. BREVORKA: Thank you, sir. I'll start where Mr. Hamilton ended. We vigorously disagree with the contention that this is not a defense theory of the case. In fact, the third instruction, "Pilot had no duty to disclose the components of cost pricing in a cost-plus deal to a customer," that is directly taken from Mr. Hardin's cross-examination of Mr. Mosher, where Mr. Mosher agreed unless Pilot had promised a customer to give them the components of cost, they didn't have


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 42 of 256 PageID #: 12676

an obligation to. And, in fact, Mr. Mosher agreed on cross to the last sentence of the first paragraph, that Pilot had no obligation to provide customers with a good deal.

Mr. Hamilton made a statement that this case is not about concealing negotiation positions. Indeed it is. I mean, that is the very basis from which they seek to prosecute Mr. Hazelwood for the wire fraud charge. The government's own witness, Mr. Seay, testified that Pilot frequently bought fuel at below OPIS average, that -- and then evidence showed that the Pilot manual discussed the idea of cost, that an industry standard is OPIS average. The components of cost were con- -- I don't want to say "concealed," but the components of cost were something that -- indeed was something Pilot -- Mr. Hazelwood and others involved in the two-tier pricing sought to set with negotiations. Those that closely inspected invoices, that cost would be -- consisted of different components, those that -- compared to those that did not closely look at it.

I want to point out one other argument, and that is that, in particular to the second paragraph, Mr. Hamilton discussed the Seventh Circuit's *Weimert* decision, which this language is almost verbatim quoted from, and noted that it's irrelevant and not the law in this case or in the Sixth Circuit. True, it's not the law yet. It doesn't mean that the Sixth Circuit has held this standard is wrong. It's just

that the Sixth Circuit hasn't considered such facts or circumstances. And it's certainly relevant here because the whole two-tier pricing plan went to either savvy and unsophisticated customers and the ability to negotiate with those customers.

THE COURT: Thank you. Let me suggest this and see how you feel about it. There are a couple of concerns the Court has in what is proposed; and one is, it refers to Pilot. And as we know, Pilot is not a defendant in this case.

MS. BREVORKA: (Moving head up and down.)

THE COURT: So what Pilot's staff had an obligation to do is really somewhat irrelevant. What we're talking about is -- are the defendants. I would suggest this: "Sharp-dealing -- sharp -- sharp-dealing business practices, by themselves, are not necessarily fraudulent. Defendants had no obligation to provide customers with a good deal. Buyers and sellers negotiate prices and other terms. They will often try to mislead the other party about the prices and terms they are willing to accept. Such practices are not, in and of themselves, fraudulent. What must be present is a material misrepresentation or concealment of a material fact with intent to defraud to obtain money or property."

MS. BREVORKA: I think that's acceptable, Your Honor. Thank you.

THE COURT: Mr. Hamilton? Do you need me to read it

again?

MR. HAMILTON: I don't think so. We do object to that, that the fact that buyers and sellers will attempt to mislead each other, that that's not -- that's -- could read that sentence again?

THE COURT: "Sharp-dealing business practices, by themselves, are not necessarily fraudulent. Defendants had no obligation to provide customers with a good deal. Buyers and sellers negotiate prices and other terms. They will often try to mislead the other party about the prices and terms they are willing to accept. What must be present is a material misrepresentation or concealment of a material fact with intent to defraud to obtain money or property."

MR. HAMILTON: It's the "buyer and seller" sentence, because, as I was arguing, this case is not about a *Weimert* situation where they're concealing from each other prices that they're willing to accept. That's not what the thrust of the case is about. The case is that misrepresentations are being made to induce conduct from -- so a Pilot -- a Pilot salesperson is saying, "If you do business with Pilot, we'll give you a cost plus .03." And it's not about hiding their negotiat- -- what they're willing to accept. It's what they're trying to induce the buyer to do. They're not hiding their negotiating positions. What they're-- They're not hiding their bottom line from the buyer, which is what the --

THE COURT: So what is it that-- So "Buyers and sellers negotiate prices and other terms." There's nothing objectionable about that, is there?

MR. HAMILTON: No. It's the --

THE COURT: So the second one is, "They will often try to mislead the other party about the prices and terms they are willing to accept."

MR. HAMILTON: That part.

THE COURT: And what's the problem with that?

MR. HAMILTON: The part is that it is not -- it's not relevant to the proceedings in this case, that it's not --

THE COURT: Is it inaccurate?

MR. HAMILTON: Is it inaccurate that they will mislead each other about what they're willing to accept? Well, it's that-- Yes, in a commercial negotiation, that certainly does happen, that they will try to --

THE COURT: Even in noncommercial transactions, if someone wants to sell a used car --

MR. HAMILTON: Yes.

THE COURT: -- to another private person, what do they do?

MR. HAMILTON: I understand. It's just this -- it's that -- if you're going to -- if the sharp business practice is going to be distilled to that, which is leading someone to believe that they would accept something -- they would not

accept something that they would, or would accept something that they wouldn't, that that creates unnecessary confusion as to what this case is about. It's not about a Pilot person concealing that they are willing to accept a cost plus .03 deal rather than a cost plus .05 deal. It's that the Pilot person is representing a cost-plus deal that they know they're not going to give.

THE COURT: Well, the next --

MR. HAMILTON: It's not a negotiating --

THE COURT: The next sentence will say, "Such practices are not, in and of themselves, fraudulent."

MR. HAMILTON: Well, that's my --

THE COURT: The last sentence would be, "What must be present is a material misrepresentation or concealment of a material fact with intent to defraud to obtain money or property."

So if you had two private individuals selling a car and one person says, "This is the best car I've ever had," that may or may not be true, but that probably is not a material misrepresentation. If the person says, "This car has never been flooded" when the car had been caught up in one of the hurricanes in Texas, that would be a material misrepresentation.

MR. HAMILTON: Right.

THE COURT: Right?


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 47 of 256 PageID #: 12681

MR. HAMILTON: Yes. And that's my concern, which is that price -- if there's nothing -- price is material to the transaction, so really that would be uniformly accepted, which is, the price of a gallon of diesel is material. And my concern is that the way in which that instruction is drafted, that it could lead a jury to believe that a negotiation of price is not material. You're-- You seem to be-- The way I'm reading that is carving that out, the "Buyers and sellers will often mislead each other about what it is that they're willing to accept."

MS. BREVORKA: Your Honor, I think there is evidence in the record, the government's exhibit about the Pilot sales manual which states that Pilot sales staff are not supposed to even mention discounts unless they're asked by the customer. I mean, this goes directly to that point, right? I mean, discounts aren't mentioned until you're specifically asked and then your position -- your negotiation position changes.

MR. HAMILTON: But that's not what-- The case is about making a fraudulent misrepresentation once discounts are on the table. It's not like coming to the -- coming to the negotiation and you know you're not supposed to mention discounts. Our point-- We're beyond that. Once you start talking about discounts and making representations to induce a customer to do business and telling them that you're going to give them a cost plus .03 and not -- knowing that you're not

going to give it to them, that is fraud.

If the Court suggests to the jury with this instruction that buyers and sellers make stuff up with each other and that's not material, by identifying that as a sharp business practice, that's not in and of itself --

THE COURT: I don't think it says that, does it? It says, "They will often try to mislead the other party about prices and terms they're willing to accept. Such practices are not, in and of themselves, fraudulent."

MR. HAMILTON: But that's my -- they -- well, it puts us in a situation of having to argue that this is not about a negotiation, about negotiation positions, which has not been injected into the case. If this instruction is --

THE COURT: Well, from what Ms. Brevorka is saying, I think you may need to argue that anyway.

MR. HAMILTON: Well, I-- But there is a difference between making that argument and having the imprimatur of the Court saying that -- the language of this instruction saying that sometimes buyers and sellers make things up, and that alone isn't fraud. And that, particularly with "what they're willing to accept," there can be a conflation there of what a negotiating -- internal negotiating position is versus what's actually represented to -- to the customer.

THE COURT: Well, I think that in your argument, then, you'll have to bring that home to the jury. One of the

fairly recent -- it was one of the Supreme Court cases, in talking about the intangible rights theory, the Supreme Court said that the mail fraud statute was not meant to encompass every single lie that is told; it was only intended to get a small spectrum of misstatements. And so I think in your closing argument, that's a point that you will have to make. Unfortunately, in our society, misrepresentations are very, very common, but all those misrepresentations do not amount to mail or wire fraud.

MR. HAMILTON: That's true. And the sharp business dealing instruction is not uncommon. It's just adding in that buyers and sellers often lie to each other, and that's not fraud, alone, is -- is problematic.

THE COURT: You'd like it "sometimes," then, instead of "often"?

MR. HAMILTON: I don't have it in front of me. I don't have the benefit of that. I can't -- I'm sorry I don't have that perfect recall, but I think that the thrust of it is the same, that by saying that they sometimes do this and that this alone is not fraud creates an additional obstacle for the government here, unnecessarily.

THE COURT: The Court will give the instruction that the Court has suggested. So the Court has adopted some of the language from the proposal, but Court has denied other -- the reminder of it.

MS. BREVORKA: Thank you, Your Honor.

The next page, I believe, is Page 39. It relates to Count 14 against Mr. Hazelwood. The first objection we have is that the charge that begins after the colon, "Whoever knowingly uses intimidation, threatens," we would ask that that language be struck, as the evidence does not support the inclusion of such language. And I don't believe the government elicited evidence or has argued that Mr. Hazelwood intimidated or threatened. In fact, I think, in his Rule 29 motion, Mr. Hamilton specifically noted that they were arguing the motion under the "corruptly persuades" standard.

THE COURT: Mr. Hamilton?

MR. HAMILTON: In our response to the Rule 29, yes, we did say that it was under "corruptly persuades."

THE COURT: So we can take out, then-- You want to take it out in just the element? Do you want to leave it in the statute?

MS. BREVORKA: Well, the element only has "corruptly persuades." So we -- our suggestion would be to take it out and -- so it reads, "Whoever knowingly," strikes "use intimidation," strikes "threatens," strikes "or," so it reads, "Whoever knowingly corruptly persuades another person."

THE COURT: Okay. That is granted.

MS. BREVORKA: Thank you, sir.

The next relates -- the next objection relates to

the language "engaging in misleading conduct." Again, we believe the government has argued a legal theory, and the evidence supports one regarding hinder, delay -- and I apologize, I'm just looking at the red-line we provided to the Court. Yes, so we would like to strike "or engages in misleading conduct toward another person with the intent to hinder, delay, or prevent," again, because the -- we believe the standard the government is arguing relates to the "corruptly persuades" standard.

THE COURT: Okay. You're on which page, now?

MS. BREVORKA: I'm sorry, sir. I'm just flipping-- It's still Page 39. It's the language in the——one, two, three, four——fifth sentence, "or engages in misleading conduct toward another person." Again, we believe that the government has asserted, in the indictment and in argument, that the standard they're using is the "corruptly persuades another person." So we do not believe the evidence or the legal theories would -- would allow for inclusion of "engages in misleading conduct."

THE COURT: Mr. Hamilton?

MR. HAMILTON: I believe that's correct.

THE COURT: So we'll take out "or engages in misleading conduct toward another person."

MS. BREVORKA: Thank you, Your Honor.

Page 40, the third element.

THE COURT: And did you also have an objection to "or

a judge of the United States"?

MS. BREVORKA: Yes, Your Honor. Thank you for catching that. Yes, neither the indictment nor the evidence nor the argument involve a judge.

THE COURT: Mr. Hamilton?

MR. HAMILTON: That's correct, Your Honor.

THE COURT: So we'll take that out.

MS. BREVORKA: And then the third element of the crime, which I believe appears on Page 40, we would like the Court to add -- remove the semicolon after the word "information" and add "communication of information to a law enforcement officer of the United States," or "to a federal law enforcement officer."

THE COURT: Mr. Hamilton?

MR. HAMILTON: We don't have an objection to that. So it would say "to a federal law enforcement officer"?

MS. BREVORKA: Yes.

MR. HAMILTON: And I think the current draft is on Page 39.

MS. BREVORKA: Thank you.

THE COURT: Okay. We will add that, then.

MS. BREVORKA: At this time, Your Honor, let me -- I believe we would also like to renew our -- for purposes of the record, renew our objection, which was filed as Docket Entry 433, to the limiting instruction found on Page 51, for the

reasons previously raised.

THE COURT: So noted.

MS. BREVORKA: Thank you. And I believe there is language between the witness tampering and the -- the Page 51 that the other defendants will address in their arguments, and we join those objections. At this point that's all we have, Your Honor.

THE COURT: Thank you.

MS. BREVORKA: Thank you.

THE COURT: Mr. Richardson?

MR. RICHARDSON: Thank you, Your Honor.

As I imagine the Court has gathered, the defendants have sort of agreed amongst themselves that different counsel will address different objections. To the extent that I do not raise or -- discuss objections or raise them but other counsel do, for the record, Mr. Wombold would join in those objections.

Having said that, with respect to a couple of the issues that Ms. Brevorka had raised, I did want to just make a couple of additional comments. And one relates to the "Deliberate Ignorance" instruction on Page 20. And I believe that one of the counsel for the other defendants will be arguing a little bit more on deliberate ignorance later. And if I understand correctly, the Court has not decided on that.

But I just wanted to make one observation, if we

look at Page 20, and I wanted to point out one particular concern about this language, understanding that it's the pattern jury instruction. But I think that there is a risk, in this particular case, of the next-to-last sentence in the pattern instruction, and that's where it says, "Carelessness, or negligence, or foolishness," and there was discussion about adding recklessness, but "on the defendant's part is not the same as knowledge, and is not enough to convict."

My concern there is that in this particular context, that sort of language could foster confusion to the jury, that, "Well, gee, if we do have more than mere carelessness, negligence, or foolishness and we do have something that rises to knowledge, either under this deliberate standard -- ignorance standard or not, if we do have knowledge, that is enough to convict." And of course knowledge of a conspiracy or knowledge of a scheme to defraud is not enough to convict. For conspiracy, you must knowingly join. And for a scheme to defraud, the substantive count, you must devise or intend to devise or, under the case law, participate.

So that's my way of saying, that next-to-last sentence, we have concerns that it does imply that mere knowledge is enough for criminal liability for conspiracy or participating in the scheme to defraud. So that's one thing that I wanted to add to the discussion, which I believe will continue on the deliberate ignorance standard. And I


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 55 of 256 PageID #: 12689

appreciate the Court indulging me on that.

Also, with respect to the charge on Counts 2 through 6, 8, and 10 at Page 30 -- and I know the Court had decided on this, but, for the record, I just wanted to point out one concern with the language, quote, "The standard has been described as a departure from fundamental honesty, moral uprightness, or fair play and candid business dealings in the general life of the community." And I know the Court's ruled on this, so I won't belabor the point, but I did want to say one additional concern, beyond what Ms. Brevorka said, that Mr. Wombold has, is that the problem with articulating that standard, even if it's fine as far as it goes, the standard there does not make any reference to the notion of defrauding, because, of course, you know, you can depart from fundamental honesty and moral uprightness and fair play without that having anything to do with defrauding someone or seeking to obtain money or property from them. So, in that sense, if we assume that we understand why that's part of the standard, it's not a complete statement of the standard because it does not incorporate, in my view, the notion of actually defrauding someone with this kind of unsavory departure from -- from societal norms.

So -- but I know the Court has ruled on that. I did want to note that for the record and point to new things that Mr. Wombold would like to address, and one is on Page 21, "Use

of the Word and in the Indictment." And I do understand that this is, of course, the pattern instruction. I do think -- in this case I do have concerns that it may not be specific enough. And if we read it, it says, "Although the indictment charges that the statutes were violated by acts that are connected by the word and, it is sufficient if the evidence establishes a violation of the statutes by any one of the acts charged."

You know, the pattern instruction here has commentary that cites to two cases, and they -- both the cases relate to the situation where a conspiracy was charged and the conspiracy had multiple criminal objects, a conspiracy to violate this statute and this statute in one case, there were two statutes; the other case, it was a conspiracy to violate this statute and this statute and this statute. (Indicating.)

And I think that the pattern instruction here is directed at the notion that we have a conspiracy charged in Count 1 with two objects; it's either to violate the wire fraud statute or the mail fraud statute and have no objection to an instruction to the jury on that line. The indictment may say that the conspiracy was to violate the mail fraud statute and the wire fraud statute, and yet proof of a conspiracy to violate either will suffice. We're totally fine with that.

My concern here is that the way this reads, I'm just

afraid that the jury could take it to mean that, based on the use of the word "acts," that if it finds certain acts as are alleged in the indictment, that that's enough. So, for example, you know, you have this speaking indictment that's very lengthy, and it alleges all kinds of acts, and I think it's important for them not to say, "Well, if we find certain -- you know, some acts but not others that are alleged in the indictment, that's -- that's enough."

I think the word "acts," in other words, is a little too broad, and maybe doesn't fully convey what I believe this instruction is really getting at; it's that if there are two objects of the conspiracy that are alleged, the government does not have to prove a conspiracy to violate both of them, even though the indictment happens to use the word "and" rather than or. And so my request is that we use some language that is more specific to the concern that this pattern instruction would be addressing.

THE COURT: Mr. Hamilton, any objection?

MR. HAMILTON: To -- to modifying this to make it specific to -- I'm --

THE COURT: Right. I think what he's saying is that the jury may read this in a much broader sense than it is intended. So he suggests that we say -- instead of the statute was violated by certain acts, say that "The indictment alleges that the object of the conspiracy was to violate the mail fraud

statute or the wire fraud statute, and it is sufficient if the evidence establishes either of those as an object. Of course, this must be proved beyond a reasonable doubt." So that would limit the jury to just the two statutory objectives alleged.

MR. HAMILTON: That's fine with the government.

THE COURT: And that's the only concern with the use of the word "and"?

MR. RICHARDSON: Was that directed at me? Yes, Your Honor, that is our concern -- our only concern with that.

THE COURT: Okay. The Court will grant that request, then. That's on Page 21.

MR. RICHARDSON: Thank you, Your Honor. And I had the next one, which is at Page 49.

THE COURT: So Pages 22 through 48 are acceptable to Mr. Wombold.

MR. RICHARDSON: That is correct, Your Honor, to the extent that no other counsel has -- has raised that. To the extent other counsel does, we would join in that. But we have nothing additional on those pages in between there.

Page 49, "Testimony of Witnesses Pleading Guilty to Conspiracy Under Reduced Criminal Liability." Our concern here relates only to the second sentence, which says, "You have heard they were involved in the same conspiracy the defendants are charged with committing." We believe that, for clarity's sake, and to avoid the jury thinking that maybe

certain things have been established that are actually for their decision, that it would be more appropriate for this to say, "You have also heard that they pleaded guilty to joining what the government claims is the same conspiracy the defendants allegedly joined." So we think that's a little more exact, and I think also it is more likely to prevent them from making assumptions about what actually happened in this case, rather than --

THE COURT: If the Court does that, then, would the instruction be given, then?

MR. RICHARDSON: Excuse me, Your Honor?

THE COURT: If that -- if that language is changed in that manner, should the instruction even be given? I think this is intended to cover cooperating codefendants. And the way this would be charged, they would be excluded from being codefendants; they're just people the government alleges something about.

MR. RICHARDSON: That is -- that is correct, Your Honor. Although, with my language, it would make clear what I believe in each case was also part of the proof. What happened here is, they pled guilty to joining a conspiracy, which -- which we think would be appropriate to instruct the jury. And I believe that, for at least some of these folks, if not all, it was made clear that there was -- made clear that it was the same conspiracy the defendants allegedly joined. And that was

certainly the lines of some cross-examination, "Well, this was -- you know, this was a conspiracy, and -- that you joined, and let's ask questions about that conspiracy," because -- the questions were asked because they were alleged to have joined the same conspiracy.

THE COURT: So that would still leave the instruction regarding witnesses who may receive some benefit from their testimony, but we'd be taking out the part of the instruction regarding cooperating defendants.

Mr. Hamilton, any objection to that?

MR. HAMILTON: I am not following what we'd be taking out. I'm sorry.

THE COURT: Instead of the defendants -- I'm sorry, instead of "These witnesses being involved in the same conspiracy," we would just delete that entirely. So we would just have "defendants testifying under hopes of getting some benefit from the government."

MR. HAMILTON: This is a proper-- The instruction that's objected to is a proper instruction in the Sixth Circuit pattern instructions. I'm looking at the committee commentary that says that the Sixth Circuit has described this as a proper jury instruction that correctly and properly informs the jury about this issue. The language in Pattern Instruction 7.08 is that, "You have heard the testimony of" fill-in-the-blank witness. "You have also heard that he was involved in the same

crime that the defendant is charged with committing." It's -- it's straight from the pattern. So we think the instruction should stay as drafted.

MR. RICHARDSON: Your Honor, if the judge is suggesting -- "if the judge" -- if Your Honor is suggesting that we simply strike the second sentence, then I think that would be appropriate, too, and would take care of the problem, particularly -- and the reason I think it would be -- would be fine is, I think when they -- the jurors hear this instruction, you know, they'll recall who these individuals were and the nature of their testimony, and probably don't need to be reminded of that by that second sentence.

MR. HAMILTON: Your Honor, this is the -- this is the pattern instruction on how to deal with this issue. It's a proper statement that's been approved by the Sixth Circuit.

MR. RICHARDSON: Well, that second sentence, though, is not part of the pattern.

MR. HAMILTON: That's not-- That's incorrect. I just read that. It says that, "You have also heard that this person was involved in the same crime the defendant is charged with committing."

MR. RICHARDSON: I'm sorry. I said that wrong. What I meant to say is that that is -- that that language assumes something; it's not like a statement of law; it assumes something about the case that I think is not -- it's

case-specific language, rather than sort of a blank statement of the law, that I think creates problems. And I think the pattern instruction would give the Court latitude to apply that instruction, not just deriving it based on the facts of the case and the evidence submitted.

THE COURT: This instruction combines two of the pattern instructions; it combines the testimony of a witness under a grant of immunity or reduced criminal liability, which I take it there is no objection to at all, and the testimony of an accomplice, as to which there is an objection.

Mr. Richardson does not want the Court to say that these people were accomplices in the same crime. So the language that he suggested was tantamount to saying that. So the Court asked, "Well, why don't we just take that out, then." So if we took out that second sentence, we'd also take out the last sentence, which says that "You cannot consider the fact they pleaded guilty to a crime as evidence that the defendants are guilty of the same crime." So we'd have to remove that, also. So we would remove the second sentence and we would remove the last paragraph. And I think the last paragraph is a pro-defendant instruction.

MR. RICHARDSON: Your Honor, the language that I'm reading is, "The fact that these witnesses have pleaded guilty to a crime is not evidence that the defendants are guilty, and you cannot consider this against the defendants in any way." I

do think that that language is a little more generic. It is evidence --

THE COURT: But the crime is the same conspiracy. The crime that's discussed in the last paragraph is the conspiracy mentioned in the second paragraph. That's the only reason that it's given. You're telling the jury that because the witness has admitted involvement in the same crime that the defendant is on trial for, you cannot use that to determine that a defendant is guilty and you cannot use that against the defendant in any way. If the person committed some other crime, then there would be no reason for the jury to conclude that a defendant was guilty.

So if someone had committed a burglary and someone was on trial for drunk driving, the fact that someone had pleaded guilty to burglary would have no effect upon drunk driving. Whereas, if they were in the car together and they were drinking together and the person admitted that he had switched positions in the front seat with the person after they had drunk and he pled guilty to it, then that would be something that a lay person could conclude meant that the defendant was guilty.

MR. RICHARDSON: Well, I think, Your Honor, that part of the problem there may be that you could have a situation where someone testifies against a defendant, even about the same general circumstances, and the witness's testimony, the

cooperator's testimony, is very relevant, talking about the same circumstances that underlie the crime against the defendant on trial, but it may technically be a different -- different crime, so the defendant's only on trial for conspiracy to commit mail and wire fraud, and the witness is -- is someone who pled guilty to a substantive count of wire fraud. So I do think, at least in that sense, the actual crime to which they pled guilty could be different from the crime for which the defendant is on trial.

So for that reason I do think the language in the pattern instruction, which I think is intentionally not specific, "a crime," is probably intended to sort of avoid the issue of whether it's the exact same crime. And so I do think leaving that language in and taking out the second sentence would, I think, be appropriate, get the -- and get the point across without engendering the problems that we see with the second sentence.

THE COURT: Mr. Hamilton, do you concede that perhaps these people identified in this instruction were not——I guess they've all been convicted now——convicted of the same conspiracy?

MR. HAMILTON: The United States does not concede that they were in a different conspiracy. These def- -- the people named were convicted of being -- well, they have entered guilty pleas of being part of the same conspiracy that is

charged in this case.

THE COURT: And from a defendant's standpoint, do you think there would be some utility in telling the jury that they cannot use the fact that these people have pleaded guilty to the same crime as evidence that these defendants are guilty of that crime?

MR. RICHARDSON: There would definitely be utility in that, Your Honor.

THE COURT: Okay. The Court will deny the request, then. What's next?

MR. RICHARDSON: All right. The next one, Your Honor, would be 59.

THE COURT: So Pages 50 through 58 are acceptable.

MR. RICHARDSON: That is correct except to the extent objected to by another defendant, that is correct, Your Honor.

THE COURT: 59.

MR. RICHARDSON: Yes, Your Honor. And this one is entitled "Statements by Defendants." And our objection here to -- is just a little bit of the language. We're not sure -- not believing that's applicable.

The first sentence reads that "You have heard evidence that Mr. Hazelwood or Mr. Wombold made statements in which the government claims they admitted certain facts." Our view, and I believe this is the view of Mr. Hazelwood and his team, but -- is that -- the notion that they admitted certain

facts, I'm not sure of the evidentiary basis for that. I'll confine my comments to Mr. Wombold.

There was certainly evidence of statements of Mr. Wombold from the tape recordings. I'm not sure any of those would constitute, quote, "admissions of facts." They were just statements of Mr. Wombold which were admitted as relevant. I just don't know that it's accurate to say that they admitted certain facts.

We also had testimony of Agent Fisher about things that Mr. Wombold said about certain facts. But, again, I think the government's point there was not that Mr. Wombold admitted certain facts but, rather, that he refused to admit certain facts that the government says are facts. I think that was exactly their point, was that he denied certain things the government calls facts. So, for that reason, we would suggest striking the language in which the government claims he admitted certain facts, and just leave the rest of the statement as in -- as is. A corresponding change would be in the second paragraph where the last two words "or admission" would be struck.

THE COURT: Okay.

Mr. Hamilton?

MR. HAMILTON: Your Honor, this is a pattern instruction. And the United States-- It's an all-or-nothing situation. If they don't want the first sentence, then the


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 67 of 256 PageID #: 12701

whole instruction should go. And this is -- this is presented in terms of a defendant who is making a statement is necessarily making an admission under -- under the rules of evidence, and that's my understanding of the way in which -- the thrust of this.

THE COURT: I think this is another instruction that is intended to protect a defendant. The Court has to make a decision regarding the admissibility of statements, but the jury also has some authority with respect to how they should consider such statements, and that's why the instruction says, "You should consider the circumstances under which the defendant allegedly made it." And the jury can make its own determination as to whether the statement was voluntarily made and whether it is credible. And I guess with Mr. Wombold the only thing we'd be talking about would be the statements made to the agents from the FBI and the Internal Revenue Service.

Mr. Hamilton, is that right? I think this refers to statements made to law enforcement.

MR. RICHARDSON: I --

MR. HAMILTON: The instruction, on its face, does not appear to be limited to that.

THE COURT: I understand that. But I think the whole purpose of it, though, is to avoid a situation where someone beats a confession out of a person.

MR. HAMILTON: Sure.


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 68 of 256 PageID #: 12702

THE COURT: Private people generally are not in a position to beat confessions or admissions out of people. I guess in some circumstances that might be the case, but that person would probably be a defendant in the case also if that happened. So let's assume it's just talking about law enforcement. Was there an event other than the FBI and IRS interrogating Mr. Wombold?

MR. HAMILTON: There is no other -- no other law -- statements made to law enforcement that's in the proof.

THE COURT: And how about Mr. Hazelwood? Any evidence of any statements he made to agents of the government?

MR. HAMILTON: There is evidence of that.

THE COURT: Okay. So, Mr. Richardson, again --

MR. RICHARDSON: My --

THE COURT: -- this allows a jury to look at the facts and determine whether they want to credit what the government says someone made. It's a pro-defendant instruction.

MR. RICHARDSON: I do think, Your Honor -- I agree with all that, and I do think the instruction's fine. I just think that it's not clear that calling a statement an admission is correct, especially in the case of --

THE COURT: I think that's what the law is. If it's a defendant and the defendant says something, the law considers any statement an admission.

