# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 3:16-CR-20 |
| | ) | (Collier/Guyton) |
| MARK HAZELWOOD, | ) | |
| | ) | |
| DEFENDANT. | ) | |

## MARK HAZELWOOD'S RULE 33 MOTION FOR NEW TRIAL

# Table of Contents

I.     BRIEF FACTUAL BACKGROUND ................................................................................ 1

II.    STANDARD OF REVIEW ......................................................................................... 1

III.   ARGUMENT ........................................................................................................ 2

   A.  Miscarriage of Justice and Against the Weight of Evidence ............................... 2

      1.  Count Fourteen ........................................................................................ 2

      2.  Counts One and Eight ............................................................................... 5

      3.  Count Eight ............................................................................................ 13

   B.  Legal Errors Warrant New Trial .................................................................... 16

      1.  Co-conspirator Guilty Pleas ...................................................................... 16

      2.  Exhibits 529-531 Should Have Been Excluded ............................................. 22

   C.  New Trial Warranted Based on Ineffective Assistance of Counsel ..................... 24

      1.  Opening Door Was Ineffective Assistance ................................................... 25

      2.  Counsel's Failure to Investigate Constituted Ineffective Assistance ............... 31

      3.  Cumulative Prejudice .............................................................................. 32

IV.   Excusable Neglect ...................................................................................... 33

Case 3:16-cr-00020-CLC-HBG   Document 566   Filed 06/25/18   Page 2 of 42   PageID #: 14595

# Table of Authorities

Page(s)

Other Authorities

*Anthony v. Tidwell,*
    560 S.W.2d 908 (Tenn. 1977) ................................................................................. 9

*Arthur Andersen LLP v. United States,*
    544 U.S. 696 (2005) ........................................................................................... 4

*Blackburn v. Foltz,*
    828 F.2d 1177 (6th Cir. 1987) .............................................................................. 31

*Bonilla v. Volvo Car Corp.,*
    150 F.3d 62 (1st Cir. 1998) ................................................................................... 15

*Carbon Processing and Reclamation, LLC v. Valero Marketing and Supply Co.,*
    694 F. Supp. 2d 888 (W.D. Tenn. 2010) ................................................................. 8

*Cornwell v. Bradshaw,*
    559 F.3d 398 (6th Cir. 2009) ........................................................................... 30, 32

*Davis v. White,*
    858 F.3d 1155 (8th Cir. 2017) .............................................................................. 29

*Gould, Inc. v. Mitsui Min. & Smelting Co.,*
    750 F. Supp. 838 (N.D. Ohio 1990) ........................................................................ 7

*In re Duramax Diesel Litig.,*
    298 F. Supp. 3d 1037 (E.D. Mich. 2018) .................................................................. 6

*In re Lupron Mktg. & Sales Practices Litig.,*
    295 F. Supp. 2d 148 (D. Mass. 2003) ..................................................................... 15

*Langford v. Rite Aid of Ala., Inc.,*
    231 F.3d 1308 (11th Cir. 2000) ....................................................................... 15, 16

*McQuiggin v. Perkins,*
    569 U.S. 383 (2013) ........................................................................................... 4

*Old Chief v. United States,*
    519 U.S. 172 (1997) ....................................................................................... 24, 26

Case 3:16-cr-00020-CLC-HBG   Document 566   Filed 06/25/18   Page 3 of 42   PageID #: 14596

*Payton v. United States,*
    222 F.2d 794 (D.C. Cir. 1955) ............................................................... 21

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship,*
    507 U.S. 380 (1993) ............................................................................... 34

*Schlup v. Delo,*
    513 U.S. 298 (1995) ................................................................................. 4

*Sims v. Livesay,*
    970 F.2d 1575 (6th Cir. 1992) ......................................................... 31, 32

*Smith v. Farley,*
    59 F.3d 659 (7th Cir.1995) ................................................................... 23

*Smith v. Morrow,*
    No. 1:09-CV-188, 2010 WL 3851708 (E.D. Tenn. Sept. 27, 2010) ........ 27, 30

*Street v. New York,*
    394 U.S. 576 (1969) ................................................................................. 5

*Strickland v. Washington,*
    466 U.S. 668 (1984) ....................................................... 24, 31, 32

*United States v. Arny,*
    831 F.3d 725 (6th Cir. 2016) ............................................................... 33

*United States v. Ashworth,*
    836 F.2d 260 (6th Cir. 1988) ......................................................... 1, 14

*United States v. Baete,*
    414 F.2d 782 (5th Cir. 1974) ............................................................... 21

*United States v. Bell,*
    516 F.3d 432 (6th Cir. 2008) ................................................................. 1

*United States v. Blandford,*
    33 F.3d 685 (6th Cir. 1994) ................................................................. 22

*United States v. Bowman,*
    302 F.3d 1228 (11th Cir. 2002) ........................................................... 23

*United States v. Brown,*
    720 F.2d 1059 (9th Cir. 1983) ......................................................... 23, 29

*United States v. Carson*,

    560 F.3d 566 (6th Cir. 2009)...................................................................... 22

*United States v. Christian*,

    786 F.2d 203 (6th Cir. 1986)...................................................................... 16

*United States v. Clay*,

    667 F.3d 689 (6th Cir. 2012)........................................................... 5, 23, 24

*United States v. Contents of Accounts*,

    No. 310-228, 2010 WL 2556849 (W.D. Ky. June 18, 2010)...................... 7

*United States v. Cooper*,

    No. 1:06-CR-92, 2007 WL 1485027 (E.D. Tenn. May 18, 2007) ............ 24

*United States v. Dowling*,

    739 F.2d 1445 (9th Cir. 1984)...................................................................... 9

*United States v. Dunn*,

    805 F.2d 1275 (6th Cir. 1986).................................................................... 23

*United States v. Eaton*,

    784 F.3d 298 (6th Cir. 2015)........................................................................ 4

*United States v. Farrell*,

    126 F.3d 484 (3d Cir. 1997)......................................................................... 4

*United States v. Fife*,

    573 F.2d 369 (6th Cir. 1976)...................................................................... 21

*United States v. Hardy*,

    228 F.3d 745 (6th Cir. 2000)...................................................................... 24

*United States v. Harris*,

    881 F.3d 945 (6th Cir. 2018)........................................................................ 7

*United States v. Hickman*,

    592 F.2d 931 (6th Cir. 1979)............................................................... 20, 21

*United States v. Jamieson*,

    427 F.3d 394 (6th Cir. 2005)........................................................................ 7

*United States v. Kallin*,

    50 F.3d 689 (9th Cir. 1995)........................................................................ 29

iv

*United States v. Krocka,*

    376 F. App'x 983 (11th Cir. 2010) ......................................................................... 4

*United States v. Maddux,*

    No. 14-20, 2015 WL 5843257 (E.D. Ky. Oct. 5, 2015) ........................................ 7

*United States v. Mentz,*

    840 F.2d 315 (6th Cir. 1988) ............................................................................... 20

*United States v. Merriweather,*

    78 F.3d 1070 (6th Cir. 1996) ............................................................................... 30

*United States v. Munoz,*

    605 F.3d 359 (6th Cir. 2010) ................................................................ 2, 3, 33, 34

*United States v. Ofray-Campos,*

    534 F.3d 1 ................................................................................................ 17, 18, 19

*United States v. Parker,*

    997 F.2d 219 (6th Cir. 1993) ............................................................................... 32

*United States v. Pelullo,*

    14 F.3d 881 (3d Cir. 1994) ............................................................................... 5, 6

*United States v. Schlei,*

    122 F.3d 944 (11th Cir. 1997) ............................................................................... 4

*United States v. Skeddle,*

    940 F. Supp. 1146 (N.D. Ohio 1996) ................................................................... 7

*United States v. Soto,*

    794 F.3d 635 (6th Cir. 2015) ................................................................................. 2

*United States v. Stahl,*

    616 F.2d 30 (2d Cir. 1980) ................................................................................. 25

*United States v. Sutherlin,*

    118 F. App'x 911 (6th Cir. 2004) ................................................................... 7, 14

*United States v. Trujillo,*

    376 F.3d 593 (6th Cir. 2004) ............................................................................... 32

*United States v. Turner,*

    490 F. Supp. 583 (E.D. Mich. 1979) ................................................................... 1

*United States v. Van Dyke*,

    605 F.2d 220 (6th Cir. 1979)................................................................. 6

*United States v. Villalpando*,

    259 F.3d 934 (8th Cir. 2001)................................................................. 28

*United States v. Warshak*,

    631 F.3d 266 (6th Cir. 2010)................................................................. 12

*United States. v. DeLucca*,

    630 F.2d 294 (5th Cir. 1980)................................................................. 17

*Ward v. United States*,

    995 F.2d 1317 (6th Cir. 1993)................................................... 27, 28, 29

*Williams v. Taylor*,

    529 U.S. 362 (2000) ............................................................................. 24

*Wilson v. Mazzuca*,

    570 F.3d 490 (2d Cir. 2009)................................................................. 28

*Zoroufie v. Lance, Inc.*,

    No. 07-2016, 2008 WL 2669105 (W.D. Tenn. June 27, 2008)................ 9

## Statutes

18 U.S.C. § 1512(b) .................................................................................... 4

T.C.A. § 47-2-201 ...................................................................................... 8

## Rules

Fed. R. Evid. 405(a)................................................................................. 24

Fed. R. Crim. P. 33 ............................................................................. 1, 2, 4

vi

Defendant Mark Hazelwood ("Hazelwood") respectfully moves this Court, under Rule 33 of the Federal Rules of Criminal Procedure ("FRCP"), for a new trial.

