UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 3:16-CR-20 |
| | ) | JUDGES COLLIER/GUYTON |
| MARK HAZELWOOD, | ) | |
| Defendant. | ) | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO
DEFENDANT HAZELWOOD'S RULE 33 MOTION FOR NEW TRIAL**

The United States of America hereby responds in opposition to Hazelwood's untimely

motion for a new trial. Doc. 566. Hazelwood received a fair trial and is not entitled to another.

**I.      As an initial matter, the motion is untimely and should be dismissed on that basis.**

Hazelwood seeks a new trial pursuant to Federal Rule of Criminal Procedure 33, but has

not complied with the time limits in that rule, nor established any basis for the Court to grant an

extension. "Any motion for a new trial grounded on any reason other than newly discovered

evidence must be filed within 14 days after the verdict . . . of guilty." Fed. R. Crim. P. 33(b)(2).

The jury found Hazelwood guilty on February 15, 2018, *see* Doc. 484, and he did not file his

Rule 33 motion until June 25, 2018. His motion is thus plainly untimely.

It is well-settled that "district courts must observe the clear limits of the Rules of

Criminal Procedure when they are properly invoked." *Eberhart v. United States*, 546 U.S. 12, 17

(2005); *see also United States v. Zertuche*, 565 F. App'x 377, 381 n.3 (6th Cir. 2014) (describing

another time limit in the Federal Rules of Criminal Procedure as a "mandatory claims-processing

requirement that may not be disregarded when the prosecutor objects"). The Court may grant an

extension only "if the party failed to act because of excusable neglect." Fed. R. Crim. P. 45(b).

"Excusable neglect" is a "strict standard which is met only in extraordinary cases."

*Nicholson v. City of Warren*, 467 F.3d 525, 526 (6th Cir. 2006); *see also United States v. Munoz*,

605 F.3d 359, 373 n.8 (6th Cir. 2010) ("late-filed motions will not routinely be indulged").  The

determination whether neglect is excusable is an "equitable one" which requires consideration of

the "relevant circumstances" including "the danger of prejudice to the [other party], the length of

the delay and its potential impact on the judicial proceedings, the reason for the delay, including

whether it was in the reasonable control of the movant, and whether the movant acted in good

faith."  *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd.*, 507 U.S. 380, 395 (1993).  Of those

factors, the reason for delay is given the greatest weight.  *Munoz*, 605 F.3d at 372.  Hazelwood's

stated reasons are his decisions to retain new counsel, *see* Doc. 542, and to contest, among other

issues, the quality of the representation provided by prior counsel.[1]  Yet he waited three months

after the guilty verdict to hire new counsel and offers no justification for that delay.  This Court

could thus reasonably find that no excusable neglect justifies review of his belated motion.

## II.    A Rule 33 motion is reserved for extraordinary circumstances not present here.

"Motions for a new trial are not favored and are granted only with great caution."  *United

States v. Garner*, 529 F.2d 962, 969 (6th Cir. 1976).  Federal Rule of Criminal Procedure 33

allows the Court to grant a new trial "if the interest of justice so requires," *i.e.*, if "*substantial*

legal error has occurred."  *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) (emphasis

added); *see also United States v. Wall*, 389 F.3d 457, 474 (5th Cir. 2004) (a new trial may be

granted for "any error of sufficient magnitude to *require* reversal on appeal" (emphasis added)).

Ordinarily, Rule 33 motions are "granted only in the extraordinary circumstance where the

evidence preponderates heavily against the verdict."  *United States v. Hughes*, 505 F.3d 578,

---

[1] To be sure, constitutionally ineffective assistance of counsel "*may* justify a finding of
excusable neglect," though defendants are ordinarily "held accountable for the acts and
omissions of their attorneys."  *Munoz*, 605 F.3d at 368-69 (emphasis added; internal citation
omitted).  And Hazelwood alleges that his trial counsel was constitutionally ineffective, but—
as shown below—he has not satisfied *Strickland*, so he has not established excusable neglect.

592-93 (6th Cir. 2007); *accord Munoz*, 605 F.3d at 373 (describing such as the "paradigmatic use of a Rule 33 motion"). In that context, the Court may "consider the credibility of the witnesses and the weight of the evidence." *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988). The defendant bears the "very heavy burden" of proving that a new trial should be granted. *United States v. Tocco*, 200 F.3d 401, 424 (6th Cir. 2000); *United States v. Seago*, 930 F.2d 482, 488 (6th Cir. 1991). Hazelwood has not carried that burden here.

## III. Hazelwood's convictions are not against the manifest weight of the evidence.

### A. Conspiracy and wire fraud convictions (Counts 1 and 8)

A wire fraud conviction requires proof a defendant (1) devised or willfully participated in a scheme to defraud, (2) used or caused use of an interstate wire communication in furtherance of the scheme, and (3) intended to deprive a victim of money or property. *United States v. Cunningham*, 679 F.3d 355, 370 (6th Cir. 2012). A wire and mail fraud conspiracy conviction requires proof the defendant (1) conspired with at least one other person to commit the fraud and (2) knowingly and voluntarily joined the conspiracy. *United States v. Rogers*, 769 F.3d 372, 382 (6th Cir. 2014) (holding that conspiracy under 18 U.S.C. § 1349 does not require an overt act). "There is no requirement that each defendant make a material misrepresentation." *United States v. Birnie*, 193 F. App'x 528, 537 (6th Cir. 2006). Here, credible evidence proved each element of the offenses and justified the verdict; the evidence did not preponderate against conviction.

Hazelwood and his conspirators were charged with a three-part scheme, in which they (1) identified and targeted customers who were unlikely to notice fraudulent cost-plus discount representations,[2] (2) falsely and fraudulently promised cost-plus discounts to those customers to

---

[2] Pilot's own Direct Sales Manual, introduced into evidence during trial, explained "cost-plus" as "a pricing format where the trucking company pays an industry-determined wholesale 'index' price [the OPIS contract average] plus a pumping fee." Gov. Ex. 302 at Trial_170.

3

induce them to purchase or continue to purchase diesel fuel from Pilot rather than a competitor, and (3) by issuing fraudulent invoices and rebate checks, among other means, that lulled those customers into believing that Pilot was honestly calculating their cost-plus discounts. Doc. 182 at 13-15. The Indictment described two classes of victimized Pilot customers: victims of "Off-Invoice Fraud" had discounts withheld through fraudulently calculated invoices, while victims of "Rebate Fraud" had discounts withheld through fraudulently calculated rebate checks. *Id.*

During trial, the United States proved that Hazelwood, first as vice president and then as president of Pilot, participated in, approved of, and sought to expand the charged conspiracy. In addition to testimony from eight cooperating co-conspirators from all levels of the sales division[3] and other current and former Pilot employees (*e.g.*, Darren Seay, Claudene Whaley, Ken Parent, and Dan Peyton), the United States presented numerous exhibits, including emails and audio recordings, about the operation of the conspiracy. Viewed in its totality, the evidence supplied overwhelming proof that Hazelwood was the chief leader of the conspiracy and could have stopped it at any time, but instead used his position within Pilot to promote and expand the conspiracy, so that Pilot's ever-expanding roster of travel plazas could sell more diesel fuel in a market with flat-lining demand.[4] Pilot's Direct Sales Manual revealed how false promises of cost-plus discounts to trucking companies could maintain and increase Pilot's market share in that context: "Fuel is a trucking company's largest variable cost . . . . Discounts on fuel gives

---

[3] Specifically, the United States called directors Brian Mosher and Arnie Ralenkotter, account managers Chris Andrews and Kevin Clark, and account representatives Katy Bibee, Lexie Holden, Holly Radford, and Janet Welch. The United States also introduced evidence showing that John Freeman, Vicki Borden, John Spiewak, and Jay Stinnett were conspirators.

[4] Ken Parent, who became Pilot's president after Hazelwood's termination in 2014, testified that Pilot experienced rapid growth from 2008 (300 truck stops) through 2012 (475 truck stops). Doc. 424 at 121-22. Such growth occurred despite a shrinking diesel fuel market, described by Hazelwood during a sales meeting in November 2012 as "probably our biggest worry" because "the pie is getting smaller." Gov. Ex. 518, 518-A.

4

the trucking company an incentive to buy fuel at Pilot … [and] will play a major role in building gallons for Pilot."  Gov. Ex. 302 at Trial_148-49; *accord* Doc. 522 at 110-11 (Bibee's testimony that she misrepresented cost-plus discounts to "get them to remain customers of Pilot").

One chillingly callous example of Off-Invoice Fraud involved Queen Transportation.  In a January 15, 2010 email, Bibee told Freeman that Queen's owner was "begging" for an "extra penny" or "won't be able to renew his [letter of credit]," then added, "[t]his guy thinks we took him from [cost-plus] .03 to [cost-plus] .04 but really he is getting [cost-plus] .08."  Gov. Ex. 715; Doc. 522 at 106-08.  Freeman directed Bibee to "[t]ell him I said the extra .01 is fine" but "[d]on't change his deal."  *Id*.  Bibee then affirmatively misrepresented to Queen that it would receive a cost-plus .03 discount, although she knew that Queen would actually receive a discount that was five cents worse per gallon. Gov. Ex. 716; Doc. 522 at 107-09.  When Stinnett and Radford were assigned to the Queen account in June 2010, Freeman warned them to be "careful" because "[h]e's not getting what he thinks."  Gov. Ex. 717; *accord* Gov. Ex. 718 ("he's not getting what he thinks he is, we just need to sing from the same hymn book.")  Stinnett continued perpetrating Off-Invoice Fraud on Queen, and he reported it in a trip report to Hazelwood without a hint of remorse while noting difficult economic conditions in the region:



Gov. Ex. 720.

