UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff, | ) | |
| v. | ) | No. 3:16-CR-20 |
| | ) | JUDGES COLLIER/GUYTON |
| MARK HAZELWOOD,<br>Defendant. | ) | |

**GOVERNMENT'S CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANT HAZELWOOD'S MOTION TO RECONSIDER ORDER DENYING ISSUANCE OF SUBPOENAS *DUCES TECUM* (Doc. 660) AND MOTION FOR ISSUANCE OF SUBPOENA *DUCES TECUM* PURSUANT TO RULE 17(c) (Doc. 661)**

The United States of America hereby provides this consolidated response in opposition to (1) Defendant Hazelwood's motion for the Court to reconsider its Order denying the issuance of subpoenas *duces tecum* to Pilot Travel Centers LLC (Pilot) and KraftCPAs (Kraft), Doc. 651, and (2) Hazelwood's motion for issuance of another subpoena *duces tecum* to Pilot. Docs. 660, 661. The government adopts its previously filed response in opposition to Hazelwood's original motion for the issuance of subpoenas, Doc. 646, and supplements that response as follows.

In his motion to reconsider, Hazelwood concedes that the purpose of his subpoenas to Pilot and Kraft has not changed; he continues to request the same information "to review and test" calculations "performed by PFJ and to compare those calculations to the totals used by Kraft." Doc. 660 at 8.[1] Thus, Hazelwood's motion to reconsider requests that the Court issue subpoenas to Pilot and Kraft for an investigatory purpose – an improper reason that the Court already has correctly rejected.[2] Doc. 651 at 2-3; *see also United State v. Al-Amin*, No. 1:12-CR-

---

[1] In his original motion, Hazelwood said that he wanted the Court to issue the Rule 17(c) subpoenas to Pilot and Kraft, so that he could "conduct adequate testing of the PFJ IA and Kraft's conclusions based on that audit." Doc. 640 at 7.

[2] The government also notes that the "fishing-expedition" nature of Hazelwood's original subpoenas to Pilot and Kraft has not changed, in that they still contain repeated requests for "all"

50, 2013 WL 3865079, at *10 (E.D. Tenn. July 25, 2013) (ruling that seeking records "for 'investigatory' purposes … is an improper purpose" for a Rule 17(c) subpoena, because "[u]sing the power of the Court to obtain information that might advance an investigation is an abuse of the authority of the Court").

Hazelwood also persists in inaccurately asserting that he

> lacks documents and electronic data collected and/or relied upon by PFJ in determining the amounts to be repaid to its customers, instructions or protocols developed and/or used by the audit team to determine the losses to be repaid, documentation of the data queries used by PFJ to identify and gather the relevant data from its systems, and any documentation of the decisions made and protocols used by the audit team to quantify the time period and amount of losses to customers.

Doc. 660 at 9. Contrary to Hazelwood's claim, on April 8, 2016, the government produced in discovery Pilot's final internal audit files for each victim customer at issue in Hazelwood's sentencing. *See* Ex. 1 at 7-11. These audit files, which were produced in well-organized electronic folders by company name, contain "all relevant information found" by Pilot's internal audit team ("Pilot-IA") during the audit for each respective customer and include "the universe of information upon which [Pilot-IA] relied during the [a]udit," and "all work papers and related audit materials." Ex. 2 at 1 (Declaration of Darren Seay).[3] As explained in Darren Seay's declaration, included among this information would be the following:

> a. Letters, contracts, forms, documented conversations, and emails and email attachments between PFJ and a customer, both historical and during the course of an audit. To be clear, any and all relevant communications between PFJ (including its sales people, auditors, and audit managers) occurring before and during the audit will be contained in the Company Review Folders.
>
> b. Correspondence between PFJ and the billing companies or any other third parties.

---

documents "relating to" or "reflecting" various subject matters. *See* Doc. 651 at 3 (finding "'fishing-expedition' nature of [Defendant Hazelwood's] requests").

[3] Darren Seay's declaration was previously submitted to the Court as Exhibit 4 to the government's response in opposition to Hazelwood's motion to continue his sentencing. *See* Doc. 628-4.

c. Weekly call sheets, Trip Reports, and sales calls reports.

d. Internal communications and documented conversations between sales representatives and/or other PFJ employees.

e. Sales Force and/or ACT notes and communications.

f. Discount Change Forms.

g. Other supporting documents, communications, reports, and customer summaries.

