UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 3:16-CR-20 |
| | ) | JUDGES COLLIER/GUYTON |
| MARK HAZELWOOD, | ) | |
| Defendant. | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM
REGARDING DEFENDANT MARK HAZELWOOD**

For the reasons that follow, and for those in the government's motion for variance or

departure, the United States maintains that the sentencing factors set forth in 18 U.S.C. § 3553(a)

justify a sentence which includes a term of imprisonment within the Guidelines range calculated

in the PSR (*i.e.*, 168 to 210 months) and a fine of $750,000.

**I.      When determining a sentence, a district court must first correctly calculate the
         advisory Guidelines range and then impose a sentence that is sufficient but not
         greater than necessary to comport with the goals of criminal justice.**

The first step in sentencing a defendant post-*Booker* is to correctly calculate the

Guidelines range and to recognize the advisory nature of that range. *Gall v. United States*, 552

U.S. 38, 51 (2007).  Second, a sentencing court post-*Booker* is required to impose a sentence that

is "sufficient but not greater than necessary," 18 U.S.C. § 3553(a), to "comport with the goals of

criminal justice." *United States v. Denny*, 653 F.3d 415, 420 (6th Cir. 2011).  To assist the Court

in that task, § 3553(a) lists factors that should be considered before the imposition of sentence.

*Id*.  More specifically, § 3553(a) requires consideration of the "nature and circumstances of the

offense and the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  It also

requires consideration of the "need for the sentence imposed to reflect the seriousness of the

offense, to promote respect the law, and to provide just punishment," as well as the need to

"afford adequate deterrence to criminal conduct," the need to "protect the public from further

crimes of the defendant," and the need "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment."  18 U.S.C. § 3553(a)(2)(A)-(D).  In this case, the United States contends that consideration of those factors should lead the Court to conclude that a custodial sentence of no less than 168 months imprisonment, along with the imposition of a $750,000 fine, would be sufficient but not greater than necessary.

## II.    The Court should calculate the advisory Guidelines range of imprisonment to be 168 to 210 months.

A.    The Court should conclude that Hazelwood's relevant conduct requires a 20-level increase to his base offense level of 7,[1] pursuant to U.S.S.G. § 2B1.1(b)(1)(K), because he is criminally responsible for a loss to victim trucking company customers of more than $9,500,000 but less than $25,000,000, and requires a 2-level increase, pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), because his offense of conviction involved 10 or more victims.

1.    *Defendant Hazelwood is criminally responsible for his own acts that aided and abetted the conspiracy as well as for the acts of others that were within the scope of the conspiracy, in furtherance of the conspiracy, and reasonably foreseeable.*

U.S.S.G. § 1B1.3 states that "specific offense characteristics" – which include loss amounts – "shall be determined" by "all acts … committed, aided, [and] abetted by the defendant [and] in the case of jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts … of others that were – (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity."  U.S.S.G. § 1B1.3(a)(1).  When holding a defendant responsible for the actions of others under § 1B1.3(a)(1)(B), the Court must make "particularized findings with respect to both the scope of the defendant's agreement and the foreseeability of his co-conspirators' conduct."  *United States v. Campbell*, 279 F.3d 392, 400 (6th Cir. 2002).

---

[1] *See* U.S.S.G. § 2B1.1(a)(1).

2

Although the evidence at trial demonstrates that Hazelwood's own acts aided and abetted the execution of the conspiracy's scheme against the victim customers at issue in his sentencing proceeding, the government asks this Court to make particularized findings pursuant to *Campbell*, because of the inextricably intertwined conduct of co-conspirators in perpetrating the conspiracy to defraud against those victim customers.

The detailed Indictment defines the scope of Hazelwood's jointly undertaken criminal activity. Doc. 182. Hazelwood was convicted of joining and participating the conspiracy to commit the mail and wire fraud scheme that is alleged with specificity in Count 1 as:

> a.     identifying trucking companies from Pilot's pool of existing and prospective customers perceived to be unlikely to detect false pretenses, promises, and representations regarding Cost-Plus Discounts;
>
> b.     inducing, and attempting to induce, such identified trucking companies to choose to purchase, and to continue to purchase Pilot's diesel fuel by falsely and fraudulently promising and representing Cost-Plus Discounts, with such false and fraudulent pretenses, promises, and representations being made orally to some victim customers, in writing to other victim customers, and to some victim customers both orally and in writing;
>
> c.     lulling, and attempting to lull, targeted trucking companies into believing that Pilot was honestly and accurately applying represented Cost-Plus Discounts by mailing, emailing, transmitting, and otherwise sending fraudulently-generated invoices, rebate amounts, and rebate checks that maintained the false pretense that Pilot was honestly and accurately applying represented Cost-Plus Discounts, and thereby also facilitated the concealment of the conspiracy and scheme;
>
> d.     inducing, and attempting to induce, such identified trucking companies to continue to purchase Pilot's diesel fuel by mailing, emailing, and otherwise sending fraudulently-generated documentation that purported to show, and thereby maintain the false pretense and attempt to lull targeted trucking companies into believing, that Pilot had been honestly and accurately applying represented Cost-Plus Discounts, and thereby also, facilitate the concealment of the conspiracy and scheme; and
>
> e.     providing false and fraudulent explanations, often by email and telephone, to targeted trucking companies when such companies questioned the application of the represented Cost-Plus Discounts to their diesel fuel purchases from Pilot.

*Id*. at 13-14.

The Indictment also alleges that the manner in which the scheme to defraud was executed against a victim customer depended on how that customer received its discount:

> For customers whose falsely and fraudulently represented Cost-Plus Discounts were to be included in the 'Invoice Total' amount that was stated on Pilot's regularly billed and sent invoices, the conspirators executed and attempted to execute the scheme to defraud by deliberately and fraudulently not submitting the represented Cost-Plus Discounts to Pilot's billing system for Off-Invoice customer billing. . . .
>
> For customers whose falsely and fraudulently represented Cost-Plus Discounts were to be provided to the customer in the form of a monthly rebate check, the conspirators executed and attempted to execute the scheme to defraud by deliberately and fraudulently withholding, by various ways, the full rebate amount due to those customers derived from the represented Cost-Plus Discounts.

*Id*. at 14-15.

Furthermore, the Indictment alleges, as "representative of the manner and means" of the conspiracy to commit that scheme to defraud, various actions by certain conspirators involving certain trucking companies that are identified as being "among the interstate trucking companies targeted by the conspiracy's scheme to defraud." *Id*. at 15. These "representative" acts of deception in furtherance of the scheme included false promises of cost-plus discounts intended to induce diesel fuel purchases from Pilot;[2] coordinated deception among the scheme's participants to conceal misrepresentations to victim customers;[3] the emailing of spreadsheets between scheme participants to facilitate fraudulent reductions of cost-plus discount rebates;[4] the emailing

---

[2] *See* Doc. 182 at 15-34 (false promises of cost-plus discounts to Queen, BP Express, Koleaseco, PI&I, Smith Transport, LTI, Honey Transport, JTL, Amerifreight, Halvor, and Ryder).

