**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>     Plaintiff, )<br><br> )<br><br> )<br><br> v. )<br><br> )<br><br> MARK HAZELWOOD, )<br> SCOTT WOMBOLD, )<br> HEATHER JONES, and )<br> KAREN MANN, )<br><br> )<br>     Defendants. ) | **No. 3:16-CR-20**<br>**JUDGES COLLIER / GUYTON**<br><br><br>**ORAL ARGUMENT REQUESTED**<br>**HEARING REQUESTED** |

**MOTION FOR DOWNWARD DEPARTURE**
**ON BEHALF OF DEFENDANT MARK HAZELWOOD**

September 12, 2018

WALDEN MACHT & HARAN LLP

Jim Walden
Georgia Winston
1 Battery Park Plaza, 34th Floor
New York, NY 10004
Tel: (212) 335-2030
Fax: (212) 335-2040

BREEDING HENRY BAYSAN PC

Bradley L. Henry
900 S. Gay Street
Suite 1950
Knoxville, TN 37902
Tel: (865) 670-8535
Fax: (865) 670-8536

*Attorneys for Mark Hazelwood*

# TABLE OF CONTENTS

I.    Introduction ........................................................................................................... 1

II.    The PSR's Loss Calculation is Severely Flawed ................................................. 2

   A.    Background on How the Loss Amounts were Calculated ................................. 3

   B.    Executive Summary of A&M's Conclusions ................................................... 5

III.    The Government's Reliance on the CSP for the Loss Amount is Improper ....................... 7

   A.    The CSP Introduced Numerous Biases That Kraft, the PSR, And The Government Have Improperly Relied On ........................................................................................... 7

   B.    Kraft's Methods Do Not Correct for the CSP Biases ...................................... 8

IV.    The Government's Reliance on the Kraft Reports for the Loss Attributions is Improper. 12

   A.    The Attributed Losses Are Materially Overstated ......................................... 12

V.    The Government's Loss Amount is Overstated by At Least $5 Million Before Offsets... 14

VI.    The Loss Amount Must Also Be Offset by the Fair Market Value of Benefits the Customer Received and Reduced by the Value of any Discounts to which the Customer Was Not Entitled ................................................................................................................. 16

VII.    The "Role in the Offense" Enhancement is Inapplicable to Mark, or, Alternatively, Is the Basis for a Downward Departure ............................................................................. 18

   A.    Control and Decision-Making Authority (Approval) ..................................... 20

   B.    Nature of Participation and Planning of the Conspiracy (Participation and Expansion) 24

VIII.    Conclusion ..................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*United States. v. DeGovanni,*
    104 F.3d 43 (3d Cir. 1997) .......................................................................................... 19, 21, 23

*United States v. Anders,*
    333. Fed. App'x 950 (6th Cir. 2009) ................................................................................ 16, 17

*United States v. Bennett,*
    708 F.3d 879, (7th Cir. 2013) .............................................................................................. 23

*United States v. Comer,*
    93 F.3d 1271 (6th Cir. 1996) ................................................................................................ 14

*United States v. Davis,*
    188 F. App'x 371 (6th Cir. 2006) ......................................................................................... 22

*United States v. Figueroa,*
    682 F.3d 694 (7th Cir. 2012) ................................................................................................ 23

*United States v. Geringer,*
    672 Fed. App'x 651 (9th Cir. 2016) ...................................................................................... 15

*United States v. Grams,*
    566 F.3d 683 (6th Cir. 2009) .................................................................................................. 2

*United States v. Jones,*
    641 F.3d 706 (6th Cir. 2011) ................................................................................................ 15

*United States v. Lanham,*
    617 F.3d 873, (6th Cir. 2010) ............................................................................................... 22

*United States v. Litchfield,*
    959 F.2d 1514 (10th Cir. 1992) ....................................................................................... 21, 23

*United States v. McBride,*
    434 F.3d 470 (6th Cir. 2006) .................................................................................................. 2

*United States v. Muaalla,*
    316 F. Supp. 3d 1015 (E.D. Mich. 2018) ............................................................................. 15

*United States v. Rangel,*
    697 F.3d 795 (9th Cir. 2012) .................................................................................................. 1

*United States v. Salazar-Medina,*
    575 F. App'x 212 (5th Cir. 2014) ......................................................................................... 19

*United States v. Sarlog,*
    504 F. App'x 426 (6th Cir. 2012) ......................................................................................... 19

iii

*United States v. Solis-Bermudez*,
   501 F.3d 882 (8th Cir. 2007)...................................................................................... 2

*United States v. Tristan-Madrigal*,
   601 F.3d 629 (6th Cir. 2010)...................................................................................... 2

*United States v. W. Coast Aluminum Heat Treating Co.*,
   265 F.3d 986 (9th Cir. 2001)...................................................................................... 13

*United States v. Washington*,
   715 F.3d 975 (6th Cir. 2013)...................................................................................... 18

*United States v. Weaver*,
   716 F.3d 439, (7th Cir. 2013)...................................................................................... 20

**Other Authorities**

U.S.S.G. § 2B1.1............................................................................................. 17, 18, 20, 26

## I. Introduction

Defendant Mark Hazelwood ("Mark") herein respectfully submits this motion to request a downward departure from the Sentencing Guidelines in this case in the event the Court accepts the government's position, in whole or in part, as to loss or role in the offense.

The loss calculation submitted by the government and in the Revised Presentence Investigation Report, ECF No. 604 ("PSR") does not begin to accurately estimate the loss reasonably attributable to Mark and cannot, therefore, reasonably form a basis for increasing his sentence—especially by 20 levels, an increase that vastly overstates the harm of his conduct of conviction. As a result of faulty underlying work, the loss amount that the government asserts is not reasonably estimable.

Moreover, there should be no adjustment for being an organizer, leader, supervisor or manager of the activity at issue. There was no testimony at trial showing that Mark led or organized any criminal activity. To support its role enhancement recommendation, the Probation Department relied on a blanket assertion that Mark "participated in, approved of, and sought to expand the conspiracy" and suggested that "because of his position, [he] could have stopped the conspiracy at any time." PSR at ¶ 36. As explained below, this evidence both misconstrues the record and is also legally insufficient to sustain a role enhancement here.[1] If the Court disagrees with our views as to application of either the loss or the role enhancement, the Court should depart on the ground that the facts and circumstances here take this case out of the heartland of each provision.[2]

---

[1] We also ask the Court to seriously consider the exculpatory evidence we described in our Rule 33 motion with respect to the witness-tampering charge in determining whether an obstruction-of-justice enhancement is inappropriate.

