**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 3:16-CR-20 |
| v. | ) | |
| | ) | Judge Collier |
| MARK HAZELWOOD, | ) | |
| | ) | |
| Defendant. | ) | |

**EXPERT REPORT OF PHILIP E. KRUSE, C.P.A.**

This Expert Report responds to the conclusions reported upon by KraftCPAs PLLC ("Kraft") relating to the asserted customer losses attributed to Mr. Hazelwood in connection with the sentencing phase of this case. The Report contains three parts:

Part I lists my qualifications, describes the assignment, provides a factual background including the source documents upon which I relied to reach my conclusions, and an executive summary of my conclusions.

Part II contains my observations concerning the methodologies and work product underpinning Kraft's conclusions.

Part III identifies specific loss overstatements and other areas of concern on a customer-by-customer basis.

**Part I.**      <u>**Introduction and Summary of Opinions**</u>

     A.   <u>Qualifications</u>

I am a Certified Public Accountant and Managing Director with the consulting firm of Alvarez & Marsal Disputes and Investigations, LLC ("Alvarez & Marsal"). I also hold the

Certified in Financial Forensics designation of the American Institute of Certified Public Accountants. My office is located at 600 Madison Avenue, New York, New York 10022.

I have been in the public accounting and consulting professions for 35 years. Prior to joining Alvarez & Marsal in 2005, I was a Partner with Deloitte & Touche LLP where I served as the firm's leader of the corporate investigations practice. In the course of my professional practice, I have provided audit, accounting, investigative, business consulting and litigation consulting services to clients across a variety of industries. I have led dozens of engagements involving the investigation of potential fraud and corruption and the assessment of losses and damages arising from such matters. My resume is attached to this report as Exhibit 1.

### B. Assignment

I have been engaged by Walden Macht & Haran LLP, counsel to Mark Hazelwood, to respond to the conclusions reported by Kraft relating to the asserted customer losses attributed to Mr. Hazelwood in connection with the sentencing phase of this case.

In obtaining an understanding of the issues and factual background relevant to this action, and in reaching the opinions expressed herein, I have been assisted by other professionals of Alvarez & Marsal. Alvarez & Marsal is a large and respected professional services organization with offices in over 20 countries and more than 3,200 employees. In preparing this report, I and others working under my direction have reviewed numerous documents produced in this and related cases. A list of these materials is attached as Exhibit 2.

Compensation to Alvarez & Marsal, under the express terms of our engagement, is not contingent upon the substance of any conclusion or the outcome or final resolution of this case.

### C. Factual Background

Mr. Hazelwood is a former employee of Pilot Travel Centers LLC (d/b/a Pilot Flying J, "PFJ"), the largest provider of diesel fuel to over-the-road trucking companies in the United States. He was convicted on February 15, 2018 on three counts of a 14-count superseding indictment including mail fraud, wire fraud and witness tampering. The charges he was convicted of arise from an alleged scheme by Mr. Hazelwood and others employed by PFJ in its Direct Sales group to deceptively withhold discounts or rebates from certain of its diesel fuel customers.

2

The deceptions alleged in this case relate to negotiated deals for discounts on diesel fuel between PFJ and its trucking company customers. These deals generally took the form of 1) off-invoice discounts which were applied through what PFJ referred to as "direct bill" customer deals, or 2) what PFJ generally referred to as "manual rebate" adjustments which were applied the month following the occurrence of the fueling transactions, normally structured as the better of a cost-plus ("CP") discount or a retail minus ("RM") discount.

As described more fully below, Kraft relied in many respects on the work of PFJ's internal team that began working almost immediately after the raid on PFJ's corporate offices on April 15, 2013 by Federal law enforcement officials. This PFJ team included members of its internal audit department along with other PFJ employees and numerous outside contractors that were hired by PFJ to assist during a significant portion of the project. While PFJ often referred to this project as its "internal audit" project, it is important to note that the use of the term "audit" has a very specific meaning in the accounting profession with an entire body of professional standards that dictate how an audit is to be conducted. This project undertaken by PFJ immediately after the highly publicized raid on its corporate offices by law enforcement officials was highly oriented toward customer relations and customer retention. It was not an audit. I refer to this project focused on calculating customer repayments as the PFJ customer satisfaction project ("PFJCSP").

Kraft has issued its findings five different times as follows:

(1)     A March 30, 2015 report ("2015 Kraft Report," SD 1[1]) that did not state its conclusions in the body of the report, but apparently included them in an Excel file accompanying the report. That Excel file asserted $133,888,895 of customer losses attributed to 42 different PFJ employees (SD 2). No losses were attributed to Mr. Hazelwood in this file. The supporting documents attached to the 2015 Kraft Report do not provide an audit trail that would allow one to recalculate how the loss amounts were derived nor how Kraft reached its conclusions concerning attribution to the various PFJ employees. Kraft described its analysis as consisting of two phases: (a) assigning customers and specific losses to salespeople, and (b) attributing specific losses to salespeople. Kraft did not conduct its own inquiry to determine the loss amounts. Instead,

---

[1] All supporting documents ("SD") cited are attached to this report in an electronic folder that is organized in subfolders for the three sections of this report.

it accumulated the PFJCSP's results that listed customer losses on a month-by-month basis and loaded them into Kraft's database. If Kraft determined attribution of losses to a defendant for a particular customer in a particular month was warranted, the entire loss amount for that month was attributed to the defendant, generally without further analysis as to the correct loss amount that was attributable to fraud.

(2)     Interim findings issued under cover of a letter from Neal & Harwell dated June 21, 2018 (SD 3) were produced to the Defendants on June 22, 2018. ("Kraft Interim Findings"). The cover letter indicated that the U.S. Attorney's Office requested, through Neal & Harwell, that Kraft "refine and narrow" the 2015 Kraft Report to include only Defendants who were either convicted or pleaded guilty, and to attribute the same universe of customer losses using an enhanced level of required documentation to attribute those losses to the Defendants. Customer losses were attributed for February 2008 through January 2013, and the stated requirement for attributing customer losses to individual salespeople was evidence of both (a) knowledge of the discount communicated to the customer, and (b) knowledge of intent to defraud the customer. The Kraft Interim Findings attributed $23,789,936 of customer losses to Mr. Hazelwood. There was no report or summary of Kraft's methodology included in the Kraft Interim Findings; they simply contained a summary of losses by defendant and a set of documents that Kraft presumably relied upon to determine whether customer losses should be attributed to the Defendants. Kraft's supporting documents did not provide any information as to how the loss amounts were derived and similar to the 2015 Kraft Report supporting documents, Kraft did not provide an easily traceable trail of how it reached its conclusions concerning attribution of loss amounts to the Defendants. The summary of the attributed losses listed a total by customer but there was no information provided concerning how that total was calculated, such as the timeframe in which such supposed losses were incurred or the monthly amounts of losses.

(3)     The Supplemental Kraft Report, dated July 18, 2018 (SD 4), superseded the Kraft Interim Findings. It reduced attributed customer losses based on a sampling plan employed by Kraft to correct what it described as the PFJCSP bias to give "benefit-to-the-customer." Kraft's revised amount of losses attributed to Mr. Hazelwood was reduced to

$21,562,648. This reduction was based in part on the statistical sampling project to adjust for the "benefit-to-the-customer" bias (referred to by Kraft as "SVRS," an abbreviation for statistically valid random sample), through which Kraft reduced all losses by 4.39% across the board. Kraft also adjusted the base level losses for the six customers that Darren Seay testified about in the criminal trial (Kraft previously failed to adjust the losses attributed for these customers as asserted by Neal & Harwell in its June 21, 2018 letter). Similar to the Kraft Interim Findings, Kraft provided loss totals by customer but did not provide detail regarding the timeframe and monthly amounts of customer loss. Kraft also asserted in the Supplemental Kraft Report for the first time that it performed an independent review of the PFJCSP project while it was ongoing, including: 1) review of the overall audit process; 2) evaluation of the "PowerPivot" computer modeling tool used by the PFJCSP team to calculate reimbursement amounts; and 3) reconciliation of differences in the calculated reimbursement amounts within an appropriate margin of error. I have seen certain instances of Kraft's involvement in the PFJCSP project, but I have not seen any documentation supporting Kraft's conclusions about the accuracy of the PFJCSP based on any independent review.

(4)     Under cover of an email from Neal & Harwell dated July 30, 2018, Kraft provided an excel spreadsheet (the "Loss Attribution Spreadsheet") that contained summaries of customer losses by month that could be sorted by employee (SD 5). Neal & Harwell explained that the "spreadsheet was inadvertently omitted from our production dated July 18, 2018" (SD 6). This is the first time Kraft provided information concerning the monthly loss amounts by customer attributed to Mr. Hazelwood.

(5)     Under cover of a letter from the United States Attorney dated August 21, 2018, Kraft produced an addendum to its Supplemental Kraft Report to provide details of the steps taken to produce its SVRS (SD 7).

I understand the losses attributed to Mr. Hazelwood were modified again pursuant to an August 1, 2018 filing titled "Government's Notice of No Objection to Presentence Investigation Report for Defendant Hazelwood" ("Government's Loss List") (SD 8). The losses attributed to Mr. Hazelwood in this filing have been reduced to $10,833,627 gross, and $10,405,826 net of a 4.39% reduction for Kraft's SVRS to account for the "benefit-to-the-customer" bias inherent in

5

the PFJCSP project. Such losses are attributed to Mr. Hazelwood through three former PFJ employees, Arnie Ralenkotter, Brian Mosher, and John Freeman.

As noted in Exhibit 2, I have reviewed all of the Kraft reports as well as the underlying documents upon which Kraft claims to rely, including documents identified by Kraft as its "attribution documents," "SVRS documents," and "PFJ internal audit documents." I have also reviewed a report prepared by an independent accounting firm, Horne LLP, in connection with *National Trucking Reclamation Services v. Pilot Corp*. Additionally, to assist with my report, I have reviewed trial and deposition testimony (both from this case and others).

Finally, I also performed a detailed analysis of the Kraft attribution and PFJCSP documents for all customers with losses above $100,000, as well as the three additional customers Darren Seay testified about that had attributed losses below $100,000, and summarized my observations in Part III of this Report.

### D. Summary of Opinions

The following is an executive summary of my conclusions. Details on these conclusions can be found in Parts II and III of this Report.

*First*, the PFJCSP was not an audit. To my knowledge, a true audit has never been conducted to identify the loss amounts that are due to fraud.[2]

*Second*, Kraft's conclusions as to loss amount should not be given any weight because Kraft provided no support for its reliance on the PFJCSP's loss calculations.

*Third*, the PFJCSP's methods introduced biases to favor customers.

*Fourth*, Kraft's SVRS project did not account for most of those biases and cannot be relied upon to remedy them.

---

[2] I am aware of one instance in which a customer conducted its own audit to determine if it had been defrauded and concluded that it had not. That customer is not included in Mr. Hazelwood's loss calculation, but according to the 2015 Kraft Report, the PFJCSP identified that customer as having sustained losses. This is discussed in further detail below.

*Fifth*, the PFJCSP's loss calculations contain material overstatements. Some of these overstatements are quantifiable, and others are not reasonably quantifiable.

*Sixth*, as a CPA firm, Kraft was not competent to perform the attribution project for which it was engaged.

*Seventh*, Kraft made numerous attribution decisions based on subjective determinations, not objective evidence, and improperly drew legal conclusions.

*Eighth*, there are numerous instances where the basis for Kraft's attribution decision is not clear from the evidence upon which Kraft states it relied.

*Ninth*, the losses attributed to Mr. Hazelwood are materially overstated, even assuming they are properly attributed.

*Tenth*, based on the evidence I analyzed, there is at least $4.041 million (Exhibit 5) that I believe was not supported in the PFJCSP's calculation of loss due to fraud, not supported by Kraft's attribution analysis, or both. In addition, there are other customer losses where I believe the evidence strongly suggests the losses attributable to fraud are overstated, but I did not have a reasonable basis to quantify such overstatements.

Finally, this Report should be read in conjunction with a separate report by Benjamin S. Wilner, Ph.D., which addresses the statistical validity of Kraft's SVRS and contains additional conclusions.

## Part II.  Observations Concerning the PFJCSP and Kraft's Work Product

### A. The PFJCSP Was Not an Audit

As noted above, while PFJ and Kraft refer to the PFJSCP as an "internal audit," the PFJCSP did not meet the professional standards to qualify as an "audit." The use of the term "audit" has a very specific meaning in the accounting profession with an entire body of professional standards that dictate how an audit is to be conducted. It is clear that the PFJCSP—undertaken by PFJ immediately after the highly publicized raid on its corporate offices by law enforcement officials— was highly oriented toward customer relations and customer retention. The PFJCSP made payments to customers in 2013 and 2014.

7

An integral element of an "audit" is that it is designed to reach accurate conclusions about the subject matter under review—which in this case would be the amount of underpayments that PFJ believed it owed to customers. It is clear from my review of the documents that such an analysis did not occur here.

Setting aside whether the PFJCSP identified underpayments that captured amounts not due to fraud—which is the subject of later sections in this Report—the PFJCSP often did not ensure that the underpayment amount itself was accurate.

For example, there is substantial evidence that the PFJCSP often ignored its own findings. In my comments on the customers subject to my review below in Part III, I highlight several instances where the available evidence indicates that the calculation of customer losses was based on arbitrary decisions to accept the representations of the customer without documentary evidence (often referred to as "business decisions" by the PFJCSP team) and to calculate the customer repayments in a manner that was clearly not designed to segregate the effect of fraud or proven misrepresentations from the numerous other factors that impacted the calculation of customer repayments (such as appeasing the customers to keep their business). In addition to those examples in Part III, I also noted several such instances relating to customers not subject to the scope of my review. For example:

- In a June 30, 2013 email relating to Gemini Transport, the PFJCSP team discusses the lack of documentation of a deal, and they acknowledge that "others in our group think we owe him nothing since there's no specific deal". Mark McHenry recommends CP.06 and Mitch Steenrod agrees. (SD 9)

- In a July 1, 2013 email relating to Refrigerated Express, the PFJCSP agrees to accept the representations of the customer on deal terms, even though the documentary evidence suggested a lower rebate was due. (SD 10)

- In an August 31, 2013 email relating to Titan Transfer, Paul Pardue discusses problems with the cost factors historically used for this customer for which the manual rebate paid was apparently higher than the global deal in place due to improper pricing used. Pardue further discusses "a lack of writing communication between us and

the customer about the manual rebate's store pricing – we need to tell the customer we are working something out here as a business decision". (SD 11)

The payments that were the result of "business decisions" were still reflected in the loss amounts determined by the PFJCSP. Although these customers are not among the customers on the Government's Loss List, the fact that the PFJCSP was making knowingly inflated payments should have required additional scrutiny by Kraft to determine whether such decision-making infected any of the customers on the Government Lost List.