MR. RICHARDSON: Well, one of the things about that, though -- and understanding that and, you know, the 800 series, 801 and so forth, I would agree with you. I do think instructing the jury, though, that the term -- when they think of "admission," you know, I think they would look at it as would a lay person. And it may even be confusing, as I say, with respect to Mr. Wombold, where they're going to scratch their heads and say, "I thought he wasn't admitting things and that that was the problem." So I just think from a layman they're going to hear about Mr. Wombold admitting things, from their perspective they're like, "What did he admit? We thought he didn't admit anything." So our objection is only to the use of that word, that for a lay person the term "admission," I think, would be confusing, particularly under the facts of this case.

THE COURT: The Court will deny that. As the Court observed, the purpose of this instruction is to provide an added layer of protection for defendants. And during the cross-examination of the agent who testified about the interview with Mr. Wombold, it was brought out that Mr. Wombold was in a closed room with two agents, the agents were armed, at some point at least one of the agents invaded the personal space of Mr. Wombold; Mr. Wombold was being ordered to do certain -- certain things. And although Mr. Wombold was told that he didn't have to submit to the interview at that time and

they could do it at some other point, because of the circumstances there, with people being kept by their statements, he was not free to just get up and leave immediately. So this instruction tells the jury they can consider all those circumstances in determining how much credit they should give to what the agent said about any statements that Mr. Wombold made. So the Court denies that request.

MR. RICHARDSON: Your Honor, I have three instructions that were not included that were requested by Mr. Wombold. I'm happy to address them now or later.

THE COURT: Please do so.

MR. RICHARDSON: Thank you, Your Honor. One would be something that we filed on PACER requesting language from *United States vs. Bostic*, that --

THE COURT: And what page should that go on?

MR. RICHARDSON: Your Honor, this one was -- was a separate filing on ECF, about a one-page document where we requested an additional -- additional instruction. So it was not included in the Court's draft charge.

THE COURT: But looking at the draft charge now, where would it go, since --

MR. RICHARDSON: Oh, where --

THE COURT: -- I'm assuming --

MR. RICHARDSON: If it were to go in, Your Honor, I believe that maybe the appropriate place would be -- it would

probably come right after the instruction -- I would say -- or maybe another way to look at it would be right before Counts 2 through 6, 8, and 10, as it's an instruction that helps further define the notion of joining a conspiracy. And so after the other instructions about conspiracy, I think that would be an appropriate place. And on this particular draft, that would place it -- the most recent draft from the Court, it would place it right before Page 29.

And the requested instruction from *U.S. vs. Bostic*, it's really simply a one-sentence instruction that, in our view, provides a good definition of joining a conspiracy. We do think that the pattern instructions are very helpful for telling the jurors what is not sufficient to join a conspiracy and also what is not required in order to join a conspiracy. What the pattern instruction is less effective at doing, though, is actually saying what is joining a conspiracy, what it does mean.

And I think that the language is very helpful for providing the definition of joining a conspiracy, rather than sort of instructions about how not to join -- what's not sufficient or what's not required to join a conspiracy. And the language is, "If a man is to be held for joining others in a conspiracy, he must in some sense promote their venture himself, make it his own, have a stake in the outcome."

And the government correctly points out in its

response that this is not a case that has otherwise been cited by the Sixth Circuit. It's a Sixth Circuit case from 1973. It had not been cited again by the Sixth Circuit. However, this venerable -- the venerable case on which the Sixth Circuit's 1973 decision in *Bostic* relied was one by Learned Hand, and it's been cited by other courts relatively recently. It's been cited many times with approval since the 1940 decision of Learned Hand. So Learned Hand came up with that language in 1940 *Bostic*, in the Sixth Circuit, cited in 1973. We have not seen the Sixth Circuit come back to that standard, but other courts certainly have. And we think it's helpful because without it the notion of what it means to join a conspiracy is not quite adequately covered.

THE COURT: Of course this language is not as eloquent as Judge Hand's language, but why isn't the second full paragraph of Page 26 saying the same thing?

MR. RICHARDSON: Second full paragraph on Page 26.

THE COURT: 26.

MR. RICHARDSON: And I wonder if I have the right version up here. Your Honor, what does that start with?

THE COURT: I think -- I don't recall everything that you said, but "If a man is to be held responsible for a conspiracy, he must make it his own," and you went on and on and on.

And the second paragraph on Page 26 says, "If the


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 73 of 256 PageID #: 12707

person joined the line of people passing buckets, or encouraged them in the line, or increased the flow of water from the faucet, or filled buckets, or took any other action that demonstrated the person had voluntarily joined in with the intent to help advance or achieve the objective of fighting the fire, then the person joined the effort." Wouldn't that be making the effort his own and whatever -- the other language that Judge Hand used?

MR. RICHARDSON: I think that language there is consistent with what Judge Hand had.

THE COURT: It's not as eloquent, but a jury might understand that a little bit more readily than Judge Hand's.

MR. RICHARDSON: I think that -- I would agree, Your Honor, that the way that example is given, it does cover the notion of promoting the venture, making it his own, having a stake in the outcome. The one concern that I had was with the analogy to begin with. And the Court has overruled the objection of Ms. Brevorka, but we did have the same concern she did, and thus were on -- were not inclined to try and rely on the analogy.

I think the Court's point, though, is, if the analogy stays in, it does cover a lot of the thoughts conveyed by Judge Hand. We do think that the generality in Judge Hand's statements, though, is particularly helpful, and does not rely on a particular analogy.


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 74 of 256 PageID #: 12708

THE COURT: What's next?

MR. RICHARDSON: Your Honor, we -- at Page 21 of the defendant's proposal for jury instructions, which was at Docket Entry Number 253, we had a couple of very short instructions that we thought would be helpful to define the offense under 1001. And of course the pattern instruction is included in the Court's draft, and I have no doubt the government will continue to say that the pattern instructions are adequate.

But we do think that the following that was included at Page 21 is a correct statement of the law, and does go a little more specifically to some of the tough issues you can have in 1001 cases, and that statement is, "A defendant cannot be convicted for making a statement which on its face is not false." That is a correct statement under the law, under the case I have cited, *Gahagan*. There have been more recent cases as well that have cited that principle.

The government, in objecting to that response, said a few things. One, they -- I think they tried to limit the applicability of that statement. And we think it's a general statement of the law which is true, that a defendant cannot be convicted for making a statement which on its face is not false. And if I read the government's response correctly, it sounded like they were saying that *Gahagan* did not say that. Maybe I was misunderstanding them, because *Gahagan* says that exactly, quoting -- quoting the case of -- I think it's the


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 75 of 256 PageID #: 12709

*Vesaas* case. So that's one of them.

And there is a similar one that we had at Page 22 that we had requested, which is, "To convict the defendant of making a false statement, the government's -- the government must negate--" Some of the cases use the term <u>negative</u>. I used the verb <u>negate</u>. So I'll start it again. "To convict the defendant of making a false statement, the government must negate any reasonable interpretation that would make the defendant's statement factually correct."

I think the government's answer is, in part, that this principle of law applies only to a situation where the statement can be true and false at the same time; otherwise, this is not an accurate statement of the law, is, I believe, the government's position. We disagree, under the cases, and think that it's an accurate statement of the law more broadly, that to convict a defendant of making a false statement, the government must negate any reasonable interpretation that would make the defendant's statement factually correct. We think this would help further inform the jurors of what is required under the law to sustain -- or to reach a 1001 conviction.

THE COURT: Mr. Hamilton?

MR. HAMILTON: Yes, the United States continues to maintain that the pattern jury instructions here cover all of the issues, that one of the elements of the pattern jury

instruction is that the statement must be false. It doesn't need any-- It needs nothing further. The pattern jury instruction that the Court is using is sufficient.

THE COURT: Suppose we added this to the end of (A) on Page 38, Mr. Richardson, "So obviously a statement that is true cannot be a false statement."

MR. RICHARDSON: That would be acceptable.

THE COURT: Mr. Hamilton?

MR. HAMILTON: Where are you suggesting --

THE COURT: This would read, "A statement was false if it was untrue when it was made and the defendant knew it was untrue at the time," period. "So obviously a statement that is true cannot be a false statement," period.

MR. HAMILTON: The government accepts that.

THE COURT: Okay. So the Court will make that change, then, on Page 38. So that new language will be added to the end of that first sentence there.

And then the other one, "The burden is on the government to prove falsity"?

Mr. Hamilton?

MR. HAMILTON: The burden that the government has to prove the elements beyond a reasonable doubt is sufficient. The jury's going to be instructed that the United States must prove that the statement was false. That's one of the elements the United States must prove beyond a reasonable doubt. It's


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 77 of 256 PageID #: 12711

covered by the instruction.

THE COURT: The Court agrees. The Court will deny this request.

MR. RICHARDSON: Thank you, Your Honor. One final point for -- for my part of this. And I believe that other defense counsel are of like mind. With respect to the verdict form, understanding that this may be a small thing and perhaps a held preference by the Court, we do see where this particular verdict form would have the jury write in is or is not. And maybe it's because we're all used to something different, where the jury has the option to check the box of guilty or not guilty, I'd prefer -- I believe that the juror -- the defense side of the case would prefer that the jurors have a box to check guilty or not guilty, rather than write those words in. And, again, a small thing, but I understand it's the unanimous preference on the defense side.

THE COURT: Okay. Thank you.

MR. RICHARDSON: Thank you.

THE COURT: Mr. Vernia?

MR. WOJCIK: Your Honor, I hate to be the person to throw myself on the restroom break --

THE COURT: Five minutes?

MR. WOJCIK: Thank you. That's plenty.

(Brief recess.)

THE COURT: You may proceed, Counsel.


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 78 of 256 PageID #: 12712

MR. WOJCIK: Thank you. And thank you for the chance for the break, Your Honor.

First -- and just to be clear for the record, that in going through Ms. Jones' objections, Ms. Jones incorporates by reference the objections made by -- incorporate the objections made by all counsel in this matter.

So, turning first, then, to Page 20, the --

THE COURT: So Pages 1 through 19 are acceptable to Ms. Jones.

MR. WOJCIK: Yes, Your Honor. I apologize, Your Honor. I printed out the copy before the Court made its minor typographical revisions, and so my page numbers may be incorrect.

The "Deliberate Ignorance" instruction. And this has been covered fairly in depth by -- by counsel for Mr. Hazelwood. So I don't want to belabor the point, but I do want to say, first and foremost, in the objection that counsel for Mr. Hazelwood filed over the evening, they cite to a case out of the Eastern District of Kentucky, which is *United States vs. Gonzalez-Pujol*, I believe, and that is 2016 WL 590219. And the reason I bring up this case is because I think it provides careful and persuasive analysis for why a "Deliberate Ignorance" instruction is inappropriate in a case such as this.

THE COURT: You realize in my discussion with


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 79 of 256 PageID #: 12713

Ms. Brevorka I had indicated that I had read her filing?

MR. WOJCIK: Yes.

THE COURT: And I was at least somewhat familiar with her cases?

MR. WOJCIK: Yes.

THE COURT: Okay. So you can take it, then, that I'm familiar with this case and the analysis in it?

MR. WOJCIK: Yes.

THE COURT: And since I made a decision regarding her objection, I made that decision in light of that decision?

MR. WOJCIK: Yes, Your Honor.

THE COURT: Do you have anything in addition to add, then?

MR. WOJCIK: Anything in addition to that case?

THE COURT: And what Ms. Brevorka said.

MR. WOJCIK: And what Ms. Brevorka says? Yes, Your Honor, simply that then in -- that the "Deliberate Ignorance" instruction would not be appropriate as to Ms. Jones because --

THE COURT: So what you'd like the Court to say is, "You can consider this only with respect to Defendant Hazelwood, Defendant Wombold, and Defendant Mann, but not Ms. Jones"?

MR. WOJCIK: Well, Your Honor --

THE COURT: I don't think I would like that.

MR. WOJCIK: Again, I believe that --


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 80 of 256 PageID #: 12714

THE COURT: I think what I would prefer was for you, when you make your argument, "The Judge is going to give you a lot of instructions. Some of those instructions pertain to my client and some of those instructions do not. One of those instructions that does not pertain to my client is the one on deliberate ignorance, and this is why."

(Brief pause.)

MR. WOJCIK: Again, Your Honor, my concern is, having the instruction in there at all creates confusion for the jury, and creates the possibility that a jury can improperly use the knowledge requirement to allow the government to --

THE COURT: I think that's the argument that Ms. Brevorka made, wasn't it?

MR. WOJCIK: Right.

THE COURT: And thoroughly.

MR. WOJCIK: And like I said, it's --

THE COURT: I think what we're doing is seeing what is different. So assuming that your client is in a different position, why can't you argue to the jury that "This instruction does not apply to my client, and this is why"?

MR. WOJCIK: Your Honor, I believe we may make that argument. My concern is, at the --

THE COURT: And if you do a good job with your argument, and the jury believes you, what's the concern?

MR. WOJCIK: Well, I guess the concern is, is that

that relies upon those two factors, Your Honor, and it's just --

THE COURT: I know you're going to make a good argument. I don't have any doubt about that.

MR. WOJCIK: Well, I trust my counsel, Mr. Vernia, to make an excellent argument, Your Honor, but I don't think -- as the Sixth Circuit has made clear that there is a risk with jury confusion and "Deliberate Ignorance" instructions, and they should therefore be used sparingly and with caution. And due to the factors outlined by Ms. Brevorka and by the cited cases --

THE COURT: It's pretty obvious, though, that every instruction does not apply to every defendant. We're giving instructions on making false statements to the government. We're giving instructions on witness tampering. So it's obvious that these instructions are general instructions for all four defendants. Some will apply to more or less degree to a defendant than others. So I don't know why we can't just make that argument to the jury. You've said that you really don't think it's appropriate for the Court to say, "Don't use this against this defendant, but use it against the other defendants;" that would not be right.

MR. WOJCIK: Well, I mean, in all fairness to the other defendants, I think it would -- they would consider it would not be right. I think Ms. Jones is fine if the jury is

instructed that they're not to use the "Deliberate Ignorance" instruction as relates to her.

THE COURT: Okay.

MR. WOJCIK: And, again, then, my -- I go back to the concern that Sixth Circuit courts have cited of the risk of confusion with the -- with an instruction like this.

THE COURT: Which Ms. Brevorka very thoroughly and eloquently argued.

MR. WOJCIK: Yes, Your Honor, she did.

THE COURT: Okay.

MR. WOJCIK: So I should move on.

THE COURT: Yes.

MR. WOJCIK: Then my next -- Ms. Jones' next objection would be to the beginning, I believe, on Page 33, the *Pinkerton* liability, and proceeding into the aiding and abetting sections of the instructions. The issue here, I believe, relates solely to Ms. Jones, and that is that it -- in the beginning of the instruction, it discusses counts -- for Ms. Jones, Counts 3, 4, 5, and 6 of the wire fraud -- of the indictment that relates to the wire fraud statute. And the instruction as phrased permits -- potentially permits the jury to improperly convict Ms. Jones under theories under which she -- it would be impossible to convict her. And the explanation for that is that Counts 3 and 5 of the indictment allege that Ms. Jones is guilty of wire fraud by sending

Mr. Mosher certain e-mails, and Counts 4 and 6 of the indictment allege that Ms. Jones is guilty of wire fraud by the act of Mr. Mosher sending the e-mails to her. So while it is theoretically possible for the jury to convict Ms. Jones under Counts 3 and 5 of a violation of the wire fraud statute through aiding and abetting liability, it is not possible under *Pinkerton* liability because *Pinkerton* liability deals with the actions of others.

And, likewise, with Counts 4 and 6, although a jury could theoretically find Ms. Jones guilty under *Pinkerton* liability for the actions of Mr. Mosher, they could not find her guilty under aiding and abetting, because she had no -- she had no involvement with the act of sending. And the way that the instruction is -- the instructions are phrased are that there are three ways which the government can prove specifically in this case Ms. Jones guilty, and those are actual sort of substantively violating the crime, *Pinkerton* liability, and aiding and abetting.

So, again, the concern for Ms. Jones is, the lack of specificity as to which of those could possibly apply to her can create confusion and create a way in which the jury can improperly convict her, and there would be no way for us to know that that had happened.

THE COURT: Mr. Hamilton?

MR. HAMILTON: All right. So Ms. Jones is charged in

Counts 3, 4, 5, and 6, and in all four of those counts the three theories of liability apply and are options for the jury.

THE COURT: You're saying it really doesn't make any difference --

MR. HAMILTON: No.

THE COURT: -- as long as the jury reaches a decision. So whether they determine that she was guilty of actually committing the wire fraud itself, whether they decided she was not guilty of committing the wire fraud itself but she was guilty because the -- those particular wire frauds were done in furtherance of the conspiracy so she was guilty under *Pinkerton*, or if they found her not guilty of the specific wire frauds herself but she was guilty as an aider and abettor, she would still be guilty, regardless of what theory was adopted?

MR. HAMILTON: That's correct.

THE COURT: Mr. Wojcik?

MR. WOJCIK: Again, I don't see how, under the definition of *Pinkerton* liability, Ms. Jones could be guilty of an act that she did.

THE COURT: Suppose they found her not guilty of it, though. She hasn't conceded that she's guilty of it. Suppose the jury found her not guilty of it.

MR. WOJCIK: That's -- obviously we're fine with that, Your Honor.

THE COURT: So if they find her not guilty of

committing the wire fraud itself but they found her guilty under *Pinkerton*?

MR. WOJCIK: As -- I'm not sure I understand the question, Your Honor.

THE COURT: Two guys rob a bank. They have guns.

MR. WOJCIK: Uh-huh.

THE COURT: On the way out, they see a police officer, and one of the robbers shoots the police officer. They're both charged with conspiracy to rob the bank.

MR. WOJCIK: Uh-huh.

THE COURT: One is charged with shooting the police officer, and the other one is charged with shooting the police officer under *Pinkerton*. The jury finds the one who was accused of shooting the police officer not guilty because they think the other person did it. But then they find them both guilty under *Pinkerton*. Is there anything wrong with that?

MR. WOJCIK: Again, I want to make sure I'm following. You're saying they found him -- found him not guilty of conspiracy --

THE COURT: No. They found him guilty of conspiracy.

MR. WOJCIK: Okay. Found him guilty of conspiracy.

THE COURT: *Pinkerton* does not apply unless there is a guilty decision on the conspiracy charge.

MR. WOJCIK: Right. So if they found him guilty of conspiracy --

THE COURT: But not guilty of the shooting.

MR. WOJCIK: -- not guilty of the shooting --

THE COURT: Himself.

MR. WOJCIK: -- not guilty of the shooting, himself, but guilty of --

THE COURT: But they determined that the shooting was foreseeable, it was a reasonable foreseeable consequence of the conspiracy, and therefore the shooting took place --

MR. WOJCIK: Right.

THE COURT: -- in the course of the conspiracy, he was guilty of the shooting even though he didn't do it.

MR. WOJCIK: Except that in Counts 3 and 5 Ms. Jones is alleged to have sent the actual e-mails.

THE COURT: And in this case the bank robber was alleged to have shot the police officer.

MR. WOJCIK: And so -- you're saying the jury could -- could find that maybe she did/maybe she didn't send the e-mails, but the e-mails were sent, and because they were allegedly sent in furtherance of the conspiracy, she can be found guilty under *Pinkerton*.

THE COURT: Isn't that what *Pinkerton* says, that a conspirator is responsible for every other act of a conspirator taken in the course of the conspiracy that's foreseeable?

MR. WOJCIK: Yes, Your Honor. But the government has alleged that Ms. Jones sent these e-mails.

THE COURT: That's right. So if they make a decision that she in fact did it, they would not get to *Pinkerton*, would they?

MR. WOJCIK: Correct.

THE COURT: The only way they would get to *Pinkerton* would be if they did what?

MR. WOJCIK: If they find that she did not send them.

THE COURT: She did not, yeah. Okay? So what's the next objection?

MR. WOJCIK: The next objection, Your Honor, would be on Page 61, and it's the unanimous verdict instruction. This may simply have just been an oversight, but in the first sentence of the instruction it says, "Your verdict, whether it is guilty or not guilty, must be unanimous." In the Sixth Circuit pattern jury instructions there is the bracketed as to -- as to each count. And although the Court includes that in the last sentence of the instruction, it does not include that in the first section of the instruction.

THE COURT: So you'd like to add that, then, as to each count?

MR. WOJCIK: Yes, Your Honor.

THE COURT: How about this, as to each count and as to each defendant?

MR. WOJCIK: Yes, Your Honor.

THE COURT: Any objection?


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 88 of 256 PageID #: 12722

MR. HAMILTON: No, Your Honor.

THE COURT: So we will make that change.

MR. WOJCIK: And then finally, Your Honor, is -- would be Ms. Jones' -- well, with the rest of the defendants, has previously proposed the inclusion of two instructions which the Court has left out. And Ms. Jones would like to renew that request. And those would have been in the defendants' jointly proposed jury instructions, Docket Number 253, Pages 8 and 9, and that would be the material -- "Multiple Conspiracy" instruction and the "Multiple Conspiracies - Factors in Determining" instruction.

THE COURT: And what evidence is there that there were multiple conspiracies?

MR. WOJCIK: Your Honor, we would assert that there has actually been significant evidence that there were multiple but similar conspiracies in this case. Every one -- every one of the government's cooperating defendants have testified, at the director level, of competition, of lack of communication, of different methods that they were engaged in below -- in the both the outside sales and the inside sales. There was -- there's been testimony about people working in silos, people working without communicating with each other about what individual teams were doing, how individual teams were doing it. There's been, again, we believe, sufficient evidence to include the instruction that although these people all worked

for Pilot, they were doing and were engaged in similar conduct, there was not a -- a hub at the center of this conspiracy connecting them all, other than, again, the similarity of what they were doing. We believe that there has been enough evidence to support the instruction that a jury might find that although the conduct was similar, there was not a unified conspiracy.

THE COURT: Mr. Hamilton?

MR. HAMILTON: The United States maintains that there is no basis for a multiple conspiracy instruction in this case. All these people worked for the same company, they worked under the same leadership. As the Court knows, there is no requirement that the government prove that every conspirator knew what every other conspirator was doing. And to the extent that there has been testimony——that's what I think that Mr. Wojcik is talking about——it might be in that vein.

But there has only been proof of one conspiracy, a conspiracy to cheat customers at Pilot Flying J in Knoxville, Tennessee. Now, granted, their conspirators did work throughout the country, and saw different customers. But the conspiracy was one conspiracy. There's not multiple conspiracies here.

THE COURT: The Court will deny that request.

MR. WOJCIK: Other than, again, to state that Ms. Jones joins in the objections of other counsel, that's all

for Ms. Jones.

THE COURT: Thank you.

Mr. Cooper?

(Brief pause.)

MR. COOPER: I was hoping it would be warmer at the podium.

(Laughter.)

MR. COOPER: Your Honor please. We, of course, join in the objections and the requests made by cocounsel. I will only highlight those three issues with the charges that we would like to register our own particular argument about.

The first one is our Page 20 "Deliberate Ignorance" instruction that the Court has heard three prior arguments regarding. The new argument that I raised is -- the new argument that I would like to raise regarding this is that Karen Mann is situated differently from the other defendants in that this is the only crime that she is charged with. She is only charged with conspiracy. And as others have pointed out, the Sixth Circuit has indicated that it would be inappropriate to give "Deliberate Ignorance" when the alleged deliberate ignorance goes to a defendant's intent to join a conspiracy.

The other differential, Your Honor, is that there is no evidence that Ms. Mann took any affirmative action to avoid knowledge. So, again, I believe that is the standard in the

circuit. And there is no proof of that for her case.

The Court pointed out before, so I may be anticipating the Court's reply to this objection, in that, first, that it would not be -- would it be appropriate to give this instruction -- or to deny giving this instruction -- let me rephrase it, I'm sorry, would it be inappropriate to single out Karen Mann for not giving this instruction and therefore highlighting it for the other defendants. And we would argue, yes, it would be fair.

With regard to the Court's concern -- or the Court's observation that we could simply argue in closing that this doesn't apply to Ms. Mann, other counsel may be confident of their abilities in front of the jury in closing argument; I'm a little more modest, and I'm concerned that I may not be able to persuade the jury that they should disregard the instructions of the Court with regard to Karen Mann. And so those are my arguments as to why, at least for Karen Mann, this "Deliberate Ignorance" instruction is inappropriate and objectionable for her case.

(Brief pause.)

THE COURT: Mr. Hamilton?

MR. HAMILTON: There is evidence in the record to support a "Deliberate Ignorance" instruction for Ms. Mann based on the cross-examination of Mr. Ralenkotter. It's the government's understanding that the line of questioning and the

testimony that was elicited was intended to show that she thought what she was doing was right, she was following the instructions of a superior. And the United States maintains that she was deliberately ignoring a high probability that what she was being asked to do was in fact -- was -- that the aim of the conspiracy that she was -- let me back up and say this. Her e-mails showed that she was voluntarily and willfully joining in the effort to change customer rebates, and to do what her -- what Mr. Ralenkotter was asking her to do, and then she took her own initiative in doing that.

And if her position is, which it seems to be from Mr. Ralenkotter's cross-examination, that she didn't realize that what she was doing was a crime, or, rather, was wrong, was a crime, then a "Deliberate Ignorance" instruction is appropriate, particularly when you combine it with the code of ethics that she executed and signed in multiple years in which she recognized the importance of being honest with customers.

So she -- there is proof to support the instruction that she deliberately ignored a high probability that re- -- that diesel discount fraud was occurring at Pilot, and that that was an unlawful aim of the conspiracy and the agreement that she -- rather, that was an unlawful aim of the agreement that she joined.

THE COURT: The Court will deny the request. What's next?


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 93 of 256 PageID #: 12727

MR. COOPER: Next, Your Honor, is -- I want to again take up a matter that the Court has already ruled on. On Pages 23, 25, and 26, the analogy that the Court included about putting out a burning building, I simply want to assert a ground that has not been previously argued to the Court, and that is that one additional objectionable aspect of this instruction -- again, joining what has been argued by others, but one additional objectionable aspect is that the Court, in this analogy, is of a lawful activity, that it is -- it is, on its face, something that somebody would want to do, and would not -- would volunteer to do because it accomplishes a good, just, and moral goal.

Our concern is that that -- it would reduce the threshold that a juror might use for deciding what is voluntary and what is within the intent of these defendants who are accused not of lawful activity but of an unlawful activity, so that it creates in their minds the impression of -- or it creates a lower threshold for intent than is required by the statute. So that's my argument, that it is confusing to the jury because it is lawful activity.

THE COURT: Mr. Hamilton?

MR. HAMILTON: Your Honor, the hypothetical is just discussing joining an agreement. However, this hypothetical, we've already argued, is acceptable and one with -- one that would be helpful to helping the jury understand, without using

a scenario in which a crime is involved. I don't really -- I guess I can't really understand why defense counsel would want to include a scenario, let's say, for example, a drug-trafficking situation, in which the person on the street corner who is distributing has joined in with the Medellin cartel as a way in which to understand an agreement in this case. This actually seems to be a very -- a very helpful way that is in no way prejudicial.

THE COURT: And the Court would point out that the hypothetical dealing with the agreement is sandwiched between discussions of a criminal agreement and criminal purpose. So counsel is correct that the factual scenario is benign, but the whole point of it was just to demonstrate what an agreement is. So whether the agreement was to do something that was lawful or the agreement was to do something unlawful, the agreement is the same, what is the mental component in reaching an agreement.

The second usage of it concerns joining, and it does the same thing. It is sandwiched between descriptions of the criminal conspiracy, and it is just meant to highlight and emphasize that just knowing about something and even saying to someone else that you approve of what's going on is not sufficient, that the person must do something that clearly demonstrates the person has joined in the effort.

So, looking at the conspiracy as a whole, the Court

does not think that a juror would be led to believe that anything less than a criminal agreement or criminal joining is what is required. So the Court will deny that request.

MR. COOPER: Your Honor, the last objection we have is not one that's been raised with the Court yet, and that is, on Pages 26 and 27, specifically, it is the last two paragraphs in the section entitled "Defendant's Connection to the Conspiracy."

There are two paragraphs in play here, one of which was requested by the government, the other I don't believe was requested by the government.

Let me start with the second paragraph first. And our objection there is that that is simply not part of the pattern instructions. If they are, I've simply overlooked that. And we do not feel that that is an emphasis that needs to be made with the jury. I don't believe any defendant has asserted that they are -- or has made any claim that they did or did not know the law of conspiracy, wire or mail fraud.

I would emphasize the paragraph before that, Your Honor, because we believe that that is also inappropriate but one in which it shifts the burden to the defendants, particularly Heather Jones and Karen Mann. And this instruction, for the record, reads, "A person who acts at the direction of another may be a conspirator even if the person giving the directions is the defendant's supervisor at his or

her place of employment. The question is whether the defendant agreed to act in concert with others to violate the law and knowingly and voluntarily joined the conspiracy. It comes down to whether the defendant voluntarily joined the conspiracy. Following directions from a defendant's supervisor at work does not, by itself, make a defendant's decision to join a conspiracy involuntary."