## I. BRIEF FACTUAL BACKGROUND

On February 15, 2018, a jury convicted Hazelwood of conspiracy to commit mail and wire fraud, wire fraud, and witness-tampering. We assume the Court's familiarity with the facts. Hazelwood maintains his innocence and preserves appellate issues not discussed herein.[1]

## II. STANDARD OF REVIEW

Under Rule 33, the Court should vacate the conviction and grant a new trial if the interest of justice so requires. FRCP 33(a). In *United States v. Turner,* 490 F. Supp. 583 (E.D. Mich. 1979), *aff'd*, 633 F.2d 219 (6th Cir. 1980), the court provided a comprehensive assessment of the scope of a court's review under Rule 33, which is "very different" from the Rule 29 standard:

> The Motion for New Trial involves a much broader standard of review than a Motion for Acquittal. A verdict may well be against the great weight of the evidence, but, nevertheless, be substantial enough to permit reasonable jurors to draw an inference of guilt. In a Motion for New Trial, the trial judge can consider the credibility of the witnesses and the weight of the evidence to insure that there is not a miscarriage of justice. It has often been said that he/she sits as a thirteenth juror.

*Id*. at 593. The Sixth Circuit has endorsed this standard. *United States v. Ashworth*, 836 F.2d 260, 265–66 (6th Cir. 1988).

If the Court made errors in admitting evidence or other errors affecting the defendant's substantive rights, it should grant a new trial. *United States v. Bell*, 516 F.3d 432, 440 (6th Cir. 2008). In assessing the impact of an erroneous ruling, the Court need find only a "*reasonable possibility*" that wrongly admitted evidence contributed to the conviction. *Id.* at 447 (emphasis added). In such instances, the "concern is not with whether there was sufficient evidence" for a

---

[1] We are grateful to the Court for extending our time and page limit. Given the complexity of the issues, the extended page limit was insufficient to allow us to cite all relevant authorities/ transcript entries and to fully explain each of the authorities. If the Court believes that issues raised herein merit further development, we would be pleased to file a supplemental brief.

conviction, as the court must assume the jury was "substantially swayed" by the improper admission of evidence unless the other evidence was "overwhelming." *Id.* Rule 33 also allows a court to vacate a conviction on a finding of ineffective assistance of counsel. *United States v. Soto*, 794 F.3d 635, 645 (6th Cir. 2015) (citing *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010)).

## III.    ARGUMENT

Justice requires this Court to vacate Hazelwood's convictions for three reasons.

### A.    Miscarriage of Justice and Against the Weight of Evidence

A new trial is warranted because, with Count Fourteen, there was an actual miscarriage of justice, and all convictions are against the weight of the evidence.

#### 1.    Count Fourteen

A central part—and certainly the most salacious part—of the government's witness-tampering case was that Hazelwood bribed Sherry Blake to ensure her complicity after learning that she would be interviewed by Pilot's counsel, Steptoe & Johnson. The government very carefully constructed its narrative to persuade the jury that (a) Hazelwood learned in April 2014 that Steptoe would interview Blake, (b) he then paid her hush money—a $20,000 gift from him and his wife, which she claimed was substantially greater than her 2013 gift of $10,000, and (c) he followed through with a call two days before the Steptoe interview to corruptly persuade her to lie. Tr. 2/7/18 at 44:20-45:20. This chronology was critical to the government's witness-tampering case because Hazelwood's supposed knowledge of the Steptoe interview supplied the reason for him to "bribe" Blake. Indeed, the prosecutor emphasized the chronology in his closing, specifying that "[t]his timeline is important for witness tampering" and laying it out for the jury:

> Next in the time line is April of 2014. What do we know from the testimony of Sherry Blake? Mark Hazelwood and Joanne Hazelwood each give Sherry Blake $10,000 in April of 2014. April of 2014, Steptoe & Johnson, who is conducting the investigation for Pilot—these are Pilot's lawyers who are conducting an internal investigation of Pilot—schedule an interview for Sherry Blake to occur on June 11th of 2014. April of 2014 Sherry Blake tells Mark Hazelwood about the Steptoe

2

> interview and puts it on his calendar. May of 2014 Mark Hazelwood is terminated
> from Pilot but leaves with a paper calendar.

Tr. 2/5/18 at 179:1-11. But, based on our investigation, the facts conclusively show that the government's narrative, including its proffered bribery theory, was wrong and the jury was misled.

*First*, contrary to Blake's testimony, her 2013 gift was $15,000, not $10,000, a serious difference that makes the 2014 $20,000 gift seem far less suspect. *See* Decl. of Mark Hazelwood in Supp. of Mot. for New Trial ("Hazelwood Decl.") Ex. A. That Blake received a $15,000 gift in 2013 was never presented to the jury. Moreover, her 2014 $20,000 gift was less than her highest gift, $25,000 in 2008. Tr. 1/29/18 at 260:10-22.

*Second*, Hazelwood had decided to give Blake the $20,000 by March 31, 2014, at the latest. On March 31, Blake emailed Hazelwood's accountant that: "Mark said he wants the gift split and $10,000 come from him and $10,000 from Joann [*sic*]."[2] *See* Decl. of Aaron Steiner in Supp. of Mot. for New Trial Ex. 1. Far from suspecting anything untoward about this gift, Ms. Blake said to the accountant: "I can't believe they are doing this for me. Needless to say, it has been a challenging year, but this is very generous." *Id.*

*Third*, Blake was not notified of her Steptoe interview until April 3, 2014[3]—*after* Hazelwood decided to gift Ms. Blake $20,000. *Compare* Decl. of Jim Walden in Supp. of Mot. for New Trial ("Walden Decl.") Ex. 7 at ¶ 86, *with* Hazelwood Decl. Ex. B. Indeed, Blake did not tell Hazelwood about the interview until even later, on Monday, April 7, 2014. *See* Hazelwood Decl. Ex. B.

The fact that Hazelwood's decision regarding the 2014 gift *preceded* both Blake's and Hazelwood's knowledge of the Steptoe interview decisively undermines the government's bribery

---

[2] This obviously was not the first discussion about the 2014 gift amount. We are investigating when Hazelwood first conveyed the gift decision to Blake, given the central importance of the timing of this decision to the government's theory.

[3] An IRS Memo puts the date of notice as April 1 based on an email we could not find. *See* Walden Decl. Ex. 7 at ¶ 86. Either way, the notice was after Hazelwood communicated his bonus decision to Blake.

3

theory. Given this newly discovered evidence, the causal-link inference put before the jury—knowledge of interview, bribe, and corrupt persuasion—completely unravels. This evidence is highly relevant, as it tends to establish factual innocence. *See McQuiggin v. Perkins*, 569 U.S. 383, 386, 392 (2013) (noting importance of actual innocence claims); *see also Schlup v. Delo*, 513 U.S. 298, 324-25 (1995) ("[T]he individual interest in avoiding injustice is most compelling in the context of actual innocence.").[4]

The government had the burden to prove, beyond a reasonable doubt, that Hazelwood "(1) knowingly and willfully used intimidation, threatened, or corruptly persuaded another person, (2) with the intent to hinder, delay, or prevent the communication to a federal official, (3) of information 'relating to the commission or possible commission of a Federal offense.'" *United States v. Eaton*, 784 F.3d 298, 304 (6th Cir. 2015) (quoting 18 U.S.C. § 1512(b)(3)). Without the bribe, the government's witness-tampering case crumbles. Evidence of persuasion alone is not sufficient to discharge the requisite burden of proof. The persuasion must be "knowingly . . . corrupt[]." 18 U.S.C. § 1512(b). This means that the government had to prove that Hazelwood was "conscious of wrongdoing" to the level of culpability typically associated with criminal liability. *Arthur Andersen LLP v. United States*, 544 U.S. 696, 706 (2005). Circuit courts have interpreted this to require conduct that is inherently wrongful, such as bribery or pressuring a witness to delay or alter his testimony. *United States v. Farrell*, 126 F.3d 484, 488 (3d Cir. 1997); *see also United States v. Krocka*, 376 F. App'x 983, 985–86 (11th Cir. 2010). It is easy to see why the government believed the chronology of the events was so important to its witness-tampering charge: a bribe by Hazelwood might prove "corrupt persuasion." Without its purported "smoking gun" that Hazelwood learned of the Steptoe interview with Blake and then bribed her, there is

---

[4]    This motion is made pursuant to Rule 33(b)(2), which permits the Court broad discretion in deciding whether there has been a miscarriage of justice. *United States v. Schlei*, 122 F.3d 944, 990-91 (11th Cir. 1997) (citation omitted). Accordingly, the standard for analyzing a Rule 33 motion based on newly discovered evidence is not relevant.

insufficient evidence of corrupt persuasion. Although the government might argue that the content and timing of the call was sufficient evidence of "corrupt intent," *the government* tied that evidence inextricably to the "evidence" of bribery, so it is impossible to know whether the jury relied on the evidence of the call or the misleading and improper "bribery" evidence, or both, and the conviction cannot stand. *Cf. Street v. New York*, 394 U.S. 576, 586-88 (1969) (reversing conviction that depended both on evidence of constitutionally protected act and unprotected act because the record was insufficient to eliminate the possibility that the defendant had been convicted in whole or in part based on protected act); *United States v. Clay*, 667 F.3d 689, 700-01 (6th Cir. 2012) (granting new trial where conviction may have been based on both inadmissible and admissible evidence).

Because Hazelwood's conviction for witness tampering must be vacated, his convictions on Counts One and Eight should be vacated as well. The prejudicial effect of the erroneous and misleading evidence of bribery—perhaps the most damning and spectacular allegation in the entire case—had a spillover effect on the jury's consideration of the other counts. That evidence was likely to incite the jury to assume that—if Hazelwood attempted to tamper with a witness—it was because he was guilty of the other offenses. When the presence of an invalidated count has a "sufficiently prejudicial" spillover effect on other counts, reversal of those counts is warranted. *See United States v. Pelullo*, 14 F.3d 881, 897-98 (3d Cir. 1994) (reversed RICO count had spillover effect warranting new trial on 48 other counts as defendant had been "pejoratively branded" by RICO count).