Radford, also copied on the trip report, testified that it meant Stinnett "discussed with the customer that he is getting the cost plus .03, but . . . [was] going to give him cost plus .07 instead, which is a worse discount." Doc. 522 at 244. Stinnett and Radford concealed Queen's victimization until another Pilot employee accidentally told Queen the truth, as described below:

| 21 | **FREEMAN**: | Jay had an account over in North Carolina, the guy was a |
| 22 | | f**kin' blowhard, I mean a f**king blowhard. 50,000 gallons, he was |
| 23 | | gettin' a cost-plus somethin', and Jay, had, "Oh yeah, I'm gonna give you |
| 24 | | a cost-plus." He says, "It needs to be a 3," and Jay's like, "Sure I'll give |
| 25 | | you a cost-plus," and he was in at a cost-plus-8 on direct-bill, but there's |
| 26 | | no way for the guy to know. Wasn't reflecting it, wasn't sendin' a price |
| 27 | | fetch. |
| 28 | **GRECO**: | And he thought he was gettin' a 3? |
| 29 | **FREEMAN**: | Yeah. |
| 30 | **GRECO**: | Yeah. |
| 31 | **FREEMAN**: | So J.W. walks in one day, after Jay had specifically sat down with him and |
| 32 | | said, "This guy thinks he's gettin' a cost-plus-3. He's gettin' a cost-plus- |
| 33 | | 8. Pay attention here." |
| 34 | **GRECO**: | Right |
| 35 | **FREEMAN**: | J.W. wasn't paying attention. |
| 36 | **GRECO**: | Whhoosssh! |
| 37 | **FREEMAN**: | Sits in front of the customer, he says, "Now listen, I'm at a cost-plus-3 |
| 38 | | now, I'm fixin' to grow by 20 trucks, I want to go to a cost-plus-2." |
| 39 | | J.W. flips open his P&L, and says, "No, you're at a cost-plus-8." |
| 40 | **GRECO**: | How'd that go over? |
| 41 | **FREEMAN**: | Oh, Jay called him and said, "Oh, no, no, J.W. doesn't know how to read |
| 42 | | the P&L, that was an 8-cent tax. You're gettin' a cost-plus-3." |
| 43 | **ANDREWS**: | That's your luster fee. |
| 44 | **GRECO**: | Gee. |
| 45 | **FREEMAN**: | (Laughter) Guy has no business gettin' a cost-plus-3 or a cost-plus-2. And, |
| 46 | | he has no way to know what his deal is. |
| 47 | **GRECO**: | Right. |
| 48 | **FREEMAN**: | I mean, f**k, go, go get you an OPIS deal, find out what the tax table is – |
| 49 | **GRECO**: | What, what if you can't talk your way out of it? Or figure out a way, and |
| 50 | | they've got you nailed? |
| 51 | **FREEMAN**: | You pay up. |

Gov. Ex. 521, 521-A. In fact, Pilot did not have to "pay up" to Queen until the government's investigation became public in April 2013, because Stinnett had offered a fictitious explanation to discredit the other employee's truthful description of the discount as cost-plus .08; Stinnett continued to defraud Queen with an affirmatively false cost-plus discount representation until at least October 2012, as proven by an October 2012 email. Gov. Ex. 724; Doc. 522 at 246-51.

Hazelwood's conspirators often used trip reports to keep him informed that the scheme was correctly targeting unsophisticated customers to increase Pilot's profits, and Hazelwood's assistant Sherry Blake was tasked with collecting and organizing those trip reports from sales

6

staff for his review. Doc. 523 at 157-62.  For example, a July 11, 2008 trip report from

Ralenkotter described how and why he intended to falsely represent cost-plus discounts to two

customers:

> Fuel optimizer not real bright, just met the newest bulbs[.] they seem slightly smarter.  I will work up some aggressive prices to move TA gallons.  Good thing is I don't actually need to change our billing[.]  they do not reconcile with fuel dispatch . . . imagine that?
>
> [Competitor] TA recently in and of course offered "better of" pricing[.]  I will need to do the same[.]  too bad since this was .045 discount and we made a bunch of money.  I will tell them cp .03 and put it in as .04 with a .04 discount.  There is a good opportunity here to address some O/O gallons.

Gov. Ex. 1101.  When asked during trial why he sent such a report to Hazelwood, who was then

Pilot's vice president, Ralenkotter explained that "[w]ith some customers it was how we did

business" and he wanted to "let [Hazelwood] know."  Doc. 336 at 261.  Ralenkotter was not

alone in describing Off-Invoice Fraud in trip reports to Hazelwood.  On October 8, 2009, Stinnett

emailed a trip report for Hazelwood's review that contained this entry:

> I had a good meeting . . . . As normal, she cried the blues about fuel a little bit.  She doesn't really understand fuel discounts much; I told her I would give her another half of a cent.  She will never know that isn't going to happen.  Between the two companies, they are buying about 100K per month from us.

Gov. Ex. 611.  And Spiewak's December 17, 2009 trip report included the following entry:

> TA was in and had offered a cost plus .005 retail minus .005.  I told him that I would match their deal.  He did not even know their current discount so I am going to tell him that I will change their discount and make no changes.

Gov. Ex. 612.  Hazelwood's "ok" response to a February 2008 email chain in which Ralenkotter

directed a subordinate to falsely bill customer Koleaseco provided evidence of Hazelwood's

affirmative approval of Off-Invoice Fraud.  Gov. Ex. 902; Doc. 520 at 180-84.

Trip reports also kept Hazelwood informed about Rebate Fraud activities.  For example,

Stinnett submitted a trip report on August 12, 2010, that mentioned that he had "spent about an

hour and a half going through [a customer's] optimizer.  Two LARGE mistakes, our discount

7

wasn't in correctly (at least what they assume they receive manually)." Gov. Ex. 606-B. A few

days later, Hazelwood responded by email, "Awesome great job Jay getem." *Id*. Similarly, in a

trip report submitted on June 17, 2011, Stinnett told Hazelwood about another customer meeting:

> We are getting 88% of his business and all we can handle logistically. Dave is
> adding about 10 trucks, and business is strong. His discount is manual, and he
> asked for more, which I will probably do in a few locations, as far as he knows[.]

Gov. Ex. 615.

The jury saw and heard extensive evidence that Hazelwood deemed the trip reports very

important. On December 11, 2006, Hazelwood emailed his subordinates Ralenkotter, Freeman,

and Mosher: "As a reminder, *I also want to see all trip reports every week*, received by Vicki

[Borden] and Sherry [Blake] before noon on Friday. We have to be seeing more customers per

week than even before and *I will be monitoring this weekly*." Gov. Ex. 601 (emphasis added).

To facilitate his efficient review of trip reports, Hazelwood directed Blake to send the following

email to all direct sales personnel on May 30, 2008: "Going forward Mark [Hazelwood] would

like all trip reports to be in the format of the one showed during the Sales Meeting (example

attached)." Doc. 523 at 159-60; Gov. Ex. 603-B. In August 2010, at Hazelwood's direction,

Blake sent another "reminder" email that "trip reports are due by 12:00 pm eastern every

Friday." Doc. 523 at 161; Gov. Ex. 603-C. In the same email, Blake mentioned that she was

"sending last weeks and this weeks to Mark to review while in Italy." *Id*.

Contrary to Hazelwood's assertion that little or no evidence even suggested that he read

any trip reports, *e.g.*, Doc. 566 at 18-19 (inaccurately asserting that the government "offered only

two examples of where Hazelwood's reaction to a trip report suggested his having read it"), the

jury saw documentary evidence that Hazelwood reviewed and responded to multiple trip reports.

*See*, *e.g.*, Gov. Ex. 606-A ("Great job"); Gov. Ex. 606-B ("Awesome great job Jay getem"); Gov.

Ex. 606-C ("nice"); Gov. Ex. 606-D ("I got Johns"); Gov. Ex. 606-G ("Brian great job especially

on heartland The Crete tech issues piss me off"); Gov. Ex. 606-H ("Great week guys . . ."). The ease with which Hazelwood could review trip reports between 2008 through 2010 was clear from witness testimony: Ralenkotter said Hazelwood received only 12 trip reports a week in 2008 and only 16 per week in 2010, and Blake explained that each report was no more than two pages long, so they all fit in a 1-inch binder. Doc. 337 at 191; Doc. 523 at 193.

On September 17, 2010, Hazelwood replied "nice" to a trip report Mosher had emailed him that same day stating that "Manual Rebates – Should save approx. 350k on the august gallons." Gov. Ex. 606-C. Mosher testified that "350k" referred to "the amount we cheated . . . – I cheated out of trucking company customers that month." Doc. 358 at 8. Mosher credibly testified that Hazelwood would have necessarily understood that $350,000 was going to be fraudulently withheld from customers, because Mosher had periodic meetings with Hazelwood and others to discuss Mosher's customer profit and loss reports, during which Mosher brought "manual rebate" spreadsheets showing how much he was fraudulently cutting his customers' rebates each month. Doc. 356 at 158-61; *see also* Doc. 424 at 190 (Clark's testimony that "[i]n the P&L reviews I would tell [Hazelwood] they're [the customers] not getting the deal they think they're getting"). Mosher said that, during one such meeting, when he said his commission cap prevented him from "profit[ing] from the fraud" and that he was thinking about ending his participation, Hazelwood replied, "[t]hat wouldn't be a very good idea." Doc. 356 at 162.