*Id*. at 3-4. Additionally, each audit file contains a "Company Review," also known as a "Company Audit Checklist," which "contains a summarization of an auditor and audit manager's checklist, findings, notes and/or recommended actions," along with "a timeline of the discounts the company had, with supporting documentation attached." *Id*. at 2. The Company Audit Checklist consists of the following parts: (a) a "header contain[ing] the company, auditor, and manager;" (b) a "checklist contain[ing] the required steps" for the audit; (c) a "notes section, for direct bill customers, [that] explains how discounts will be represented in the supporting documentation and the hierarch of evidence;" (d) a "comments section contain[ing] the auditor's findings, notes, documented conversations, and/or recommended actions; and (e) the audit "manager's comments section contain[ing] the manager's findings, notes." *Id*. The audit files further contain "Customer Reports," which "include reports obtained to reflect historical customer gallons, discounts, rebates, profit and loss statements, payments, and and/or store activity. The reports could be received and/or generated from Ascend, PriceFetch, Lawson, Mobius, billing services, Excel, or some other source." *Id*. at 3. And the audit files contain, "discounts reflected in the system[,] specifically Ascend and/or PMIS spreadsheets which reflect the historical discounts, rebates, and/or exceptions set up in the source systems for the customer at the time of the report." *Id*. at 3.

As noted above, all of this information can be accessed through the well-organized electronic folders that accompanied the government's production to Defendant Hazelwood on April 8, 2016. *See* Ex. 1 at 7-11. For example, by clicking on electronic folder, "FalconTranportCo_315199," seen at right, the following folders and documents appear, consistent with the descriptions in Mr. Seay's declaration:

EquityTransportation_517002
FalconTransportCo_315199
FlashTruckLinesCorporation_612142




And, when the Word file "PFJ_Alloc_Cust_032485.docx" (highlighted above) is opened, the sixteen-page Company Audit Checklist for Falcon Transport Co.[4] appears:

---

[4] Gov. Ex. 1101, a trip report sent to Hazelwood on July 11, 2008 that was admitted at trial, expressed co-conspirator Ralenkotter's plan to execute the scheme to defraud against Falcon Transport, when Ralenkotter wrote:

> Fuel optimizer not real bright, just met the newest bulbs[.] [T]hey seem slightly smarter. I will work up some aggressive prices to move TA gallons. Good thing is I don't actually need to change our billing[.] [T]hey do not reconcile with fuel dispatch… imagine that?

Gov. Ex. 1101.

**Company Audit Checklist (08-13-2013 updated)**

**Auditor: Ben Woods**

**Manager: Erik Lane**

Company Name – including related Companies: Falcon Transport Co

DB Sales Acct #: 315199

*See* Ex. 4. Contrary to Hazelwood's repeated claim that he has not had access to the "instructions or protocols developed and/or used by the audit team to determine the losses to be repaid," the first four pages of the Company Audit Checklists – as seen in attached Exhibit 4, and consistent with Mr. Seay's declaration, – provide a checklist and protocol for Pilot's internal audit team to follow, including the following instruction and guidance about where to search and how to then prioritize documentation and information related to customer discount deals:

7. The deal paperwork will be in the form of letters to the customers; older deals have 2-3 page contracts, e-mails and similar documentation. Other documentation will include internal e-mails, notes of sales calls in Sales Force and ACT and sales calls reports, communication to billing service companies and then discount change forms. Hierarchy of pricing deal paperwork is as follows:
    1. Letters, contracts and e-mails between Pilot and the customer. Look in Xera to make sure this was sent to the customer.
    2. Correspondence between Pilot, usually Lori McFarland and the billing companies, Comdata, TCH/EFS, etc. This correspondence usually is found in the discount folder with the DCF. If there is a DCF and it is marked for reflection then there must be a communication between Lori McFarland and the billing company. If no communication is found with the DCF then you should look in Xera for the communication.
    3. Weekly call sheets and sales call reports from the outside sales reps to their bosses – the divisional sales reps.
    4. Communications between the outside sales reps (OSR) and the inside sales reps(ISR). Watch for language that confirms two deals, maybe one to set up in the system and one that was promised to the customer.
    5. Copies of outsides sales reps sales weekly trip reports. These reports are usually found in an email search.
    6. Sales Force/ACT Notes communications. They usually involve the notes an OSR or ISR will document in in Sales Force/ACT Notes about a deal, or communication, or interaction with a customer.
    7. Discount Change Form (DCF) only, unless they are accompanied by emails or letters that verify the deals.
    8. No supporting evidence found regarding the customers deal.