[3] *See* Doc. 182 at 16-18 (coordination among Freeman, Radford, and Stinnett to conceal cost-plus misrepresentation to Queen); 21-22 (coordination among Ralenkotter and Welch to conceal cost-plus misrepresentation to PII and LTI); 24 (coordination among Mosher and Jones to conceal cost-plus misrepresentations to JTL); 27-28 (coordination among Mosher and Wombold to conceal cost-plus discount to Amerifreight).

[4] *Id*. at 24-27 (Mosher and Jones emailing spreadsheets to fraudulently determine JTL's monthly rebates); 27-29 (Mosher and Jones emailing spreadsheets to fraudulently determine Amerifreight's monthly rebate); 30-32 (Mosher and Jones emailing spreadsheets to fraudulently determine Halvor's monthly rebates).

4

of fraudulently fabricated backup to customers in support of fraudulently calculated rebates paid

to those customers for the purpose of lulling those customers into believing their rebates had

been honestly calculated;[5] and false explanations of innocent mistake to customers who

suspected victimization by the scheme.[6] *Id*. at 15-34. The government proved that Hazelwood

joined, participated in, and promoted the conspiracy no later than February 2008. *See* Doc. 356

at 37-39, 44 (Mosher testimony that Freeman started rebate fraud, Hazelwood said to do it as

much as possible because there are no contracts, and that his conversations with Hazelwood

occurred in the end of 2007, beginning of 2008); *see also* Gov. Ex. 902 (2/18/2008 email from

Hazelwood to Janet Welch approving Arnie Ralenkotter-directed fraud on customer Koleaseco).

All customers victimized by the scheme to defraud alleged in the Indictment from February 2008

through April 2013 are within the scope of Hazelwood's jointly undertaken criminal enterprise.

> 2. *Brian Mosher's, John Freeman's, and Arnie Ralenkotter's conduct in furtherance of the conspiracy to commit the scheme to defraud alleged in the Indictment was foreseeable to Hazelwood.*

As noted above, Mosher testified that Freeman began participating in the scheme to

defraud first, but Hazelwood, in his capacity as Mosher's corporate superior, encouraged

Mosher's full participation no later than early 2008. Hazelwood himself corroborated Mosher's

testimony that Hazelwood knew about Freeman's fraudulent activities and encouraged the use of

manual rebates to mislead Pilot's customers, as shown in a March 27, 2012 email chain. Gov.

Ex. 2194. Freeman copied Hazelwood on an email stating that Pilot was "making .10 a gallon

using [its] best price for this customer . . . [W]e better come to the understanding that .10-.12/gal

---

[5] *Id*. at 19-20 (emailing fraudulently fabricated backup to BP Express); 27-29 (emailing fraudulently fabricated backup to Amerifreight); 33-34 (emailing fraudulently fabricated back to Ryder).
[6] *Id*. at 15-18 (using Queen as an example, Freeman telling Andrews how to lie to a cheated customer when caught); 22-24 (Andrews and Bibee falsely telling Honey Transport that a noticed discount discrepancy was caused by an innocent mistake, rather than fraud).

may not keep us whole in this market space. . . [,]" and Hazelwood replied, "Rebate rebate masturbate make him feel special[.]" *Id.* An October 25, 2012 audio recording captured Hazelwood approving a plan for Mosher to teach manual rebates to all direct sales staff during a sales meeting the following month. Gov. Ex. 509, 509-A. Mosher testified that he understood that Hazelwood wanted him to teach "Manual rebates, how to defraud trucking companies without their knowledge." Doc. 356 at 168.

Mosher, Welch, and Radford all testified that, in furtherance of the conspiracy, Mosher thereafter taught Pilot sales staff to deceive Pilot's customers using manual rebates; that training session was recorded in Gov. Ex. 514. Doc. 358 at 5-23; Doc. 336 at 14-54; Doc. 522 at 270. During Mosher's November 2012 presentation, he claimed that the fraudulent manual rebate practices were "an art, . . . a feel, it's do what you can. . . . [but] don't ever expose yourself." Gov. Ex. 514, 514-A. And Hazelwood used virtually identical language during his voluntary interview with federal agents on April 15, 2013, when he defined the term "manuel" as "the method of applying the art, of determining the discount for a customer." Doc. 445 at 152.

Hazelwood not only approved of the fraudulent "Manual Rebate" scheme, he advocated for its expansion. On February 18, 2013, after a management meeting in Orlando, Florida, Hazelwood said, in the presence of Freeman, Wombold, and Mosher, "Aunt Bea. That's what we'll call this, Aunt Bea pricing," and then said, "We got Manuel, Manuel does a helluva job. Wonder around what percent of our volume's on Aunt Bea?" Gov. Ex. 524, 524-A. The manifest weight of the evidence showed that Hazelwood's use of the term "Manuel" on that occasion shared the same fraudulent meaning as Freeman's use of the term "manwell" during the October 25, 2012 lake house meeting, Gov. Ex. 503-A, and as Mosher's use of the term "Manual Rebate" in the February 2011 email exchange between Wombold and Mosher regarding Amerifreight, Gov. Ex. 1602. Indeed, Mosher's testimony confirmed that meaning. Doc. 358 at

6

47. Hazelwood described the process for sorting customers in the "Aunt Bea" scheme as "Customer A, Customer B. Customer A [] looks [in] every orifice you have, Customer B doesn't even know you have an orifice," and the raucous laughter erupting among the conspirators after the following exchange on February 18, 2013 would have left no doubt that Hazelwood's "Aunt Bea" idea was merely an expansion of the existing conspiracy:

| 222 | **FREEMAN:** | I mean, this is all part of the game, I mean, but you, if you |
| 223 | | don't know how they buy and what they understand, then |
| 224 | | you can't take advantage of these things. And it's our job |
| 225 | | to teach, manage, direct our regionals to do the deals and |
| 226 | | understand all this stuff. And then Jay can get us set up to |
| 227 | | where we can have A and B buckets. Yeah, f**k 'em, just |
| 228 | | give 'em what they want. |
| 229 | **HAZELWOOD:** | And what'd you asked for. |
| 230 | **STINNETT:** | And you're takin' — |
| 231 | **FREEMAN:** | You're exactly right. |
| 232 | **STINNETT:** | You're takin' advantage of our advantages. |
| 233 | **FREEMAN:** | Sellin' it to 'em the way they wanna buy. |
| 234 | **MOSHER:** | Our advantage is their ignorance. |
| 235 | **STINNETT:** | Yeah, AKA, we're f**kin' 'em. (Laughter.) |

Gov. Ex. 522-A. The evidence further showed that, on February 20, 2013, when Hazelwood replied to Freeman's Orlando meeting summary by stating "Great recap" and then directing, "lets get cost plus B plan going ASAP thanks," Hazelwood was referring to his "Aunt Bea" expansion of the scheme to defraud Pilot's customers. Gov. Ex. 2217. Mosher explained at trial that Hazelwood was directing the existing fraud to be "take[n] … to the next level." Doc. 358 at 44.