[2] We are filing today a separate motion for downward variance based on other factors. A departure motion, unlike one for a variance, is grounded in the Guidelines themselves. *United States v. Rangel*, 697 F.3d 795, 801 (9th Cir. 2012) ("A 'departure' is typically a change from the final

1

## II.     The PSR's Loss Calculation is Severely Flawed

The PSR guidelines range of 168 to 210 months is based largely on the calculation of loss. Here, rather than undertake to calculate the losses, the government made this Court's job much harder and injected a significant and unnecessary appellate issue about the sufficiency of the evidence supporting a loss enhancement by outsourcing the loss estimation to a third-party company employed by Pilot, KraftCPAs PLLC ("Kraft"). Kraft, in turn, conducted no independent audit to quantify loss but, instead, relied on Pilot's own calculations, which both Kraft and the government admit are inherently inaccurate and flawed. Pilot's work was no audit at all, but rather a project to determine "make good" payments, whether the amounts were attributable to fraud, mistakes, miscalculations or, in several instances, capitulation to customers' demands for more money. Because this project was, in fact, a customer satisfaction project, we refer to it herein as the "CSP."

Our experts will attest that the resulting loss attributions, derived from the CSP, are flawed beyond possible rehabilitation. A detailed breakdown of the flaws in the methodologies is found in our attached expert report, discussed further below. Among other things, the expert report shows that (i) the underlying CSP resulted in overstated loss amounts; (ii) Kraft's attribution project employed a faulty methodology grounded in subjective data; (iii) Kraft rendered opinions outside of its area of expertise; and (iv) Kraft failed to show its work or support its conclusions. Our

---

sentencing range computed by examining the provisions of the Guidelines themselves." (citation omitted)). Guideline departures are still a relevant consideration for determining the appropriate guideline sentence. *United States v. McBride*, 434 F.3d 470, 477 (6th Cir. 2006). Because standards justifying departures under the advisory Guidelines are narrower than the factors enumerated in § 3553(a), *e.g.*, *United States v. Solis-Bermudez*, 501 F.3d 882, 886 (8th Cir. 2007) (cited approvingly in *United States v. Tristan-Madrigal*, 601 F.3d 629, 635 (6th Cir. 2010)), the departure grounds urged here, considered alone or in combination with other factors, also would support a variance from the Guidelines. *See, e.g.*, *United States v. Grams*, 566 F.3d 683, 687 (6th Cir. 2009) ("[T]he same facts and analysis can, at times, be used to justify both a Guidelines departure and a variance . . . .").

expert will attest that the results of the attribution project are inherently unreliable. The Court should disregard the PSR's loss calculation.

Acknowledging the weaknesses in the loss calculations, the government has retreated to what it (wrongly) seems to consider more defensible ground, namely, reducing the loss total it intends to prove at sentencing to $10,405,836, based on losses tied to three employees. That number is no more defensible than the PSR's calculation, as its genesis is still with the CSP and Kraft Reports. It is still rooted in the same flawed methodologies, with the same inherent biases. Even with the very limited time our experts had with the underlying data, they found serious mistakes in it.

### A. <u>Background on How the Loss Amounts were Calculated</u>

The CSP followed federal law enforcement's April 15, 2013 raid. It was neither designed nor ever intended to distinguish whether any underpayments were related to fraud. Instead, the CSP's focus was on customer relations and retention, meaning that PFJ would identify and pay back any potential type of discount or rebate underpayment—whether due to fraud, mistake or other factors—and repay the customer, even if PFJ did not believe it owed the customer money. Customer payments coming out of the CSP were made in 2013 and 2014. *See* Expert Report of Philip E. Kruse, C.P.A. ("Kruse Report"), which is attached hereto as Exhibit 1[3] and is incorporated by reference herein, at 7. The result of the CSP was intentional and massive overpayments based on a significant amount of subjective information and guesswork.

Then, in or around 2014, the government asked Pilot to engage a third party to assist with determining which customer repayments should be attributed to particular charged defendants.

---

[3] The Kruse Report is supported by voluminous exhibits subject to the Protective Order, ECF No. 70. We are awaiting the government's position on whether or not these exhibits should be filed under seal. In either event—whether under seal or on the public docket—we will manually file these exhibits tomorrow, September 13, 2018, and provide a courtesy copy to the Court.

Pilot engaged Kraft for this exercise. Kraft started with the CSP dataset, without accounting for the fact that the CSP identified underpayments other than those related to fraud. *Id.* at 3-4; *Id.* Ex. SD 4 (Supplemental Kraft Report), at 5 ("Kraft used the [CSP] Reimbursements as the customer loss amounts for the 2015 [Kraft Report] and this [Supplemental Kraft Report]."). Kraft did not conduct its own audit, but it issued three reports.[4]

First, a March 2015 analysis (the "2015 Kraft Report") purported to determine, on a month-by-month basis for each customer where the CSP had identified an underpayment, whether any portion of that underpayment could be attributed to fraud by any of the charged defendants. If Kraft determined a portion of the underpayment could be attributed to fraud by a defendant, Kraft attributed the entire underpayment (the loss amount) to that defendant without any further consideration of whether that amount was due *exclusively* to fraud or was caused by other factors. *Id.* at 3-4. Kraft did not assess whether the underpayments—including the loss amounts the government now seeks to attribute to Mark—were accurate. That report attributed no losses to Mark. *Id.*

Second, on June 22, 2018, Kraft issued interim findings, at the government's behest, that "refine[d] and narrow[ed]" the 2015 Kraft Report by including only defendants who were convicted or pleaded guilty and using a supposedly "enhanced" level of required documentation to attribute losses ("Kraft Interim Findings"). *Id.* at 4. This report attributed $23.7 million of losses to Mark using a methodology that attributed to him the losses of any of his direct reports. *Id.*; *Id.* Ex. SD 4 at 3, 4.

---

[4] We have been advised by counsel for Pilot, and the government confirmed, that Kraft was engaged by Pilot to conduct a privileged and confidential examination of the loss, but the results of that examination would not be disclosed and, to our knowledge, remain a secret.

Third, Kraft issued a supplemental report on July 18, 2018 ("Supplemental Kraft Report"). In that report, which superseded the Kraft Interim Findings, Kraft called its project statistically valid random sample (the "SVRS") that would supposedly correct for biases caused by the CSP's effort to always give the benefit to the customer. The report reduced Mark's loss amount to $21.6 million. *Id.* at 4-5. On August 21, 2018, Kraft produced an addendum to the Supplemental Kraft Report with more information about its methodology for calculating SVRS. *Id.* at 5.