I have also not seen any evidence that the PFJCSP had protocols or other formal instructions as to how to resolve uncertainty or how to make decisions on issues in dispute or controversy, and the emails above suggest that none existed. Accordingly, they were not bound to approach similar circumstances in a consistent way and this inherently means that the outcome of the project was not designed with true accuracy as a priority, and, thus, should not be considered as reliable.

### B. Kraft Provided No Support for Its Reliance on the PFJCSP's Loss Calculations

General Standards promulgated by the American Institute of Certified Public Accountants ("AICPA"), which govern all professional services provided by CPAs, require sufficient support for any conclusions offered by a CPA:

> *Sufficient relevant data*. Obtain sufficient relevant data to afford a reasonable basis for conclusions or recommendations in relation to any professional services performed. (CS Section 100, par. .06).

Although Kraft's work product purports to state the loss amount attributed to Mr. Hazelwood, Kraft has not demonstrated that it obtained sufficient relevant data to draw the conclusion that the loss amount is correct.

In fact, Kraft initially asserted in its 2015 Kraft Report that it relied solely on the PFJCSP for quantification of losses. Kraft asserts in the Supplemental Kraft Report for the first time that it performed an independent review of the PFJCSP project during the course of the project including: (a) an independent review of the overall audit process; (b) evaluation of the "PowerPivot" computer modeling tool used by the PFJCSP team to calculate reimbursement amounts; and (b) reconciliation of differences in the calculated reimbursement amounts within an

9

appropriate margin of error. However, I am not aware that Kraft has produced any documentation supporting its conclusions about the accuracy and reliability of the PFJCSP and its related quantification of losses.

In the Supplemental Kraft Report, Kraft also indicates that it is placing reliance on the Horne Report in connection with the quantification of customer losses. I am not aware that Kraft has produced any documentation supporting its basis for such reliance. Further, I have seen no evidence that Kraft has addressed the significant concern that Horne's work was performed for a far different purpose—namely, giving comfort to class action plaintiffs that the customer repayments were adequate to make them whole—and that Horne did not consider overpayments to customers to be errors, which is a clear divergence of objectives between Kraft's engagement and the work Horne performed. Finally, Kraft did not provide Horne's work papers, or state that it independently reviewed Horne's work.

For these reasons, I conclude that Kraft's conclusions as to loss amount should not be given any weight.

### C. The PFJCSP's Methods Introduced Biases to Favor Customers

Kraft asserts that the amount of customer losses attributed to Mr. Hazelwood and other PFJ employees were based on the reimbursement amounts calculated by the PFJCSP team. Yet, in addition to the "business decisions" discussed above that resulted in the payment to customers of more than necessary based on the verifiable evidence, the PFJCSP also introduced several other biases to favor greater customer repayments. Kraft itself has acknowledged the "benefit-to-the-customer" bias inherent in the PFJCSP project. The result is that the PFJCSP arrived at monthly loss calculations that do not accurately reflect the amount of loss due to fraud.

Evidence of bias that favored higher payments to the customer ("PFJCSP Bias") is apparent both from secondary sources, such as the Horne Report and testimony about the PFJCSP, as well as from my primary source review of the PFJCSP's work.

For example, Paul Pardue, the head of the PFJCSP, in a May 15, 2015 deposition in the PFJ Rebate Litigation, described how the PFJCSP's methods were overly remunerative to customers:

the main assumption that we tried to use not only was the hierarchy of evidence but just that the deal got worse, and the customer was not made aware. That was the main assumption that we used, that we would re-price back to the previous deal. We made that assumption because we didn't have anything in writing, but also, the customer may have been made verbally aware that their deal was getting worse. But we wouldn't have been privy to those conversations, so we made the assumption that the better deal would be put back in place lacking evidence to the contrary. (SD 12, p. 59-60)

Mr. Pardue further acknowledged that the majority of customer deals were not in writing:

There were many deals that were not in writing. That's correct. Q. In fact, the majority were not in writing. Isn't that true? A. I believe that's true. (SD 12, p. 70-71)

Mr. Pardue testified the PFJCSP sometimes changed deal terms based on representations from customers without any supporting documentation:

but there was no hard and fast guidelines that we had with verbal representations from customers, but if customers presented certain information, there were times when we changed the deal to agree to the customer's representation…Generally there were times we changed our position without anything in writing from the customer. (SD 12, p. 116-117)

Mr. Pardue testified that PFJCSP would rely on a single document, regardless of its nature and reliability for documentation of deal terms:

Q. How much documentation did Pilot Flying J require before concluding whether a deal was, say, for example, cost plus two or cost plus three? What level of documentation was required? Could it be a single document?

A. It could have been a single document. Oftentimes, there were multiple documents internally, but it could have been a single document.

Q. What if you had a single document but it was just, let's say, for example, sales force notation…

A. If the deal didn't get worse and that's all we had, that would have carried the day, yes. (SD 12, p. 110-111)

Each of these are evidence of PFJCSP Bias that resulted in overstated loss amounts.

The substance of Mr. Pardue's testimony is reflected in the July 10, 2014 Criminal Enforcement Agreement (the "CEA") entered between the US Attorney's Office for the Eastern District of Tennessee and PFJ, which indicates, in part, that PFJ "issued make-good payments to the customers found by the audit process to be owed money, regardless of whether the

11

underpayment was the product of fraud or innocent mistake. [PFJ] has also issued make-good payments in situations where [PFJ] could not confirm that a customer had been notified of a prior reduction in its discount arrangement" (SD 13, p.6).

The Horne report likewise identified overpayments to customers, but, as Horne was engaged to provide comfort to the class-action plaintiffs, it did not consider overpayments to be errors. Horne further indicated "overpayments that we identified were generally caused by using a previous version of the recalculation software. As the tool was updated and customer accounts were reprocessed, it was discovered that Pilot had overpaid a number of customers." (SD 14, p. 10.) There is no indication that Horne performed any work to identify customer repayments arising from fraud.

Darren Seay, who had a senior technical role on the PFJCSP team, testified in the criminal trial in this case that the PFJCSP commonly gave the benefit of the doubt to the customers in determining repayment amounts. (SD 15, Day 15, p. 242.)

Mr. Seay further testified that the he and the PFJCSP team in general had very little interaction with the sales team employees during the course of the project, so the PFJCSP would have had little to no input from the people that had direct contact with the customers. (SD 16, Day 16, p. 51, 60-61, and 78-79.) This was a source of PFJCSP Bias that likely led to a significant overstatement of the loss amount, since it precluded the possibility of a sales employee providing valuable insight about the account that could reduce the PFJCSP's findings. For example, as noted by Mr. Pardue in the testimony quoted above, the sales employee may have been aware of reduced discount terms that were orally conveyed to the customer. During my review of the primary source materials, I noted many instances in which discount terms were conveyed orally, so this form of PFJCSP Bias could have made a significant impact on the PFJCSP's loss calculations.

I have also noted additional forms of PFJCSP Bias during my review of the primary source documents. Based on my understanding of the PFJCSP process for calculating customer losses, the PFJCSP team built a large and complicated calculation tool referred to as the PowerPivot tool. This calculation took inputs from various sources within PFJ for items like daily retail diesel fuel prices for several hundred locations; daily diesel cost from all loading locations; transaction information, including customer, gallons purchased, date purchased, and location; discount

program information by customer, with the more complex having frequent changes, and with the discount program arrangement varying by store location and/or region. I understand PFJCSP relied upon OPIS (Oil Price Information Service) for the fuel cost aspects of the required inputs. Any of these inputs used by the PFJCSP could have varied from the actual inputs used in the ordinary course of business for any number of reasons. To the extent that any of these inputs used in the PFJCSP calculations varied from the original calculations, the calculation of customer repayments would have varied as well. Because the PFJCSP did not control for the numerous relevant inputs that were not related to potential fraud, the calculations cannot be considered reliable for purposes of attributing losses to the defendants arising from fraud. For example, the PFJCSP and Kraft do not appear to have compared the fuel cost applied in the course of the PFJCSP project, to the cost actually used by PFJ at the time the rebates were first calculated. Fuel cost has a material effect on the calculation of customer repayments since most of the rebates were based on a cost-plus model, as opposed to a retail minus model where the customer was given the better of the two prices. I have identified instances of PFJCSP Bias in the way the PFJCSP determined the fuel cost.

In that regard, I understand there were two sources of cost used in the ordinary course of business for PFJ. The "industry standard" OPIS cost that was used by the PFJCSP was not accepted for customers whose paying agent was T-Check. T-Check used AXXIS as its source for fuel cost and they had a different method for determining fuel cost as compared to OPIS (SD 17, SD 18, SD 19). To the extent the PFJCSP customer repayments were all based on OPIS costing, such repayments would have been misstated for all customers that used T-Check as its paying agent (SD 20, SD 21, SD 22, SD 23, SD 24, SD 25). This would result in a greater discount for the customer, because AXXIS prices were generally higher than OPIS (SD 26).

Finally, I understand that one customer, Frozen Food Express, was a public company and engaged an independent auditor to review five years of fuel purchases from PFJ and compare them to the agreed-upon discounts to determine whether the company had been defrauded. The auditor determined that Pilot had honored all pricing agreements that were in place (SD 27). Nevertheless, the 2015 Kraft Report indicates that the PFJCSP identified losses associated with this customer. (These losses were not attributed to the defendants, possibly because the customer notified PFJ that it believed it had not been defrauded.) These facts indicate a third party, acting with

13

independence and objectivity, arrived at a different result than the PFJSCP using the same information available to the PFJCSP. I have also reviewed a Form 302, prepared by the FBI, based on its interview of Thomas S. Foltz of Foltz Trucking. The FBI summarized its interview of Mr. Foltz as follows: "Foltz Trucking has a fuel consultant and uses a fuel optimizer. Foltz further advised that everything matched on their account" (SD 28). The PFJCSP attributed $19,665 of losses relating to Foltz Trucking to Mr. Hazelwood, apparently unaware that the customer did not consider there to be any problems with their account (SD 8).

Generally speaking, it is clear from my review that the PFJCSP was focused first on dealing with the significant public relations and customer relations issues that arose for PFJ after the publicized raid on its corporate headquarters by Federal law enforcement officials. Its emphasis appears to have been oriented to customer relations and customer retention issues, and not on being as accurate as possible concerning the determination of customer repayments, or on assessing the incremental effect of potential fraud.

### D.  Kraft's SVRS Project Did Not Account for Most of the PFJCSP Biases

I believe the appropriate way to isolate the effect of intentional misrepresentations to customers would be to start with the calculation of the customer rebate as was done in the ordinary course of business by the PFJ employees responsible for such calculations. Then for each customer month that evidence of fraud is established, one should recalculate the rebate in the same manner as was done originally and using all of the same inputs except for the use of the corrected rebate deal terms so that the only issue being measured is the incremental effect of the fraud on that customer. Kraft did not conduct a comprehensive calculation to isolate the effects of the fraud. Nor did it perform a comprehensive investigation to quantify the effect of PFJCSP Bias. Instead, it used a sampling process to review the PFJCSP's findings, and extrapolated the results. The statistical work performed by Kraft is the subject of a separate report by my colleague, Benjamin S. Wilner, Ph.D. Separate and apart from Dr. Wilner's statistical analysis, the SVRS was flawed because it did not take into account most forms of PFJCSP Bias. If it had, it would have reduced the losses by a far greater amount.

Notably, Kraft does not claim that its SVRS project removed all forms of PFJCSP Bias. Kraft states in its Supplemental Report it "selected a statistically valid random sample (SVRS) of

14

customers' losses to address the [PFJCSP's] 'benefit-to-the-customer' methodology" (SD 4, p. 5). But Kraft defines the term "benefit-to-the-customer methodology" as "an approach in the audit of accounts by which discrepancies in the discount terms promised to customers were resolved to the benefit of customers" (SD 4, p. 2). This is far too limited to account for all forms of PFJCSP Bias, as I describe below.

Kraft states that it "used a holistic and objective business approach limiting the benefit of the doubt to the customer and searched historical documents for additional communication of customer discounts" (SD 4, p. 5). In other words, Kraft's SVRS was focused on finding additional documents that may not have been used by the PFJCSP to assess whether the customer received a "benefit of the doubt' from the available documents. Accordingly, Kraft ignored several other sources of PFJCSP Bias that have been previously described. For example:

- As characterized by the head of the PFJCSP team, Paul Pardue, the "main assumption" the PFJCSP used was to re-price back to the previous deal if the rebate terms got worse for the customer. Mr. Pardue acknowledged that since most of the deals were not in writing, the customer could have been made verbally aware of the revised deal. But in the absence of a document concerning the change in the deal, they reverted to the better deal for the customer (SD 12, p. 60). This form of PFJCSP Bias could not have been picked up by Kraft's SVRS since they were looking for documents available to the PFJCSP team, failing to account for oral communications with customers.

- Mr. Pardue further testified that most of the customer deals were not in writing and based on my review of the available evidence, there was often significant ambiguity about the true terms of the deal with a customer (SD 12, p. 70-71). Mr. Pardue testified they often changed a deal based on representations made by the customer (SD 12, p. 116-117). It is not clear how this inherent PFJCSP Bias was addressed in Kraft's SVRS.

- Mr. Pardue acknowledged that they gave equal weight to any available evidence in determining the deal terms with a customer, regardless of the reliability of the evidence (SD 12, p. 115-117). This was a form of PFJCSP Bias and it is not clear that Kraft addressed it in its SVRS.

- Mr. Seay testified that he and the PFJCSP had little to no access to the sales staff that would have had the most intimate knowledge about the agreements with customers

15

(SD 16, p. 78-79). Accordingly, the PFJCSP did not have the benefit of potentially exculpatory input about the customer deals. This inherent PFJCSP Bias could not have been measured by Kraft's SVRS.