While the Court included this instruction and cited two Sixth Circuit cases, one being *United States vs. Susnjar*, and then *United States vs. Lewis*. The *Susnjar* case, of course, is from 1928. This was a very brief opinion, a little more than one page, and in that case the Sixth Circuit, in 1928, did state something very similar to what the Court included in the instruction, but they also made clear that the defendant about which this instruction pertained was in place and was involved in a way that it was, quote, "conversant with the whole unlawful scheme, and entered actively into the prosecution of it."

In this case, Your Honor, we would say that the government is free to make this argument, but it is -- it is too strong a statement to the jury for the Court to give its sanction of this language. And so while it's not something that -- you know, it's something that the government's free to argue, it's not something the Court should -- should sanction.

THE COURT: Mr. Hamilton?

MR. HAMILTON: Your Honor, if there has been a centerpiece of the defense of this case, it is that these employees, particularly Ms. Jones and Ms. Mann, were following the instructions of Mr. Ralenkotter, Mr. Mosher, and so therefore they should be absolved for anything that they may have thought was wrong at the time; second, that there was a consistent line of questioning of all the government witnesses of whether or not they knew what they were doing was wire fraud or mail fraud. It's been a centerpiece of the defense. And in our view this is -- this defense is to ask the jury to overlook what the law is and to reach a decision on another basis. This -- this is the law in the Sixth Circuit, the statements that are in here, and it makes it clear that that is not an acceptable defense to -- to the conspiracy charges and the wire fraud charges.

MR. COOPER: Your Honor, that's exactly why this instruction is inappropriate, because that is not at all the defense that Karen Mann or, I dare say, any defendant has made. At no time has Karen Mann asserted or asked a witness any question that would lead anyone to believe that they were -- that they were simply relying on the instructions of their supervisors. At no point did anyone make any claim that Karen Mann knew what was going on was unlawful but was simply doing it following instructions. That's not what we're saying. And that's the problem with this instruction, it leads -- it could

lead a jury to believe that even if a defendant was unaware that what they were doing was unlawful, they could still be guilty if they were following the instructions of their supervisor.

THE COURT: I'm not sure how you get that out of it. It says it comes down to whether the defendant voluntarily joined the conspiracy, knowingly and voluntarily joined the conspiracy. It emphasizes the knowledge on the part of a defendant, and that with that knowledge the person must voluntarily join the conspiracy, right? It says, "The question is whether the defendant agreed to act in concert with others to violate the law and knowingly and voluntarily joined the conspiracy."

MR. COOPER: Well, I haven't been able to get to this yet, but I'd like to now, Your Honor. What -- I do have some proposed language that I think addresses the issue, specifically the last sentence of that -- it's the first full paragraph, very first paragraph on Page 27, that says, "Following directions from a defendant's supervisor at work does not, by itself, make a defendant's decision to join a conspiracy involuntary." If I could --

THE COURT: "Involuntary." "Involuntary."

MR. COOPER: Yes. If I could pass --

(Brief pause.)

MR. COOPER: Your Honor, the language that I have

proposed is that -- at the beginning of that sentence adding language that was previously given as part of the instruction, that "If the defendant knew the conspiracy's main purpose and he or she voluntarily joined it intending to help advance or achieve its goals, then following directions from a defendant's supervisor at work does not, by itself, make a defendant's decision to join the conspiracy involuntary."

THE COURT: Any objection to that addition?

MR. HAMILTON: No objection.

THE COURT: Okay. We'll add that, then.

MR. COOPER: Thank you, Your Honor. I'll return to the meat locker.

MS. BREVORKA: Your Honor, I apologize, but just for purposes of the record, so it's clear, did the Court deny Mr. Hazelwood's first objection regarding the deliberate indifference instruction, that it should not apply to him?

THE COURT: The Court did.

MS. BREVORKA: Thank you.

THE COURT: We will make these changes, and we'll try to get a copy of it out to you before arguments begin. We're having the jury come back at 12:30. And the government will be making its argument then.

MR. COOPER: If Your Honor please, does the Court want to hear our renewed Rule 29 arguments?

THE COURT: Yes. We can do that now.


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 100 of 256 PageID #: 12734

MS. BREVORKA: On behalf of Mr. Hazelwood, I'd renew our general Rule 29 motion that we made at the close of the government's evidence, and we renew this general Rule 29 motion as to all counts against Mr. Hazelwood.

THE COURT: Thank you.

Mr. Richardson?

MR. RICHARDSON: Thank you, Your Honor. Your Honor, Mr. Wombold likewise renews his Rule 29 motion. Again, the basis of the motion is general; it's that the evidence in this case is insufficient to establish the elements of the crimes with which Mr. Wombold has been charged in all counts, specifically Counts 1 through 4 and Counts 11 through 13. Thank you.

MR. VERNIA: Good morning, Your Honor. On behalf of Heather Jones, we would renew our general Rule 29 argument as to all counts, specifically Counts 1 and 3 through 6.

THE COURT: Thank you.

MR. VERNIA: I do have one housekeeping matter that I'd like to raise after this.

THE COURT: Very well.

MR. COOPER: Your Honor, as I understand it, Ms. Mann's motion for judgment of acquittal that was raised at the close of the government's proof was taken under advisement by the Court. So at this time, at the close of all proof, we would ask the Court to enter a judgment of acquittal and

dismiss the case against Ms. Mann.

In addition to the argument that I made at the close of government proof and more specifically in response to some of the statements by the government, I would assert that in order to find that there is sufficient proof, the Court is going to have to assume certain facts that are not in evidence with regard to any activities by Ms. Mann and any proof that indicates that she joined the conspiracy and had the intent to cheat trucking customers. Thank you.

THE COURT: Mr. Hamilton, do you have anything in addition to what you advanced last week?

MR. HAMILTON: No, we incorporate our previous argument, Your Honor, in response to that.

THE COURT: Okay. The Court will adhere to its earlier decision on this -- this matter.

The Court received a motion from the government, filed over the weekend, regarding *Enright* findings. The Court made an inquiry last week as to whether the Court had to make such findings. The Court was told that it did not. The government's motion indicates that they have changed their position, and now assert that the Court should -- should do so. Is that correct?

MR. HAMILTON: Well, yes, and those -- with those short declarative sentences, it leaves out the part that -- the Court did inquire of the government, and we said we didn't

believe so based on the lack of objections throughout the record. I went back and I looked at the law, of course, on this, to make sure about this, and it seems to me that the potential outcome could be that if on -- in the event there is an appeal, if the defendants were to lodge objections to that, even though they weren't raised below, that the Sixth Circuit could review on the record, that it would not necessarily require a remand. But it seemed to me that, out of an abundance of caution, while I regret the inconvenience to the Court, with this submission, that the Court make the findings, that the United States did try to make it more convenient for the Court by doing categories.

As the Court saw in our submission, we had three categories, e-mails, recordings, and testimonial evidence. And we tried to set that out in a very organized fashion, so that the Court, should it choose to do so, could make its ruling based on those categories and use the government's attachments as a way to conveniently and efficiently make the ruling.

THE COURT: Thank you.

Does anyone disagree with Mr. Hamilton's statement?

(Brief pause.)

THE COURT: Okay. Apparently not, then. So the Court will take it, then, that it is being asked to make the findings that the government calls *Enright* findings. The

government has placed in categories the evidence that was admitted that it believes contains the statements that would be covered by the *Enright* decision. The government calls them Category 1, Category 2, and Category 3.

The Court is required to make a finding that a conspiracy existed. Considering the testimony of numerous witnesses in this case as well as much of the documentary evidence, especially the e-mail communications, the Court makes a finding that a conspiracy existed largely along the lines that is outlined in the indictment. And obviously this finding is an evidentiary finding; it is not meant to suggest that a jury could or should make that finding by a -- by proof beyond a reasonable doubt. The Court's burden is only by a preponderance of the evidence, which, as we all know, is a very, very low standard.

The Court also finds that the defendants against whom the hearsay in these various categories was offered were members of the conspiracy. Again, this is based upon the low standard of preponderance of the evidence.

And, lastly, the Court makes a finding that the statements were made in the course and furtherance of the conspiracy. The defendants here as against whom the statements were being offered obviously are the Defendant Hazelwood, the Defendant Wombold, the Defendant Jones, and the Defendant Mann.

Mr. Hamilton, does that suffice?

MR. HAMILTON: Yes, Your Honor.

THE COURT: Is there anything further we need to do, then, before the break?

MS. COMPHER-RICE: There is, Your Honor. The defendants actually have a pending motion in limine that I'd like to bring up, as well as a renewed motion at this time.

THE COURT: Very well. A motion in limine. Okay.

MS. COMPHER-RICE: Yes, Your Honor. If the Court please, the background on this -- this is the defense motion in limine to exclude the prejudicial exhibit descriptions in JERS as they were submitted by the government. Your Honor, on October 23rd, prior to trial, the defendants received a list of the government's --

THE COURT: I can save you some time. The Court is going to grant that motion.

MS. COMPHER-RICE: Thank you, Your Honor. And actually, if the Court please, to help -- to help the government. I would specifically ask that the government be required to use the neutral naming convention that the defendants used. Because I know that this case is going to the jury soon, I did take the time over the weekend to fill that in for the government. And I can give them -- they're free to use it or free to reject it, but I'm happy to provide that to them as well.


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 105 of 256 PageID #: 12739

THE COURT: Okay.

MS. COMPHER-RICE: And, Your Honor, moving on, at this time, on behalf of the defendants, I would like to renew our joint motion to strike surplusage from the indictment. Your Honor, I would be renewing the same motions that were made in the documents filed by the defense in Document 200, 201, as well as our response to the government in 213.

Your Honor, this motion is pursuant to Federal Rule of Criminal Procedure 7(d) which indicates that it can properly be invoked when an indictment contains nonessential allegations that could prejudicially impress the jurors. Your Honor, this -- the defendants specifically move to strike Paragraphs 23 and 25(d) of the indictment relating to the Pilot code of ethics and business conduct.

THE COURT: Surplusage generally refers to language in an indictment that is not related to the evidence going to be introduced at trial. Was evidence introduced at trial regarding this particular matter?

MS. COMPHER-RICE: It was introduced at trial, Your Honor. The defense does --

THE COURT: So it cannot be surplusage, then, can it?

MS. COMPHER-RICE: Well, Your Honor, the way in which it is included in the indictment, the defense would claim that it is surplusage and specifically that it is not relevant for the purposes in which it's included in the indictment,

particularly in Rule -- or, I'm sorry, in Paragraph 25 as it's included under the heading "Goals of the Conspiracy."

Your Honor, as has been argued to the Court earlier today by Ms. Brevorka, the inclusion of this language in the code of ethics does not parallel the federal law, and, as such, it certainly could lead to the confusion of the jury and the standard by which they are to decide this case against the defendants.

THE COURT: But this is an exhibit that has already been alluded to in front of the jury. Is that correct?

MS. COMPHER-RICE: It has, Your Honor, yes.

THE COURT: So the jury knows about it?

MS. COMPHER-RICE: They do.

THE COURT: The jury has heard witnesses talk about it?

MS. COMPHER-RICE: Yes, Your Honor.

(Brief pause.)

MS. COMPHER-RICE: We certainly do not object to the introduction, as we did not during the trial. We do object to its inclusion, again, specifically referenced in Paragraph 25, as it could lead to confusion of the jury in this matter.

THE COURT: Okay. Is that it?

MS. COMPHER-RICE: That's all we have, Your Honor.

THE COURT: Mr. Hamilton?

MR. HAMILTON: We incorporate our-- We've responded

to this on paper. I'm sure the Court's reviewed it. We have stated the reasons why it's in the indictment, why it's relevant. And I've previously argued today why it was offered into evidence and why it's relevant, potentially, to argument, depending on the arguments that are made.

THE COURT: The Court withheld ruling on this prior to trial because the Court did not know whether it would be used during the presentation of evidence in the case. I've forgot who used it initially, but it came in without objection. So it was discussed by witnesses. It was admitted into evidence without objection. There is an exhibit that is before the jury now. So the Court cannot see any prejudice at all. The Court does not conclude that it could be surplusage for that reason. So the Court at this point denies the motion.

Anything further?

MR. VERNIA: Your Honor.

THE COURT: Yes.

MR. VERNIA: A quick request. Would it be all right with you if defense counsel who are not involved in arguing sit in the gallery?

THE COURT: Yes. Yes. You can sit wherever you wish. And if someone needs to leave for a while, as long as there is some attorney representing a defendant in the courtroom, that is also permissible.

MR. VERNIA: Thank you, Your Honor.


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 108 of 256 PageID #: 12742

THE COURT: And I anticipate that there may be use of charts and other things. And it may be, to get a better view of what's being used by counsel, sitting somewhere other than at counsel table might be helpful.

MR. VERNIA: Thank you, sir.

THE COURT: Yes, sir.

MR. RICHARDSON: Thank you, Your Honor. Very briefly. At the end of last week there was some concern on the parts of the defendants that the Court's remarks could have been misconstrued by the jury that they needed to reach a verdict by the close of business Wednesday. I was wondering if at such time as the Court felt appropriate, that it may address that particular topic with the jury, which could be, I guess, before argument starts, or at least prior to deliberations, just this notion that they can deliberate without a time limitation.

THE COURT: Suppose I include that in the final instructions. We've talked about --

MR. RICHARDSON: (Moving head up and down.)

THE COURT: -- deliberations, and we will just tell them once the case is theirs, how long they deliberate is completely in their hands.

MR. RICHARDSON: That would be fine. Thank you, Your Honor.

MR. HAMILTON: We have two things, Your Honor. It

comes back to the code of ethics. I just -- if the defendants are not going to request a limiting instruction, I just would like to have -- I would like to make a record of that, if they're waiving a limiting instruction for the code of ethics. Given the nature of the argument, that's what I would just ask the Court to inquire of defense counsel.

THE COURT: I observed at the outset of this case, and I think I did this to the jury, we have some of the finest lawyers in the United States in this courtroom. They're all experienced, they're all extremely competent, and they're all very knowledgeable in the law. I don't think that the Court should be inquiring of the attorneys whether they would like something or not. I think they can let us know that if they did.

If you'd like to file that to indicate that this is what you had prepared and had shared with the defendants, that is fine. But I think I'm entitled to assume that if counsel would like the Court to know something, like the Court to take some action on something, they'd let the Court know.

MR. HAMILTON: Thank you, Your Honor. The last issue that we had is something that the United States would like to take up either at sidebar very quickly or it can be addressed very quickly in chambers, but it relates to a matter that is presently sealed, and the United States -- I think it would appropriate for me to raise in this form. It could be taken up


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 110 of 256 PageID #: 12744

at sidebar very quickly.

THE COURT: Why don't we come to sidebar, then.

(A sidebar discussion was held between the Court and counsel, outside the hearing of the jury, as follows:)

MR. HAMILTON: This relates to Defendant Wombold. I raise this -- I told them that I was going to raise this beforehand. In the preparation time before recordings 529 and 530 -- 529, 530, and 531 were played in court, the United States discussed with counsel for Mr. Wombold that Mr. Wombold's voice had been completely redacted from the recordings as well as from the transcript, and references to him from the recording as well as from the transcript. It's evident from the transcript of that, but I wanted to put on the record that counsel for Mr. Wombold have in fact confirmed for the United States that Mr. Wombold's voice has been completely removed from 529, 530, and 531. There is no other way for me to do this other than to have their counsel confirm that.

MR. RIVERA: Well, Your Honor, speaking on behalf of Mr. Wombold, I don't think that's something we can do right now. We'd have to listen to it.

THE COURT: You don't recall, when it was played, whether his voice could be heard or not?

MR. RIVERA: You know, the problem, Your Honor, is, to say with any exactitude that there isn't a comment or that

his voice doesn't appear in some way -- it was played once in court.

THE COURT: Okay.

MR. RIVERA: I'd have no problem listening to it again to make sure of that, but -- but I can't say, just to be sure.

MR. KELLY: Judge, can I have one second just to talk with Mr. Rivera?

THE COURT: (Moving head up and down.)

MR. KELLY: Thanks.

(Brief pause.)

MR. RIVERA: All right, Judge. I stand corrected. Apparently one of my co-counsel has listened to it and is sure that his voice does not appear on the recording.

THE COURT: Okay.

MR. HARDIN: Your Honor, may I ask one housekeeping thing?

THE COURT: Yes.

MR. HARDIN: I don't know what the Court's normal practice is, but I wanted to beseech the Court not to tell the jury how much time the lawyers have, because when that happens they start looking at their watch and the clock.

MR. KELLY: Do you still want us back at 12:30?

THE COURT: Yes. The argument will start at 12:30.

MR. KELLY: Okay.


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 112 of 256 PageID #: 12746

(The sidebar conference concluded, and the proceedings continued in open court as follows:)

THE COURT: Ms. Lewis.

(Luncheon recess.)

THE COURT: It's 12:37. Mr. Hamilton, you may proceed.

MR. HAMILTON: May it please the Court.

Ladies and gentlemen, this is the closing argument for the United States. I want to start with three words—identify, cheat, lull; identify, cheat, lull. Identify the customers who were thought to be unlikely to notice that their cost-plus discount was going to be deceptively withheld. Cheat those customers first by baiting them to do business with Pilot by falsely representing a cost-plus discount to beat out Love's and TA, the competition. Then cheat them again after you lie to them. Fraudulently reduce their rebate check. Fraudulently calculate the invoice. Then lull them by sending false pricing information, false backup information. And when they ask you questions about it, the customers, that is, tell them a story, lie to them again, say that "The discrepancy you noticed, well, that wasn't because of anything nefarious; that was because we made a mistake, computer mistake, an accounting mistake, an employee mistake," but certainly not because the direct sales employees committed fraud.


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 113 of 256 PageID #: 12747

Ladies and gentlemen, the scheme that I just described is the scheme that was at the heart of a conspiracy to commit mail and wire fraud that affected the direct sales division at Pilot from 2008 to 2013, and that, but for law enforcement, would have continued.

During my presentation today, I'm going to review a lot of the evidence. We've obviously been in trial since November. So I'm pretty sure you don't want me to go over all of the evidence. But I'm going to highlight the evidence upon which you can find the defendants guilty beyond a reasonable doubt.

Before I get to reviewing the facts with you, though, I want to take a few minutes to talk about the law. This has been the government's opportunity -- this is the government's opportunity now to talk about the law. The reason why I want to talk about the law before we get to the facts is because I hope that you'll take my quick review of the law and use it as a framework in which to think about the facts that I'm going to review with you.

One important thing to say about the law, which is that what I say is not the law. What Judge Collier says is the law. So listen to his complete instructions at the end to know exactly what the law is.

One thing that Judge Collier has done is, he's given the lawyers a copy of the instructions, as they're called, the

legal instructions that he has explained to us that he is likely to use at the end of the trial. So the lawyers have a general understanding of what the law is that he's going to tell you. So that's where this is coming from. Again, it's a summary. The instruction that you're going to hear is quite lengthy, and so I wouldn't have time to go over all of it. I'm going to highlight some significant points.

All right. So, with that said, I want to talk to you first about conspiracy law. Count 1 in the indictment charges a conspiracy. And for you to find the defendants guilty beyond a reasonable doubt, you need to find that -- excuse me, for you to find them guilty, you need to find beyond a reasonable doubt that two or more persons agreed to commit the crimes of mail fraud and wire fraud, and that the defendant——each defendant you have to consider separately——that the defendant knowingly and voluntarily joined the conspiracy. So two or more persons agreed to commit the crime of mail fraud and wire fraud, and that the defendant knowingly and voluntarily joined the conspiracy.

Now, I have now introduced the legal concept of conspiracy, and I'm going to talk more about that in a few minutes, but because the crimes that are at the core of the conspiracy are mail and wire fraud and you've heard those terms talked a lot about in the trial, I want to take a few minutes and address those first, the crimes that were the


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 115 of 256 PageID #: 12749

object -- the criminal objects of the conspiracy, the crimes that are at the heart of the conspiracy.

What is wire fraud? You're going to hear that it involves a scheme to defraud or obtain money by means of false pretenses, representations, or promises, that that scheme included a material misrepresentation or a concealment of a material fact, that there was a use of a wire communication in interstate commerce in furtherance of the scheme, and that there was participation with the intent to defraud. So as we're talking through the evidence, I encourage you to look for those things in the facts. Look for the material misrepresentation. What's more material than a price? What's more of a misrepresentation than giving a cost-plus deal, representing it, that you know you're not going to give?

Think about conceal- -- looking for concealments of material facts. How about false backup being sent, leading the customer to believe that they were actually getting the pricing that they were promised? Use of wire in interstate communica- -- use of wire in interstate commerce in furtherance of the scheme. Look for all of the e-mails that were sent. E-mails are wire communications. Look for the e-mails that were sent among the conspirators and from the conspirators to the customers. And then look for the intent to defraud, intent to deceive, intent to cheat. And I've walked through these elements, and these elements are going to


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 116 of 256 PageID #: 12750

be defined in further detail in the instructions. And I'll go over some of those now.

I pause here just to talk about mail fraud. I was talking about wire fraud. Mail fraud has the same elements as wire fraud, except it's the use of the mail instead of the use of the wire.

All right. False or fraudulent pretenses, representations, or promises. So any material false statement or assertion, whether written or oral, whether written or oral. So there's been a lot of talk and questions about, well, was this deal in writing, was it made orally? It doesn't matter, under the law, if it was made and stated with the intent to deceive and cheat.

If Brian Mosher told a customer, "I'm going to give you a cost plus .02," but he knew that it was a cost plus .04, and he said that orally, it wouldn't matter if he ever wrote it down, if he had the intent to deceive when he did it. The other part of it, "was known to be untrue when made, or with reckless indifference to the truth." That obviously speaks for itself, did you know it was false when you said it, did you know it was untrue, or were you just recklessly indifferent to it when you said it.

Another important point is that false or fraudulent pretenses, representations, or promises can be based on actual direct statements, like the one in which -- I just described

where, say, a direct sales representative tells a customer one thing with the intent to do another, or a half-truth, or a knowing concealment of a material fact. Knowing concealment of a material fact. Sending false backup information.

What is material? Material is going to be a term that comes up in a number of the charges. Materiality. What is material? The simplest way to say it is, it matters, it's important, it matters, and it's important to the decision-making process at issue.

So what's really at the core of what we're talking about in this trial? Where trucking companies are going to buy their fuel, right? Who are they going to choose? Price is material to that decision. It's in the direct sales manual, right? The direct sales manual, Government Exhibit 302, you probably saw it a hundred times if you saw it ten. Probably got tired of seeing it. There is a paragraph in there, right, that says, "Diesel fuel cost is the largest variable cost of trucking companies. As a result, using discounts will play a major role in building market share for Pilot."

So the direct sales employees and the defendants in this case and their coconspirators knew that cost-plus discounts were material to the trucking company industry and to the victims that they were defrauding.

Now, intent to defraud, how do you define intent to


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 118 of 256 PageID #: 12752

defraud? It means "to act with the intent to deceive or cheat for the purpose of either causing a financial gain to yourself or to another person or causing a financial loss to another person." So, intent to deceive. Intent to deceive a trucking company out of a rebate that they were promised. Intent to deceive a trucking company out of a cost savings that they were promised. And we're going to look at individual customers, and we're going to look at the loss that was caused by this conspiracy. We're going to look at the profit that was gained from the conspiracy to Pilot and to the coconspirators.

But keep an eye on the kind of evidence, in deciding whether or not there was an intent to defraud. Look for the intent to deceive. Look for the intent to cheat.

The very first e-mail we're going to look at has Arnie Ralenkotter, in the subject line, saying, "I'm going to sneak a penny." And when you sneak a penny, think about intent to deceive, intent to cheat.

Now, coming back, we've talked about mail fraud and wire fraud and some of the elements of that. We're going to come back now and talk about conspiracy. What does it mean to be in a conspiracy? Again, I said these before. For you to find the defendants guilty of Count 1, you have to find that there was an agreement between two or more persons to commit the crimes of wire fraud and mail fraud; and, second, that the

defendant knowingly and voluntarily joined that conspiracy.

So, what is an agreement? Now, an agreement, in conspiracy law, has a special definition. The Court's going to give you detailed instructions about it. But as you look through the evidence that I'm going to review with you, keep this in mind, that what you're looking for isn't something that's a formal agreement. It's a mutual understanding that's either spoken or unspoken. In other words, you don't even have to exchange words with someone; your conduct alone can show that you have entered into an agreement to engage in a criminal enterprise. Mutual understanding that's spoken or unspoken between two or more people, two people——you have to have two people to conspire——and then to cooperate with each other to commit the crimes of wire fraud or mail fraud.

Now, here, you'll see I've put in this that it says wire fraud or mail fraud, because the Court's going to tell you that although the indictment charges -- let's -- although the indictment charges that the conspiracy was a conspiracy to commit the crimes of wire fraud and mail fraud, for you to convict the defendants, each defendant considered separately, you need only find that there was an agreement to commit one of -- one, either mail fraud or wire fraud. The indictment charges both, but you need only find an intent to commit one of those crimes.

Again, it does not require proof of a formal


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 120 of 256 PageID #: 12754

agreement. There is no requirement that there be proof that everyone involved agreed on all of the details; nor is there a requirement that everyone involved knew all of the other people. And you will recall during the trial when there were questions about, "Well, did you know all of your conspirators? Did you know this person? Did you know this person was doing it?" It's not required. Not required. What the United States must show is that there was an agreement between two or more people to commit the crimes, and that the defendant, who is charged, joined that agreement. Whether the defendant -- other coconspirators knew all of their coconspirators or whether that defendant knew all of his coconspirators is not -- is not a requirement to prove a conspiracy beyond a reasonable doubt.

Now, having given——that probably seemed longer to you than it did to me——a summary of the law that is involved here, let's talk about the evidence itself. And, please, as I go through this, think about where this evidence fits into the law that we just reviewed.

As promised, the first e-mail I want to show you is an e-mail that was referenced during Mr. Ralenkotter and Ms. Welch's testimony, Exhibit 2104. You can see the subject line. This is a January 9th, 2008, an e-mail from Arnie Ralenkotter to Janet Welch, saying, "Let's sneak a penny to the plus numbers on the following," and he lists some

customers. And he says, "I'm not telling the customers. These are the ones that I don't think they will notice. If you think differently, let me know."

So this is under the category of identify, identify the customers that you can cheat. And what's interesting about this e-mail is that it shows how the scheme can be executed at different points in a relationship with a customer. These customers already are existing customers with Pilot, but what you see Mr. Ralenkotter doing is identifying whether these are customers who can be cheated now and in the future.

The next e-mail, the same -- this is an e-mail in that chain where Janet Welch says to Lori McFarland, "Before I do the below, can you tell me if we are sending them cost-plus spreadsheets?" This also was an important part of identifying the right kind of customers. The conspirators wanted to know which customers were getting information that could reveal that they were being cheated.

You recall during the trial when Mr. Ralenkotter was asked how noticing -- how a customer noticing might affect the way that customer is treated in the future, and Mr. Ralenkotter said, "Well, if we thought they would notice or if we thought they were watching it closely, we wouldn't cheat them. And you know, once -- I guess I'd say once we got caught, then we'd stop doing it." Mr. Ralenkotter explained


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 122 of 256 PageID #: 12756

the significance of knowing which customers would catch you and which ones wouldn't, the obvious point being, you want to avoid cheating the ones that are going to catch you.

Mr. Mosher also made this point at the direct sales meeting in November 19th, 2012, at Pilot headquarters. Now, remember, Mr. Mosher was chosen to teach rebate fraud at Pilot headquarters following a meeting in October of 2012 at John Freeman's lake house where direct sales management made this decision. You'll recall, and we'll get to this in a minute, where Mr. Mosher actually was identified as being an expert at manual rebate fraud, and he was selected to teach this course by Mr. Freeman, Mr. Wombold, and ultimately approved by Mark Hazelwood once he arrived.

Let's listen to what Brian Mosher had to say about the customers you should select to cheat.

(The recording was played in open court, and the proceedings continued as follows:)

MR. HAMILTON: The rebate fraud expert, Brian Mosher, teaching class, "You've got to know your customers to be able to do this. Don't be foolish when you do it."

And Ms. Welch, who was present, was asked, "What's the significance of not being foolish?"

And she says the obvious, "Because you don't want to get caught cheating the customer out of their discounted rebate check that they're supposed to be getting."


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 123 of 256 PageID #: 12757

Then I asked, "What, if any, importance is there to know your customer?"

And she says, "To know who you can manipulate and who you can't, whether they monitor their pricing or whether they don't."

So I go back to where I began, identify the customers who are unlikely to notice that their rebate and invoice is being deceptively calculated.

This point was also made at the October 25th, 2012, direct sales management meeting, although more profanely, by Mr. Freeman.

(The recording was played in open court, and the proceedings continued as follows:)

MR. HAMILTON: "Understand, if the f'er's got the ability to know what you're doing to them." That was the vice president of direct sales. That was the man that Mark Hazelwood promoted to be vice president and to run the direct sales division.