## 2.     Counts One and Eight

With the fraud counts, the government's theory rested on the notion that Pilot had no right to unilaterally change discounts. As with the witness tampering count, our investigation has revealed exculpatory evidence (buried in the government's discovery and not included within its marked file of *Brady* material) that was not presented to the jury: communications to customers reserving Pilot's right to change discounts. For example, Pilot Employee John Spiewak wrote customer Classic Carriers as follows: "At the conclusion of that ramp up period we will review

5

your volume progress and agree to keep the discount pricing in place *or change the discount structure*." *See* Walden Decl. Ex. 1 (emphasis added). We found two other similarly worded letters. *See id.* Exs. 2 and 3. We do not know how many of these letters went out to customers, but they appear to give Pilot the very thing the government claimed—as the central tenet of its theory—it lacked: the right to change discounts without notice.[5]

Putting that aside, the government's mail and wire fraud case against Hazelwood, in essence, was that he conspired with various members of Pilot's sales department to "cheat" certain unsophisticated trucking company customers out of promised discounts on diesel fuel. Government witnesses lumped together distinct forms of alleged deception, referring interchangeably to each as "cheating," including affirmative misrepresentations (such as promising a specified discount without ever intending to pay it, or lying about the amount of a discount that was being paid) as well as merely *omitting* to provide information to the customer—in particular, reducing a customer's discount without letting the customer know. But the distinction between affirmative misrepresentations or concealment, on the one hand, and mere omissions or silence, on the other hand, is critical, because the direct evidence *against Hazelwood* consisted entirely of the latter—conduct that, as a matter of law, does not amount to fraud in this Circuit. For this reason, a new trial is warranted on the mail and wire fraud counts.

While the issue apparently has not been squarely decided by the Sixth Circuit,[6] multiple district courts within this circuit have held that a conviction for mail/wire fraud based on an omission requires the government to prove that the defendant had a duty to disclose information.

_____

[5] We hope the Court will give us some latitude to make an additional submission once we fully investigate this serious issue.

[6] *See In re Duramax Diesel Litig.,* 298 F. Supp. 3d 1037, 1085–86 (E.D. Mich. 2018) (6th Circuit "has never articulated a duty to disclose requirement"). One can find instances in which the Sixth Circuit refers to the possibility of a scheme to defraud being predicated on "fraudulent omissions," without explanation as to what that means. *See, e.g., United States v. Van Dyke*, 605 F.2d 220, 225 (6th Cir. 1979).

6

*See United States v. Skeddle*, 940 F. Supp. 1146, 1149 (N.D. Ohio 1996) ("Because the scheme to defraud of property or money counts are based on what was not said (i.e., omissions), the defendants are culpable under this branch of the mail fraud statute only if the government proves the defendants had a duty to disclose their interest in the transactions."); *Gould, Inc. v. Mitsui Min. & Smelting Co*., 750 F. Supp. 838, 843 (N.D. Ohio 1990) ("[T]here has been no attempt to delineate what facts were omitted or what duty defendants had to disclose information to [plaintiff], which is necessary when one alleges a material omission."); *see also United States v. Maddux*, No. 14-20, 2015 WL 5843257, at *4 (E.D. Ky. Oct. 5, 2015) ("[A] scheme or artifice to defraud may simply involve a knowing omission of a material fact.  An omission results from a failure to speak when there was a duty to do so.") (citations omitted); *United States v. Contents of Accounts*, No. 310-228, 2010 WL 2556849, at *5 (W.D. Ky. June 18, 2010), *aff'd in part, appeal dismissed in part*, 629 F.3d 601 (6th Cir. 2011) ("[T]here was an explicit statutory duty to report here and a failure to do so can create the necessary material omission to establish mail fraud.").

Moreover, the Sixth Circuit recently approved of a district court's instructions in a case charging conspiracy to commit wire fraud that "the jury had to find a fiduciary relationship existed before it could convict [the defendant] on the government's failure-to-disclose theory."  *United States v. Harris*, 881 F.3d 945, 952 (6th Cir. 2018).[7]

Indeed, the Sixth Circuit has interpreted jury instructions like those that the court gave in this case (drawn from the Sixth Circuit pattern instructions) as "instruct[ing] the jury to base any conviction on the defendants' acts and representations" and as "not so broad to permit the jury to consider non-disclosures as well as affirmative misstatements."  *United States v. Sutherlin*, 118 F. App'x 911, 913 (6th Cir. 2004).  Thus, the jury should not have convicted Hazelwood if the evidence showed he condoned only *not disclosing* discount reductions to certain customers.

---

[7]  *See also United States v. Jamieson*, 427 F.3d 394, 415 (6th Cir. 2005) (noting the importance of a jury instruction that "adequately guards against the jury finding that a simple omission, independent of any other statements encouraging trust and confidence in the defendant, can constitute fraud.").

Because the government neither argued nor proved that Pilot had any duty to report the reductions to trucking customers, the question is whether the evidence at trial showed that Hazelwood condoned something more than mere omissions. It did not. The weight of the evidence offered at trial showed, *at most*, that Hazelwood endorsed the practice of reducing discounts without disclosing the reductions to trucking customers, based on a view that such changes were contractually permissible.

The Court correctly noted the absence of evidence that Hazelwood devised or intended to devise the alleged scheme to defraud. Tr. 2/5/18 at 25:21-23, 27:19-23. The jury thus needed to decide, in essence, whether Hazelwood knowingly and voluntarily agreed to join a scheme to defraud *devised by others*. And when others described their conversations with Hazelwood, there was very little testimony as to instruction or direction that was given by Hazelwood relating to alleged discount fraud. *See, e.g.*, Tr. 11/9/17 at 115: 2-13 (Ralenkotter testifying that he acted on his own without instruction from others).

The only direct testimony we saw in the trial transcript came from Brian Mosher, who testified that Hazelwood expressed the view that his sales staff could change customers' rebates "without their knowledge," because Pilot did not have contracts with the customers. Tr. 11/27/17 at 39:3-20; *see also* Tr. 11/28/17 at 121:7-22. To hear Mosher tell it, this secret discount reduction is what Hazelwood was referring to in his statements—much touted by the government—regarding "Manuel." *See* Tr. 11/28/17 at 47:5-23. More generally, Mosher repeatedly talked about manual rebates—an alleged central part of the fraud—as nothing more than "where we cut customers' rebates without their knowledge." Tr. 11/28/17 at 47: 22-23; *see also id.* at 49:18-24.

Even if the Court credits Mosher's testimony, the point is this: changing the terms of a customer's deal without announcing it to the customer, while it may be *a breach of contract*,[8] is

---

[8] It bears mention that under Tennessee's Statute of Frauds, codified at T.C.A. § 47-2-201, oral contracts of the kind at issue in this case are unenforceable, so the discounts could never be enforced. *Carbon Processing and Reclamation, LLC v. Valero Marketing and Supply Co.*, 694 F. Supp. 2d 888, 904 (W.D. Tenn. 2010) (statute of frauds rendered unenforceable an alleged

8

not *fraud,* unless the company has a duty to tell the customer. Criminalizing failure to speak only when there is a duty to speak is an important limitation on the scope of mail and wire fraud, because parties to business transactions fail to provide certain information to their counterparties all the time, and we should be hesitant to convict those who are merely silent. *See United States v. Dowling*, 739 F.2d 1445, 1450 (9th Cir. 1984) (holding that nondisclosure may form the basis of a scheme to defraud only where there is a fiduciary or explicit statutory duty to disclose and further noting that "[t]o hold otherwise . . . would have the potential of bringing almost any illegal act within the province of the mail fraud statute"), *rev'd on other grounds*, 473 U.S. 207 (1985)). Otherwise, the federal government could turn every breach of contract case into a fraud claim, something courts have repeatedly refused to do.

Testimony from the few other cooperating witnesses who were called upon to testify about Hazelwood's direct knowledge of the scheme yielded similar results. Clark testified that, during P&L reviews, he told Hazelwood that some customers were "not getting the deal they think they're getting." Tr. 1/10/18 at 190:18-19. Radford expressed a firm conviction that Hazelwood knew about the scheme but, when pressed on cross examination, admitted that she made that assumption because of a single comment Hazelwood made about rebate savings in one month. Tr. 11/21/17 at 194:22-196:11. Similarly, Clark claimed Hazelwood knew because he told Hazelwood he was "taking a penny or two off of that deal." Tr. 1/10/18 at 158:10-18. For her part, Welch testified that she "assumed" Hazelwood knew she was giving customers lower-than-promised discounts. Tr. 11/8/17 at 204:6-205:13. Welch acknowledged that these beliefs were based on assumptions. *Id.* at 210:9-211:1.[9]

---

oral agreement for the sale of goods over $500), *modified on other grounds*, No. 09-2127, 2010 WL 3925261, at *5 (W.D. Tenn. Sept. 29, 2010); *Zoroufie v. Lance, Inc.*, No. 07-2016, 2008 WL 2669105, at *3 (W.D. Tenn. June 27, 2008) (same); *Anthony v. Tidwell*, 560 S.W.2d 908, 910-11 (Tenn. 1977) (same).

[9] Two other witnesses provided even weaker versions of the same theme. Peyton claimed that he told Hazelwood that Ralenkotter and Prins had "cheated the customer out of four cents a

9

The government may argue that all this talk of material omissions is irrelevant given the evidence at trial of affirmative conduct—false promises and active concealment of material facts. But Hazelwood was not linked to evidence of this sort. This becomes clear when examining the three ways the cooperators indicated that *they* (not Hazelwood) affirmatively lied or concealed information.

First, the government argued that Pilot salespeople falsely promised certain trucking customers a particular cost-plus discount without intending to honor it, as part of a bait and switch. Tr. 2/5/18 at 113:9-17. The government referred to its own cooperators as having made such false promises. *See*, *e.g., id.* at 117:14-16 (Mosher), *id.* at 126:14-127:1 (Ralenkotter). But when it came to Hazelwood, the government had little to say about false promises. *No* cooperator testified that Hazelwood himself made such a false promise or instructed the cooperator or anyone else to do so.