Among the conspirators, the term "manual rebate" had a coded meaning, as evidenced by testimony regarding Gov. Ex. 1602, a February 11, 2011 email chain among Wombold, Jones, and Mosher. Jones sought permission, on Mosher's behalf, to offer a deep discount – "cost minus .03" – to customer Amerifreight, and Wombold questioned the size of the account. Gov. Ex. 1602. Mosher simply replied, "Manual Rebate." *Id*. He then testified at trial that he was signaling that the promised "cost minus .03 was irrelevant. It was a manual rebate, so

9

[Wombold] would know that we would cut the discount anyway . . . and manually cheat that customer on a monthly basis, going forward." Doc. 356 at 63, 78. The jury plainly credited that testimony by convicting Wombold of Count 2, which alleged that Wombold's reply email to Mosher, "Approved . . . still pretty aggressive," had been transmitted for the purpose of executing the scheme to defraud. Doc. 484. Mosher's testimony about the meaning of "manual rebate" in the Amerifreight email chain was consistent with his testimony about the executions of Rebate Fraud directed at customers JTL, Halvor, Ryder, Hayes, and Marathon Electric. Gov. Ex. 1502, 1513, 1701, 1703, 1801, 1808, 2114, 2117; Doc. 356 at 16-17, 39-44; 78-88; 97-101, 105-116. Mosher also testified about the means by which he and Heather Jones fraudulently determined the manual rebates for dozens of customers each month from 2008 through 2012, *i.e.*, by emailing spreadsheets to each other. Doc. 367 at 109; Doc. 374 at 139-40, 170.

An audio recording from the October 25, 2012 management meeting at Freeman's lake house clearly shows that the conspirators understood that "manual rebates" – which Freeman called "[m]anwell" and the "manual stuff" – were used in furtherance of the scheme to defraud. Although Freeman said at one point, "you cannot have a case where you don't do what you say," he immediately qualified that statement: "I'm not talking about the manual stuff. I mean, hey, it, this is a game. We're playin' f**kin' poker with funny money, and it's liars poker with funny money because of all this cost-plus stuff. . . . I don't want to get into a moral or an ethical conversation[.]" Gov. Ex. 503, 503-A; 506, 506-A. Hazelwood shared that understanding of how manual rebates were used to mislead Pilot's customers, as shown in a March 27, 2012 email chain. Gov. Ex. 2194. Freeman copied Hazelwood on an email stating that Pilot was "making .10 a gallon using [its] best price for this customer . . . [W]e better come to the understanding that .10-.12/gal may not keep us whole in this market space. . . [,]" and Hazelwood replied, "Rebate rebate masturbate make him feel special[.]" *Id.* An October 25, 2012 audio recording

10

captured Hazelwood approving a plan for Mosher to teach manual rebates to all direct sales staff during a sales meeting the following month. Gov. Ex. 509, 509-A. Mosher testified that he understood that Hazelwood wanted him to teach "Manual rebates, how to defraud trucking companies without their knowledge." Doc. 356 at 168.

Mosher, Welch, and Radford all testified that, in furtherance of the conspiracy, Mosher thereafter taught Pilot sales staff to deceive Pilot's customers using manual rebates; that training session was recorded in Gov. Ex. 514. Doc. 358 at 5-23; Doc. 336 at 14-54; Doc. 522 at 270. During Mosher's November 2012 presentation, he claimed that the fraudulent manual rebate practices were "an art, . . . a feel, it's do what you can. . . . [but] don't ever expose yourself." Gov. Ex. 514, 514-A. And Hazelwood used virtually identical language during his voluntary interview with federal agents on April 15, 2013, when he defined the term "manuel" as "the method of applying the art, of determining the discount for a customer." Doc. 445 at 152.

Hazelwood not only approved of the fraudulent "Manual Rebate" scheme, he advocated for its expansion. On February 18, 2013, after a management meeting in Orlando, Florida, Hazelwood said, in the presence of Freeman, Wombold, and Mosher, "Aunt Bea. That's what we'll call this, Aunt Bea pricing," and then said, "We got Manuel, Manuel does a helluva job. Wonder around what percent of our volume's on Aunt Bea?" Gov. Ex. 524, 524-A. The manifest weight of the evidence showed that Hazelwood's use of the term "Manuel" on that occasion shared the same fraudulent meaning as Freeman's use of the term "manwell" during the October 25, 2012 lake house meeting and as Mosher's use of the term "Manual Rebate" in the February 2011 email exchange between Wombold and Mosher regarding Amerifreight. Indeed, Mosher's testimony confirmed that meaning. Doc. 358 at 47. Hazelwood described the process for sorting customers in the "Aunt Bea" scheme as "Customer A, Customer B. Customer A [] looks [in] every orifice you have, Customer B doesn't even know you have an orifice," and the

11

raucous laughter erupting among the conspirators after the following exchange would have left

no doubt that Hazelwood's "Aunt Bea" idea was merely an expansion of the existing conspiracy:

| 222 | **FREEMAN:** | I mean, this is all part of the game, I mean, but you, if you |
| 223 | | don't know how they buy and what they understand, then |
| 224 | | you can't take advantage of these things. And it's our job |
| 225 | | to teach, manage, direct our regionals to do the deals and |
| 226 | | understand all this stuff. And then Jay can get us set up to |
| 227 | | where we can have A and B buckets. Yeah, f**k 'em, just |
| 228 | | give 'em what they want. |
| 229 | **HAZELWOOD:** | And what'd you asked for. |
| 230 | **STINNETT:** | And you're takin' − |
| 231 | **FREEMAN:** | You're exactly right. |
| 232 | **STINNETT:** | You're takin' advantage of our advantages. |
| 233 | **FREEMAN:** | Sellin' it to 'em the way they wanna buy. |
| 234 | **MOSHER:** | Our advantage is their ignorance. |
| 235 | **STINNETT:** | Yeah, AKA, we're f**kin' 'em. (Laughter.) |

Gov. 522, 522-A. The evidence further showed that, on February 20, 2013, when Hazelwood

replied to Freeman's Orlando meeting summary by stating "Great recap" and then directing "lets

get cost plus B plan going ASAP thanks," Hazelwood was referring to his "Aunt Bea" expansion

of the scheme to defraud Pilot's customers. Gov. Ex. 2217. As Mosher explained during trial,

Hazelwood was directing that the existing fraud be "take[n] … to the next level." Doc. 358 at

44. The evidence convincingly supported the jury's verdict on Count 8 that Hazelwood sent his

February 20, 2013 email for the purpose of executing the scheme to defraud that was alleged as

the object of the conspiracy. Doc. 182 (Indictment) at 50-51; Doc. 484 (Verdict Form).

Hazelwood claims the jury ignored exculpatory evidence, rendering its Count 8 guilty

verdict against the weight of the evidence; specifically, he claims "Mosher could offer no

explanation for how Hazelwood's call for transparency . . . squared with Mosher's

'interpretation' that the discussion concerned a fraudulent scheme." Doc. 566 at 21. In fact,

Mosher explained that, although Hazelwood had told his executives to "have a conversation with

the customer," Hazelwood did so only in the context of "how to put customers that are receiving

cost-plus pricing on the one-price file," *i.e.*, something unrelated to whether the customer would

be told the actual cost-plus discount. Doc. 367 at 55; Doc. 358 at 35-37. Mosher explained how

moving a customer to a "one-price file" could facilitate the fraud by reducing outside scrutiny:

> [I]f the third-party billing company has the discount structure, there would be . . .
> a natural check and balance between the third-party billing company and the invoice
> they receive from Pilot. If we put them on the one-price file, . . . we are calculating the
> price at Pilot and sending the price to the third-party billing company, then there is no
> check and balance, it's just the data we send them.

Doc. 358 at 36-37. Hazelwood's purported call for transparency actually referenced a means to

further conceal the nature and extent of the fraudulent scheme; it was not exculpatory.

Hazelwood's arguments regarding his conspiracy conviction are likewise meritless. He

claims the government did not prove he *personally* made false representations to customers, sent

false backup documents to customers, or knew that sales personnel had lied to customers. Doc.

566 at 17-18. But the government was not required to prove such facts to sustain a conviction;

a conspirator need not personally commit an overt act in furtherance of the conspiracy nor

"kn[o]w everything about the conspiracy." Doc. 513 at 69. Rather, it only needed to prove that

Hazelwood "knew the conspiracy's main purpose and . . . voluntarily joined it intending to help

or achieve its goals," *id.*, and the overwhelming weight of the evidence proved precisely that.[5]

---

[5] Hazelwood claims that the government's entire theory of prosecution "rested on the
notion that Pilot had no right to unilaterally change discounts." Doc. 566 at 12. The Indictment's
allegations and the proof at trial reveal that this position is uninformed. *Compare* Doc. 182
(Indictment) at 13-15 (alleging a scheme that involved inducement through false promises and
pretenses) *with* Doc. 358 at 139-40 (Mosher admitting that, beginning in 2008, he never intended
to keep any discount promise made to a manual rebate customer). To be sure, the government
offered some evidence of deceptive discount changes that could be labeled "unilateral," but that
evidence was introduced to show how the conspirators "identif[ied]" their targeted victims as
being susceptible to the scheme's fraudulent inducements. *Compare* Doc. 182 at 13 (alleging
that the scheme involved "identifying trucking companies … perceived to be unlikely to detect
false pretenses, promises, and representations regarding Cost-Plus Discounts") *with* Gov. Ex.
2104 (email from Ralenkotter to Welch, "Let's sneak a [penny] . . . on the following [customers]
. . . I don't think they will notice"); *and* Doc. 520 at 168-74 (testimony from Welch about lying
only to Pilot customers "we thought we could get by with lying to . . . , the smaller ones").