Ex. 4 at 4.

As further noted in Mr. Seay's declaration, these audit files also "contain the Manual Rebate and/or Direct Bill repricing tools," which were also referred to as "the Power Pivot Manual Rebate Tool and/or Power Pivot Repricing Tool." *See* Ex. 2 at 2. These repricing tools exist in the audit file in a native Excel file format. At trial, Mr. Seay testified on direct examination and was vigorously cross-examined about Pilot's internal audit, including the creation and use of the repricing tools used to recalculate the amounts of withheld discounts owed to Pilot's customers. Doc. 429 at 192-245; Doc. 443 at 16-86; Doc. 445 at 6-99.

Additionally, Hazelwood received in discovery the government's March 29, 2017 production of Darren Seay's March 24, 2017 report that also detailed how Pilot's repricing tools were created for, and used during, Pilot's internal audit, and how those repricing tools were used to calculate the losses set forth in the summary exhibits admitted at trial for customers Amerifreight (Gov. Ex. 1613-A); BP Express (Gov. Ex. 810-A); Halvor (Gov. Ex. 1712-A); JTL (Gov. Ex. 1522-A); Queen (Gov. Ex. 727-A); and Ryder (Gov. Ex. 1826-A). *See* Ex. 3.

In short, Hazelwood has provided no basis for the Court to reconsider its previous ruling denying Hazelwood's motion for the issuance of Rule 17(c) subpoenas to Pilot and Kraft. First, Hazelwood has offered nothing to disturb the Court's conclusion that the purpose of his original subpoena requests to Pilot and Kraft "is to investigate the loss calculation, not to obtain specific documents or information to introduce at his sentencing." Doc. 651 at 2. Second, the Court's conclusion that Hazelwood "has failed to show the items he seeks are not otherwise procurable through due diligence," Doc. 651 at 4 n.1, continues to be well-supported by Darren Seay's declaration, the example Company Audit Checklist described above, in addition to Mr. Seay's testimony at trial. *See* Exs. 2, 4.

Turning to Hazelwood's new motion for the issuance of a Rule 17(c) subpoena to Pilot, the government first notes that the two internal Pilot email chains that Hazelwood attached to his motion were found in the final audit files that the government produced to Hazelwood on April 8, 2016. Their respective Bates-numbers are: PFJ_ALLOC_CUST_1651866 (Ex. 1, Doc 661-1) and PFJ_ALLOC_CUST_742307 (Ex. 2, Doc. 661-2). This screenshot shows that Ex. 1 to Hazelwood's new motion, Doc. 661-1, can be found in the final audit file for Ryder produced in discovery on April 8, 2016 (Ex. 1 at 7-11):

2016 > 2.11.2016 > Records > Thumb drive > Manual Rebates Accounts > Ryder > Ryder

Name

PFJ_ALLOC_CUST_1651848.xlsx
PFJ_ALLOC_CUST_1651849.xls
PFJ_ALLOC_CUST_1651850.xls
PFJ_ALLOC_CUST_1651851.msg
PFJ_ALLOC_CUST_1651856.msg
PFJ_ALLOC_CUST_1651857.xlsx
PFJ_ALLOC_CUST_1651858.msg
PFJ_ALLOC_CUST_1651860.msg
PFJ_ALLOC_CUST_1651862.msg
PFJ_ALLOC_CUST_1651864.msg
PFJ_ALLOC_CUST_1651866.msg
PFJ_ALLOC_CUST_1651868.msg
PFJ_ALLOC_CUST_1651870.pdf
PFJ_ALLOC_CUST_1651876.xlsx

And, the following screenshot shows that Ex. 2 to Hazelwood's new motion, Doc. 661-2, can be found in the final audit file for Cassens also produced in discovery on April 8, 2016 (Ex. 1 at 7-11):