Additionally, evidence presented at trial proved that Hazelwood directly approved of Ralenkotter's execution of the scheme to defraud. *See* Gov. Ex. 902 (2/18/2008 email from Hazelwood to Janet Welch approving Arnie Ralenkotter-directed fraud on customer Koleaseco). Moreover, Ralenkotter and others used trip reports to show Hazelwood the scheme was correctly targeting unsophisticated customers to increase Pilot's profits, and Hazelwood's assistant Sherry Blake was tasked with collecting and organizing those trip reports from sales staff for his review.

7

Doc. 523 at 157-62. For example, a July 11, 2008 trip report from Ralenkotter described how and why he intended to falsely represent cost-plus discounts to two customers:

> Fuel optimizer not real bright, just met the newest bulbs[.] they seem slightly smarter. I will work up some aggressive prices to move TA gallons. Good thing is I don't actually need to change our billing[.] they do not reconcile with fuel dispatch . . . imagine that?
>
> [Competitor] TA recently in and of course offered "better of" pricing[.] I will need to do the same[.] too bad since this was .045 discount and we made a bunch of money. I will tell them cp .03 and put it in as .04 with a .04 discount. There is a good opportunity here to address some O/O gallons.

Gov. Ex. 1101. When asked during trial why he sent such a report to Hazelwood, who was then Pilot's vice president, Ralenkotter explained that "[w]ith some customers it was how we did business" and he wanted to "let [Hazelwood] know." Doc. 336 at 261.

Therefore, overwhelming trial evidence proves by a preponderance of the evidence that Mosher's, Ralenkotter's, and Freeman's acts in furtherance of the conspiracy were foreseeably within the scope of Hazelwood's jointly undertaken criminal enterprise. Therefore, the Court should hold Hazelwood criminally responsible for their conduct under the relevant conduct provisions of U.S.S.G. § 1B1.3.

3. *The summary charts prepared by Darren Seay, and admitted at trial, for customers Amerifreight, BP Express, JTL, Halvor, Queen, and Ryder, along with the summary chart prepared by KraftCPAs, Gov. Ex. 5079-A,[7] combining the amounts from Darren Seay's summaries with other victim loss amounts derived from Pilot's internal audit, provide a reasonably reliable and conservative estimate of the amount of loss that was reasonably foreseeable to Hazelwood from his participation in the joint criminal enterprise that is his offense conduct in Count 1.*

Because of the difficulties associated with attempting to calculate loss in a fraud case, the district court "need only make a reasonable estimate" of the loss using a preponderance of the

---

[7] Contemporaneously with the filing of this sentencing memorandum, the United States has manually filed with the Clerk of Court the Government's Notice of Manual Filing of Sentencing Exhibits, as well as a DVD containing the exhibits the government intends to submit to the Court at sentencing. Those exhibits have been numbered as Gov. Ex. 5001 through 5085.

evidence standard. *United States v. Wendlandt*, 714 F.3d 388, 393-94 (6th Cir. 2013) (quoting U.S.S.G. § 2B1.1 cmt. n.3(C)); *see also United States v. Howley*, 707 F.3d 575, 583 (6th Cir. 2013) ("The Guidelines require only a 'reasonable' estimate of actual or intended loss within broad ranges."). "[T]he Sentencing Guidelines import the legal concept of a causal relationship between the defendant's conduct and the determined loss." *United States v. Rothwell*, 387 F.3d 579, 583 (6th Cir. 2004). However, such loss estimates "need not be determined with precision." *United States v. Miller*, 316 F.3d 495, 503 (4th Cir. 2003). "When all is said and done, a sentencing judge's inquiry is 'broad in scope' and it is 'largely unlimited as to the kind of information he may consider, or the source from which it may come.'" *United States v. Graham-Wright*, 715 F.3d 598, 601 (6th Cir. 2013) (*quoting United States v. Tucker*, 404 U.S. 443, 446 (1972)). There is no requirement for the Court to make a precise finding of loss for each victim of a fraud to determine a reasonable estimate of loss. *See* U.S.S.G. § 2B1.1 cmt. n. 3(C)(iv) (stating that that among the non-exhaustive factors a Court should consider when making a reasonable estimate of loss is "[t]he approximate number of victims multiplied by the approximate average loss to each victim"); *see also United States v. Wallace*, No. 17-12608, 2018 WL 3098772, at *2-*3 (11th Cir. June 25, 2018) (citing Guidelines § 2B1.1 cmt. n. 3(C) and approving the use of a "statistical sample" to determine "reasonable estimate of loss based on available information"); *United States v. Natour*, 700 F.3d 962, 977-78 (7th Cir. 2012) (citing Guidelines § 2B1.1 cmt. n. 3(C)(iv) and explaining that "the Guidelines specifically contemplate that exact figures will not always be available and among other acceptable methods of arriving at an approximation, is one in which limited evidence is scaled to reflect the scope of the loss involved."); *United States v. Jones*, 372 F. App'x 530, 531-32 (5th Cir. 2010) (citing Guidelines § 2B1.1 cmt. n. 3(C)(iv) and holding that the district court properly extrapolated the total amount of loss arising from four trips in which the defendant used fraudulently obtained access devices

9

based on the actual loss from one of the trips and multiplying that known amount by four where the Court could not determine the actual loss for three of the four trips).

The summary charts prepared by Darren Seay for losses to customers Amerifreight, BP Express, Halvor, JTL, Queen, and Ryder, along with the summary chart prepared by KraftCPAs that incorporates monthly losses from other victim customers, provide a reasonably reliable and conservative basis for the Court to determine the amount of loss that was reasonably foreseeable from the criminal enterprise undertaken by Hazelwood in concert with others.

> a. Darren Seay's summary charts for losses to Amerifreight, BP Express, Halvor, JTL, Queen, and Ryder are a reasonably reliable estimation of Hazelwood's foreseeable loss from the execution of the scheme to defraud against those customers.