Kraft's "moving target" is a likely reflection of the inherent imprecision of the CSP's work, which was never intended for the purpose to which the government now seeks to put it. On August, 1, 2018, in its Notice of No Objection to Hazelwood's PSR, ECF No. 620, the government announced that it would seek to prove only $10.4 million in losses attributable to Mark. That $10.4 million in losses, attributable to 78 customers, was based on losses Kraft attributed to three of Mark's direct reports, Arnie Ralenkotter, Brian Mosher and John Freeman (the "Aug. 1 List"). Accordingly, we focus here on that $10.4 million figure.

## B. Executive Summary of A&M's Conclusions

Our experts from the distinguished consulting firm of Alvarez & Marsal Disputes and Investigations, LLC ("A&M") have independently reviewed Kraft's work product and the underlying source documents. A&M has issued two reports concerning the Kraft conclusions (the "A&M Reports"). The first is the Kruse Report, which analyzes Kraft's work and the underlying data from the CSP and explains why Kraft's conclusions are not reliable. The second report is by Benjamin S. Wilner, Ph.D. (the "Wilner Sampling Report"), which is attached hereto as Exhibit 2 and is incorporated by reference herein. The Wilner Sampling Report focuses on the limited issue of the problems inherent in Kraft's statistical sampling methodology for its "SVRS analysis," which is explained in further detail below. We summarize their conclusions and highlight key findings below.

A&M was able to reach several conclusions based on the available information.[5]  Those conclusions make clear that Mark should not be attributed with anywhere near the $10.4 million in losses the government seeks to prove, much less the $21 million set forth in the PSR.  In short, A&M concluded the following:  (1) the CSP's methods introduced biases that favored customers and thus inflated the payments made to them, which are now being treated as losses due to fraud; (2) the CSP was not an audit and should not be relied upon as if it were; (3) the CSP's loss calculations contain material overstatements, some of which are quantifiable, but others of which are not; (4) Kraft's SVRS sampling method—which it called a "statistically valid random sample"—did not account for the vast majority of those biases and so does not address or remedy them; (5) Kraft's conclusions as to loss amount should not be given any weight because Kraft provided no support for its reliance on the CSP's loss calculations; (6) Kraft's SVRS project suffers from fatal mathematical and methodological flaws that make it wholly unreliable, and even ignoring those flaws, the SVRS was calculated improperly and proper analysis of the SVRS data shows that, on the numbers alone and without consideration of other biases, the reduction should have been significantly higher than the 4.39% that Kraft applied; (7) in numerous instances, the basis for Kraft's attribution decision is not clear from the evidence upon which Kraft states it relied; (8) even assuming they were properly attributed, the losses attributed to Mark are materially

---

[5] As the Court is aware, we originally requested additional time before sentencing, as the amount of data requiring analysis is very substantial.  The Court allowed a one-month delay, despite our request for four.  Not surprisingly, A&M was unable to complete its work, analyzing less than half of the 78 separate customer files.  For this reason, we renew our request for additional time.  It is quite common for courts in this District to grant sentencing adjournments, particularly in complex fraud cases.  For example, in *U.S. v. Dobson*, this Court adjourned the sentencing five separate times, moving the date from August 8, 2013 to the final date of April 29, 2014.  *See* Orders Rescheduling Judgment, *United States v. Dobson*, No. 1:12-CR-42 (E.D. Tenn.) (ECF Nos. 109, 122, 132, 149, 153).  By comparison, our request for three additional months is entirely reasonable in light of the complexity of the issues presented in this case.

6

overstated; (9) because it is a CPA firm, Kraft was not competent to perform the attribution determinations that it made; and (10) Kraft made numerous attribution decisions based on subjective determinations, not objective evidence, and improperly drew legal conclusions. Kraft Rep. at 6-7; Wilner Sampling Rep. at 1, 19-21.

### III. The Government's Reliance on the CSP for the Loss Amount is Improper

For the reasons explained below, the government loss amount of $10,405,826 is insufficiently reliable and severely overstates any loss attributable to Mark.

### A. The CSP Introduced Numerous Biases That Kraft, the PSR, And the Government Have Improperly Relied On

As noted, and as the government has conceded, the CSP was undertaken to find underpayments to customers for any reason, with a focus on customer relations and retention, not on identifying potential fraud. Kruse Rep. at 7-9, 14. The CSP payment amounts are thus a poor proxy for the loss amount due to fraud and are unfairly inflated. *See generally* A&M Reports. The government is improperly trying to leverage the work done on a project (the CSP) that had a very different objective from determining the fraud loss amount. *Id.* at 7–9, 14. The government's decision here is quite mystifying, as our experts believe the true loss amount is actually estimable with adequate information and time, and the government (which is assisted by two large and well-resourced investigative agencies: the IRS and FBI) has ample resources to conduct the work properly.

The Kruse Report cites numerous ways in which the CSP gave beneficial (and in many instances outright generous) treatment to the customers. *Id.* at 8-9, 10-17. We collectively refer to these as the CSP Biases. Because the CSP Biases resulted in Pilot making customer payments that were inflated to include more than just amount due to fraud, Kraft should not have wholesale

adopted the calculations as a computation of loss due to fraud. Kraft's 11th-hour decision to attempt to apply the SVRS (flawed as it is) is a too-little-too-late confession of this reality.

## B. Kraft's Methods Do Not Correct for the CSP Biases

Kraft acknowledged that the objectives of the CSP were not consistent with identifying the loss due to fraud, but it failed to adequately correct for the problem. For one thing, in its attribution analysis in the 2015 Kraft Report, Kraft made a serious "in for a penny, in for a pound" error. Under its month-by-month analysis of the CSP numbers, if any portion of the underpayment for a given month could be attributed to fraud by any of the charged defendants, Kraft attributed the entire month's underpayment—the loss amount—to that defendant without any further consideration of whether that amount was due exclusively to fraud or was occasioned by other factors, such as errors or innocent mistakes. *Id.* at 4.

The statistical sampling exercise was also flawed. Rather than affirmatively test or validate the loss amounts determined by the CSP in their entirety, Kraft sampled 133 monthly loss amounts (out of 8,812 total) ostensibly to conduct a documentary review of those months to identify and correct the CSP's "benefit-to-the-customer methodology." This means it tested only 1.5% of the total. It called this project its "SVRS," for "statistically valid random sample." Based on this analysis, Kraft determined that all loss amounts should be reduced by 4.39%. Wilner Sampling Rep. at 3-4.