- As stated previously, there is no indication that the PFJCSP calculated its customer repayments in a way that was designed to delineate the effect of fraud as opposed to other differences in the many inputs to a rebate calculation. As explained in the CEA between PFJ and the U.S. Attorney's Office, PFJ issued make-good payments to customers regardless of whether the payment was caused by fraud or innocent mistake. Since the PFJCSP project and Kraft's SVRS was not designed to parse the effect of fraud from innocent mistake in those payments deemed attributable to fraud, the SVRS could not have calculated this form of PFJCSP Bias.

- Kraft failed to address the source of customer overpayments identified by Horne in its June 12, 2014 report. As described previously, Horne noted that PFJ overpaid many customers due to flaws in the PowerPivot calculation tool during the PFJCSP. It is clear that Kraft did not correct for this form of overpayments to customers.

- There is no indication that Kraft addressed overpayments that were the result of "business decisions" to pay the customer more than supported by the underlying documentation.

PFJCSP Bias was pervasive within the 36 customers for which I conducted a thorough review of the underlying primary source materials. I have identified at least 19 customers where PFJCSP Bias may have played a significant role, and additional customers where PFJCSP Bias may have played at least some role. Of the 19 customers, 11 overlapped with Kraft's SVRS sample, and for many of those, Kraft did not flag the loss amount as overstated, as it should have. In some cases, Kraft's underlying data shows that it believed the loss amount might have been *understated*. Because Kraft's SVRS project only looked for examples of contradictory discount amounts in a given month, it did not identify or account for the other biases and errors. In Part III of this Report, I note several examples where I found that the PFJCSP's decisions were likely impacted by PFJCSP Bias, and compared them to Kraft's SVRS findings. I also noted where there was likely PFJCSP Bias that was never tested by Kraft's SVRS methodology. I conclude that Kraft's 4.39%

16

reduction significantly underestimates the true impact of PFJCSP Bias and should not be credited by an outside observer or fact finder.

### E. The PFJCSP Loss Calculations Contain Material Overstatements

As a result of the above, I have concluded that the PFJCSP loss amounts are materially overstated. In Part III of my Report, I identify some specific instances of PFJCSP loss overstatements. Some of these overstatement amounts are quantifiable, and they are listed in Exhibit 5. Other amounts are not quantifiable given the constraints of time and source documents I have been provided. I believe the unquantifiable overstatements are likely significant. As noted above, I believe the best way to identify the loss amount that is due exclusively to fraud would be to conduct an investigation that is designed to isolate the effects of fraud.

### F. As a CPA Firm, Kraft Was Not Competent to Perform its Attribution Project

Standards for independent auditors promulgated by the AICPA make clear that CPAs do not have the requisite competency to make conclusions concerning illegal acts, including fraud:

> Although the auditor may suspect or, in rare cases, identify the occurrence of fraud, the auditor does not make legal determinations of whether fraud has actually occurred. (AU-C Section 240, Consideration of Fraud in a Financial Statement Audit, par. .03).

> Whether an act constitutes noncompliance with laws and regulations is a matter for legal determination, which ordinarily is beyond the auditor's professional competence to determine. Nevertheless, the auditor's training, experience, and understanding of the entity and its industry or sector may provide a basis to recognize that some acts coming to the auditor's attention may constitute noncompliance with laws and regulations. (AU-C Section 250, Consideration of Laws and Regulations in an Audit of Financial Statements, par. A5).

In other words, while auditors are trained to be on alert for the occurrence of illegality and fraud, they are not qualified to make legal conclusions or to undertake a project in which the sole purpose is to make determinations about whether fraud occurred.

Kraft asserts that it did not purport to substitute its judgement for the trier of fact in determining the "mens rea", or intent of the defendants—but it is unavoidable that this is the very nature of their work in this case. Kraft described its analysis as consisting of reviewing documents to identify "documentation of intent" and performing an "intent analysis." Kraft's supporting

17

documentation for attribution to the defendants includes a short narrative description of the documents upon which they rely for attribution of loss, along with various documents that appear to have been gathered from the PFJCSP project documentation or provided by the U.S. Attorney. The narrative documents—which are Kraft's work product—summarize the documents supporting a determination that the "intent analysis" was satisfied, and, if so, draw the conclusion to attribute losses to defendants. Additionally, in its 2015 Kraft Report, Kraft states that it "inferred participation based on the sales representatives' documented patterns of behavior." (SD 1, p. 6). It is inescapable that Kraft's attribution project required Kraft to determine intent and to draw legal conclusions.

I have not seen further explanations of how and on what basis Kraft made these inferences, or what Kraft's grounds were to allow it to perform this project.

AICPA General Standards, which provide the basic standards that govern all professional services performed by CPAs, include in relevant part the following standard:

> *Professional competence*. Undertake only those professional services that the member or the member's firm can reasonably expect to be completed with professional competence. (CS Section 100, par. 06).

Accordingly, it is my view that Kraft should not have accepted this assignment, and there is no basis to conclude that Kraft competently performed the task of determining which customer losses to attribute to Mr. Hazelwood.

G. Kraft Made Subjective Determinations and Drew Legal Conclusions

Kraft made numerous attribution decisions based on subjective determinations that required it to draw legal conclusions.

Kraft's reports outline the test it developed to determine whether to attribute losses to a defendant. The test has two parts, and, with only some exceptions, both are required to be met in order to attribute losses to a defendant. The first is that the defendant had "knowledge of the discount communicated to the customer," and the second is the defendant had "knowledge of intent to defraud the customer" (SD 4, p. 2). Supervisors, including Mr. Hazelwood, were attributed the losses of their subordinates.

Based on my review of this material for many of the customers, it is generally very difficult to assess the specific basis for Kraft's attribution to the various defendants. In many instances, it is not evident that Kraft's two-part attribution test could be satisfied without inferring certain facts to have occurred. For example, although the first part of the attribution test requires that the defendant had "knowledge of the discount communicated to the customer," Kraft often assigns attribution without identifying a communication of a discount to the customer, and instead makes an inference from a document that the communication likely occurred. In Part III of my Report, below, I have identified some of the specific instances where Kraft made such inferences. In my view, these examples constitute a violation of Kraft's obligation to rely on objective data, and indicate Kraft exercised its own subjective judgment and made legal conclusions in the process. In those instances, I take no position on whether the loss was the result of fraud. I conclude, however, that only a trier of fact or a legal expert is competent to make those determinations, and that Kraft was not competent to do so. Accordingly, I believe Kraft's determinations in those instances are unsupportable and therefore should be assumed to be erroneous.

### H. The Losses Attributed to Mr. Hazelwood are Materially Overstated

I have reviewed the Kraft attribution documents and the PFJCSP summary documents for all 33 customers with losses attributed to Mr. Hazelwood over $100,000, along with three other customers with losses below $100,000 which Darren Seay testified at trial. This selection was based on the Government's Lost List, produced on August 1, 2018. My observations are noted below in Part III. There are four problems with the way in which Kraft executed its attribution analysis.

First, Kraft's attribution documents generally fail to clearly show its basis for attribution of losses for the entire attribution period. The 2015 Kraft Report (SD 1, p. 7) states:

> "The commencement and timing of attributing customer losses [footnote omitted] varied based on customer type. Manual rebate losses were attributed for the month prior to the communication; direct bill losses were attributed in the month subsequent to the communication"

In other words, Kraft states that it used documentation to determine the beginning of an attribution period, but apparently never considered whether changes in circumstances should warrant an end point to the attribution period. Kraft does not address its approach to continuing

the attribution period and what, if anything, was required for continued attribution. Moreover, Kraft's attribution documents generally contain attribution evidence for a very limited number of months of the total attribution period. Kraft should have continued its review through the entirety of the attribution period, especially in cases where the discount terms changed over time or if new discounts were communicated to the customer.

Second, as noted several times elsewhere in this Report, in many cases the attribution documents arguably do not meet the two-prong requirements adopted by Kraft that the defendant had to have knowledge of the deal communicated to the customer *and* the defendant had to have demonstrated intent to defraud the customer.

Third, the attribution documents also often indicate the attributed losses were materially overstated based on the details in the documents themselves. These details generally took the form of "Mosher Spreadsheets," where Brian Mosher employed a method of using Excel spreadsheets to provide input to his staff to reduce the originally calculated rebate with his "Mosher adjustment" or sometimes called a "Brian adjustment." In the case of many customers for which Kraft identified a Mosher Spreadsheet, Kraft did not apply the two-part attribution test, relying instead on the existence of the Mosher Spreadsheet to determine that the customer was defrauded and ending the analysis there. In nearly all of those instances, the fraudulent reduction listed in the Mosher Spreadsheets are lower—far lower—than the attributed loss amount. On an aggregate basis, for those customers that had these details available in Kraft's attribution documents, the attributed customer losses were overstated by 46.5%. (See Exhibit 3.) To the extent that the originally calculated rebate in these spreadsheets may not have been accurate as a starting point, it is generally clear that Kraft did not seek further evidence to support loss attribution beyond what is contained on the face of the spreadsheets. One of Kraft's stated exceptions to the two-pronged attribution test was that because Mosher testified at trial that he had defrauded certain customers, the customer losses were attributed to the defendants regardless of whether both attribution tests were met. But in most instances,[3] Mosher did not testify that he defrauded a particular customer. His testimony stated that he defrauded customers generally by changing the rebate amount on his Mosher Spreadsheet. Kraft apparently extends this testimony to mean that if a customer appeared

---

[3] The exceptions to this include the following customers: JTL, Amerifreight, Halvor Lines, Hayes Transport, Marathon Electric, Ryder, Allied, and Schrock.

on the Mosher Spreadsheet, then the customer had been defrauded for _all_ losses, both for the losses that appeared on the Spreadsheets on their face, and also for the losses that resulted from other reasons. I believe the Mosher Spreadsheets should not have been used to justify losses in excess of the rebate reductions documented by Mosher in the spreadsheets.

Fourth, as noted above, the PFJCSP and Kraft did not clearly document the deal changes and deal communications that fed into the calculation of customer repayments in a way that distinguished between fraud and other changes that could have been the product of errors, miscommunications, or legitimate changes where no evidence for fraud was established, even though underlying documents confirm such events for a number of customers. Accordingly, the approach used by the PFJCSP and relied upon by Kraft assumes all customer repayments during its assigned attribution period are attributable losses without providing clear documentation of the losses resulting from fraud versus losses attributable to other issues. For example, in many instances summarized below in Part III of this Report, there were multiple deal changes during the attribution period and the PFJCSP and Kraft generally did not provide documentation that all changes were the result of fraud or misrepresentations to customers. In my review of many of the PFJCSP documents, I found it very difficult, and in many cases impossible, to follow the basis for decisions made by the team and the documentary basis for the assumptions used in the calculation of losses. There were often multiple versions of the team's checklist summary and calculation sheets summarizing the calculation of customer loss and the PFJCSP team did not identify final versus interim versions of this material.

**Part III.      Customer-by-Customer Observations**

As noted above, I have reviewed the Kraft attribution documents and the PFJCSP summary documents for all 33 customers with losses attributed to Mr. Hazelwood over $100,000, along with three other customers with losses below $100,000 that Darren Seay testified about at trial. This selection was based on the currently attributed losses as described in the Government's Loss List.

Exhibit 5 summarizes the quantifiable overstatement of attributed losses from my review of these 36 customers, which covers $8.959 million of the $10.884 million of gross losses

attributed to Mr. Hazelwood (82.3%)[4]. Based on the evidence I have analyzed, I have identified loss overstatements aggregating to at least $4.041 million that I believe are improperly calculated, improperly attributed to Mr. Hazelwood, or both. These potential overstatements include: (a) instances where there is evidence the PFJCSP erred in its calculation; (b) PFJCSP calculations that are not supported by evidence, or that are influenced by PFJCSP Bias; and (c) attribution determinations Kraft made that are not adequately supported.

There are other customer losses where I believe the evidence strongly suggests the losses attributable to fraud are overstated, but I did not have a reasonable basis to quantify such overstatements. Many of these loss overstatements are the result of PFJCSP Bias. A summary of my observations and analysis of the attribution and PFJCSP documents for these customers follows (all references to customer losses are gross amounts, before Kraft's SVRS adjustment). Based on the analysis below and summarized in Exhibit 5, Kraft's analysis (putting aside all of the methodology flaws and unquantifiable errors) should have yielded a loss of no more than $6.843 million, which would then require reduction by a valid method to account for the PFJCSP Bias.

1. *Cassens Transport Co.; $386,896 via Ralenkotter; October 2008 through June 2012 for manual rebates*

Kraft allocated $386,896 in losses to Mr. Hazelwood for Cassens Transport Co. ("Cassens"). It did so despite the fact that PFJCSP was unable to determine the actual amount of losses due to the lack of clarity of the deal terms for Cassens based on the evidentiary material.

PFJCSP made two clear conclusions. First, as of November 11, 2008, Cassens had an approved discount of CP.05, effective October 1, 2008 (Cassens SD 1). As of April 2013, Cassens had an approved discount of CP.00 (Cassens SD 1). What happened in between these events was not documented and was inconsistent with the deal the client believed they had, according to PFJCSP's own estimation (the client believed they were at CP.035) (Cassens SD 1). Kraft cites

---

[4] At the request of Walden Macht & Haran, and based on the information available, we have estimated that the total rebates and discounts paid to the customers attributed to Mr. Hazelwood during the attribution period are approximately $82 million. Accordingly, the net losses attributed to Mr. Hazelwood are approximately 12.7% of the total rebates and discounted paid.

an email from November 2008, in which Ralenkotter told Janet Welch: "Calculate Cassens on a monthly funded at CP.05. If he asks we are doing CP.02 monthly." (Cassens SD 2). Kraft also cites a spreadsheet from Brian Mosher (who may have taken over the account from Ralenkotter), in which he appears to have reduced the June 2012 discount by $3,118[5] (Cassens SD 3). The PFJCSP calculated the loss for this month as $47,586 – so customer loss is overstated by 93.4 % based on the evidence Kraft relied upon for attribution. It is not clear what basis Kraft had for its attribution between October 2008 and June 2012 (since the November 2008 email does not meet the two-prong test for attribution), which constitutes $339,310 of the attributed losses (See Exhibit 3). We found no other Mosher Spreadsheets listing Cassens during the attribution period.