The indictment alleges two methods for cheating identified victim customers, off-invoice fraud and rebate fraud. And this is an opportunity -- I think it's important to go ahead and let you know how the indictment is structured. What I'm holding is a copy of the indictment. The -- and you are going to receive a copy of this during your deliberations. The indictment runs more than 50 pages. But the reason why it


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 124 of 256 PageID #: 12758

runs 50 pages is because the indictment has what's called a Manner and Means section in it. Conspiracy counts -- conspiracy charges often have what's called Manner and Means sections. In this indictment, the Manner and Means section begins on Page 13 and continues through Page 48. And in the Manner and Means section, that's where the scheme is laid out and where the criminal objects of the conspiracy is laid out, as well as representative conduct in furtherance of the scheme and conspiracy. And in that section that's where the example representative victim customers are identified in the indictment. That's where in the -- that's where representative actions taken in furtherance of the conspiracy are identified. The reason why I point that out is because I didn't want you-all to be surprised by the length of the indictment. I wanted you to hear it from -- beforehand about why the indictment is as lengthy as it is. But it lays out in detail.

So this brings me back to the way in which the scheme to defraud is outlined in the indictment, and it's identified as off-invoice fraud. And there are a number of customers who are identified as example customers, example victim customers in the indictment. And you heard proof related to all these that are listed on the screen right now, PI&I, Queen, Smith Transport, Koleaseco, and it relates to off-invoice fraud. And with respect to rebate fraud, the


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 125 of 256 PageID #: 12759

indictment also alleges examples of customers of Amerifreight, BP Express, Halvor Lines, JTL, Ryder, and Honey Transport.

And, again, this is where I reiterate that there isn't sufficient time for me to review evidence related to all of those customers. So I am going to hit highlights at this point in this portion of the closing.

I point out PI&I as an example of off-invoice fraud. This is Government's Exhibit 1101, and it relates to a trip report that Mr. Ralenkotter sent to Sherry Blake. And Sherry Blake's testimony is recent enough that I'm sure you'll remember that she explained that her job was to round up the trip reports for Mark Hazelwood and put them in a binder so that he could review them every Friday.

In this trip report Arnie Ralenkotter says, with respect to PI&I, he says that "TA in recently and has offered a better-of pricing. I'll need to do the same. I will tell them cost plus .03 and put it in as cost plus .04 with a four-cent discount. This is a good opportunity here to address some owner-operator gallons."

So what's Mr. Ralenkotter saying? He's saying that the competition, TA, has come in and they need to beat them. "I'm going to offer them a discount to beat TA, but I have no intention of giving them the discount." That is called an intent to cheat and -- an intent to cheat and deceive that he's laying out in this trip report that goes to


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 126 of 256 PageID #: 12760

Mr. Hazelwood.

And then Mr. Ralenkotter sends a letter to this customer saying that they're going to get a cost plus .02. And look at the time, 9:47 in the morning, July 11th, 2008. Then at 10:03 he tells Janet Welch to put PI&I in as a cost plus .04/retail minus .04, having just sent a letter to PI&I a few minutes earlier saying that they were going to get a different deal. Then Arnie Ralenkotter tells Janet Welch, "Do not reflect PI&I unless he asks. If he does, put his legit pricing in." Right? Legit, the honest pricing in, the pricing that he represented, rather than the fraudulent pricing that he has directed Ms. Welch to carry out. And Janet Welch says, "Okay."

Mr. Ralenkotter doesn't want the pricing to be reflected. And you-all recall that reflection means that information is given to a billing card company so that the billing card company can let the customer know what their pricing would be. Mr. Mosher referred to it as a check and balance, an opportunity for the customer to know that they're getting fair pricing. And Mr. Freeman explained the problem with reflection as it relates to executing the scheme to defraud.

(The recording was played in open court, and the proceedings continued as follows:)

MR. HAMILTON: The problem with reflection is that


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 127 of 256 PageID #: 12761

they can get your pricing and compare it with the competitor and realize that they're being cheated. That's the problem with reflection. That's why Arnie Ralenkotter didn't want PI&I to be, as it said, reflected.

Queen is a very helpful example about the way in which off-invoice fraud was completed and executed, and it shows a concerted effort to cheat the customer; in a sense, the baton in a relay being passed from one direct sales employee to another to keep the fraud race going with Queen.

Let's look at the beginning of it. You'll remember, Katy Bibee explained that -- and this is Government Exhibit 715. And you look at this thread of e-mails, and what we see happening here, you recall, Mike Queen calls Katy Bibee. Katy Bibee reports what happened to the conversation in this e-mail. Katy Bibee tells John Freeman, "You remember Mike Queen. He thinks we took him from a cost plus .03 to a cost plus .04, but really right now in our system he's at a cost plus .08. Saying he needs another penny so he can keep his LOC, his letter of credit. What do you want me to do?"

John Freeman says, "Tell him I said the extra penny is fine to renew. But don't change the deal."

Say one thing with the intent to do another. Say one thing with the intent to do another.

Katy Bibee says, "Okay, will do."

Do you know what the response "Okay, will do" is?


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 128 of 256 PageID #: 12762

It's an agreement. It's an expression of an agreement to lie to this customer.

And Ms. Bibee, on direct examination, confirmed it. I asked her, "What did you understand him to be asking you to do?

"To lie to the customer.

"And how did you understand it? How did you -- how did you respond to Mr. Freeman?"

She said, "Okay, will do."

"Did you agree to lie to the customer?"

Ms. Bibee said, "Yes."

Agreement between two or more people to commit the crime of wire fraud or mail fraud. We're already there, right? We have two people who have agreed to lie to a customer.

Then Katy Bibee writes Mike Queen. "Hi, Mike. I spoke with John, and he is good with giving you the additional penny back on your discount. This will be effective Monday. Have a good weekend."

She is almost gleeful in her lying to this customer. John Freeman just asked her to do it, and she said, "Okay, will do." And, look, she's already doing it just a few minutes later on the same day.

Then we're going to fast-forward six months. So this customer is being cheated, and what's significant here is


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 129 of 256 PageID #: 12763

that there are actually -- there's a direct lie, and then there is also a material concealment. This is where we talked about the law at the beginning.

So when Ms. Bibee tells John Freeman, "This customer thinks that he is at a cost plus .04. He wants to go to a cost plus .03, but really internally he's at a cost plus .08," Ms. Bibee confirmed that when she called back Mike Queen -- she e-mailed him back, rather——that's important; remember, Mike Queen's company is in North Carolina, and Katy Bibee is in Knoxville, so the e-mail lying to him went over to North Carolina and crossed a state line; that would be wire fraud——that she confirmed that he -- that she led him to believe that he was getting a cost plus .03 when really in the system he was at a cost plus .08, a five-cent differential, which if the -- there is something that you-all now know from this experience, is that five cents in the diesel fuel world is a big deal. Five -- five cents is significant. The power of a penny.

So here we are, Government Exhibit 717, and here is where we see the concerted effort to contain the fraud. John Freeman writes to Holly Radford and Jay Stinnett now, saying that -- asking, "Did we respond to Queen? He's crazy and thinks he's getting a deal that he's not. Be careful."

And then at the top, John Freeman, in responding to Holly Radford, says, again, "Careful with the deal. He's not

getting what he thinks," letting the coconspirators know that, "Here is a customer who's not getting what he thinks. Be careful."

Jay Stinnett reiterates this with Holly Radford, "John says he's not getting what he thinks. We just need to sing from the same hymn book."

Mike Queen, unbeknownst to him that he's being cheated, sends an e-mail to Katy Bibee and John Freeman and Holly Radford, thanking them. "John and Katy, you both went to bat for me. I haven't forgotten it, and I appreciate it. I gave you my word that we were going to grow and increase our fuel consumption, and we have."

Little did he know that John Freeman was writing his coconspirators saying, "Careful. This guy isn't -- he thinks he's getting a deal that he's not."

Rather than telling Mr. Queen, "You really shouldn't be thanking us, because we've been cheating you," John Freeman writes, "Thanks, Mike. It's a crazy time right now. All good stuff. Thanks for your business and kind words."

We'll fast-forward now to July of 2011, so just the next month. Jay Stinnett writes in a trip report that he has visited with Queen and has given Mike another penny, saying, "I gave Mike another penny, to cost plus .07," comma, "or cost plus .03," dot, dot, dot, dot. We're going to see the dot, dot, dot come up again in some of these other e-mails, a


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 131 of 256 PageID #: 12765

mutual understanding as to what's really going on here, that he told Mike Queen that he was getting a cost plus .03, but really in the system at Pilot it's going to be a cost plus .07.

And he adds in this trip report -- while he is -- while he is memorializing the fact that he has misrepresented the cost-plus discount to Mike Queen, he writes, "The vibe I got in the Hickory area is that a lot of guys are really struggling. There has been about five guys shut their doors in the last 45 days." 2011. This trip report goes to Mark Hazelwood.

Ms. Radford, in her testimony, explained that was her understanding, that -- and then she explained what she did, that her understanding was that Queen was being told they're getting a cost plus .03, but in the Pilot system Queen was going to get a cost plus .07 instead. And we showed you the documentation to confirm that. Here is Holly Radford sending a discount change form to put in a cost-plus pump fee of .07, rather than the cost plus pump fee of .03 that Mike Queen believes he is getting.

Now, we'll jump ahead another year, to July 20 of 2012, where J.W. Johnson writes in a trip report about Mike Queen, "My first f-up. This guy Mike can talk forever, and during the conversation he started asking about his discount. I looked at the P&L and said, 'Oh, you're at a cost plus .07.'


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 132 of 256 PageID #: 12766

He said, 'Well, I was told I had a cost plus .04.'"

And he says later in this trip report, "I'm going to hold off on the backtracking."

And Holly Radford explained that what the trip report indicated was that during the meeting with Mr. Queen, J.W. Johnson looked down at his P&L statement related to this customer and accidentally told Mr. Queen the truth, accidentally told him the truth. And Mr. Queen, because the discount was important to him, to his business price, it's material, it matters to his decision-making, said, "Whoa, wait a second, I thought I was getting something else. I thought I was getting a better deal than that."

J.W. Johnson says he's going to hold off on the backtrack. And what Ms. Radford explained about the backtrack was, hold off on trying to figure out how to get out of this, what story to tell him.

This takes us to Government Exhibit 724, October of 2012. And after all that, after Mr. Queen was accidentally told the truth, we have Jay Stinnett telling Mr. Queen, "Oh, you are definitely getting a cost plus .03. In fact, we're now going to add a retail minus .02 to help you out a little bit more on the months when the cost plus .03 might not help you out." It was all a lie. Not going to happen.

Because, as Ms. Radford explained, that's the only thing she did, the direction of Jay Stinnett, was to change it


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 133 of 256 PageID #: 12767

to a off- -- to change the retail minus side, not the cost plus side. You'll see that it says cost plus pump fee the same. Let me go back to the slide before, where -- this is Exhibit 724, where Jay Stinnett says, "Wanted to make sure you add the retail minus .02 side." That's the only side that gets added.

And you can -- I now have Government Exhibit 721 and 726, where 721 shows that the cost plus pump fee was cost plus .07. And when she puts in October 22, 2012, after the e-mail communication where Mr. Queen was told he was going to get a cost plus .03, cost plus .07 is staying the same as the document, no change.

So, after all this effort, after Mike Queen has been victimized for two years by Pilot, do you know all Mike Queen becomes? He just becomes a teaching point on a sales trip that John Freeman shared with Chris Andrews, who is relatively new to the company. Let's listen to it. You heard it before. This is Government Exhibit 521.

(The recording was played in open court, and the proceedings continued as follows:)

MR. HAMILTON: It's all there, right, the entire scheme, the lie, the cover-up, the lull that works with Mike Queen. Jay said, "Ah, he doesn't know how to read the P&L. That was the eight-cent tax." That was the lulling that I was talking about. Make up a story. See if you can get away with

it.

See how they look at this customer, the conspirators? "He can't figure this out, he doesn't deserve it. Let's lie to him. Let's keep lying to him. It's his fault."

Fortunately we have the mail and wire fraud statute to criminalize this kind of behavior.

You saw proof that Queen lost $60,000 from this fraud, $60,000 from the fraud. When you think about that $60,000 in the period of 2010 to 2012, please remember Jay Stinnett's trip report, when he said that companies were struggling to keep their doors open in that area of North Carolina, and how important this money could have been to a company like Queen at that time, that the conspirators knew about in that trip report. Look at the profit that Pilot made during the time when companies were struggling in North Carolina, based on their own trip report that was written -- the conspirators wrote and sent to Mark Hazelwood. That man that you heard on that recording was promoted by that man, Mark Hazelwood. (Indicating.)

As I said before, the indictment alleges two kinds of fraud -- of diesel discount fraud, off-invoice fraud, manual rebate fraught. We talked about two examples. I showed PI&I. I showed you Queen.

I want to move on to talk about some examples of

rebate fraud. Just to give you a preview of what's happening here, the United States, right now in its closing argument, is proving the existence of a conspiracy. The second half we're going to talk about these four defendants. All right? So they're coming.

Rebate fraud. I've already mentioned it. The expert in rebate fraud was selected to teach rebate fraud at the November 19th, 2012, direct sales meeting.

And let's hear his explanation of why you -- why and when you go to the manual rebate method for the scheme to defraud.

(The recording was played in open court, and the proceedings continued as follows:)

MR. HAMILTON: Identify the customer, hit him again. So that customer who you think you can put on a rebate, who has heard cost plus, knows it's important because other competitors are offering it, knows that it's important because, as you see in the direct sales manual, the large variable cost for a trucking company is its fuel, wants cost plus, wants a cost-plus discount. Brian Mosher says, "Solution, tell him we can do it on a rebate."

Janet Welch explained why you put someone on a rebate, because, as she testified, "We," meaning the conspirators, "can manipulate it and make it whatever we want it to be."


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 136 of 256 PageID #: 12770

And then I ask, "When you say 'manipulate,' what do you mean?"

And she answered, "To change it to whatever we want the discount to be, without the customer knowing it."

The rebate fraud example that you've heard about in the trial that I want to review with you is Honey Transport. I'll start with the trip report that's Government Exhibit 1402, from Chris Andrews to John Freeman, copying Sherry Blake. And he says that, "Met with Sandy, who is pissed because she's been shopping us to Love's, cost plus .02, and seeing a daily Fetch of cost plus .05, thinking it was cost plus .02. I apologized for the confusion, confirmed her deal with us and corrected the Fetch."

So what Mr. Andrews testified that had been occurring here was that this customer had been told it was getting a -- had been told it was getting a cost plus .02, but really what Pilot was billing and rebating, rather, rebating, was a cost plus .05 but sending Price Fetch information. And the Price Fetch information showed a cost plus .05. Remember, Price Fetch information would be information to allow the customer to look at pricing.

And what this customer did is, it showed that pricing to a competitor, to Love's. And Love's said, "Do you think is cost plus .02? No, this isn't cost plus .02." So she figured it out.


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 137 of 256 PageID #: 12771

And what Mr. Andrews testified that he did was, he didn't fix it in Pilot's system, he didn't change it in Pilot's system to the cost plus .02, he left it as a cost plus .05 in the system, but he continued -- but then he changed the Price Fetch to send her to be a cost plus .02. So he keeps the system in as a cost plus .05, in the Pilot system as a cost plus .05, but he tells her it's a cost plus .02, and then changes the pricing information so that she will receive cost plus .02 pricing, leading her to believe, if she were to show it to the Love's person again, that she is getting a cost plus .02. That was in June of 2011, when that happened.

Then we fast-forward up to February 23rd of 2012, and Chris Andrews explained that he had gotten busted. That was a word -- not that he used, it was a word in his testimony, but he was -- you recall he was in a car on a sales trip with John Freeman, and he had this call that came in from Honey Transport, and John Freeman says, "Sounds like you got busted." And in fact he had. Honey Transport had figured out that Chris Andrews had not done what he said he was going to.

Chris Andrews had to come up with a story. And Chris Andrews and Katy Bibee came up with a story. And, again, this is where we move from the lie to the lull, the lie to the lull. So here is Honey Transport being lulled. And you'll remember that Katy Bibee and Chris Andrews worked on this e-mail. And there was another draft that you saw. The


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 138 of 256 PageID #: 12772

e-mail that was ultimately sent said, "Hi, Sandy," who was the representative at Honey. "I've done my research and it seems that your pricing was inadvertently changed in our system on the 19th of December. We're sincerely sorry for this mishap and assure you that this error has been corrected and your February rebate will be accurate."

Mr. Andrews told you that this was not a mishap, this was not an error, this was deliberate fraud that they got caught in.

Mr. Andrews says -- and when I asked him what actually happened, Mr. Andrews said, "We had actually been manipulating the rebate for some time. We just completely fabricated the December 19th date to hopefully satisfy the customer." So, as he testified, they just pulled that December 19th date out of the air, made up a story about how -- you recall, how there was some other customer that had a similar name, and that the discount that was supposed to be put into the system was for the customer with the similar name, and all this just innocent confusion, and "We figured this all out, and this is what we owe you, $10,000." And he testified that that's not what they owed, they owed way more than that, but that was enough to satisfy and lull this customer to make them go away.

And what we see happening here is that Katy Bibee makes a request for an ACH payment to go to Honey Transport


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 139 of 256 PageID #: 12773

for that amount in the e-mail. And that ACH payment, you heard, began in the Pilot headquarters in Knoxville, Tennessee. Meredith Vaughn testified about that, about how the ACH payment system would be initiated in headquarters in Knoxville, and then it goes -- it makes its way to Birmingham. Kimberly Townsley testified about that, that the ACH payment from Regions would have originated in Alabama.

And then Rita Irwin, who was a representative of the United Southern Bank, said that the ACH payment was received in Florida. So it's initiated in Knoxville, goes to Alabama, and ends up in Florida. That's called wire fraud because it is a lulling payment to this customer to make them go away, a concealment of a material fact, the material fact being, look -- the material fact being that this isn't all that they were due, it was just enough to lull them into going away.

The other part of this conspiracy, and that was -- as we move away from -- move on from just talking through example customers, again, to repeat, we have looked at two example off-invoice customers. We have looked at an example of rebate fraud customer, Honey Transport.

The other part that I want you-all to recall is the effort, concerted effort, collaboration, working together to advance the goals of the conspiracy. And we see it here in this e-mail that's Exhibit 2109, from Janet Welch to Lori McFarland -- excuse me, Janet Welch to Jerry Beets, copying

Vicki Borden, where she writes, "With our new system, will there be a place near the customer name or discount we could insert an asterisk or something to flag a customer? Sometimes discounts are modified and customers are not notified."

Ms. Welch testified that the reason why it would have been helpful to put an asterisk there, what she was looking for, was to make sure that the J.W. Johnson incident didn't happen, which is that a salesperson walks into a meeting, forgetting that this customer's being lied to, this is where the whole -- the tangled web we weave when we practice to deceive. You've got to keep up with your lies. And that was the purpose of the asterisk, to help the conspirators keep up with their lies.

Another example, protecting the conspiracy. Protecting the conspiracy, make sure that the information is kept within the conspiracy, not people who might cause problems for the conspiracy. Arnie Ralenkotter to Lexie Holden, at the bottom of this e-mail -- excuse me. Lexie Holden to Arnie Ralenkotter, June 14th of 2011, she writes, "Just a thought. We aren't discussing any adjustments to rebates because of Kevin's connections to trucking, right? If so, have you mentioned this to Tim?"

And Arnie Ralenkotter writes, "I'll call Tim."

Ms. Holden was asked, "What does the connection with the trucking companies have to do with anything?"

And she said, "Well, because we were fraudulently adjusting rebates."

I said, "Well, why were you concerned about trucking companies?

"Because he might have a loyalty to the trucking companies, to tell them what was happening."

Working together to protect the conspiracy. Working together in a concerted effort to protect the conspiracy.

Mr. Ralenkotter corroborated that understanding. And I make this point because you want to look for evidence of a mutual agreement. Doesn't have to be formal. You're looking for a mutual agreement. Mr. Ralenkotter says that "We would have wanted him on board a little while longer, to know him a little bit before we told him how we were cheating the customers, for fear that, you know, he could communicate that to the trucking companies."

Protecting the conspiracy.

Another example of collaboration and encouragement to cheat and deceive. You recall this e-mail where a spreadsheet is created by Holly Radford of all of Jay Stinnett's rebate cuts, cheats, and there's a saving -- there is an "Original" column of 64,000 -- excuse me -- an "Original" column, a "Sent" column, and a "Savings" column. And in the "Savings" column you see $115,525.35. That was not a savings for the customer. That was a savings of the


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 142 of 256 PageID #: 12776

additional profit to Pilot by cheating its customers this month. And the clue to this is Jay Stinnett's e-mail, when he forwards this on to John Freeman and Vicki Borden and writes, "Good number. 115,000-dollar screw."

Vicki Borden writes back, "You are the best."

And if you needed further evidence as to why he might -- Mr. Stinnett might refer to this as a, quote, "screw," take a look at Government Exhibit 2129, where Jay Stinnett tells Holly Radford to -- with respect to RWH, RWH being the customer that's at the bottom of the chart -- the spreadsheet that Holly Radford has created, where she was -- RWH was supposed to get an original 64,000-dollar rebate but was sent a 32,000-dollar rebate, Jay Stinnett says, "Run it at cost plus .20 and get it done. Send it back to me." The evidence showed that RWH had just been promised a cost plus zero discount.

So I asked Ms. Radford, "In fact, is, quote, 'screw' a more accurate description for that?"

And she said, "It is. Definitely."

And that was consistent with what management was saying, too.

So I take you back to the October 25th, 2012, meeting at John Freeman's lake house, where the following was said among Arnie Ralenkotter, John Freeman, where Mr. Wombold was also a participant in this meeting as well.

(The recording was played in open court, and the proceedings continued as follows:)

MR. HAMILTON: That was the man that John -- that Mark Hazelwood promoted to be vice president, John Freeman. And what you're seeing is that this is not an aberration for him. We heard him, how he was communicating about Queen when on the sales trip with Chris Andrews. We heard him talking about reflection. Now we hear him talking about what to do to customers, "F them early, F them often." And Brian Mosher explained that he was unmistaken in what Mr. Freeman -- in the sentiment that was expressed there at the group where he was present. He says he understood it to mean, "Lie, cheat, deceive them early and often." That is exactly what the proof has shown.

As I wrap up my overview of the existence of a conspiracy, some things I want to point out. I've already touched upon them. But wire communications, you have seen countless wire communications. All of the e-mails between the conspirators were wire communications. As it relates to wire fraud, the question is, did they cross state lines. And you have seen dozens of wire communications that crossed state lines. How do we know this? Arnie Ralenkotter worked in Kentucky. John Spiewak worked in Ohio. Brian Mosher worked in Iowa. And that's just where they were based out of. They traveled all over the country in different regions. So most

of the e-mail communications had to cross state lines.

Now, there are some specific e-mail communications that we are going to show you how we very carefully, methodically proved that they crossed state lines, but it was certainly foreseeable and known to all of the conspirators that the way in which this conspiracy was going to be furthered was through wire communications, and that's what puts it within the reach of the federal wire fraud statute and the conspiracy to commit the same.

We also had e-mails between the conspirators and the customers. I've already shown you at least two. You saw the e-mail, the forward, to PI&I. You've also seen the e-mail communication to Queen. PI&I was in Ohio. And Queen was in North Carolina. Interstate wire communications.

It was also known to the conspirators that the mails would be used to send rebate checks, right? These rebate checks were fraudulently calculated, and they were sent out every month. Ms. Jones memorialized this is an e-mail, Government Exhibit 2149, when she asked Brian Mosher, "Would it be okay with you if I start having the checks under $5000 sent via regular mail? It would help reduce the cost and also help reduce the time required. We are up to 46 manual rebates now. Fifteen of them were under $5000 last month. I would continue sending the rest via FedEx."

So, over-5000 is going by FedEx, which is an


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 145 of 256 PageID #: 12779

interstate commercial carrier, and the other ones are going by U.S. Mail. So we have 46 manual rebates. Brian Mosher testified on cross-examination, as a matter of fact, that he had more than 70 manual rebate customers that he was cheating. The mails were used. Interstate commercial carriers were used. All the conspirators knew it.

Here are four Government Exhibits: 2001, BP Express; 2002, JTL Carriers; 2003, Halvor; 2004, Ryder. Those are checks, and those are collections of rebate checks. So in Government 2001 you're going to see a series of rebate checks, same thing with 2002, 2003, and 2004. And the testimony for BP Express from Katy Bibee was that those checks were mailed. And the testimony, based on Government Exhibit 2249, which we just looked at, which was Katy Bibee explaining her method of getting checks over $5000 to customers, these checks were Fed Ex'd, because they were over $5000.

And what lulling power did these checks have on the customers? Arnie Ralenkotter told you. He said that it had the customers think that they were legitimate, that they were getting what they had coming to them, and that they were saving money. The effect, the known effect that sending a fraudulently calculated rebate check would have on a customer, was to lull them into keeping them as Pilot customers, to make them think that they were continuing to honestly receive their rebate check, when in fact they were not.

The United States submits to you that with the evidence that I've just reviewed, that it has proved beyond a reasonable doubt that a conspiracy existed between two or more persons to commit the crimes of mail and wire fraud.

Now, I want to focus our attention -- and we've touched on some of them so far. I've certainly been pointing out that Mark Hazelwood promoted John Freeman, and that is significant to you. We talked about Scott Wombold being present at the -- at the meeting where Brian Mosher was selected. But I want to spend more time now in talking about these four defendants and their connection to the conspiracy that the United States has proved existed beyond a reasonable doubt.

We're going to start with defendant Heather Jones. As you heard, Defendant Heather Jones' principal role in the conspiracy was to send spreadsheets to Brian Mosher and to receive them and then to do what Brian Mosher referred to as "the gyration," the taking the number that Brian Mosher sent back and turning it into what Brian Mosher referred to as "a believable number."

And I asked Mr. Mosher, "Could the fraud have occurred without Ms. Jones' sending you the spreadsheet?"

He said, "No, sir."

And I said, "Was that true for every month?"

And he said, "Yes."


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 147 of 256 PageID #: 12781

And I asked, "From 2008 to 2012?"

And he said, "Yes."

From 2008 to 2012 Heather Jones was essential to the successful operation of the conspiracy. And what the instruction is going to show you is that not every conspirator has to play the same role. There are different roles in the conspiracy. Look, in any organization, not everyone can be a leader. There are leaders, and there are nonleaders. Heather Jones was doing what Brian Mosher asked her to do. No question about that. But she knew that she was participating in a fraud and a deceit on these customers, and she knew that her participation was essential to the successful completion of it.

We're going to hear in a moment how she, on her own, volunteers comments in the breakout session. Nobody asked her to do that. She did it. Let's listen to what Brian Mosher said. Brian Mosher, in rebate fraud school, touches upon, touches upon, Heather Jones' role in the successful operation of the conspiracy.

(The recording was played in open court, and the proceedings continued as follows:)

MR. HAMILTON: So what's significant about this? Well, Brian Mosher testified that from 2008 to 2012, that Heather Jones was indispensable to the success of the conspiracy. Brian Mosher has a cooperation plea agreement with


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 148 of 256 PageID #: 12782

the United States. And you are right to look carefully at, in my opinion, who is in that situation. Brian Mosher had no idea he was being investigated when he said this about Heather Jones and the important role that she played in the conspiracy. This, right here, corroborates exactly what Brian Mosher was saying on his direct examination, that she was indispensable to the successful operation of the conspiracy. "I send this back to Heather, and Heather makes the backup equate to $20,996.63." He said 21,000. It was Heather Jones that figured out how to make it look believable.

And as I asked him, "So what is the gyration that you're referring to?"

And he said, "The creating of a believable number and the spreadsheet backup that goes with it."

And this is what I alluded to a moment ago. So I want you to try to take yourself-- We've shown you pictures of Pilot headquarters. There is not any picture of the breakout room in which they were in, but, you know, imagine yourself, as best you can, in your imaginary breakout room at a headquarters office building, and this conversation is going on. Brian Mosher is giving his presentation. And Heather Jones, on her own, just chimes in. You hear her chime in on her own. You don't hear anyone asking her to do it. She says the following.

(The recording was played in open court, and the


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 149 of 256 PageID #: 12783

proceedings continued as follows:)

MR. HAMILTON: I asked Janet Welch, who was present for that, "What would be the importance of that?"

Janet Welch says, "The fewer that asked for backup, the more you can do it."

I said, "The more you can do what?"

And she said, "Manual rebates and change the discounts."

I said, "For the purpose of doing what?

"Cheating the customers."

"So the fewer who ask for backup, the more you can cheat," that was her mutual understanding of the point that Heather Jones was making. And one of the instructions that you are going to receive is that you are not supposed to leave your common sense at the door when you go into the deliberation room. And this is an opportunity to take it out. Why else would Heather Jones chime in and make this point, "To the point of them not knowing, very few of them ask for backup."