Second, the government argued that Pilot salespeople lied about why discounts had been reduced, falsely claiming a "mistake." *See e.g.*, Tr. 2/5/18 at 137:5-139:23 (discussing Andrews testimony concerning Honey Transport). But there was no testimony supporting any conclusion that Hazelwood knew about or condoned lies of this sort. As it relates to Hazelwood, the best that the government could come up with in its summation was an email from a cooperator (Ralenkotter) to Hazelwood and others, referring to a customer as having been "mistakenly" charged, with the quotation marks in the original email. *See id.* at 164:13-167:3. The government portrayed the quotation marks around "mistakenly" as a lie. *See id.* at 166:14–18. But this email did not say *the customer was going to be told* that the charges were a "mistake," much less show that Hazelwood approved of making a false explanation to customers. To the contrary, what Ralenkotter said in

_____

gallon" without further explanation, and Hazelwood told Peyton that Pilot would pay back the money that was owed. Tr. 1/18/18 at 111:22-112:5. Andrews asserted that Hazelwood's reference to "Manuel" in an audio recording was a reference to "telling the customer one discount but charging them another." Tr. 11/20/17 at 89:11-20.

10

the email was that he would "rebate the difference" between what the customer expected and received—a pro-customer resolution. *See* Walden Decl. Ex. 6.

Third, the government argued there was also "concealment of material facts," referring to only one type of such alleged concealment: false backup documents, sent to "lull" customers. Tr. 2/5/18 at 116:15-18; *id*. at 118:3-4. But there was no evidence linking Hazelwood to these alleged false backups either.

Faced with this dearth of evidence relating to Hazelwood's participation in any affirmative "misrepresentation" or "concealment," the government relied heavily on trip reports sent to Hazelwood's assistant, Sherry Blake, arguing that "Mark Hazelwood knew that cheating was going on, because it was coming to him in trip reports." Tr. 2/5/18 at 168:1-2. But these trip reports must be put into proper context. The evidence at trial clearly established that the discount fraud alleged by the government was a relatively rare occurrence, even by the reckoning of the government's own witnesses.[10] It is not surprising then that, while reference was made at the trial to approximately 8,000 trip reports (consisting of approximately 120,000 entries of customer visits) that were sent to Blake over the years, Tr. 11/7/17 at 27:7-18, the government found and admitted into evidence only 17 such trip reports, or approximately 0.2 percent of the total. Fewer than half of those 17 even contained anything that could conceivably be regarded as an affirmative lie to a customer. Even insofar as there was evidence that Hazelwood sometimes read these trip reports (and there was little evidence even of this), there was no evidence that Hazelwood read all or anything approaching nearly all of the 8,000 reports, start to finish. To conclude that Hazelwood—who by all evidence (a) was an extremely busy executive, Tr. 1/29/18 at 246:9-251:6, (b) was in the office at most two days every week, *id.* at 195:25-196:11, and (c) never took the trip reports with him when they were in hard copy, *id.* at 195:18-21 (and the government offered no proof he read them once they were placed in the Dropbox)—read the tiny number of allegedly

---

[10]   *See, e.g.*, Tr. 11/9/17 at 180:18-23 (manual rebate fraud involved 1% of the customers).

11

damning trip reports cherry-picked by the government requires concluding that Hazelwood read almost all of the thousands of reports sent to him (or that he just happened to stumble upon the purportedly incriminating few). It is a bridge too far to convict a busy executive on the assumption that he systematically read nearly every one of a huge volume of trip reports. Again, putting assumption and speculation aside (and there was a fair amount of that from Welch and Blake concerning whether Hazelwood read the trip reports), not a single witness said they saw Hazelwood reading them and the government offered only two examples where Hazelwood's reaction to a trip report suggested his having read it. *See* Walden Decl. Exs. 5 and 6. Notably, those two exhibits do not discuss telling affirmative lies or engaging in acts of concealment. *See id*.

We note that buried in the government's massive e-discovery is an exculpatory document on the precise point of whether Hazelwood had regular access to the trip reports, which was not marked as *Brady* material, and was never presented to the jury. In that email, Sherry Blake told a colleague: "After you have the trip reports in the book, please put in Mark's in box. *I think I have gotten away from giving him the book each week*." *See* Walden Decl. Ex. 7 at 35 (emphasis added). Although the government's e-discovery production included a section called "Exculpatory Documents," this email was not included in that file. Moreover, the Blake email had to have been front of mind for the government, as they specifically asked her about it on November 18, 2014, during an interview that both prosecutors attended. *See id*. Thus, when Blake testified that she provided trip reports to Hazelwood every Friday, Tr. 1/29/18 at 157:17-22, the prosecutors arguably acted in bad faith. For these reasons, we also make this Rule 33 motion based on prosecutorial misconduct. *See United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010) (the government may be acting in bad faith where it deliberately conceals exculpatory evidence in the information it turns over to the defense).

12

In sum, the jury's verdicts on Counts One and Eight were against the manifest weight of the evidence, and Hazelwood should be granted a new trial on these counts.

### 3.    Count Eight

Count Eight (and acquittal Count Ten) accused Hazelwood of substantive wire fraud based on a February 18, 2013 discussion with other Pilot executives about so-called "A/B pricing." These fraud counts were based on two emails Hazelwood sent on February 20, 2013 (GX 2127), as part of the same email chain, in which he encouraged other executives to develop an A/B pricing plan. *See* Tr. 11/28/17 at 40:22-51:25 (Mosher). As we explain below, it is no wonder the jury returned inconsistent verdicts, acquitting on Count Ten but convicting on Count Eight.

These Counts hinged solely on the testimony of Brian Mosher and his interpretation of a recorded February 18, 2013 conversation at a sales meeting and the email chain. Mosher testified that, during the recorded discussion, Hazelwood and others discussed the possibility of differential pricing, meaning the possibility of calculating the "cost" part of "cost-plus pricing" differently for different customers. Tr. 11/28/17 at 41:8-13. Pilot's sophisticated customers would receive the lowest possible cost (A pricing) while its unsophisticated customers would receive a less favorable cost (B pricing).[11] The government argued that this recorded discussion represented Hazelwood's effort to "expand" the conspiracy to cover direct-bill (*i.e.*, off-invoice) customers, who did not get "manual rebates." *See* Tr. 2/5/18 at 172:18-20. Two aspects of the recorded conversations bear special mention.

First, as Mosher was forced to concede, Hazelwood can be heard at two separate times during this discussion saying quite explicitly that customers should be consulted on changes. Tr.

---

[11]   Mosher contradicted himself about what, specifically, would "change" for the so-called unsophisticated customers with A/B pricing: was it the cost or the discount? *Compare* Tr. 11/28/17 at 49:21-24 (discount would be changed), *with* Tr. 12/6/17 at 57:6-58:14 (cost would be changed). This was reason enough alone for the jury to disregard Mosher's testimony on Count Eight. However, given the ample other evidence in the record, Mosher could not have intended that discounts were going to be changed across the board because they were the subject of individualized negotiations.

13

11/28/17 at 35:4-6 ("I think you have to do this, I think you have to have that conversation with the carrier."); Tr. 12/6/17 at 55:2-8 ("If you tell them first, say, 'Hey, listen, let's have this conversation.'"). Mosher could offer no explanation for how Hazelwood's call for transparency with the customers on this topic—transparency entirely inconsistent with defrauding those customers—squared with Mosher's "interpretation" that the discussion concerned a fraudulent scheme. Tr. 12/6/17 at 56:1-18. For this reason alone, the jury's conviction on Count Eight should be reversed for ignoring—what is so plainly—critical exculpatory evidence. *See Ashworth*, 836 F.2d at 265–66.

Second, the conversation makes it abundantly clear that, whatever this idea was, it was new and had not been implemented. Tr. 11/28/17 at 51:13-18 (Mosher discussing Freeman email indicating that "opportunity to implement cost plus B pricing or change" might be there). Indeed, the only other proof offered with respect to Count Eight was a single email chain two days later, during which Hazelwood said to John Freeman, "Let's get cost B plan going ASAP." Tr. 11/28/17 at 50:14-19. Freeman responded, "Just met with Joe [Cate]. Opportunity is there." *Id*. at 50:20. As the government called neither Freeman nor Cate as witnesses, the record is devoid of any information about what they discussed. Moreover, the record is utterly devoid of any other evidence that this theoretical plan matured or developed in any way.

In any event, the very nature of the conduct at issue cannot support a conviction for fraud, which requires "false and fraudulent pretenses, representations, or promises" that were part of the alleged "scheme." *Sutherlin*, 118 F. App'x 913–14. The A/B scheme involved no affirmative misrepresentations. Indeed, when pressed about this subject on cross-examination, Mosher flatly admitted as much: "We did not say we would lie to the customer." Tr. 12/6/17 at 27:9. Offering the lowest possible price to a customer, and offering a higher price to another customer is not a crime. Nor was Pilot under a duty to disclose its pricing structure to customers. In short, offering a low price to one customer and a higher price to another customer is not a crime.

We found no federal case in which an individual was indicted under a "differential pricing" scheme. The most likely reason for the absence of criminal authorities seems clear: "there is nothing in the law of fraud that prevents even a single seller from charging different markups in different markets so long as there is no affirmative misrepresentation." *Bonilla v. Volvo Car Corp.*, 150 F.3d 62, 71 (1st Cir. 1998). Multiple circuit courts have followed *Bonilla's* reasoning that "[d]ifferential pricing alone is not a fraudulent practice; plaintiffs must assert some particular reason why the relationship . . . was such that non-disclosure of the differential pricing structure constitutes a violation of the mail and wire fraud statutes." *Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308, 1314 (11th Cir. 2000); *see also In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 167 (D. Mass. 2003) (no federal case or statute imposes a duty to disclose differential pricing).