13

### B.  Witness-tampering conviction (Count 14)

To obtain a conviction for witness-tampering, the government must prove that the defendant (1) knowingly and willfully used intimidation, threatened, or corruptly persuaded another person, (2) with the intent to hinder, delay, or prevent the communication to a federal official, (3) of information relating to the commission or possible commission of a federal offense. *United States v. Eaton*, 784 F.3d 298, 304 (6th Cir. 2015).  *See also* Doc. 513 at 80-81 (Jury Charge).  In this case, Hazelwood was charged with attempting to hinder, delay, and prevent Blake from communicating to federal agents regarding the possible commission of federal fraud offenses; the Indictment specifically charged that Hazelwood had done so during a June 9, 2014 phone call to Blake.  Doc. 182 at 56.

During trial, the United States relied upon the testimony of FBI Special Agent Andrew Chapman and Pilot employee Sherry Blake to prove that Hazelwood was explicitly told in April 2013 that the FBI and IRS were investigating a federal criminal offense "generally concern[ing] [Pilot's] manual rebates to diesel fuel customers," Doc. 445 at 151, and that Hazelwood phoned Blake on June 9, 2014, and told her that he knew that she had told his lawyer's investigators that he requested and read trip reports, and insisted that she "need[ed] to know that [he] didn't read them."  Doc. 523 at 168.  As discussed above, numerous exhibits showed that Hazelwood's statement to Blake that he did not read trip reports was false.  The jury heard evidence, too, about Blake's proven loyalty to Hazelwood, *e.g.*, assisting him with personal matters outside the scope of her employment by Pilot, and about Hazelwood's financial compensation to Blake.  The only logical inference from the evidence at trial was that Hazelwood sought to corruptly persuade Blake not to tell federal investigators that Hazelwood had read trip reports regarding the fraudulent scheme.  The weight of the evidence fully supports his conviction on Count 14.

Hazelwood's challenge to the weight of the evidence stems entirely from his mistaken belief that the government's "carefully constructed" theory of the offense was that Hazelwood "bribed" Blake with $20,000 after learning that she would be interviewed by Steptoe & Johnson, an outside law firm retained by Pilot to investigate the diesel fuel discount practices of Pilot's sales division. Doc. 566 at 9. The United States had no such theory, nor did it advance the timeline Hazelwood now attributes to it, so Hazelwood's current argument is without merit.

On direct examination, Blake testified that she was Hazelwood's executive assistant at Pilot for many years; she performed "basic secretarial tasks" including "expense reports [and] emails." Doc. 523 at 141-42. Hazelwood also "expected [her] to receive trip reports from all the sales team by Friday each week, 12:00, put [them] in a notebook, and give to him for the afternoon." *Id*. at 157. Numerous exhibits, including Blake's performance reviews and emails, proved that Hazelwood expected her to collect and provide the trip reports to him each week. *Id*. at 157-162; Gov. Ex. 601, 618, 619, 620, 603A, 603B, 603C; *see also* Doc. 336 at 250. Blake testified that, from 2008 through 2010, she ordinarily printed the trip reports, placed them in a notebook, and left the notebook in Hazelwood's office in-box each week. Doc. 523 at 161. Sometimes Blake delivered the notebook to Hazelwood's Knoxville residence instead, *id*. at 159, and sometimes more than a week passed before Blake provided the trip reports. In late August 2010, for example, Blake emailed Pilot's sales staff to remind them of their obligation to submit trip reports and noted that she was "sending last weeks and this weeks to [Hazelwood] to review while in Italy." *Id*. at 159, 161; Gov. Ex. 603-C. Later in 2010, Blake "started putting the trip reports in Dropbox so [Hazelwood] could view them on his iPad instead of having the actual notebook." Doc. 523 at 161. At times, sales staff emailed trip reports directly to Hazelwood, who replied to them, and at times, copied Blake, thereby confirming his receipt and review of the reports. *E.g.*, Gov. Ex. 606-A, 606-B, 606-C, 606-D, 606-G, 606-H.

15

As early as 2003 or 2004, Hazelwood had asked Blake, in addition to her responsibilities at Pilot, to "start[] helping pay some of his personal bills—mortgage, utilities, insurance," and to provide similar assistance for his personal business ventures "[d]uring Pilot business hours." Doc. 523 at 143, 147. Blake explained: "I worked directly with his accountants, his private bankers, his insurance companies. I was a signature on his checking accounts. I was authorized on his credit cards. I was given power of attorney at times to sit in on real estate closings for Hazel Development." *Id*. at 144. When asked on direct examination whether she was compensated for assisting Hazelwood with non-Pilot matters, Blake said that Hazelwood gave her "a monetary gift each year" from 2008 or 2009 until 2014. *Id*. at 147-48. In April 2014, "Mark Hazelwood gave [her] $10,000, and [his wife] Joanne . . . gave [her] $10,000." *Id*.

Blake testified that she was present when federal agents executed a search warrant at Pilot's corporate headquarters on April 15, 2013, and that, after identifying herself as Hazelwood's executive assistant, she was "briefly" interviewed by them. *Id*. at 162. That evening, Hazelwood phoned Blake, and Blake "told him that [she] had met with the FBI." *Id*.

Blake also testified about a telephone conversation with Hazelwood on June 9, 2014, after Hazelwood was no longer employed by Pilot. *Id*. at 162-70. As corroborated by her mobile phone records admitted into evidence, Gov. Ex. 1901-A, Blake testified that, within a span of 30 minutes, she received four telephone calls from numbers used by Hazelwood, but she declined the first three calls—from Joanne Hazelwood's mobile phone at 6:24 p.m., from the Hazelwoods' home phone at 6:42 p.m., and from a mobile phone the Hazelwoods used for international travel at 6:43 p.m. Doc. 523 at 163-68. At 6:52 p.m., Blake answered the fourth call—from Joanne Hazelwood's mobile phone—and exchanged "pleasantries" with Joanne, who "said, 'Here's Mark,' and she put Mark on the phone." *Id*. at 168. Hazelwood then told Blake, "Hey, I know you told [trial counsel's] investigator that I read the trip reports. I just need you to

16

know I didn't read the trip reports. I didn't have a way to respond to the trip reports. I know I was a bulldog when I asked for them, but I just need you to know I didn't read them. Do you understand?" *Id.* Blake said "yes, because [she] wanted the phone call to be over," but she "felt like [she] was being used." *Id.* As she explained during trial, "I felt betrayed. And I felt that everything generous Mark had done for me in the past was being called upon. I couldn't believe that he had called me." *Id.*

On cross-examination by Hazelwood's trial counsel, Blake confirmed that, from 2008 to 2010, she printed out trip reports each Friday, "put them in a book," and put it into Hazelwood's inbox. *Id.* at 192; *see also id.* at 198 (confirming that "they were on his desk each week"). Blake also reiterated that, late in 2010, she began placing the weekly trip reports into an electronic Dropbox, so Hazelwood could review them more easily while traveling. *Id.* at 195. Blake candidly acknowledged that she may have sometimes "skipped or forgot[ten]" to update the Dropbox. *Id.* at 227. Hazelwood's counsel also asked Blake about the gifts from Hazelwood for assisting with his personal affairs. *Id.* at 259-62. Blake said the April 2014 payment from Hazelwood was not "unique," because Hazelwood had given her "a personal check" for $10,000 for "five or six" years beforehand, and had given her $25,000 the first year. *Id.* at 259-60. Counsel elicited testimony that, during the five-year period before April 2014, *i.e.*, starting "long before the government came calling," Hazelwood had gifted Blake at least $75,000 from "his personal funds" for "all the extra things [she was] helping him with." *Id.* at 260-62.

Although the United States had not asked any questions on direct examination about the internal investigation conducted by Steptoe & Johnson on Pilot's behalf, Hazelwood's counsel elicited testimony that Steptoe had been retained to conduct an investigation, *id.* at 221-22; that Steptoe wrote to Blake in April 2014 requesting an interview, and Blake told Hazelwood "as soon as [she] received the letter," *id.* at 235; that "soon after[wards]," Hazelwood's counsel

17

asked Blake to "interview with them," *id.*; and that on April 9, 2014, Blake told an investigator employed by Hazelwood's counsel that she believed that Hazelwood read trip reports, *id.* at 219-20. Blake also testified that Hazelwood's employment at Pilot was terminated in May 2014, and then, when he left, Hazelwood took with him a "hard-copy calendar" showing that Blake was scheduled to meet with Steptoe investigators on June 11, 2014. *Id.* at 211, 234-38. During her Steptoe interview on June 11, 2014, Blake reported her phone conversation with Hazelwood two days earlier; she had no plans to meet with federal agents. *Id.* at 221-25. In September 2014, Steptoe informed the government of the substance of Blake's June 2014 interview. *Id.* at 231.

On redirect, in response to those facts elicited by cross-examination, the United States introduced an email showing that Hazelwood knew, in April 2013, that federal agents were investigating fraud at Pilot, that Pilot's investigators (*e.g.*, Steptoe) were "cooperating" with that investigation, and that any information incriminating him as being involved could be shared by Pilot's investigators with federal investigators. Gov. Ex. 2229; Doc. 523 at 267-69.