2016 > 2.11.2016 > Records > Thumb drive > Manual Rebates Accounts > Cassens > Research

| Name |
| --- |
| PFJ_ALLOC_CUST_742290.msg |
| PFJ_ALLOC_CUST_742291.xls |
| PFJ_ALLOC_CUST_742292.docx |
| PFJ_ALLOC_CUST_742293.xlsm |
| PFJ_ALLOC_CUST_742294.msg |
| PFJ_ALLOC_CUST_742296.pdf |
| PFJ_ALLOC_CUST_742297.msg |
| PFJ_ALLOC_CUST_742298.xls |
| PFJ_ALLOC_CUST_742299.xls |
| PFJ_ALLOC_CUST_742300.msg |
| PFJ_ALLOC_CUST_742301.xls |
| PFJ_ALLOC_CUST_742302.msg |
| PFJ_ALLOC_CUST_742303.xlsx |
| PFJ_ALLOC_CUST_742304.msg |
| PFJ_ALLOC_CUST_742305.msg |
| PFJ_ALLOC_CUST_742306.msg |
| PFJ_ALLOC_CUST_742307.msg |
| PFJ_ALLOC_CUST_742309.xlsx |

The fact that these documents are located in the above-named final audit files is consistent with Darren Seay's declaration that the audit files contain "the universe of information upon which [Pilot-IA] relied during the [a]udit," and "all work papers and related audit materials," including, "internal communications and documented conversations between sales representatives and/or other PFJ employees." Ex. 2 at 1, 3. Indeed, the fact that the two email exhibits that Hazelwood attached to his motion as representative of the kind of emails he seeks through a Rule 17(c) subpoena to Pilot were found exactly where Darren Seay's declaration said that "internal communications and documented conversations between sales representatives and/or other PFJ employees" would be located – namely in the final audit files – is sufficient reason for the Court to conclude that the material Hazelwood seeks is otherwise procurable through due diligence, namely through the review of the audit files that were produced to him in discovery.

Moreover, Hazelwood's motion to reconsider effectively concedes that he has already procured the so-called "business-decision" emails and documentation that he seeks through his new motion for another subpoena to Pilot. Specifically, in his motion to reconsider, Hazelwood

cites "Exhibit A," a June 29, 2013 email[5] to support his assertion that "documentation makes clear that the ultimate decision concerning losses was a 'business decision' to maintain customer's business," and then states, "[t]he court will see, based on our forthcoming [departure][6] motion, the example above [Exhibit A] is fairly common." Doc. 660 at 4. By stating that he already possesses sufficient documentation to show in a downward departure motion that "business decision" payments were "fairly common" during the audit, Hazelwood has effectively conceded that the documents and information he seeks through his new subpoena to Pilot are otherwise procurable through due diligence.[7]

---

[5] This is same June 29, 2013 email attached as "Exhibit 2" to Hazelwood's new motion for a Rule 17(c) subpoena. *Compare* Doc. 660-1 *with* Doc. 661-2.

[6] On page 3 of his motion to reconsider, Hazelwood states his plan to file a "motion for downward departure" to show the Court that Pilot's internal audit method resulted in "overpayment to customers [that] was the result of 'business decisions' made by [Pilot's Chief Financial Officer] and [Pilot's] internal auditors." Doc. 660 at 2-3. Hazelwood cites the June 29, 2013 email attached as Exhibit A to his motion to reconsider as "one example," but states his plan to "document many others in [his] forthcoming motion for downward departure." *Id*. at 3.

[7] The "business decision" argument that Hazelwood says he plans to make at sentencing was also explored at trial by his counsel:

**Trial counsel**: [S]o Pilot paid -- as -- in the course of this audit, repaid any customer that Pilot believed lost money due to fraud, correct?
**Seay**: That's my understanding, yes.
**Trial counsel**: And, in total, Pilot paid more than 56 million back to customers they thought lost money due to fraud, correct?
**Seay**: I believe that's correct, yes.
**Trial Counsel**: Pilot also went so far as to pay customers who may have lost money due to innocent mistakes, correct? A clerical error, or just a mistake?
**Seay**: Yes.
**Trial Counsel**: So even in instances where fraud was not conclusively found, Pilot said, "We're still going to pay this customer, because we think they should have received more," right?
**Seay**: Can you -- can you restate that question?
**Trial Counsel**: Sure. So there were cases or certain customers where sometimes the audit team may have found a mistake but they couldn't determine whether it was fraudulent or benign, correct?
**Seay**: Yes.