Evidence admitted at trial proved that victim customers Amerifreight, BP Express, Halvor, JTL, Queen, and Ryder were fraudulently induced to purchase diesel fuel from Pilot through false promises of cost-plus discounts: Cost-Minus .03 for Amerifreight;[8] Cost-Plus .00 for BP Express;[9] Cost-Minus .05 for Halvor;[10] Cost-Plus .02 for JTL;[11] Cost-Plus .03 for Queen;[12] and Cost-Plus .05 for Ryder.[13]  Evidence admitted at trial also proved that those customers were victimized by Mosher's and Freeman's collaboration with other scheme participants (which in total exceeded more than five participants) in fraudulently reducing their

---

[8] *See* Gov. Ex. 5001 (collective exhibit of Amerifreight-related Government Trial Exhibits); Doc. 356 at 58-75 (Mosher testimony related to Amerifreight).

[9] *See* Gov. Ex. 5002 (collective exhibit of BP Express-related Government Trial Exhibits); Doc. 522 at 94-102 (Bibee testimony related to BP Express).

[10] *See* Gov. Ex. 5003 (collective exhibit of Halvor-related Government Trial Exhibits); Doc. 356 at 78-94 (Mosher testimony related to Halvor).

[11] *See* Gov. Ex. 5004 (collective exhibit of JTL-related Government Trial Exhibits); Doc. 356 at 16-56 (Mosher testimony related to JTL).

[12] *See* Gov. Ex. 5005 (collective exhibit of Queen-related Government Trial Exhibits); Doc. 522 at 105-10 (Bibee testimony related to Queen); Doc. 522 at 239-55 (Radford testimony related to Queen).

[13] *See* Gov. Ex. 5006 (collective exhibit of Ryder-related Government Trial Exhibits); Doc. 356 at 103-18 (Mosher testimony related to Ryder).

respective monthly rebate and discount savings.[14]   Darren Seay's testimony and related summary

charts proved the following losses to those customers from Mosher's and Freeman's deceptive

withholding of these customers' promised discounts in furtherance of the scheme to defraud:

$7,041.97 in loss to Amerifreight for the period 02/01/2011 to 02/28/2011;[15] $218,463.46 in loss

to BP Express for the period 01/01/09 to 10/31/2012;[16] $119,222.01 in loss to JTL for the period

05/01/2008 to 01/31/2012;[17] $131,188.42 in loss to Halvor for the period 06/01/2011 to

04/30/2012;[18] $60,656.64 in loss to Queen for the period 1/16/2010 to 11/15/2012;[19] and

$82,236.77 in loss to Ryder for the period 09/01/2012 to 10/31/2012.[20]   Doc. 429 at 230-32; Doc.

443 at 157-69.   Additionally, Ralenkotter's testimony proved that customer Smith Transport was

defrauded of $67,372.45 before that customer discovered that they had been shorted their

promised discount of cost-minus .02[21] and demanded payment from Pilot.   Doc. 337 at 18-33.[22]

Accordingly, based on evidence admitted at trial, the government has already proved by a

preponderance of the evidence that Hazelwood's foreseeable loss within the scope of the jointly

undertaken criminal activity alleged with specificity in Count 1, his count of conviction, well

exceeds $550,000.   At an absolute minimum, Hazelwood would be subject to a 14-level increase

under the advisory guidelines.

---

[14] *See generally* Gov. Ex. 5001 through 5006.
[15] *See* Gov. Ex. 1613-A.
[16] *See* Gov. Ex. 810-A.
[17] *See* Gov. Ex. 1522-A.
[18] *See* Gov. Ex. 1712-A.
[19] *See* Gov. Ex. 727-A.
[20] *See* Gov. Ex. 1826-A.
[21] *See* Gov. Exs. 1201, 1202, 1203, 1204-A, 1207, 1208.
[22] Hazelwood was copied on an email from Ralenkotter that directed scheme participants to tell Smith Transport that its shorted savings was due to a "mistake" rather than the actual reason – deliberate deception.   Doc. 337 at 35; Gov. Ex. 1205.

11

b.    The summary chart prepared by KraftCPAs, Gov. Ex. 5079-A, combining the amounts from Darren Seay's summaries with other victim loss amounts derived from Pilot's internal audit, provides a reasonably reliable and conservative estimate of the amount of loss that was reasonably foreseeable to Hazelwood from his participation in the joint criminal enterprise that is his offense conduct in Count 1.

Exhibit 1 to this memorandum, also marked as Gov. Ex. 5079-A for the sentencing hearing, is Defendant Hazelwood's loss-related summary prepared by KraftCPAs[23] that 1) states, in the columns named "Loss before SVRS Reduction" and "SVRS Reduced Loss," the amount of loss to each victim customer both before and after KraftCPAs' SVRS reduction exercise, 2) provides, in the column named "Attribution Months," the months of loss at issue[24] for each customer (which is supported by the attached Data file that lists the month-by-month loss amounts for the customers included on the summary derived from Pilot's internal process, with the Darren Seay-summary-related customers), 3) identifies, in the column named "Trigger Documents,"[25] the documents that support a finding that each customer was actually or intended to be victimized by the conspiracy and scheme to defraud, and 4) specifies, in the column named "Exhibits," the Government Exhibit number in which those trigger-documents are located.[26]

By limiting Hazelwood's loss to only the customers included on the summary chart attached as Exhibit 1 (Gov. Ex. 5079-A), rather than the loss foreseeably caused by the entire

---

[23] The government adopts the detailed explanation of KraftCPAs' loss amounts and supporting material that the government provided in the government's consolidated response in opposition to Defendant Hazelwood's motion to continue sentencing. *See* Doc. 628.

[24] In the column "Attribution Months," the date range is identified as either "OI" for an "off-invoice" period or "MR" for a "manual rebate" period.

[25] Gov. Ex. 5084 is the declaration of Bob Massengill that authenticates Pilot company documents included in Gov. Exs. 5007 to 5078. All of the documents contained in Gov. Exs. 5001 to 5006 were admitted in evidence at trial.

[26] As noted above, the government has manually filed a DVD with the Government's Notice of Filing Sentencing Exhibits that contains Government Exhibits 5001 through 5085 that are listed in the "Exhibits" column of Gov. Ex. 5079-A. The "Exhibits" column also cites pertinent Government Exhibits admitted at trial.

scheme and conspiracy,[27] the government has offered a "loss calculation methodology [for Hazelwood that is] conservative." *United States v. Rafferty*, 296 F. App'x 788, 798 (11th Cir. 2008); *see also United States v. Masek*, 588 F.3d 1283, 1289 (10th Cir. 2009) (finding that a court "acted consistently with its obligation to arrive at a 'reasonable estimate'" by "adopting the most conservative figures advanced by the government in determining the amount of loss").

        i.     To begin with, sufficient evidence supports a finding by a preponderance of the evidence that the customers listed in Gov. Ex. 5079-A, which exceed 10 in number, were actual or intended victims of the conspiracy, warranting a 2-level increase pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i).