But this adjustment is severely understated. Even without considering the numerous customer-favoring biases that the SVRS does not account for at all, the SVRS should be more than doubled because Kraft's SVRS project "made mathematical and methodological errors that fatally undercut [the SVRS] analysis." *Id.* at 1. This includes the fact that, despite its name, the analysis did not use a statistically valid random sample. *See generally id.* (describing errors in detail); *id.* at 1, 9. The Wilner Sampling Report recalculated the data and found that, by correcting some of

Kraft's mathematical and methodological errors (given the data Kraft provided, some of these errors cannot be corrected), the SVRS project should have reduced the losses in the government's Aug. 1 List by $959,364, and not by the $478,142 that Kraft found. *Id*. at 19-21.

Moreover, Kraft's SVRS methodology failed to account for numerous forms of bias in the CSP that further overstated the losses by favoring the customer rather than seeking to accurately calculate the losses due to fraud. For example, the SVRS project did not account for the fact that the CSP: (1) issued make-good payments to customers regardless of whether the payment was caused by fraud or innocent mistake; (2) accepted the representations made by the customer when there were no documents corroborating the customer's word; (3) assumed that if rebate terms were changed to a worse deal, the customer was not notified about it, even without evidence of whether that was true; (4) gave equal weight to any available evidence in determining the deal terms with a customer, regardless of the reliability of the evidence; (5) excluded potentially exculpatory evidence by not providing the CSP team access to the sales staff that would have had the most intimate knowledge about the agreements with customers; (6) made overpayments to customers due to flaws in its recalculation software during the CSP; and (7) disregarded its own supportable findings if a customer complained, and instead increased the payment amount if it was a good "business decision" to do so. Kruse Rep. at 14-17.

Indeed, as A&M's analysis shows, the Kraft Report is replete with examples of customer-leaning bias that the SVRS did not address. *Id*. For example, the CSP concluded that one customer, Kohler, was required to purchase a minimum monthly number of gallons in order to earn its rebate. Yet, the CSP chose not to account for Kohler's failure to meet that gallon requirement for 31 out of 41 months. *Id*. at 42-43. Instead, the CSP made a business decision to pay the customer back the full rebate—for all 41 months—anyway. *Id*. That entire 41-month

amount was included as a "loss" on the Kraft report, and the government now seeks to attribute it to Mark. *Id.*

As another example, Pilot could not determine how much money should be paid back to Cassens Transport Co. ("Cassens"). *Id.* at 22-25. The CSP's work product shows the CSP team acknowledging that while *the CSP* re-calculated the discount at cost plus ("CP") .02, *the customer* "said it was CP .035 [*i.e.*, a worse deal for the customer] back from day one to 3/1/2013." *Id.* at 23. According to the CSP recalculation software, the company owed Cassens $449,674 if the deal was CP .035, and $541,838 if the deal was CP .02. The CSP employee reviewing this account stated that without evidence to resolve this discrepancy, "[i]t is just a business decision . . . Not anything documented." *Id.* An internal CSP team email shows that a supervisor decided to split the baby: "I think the right thing to do is pay them $500,000 plus interest. We should land in the middle."[6] *Id.* at 24. But rather than determine that the losses due to fraud were $449,674 and then write a check for a greater amount, the CSP team manipulated the deal terms in the recalculation software to make the outcome come close to $500,000. *Id.* The CSP work product states that "to make it come out on a spreadsheet we arrived at $501,800.57." *Id.* This means that an additional $52,127, admittedly not due to fraud, was included within the loss data supplied to Kraft, which Kraft incorporated into its own model for loss attributions. *Id.* Kraft concluded that this amount was a fraud-related loss, and the government now seeks to attribute it to Mark. *Id.*

---

[6] Sharkey/Sysco/Shipper's Rental is a similar example. The CSP work product shows that Paul Pardue stated, "[w]e have nothing in any e-mail or company document about their deal… we either owe them nothing, $170,000, $638,605 or $675,000." Noting that they had "no clue" how to handle the lack of evidence but that Sharkey "won't be happy unless [we agree to their discount terms]," PFJ then made the "business decision" to pay Sharkey $742,849 (before interest), apparently at the customer's behest. The additional amount that PFJ agreed to pay above what it really owed the customer inflates the loss calculation the government now asks the Court to accept. *See id.* at 46–47.

A&M found similar evidence of such CSP customer-leaning biases in at least 19 of the 36 customers (53%) it reviewed. *Id.* at 16. Kraft sampled 11 of these 19 customers within their attribution period in its SVRS project. *Id.* However, because the SVRS project was limited and looked only for examples where the CSP had evidence of contradictory discount amounts in a given month, it did not identify, much less account for, these other biases and errors. *Id.* To the contrary, for each of these 11 customers, Kraft found either no loss overstatement in the CSP, only a very small loss overstatement, or that the loss was *understated*. *Id.* In many instances, although the overstatement caused by CSP bias is not quantifiable, it is still plainly significant. *Id.* at 16-17. Even where the bias cannot be precisely quantified, one thing is clear: the Kraft numbers are incomplete, inaccurate, and unreliable. *See id.*

The Wilner Sampling Report contains scenarios showing what Kraft's SVRS reduction might have been had it conservatively identified CSP Bias for just eight of these 11 customers. *See* Wilner Sampling Rep. at 21–23. It found that if the loss for just those eight customers was reduced by 10%, Mark's loss amount would fall by nearly $1.9 million. *Id.* at 22. A conservative estimate of overstatement of 30% for just these eight customers—a reasonable approximation because the Kruse Report found that some of these customers could have had a 100% reduction for the months tested—would have resulted in an SVRS reduction of nearly $5 million. *Id.* This reflects how significant the impact would have been if Kraft had properly reviewed the underlying evidence and entered the appropriate observations into its statistical model. *Id.* at 22-23; s*ee generally* Kruse Rep.; *id.* at 16-17.

We hope the Court can understand and appreciate how wholly inappropriate it is—given these limitations of the CSP—to use these figures for sentencing purposes. Kraft has provided no other support for its loss calculation conclusion.