Based on my review of the PFJCSP documents (Cassens SD 1), there are more questions raised about the attribution and calculation of customer losses and the arbitrary nature of many of the decisions made in the course of the PFJCSP project from a June 26, 2013 email from Paul Pardue, who led the PFJCSP audit team:

> Cassens is a lot like K&B and Shippers/Sharkey in that there is very little documented. We ran the deal at CP .02 because Arnie told Janet to run the deal at CP .05 but if they ever call and ask about their deal tell them it is CP .02. So we thought the deal was CP .02. I called the customer and asked them about their deal and they said it was CP .035 back from day one to 3/1/2013 when they went to CP .00. Run at CP .035 we owe them 449,674; run at CP .02 we owe them $541,838. I agree it seems silly to run at CP .02 when they at least agree it is .035 but we do have something documented at .02 and nothing documented at .035. He doesn't know much about the .035 and how it originated. It is just a business decision like K&B and Shippers and Cassens. Not anything documented. (Cassens SD 1.)

---

[5] Based on a filing by the Government on September 9, 2008, I understand they assert this is a misinterpretation of the Mosher Spreadsheet and that Mosher did not take over the Cassens account until after June 2012. While it is possible Mosher did not intend to adjust the rebate for this amount as the spreadsheet suggests, this is relevant because Kraft offers this as attribution evidence and did not attempt to compare the potential adjustment by Mosher to the attributed loss for that month. I further note that there was an error by PFJ resulting in the failure to pay the rebate for June 2012 of $42,802, as described below. The Government's September 9 filing does not acknowledge this error that was unrelated to alleged fraud.

The reply to this email from Mitch Steenrod was: "I think the right thing to do is pay them $500,000 plus interest. We should land in the middle. Just my opinion." (Cassens SD 1).

This "methodology" is also captured in the PFJCSP Customer Review/Checklist itself: "Since we do have documentation for CP.02, we felt this was a business decision. Mitch Steenrod made the decision to pay them $500,000 plus interest." (Cassens SD 1).

The PFJCSP Checklist also notes that, "[t]o make it come out on a spreadsheet we arrived at $501,800.57." (Cassens SD 1.) This reflects that the PFJCSP re-calculated the discount with new cost and rebate inputs in order for the rebate recalculation software to yield a result close to $500,000. This means that an additional $52,127 ($501,801-$449,674) for which there was not adequate evidence to establish fraud, was included within the month-by-month loss data that was supplied to Kraft, which Kraft ingested into its own model for loss attributions, and which Kraft then concluded was fraud-related losses in its various reports.

We have found no document or spreadsheet calculating the effect of alleged fraud as distinguished from other factors not thought to have resulted from misrepresentations to the customer.

But we found additional problems with PFJCSP's analysis, which were nowhere corrected in the Kraft allocation report. For example, another email in the PFJCSP documents, dated May 21, 2013, from Paul Pardue to Arnie Ralenkotter and Janet Welch, indicates that a significant portion of the payment to Cassens arose from an inadvertent failure to send the rebate checks for three months:

> So far I am showing we owe them $284,000, mainly on missing the payment for February 2012 for $20,644.12 and we missed the payment for June 2012 for $42,802.37 and the January 2012 amount of $17,937.41. So that is $81,384.40 of the shortfall (Cassens SD 1, p. 58).

Kraft does not appear to have taken into account the customer losses arising from the inadvertent errors.

In summary, for Cassens, the attributed losses are apparently overstated by various bases including: 1) $81,384 from including the apparent error from missing payments; 2) approximately

$52,127 from the arbitrary decision to pay an amount between the deal the PFJCSP thought was in place and the deal the customer thought was in place; and 3) depending on the legal conclusions one can draw from the attribution support, $339,310 from the lack of attribution evidence for the first 44 months of the attribution period.

2. *Central Transport, LLC (Fleet Fuel); $256,753 via Ralenkotter; March 2008 through April 2012 for direct bill*

Kraft allocated $256,753 in losses to Mr. Hazelwood for Central Transport, LLC ("Central"). Kraft noted that this account had two account numbers—one in the name of PAM Transport and one in the name of Fleet Fuel—explaining "it appears both accounts should have had the same deals" (Central SD 1). For its part, PFJCSP found that Central's discount was changed at various times, and that in three instances internal notes reflected that the customer was not told of the change (Central SD 2). The evidentiary material does not indicate whether these changes applied to one or both accounts. The evidentiary material does not reflect an affirmative misrepresentation to the customer. Moreover, the Kraft analysis ignored PFJCSP's conclusion that various mistakes were evident in PFJ's systems: "This account had 'deals not in Ascend' this was caused by entries into Ascend being done improperly, instead of making new lines for the new deal, they copy and pasted on top of older deals. . ." (Central SD 2). Neither PFJCSP nor Kraft quantify the extent to which these and other noted errors impact the overall loss assessment in either or both accounts. Moreover, neither report included a description of how or why the deals were changed over time, as that information had been (by PFJCSP's description) over-written.

Neither PFJCSP nor Kraft assessed other evidence, which may provide some context for some of the deal changes. For example, in a May 14, 2008 email from Janet Welch to Ralenkotter, there is a reflection that rebates were apparently adjusted due to decreased volume activity: "Fleet Fuel's gallons fell even further. They are 14,663 this week from 37,005, 49,394 and 50,078." (Central SD 3). Kraft's SVRS did not reduce the loss amounts for Central, which may reflect a failure of the SVRS methodology to account for all forms of PFJCSP Bias.

Moreover, another email dated May 9, 2012 states that Fleet Fuel was one of several customers that received discounts due to a mistake:

25

> Joan Minge is going into Ascend this morning (probably effective tomorrow or Friday) to remove the capability of having a discount or cost plus on direct bill for all gasoline products. We are making the change at this level because it can be done quickly, but will prevent us from setting up any gasoline discounts in the future. Some of the customers who have been receiving discounts by default (mistake) may call when they stop receiving these. Be prepared to explain that it was a mistake that they ever received discounts on gasoline. Because of the way Joan is correcting this, we cannot set them up with a discount without a lot of programming and time and it is not on the schedule to be done. It is up to you to discourage it if needed. (Central SD 4.)

Accordingly, depending on the legal conclusion that can be drawn from the available evidence, this entire amount of customer losses may be improperly attributed.

### 3. Dana Transport; $194,854 via Ralenkotter; February 2012 through January 2013 for direct bill

Kraft allocated $194,854 in losses to Mr. Hazelwood for Dana Transport ("Dana"). Kraft reviewed and summarized Dana along with Liquid Transport, an affiliate of Dana. Kraft attributed losses for Dana but did not attribute losses for Liquid Transport and the basis for this distinction is not clear from Kraft's attribution summary other than the fact that Ralenkotter and Janet Welch referred to Dana in their plea agreements. (Dana SD 1, Dana SD 2). Ralenkotter's plea agreement indicated that he caused a spreadsheet to be sent with a deceptively reduced rebate for February 2012 (Dana SD 3), and while this appears to constitute Kraft's basis for starting the attribution period in February 2012, Kraft did not specify its basis for the attribution period. Welch's plea agreement states that she caused numerous deceptively reduced rebate checks to be sent to Dana Transport but there were no details provided (Dana SD 4).

The remaining attribution documents relied upon by Kraft were difficult to follow and do not clearly delineate the specifics of the misrepresentations made to the customer. The PFJCSP calculated the loss based on CP.01/RM.05 (Dana SD 5) and this agrees with an offer letter dated July 17, 2008 (Dana SD 6). Assuming the misrepresentation by Ralenkotter and Welch relate to the full attribution period, the calculated loss may be appropriately attributed.

### 4. Dick Lavy; $183,626 via Ralenkotter; February 2008 through January 2013 for direct bill

Kraft allocated $183,626 in losses to Mr. Hazelwood for Dick Lavy. However, the PFJCSP Company Review Checklist, which is the work product produced by the PFJCSP, indicates that

the "amount owed" is only $37 (Lavy SD 1). That document also indicates that, in 2010, PFJ sent the customer a significant rebate check to make up for earlier missed payments. There is no further PFJCSP Company Review Checklist to explain the greater amount.

Additionally, the attribution documents relied upon by Kraft appear to indicate a legitimate basis for the price reduction. The written agreement with the customer included in the attribution documents is a June 2006 letter offering the better of CP.025 or RM.04 (Lavy SD 2). The letter further states: "This offer will remain in effect for a minimum of 4 months. After 4 month (sic) we will re-evaluate to determine the effectiveness of the pricing in increasing volume." (Lavy SD 2.) Based on Kraft's attribution summary, the deal first changed in February 2007 (after the four-month period had expired) to CP.02 "but no customer communication was found." (Lavy SD 3.) Kraft appears to attribute losses based on a November 2007 email where Ralenkotter instructs Welch to increase the CP by .01 and that he was not notifying the customer (Lavy SD 4, Lavy SD 5). But the terms of the initial deal with the customer allowed for changes in pricing based on volume trends and this was not taken into account in Kraft's assessment of fraud. Kraft does not account for the fact that PFJ may have been permitted to reduce the discount, based on volume of sales. At the time the change was made in November 2007 the monthly gallons had been trending down from a high of over 60,000 gallons in the March to May 2007 period, down to 40,000 to 50,000 gallons prior to the change (Lavy SD 6). Therefore, PFJ may have had a legitimate basis for reducing or modifying the rebate deal based on the available evidence, raising a question whether losses should have been attributed at all for Dick Lavy. Failure to acknowledge this legitimate basis for a rebate reduction was also a form of PFJCSP Bias, but Kraft's SVRS data reflects that Kraft did not identify benefit-to-the-customer bias for this customer.

Kraft also cites a Ralenkotter trip report from December 2007 (but acknowledges the suggested CP increase was not implemented) (Lavy SD 7) and a Sales Force note from February 2008 indicating the intent to increase pricing to CP .045 without notifying the customer. (Lavy SD 8) However, it is unclear from the direct bill account reconciliation in Kraft's attribution documents what the terms of the calculation were based on (Lavy 6).

*5.  Equity Transportation; $224,362 via Ralenkotter; February 2008 through January 2013 for direct bill*

Kraft allocated $224,362 in losses to Mr. Hazelwood for Equity Transportation.  There is an August 2006 Salesforce note stating: "added CP to Brad's deal. Changed all CP to at least .04. Brad thinks its CP.03" (Equity SD 1).  Kraft also refers to an April 2008 email from Welch where she states; "do not send CP pricing customer thinks it's CP.01" (Equity SD 2); and a July 2008 email from Welch stating, "the customer doesn't know we are changing it." (Equity SD 3.)

However, the deal changed after 2008.  In December 2009, for example, PFJ improved the discount, to CP $0.005, for a number of specific locations (Equity SD 4, Equity SD 5).  In January 2011, Ralenkotter emailed the customer a deal of RM .05, and then PFJ in fact did enter a change form to make the deal the better of better of RM $0.05 and CP $0.03 off invoice (Equity SD 6, Equity SD 7).  In January 2012, Welch informed the customer that the discount was being changed to CP0 or RM.05, and that all Illinois locations were to be CP0 or RM.12, and then submitted a change form with those same discounts (Equity SD 8, Equity SD 9).

The PFJCSP did not appear to account for the truthful representation to the customer concerning the CP deal in January 2012.  Kraft sampled this customer for the SVRS.  It chose to review October 2011, which was after two of these truthful communications to the customer.  Nevertheless, Kraft's SVRS data reflects only a 4.8% overstatement (losses of $5,500 reduced by $267), which I believe likely underestimates the true loss overstatement.

This is an example that reflects that Kraft's method of ending its analysis after determining the starting date for attribution, without identifying an end date for attribution, was flawed.  While it seems clear in this case that portions of the loss should not have been attributed to the Defendants, Kraft attributes the entire period (February 2008 to January 2013) to Mr. Hazelwood.

*6.  Falcon Transport Co.; $298,786 via Ralenkotter; February 2008 through January 2013 for direct bill*

Kraft allocated $298,786 in losses to Mr. Hazelwood for Falcon Transport Co. ("Falcon").  Kraft's attribution documents are from December 2007, November 2008, and January 2009.  The

December 2007 document is outside the attribution period and it suggests a misrepresentation to the customer about the pricing at three locations out of at least 57 total locations (Falcon SD 1, Falcon SD 2). Kraft's attribution summary suggests the customer pricing became more favorable for the customer between December 2007 and November 2008 (having gone from CP.02 to CP.01) (Falcon SD 3). It is not clear whether this more favorable pricing to the customer was factored into the PFJCSP calculation of customer repayment based on the documents produced by Kraft.

Finally, the PFJCSP documents reflect an email, dated August 28, 2009, in which Falcon stated that it was their goal "to achieve the entire discount." (Falcon SD 4.) This indicates that there were terms that the customer needed to meet in order to get the entire discount. It is not clear that the PFJCSP took this into account (possibly reflecting PFJCSP Bias), or that Kraft considered it in its attribution determination.

7. *Midwest Logistics Systems; $432,815 via Ralenkotter; February 2009 through January 2013 for manual rebates*

Kraft allocated $432,815 in losses to Mr. Hazelwood for Midwest Logistics Systems ("Midwest Logistics"). I believe that most of this should not have been attributed to him.

The attribution documents cited by Kraft for this customer include two examples which appear to be one-off issues and do not seem to represent an intention to change the rebate during the entire loss period. Based on my review of the PFJCSP documents (Midwest SD 1), I noted no evidence of a systematic attempt to misrepresent the rebate deal to Midwest Logistics.

There is evidence of the actual rebate reduction for two months, February and July 2009, where the attributed loss appears to be overstated by 30.8% based on the evidence Kraft relied upon. However, for the February 2009 rebate reduction, Kraft cited evidence suggesting the rebate was reduced from $79,093 to $66,979 (Midwest SD 2, Midwest SD 3), but they do not have evidence demonstrating that the rebate reduction was a result of fraud (as opposed to correcting a previous error) or even that Ralenkotter directed the rebate reduction to occur. Therefore, the basis for attributing this amount to Mr. Hazelwood is unsupported. I noted an email from the customer, dated August 15, 2012, where it states: "We ask that you give us the best price you can" (Midwest SD 4). This suggests there may not have been a binding agreement in place.

29

I noted two different versions of the Company Review/Checklist reflecting different amounts owed to Midwest Logistics with no apparent reason noted for the differences ($452,059.87 and $590,727.60). This is a customer example with apparent PFJCSP Bias. Yet, when Kraft sampled Midwest Logistics in December 2012 for its SVRS analysis, it did not reduce the losses, suggesting that that SVRS significantly understates the impact that benefit-to-the-customer bias played in increasing the loss amounts.