Well, Brian Mosher is there teaching people how to cheat with rebate fraud, and she makes this point. And the proof has shown that there were people who were new to Pilot, like Jason Holland, you heard, who actually said something expressing concerns about a gray area. Heather Jones made that comment, the circumstances show, to encourage other


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 150 of 256 PageID #: 12784

people to join in to the conspiracy, like she had done.

And her statement is grounded in her personal participation in the conspiracy from 2008 to 2012. Let's look at that. Government Exhibit 1502, Brian Mosher tells her, "We are going to give JTL Trailers cost plus .04/retail minus .04, off retail. They think it is cost plus .02/four cents off retail."

Heather Jones writes, "Okay."

You know what "Okay" is? Agreement.

Then we see Brian Mosher and Heather Jones exchange e-mails, spreadsheets. And you'll remember Brian Mosher's testimony when we walked through a number of spreadsheets that were sent between Brian Mosher and Heather Jones. And here is one of them, where Brian Mosher cuts a rebate from 79 -- $7,941 to $5,000, Government Exhibit 1515.

Then, in October, this is October of 2009, Government Exhibit 1515, where this customer, JTL customer writes, "Heather, can you please start sending me our daily pricing at all locations? Brian said you would be able to do this for us."

And she sends to Brian Mosher, "What pricing do you want me to send Jeff with JTL?"

And Brian Mosher writes, "He thinks it will be cost plus .02/retail minus .04, but send cost plus .04/retail minus .04."


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 151 of 256 PageID #: 12785

Heather Jones says, "Will do. Thanks."

"The customer thinks one thing, but I want you to send another." That's agreement.

JTL lost $119,000. Pilot profited $286,540 for the time period at issue.

And I'm going to pause here to make this point, to remember the testimony of Mr. Jennings, a guy who was paid $250,000 to review six customers. And he was poking at Mr. Seay's conclusions because there did not appear to be a basis for the cost plus number that was chosen and the time period. Well, if you look at the cost plus number, which was cost plus .02 for JTL, the reason why that was chosen by the -- and requested by the United States of Mr. Seay is because that is the e-mail. You can look over at the e-mail. Cost plus .02 is what Brian Mosher told this customer that they were going to get. So that's why the cost plus .02 pump fee was selected for this calculation by Mr. Seay.

And the time frame at issue, from January 1 to 20 -- January 1, 2010, to January 31 of 2012, was because that was a time period that was covered by the JTL -- the fraud on JTL. But as Mr. Seay testified, P&L statements were not available before January of 2010 for this particular customer. It's all that was available. So that is why this time frame -- the time frame for that cost plus pump fee was chosen, and that is the consistent reason for all of the calculations that were

done, was because there was an e-mail in the record or testimony in the record that supports the cost plus number that's included in Mr. Seay's calculations.

Next customer related to Heather Jones, Amerifreight. And here is an e-mail from Cathy Sokolowski, telling this customer that if it does business with Pilot, it will receive a cost minus .03 discount. The customer in Government Exhibit 1602 tells Pilot that it wants the cost minus .03 and is willing to lock down its network to receive it. So this customer is definitely communicating that this discount is important to it. It's so important that it's willing to lock down its network to Pilot.

Then we see this e-mail that we've seen a lot of in this trial, Government Exhibit 1602, where Heather Jones writes to Scott Wombold, "Will you please approve the new discount for Cathy's account, Amerifreight, of cost minus .03 across the network? It is a manual rebate. Per the attached message, they have locked down their network to Pilot Flying J."

Scott Wombold writes back. This is February 11th of 2011. "Cost minus .03? How big is this discount?"

Brian Mosher writes two words, "Manual Rebate."

Scott Wombold writes, "Approved," dot, dot, dot. "Still pretty aggressive," dot, dot, dot.

Heather Jones commences her back-and-forth


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 153 of 256 PageID #: 12787

spreadsheet routine with Brian Mosher in furtherance of the conspiracy. This is Government Exhibit 1605, Government Exhibit 1606, and then Government Exhibit 1607 and 1608 -- excuse me, 1606, where we see Ms. Jones now telling Ms. Yarber——now Ms. Jones is giving direction to someone——"Please let me know if you have any questions. I appreciate your help."

What we see here is that Ms. Jones has taken the cut amount of $46,000, done the gyration that Mr. Mosher talked about, and now sent it to Barbara Yarber to have the payment go out of $46,392.84.

Here we see in Government Exhibit 1608 the check request for $46,392.84 to go to Amerifreight, which was cut from their original discount, their originally calculated rebate based on the cost minus .03.

Then in Government Exhibit 1609 we see Heather Jones sending the backup that's fabricated to go along and match the fraudulently calculated rebate to the customer. There is another e-mail in interstate commerce that's being sent to the customer, concealing the material fact that this is -- this calculation is not based on a cost minus .03. Who knows what it's based on. It's just made to match the number on the check that they're sending out, to lull them into believing that the check they're receiving has been honestly calculated.

And I misspoke when I said "check." This actually


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 154 of 256 PageID #: 12788

was a customer that received their rebate by way of ACH payment. So here is yet another wire in interstate commerce where the customer is receiving an ACH payment in the amount of the fraudulently calculated rebate. And we heard from Meredith Vaughn, Kimberly Townsley, and Allison Cimpl-Wiemer, who worked at the bank in Wisconsin, who collectively told you that the ACH payment went from Knoxville to Alabama up to Wisconsin for this customer's -- up to this customer's bank account. Fraud in interstate commerce.

The loss to Amerifreight for one month, just one month, was $7,000. The profit to Pilot was $67,000.

And there are other examples where Brian Mosher told Heather Jones that there was going to be rebate fraud. Here is Marathon Electric, where he says that, "I told them we will go to cost plus .03 for the notes. I still want you to run the manual rebate at cost plus .045."

Heather Jones expresses her agreement. She says, "Okay."

Now, let's turn to Karen Mann. And you will recall that Karen Mann sent an e-mail on January 15th of 2009, where she said that she had just increased the cost plus numbers for a customer, and she said that she's been doing this a lot more and loves it. And what this e-mail shows is what was going on before January 15th of 2009, where Arnie Ralenkotter wrote, November 13th, "Karen, did you send this detail to the


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 155 of 256 PageID #: 12789

carriers? If so, simply adjust the cost plus number. So better yet, don't send the backup and see if they call and ask."

And Arnie Ralenkotter writes -- excuse me, Karen writes, "I do not send the details unless they ask for it. These rebates will not have backup."

Arnie Ralenkotter writes, "Good."

Karen Mann's knowing and voluntary participation in the conspiracy.

Then Karen Mann writes, in response to an e-mail from Tim Prins, who had asked Karen Mann to remind him, "We can't adjust Interstate or Patrick, since they caught it last month."

And Karen writes, "Arnie said he didn't need to see the two that watch theirs closely."

Then we have Government Exhibit 2147, where Tim Prins writes to Karen, "I need a number of price reports set up for several customers I've met in the last week," and refers to one, "A. Duie Pyle. Send cost plus .07, just the locations like Prins Trucking report. This will be a manual rebate, and the customer's thinking cost plus .03, but we are putting in an extra four-cent markup to the cost."

Karen Mann writes, "Do I need to send a daily cost plus report to A. Duie Pyle?"

And Tim Prins writes, "Yes. We are sending cost


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 156 of 256 PageID #: 12790

plus .07, then rebating cost plus .07. He thinks it's .03, but the rebate will match the prices you send him."

"Thinks it's a cost plus .03, but we're going to cover up the fact that it's a cost plus .07 by sending him pricing that matches that."

Karen Mann says, "Gotcha. Thanks." Agreement.

Then Karen Mann, in February of 2009, lets Arnie know, "I just -- I adjusted our manual rebates by doubling the cost plus numbers."

And Arnie Ralenkotter writes, "Okay. Great." More mutual understanding and agreement.

Again, after the January 15th, 2009, e-mail where she writes, "I've been doing this a lot more and love it," she sends an e-mail to Arnie Ralenkotter, attaching the spreadsheet that shows "Quoting Customer" and "Discount Rebate," showing the amount that was -- showing the cost plus number that was being quoted to the customer and the amount that was actually being rebated to the customer. Knowing and voluntary participation.

Government Exhibit 2187 involving Karen Mann. You heard testimony about this from Lexie Holden and Janet Welch. Janet Welch tells Arnie Ralenkotter, in response to his e-mail -- so Arnie Ralenkotter, December 19th of 2011, writes, "Ask Janet about Janet manual. We should do Lexie manual and Karen manual, also."

Janet Welch writes, "The three of us have spoken about it," meaning Karen Mann, Lexie Holden, and Janet Welch. That is concerted corroborative effort to further the conspiracy.

And I asked her, "What were you communicating to Mr. Ralenkotter?"

She said, "That I explained my spreadsheet to them, and we were all three going to do it exactly the same. It's a spreadsheet that we kept that was by customer that we were adjusting each month and sending the manual rebate, and it would have their guidelines, it would have what the actual rebate was supposed to be, and then it would have the changed rebate." Working together to achieve the common goal of cheating customers and using the same kind of way to track it.

The United States has proved beyond a reasonable doubt that defendant Karen Mann knowingly and voluntarily joined the conspiracy.

The United States has thus far proved beyond a reasonable doubt that Heather Jones and Karen Mann knowingly and voluntarily joined the conspiracy, based on their own actions and conduct.

Defendant Scott Wombold. And when you think about Defendant Scott Wombold, remember Lexie Holden's testimony January of this year, January 18th of 2018, and I asked her, "When you had this discussion with Mr. Wombold after


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 158 of 256 PageID #: 12792

April 15th of 2013, what, if anything, did Mr. Wombold say about Brian Mosher?"

And Ms. Holden answered, "Mr. Wombold made the comment that he was aware that rebate adjustments were happening, but that he if -- if he was guilty of anything, it was sticking his head in the sand."

Of course he knew what Brian Mosher was doing. He admits as much on this recording that you heard from the rebate fraud school session that was led by Brian Mosher. Let's listen.

(The recording was played in open court, and the proceedings continued as follows:)

MR. HAMILTON: Now, there is more to that, but I wanted to focus in on that first sentence that he says -- rather, the second sentence, "Brian and I have worked as closely together as anybody. I might be a little more in your camp."

Scott Wombold knew that the Brian Mosher camp was the fraud camp, the rebate fraud camp, the lie-to-the-customer camp, the cheat-the-customer camp, and he admitted as much when he told that to Lexie Holden.

So when you're thinking about what it is that Scott Wombold means when he says, "might be a little more in your camp," what's the other camp? It's the Brian Mosher camp. It's the camp that he admitted to Lexie Holden that he knew


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 159 of 256 PageID #: 12793

was part of rebate adjustments that he stuck his head in the sand about.

Scott Wombold, and the proof shows this, knew what the camp of Brian Mosher was, because he was present on October 25th, 2012, when the following was said.

(The recording was played in open court, and the proceedings continued as follows:)

MR. HAMILTON: "Whatever Brian's best thing he does." John Freeman immediately says, "Manuel," and that he had to, one time, buy an airplane to correct Manuel. There was no question everybody knew in this meeting that Brian Mosher was in the rebate fraud camp. No question about it. And there is no question that Scott Wombold knew exactly what John Freeman was talking about when he referred to "Manuel."

(The recording was played in open court, and the proceedings continued as follows:)

MR. HAMILTON: You don't want to get into a moral or ethical conversation when you're talking about rebate fraud, because it's fraud.

And Mr. Freeman says, "Say what you do, do what you say, on the surface."

And then he goes on to say, "You cannot have a case where you don't do what you say in this business. Now, again, I'm not talking about the manual stuff."

"I'm not talking about the manual stuff," because


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 160 of 256 PageID #: 12794

everybody in that room knew that when you're talking about "the manual stuff," you are not talking about doing what you say and saying what you do; you were talking about fraud and lying, which is why it would need to be excluded from that as well as excluded from a moral and ethical conversation.

And Scott Wombold knew it, too. Scott Wombold knew exactly why Brian Mosher was selected to teach manual rebate fraud. You just heard it on the recording. He was present when Scott -- when John Freeman identified him as a person who knew what Manuel was and who would be good at teaching it. And then you heard several -- several moments later where Scott Wombold says, "Yeah, let's test on that."

Scott Wombold, July of 2012, selected Brian Mosher to be the point of contact and the account representative for Ryder. And he writes——this is Government Exhibit 1801——"This will be a great account for Brian," and some kind of emoticon there, a big -- a face with the mouth open. And that's right, that's probably the way that Ryder felt after all this was over, after dealing with Brian Mosher, having Scott Wombold select him.

Scott Wombold said, "It is a rebate. Brian will be figuring." This is August of 2012. Scott Wombold, vice president of western sales, knowing exactly what camp Brian Mosher is in, the fraud camp.

Again, Lexie Holden said that when she talked to


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 161 of 256 PageID #: 12795

Scott Wombold after April 15th of 2013, Scott Wombold told her that he was aware that rebate adjustments were happening, that if he was guilty of anything, it was sticking his head in the sand. Look what Scott Wombold put in place by putting Brian Mosher in charge of the Ryder account. Fraud. Completely fabricated checks and backup. You recall the testimony that that 78,878-dollar figure came from a completely made up number, $79,000, that Brian Mosher sent to Lexie Holden, and then she fabricated the backup and sent it on to Ryder.

Then the same thing happened the next month, Brian Mosher completely made up the number $90,000, Lexie Holden completely made up the backup for it, both sent to Ryder to cheat them and to defraud them. The loss that you see here of $82,236.77 and the profit to Pilot of $576,309, that was all put into motion by Scott Wombold's selection of Brian Mosher, who he said this would be a great account for, who he knew was in the rebate fraud camp, his selection of Brian Mosher for Ryder.

And I come back to Government Exhibit 1602. And everything that we've just gone through, especially what Lexie Holden told you that Scott Wombold said, should inform your deliberative process about what he understood "Manual Rebate" to mean in this exhibit when he asked, "Cost minus .03? How big is this discount?"

And Brian Mosher writes two words, "Manual Rebate,"


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 162 of 256 PageID #: 12796

nothing else. That's the answer?

"How big is this discount? How big is this account?

"Manual Rebate."

Brian Mosher explained to you that by saying, "Manual Rebate," that Scott Wombold understood exactly what he meant by that; he says, "Why are you asking me? This is a manual rebate. We're not going to really pay them cost minus .03. So who cares?"

Scott Wombold writes, "Approved," dot, dot, dot. "Still pretty aggressive," dot, dot dot.

As I said, when you think about this, think about Lexie Holden's testimony and what she said that Scott Wombold said after April 15th of 2013.

United States has proved beyond a reasonable doubt that Defendant Scott Wombold knowingly and voluntarily joined this conspiracy. Scott Wombold was the highest ranking person in Brian Mosher's breakout session. Did you hear him on that recording say, "Stop. Brian Mosher, this is -- this is wrong. Don't do this"?

Instead what you heard was a bunch of "maybe"/"might" mush, "maybe"/"might" mush, presenting it as an option. "Oh, Mr. Holland, maybe you should tell the customer," but not, "This is wrong. Don't do this. This is fraud. Lying to customers is wrong. This is not what we stand for at Pilot."

The vice president of sales was in the room when Brian Mosher was teaching this; and he presented it, in response to Mr. Holland's question, as an option. "You figure out how to best use this spreadsheet. You figure it out. Wrap your mind around it." "Maybe"/"might" mush.

His presence there and the words that he spoke in front of the subordinates approved what Brian Mosher was doing, presented it as an option. And that Amerifreight e-mail shows you that he knew exactly what he was approving. Lexie Holden's testimony shows you that Scott Wombold knew exactly what he was approving when he was approving the manual rebate response that Brian Mosher gave with Amerifreight.

Let's turn to Mark Hazelwood now. And I want to begin our discussion about Mark Hazelwood by talking about Smith Transportation. So the story with Smith, as you'll recall, is that Tim Prins told Arnie Ralenkotter that he was offering a cost minus .02 deal to Smith, and Arnie Ralenkotter says, "Put the actual billing in as cost plus .02 and see if he notices," a four-cent difference from what the customer believed they were getting. So customer thinks he's getting cost minus .02, Arnie Ralenkotter says, "Put it in and see if he notices." Sounds a little bit like, "Sneak a penny, see if he notices." This is how Arnie Ralenkotter operates.

And Tim Prins sends an e-mail to Karen Mann, so she's implicated in this as well. Tim Prins sends an e-mail

to Karen Mann, says, "See Arnie's advice and set Smith up accordingly," which she did. Mutual understanding, agreement, participation in the conspiracy. So that's July of 2008.

Now we're going to jump ahead to October of 2008. A little more than three months have gone by. Tim Prins tells Arnie Ralenkotter, "We're in a situation at Smith. The deal we quoted them was not the deal that we implemented back in July."

Of course Arnie Ralenkotter had directed the team to cheat them, so it wasn't put in. "They were quoted cost minus .02. We billed them cost plus .02. There's a difference of least three months of $60,000."

Dan Peyton came in here and testified that he worked at Pilot from 2003 to 2010. He reported to Mark Hazelwood during that time. He was a national account representative. Dan Peyton learned about what was going on here because he was working with U.S. Xpress that was working towards an acquisition that related to Smith. So U.S. Xpress had discovered this and communicated it to Dan Peyton. Dan Peyton called Arnie Ralenkotter and Tim Prins and learned what was going on, learned about fraud that had occurred. He testified that he called Mark Hazelwood. He's asked why. He said, "Because I was upset about how -- what they did to Smith, and we needed to get it fixed in order to make it better with U.S. Xpress."

He was asked, so what did Mark Hazelwood tell -- what did you tell? What did you tell Mark Hazelwood? Mr. Peyton said, "I told Mark that Arnie and Tim didn't put the discount in, that they cheated the customer out of four cents a gallon."

"And what did Mark Hazelwood say?"

"Mark said he'd take care of it."

Then what we have is an e-mail from Arnie Ralenkotter, October of 2008, to Dan Peyton, Karen Mann, and Mark Hazelwood, where he tells Karen, "Do what is necessary to rebate the difference between what they thought they got and what we"——and here come the air quotes——"'mistakenly' were charging for the three-month period." (Indicating.)

There was no mistake here, the proof has shown. And the proof has shown that this cheat, the fact of the cheating, was communicated to Mr. Hazelwood by Dan Peyton, and here Mark Hazelwood is on an e-mail where it's being referred to as "mistakenly," in quotes.

Ultimately Smith Transport is paid back $67,000 and this reminds me of -- do you remember when John Freeman was recounting the story of Queen to Chris Andrews and Vince Greco, and he says, "And then what happens if you get caught?"

And John Freeman says, "You pay up."

Well, that's what happened here. There was no way out. They paid up. But the teaching point here, Mark


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 166 of 256 PageID #: 12800

Hazelwood was told by Dan Peyton that this customer was being cheated. That was Mr. Peyton's testimony, "The customer's being cheated."

But the proof has shown that being told that a customer was being cheated in October of 2008 would have come as no surprise to Mr. Hazelwood, because in February of 2008 he had received an e-mail from Janet Welch that said, "Mark, Arnie has approved a better-of deal for John's Koleaseco. Is this okay with you? He is offered cost plus a cent and a half/retail minus .045 cents, so we are setting it up as cost plus .025/retail minus .045."

And his response was -- when Janet Welch is saying, "We've offered one thing, but we're going to do another," his response is, "How many gallons?"

And she answers, "100,000 to start with, 60,000 more coming from Simmons."

And he writes, "Okay."

What Janet Welch forwarded to Mark Hazelwood was what you see next, where Arnie Ralenkotter says, "Okay, put it in the billing system as cost plus .025/retail minus .045, unless you think they have a way to track the cost. Do not reflect pricing."

Mark Hazelwood's response to the forward, "How many gallons?" That's all that mattered to him. "How many gallons?"


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 167 of 256 PageID #: 12801

Mark Hazelwood knew that cheating was going on, because it was coming to him in trip reports. Here is a trip report from John Spiewak about Online Transport. "They continue to use the IDSE system, and he says much of their volume decreased since they installed bulk tanks. I am going to change their deal without notification. There is no way he sees the Pilot invoices."

Another trip report from Jay Stinnett, October of 2009, where Jay Stinnett sends the trip report in, as directed, to Sherry Blake, who, as you know, was -- her job was to print them out, put them in a binder, and give them to Mark Hazelwood for his review. "She doesn't really understand fuel discounts much. I told her I would give her another half cent. She will never know that isn't going to happen."

Another trip report from One World -- related to One World Logistics, 2009. "TA was in and had offered a cost plus half a cent/retail minus half a cent. I told them that I would match their deal. He did not know their current discount, so I'm going to tell him I will change their discount and make no changes." Paraphrased that means, "I will lie to them. I'm going to lie to them."

Another trip report from Jay Stinnett to Mark Hazelwood, we're -- about Action Expediting, where he writes, "His discount is manual, and he asked for more, which I will probably do in a few locations, as far as he knows."


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 168 of 256 PageID #: 12802

Another trip report, from Arnie Ralenkotter, 2008, related to PI&I. And we've already looked at that one where he said he was going to lie to PI&I. And in that same trip report was a comment related to Falcon, "Fuel optimizer not real bright. Just met the newest bulbs and they seem slightly smarter. I will work some up aggressive prices to move TA gallons. Good thing I don't actually need to change our billing. They do not reconcile with fuel dispatch. Imagine that."

I asked Mr. Ralenkotter where Mark Hazelwood fit into the hierarchy at Pilot at the time he sent that e-mail, and he said he was a vice president. And I said, "So why would you be comfortable sending an e-mail that says you're going to lie to the customer to the vice president of Pilot?"

He matter-of-factly answered, "With some of our customers, it was how we did business.

"Well, why would you send that to Mr. Hazelwood?

"To let him know what I was doing."

Mr. Ralenkotter testified that he did not recall receiving any negative response to his trip reports from Mark Hazelwood. And you saw proof that Mr. Hazelwood knows how to express his disapproval.

"John, Scott, RUFKM. Get it done now."

You remember Mr. Ralenkotter explaining what RUFKM means.


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 169 of 256 PageID #: 12803

Mr. Tim Clark testified, on cross-examination, when asked, "And you never told Mark Hazelwood that you were giving the customers a different deal than you had agreed to, did you?"

Mr. Clark said, "In the P&L reviews, I would tell them they're not getting the deal they think they're getting."

And Mr. Mosher was asked, "Why did your manual rebate changes change? Why did your manual rebate practices change in 2008?"

He said, "That's when we started to actually -- started actually changing them."

And I said, "Why did you start changing them?"

And he said, "I was told it was a good idea to do so.

"Who told you that it was a good idea?"

"Mark Hazelwood."

Mark Hazelwood. And that's exactly consistent with what you hear in the recording at the direct sales management meeting in Orlando, Florida, on February 18th, 2013, Mark Hazelwood leading the fraud charge. Let's listen.

(The recording was played in open court, and the proceedings continued as follows:)

MR. HAMILTON: "Customer A looks every orifice you have. Customer B doesn't even know you have an orifice."

Sounds a little bit like identify, right? Sounds a

little bit like Arnie's "sneak a penny" e-mail, right? "See if they notice."

Then Mr. Hazelwood says:

(The recording was played in open court, and the proceedings continued as follows:)

MR. HAMILTON: "Time to do it. Time to do it, right?" says Mr. Hazelwood. "It's time to expand the fraud. Let's make a list of the customers who don't know they have orifices, expand the fraud."

(The recording was played in open court, and the proceedings continued as follows:)

MR. HAMILTON: Mark Hazelwood says, "We've got Manuel. Manuel does a hell of a job," right after he says "Aunt Bea, that's what we'll call this, Aunt Bea pricing."

"Aunt Bea, Aunt Bea pricing. We got Manuel. Manuel does a hell of a job." The tying together of Manuel and Aunt Bea tells you all you need to know about Mark Hazelwood's knowledge and his voluntary joining and leading of this conspiracy and his role.

"Manuel. We got Manuel. Manuel does a hell of a job." What's the hell of a job that Manuel is doing? Well, you've seen it in the charts. Making Pilot money, not giving all of the customers what they're due, cheating them out of what they're due. Making Pilot money, more money, that's the hell of a job that Manuel is doing, and had been doing. And

now he is looking to expand the fraud by identifying the customers who don't even know they have orifices.

Government Exhibit 2217, February 20th of 2013, after the meeting, Mark Hazelwood tells John Freeman, "Great recap. Let's get cost plus B plan going ASAP. Aunt Bea. That's what we'll call this, Aunt Bea. Got Manuel. Manuel does a hell of a job. Let's get cost plus B plan going ASAP."

John Freeman writes, "Just met with Joe. Opportunity is there." You heard testimony who Joe is. Joe is Joe Cate. He is the -- one of the IT guys, right? He helps build infrastructure, helps build what would be needed to be able to take advantage of ident- -- once you identify the customers who don't know they have orifices.

Mark Hazelwood writes back, "Awesome."

Mark -- excuse me, Brian Mosher explained that the new list for the Customer B's was to be the beginning of the new Customer A/Customer B off-invoice discount fraud for customers. It was going to be taking manual rebates to the next level and doing it with customers that were receiving discounts off-invoice.

United States has proved beyond a reasonable doubt that Defendant Mark Hazelwood knowingly and voluntarily joined this conspiracy.

The goals of the conspiracy were more money and more market. You saw proof of that with Arnie Ralenkotter, who

said that he was cheating them to make more commission and more profit. You saw this with Katy Bibee, about more market share, who said that she was lying to customers to keep them as customers of Pilot. And you saw this in the e-mail between Scott Wombold and Brian Mosher about Amerifreight, where Brian Mosher wrote, "Should I have let them go to Love's?"

The goals of the conspiracy, to make more money, maintain and grow market share for Pilot by baiting customers to do business with Pilot rather than the competition, based on false promises of discounts.

There are also individual wire counts that are charged in the indictment. They are Counts 2, 3, 4, 5, 6, 8, and 10, and I am going to quickly walk through the documents that show this.

Count 2 is a wire fraud count related to the Amerifreight e-mail, February 11th of 2011. It shows that the e-mail from Scott Wombold traveled in interstate commerce. And there are documents that -- that support that. Brian Mosher testified that he was in Iowa at the time that that happened. Government Exhibit 1602 supports Count 3, March 11, 2011, count, which was an e-mail from Heather Jones to Brian Mosher. Scott Wombold is charged in this count because he approved the manual rebate fraud for Amerifreight. So that's Government Exhibit 1605 for Count 3.

Count 4 is another wire fraud count, which is


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 173 of 256 PageID #: 12807

Government Exhibit 1606, which is an e-mail from Heather Jones and Scott -- it's an e-mail from Heather -- excuse me, an e-mail from Brian Mosher to Heather Jones. And Scott Wombold is charged in this count. And it relates to Amerifreight as well.

Count 5 is another wire fraud count. And the basis for that is Government Exhibit 1518. That is an e-mail from Heather Jones to Brian Mosher, who was in Nebraska at the time.

Count 6 is a wire fraud count charging Heather Jones for a January 13, 2012, e-mail related to JTL. And the testimony showed that Brian Mosher was in Iowa at the time. Again, that's Government Exhibit 1519.

Government Exhibit 2217 supports Count 8, which charges Mark Hazelwood with wire fraud. The testimony showed that he was in Texas at the time when he was encouraging the continuing -- the beginning of the Aunt Bea cost plus B fraud, the expansion of the fraud.

Count 20 -- excuse me -- Count 10 is supported by Government Exhibit 2219, where Mark Hazelwood sends an e-mail from Texas to Knoxville through the Knoxville server. And that's a point I want to make. You heard from Bob Massengill, all of the e-mails went through the Pilot server in Knoxville, Tennessee. So all of the e-mails left and traveled in interstate commerce.

I'm going to walk through the false statement counts. Scott Wombold is charged with false statement counts in Counts 11, 12, and 13. To prove a false statement the United States has to show that Scott Wombold made a statement, the statement was false, the statement was material, and that Scott Wombold acted knowingly and willfully, and that the statement pertained to a matter within the jurisdiction of the executive branch of the United States government.

Count 11 charges that Scott Wombold stated that he was not aware of any specific customers other than Star Transport whose rebates were reduced by Pilot employees without the customer's knowledge or approval. This was false when made to the FBI and IRS agents because you have heard testimony that Scott Wombold knew, in fact, that customers' rebates were being reduced. And I point you to the testimony of Lexie Holden. Also there was proof from the October 25th, 2012, sales meeting where Scott Wombold heard what had happened to Western Express and that John Freeman had cost them more than a million dollars. Scott Wombold knew that when he said that to the agents it was false.

Count 12, that's -- charges that Scott Wombold stated that reducing rebates without the customers' knowledge was not discussed during the sales meetings. That was clearly false. Scott Wombold was present when Brian Mosher taught people how to reduce rebates without the customers' knowledge.