The weight of the evidence at trial here showed that Hazelwood, *at most*, intended to enact a variable pricing system to charge Pilot's customers differently based on their "savvy." Brian Mosher testified:

> Atty. Trial counsel: And what we're talking about, really, is two-tiered customers. What it had to do with, isn't it true, Mr. Mosher, the two-tiered pricing was, the pricing you would give one group, the customers that you knew were sophisticated and really understood how it was, and you better not be charging them for a rack that was in a further distance and therefore would have higher cost, you better be giving them the lowest possible price you could in charging, that's what Tier A would be, isn't it?
>
> Mosher: The lowest possible price, yes.
>
> Atty Trial counsel: And that's what we're talking about, is two-tiered customers. And Tier B, isn't it true, Mr. Mosher, would be those customers that you could legitimately charge more because they weren't as sophisticated and did not know as much about the process and weren't monitoring as closely the process is the people in Tier A? Isn't that true?
>
> Mosher: I would question the legitimacy.
> …
>
> Atty Rivera: Mr. Mosher, can you answer the very last question that was asked of you by Mr. Trial counsel with respect to two-tiered pricing? You said, "I would

15

question the legitimacy." What he asked you was whether Tier 1 was for customers who were sophisticated enough to understand the pricing, and you give them a better price, and Tier 2 is for customers who may not, and you give them a different price. Do you agree that that's what Tier 1 and Tier 2 is?

Mosher: Yes.

Tr. 12/6/17 at 57:22, 58:6-14. The government introduced no evidence of any affirmative misrepresentation or any intent to make an affirmative misrepresentation.[12]

More than that, the law recognizes that failure to provide information to a counterparty is not necessarily fraud when a prudent counterparty could have obtained the information on its own. *Id*. Otherwise, the omission is simply not material. *Id*. None of the information on which Pilot bases its prices—OPIS average, taxes, Pilot mark-up—are unavailable to the customer. In fact, only the OPIS average price affects the differential between the customer prices for unsophisticated customers and that for sophisticated customers. OPIS average pricing is a publicly obtainable resource offered for a subscription fee. Unsophisticated customers are just as capable of seeking and using that information as their more sophisticated counterparts.

Accordingly, the jury's conviction of Hazelwood on Count Eight was against the manifest weight of the evidence, and a new trial is warranted.

### B.      Legal Errors Warrant New Trial

#### 1.      Co-conspirator Guilty Pleas

The law is clear that "a guilty plea of a codefendant may not be received as substantive evidence of a codefendant's guilt . . . ." *United States v. Christian*, 786 F.2d 203, 214 (6th Cir.

---

[12] Mosher confirmed that Pilot offered its customers cost-plus deals typically without defining the variable OPIS average price or the other price components. Tr. 12/6/17 at 37:21-38:15. He further confirmed that they would rarely make any affirmative statement about the make-up of the pricing at all. *Id.* at 41:5-13. This practice of differential pricing is the "norm" in industries across the country. *See Langford*, 231 F.3d at 1313–14 ("Airlines frequently charge different groups of consumers different rates for the same seat, hotels often charge different rates to different consumers for the same room, and car dealerships sell identical vehicles for a variety of prices, depending upon the identity (and savvy) of the consumer. There are a number of legitimate business reasons for doing this, obnoxious as it may seem . . . .").

16

1986); *see also United States. v. DeLucca*, 630 F.2d 294, 298 (5th Cir. 1980). The risk that a jury will inappropriately rely on a guilty plea of a cooperating witness as evidence of the remaining defendants' guilt is heightened where the cooperator has pleaded guilty to the same conspiracy with which the remaining defendants are also charged. *See id.* at 298. Moreover, the danger of guilt by association is arguably even greater where, as is the case here, the cooperator who pleaded guilty was working at the company over which the defendant presided. *See United States v. Ofray-Campos*, 534 F.3d 1, 23 (noting risk of guilt by association is especially dangerous where co-defendants allegedly conspired for nearly a decade).

A cooperator's guilty plea is admissible at trial for the proper purpose of establishing or challenging his or her credibility, *see DeLucca*, 630 F.2d at 298, but should not be used in a manner that may adversely affect the defendant's rights. Whether a guilty plea is being misused depends on "the way in which the plea is brought to the jury's attention, the purpose for introducing the plea, undue emphasis on the plea as it relates to the substantive aspects of the case, and counsel's approach to the use of the plea." *Id.* (citations omitted). Here, consideration of those factors plainly shows that the guilty plea of one cooperator, Arnold Ralenkotter (one of the government's central witnesses), was misused, in particular through the placement of "undue emphasis" on his plea to establish the existence of the conspiracy at issue in the trial, thereby substantially prejudicing Hazelwood.

During its direct examination of Ralenkotter, the government set the table by punctuating a question with an explicit reference to Ralenkotter's guilty plea to the conspiracy at issue, with the apparent intention of bolstering his testimony. The prosecutor's provocative question was this: "Based on your participation and your role in the conspiracy that you pled guilty to and part of your plea agreement . . . how would this kind of conduct be in furtherance of the conspiracy in which you participated?" Tr. 11/9/17 at 50:1–4. Thereafter (as well as earlier), the prosecutor repeatedly asked Ralenkotter to answer questions "based on your participation in the conspiracy,"

a not-so-subtle reference to Ralenkotter's conspiracy guilty plea. *See, e.g.*, *id.* at 34:24–35:1, 48:22–23, 50:10–12, 51:10–12, 51:21–24, 84:23–24, 90:11–12, 91:22–24, 92:11–12, 94:12–14, 94:17–20, 100:4–6, 101:5–8. In fact, one of the defense counsel pointed out to the court that he counted 14 different occasions in Ralenkotter's testimony when Hamilton asked Ralenkotter to answer questions "based on your participation in the conspiracy." Tr. 11/14/17 at 61:11–19. The prosecutor also indicated in other ways that the existence of the conspiracy was *a settled fact*, rather than an allegation yet to be proven.[13] In fact, on one occasion, when discussing an email that Ralenkotter had sent to Hazelwood and others, the prosecutor asked what Ralenkotter was communicating "to the members of the conspiracy," thereby unmistakably identifying Hazelwood as a guilty co-conspirator. *See* Tr. 11/9/17 at 35:17–18.

The prosecutor's misuse of Ralenkotter's guilty plea to suggest that "the conspiracy" on trial had already been proven—and that Hazelwood was a "member" of it—did not stand alone, but rather was later validated and amplified by the Court. The Court shut down a line of cross examination intended to separate Hazelwood from "the conspiracy," in the process emphasizing the significance of Ralenkotter's guilty plea as establishing the existence of "the" conspiracy. Early in Ralenkotter's cross examination, Hazelwood's trial counsel attempted to explore the nature of Ralenkotter's supposed agreement with others, asking whether he, in fact, acted with others or alone. *Id.* at 111:16–19. Remarkably, given his repeated prior questioning of Ralenkotter in which he assumed the fact of "the conspiracy," the prosecutor objected to this question as going

---

[13] *See, e.g.*, Tr. 11/9/17 at 34:22 (referring to "the conspiracy"), 33:23–24 (referring to "the conspirators"), 34:12–13 (same), 34:21–23 ("Let's talk about the big picture of the conspiracy and the scheme and the way in which it operated as a starting point."), 34:24–25 (referring to "the scheme to defraud" and "the conspiracy"), 35:3–5 (referring to "the scheme"), 39:22 (asking "was that the discount fraud of the conspiracy"), 40:1–2 ("I want to now shift gears and talk about the manual rebate fraud part of the conspiracy."), 45:3–4 (asking how an email communication "related to the conspiracy"), 79:22 (referring to "the scheme and conspiracy"), 94:4–5 ("This question relates generally to the scheme and conspiracy to defraud."), 100:6 (referring to "the scheme to defraud"), 104:11–13 ("was there a language that was established during the course of the conspiracy about the scheme to defraud . . .").

18

to "an ultimate issue for the jury to decide," an objection that the Court sustained. *Id.* at 111:20–22. Hazelwood's counsel persisted in asking whether Ralenkotter had an agreement with others to commit fraudulent activity, prompting another objection, which the Court sustained after providing a brief explanation to the jury of the meaning of an agreement under the conspiracy laws. *Id.* at 111:24–112:17. Hazelwood's counsel took exception, arguing that he should be able to explore with the witness whether he believed he had "an agreement with people" to help the jury decide "whether or not these people who are saying they were in a conspiracy actually were as defined by the law." *Id.* at 113:4–10. The Court then stated the following, in front of the jury:

> Well, I did not take this person's guilty plea, but I'm assuming what happened was, he walked into a courtroom such as this, after having some time to discuss things with his attorney, going over things in his own mind, he appears before that judge and raises his right hand and he swears to tell the truth and his answers to the judge's questions would have been subject to the laws of perjury. The judge would have spent an awful lot of time asking him questions about what he believes he was charged with, the elements of the offense, his -- the time that he spent with his attorney discussing things, whether he had any questions at all about the case. That should have taken about 20 minutes, perhaps longer. And at the end of that, the judge would have accepted or rejected the defendant's plea of guilty. I'm assuming that that plea was accepted since you and the government said that it was.

> If you want to ask him what he understood he was doing, that is one thing. What you're asking him is whether there was an agreement with other people, and that was not determined by whether he sat down and drew up a contract or whether he had a conversation with someone. That's a legal issue, and the jury will determine that by objective evidence, not based upon this witness's testimony.

*Id.* at 113:11–114:8.

These remarks by the court indicated that Ralenkotter's guilty plea conclusively settled the question of whether there was a conspiracy and that a careful judge was satisfied that what Ralenkotter admitted to constituted conspiracy—the same conspiracy with which Hazelwood was charged and of which he was, according to the government, "a member." To be sure, the Court thereafter indicated that the jury had something to decide, but it should do so by "objective evidence," not "based upon this witness's testimony." It is likely that the jury took from this that the "objective evidence" of whether there was a conspiratorial agreement was Ralenkotter's

19

admission of the same before a knowledgeable judge who accepted his plea, not anything he might say about the agreement on cross-examination (which questioning was, in any event, curtailed).