Contrary to Hazelwood's assertion that the Steptoe investigation, and Hazelwood's knowledge of it, was "critical" to the government's theory of the case, Doc. 566 at 9, the United States proved Hazelwood's guilt of Count 14 through the *direct* examinations of Chapman and Blake without ever referencing the Steptoe investigation. Hazelwood was rightly convicted of witness tampering because (1) Hazelwood knew that federal agents were investigating Pilot for federal fraud offenses and had spoken to his assistant Blake; (2) Hazelwood had received and reviewed at least some trip reports during the time period under investigation, as evidenced by the fact that he replied to emails in a manner showing that he had read certain trip reports; and (3) Hazelwood, after his termination from Pilot, contacted Blake and told her that he had learned from his counsel's investigator that she had said that he read trip reports but that she needed to "understand" that he never read trip reports. From that evidence, the jury could easily conclude

18

that Hazelwood believed it was reasonably likely that Blake "would communicate information related to . . . possible commission of a federal offense to a federal law enforcement officer." Doc. 513 at 81 (Jury Charge). After all, Hazelwood knew Blake had been identified by the FBI and IRS as his executive assistant, had already been interviewed once, and possessed information of sufficient interest to prompt his counsel's investigator to tell him about the trip-report-related aspect of his interview of her. The email exhibits showing that Hazelwood not only read trip reports, but also responded to them, created a strong inference that Hazelwood was "conscious of his dishonesty and of the wrongfulness of conduct" when he told Blake on June 9, 2014 that he never read trip reports and did not have a way of responding to them.[6] *Id.* The jury thus reasonably concluded that Hazelwood attempted to corruptly persuade Blake not to tell federal agents, when she was inevitably interviewed by them, that Hazelwood had read trip reports.

Confronted with such compelling evidence, Hazelwood's trial counsel strategically introduced the facts that (1) Steptoe contacted Blake in April 2014 to schedule an interview for June 2014; (2) Blake immediately told Hazelwood that Steptoe had requested an interview; (3) Blake was interviewed by an investigator for Hazelwood's counsel in April 2014; and (4) when interviewed by Steptoe in June 2014, Blake had no plans for an interview with federal agents. Taken together, those facts could have been interpreted to mean that, even if Hazelwood intended for Blake to lie about his review of trip reports, Hazelwood intended to prevent her communications *only* to Steptoe, not to federal agents. If the jury had so found, it would have been legally obliged to acquit Hazelwood of witness tampering. The United States thus

---

[6] When cross-examining Blake, Hazelwood's trial counsel rightly noted the incriminating nature of Hazelwood's June 2014 phone call: "obviously we know 'never' cannot be right, because you know he's responded to some, right?" Blake responded, "Yes." Doc. 523 at 199.

introduced an email on redirect examination to prove that Hazelwood had been specifically told that information gathered by Pilot's investigators could be shared with federal investigators.

Because facts about the Steptoe investigation had been elicited by Hazelwood's counsel, the government chose to incorporate them into its closing argument. Doc. 511 at 176-81. By quoting only a few lines of the closing, Hazelwood misrepresents the government's argument and theory of the offense. Doc. 566 at 9-10. The core of the government's argument was this:

> There are two ways for Mark Hazelwood to believe that it was reasonably likely that Ms. Blake would communicate information about trip reports to federal law enforcement. One, directly to them. This is why the time line was important. Remember, federal law enforcement had already identified Ms. Blake as a potential witness. On April 15th of 2013, she told them that she worked for Mark Hazelwood. She told Mark Hazelwood that, that she had met with federal law enforcement. Mark Hazelwood met with federal law enforcement and knew that there was an investigation. Mark Hazelwood knew that there was incriminating information in those trip reports, that if they got to federal law enforcement would put him in the scope of the investigation. That's what the circumstances show you. He was corruptly persuading her to prevent her from communicating with federal law enforcement directly. He also knew that she had an interview with Steptoe & Johnson two days later, and he knew from Jimmy Haslam's e-mail that Pilot was going to cooperate with external investigations.

Doc. 511 at 176-77. At no time did the government even suggest that the Hazelwoods' $20,000 gift in April 2014 was a "bribe" intended to persuade Blake to lie to Steptoe; the testimony made clear that Hazelwood's June 9, 2014 phone call was not prompted by his knowledge that Steptoe wished to interview Blake, but his subsequent knowledge of what Blake told his counsel's investigator. The government referenced the $20,000 gift – and the prior payments Hazelwood had made to Blake in recognition of her assistance with his personal affairs – solely to provide context for Blake's testimony that she felt "used and betrayed" by Hazelwood's June 2014 phone call, when "everything *generous* [Hazelwood] had done for [her] in the past was being called upon." Doc. 523 at 168 (emphasis added); *accord* Doc. 511 at 177-79.

Contrary to Hazelwood's motion, the proof did not specify a date certain for the $20,000 gift or the Steptoe interview request, both of which occurred in April 2014; accordingly, the

government consistently mentioned the gift *before* the Steptoe contact.  Compare Doc. 511 at

178-79 (Closing) *with* Doc. 513 at 44 (Rebuttal).[7]  After baiting the government to incorporate

the Steptoe-related facts into its closing argument, Hazelwood's trial counsel set up a classic

defense, *i.e.*, that the government had "kep[t] evidence from [the jury]."

> [A]bout the lowest blow of this trial has been this thing about $10,000 that Mark
> Hazelwood did in April of 2000 and . . . that his wife Joanne did in 2000 [*sic*].
> The clear implication there was that they were doing something around that time
> to try to curry favor with her and *maybe bribe her*. Otherwise, it is totally
> irrelevant. Why did they put that in there? And did they, like they've done
> everything else in this case, keep things from you? Keep people from you?  Keep
> evidence from you? Yes, they did, because . . . [w]hat did she say later? . . .
> "QUESTION: So for the last five years before he left"—he left in May of 2014—
> "in addition to whatever you made from the company, was he giving you a
> 10,000-dollar personal check as a gift?" . . . "ANSWER: The first year he gave
> it to me, it was more than that." "Well, how much was it the first time?" "The
> first year was 25,000." . . . "So was the total seventy-five or eighty thousand?"
> "That's accurate, yes."  I respectfully, kindly, gently suggest that the government
> ought to be incredibly embarrassed about what they tried to suggest to you.

Doc. 512 at 190-91 (emphasis added).  The record demonstrates that Hazelwood's trial counsel

was the only person during trial to refer to the gifts to Blake as a potential "bribe," and that the

hyperbolic description was employed only to criticize the government for referencing the

Hazelwoods' undisputed multi-year history of gifts to Blake.  Hazelwood's current claim that

the government "very carefully constructed [a] narrative" around "hush money" because of the

Steptoe interview, Doc. 566 at 9, is contradicted by the record and should be flatly rejected.  The

government referenced facts about the Steptoe investigation only to clarify that those facts, as

presented by Hazelwood's trial counsel, did not change the obstructive nature of Hazelwood's

June 9, 2014 phone call to Blake.  The evidence overwhelmingly supports the jury's verdict.

---

[7] During rebuttal, government counsel repeated the same timeline, but mistakenly said the
Hazelwoods had given Blake $20,000 on "April 14th," rather than April '14.  Doc. 513 at 44.  As
before, government counsel referenced that gift *before* saying that, also in April 2014, Steptoe
arranged to interview Blake on "June 11th of 2014." *Id.*

**IV.    Hazelwood's other allegations of error are likewise meritless.**

   **A.    The prior guilty pleas and plea agreements of cooperating witnesses were
          properly referenced by the Court and all parties throughout trial so that
          the jury would accurately assess those witnesses' credibility and the basis
          for their knowledge about who participated in the charged conspiracy.**

The government's opening statement warned jurors they would hear from "cooperating

witness[es]" who are "criminals" and had "pled guilty to conspiring to defraud truck companies

by violating federal mail and wire fraud laws." Doc. 333 at 21. Counsel for Hazelwood's co-

defendant Wombold described the government's cooperating witnesses as "bad actors who took

advantage of smaller regional accounts and cheated these customers," yet argued that Wombold

had not participated in their crimes. Doc. 520 at 60. And Hazelwood's trial counsel similarly

conceded that the jury would hear evidence that some Pilot employees misled customers, while

insisting Hazelwood "wasn't involved in it and he didn't endorse it." *Id.* at 36. From the start of

trial, it was clear that Hazelwood and Wombold were conceding that fraudulent conduct occurred

at Pilot – they could hardly do otherwise – while arguing that they were not personally involved.

To help the jury evaluate the credibility of its cooperating witnesses, the government

offered each cooperator's plea agreement into evidence; they were admitted without objection.[8]

*See United States v. Carson*, 560 F.3d 566, 574-75 (6th Cir. 2009) ("evidence of a guilty plea

may be elicited by the prosecutor on direct examination so that the jury may assess the credibility

of the witnesses the government asks them to believe"). Hazelwood's trial counsel relied heavily

on those plea agreements during cross-examination for two reasons: to suggest that cooperators

did not believe that they had committed fraud until threatened with criminal prosecution, and to

---

[8] Gov. Ex. 2501, 2502, 2502-A, 2504, 2507, 2509, 2510, 2511, 2514; Doc. 520 at 110-12
(Welch); Doc. 336 at 248-50 (Ralenkotter); Doc. 521 at 165-66 (Andrews); Doc. 522 at 92-93
(Bibee); Doc. 522 at 237-38 (Radford); Doc. 424 at 154-55 (Clark); Doc. 445 at 165-66
(Holden); Doc. 356 at 14-15 (Mosher) .