"Mere[ly] hop[ing]" for more, *Al-Amin*, 2013 WL 3865079, at *6, Hazelwood's latest subpoena request seeks to use Rule 17(c) for an investigatory purpose by demanding all "[e]mails between [seventeen named individuals] related to the Pilot Flying J internal audit conducted between April 2013 and April 2014 discussing or otherwise referencing a decision to alter, change, amend, adopt, increase, make 'business decisions' or otherwise manipulate the amount of loss calculated to customers as a result of fraud, innocent mistake, miscalculation, customer complaint, or otherwise." Doc. 661-3 at 7. The breadth of this request has all of the hallmarks of a "fishing expedition" by demanding emails that "discuss[] or otherwise referenc[e]" a decision to do various things, including to "adopt," "make 'business decisions', "or otherwise manipulate" "the amount of loss" calculated for customers "as a result of" various circumstances, including the circumstance of "or otherwise." *Id*. The scope of Hazelwood's subpoena effectively demands every email related to Pilot's internal audit that the seventeen named individuals sent from April 2013 to April 2014. Hazelwood concedes as much when his motion candidly states, "we are seeking emails of individuals who were involved in 'business decisions' during the [Pilot internal audit]." Doc. 661 at 3.

---

**Trial Counsel**: And in those instances, Pilot said, "We will still pay the customer the money -- the money they should have been paid originally," correct?

**Seay**: There was a reasonableness judgment, but, yes, that was -- commonly if it was a borderline scenario, we would err in the customer's favor.

Doc. 443 at 70-71. *See also* Doc. 429 at 242 (Counsel for Jones: "During the process of audit, isn't it true that Pilot gave the benefit of the doubt to trucking company?" Seay: "That was common, but that was not always the case, but when in doubt, if we had – yes, I mean that was common.") Thus, Hazelwood's sentencing argument that the Pilot audit was an exercise in "client-satisfaction" is hardly a novel defense theory in this case. Doc. 660 at 2; Doc. 661 at 1. Indeed, it was trial counsel's benefit-to-the-customer line of cross-examination at trial that prompted the government's request for SVRS testing for sentencing.

Thus, the Court should conclude that Hazelwood's new subpoena is for an improper investigatory purpose and the material he seeks is otherwise procurable through due diligence, namely from the internal audit files that have been produced.

In denying Hazelwood's new motion for a subpoena, the Court has additional information upon which to again conclude that

> [i]f any of Kraft's conclusions are unreliable because they are unsupported or based on an insufficient methodology, Defendant may demonstrate these flaws to the Court during the sentencing hearing through cross examination of the Government's witnesses, the testimony of Defendant's own experts, or simple argument based on the allegedly faulty portions of the reports.

Doc. 651 at 4. Through his detailed criticism of Pilot-IA's work related to the audit of Cassens, Hazelwood has demonstrated, through his motion to reconsider, that contrary to his new motion for another subpoena to Pilot, he possesses the information he needs, and is well-equipped, to attack the government's position through the various means listed by the Court. *See* Doc. 660 at 3-4.

Of course, the government will in turn be prepared to respond. For example, in criticizing the inclusion of Cassens' loss in his relevant conduct, Hazelwood summarily disregards the probative value of co-conspirator Arnie Ralenkotter's email to co-conspirator Janet Welch directing her to lie to Cassens:

> To: Janet Welch[Janet.Welch@pilottravelcenters.com]
> From: Arnie Ralenkotter
> Sent: Tue 11/11/2008 12:54:43 PM
> Importance: Low
> Subject: Calculate Cassens on a monthly funded at CP .05
> MAIL_RECEIVED: Tue 11/11/2008 12:54:00 PM
>
> If he asks we are doing cp .02 monthly. Also, let me know the rebate amount before sending.
>
> *Arnie Ralenkotter*
> Pilot Travel Centers LLC
> Director of Sales Northeast Region
> Office: 800-871-9952
> Cell: 865-805-5537
> Fax: 865-297-1778

PFJ_ATTRIB3_000000900;[8] Doc. 660 at 3. This Ralenkotter conduct that Hazelwood dismisses as irrelevant, *see id.*, is strikingly similar to trial evidence that was admitted to prove Hazelwood's conspiracy conviction. *See*, *e.g.*, Gov. Ex. 902 (Koleaseco), 1102 (PI&I), 1103 (PI&I), 1304 (LTI), 1513 (JTL).