At the outset, the government contends that the proof at trial already establishes by a preponderance of the evidence that Hazelwood's offense involved 10 or more victims – namely, Amerifreight (Gov. Ex. 5001, collection of trial exhibits), BP Express (Gov. Ex. 5002, collection of trial exhibits), Halvor (Gov. Ex. 5003, collection of trial exhibits), Hayes (Gov. Ex. 2114), Honey Transport (Gov. 1402-1413-A) JTL (Gov. Ex. 5004, collection of trial exhibits), Koleaseco (Gov. Ex. 902), LTI (Gov. Ex. 1305), Marathon Electric (Gov. Ex. 2117), PI&I (Gov. Ex. 1101-1103), Queen (Gov. Ex. 5005, collection of trial exhibits), Ryder (Gov. Ex. 5006, collection of trial exhibits), and Smith (Gov. Ex. 1201-1208) – thereby justifying a 2-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i) without any additional proof from the government at sentencing.

---

[27] *See United States v. Carr*, 5 F.3d 986, 994 n.4 (6th Cir. 1993) (rejecting as "entirely without merit" defendant's contention that the district court was forbidden from considering "the entire amount of loss in the conspiracy," further rejecting his argument that he should have been held accountable only "for the amount of loss within the scope of [his] agreement personally," and finding that defendant could "properly be held accountable for the entire amount of loss occasioned by the conspiracy because there was ample evidence that he either personally caused the various losses or that the losses were reasonably foreseeable to him.").

That said, turning to Gov. Ex. 5079-A, the customers listed on that summary are organized around the conduct of Hazelwood's conspirators Arnie Raleknotter, Brian Mosher, and John Freeman. As discussed above, the actual victimization of 6 of the listed customers (Amerifreight, BP Express, Halvor, JTL, Queen, and Ryer) was proved at trial. Proof that the other 72 listed customers were victimized by the scheme is found in Gov. Ex. 5007 through 5078 wherein the documents listed by Bates-number in Gov. Ex. 5079-A's "Trigger Documents" column can be found.

As for the customers listed on Gov. Ex. 5079-A under Brian Mosher's name, documentary evidence supports a finding by the Court that each of these customers was actually or intended to be victimized by the scheme to defraud alleged in the Indictment in ways consistent with the Indictment's "representative" manner and means allegations. Exclusive of Amerifreight, Halvor, JTL, and Ryder, whose victim status and related loss amounts were established at trial, 34 of the remaining 48 victims under Mosher's name are listed in an admitted Joint Defense Exhibit (JDX 1802)[28] – a manual rebate spreadsheet emailed between Mosher and Jones – that Mosher admitted, during cross-examination, to identifying 74 victims against whom he executed the scheme to defraud.[29] Those 34 customers alone total $5,612,279 in aggregated loss, using their respective "SVRS Reduced Loss" amounts from Gov. Ex. 5079-A (Exhibit 1

---

[28] AV Transportation, Benefit Trucking, Black Horse Carriers, B-T Inc. (Part of Decker), C&K Trucking, CDN Logistics, Inc., Compass Funding Solutions, Decker, Dillon Transport Inc., DOT Transportation, Doug Marquardt/Skyway Transportation, Foltz Trucking Inc., Holland Transport, Iowa Motor Truck, J-Mar Enterprises, K&S Transport Services, Kohler, Madden, Midwest Refrigerated, MM Global/M&M Transport, Mobility Network, Nationwide Transportation Inc., Paragon Motor Lines Inc., Progressive Transportation, Regal Beloit Logistics LLC (Marathon), Riverside, Rubber Duckling, Sharkey/Sysco/Shipper's Rental, Smith Trucking Inc., Sue Vinjie, Tri-Hi Transportation, TTI Inc., Warren Transport, and Wiseway Motor Freight.

[29] Referencing the manual rebate spreadsheet admitted as JDX 1802, counsel for Wombold asked Mosher on cross-examination, "For the record, is it clear to you that in July of 2010, 76 customers were being defrauded?" and Mosher answered, "74, sir." Doc. 367 at 110.

hereto).  As for the remaining 14 victims under Mosher's name,[30] the documents identified in the

"Trigger Documents" of Gov. Ex. 5079-A (Exhibit 1 hereto) show that the Indictment's scheme

to defraud was executed against those customers through Mosher's foreseeable conduct.

    As for the customers listed under Arnie Ralenkotter's name, the Court will see that the

documents listed in Gov. Ex. 5079-A's "Trigger Documents" column also support a finding by

the Court that each of these customers was actually or intended to be victimized by the scheme to

defraud alleged in the Indictment in ways consistent with the Indictment's "representative"

manner and means allegations.  For example, with respect to Equity Transportation,

PFJ_ATTRIB3_000001543, found in Gov. Ex. 5032, proves that Equity Transportation was

defrauded:

| PLEASE LIST SPECIFIC DISCOUNTS BELOW: | | | | |
|---|---|---|---|---|
| Store Number | Location | Off Invoice | Rebate | Cost Plus Pump Fee |
| Default (every location w/o a Site Specific Discount) | | 0.045 | Better of | 0.03 |
| | | | | |
| | IL locations remain the same | | | |
| | | | | |
| Do not send cp pricing. | | | | |
| Customer thinks it is cp .01 | | | | |

Another example under Ralenkotter's name is Midwest Logistics for which admitted trial

evidence proved that company's victim status:

| Message | |
|---|---|
| From: | Janet Welch [/o=pilotcorp.com/ou=Pilot Headquarters/cn=Recipients/cn=WELCHJ] |
| on behalf of | Janet Welch [/o=pilotcorp.com/ou=Pilot headquarters/cn=recipients/cn=welchj] |
| Sent: | 1/28/2013 12:06:23 PM |
| To: | Lori McFarland [lori.mcfarland@pilottravelcenters.com] |
| Subject: | RE: Midwest Logistics - IN 12-1-12.xls |

Customer thinks it is cp .03/rm .04 but it was really cp .08???  This makes me nervous.

---

[30] ATA Transportation, Bison Transport, First Choice Logistics, Fremont Contract
Carriers, Grand Island Express, Gretna Enterprises LLC, JKC Trucking, M Brothers/Safe
Logitics, Merit Transportation Co Inc., Prima Express Inc., Rite Logistix (Kozy's), Roger's
Trucking, Transco Lines, and W N Morehouse Truck Line, Inc.

Gov. Ex. 2214; Doc. 520 at 195-98.