## IV. The Government's Reliance on the Kraft Reports for the Loss Attributions is Improper

In addition to the loss *amounts* in Kraft's reports being unreliable, Kraft's *attributions* should be disregarded by the Court for purposes of sentencing because they are faulty for two primary reasons: (1) Kraft is not competent to offer conclusions concerning fraud, and (2) Kraft's attribution decisions are highly suspect and materially overstate the attributable loss.[7]

### A. The Attributed Losses Are Materially Overstated

Kraft's reports outline the test it developed to determine whether to attribute losses to a defendant. The test has two parts, and, with only some exceptions, Kraft stated that both are required to be met in order to attribute losses to a defendant. The first is that the defendant had "knowledge of the discount communicated to the customer," and the second is the defendant had "knowledge of intent to defraud the customer." Kruse Rep. Ex. SD 4, at 2–3. Supervisors, including Mark, were attributed the losses of their subordinates. *Id*. Ex. SD 4, at 3, 4.

A&M reviewed Kraft's supporting material for many of the customers whose losses were attributed to Mark and found that it was generally very difficult to assess the specific basis for Kraft's attribution to the various defendants. As noted in the Kruse Report, Kraft's attribution documents show that Kraft often attributed losses for the entire attribution period, even when the discount terms changed over time or there were additional communications with the customer that suggested an end point to the conduct. But Kraft's documents often fail to show why it is attributing losses to cover the entire attribution period and even fail to meet Kraft's own two-prong test. *Id*. at 19–21.

---

[7] Auditors are not qualified to make legal conclusions or to undertake a project in which the sole purpose is to make determinations about whether fraud occurred, and standards promulgated by the American Institute of Certified Public Accountants, which govern all professional services provided by Certified Public Accountants, do not permit them to do so. Kruse Rep. at 7, 17–18.

For example, Kraft attributed $432,815 in losses for Midwest Logistics Systems. However, the attribution documents Kraft cited only include two examples of manual rebate reductions, neither of which appears to reflect an intention to change the rebate during the entire loss period or a systematic attempt to misrepresent the rebate deal to the customer. *Id*. at 29-30. Accordingly, the loss attribution for that customer is overstated by as much as $422,815. *Id*.

In another example, Kraft attributed $224,362 in losses for Equity Transportation for the period of February 2008 through January 2013. *Id*. at 28. But there is evidence that in January 2012, PFJ improved and implemented the discount of CP 0.0 or retail minus 0.05, and PFJ communicated this discount change to the customer—meaning that as of January 2012 at the latest, PFJ had informed the customer of the actual discount the customer was receiving. *Id*. Kraft provides no support for continuing the attribution period—and therefore attributing fraud losses— after January 2012. *See id*. Accordingly, the loss amounts Kraft attributed for Equity Transportation are overstated for the attribution period from January 2012 to January 2013.[8] *Id*. *See United States v. W. Coast Aluminum Heat Treating Co.*, 265 F.3d 986, 989, 992 (9th Cir. 2001) (finding that PSR properly reduced the loss amount to account for defendants' correct application of contractual requirements).

We hope the Court will understand something important: A&M believes that, if given enough time, the loss calculation is reasonably estimable. However, the way in which the government has proceeded here—by relying on a third-party's flawed, faulty, and unreliable work product—has created a "hot mess." We respectfully request that the Court either (a) disregard the

---

[8] A&M cannot calculate the overstatement due to the lack of clarity in the CSP documents as to the deal terms being applied during the course of the attribution period.

Kraft analysis and permit A&M to accurately calculate attributable loses or (b) require the government to do so.

### V. The Government's Loss Amount is Overstated by At Least $5 Million Before Offsets

A&M conducted a thorough review of the underlying primary source documents for 36 customers that collectively are assigned $8.959 million in gross loss (before the SVRS reduction).[9] *See* Kruse Rep. at 21-22. For those 36 customers, A&M identified $4.041 million in total potential overstatements of the loss amount. *Id.* These potential overstatements include: (a) instances where there is evidence the CSP erred in its calculation; (b) CSP calculations that are not supported by evidence, or that are influenced by CSP Bias; and (c) attribution determinations Kraft made that are not adequately supported. *Id.*

Combined with the revised SVRS finding in the Wilner Sampling Report, which found that a proper statistical test would have reduced the loss amount by approximately $959,000, the total potential overstatement of the loss amount is approximately $5.0 million, reducing the loss amount on the Aug. 1 List from $10,883,627, to approximately $5.88 million. *See* Wilner Sampling Rep. at 19-21; Kruse Rep. at 22.

Yet even this number is too high, because many of the flaws in the CSP's and Kraft's analysis cannot be quantified. For example, A&M identified seven forms of CSP Bias that were not corrected by Kraft's SVRS project. *See* Kruse Rep. at 15–16. Thus, the loss amount is overstated by an additional unknown sum. For this reason, as well as the others stated above, the Court should determine that the losses are not reasonably estimable and use a different metric for calculating any sentencing enhancement.

---

[9] Time constraints prevented A&M from reviewing the documents relating to all 78 customers the government seeks to attribute to Mark here.

The law is clear that a district court cannot accept a loss calculation that is unsupported or speculative, and the government bears the burden of supporting its loss calculation by a preponderance of the evidence with reliable and specific evidence. *See United States v. Comer*, 93 F.3d 1271, 1284–85 (6th Cir. 1996) (finding the district court's loss attribution to defendant clearly erroneous because "a court may not attribute a loss to a defendant based on mere speculation"). In *Comer*, the Sixth Circuit held that the district court clearly erred by attributing loss relating to one alleged jewelry theft "based on the sole fact that [the defendant] stole jewelry . . . on several other occasions." *Id.* at 1285. Speculation, without additional evidence, fails the preponderance of the evidence standard. *Id.*

A sentence based on flawed methodology simply cannot stand. *See United States v. Jones*, 641 F.3d 706, 712 (6th Cir. 2011) (vacating sentence where the government's "statistical analysis was flawed"). A loss amount is not supported by a preponderance of the evidence—and therefore cannot be the basis of a valid sentence—where its calculation is riddled with errors and biases. *See United States v. Muaalla*, 316 F. Supp. 3d 1015, 1020–21 (E.D. Mich. 2018) (finding "the evidence does not demonstrate that the Government's loss calculations are correct by a preponderance of the evidence" as a result of unaccounted for flaws and biases).

Here, as noted above, the government fails to meet its burden "to prove the amount of loss by a preponderance of the evidence." *See Jones*, 641 F.3d at 712. Even if the government's witnesses admit at the sentencing hearing that they should be *attributed* losses for specific customers, that still would not remedy the significant issue that the *amount* of losses would be based on the CSP, which was biased in favor of the customers, and therefore overstated and unreliable. Kruse Rep. at 7-17.