Based on the above, other than the $10,000 rebate adjustment in July 2009 (Midwest SD 5), the basis of the remaining $422,815 of attributed loss for this customer is not supported based on my review of the available evidence put forth by Kraft.

8. *R&L Carriers; $196,420 via Ralenkotter; February 2008 through January 2013 for direct bill*

Kraft allocated $196,420 in losses to Mr. Hazelwood for R&L Carriers ("R&L"). Kraft bases its attribution of losses on two changes to the customer deal which were apparently not communicated with the customer. The written customer deal was made in May 2007 at the better of CP.015 or RM.05, but Ralenkotter instructed Janet Welch to input the deal at CP.025 (R&L SD 1, R&L SD 2). Then, in January 2008, Ralenkotter instructed Welch to increase the CP by another .01 (R&L SD 3). However, in January 2009, PFJ told the customer that its discount was better of CP $0.045 and RM $0.05, which matches a PFJ internal Change Form submitted in September 2008 (R&L SD 4, R&L SD 5, R&L SD 6, R&L SD 7). Once this accurate representation to the customer was identified, Kraft should have ended the attribution period, and not attributed any further losses without satisfying the two-part attribution test again for any subsequent period. Moreover, this example further highlights impact of Kraft's failure to determine an end date to the attribution period.

The PFJCSP calculated the loss based on an assumed deal of CM0.015 or RM0.05 (R&L SD 8), but that is inconsistent with the discount terms (less favorable to the customer) that were communicated to the customer in January 2009 (R&L SD 9). The CM0.015 or RM0.05 terms were apparently based on an offer letter in May 2009, but that offer was contingent on an agreement for R&L's purchases along with three other R&L-affiliated companies, and there is no evidence that this offer was accepted by R&L and its affiliates (R&L SD 10, SD 11). In fact, there

is evidence that negotiation for R&L and its affiliates' combined fuel purchases continued into July 2009, which suggests R&L did not accept the May 2009 offer (R&L SD 12). The PFJCSP's failure to account for this is an example of PFJCSP Bias, but Kraft did not sample R&L in its SVRS analysis.

Finally, in my review of the calculation of customer losses by the PFJCSP, it is unclear how the calculation was done. The monthly losses attributed for the seven months between February 2008 to August 2008 averaged $439. Then, for reasons that are not clear from Kraft's documents, the average monthly losses for the remaining 53 months averaged $3,648 (R&L SD 13).

### 9. *Amerifreight; $7,042 via Mosher; February 2011 for manual rebate*

Kraft allocated $7,042 in losses to Mr. Hazelwood for Amerifreight, which was one of the six customers Darren Seay testified about at trial and, accordingly, its customer losses were based on inputs provided by the U.S. Attorney's Office. I understand the evidence relied upon for the inputs could not be disclosed to Mr. Seay due to grand jury secrecy rules. Kraft's attribution documents include a July 2010 Mosher spreadsheet and a February 2011 email that may serve as the primary attribution evidence, since it coincides with the month attributed in the Seay testimony exhibit (Amerifreight SD 1, SD 2). This email discusses a deal at cost minus .03, which is what the rebate computed by Seay was based on, but it does not appear to directly suggest a misrepresentation to the customer (Amerifreight SD 2). While Seay testified as to the loss amount, he did not testify as to whether that customer had been affected by fraud.

The February 10, 2011 offer to Amerifreight at CM.03/RM.05 stated: "Pilot Flying J is anticipating all your gallons every month" (Amerifreight SD 3). I have not seen evidence that Amerifreight complied with this provision.

### 10. *Benefit Trucking; $171,793 via Mosher; July 2010 through June 2012 for manual rebates*

Kraft allocated $171,793 in losses to Mr. Hazelwood for Benefit Trucking ("Benefit"). Kraft's attribution documents do not include evidence of any customer communications, but they rely on the Mosher Spreadsheet exception to the two-prong attribution test. Kraft cites only one month, July 2010, of evidence for attribution over a 24-month period (Benefit SD 1). The losses attributed to Mr. Hazelwood for July 2010 are approximately equal to the implied customer loss

31

from this Mosher spreadsheet, with an overstatement of the attributed loss of $18, or .3% (See Exhibit 3). We found a total of 19 months of Mosher Spreadsheets where the implied customer loss in the spreadsheets show the losses attributed by Kraft/PFJCSP are overstated by 25.5%, or $29,736. This extrapolates to a total potential overstatement of losses of $43,721 (Exhibit 4).

11. *Bison Transport; $231,188 via Mosher; February 2011 through February 2012 for manual rebates*

Kraft allocated $231,188 in losses to Mr. Hazelwood for Bison Transport ("Bison"). I noted no evidence of an overt misrepresentation to the customer. Kraft is presumably relying on its exception to meet both prongs of the attribution test for the Mosher Spreadsheets. Kraft cites to a spreadsheet that relates to December 2010, which is outside the loss attribution period (Bison SD 1). We found a total of 10 months of Mosher Spreadsheets where the implied customer loss in the spreadsheets show the losses attributed by Kraft/PFJCSP are overstated by 11.7%, or $22,002. This extrapolates to a total potential overstatement of losses of $27,137 (Exhibit 4).

I also noted that a PFJCSP document included in Kraft's SVRS testing for Bison states: "Verified PF [Price Fetch] archive appears to match the listed deal in Salesforce" (Bison SD 2). The deal quoted in this document is also consistent with Mosher's January 2011 email communication with the customer cited in Kraft's attribution documents (Bison SD 3). Kraft's SVRS tested one month for Bison and found no potential overpayment.

Finally, I have identified a PFJCSP document indicating that Bison and Pilot were approximately $56,000 apart during settlement negotiations (Bison SD 4). PFJCSP agreed to adopt Bison's method of loss calculation (using daily pricing instead of monthly averages) in order to save the business relationship. This amount constitutes an overstatement because PFJ's manual rebate deals were based on monthly averages, not daily averages (Bison SD 4).

12. *Black Horse Carriers; $235,177 via Mosher; November 2008 through March 2012 for manual rebates*

Kraft allocated $235,177 in losses to Mr. Hazelwood for Black Horse Carriers ("Black Horse"). Kraft appears to rely on Mosher Spreadsheets which cover November 2008 and June and July 2010 (Black Horse SD 1, SD 2). Based on the implied customer loss from the Mosher Spreadsheets for these three months, the attributed loss is overstated by 20.2%. (See Exhibit 3.) We found a total of 39 months of Mosher Spreadsheets where the implied customer loss in the

spreadsheets show the losses attributed by Kraft/PFJCSP are overstated by 22.7%, or $51,795. This extrapolates to a total potential overstatement of losses of $53,274 (Exhibit 4).

Based on my review of the PFJCSP documents, this customer was initially set to receive $176,209 but this was later changed based on a document found in Xera that suggested the deal should have been set up at CP0, RM.05—this is presumably a January 2009 email from Giesek to the customer saying "your price is based on cost plus zero" (Black Horse SD 3). It is not clear that this difference in the rebate was made with intent to deceive versus an error (suggesting a possible effect of PFJCSP Bias), and Kraft did not conduct its attribution test to determine whether to attribute these incremental losses.

*13. B-T Inc.; $145,889 via Mosher; April 2008 through January 2013 for manual rebates*

Kraft allocated $145,889 in losses to Mr. Hazelwood for B-T Inc. ("B-T"). B-T and Decker are noted as affiliated companies, and the same issues noted for Decker generally apply for B-T. Kraft relies on multiple Mosher Spreadsheets for loss attribution that cover 22 months between April 2008 and July 2012 (B-T SD 1, SD 2). The implied customer loss from these spreadsheets suggest the attributed losses are overstated by 63.9% (Exhibit 3).

We found 54 months of Mosher Spreadsheets where the implied customer loss in the spreadsheets show the losses attributed by Kraft/PFJCSP are overstated by 57.8%, or $83,795. This extrapolates to a total potential overstatement of losses of $84,170 (Exhibit 4).

Kraft cites a calendar reminder from May 2008 from Heather Jones stating: "Per Brian, we will run at cost plus 0, retail minus 6 and customer thinks they're getting a cost minus 1." (B-T SD 3). This may account for a portion of the overstatement. However, it does not account for the full amount, and, as described below, there were multiple changes to the deal over time asserted by the customer, some of which could not be confirmed.

As with Decker, I reviewed the PFJCSP Company Review/Checklist and related documents for B-T, Inc. (B-T SD 4) and note that the customer repayment was based largely on information provided by the customer in an email, dated April 30, 2013, after the PFJCSP project had begun. There were multiple changes in the deal over time and the PFJCSP team did not appear to have contemporaneous company records to confirm some of B-T's assertions concerning discount changes. Based on my review of the information contained in the PFJCSP documents,

33

there does not appear to be any way to reliably calculate the amount that was related to fraud or customer misrepresentations and the PFJCSP team did not attempt to do so. This was a reflection of PFJCSP Bias.

The PFJCSP documents for B-T also indicate that the team assumed changes favorable to the customer occurred in the beginning of the year when they did not have specific information to confirm the timing of the change. This represents another "benefit-to-the-customer" bias that was apparently not addressed in Kraft's SVRS. Kraft did not reduce losses for B-T in its SVRS analysis.

*14. CDN Logistics Inc.; $345,431 via Mosher; February 2008 through April 2008 for direct bill ($2,095) and February 2009 through June 2012 for manual rebates ($343,336)*

Kraft allocated $343,336 in manual rebates losses, and $2,095 in direct bill losses to Mr. Hazelwood for CDN Logistics Inc. ("CDN").

For direct bill, Kraft relies on a January 2008 email from Cathy Giesick where she singles out several customers for cuts to their discounts. She states: "If an account happens to call in refer them to me. My excuse is that Pilot is pushing all accounts to a stand discount and if they were not doing the required amount of gallons then they reverted back to whatever discount we cut them to" (CDN SD 1). This does not represent an overt misrepresentation to the customer, and it therefore calls Kraft's attribution decision into question.

For manual rebates, Kraft relies upon Mosher Spreadsheets for loss attribution that cover three months that overlap with the loss attribution period, February 2009 and June and July 2010 (CDN SD 2, SD 3). The implied loss from this evidence shows that the losses attributed are understated by 25.0% ($5,378). In this instance, this means Kraft attributed less loss to Mr. Hazelwood for that month than what is reflected on the Spreadsheet, showing the unreliability of the PFJCSP's calculations and Kraft's attribution yet again, but this time in the other direction (See Exhibit 3). However, in our own investigation and review of documents, we found 37 additional months of Mosher Spreadsheets that fall within the attribution period but were not considered by Kraft, and these spreadsheets show that the implied customer loss attributed by Kraft/PFJCSP are overstated by 7.7%, or $23,551. This extrapolates to a total potential overstatement of losses of $26,526 (Exhibit 4).

34

Kraft's attribution summary does not acknowledge an email dated October 6, 2010 from Heather Jones to Brian Mosher which states: "Cathy is taking the retail off for CDN from .03 to .05 (off-invoice) for 260,000 gallons. I need your approval on the disc change (they get a manual rebate also)" (CDN SD 4). Based on the PowerPivot table in Kraft's SVRS documents (CDN SD 5), CDN failed to meet the 260,000-gallon requirement for 11 months (October 2010, July 2011, September 2011, and November 2011 through June 2012), but the PFJCSP calculation assumed a .05 retail minus rebate for the entire period (including before the October 2010 change) until December 2012 when the retail minus increased to .07. Kraft does not provide support for the increased amount in December 2012 and they do not recognize the customer failed to meet the gallon threshold for 11 months of the loss attribution. Accordingly, the attributed losses are overstated for each of these issues.

Based on review of the PFJCSP documents (CDN SD 6), there were several changes to the amount the PFJCSP deemed to be owed and significant uncertainty about the terms of the deal with the customer. There were apparently errors in the off-invoice element of the amounts due, which appear to have been on top of the manual rebate amounts. It is not clear that there was "fraud" with respect to the off-invoice errors, which may constitute a large portion of the amount repaid to the customer. It is not at all clear what portion of the customer repayment arose from misrepresentations to the customer.

The PFJCSP concluded CDN's retail-minus portion of its discount was $0.05 from April 2008 to October 2010. This was in error. I noted evidence in the PFJCSP documents describing the historical documents, "CDN knew the RM was 0.03… but if we give the customer the benefit of the doubt, he gets RM.05" (CDN SD 7). This is because in October 2010, in response to a competitor's offer, Pilot proposed to change CDN's retail-minus discount from $0.03 to $0.05 in exchange for CDN increasing its fuel purchase to 260,000 gallons a month (CDN SD 4). If CDN's discount was already retail-minus $0.05, it surely would have rejected Pilot's offer that CDN increase its fuel purchases for no additional discount. Instead, CDN agreed to Pilot's offer and committed to the higher gallon requirement.

Finally, I noted that the PFJCSP documents contained a document labeled "customer reconciliation" that indicates that Kraft was assisting the PFJCSP in reconciling certain customer

losses, demonstrating that Kraft played an active role in the project, which would call its objectivity into question (CDN SD 6).

Overall, there appears to be significant PFJCSP Bias in the way in which the losses were determined. Yet Kraft reflected only a $2 adjustment for CDN for one of the two months included in its SVRS analysis. This is a further indication that the SVRS understated the impact of PFJCSP Bias.

15. *Compass Funding Solutions; $158,092 via Mosher; October 2008 through June 2012 for manual rebates*

Kraft allocated $158,092 in losses to Mr. Hazelwood for Compass Funding Solutions ("Compass"). Kraft's attribution documents do not contain any evidence of misrepresentations made to the customer. Kraft relies primarily on the Mosher Spreadsheet for June and July 2010 (Compass SD 1). It is not clear what the basis of attribution is for the remaining months in the loss attribution period. The losses attributed for June and July 2010 are overstated by 51.4% as compared to the implied loss in the Mosher Spreadsheet relied upon by Kraft (See Exhibit 3).

In our own investigation and review of documents, we found 36 months in Mosher Spreadsheets within the attribution period, not considered by Kraft in its attribution analysis, where the implied customer loss in the spreadsheets show the losses for Compass attributed by Kraft/PFJCSP are overstated by 59.8%, or $78,676. This extrapolates to a total potential overstatement of losses of $94,597 (Exhibit 4).