That was a false statement, Count 12.

Count 13, Scott Wombold stated to the FBI and IRS that he was -- that he had never heard the term Manuel used to refer to reducing customers' rebates without their knowledge. Here is the direct sales -- the direct sales October meeting.

(The recording was played in open court, and the proceedings continued as follows:)

MR. HAMILTON: Scott Wombold was present when that was said. When Scott Wombold said that he had never heard that term referred to reducing a customer's manual rebate without their knowledge, that was false.

Defendant Hazelwood is charged with witness tampering in Count 14. In order to prove this beyond a reasonable doubt, the United States has to prove beyond a reasonable doubt that Defendant Hazelwood attempted to corruptly persuade Sherry Blake, the act of knowingly and willfully, that he acted with the intent to hinder, delay, or prevent the communication of information to a law enforcement officer, that the information related to the commission or possible commission of a federal offense, and that he believed it was reasonably likely that Ms. Blake would communicate information related to the possible commission of a federal offense to a law enforcement officer.

Let's walk through this. First, what was the statement? You heard Ms. Blake testify that on June 9th of

2014, she got this cell phone call -- she had the cell phone call with Mark Hazelwood where he said, "Hey, I know you told Rusty's investigator that I read the trip reports. I just need you to know that I didn't read the trip reports. I didn't have any way to respond to trip reports. I know I was a bulldog when I asked for them, but I just need you to know that I didn't read them. Do you understand?"

Ms. Blake said she felt like she had been used and betrayed. Why? Because Mark Hazelwood's statement was false. She knew that Mark Hazelwood, for years, had been asking for the trip reports. She had been putting them in a binder for him for years, delivering them to his house. You saw e-mails sending them to him while he was in Italy. And Mark Hazelwood himself had sent an e-mail, "Look, as a reminder, I also want to see all trip reports every week, before noon on Friday." Mark Hazelwood's statement was false. He had responded to trip reports.

Government Exhibit 606B, look at this, a response from Mark Hazelwood, "Awesome. Great job. Get 'em," to a trip report.

606G, Mark Hazelwood writes to Brian Mosher, regarding a trip report, "Great job, especially on Heartland. The Crete tech issues piss me off." He's writing about two customers that are in the trip report. This is where common sense comes in. The trip reports had both of those, one in

the middle and one at the end. You don't make a comment about something that you haven't read.

Mark Hazelwood, Government 606H, writes, "Great week, guys. What location is loving quoting daily Platts for Estes?" He's referring to Love's, misspelled, in the trip report, but you see he's referring to Estes and Platts. He's read this trip report. He was lying when he told that to Sherry Blake.

This time line is important for witness tampering. April 15th of 2013, Mark Hazelwood meets with Special Agent Andy Chapman. He's told that federal law enforcement is executing a federal search warrant that concerned manual rebates to diesel fuel customers. So he's told that an investigation is going on by federal law enforcement.

Sherry Blake is also interviewed on that same day, and she tells them that she is Mark Hazelwood's assistant. Sherry Blake, later that day, tells Mark Hazelwood that she was interviewed by the FBI. All of this happens on April 15th of 2013. April 15th of 2013, Jimmy Haslam sends an e-mail to Mark Hazelwood saying that "Pilot Flying J was informed on Monday that it was the subject of a federal investigation. We are cooperating appropriately with any and all external investigations and are conducting our own."

What is the external investigation? The federal investigation, and they're cooperating.

Next in the time line is April of 2014. What do we know from the testimony of Sherry Blake? Mark Hazelwood and Joanne Hazelwood each give Sherry Blake $10,000 in April of 2014. April of 2014, Steptoe & Johnson, who is conducting the investigation for Pilot——these are Pilot's lawyers who are conducting an internal investigation of Pilot——schedule an interview for Sherry Blake to occur on June 11th of 2014. April of 2014 Sherry Blake tells Mark Hazelwood about the Steptoe interview and puts it on his calendar. May of 2014 Mark Hazelwood is terminated from Pilot but leaves with a paper calendar.

That brings us to June 9 of 2014. Mark Hazelwood does not work at Pilot anymore, he is not Sherry Blake's boss anymore, and they -- Hazelwood numbers call her a lot. This is two days before her interview with Steptoe & Johnson, which is scheduled for June 11th. And they talk. And she says -- you heard her testimony, where Mark Hazelwood says, "I know you told Rusty's investigator that I read the trip reports. I just need you to know I didn't read the trip reports. I didn't have any way to respond to the trip reports." You've all seen the proof that this was a lie. You need to determine why.

There are two ways for Mark Hazelwood to believe that it was reasonably likely that Ms. Blake would communicate information about trip reports to federal law enforcement.


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 179 of 256 PageID #: 12813

One, directly to them. This is why the time line was important. Remember, federal law enforcement had already identified Ms. Blake as a potential witness. On April 15th of 2013, she told them that she worked for Mark Hazelwood. She told Mark Hazelwood that, that she had met with federal law enforcement. Mark Hazelwood met with federal law enforcement and knew that there was an investigation. Mark Hazelwood knew that there was incriminating information in those trip reports, that if they got to federal law enforcement would put him in the scope of the investigation. That's what the circumstances show you. He was corruptly persuading her to prevent her from communicating with federal law enforcement directly. He also knew that she had an interview with Steptoe & Johnson two days later, and he knew from Jimmy Haslam's e-mail that Pilot was going to cooperate with external investigations.

THE COURTROOM DEPUTY: Mr. Hamilton.

MR. HAMILTON: Yes.

THE COURTROOM DEPUTY: You have five more minutes.

MR. HAMILTON: Thank you.

And in September of 2014, Steptoe & Johnson, as you heard, did in fact share what happened with the Sherry Blake interview with the federal investigation. Exactly what Mr. Hazelwood was afraid of could happen did happen. But he was trying to get in front of that before she had the

interview with Steptoe, knowing that she was aware that he read trip reports, knowing that there was incriminating information in those trip reports, and he wanted to corruptly persuade her to say that he did not. "Do you understand?" He said, "Do you understand?"

There's that One World Logistics e-mail again, saying that they were going to lie to the customer, sent to Mark Hazelwood. And it's this kind of incriminating e-mail that he didn't want any part of, wanted Sherry Blake to lie for him.

The United States has proved all of these defendants, Ms. Mann, Ms. Jones, Mr. Wombold, Mr. Hazelwood, are guilty beyond a reasonable doubt of all of the offenses charged in the indictment, and we ask that you return a verdict of guilty after your deliberations.

THE COURT: We'll take our afternoon break now. Let's see if we can get back at ten minutes until the hour, ten minutes until the hour.

(Brief recess.)

THE COURT: Mr. Vernia?

MR. VERNIA: Yes, sir.

THE COURT: You may proceed.

MR. VERNIA: Thank you, sir. Thank you, Your Honor. May it please the Court.

Ladies and gentlemen of the jury, I don't think we

need to be introduced anymore. My name is Ben Vernia, and I represent Heather Jones, sitting over at the counsel table. (Indicating.)

When I was a kid, I used to watch a TV show called *Dragnet*. I don't know if any of you ever watched that. It was about a couple of police officers in Los Angeles. Actually this is not a story about police officers or about TV. I only wanted to raise that because when I was a kid I remember looking up the name *Dragnet* in the dictionary to find out, what does it mean. And it had some police meanings, but, really, it comes from fishing, commercial fishing, where you let -- say you're out for red snapper and you drop this huge net into the water, and it's called a dragnet because it goes all the way to the bottom and you drag it along and you scoop up this school of fish and bring it out of the water and you dump it all out. And, you know, it's pretty effective. It's -- you know, you can get a lot of fish that way. But one of the things people have found recently is, you get this thing called by-catch. And by-catch is all the other sea creatures you're not actually trying to catch. You may get a dolphin or a turtle or things that were all on the bottom, instead of the snapper you were looking at.

And this case is, sadly, kind of like that, because I'm not going to try to tell you that there was no crime going on at Pilot. You know, clearly, you know, Mr. Hamilton has


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 182 of 256 PageID #: 12816

done an effective job in the first hour, I think, of demonstrating that many of the people that you heard testify in that chair are in fact guilty of fraud. It was when he turned to the second hour that I think we got into the by-catch problem.

So this is the last time that I'm going to get to talk to you on behalf of Heather Jones, so I apologize if I cover some things that Mr. Hamilton didn't. He gets another chance or Mr. Lewen gets another chance to talk to you, and I don't. But I think that when you look at all the evidence carefully, you will realize that the government's case has really fallen far short, with respect to Heather Jones, of proving her guilt of any of the counts -- guilty of any of the counts against her beyond a reasonable doubt.

So, with that in mind, let's move on. I think when we first met I told you that you need to keep your eye on the ball. And I told you that the critical issues in the case of Heather Jones were whether Heather Jones had an intent to defraud trucking companies and whether she knowingly and voluntarily joined a conspiracy to defraud them.

Now, again, we're not contesting that there were some people doing very bad things at Pilot. But this is not about that. This is not about John Freeman or Katy Bibee or other people. This is about Heather Jones. And these are the two questions that you need to focus on.

There's a lot of evidence in this case. I mean, you've -- you've been extraordinarily patient, and you've sat through -- I think it was 19 days of testimony, and you've seen hundreds and hundreds of exhibits and been very patient with all of our scheduling problems and with the things that lawyers have to do in court, and we appreciate that. But there's a lot of evidence that I don't even need to touch on, because most of it doesn't have anything to do whatsoever with Heather Jones or the work that she did.

Now, we can divide Pilot sales division employees into several categories. There's the executives, people like Mr. Haslam you've heard about, Mr. Steenrod, Mr. Hazelwood, Mr. Wombold, based in headquarters in Knoxville. There were directors, people in the field——you've met many of those——people like Arnie Ralenkotter, for example. You've heard about Vince Greco and John Freeman. You've heard these names bandied about. There were also the outside sales representatives; you've met a few of them——Kevin Clark, Chris Andrews, some others. Then there were regional account representatives like Heather Jones; and she had coworkers, like Katy Bibee and Lexie Holden, who you've met. But I think that really once you divide these people up into these four layers, you get a sense of how this -- how this situation worked.

There's a bunch of people that I'm not really going

to even talk to you about at all. You heard from a number of third parties that Mr. Hamilton just mentioned. For example, there was the lady from Verizon. There were the bank ladies. Really, none of that is all that critical for you in evaluating the two critical issues that I just mentioned. Similarly, you've heard from law enforcement witnesses. Several IRS and FBI agents took the stand, and, really, they didn't have much to say -- much of anything to say about Heather Jones. So those witnesses I'm not really going to talk to you about.

There were two opinion witnesses you heard from, Mr. Seay and Mr. Jennings, and I'm going to -- very briefly going to discuss them later on.

But, you know, primarily——and I think you understand this, having sat in those chairs for 19 days or 20 days, whatever it is now——you know that mostly this case is about Brian Mosher. So we're going to spend a lot of time talking about Brian Mosher.

The other part of the case is Heather's peers in the direct sales division at Pilot, people you've met, like -- that I just named. Of course there are also a lot of exhibits, including one audio recording. I'm not going to talk about all those. I'm going to talk about some of the key ones, and I'm going to identify some of the ones you need to look for when you go back to deliberate. But my goal is

really to try to give you a roadmap so that you understand where the critical issues in Heather's case lie.

One way to look at the government's case against Heather Jones is that there's two layers. There's some very specific things. You know, you've heard Amerifreight. You've heard JTL. I don't think Mr. Hamilton mentioned it, but you've heard of Halvor. So you have these very specific company transactions. And then you have this sort of cloud that surrounds that, of, you know, suggestions on direct testimony from people that -- that everybody knew at Pilot that this was going on. There's sort of this nebulous cloud. And I'm going to try to blow away that cloud first, so that we can then focus on specifics. And, really, that cloud, the evidence about that, really came in through -- through Heather's peers, from Janet Welch, from Katy Bibee, Holly Radford, and Lexie Holden.

Now, if you've worked in an organization of any size at all, you know that different people have different perspectives on the role that their job plays in their life. You know, for most of us, we -- you know, we get up in the morning, you know, have a cup of coffee and some breakfast, hop in the car, go to work, do our job, and come home. If we're lucky, the work is interesting and the people are interesting and maybe, you know, the people are people that you can socialize with, you know, go to lunch with, talk about

your plans, your dreams, share the highs and lows of life.

And that's, I think -- I think you got the sense that that's kind of the environment that Heather Jones worked in at Pilot. You know, these were a close group of ladies. And you've heard them talk about that. And you can -- when you heard them testify, you could also tell that they'd been proud of working at a place like Pilot. It's respected in its community, for both its business and its charity. It's the kind of place where you would proudly say to somebody you just met, maybe in your neighborhood or somewhere, that you worked at Pilot Flying J.

But I think that what the government attempted to do was to translate the closeness -- the social closeness of these women into criminal closeness. And I'm not -- I'm not going to excuse some of the things that Lexie Holden did, or Holly Radford. But it really is -- it's really different to be——and you know this, I think——to be someone who you're friendly with at work, you maybe go to lunch with, you know, maybe once a year there's a business trip and you socialize with them, that's different from knowing what they do on a detailed basis.

And I think you'll agree that virtually every one of these women who testified here said that they had very little idea what one another was doing with respect to manual rebates and discounts, because they worked essentially in silos. You


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 187 of 256 PageID #: 12821

know, they worked in teams, they worked in the same physical space, but in terms of the Pilot organization, they were divided into regions. And you've heard this over and over again. But those regions did not communicate very much. They didn't communicate very much at the director level. You know, Mr. Ralenkotter didn't communicate much with Mr. Greco. And that was for a different reason.

Now, I said a few minutes ago that, you know, there's people who go to work just because it's -- you know, it's a way to put food on the table, pay your bills, that kind of thing. You know, there's other people who are much more ambitious, you know, and maybe they get to the point in their life where they kind of confuse their workplace with *Game of Thrones*. And that, I think, is the kind of people that you heard about in that, in Mr. Ralenkotter, in Mr. Mosher. You've heard about it in Mr. Greco and Mr. Freeman. I think you've heard their voices, but you haven't actually met them.

But it's clear that this was a family-run business with very little room at the top. You know, the people in the executive level that we just looked at a minute ago were -- people in the executive level were -- they had essentially made it. But these guys one rung below, you know, there was just so little room to move up, and they were all competitive. Maybe it had something to do with the fact that they were spread out around the country. It wasn't like they had to,

like, see each other every day and work with each other and talk to each other. They were out -- out in the country.

Well, one of the problems that occurred, and the reason -- the reason that some of the ladies that you've met got into trouble, is because they began to -- because their directors, the people who were competing with each other strenuously, began to take them into their confidence about some of the things that they were doing that they shouldn't have been doing.

And, again, this is in contrast-- I think you need to look very carefully at the kind of documents that relate to Heather Jones, but I think you've seen these before. You know, Ms. Welch, you know, is talking to Lori McFarland. You have Arnie Ralenkotter and Janet Welch communicating, saying, "See if they notice," and some of these kind of e-mails Mr.-- Mr. Hamilton put up. You know, these are -- they were essentially in the know with their directors. But that's not true of Heather Jones, and we're going to get to the details on that.

Now, I think you've, unfortunately, learned so much about the diesel fuel industry that you never really wanted to learn; but one of the things you've learned is, frankly, that the selling situation is more complicated than the government depicted it. This is not a -- this is really not a situation where, you know, there was a -- one kind of a deal for every

customer there is. In fact, through many witnesses, including Janet Welch, you've heard that there were a lot of reasons, legitimate reasons, for adjusting rebates. Now, I'll remind you, you heard this from people who have pled guilty to rebate fraud. So they've had an education in -- they've had an education in the nature of the criminal justice system, and yet they still came in and said, "Yeah, there's a bunch of reasons why this makes sense, why some adjustments make sense." For example, probably the most obvious one is if you tell the customer, "I'm changing your rebate." Well, that customer may complain, but that seems aboveboard. And most of this, I think-- I know many of you have been taking notes. Most of this has been coming from the testimony of Janet Welch. Another reason may have been because the customer failed to meet gallon requirements. And you've heard from that -- about that. Also, maybe the customer maybe failed to ramp up their purchases as expected, or they failed to lock down their network and remain exclusively a customer of Pilot.

Now, maybe the customer was one -- was on what I will call the generic cost plus deal. And this is going to become important when we talk about the breakout session. Now, I don't think you've ever seen that phrase, generic cost plus, because I'm using it to describe a deal that Mr. Mosher and I talked about in terms that I'll get to in a minute, basically where the customer knows -- or the customer believes

they're getting cost plus something, not cost plus .02, not cost plus .03, or cost minus .01, just they say, "I want cost plus." And this is what I'm talking about with generic cost plus deal. And we've had witnesses testify that adjusting those was fine, because they weren't expecting a specific penny amount.

Am I going too fast? No. Oh, one that I missed was, sometimes the sales rep forgot what the deal was. I think Ms. Welch testified about that. Or maybe margins fluctuate. And, remember, this is from the DSM, the direct sales manual. I apologize for using that. That's the way I've been writing it over and over for the past few months. The direct sales manual says, "Tell your customer that if the margins fluctuate, we may have to adjust the deal."

Another item from the DSM was, maybe if the customer was late on its payments, you wouldn't necessarily be giving a discount or a rebate to somebody who owed you money.

Maybe the customer was believed to be lying to Pilot. And one of the Pilot employees testified about that.

Now, the last item, the last possibility on this list of things that we went through with these folks, I'll put here in red, and that was fraud. And sometimes that happened at Pilot.

Now, I just realized that I used an odd word for the title of this, but we're going to classify customers. And

this is something that I went through with Mr. Mosher. I don't know if you remember this, but when he was on the stand, I said, "Let's talk about the different kinds of customers. Starting at the very bottom, starting at the very most unsophisticated kind of customer," and we -- and I -- he didn't do this, but I did, I called that an Alpha customer. And the Alpha customer, he said, basically, using my term, was a small company, it was somebody unsophisticated, literally just driving up to the pump and paying retail price. So they don't really factor into this at all.

We talked about the next step up, what I called the Bravo company. These are people that are not on direct bill, they don't receive a cost-plus discount, but they get a retail minus rebate. You can imagine, this is essentially like the Alpha people, but they're just getting a few cents back every month. You know, if you have one of those loyalty cards with Mobile or Exxon or something, you know, sometimes you get the same kind of deal from them for regular gasoline purchases.

The next level up is an important one. That I called Charlie, because it's A, B, C, D, et cetera. And the Charlie customer, Mr. Mosher discussed with me, only knows the term cost plus. Remember that generic cost plus deal that I mentioned just a minute ago? That's what Mr. Mosher and I talked about. And the Charlie customer may not know that OPIS average is the standard used in the industry for cost plus

deals. The only thing the Charlie customer knows is, he wants a cost-plus discount.

Now, I'm going to probably remind you too much of this, but there were witnesses who testified that it was -- people who've been through the wringer on this case who have testified that it's okay to adjust those discounts, to adjust those rebates. Even today they say that.

The next level up -- for time purposes I'm going to skip through these, but there were two more levels up. And, really, I'm not going to focus much on those people at all. There was the Delta. These are people who understood -- they wanted a, you know, like, cost plus .03, or cost plus .02, but they didn't really have access to the OPIS information.

And then the top level was really people who had, you know, both the most sophisticated knowledge and also had OPIS numbers.

Again, I'm going to focus on the ones in the middle, the Charlie, because those are the ones that I really talked to Mr. Mosher about.

Excuse me one moment.

(Brief pause.)

MR. VERNIA: Now, you'll remember that the headquarter employees like Heather saw their directors and their outside sales representatives very infrequently. And they had to learn somehow, like, how the business was done.


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 193 of 256 PageID #: 12827

And I'm actually going to skip over showing you some slides, but what I would suggest is that you look at Document Number 302. It's a government exhibit. And you'll recognize it. You've seen it a hundred times before. There's a number of places in there where they point out, you know, "Don't offer the discount up front," you know, "Wait for the person to ask for it," you know, "Always get it in writing. Always link it to gallon requirements." And what I would urge you to think about is that this was the perception of someone not out in the field, but learning it basically by the book back at headquarters in Knoxville. Specifically, if you look at Page 10, Pages 11 to 12, this is of the actual document, 13 and 14, you'll see what I'm talking about. There's a section called, you know -- a section called "Tips," which summarizes some of those. I think you've seen it before.

You'll remember, though, Brian Mosher, who is going to figure prominently in my discussion with you, you know, he said he hadn't read the DSM since 1998. You know, he was an experienced salesperson, but he also said he didn't follow the DSM, too. You may remember that. And he didn't know whether Heather expected him to or whether Heather followed the DSM.

Now, you've heard of a number of -- a number of practices in the business. And some of these have been mischaracterized, I think. Some of them have been kind of demonized. And one of those is the profit and loss statement.

You'll see the profit and loss statement referred to in the DSM. It's basically simply a breakdown, for each customer, of where they've purchased fuel for the month and how much profit Pilot made off of each one of those. And there were very legitimate reasons for a salesperson to have one of these. One of the witnesses testified that you could use that to try to steer customers to a place where you had a high margin, a high profit margin, and you could save them money and you could make more money, it was like a win-win situation. So there were quite legitimate reasons for using P&Ls. There's nothing inherently wrong with them.

You know, I think I lost track of how many witnesses said there's nothing inherently wrong with manual rebates. And that's true. You know, that's another -- that's another device that people -- you know, you probably initially thought that that equaled fraud, but basically every witness who got up here said that a manual rebate was perfectly fine. And I think it's important to remember that when the government takes the term manual rebate and tries to make it into a code word, something that equals fraud.

Let's talk some more about Brian Mosher. Brian Mosher was a witness on whom the government banked the most in terms of Heather Jones. And it's understandable. They worked together for several years. You know, with all of these witnesses -- for all these witnesses who have pled guilty,

though, you know, Mr. Hamilton, to his credit, went over this with them when they sat in the witness stand, you know, they have substantial reasons to -- to want to please the government. They've pled guilty. They're expecting Judge Collier here to sentence them. They want to make these gentlemen happy. (Indicating.)

Brian Mosher sat down, and, in addition to that, you heard him say——I don't want to misquote him——"I cheated customers, and I did it well." And I think you might remember he almost looked like he had a little pride about that. That's the kind of person that Brian Mosher is.

You know, it took a while, but Brian Mosher finally admitted that he had had a conversation with Heather in which Heather had come up to him and said -- or called him, I can't recall which, and said, "Is this really okay?" And Brian Mosher finally confirmed on the stand that, yeah, he had told her it was okay, and, yeah, he had believed at the time that it was industry standard practice. So that was the information that Heather had from Brian Mosher, her supervisor, who was giving her instructions.

I don't want to-- I want to make clear that we're not saying Heather Jones just followed orders. That's not an excuse, and we're not saying that. What we are saying is, she followed information that Brian Mosher gave her. She was dependent on him for information. And you'll find out when we

talk about Halvor especially——I think Halvor is a great example of this——that Brian Mosher had no compunction about lying to Heather Jones, about not passing on information to Heather Jones.

Another thing I want to talk about is backups. Those backups figure prominently in the government's argument about this case. And they've had numerous witnesses get up and testify that backup -- backups were used to cheat customers. And Brian Mosher, specifically, believed -- I'm not saying he didn't believe this, but he believed that backups essentially were part and parcel of the fraud scheme. He called the backups that were generated "gyrations." But, you know, virtually every other witness who testified besides Brian Mosher testified that backups were a legitimate thing.

Meredith Vaughn, who was a Pilot employee, worked in the accounts payable office. She's not a part of this investigation. She was just a witness. And I went through with her, "What is the process of getting a rebate paid?"

And she confirmed, "Yeah, part of that is, you have to justify the check."

If she's going to send out a check for a hundred thousand dollars, naturally she's got to have some documentation for that. And that was referred to as backup, on the form that I think you'll see in evidence. So this is a preexisting term, backup, and it applied to every single

rebate check that Pilot sent out, whether it was adjusted for legitimate reasons, adjusted for fraudulent reasons, not adjusted at all. All of these checks had backup. And the backup for manual rebates was generated the same way, by using the Price Fetch system to generate the breakdown of how that number at the bottom, the number that was on the check, was allocated amongst each of the locations. There was nothing sinister about it.

Again, I think Brian Mosher genuinely believed that he had played -- that he played some role in the creation of this amazing lulling document, to use the prosecution's phrase. But that's not what any other witness testified about.

Now, going back to the question that Heather Jones posed to Mr. Mosher, "Is this okay?" You know, there are some questions -- if you think about it, there are some questions that are really -- they don't communicate anything in themselves. Like, if I say to somebody, "Is it -- is it raining outside?" you know, I guess it communicates that I'm not outside, because I wouldn't have to ask the question, but it doesn't communicate anything about my state of mind, the kind of person I am. But in the context of asking someone to do something such as this, you know, it does communicate. When you say, "Is this okay?" it communicates two things. To someone like Brian Mosher who cheats customers and does it

well, it communicates that you have scruples, that you have principles that -- that are making you the question in the first place, Number 1; and, Number 2, that you're willing to do it, that you're not just going to, like, you know, say "Well, c'est la vie, I'm going to just sit in my cubicle and just do whatever he wants."

So she asked for some justification for it, and he told her, "It's okay." And he said at the time that he said that, that it was industry practice.

I asked him, "Do you recall telling her whether the deals were not real deals?"

He answered, "I -- again, I don't recall the exact conversation."

And I said, "At the time that you began these cuts in 2008, was that your perception, that it was standard industry practice and that these were not real deals?"

And he said, "Yes, sir.

"So even though you don't recall the conversation," my question, "if it happened, then you may have told her that?

"ANSWER: Yes, sir.

"QUESTION: Okay. Now, you've already testified that as a salesman you -- you discovered you have a knack for convincing people, right?

"ANSWER: I believe so, yes, sir."

I think all of that was honest. I think he does

have a knack for convincing people. A lot of people who commit fraud do. And he convinced Heather that he was not asking her to do anything that wasn't industry practice and wasn't outside the -- the realm of reason.

You know, you might remember Mr. Wroblewski. It's been a long time. I mean, Mr. Wroblewski, probably November, something like that. And -- nice guy from Pilot, and he testified about the code of business ethics. And, you know, I asked him a bunch questions about it, but one of them I -- one of them was to ask him, "Would this type of conversation have satisfied Pilot's own standards for what employees were expected to do?"

And he said, "Yeah, that would."

Brian Mosher was a supervisor. The manual said, "Talk to your supervisor." And that's exactly what Heather Jones did.

You might remember, also -- I mean, I've -- I've got terrible handwriting, and you may remember some of my bad drawings on my iPad here, but you might remember that I went through a list with Mr. Mosher of information that was available to him and to anybody else about -- about a deal with a trucking company. And I may be off on my PowerPoint here. Oh, I'm not. Oh, good. That works. I call this "Brian Mosher's Superior Knowledge." And I typed it in so you don't have to read my handwriting. But basically you might


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 200 of 256 PageID #: 12834

remember I asked him, you know, "One of the things you might know about are industry practices," like we just talked about, you know, was this a standard industry practice.

And he said, yeah, that's something that you could know about, how deals were done.

And then I asked him, "What about facts about specific deals? Let's talk about that." And we discussed that, and we went over the fact that there were specifics of deals like, you know, was it cost plus this, retail minus that, is there a gallon requirement?

Oh, I hit -- too fast. Another one was company performance, was the company meeting its expectations from Pilot, was it fueling at all the stops and finding exclusive use, et cetera.

And, finally, how was the deal communicated to the customer, what did the customer know about the deal. And the example that he and I went over was this sort of generic cost plus, somebody just getting cost plus and there's no number attached to it versus something specific, cost plus .03, cost plus .04, et cetera. And you may remember that I had a little talk with him about, "Well, isn't it true that you knew more about every one of those things on that list with respect to any one of your deals than Heather Jones did?"

And he initially said, "No, that's not right."

So we went through them again, and he finally said,


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 201 of 256 PageID #: 12835

"Yeah, you're right."

And it's obviously true. Mr. Mosher is out there in Iowa, he's driving around meeting with company officials. Of course he knows those deals, those conversations, far better than Heather Jones could possibly know.

Now I'm going to shift gears a little bit and talk about the specifics. Remember, I began saying, you know, there's sort of the specifics, et cetera, then there's kind of the nebulous cloud of allegations. I hope that I've dispelled that cloud. But we're going to get to the specifics. But before I do that, I want to make sure that I don't forget to say that there's something -- there's something odd about the situation. You've heard how many hundreds of companies these ladies in inside sales dealt with, and you've heard that they had many, many things to do. They had to, you know, answer the phones for these customers, they had to answer e-mails, they had to get them directories, they had to do this, they had to do that, all this stuff that had nothing to do with rebates or discounts, nothing at all. And then they had this one terrible day a month where they had to, you know, process these rebate checks and deal with people in the field and get their approval and all of that. But I think it's -- as you look at the specifics, I think you have to bear in mind, you know, life goes by you fast, and there is no slowing things down when you're basically drinking -- trying

to get a drink of water from a fire hydrant.