Any doubt that the jury might have had as to the conclusive nature of the cooperator's guilty plea was removed a few days later, when the Court again mentioned in front of the jury that another cooperator had pleaded guilty in front of him and he had taken the plea after going "through all the elements of the offense with her." Tr. 11/20/17 at 139:17-18. The Court emphasized that this necessarily means she was guilty, otherwise she committed perjury. *See* Tr. 11/20/17 at 139:13–140:13. When counsel sought to argue the point, stating, "I don't concede that a conspiracy even existed," the Court replied, "isn't the hole deep enough already?" conveying the Court's view to the jurors that the conspiracy had already been proven.[14] Tr. 11/14/17 at 182:5-7.

It is critical that a trial judge maintain an appearance of impartiality, in part by commenting on evidence only if his or her "remarks do not convey the impression that they are established truths, such that the jury may not deviate from them." *United States v. Mentz,* 840 F.2d 315, 321–22 (6th Cir. 1988) (citation omitted). Here, the Court's remarks, combined with the prosecutor's earlier questioning of Ralenkotter, conveyed the unmistakable impression that the matter of whether there was a conspiracy—an ultimate issue for the jury to decide—was in fact "an established truth" found by another judge. "A trial judge's position before a jury is overpowering. His position makes his slightest action of great weight with the jury." *United States v. Hickman*, 592 F.2d 931, 933 (6th Cir. 1979) (internal quotation marks and citation omitted). Here, the jury was overpowered by the conclusion of not just one, but two judges.

Not only did the combined effect of the prosecutor's questioning and the Court's remarks to the jury conclusively suggest that a conspiracy existed, but the Court made additional comments to the jury signifying that the conspiracy was a particularly nefarious one. The Court repeatedly compared the conspiracy on trial to one of the most vile and violent drug conspiracies in history.

---

[14]  We rely here on the transcript, which suggests the jury was present for the comment.

*See* Tr. 11/8/17 at 171:25–172:4 (judge referring to "the Medellin cartel"), 178:14–179:18 (judge again using the Medellin cartel as a comparative example of a conspiracy); Tr. 11/9/17 at 49:3–13 (same); Tr. 11/14/17 at 179:9–180:6 (using a drug cartel comparison to address a hearsay issue). The unintended but real effect of these comments, especially when paired with the jury's having been told definitively that a conspiracy existed, was to create the impression to the jury that defendants' company was a corrupt enterprise, that the conspiracy permeated the company, and that the defendants were bad people, like drug dealers. In so doing, the Court's words "must have left the jury with a strong impression of the judge's belief of the defendant's probable guilt such that it was unable to freely perform its function of independent fact finder." *Hickman*, 592 F.2d at 936.

We recognize that the court's final instructions to the jury stated, "The fact that these witnesses have pleaded guilty to a crime is not evidence that the defendants are guilty, and you cannot consider this against the defendants in any way." Tr. 2/7/18 at 85:19–21. However, courts have recognized "[t]he fact that there may be aggravated circumstances in which the strongest corrective instruction would be insufficient, as, for example, *where the guilty plea of one codefendant necessarily implicates another or others*," which is clearly the case here. *United States v. Baete*, 414 F.2d 782, 783–84 (5th Cir. 1974) (*per curiam*) (emphasis added). The Sixth Circuit has also highlighted a court's repeated references to the fact of a guilty plea in the presence of the jury and "a close association between the co-defendant who had pled guilty and the defendant whose trial continued" as factors contributing to "aggravating circumstances," both of which contributed to the prejudice to Hazelwood in this case. *See United States v. Fife*, 573 F.2d 369, 374 (6th Cir. 1976) (approvingly citing *Payton v. United States*, 222 F.2d 794, 797 (D.C. Cir. 1955), where the court found such references "prejudiced appellant's right to be tried solely on the evidence against him"). And this is not an instance where the offending remarks were made solely by the prosecutor and were "mere isolated remarks, incapable of infecting the entire trial." *See*

*United States v. Carson*, 560 F.3d 566, 576 (6th Cir. 2009) (internal citation and quotation marks omitted); *see also United States v. Blandford*, 33 F.3d 685, 709 (6th Cir. 1994) (finding cautionary jury instructions regarding proper use of guilty plea cured prejudice caused by single instance of misuse of the plea during direct examination). In any event, the instruction here does not directly address what was troubling in this case.

To add to the combined effect of the Court's and prosecutor's remarks, almost immediately before the "guilty plea" instruction, the Court told the jury, "You've . . . heard that they [Ralenkotter and the other cooperators] were involved *in the same conspiracy* the defendants are charged with committing." Tr. 2/7/18 at 84:24-85:3 (emphasis added). Counsel for all defendants objected to this statement being made to the jury, "to avoid the jury thinking that maybe certain things have been established that are actually for their decision," and proposed alternative language, which request the Court denied. Tr. 2/5/18 at 59:20–60:8, 62:22–63:5; 64:22–65:17. This statement that the witnesses "were involved in the same conspiracy" with which the defendants are charged (which varies from the pattern instruction precisely by its specification of "the same conspiracy") reinforced the sense previously conveyed to the jury that because these witnesses pleaded guilty to a conspiracy, there *was* "a conspiracy"—indeed "the same conspiracy the defendants are charged with committing." Tr. 2/7/18 at 85:1-3. This portion of the jury instructions thus invited the jury to assume the existence of the conspiracy at issue in the case and thereby use the guilty pleas against the defendants, notwithstanding the subsequent instruction not to do so.

For these reasons, a new trial is clearly warranted.[15]

### 2. Exhibits 529-531 Should Have Been Excluded

We recognize the time and effort that the Court has already devoted to ruling on Government Exhibits 529-531, the audio recordings of Hazelwood using racially charged

---

[15] It was also error to permit over defendants' objections the testimony of Darren Seay on the scope of loss, which was not an element of the charged offenses. Mr. Seay's lay opinion

22

language.  We renew, but will not rehash, the previously litigated arguments that the Court erred in (1) admitting the recordings under Rule 401; (2) admitting the recordings as rebuttal evidence of a "pertinent trait" under Rule 404(a); (3) admitting the recordings as "other acts" evidence under Rule 404(b); and (4) failing to exclude the recordings as unfairly prejudicial under Rule 403.  *See Clay*, 667 F.3d at 696 (rejecting admission of "other acts" evidence under Rule 404(b) as too unrelated to the underlying conduct); *United States v. Bowman*, 302 F.3d 1228, 1239–40 (11th Cir. 2002) ("[t]he uneasy racial history of criminal law in the United States has yielded a simple rule-of-thumb: 'There is no place in a criminal prosecution for gratuitous references to race, especially when a defendant's life hangs in the balance.'" (quoting *Smith v. Farley*, 59 F.3d 659, 663 (7th Cir.1995))); *United States v. Dunn*, 805 F.2d 1275, 1280 (6th Cir. 1986) (holding "evidence [of other acts for rebuttal purposes] must nonetheless be subjected to Rule 404(b) inquiry"); *United States v. Brown*, 720 F.2d 1059, 1069 (9th Cir. 1983) (in drug conspiracy case, trial court abused its discretion in admitting testimony that defendant used "racial slurs," in part, because it "had a direct tendency to distort the trial by its appeal to the fears and passions of the jury").[16]  In addition to previous arguments, we respectfully submit that the recordings were admitted in error because the recordings are improper extrinsic evidence, rather than permissible "reputation" or "opinion" evidence.  Fed. R. Evid. 405(a); *see also* Tr. 12/7/17 at 181:13-20 (oral ruling of the Court recognizing that "the prosecution is prohibited from introducing extrinsic evidence to prove the specific instance; it is limited to what the witness says . . .  if this is character evidence we're dealing with here, then the underlying testimony and exhibits cannot be introduced into evidence").

---

testimony was improper under Rule 701, and this speculative and improper testimony resulted in extreme prejudice to defendants.  If permitted, we would gladly brief this issue.

[16]  The prejudice from the recordings to Mr. Hazelwood was astounding.  In addition to the obvious danger that its inflammatory content alone would induce the jurors to convict on a purely emotional basis, this evidence relating only to Mr. Hazelwood in a trial of four defendants was before the jury for an extended period of time.  Two witnesses were called to testify to the jury about the tapes, and the testimony and related proceedings took approximately 64 pages of trial transcript Tr. 1/10/2018 at 23:12-88:4.

23

Even if there were a "proper purpose" theoretically driving the admission of the recordings under Rule 404(b), it is undeniable that the acts captured by the recordings are not "inextricably intertwined with the charged offense[s]." *United States v. Hardy*, 228 F.3d 745, 748–50 (6th Cir. 2000) (Collier, J.). That means that the recordings are extrinsic evidence, which is admissible under Rule 404(b) only if it "deal[s] with substantially similar conduct" to the charged offenses, which the recordings plainly do not. *United States v. Cooper*, No. 1:06-CR-92, 2007 WL 1485027, at *2 (E.D. Tenn. May 18, 2007) (Collier, J.). Moreover, the Court erred by not assessing, under Rule 403, whether a narrower alternative to the incendiary recordings existed, including through examination of the witnesses. *See Old Chief v. United States*, 519 U.S. 172, 182–83 (1997) (probative value is evaluated based on availability of less prejudicial alternatives); *Clay*, 667 F.3d at 696 (finding evidence had limited probative value when there are alternative methods of proving same facts). The admission of the recordings was so prejudicial that this Court should grant a new trial.

### C.    New Trial Warranted Based on Ineffective Assistance of Counsel

Hazelwood's trial counsel committed multiple errors that rose to the level of ineffective assistance of counsel. The Supreme Court has created a two-part analysis for determining when a lawyer's errors and omissions rise to the level of ineffective assistance of counsel: deficient performance and prejudice. *See Strickland v. Washington*, 466 U.S. 668, 686–87 (1984). The deficient performance prong requires a defendant to show that counsel's conduct fell below an objective standard of reasonableness, such that counsel's "identified acts and omissions were outside the wide range of professionally competent assistance." *Id*. at 690. The prejudice prong requires a defendant to show that a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different. *Id*. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id*. And the reasonable-probability standard is a lesser standard than a preponderance of evidence. *See Williams v. Taylor*,

529 U.S. 362, 405–06 (2000). In this case, the errors committed by Hazelwood's trial counsel included: (1) persisting in asking questions that caused highly prejudicial recordings to be admitted despite judicial warnings, and (2) failing to investigate facts essential to the defense.[17] Counsel's errors individually, as well as cumulatively, significantly impacted the trial. The jury heard irrelevant and prejudicial evidence that played to the jury's negative emotions, and yet the jury was completely unaware of available evidence showing Hazelwood's factual innocence. In a case like this one—where the bulk of the evidence against Hazelwood was circumstantial—there is a reasonable probability that, but for counsel's serious deficiencies, Hazelwood would have been acquitted.