22

require the cooperators to name all the persons with whom they believed they had entered into an "agreement . . . to commit fraud." *E.g.*, Doc. 336 at 172-73, 175; Doc. 522 at 141-42. Under such cross-examination, Welch identified coconspirators "that have already pleaded guilty . . . [as] Katy Bibee[,] Holly Radford, Ashley Judd, Lexie Holden[,] and Vicki Borden." Doc. 336 at 175. Although Welch named Hazelwood's co-defendants "Karen Mann [and] Heather Jones" as fellow employees she also understood to be involved, she did not name Hazelwood as a person with whom she had a criminal agreement. *Id.* at 169-83. Hazelwood's trial counsel used the same strategy with Bibee, who named Chris Andrews, Kevin Hanscomb, John Freeman, and Jay Stinnett – but not Hazelwood – as persons from whom she received instructions to engage in the conduct for which she had pleaded guilty. Doc. 522 at 160-62. Wombold's counsel engaged in similar questioning. *See* Doc. 521 at 70-71 (having Ralenkotter agree that not every person in the direct sales group was a co-conspirator). Such questioning was necessarily designed to imply that Hazelwood (and Wombold) were not involved in the conspiracy to commit fraud.

Hazelwood now accuses the government of asking "provocative" and allegedly improper questions that included a foundational condition—*i.e.*, "based on your participation and your role in the conspiracy that you pled guilty to"—or that asked how specified conduct would have been "in furtherance of the conspiracy in which [the witness] participated." Doc. 566 at 24 (citing Doc. 337 at 50). Hazelwood conveniently omits the fact that such questions were formulated in response to a co-defendant's objection about whether the government had proven the requisite foundation, *see* Doc. 337 at 33-35, 48-50, and to establish that the cooperating witnesses had personal knowledge about the aspects of the conspiracy about which they testified.[9] At no time

---

[9] Hazelwood notes that his co-defendant's counsel had counted 14 instances where the government asked Ralenkotter to answer "based on [his] participation in the conspiracy," Doc. 566 at 25, but he omits that attorney's conclusion at the time: "I'm not at all complaining about these questions in any way, or suggesting that they were improper, not at all." Doc. 521 at 61.

did the government ever suggest that a plea agreement could be used for a prohibited evidentiary purpose, and the Court rightly instructed the jury that "[t]he fact that these [cooperating] witnesses have pleaded guilty to a crime is not evidence that the defendants are guilty, and you cannot consider this against the defendants in any way." Doc. 513 at 85 (Jury Charge).

Hazelwood next faults the portion of the Court's limiting instruction that included the phrase "same conspiracy." Contrary to Hazelwood's motion, the challenged language correctly tracked the Sixth Circuit's pattern instruction, which states, in relevant part, "[y]ou have heard the testimony of [a cooperating witness, and] that he was involved in the *same crime* that the defendant is charged with committing." 6th Cir. Pattern Jury Instruction 7.08 (emphasis added).

Hazelwood contends that the Court's rulings on objections throughout trial would have forced the jury to conclude that a conspiracy existed,[10] but he has cobbled together two unrelated rulings from separate occasions and presented them as if they happened contemporaneously. Doc. 566 at 27 (implying that a hearsay objection during the direct examination of Andrews on November 14, 2017 by counsel for Jones was a continuation of an exchange between the Court and Hazelwood's trial counsel during the cross-examination of Bibee on November 20, 2017). Viewed in its totality, the record demonstrates the Court's unfailing impartiality and its repeated jury instructions. *E.g.*, Doc. 522 at 141 (ruling, in the jury's presence, "it's not this Court's role to protect this witness. It's the Court's role to see that these defendants get a fair trial.").

---

[10] In a subsidiary claim, Hazelwood claims the Court signaled that the conspiracy was "particularly nefarious" because the Court occasionally referenced a drug conspiracy, wholly unrelated to the charged offenses, to explain foundational legal principles about conspiracy. Doc. 566 at 27-28. For example, the Court used that analogy to explain the uncontroversial legal premise that a person may be involved in a criminal conspiracy with someone whose identity he does not know. *Compare* Doc. 336 at 178-79 *with* Doc. 513 at 69-70. Notably, Hazelwood's trial counsel elected to use a more violent analogy in closing argument by comparing the charged conspiracy to "capital murder" and describing Mosher as the "triggerman." Doc. 512 at 140. And Hazelwood did not object when counsel for Wombold employed the drug-dealer analogy in his own closing argument. Doc. 512 at 12-14.

The guilty pleas of the cooperating witnesses were properly referenced by the Court and the parties during trial. And the Court's repeated jury instructions delineated the narrow purpose for which that information could be considered. This claim does not justify a new trial.

**B.    Hazelwood's insinuations of prosecutorial misconduct are unfounded.**

Hazelwood accuses the undersigned prosecutors of "bur[ying]" exculpatory documents in "massive e-discovery" and "arguably act[ing] in bad faith." Doc. 566 at 12, 19. Nothing could be further from the truth. As the United States established in an earlier response, when opposing a co-defendant's motion for a bill of particulars, the United States produced extraordinarily well-organized discovery, facilitated Pilot's provision of a sophisticated document-review platform for defense counsel's use, and designated government trial exhibits long before trial. *See* Doc. 147, 166, Ex. 1-12; *see also* Ex. 1, 1/19/2017 USAO Letter (facilitating the uploading of government trial exhibit designations onto a document review platform).

Contrary to Hazelwood's claim that the government provided a single "marked file of Brady material,"[11] the government took its *Brady* obligations seriously and required that Pilot's outside counsel provide any potentially exculpatory information related to defendants, which was then produced to defendants, including Hazelwood. Doc. 147, 166, Ex. 6 at 54-56 (stating that productions from Pilot's external counsel included "exculpatory" material); Ex. 10 at 1 (same).

Equally inaccurate is Hazelwood's claim that the government's discovery was produced with the intent to "bury" evidence. With respect to customer-related material, the Court file

---

[11] Doc. 566 at 12, 19. The United States can only speculate that this characterization stems from an April 8, 2016 production letter that stated, in part, that investigative agents who reviewed materials seized pursuant to search warrants had been asked to use the FBI's document management platform to "tag" any documents the FBI identified as "potentially exculpatory," and that the attached disc contained all of the electronic documents so tagged. Ex. 2, USAO 4/8/2016 Production Letter No. 3. Although that letter reiterated that the government was mindful of its *Brady* obligations, it did not in any way suggest that the referenced disc contained all potential *Brady* material in the entire universe of the government's production.

25

already shows that the government provided well-organized collections of customer audit information. *E.g.*, Doc. 147, 166, Ex. 6 at 25-43, 45-46. Two of the three so-called "buried" documents identified by Hazelwood bear Bates-numbers[12] that identify where they were produced in the government's discovery *and* where they were found during the search of Pilot's headquarters. *See* Ex. 3, 4/8/2016 Production Letter 1 (including a detailed table of contents showing that the documents were hard copies, not electronic files, seized from Welch's cubicle during a search).

In any event, a review of the government's well-organized discovery in conjunction with the trial record confirms that the government never alleged that customers Classic Carriers, R&R Express Freight, or Jag Trucking Inc. are victims of the scheme to defraud. *See* Doc. 147, 166, Ex. 6 at 1-3, 45-52 (listing customers with fraud losses, according to certified public accountants, and advising that audit files for those customers were being placed on a review platform for defense counsel). Accordingly, any letters that customers Classic Carriers, R&R Express Freight, and Jag Trucking Inc. received from Pilot are not pertinent, as the government has never asserted that the conspirators targeted all of Pilot's customers. Finally, to the extent Hazelwood claims those customer letters offer a "newly discovered" defense that Pilot could unilaterally change customer discounts without notice, that theory is not novel, but was vigorously pursued by Hazelwood's trial counsel. *See*, *e.g.*, Doc. 361 at 79-80 (having Mosher agree that documents sent to some customers said, "Pilot reserves the right to renegotiate all discounts, rebates, or fees should margins or volumes fluctuate dramatically").[13]

---

[12] The third of Hazelwood's exhibits did not show a Bates-number. *See* Doc. 568, Ex. 2, 568-1.

[13] *Accord* Doc. 520 at 30-31; Doc. 521 at 123-25, 218-20, 231-42; Doc. 522 at 11-16, 149-53, 162-64; Doc. 354 at 175-76; Doc. 445 at 198-201; Doc. 358 at 104-05, 127, 138-40; Doc. 367 at 18-23, 30-34, 42-45.

The government continued its organized approach to discovery when it produced, on June 15, 2017, in compliance with the Court's scheduling order agreed upon by the parties, "Jencks Act materials or agency interview memoranda for the Government's witnesses in its case-in-chief," along with a table of contents for that material. *See* Ex. 4, 6/15/2017 USAO Letter. Included within that production was a "memorandum of interview" ("MOI") regarding Sherry Blake's November 18, 2014 interview with federal agents, along with many documents referenced during that interview, including the document Hazelwood now contends undermines Blake's trial testimony that she regularly provided trip reports to Hazelwood. Doc. 566 at 19 (citing Walden Decl. Ex. 7, refiled as Doc. 577). The document was certainly not "buried," because Hazelwood's trial counsel referenced the MOI to which the document was attached when cross-examining Blake. Doc. 523 at 229, 241. And Blake candidly acknowledged that she could not say that she never forgot to update the trip reports, and at least one email offered into evidence during direct examination showed that more than one week had passed since she had sent Hazelwood the trip reports. Blake also testified that she never "personally" saw Hazelwood looking at the notebook of trip reports and that she had no "personal knowledge one way or the other" whether he "accessed the Dropbox to review trip reports." Doc. 523 at 199, 201.