Even more problematic is Hazelwood's erroneous conclusion that Kraft "overstated" Cassens' loss by "93.4%" for the month of June 2012. Doc. 660 at 3. Hazelwood claims that Kraft's attribution documents for Cassens show that Cassens sustained only a $3,118 loss for the month of June 2012, and that Kraft therefore erroneously attributed more than $47,000 in loss to Cassens for that month, resulting in an overstatement of loss by 93.4% for June 2012. *Id.* It appears that Hazelwood has misread the Power Pivot Manual Rebate Tool spreadsheet for Cassens, which is found in Pilot's internal audit file[9] for Cassens as well as in the well-organized attribution documents[10] produced in support of KraftCPAs' July 2018 report. The Cassens' Power Pivot Manual Rebate Tool plainly shows that Cassens was owed $47,665.75 for the month of June 2012, but according to Pilot's Lawson accounting system was paid *nothing*, resulting in a loss, or "Monthly Total Variance" of $47,665.78, as seen below:

| | | Sum of Savings | AP Lawson Check Date | AP Lawson Check Number | AP Lawson Check Amount | Variance | Monthly Total Variance |
|---|---|---|---|---|---|---|---|
| Cassens | Jun-2012 | $47,665.78 | | | | $47,665.78 | $47,665.78 |

[8] This document was produced in discovery, *see* Doc. 632-4 at 6, and will be submitted to the Court as an exhibit in connection with the sentencing proceeding.

[9] The government has previously explained that Hazelwood knows from the discovery produced in this case that "Kraft looked first to Pilot's internal 'audit results that listed [discount underpayment] losses on a month-by-month basis," in aggregating loss amounts for customers who appeared to have been targeted by the scheme based on "attribution" documentation. *See* Doc. 628, Gov. Cons. Resp. to Hazelwood's Motion to Continue Sentencing, at 4-7.

[10] *See* PFJ_ATTRIB3_000000893-95.

PFJ_ATTRIB3_000000893-95.[11] Thus, the Cassens-related internal audit spreadsheet, upon which Kraft based its month-by-month loss amounts, shows that for the month "Jun-2012," Cassens was owed $47,665.78 in the "Sum of Savings" column, but received no payment from Pilot, as evidenced by the empty cells in the columns "AP Lawson Check Date," "AP Lawson Check Number," "AP Lawson Check Amount." Thus, it appears that Hazelwood was mistaken when he asserted that Kraft overstated the loss to Cassens for June 2012 by 93.4%.[12] In any event, although erroneous, Hazelwood's critique of Cassens' loss calculation shows the Court

---

[11] This document was produced in discovery, *see* Doc. 632-4 at 6, and will be submitted to the Court as an exhibit in connection with the sentencing proceeding.

[12] Hazelwood chose not to identify the month upon which he based his "overstatement" challenge to Kraft's work, which he asserted to be offering to show the credibility of "his auditor's findings." Doc. 3-4. However, the government was able to determine the month in question by consulting the "single spreadsheet from Brian Mosher," upon which Hazelwood based his "overstatement" criticism of Kraft. *See* Doc. 660 at 3 (stating that "Kraft … cites a single spreadsheet from Brian Mosher (who may have taken over the account from Ralenkotter) in which he reduced a single month's discount by $3,118.") On the spreadsheet cited in Kraft's attribution summary for Cassens, which was submitted to the Court as Exhibit 2 to the government's response to Hazelwood's PSR objections, Doc. 645-2 at 38, Kraft cites "PFJ002498082," which is a spreadsheet identified as PFJ_ATTRIB3_000000906:

| Customer | Account | Old | New | From? | June Gallons | Jun-12 | Brian | PFJ |
|---|---|---|---|---|---|---|---|---|
| Cassens | RESTRICTED | AR | BM | .75 on transactions | | | | |
| Cassens | RESTRICTED | AR | BM | PF - CP 2 | 171,416.00 | 42,802.87 | – | 39,685.22 |
| ATC Leasing (Unimark Lowboy) | RESTRICTED | BM | BM | Brian Webb Sends | 9,519.21 | from Brian | 2,179.90 | 2,179.90 |
| ATC Leasing (Unimark) | RESTRICTED | BM | BM | Brian Webb Sends | 52,415.89 | from Brian | 12,003.24 | 12,003.24 |
| B-T Inc (part of Decker) | 103201; 026930 | BM | BM | PF | | 20,693.41 | 18,000.00 | 18,162.08 |
| Decker | | BM | BM | PF | 475,434.91 | 155,673.70 | 140,000.00 | 142,727.93 |
| DOT Transportation (DOT Foods) | 029542 | BM | BM | PF | 268,587.28 | 82,172.63 | 60,000.00 | 60,208.38 |
| Halvor Lines | 026365 & RESTRICTED | BM | BM | PF | 330,518.70 | 68,410.43 | 44,000.00 | 44,250.67 |
| IMTA (Pay via check request) | | BM | BM | Tier Rebate | 188,754.10 | 1,800.66 | | 1,800.66 |