Turning to the customers listed on Gov. Ex. 5079-A under John Freeman's name, two of those customers, BP Express and Queen were customers for which Darren Seay-created loss summaries and other exhibits were admitted at trial. *See* Gov. Ex. 5002 (BP Express-related trial exhibits); Gov. Ex. 5005 (Queen-related trial exhibits). The third Freeman customer is Honey Transportation, whose victim status was also proved at trial through the testimony of Chris Andrews. Specifically, Andrews testified that, beginning in June 2011, he falsely promised Honey Transport a cost-plus .02 discount, deceptively allowed a cost-plus .05 discount to remain in Pilot's billing system, fraudulently caused Honey to be sent false pricing information to maintain the false pretense that Honey was in fact receiving a cost-plus .02 discount, and then fabricated a story about how a Pilot billing "mishap" had occurred when Honey Transport noticed the fraud in February 2012. Doc. 521 at 188-202; Doc. 522 at 85-87; Gov. Tr. Ex. 1402, 1408, 1409. Freeman's fourth customer is G&P Trucking, and email evidence, PFJ_ATTRIB3_000001736 (found in Gov. Ex. 5037), confirms that his subordinate Jay Stinnett executed the scheme against that customer, too:

---

**From:** Jay Stinnett
**Sent:** Mon 8/4/2008 9:27 PM
**To:** Holly Radford
**Subject:** FW: *G & P* July Transactions Avg Cost by Stop.xls

Close..but subtract $.04 off of each average...I couldn't figure it out, other than hiding a column...We discount CP $.04, but he thinks it's CP zero

---

In sum, a preponderance of the evidence supports a finding that the customers listed on Gov. Ex. 5079-A (Exhibit 1 hereto) were either actual or intended victims of the scheme, and because those victims, in addition to the other intended victims proven at trial, number more than 10, a 2-level increase is warranted under U.S.S.G. § 2B1.1(b)(2)(A)(i).

16

ii.   The month-by-month loss amounts for each customer listed in Gov. Ex. 5079-A are reasonably reliable estimates of loss sustained during the periods of time identified in the "Attribution Months" column, because, other than the six loss amounts derived from the Darren Seay summary trial exhibits, the amounts are derived from Pilot's internal audit, and because KraftCPAs has further reduced those amounts to Defendant Hazelwood's benefit pursuant to SVRS and immaterial variance analysis.

With the exception of the Darren Seay summary trial exhibits, the month-by-month loss amounts stated on Gov. Ex. 5079-A are derived from Pilot's internal audit. *See* Gov. Ex. 5080-A (KraftCPAs March 30, 2015 Report); Gov. Ex. 5080-C (Scouten Declaration).[31]  The September 7, 2018 declaration of Darren Seay, Gov. Ex. 5081-B, states that each of the "Power Pivot Table Summaries" contained in Gov. Exs. 5007 through 5078, which contain source documents for the customer loss amounts and the attribution citations listed on Gov. Ex. 5079-A that were not the subject of a Darren Seay summary trial exhibit, were generated from Pilot's "Power Repricing Tool (in the case of the off-invoice direct bill accounts) and Pilot's Power Pivot Manual Rebate Tool (in the case of manual rebate accounts) (collectively the 'Power Pivot Tools')."  Gov. Ex. 5081-B.  At trial, Mr. Seay, who served as a senior manager in Pilot's internal audit, testified on direct examination and was vigorously cross-examined about the reliability of Pilot's audit process, including the creation and use of the Power Pivot Tools during the audit. Doc. 429 at 192-245; Doc. 443 at 16-86; Doc. 445 at 6-99.  Darren Seay's trial testimony, his March 24, 2017 report,[32] and his September 7, 2018 declaration,[33] along with Horne LLP's report to the United States District Court for the Eastern District of Arkansas,[34] provide sufficient evidence

---

[31] The loss amounts stated in Gov. 5079-A's columns "Loss before SVRS Reduction" and "SVRS Reduced Loss" are the same loss amounts stated in Gov. Ex. 5079-B, which is the August 1, 2018 Hazelwood summary previously attached as Exhibit 2 to Doc. 645 and Exhibit 10 to Doc. 628.  *See* Docs. 645-2, 628-10.

[32] *See* Gov. Ex. 5081-A.

[33] *See* Gov. Ex. 5081-B.

[34] *See* Gov. Ex. 5082.

17

for the Court to find by a preponderance of the evidence that the month-by-month underpayment amounts determined by Pilot's internal audit process, as reflected in the Power Pivot Table Summaries contained in Gov. Ex. 5007 through 5078, provide a reasonably reliable basis for determining an estimation of loss to the victimized customers listed on Gov. Ex. 5079-A. Additionally, KraftCPAs' SVRS analysis and resulting loss reductions[35] further demonstrate the reliability of Gov. Ex. 5079-A as a reasonable estimation of loss. Finally, KraftCPAs has even endeavored to account for the phenomenon of "immaterial variances" that can occur in large datasets than span lengthy historical periods by reducing every month of loss at issue by $80, even though the average monthly "immaterial variance" that KraftCPAs found during the time in question for the customers listed in Gov. Ex. 5079-A amounted to an average immaterial variance of only $29 per month.[36]

        iii.    As an alternate method of loss estimation, pursuant to U.S.S.G. § 2B1.1 Application Note 3(C)(iv), the Court may extrapolate the loss to intended victims whose loss cannot be determined from the average loss to victims whose actual loss can be determined.

The trial testimony and exhibits related to the victimization of Pilot customer Smith Transportation unequivocally proved that when the scheme to defraud was successfully executed against a customer, the victimized customer was financially harmed. *See* Doc. 337 at 31-33. Indeed, documentary evidence that was created contemporaneously with the completed fraud against Smith Transport proved that by cheating Smith Transport out just four cents per gallon for their purchases over three months, Smith was financially harmed in the amount of

---

[35] *See* Gov. Ex. 5080-B (July 18, 2018 KraftCPAs Report); Gov. Ex. 5080-E (August 20, 2018 KraftCPAs' Letter).

[36] *See* Gov. Ex. 5080-A (March 30, 2015 KraftCPAs Report) at footnote 37; Gov. Ex. 5080-D (September 7, 2018 KraftCPAs Letter).

$67,372.45.  *See* Exs. 1207, 1208; Doc. 337 at 31-33.[37]  The Court has received evidence of six

other customers whose actual loss caused by the scheme to defraud was proved at trial through

the testimony of Darren Seay, who did loss calculations independent of the Pilot's internal audit

process for specified cost-plus discounts and timeframes proven at trial:  Amerifreight ($7041.97

- Gov. Ex. 1613-A); BP Express ($218,463.46 - Gov. Ex. 810-A); Halvor ($131,188.42 – Gov.

Ex. 1712-A); JTL ($119,222.01 - Gov. Ex. 1522-A); Queen ($60,656.64 – Gov. Ex. 727-A); and

Ryder ($82,236.77 - Gov. Ex. 1826-A; *see also* Gov. Ex. 5001 – 5006.  The average loss to these

seven customers (Amerifreight, BP Express, Halvor, JTL, Queen, Ryder, and Smith Transport) is

$98,025.96 ($686,181.72 divided by 7).[38]  This is a reasonably reliable average of actual loss per

customer from which the Court can make a legitimate extrapolation of intended loss for those

victim customers whose losses the Court concludes that it cannot determine with precision.