**VI.    The Loss Amount Must Also Be Offset by the Fair Market Value of Benefits the Customer Received and Reduced by the Value of any Discounts to which the Customer Was Not Entitled**

In calculating loss, the PSR also failed to account for the fair market value of the benefits and services rendered to the customers. A note added in 2001 to Section 2B1.1 titled "Credits Against Loss" ("Credits Against Loss Rule") provides that "[l]oss shall be reduced by. . . [t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." U.S. Sentencing Guidelines § 2B1.1, cmt. n.3(E)(i). In its statement of reasons accompanying the Guidelines amendment adding the Credits Against Loss Rule, the Commission made clear that loss is a measurement of economic harm to the victims and must therefore measure *net* economic deprivation.

> The loss definition also provides for the exclusion from loss of certain economic benefits transferred to victims, to be measured at the time of detection. This provision codifies the "net loss" approach that has developed in the case law, with some modifications made for policy reasons. This crediting approach is adopted because the seriousness of the offense and the culpability of a defendant is better determined by using a net approach. This approach recognizes that the offender who transfers something of value to the victim(s) generally is committing a less serious offense than an offender who does not.

U.S. Sentencing Guidelines, Supplement to Appendix C, Amendment 617, at 184 (Reason for Amendment) (Nov. 1, 2001); *see United States v. Smith*, 749 F.3d 465, 485 (6th Cir. 2014) (affirming the district court's application of a "net loss" calculation that subtracted out royalties paid to defrauded investors, citing to 3(E)(i)); *accord United States v. Brownell*, 495 F.3d 459, 463 (7th Cir. 2007) (Note 3(E)(i) "call[s] for the court to determine the net detriment to the victim." (internal quotation marks and citation omitted)). As such, "[a] victim's loss should be offset by the victim's benefit for the purpose of calculating loss under the Sentencing Guidelines." *United States v. Geringer*, 672 F. App'x 651, 652–53 (9th Cir. 2016); *accord United States v. Anders*, 333

F. App'x 950, 955 (6th Cir. 2009) (finding that, in calculating loss incurred by contractor, court must include "a credit against the loss in an amount equal to the value of services rendered"). "This credit accounts for the fact that value may be rendered even amid fraudulent conduct." *United States v. Armas*, 712 F. App'x 923, 928 (11th Cir. 2017) (internal quotations marks and citation omitted).

The government has focused solely on the amount of losses it claims were caused when certain of Pilot's customers failed to receive the full amount of one promised discount, a cost plus discount. This is the *gross* loss. But the "net loss" approach requires that the gross loss be offset by benefits transferred by Pilot to those victims before the fraud was detected. *See United States v. Pappert*, 112 F.3d 1073, 1079 (10th Cir. 1997) (noting that cases applying a net loss calculation "subtract[] the value of what was given to the victim(s) *during the course of the transaction* from the value of what was fraudulently taken" (emphasis in original)). Here, the same victims who did not receive promised cost plus discounts when they purchased fuel from Pilot nonetheless simultaneously received other discounts and benefits from Pilot (that were not provided by Pilot's competitors).

Unlike its competitors, Pilot waived its transaction fees for all direct bill customers. *See* Sentencing Mem. Ex. A, Tab 10. Although the amount of the transaction fee varied over time, during the 2008 to 2013 period, it was approximately $0.01 per gallon—meaning that, even if a competitor had matched Pilot's discount, Pilot also provided that customer with an additional benefit that it would not have gotten elsewhere, of $.01 per gallon in fees waived. *Id.* Moreover, Pilot also allowed customers to participate in its fuel-hedging program, which by one account saved customers "thousands if not million dollars [*sic*]," *see* Sentencing Mem. Ex. A, Tab 11, and Pilot also had a generous credit program, which other fueling companies did not offer. *See*

Sentencing Mem. Ex. A, Tab 10. These are all real and tangible benefits to Pilot's trucking company customers. Here, as in *Geringer*, the value of any such benefits received by customers whose losses the government is attributing to Mark must be offset against those losses. Indeed, the Sixth Circuit has held that a district court's "fail[ure] to apply the required credit against loss" renders a defendant's sentence "procedurally unreasonable." *Anders*, 333 F. App'x at 955.

Of the 78 customers whose losses the government seeks to attribute to Mark, 53 were on direct bill for all or part of the 2008–2013 period according to the Kraft and CSP materials. These materials also indicate that these 53 customers purchased approximately 354,462,705 gallons while on direct bill. Because their transaction fees of $.01 per gallon were waived, they benefited, collectively, by approximately $3,544,627—a benefit that should be offset against any loss calculation.[10]

## VII. The "Role in the Offense" Enhancement is Inapplicable to Mark, or, Alternatively, Is the Basis for a Downward Departure

The PSR's basis for applying a leadership enhancement for Mark apparently revolved around its finding that he "participated in, approved of, and sought to expand the conspiracy." PSR at ¶ 36. On that basis, the PSR calls for a four-level enhancement. However, there is no evidence that Mark took a leadership role in the offenses. To the contrary, the evidence at trial

---

[10] If the Court accepts the government's loss calculation—or a lower number based even in part on the government's methodology—a downward departure is warranted under application note 20(C) to U.S. Sentencing Guidelines § 2B1.1, which acknowledges there "may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense," in which case "a downward departure may be warranted." The government's over-inclusive approach means that loss for non-fraud underpayments will be included, which distinguishes this case from the heartland of fraud cases. In addition, two special factors apply here to warrant a departure under the same application note: (1) the diffuse amount of the loss, and (2) the lack of any motive for personal gain or intent to harm the customers. We have addressed these issues in our variance motion, but each argument is also an appropriate ground for departure.

established that Mark did not lead or organize others in the alleged scheme within the meaning of the Guidelines. Indeed, by the third day of trial, Janet Welch had already established that Mark did not lead or organize others in the alleged scheme when she was asked "Do you know of any direction or statement or act Mark Hazelwood ever took with you or anyone else to instruct them or approve of them changing a deal with a customer without telling you?" and she answered, "Not to my knowledge." 11/08/17 Tr. 217:19–23. Many other cooperators testified to the same effect. *See e.g.*, 11/9/17 Tr. at 131:18–132:17 (Arnie Ralenkotter), 11/21/17 Tr. at 177:21–23 (Holly Radford), 1/10/18 Tr. at 188:4–15, 198:3–8 (Kevin Clark), 1/18/18 Tr. at 195:14–202:8 (Lexie Holden). The Court therefore should not apply any leadership enhancement to Mark, much less the four-point enhancement recommended in the PSR.