16. *Decker; $965,484 via Mosher; April 2008 through January 2013 for manual rebates*

Kraft relies upon multiple Mosher Spreadsheets for loss attribution. The documents relied upon by Kraft cover 22 months between April 2008 to July 2012 (Decker SD 1, SD 2, SD 3). However, the implied customer loss from these spreadsheets suggest the attributed losses are overstated by 65.9%. (See Exhibit 3) We found 54 months of Mosher spreadsheets where the implied customer loss in the spreadsheets show the losses attributed for Decker by Kraft/PFJCSP are overstated by 60.9%, or $577,252. This extrapolates to a total potential overstatement of losses of $587,950 (Exhibit 4).

I reviewed the PFJCSP Company Review/Checklist and related documents for Decker (Decker SD 4) and note that the customer repayment was based largely on information provided by the customer in an email dated April 30, 2013, after the PFJCSP project had begun. There were multiple changes in the deal over time and the PFJCSP team did not appear to have contemporaneous company records supporting the assertions made by the customer for the timing of the changes asserted by Decker. The PFJCSP initially calculated a customer repayment of $329,024 based on the representations by Decker, but that repayment was later modified to over $1 million for the period from January 2008 through March 2013 (Decker SD 4, p. 3-5). Based on my review of the information contained in the PFJCSP documents, there does not appear to be any way to reliably calculate the amount that was related to fraud or customer misrepresentations, and the PFJCSP team did not attempt to do so. For example, the customer asserted that their deal should have been CM.03/RM.07 at some unknown time in 2011, but I noted a document that indicates this change was not made until April 1, 2013—after the attribution period (Decker SD 5). Darren Seay made the following comment concerning Decker: "There is little documentation on the deals, but an email from Decker confirming their historic deals provides some specifics." (Decker SD 4, p. 5). This suggests PFJCSP Bias, but Kraft's SVRS reflects that it determined the losses to Decker were overstated by only 1.2% (monthly losses in January 2012 reduced from $13,838 by $162). This indicates the SVRS did not adequately take all forms of PFJCSP Bias into account.

The PFJCSP documents for Decker also indicate that the team assumed changes favorable to the customer occurred in the beginning of the year when they did not have specific information to confirm the timing of the change. This represents another "benefit-to-the-customer" bias that was apparently not addressed in Kraft's SVRS.

### 17. Dillon Transport Inc.; $231,127 via Mosher; May 2008 through June 2012 for manual rebates

Kraft allocated $231,127 in losses to Mr. Hazelwood for Dillon Transport Inc. ("Dillon").

Kraft asserts that "Giesick emailed the customer in May 2008 confirming Dillon's discount of CP.0015/RM.045 with a gallon threshold of 120,000 gallons/month" (Dillon SD 1). However, the email Kraft references specifically notes that the discount applied "for gallons over 120,000 per month" (Dillon SD 2). This distinction in language is important, because the deal actually

presented to Dillon was RM.04 for the first 120,000 gallons purchased each month (Dillon SD 3), with an incremental rebate for each gallon "over 120,000" based on better of CP.0015/RM.045.[6] (Dillon SD 3).

Furthermore, Kraft's own attribution documents have a PowerPivot table showing that the customer did not purchase more than 120,000 gallons per month for six months of the attribution period (May, June, November, December 2008, December 2009 and October 2010, with attributed losses totaling $34,041) to qualify for the better of incremental rebate (Dillon SD 9).

The PFJCSP incorrectly computed the loss amount in another way, as well. The PFJCSP concluded Dillon's discount was improved to CP.005 for March 2009 through October 2011, and then CP0 from November 2011 onwards (Dillon SD 6, p. 1). There is insufficient evidence to support this. Although there was a hypothetical discussion on February 20, 2009 of changing Dillon's cost-plus discount from CP.015 to CP.005, this offer was expressly conditioned on Dillon purchasing more bulk fuel from Pilot (Dillon SD 7). Neither PFJ nor Kraft has cited any evidence that this was an actual offer, that Dillon accepted assuming this was offered, or that Dillon bought more bulk fuel from Pilot. The PFJCSP's assumption that the deal changed to CP0 in November 2011 was also not supported. That offer was conditioned on Dillon locking its network down to Pilot to increase its gallons purchased by 100,000 gallons per month (Dillon SD 8). Dillon agreed to the discount and that it would "work on the gallons," but PFJ became aware in February 2012 that Dillon was only buying 40% of its fuel from Pilot for the prior five months and immediately advised Dillon of this fact (Dillon SD 9, Dillon SD 10). Dillon also failed to increase its purchase by 100,000 gallons per month (having bought 183,521.10 gallons from Pilot in October 2011, the month before the offer). Not only did Dillon fail to hit 283,521.10 gallons per month after October 2011, it actually bought less fuel from Pilot from November 2011 through December 2012 (Dillon SD 11, SD 12). Therefore, Dillon was not entitled to a discount of CP0. The failure of the PFJCSP

---

[6] It was one of PFJ's practices to offer incremental discounts like this to customers. For example, PFJ's deal with Black Horse was "We have you on a cp zero and retail minus .05. Also, we are paying you an additional .05 on every gallon over 190,000" (Dillon SD 4). PFJ had a similar deal with Riverside Transport, Inc. (See Dillon SD 5, which confirmed a deal for a bonus rebate for gallons after the 200,000th gallon.)

to take this into account was an example of PFJCSP Bias, but Kraft did not sample Dillon for the relevant attribution period in its SVRS analysis.

Finally, Kraft also relies upon Mosher Spreadsheets that cover May 2008 and June and July 2010 (Dillon SD 13, SD 14). The implied customer loss from these spreadsheets suggests that the attributed loss is understated by $25,123. However, the PFJCSP documents state that the RM portion of the deal was input incorrectly, and this caused a reduction of PFJ's liability to the customer (Dillon SD 7, p.3). Accordingly, the attributed losses for Dillon are not directly comparable to the Mosher adjustments.

*18. DOT Transportation; $273,921 via Mosher; July 2010 through January 2013 for manual rebates*

Kraft allocated $273,921 in losses to Mr. Hazelwood for DOT Transportation ("DOT"). Kraft does not cite any misrepresentation to the customer, but relies on its Mosher Spreadsheet exception to the two-prong test for loss attribution. The Mosher Spreadsheets considered by Kraft cover 19 months of the loss attribution period, with the implied customer loss suggesting the attributed losses were overstated by 16.3 % (See Exhibit 3). In our own investigation and review of documents, we found Mosher spreadsheets covering all 30 months of the attribution period where the implied customer loss in the spreadsheets show the losses attributed by Kraft/PFJCSP are overstated by 11.7%, or $32,141 (Exhibit 4).

*19. Doug Marquardt/Skyway Transportation; $131,190 via Mosher; July 2010 through June 2012 for manual rebates*

Kraft allocated $131,190 in losses to Hazelwood for Doug Marquardt/Skyway Transportation ("Skyway"). Kraft's attribution documents do not have evidence of any misrepresentations to the customer. Kraft relies upon Mosher Spreadsheets for February 2009 and June and July 2010 for attribution but only July 2010 is within the attribution period (Marquardt/Skyway SD 1, SD 2). The attributed loss for July 2010 is overstated by 70.4% compared to the implied loss in the Mosher Spreadsheets considered by Kraft (see Exhibit 3).

I reviewed the PFJCSP documents (Marquardt/Skyway SD 3) and noted that the customer told PFJ they were promised CP.01 and, despite the lack of supporting evidence, PFJ paid them accordingly. The Company Review/Checklist states: "We have no documentation to support CP

39

.01 nor does the customer. This is a business decision… We have some documentation the deal is CP.04/RM.04. The customer says the deal is CP.01/RM.04… This is a business decision approved by senior leadership." (Marquardt/Skyway SD 3, p. 4.) This obvious instance of PFJCSP Bias indicates that the payment to this customer was not fully due to confirmed fraud and any attributed loss should not exceed the implied customer loss from the Mosher Spreadsheets. The SVRS analysis did not sample Skyway.

In our own investigation and review of documents, we found 23 months of Mosher Spreadsheets falling into the attribution period where the implied customer loss in the spreadsheets show the losses attributed by Kraft/PFJCSP are overstated by 56.6%, or $69,135. This extrapolates to a total potential overstatement of losses of $74,207 (Exhibit 4).

20. *Halvor Lines Inc.; $131,188 via Mosher; June 2011 through April 2012 for manual rebates*

Kraft allocated $131,188 in losses to Mr. Hazelwood for Halvor Lines Inc. ("Halvor"). Halvor was one of the six customers Darren Seay testified about at trial and accordingly, its customer losses were based on inputs provided by the U.S. Attorney's Office. I understand the evidence relied upon for the inputs could not be disclosed to Mr. Seay due to grand jury secrecy rules. In its 2015 Kraft Report, the attributed losses for Halvor from June 2011 through April 2012 were $229,140, or 74.7% higher than the losses testified to at trial for this period (Halvor SD 1). The Seay trial exhibit for Halvor indicates the losses were calculated assuming the discount should have been RM.05 (Halvor SD 2). It is not clear what the Government's basis was for that discount based on my review of Kraft's attribution documents, but it suggests that the government knew information that was not accounted for by the PFJCSP or Kraft. Given that this information remains confidential, there is no basis for knowing whether the information, if known, would have other implications that could be broadly applied to the loss amounts attributed to other customers, which could reduce the loss attributions across the board.

Even the Seay amounts, which are lower than the PFJCSP's, may be overstated. I noted an email, dated June 1, 2011, from Heather Jones to Scott Wombold, with a copy to Brian Mosher stating:

Loves and TA have come in with some aggressive discounts at Halvor. Brian needs to change their monthly manual rebate to a cost minus .025/retail minus .09. This will be with gallons starting June 1. We need your approval on this please (Halvor SD 3).

Wombold gave his approval the same day. Based on this evidence, it appears that the losses calculated for the Seay trial exhibit are overstated.

Kraft's attribution documents for Halvor rely on various Mosher Spreadsheets for which there are four months that overlap with the attribution period. The implied loss from the Mosher Spreadsheet for these four months suggests that the losses originally calculated by the PFJCSP and attributed by Kraft in connection with its 2015 report, were overstated by 42.5%. Accordingly, both the Mosher Spreadsheet and the losses Seay testified to at trial suggest the customer losses calculated by the PFJCSP were materially overstated.

21. *Holland Transport; $489,676 via Mosher; July 2010 through June 2012 for manual rebates ($486,628) and February 2008 through June 2010 for direct bill ($3,048)*

Kraft allocated $486,628 in manual rebate losses, and $3,048 in direct bill losses to Mr. Hazelwood for Holland Transport ("Holland").

For the manual rebate attribution, Kraft relies on a July 2010 Mosher spreadsheet, without citing evidence of a misrepresentation to the customer (Holland SD 1). For the reasons stated earlier, this was improper and resulted in a material overstatement. The implied customer loss from the July 2010 spreadsheet suggests the attributed loss was overstated by 11.2% (See Exhibit 3). We found 21 months of Mosher spreadsheets where the implied customer loss in the spreadsheets show the losses attributed by Kraft/PFJCSP are overstated by 17.4%, or $67,020. This extrapolates to a total potential overstatement of losses of $85,084 (Exhibit 4).

22. *JTL Trailers/Carriers; $119,222 via Mosher; May 2008 through January 2012 for manual rebates*

Kraft allocated $119,222 in losses to Hazelwood for JTL Trailers/Carriers ("JTL"). JTL was one of the six customers Darren Seay testified about at trial and, accordingly, its customer losses were based on inputs provided by the U.S. Attorney's Office. I understand the evidence relied upon for the inputs could not be disclosed to Mr. Seay due to grand jury secrecy rules. In the 2015 Kraft Report, the attributed losses originally calculated by the PFJCSP for JTL via

Mosher from May 2008 through January 2012 were $193,736, or 62.5% higher than the losses testified to at trial for this same period (JTL SD 1).

Kraft's attribution documents for this customer refer to a May 16, 2008 email from Mosher that indicates an intent to set up the account at CP.04/RM.04 when the customer believed it was getting CP.02/RM.04 (JTL SD 2). The Seay trial exhibit compares the rebate actually paid to CP.02 and the computed difference is the attributed losses of $119,222—so the asserted fraud or misrepresentation should have been fully accounted for in the Seay trial exhibit (JTL SD 3). However, Kraft cites a Mosher Spreadsheet for June and July 2010 which shows the attributed losses originally calculated by the PFJCSP exceed the implied losses from the spreadsheet by 44.4% (JTL SD 1, SD 4). The PFJCSP calculation of losses also exceed the losses calculated for the Seay trial exhibit by 24.1% (Exhibit 3). I have seen no evidence that Kraft or the PFJCSP examined the reasons for their overstatement of losses and the broader effects on the reliability of the PFJCSP loss calculations.

### 23. *Kohler; $186,535 via Mosher; February 2009 through June 2012 for manual rebates*

Kraft allocated $186,535 in losses to Hazelwood for Kohler. Kraft's attribution documents do not contain evidence of a misrepresentation to the customer, but instead rely on Mosher Spreadsheets covering February 2009 and June and July 2010 for attribution of losses to Hazelwood (Kohler SD 1, Kohler SD 2). The attributed losses for these three months exceed the implied customer loss shown in the Mosher Spreadsheets relied on by Kraft by 57.7% (Exhibit 3). In our own investigation and review of documents, we found a total of 36 months of Mosher spreadsheets falling into the attribution period where the implied customer loss in the spreadsheets show the losses attributed by Kraft/PFJCSP are overstated by 74.8%, or $119,998. This extrapolates to a total potential overstatement of losses of $139,502 (Exhibit 4).

I reviewed the PFJCSP documents (Kohler SD 3) and noted that the PFJCSP team was aware that there was a volume requirement for Kohler of 80,000 gallons per month or 70% of the customer's OTR (over the road) fuel requirements. The PFJCSP team also was aware that the customer rarely made its gallon requirement to get the agreed rebate, but they made a business decision to pay the customer in full anyway—an example of PFJCSP Bias. Based on my review of the PowerPivot table included in Kraft's attribution documents (Kohler SD 4), Kohler made its

gallon requirement in only 10 of the 41 total months in the attribution period (February through April 2009, January through April 2010, June 2010, August 2010, and March 2011). The total attributed losses for these ten months obtained from the Loss Attribution Spreadsheet is $58,289, meaning the attributed losses are overstated by $128,246, assuming the originally attributed losses are accurate. This amount of $128,246 appears to be a result of PFJCSP Bias and should not have been included in the amount of loss due to fraud.