Despite the fact that there are hundreds of companies and thousands of e-mails, the government has selected a very few to present to you. And you should not, and you cannot, presume that what they're presenting to you is typical of what Heather Jones saw.

Now, I'm going to say, imagine a basketball game. I don't know how many of you are basketball fans. But, you know, one of the things that happens, you have, you know, 40 minutes, I guess, for a college game, and it's kind of nonstop action. And I think, as an analogy, imagine that Brian Mosher's out on the court, and he is doing deals and he is, you know, interacting with other people. And Heather Jones is off, on the bench. You know, she's got a pretty good view. I mean, she's not, like, up in the stands somewhere. But she's on the bench. And she has one view. And meanwhile this game is being televised, and there's, like, say, five cameras in the arena, and they're taking it all in. And I think you've known that -- from your own experience watching something like that, that you get a much better idea of the specifics of what's going on when you're at home and you're watching it on TV and they can cut and they can do instant replays and stuff.

You know, in some ways, this prosecution is -- I'm not going to say worse, but it's more detailed than that. Imagine if you were to take the video from those four or five

cameras, whatever it is, and then gather it all up, and then watch every single frame of every single one of those cameras and analyze it. "Was -- was this a foul? Was this across the line? What about this? What about that? You know what, let's take this one and this one and this one, and we'll put them together, and that's our case." Now, it's not unfair to the guy who's smashing the other guy's face, but it is unfair to the person who is sitting all the way across the basketball court and doesn't have that view, doesn't have all that information.

Every trial necessarily consists of a small subset of what took place in real life. I mean, you've been here a long time. If we were to do that, if we were to present, like, everything that happened with Pilot, we would never leave this courtroom. So of course every trial is going to be selective. But you have to try to bear that in mind as you deliberate. Try to adjust your perspective on the evidence to say, "Well, you know what, this may not be representative. This is cherry-picked."

All right. So let's talk about some specifics. And I'm going to start with JTL. And I don't know how many specific documents I'm going to go into with you, but I wanted to give you a little bit of an over- -- over- -- you know, I'm blanking on the word -- overview of the situation. JTL is based in Franklin, Wisconsin. In mid April 2008 Brian Mosher

e-mails a woman named HollyAnn Kulmann, and gives her an offer for the company, diesel. A month later-- Now, bear that in mind. A month later he e-mails Heather Jones. And that's Government Exhibit Number 1502. And I'm sure you're going to look at it, and you should. And that e-mail contains some representations about what he wants Heather to do and what he thinks -- what he says JTL thinks it is getting.

All right. Two points about that. And, actually, I think I do want to pull that up.

(Brief pause.)

MR. VERNIA: All right. Here's the document. Let's pull up the part that Brian Mosher sends Heather Jones. "We're going to get JTL Trailers cost plus .04/.04 off retail. They will think it is cost plus .02/.04 off retail. Anyway. Go ahead and get a check out to them for their April gallons. They did increase so it would only be right. They are a restricted account so it will be a rebate." And I'll skip the rest of that.

All right. Now, the government basically says that Heather Jones knew at this moment that Brian Mosher was committing rebate fraud. And I think what they're probably relying on is this part right here, "They will think it is cost plus .02/.04 off retail."

Now, a couple of things to bear in mind about this. One is, it's rather odd that he immediately says that and then


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 205 of 256 PageID #: 12839

he says, "Anyway," almost as if he's saying, "Never mind," or "Forget about that," he's turning a corner, and says, "Go ahead and get a check out to them for their April gallons. They did increase so it would only be right." Mr. Mosher -- remember, Mr. Mosher knows when he's writing this that he made this deal back in April. So he's trying to convince Ms. Jones that, notwithstanding what he just told her, he's a fair guy, he's giving them -- he's giving them what's right.

But the government's case isn't limited to this time period. This is very, very important, because I think, you know, it may have gotten lost in the presentation when Mr. Hamilton talked to you earlier. They move forward to -- they move forward -- let me go back -- seventeen months, when Mr. Lorino at JTL requested daily pricing. Now, Mr. Hamilton's suggested that daily pricing was a way of deceiving the customer. And I think we've talked about -- I've talked about this with some of the witnesses, but there is an important point to keep in mind. If Heather Jones or anybody at Pilot is sending daily pricing at a certain amount, many witnesses have said, "That is essentially what that person's going to get charged for and will get."

Now, why would they want daily pricing? They would want daily pricing usually because they want to shop around. They want to get daily pricing from Love's. They want to get daily pricing from Pilot. They want to say, "Where should I

send my trucks?"

So Pilot, by giving them a worse deal in the daily pricing, is just shooting itself in the foot. That business may got to Love's. That business may go to Travel America. So just keep that in mind, Number 1.

But the substantive wire fraud counts that the government really rests its case on happened 27 months later, and that's in January of 2012. Now, I think you've seen enough about these deals to know that a lot changes in over three and a half years from the initial e-mail that Mr. Mosher sent. And Mr. Mosher told you-all that he didn't share everything with Heather Jones. So it was perfectly reasonable for Heather Jones to assume that there was some component of this that she didn't know about, that he did, and that made it -- made it fine, which is what he told her it would be.

Now, that may sound -- that may sound strange. How could it be -- how could it be appropriate to say, "They think they're going to get this, but they're really going to get that"? And I want to show you an example that we talked about a little bit with Mr. Mosher that I think makes this clear. Now, this is not a document of Mr. Mosher's. It's a document from-- Let me zoom in a little bit. All right. Look at the top of this document. This is very similar. "Leave the Price Fetch as is. Don thinks he's getting a steal but hasn't performed from a gallons standpoint, therefore I haven't

enhanced his pricing. If he asks, he's getting the better deal." This sounds very similar. But you know what? Mr. Mosher, when we walked through this, basically agreed that the only thing that he would disagree with, and he would only disagree with it now, was not telling the customer, because the rest of this e-mail——and I suggest you take a look at it back in the jury room, 2106——makes clear that this is a customer who is not performing their side of the deal.

And if they weren't performing their side of the deal, what is Pilot to do? Now, one option would be to tell the customer, "Hey, I'm going to change your deal." That was certainly one of those valid options that we looked at a few minutes ago. But other witnesses have told you, "There may be reasons you don't want to tell the customer you're changing the deal if they've breached their side of it." For example, you may not want to have that conversation that would basically terminate that relationship. It's not that you don't have a contractual right to do it, but you may just not want to basically offend the customer by saying, "Hey, you promised this, and you're not delivering it, so I'm cutting your deal."

And, for example, I think if you look back at the testimony of Kevin Clark and Arnie Ralenkotter, both of those men said that under these circumstances, under this kind of circumstance, it would be perfectly legitimate, even now, to


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 208 of 256 PageID #: 12842

change the deal without telling the customer. So there are several reasons why Heather might have thought there was a legitimate basis for Brian Mosher to instruct her on JTL as he did.

Another thing to bear in mind is that, as with Allied, it may have been that Mr. Mosher knew-- Allied is the 2106. It may have been that Mr. Mosher knew that JTL was not living up to its side of the bargain. This may have just blown past you in the testimony, but JTL was a successor company to a company called JDC that Pilot had been in business with before. So the deal that JTL struck with Pilot was not the first relationship between the people talking. They had prior relationships that they could have been that Mr. Mosher -- or that Heather Jones could have thought that Mr. Mosher was drawing on when he sent her that e-mail.

When I -- when Mr. Mosher testified on December 7th, it was clear that he may have known, for example, that the deal was unenforceable for some other reason but just kept that from Heather. You may recall his testimony. I said:

"QUESTION: All right. Now, when she responded 'Okay' in that e-mail, you don't know what, if anything, she understood about whether Pilot had an enforceable contract with JTL, right?

"ANSWER: I wouldn't -- I wouldn't know what she thought.


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 209 of 256 PageID #: 12843

"QUESTION: All right. And it wasn't really relevant, though, right?

"ANSWER: Correct.

"QUESTION: You just wanted her to do this one thing?

"ANSWER: Yes, sir.

"QUESTION: Not to evaluate the whole deal?

"Correct."

Remember, he had assured her that things he was asking her to do were okay.

Now, we talked a little bit before about -- with Mr. Mosher especially, about the sub- -- what's called the substantive wire fraud counts. And you may remember that I showed him that there's four of them for Heather Jones. There were two for Amerifreight and two for JTL.

Count 5 alleges that Heather sent a December 2011 manual rebate approval sheet to Brian Mosher in January 2012, and Count 6 alleges that he sent it back to her. But you may also remember that I asked Mr. Mosher, "Let's set aside this initial e-mail three and a half years earlier about what the deal was. Was there anything fraudulent about the e- -- about the spreadsheet that Heather Jones sent to you in January of 2012 with respect to JTL?" let's -- focusing solely on JTL.

And he said no, it was -- if you set that initial e-mail from 2008 aside, there was nothing wrong with the number that she provided him.

And I asked him, "So it was your decision, wasn't it, to decide to cheat JTL out of a rebate?"

He said, "Yes."

And you may remember that I asked him, "You could have decided to approve all of those rebates without making any changes whatsoever, and Heather Jones would have been happy to do it?"

And he said, "Yes."

We're going to come back to some of the other failings with the government's proof of Ms. Jones' intent to defraud her customers, but let's move on to Amerifreight.

Amerifreight was based outside of Chicago. And you've heard Mr. Hamilton go through this a minute ago. In February 11, 2011, Cathy Sokolowski offered cost minus .03 to Amerifreight, including retroactivity. Now, that's important. And you'll note that this is a JDX 708 number. This is a defense exhibit. The government didn't introduce this. It was an e-mail from Cathy Sokolowski to Pavel Valnev, the head of Amerifreight, making this offer and saying it's going to be retroactive back to January 1st [sic].

That same day, she sought approval through Heather for the deal. And Heather, as she was supposed to do, sent it up to Mr. Wombold. And we're going to get to that e-mail, which I'm -- which you've seen 40, 50 times, something like that. What the government is alleging is that in mid March


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 211 of 256 PageID #: 12845

she sent to Brian Mosher the rebate approval sheet, and that that had the adjustment.

Now, I went over this with Mr. Mosher, and this is one of the strangest counts in the indictment, because, as I said, if you look at JDX 708, you'll see that she's saying, "This deal is retroactive to February 1st." If you look at Government 1602, you'll see that she doesn't tell Heather Jones that. Okay? As far as Heather Jones knows from the e-mails, the deal starts on February 11th. At the end of the month Heather Jones runs a rebate that includes all of February and sends that off to Brian Mosher, who cuts it and sends it back.

Now, not knowing about the promise to take it back to February 1st, it is perfectly plausible that Ms. Jones could assume that Mr. Mosher cut it because the deal didn't cover all of February, it only covered 17 days of February. Mr. Mosher could have cut that deal 40 percent, and it would have been completely expected. As it was, he only cut it about 20 percent. So, from Ms. Jones' perspective, they may have been overpaying Amerifreight.

The other odd thing about this one is, this is -- there was only one month. You might remember that there was one of these companies that only had one month. That was Amerifreight, because then they went on -- I believe that they went on direct bill. So there are innocent reasons why she

might have thought that Mr. Mosher's reduction was completely legitimate. Maybe it was to account for the agreement to the deal being made in the middle of the month. Maybe it was for some other reason that he would know and not share with her.

But let's talk -- you know, what the government really focuses on is that exchange between Mr. -- Mr. Mosher and Mr. Wombold, and Heather Jones as well. This is 1602. And this is the one you've seen 50 times. I'll start towards the bottom. Actually I'm going to skip the part where Mr. Valnev notifies them that he's locked down his network for Pilot. There is really nothing remarkable about Heather's e-mail to Scott Wombold, cc'ing Brian Mosher and Cathy Sokolowski, the two salespeople on this deal. As for approval, nothing strange about that.

Mr. Wombold simply asked a question, "Cost minus .03? How big is this account?"

Mr. Mosher says, "Manual Rebate."

Now, you're going to get a copy of the indictment, and you're going to see in the indictment there is an allegation that "Manual Rebate," those two words, with both front -- both first letters capped, was code, was code for, "It's okay because I'm defrauding them." But you know what? You've also heard other witness say there were reasons why you might do a deeper discount for a customer who was on manual rebate. One reason is, if they were on direct bill, Pilot was

extending them credit; and if they went belly up, Pilot would lose money. So, yeah, maybe you would give them a little better deal.

So, the other point I want to make about this is, if you've been involved in e-mail chains involving work, relatives, whatever, you know that sometimes people kind of go off on their own little tangent, and you really only need to follow it for the thing that you're looking for. And the thing that Heather Jones was looking for was not this top line where Mr. Wombold calls Mr. Mosher a name, but the line below that where it says -- two lines below that, where it says, "Approved. Still pretty aggressive."

You know, at that point, this was done for Heather Jones, right? That's all she needed. She just needed to get the approval. You know, the rest of this was, you know, Mr. Mosher's resentment against Mr. Wombold.

But there was nothing -- even looking at the whole e-mail, there's really nothing code word about it. He says, "Manual Rebate," which you've heard 20 witnesses say is not inherently fraudulent, and that's it. There's really nothing about Amerifreight that is at all interesting or criminal.

And, again, I -- this was -- remember my two and two? This was the other two. This is Counts 3 and 4, Heather Jones sending a manual rebate spreadsheet to Mr. Mosher, him sending it back. Now, on this one he was unequivocal, there

was nothing wrong at all, there was nothing in the past, there was nothing in the present, there was nothing wrong at all about the rebate spreadsheet that she sent to him with the Amerifreight number on it. And he said that he chose to cut it and he chose to cut it for reasons of fraud. There is no evidence that he ever told her, "Hey, I'm cutting this for fraudulent reasons." In fact, the evidence is that he had told her, "No, don't worry about it. What I'm doing is standard practice, and it's okay."

All right. Let's move on to Halvor. Halvor is based in Superior, Wisconsin, on the shores of Lake Superior, not Lake Erie, like I said before, getting my lakes mixed up.

On June 1st, 2011, Heather Jones sought approval of a deal from Scott Wombold. I apologize for not having the-- It's Government 1701. And then a funny thing happens. You'll notice the deal here. I've written it down. Cost minus 2.5/retail minus .09, with Illinois locations at cost minus .12/retail minus .15. All right. Nothing -- nothing exciting about that. She just asked him for approval, he gives it gladly, and they move on. And then the interesting thing happens. Four months later-- Let me pull this one up. This is 1703. All right. And this one is worth -- I mean, worth to a lawyer, maybe not worth to you, but worth to a lawyer, looking at in some detail.

All right. You may remember, it starts with

Mr. Mosher, and these are all -- remember, I had objected at one point about the time zone thing, or, like, tried to clarify it, and then I talked to Mr. Mosher about it. You'll notice when you look at this, these e-mails are just back and forth, one after the other, with one break where Mr. Fraley says, "I'm going to be out of pocket," or "I'm going to be in the car for 45 minutes. I'll get to you when I get to the office."

Mr. Mosher send an email saying, "I got your e-mail. Can you send me what you have in place in your optimizer for us?" He's talking about pricing.

And then Mr. Fraley responds with the deal. And you'll notice, and I should have pointed this out, the deal Mr. Fraley responds is, cost minus 2. -- or he says cost minus .05, right? In the bottom line there. The rest of the Pilot Flying J numbers there, retail minus .09/cost minus .05, that's two and a half cents better per gallon than the deal that Ms. Jones had sought approval for.

Okay. So Mr. Mosher gets that back, says, "Perfect, I show the same." Again, you'll notice, this is like -- because of the time zone difference, that's why I asked that question. This is, like, three minutes later, he says, "Perfect, I show the same," and then keeps -- they keep talking. You can read the rest of it.

When I talked to Mr. Mosher about this, I said,

"Why did you do this in the first place? You know, why -- why -- you know, what was the basis of this? Why didn't you -- weren't you able to tell them what the deal was?"

And he had forgotten. You know Mr. Hamilton used the famous Sir Walter Scott poem line, you know, "Oh, what a tangled web we weave when first we practice to deceive." Mr. Mosher admitted that that was what happened here. And here is the testimony. I said:

"QUESTION: This deal that he tells you he has in his optimizer in September of 2011 --

"ANSWER: Yes.

"QUESTION: -- that's the one he thought he was getting all along?"

Okay. So this is not some new deal. This is the one that he thought he was getting back when Ms. Jones sought permission for a different deal.

"ANSWER: Yes.

"QUESTION: And he wasn't?

"ANSWER: Correct.

"QUESTION: And you had told Ms. Jones a completely different deal?

"ANSWER: Correct.

"QUESTION: That she got approval for?

"ANSWER: Yes.

"QUESTION: Okay. And I can go back and look if you


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 217 of 256 PageID #: 12851

care to, but that thing with Cameron Fraley, that whole exchange, Ms. Jones is not on that at all.

"ANSWER: No, sir.

"QUESTION: Okay. At this point in 2011, so this is, like, two and a half years after, a little longer than that, two years and nine months after, you had started adjusting things in earnest, right?

"ANSWER: Yes, sir.

"QUESTION: Were you basically just, like, so deep into this you couldn't remember what lies you had told to which people?

"ANSWER: That -- that could be true, yes, sir."

That's what we're dealing with. That's the government's star witness against Heather Jones.

Now, one more thing about trucking companies. I'm going to move on from that part of the specifics. The only other specific thing that I'm going to address, really, is the breakout session. But I do want to talk -- mention one thing about it. You've heard about so many trucking companies in this case; and questions have been raised with Pilot witnesses, including Brian Mosher, about their communications, and "What did the trucking company understand? What did you tell them? Was there a meeting of the minds between you and the trucking company person?"

Now, you'll notice, you've never met a single

trucking company employee in this case. Now, the Constitution allows, or empowers, defendants in criminal cases to subpoena anybody we like. You know, they could -- if they have a problem, you know, relating to privilege, like, you know, we're asking them questions about them talking to their lawyer, they don't have to answer that; but, otherwise, we have very broad power to subpoena witnesses and put them in that chair, but so does the government. And we also-- The same Constitution places the burden of proving the case on the government. If they haven't proven their case, we don't need to put on any evidence whatsoever.

Now, one other little thing I want to talk about before I move on to the breakout session, because -- and I apologize, but I'm not going to get to speak to you again. Mr. Hamilton will, and he might raise this issue.

You remember that spreadsheet in which somebody had entered some comments saying, like, "They're watching their deal or something"? I can't remember the specifics of it. But that was on Mr. Mosher's direct exam. And when I cross-examined Mr. Mosher, I pointed out with him this little odd thing about Microsoft Excel, and that is -- you can see it here. Let me do a call-out. You see how it says, "Four sales with comments shown," and there's three options? And you can either do "No indication whatsoever," so don't show the little balloons, don't show the -- you know, anything else, you can

say "Indicators only," and those are the little red triangles in the corner that I'll show in a minute, or -- and comments when you hover the mouse over it, you know, the comment will pop up, or you can always show those comments and indicators. Okay?

And the version that the government put on the stand for Mr. Mosher was the one that had all those comments out there. But, you'll notice, here is an example of one with that first option, nothing showing, right? You can't tell from this that there's even comments in those boxes. You would have to do something else to show those.

And this is -- this is with the little indicators. You see those red triangles? Let me zoom in. Whoops. See that little red triangle there? That indicates there's a comment there. And if you move your mouse over that cell, the comment pops up and you can see what it says, like maybe "They're watching their prices" or whatever.

And then the last one is -- whoops -- where it's always showing up, like this. And that's the kind the government showed to Mr. Mosher. But Mr. Mosher had no idea how Heather Jones had set that button on the computer, whether she never saw comments at all, or whether she saw them all. And he also testified that there were other people who handled those spreadsheets. There was Ms. Sokolowski. You may remember, she was also referred to as Cathy Giesick. That's

her married name. Then there was a woman named Barbara Yarber, another Pilot employee, who also was on the e-mail regarding these spreadsheets. So, really, there was nothing about this spreadsheet that connects to a reasonable -- beyond a reasonable doubt to Heather Jones.

All right. So let me move on from there to the breakout session.

Your Honor, I apologize, I forgot to ask you for the time that I would be allowed. How am I doing?

THE COURT: You have about 50 to 55 more minutes.

MR. VERNIA: Thank you, sir.

All right. Now, we're on the breakout session. Now, you know what? I am going to tell you a little TV analogy right now. There's this -- there used to be a show on, I can't remember which cable channel; it was called *The Masked Magician*. And this was a guy who's a magician in Las Vegas, and he would, you know, sort of like reveal tricks of magicians. And, you know, I'm sure this irritated other magicians to no end. And, you know, there's a lot of -- geez, there's a lot of lawyers in this room, and I'm probably going to get thrown out of the lawyer guild by mentioning this. It's not a trick. It's just a technique. You know, a lot of things that lawyers can do to try to convince you to do things, and one of them is -- a good one is alliteration, which you may know from high school. That's where you put two

words that start with the same letter together. So, you may remember "the power of pennies." It's catchy. It works. "No swans in the sewer." Remember that one? That one's a good one, too. But, you know, so that's a technique. And you -- actually, you know, when you hear something like that, you probably ought to think, "Wait a minute. Why is -- why are they using that technique on me like that?"

But the other -- another technique is hyperbole, and that's where you take something and just blow it up into something really grand. And I was reminded of hyperbole earlier this afternoon when I heard the breakout session referred to as "rebate fraud school." Remember that? Now, I do not recall, perhaps you do, I do not recall any witness ever using the phrase "rebate fraud school." It just wasn't something that was done.

But the government leans so heavily, especially in the case of Heather Jones, on the breakout session at the sales meeting—I think that's probably a better way of describing it—at Pilot Flying J headquarters in November 2012 and on three things that she says. And, you know, I've read that transcript 40 times, and I'm probably no closer to understanding half of what it's got it than you are having heard it, I think, ten times. But I want to remind you -- I don't know that we're ever going to collectively get to an understanding of what happened there. You know, clearly

Mr. Mosher testified about what he intended, and I'm not saying that he was lying about that, but he also testified, when I talked to him, about what he was trying -- what his -- the structure of his talk was about.

And this is getting back to that Charlie customer. Remember I was talking about the Alpha, Beta -- Alpha, Bravo, Charlie, Delta, Echo customers? And we were focusing on the Charlie customers, and these are the people who would get a generic cost-plus rebate, and they -- and it would be perfectly legitimate to change those, and they just wouldn't have any idea really what cost plus meant.

Now, again, people testified in that chair in 2017 and 2018 that it was perfectly legitimate to change these generic cost-plus discounts now. But I went over this with Mr. Mosher, and I said, you know, "Isn't that the case -- isn't it the case that that's the hypothetical that you're talking about in that scenario?" And, frankly, you've heard snippets, portions, of that played from the government, and, you know, I hate to recommend it, but I think it would make sense to listen to the whole thing and keep in mind what Brian Mosher told me about that conversation, because I think it puts that conversation in a completely different light than what the government is trying to depict it.

I said to him:

"QUESTION: If we go back to our little hierarchy of

customers, would it be fair to say that this could be one -- a person in the Charlie category?

"ANSWER: Yes."

This is Brian Mosher.

"QUESTION: Okay. In fact, his basis for cost might be something other than -- what he understands in his head about cost might be something other than OPIS average, right?

"ANSWER: It could be.

"QUESTION: Now, you come back again and again to this hypothetical situation, right, throughout this, throughout this presentation?

"ANSWER: Yes."

And I'm just going to break here for a minute, but if you listen to that, you'll hear him say over and over, "This guy," "This guy," "This guy." "This guy" is the Charlie customer. He's said that. He's testified to that.

"And you're really talking about that specific hypothetical, right?

"ANSWER: I can't tell you exactly."

All right. Fair enough.

"QUESTION: Well, let's go down to -- let's pull up an example. You look at Line 167, and you say, 'I'm sending cost-plus pricing to a guy that has absolutely no idea what cost-plus pricing is. He's heard it. He doesn't have a clue what it means to him or his business, other than he's heard it

from Comdata, he's heard it from EFS in the past, T-Chek in the past, Love's, TA. He doesn't know what it means.' This is-- You're still --"

This is me talking now. I stopped my quote.

"You're really still talking about the Charlie type customer, right?

"ANSWER: The same type customer, yes."

So Brian Mosher acknowledged that the discussion centered on the very kind of customer for whom rebate adjustments are perfectly legitimate.

Toward the end of the discussion, toward the end of the breakout session-- And this is very important. And if you listen to this, you'll hear this. And just -- when you keep in mind, you know, what he has said about this Charlie type customer, I think it will help you understand it. He discussed competitor's caps on rebates. And why? Because that is essentially what cutting a rebate is -- which is a legitimate practice. "For someone with a generic cost-plus deal, it is essentially like capping their rebate." And he says -- he sort of sums up the presentation. Let me actually-- All right. "Now, also remember this, okay?" I apologize, this is a lengthy session; but if you follow along, I think you'll see what I'm talking about.

"The Schneider Logistics program is already capped out about 95 percent. They've gone out to a handful of

carriers and said, 'I'll take the cap off,' because they scream, you know, bloody murder. But 95 percent of them cap it, okay? So you've got that. And the carrier doesn't hear that part. They don't know they're capped. They know they're at cost plus."

All right. I'm going to stop for a second. "They know they're on cost plus," right? Sounds like the Charlie customer, right? "They don't know cost plus .03, cost plus .02. They know that they're on cost plus. Do they know cost plus .01? They have no idea. They know it's cost plus, and they have no clue that it's capped, okay? The guys don't even know the tiers because there's three tiers in Schneider Logistics. You know that. The customer has no idea. He may not even be on cost plus yet because he's not doing a large enough percentage. But he knows that number, he knows that lingo, all right?" The cost plus lingo, in other words.

"NASTIC, and that's the guys where you're going to use this. Those guys don't get a cost plus number," right? That summarizes what he's talking about in the entire conversation. "That's the guys where you're going to use this," "this" being the thing he's teaching. Now, if the thing he is teaching is adjusting rebates, that even people coming in here now say are legitimate to adjust, it's not rebate fraud school, right? It's teaching that little technique that everyone here has said is legitimate.


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 226 of 256 PageID #: 12860

"They know they are on cost plus. There's no number." That's the Charlie customer. "So a fair way to do this, and, I mean, it's just playing in the same area that the Nastic folks and the Schneider Logistics folks are." And look at that word "fair." All right. Now, imagine that you're Heather Jones and you're sitting in this and you hear the word "fair." And, please, play the tape and make a note of every time you hear the word fair. I think you'll hear it nine times. People talk about being fair to the customer in the rebate fraud school breakout session, quote, unquote. (Indicating.)

When you consider that context-- Remember Holly Radford, she testified, she said that it was basically rebate fraud school? And then there was a stipulation. One of the last things that you saw as evidence was a stipulation where we entered into with the government, actually Mr. Wombold's counsel did. And the stipulation was that if a Mr. Gibson was called to the stand-- Mr. Gibson is an investigator hired by Pilot shortly after the search warrant was executed. And the stipulation was, if Mr. Gibson was called to the stand, he would say—and I don't want to misquote this—"that she did not recall leaving the breakout session feeling uncomfortable that something illegal or unethical was done." She testifies here it was terrible. Ms. Radford has pled guilty, and she's looking to be sentenced. Okay?

All right. Now, maybe if I draw this out a little bit further, you won't have to listen to this breakout session tape five more times on your own, but clearly my concern is with Heather Jones and those three comments that Heather Jones made. Now, first of all, I submit to you, on the basis of Mr. Mosher's testimony and on the basis of Mr. Mosher's statements in the breakout session, that there was nothing wrong with that breakout session. All right? And if that's the case, then Ms. Jones' comments are not part of rebate fraud school, either. But if you look at them, there's three of them, and there's two that basically have to deal with just what goes into a P&L and why it would be useful to look at. And we already talked about that, I'm not going to belabor the whole P&L issue, but I told you, there's legitimate reasons and everybody agrees that there's legitimate reasons for using P&L's of customers. That's not -- that's not an issue.

The third comment requires a little bit of context to understand. And, again, remember, this whole conversation is legitimate. And Ms. Jones says, "And to the point of them not knowing, I mean, on a percentage-wise, very few of them actually ask for backup, I would say less than 10 percent."

Now, the question you need to ask yourself about this comment is, when she says, "And to them -- and to the point of them not knowing," the question is, not knowing what? What is the logical blank to fill in there? And I put this at


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 228 of 256 PageID #: 12862

the bottom because this is the last thing. This is like a chain of things that were said that you have to put together. So that's what she said, and that's what the government says basically is evidence of her voluntarily and knowingly joining a conspiracy.