### 1.     Opening Door Was Ineffective Assistance

The Court found that Hazelwood's counsel opened the door to the admission of the recordings of Hazelwood using racially charged language by eliciting testimony about his business judgment and reputation. Counsel's conduct constitutes ineffective assistance. First, eliciting such testimony fell well below an objective standard of reasonableness because it gave the government the opportunity to argue that the highly prejudicial recordings of Hazelwood (Government Exhibits 529-531) were admissible as rebuttal evidence. Second, there is a reasonable probability that the verdict as against Hazelwood would have been different had trial counsel not elicited the testimony and the recordings therefore had not been admitted.

Despite repeated warnings, Hazelwood's counsel persisted in asking questions that, the Court found, opened the door to the admission of the highly inflammatory recordings. During cross examination of Ms. Welch on the third day of trial, the prosecution objected to defense counsel's question about whether Hazelwood would approve of certain conduct, and the Court

---

[17] Counsel was also ineffective for failing to object to the government's presentation of Hazelwood's total compensation. *See, e.g.*, *United States v. Stahl*, 616 F.2d 30, 32–33 (2d Cir. 1980) (overturning conviction on grounds of undue prejudice and misconduct in bribery prosecution when prosecutor made repeated inflammatory references to wealth during opening and summation). If permitted, we would gladly address this issue in an additional brief.

25

warned trial counsel that he was dangerously close to opening up issues of character. Tr. 11/8/17 at 215:23–216:3. The Court asked trial counsel point blank, "Do you want to open up issues of character?" to which trial counsel responded, "I don't believe so." *Id.* at 216:2–4. The underlying objection was sustained, and trial counsel moved on with his questioning. *Id.* at 216:6.

Despite this warning, and moments after telling the Court he did not wish to open the door to character evidence, Hazelwood's counsel elicited testimony from Ms. Welch that she had great regard for Hazelwood, that she considered him to be an "excellent" president and that "he had a great relationship with the customers." *Id.* at 221:6–20. Defense counsel also elicited testimony from Ms. Welch that just about every major innovation that led to Pilot's growth began with an idea of Mark Hazelwood. *Id.* at 220:7–10. Having realized that its earlier objection effectively warned defense counsel about opening the door, the government chose not to object to this new line of questioning and, instead, promptly argued that trial counsel had in fact opened the door to rebuttal evidence about Hazelwood's reputation. *Id.* at 230:5–15.

The Court suggested that trial counsel "may have" opened the door by eliciting testimony about Hazelwood's reputation but acknowledged that "it wasn't [trial counsel's] intent to [open the door]." *Id.* at 230:16, 264:16–17. Counsel was clearly upset by the government's attempt to argue that he had opened the door, as he knew that it carried grave consequences that he did not intend to bring about. *Id.* at 231:11–232:16. The Court even had to warn counsel, "let's sit down, let's calm down," and felt obliged to address the jury and explain the reason why "emotions may get a little bit raw and will flare up." *Id.* at 232:15–16, 242:13–10.

On three separate occasions on the third day of trial, the government attempted to introduce character evidence based on Ms. Welch's testimony about Hazelwood's reputation. *Id.* at 231:8–10, 242:2–8, 263:15–264:8. Following the government's third attempt to introduce character evidence, the Court reiterated its warning and noted that, although trial counsel had intended to

26

"back away from issues of character," it remained to be seen "whether [trial counsel] succeeded or not." Tr. 11/9/17 at 61:14–18.

Despite these repeated warnings about eliciting testimony about Hazelwood's business judgment, on the eleventh day of trial, defense counsel elicited testimony from Mr. Mosher that Hazelwood was too good a businessman and president to engage in conduct that would put Pilot at risk—precisely the type of testimony that the Court had previously warned counsel might open the door to the government's character evidence. Tr. 11/30/17 at 103:24–105:9.

### a. Deficient Performance

By eliciting testimony about Hazelwood's reputation and business judgment, defense counsel gave the government the opportunity it had been looking for since the very beginning of the trial: to argue that the highly prejudicial recordings of Hazelwood should be admitted as rebuttal evidence. Opening the door to highly prejudicial evidence without a sound trial strategy may constitute objectively unreasonable conduct under the first prong of the *Strickland* test. *See Ward v. United States*, 995 F.2d 1317, 1318–19 (6th Cir. 1993) (ordering a new trial and holding that defendant was deprived of effective assistance of counsel in part because trial counsel had opened the door to highly prejudicial and otherwise inadmissible evidence of defendant's character); *Smith v. Morrow*, No. 1:09-CV-188, 2010 WL 3851708, at *16 (E.D. Tenn. Sept. 27, 2010) (Collier, J.).

Two things are undeniably true. First, the recordings of Hazelwood making racially charged comments—and repeatedly using the single most incendiary word in the English language—cast Hazelwood in an incredibly unfavorable light before the jury. Second, this did not need to happen. At the outset of the trial, the recordings were plainly inadmissible; the Court ruled that they became admissible only because of the questions that trial counsel asked of witnesses during trial. We disagree with the Court's admissibility ruling, but the fact remains that, but for trial counsel's conduct during trial, those prejudicial tapes would not have been played to the jury in this case. Moreover, trial counsel was on clear notice that his questioning risked opening the

27

door based on repeated warnings from the trial court and the government's repeated efforts to offer rebuttal character evidence in general and the tapes in particular. Reviewing courts have consistently emphasized that the reasonableness of trial counsel's conduct is measured in significant part by the degree to which counsel heeds or ignores warnings as to how the trial court views the evidence. *See Wilson v. Mazzuca*, 570 F.3d 490, 505–06 (2d Cir. 2009) (opening the door to previous bad acts "was objectively unreasonable . . . particularly in the face of the trial court's warnings"); *Ward*, 995 F.2d at 1322. Even if the trial court was incorrect in its assessment of this evidentiary issue (and we maintain that it was) it had to be abundantly clear to trial counsel, especially by the eleventh day, when he engaged in his questioning of Mosher, that in this Court's view, the questions he asked of Mosher on that day would open the door.

In short, the Court's determination that trial counsel "opened the door" is essentially a judicial finding that counsel seriously erred when he persisted, despite judicial warnings, to ask questions that caused the recording to be admitted. Regardless, whether trial counsel erred or the Court did (as we argued above), it cannot be that neither seriously erred. It would mean that nobody acted unreasonably, and yet a completely unreasonable and intolerable outcome occurred: a tape was played to the jury that had no relevance to the charged offenses but portrayed Hazelwood as the worst of racists, when that simply need not have happened if things had been handled differently.

As for trial counsel's conduct, we recognize that the questioning of witnesses often involves a cost-benefit analysis and that decisions as to what to ask and not ask on cross-examination are thus often protected from ineffective assistance claims as "trial strategy." But that typically is not the case with questioning that opens the door to damning other-acts evidence. *See Wilson*, 570 F.3d at 505–06; *Ward*, 995 F.2d at 1322; *see also United States v. Villalpando*, 259 F.3d 934, 939 (8th Cir. 2001) (trial counsel's cross-examination unreasonable because it elicited testimony tending to establish the defendant's character as threatening and murderous

when such evidence had absolutely no strategic value).  And that is because, as here, the proper cost-benefit analysis is often so objectively clear in these situations.  First, the benefit of the questioning was slim: the issue of "sound business judgment" was wholly unrelated to the offenses charged, as successful and skilled businesspeople sometimes commit crimes.  Even if one might say that the questioning had somewhat more value than this, any possible benefit was nonetheless clearly outweighed by the risk that the questioning would result in the admission of the tapes, with their obviously devastating effect on Hazelwood.

Indeed, in *Ward*, the Sixth Circuit found ineffective assistance of counsel and ordered a new trial in part because trial counsel had unreasonably opened the door to prejudicial character evidence by asking, despite caution from government's counsel, whether blowing up pipe bombs would be consistent with the defendant's character.  *Ward*, 995 F.2d at 1318–19.  Likewise, here, trial counsel displayed an astonishing disregard for the damage that would come from eliciting Ms. Welch and Mr. Mosher's testimony about Hazelwood's reputation and business judgment— questioning that could not have been based on sound trial strategy, especially given the Court's warnings and counsel's knowledge of the government's possession of the recordings.

### b.  Prejudice

There is a reasonable probability that, but for counsel's opening the door to the admission of the recordings, the jury would not have convicted Hazelwood of any of the counts.  Courts routinely find unacceptable prejudice when inflammatory evidence like these recordings enters the jury box.  *See, e.g.*, *Davis v. White*, 858 F.3d 1155, 1160 (8th Cir. 2017) (affirming exclusion of racist emails sent and received by officer who failed to preserve video recording of alleged use of excessive force because evidence was so unfairly prejudicial that "even a limiting instruction would be ineffective"); *United States v. Kallin*, 50 F.3d 689, 696 (9th Cir. 1995), *as amended* (Mar. 17, 1995) (in tax fraud case, trial court abused its discretion in admitting evidence that defendant disliked Mexicans because it was not relevant, and even if it had some probative value, it was far outweighed by its prejudicial effect); *Brown*, 720 F.2d at 1062, 1069 (reversing drug-conspiracy

29

conviction and holding trial court abused its discretion in admitting "highly volatile and inflammatory" testimony that defendant used terms such as "honkies," "white bitches," and "whores"; together with "testimony commenting on their lifestyles, evidence of wealth, and general demi-monde characters," this evidence "was inherently likely to inject prejudice and animosity into [defendant's] trial").