The government did not act in bad faith regarding discovery, but provided well-organized categories of discovery with detailed tables of contents and facilitated access to a review platform for a substantial portion of that material, thereby exceeding the discovery approach approved by the Sixth Circuit in *United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010).

### C. Government Exhibits 529 through 531 were properly admitted into evidence.

Hazelwood's grounds for excluding Gov. Ex. 529, 530, and 531, including his Rule 404(b) and "narrower alternative" arguments, Doc. 566 at 31, were previously fully considered and ultimately rejected by the Court. Doc. 455. Hazelwood has not identified any matter of fact

27

or law which the Court misapprehended.  The government adopts the Court's memorandum, Doc. 455, and incorporates by reference its own consolidated response in opposition to the defendants' motions to reconsider.  Doc. 417; Doc 509 (public version of Doc. 417).

The Court also effectively ruled that the admission of Gov. Ex. 529 through 531 does not warrant a new trial when it denied a consolidated motion for mistrial, joined by Hazelwood, at the close of the government's case-in-chief.  Doc. 471 at 55-74.  During argument on the motion for mistrial, the Court observed that very little time had been spent on the recordings when compared to the length of the entire trial.  *Id.* at 68, 72-73.  Collectively, the length of the three recordings was 8 minutes, 37 seconds:  Gov. Ex. 529 (4:10); Gov. Ex. 530 (1:33); and Gov. Ex. 531 (3:04).[14]  And after Agent McCord's testimony, the government made no other reference to the recordings during trial.  The Court's clear limiting instruction sufficiently directed the jury that those recordings "do not prove any of the elements of the offenses with which Mr. Hazelwood is charged" and that the evidence could be used by them only for a single purpose: the "consider[ation] of what, if any, weight should be given to certain evidence . . . regarding whether Mr. Hazelwood was a good businessman and an excellent company president for Pilot . . . and whether in those roles, [he] would engage in conduct that ran the risk of putting Pilot . . . in jeopardy . . . ."  Doc. 513 at 85-87.  As the Court previously recognized, juries are presumed to follow the instructions they receive.  Doc. 471 at 68-69; *see also* Doc. 455 at 15-17 (citing authorities).  The final verdict, which acquitted Hazelwood of one count, acquitted Wombold of five counts, acquitted Jones of three counts, and fully acquitted Mann, conclusively

---

[14] Before commencing deliberations, the jury heard testimony during 18 separate trial days.  Conservatively assuming that the jury heard approximately 4.5 hours of testimony each trial day, it heard a total of approximately 4,860 minutes of testimony.  The recordings' length— 8 minutes, 37 seconds—amounts to approximately .17% of that time, *i.e.*, less than one percent.

proves the jury was not so inflamed by the recordings as to be unable to fairly weigh evidence. Doc. 484.

### D. Hazelwood's trial counsel was not constitutionally ineffective.

Prior counsel's representation can justify a new trial only where counsel "failed to adhere to the constitutional standard set forth in *Strickland* [*v. Washington*, 466 U.S. 668 (1987)]." *United States v. Arny*, 831 F.3d 725, 731 (6th Cir. 2016). *Strickland* announced a two-part test, under which a defendant must establish, by identifying specific acts or omissions, that counsel's performance was deficient as measured by "prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005); *accord Strickland*, 466 U.S. at 689 (requiring a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"). He must also prove "a reasonable probability that, but for [those acts or omissions], the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694 (also defining a reasonable probability as one "sufficient to undermine confidence in the outcome"). "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment . . . if the error had no effect on the judgment." *Id*. at 691; *accord Smith v. Robbins*, 528 U.S. 259, 285-86 (2000). Because defendant "must satisfy *both* prongs [of *Strickland*], the inability to prove either one of the prongs . . . relieves the reviewing court of any duty to consider the other." *Nichols v. United States*, 563 F.3d 240, 249 (6th Cir. 2009) (*en banc*) (emphasis in original).

"Every trial lawyer has a professional obligation to exercise his best judgment on matters of trial tactics and strategy, and reasonable people often differ on such matters." *United States v. Medved*, 905 F.2d 935, 942 (6th Cir. 1990) (explaining that even if a defendant had "a better sense of trial strategy than his lawyer," that would not prove constitutional ineffectiveness); *accord Strickland*, 466 U.S. at 689 (stating that "reasonable professional assistance" spans a "wide range"). That is why courts "must take care to avoid 'second-guessing' strategic decisions

29

that failed to bear fruit." *United States v. Dado*, 759 F.3d 550, 563 (6th Cir. 2014). If the record

permits an inference of reasonable strategy, the related ineffectiveness claim must be rejected,

and no evidentiary hearing is necessary. The government submits that such is the case here.[15]

> **1.** **Decisions about what questions to ask witnesses are quintessentially matters of strategy, and Hazelwood has not shown that trial counsel's questions were outside the wide range of reasonable professional assistance, nor that he was prejudiced as a result.**

Hazelwood argues that trial counsel rendered ineffective assistance by eliciting favorable

testimony about Hazelwood's business judgment and reputation. Doc. 566 at 32. Except for that

questioning, Hazelwood argues, the United States would not have been able to seek to admit

---

[15] If the reasonableness of a strategic choice is not apparent to the Court, however, prior counsel should be invited to explain the basis for his action, because even "a seemingly unusual or misguided action by counsel [may have] had a sound strategic motive or [may have been] taken because the counsel's alternatives were even worse." *Massaro v. United States*, 538 U.S. 500, 505 (2003) (encouraging courts to "take testimony . . . from the counsel alleged to have rendered the deficient performance"); *accord Janosky v. St. Amand*, 594 F.3d 39, 48 (1st Cir. 2010) ("To be sure, counsel's strategy was not free from risk—but the state's case . . . was formidable, and counsel did not have any really attractive options."). If so, prior counsel should also be asked about his conversations with Hazelwood, because counsel cannot be deemed ineffective for doing what his client requested at the time. *See, e.g., Owens v. Guida*, 549 F.3d 399, 412 (6th Cir. 2008) ("A defendant cannot be permitted to manufacture a winning [ineffectiveness] claim by sabotaging her own defense"); *Coleman v. Mitchell*, 244 F.3d 533, 545 (6th Cir. 2001) (finding no deficient performance where counsel "follow[ed] his client's instructions" after the client participated in strategic decisions); *see also United States v. Ferguson*, 669 F.3d 756, 763 (6th Cir. 2012) (reiterating the need for evidence about counsel's strategy and client discussions). Because the trial record permits an inference of reasonable strategy, the United States has not requested a discussion with Hazelwood's trial counsel. Should the Court find that testimony from trial counsel is necessary, the United States will seek an appropriate order from the Court authorizing the permissible scope of the government's questioning based on Hazelwood's implied waiver of his attorney-client privilege. *See United States v. Clark*, No. 1:10-cr-366, 2013 WL 74616, at *1 (W.D. Mich. Jan. 7, 2013) ("By claiming ineffective assistance of counsel and otherwise raising issues regarding his attorney's performance, a defendant implicitly waives the attorney-client privilege to the extent that any privileged communication bear on his attorney's performance. In such circumstances, courts routinely issue orders finding a limited, implied waiver of the attorney-client privilege.") (citations omitted).

certain recordings,[16] and the Court would not have admitted them into evidence. *Id.* at 32, 34-35. But the fact that unfavorable evidence was admitted does not mean counsel was ineffective. It is well-settled that a "defense counsel's elicitation of damaging testimony does not of itself rise to the level of ineffective assistance." *Galloway v. United States*, 187 F. App'x 507, 510 (6th Cir. 2006) (internal citation omitted). Nor is counsel ineffective even for violating "the first rule of cross-examination: don't ask a question unless you know what the answer will be." *Campbell v. United States*, 364 F.3d 727, 735 (6th Cir. 2004). Here, the complained-of questioning was one step farther removed, in that it did not elicit any damaging or unfavorable evidence, but merely allowed the United States to seek to admit certain recordings in rebuttal.

Given the totality of the evidence, Hazelwood's trial counsel had few realistic options for attempting to obtain a not-guilty verdict. And it is not unusual for white-collar defendants to argue that charged criminal conduct is inconsistent with their reputation or pattern of behavior, *i.e.*, that they lacked the motive or capacity to commit the charged offenses. *E.g.*, *United States v. Worthington*, 698 F.2d 820, 827 (6th Cir. 1983) (healthcare fraud case where "defense counsel attempted to portray defendant as a dedicated, hard-working, honorable doctor"); *United States v. Johnson*, 634 F.2d 735, 737-38 (4th Cir. 1980) (tax evasion case where doctor argued that she did not care about money and instead focused on patients). It is thus not surprising—and not outside the realm of objectively reasonable professional assistance—that trial counsel introduced Hazelwood as a model of exemplary executive leadership. Beginning with opening statements, for example, trial counsel said Hazelwood was "committed to the survival, to the success, and to the . . . reputation of Pilot." Doc. 520 at 13. That theme recurred in counsel's cross-examination

---

[16] Hazelwood asserts—wrongly—that, from "the very beginning of the trial," the United States attempted to introduce the recordings. Doc. 566 at 34. In fact, the United States initially sought to introduce other rebuttal evidence, and this Court denied that request. *See generally* Doc. 338 (*in camera* proceeding).