Contrary to Hazelwood's assertion, that spreadsheet does not show that Brian Mosher gave an instruction for any reduction to Cassens for Jun-12, because no number is entered in the "Brian" column for Cassens for "Jun-12." *See, e.g.*, Doc. 356 at 20, 26-28; Doc. 358 at 10; Doc. 374 at 140; Gov. Exs. 514, 514-A (Mosher testifying about how he provided a "round figure" to Heather Jones for an approximate fraudulent reduction, and Jones manipulated that number to look "more believable by the customer," and explaining that he referred to this process as a "gyration" during his November 19, 2012 breakout session at the Pilot sales meeting). But the referenced Mosher spreadsheet does show the figures $42,802.87 and 39,645.22 for Cassens for the columns associated with June 2012, and the difference between those figures is $3,117.65, which rounds up to the $3,118 figure upon which Hazelwood bases his "overstatement" criticism of Kraft. Cassens was not assigned to Mosher until after June 2012. No loss is attributed to Hazelwood for Cassens after June 2012. Put another way, Hazelwood's Cassens-related loss is triggered exclusively by co-conspirator Ralenkotter-related conduct.

that he is capable of constructing an attack of the government's loss calculation through the various means identified by the Court.

In sum, the United States urges the Court to exercise its discretion and deny Hazelwood's motion to reconsider the Court's Order denying his first motion for Rule 17(c) subpoenas (Doc. 660) and deny his new motion for the issuance of another Rule 17(c) subpoena to Pilot (Doc. 661).[13]

Respectfully submitted,

CHARLES E. ATCHLEY, JR.
ATTORNEY FOR THE UNITED STATES
ACTING UNDER AUTHORITY
CONFERRED BY 28 U.S.C. § 515

By: *s/ Francis M. Hamilton III*
Francis M. Hamilton III
David P. Lewen, Jr.
Assistant United States Attorneys
800 Market Street, Suite 211
Knoxville, Tennessee 37902
(865) 545-4167

[13] After advising the Court that denying his motion "is an invitation for reversal," Hazelwood cites a law review article co-authored by "Curtis L. Collier," and states "[g]iven the Court's prior comments about the need for discovery at the sentencing phase," Melanie Reid & Curtis L. Collier, When Does Restitution Become Retribution?, 64 Okla. L. Rev. 653, 696 (2012), "we beseech the Court to reconsider this issue." Doc. 660 at 6. Pinpointed at page 696 of the article, the "prior comment," that Hazelwood appears to attribute to "the Court" is the following sentence from part "IV. Conclusion:" – "Restitution amounts should be subject to discovery prior to sentencing." 64 Okla. L. Rev. at 696. Hazelwood fails to note that the article expressly states that "[t]he conclusory sub-sections in Part II, the proposals delineated in Part III, and Part IV's conclusion have been written solely by Melanie Reid to serve as suggestions and guidelines to be used by practitioners, federal judges, or members of Congress" and further states in a footnote that "Judge Collier collaborated on Part II of this article in an attempt to educate and acquaint practitioners and judges with the pitfalls and peculiarities of this issue. Any advocacy or suggestions on policy issues are the opinions solely of co-author, Melanie Reid, as Judge Collier takes no position on any suggested proposals addressed below." *Id*. at 659, 659 n.27. Thus, it appears that Hazelwood inaccurately attributes the commentary on page 696 of the article to the Court. Additionally, Hazelwood fails to note that the article itself is focused upon the unique issues surrounding restitution in child pornography cases, not the estimation of loss for sentencing purposes in wire and mail fraud cases. *Id*. at 659-60.

**CERTIFICATE OF SERVICE**

I hereby certify that on September 9, 2018, the foregoing response was filed electronically. Notice of its filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail and e-mail. Parties may access this filing through the Court's electronic filing system.

*s/ Francis M. Hamilton III*
Francis M. Hamilton III
Assistant United States Attorney