The customer gallon purchases, cost-plus discount deals, and timeframes of loss upon which that

seven-customer average is based are sufficiently varied to constitute a representative sampling of

the scheme's financial impact on its victims.

  This alternative method of loss estimation is approved by the Guidelines, in that U.S.S.G.

§ 2B1.1 Application Note 3(C)(iv), states that the Court may base a loss estimate on "the

approximate number of victims multiplied by the average loss to each victim." U.S.S.G. § 2B1.1

---

[37] *See also* Doc. 337 at 33 (AUSA:  "Who didn't get that $67,000?"  Ralenlenkotter: "Smith Transport" AUSA: Because of what?  Ralenkotter: "Because we cheated them, we overbilled them.")

[38] If the Court were to use KraftCPAs' adjusted loss amounts for the six Darren-Seay-summary-related customers that account for reductions from the SVRS and immaterial variance analysis, set forth in Gov. Ex. 5079-A and more fully described in Gov. Exs. 5080-A, 5080-D, and 5080-E, the average loss per customer from those six customers combined with Smith Transport would be $91,428.06, derived from the following: (Amerifreight-$6,656) + (Halvor-$124,588) + (JTL-$110,546) + (Ryder-$78,474) + (B.P. Express-$198,320) + (Queen-$54,040) + (Smith-$67,372.45) / 7.  The government notes that because the Smith Transport loss figure was determined immediately following the successful, but discovered, execution of the conspiracy, as proven in Gov. Exs. 1207, 1208, there is no need for SVRS or immaterial variance analysis.

cmt. n. 3(C)(iv). Thus, the Court may estimate loss in this case by first determining the total

number of additional intended victim customers (other than the seven named above) who were

targeted by the scheme and then multiplying that number against the average actual loss to the

seven customers above, and then second, adding that intended loss amount to the actual loss of

the seven customers above. *See*, *e.g.*, *United States v. Mickens*, 453 F.3d 668, 671 (6th Cir.

2006) (upholding loss estimation based on the addition of proven actual loss to the estimated

intended loss derived from the multiplication of the number of 32 unused illegally-obtained

access devices against the average loss derived from proven fraudulent transactions); *United

States v. Watson*, 118 F.3d 1315, 1319 (9th Cir. 1997) (holding in a fraudulent phone cloning

case that "[b]ecause the number adopted by the district court was based upon an average actual

loss [of $456,632] resulting from 156 ESN–MIN combinations posting traceable losses at the

time of sentencing [an average of $3030 in loss per combination], multiplied by the approximate

number of 600 ESN–MIN combinations taken from Watson's home, it cannot be said that the

district court was unreasonable in estimating Watson's loss at around two million dollars . . . .");

*United States v. Chernoff,* Nos. 92–2844, 92–3040, 92–3083, 92–3093, 92–3348, 1994 WL

142896, at *6 (7th Cir. Apr. 19, 1994) (concluding that where $135,000 in actual loss was

established for 250 fraudulent phone cards, $270,000 in additional loss could be reasonably

inferred for 500 unused phone cards for a total loss of approximately $400,000).

B.    The Court should conclude that Hazelwood's advisory Guidelines' calculation
justifies a 4-level increase, pursuant to U.S.S.G. § 3B1.1, because he was an
organizer or leader of criminal activity that involved five or more participants
or was otherwise extensive.

In determining whether to apply a § 3B1.1 enhancement to a particular defendant,

a sentencing court is to consider "the exercise of decision making authority, the nature of

participation in the commission of the offense, the recruitment of accomplices, the claimed right

20

Case 3:16-cr-00020-CLC-HBG   Document 669   Filed 09/12/18   Page 20 of 26   PageID #:
18319

to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1 cmt. n. 4; *see also United States v. Cruz Camacho*, 137 F.3d 1220, 1224 (10th Cir. 1998) (holding that in order to receive an enhancement under § 3B1.1, defendant must have "exercised control consistent with his leadership role over at least one other participant"); *United States v. Embry*, 61 F. App'x 166, 167 (6th Cir. 2003) ("At a minimum, the defendant must have been the leader or organizer of at least one participant. Participants include . . . persons who were (i) aware of the criminal objective, and (ii) knowingly offered their assistance.") (internal citation omitted); *United States v. Mahmud*, 541 F. App'x 630, 636-37 (6th Cir. 2013) (affirming four-point leadership enhancement where record showed the defendant role in the scheme included "recruit[ment] of accomplices," "planning," and "claim[ing] a larger share of the fruits of the crime.").

The proof at trial, as reiterated above, showed that Hazelwood was an organizer or leader, that this criminal activity involved five or more participants, and that Hazelwood exercised control consistent with a leadership role over at least one other participant. Hazelwood directed subordinates to send him trip reports; he provided leadership, vision casting, and planning at sales meetings; he approved Mosher teaching the fraud to new Pilot sales employees; he attempted to expand the fraud; and he received outsized compensation (when compared to his conspirators). In other words, Hazelwood had decision making authority, recruited accomplices, planned and organized the offense, claimed a larger share of the fruits of the crime, and had control and authority over others. That activity demands a four-level leadership enhancement.

The enhancement applies where five or more people are involved in the criminal activity or where the activity "was otherwise extensive." U.S.S.G. § 3B1.1. Criminal activity is deemed "otherwise extensive" "when the combination of knowing participants and non-participants in

21

the offense is the functional equivalent of an activity involving five criminally responsible participants." *Embry*, 61 F. App'x at 167. Here, the Court need not consider whether the criminal activity was "otherwise extensive," because the number of knowing participants far exceeded five: Hazelwood, his subordinate vice presidents (including Scott Wombold and John Freeman), his subordinate sales directors (including Arnie Ralenkotter and Brian Mosher), his subordinate regional sales managers (including Kevin Clark and Chris Andrews), and his subordinate regional account representatives (including Holly Radford, Janet Welch, Katie Bibee, and Lexie Holden). The four-level enhancement should thus be applied, subject to this Court making the requisite findings on the record to satisfy *United States v. Bertram*, No. 17-6527, __ F.3d __, 2018 WL 3966510, at *7 (6th Cir. Aug. 20, 2018) (requiring district court to make finding that the defendant "managed or supervised another criminal participant" before applying § 3B1.1(b) enhancement).