It is the government's burden to prove the defendant's role in the criminal activity at issue. *United States v. Washington*, 715 F.3d 975, 984 (6th Cir. 2013). Section 3B1.1 allows for a role enhancement only if the defendant was an organizer, leader, manager, or supervisor of the criminal activity itself, with managers and supervisors being less culpable than organizers and leaders. Application Note 4 of § 2B1.1 lists several non-exhaustive factors for sentencing courts to consider when distinguishing whether a defendant was a leader and organizer, or a manager, or a supervisor of the criminal activity, including: (1) the control and exercise of decision making authority; (2) the nature and degree of participation in (and planning of) the commission of the offense; (3) the recruitment of accomplices; and (4) the claimed right to a larger share of the fruits of the crime.[11] Although recognizing that these factors are designed to distinguish between differing levels of

---

[11] The application note sets forth seven factors, which we combined into four due to their significant overlap.

leadership responsibility, *see, e.g.*, *United States v. Sarlog*, 504 F. App'x 426, 432 (6th Cir. 2012), it is also a rational framework for assessing any role enhancement here.[12]

### A.  <u>Control and Decision-Making Authority (Approval)</u>

The Probation Department cited Mark's position as president of Pilot as a reason for saying he "approved of…the conspiracy" and thus should be subject to a four-level role enhancement, noting that Mark "oversaw the entire Direct Sales division," "directly supervised John Freeman and Scott Wombold," and "used his position" to aid the fraud.  PSR at ¶¶ 35, 36.  As the Third Circuit has explained, however, "one is only a 'supervisor' under U.S. Sentencing Guidelines § 3B1.1(c) when he is so involved in, and connected to, the illegal activity of others that he actually supervises their illegal conduct, and is not just a supervisor by virtue of his *de jure* position . . . ." *United States v. DeGovanni*, 104 F.3d 43, 44 (3d Cir. 1997); *see also United States v. Dominguez*, 616 F. App'x 905, 909 (11th Cir. 2015) ("The determination as to whether the leadership role enhancement applies should be based on [the defendant's] actual conduct rather than [] job title").  Even instructing a coconspirator to engage in illegal conduct does not make one a leader under § 3B1.1.  *See United States v. Weaver*, 716 F.3d 439, 445 (7th Cir. 2013) (instructing coconspirators to promptly engage in illegal conduct does not make one a leader under § 3B1.1).

The overwhelming evidence at trial suggested that Mark did not exercise decision making authority over the criminal activity of the codefendants, regardless of his job title.  *See e.g.,* 11/9/17 Tr. at 131:18–132:17 (Arnie Ralenkotter), 11/21/17 Tr. at 177:21–23 (Holly Radford), 1/10/18 Tr. at 188:4–15, 198:3–8 (Kevin Clark), 1/18/18 Tr. at 195:14–202:8 (Lexie Holden).  The

---

[12] *See United States v. Salazar-Medina*, 575 F. App'x 212, 215 (5th Cir. 2014) ("Understanding that the purpose of this guideline is to determine whether the defendant played an aggravating role in the offense, however, we have used the factors in Note 4 as aids in the determination of whether an individual is an organizer, leader, manager, or supervisor of criminal activity.").

government's sole "approval" evidence was the uncorroborated testimony of Brian Mosher that Mark told him "we should do it." PSR at ¶ 37. However, not one of the other 27 witnesses called by the government testified that Mark had even a supervisory role over the fraud.[13] Rather, Freeman conceived of the fraud, which was then implemented by Freeman's sales team. *See* Mosher Testimony, 11/28/17 Tr. at 153:9-10 ("John had started the process. I had done it not long after, but after."). Indeed, even Mosher was unclear about Mark's role. Although Mosher testified that Mark had instructed him to change customer discounts "as much as we can" (11/27/17 Tr. at 38:23-24), he also acknowledged that Mark had explained the instruction by noting that "we didn't have a formal contract with the customer and we reserved the right to change their discounts however we felt like."[14] Indeed, no one—not even Mosher—testified that Mark condoned, or even knew about, his employees affirmatively lying to customers or providing them false back-up data.

The PSR also states that "[b]ecause of his position, [Mark] could have stopped the conspiracy at any time." PSR at ¶ 36. This basis for the enhancement is wrong as a matter of law. The mere fact that Mark had the authority to prevent a conspiracy does not mean that he led that conspiracy. *DeGovanni*, 104 F.3d at 46. For a role enhancement to be applicable, the government must show that Mark *actually supervised* criminal activity, not just that his subordinates were engaged in criminal activity. *Id*.

In *DeGovanni*, the Third Circuit vacated and remanded because of a two-level enhancement for a police sergeant based on him being the supervisor of the others who committed

---

[13] The PSR references the testimony of Kevin Clark, stating that he told Mark that customers are "not getting the deal they think they're getting." PSR at ¶ 44. However, even here, Clark had to acknowledge on cross that "Mark never responded to that one way or the other." (1/10/18 Tr. at 188). In addition, the PSR also identified a number of trip reports as evidence of Mark's approval but without any evidence that Mark read or responded to them in any way. PSR at ¶¶ 39-43.

[14] We hope, based on our Rule 33 Motion, the Court now understands that Mark's statement is literally true with respect to some customers.

the offense. Even though the defendant participated in, and profited from, the conspiracy, such "rank and file" participation in criminal activity was not enough. "His activities mirrored those of the other low-level participants; his role was clearly distinguishable from primary players in the conspiracy . . . and the evidence of record does not support DeGovanni's role as a manager or supervisor of the illegal activities . . . ." *DeGovanni*, 104 F.3d at 46. In so finding, the Third Circuit held that "one must [] have an active supervisory role *in the actual criminal conduct* of others to justify the [role] enhancements," and a failure to report and otherwise deter subordinates from engaging in criminal misconduct does not constitute the type of leadership to which § 3B1.1 refers. *Id.* at 45-46 (emphasis in original).