### 24. Madden; $197,442 via Mosher; April 2008 through June 2012 for manual rebates

Kraft allocated $197,442 in losses to Hazelwood for Madden. However, the PFJCSP Company Review/Checklist states that the "amount owed" to Madden is only $162,697 (increased from an initial calculation of $124,123) (Madden SD 1). I have seen no evidence explaining whether the PFJCSP or Kraft took this into account when attributing the loss amount.

Kraft's attribution documents do not contain evidence of a direct misrepresentation to the customer, but Kraft relies on Mosher Spreadsheets covering April 2008 and June and July 2010 for attribution to Hazelwood (Madden SD 2, Madden SD 3). The attributed losses for these three months are overstated by 10.6% compared to the implied customer loss in the Mosher Spreadsheets considered by Kraft (Exhibit 3). In our own investigation and review of documents, we found 48 months of Mosher Spreadsheets where the implied customer loss in the spreadsheets show the losses attributed by Kraft/PFJCSP are overstated by 18.8%, or $35,134. This extrapolates to a total potential overstatement of losses of $37,114 (Exhibit 4).

Finally, there is evidence PFJCSP miscalculated the loss amount that resulted from a purported rebate adjustment. The PFJCSP team stated they recalculated the deal at CP0.02 and RM0.04 from November 2008 through December 2012. However, there is contemporaneous evidence from May 2011 (Madden SD 4) stating that the customer "is very happy with the deal he has in place (CP.04)." I have seen no evidence explaining why the PFJCSP and Kraft teams did not take this into account. This appears to reflect PFJCSP Bias. Kraft did not sample Madden for its SVRS analysis.

### 25. Rite Logistix; $112,297 via Mosher; September 2010 through June 2012 for manual rebates

Kraft allocated $112,297 in losses to Hazelwood for Rite Logistix ("Rite"). Kraft's attribution summary indicates that this customer carried over to PFJ from the July 2010 merger with Flying J with an agreed deal of CP.02/RM.02 (Rite SD 1). Kraft's attribution of losses is based on emails in September 2010 and October 2010 indicating an intent to adjust the rebates to CP.04 and CP.05 (Rite SD 2, SD 3, SD 4).

Kraft did not cite any Mosher Spreadsheets in his attribution evidence, but, in our investigation and review of documents, we found spreadsheets covering 13 months of the attribution period where the implied customer loss in the spreadsheets show the losses attributed by Kraft/PFJCSP are overstated by 48.6%, or $44,363. This extrapolates to a total potential overstatement of losses of $54,540 (Exhibit 4).

Based on my review of the PFJCSP documents (Rite SD 5), this customer's deal was adjusted to CP.015 in or around September 2011 (a better deal for the customer than the original agreement).

26. *Riverside; $444,825 via Mosher; July 2010 through January 2013 for manual rebates*

Kraft allocated $444,825 in losses to Hazelwood for Riverside. I noted no evidence of a misrepresentation to the customer. Kraft's attribution determination relies solely upon testimonial evidence from Mosher and Holden that they defrauded certain customers, in which they referenced Mosher Spreadsheets that listed Riverside. There is otherwise no additional evidence cited by Kraft to base its attribution for any loss not identified within the Mosher Spreadsheets. The Mosher Spreadsheets relied upon by Kraft to attribute Riverside losses contained 20 months of customer rebate adjustments from the attribution period where the implied customer loss suggests the attributed losses were overstated by 29.9%. (See Exhibit 3). In our own investigation and review of documents, we found Mosher Spreadsheets covering all 31 months of the attribution period, where the implied customer loss in the spreadsheets show the losses attributed by Kraft/PFJCSP are overstated by 38.9%, or $173,128 (Exhibit 4).

27. *Roger's Trucking; $104,256 via Mosher; April 2011 through January 2013 for manual rebates*

Kraft allocated $104,256 in losses to Hazelwood for Roger's Trucking ("Roger's"). The PFJCSP reviewed Roger's together with its parent company (Tankstar) and sister company (Schwerman Trucking).

Kraft relies on Mosher Spreadsheets from June 2012 to September 2012 for attribution (Roger's SD 1). The attributed losses for these four months exceed the implied loss from these Mosher Spreadsheets by 22.4% (Exhibit 3). In our own investigation and review of documents, we found 20 months of Mosher Spreadsheets from the attribution period, where the implied customer loss in the spreadsheets show the losses attributed by Kraft/PFJCSP are overstated by 30.3%, or $30,736. This extrapolates to a total potential overstatement of losses of $31,612 (Exhibit 4).

For additional reasons, the loss calculation by the PFJCSP may have been too high. For example, the PFJCSP assumed that Roger's received the same discounts as Schwerman, even though the deal documentation did not expressly include Roger's. Additionally, the PFJCSP identified some rebate variances and concluded that "[i]t may be possible that the deal was different or that there were gallon requirements that were not met, but this could not be verified." (Roger's SD 2). It appears this amount was therefore included in the loss calculation. These are examples of PFJCSP Bias that are not easily quantifiable, but nonetheless suggest there was an overpayment to this customer. Kraft did not sample Roger's, Tankstar, or Schwerman in its SVRS analysis.

28. *Ryder Integrated Logistics; $82,237 via Mosher; September 2012 and October 2012 for manual rebates*

Kraft allocated $82,237 in losses to Hazelwood for Ryder Integrated Logistics ("Ryder"). Ryder was one of the six customers Darren Seay testified about at trial and, accordingly, its customer losses were based on inputs provided by the U.S. Attorney's Office. I understand the evidence relied upon for the inputs could not be disclosed to Mr. Seay due to grand jury secrecy rules.

Kraft's attribution support documents include a letter, dated February 23, 2011, in which PFJ offered to pay a direct bill rebate based on CP.05 if monthly gallons exceeded 800,000. The letter also indicates that the discounts assumed the customer was approved for direct bill and there

was agreement on a "go live" date (Ryder SD 1). On April 12, 2012, the customer emailed PFJ stating: "it appears to us we have reached the first level of volume (800k) that would move Ryder to OPIS pricing" (Ryder SD 2). Kraft's attribution summary indicates PFJ decided in August 2012 to pay a rebate for gallons purchased since April 2012 and did so over a two-month period (Ryder SD 3). PFJ appears to have agreed to pay the rebates for April through August 2012 even though the customer had apparently not been approved for direct bill yet and did not hit the gallons requirement for April, June and July 2012 based on the gallons data in the PFJCSP documents (Ryder SD 4). This CP.05 rebate is what Seay's calculation of customer losses was based on for September 2012 and October 2012 when Ryder did exceed 800,000 gallons and after Ryder started on direct bill. Accordingly, PFJ appears to have paid a rebate for three of five months in 2012 when it was not obligated to do so under the agreement with the customer. The two months of the attribution period do appear to have required the payment of a rebate based on CP.05 based on the information available.

I noted a July 30, 2013 email where the PFJCSP team acknowledged the payments for April through July 2012 were extra payments they were not obligated to pay: "I told [Ryder] those were extra rebate payments and we would not include those in our analysis because it would actually lower the settlement with them" (Ryder SD 5). This illustrates the PFJCSP Bias to give benefit to the customer beyond what was required by the customer agreements. Kraft did not sample Ryder in its SVRS analysis.

29. *Sharkey/Sysco/Shipper's Rental; $591,926 through Mosher; July 2010 through January 2013 for manual rebates*

Kraft allocated $591,926 in losses to Hazelwood for Sharkey/Sysco/Shipper's Rental ("Sharkey").

Kraft relies upon the Mosher Spreadsheets in its attribution documents. The Mosher Spreadsheets relied upon by Kraft cover 20 months of the loss attribution period between July 2010 to July 2012, with the implied customer loss in the spreadsheets suggesting the PFJCSP/Kraft attributed losses were overstated by 76.4%. (See Exhibit 3). In our own investigation and review of documents, we found Mosher spreadsheets for all 31 months of the attribution period where the implied customer loss in the spreadsheets show the losses attributed by Kraft/PFJCSP are overstated by 78.7%, or $465,573 (See Exhibit 4).

46

I noted an email, dated June 20, 2013, contained in Kraft's SVRS folder (two months of Sharkey's losses were included in the sampling plan to address the "benefit-to-the-customer" bias inherent in the PFJCSP audit), which highlights the difficulty PFJ had in assessing the true customer deal with customers where they were negotiated and agreed to orally, without any record in writing. In the email, Paul Pardue, who led the PFJCSP, states: "We have nothing in any e-mail or company document about their deal…we either owe them nothing, $170,000, $638,605 or $675,000" (Sharkey SD 1). In a follow-up email, Pardue recounts a conversation with the Sharkey where he states: "he says he has an e-mail…that he sent to Lexie Holden that recapped a conversation that Mr. Sharkey said he had with Brian Mosher that their deal was RM .05 and CP .015. He says the conversation was on 7/2/10 at the time of the Flying J rebate." (Sharkey SD 2). The PFJCSP appears to have accepted the customer representation of the deal terms and, based on a copy of the PowerPivot recalculation, PFJ paid Sharkey $742,849 in total before interest.

I noted another email, dated June 26, 2013, where PFJ referred to its payment to Sharkey as a "business decision," Mitchell Steenrod of PFJ stating: "What do you guys recommend in shippers sharkey? I have no clue. They won't be happy unless it is rm -5 and cp 1.5." (Sharkey SD 3). This email further supports the arbitrary nature of the payment to Sharkey and how it was not necessarily tied to fraud or confirmed misrepresentations to the customer.

In its review of two months of Sharkey's losses for its SVRS analysis, Kraft found, in the aggregate, that Sharkey's losses were overstated by 6%.[7] This calculation does not appear to accurately reflect the significant PFJCSP Bias that was present in the determination of Sharkey's loss amount.

### 30. Sue Vinjie; $191,149 via Mosher; December 2009 through January 2013 for manual rebates

Kraft allocated $191,149 in losses to Hazelwood for Sue Vinjie. Kraft's attribution summary states that Sue Vinjie was acquired by Halvor Lines and should have had the same deal (Vinjie SD 1). However, the document to which Kraft cites for this proposition is only an internal communication in which Mosher tells Holden that Halvor had purchased Sue Vinjie, and that she

---

[7] For December 2012, Kraft found no overstatement, but, instead, an understatement of the loss amount of $33,401. For October 2010, Kraft found that the losses were overstated by 17.7% (losses of $17,206 reduced by $3,036).

should apply (internally) the same discount to Sue Vinjie that PFJ gave to Halvor (Vinjie SD 2). In other words, Sue Vinjie's deal was likely improved significantly. Kraft does not cite to any misrepresentation to the customer, or, for that matter, that any discount amount was communicated to Sue Vinjie.

Kraft relies on Mosher Spreadsheets covering 22 months between December 2009 and July 2012, which overlaps with the attribution period for Sue Vinjie. The attributed losses for these months exceed the implied loss from the Mosher Spreadsheets by 40.5% (Exhibit 3). In our own investigation and review of documents, we found Mosher Spreadsheets covering all 38 months of the attribution period where the implied customer loss in the spreadsheets show the losses attributed by Kraft/PFJCSP are overstated by 42.2%, or $80,674 (See Exhibit 4).

31. *Transco Lines; $259,700 via Mosher; April 2012 through January 2013 for manual rebates*

Kraft allocated $259,700 in losses to Hazelwood for Transco Lines ("Transco").

Kraft's attribution documents contain Mosher Spreadsheets covering the four-month period from April 2012 through July 2012, which overlap with the attribution period (Transco SD 1, SD 2). The implied customer loss from these spreadsheets suggests the losses attributed by the PFJCSP/Kraft were overstated by 21.5%. (See Exhibit 3.) In our own investigation and review of documents, we found Mosher Spreadsheets covering all 10 months of the attribution period, where the implied customer loss in the spreadsheets show the losses attributed by Kraft/PFJCSP are overstated by 38%, or $98,576 (See Exhibit 4).

Based on a review of the PFJCSP documents (Transco SD 3), the customer repayment was initially determined to be $176,723 on or about May 9, 2013; it then changed to $315,280 on or about June 5, 2013; it changed again to $277,032 on or about June 10, 2013; and it changed yet again to $299,832 on or about July 19, 2013. These frequent fluctuations in the loss amount demonstrate the trouble the PFJCSP had in calculating the loss amount with certainty.

Finally, I note that the PFJCSP documents state that "Kraft agrees to the deals we used for 4/2012 – 3/2013" (Transco SD 2), suggesting a direct role by Kraft in the PFJCSP, which would call its objectivity into question.

*32. Tri-Hi Transportation; $139,507 via Mosher; June 2008 through April 2011 for manual rebates*

Kraft allocated $139,507 in losses to Hazelwood for Tri-Hi Transportation ("Tri-Hi"). Kraft's attribution documents do not cite to a misrepresentation to the customer, but they rely on Mosher Spreadsheets from June 2008 and June and July 2010 for attribution (Tri-Hi SD 1, Tri-Hi SD 2). The attributed losses for these three months exceed the implied loss from the Mosher Spreadsheets by 42.1% (Exhibit 3). In our own investigation and review of documents, we found 28 months of Mosher spreadsheets, where the implied customer loss in the spreadsheets show the losses attributed by Kraft/PFJCSP are overstated by 50.5%, or $61,754. This extrapolates to a total potential overstatement of losses of $70,420 (Exhibit 4).

*33. Warren Transport; $133,900 via Mosher; July 2010 through January 2013 for manual rebates*

Kraft allocated $133,900 in losses to Hazelwood for Warren Transport ("Warren"). Kraft's attribution documents do not indicate an overt misrepresentation to the customer, but they rely on Mosher Spreadsheets for attribution that cover 21 months of the attribution period between July 2010 and July 2012 (Warren SD 1, Warren SD 2). The attributed losses for these 21 months are significantly understated as compared to the implied loss from the Mosher spreadsheets. However, based on my review of the PFJCSP documents (Warren SD 3), there was a significant overpayment to this customer because they received a 6 cent per gallon rebate in addition to a better of CP or RM rebate. This prior overpayment makes the comparison of the Mosher adjustments to the attributed losses an inappropriate comparison, so this customer is not included in Exhibit 3.