If you back up a little bit, what Mr. Mosher says is, "You're getting a fair price. And I'll tell you this, if I send this guy 21,000 instead of 25,000 -- instead of 25-, and his buying hasn't changed, well, that's a pretty fair price. I mean, I sent the guy 21 cents a gallon, you know? I mean, he has no earthly idea what the hell"——excuse me, I apologize for the language——"he did to get to 21 cents a gallon. He has no clue." I'm going to skip the rest of that, because that's the part -- where he says "he has no clue," that immediately precedes this thing where she says, "And to the point of them not knowing."

Now, remember, in the Charlie customer, the change from 25 to 21 is perfectly legitimate. But that's not even really precisely the circumstance here, because if you go further back, this is, you know, several minutes earlier, he says, "Okay, so let's go -- let's just go to the first column." I'm going to skip that a little bit. "So make a number up, a hundred thousand, customer did a hundred thousand gallons, right? You know, August the 12th that customer did a hundred thousand gallons, and his Price Fetch for the month


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 229 of 256 PageID #: 12863

was running at whatever it is, cost plus .04, okay?"

All right. Now you have to ask yourself, "Well, why are they running a Price Fetch at cost plus .04?" Well, they've got to run it at something; they're giving them cost plus something, right? But everyone's basically said that it's okay to adjust this customer's gallons. So in order to get a number, you have to run it at something.

"And at a cost plus .04, on August the 12th this customer's rebate would have been 25,000, okay?" 25 cents a gallon at a cost plus .04, for 25,000, right? The 25,000 he's talking about there, that's the -- I submit that's the same -- possibly the same 25,000 he's talking about in that other section there. But then he says, "25 cents -- BM means you, you, me, gosh." He's talking about Brian Mosher. "And, again, I'm not -- I'm looking at history back here so I can see July's numbers when I'm doing this. Add it up. He did 110,000 gallons in July and his rebate was only 12,000. Um, okay. Does this -- and then I ask myself, 'Is this customer a customer that I send a daily Price Fetch to? Does he buy from anybody else? Does he have any idea what cost plus .04 means to his business?' No, has no clue, absolutely no idea."

Now, he wouldn't know because he thinks he's getting cost plus, period. They're running it internally at Pilot, in this hypothetical, to get a number. And that number happens to come out, in August, to 25,000. And Mr. Mosher is looking


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 230 of 256 PageID #: 12864

at a customer who has lost 10,000 gallons and has more than doubled the rebate that would be paid under the old way of calculating it. So he's suggesting that they adjust it, which everybody has said is legitimate for this kind of customer. That's the scenario. You know, you've seen some of these words parroted back at us as, you know, evidence of fraud. This scenario is one that is perfectly legitimate. In fact, it's a scenario in which a customer goes from a 12,000-dollar rebate to a 21,000-dollar rebate despite the drop in gallons. Rebate fraud school.

Excuse me just one moment, please.

(Brief pause.)

MR. VERNIA: All right. I think I've talked enough about the facts. I think I've covered everything in that little core, and I hope I've covered everything in the cloud arounding it -- around it. It's getting late.

I want to talk a little bit about the law. And you've already seen this, I think. "The elements of conspiracy are, first, that two or more persons"——I guess we have a typo there——"conspired, or agreed, to commit the crimes of wire fraud and/or mail fraud; and, second, that the defendants knowingly and voluntarily joined that conspiracy."

As for the first element, an agreement, you will hear that it is essential that the government prove beyond a reasonable doubt that Heather was part of a mutual

understanding to commit the crime of mail or wire fraud. Now, the government can use circumstantial evidence to try and prove the existence of that agreement, but it has fallen far short of doing that in this case.

Keep in mind, Heather Jones worked in the same business as Brian Mosher. The business wasn't a meth lab, the business wasn't the Mafia, it wasn't something where everything you do is a crime. So there's going to be connections between Heather Jones and many of the people the government has labeled conspirators and prosecuted as conspirators in this case. Those connections just naturally exist because she works in the business. But working in the business doesn't satisfy the first element of being a conspirator.

Furthermore, if Brian Mosher kept secret his efforts to defraud his customers; and you've heard him say he did, you've heard him say that he shielded information from Heather——take a look at Halvor; that is a great example——then Heather did not have the kind of understanding that would allow her agreement to be one of conspiracy with him.

You know, let me just go back. I think the Halvor case is an interesting example of this. But ask yourself, why did he not tell Heather Jones about the deal? He knew that Heather, knowing -- doing her job conscientiously, would seek approval from Scott Wombold. I think -- my recollection is,

when I cross-examined Mr. Mosher, he said he didn't ask Heather Jones to seek approval. But once he knew that she was going to go by the book, he probably knew that he was going to get pushback from Mr. Wombold if he made too aggressive a deal, like the deal he actually made with Cameron Fraley. So he's hiding from everybody. Is it possible to have an understanding with such a person, an understanding that constitutes a conspiracy? Are you agreeing to commit mail and wire fraud with such a person?

The next element is, "the defendant must have voluntarily and knowingly"——got it backwards——"joined the conspiracy." Now, this is where you need to remember that conversation that Heather had with Brian, where she said, "Is this okay?" and he said, "It is," and at the time he says he would have believed it would have been industry practice and he possibly would have told her that as well. That comment alone is enough to take somebody out of voluntarily and knowingly joining a conspiracy. You can't knowingly join something if the person you're supposedly joining with is lying to you about the very nature of the endeavor, right? That is-- The whole point of the conspiracy laws is to punish people who get involved knowingly with criminal activity. And if the person you're talking to says, "This is perfectly fine, don't worry about it," or even says it's industry standard practice, it's not possible to have voluntarily and knowingly

joined with them in their conspiracy.

I want to go back. I think I may have-- If I didn't read this before, I think I should now. You may remember Mr. Hardin was interviewing -- not interviewing -- cross-examining Brian Mosher, and there was this conversation. Mr. Hardin says, "Okay --

"QUESTION: Okay. Was that the way you felt at the time that you were instructing Ms. Heather Jones as to what she was to do?

"ANSWER: Yes.

"QUESTION: Was that the way you felt when she asked if this was okay?

"ANSWER: Yes.

"QUESTION: And you told her it was, right?

"ANSWER: I did.

"QUESTION: You told her it was because you believed it was at the time. Is that right?

"ANSWER: Yes. I had been given guidance that it was."

Now, you don't need to give -- you don't need to believe that Mr. Mosher actually was given guidance or not, but clearly, the evidence is, he had no reason to deny -- he had no reason to fabricate this conversation. Of course this conversation occurred.

One of the things--

Your Honor, I apologize, what time is my time up?

THE COURT: Ms. Lewis?

MR. VERNIA: I'm sorry, I should --

THE COURTROOM DEPUTY: You have till five minutes before the hour.

MR. VERNIA: All right. Thank you.

THE COURTROOM DEPUTY: And I'll give you a five-minute warning.

MR. VERNIA: Thank you.

One of the things that you're going to see in your jury instructions is an instruction on something called "deliberate ignorance." Now, you know, this kind of reminds me of a George Carlin routine, you know, like, oxymorons like jumbo shrimp. Deliberate ignorance kind of sounds like that a little bit, but if you take it apart I think you'll see that what it means is ignorance that is the product of some act; it's not simply that you don't know something because no one's told you, but you've taken some step to avoid finding out the truth.

And Judge Collier will instruct you on that. You may not find the defendant joined a conspiracy through deliberate ignorance, but you may find that a defendant was deliberately ignorant about the criminal goals of the conspiracy, and I think -- at least I hope that the instructions will clarify that.

But for Heather Jones, I think, frankly, deliberate ignorance doesn't really apply. Heather Jones took steps to find out. She talked to Brian Mosher. She asked him if it was right, if it was okay. And he said yeah. So this is not-- Sometimes deliberate ignorance is described as like the ostrich sticking its head in the sand, you don't want to find out something. Clearly that's not the case with Heather Jones. She wanted to find out. She was just lied to, like Brian Mosher lied to so many other people.

Now, one factor to consider in evaluating the government's claim that Ms. Jones voluntarily and knowingly joined the conspiracy is her possible motivation for doing so. And the government said in its opening that it boiled down-- You remember the government's opening statement. It was, like, three months ago, but it was memorable, and they -- Mr. Lewen said that this case boiled down to greed and power. And I think you probably recognize by now that Ms. Jones had a comfortable life, she had a good job. She didn't have a lot of power. I think that's self-evident. But, you know, the question is, greed, is that a motivation. The government said that it was. And we can try to qualify greed, unlike power, right? I mean, we can put a number on it. At least we can do that with money. And that's what Bill Jennings did.

Now, here I'm going to digress for a minute, and I'm going to say something that I always say to juries, which is,


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 236 of 256 PageID #: 12870

I greatly appreciate -- we greatly appreciate your time and your service on the jury. You've been enormously patient. This has been a very long trial, and we can't even imagine how inconvenient it's been to you. So we appreciate your attendance, your attention. And, the last month, sitting over on that side of the courtroom has been frustrating, and I assume it's been frustrating for you as well, in part because -- well, there's two reasons, really, and the first one is, you know, we had the -- we began the year, really, with the playing of the audiotape that you'll remember and I don't really need to describe because there was that one terrible audio tape, or, actually, there were three, I guess. Ms. Jones had nothing to do with that. She was not present when that happened. She was not present at many of the audio recordings. The government's introduced one at which Ms. Jones was present, and that was the breakout session that we just talked at length about. But she was not present at the lake house. She was not present in Orlando. She was not present when that terrible -- those terrible recordings were made.

The next thing that kind of, from our perspective, slowed things down, really, and was -- you know, we spent a substantial amount of time on Mr. Seay, Mr. Darren Seay, perfectly nice gentleman from Pilot, came in to testify. Sometimes lawyers do things in court, not because the stakes


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 237 of 256 PageID #: 12871

on that issue are so high, but because we don't know what the stakes are on that issue. And I'm going to spend five minutes on this topic entirely, even though that testimony seemed to go on and on and on, especially with, you know, the discussions, some of the arguments amongst counsel, and that kind of thing.

You know, I know that Mr. Hamilton's criticized Mr. Jennings, you know, his bills in the case, pointed out that they were $250,000. I think Mr. Jennings pointed out that that was for a lot of work that never made it onto the witness stand. Again, we're responding to the government. We have to prepare for a lot of things, some -- you know, some of which ends up, as they say, on the cutting room floor.

I think both gentlemen were perfectly credible. I don't think they added all that much to the case. Mr. Seay basically documented the loss -- the alleged loss to the customers and then tried to calculate the gain to Pilot in two different ways. I don't think anybody is particularly disputing that if you don't pay a customer, as a company you're going to have more money. There is that. You know, I guess it's nice to have a number.

But, conversely, Mr. Hamilton, in his examination of Mr. Seay, I mean, he criticized the payments, et cetera, the bills, but, you know, I don't recall him ever really addressing Mr. Seay's conclusion -- I'm sorry, Mr. Jennings'


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 238 of 256 PageID #: 12872

conclusions, which were regarding the amount of commission money that Mr. Wombold and Ms. Jones and Ms. Mann made from the alleged fraud scheme. And Ms. Christoff was kind enough to lend me-- I'm not sure where this is. Ah, here it is. Ms. Christoff was kind enough to lend me her handwritten note. Her handwriting is better than mine. You'll remember this from just a few -- I guess a week or so ago. And it summarized the impact for both Scott Wombold and Heather Jones. And you can see the numbers right there. You know, Mr. Jennings-- You know, like I said, Mr. Hamilton really didn't challenge Mr. Jennings on his calculations. They're pretty much unrebutted.

Heather Jones' entire loot from this scheme, if you want to call it that, if you must call it that, was $246 over 53 months, which Ms. Christoff's calculator said was $4.64. So I'm just going to show you, this is essentially all of it, per month, that Ms. Jones allegedly made off of this scheme. (Indicating.) Does it make sense for a woman who challenged her supervisor on this to risk her job, to risk her -- her liberty, over this? I think it's self-evident. No.

Now, the other thing to think about was what was motivating people at Pilot at this time. They were making pretty good money. And you saw Ms. Whaley broke down Ms. Jones' payments. You remember Ms. Whaley. She was the lady from Pilot who had the commission breakdown sheets. And


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 239 of 256 PageID #: 12873

she said on cross-examination by Mr. Murray that the growth in the commission really was a factor not of any, you know, pennies around the edges, the power of pennies, or anything like that; it was the fact that Pilot had grown by leaps and bounds. They had bought Flying J. All of those customers -- all of those diesel gallons flowed into Pilot's coffers. I think it was Mr. Andrews who testified that he had been -- he had worked at Flying J, and he said that he was, like, the only person in their sales division who survived the merger and went over. Basically it wasn't really a merger. It was an acquisition of a lot of stores and a lot of customers and a lot of business. So that was the main driver then. And for Ms. Jones, you'll recall, you may recall—it's been a long trial—you may recall that her commission increased as well because the rates at which it was calculated increased and the base number of customers that her -- that her sales representatives increased. It had nothing to do with this stuff.

Now, moving on on the legal issues, the next thing you have to find is that there was an intent to defraud. To find Heather guilty of conspiracy to commit mail and wire fraud, you have to find that she intended to defraud trucking companies or to deceive someone for the purpose of causing that person financial loss or causing her or another's financial gain.

Now, we've been over most of the evidence and pretty much all of the key evidence, and there's really nothing substantial, direct evidence, circumstantial evidence, that Heather ever intended to deceive anyone. But I want to point out -- I just want to read you briefly my conversation -- from my conversation with Brian Mosher when he was on the stand about -- about Heather's attitude about all this.

"QUESTION: Okay. Did Ms. Jones like making adjustments to manual rebates?

"ANSWER: It was cumbersome and timely."

I think he means——what does he mean?——cumbersome and time-consuming, perhaps, but he says "timely." All right.

"QUESTION: Isn't it true that on any given month you could have simply replied to Ms. Jones, 'They're all approved'?

"ANSWER: Yes.

"QUESTION: You could have done that through an e-mail, or phone call, any number of ways, right?

"ANSWER: Yes."

So, bear in mind, she -- he didn't have to send those spreadsheets back. He could have contacted her and just said, "They're all approved."

"QUESTION: And she would have done exactly that, she would have just paid the amounts that were originally in there, right?

"ANSWER: Yes.


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 241 of 256 PageID #: 12875

"QUESTION: You didn't need to fill the spreadsheet out and send anything back. You could just tell her. So the choice of whether to reduce any rebates, whether to do it at all, which customers to do, and by how much, that was yours entirely?

"ANSWER: Yes."

Does that sound like somebody who intends to defraud, somebody who talks to their boss about whether it's okay and is told yes, and who would gladly not do the thing at all because it's cumbersome and time-consuming? So the evidence fails utterly to establish that Heather intended to defraud her customers.

I'd like to talk a little bit about Ms. -- I may touch on the case, but I'm going to talk really about -- about your role as jurors and about -- about the big law. You know, we've talked about conspiracy law, we've talked about wire fraud, but, you know, there is the Constitution, which is over all of that. The Constitution is extremely important to someone sitting across the room like Heather Jones is.

Most of us, I think, everyone would admit, who isn't currently in the military or similarly employed, most of us take liberty for granted, you know, freedom is something that's always there, it's not going to require a lot of attention from us. But I think, really, you can think of it like a structure built of stone blocks, you know, and each of

those stones is a right that has to be crafted, put into position, and maintained.

Now, one set of those stones makes up the criminal justice system that Ms. Jones is now, unfortunately, a part of. Every person sitting across from your jury box in this historic courtroom has found out how important those rights are to them. You may not-- If you think about it, some of the rights are protected by other people. Some -- even in the criminal justice system, some rights are protected by other people. For example, 12 of you are going to go off and decide this case. Well, somebody had to make sure there were enough of you here so that we would have 12, right? Judge Collier, you know, works on that. People in the clerk's office that we've never met work on that. So that right that's in -- that is guaranteed to Ms. Jones is provided by somebody else, really. But there are three rights, at least, that you, and you alone, can guarantee. And I've put them up there, the defendants rights that are safeguarded by jurors. The first one is the presumption of innocence. The second one is the burden of proof on the government. And the third is proof must be beyond a reasonable doubt.

Now, you know, we hear these kinds of things in our culture, maybe on, you know, reality shows involving police officers, reading in the newspaper, but I do want to take some time to talk to you about them so that you'll think about them

maybe in a way that you haven't thought about them before.

First of all, the presumption of innocence. And, again, this is something that only you can guarantee. Only you know whether in your heart Heather Jones enjoyed the presumption of innocence up until the close of the evidence and up until the jury is charged. Only you know whether you guaranteed that right to her. And I want to emphasize that the presumption of innocence is especially important in this case, because you may have noticed that nearly every one of the Pilot employee witnesses who took the stand and testified on direct, they testified about something, something important to the lives of these four people, walked that back significantly on cross-examination. The number of times that people said yes to the answer -- to the question, "You just assumed that that was the case, didn't you?" is phenomenal. Virtually every witness in this case has done that, beginning with Janet Welch, a coworker -- former coworker of Ms. Jones. Ending just last week with Sherry Blake, we heard it again. And Sherry Blake has nothing to do with Heather Jones. And we heard it time after time after time, people testifying that they had assumed that the defendants knew something or were participants in something. And that assumption had to be pulled out of them on cross-examination.

Now, how does this relate to the presumption of innocence? Well, if Heather Jones has a right to be presumed

innocent, and she does, then you cannot convict her using testimony from witnesses who just assumed she was guilty.

The next thing I want to talk about is the burden of proof. And you've heard from Judge Collier at the beginning that the government bears the burden of proving Heather Jones' guilt beyond a reasonable doubt, and that that burden remains on the government throughout the trial.

The Constitution -- our Constitution places no burden of proof whatsoever on an accused person. In a case such as this where the government falls short of proving their case beyond a reasonable doubt, a defendant such as Heather has no need to introduce any evidence whatsoever. And you should not hold that against them -- against her when you consider whether the government's carried its burden. Now, again, this is a right. It's an important right. But you're the only ones who can tell whether you've guaranteed it. If you identify in yourself or, through discussion in the jury room, in your fellow jurors a tendency to believe that Ms. Jones was obligated to put on any evidence, then I would encourage you to discuss those feelings and work through them, bearing in mind that she has no such obligation, and that that's a constitutional right.

If I could have just a minute. I'm going to get a cup of water. Excuse me.

THE COURTROOM DEPUTY: There's more water in the

pitcher.

MR. VERNIA: I just needed to wet my lips. Excuse me. Thank you.

(Brief pause.)

MR. VERNIA: Finally in this line, reasonable doubt. Judge Collier will instruct you that proof beyond a reasonable doubt means proof which is so convincing that you would not hesitate to rely on it and act on it in making the most important decisions in your own lives.

Now, again, this is one of these things you've heard a thousand -- maybe a million times, proof beyond a reasonable doubt. Mr. Hamilton mentioned it. He's aware of the standard.

I want to make several points about this instruction. First, it underscores the gravity of the decision you're facing, by saying that it must be so convincing that you would not hesitate to rely and act on it, not that you would take a chance on it, not that you would think something's probably true or mostly probably true, but you would not hesitate to rely on that information.

Second is the phrase "in making the most important decisions in your own lives." Even though the case is about Heather, the law instructs you to measure it against those things that matter to you the most, your most important decisions; for example, should you marry a certain person,

should you buy a certain house; if your child is sick, should they have an operation with some risk attached to it. These are most important decisions. And, again, tying this back to the other phrase, the kind of information, for those decisions, that you would not hesitate to rely and act on.

Now, another thing that I want to point out is that by placing the emphasis on you, the instruction does not allow you to substitute the judgment of somebody else, somebody else in the jury room, in your home, in the media, anywhere. "Your own judgment." Now, I'm going to try to relate this to something that some of you may have experienced. If you've ever signed up for, like, a 401(k) or an IRA, one of the things they'll ask you, "What is your tolerance for risk? Like, how comfortable are you with risk?" Because if you think about the reasonable doubt instruction, it's really asking you what is your personal tolerance for risk if this was a most important decision in your life and this was the kind of information you had on it. And you'll realize, by thinking about the fact that -- that IRA companies ask that question, that you're all different about that. You know, some people go to casinos every week, some people would never enter a casino in their life. Some people drive 5 miles over the speed limit routinely, some people drive 5 miles under because they want to have that little hedge. Those people all have different levels of risk tolerance, and it bears directly

on reasonable doubt. Reasonable doubt is not a one-size-fits-all concept.

Twelve of you are going to decide the case here. Heather Jones is entitled to that diversity of experience and judgment. You should be open to hearing others' views, to trying to talk through your differences. But those of you who are especially prudent and careful should not surrender that standard just to get the job done and to get a result.

Again, on behalf of Heather Jones and her defense team, Cullen Wojcik and Andrew Murray, I thank you for your patience today and really since we began this trial three months ago.

On April 15th, 2013, a day you've heard about over and over and over again, when the agents of the U.S. came to Pilot and served a search warrant, Heather Jones was a regular person just like you. She had a good job, a loving family, husband. She's not guilty. She wasn't then. She's not now.

Thank you, Your Honor. I'm sorry.

And I'm not going to let you see my password again.

THE COURT: Ladies and gentlemen, it's about 15 minutes until 5:00. So we're going to close now. And we should be able to hear from all of the other attorneys tomorrow.

I'm going to have you come back at 9:30 tomorrow, and we'll start right up with closing arguments. So the jury

is free to go.

(The jury exited the courtroom, and the proceedings continued as follows:)

THE COURT: Please be seated.

I noticed there were some youngsters in the courtroom today. Is this a class trip or a family trip?

MRS. LEWEN: Class trip.

THE COURT: Class trip. Okay. What school?

MRS. LEWEN: We actually have been following some of the news reports from Knoxville.

THE COURT: And which school are you?

MRS. LEWEN: We're not from a school.

THE COURT: Huh?

MRS. LEWEN: We're homeschoolers.

THE COURT: Okay. Homeschoolers. Homeschoolers. Okay. And what grades are they?

MRS. LEWEN: We have eighth grade, fifth grade, and fourth grade.

THE COURT: Who is the fourth grader? Stand up, fourth grader. What's your name?

DAVID PAUL LEWEN III: David Paul.

THE COURT: Okay. David. Excellent. Are you good at math?

DAVID PAUL LEWEN III: Yes.

THE COURT: Okay. Very good. You see above my head

there is a round object with something in it. Do you see that?

DAVID PAUL LEWEN III: (Moving head up and down.)

THE COURT: Ask your mother if she has a dollar bill.

(Brief pause.)

THE COURT: Okay. Look on the dollar bill and see if you see anything on the dollar bill that looks like what's above my head in the circle.

DAVID PAUL LEWEN III: (Moving head up and down.)

You do? You see it?

DAVID PAUL LEWEN III: (Moving head up and down.)

THE COURT: Excellent. Excellent. That is the Great Seal of the United States. What we see on top of my head is the front of the seal. There is a back of the seal, also. And the only place you'll ever see the back of the seal is on the dollar bill. So you'll see two circles there. One is the front, and one is the back. And what we have here is the front.

Now, you see an eagle there on the -- in the circle, right?

DAVID PAUL LEWEN III: Yes.

THE COURT: Okay. Well, this seal was designed by Benjamin Franklin, Thomas Jefferson, and John Adams.

DAVID PAUL LEWEN III: (Moving head up and down.)

THE COURT: Okay. Have you had any history yet?

DAVID PAUL LEWEN III: Yes.

THE COURT: So you know who those people were?

DAVID PAUL LEWEN III: Yes.

THE COURT: Okay. They were great men who were very much involved in the founding of our country. Benjamin Franklin did not think that we should have an eagle. Do you know what he thought we should have?

DAVID PAUL LEWEN III: A turkey.

(Laughter.)

THE COURT: A turkey. That's exactly right. That's exactly right. He wanted a turkey, but he got voted out, and they decided that there would be an eagle.

Now, in the talons of the eagle, you will see some arrows in one talon and you will see olive leaves -- an the olive branch in the other talon. At first they decided to have the olive branch in the right talon. And in the symbols like this, the right side is the favorite side, it's the side of honor. And they decided to move the arrows from the right side to the left side. Do you know why that was?

DAVID PAUL LEWEN III: (Turning head from side to side.)

THE COURT: Because the United States is for peace first. The olive branch is a sign of peace. And the arrows are a sign of war. So although we're happy to fight if necessary, we prefer peace. So we have the olive branch, the peace, on the favorite side, and then we have arrows on the

other side.

Now, if you count the arrows there, how many arrows do you see? Can you count them?

(Brief pause.)

THE COURT: There are 13, 13 arrows. Okay? And then if you look at the olive branch, there are some leaves. How many leaves are there?

DAVID PAUL LEWEN III: Thirteen.

THE COURT: Thirteen. Excellent. Excellent. Then you see some olive pits on the leaves. How many pits are there?

DAVID PAUL LEWEN III: Thirteen.

THE COURT: Thirteen.

(Laughter.)

THE COURT: Excellent. Excellent. Excellent. And then in the eagle's -- in the eagle's beak there is a banner, and the banner has some words on it, "E pluribus unum." How many letters are there in "E pluribus unum"?

DAVID PAUL LEWEN III: Thirteen.

THE COURT: Thirteen. Exactly. That's good.

Then on top of the eagle's head there is a glory, with stars and glory. How many stars are in the glory?

DAVID PAUL LEWEN III: Thirteen.

THE COURT: Excellent. You are a good mathematician. You've got it down pat. Do you know why we see so many

thirteens?

DAVID PAUL LEWEN III: (Moving head from side to side.)

THE COURT: Okay. There were 13 original colonies.

MR. VERNIA: Oh, yeah.

(Laughter.)

THE COURT: And so the Founders wanted to make sure that as a reminder, that when we looked at the Great Seal we would remember that there were 13 original colonies. And out of those 13 original colonies came what?

DAVID PAUL LEWEN III: America.

THE COURT: One nation, one people. That's exactly right. You're excellent, David. You get an A today.

DAVID PAUL LEWEN III: Thank you.

THE COURT: Do you-all have any questions about court or anything that you've seen? I may not be able to comment on much, but what we have here today is something that the Founders had in mind when they separated from England and this country was created and the Constitution was drafted.

They wanted to make sure that the people had some protections from the government. You heard one of the lawyers, in the end, mention some of those things. The Founders felt that it was very, very important that the average person not be subject to the same type of oppression that the people suffered under the British, so they decided

that this system that we have now would exist.

They wanted to separate the powers that the king had, and they separated those powers into three branches. And the branch that we have here is the judicial branch. So the judicial power was separated from the executive power and the legislative power and put in the court system. The executive power is represented by those people sitting at that table there. (Indicating.) They work for the Department of Justice. And the Attorney General is the head of the Department of Justice. And the Attorney General works for the President of the United States, who is the executive. So that is the branch of government that enforces the laws.

And what we are discussing here, in part, is what the laws say. And the Congress wrote the laws. In fact, one of the laws that we're dealing with was written -- I think it was right after the Civil War. The mail fraud statute was written right after the Civil War. So it's a law that's been around for a long time. And the Congress cannot enforce its laws, so it creates laws, and the executive branch has to enforce the laws.

And this is one of those laws that there are a great deal of differences about. So someone has to interpret it, and unfortunately that falls to people like me, and we have to look at it and we do studies and we scratch and we it over and we make the best decision that we can about what that law


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 254 of 256 PageID #: 12888

means.

So you're actually seeing all three branches of government in action right now. Okay?

DAVID PAUL LEWEN III: (Moving head up and down.)

THE COURT: Okay. There is nothing magic about what we have. We have the longest lived democracy on earth, by far. And there are other countries that have had democracies, that have had constitutions, that are better than ours on paper, but those countries have fallen by the wayside for various reasons.

Our Constitution has survived because people like you youngsters grow up believing in it, grow up supporting it, and grow up wanting it to continue so that your children and your children's children can derive the same benefits from it that your parents did. And it can't survive unless you're willing to do that.

Okay. Do you have any questions you'd like to ask me?

(Brief pause.)

DAVID PAUL LEWEN III: No, sir.

THE COURT: Okay. Well, thank you. We appreciate you coming.

Ms. Lewis.

MR. RIVERA: Your Honor?

THE COURT: Yes.

MR. RIVERA: On behalf Mr. Wombold, we had requested,

for planning purposes, three hours for closing, and weren't sure the Court had approved it.

THE COURT: I don't think I heard that. When did you say that? Was that last week?

MR. RIVERA: Yes, sir. We have more counts in the indictment, Your Honor. We have -- by far I think we have more counts.

THE COURT: I think somebody at the very beginning asked for that, and I think we negotiated it down.

MR. RIVERA: Well, Judge, I'm going to abide by whatever you decide, but that was --

THE COURT: Two hours.

MR. RIVERA: Two hours.

THE COURT: Two hours.

MR. RIVERA: Very well. Thank you.

THE COURT: Ms. Lewis.

(Evening recess.)


Case 3:16-cr-00020-CLC-HBG Document 511 Filed 03/09/18 Page 256 of 256 PageID #: 12890