*White*, *Kallin*, and *Brown* are Rule 403 cases, but their determinations as to prejudice apply with equally persuasive force here, where Hazelwood's burden under *Strickland*'s prejudice prong is only to "undermine confidence in the outcome" of the trial, which requires "less than a preponderance of the evidence." *Cornwell v. Bradshaw*, 559 F.3d 398, 405 (6th Cir. 2009) (citation omitted). The recordings here are strikingly similar to the *Brown* defendant's statements in their irrelevance and shock value and, thus, in their prejudicial effect; indeed, the Court itself agreed that they contained "vile, despicable, inflammatory, and offensive racial epithets." Tr. 12/7/17 at 189:11–12. And, unlike cases in which "overwhelming" evidence of guilt precludes reversal, *Smith*, 2010 WL 3851708, at *16, the case was a far cry from overwhelming, such that the severe prejudice should certainly undermine the Court's confidence in the jury's verdict.

Because Hazelwood was deprived of his constitutional right to effective counsel, this Court should grant his motion for a new trial.

### c. The Court's Limiting Instruction

The Court's limiting instruction only compounded the error. Notably, the Court's instruction differed from its proposed instruction in a critical way. The final instruction said, "You cannot and must not use this evidence *by itself* to decide that Mr. Hazelwood is guilty of the offense charged in the indictment." Tr. 2/7/18 at 86:19–21 (emphasis added). This clearly communicated to the jurors that, as long as they also factored in other evidence, they could rely on the racially charged comments to convict Hazelwood of the indictment. This was error warranting reversal of Hazelwood's convictions. *United States v. Merriweather*, 78 F.3d 1070, 1077 (6th Cir. 1996)

30

(instructions were erroneous because it included purposes for use of "other act" evidence that were not in issue).

## 2. Counsel's Failure to Investigate Constituted Ineffective Assistance

Trial counsel failed to investigate the facts relating to the government's "bribery" theory on which the witness-tampering charge was founded. This error allowed the jury to be misled about the causal link between Hazelwood's conduct and the witness tampering alleged, constituting ineffective assistance. Moreover, there is a reasonable probability that it prejudiced the jury with respect to the witness-tampering charge as well as the other offenses charged.

### a. Deficient Performance

Even "[s]trategic choices made after less than complete investigation . . ." are unreasonable unless counsel's reasonable judgment "[m]akes particular investigations unnecessary." *Sims v. Livesay*, 970 F.2d 1575, 1580 (6th Cir. 1992) (quoting *Strickland*, 466 U.S. at 690–91) (counsel's failure to carefully examine known evidence consistent with defense theory constituted ineffective assistance); *see also Blackburn v. Foltz*, 828 F.2d 1177, 1183 (6th Cir. 1987) (counsel's failure "[t]o investigate a known and potentially important" witness was ineffective assistance).

Here, as in *Sims*, trial counsel was fully aware of the state's "bribe" theory of Hazelwood's alleged witness tampering and yet failed to make even a primitive investigation into whether its factual predicates were true. Just like in *Sims*, the documents discussed at Section A *supra* were neither presented to the jury by the government nor inquired into by defense counsel. This "failure to investigate key evidence may not be excused." *Sims*, 970 F.2d at 1581-82. Nor did defense counsel "suggest to the jury," *id.* at 1580, that Ms. Blake's gift in 2013 was in fact $15,000 rather than $10,000, so as to undercut the prosecutor's argument that Ms. Blake's gift doubled in 2014; or that the government's "timeline" was in fact unsupported; or that Hazelwood did not even learn of Ms. Blake's interview with Steptoe until April 7, 2014—*after* finalizing the 2014 gifts to Ms. Blake. Most glaringly, the clearly exculpatory documents described on pages 5, 6, and 12 *supra*

31

were completely absent from the defense's presentation, despite their centrality to exposing the government's false narrative about the trip reports and about Pilot's right to unilaterally change discounts. Counsel's failure to investigate these issues was "[n]o strategy . . . only negligence," and counsel simply did not make any reasonable judgment that would have "ma[de] [these] . . . particular investigations unnecessary." *Id*. at 1580–81 (internal citation omitted).

### b. Prejudice

Trial counsel's failure to investigate the payments and the government's timeline as to Count Fourteen was prejudicial because the readily ascertainable evidence is evidence of Hazelwood's actual innocence of the charged offense. In *Sims*, the state "relied heavily" on a theory that the gun was fired from a distance, *id.* at 1581; here, the government likewise "relied heavily" on a theory that Hazelwood knew of Blake's upcoming meeting with Steptoe & Johnson and hoped to bribe her into telling them his version of the events. *Id.* But for trial counsel's failure to conduct even a minimal investigation into the government's theory of the offense, the jury would have been presented with evidence of actual innocence. Trial counsel's failure is thus sufficient to "undermine confidence in the outcome" of the trial. *Cornwell*, 559 F.3d at 405. This Court should therefore set aside the jury's verdict and order a new trial as to Count Fourteen.

### 3. Cumulative Prejudice

A defendant may show that the combined effect of individual errors was so cumulatively prejudicial as to render his trial fundamentally unfair. *See United States v. Parker*, 997 F.2d 219, 221 (6th Cir. 1993); *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004); *see also Strickland*, 466 U.S. at 690 (requiring consideration of counsel's actions "in light of all of the circumstances"). Here, among other things, trial counsel persistently asked certain questions, despite judicial warnings, that caused highly prejudicial recordings to be admitted and failed to investigate the facts relating to the witness tampering charge and other key claims, as well as failing to object to the government's presentation of irrelevant and prejudicial evidence of Hazelwood's total compensation package. The cumulative effect of these errors rendered

32

Hazelwood's trial fundamentally unfair because it allowed the jury to hear evidence that constructed a false narrative while at the same time painting a highly negative portrait of Hazelwood: he was wealthy and holds racist views that the district court characterized as "vile." The admission of this evidence, which had nothing to do with the alleged offense, along with the errors leading to, among other things, the misleading timeline that appeared to support the government's "bribery" theory, poisoned the jury against Mark Hazelwood and certainly affected the outcome of a close trial where most of the direct and circumstantial evidence showed that some members of Pilot's sales team manipulated customer pricing without Hazelwood's knowledge.

## IV.     Excusable Neglect

In its June 14, 2018, Order, after granting Hazelwood's motion for leave to file this Rule 33 motion out of time on grounds of excusable neglect, *see* Dkt. 555, the Court stated it had "not made a finding with respect to excusable neglect and Defendant has not furnished the Court with any basis upon which to do so."  *See* Dkt. 558 at 2.  Accordingly, we incorporate, by reference, the reasons articulated in the May 25, 2018, motion, Dkt. 542, and further respectfully state that the failure to file a timely motion was excusable because Hazelwood's prior counsel did not consult him before deciding not to move for a new trial.  Hazelwood Decl. at ¶ 5.  In addition, Sixth Circuit precedent supports a finding of excusable neglect so that the Court may conduct an evidentiary hearing on Hazelwood's ineffective-assistance claims now, rather than postponing the adjudication of those claims until after direct review.  *See United States v. Munoz*, 605 F.3d 359, 361-71 (6th Cir. 2010); *United States v. Arny*, 831 F.3d 725, 730 n.3 (6th Cir. 2016).

*Munoz* presented the same scenario as Hazelwood does: "after the verdict, but before sentencing, Munoz obtained new counsel" and filed an otherwise untimely Rule 33 motion for new trial including claims of trial counsel's ineffective assistance.  605 F.3d at 362.  The government appealed the trial court's consideration (and grant) of that motion, but the Sixth Circuit affirmed the trial court's discretion to allow the motion because (1) trial counsel's "refus[al] to fall on his own sword for his client" excused trial counsel's failure to file the motion, *id.* at 371; (2)

33

the delay between the Rule 33 filing deadline and the actual filing of Munoz's motion by new counsel "was not fairly within Munoz's control," *id.*, even though Munoz's trial counsel was his "freely selected agent," *id.* at 368 (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 397 (1993)); and (3) "Munoz's delay involved no bad faith," *id.* at 372. The circuit firmly rejected the government's contention that the "your lawyer, your fault" principle from the civil context should apply equally in the criminal context, and it upheld the discretion of district courts to distinguish "frivolous ineffective-assistance allegations from those with potential merit," so that trial courts may adjudicate the latter set of claims when raised in a Rule 33 motion *Id.* at 369, 373.

Here, as in *Munoz*, Mr. Hazelwood's failure to timely file his Rule 33(b)(2) motion was the fault of his prior counsel, who decided unilaterally not to file the motion and would be disinclined to "fall on his own sword." *Id.* at 371. Hazelwood sought leave to file the instant motion *the same day* that his new counsel entered an appearance. Dkts. 540, 542. And Hazelwood presents only good-faith claims of error and ineffective assistance, as in *Munoz*. These reasons alone are sufficient bases for a finding of excusable neglect so that this Court may hear this motion. Moreover, as in *Munoz*, there is no reason why Hazelwood's ineffective-assistance claims should be shelved for post-conviction review when counsel is prepared to litigate those claims now.

34

**CONCLUSION**

For the foregoing reasons, Hazelwood respectfully requests that this motion be granted.

Respectfully submitted,

/s/ Jim Walden
Jim Walden
Georgia Winston
WALDEN MACHT & HARAN LLP
1 Battery Park Plaza, 34th Floor
New York, NY 10004
(212) 335-2030- Telephone
(212) 335-2040- Facsimile
jwalden@wmhlaw.com
gwinston@wmhlaw.com
*Attorneys for Defendant Hazelwood*

/s/ Bradley L. Henry
Bradley L. Henry (BPR # 025447)
BREEDING & HENRY, LLC
900 South Gay Street, Suite 1950
Knoxville, Tennessee 37902
(865) 670-8535- Telephone
(865) 670-8536- Facsimile
brad@breedinglaw.com
*Attorneys for Defendant Hazelwood*

35