31

of government witnesses. *E.g.*, Doc. 336 at 220-21; Doc. 361 at 103-05. Considering the overwhelming evidence against Hazelwood, had trial counsel not pursued that strategy, Hazelwood's convictions would have been more, not less, likely.

According to Hazelwood, it was "abundantly clear to trial counsel" before he questioned Mosher that such questioning would "open the door" for the recordings as rebuttal evidence. Doc. 566 at 35. Significantly, however, the Court had not yet ruled that the recordings would, in fact, be admissible, so this case is easily distinguishable from *Wilson v. Mazzuca*, 570 F.3d 490 (2d Cir. 2009), upon which Hazelwood relies. In *Wilson*, the court had explicitly warned that "questioning the adequacy of the investigation would trigger the admission of . . . [photographic] identification evidence" and that "if [defense counsel] elicited character testimony, the prosecution would be able to introduce [his client's] criminal record as rebuttal evidence." *Id.* at 504-05. Wilson's counsel disregarded both warnings, among others, and was later unable to articulate any plausible strategy for his actions. *Id.*

Here, by contrast, as the trial progressed, and having prevailed when the government had sought to introduce other rebuttal evidence earlier, *see* Doc. 338 (sealed *in camera* proceeding), trial counsel may have calculated the risk of the recordings actually being admitted as a very remote possibility. Trial counsel vigorously argued, as Hazelwood still does, that the recordings were not admissible. Doc. 566 at 29-31, 34-35. And trial counsel could have reasoned that the value of favorable testimony about Hazelwood's leadership outweighed any potential harm from the recordings, even if admitted.[17] Trial counsel's cross-examination of Special Agent Kevin

---

[17] Another example of this trial tactic, immediately after being warned by the Court about "the danger of character evidence," counsel for co-defendant Mann specifically asked a government witness whether Mann had ever expressed "racist views," eliciting testimony that Mann participated in emails that "could be viewed in an unsavory manner" as involving people unable to "speak clear English." Doc. 424 at 85-86. Mann was nonetheless acquitted at the

McCord, through whom the recordings were offered, showed that trial counsel was prepared to develop facts to argue that the setting and context of the recordings made them unrelated to Hazelwood's role as a Pilot senior executive. Doc. 424 at 64-65. To be sure, the recordings captured Hazelwood using "incredibly offensive" language, Doc. 424 at 51,[18] but that language was categorically different from the charged criminal conduct. This is not a case in which the rebuttal evidence involved the same type of conduct as the charged offense, such that a jury would have been tempted to consider it for an impermissible purpose. Thus, this case is also distinguishable from *Ward v. United States*, 995 F.2d 1317 (6th Cir. 1993), another case cited by Hazelwood, Doc. 566 at 34-36, because the trial counsel in *Ward* opened the door for the government to introduce evidence that the defendant had the propensity to engage in the charged conduct of making illegal explosive devices.

### 2. Trial counsel was not ineffective for not investigating further.

By alleging that counsel failed to conduct adequate investigation, Hazelwood necessarily presumes there were additional facts such an investigation might have revealed. But the record suggests trial counsel was aware of the information Hazelwood says he should have investigated. Moreover, Hazelwood knew of his prior payments to Blake, and "an attorney does not provide deficient counsel by making investigative decisions based, quite properly, on information

---

close of trial. Doc. 484. Mann's acquittal in the wake of the evidence elicited about her during cross-examination again demonstrates that the jury dispassionately considered the evidence.

[18] Hazelwood asserts that "the district court characterized" the recordings as "vile." Doc. 566 at 40. He is mistaken, as the Court explained during a mid-trial hearing:

> [Counsel for co-defendant Jones] has quoted the Court as describing the recordings as being inflammatory, vile, or – or offensive. And actually what I was doing was quoting language from one of the filings in this case by one of the defendants. So *that was not the Court's language*. The Court was just using the language of one of the parties to describe the contents of it. So the Court did not offer its own opinion. The Court was actually quoting language from some – some of the filings.

Doc. 444 at 7-8 (emphasis added).

supplied by the defendant." *Cope v. United States*, 385 F. App'x 531, 533-34 (6th Cir. 2010). "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigation unnecessary," but courts "apply[] a heavy measure of deference to counsel's judgments." *Munoz*, 605 F.3d at 376-77 (quoting *Strickland*, 466 U.S. at 691).

Although Hazelwood claims that his trial counsel failed to conduct "even a primitive investigation" into the facts underlying the witness-tampering offense, Doc. 566 at 38-39, his claim rests upon a distorted perception of the government's theory of the offense, as shown above. The fact that Hazelwood's trial counsel cross-examined Blake about the payments she received from Hazelwood and the timing of the Steptoe investigation shows that counsel knew the information Hazelwood now claims counsel should have investigated and that additional investigation was unnecessary. *See generally* Doc. 523 at 259-62. To the extent Hazelwood faults counsel for not introducing his 2013 check to Blake or the 2014 email in which Blake described him as "very generous," he overlooks the fact that such evidence would have been cumulative to testimony that Hazelwood had paid Blake approximately $80,000 total for assisting with his personal affairs and that Blake felt that "everything generous [Hazelwood] had done for [her] in the past was being called upon" when Hazelwood called in June 2014 to insist that Blake understand that he had never read trip reports. Doc. 523 at 168. Given that context, the email Hazelwood labels "clearly exculpatory," Doc. 566 at 38, could be viewed as inculpatory and corroborative of Blake's testimony. Similarly, if Hazelwood's trial counsel had introduced the $15,000 check into evidence, the jury could have used it to compare Hazelwood's signature with other documents witnesses had attributed to Hazelwood. *E.g.*, Gov. Ex. 409, 2200. In sum, there is no reasonable probability that additional investigation by trial counsel would have resulted in Hazelwood's acquittal as to witness tampering.

**V.     Hazelwood has not established any errors to be cumulated.[19]**

It is true that errors which are individually harmless may cumulatively amount to a denial of due process.  *E.g.*, *United States v. Parker*, 997 F.2d 219, 221-22 (6th Cir. 1993).  But a defendant must "show that the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair," and Hazelwood has not done so here.  *United States v. Warman*, 578 F.3d 320, 349 (6th Cir. 2009) (quoting *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004)).  Moreover, cumulative-error analysis only applies to evaluate the effect of matters which this Court finds to be error, not the cumulative effect of non-errors.  *Campbell v. United States*, 364 F.3d 727, 736 (6th Cir. 2004).  Because Hazelwood has identified no errors, there is nothing to cumulate.

Hazelwood was fairly tried, and his motion for new trial should be soundly rejected.

---

[19] In a footnote, Hazelwood disputes the admission of Seay's testimony about the scope of loss, arguing that (1) loss is not an element of the charged offenses and (2) the testimony allegedly violated Fed. R. Evid. 701.  Doc. 566 at 29-30 n. 15.  Aside from the fact that there was no contemporaneous relevance-based objection to Seay's testimony, victim loss in fraud case *is* relevant to prove specific intent to defraud.  *See United States v. Sutherlin*, 118 F. App'x 911, 915 (6th Cir. 2004) ("The government was entitled to introduce proof of investor loss to prove the defendants' specific intent to defraud."); *accord United States v. Heimann*, 705 F.2d 662, 669 (2d Cir. 1983).  And the Court correctly rejected Hazelwood's Rule 701-based claim during trial.  Doc. 443 at 109-10.  The United States incorporates by reference its earlier pleadings in opposition to defendants' joint motion to exclude Seay's testimony.  *See* Doc. 234, Doc. 236.

In another footnote, Hazelwood faults trial counsel for not objecting to evidence of his "total compensation."  Doc. 566 at 32 n.17.  Because he does not further develop that claim, it is unreviewable.  *United States v. Roach*, 502 F.3d 425, 442 (6th Cir. 2007); *United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999).  In any event, any objection would have been futile.  Despite Hazelwood's 3.5% profit-sharing arrangement that yielded millions in compensation between 2008 through 2012, he had four homes and his monthly expenditures exceeded $60,000, as testified by Blake, so he was sometimes obliged to sell stock holdings to prevent bank overdrafts when paying his monthly expenses.  Doc. 523 at 146-47, 271-72.  Proof of Hazelwood's significant compensation was thus relevant and admissible to establish his motive to participate in the conspiracy; his profit-sharing arrangement meant he personally profited from every dollar defrauded from a victim customer.  Gov. Ex. 401.  Therefore, trial counsel was not ineffective for not objecting to evidence of Hazelwood's total compensation.

Respectfully submitted,

CHARLES E. ATCHLEY, JR.
ATTORNEY FOR THE UNITED STATES
ACTING UNDER AUTHORITY
CONFERRED BY 28 U.S.C. § 515

By:     *s/ Francis M. Hamilton III*
         Francis M. Hamilton III
         David P. Lewen, Jr.
         Assistant United States Attorneys
         800 Market Street, Suite 211
         Knoxville, Tennessee 37902
         (865) 545-4167

## CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2018, the foregoing response was filed electronically. Notice of its filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail and e-mail. Parties may access this filing through the Court's electronic filing system.

*s/ Francis M. Hamilton III*
Francis M. Hamilton III
Assistant United States Attorney