C.      <u>The Court should conclude that Hazelwood's advisory Guidelines' calculation justifies a 2-level increase, pursuant to U.S.S.G. § 3C1.1, because the jury found he obstructed justice by convicting him of witness tampering on Count 14.</u>

The jury convicted Hazelwood of witness tampering, and the PSR correctly assigns a two-point enhancement for obstruction of justice. PSR ¶ 152. Obstruction of justice under U.S.S.G. § 3C1.1 includes "unlawfully influencing a … witness … or attempting to do so." U.S.S.G. § 3C1.1, cmt. n. 4(A). Thus, Hazelwood's Count 14 conviction for witness tampering squarely fits within the example specifically noted in the Application Notes to this enhancement. To support application of the enhancement, the government adopts its earlier response that demonstrated how the weight of the evidence at trial supports the jury's verdict on Count 14. *See* Doc. 578 at 14-21. The obstruction enhancement is properly applied to Hazelwood.

In sum, the advisory Guidelines range has been properly calculated as 168 to 210 months' imprisonment, based on a total offense level of 35 and criminal history category of I.

### III. The factors set forth in 18 U.S.C. § 3553(a) require a custodial sentence of no less than 168 months' imprisonment.

*The Seriousness of the Offense.* The pervasive, nationwide fraud in this case, which Hazelwood led and sought to expand, took place over a period of several years and involved millions of dollars. The fraud inflicted financial damage and harm to many trucking companies, including small companies already facing economic peril. Hazelwood set the culture for Pilot's Direct Sales division and instigated a mentality in his subordinates to prey upon companies that were deemed naïve, trusting, and unsophisticated – indeed, Hazelwood, when hatching his expansion scheme in Orlando, told his subordinates to find customers who "don't know they have an orifice." Hazelwood's activities had a corrosive effect on the over-the-road diesel sales industry specifically and the trucking industry generally. Once caught, Hazelwood took deliberate and intentional steps to obstruct justice by calling his long-time personal assistant and attempting to persuade her to lie about Hazelwood's knowledge of trip reports.

*The History and Characteristics of the Defendant.* One of Hazelwood's significant characteristics relates to the sophistication of the criminal activity he directed. Hazelwood used his knowledge and expertise in over-the-road trucking diesel sales to commit the fraud. Because of Hazelwood's supposed "expertise" in this area, and his deceitful nature, his subordinates did not seriously question the fraud, as revealed by Mosher's trial testimony. Doc. 356 at 38-39 (Mosher recalling that he asked Hazelwood "several times," who responded that changing manual rebates was "absolutely" permissible due to a lack of "contracts."). Hazelwood further admonished Mosher that it "would not be a very good idea" to stop doing manual rebates. *Id.* at 162. Hazelwood's actions were calculated, premeditated, and revealed a willingness to use his power and position to override others, as in his June 9, 2014 phone call to Sherry Blake that underpins his witness tampering conviction.

23

Hazelwood has no prior criminal history. His lack of criminal convictions suggests mitigation, which is reflected by his criminal history calculation. But Hazelwood certainly has the intelligence and ability to pursue law-abiding ventures. To the detriment of his victims, Hazelwood's greed led to criminal choices that require serious consequences.

*Respect for the Law and General Deterrence.* Given the seriousness of the offense and the harms caused by Hazelwood, a significant sentence is necessary to promote respect for the law. This factor is especially important in this context. Hazelwood's crimes were not crimes of opportunity or passion, but were premeditated and carefully orchestrated. A lengthy sentence is thus necessary to provide general deterrence to educated, responsible, intelligent, and calculating individuals. *United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008) ("[a] central reason[] for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes.").

*Protection of the Public from Further Crimes by the Defendant.* Normally, the United States would agree that a white-collar defendant is unlikely to be able to commit another such crime in the future. But given the nature and extent of Hazelwood's arrogance, obstruction, and sophistication in operating a complicated, long-running scheme, Hazelwood would again readily seek to defraud those he views as naïve or unsophisticated. Accordingly, the government seeks a lengthy custodial sentence to protect the public.

*Provision of Needed Education, Vocational Training, Medical Care or Other Correctional Treatment to the Defendant.* Hazelwood led a sophisticated, long-term fraudulent scheme with nationwide consequences even though his formal education ended when he graduated from high school. PSR ¶ 171. A lengthy prison sentence would allow Hazelwood to avail himself of post-secondary education opportunities within the Bureau of Prisons.

*The Need to Avoid Unwarranted Sentencing Disparities.*  Finally, in fashioning a sentence, the Court also must consider the "need to avoid unwarranted sentence disparities" among "defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  The Guidelines as a whole exist so similarly-situated individuals are treated similarly, *United States v. Phinazee*, 515 F.3d 511, 520 (6th Cir. 2008), so a custodial sentence within the Guidelines range calculated in the presentence report would satisfy this factor.

## IV.    The Court should impose the statutory maximum fine of $750,000.

For the reasons set forth in its contemporaneously filed motion for an upward variance and, alternatively, an upward departure, the United States contends that the Court's imposition of sentence should include a $750,000 fine.  The United States seeks this fine in lieu of forfeiture.

## V.    Restitution required under 18 U.S.C. § 3553(a)(7) and 18 U.S.C. § 3663A already has been paid by Pilot.

The Court is to consider "the need to provide restitution to any victims of the offense," 18 U.S.C. 3553(a)(7), and to order a defendant to make restitution to victims of fraud offenses, 18 U.S.C. § 3663A.  In this case, however, all restitution already has been paid by Pilot.  As shown in Exhibit 2 to this memorandum, also marked as Gov. Ex. 5083-A for the sentencing hearing, the declaration of Pilot's general counsel states that all restitution has been paid, or attempted to be paid, to affected trucking company customers, resulting in overall payment of $78,949,333.12 to all possibly affected customers, and a total of $20,276.332.18 to the 78 customers on Gov. Ex. 5079-A (attached as Exhibit 1).[39]  It should be noted that both figures include interest and cover a period of time broader than the timeframe of the conspiracy alleged in the Indictment.

---

[39] Gov. Ex. 5083-B is Ms. Seabrook's declaration with all exhibits attached, which was too large to file on ECF.  Gov. Ex. 5083-B is included on the DVD attached as Exhibit 1 to the Government's Notice of Manual Filing of Sentencing Exhibits filed on this date.

Respectfully submitted,

CHARLES E. ATCHLEY, JR.
ATTORNEY FOR THE UNITED STATES
ACTING UNDER AUTHORITY
CONFERRED BY 28 U.S.C. § 515

By:     *s/ Francis M. Hamilton III*
        Francis M. Hamilton III
        David P. Lewen, Jr.
        Assistant United States Attorneys
        800 Market Street, Suite 211
        Knoxville, Tennessee  37902
        (865) 545-4167

## CERTIFICATE OF SERVICE

I hereby certify that on September 12, 2018, the foregoing sentencing memorandum was filed electronically.  Notice of its filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. mail and e-mail.  Parties may access this filing through the Court's electronic filing system.

        *s/ Francis M. Hamilton III*
        Francis M. Hamilton III
        Assistant United States Attorney