The facts of Mark's case are strikingly similar: certainly he is "distinguishable from primary players in the conspiracy," accompanied by a failure to prevent fraud. *Id.* Indeed, if failure to deter subordinates from engaging in criminal misconduct were to constitute a leadership role, then every conspirator holding an executive or other company leadership position would be deemed a leader of the conspiracy—an application of the leadership enhancement that would be entirely inappropriate. *See United States v. Litchfield*, 959 F.2d 1514, 1523 (10th Cir. 1992) ("we do not believe that the guidelines intend to define organizer or leader so broadly that nearly every member of a conspiracy qualifies"). In *Litchfield*, the Tenth Circuit held that a role enhancement was improper in part because, even though the defendant might have been an organizer or leader of a mining operation, the mining operation itself did not constitute criminal activity, and the defendant had not exercised his decision-making authority over his co-conspirators' involvement in the fraudulent scheme itself. Likewise, here, as president, Mark was an organizer and leader at Pilot, but he did not exercise his authority over the codefendants as related to their criminal activities.

The government presented no evidence that Mark devised the scheme, carried it out, or showed others how to further it—the kind of conduct that courts have found to warrant a role enhancement.  *See United States v. Davis*, 188 F. App'x 371, 372 (6th Cir. 2006) (*per curiam*) (affirming leadership enhancement for a defendant who admitted devising the scheme, carrying it out and showing others how to do it); *United States v. Lanham*, 617 F.3d 873, 890 (6th Cir. 2010) (initiation of the offense is "significant in assessing the defendant's exercise of decision making authority, the nature of participation in the commission of the offense, the degree of participation in planning or organizing the offense, and the degree of control and authority exercised over others.") (internal quotes omitted).  Indeed, this Court specifically recognized during the charge conference that there was no evidence that Mark was one of the "ones who actually devised or intended to devise the scheme or artifice to defraud." 2/5/18 Tr. at 27:18–22.  There is no evidence that Mark administered sanctions to any co-conspirator for poor performance in the commission of the conspiracy.[15]  *See United States v. Bennett,* 708 F.3d 879, 892 (7th Cir. 2013) (affirming supervisory enhancement where defendant administered punishment on a co-conspirator for failing to follow instructions).  There is also no evidence that Mark directed people what to do or determined whether they had completed their assigned tasks.  *United States v. Figueroa*, 682 F.3d 694, 697 (7th Cir. 2012) (affirming supervisory enhancement for an individual who had directed a drug mule where to go to get the drugs and where to meet him to return the drugs and get paid).  Thus, there is no evidence to conclude that Mark had control or decision-making authority in connection with the fraudulent activity.

---

[15] The closest the government came to showing Mark "reprimanded" anyone for failing to engage in the fraud was the uncorroborated testimony of Mosher, who testified that Mark told him it "wouldn't be a very good idea" to stop manual rebates.  11/27/17 Tr. at 162:18.  This would be a strained and unfair basis on which to impose a leadership enhancement that would add more than five years to Mark's sentence.

## B. <u>Nature of Participation and Planning of the Conspiracy (Participation and Expansion)</u>

The PSR's second and third bases for applying a leadership enhancement to Mark were that he "participated in" and "sought to expand" the conspiracy. PSR at ¶ 36. As noted above, however, mere participation is not enough. And the PSR's basis for finding that Mark sought to expand the conspiracy is premised on a misunderstanding of a business proposal and a misleading interpretation of a conversation that was misquoted in a particularly problematic fashion.

The PSR's support for finding that Mark "sought to expand the conspiracy" was his participation in a conversation about developing a two-tiered pricing strategy and a subsequent email to instigate the strategy. PSR at ¶ 46. However, as we argued in a supplemental brief in support of our Rule 33 motion, the government's entire theory of fraud based on the two-tiered pricing derived from an erroneous understanding of the pricing proposal. Two-tiered pricing was a business proposal that would offer preferential pricing to the savvier customers and take advantage of information disparities for customers that were not as knowledgeable. (Mosher: "Our advantage is their ignorance"; PSR at ¶ 46.). What it was not, however, was fraud. As set forth in our Rule 33 supplemental submission, although the PSR relies on a transcript of a recording in which John Freeman is quoted as saying "Yeah f**k 'em [customers] just give 'em what they want," this was based on a transcription error. *See* PSR at ¶ 46.[16] The recording itself shows that Freeman actually said, "we're ***not*** f*ckin' 'em, just givin' 'em them what they want," and later Mark commented that the two-tiered pricing plan would be "a fair deal." *See* Br. in Further Supp. of Mark Hazelwood's Mot. for Leave to File a Suppl. Br., Aug. 31, 2018, ECF No. 656. Using the two-tiered pricing strategy as a basis for a leadership enhancement is therefore unsupported by

---

[16] It is particularly noteworthy that the Probation Department chose to rely on this quote as support for its findings. It highlights that the transcription error, which was the partial subject of our Rule 33 motion, was powerfully misleading.

the evidence and would serve to compound a substantial injustice.

Even if the Court will not consider this argument, use of the differential pricing evidence to apply a very substantial enhancement—increasing Mark's guidelines range by between five to six years—is inappropriate. Even by the government's evidence, Freeman, not Mark, proposed differential pricing, although Mark agreed with the concept and encouraged Freeman to explore a way to make it work. But nothing happened. Moreover, this was literally at the tail end of the conspiracy, just two months before the FBI raid. Imposing a leadership role based on this evidence would simply be improper and unfair.[17]

## VIII. Conclusion

For the reasons stated above, we respectfully request that this Court grant a substantial downward departure from the sentencing guidelines, imposing a noncustodial sentence with home detention. If, however, the Court determines that a term of incarceration is necessary to serve as a deterrent or to meet other sentencing goals, we ask the Court to sentence Mark to no more than 36 months.

---

[17] If this Court determines that the literal language of the Guideline for role enhancement applies to Mark, a downward departure is nonetheless warranted. The various factors noted above readily distinguish his case from the "heartland," which the Commission defines as "a set of typical cases embodying the conduct that each guideline describes." U.S. Sentencing Guidelines Ch. 1 Pt. A(1)(4)(b). "When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." *Id.* This is such a case.

Case 3:16-cr-00020-CLC-HBG   Document 673   Filed 09/12/18   Page 29 of 30   PageID #: 18804

/s/ Jim Walden
Jim Walden
Georgia Winston
WALDEN MACHT & HARAN LLP
One Battery Park Plaza, 34th Floor
New York, New York 10004
(212) 335-2030
jwalden@wmhlaw.com
***Attorneys for Defendant Hazelwood***

/s/ Bradley L. Henry
Bradley L. Henry (BPR # 025447)
BREEDING HENRY BAYSAN PC
900 South Gay Street, Suite 1950
Knoxville, Tennessee 37902
(865) 670-8535
bhenry@bhblegal.com
***Attorneys for Defendant Hazelwood***