The PFJCSP documents also indicate there was significant confusion about the deal terms with Warren Transport since there was nothing finalized in writing for the deal, and there were varying internal emails and recollections about the deal terms. Accordingly, it is not clear how one could measure the losses attributable to fraud beyond using the Mosher adjustments themselves for the 21 months of spreadsheets relied upon by Kraft. However, since PFJ had been overpaying this customer on the off-invoice rebate, it is questionable as to whether a fraud was committed which resulted in monetary harm to the customer.

*34. BP Express Inc.; $210,546 via Freeman; July 2009 through October 2012 for manual rebates*

Kraft allocated $210,546 in losses to Hazelwood for BP Express, which was one of the six customers Darren Seay testified about at trial. However, the attributed losses and the attribution period asserted by Kraft differ from the Seay trial exhibit in that Seay's attribution period was from January 2009 (rather than July 2009 per Kraft) and he testified to $218,463 in customer losses (rather than $210,546) (BP SD 1). I have not seen an explanation for these differences.

Kraft's attribution documents include an August 2009 email in which Freeman told Katy Bibee to "take .04 off BP." (BP SD 2). There is a June 2011 email in which Bibee noted that BP Express was at .2768 and Freeman replied, "take them all to .25 and change range." (BP SD 3). In a January 2012 email Radford stated "don't think this has ever been moved. Ok or change?" Stinnett replied, "Raise it $.02 and send" (BP SD 4). In an April 2013 email, Paul Pardue indicates that Freeman told him that he made an oral agreement with BP Express at CP0 (BP SD 5). This deal is consistent with assertions made in Freeman's plea agreement and it appears to be the basis for the Seay trial exhibit being run at CP0.

Based on the PowerPivot rebate sheet included in Kraft's attribution documents, PFJ repaid BP Express only $87,129 for July 2009 through October 2012 (BP SD 6), suggesting that the attributed losses are overstated by 58.6%.

I also noted an email in Kraft's SVRS documents, dated April 29, 2013, prepared by Paul Pardue, in which he discusses a meeting he held that day with BP Express where it was agreed that PFJ would pay BP Express $158,857 before interest (BP SD 7). This does not agree to the amount paid to the customer per the PowerPivot rebate sheet noted above, but it is significantly less than the amount attributed by Kraft.

Based on review of the PFJCSP documents, the amount paid to BP Express of $158,857 is supported, but there were also discussions of holding the audit open pending review of further documents, because the customer believed his deal was CP0 rather than CP.02, which is what this payment was based on. It is possible that the $87,129 amount noted above was a subsequent payment in addition to the $158,857 after Freeman apparently agreed there was an oral deal at CP0. I further noted a version of the PowerPivot recalculation sheet labeled "Kraft recon,"

suggesting a direct role played by Kraft in the PFJCSP, which, as noted previously, would call its objectivity into question.

Kraft and the PFJCSP appear to have ignored evidence of a gallon requirement for BP Express, as well as an obligation by BP Express to limit its fueling to PFJ, as documented in a December 31, 2008 email from Freeman to the customer:

> Going forward, as agreed, we will not show any discounts on your Pilot bill or your Comdata statement. We will cut you a check based on cost plus/retail minus pricing at months end. Based on the market, we can then figure out what the cost plus pricing equates to in a cent per gallon basis off the retail price. Your obligation is to limit the drivers to the Pilot truckstops with a goal of a minimum of 130k per month going to the network of Pilot Travel Centers (BP SD 8).

I understand the reason the customer did not want its discounts appearing on its billing statements is that BP Express used owner-operator drivers and it did not want to share the discounts with its drivers. And, because these were owner-operator drivers with no known incentives to limit their fueling activity to PFJ, it is not clear how BP Express could have kept its commitment to limit its fuel purchases to PFJ. This calls into question whether any losses should have been attributed for BP Express. Even if the customer could document its compliance with the exclusivity requirement—and there is no evidence it did so—it is clear from the gallons activity on the PowerPivot calculation sheet that they did not meet the gallons requirement until October 2010. Accordingly, at a minimum, the attributed losses from July 2009 through September 2010, totaling $68,795, should be eliminated. Moreover, because BP Express was arguably not entitled to any discount because it did not meet its exclusivity obligations under the deal, the entire loss amount could be overstated.

There are ample examples of PFJCSP Bias with respect to BP Express. The PFJSCP Checklist also notes that "BP Express was one of the early accounts that contacted [PFJ] threatening legal action..." (BP SD 9). This may have provided the PFJCSP additional motivation to satisfy the customer with a larger reimbursement amount. Yet when Kraft analyzed BP Express for its SVRS analysis, it did not find that the loss amount was overstated at all.

51

*35. G&P Trucking; $434,435 through Freeman; August 2008 through January 2013 for direct bill*

Kraft allocated $434,435 in losses to Hazelwood for G&P Trucking ("G&P"). Kraft's attribution documents include an August 2008 email in which Stinnett states: "we discount CP.04 but he thinks it's CP0." (G&P SD 1). Radford then sends the customer a letter summarizing the deal at CP0/RM.05 with varying site-specific deals (G&P SD 2, G&P SD 3). Kraft did not include any evidence that indicates the customer misrepresentation continued throughout the attribution period through January 2013. I also noted that Freeman is not included in the attribution documents for G&P, raising a question as to the basis for attribution of losses to Mr. Hazelwood through Freeman.

Kraft did not provide evidence of the full context of the PFJ's agreement with G&P Trucking, but I noted an email, dated May 8, 2009, from Jay Stinnett to the customer: "How bout that deal we made for you to send me your monthly gallons summary" (G&P SD 4). In a February 3, 2009 email from Stinnett to the customer, he states: "send me your gallon summary for January, so I can make certain we are getting our fair share" (G&P SD 5). This suggests the customer was obligated to send a monthly gallons summary to PFJ to document the portion of its fueling needs that were done with PFJ, and I have not seen evidence that the customer met this obligation. Accordingly, PFJ may have had the right to change the discount.

*36. Queen Transportation; $59,162 via Freeman; February 2010 through October 2012 for direct bill*

Kraft allocated $59,162 in losses to Hazelwood for Queen Transportation ("Queen"). Queen was one of the six customers Darren Seay testified about at trial. However, the attributed losses and the attribution period asserted by Kraft differ from the Seay trial exhibit (Queen SD 1) in that Seay's attribution period was from January 19, 2010 (rather than February 2010 per Kraft) to November 16, 2012 (rather than October 2012) and he testified to a customer loss amount of $60,657 (rather than $59,162). I have not seen an explanation for these differences.

Kraft's attribution documents refer to a January 2010 internal PFJ email exchange in which it was noted that the customer "thinks we took him from a CP.03 to CP.04 but he is really getting

CP.08 right now" (Queen SD 2). Kraft also includes plea agreements for Freeman and Bibee in which they both agree to the attribution period used by Kraft.

In my own investigation and review of documents, I have noted documents indicating the initial deal with this customer made in February 2008 was based on a 50,000-gallon monthly requirement (Queen SD 3). Sometime during the next year, the gallon requirement had been reduced to 25,000 per month, and the customer had never met that reduced requirement (Queen SD 4). Based on my review of the monthly gallons activity of Queen (Queen SD 5), at the time of the January 2010 email relied upon by Kraft, Queen had not met its monthly gallons requirement in any month since the deal began in April 2008 and was generally significantly below 25,000 gallons. Queen failed to meet the 25,000-gallon threshold in two months during the attribution period, February and April 2010, and appears to have only exceeded the threshold on a consistent basis after the merger with Flying J in July 2010. Accordingly, PFJ may have paid rebates the customer was not entitled to for a significant period. The attributed losses totaled $2,255 for the two months within the attribution period during which the customer failed to meet its gallons requirement (Queen SD 6).

\*\*\*

I may supplement or amend this report as additional information becomes available.

Submitted by:

_____                    _9/12/2018_____

Philip E. Kruse                                                          Date

**EXHIBIT 1**

**Alvarez & Marsal**
**Disputes and Investigations, LLC**
600 Madison Avenue, 8th Floor
New York, NY 10022
Phone: +1 212 759 4433
Fax: +1 212 759 5532

## Philip E. Kruse, CPA, CFF
## Managing Director – Disputes and Investigations

**CERTIFICATIONS**

Certified Public Accountant
States of New York and Texas

Certified in Financial Forensics
(AICPA)

**PROFESSIONAL AFFILIATIONS**

American Institute of Certified Public
Accountants

New York Society of Certified Public
Accountants

SEC Historical Society, Board of
Advisors

**EDUCATION**

B.S. Accounting and Business
Administration
University of Kansas

**CONTACT INFORMATION**

212-328-8613 (office)
646-591-2330 (mobile)
pkruse@alvarezandmarsal.com

Mr. Kruse has over thirty years of experience providing audit, accounting and consulting services in various industries including financial services, real estate, high technology, media and publishing, leasing, manufacturing and retail. Phil has expertise in forensic accounting investigations, post-closing purchase price disputes, accounting restatements and securities litigation. Prior to joining A&M in 2005, he was a Partner in the Forensic and Dispute Services practice of Deloitte & Touche, where he served as the firm's leader of the Corporate Investigations practice. His engagement experience includes the following:

- Mr. Kruse led the forensics team at Lehman Brothers Holdings Inc. from its bankruptcy in September 2008 to 2016. This team was responsible for the investigation of various issues and potential claims for the Estate and assisted outside counsel in several significant litigations to recover money on behalf of the creditors of LBHI and its subsidiaries.

- From 2005 to 2008 Mr. Kruse led an engagement on behalf of counsel to Bank of America in defending the bank against allegations that the bank knew, or should have known, of the accounting fraud at Parmalat that was first disclosed in 2003.

- In 2005 and 2006 Phil led an investigation on behalf of counsel to a Special Litigation Committee of CA, Inc. (formerly Computer Associates) to assist the Board in evaluating the facts that led to the restatement of its financial statements and to evaluate whether the company should take over class action claims against the company's current and former auditors.

- Phil has led over fifty engagements involving post-closing purchase price and earn-out disputes including service as a neutral arbitrator, investigation of potential objections to closing balance sheets, preparation of arbitration submissions, settlement negotiations and serving as an expert witness in arbitration and court proceedings.

- Mr. Kruse has led several engagements to assist in accounting restatements and reconstructions, including assistance in meeting regulatory filing requirements and working with outside auditors in the verification of the restatements.

- In 2004, Phil led an investigation of allegations concerning violations of the Foreign Corrupt Practices Act on behalf of counsel to Daimler Chrysler in Germany.

- In 2003 and 2004, Phil led the investigation on behalf of counsel to the Special Litigation Committee of Tyco International to assist the new Board of Directors in its evaluation of all pending and potential claims, both against the company and claims that the company could consider making against third parties as a result of the highly publicized corporate governance and financial reporting issues the company had faced.

- In 2002 and 2003, Phil led the investigation of various accounting and financial reporting issues on behalf of counsel to Bristol-Myers Squibb.

- In 2000, Phil led the investigation on behalf of counsel to the audit committee of Rite Aid Corporation which resulted in the largest restatement in SEC history at that time. He led the communication of the investigative findings to the SEC and the US

Attorney and ultimately testified at a pre-trial hearing which was followed shortly thereafter by the criminal plea of the former CFO and CEO.

- From 1987 through 1992 Phil was involved in numerous investigations of failed savings and loan institutions on behalf of various regulatory and law enforcement agencies. Phil was integrally involved in several of the most high profile investigations of the savings and loan crisis and was personally responsible for investigative findings that led to criminal indictments and convictions of certain former S&L executives.

- Mr. Kruse has led numerous other engagements in various other litigation matters including securities litigation, lender liability, product liability, patent and trademark infringement, fraudulent conveyance and preference claims, substantive consolidation and solvency analysis in bankruptcy, breach of representation claims, contract disputes including the valuation of contractual rights, appraiser malpractice and investor disputes.

**Articles:**

*Daily Deal, "Performance Anxiety" (A guide to the use of earn-out provisions in buy/sell agreements);* published August 6, 2002; co-authored

*New York Law Journal, "Earnouts: Preserving a Stake in an Entity After the Acquisition";* published October 18, 2002; co-authored

**Testimony:**

Evangelia Manios Zachariou v. Vassilios Manios; AAA Case No. 50 181 T00107 09; Deposition, June 14 and 15, 2012; Arbitration Hearing, January 22, 2013

Lehman Brothers Holdings, Inc., Debtor; U.S. Bankruptcy Court, SDNY, Chapter 11 Case No. 08-13555; Deposition, December 17, 2009

DJK Residential, et al., Debtors; U.S. Bankruptcy Court, SDNY, Chapter 11 Case No. 08-10375; Deposition, April 10, 2008; Trial, April 22, 2008

Cohen PDC, LLC, et al. v. Cheslock-Bakker Opportunity Fund, LP, et al.; Supreme Court of New York, Case No. 601024/03; Deposition, May 23 and 29, 2007

United States of America v. Martin L. Grass, Franklin C. Brown, Franklyn M. Bergonzi; U.S. District Court, MDPA, Case No. CR-02-146; Hearing on Defendants' Motion in Limine, May 20, 2003

Mervyn D. Lentz, et al. v. Brescome Barton, Inc.; Arbitration Hearing, April 17, 1997

# EXHIBIT 2

## Documents Reviewed

U.S.A. vs. Mark Hazelwood, et al. Superseding Indictment

Trial Testimony, Including Exhibits

- Daren Seay; January 11, 12 and 18, 2018

- William Jennings; January 31, 2018

- Brain Mosher; November 27, 28 and 30, December 6 and 7

Criminal Enforcement Agreement dated July 10, 2014

Deposition Transcript, Paul Pardue; May 14, 2014, Re. PFJ Rebate Litigation

Horne LLP Report dated June 12, 2014

Amended Class Settlement Preliminary Approval Order, dated July 24, 2013, re. National Trucking Financial Reclamation Services vs. Pilot Corporation

2015 Kraft Report, with attachments

Kraft Interim Findings, with attachments

Supplemental Kraft Report, with attachments

Kraft Loss Attribution Spreadsheet produced July 30, 2018

Government's Notice of No Objection to Presentence Investigation Report for Defendant Hazelwood filed August 1, 2018

AICPA Standards as Referred to in Expert Report

Reply in Support of Motion in Limine to Exclude Testimony of Government's Disclosed Witness, Darren Seay, filed October 4, 2017

Government's Consolidated Response in Opposition to Defendant Hazelwood's First Motion to Continue Sentencing, with accompanying documents, filed August 3, 2018

Various documents from PFJCSP files