| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 3:16-CR-20 |
| v. | ) | |
| | ) | Judge Collier |
| MARK HAZELWOOD, | ) | |
| | ) | |
| Defendant. | ) | |

# EXPERT REPORT ON SAMPLING OF BENJAMIN S. WILNER, Ph.D.

Alvarez & Marsal Disputes and Investigations, LLC ("A&M") has been retained by counsel representing the Defendant, Mark Hazelwood, to comment on the alleged customer loss in the aforementioned matter. In particular, in this Expert Report, I, Benjamin S. Wilner Ph.D., am evaluating the statistical sampling analysis of Vic Alexander, CPA, ABV, CFF and KraftCPAs PLLC included in his July 18, 2018 as well as his August 20, 2018 letters to Aubrey B. Harwell, Jr.[1]

I conclude that the Government and Mr. Alexander made mathematical and methodological errors that fatally undercut his sampling analysis. He utilized an incorrect sampling procedure. Mr. Alexander did not accurately describe the universe / target population or Sampling Frame. He incorrectly calculated his sample size because he misapplied a Federal government rule that could be superseded by other rules. He further utilized an improper metric that caused him to draw incorrect conclusions from his analysis. His analysis is also statistically imprecise. Additionally, the Government blindly applied Mr. Alexander's conclusions, which relate to one data series, to another data series.

If one assumes that the sampling data Mr. Alexander generated and his reimbursement calculations are accurate, I find that by applying proper statistical analyses, the losses attributed to Mr. Hazelwood are at most $9,924,263, and not the $10,405,836 in the Government's August 1, 2018 Notice of No Objection to the Presentence Investigation Report For Defendant Hazelwood. The Expert Report of Philip E. Kruse, C.P.A. ("Kruse Report") demonstrates that Mr. Alexander made errors in recalculating customer reimbursements. I demonstrate that these errors would have a sizable effect. For example, if the reimbursements for just eight customers Mr. Alexander studied were changed by 10%, the losses attributed to Mr. Hazelwood for the 78

---

[1] As Mr. Alexander signed a letter on this date introducing the July 18th Report and referred to it as "My work," for the purposes of this Expert Report, I refer to this analysis as being in Mr. Alexander's July 18th Report and Mr. Alexander's August 20th Report.

customers identified in the Government's August 1, 2018 Notice of No Objection to the Presentence Investigation Report For Defendant Hazelwood would be reduced by almost $1.9 million, not the approximately $480,000 shown in that Notice. Consequently, small changes in the reimbursement amounts inputted into Mr. Alexander's model would have a large effect on the True Loss Allegedly Relevant to Mr. Hazelwood, demonstrating the instability of his model.

I generated the aforementioned conclusions by solely reviewing Mr. Alexander's Report, court submissions as well as various statistics texts cited in this Expert Report. **Exhibit 1** is a full listing of the documents I considered. I reserve the right to modify and/or expand my opinions as I obtain and analyze additional information.

No one from A&M who has contributed to this engagement has any known financial interest in any party to the matter. A&M's compensation is neither based nor contingent on the results of this analysis.

This Report is provided solely for use in the matter described in the caption at the top of this Report. This Report is not to be used with, circulated, quoted or otherwise referred to in whole or in part for any other purpose, or in any other document without the express written consent of Alvarez & Marsal Disputes and Investigations, LLC.


# I.   Qualifications

My qualifications are stated in my curriculum vita, which is attached as **Exhibit 2**. That Exhibit details my education, credentials, testimony, publications and relevant presentations.

I am a Managing Director at Alvarez & Marsal Disputes and Investigations, LLC. I have performed economic and statistical analyses in a great variety of engagements, including financial analysis, contract losses, a wide range of class action, intellectual property and lost income matters. In addition to testifying in a variety of matters, I also serve as a business consultant. For example, I have been retained by the U.S. Department of Homeland Security to economically and statistically analyze various proposed policies. For one such project, I received a special commendation from the Commissioner of U.S. Customs and Border Protection for revising a $2.5 billion annual tariff. I also have been retained as a statistician by the Office of Mortgage Settlement Oversight, the Illinois Department of Insurance, the National Science Foundation and multiple corporations.

I have a Bachelor of Arts degree, Magna cum Laude with Distinction in Major in Mathematics and Economics from the University of Pennsylvania as well as a General Course Degree in Mathematics and Statistics from the London School of Economics. I was awarded a Ph.D. in Managerial Economics and Decision Science from the Kellogg Graduate School of Management at Northwestern University.

I have served as a professor of economics, finance and statistics in the business schools at the University of Michigan, the University of Iowa, Northwestern University and the Helsinki School of Economics. I received multiple teaching awards.

My research has been published in the peer reviewed academic journals including the *Journal of Finance*, the leading academic journal in finance. I have been awarded research grants from multiple universities as well as from the United States Government's National Science Foundation. My research has been extensively cited. For example, the former President of the University of Chicago relied on my undergraduate thesis as the theoretical basis for one of his published research papers. I also served as a referee for multiple academic journals and textbooks.

As an undergraduate, I spent three years as a research assistant to the 1980 Nobel Prize winner Lawrence R. Klein. Dr. Klein was awarded the Nobel Prize in Economics for economic and statistical forecasting. As a graduate student, I studied under Roger Myerson, who won the 2007 Nobel Prize in Economics for a type of game theoretic modeling, and Dale Mortensen, who won the 2010 Nobel Prize in Economics for his study of labor markets.

# II. Sampling Analysis in the Alexander Reports

Mr. Alexander noted in his July 18th Report that Pilot Flying J's Internal Audit department reviewed the Attributed Losses Pilot Flying J previously calculated and recalculated the losses each customer allegedly suffered because of the Defendant's alleged actions. He called Internal Audit's recalculated figures the "IA Over/Under Reimbursements."

However, he noted that the Internal Audit department's recalculations could be erroneous. To measure the magnitude of Pilot Flying J's errors, Mr. Alexander sampled these customer files and recalculated what the alleged loss was for those sampled files. He then extrapolated the recalculated results from these sample observations to all allegedly relevant customers. In his extrapolation, he concluded that the "IA Over/Under Reimbursements" were overstated by 4.39%. I call this 4.39% the Reduction Percentage.

The Government in its August 1, 2018 Notice of No Objection to the Presentence Investigation Report For Defendant Hazelwood concluded that only $10,883,627 in Attributed Losses were relevant to Mr. Hazelwood before applying the Reduction Percentage. After applying Mr. Alexander's 4.39% Reduction Percentage (that was based on "IA Over/Under Reimbursements") to the Attributed Losses, the Government claims that Attributed Losses were overstated by $478,142.

The only reference to his sampling analysis in Mr. Alexander's July 18th Report is on pages 5 – 6. The relevant paragraphs state:

> Kraft selected a statistically valid random sample ("SVRS") from the universe of the 313 PFJ customers included in the 2015 Project [Footnote: Due to time constraints, it was not possible to wait until Kraft had completed the attribution analysis that reduced the universe of customers from 313 to 214 customers before beginning the SVRS analysis. Therefore, Kraft pulled the SVRS from the original set of 313 customers whose losses were attributed in the 2015 Project.] in order to determine what discounts should have contemporaneously applied to a customer's diesel fuel purchases ("SVRS Discounts"). In calculating the SVRS

3

Discounts, Kraft used a holistic and objective business approach limiting the benefit of the doubt to the customer [Footnote omitted] and searched historical documents for additional communication of customer discounts. Kraft computed the difference between the Applied Discounts and the SVRS Discounts ("SVRS Reimbursements").

In selecting the sample from the universe of customers, Kraft used a statistically valid random sampling tool, RAT-STATS 2010, as utilized by the U.S. Department of Health and Human Services Office of the Inspector General ("OIG"). The OIG recommended a 90 percent confidence level and 25 percent precision level. Based on these inputs, RAT-STATS 2010 randomly selected a sample of 133 customer months. [Footnote: There were 8812 unique customer loss calculations (i.e., a customer's monthly loss amount) in the universe of 313 customers from the 2015 Project. RAAT (sic.) STATS's sample included 133 specific monthly loss amounts out of the total of 8812 such monthly amounts. The 133 monthly loss amounts in the sample were associated with a total of 103 customers.] Kraft calculated the SVRS reimbursements for this sample to compare with the IA Reimbursements.

To compute a reduction for the benefit-to-the-customer methodology, Kraft aggregated instances where the IA Reimbursements exceeded the SVRS Reimbursements ("Potential Overpayments") and divided the Potential Overpayments by the IA Reimbursements. [Footnote omitted] The reduction percentage was extrapolated across attributed customer losses. Kraft calculated a reduction factor of 4.39%; therefore, all attributed losses were reduced by 4.39%.

Kraft created a folder for each sampled customer located in subfolder "3_SVRS" of Exhibit B that includes a Repricing Memorandum, Kraft's SVRS Reimbursement calculation, [Footnote omitted] the IA Reimbursement calculation, and an "Attachments" subfolder that contains the supporting documents used in Kraft's calculation. The Repricing Memorandum provides a customer overview, [Footnote omitted] discounts used in the SVRS Reimbursement computation, and a comparison to the IA Reimbursement. The statistically valid random sample and the SVRS reduction percentage are also located in subfolder "3_SVRS" of Exhibit B.[2]

Data underlying Mr. Alexander's sampling analysis were contained in his August 20th Report.

---

[2] Alexander July 18th Report, p. 5 – 6. As discussed in the next Section, I have no independent opinion about Mr. Alexander's actual accounting calculations. The omitted footnotes refer to Mr. Alexander's accounting calculations.

4

# III.    Summary of Opinions

This Expert Report solely focuses on Mr. Alexander's statistical sampling analysis. I have no independent opinions about the accounting validity or accuracy of the Attributed Losses, "IA Over/Under Reimbursements," or "SVRS Over/Under Reimbursements" for each customer month. For the purposes of most of my Expert Report, I assume these figures are valid and accurate in an accounting sense for each customer month. To the extent that they are invalid and/or inaccurate in an accounting sense, Mr. Alexander's analysis is further compromised. As discussed below, I also perform a statistical analysis of the data simulating some of Mr. Kruse's critiques of Mr. Alexander's work recalculating the reimbursements.

As discussed below, I conclude that Mr. Alexander has not performed a valid statistical sampling and extrapolation analysis in his Reports. My Expert Report demonstrates that even if Mr. Alexander's reimbursement calculations are valid and accurate from an accounting point of view, he did not calculate a statistically valid Reduction Percentage.

My Expert Report continues in Section IV below by providing some background on proper statistical sampling and generally recognized steps that are required to perform a statistical extrapolation. However, as discussed below, Mr. Alexander failed to perform to these steps.

In Section V, I show that Mr. Alexander did not accurately describe the universe / target population. Section VI shows that Mr. Alexander did not properly define the Sampling Frame. By misdefining the universe / target population and the Sampling Frame, Mr. Alexander cannot generalize his conclusions to the entire target population / universe or even claim that his survey is "worthwhile." Consequently, he cannot say that his Reduction Percentage is applicable to the allegedly relevant customers.

Section VII demonstrates that Mr. Alexander incorrectly calculated the Sample Size. Mr. Alexander allegedly utilized the sample size guidelines of the U.S. Department of Health and Human Services OIG; however, he did not properly apply the guidelines. In addition, Mr. Alexander did not demonstrate why other governmental guidelines are not proper for this analysis. These other guidelines require different sample sizes than what Mr. Alexander utilized. Lastly, the OIG guidelines, that Mr. Alexander allegedly utilized, require the sampler to verify that their conclusions conform to the relevant statistical parameters; however, Mr. Alexander also failed to perform this step in his analysis.

Section VIII illustrates that Mr. Alexander's analysis demonstrates that Pilot Flying J's Internal Audit department's analysis of "IA Over/Under Reimbursements" as well as the Attributed Losses are unreliable.

Section IX demonstrates how Mr. Alexander utilized an improper statistical metric to calculate his Reduction Percentage.

Section X hypothetically assumes that Mr. Alexander properly selected his sample and his reimbursement calculations are accurate. It goes on to demonstrate that Mr. Alexander overstated the loss allegedly attributable to Mr. Hazelwood under these assumptions if one conducts a proper statistical analysis.

Section XI provides some simulations on how the losses allegedly attributable to Mr. Hazelwood would significantly change if Mr. Alexander overstated some of the reimbursements in his sample.

Section XII concludes.


# IV.    Statistical Sampling Background

Statistics is vital to the sampling analysis Mr. Alexander performed.  In essence, Mr. Alexander performed a survey of customer reimbursements.  He attempted to extrapolate results from his surveys to all allegedly relevant customers.  Because "[i]n practice, surveys typically count or measure only a portion of the individuals or other units that the survey is intended to describe,"[3] unbiased, representative and non-"cherry picked" sampling is required.  The Reference Guide on Statistics published by the Federal Judicial Center states "[i]n short, a good survey defines an appropriate population, uses a probability method for selecting the sample, has a high response rate, and gathers accurate information on the sample units."[4]  Statistical tools such as variance, standard deviation, and confidence intervals are applied to best describe the survey's results.

As set forth below, Mr. Alexander did not perform such generally recognized steps that are required to perform the extrapolation he attempts to include in his Report. Consequently, his results cannot be extrapolated to all allegedly relevant customers.


# V.    Mr. Alexander Does Not Accurately Describe the Universe / Target Population

"The target population [or universe] consists of all elements (i.e., individuals or other units) whose characteristics or perceptions the survey is intended to represent."[5]

According to Mr. Alexander, "[t]here were 8812 unique customer loss calculations (i.e., a customer's monthly loss amount) in the universe of 313 customers."[6]

However, the Government changed the universe / target population in its August 1, 2018 Notice of No Objection to the Presentence Investigation Report For Defendant Hazelwood submission when it restricted the universe / target population to 78, not 313, customers.  Consequently, the universe / target population Mr. Alexander utilized in his sampling analysis deviates from the universe / target population the Government now says is relevant.

---

[3] Diamond, Shari Seidman. "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Third Edition, 2011, Federal Judicial Center ("Reference Guide on Survey Research"), p. 361.
[4] Kaye, David H. and David A. Freedman.  "Reference Guide on Statistics," in *Reference Manual on Scientific Evidence* Third Edition, Federal Judicial Center, 2011 ("Reference Guide on Statistics"), p. 226.
[5] Reference Guide on Survey Research, p. 376 (emphasis added)
[6] Mr. Alexander's July 18th Report, p. 5 at footnote 12.

Even without this Governmental change, Mr. Alexander is not internally consistent in his July 18th Report with regards to the universe / target population. While Mr. Alexander stated in his July 18th Report that the universe was the 313 customers in the above quote, the overall loss conclusion in his July 18th Report relates to 214 customers. Consequently, the universe / target population Mr. Alexander utilized in his sampling analysis deviates from the universe / target population even he said was relevant.

An improperly defined universe / target population could invalidate a sampling analysis even before any calculations are performed.

# VI.  Mr. Alexander Did Not Properly Define the Sampling Frame

"The <u>sampling frame</u> is the source (or sources) from which the sample actually is drawn."[7]

As of July 18, 2018, the date of Mr. Alexander's first Report, Mr. Alexander claimed that the target population / "universe [is] the 313 PFJ customers included in the 2015 Project" and that he sampled from all 313 of these customers.[8] Consequently, the Sampling Frame equals all 313 customers.

However, as discussed in the prior Section, Mr. Alexander misdefined the relevant target population / universe. It is my understanding that some of the 313 PFJ customers are unrelated to Mr. Hazelwood (e.g., American Furniture, Andrus Transportation, Bestway System, and Buchanan Hauling & Rigging). As mentioned above, in its August 1, 2018 submission, the Government also limited the relevant target population / universe to 78 customers.[9] As a result, Mr. Alexander's Sampling Frame is overinclusive relative to the relevant target population / universe.

Standard texts discuss problems when the Sampling Frame and the target population / universe differ. For example, the Reference Guide on Survey Research states:

> More commonly, however, the sampling frame and the target population have some overlap, but the overlap is imperfect: The sampling frame excludes part of the target population, that is, it is underinclusive, or the sampling frame includes

---

[7] Reference Guide on Survey Research, p. 240. (emphasis added)

[8] Mr. Alexander's July 18th Alexander Report, p. 5. Footnote 10 of the Alexander Report is unclear and could be interpreted to imply that he only sampled from 214 customers because "time constraints" "prevented" him from analyzing 99 (over 30%) of the allegedly relevant customers. In such a case, Mr. Alexander's Sampling Frame could be underinclusive of the target population / universe. He presents no analysis for why the 99 customers were not analyzed. He did not investigate whether the excluded customers differed in any way from the included customers. Without such an investigation, Mr. Alexander cannot generalize his conclusions to the entire target population / universe or even claim that his survey is "worthwhile." Additionally, it could be possible that Mr. Alexander "cherry picked" the customers he did analyze and purposefully excluded the customers allegedly due to "time constraints," which "prevented" him from analyzing, to artificially lower the Reduction Percentage.

[9] Government's Notice of No Objection to the Presentence Investigation Report For Defendant Hazelwood.

individuals who are not members of the target population, that is, it is overinclusive relative to the target population. Coverage error is the term used to describe inconsistencies between a sampling frame and a target population. If the coverage is underinclusive, the survey's value depends on the proportion of the target population that has been excluded from the sampling frame and the extent to which the excluded population is likely to respond differently from the included population….

If the survey expert can demonstrate that a sufficiently large (and representative) subset of respondents in the survey [with an overinclusive sampling frame] was drawn from the appropriate sampling frame, the responses obtained from that subset can be examined, and inferences about the relevant population can be drawn based on that subset. [Footnote: See National Football League Props. Inc. v. Wichita Falls Sportswear, Inc. 532 F. Supp. 651, 657–58 (W.D. Wash. 1982).] If the relevant subset cannot be identified, however, an overbroad sampling frame will reduce the value of the survey. [Footnote: See Leelanau Wine Cellars, Ltd. v. Black & Red, Inc., 502 F.3d 504, 518 (6th Cir. 2007) (lower court was correct in giving little weight to survey with overbroad universe); Big Dog Motorcycles, L.L.C. v. Big Dog Holdings, Inc., 402 F. Supp. 2d 1312, 1334 (D. Kan. 2005) (universe composed of prospective purchasers of all t-shirts and caps overinclusive for evaluating reactions of buyers likely to purchase merchandise at motorcycle dealerships). See also Schieffelin & Co. v. Jack Co. of Boca, 850 F. Supp. 232, 246 (S.D.N.Y. 1994).][10]

W. Edwards Deming, a leading statistician, wrote:

The frame must cover enough of the universe to make the study worthwhile…. [T]he results of any survey or experiment may be limited if a proposed frame and experimental conditions fail to include all the materials, areas, methods, levels, types, and conditions concerning which he desires information…. The statistician's report will cover only the frame that was subjected to sampling. It will not attempt to generalize to other firms, people, cities, material, concentrations, levels, and conditions not covered by the survey or experiment. ….

[I]f a medical survey be carried out in Chicago, … [testing results] will clearly refer only to Chicago, or to whatever part of Chicago was in the frame and hence subjected to the sampling procedure…. No statistical theory in existence can carry the generalization from Chicago to Denver, as Denver was not in the frame.[11]

Mr. Alexander presented no analysis of whether the relevant population / universe forms a sufficiently large subset of the Sampling Frame. Nor did Mr. Alexander show that the customers in the Sampling Frame are representative of the customers in the relevant population / universe.

---

[10] Reference Guide on Survey Research, p. 378.
[11] Deming, W. Edwards *Sample Design in Business Research*, John Wiley, 1960 ("Deming"), p. 9 – 10, 13, and 14 – 15.

He did not analyze the extent to which the subset of customers in the Sampling Frame, but not in the relevant population / universe, is likely to be different from the subset in both. He did not show that these two subsets cover the same "materials, areas, methods, levels, types, and conditions."

Without such an analysis, Mr. Alexander cannot generalize his conclusions to the entire target population / universe or even claim that his survey is "worthwhile." Consequently, he cannot say that the Reduction Percentage he calculated is applicable to all the allegedly relevant customers. Because the Government's final calculations multiply the Reduction Percentage Mr. Alexander calculated by the Attributed Losses just the customers listed in the Notice of No Objection to the Presentence Investigation Report For Defendant Hazelwood submission, the Government's conclusion does not follow from Mr. Alexander's statistical analysis.

In addition to the difference between the number of customers in the universe / target population and the Sampling Frame, different data are measured for the customers in the universe / target population and the Sampling Frame. While the universe / target population in the Government's August 1, 2018 Notice of No Objection to the Presentence Investigation Report For Defendant Hazelwood covers Attributed Losses, the Sampling Frame that Mr. Alexander includes "IA Over/Under Reimbursements," not Attributed Losses. As "IA Over/Under Reimbursements" differ from Attributed Losses, Mr. Alexander's Sampling Frame generates conclusions about something different than the universe / target population.

One cannot blindly apply conclusions generated from one data series to another data series as the Government attempts to do. This mismatch of the Sampling Frame and universe / target population further compromises Mr. Alexander's and the Government's analysis.

# VII.   Mr. Alexander Incorrectly Calculated the Sample Size

Mr. Alexander's sole statement in his July 18th Report regarding how he selected his sample size is contained in one sentence:

> The [U.S. Department of Health and Human Services Office of the Inspector General ("OIG")] recommended a 90 percent confidence level and 25 percent precision level.[12]

Section A below provides statistical background explaining the terms in Mr. Alexander's sample size sentence above. Section B demonstrates that Mr. Alexander misapplied this OIG guidance. Section C shows why the OIG's recommendations might not be proper within the context of this litigation.

---

[12] Alexander July 18th Report, p. 5.

## A. Statistical Background

Let's say that someone flips a fair coin 100 times. Their best guess is that they would obtain 50 heads. However, they likely would not be surprised if they would obtain 48 or 51 heads as randomness reasonably could cause such deviations. However, they likely would be surprised if they obtained 10 heads. While theoretically possible, the odds of obtaining 10 heads are so low that such a result should be considered unlikely.

Statisticians have built on this concept with something called a Confidence Interval. A statistician would say that they are 95% confident in the 100 coin flip example that between 42 and 58 heads would be obtained. In other words, they are 95% confident of obtaining 50% ± 8% heads. In this example, 50% is called the Point Estimate and 8% is called the Margin of Error. A statistician could also use a different confidence level and state that they are 90% confident of obtaining 50% ± 6.5% heads.

While 90%, 95% and 99% confidence levels are standardly utilized, there is no statistical rule stating which level should be utilized, but, as discussed in the next Section, various government agencies have made recommendations. Judge Richard Posner wrote that the use of a 95% confidence level

> is arbitrary… It is for the judge to say, on the basis of the evidence of a trained statistician, whether a particular significance level, in the context of a particular study in a particular case, is too low to make the study worth the consideration of judge or jury.[13]

While a statistician would be 95% confident of obtaining 50% ± 8% heads if a coin was flipped 100 times, they would be 95% confident of obtaining 50% ± 50% heads if a coin was flipped twice as 50% heads is most likely, but the probabilities of obtaining 2 heads or 2 tails are high. Alternatively, a statistician would be 95% confident of obtaining 50% ± 2.6% heads if a coin was flipped 1,000 times.

The prior paragraph provides an example of how the Margin of Error is inversely related to the number of coin flips. In other words, the Margin of Error is lower (higher) with more (fewer) coin flips. Statisticians have standard formulas to determine what the Margin of Error would be for a given number of coin flips.

Statisticians ask the converse question in order to calculate recommended sample size: how many coin flips would have to occur in order to obtain a given Margin of Error. Answers can be obtained by algebraically reversing these standard formulas.

There is a statistical concept called Precision, where Precision equals the Margin of Error divided by the Point Estimate. For example, the Precision for a Confidence Interval of 50% ± 8% heads is 16% (= 8 / 50). Consequently, if the Point Estimate and the desired Margin of Error are known, a statistician can utilize the reversed standard formulas to calculate a recommended sample size.

---

[13] *Kadams v. MCI Systemhouse Corp.*, 255 F.3d 359 (7th Cir. 2001)

The above discussion describes an analysis of a binary choice: Yes or No. This is often called Attribute Sampling as the surveyor asks whether a given attribute exists in a universe / target population. For example, one might ask whether heads occur in a coin flip or whether an "IA Over/Under Reimbursement" and/or Attributed Loss is accurate or not.

An enhanced statistical methodology is required if one wants to ask the further question of quantifying the magnitude by which the "IA Over/Under Reimbursements" and/or Attributed Losses are inaccurate. Sampling in order to quantify such monetary disparities is often called Variable Sampling.

Because Mr. Alexander is attempting to quantify the amount by which "IA Over/Under Reimbursements" were overstated, his analysis requires Variable Sampling.

To determine the required sample size in Variable Sampling, one needs to know more than just the desired Margin of Error. One needs to know at least the Standard Deviation of the monetary disparities. The Standard Deviation measures the deviations from the average inherent in the data. For example, a Standard Deviation of zero for the overstated amount would result if the "IA Over/Under Reimbursements" were overstated by exactly $100 for each sampled item. The Standard Deviation would be greater in a Hypothetical Scenario 1, where half of the "IA Over/Under Reimbursements" were overstated by $50 and half overstated by $150, than in a Hypothetical Scenario 2, where half of the "IA Over/Under Reimbursements" were overstated by $90 and half overstated by $110. In general, the greater the Standard Deviation, the greater the required sample size.

It is important to note two things when attempting to use sampling to determine errors in calculations like "IA Over/Under Reimbursements."

First, there are two potentially relevant data series at issue in Mr. Alexander's analysis: 1) "IA Over/Under Reimbursements" and 2) the Errors in "IA Over/Under Reimbursements," which Mr. Alexander calls the Potential Overpayments. Mr. Alexander shows sample data for the first data series in the third column of Exhibit C to his July 18th Report. Mr. Alexander shows sample data for the second data series in the last column of that Exhibit.

When one determines sample size, it is vital to use the Standard Deviation / Margin of Error / Precision from the proper data series. In the situation relevant for this matter, statistical formulas require the use of the Standard Deviation / Margin of Error / Precision from the Potential Overpayments data series and **NOT** the "IA Over/Under Reimbursements" data series.

However, Mr. Alexander did the converse. His sample size formulas are based on the Standard Deviation / Margin of Error / Precision from the "IA Over/Under Reimbursements" data series and **NOT** the Potential Overpayments data series.

By utilizing the incorrect data series, Mr. Alexander significantly skewed the Standard Deviation / Margin of Error / Precision that his computer program utilized. For example, *Exhibit 3* shows that the Standard Deviation for the "IA Over/Under Reimbursements" based on Mr. Alexander's sample data is $7,693, while the Standard Deviation for the Potential Overpayments based on Mr. Alexander's sample data is only $489.

Second, statisticians need to account for a "circular logic" wrinkle when using the statistical formulas that require a Standard Deviation / Margin of Error / Precision. In this example, the Standard Deviation / Margin of Error / Precision of the Potential Overpayments is required to determine the sample size necessary to commence the sampling analysis. However, data on the Potential Overpayments (including its Standard Deviation / Margin of Error / Precision) are generated by the sampling analysis. Consequently, data "required" to commence the analysis is only generated by completing that analysis.

To get around this "circular logic" wrinkle, statisticians either estimate what the Standard Deviation / Margin of Error / Precision from the Potential Overpayments will be or conduct what is called a Probe Sample. A Probe Sample is where the statistician determines the Potential Overpayments for a few data points and uses information from those few data points to estimate the Standard Deviation / Margin of Error / Precision from the Potential Overpayments.

Mr. Alexander recognized the need to obviate this "circular logic" wrinkle when he stated in his August 20th Report that he used a Probe Sample. He demonstrated this fact with the following picture in this August 20th Report that highlights "Using a Probe Sample."

### Excerpt from Page 2 of Mr. Alexander's August 20th Report



As discussed in the next Subsection, Mr. Alexander did not properly perform these sample size analyses.

## B. Mr. Alexander Did Not Properly Apply The U.S. Department of Health and Human Services Office of the Inspector General Sample Size Determination Guidelines

Mr. Alexander stated that his analysis complied with a rule put forth by the U.S. Department of Health and Human Services OIG. As noted above, he wrote that "The OIG recommended a 90 percent confidence level and 25 percent precision level."[14]

As discussed in the prior Section, it is vital to use the Standard Deviation / Margin of Error / Precision from the Potential Overpayments data series and **NOT** the "IA Over/Under Reimbursements" when determining sample sizes.

For example, the U.S. Department of Health and Human Services OIG put forth guidelines, which Mr. Alexander allegedly utilized, to assist in determining whether the Department overpaid medical providers. Therefore, like what was described in the prior Subsection, the OIG must account for two data series: the amount paid to medical providers and the overpayment to these providers. While the amount paid to medical providers can be determined from claims data, individual claim file review is required to determine the overpayments.

In describing the Corporate Integrity Agreement ("CIA") procedures to determine the required sample size of claim files that have to be reviewed, the OIG emphasizes that Probe information about the overpayments, not the total amounts paid to medical care providers, should be inputted into RAT-STATS. In particular, the OIG states:

> Some CIAs include claims review procedures that **require a [Probe] sample of 50** paid claims to be randomly selected for review[15]….

> How is RAT-STATS used to determine the Full Sample size?

> Once the mean and standard deviation **of the overpayment amount** in the [Probe] sample have been calculated, the full sample size can be determined[16]….

> The full sample must include a sufficient number of paid claims to yield results that estimate **the overpayment in the population** within a 90 percent confidence and 25 percent precision level.[17]

However, Mr. Alexander did **NOT** input data relative to the Potential Overpayments, instead he inputted the data relative to "IA Over/Under Reimbursements." Consequently, he did not comply with OIG guidelines. By not fulling quoting the OIG and only citing to the last 9 words in the above quote and not the prior 6 words, Mr. Alexander misinforms readers of his Report of the OIG's true guidelines.

---

[14] Alexander July 18th Report, p. 5.
[15] https://oig.hhs.gov/faqs/corporate-integrity-agreements-faq.asp, "Background" section. (emphasis added) The OIG uses the synonymous term discovery sample instead of probe sample in the text.
[16] Ibid., "How is RAT-STATS used to determine the Full Sample size?" section (emphasis added)
[17] Ibid., "Background" section (emphasis added)

Additionally, despite Mr. Alexander's recognition of the need to obviate the "circular logic" wrinkle, he did not do so. Mr. Alexander did **NOT** conduct a Probe sample as required by the OIG. He inputted his alleged entire Sampling Frame of 8,812 customer months.[18] Consequently, his analysis further departs from OIG guidelines.

If one assumes that Mr. Alexander's results from the 133 customer months he reviewed from a Probe Sample and that overpayment data related to these customer months are entered into RAT-STATS, the computer program states that the required sample size using Mr. Alexander's parameters is **305**. Consequently, by only testing 133 customer months, Mr. Alexander tested less than half of the OIG required sample size (44% = 133 / 305). Furthermore, as discussed below in Section X, only 39 of the customer months Mr. Alexander tested are relevant to Mr. Hazelwood, creating an effective understatement of 87% (13% = 39 / 305).

Even if it were proper for Mr. Alexander to input the full reimbursement amounts, and not overpayment amounts, into RAT-STATS, he does so improperly. The file that he sent along with his August 20th Report shows that he inputted reimbursement amounts based upon Attributed Losses into RAT-STATS for his sample size determination. However, his July 18th Report shows that he performed calculations on reimbursement amounts based upon "IA Over/Under Reimbursements." As Attributed Losses, the universe / target population, differ from "IA Over/Under Reimbursements," the Sampling Frame, <u>Mr. Alexander's sample size analysis mixes apples and oranges and is statistically incorrect even if it were relevant.</u>

## *C. Mr. Alexander's Sample Size Rule Might Not Be Applicable*

As discussed in the prior Subsection, Mr. Alexander cited to a rule put forth by the U.S. Department of Health and Human Services OIG to calculate sample sizes in order to determine whether health care providers accurately submitted bills to the Centers for Medicare and Medicaid Services.

Mr. Alexander provided no support as to why this rule that is relevant to medical charges to the Federal government is relevant to the fuel billing between private entities at issue in this case. He further did not explain why statistical rules of other governmental agencies should not be applied or why one should not follow the rule Judge Posner recommended: "on the basis of the evidence of a trained statistician."[19]

For example, while the U.S. Department of Health and Human Services OIG has one rule about improper payments that are specific to health care payments, the U.S. Office of Management and Budget ("OMB") provides broader guidance on improper payments in its Appendix C to Circular No. A-123, *Requirements for Effective Estimation and Remediation of Improper Payments*.[20] In this Appendix, the OMB defines improper payments to be:

> An improper payment is any payment that should not have been made or that was made in an incorrect amount under statutory, contractual, administrative, or other

---

[18] Alexander August 20th Report, p. 2.
[19] *Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359 (7th Cir. 2001)
[20] https://paymentaccuracy.gov/pdf/m-15-02.pdf.

legally applicable requirements. Incorrect amounts are overpayments or underpayments that are made to eligible recipients (including inappropriate denials of payment or service, any payment that does not account for credit for applicable discounts [Footnote: Applicable discounts are only those discounts where it is both advantageous and within the agency's control to claim them.], payments that are for an incorrect amount, and duplicate payments). An improper payment also includes any payment that was made to an ineligible recipient or for an ineligible good or service, or payments for goods or services not received (except for such payments authorized by law). In addition, when an agency's review is unable to discern whether a payment was proper as a result of insufficient or lack of documentation, this payment must also be considered an improper payment.[21]

This Appendix presents a different sample selection rule than the OIG. In particular,

Agencies should design the sample and select a sample size sufficient to yield an estimate of improper payments with a 90 percent confidence interval of plus or minus 2.5 percent of the total amount of all payments for a program around the estimate of the dollars of improper payments. [Footnote: Agencies may alternatively use a 95 percent confidence interval of plus or minus 3 percent around the estimate of the dollar amount of improper payments.] For example, if the total amount of all payments for a program was $1,000,000,000 and the estimated total of improper payments based upon the statistical sample was $80,000,000, the 90 percent confidence interval around the estimate should be no more than plus or minus $25,000,000-i.e., $55,000,000 to $105,000,000. These guidelines for precision shall be taken as the minimum, and agencies are encouraged to increase samples above the minimum to achieve greater precision in their estimates in order for agencies to better understand underlying causes of improper payments and creating action plans. Agencies shall maintain documentation to support the calculation of these estimates.[22]

Additionally, the Internal Revenue Service utilizes a different rule to calculate a wide variety of financial statistics for companies in all industries. I have personally utilized the IRS rule to calculate corporate revenue and cost components as well as how actual revenue and cost components differ from what was recorded by firms' accounting departments. The IRS rule is based on a 95% Confidence Level and Precision numbers much lower than the one Mr. Alexander applied (i.e., the IRS requires analyses to be more precise).[23]

As each of these guidelines utilized different confidence levels and precisions, different sample sizes will result from the standard statistical formula used by Mr. Alexander. Also, the guidelines require the sampler to verify that their conclusions conform to the relevant statistical parameters; however, Mr. Alexander failed to do this in his analysis.

---

[21] Ibid., p. 7.
[22] Ibid., p. 14.
[23] Internal Revenue Service, Revenue Procedure 2011-42.

# VIII. Mr. Alexander's Analysis Shows That Pilot Flying J's Internal Audit Department's Analysis as well as Pilot Flying J's Attributed Losses Are Unreliable

Mr. Alexander's analysis shows how deeply flawed Pilot Flying J's Internal Audit department's analysis was. Disregarding the aforementioned errors in Mr. Alexander's analysis, applying the standard Attribute Sampling formula to Exhibit C of Mr. Alexander's July 18th Report even shows that he believes that 74% ± 8% of the "IA Over/Under Reimbursements" were erroneously calculated.[24] Additionally, all of the results from Mr. Alexander's SVRS analysis differ from the Attributed Losses Pilot Flying J found. Therefore, this statistical illustration using Mr. Alexander's own data shows how often Pilot Flying J and its Internal Audit department made errors in their analyses.

# IX. Mr. Alexander Utilized An Improper Metric in his Analysis

In Exhibit C to his July 18, 2018 Report, Mr. Alexander displayed the "IA Over/Under Reimbursements" that Pilot Flying J's Internal Audit department calculated for each of the 133 customer months he included in his sample. He then displayed the "SVRS Over/Under Reimbursements" that he calculated along with the resulting Potential Overpayments for these 133 customer months.

As stated in Section III above, I have no independent opinions about the validity or accuracy of the Attributed Losses, "IA Over/Under Reimbursements," the "SVRS Over/Under Reimbursements" or the Potential Overpayments for each customer month. For the purposes of most of my Expert Report, I assume these figures are valid and accurate in an accounting sense for each customer month. To the extent that they are invalid and/or inaccurate in an accounting sense, Mr. Alexander's analysis is further compromised. Section XI below includes some of Mr. Kruse's critiques of Mr. Alexander's work calculating reimbursements in a statistical analysis.

Mr. Alexander summed the "IA Over/Under Reimbursements," the "SVRS Over/Under Reimbursements" and the Potential Overpayments for all allegedly relevant 133 customer months. He then divided the sum total of the Potential Overpayments by the "IA Over/Under Reimbursements" to calculate his Reduction Percentage. The Government multiplied this Reduction Percentage metric (which is based on "IA Over/Under Reimbursements) by Attributed Losses in its August 1, 2018 Notice of No Objection to the Presentence Investigation Report For Defendant Hazelwood submission to calculate the alleged Loss related to Mr. Hazelwood.

---

[24] Mr. Alexander determined that "IA Over/Under Reimbursements" differed from the "SVRS Over/Under Reimbursements" he calculated for 98 of the 133 customer months he sampled.

Essentially, Mr. Alexander utilized the Ratio Method of estimating his Over/Under Reimbursements, where the Reduction Percentage is the ratio.[25] The Ratio Method is sometimes called the (combined) Ratio Method.[26] In Mr. Alexander's analysis, his belief about what the Potential Overpayments were (the numerator in his ratio) is called the "primary variable of interest," while the "IA Over/Under Reimbursements" (the denominator in his ratio) is called the "paired variable."

It is well known in statistics that "ratio estimators are usually *biased*."[27] However, the bias is negligible if the reported values of the units are of the same sign (e.g., positive or negative).[28] Furthermore, the Internal Revenue Service wrote:

> For either the (combined) Ratio or Regression methods (as described in section 4.02(2)(c)), in order to demonstrate that little statistical bias exists, the following applies …. (iii) the coefficient of variation of the paired variable must be 15% or less; (iv) the coefficient of variation of the primary variable of interest, represented by either the corrected value or the difference between the reported and corrected values in common accounting situations, must be 15% or less; and (v) for only the (combined) Ratio method, the reported values of the units must be of the same sign.[29]

However, none of these three conditions apply. As shown in *Exhibit 3*, the coefficients of variation both exceed 15%, violating Rules (iii) and (iv) above. Exhibit 3 also shows that some of the "IA Over/Under Reimbursements" are positive while others are negative, violating Rule (v) above. For example, while most of the "IA Over/Under Reimbursements" are positive, the "IA Over/Under Reimbursement" for the sample relating to Warrant Transport is negative.

Because of the Ratio Estimator is biased given the data that Mr. Alexander reported, Mr. Alexander's estimation methodology is not statistically valid.

Additionally, Mr. Alexander only provided the point estimate of his Reduction Percentage. As discussed above in Section VII.A., there is generally a Margin of Error around any statistical calculation. Without discussing the Margin of Error in his estimate, Mr. Alexander is unable to verify if his calculations conform to the statistical Precision parameters that he intended.

Utilizing standard formulas[30] and assuming there are 2,309 observations,[31] the statistical Precision resulting from Mr. Alexander's Ratio Estimator is approximately 39%.[32] Given the

---

[25] See, for example, Lohr, Sharon L. *Sampling: Design and Analysis* Second Edition, 2010, ("Lohr") p. 118.

[26] The word combined is used if the Sampling Frame is stratified, which it was not in this case.

[27] Lohr, p. 122.

[28] Schaeffer, Richard L., William Mendenhall, III, R. Lyman Ott and Kenneth G. Gerow *Elementary Survey Sampling* Seventh Edition, 2012, ("Schaeffer") p. 195.

[29] Internal Revenue Service, Revenue Procedure 2011-42, Section 4.03.(3).

[30] Schaeffer, p. 175-176.

[31] The Kraft CPAS SVRS data file 8-20-18.xlsx (02072529x9DAC1).xlsx file attached to Mr. Alexander's August 20th Report shows there to be 2,309 observations for the 78 customers listed in the Government's August 1, 2018 Notice of No Objection to the Presentence Investigation Report For Defendant Hazelwood submission related to the individuals in the Government's submission.

sparsity and inconsistency of the underlying data as well as the general invalidity of Mr. Alexander's analysis, the resulting Margin of Error could be even higher.

This large Precision figure by itself could cause one to reject Mr. Alexander's analysis. As discussed above, the OIG, the entity whose guidelines Mr. Alexander allegedly followed, requires at most a "25 percent precision level."[33]  This Precision figure also would be rejected by OMB guidance.

Additionally, Courts have rejected surveys with such a large Precision / Margin of Error.  While Federal Courts have generated similar conclusions,[34] I found that the California Supreme Court best described issues relating to this topic in *Duran v. US Bank*, a matter where statistical sampling was used to estimate weekly overtime hours.  In that matter, the California Supreme Court found that the Plaintiff's survey revealed:

> [The Plaintiffs' estimate of the Plaintiffs' average weekly overtime was 11.86 hours with] a margin of error of 5.14 hours, or 43.3 percent…. This means that the actual average overtime worked by class members could have been 43.3 percent higher (17.00) or lower (6.72) than the 11.86–hour estimate….
>
> With input from the parties' experts, the court must determine that a chosen sample size is statistically appropriate and capable of producing valid results <u>within a reasonable margin of error</u>….
>
> <u>The wide range of error means that a judgment based on the estimate could reflect an amount nearly double the true extent of USB's liability. As even plaintiffs acknowledge, this margin of error was intolerably high</u>….
>
> <u>We question whether</u> such ancillary indicia of reliability could ever be sufficient <u>to justify reliance on an estimate with a margin of error approaching 50 percent.</u>[35]

---

[32] Standard statistical formulas show that the Standard Error is $112,763.  Then using the z-statistic of 1.645 implies a Margin of Error of $185,479.  39% = $185,479 / $478,142.

[33] Alexander July 18th Report, p. 5.

[34] For example, in excluding the plaintiffs' expert, the Court in *United States ex rel. Loughren v. UnumProvident Corp.*, 604 F. Supp. 2d 259, 269. (D. Mass 2009) wrote that

> the Court is troubled by the size of the confidence interval, ± 5,868.3 claims, in Mercurio's final calculation of 8,027 false claims, with 95% confidence. ± 5,868.3 claims is an extremely wide confidence interval…. Viewed in this manner, Mercurio's result amounts only to a conclusion that somewhere between 2,158.7 and 13,895.3 false claims were filed, with 95% confidence. As the *Reference Manual on Scientific Evidence* states, "a broad interval signals that random error is substantial"; "the standard error measures the likely size of the random error . . . . If the standard error is large, the estimate may be seriously wrong." David H. Kaye & David A. Freedman, *Reference Guide on Statistics*, in *Reference Manual on Scientific Evidence* 83, 119 n. 120, 118 (Fed. Judicial Ctr. 2d ed. 2000). This leaves the Court's confidence in the reliability of Mercurio's result shaken.

[35] *Duran v. U.S. Bank Nat'l Assoc.*, 325 P.3d 916, 937-38 (Cal. 2014) (emphasis added)

18

Given OIG and OMB guidance and that *Duran* found a 43% Precision / Margin of Error to be too large, the Finder of Fact could conclude that the 39% Precision / Margin of Error implied by Mr. Alexander's analysis is too large and exclude his analysis.

Even if the Reduction Percentage from Mr. Alexander's analysis that improperly utilized the Ratio Estimator and had a high Precision / Margin of Error were valid, the Government improperly applied the Reduction Percentage. As discussed above, the Reduction Percentage equals the Potential Overpayments divided by the "IA Over/Under Reimbursements." However, in its August 1, 2018 Notice of No Objection to the Presentence Investigation Report For Defendant Hazelwood submission, the Government applies this Reduction Percentage to Attributed Losses. As Attributed Losses, the universe / target population, differ from "IA Over/Under Reimbursements," the Sampling Frame, the Government's analysis mixes apples and oranges and is statistically incorrect even if it were relevant.

# X. Assuming His Reimbursement Calculations Are Accurate, Mr. Alexander's Analysis Does Not Meet Statistical Requirements and if Accepted, Overstates the Losses Allegedly Due to Mr. Hazelwood

As discussed above, Mr. Alexander included customers unrelated to Mr. Hazelwood in his universe / target population, Sampling Frame and Sample. In fact, as per the Government's August 1, 2018 Notice of No Objection to the Presentence Investigation Report For Defendant Hazelwood, only 39 of the 133 customer months Mr. Alexander sampled relate to Mr. Hazelwood. These 39 items are displayed in *Exhibit 4*. Comparing Exhibits 3 and 4 shows that by including non-Hazelwood related items in his sample, Mr. Alexander's analysis understates the average reimbursement size measured by "IA Over/Under Reimbursements" ($4,120 vs. $5,693 per customer month) and the amount by which "IA Over/Under Reimbursements" are overstated using Mr. Alexander's method of comparing "IA Over/Under Reimbursements" to "SVRS Over/Under Reimbursements" ($181 vs. $236 per customer month). Exhibit 4 also shows that the average reimbursement using Attributed Losses differs from the "IA Over/Under Reimbursements."

In addition to limiting the Sampling Frame and Sample to customer months allegedly relevant to Mr. Hazelwood, I utilize Attributed Losses not "IA Over/Under Reimbursements" in my analysis as the universe / target population relates to the former.

I then follow the IRS' methodology for extrapolating from a sample, codified in its Revenue Procedure 2011-42,[36] utilizing Attributed Losses and the amount by which Attributed Losses were overstated based on Mr. Alexander's SVRS reimbursement calculations. The IRS only accepts four different estimators / metrics to perform such an extrapolation.[37] However, for

---

[36] The OIG and OMB do not specify extrapolation techniques.
[37] Internal Revenue Service, Revenue Procedure 2011-42, Section 4.02.(2)(c).

similar reasons to what was described in the prior Section, its methodology considers the Ratio and Regression Estimators to be biased in this situation.

**_Exhibit 5_** displays the point estimate of the amount Attributed Losses are overstated for the IRS-specified Mean Estimator. I utilize the Mean Estimator as the IRS requires one to utilize the estimator with the smallest standard error.[38]

Exhibit 5 also shows that the point estimate of the Mean Estimator has a high Margin of Error / Precision. The Internal Revenue Service in its Revenue Procedure 2011-42 provides a procedure to handle surveys with large Margins of Error.[39] In this Revenue Procedure, the surveyor is able to utilize the Point Estimate if the Precision is less than 10%. If the Precision is greater than 15%, the least advantageous 95% one-sided confidence limit is used. If the Precision is between 10% and 15%, a sliding scale between the Point Estimate and the least advantageous 95% one-sided confidence limit is used.

It is advantageous for the Government, the party that is putting forth the sampling analysis, to have a low overstatement of the Attributed Losses as that increases the relevant Losses and increases Mr. Hazelwood's potential sentence. Consequently, the least advantageous 95% one-sided confidence limit would be the number such that one would be 95% confident that the true Attributed Losses overstatement is less than this number.

Exhibit 5 demonstrates that the 95% one-sided confidence limit of the amount Attributed Losses implied by Mr. Alexander's data is overstated by $959,364.

As the Precision implied by Mr. Alexander's data exceeds 15%, I conclude that Attributed Losses are overstated by $959,364 assuming there is any validity to Mr. Alexander's statistical analysis.

While the calculations in this Section are the proper method of utilizing Mr. Alexander's sample data, the results might still not be sufficiently precise to be acceptable. These results could be excluded per the logic of the OIG and OMB as the corrected calculations imply a Precision of over 75%. The OIG, the entity whose guidelines Mr. Alexander allegedly followed, requires at most a "25 percent precision level."[40]

Additionally, the resulting margin of error using a 90% confidence interval is 2.95% of the total amount of all allegedly relevant payments the Government stated in its August 1, 2018 Notice of No Objection to the Presentence Investigation Report For Defendant Hazelwood submission of $10,883,627. The margin of error is 3.82% using a 95% confidence interval. However, these margins of error do not meet the standards required by the U.S. Office of Management and Budget as discussed in Section VII.B. above.

---

[38] Ibid. I separately calculated amounts using the IRS-specified Difference Estimator. In this case, the Standard Error for the Mean Estimator is $223,047, while the Standard Error for the Difference Estimator is $3,565,029. Because the Standard Error of the latter exceeds the former, I utilize the Mean Estimator in my calculations.
[39] Internal Revenue Service, Revenue Procedure 2011-42, Section 4.02.(2)(c).
[40] Alexander July 18th Report, p. 5.

Consequently, the incomplete nature of Mr. Alexander's sampling data could cause even these corrected calculations to be rejected by the OIG and the Federal government's Office of Management and Budget.[41]

However, if the Finder of Fact accepts these corrected calculations, they demonstrate that the Government and Mr. Alexander overstated the losses allegedly due to Mr. Hazelwood. The Government's August 1, 2018 Notice of No Objection to the Presentence Investigation Report For Defendant Hazelwood submission claims that there were $10,883,627 in Losses before applying the Reduction Percentage. Assuming this number is valid, of which I have no independent opinion, and given the aforementioned caveats, the true loss relevant to Mr. Hazelwood is at **most** $9,924,263.

# XI. Correcting for Some of Mr. Alexander's Reimbursement Calculation Errors Demonstrates the Sensitivity of His Methodology to Small Changes in the Reimbursement Amounts

As discussed above, statistical conclusions generated from Mr. Alexander's sampling methodology are not precise. Slight changes in data underlying an imprecise model often can cause significant changes in the model's results. Mr. Alexander's imprecise sampling model is no exception.

In the Kruse Report, Mr. Philip Kruse critiqued Mr. Alexander's conclusions about what reimbursements should have been. It is my understanding that he concluded that Attributed Losses, "IA Over/Under Reimbursements," and "SVRS Over/Under Reimbursements" were significantly overstated. Mr. Kruse concluded that there should have been no reimbursements for certain customers. In other words, the Attributed Losses, "IA Over/Under Reimbursements," and "SVRS Over/Under Reimbursements" for those customers were overstated by 100%. For other customers, Mr. Kruse determined that there should have been some reimbursements, but those reimbursements would only be a fraction of the Attributed Losses, "IA Over/Under Reimbursements," and "SVRS Over/Under Reimbursements."

In particular, I understand that Mr. Kruse concluded that Pilot Flying J and Mr. Alexander overstated what the reimbursements should have been for several customers including, but not limited to:

1. B P Express
2. Bison Transport
3. B-T Inc (Part of Decker)
4. CDN Logistics Inc.
5. Decker
6. Equity Transportation

---

[41] These conclusions would also be rejected under *Duran*, which rejected a study with a 43.3% Precision.

7. Midwest Logistics Systems
8. Sharkey/Sysco/Shipper's Rental

However, Mr. Kruse was unable to quantify with specificity the amount of Pilot Flying J and Mr. Alexander's overstatements for these customers.

Therefore, to assist the Finder of Fact, I calculated what the True Loss Allegedly Relevant to Mr. Hazelwood would be for various simulations to demonstrate the fragility of Mr. Alexander's sampling methodology. I ran simulations conservatively assuming that Attributed Losses for the months in Mr. Alexander's sample that allegedly relate to Mr. Hazelwood for the aforementioned eight customers were overstated by 10%, 20% and 30%. These simulations do not alter the Attributed Losses for the other twenty-three customers that are in Mr. Alexander's sample that allegedly relate to Mr. Hazelwood. I understand that these assumptions relating to the overstated amounts for just these eight customers are conservative given the sizable, but unquantifiable reimbursement overstatements that Mr. Kruse found. However, as demonstrated below, even these small changes have a large effect on what conclusions could be drawn regarding the True Loss Allegedly Relevant to Mr. Hazelwood.

I commence these simulation analyses in *Exhibit 6* where I assume that the Attributed Losses for the eight aforementioned customers were overstated by 10%. *Exhibit 8* and *Exhibit 10* assume that the Attributed Losses for these eight customers were overstated by 20% and 30%, respectively.

*Exhibit 7* displays the calculations necessary to determine the amount Attributed Losses are overstated if the Attributed Losses for the eight aforementioned customers were overstated by 10%. *Exhibit 9* and *Exhibit 11* display the corresponding calculations if the Attributed Losses for these eight customers were overstated by 20% and 30%, respectively.

Because the Precision is greater than 15% in all three scenarios, I utilize the Least Advantageous 95% One-Sided Confidence Limit of the Overstatement to generate the amount by which Total Attributed Losses were overstated. The Table below summarize the results of these scenarios

| Simulated Percentage Attributed Losses Were Overstated for the Eight Customers | Amount By Which Total Attributed Losses Were Overstated in Simulation | Simulated Revised Loss Allegedly Relevant to Mr. Hazelwood |
|---|---|---|
| 10% | $1,866,932 | $9,016,695 |
| 20% | 3,402,523 | 7,481,104 |
| 30% | 4,958,469 | 5,925,158 |

The Table above demonstrates the sensitivity of the True Loss Allegedly Relevant to Mr. Hazelwood calculation. Each 10% change in the Attributed Losses for just eight customers causes approximately a $1.5 – 1.9 million change in the True Loss Allegedly Relevant to Mr. Hazelwood.

Consequently, small changes in the proper reimbursement amounts have a large effect on the True Loss Allegedly Relevant to Mr. Hazelwood. Given this sensitivity inherent in Mr. Alexander's imprecise sampling methodology, great care should be employed to ensure the accuracy of the reimbursement amounts inputted into the sampling model.

# XII.   Conclusion

The Government and Mr. Alexander made multiple mathematical and methodological errors that fatally flaw his sampling analysis. As detailed in this Expert Report,

- The Sampling Frame he defined in his July 18th and August 20th Reports overstated the target population / universe that he defined in his July 18th Report as well as the target population / universe the Government defined in August 1, 2018 Notice of No Objection to the Presentence Investigation Report For Defendant Hazelwood.
- Mr. Alexander's statistical formula are based on the wrong data. His analysis relates to "IA Over/Under Reimbursements" and not Attributed Losses.
- The Government blindly applied conclusions generated from one data series to another data series.
- Mr. Alexander misquoted and misapplied the statistical rules of the U.S. Department of Health and Human Service's Office of Inspector General. Not only did he utilize the wrong data, but he did not perform a Probe sample, which caused him to statistically mix apples and oranges. If correctly applied, these rules imply that Mr. Alexander understated the required sample size by 56%. Instead of testing the 133 customer months he did, statistical formula suggest that he should have tested at least 305 customer months. Additionally, because only 39 of his customer months relate to Mr. Hazelwood, Mr. Alexander effectively understated the sample size by 87%. Because of his insufficient sample, Mr. Alexander's conclusions are considerably imprecise.
- Even if he correctly applied them, Mr. Alexander did not demonstrate that the statistical rules of the U.S. Department of Health and Human Service's Office of Inspector General are more applicable than other governmental rules.
- Mr. Alexander utilized a Ratio Estimator, even though it is known to be statistically biased in situations like this.
- Mr. Alexander did not provide any Precision statistics in his Reports that would allow the reader to identify the imprecision of his analysis.

As discussed in the introduction, my Expert Report only evaluated Mr. Alexander's statistical sampling analysis. Given the multitude of errors I detailed in that analysis, one might question the validity of other parts of Mr. Alexander's analysis.

September 12, 2018

_Benedl Wilner_

Benjamin S. Wilner, Ph.D.

**Exhibit 1**

## <u>Documents Considered</u>

*Plaintiff's Statistical Analysis*

1. Letter by Vic Alexander, CPA, ABV, CFF and KraftCPAs PLLC to Aubrey B. Harwell, Jr. dated July 18, 2018.
2. Letter by Vic Alexander, CPA, ABV, CFF and KraftCPAs PLLC to Aubrey B. Harwell, Jr. dated August 20, 2018.
3. Loss Attribution Spreadsheet (*Data file.xlsx*).

*Legal Filings*

4. Government's Notice of No Objection to the Presentence Investigation Report For Defendant Hazelwood dated August 1, 2018.

*Court Cases*

5. *Duran v. U.S. Bank Nat'l Assoc.*, 325 P.3d 916, 937-38 (Cal. 2014).
6. *Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359 (7th Cir. 2001).
7. *United States ex rel. Loughren v. UnumProvident Corp.*, 604 F. Supp. 2d 259, 269. (D. Mass 2009)

*Literary Sources*

8. American Institute of Certified Public Accountants *Audit Sampling*, Section 2.24.
9. Centers for Medicare and Medicaid Services' Medicare Program Integrity Manual.
10. Deming, W. Edwards *Sample Design in Business Research*, John Wiley, 1960.
11. Diamond, Shari Seidman. "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Third Edition, 2011, Federal Judicial Center ("Reference Guide on Survey Research").
12. Internal Revenue Service, Revenue Procedure 2011-42.
13. Kaye, David H. and David A. Freedman. "Reference Guide on Statistics," in *Reference Manual on Scientific Evidence* Third Edition, Federal Judicial Center, 2011 ("Reference Guide on Statistics").
14. Lohr, Sharon L. *Sampling: Design and Analysis* Second Edition, 2010.
15. Schaeffer, Richard L., William Mendenhall, III, R. Lyman Ott and Kenneth G. Gerow *Elementary Survey Sampling* Seventh Edition, 2012.

*Online Sources*

16. https://oig.hhs.gov/faqs/corporate-integrity-agreements-faq.asp.
17. https://paymentaccuracy.gov/pdf/m-15-02.pdf.

**EXHIBIT 2**



**Alvarez & Marsal**
**Disputes and Investigations, LLC**
540 West Madison Street – Suite 1800
Chicago, IL 60661
Phone: +1 312 601 4220
Fax: +1 312 332 4599

### Benjamin S. Wilner, Ph.D.

Managing Director – Disputes and Investigations
bwilner@alvarezandmarsal.com

540 West Madison St.
Suite 1800
Chicago, IL 60661
Tel: (312) 470-8450

**Education**
Kellogg Graduate School
of Management,
Northwestern University
Ph.D.
Managerial Economics
and Decision Science

University of
Pennsylvania
BA magna cum laude
with distinction in major
Economics &
Mathematics

London School of
Economics
General Course Degree
Mathematics & Statistics

Dr. Benjamin Wilner has more than twenty years of advisory, valuation, and general economic & financial services experience as a consultant, academic & testifier. He is a Ph.D. economist and statistician who regularly serves as a consultant and testifying expert witness on financial damages, economic & statistical issues.

Dr. Wilner's disputes experience encompasses many industries and a broad range of single plaintiff, class action and criminal disputes including antitrust liability & damages, business interruption, business valuations, economic analyses, intellectual property, labor, lost income, product liability, statistical data analyses, and other corporate and litigation related matters.

In his consulting practice, Dr. Wilner advises corporations and governments on economic and statistical issues. For example, in addition to redesigning statistical aspects of an automobile manufacturer's warranty process, Dr. Wilner received a special commendation from the Commissioner of US Customs & Border Protection for building an economic model to restructure a $2.5 billion tariff, which has won praise by a Cabinet member, Congressional officials, and the industry.

Prior to joining Alvarez & Marsal, Dr. Wilner worked at other multinational consulting firms. He also has been a professor in the business schools at the University of Michigan, University of Iowa, Northwestern University, and the Helsinki School of Economics. Dr. Wilner was a research assistant for a Nobel Prize–winning economist and studied under two other Nobel Laureates. His work has been published in leading academic journals and textbooks as well as regularly cited in the academic and popular press. Dr. Wilner won several awards for teaching and research including a grant from the National Science Foundation.

www.alvarezandmarsal.com

**Testimony before a Trier of Fact**

- Arbitration Testimony in Topix Media Lab, LLC, v. Athlon Sports Communications, Inc., American Arbitration Association, November 2017

- Trial Testimony in Syngenta Crop Protection, LLC v. Willowood, LLC, Willowood USA, LLC, Willowood Azoxystrobin, LLC, and Willowood Limited, United States District Court, Middle District of North Carolina, September 2017

- Trial Testimony in Christine Ekalliipse Mouloki v. Marie Paule Epee and Eric Ngado Epee, United States District Court, Northern District of Illinois, Eastern Division, July 2017

- Trial Testimony in The People of the State of Illinois v. Ronald A. Pieri, State of Illinois, Circuit Court of Lake County, October 2015

- Trial Testimony in Sleepy's LLC, v. Select Comfort Wholesale Corporation, et al., United States District Court, Eastern District of New York, May – June 2012 & July 2015

- Trial Testimony in Grater, Inc., and James T. Zavacki v. Kevin T. Keating and Keating & Shure, Ltd., State of Illinois, Circuit Court of Cook County, March 2015

- Trial Testimony in Think Tank Software Development Corporation et al. v. Chester Inc., et al., State of Indiana, County of Porter, March 2014

- Trial Testimony in Sharon P. Clark, Commissioner of the Kentucky Department of Insurance, in her Capacity as Rehabilitator of AIK Comp v. TransAmerica Insurance Company and TIG Insurance Company, Commonwealth of Kentucky, Franklin Circuit Court, Division Two, October 2012

- Trial Testimony in Mario Vara v. Integra Properties, Inc., Abe Polatsek, S&M Corporation and Michael Strick, State of Illinois, Circuit Court of Cook County, July 2011

- Trial Testimony in Indeck Power Equipment Company v. Professional Power Products, et al., State of Illinois, Circuit Court of Cook County, April 2010

- Trial Testimony in Saint-Gobain Autover USA, Inc., et al. v. Xinyi Glass North America, Inc., et al., United States District Court, Northern District of Ohio, Eastern Division, November 2009

- Trial Testimony in NSM Music Group, Ltd. and NSM Music, Inc. v. Synergy Law Group and Arthur E. Mertes, State of Illinois, Circuit Court of Cook County, June 2009

- Arbitration Testimony in Global Link Logistics, Inc., GLL Holdings, Inc., and Golden Gate Logistics, Inc., v. Olympus Growth Fund III, L.P., et al., American Arbitration Association, October 2008
- Arbitration Testimony in Sarah Sanford v. Society of Actuaries & Bruce Schobel, American Arbitration Association, August 2008
- Hearing Testimony in Chinitz v. Chinitz, State of Michigan, Circuit Court for the County of Oakland, May 2008
- Arbitration Testimony in BP Products North America, Inc. v. Laidlaw Educational Services, JAMS Arbitration, October 2007

**Deposition Testimony**
- Teresa Elward, et al. v. Electrolux Home Products, Inc., United States District Court, Northern District of Illinois, Eastern Division, August 2018
- Roger Coffelt, Jr., et al. v. The Kroger Co., The Pictsweet Company and CRF Frozen Foods LLC., et al., United States District Court, Central District of California, Riverside Division, May 2018
- Rick Lindsey v. Officer Michael Orlando, Officer Jamie Falardeau, the City of Chicago, Delta Airlines, Thomas Steinfels, and Marcella Pirvu, United States District Court, Northern District of Illinois, Eastern Division, March 2018
- Syncora Guarantee Inc. v. Alinda Capital Partners, LLC, American Roads LLC, Macquarie Securities (USA) Inc., and John S. Laxmi, Supreme Court of the State of New York, County of New York, December 2017
- Kelley Antekeier v. Laboratory Corporation of America, United States District Court, Eastern District of Virginia, Alexandria Division, November 2017
- Topix Media Lab, LLC, v. Athlon Sports Communications, Inc., American Arbitration Association, October 2017
- Christine Ekalliipse Mouloki v. Marie Paule Epee and Eric Ngado Epee, United States District Court, Northern District of Illinois, Eastern Division, July 2017
- Syngenta Crop Protection, LLC v. Willowood, LLC, Willowood USA, LLC, Willowood Azoxystrobin, LLC, and Willowood Limited, United States District Court, Middle District of North Carolina, September 2016
- In re: Hardieplank Fiber Cement Siding Litigation, United States District Court, District of Minnesota, February 2016

- In re: Atlas Roofing Corporation Chalet Shingle Products Liability Litigation, United States District Court, Northern District of Georgia, December 2015
- Churchill Downs Incorporated v. Illinois Department of Revenue, Brian Hamer, as Director of The Illinois Department of Revenue, and Dan Rutherford as Treasurer of the State of Illinois, State of Illinois, Circuit Court of Cook County, August 2014
- Victor Tracy, Power of Attorney for Anne Tracy and Victor Tracy, Individually v. Robert K. Erickson, M.D., Lake County Neurosurgery, LLC, Advocate Condell Medical Center, State of Illinois, Circuit Court of Cook County, July 2014
- Marylee Arrigo v. Link Stop, Inc., et al., United States District Court, Western District of Wisconsin, October 2013
- Andrew C. Dillon v. Transportation Solutions Group, LLC, Freight Exchange of North America, LLC, 3PLogic, LLC, Transportation Solutions Enterprises, LLC and Todd Berger, United States District Court, Northern District of Illinois, Eastern Division, September 2013
- Grater, Inc., and James T. Zavacki v. Kevin T. Keating and Keating & Shure, Ltd., State of Illinois, Circuit Court of Cook County, September 2013
- Think Tank Software Development Corporation et al. v. Chester Inc., et al., State of Indiana, County of Porter, February 2012 & October 2009
- Continental Datalabel, Inc. v. Avery Dennison Corporation, United States District Court, Northern District of Illinois, Eastern Division, December 2011
- Ross v. Ross, Circuit Court of the Nineteenth Judicial Circuit, Waukegan, Lake County, Illinois, September 2011
- In re: IKO Roofing Shingle Products Liability Litigation, United States District Court, Central District of Illinois, Urbana Division, August 2011
- Jessica Ellen Legens, et al. v. Mark Alan Ikerman and Manheim Services Corporation, d/b/a Manheim Gateway St. Louis, et al., State of Illinois, Circuit Court of Madison County, November 2010
- Ronald Seymour v. Wausau Signature Agency, et al., United States District Court, Northern District of Illinois, Eastern Division, May 2010
- Neil Simon and Clarissa Simon v. Heritage Title Company, State of Illinois, Circuit Court of Cook County, December 2009
- Mario Vara v. Integra Properties, Inc., Abe Polatsek, S&M Corporation and Michael Strick, State of Illinois, Circuit Court of Cook County, December 2009

- Saint-Gobain Autover USA, Inc., et al. v. Xinyi Glass North America, Inc., et al., United States District Court, Northern District of Ohio, Eastern Division, October 2009
- Sleepy's LLC, v. Select Comfort Wholesale Corporation, et al., United States District Court, Eastern District of New York, July 2009
- Indeck Power Equipment Company v. Professional Power Products, et al., State of Illinois, Circuit Court of Cook County, September 2008
- NSM Music Group, Ltd. and NSM Music, Inc. v. Synergy Law Group and Arthur E. Mertes, State of Illinois, Circuit Court of Cook County, May 2008
- Maria Belbis, et al. v. County of Cook, United States District Court, Northern District of Illinois, Eastern Division, January 2008
- Bucyrus International, Inc. v. Price Erecting Company and Kentucky Rebuild Corp., State of Wisconsin, Circuit Court of Milwaukee County, October 2007
- Mark A. Sindecuse, M.D. v. Dean M. Katsaros, Katsaros & Associates, and CIB Marine Bancshares, Inc., United States District Court, Eastern District of Missouri, Eastern Division, June 2007
- Quentin Bullock et al., v. Michael Sheahan and Cook County, United States District Court, Northern District of Illinois, Eastern Division, September 2006

## Awards
- National Science Foundation Grant, 1998
- Old Gold Research Fellowship, University of Iowa, Summer 1997
- Outstanding Professor, University of Iowa Panhellenic Council, Fall 1996
- Doctoral Teaching Award, Kellogg Graduate School of Management, 1994

## Professional Memberships
- American Bar Association (Associate Status)
- American Statistical Association
- Credit Research Foundation (Research Fellow)



**Publications**

- "The U.S. Federal Crop Insurance Program in 2012 and Beyond," (with Frank Schnapp) Trébol, July 2013
- "Profitability & Effectiveness of the Federal Crop Insurance Program," (with Laura Carolan & Frank Schnapp), Crop Insurance Today, 44(2), pp. 28 – 32, May 2011
- "Economic and Accounting Analyses in Post-Acquisition Disputes," (with Allen Burt and Matthew Paye) The SRR Journal, Spring 2010
- "Statistical Analyses Relation to Reductions In Force," The SRR Journal, Spring 2009
- "Antitrust Analyses in Horizontal Mergers," (with Thomas R. Jackson) The SRR Journal, Fall 2007
- "Options Backdating: The Latest Corporate Imbroglio," (with Idris Raja) The SRR Journal, Spring 2007 (reprinted on mondaq.com)
- "Multi-Unit Auctions: A Comparison of Static and Dynamic Mechanisms" (with Alejandro Manelli and Martin Sefton), Journal of Economic Behavior and Organization, 61(2), pp. 304 – 323, October 2006
- "The Exploitation of Relationships in Financial Distress: The Case of Trade Credit," Journal of Finance, February 2000
- "Everything you always wanted to know about discounting, but were afraid to ask: A Finance 101 Primer," Credit and Financial Management Review, Summer 1999
- "Paying Your Bills: The Effect of Corporate Quality" September 1996
- Refereed for the American Economic Review, American Real Estate Society, Journal of Finance, the Journal of Business, Finance and Accounting, and John Wiley Publishers

# Exhibit 3
## Sample Data
### (From Exhibit C to Mr. Alexander's July 18th Report)

| Customer | Period | IA Reimbursements (Over)/Under | SVRS Reimbursements (Over)/Under | Potential Overpayments (According to Mr. Alexander) |
|---|---|---|---|---|
| ABC Transportation Company | 2010-10 | $ 695 | $ 770 | $ - |
| All American Xpress Inc | 2010-08 | 41,287 | 41,278 | 8 |
| Altendorf | 2009-11 | 127 | 138 | 0 |
| Altendorf | 2010-08 | 370 | 392 | 0 |
| American Furniture Mfg Inc | 2011-04 | 262 | 262 | 0 |
| American Furniture Mfg Inc | 2012-01 | 223 | 223 | 0 |
| Andrus Transportation | 2011-11 | 104 | (1,281) | 1,385 |
| Ashley Distribution Services | 2011-05 | 514 | 10,011 | 0 |
| ATC Leasing Unimark Truck Trans | 2011-02 | 297 | 297 | 0 |
| B P Express Inc | 2011-10 | 4,001 | 4,001 | 0 |
| Beelman Truck Co | 2012-04 | 368 | 580 | 0 |
| Bestway System/Total Transportation | 2010-04 | 5,090 | 4,355 | 735 |
| BIH | 2010-01 | 4,381 | 4,367 | 14 |
| Bison Transport | 2011-11 | 24,063 | 25,046 | 0 |
| Black Horse Carriers | 2010-12 | 6,942 | 6,933 | 9 |
| Black Horse Carriers | 2012-03 | 1,683 | 1,676 | 7 |
| B-T Inc (Part of Decker) | 2010-12 | 2,208 | 2,225 | 0 |
| B-T Inc (Part of Decker) | 2013-01 | 4,899 | 4,910 | 0 |
| Buchanan Hauling & Rigging Inc | 2012-01 | 475 | 753 | 0 |
| C & K Trucking | 2011-04 | 1,873 | 1,873 | 0 |
| C & K Trucking | 2012-01 | 2,219 | 2,219 | 0 |
| C D N Logistics Inc | 2008-09 | 2,284 | 4,478 | 0 |
| C D N Logistics Inc | 2011-12 | 46,003 | 46,001 | 2 |
| California Overland | 2009-09 | 4,115 | 4,661 | 0 |
| Cedar Valley | 2008-12 | 9,654 | 9,335 | 319 |
| Central Transport, LLC (Fleet Fuel) | 2008-04 | 1,067 | 1,067 | 0 |

# Exhibit 3
## Sample Data
### (From Exhibit C to Mr. Alexander's July 18th Report)

| Customer | Period | IA Reimbursements (Over)/Under | SVRS Reimbursements (Over)/Under | Potential Overpayments (According to Mr. Alexander) |
|---|---|---|---|---|
| Central Transport, LLC (Fleet Fuel) | 2009-09 | 3,419 | 3,419 | 0 |
| Centurion Auto Transport Inc. | 2009-09 | 1,560 | 1,560 | 0 |
| Chambers Transportation | 2011-01 | 0 | 0 | 0 |
| Chandler Trucking | 2011-06 | 598 | 522 | 76 |
| Chief Express LLC | 2011-09 | 1,257 | 1,210 | 47 |
| Commonwealth Express | 2011-10 | 7,126 | 6,985 | 141 |
| Compass Funding Solutions | 2009-07 | 6,319 | 6,286 | 33 |
| Compass Funding Solutions | 2012-12 | 10,217 | 10,171 | 47 |
| Cooke Trucking | 2011-04 | 5,687 | 5,704 | 0 |
| CRT Transportation | 2012-03 | 4,939 | 4,952 | 0 |
| Decker | 2012-01 | 13,838 | 13,676 | 162 |
| Dick Lavy | 2011-07 | 4,716 | 5,586 | 0 |
| Dillon Transportation | 2012-08 | 22 | 29 | 0 |
| Doug Marquardt/Skyway Transportation | 2010-05 | 2,638 | 2,020 | 618 |
| Doug Marquardt/Skyway Transportation | 2012-12 | 7,609 | 5,836 | 1,773 |
| Dowell Transport | 2011-08 | 3,401 | 3,427 | 0 |
| Dutch Maid Logistics Inc | 2011-01 | 373 | 219 | 154 |
| Dutch Maid Logistics Inc | 2011-02 | 398 | 244 | 154 |
| Equity Transportation | 2011-10 | 5,500 | 5,234 | 267 |
| First Choice Logistics | 2012-10 | 1,482 | 1,481 | 1 |
| G & P Trucking | 2008-08 | 5,713 | 5,713 | 0 |
| Gdx Trucking Inc | 2011-01 | 1,220 | 0 | 1,220 |
| Grand Island Express | 2008-05 | 745 | 487 | 259 |
| Grand Island Express | 2009-07 | 216 | 216 | 0 |
| Gretna Enterprises LLC | 2009-08 | 1,276 | 1,277 | 0 |
| H & M Trucking Inc | 2011-02 | 2,425 | 2,321 | 103 |

# Exhibit 3
## Sample Data
### (From Exhibit C to Mr. Alexander's July 18th Report)

| Customer | Period | IA Reimbursements (Over)/Under | SVRS Reimbursements (Over)/Under | Potential Overpayments (According to Mr. Alexander) |
|---|---|---|---|---|
| Halvor Lines Inc | 2009-06 | 19,348 | 19,404 | 0 |
| Heniff Transportation | 2008-12 | 20,146 | 18,831 | 1,315 |
| Hill Transportation Inc | 2008-08 | 789 | 789 | 0 |
| Holland Transport | 2012-07 | 39,801 | 39,822 | 0 |
| Holland Transport | 2009-11 | 245 | 245 | 0 |
| Holmes Company of Jackson Inc. | 2012-05 | 501 | 331 | 170 |
| Honey Transport | 2011-09 | 4,555 | 4,295 | 260 |
| Iowa Motor Truck | 2010-12 | 613 | 609 | 5 |
| Iowa Motor Truck | 2012-10 | 1,036 | 1,019 | 17 |
| Issac Transportation/Carlos Rodriguez | 2010-03 | 1,229 | 1,185 | 44 |
| J-Mar Enterprises | 2010-02 | 1,423 | 1,419 | 3 |
| K & C Trucking | 2012-02 | 194 | 194 | 0 |
| K & C Trucking | 2012-11 | 183 | 183 | 0 |
| Kenan Advantage Group Inc. | 2011-10 | 527 | 22 | 505 |
| Laris Shelman & Sons Trucking | 2010-02 | 1,623 | 1,517 | 106 |
| MAINE'S PAPER & FOOD SERVICE | 2008-05 | (210) | (211) | 1 |
| MAINE'S PAPER & FOOD SERVICE | 2008-09 | 450 | 449 | 1 |
| MAINE'S PAPER & FOOD SERVICE | 2008-10 | 3,092 | 3,091 | 1 |
| Major Transportation Services | 2011-12 | 3,466 | 3,443 | 23 |
| Midwest Coast Transport | 2010-05 | 998 | 378 | 620 |
| Midwest Coast Transport | 2010-11 | 1,012 | 138 | 874 |
| Midwest Logistics Inc. / IN | 2010-06 | 564 | 565 | 0 |
| Midwest Logistics Systems | 2012-12 | 6,390 | 6,432 | 0 |
| Mobility Network | 2011-06 | 5,145 | 3,178 | 1,967 |
| MR Trucking | 2012-03 | 1,601 | 1,392 | 209 |
| New Line Transport LLC. | 2009-06 | 3,396 | 3,381 | 15 |

# Exhibit 3
## Sample Data
### (From Exhibit C to Mr. Alexander's July 18th Report)

| Customer | Period | IA Reimbursements (Over)/Under | SVRS Reimbursements (Over)/Under | Potential Overpayments (According to Mr. Alexander) |
|---|---|---|---|---|
| Nick Strimbu Inc ATTN: William Strimbu | 2009-10 | 986 | 986 | 0 |
| Nick Strimbu Inc ATTN: William Strimbu | 2012-12 | 1,214 | 1,214 | 0 |
| Northwest Pallet | 2012-10 | (886) | (886) | 0 |
| Online Transport Inc | 2010-03 | 4,145 | 4,148 | 0 |
| Park Transportation | 2013-01 | 8,825 | 8,825 | 0 |
| Patriot Transport Inc | 2013-01 | 1,912 | 2 | 1,911 |
| Piedmont Express | 2008-11 | 3,479 | 3,452 | 27 |
| Pohl Transportation Inc | 2010-07 | 1,500 | 1,500 | 0 |
| Pohl Transportation Inc | 2012-01 | 1,242 | 1,242 | 0 |
| Pollywog Transport | 2012-05 | 1,618 | 1,618 | 0 |
| Pope Trucking | 2011-07 | 1,574 | 0 | 1,574 |
| Preferred Transport & | 2013-01 | 678 | 678 | 0 |
| Queen Transportation | 2010-04 | 1,247 | 1,231 | 16 |
| Queen Transportation | 2010-10 | 1,482 | 1,506 | 0 |
| R & R Trucking | 2012-11 | 139 | (1) | 140 |
| Refrigerated Express LC | 2012-10 | 1,505 | 751 | 754 |
| Regal Beloit Logistics LLC (Marathon) | 2011-11 | 1,177 | 1,179 | 0 |
| Rose Acre Farms Inc | 2010-05 | 224 | 224 | 0 |
| Rose Acre Farms Inc | 2010-12 | 332 | 332 | 0 |
| Rose Acre Farms Inc | 2011-06 | 372 | 372 | 0 |
| Rose Acre Farms Inc | 2012-12 | 388 | 388 | 0 |
| RWH Trucking Inc/Southern Service | 2011-09 | 4,803 | 4,795 | 7 |
| Service Trucking Eustis, Florida | 2010-03 | 1,435 | 1,436 | 0 |
| Service Trucking Eustis, Florida | 2010-09 | 1,738 | 1,738 | 0 |
| Sharkey/Sysco/Shipper's Rental | 2010-10 | 17,206 | 14,170 | 3,036 |
| Sharkey/Sysco/Shipper's Rental | 2012-12 | 33,401 | 36,027 | 0 |

# Exhibit 3
## Sample Data
### (From Exhibit C to Mr. Alexander's July 18th Report)

| Customer | Period | IA Reimbursements (Over)/Under | SVRS Reimbursements (Over)/Under | Potential Overpayments (According to Mr. Alexander) |
|---|---|---|---|---|
| Silver Line Building Products | 2013-01 | 219 | 219 | 0 |
| Simbeck Inc | 2010-09 | 6,113 | 6,131 | 0 |
| Simbeck Inc | 2011-11 | 4,952 | 4,995 | 0 |
| Solid Group Inc. | 2011-10 | 984 | 984 | 0 |
| South East Express Inc | 2011-03 | 293 | 0 | 293 |
| Stan Koch & Sons | 2011-07 | 14,363 | 14,443 | 0 |
| Star Trans | 2009-10 | (440) | (446) | 6 |
| Store & Haul Inc | 2011-06 | 998 | 999 | 0 |
| T H X Transport LLC | 2012-02 | 892 | 894 | 0 |
| T H X Transport LLC | 2012-12 | 726 | 728 | 0 |
| Tanks Alot LLC DBA | 2011-08 | 279 | 279 | 0 |
| Taylor Express Inc. | 2008-06 | (1,047) | 1,804 | 0 |
| Titan Transfer Inc | 2009-09 | 15,609 | 15,683 | 0 |
| Tld Logistics Services Inc | 2010-02 | 1,778 | 1,778 | 0 |
| Transport One | 2012-08 | 1,330 | 1,317 | 14 |
| TRANSTECH LOGISTICS | 2011-10 | 3,105 | 3,108 | 0 |
| Tri-Hi Transportation | 2010-04 | 3,523 | 3,517 | 7 |
| Trio Trucking Inc | 2009-08 | 1,134 | 1,138 | 0 |
| Truckmen Corporation | 2012-08 | 2,519 | 2,519 | 0 |
| Trucks Inc | 2011-10 | 3,793 | 3,747 | 46 |
| TTI Inc. | 2012-04 | (7) | 307 | 0 |
| W E L Companies Inc | 2010-03 | 5,614 | 5,614 | 0 |
| W E L Companies Inc | 2010-11 | 6,003 | 5,995 | 8 |
| W E L Companies Inc | 2011-05 | 6,760 | 6,759 | 1 |
| Warren Transport | 2011-10 | (3,224) | (5,415) | 2,192 |
| West Wisconsin/Leonards Express | 2010-12 | 3,124 | 2,755 | 369 |

# Exhibit 3
## Sample Data
### (From Exhibit C to Mr. Alexander's July 18th Report)

| Customer | Period | IA Reimbursements (Over)/Under | SVRS Reimbursements (Over)/Under | Potential Overpayments (According to Mr. Alexander) |
|---|---|---|---|---|
| Wooster Motor Ways | 2012-08 | 344 | 345 | 0 |
| Wooster Motor Ways | 2012-11 | 228 | 229 | 0 |
| Your Town Transport Inc | 2012-11 | 242 | 240 | 2 |
| | | | | |
| Average | | $ 4,120 | $ 4,097 | $ 181 |
| Standard Deviation | | 7,693 | 7,784 | 489 |
| Population Size | | 2,309 | 2,309 | 2,309 |
| Sample Size | | 133 | 133 | 133 |
| Coefficient of Variation [1] | | 15.7% | 16.0% | 22.8% |

Notes
1. The Coefficient of Variance equals the Average times the Sample Size divided by the Standard Deviation adjusted by the Sample Size and Finite Population Correction Factor.

Exhibit 4
Sample Data Allegedly Relevant to Mr. Hazelwood

| Customer | Period | Sample Item Allegedly Relevant to Mr. Hazelwood | Sample Items Alleged Relevant to Mr. Hazelwood | | | | |
|---|---|---|---|---|---|---|---|
| | | | IA Reimbursements *(Over)/Under* | Loss Attribution (Over)/Under | SVRS Reimbursements (Over)/Under | Potential Overpayments (per Mr. Alexander) | Potential Overpayments (Loss Attribution - SVRS Reimbursements) |
| ABC Transportation Company | 2010-10 | No | | | | | |
| All American Xpress Inc | 2010-08 | No | | | | | |
| Altendorf | 2009-11 | No | | | | | |
| Altendorf | 2010-08 | No | | | | | |
| American Furniture Mfg Inc | 2011-04 | No | | | | | |
| American Furniture Mfg Inc | 2012-01 | No | | | | | |
| Andrus Transportation | 2011-11 | No | | | | | |
| Ashley Distribution Services | 2011-05 | No | | | | | |
| ATC Leasing Unimark Truck Trans | 2011-02 | No | | | | | |
| B P Express Inc | 2011-10 | Yes | $ 4,001 | $ 4,001 | $ 4,001 | $ - | $ 0 |
| Beelman Truck Co | 2012-04 | Yes | 368 | 288 | 580 | 0 | 0 |
| Bestway System/Total Transportation | 2010-04 | No | | | | | |
| BIH | 2010-01 | No | | | | | |
| Bison Transport | 2011-11 | Yes | 24,063 | 26,498 | 25,046 | 0 | 1,452 |
| Black Horse Carriers | 2010-12 | Yes | 6,942 | 6,862 | 6,933 | 9 | 0 |
| Black Horse Carriers | 2012-03 | Yes | 1,683 | 1,603 | 1,676 | 7 | 0 |
| B-T Inc (Part of Decker) | 2010-12 | Yes | 2,208 | 2,128 | 2,225 | 0 | 0 |
| B-T Inc (Part of Decker) | 2013-01 | Yes | 4,899 | 4,819 | 4,910 | 0 | 0 |
| Buchanan Hauling & Rigging Inc | 2012-01 | No | | | | | |
| C & K Trucking | 2011-04 | Yes | 1,873 | 1,793 | 1,873 | 0 | 0 |
| C & K Trucking | 2012-01 | Yes | 2,219 | 2,139 | 2,219 | 0 | 0 |
| C D N Logistics Inc | 2008-09 | No [1] | | | | | |
| C D N Logistics Inc | 2011-12 | Yes | 46,003 | 45,923 | 46,001 | 2 | 0 |
| California Overland | 2009-09 | No | | | | | |
| Cedar Valley | 2008-12 | No | | | | | |
| Central Transport, LLC (Fleet Fuel) | 2008-04 | Yes | 1,067 | 987 | 1,067 | 0 | 0 |
| Central Transport, LLC (Fleet Fuel) | 2009-09 | Yes | 3,419 | 3,339 | 3,419 | 0 | 0 |
| Centurion Auto Transport Inc. | 2009-09 | No | | | | | |
| Chambers Transportation | 2011-01 | No | | | | | |
| Chandler Trucking | 2011-06 | No | | | | | |
| Chief Express LLC | 2011-09 | No | | | | | |
| Commonwealth Express | 2011-10 | Yes | 7,126 | 7,046 | 6,985 | 141 | 61 |
| Compass Funding Solutions | 2009-07 | Yes | 6,319 | 6,239 | 6,286 | 33 | 0 |
| Compass Funding Solutions | 2012-12 | No [1] | | | | | |
| Cooke Trucking | 2011-04 | No | | | | | |
| CRT Transportation | 2012-03 | No | | | | | |
| Decker | 2012-01 | Yes | 13,838 | 13,758 | 13,676 | 162 | 82 |
| Dick Lavy | 2011-07 | Yes | 4,716 | 4,636 | 5,586 | 0 | 0 |
| Dillon Transportation | 2012-08 | No [1] | | | | | |

# Exhibit 4
## Sample Data Allegedly Relevant to Mr. Hazelwood

| | | | Sample Items Alleged Relevant to Mr. Hazelwood | | | | |
|---|---|---|---|---|---|---|---|
| Customer | Period | Sample Item Allegedly Relevant to Mr. Hazelwood | IA Reimbursements *(Over)/Under* | Loss Attribution (Over)/Under | SVRS Reimbursements (Over)/Under | Potential Overpayments (per Mr. Alexander) | Potential Overpayments (Loss Attribution - SVRS Reimbursements) |
| Doug Marquardt/Skyway Transportation | 2010-05 | No [1] | | | | | |
| Doug Marquardt/Skyway Transportation | 2012-12 | No [1] | | | | | |
| Dowell Transport | 2011-08 | No | | | | | |
| Dutch Maid Logistics Inc | 2011-01 | No | | | | | |
| Dutch Maid Logistics Inc | 2011-02 | No | | | | | |
| Equity Transportation | 2011-10 | Yes | 5,500 | 5,420 | 5,234 | 267 | 186 |
| First Choice Logistics | 2012-10 | No [1] | | | | | |
| G & P Trucking | 2008-08 | Yes | 5,713 | 5,633 | 5,713 | 0 | 0 |
| Gdx Trucking Inc | 2011-01 | No | | | | | |
| Grand Island Express | 2008-05 | Yes | 745 | 665 | 487 | 259 | 178 |
| Grand Island Express | 2009-07 | Yes | 216 | 136 | 216 | 0 | 0 |
| Gretna Enterprises LLC | 2009-08 | Yes | 1,276 | 1,196 | 1,277 | 0 | 0 |
| H & M Trucking Inc | 2011-02 | No | | | | | |
| Halvor Lines Inc | 2009-06 | No [1] | | | | | |
| Heniff Transportation | 2008-12 | No | | | | | |
| Hill Transportation Inc | 2008-08 | Yes | 789 | 709 | 789 | 0 | 0 |
| Holland Transport | 2012-07 | No [1] | | | | | |
| Holland Transport | 2009-11 | Yes | 245 | 165 | 245 | 0 | 0 |
| Holmes Company of Jackson Inc. | 2012-05 | No | | | | | |
| Honey Transport | 2011-09 | Yes | 4,555 | 4,475 | 4,295 | 260 | 180 |
| Iowa Motor Truck | 2010-12 | Yes | 613 | 533 | 609 | 5 | 0 |
| Iowa Motor Truck | 2012-10 | No [1] | | | | | |
| Issac Transportation/Carlos Rodriguez | 2010-03 | No | | | | | |
| J-Mar Enterprises | 2010-02 | Yes | 1,423 | 1,343 | 1,419 | 3 | 0 |
| K & C Trucking | 2012-02 | No | | | | | |
| K & C Trucking | 2012-11 | No | | | | | |
| Kenan Advantage Group Inc. | 2011-10 | No | | | | | |
| Laris Shelman & Sons Trucking | 2010-02 | No | | | | | |
| MAINE'S PAPER & FOOD SERVICE | 2008-05 | No | | | | | |
| MAINE'S PAPER & FOOD SERVICE | 2008-09 | No | | | | | |
| MAINE'S PAPER & FOOD SERVICE | 2008-10 | No | | | | | |
| Major Transportation Services | 2011-12 | No | | | | | |
| Midwest Coast Transport | 2010-05 | No | | | | | |
| Midwest Coast Transport | 2010-11 | No | | | | | |
| Midwest Logistics Inc. / IN | 2010-06 | No | | | | | |
| Midwest Logistics Systems | 2012-12 | Yes | 6,390 | 6,310 | 6,432 | 0 | 0 |
| Mobility Network | 2011-06 | Yes | 5,145 | 5,065 | 3,178 | 1,967 | 1,887 |
| MR Trucking | 2012-03 | No | | | | | |

Exhibit 4
Sample Data Allegedly Relevant to Mr. Hazelwood

| Customer | Period | Sample Item Allegedly Relevant to Mr. Hazelwood | Sample Items Alleged Relevant to Mr. Hazelwood | | | | |
|---|---|---|---|---|---|---|---|
| | | | IA Reimbursements *(Over)/Under* | Loss Attribution (Over)/Under | SVRS Reimbursements (Over)/Under | Potential Overpayments (per Mr. Alexander) | Potential Overpayments (Loss Attribution - SVRS Reimbursements) |
| New Line Transport LLC. | 2009-06 | No | | | | | |
| Nick Strimbu Inc ATTN: William Strimbu | 2009-10 | No | | | | | |
| Nick Strimbu Inc ATTN: William Strimbu | 2012-12 | No | | | | | |
| Northwest Pallet | 2012-10 | No | | | | | |
| Online Transport Inc | 2010-03 | No | | | | | |
| Park Transportation | 2013-01 | No | | | | | |
| Patriot Transport Inc | 2013-01 | No | | | | | |
| Piedmont Express | 2008-11 | No | | | | | |
| Pohl Transportation Inc | 2010-07 | Yes | 1,500 | 1,420 | 1,500 | 0 | 0 |
| Pohl Transportation Inc | 2012-01 | Yes | 1,242 | 1,162 | 1,242 | 0 | 0 |
| Pollywog Transport | 2012-05 | No | | | | | |
| Pope Trucking | 2011-07 | No | | | | | |
| Preferred Transport & | 2013-01 | No | | | | | |
| Queen Transportation | 2010-04 | Yes | 1,247 | 1,247 | 1,231 | 16 | 16 |
| Queen Transportation | 2010-10 | Yes | 1,482 | 1,482 | 1,506 | 0 | 0 |
| R & R Trucking | 2012-11 | No | | | | | |
| Refrigerated Express LC | 2012-10 | No | | | | | |
| Regal Beloit Logistics LLC (Marathon) | 2011-11 | Yes | 1,177 | 243 | 1,179 | 0 | 0 |
| Rose Acre Farms Inc | 2010-05 | No | | | | | |
| Rose Acre Farms Inc | 2010-12 | No | | | | | |
| Rose Acre Farms Inc | 2011-06 | No | | | | | |
| Rose Acre Farms Inc | 2012-12 | No | | | | | |
| RWH Trucking Inc/Southern Service | 2011-09 | No | | | | | |
| Service Trucking Eustis, Florida | 2010-03 | No | | | | | |
| Service Trucking Eustis, Florida | 2010-09 | No | | | | | |
| Sharkey/Sysco/Shipper's Rental | 2010-10 | Yes | 17,206 | 17,126 | 14,170 | 3,036 | 2,956 |
| Sharkey/Sysco/Shipper's Rental | 2012-12 | Yes | 33,401 | 33,321 | 36,027 | 0 | 0 |
| Silver Line Building Products | 2013-01 | No | | | | | |
| Simbeck Inc | 2010-09 | No | | | | | |
| Simbeck Inc | 2011-11 | No | | | | | |
| Solid Group Inc. | 2011-10 | No | | | | | |
| South East Express Inc | 2011-03 | No | | | | | |
| Stan Koch & Sons | 2011-07 | No | | | | | |
| Star Trans | 2009-10 | No | | | | | |
| Store & Haul Inc | 2011-06 | No [1] | | | | | |
| T H X Transport LLC | 2012-02 | No | | | | | |
| T H X Transport LLC | 2012-12 | No | | | | | |
| Tanks Alot LLC DBA | 2011-08 | No | | | | | |
| Taylor Express Inc. | 2008-06 | No | | | | | |

# Exhibit 4
## Sample Data Allegedly Relevant to Mr. Hazelwood

| Customer | Period | Sample Item Allegedly Relevant to Mr. Hazelwood | Sample Items Alleged Relevant to Mr. Hazelwood | | | | |
|---|---|---|---|---|---|---|---|
| | | | IA Reimbursements *(Over)/Under* | Loss Attribution (Over)/Under | SVRS Reimbursements (Over)/Under | Potential Overpayments (per Mr. Alexander) | Potential Overpayments (Loss Attribution - SVRS Reimbursements) |
| Titan Transfer Inc | 2009-09 | No | | | | | |
| Tld Logistics Services Inc | 2010-02 | No | | | | | |
| Transport One | 2012-08 | No | | | | | |
| TRANSTECH LOGISTICS | 2011-10 | No | | | | | |
| Tri-Hi Transportation | 2010-04 | Yes | 3,523 | 3,443 | 3,517 | 7 | 0 |
| Trio Trucking Inc | 2009-08 | Yes | 1,134 | 1,054 | 1,138 | 0 | 0 |
| Truckmen Corporation | 2012-08 | No | | | | | |
| Trucks Inc | 2011-10 | No | | | | | |
| TTI Inc. | 2012-04 | Yes | (7) | (7) | 307 | 0 | 0 |
| W E L Companies Inc | 2010-03 | No | | | | | |
| W E L Companies Inc | 2010-11 | No | | | | | |
| W E L Companies Inc | 2011-05 | No | | | | | |
| Warren Transport | 2011-10 | Yes | (3,224) | (3,224) | (5,415) | 2,192 | 2,191 |
| West Wisconsin/Leonards Express | 2010-12 | No | | | | | |
| Wooster Motor Ways | 2012-08 | No | | | | | |
| Wooster Motor Ways | 2012-11 | No | | | | | |
| Your Town Transport Inc | 2012-11 | No | | | | | |
| | | | | | | | |
| Average | | | $ 5,693 | $ 5,666 | $ 5,610 | $ 215 | $ 236 |
| Standard Deviation | | | 9,534 | 9,675 | 9,768 | 656 | 672 |
| Population Size | | | 2,309 | 2,309 | 2,309 | 2,309 | 2,309 |
| Sample Size | | | 39 | 39 | 39 | 39 | 39 |
| Coefficient of Variation | | | 26.6% | 27.1% | 27.6% | 48.5% | 45.3% |

Notes

1. Even though this customer name is included in the Government's August 1, 2018 Notice of No Objection to the Presentence Investigation Report For Defendant Hazelwood, this particular month is not included

2. The Coefficient of Variance equals the Average times the Sample Size divided by the Standard Deviation adjusted by the Sample Size and Finite Population Correction Factor

# Exhibit 5

## Calculation of Overstatement Assuming Mr. Alexander's Accounting Calculations Are Accurate

| | | |
|---|---|---:|
| Estimated Average Sample Overstatement | (A) = Average Last Column of Exhibit 4 | 236 |
| Population Size | (B) | 2,309 |
| Sample Size | (C) | 39 |
| | | |
| Point Estimate of Overstatement | (D) = (A) * (B) | 544,088 |
| | | |
| Estimated Standard Deviation of Overstatement | (E) = Standard Deviation of Last Column of Exhibit 4 | 672 |
| Estimated Standard Error | (F) = SQRT [ {(B) / (C)} * {(B) - (C)} * (E) ^2 ] | 246,315 |
| | | |
| Degrees of Freedom | (G) = (C) -1 | 38 |
| t-value 95%, one-sided | (H) from Standard Tables | 1.6860 |
| | | |
| Least Advantageous 95% One-Sided Confidence Limit | (I) = (D) + (F) * (H) | 959,364 |
| | | |
| Precision | (J) = { (I) - (D) } / (D) | 76.3% |

Exhibit 6

Sample Data Allegedly Relevant to Mr. Hazelwood Modified by a 10% Reduction for Eight Customers

| Customer | Period | Sample Item Allegedly Relevant to Mr. Hazelwood | Loss Attribution (Over)/Under | SVRS Reimbursements (Over)/Under | Assuming Attributed Losses for the Eight Customers Were Overstated by 10% (Over)/Under | Potential Overpayments (Loss Attribution - (Reimbursements less 10% if applicable, if not, SVRS Reimbursements)) |
|---|---|---|---|---|---|---|
| ABC Transportation Company | 2010-10 | No | | | | |
| All American Xpress Inc | 2010-08 | No | | | | |
| Altendorf | 2009-11 | No | | | | |
| Altendorf | 2010-08 | No | | | | |
| American Furniture Mfg Inc | 2011-04 | No | | | | |
| American Furniture Mfg Inc | 2012-01 | No | | | | |
| Andrus Transportation | 2011-11 | No | | | | |
| Ashley Distribution Services | 2011-05 | No | | | | |
| ATC Leasing Unimark Truck Trans | 2011-02 | No | | | | |
| B P Express Inc | 2011-10 | Yes | $ 4,001 | $ 4,001 | 3,601 | 400 |
| Beelman Truck Co | 2012-04 | Yes | 288 | 580 | | 0 |
| Bestway System/Total Transportation | 2010-04 | No | | | | |
| BIH | 2010-01 | No | | | | |
| Bison Transport | 2011-11 | Yes | 26,498 | 25,046 | 23,848 | 2,650 |
| Black Horse Carriers | 2010-12 | Yes | 6,862 | 6,933 | | 0 |
| Black Horse Carriers | 2012-03 | Yes | 1,603 | 1,676 | | 0 |
| B-T Inc (Part of Decker) | 2010-12 | Yes | 2,128 | 2,225 | 1,915 | 213 |
| B-T Inc (Part of Decker) | 2013-01 | Yes | 4,819 | 4,910 | 4,337 | 482 |
| Buchanan Hauling & Rigging Inc | 2012-01 | No | | | | |
| C & K Trucking | 2011-04 | Yes | 1,793 | 1,873 | | 0 |
| C & K Trucking | 2012-01 | Yes | 2,139 | 2,219 | | 0 |
| C D N Logistics Inc | 2008-09 | No [1] | | | | |
| C D N Logistics Inc | 2011-12 | Yes | 45,923 | 46,001 | 41,330 | 4,592 |
| California Overland | 2009-09 | No | | | | |
| Cedar Valley | 2008-12 | No | | | | |
| Central Transport, LLC (Fleet Fuel) | 2008-04 | Yes | 987 | 1,067 | | 0 |
| Central Transport, LLC (Fleet Fuel) | 2009-09 | Yes | 3,339 | 3,419 | | 0 |
| Centurion Auto Transport Inc. | 2009-09 | No | | | | |
| Chambers Transportation | 2011-01 | No | | | | |
| Chandler Trucking | 2011-06 | No | | | | |
| Chief Express LLC | 2011-09 | No | | | | |
| Commonwealth Express | 2011-10 | Yes | 7,046 | 6,985 | | 61 |
| Compass Funding Solutions | 2009-07 | Yes | 6,239 | 6,286 | | 0 |
| Compass Funding Solutions | 2012-12 | No [1] | | | | |

# Exhibit 6
## Sample Data Allegedly Relevant to Mr. Hazelwood Modified by a 10% Reduction for Eight Customers

| Customer | Period | Sample Item Allegedly Relevant to Mr. Hazelwood | Loss Attribution (Over)/Under | SVRS Reimbursements (Over)/Under | Assuming Attributed Losses for the Eight Customers Were Overstated by 10% (Over)/Under | Potential Overpayments (Loss Attribution - (Reimbursements less 10% if applicable, if not, SVRS Reimbursements)) |
|---|---|---|---|---|---|---|
| Cooke Trucking | 2011-04 | No | | | | |
| CRT Transportation | 2012-03 | No | | | | |
| Decker | 2012-01 | Yes | 13,758 | 13,676 | 12,382 | 1,376 |
| Dick Lavy | 2011-07 | Yes | 4,636 | 5,586 | | 0 |
| Dillon Transportation | 2012-08 | No [1] | | | | |
| Doug Marquardt/Skyway Transportation | 2010-05 | No [1] | | | | |
| Doug Marquardt/Skyway Transportation | 2012-12 | No [1] | | | | |
| Dowell Transport | 2011-08 | No | | | | |
| Dutch Maid Logistics Inc | 2011-01 | No | | | | |
| Dutch Maid Logistics Inc | 2011-02 | No | | | | |
| Equity Transportation | 2011-10 | Yes | 5,420 | 5,234 | 4,878 | 542 |
| First Choice Logistics | 2012-10 | No [1] | | | | |
| G & P Trucking | 2008-08 | Yes | 5,633 | 5,713 | | 0 |
| Gdx Trucking Inc | 2011-01 | No | | | | |
| Grand Island Express | 2008-05 | Yes | 665 | 487 | | 178 |
| Grand Island Express | 2009-07 | Yes | 136 | 216 | | 0 |
| Gretna Enterprises LLC | 2009-08 | Yes | 1,196 | 1,277 | | 0 |
| H & M Trucking Inc | 2011-02 | No | | | | |
| Halvor Lines Inc | 2009-06 | No [1] | | | | |
| Heniff Transportation | 2008-12 | No | | | | |
| Hill Transportation Inc | 2008-08 | Yes | 709 | 789 | | 0 |
| Holland Transport | 2012-07 | No [1] | | | | |
| Holland Transport | 2009-11 | Yes | 165 | 245 | | 0 |
| Holmes Company of Jackson Inc. | 2012-05 | No | | | | |
| Honey Transport | 2011-09 | Yes | 4,475 | 4,295 | | 180 |
| Iowa Motor Truck | 2010-12 | Yes | 533 | 609 | | 0 |
| Iowa Motor Truck | 2012-10 | No [1] | | | | |
| Issac Transportation/Carlos Rodriguez | 2010-03 | No | | | | |
| J-Mar Enterprises | 2010-02 | Yes | 1,343 | 1,419 | | 0 |
| K & C Trucking | 2012-02 | No | | | | |
| K & C Trucking | 2012-11 | No | | | | |
| Kenan Advantage Group Inc. | 2011-10 | No | | | | |
| Laris Shelman & Sons Trucking | 2010-02 | No | | | | |
| MAINE'S PAPER & FOOD SERVICE | 2008-05 | No | | | | |

Exhibit 6

## Sample Data Allegedly Relevant to Mr. Hazelwood Modified by a 10% Reduction for Eight Customers

| Customer | Period | Sample Item Allegedly Relevant to Mr. Hazelwood | Loss Attribution (Over)/Under | SVRS Reimbursements (Over)/Under | Assuming Attributed Losses for the Eight Customers Were Overstated by 10% (Over)/Under | Potential Overpayments (Loss Attribution - (Reimbursements less 10% if applicable, if not, SVRS Reimbursements)) |
|---|---|---|---|---|---|---|
| MAINE'S PAPER & FOOD SERVICE | 2008-09 | No | | | | |
| MAINE'S PAPER & FOOD SERVICE | 2008-10 | No | | | | |
| Major Transportation Services | 2011-12 | No | | | | |
| Midwest Coast Transport | 2010-05 | No | | | | |
| Midwest Coast Transport | 2010-11 | No | | | | |
| Midwest Logistics Inc. / IN | 2010-06 | No | | | | |
| Midwest Logistics Systems | 2012-12 | Yes | 6,310 | 6,432 | 5,679 | 631 |
| Mobility Network | 2011-06 | Yes | 5,065 | 3,178 | | 1,887 |
| MR Trucking | 2012-03 | No | | | | |
| New Line Transport LLC. | 2009-06 | No | | | | |
| Nick Strimbu Inc ATTN: William Strimbu | 2009-10 | No | | | | |
| Nick Strimbu Inc ATTN: William Strimbu | 2012-12 | No | | | | |
| Northwest Pallet | 2012-10 | No | | | | |
| Online Transport Inc | 2010-03 | No | | | | |
| Park Transportation | 2013-01 | No | | | | |
| Patriot Transport Inc | 2013-01 | No | | | | |
| Piedmont Express | 2008-11 | No | | | | |
| Pohl Transportation Inc | 2010-07 | Yes | 1,420 | 1,500 | | 0 |
| Pohl Transportation Inc | 2012-01 | Yes | 1,162 | 1,242 | | 0 |
| Pollywog Transport | 2012-05 | No | | | | |
| Pope Trucking | 2011-07 | No | | | | |
| Preferred Transport & | 2013-01 | No | | | | |
| Queen Transportation | 2010-04 | Yes | 1,247 | 1,231 | | 16 |
| Queen Transportation | 2010-10 | Yes | 1,482 | 1,506 | | 0 |
| R & R Trucking | 2012-11 | No | | | | |
| Refrigerated Express LC | 2012-10 | No | | | | |
| Regal Beloit Logistics LLC (Marathon) | 2011-11 | Yes | 243 | 1,179 | | 0 |
| Rose Acre Farms Inc | 2010-05 | No | | | | |
| Rose Acre Farms Inc | 2010-12 | No | | | | |
| Rose Acre Farms Inc | 2011-06 | No | | | | |
| Rose Acre Farms Inc | 2012-12 | No | | | | |
| RWH Trucking Inc/Southern Service | 2011-09 | No | | | | |
| Service Trucking Eustis, Florida | 2010-03 | No | | | | |
| Service Trucking Eustis, Florida | 2010-09 | No | | | | |
| Sharkey/Sysco/Shipper's Rental | 2010-10 | Yes | 17,126 | 14,170 | 15,414 | 1,713 |

Exhibit 6

# Sample Data Allegedly Relevant to Mr. Hazelwood Modified by a 10% Reduction for Eight Customers

| Customer | Period | Sample Item Allegedly Relevant to Mr. Hazelwood | Loss Attribution (Over)/Under | SVRS Reimbursements (Over)/Under | Assuming Attributed Losses for the Eight Customers Were Overstated by 10% (Over)/Under | Potential Overpayments (Loss Attribution - (Reimbursements less 10% if applicable, if not, SVRS Reimbursements)) |
|---|---|---|---|---|---|---|
| Sharkey/Sysco/Shipper's Rental | 2012-12 | Yes | 33,321 | 36,027 | 29,989 | 3,332 |
| Silver Line Building Products | 2013-01 | No | | | | |
| Simbeck Inc | 2010-09 | No | | | | |
| Simbeck Inc | 2011-11 | No | | | | |
| Solid Group Inc. | 2011-10 | No | | | | |
| South East Express Inc | 2011-03 | No | | | | |
| Stan Koch & Sons | 2011-07 | No | | | | |
| Star Trans | 2009-10 | No | | | | |
| Store & Haul Inc | 2011-06 | No [1] | | | | |
| T H X Transport LLC | 2012-02 | No | | | | |
| T H X Transport LLC | 2012-12 | No | | | | |
| Tanks Alot LLC DBA | 2011-08 | No | | | | |
| Taylor Express Inc. | 2008-06 | No | | | | |
| Titan Transfer Inc | 2009-09 | No | | | | |
| Tld Logistics Services Inc | 2010-02 | No | | | | |
| Transport One | 2012-08 | No | | | | |
| TRANSTECH LOGISTICS | 2011-10 | No | | | | |
| Tri-Hi Transportation | 2010-04 | Yes | 3,443 | 3,517 | | 0 |
| Trio Trucking Inc | 2009-08 | Yes | 1,054 | 1,138 | | 0 |
| Truckmen Corporation | 2012-08 | No | | | | |
| Trucks Inc | 2011-10 | No | | | | |
| TTI Inc. | 2012-04 | Yes | (7) | 307 | | 0 |
| W E L Companies Inc | 2010-03 | No | | | | |
| W E L Companies Inc | 2010-11 | No | | | | |
| W E L Companies Inc | 2011-05 | No | | | | |
| Warren Transport | 2011-10 | Yes | (3,224) | (5,415) | | 2,191 |
| West Wisconsin/Leonards Express | 2010-12 | No | | | | |
| Wooster Motor Ways | 2012-08 | No | | | | |
| Wooster Motor Ways | 2012-11 | No | | | | |
| Your Town Transport Inc | 2012-11 | No | | | | |

Exhibit 6

Sample Data Allegedly Relevant to Mr. Hazelwood Modified by a 10% Reduction for Eight Customers

| Customer | Period | Sample Item Allegedly Relevant to Mr. Hazelwood | Loss Attribution (Over)/Under | SVRS Reimbursements (Over)/Under | Assuming Attributed Losses for the Eight Customers Were Overstated by 10% (Over)/Under | Potential Overpayments (Loss Attribution - (Reimbursements less 10% if applicable, if not, SVRS Reimbursements)) |
|---|---|---|---|---|---|---|
| Average | | | $ 5,666 | | | $ 524 |
| Standard Deviation | | | 9,675 | | | 1,062 |
| Population Size | | | 2,309 | | | 2,309 |
| Sample Size | | | 39 | | | 39 |
| Coefficient of Variation [2] | | | 27.1% | | | 32.2% |

Notes
1.  Even though this customer name is included in the Government's August 1, 2018 Notice of No Objection to the Presentence Investigation Report For Defendant Hazelwood, this particular month is not included

2. The Coefficient of Variance equals the Average times the Sample Size divided by the Standard Deviation adjusted by the Sample Size and Finite Population Correction Factor.

# Exhibit 7

## Calculation of Overstatement Assuming Mr. Alexander's Accounting Calculations Are Accurate & Including a 10% Reduction for Eight Customers

| | | |
|---|---|---|
| Estimated Average Sample Overstatement | (A) = Average Last Column of Exhibit 6 | 524 |
| Population Size | (B) | 2,309 |
| Sample Size | (C) | 39 |
| | | |
| Point Estimate of Overstatement | (D) = (A) * (B) | 1,210,353 |
| | | |
| Estimated Standard Deviation of Overstatement | (E) = Standard Deviation of Last Column of Exhibit 6 | 1,062 |
| Estimated Standard Error | (F) = SQRT [ {(B) / (C)} * {(B) - (C)} * (E) ^2 ] | 389,440 |
| | | |
| Degrees of Freedom | (G) = (C) -1 | 38 |
| t-value 95%, one-sided | (H) from Standard Tables | 1.6860 |
| | | |
| Least Advantageous 95% One-Sided Confidence Limit | (I) = (D) + (F) * (H) | 1,866,932 |
| | | |
| Precision | (J) = { (I) - (D) } / (D) | 54.2% |

# Exhibit 8
## Sample Data Allegedly Relevant to Mr. Hazelwood Modified by a 20% Reduction for Eight Customers

| Customer | Period | Sample Item Allegedly Relevant to Mr. Hazelwood | Loss Attribution (Over)/Under | SVRS Reimbursements (Over)/Under | Assuming Attributed Losses for the Eight Customers Were Overstated by 20% (Over)/Under | Potential Overpayments (Loss Attribution - (Reimbursements less 20% if applicable, if not, SVRS Reimbursements)) |
|---|---|---|---|---|---|---|
| ABC Transportation Company | 2010-10 | No | | | | |
| All American Xpress Inc | 2010-08 | No | | | | |
| Altendorf | 2009-11 | No | | | | |
| Altendorf | 2010-08 | No | | | | |
| American Furniture Mfg Inc | 2011-04 | No | | | | |
| American Furniture Mfg Inc | 2012-01 | No | | | | |
| Andrus Transportation | 2011-11 | No | | | | |
| Ashley Distribution Services | 2011-05 | No | | | | |
| ATC Leasing Unimark Truck Trans | 2011-02 | No | | | | |
| B P Express Inc | 2011-10 | Yes | $ 4,001 | $ 4,001 | 3,201 | 800 |
| Beelman Truck Co | 2012-04 | Yes | 288 | 580 | | 0 |
| Bestway System/Total Transportation | 2010-04 | No | | | | |
| BIH | 2010-01 | No | | | | |
| Bison Transport | 2011-11 | Yes | 26,498 | 25,046 | 21,198 | 5,300 |
| Black Horse Carriers | 2010-12 | Yes | 6,862 | 6,933 | | 0 |
| Black Horse Carriers | 2012-03 | Yes | 1,603 | 1,676 | | 0 |
| B-T Inc (Part of Decker) | 2010-12 | Yes | 2,128 | 2,225 | 1,703 | 426 |
| B-T Inc (Part of Decker) | 2013-01 | Yes | 4,819 | 4,910 | 3,855 | 964 |
| Buchanan Hauling & Rigging Inc | 2012-01 | No | | | | |
| C & K Trucking | 2011-04 | Yes | 1,793 | 1,873 | | 0 |
| C & K Trucking | 2012-01 | Yes | 2,139 | 2,219 | | 0 |
| C D N Logistics Inc | 2008-09 | No [1] | | | | |
| C D N Logistics Inc | 2011-12 | Yes | 45,923 | 46,001 | 36,738 | 9,185 |
| California Overland | 2009-09 | No | | | | |
| Cedar Valley | 2008-12 | No | | | | |
| Central Transport, LLC (Fleet Fuel) | 2008-04 | Yes | 987 | 1,067 | | 0 |
| Central Transport, LLC (Fleet Fuel) | 2009-09 | Yes | 3,339 | 3,419 | | 0 |
| Centurion Auto Transport Inc. | 2009-09 | No | | | | |
| Chambers Transportation | 2011-01 | No | | | | |
| Chandler Trucking | 2011-06 | No | | | | |
| Chief Express LLC | 2011-09 | No | | | | |
| Commonwealth Express | 2011-10 | Yes | 7,046 | 6,985 | | 61 |
| Compass Funding Solutions | 2009-07 | Yes | 6,239 | 6,286 | | 0 |
| Compass Funding Solutions | 2012-12 | No [1] | | | | |

# Exhibit 8
## Sample Data Allegedly Relevant to Mr. Hazelwood Modified by a 20% Reduction for Eight Customers

| Customer | Period | Sample Item Allegedly Relevant to Mr. Hazelwood | Loss Attribution (Over)/Under | SVRS Reimbursements (Over)/Under | Assuming Attributed Losses for the Eight Customers Were Overstated by 20% (Over)/Under | Potential Overpayments (Loss Attribution - (Reimbursements less 20% if applicable, if not, SVRS Reimbursements)) |
|---|---|---|---|---|---|---|
| Cooke Trucking | 2011-04 | No | | | | |
| CRT Transportation | 2012-03 | No | | | | |
| Decker | 2012-01 | Yes | 13,758 | 13,676 | 11,006 | 2,752 |
| Dick Lavy | 2011-07 | Yes | 4,636 | 5,586 | | 0 |
| Dillon Transportation | 2012-08 | No [1] | | | | |
| Doug Marquardt/Skyway Transportation | 2010-05 | No [1] | | | | |
| Doug Marquardt/Skyway Transportation | 2012-12 | No [1] | | | | |
| Dowell Transport | 2011-08 | No | | | | |
| Dutch Maid Logistics Inc | 2011-01 | No | | | | |
| Dutch Maid Logistics Inc | 2011-02 | No | | | | |
| Equity Transportation | 2011-10 | Yes | 5,420 | 5,234 | 4,336 | 1,084 |
| First Choice Logistics | 2012-10 | No [1] | | | | |
| G & P Trucking | 2008-08 | Yes | 5,633 | 5,713 | | 0 |
| Gdx Trucking Inc | 2011-01 | No | | | | |
| Grand Island Express | 2008-05 | Yes | 665 | 487 | | 178 |
| Grand Island Express | 2009-07 | Yes | 136 | 216 | | 0 |
| Gretna Enterprises LLC | 2009-08 | Yes | 1,196 | 1,277 | | 0 |
| H & M Trucking Inc | 2011-02 | No | | | | |
| Halvor Lines Inc | 2009-06 | No [1] | | | | |
| Heniff Transportation | 2008-12 | No | | | | |
| Hill Transportation Inc | 2008-08 | Yes | 709 | 789 | | 0 |
| Holland Transport | 2012-07 | No [1] | | | | |
| Holland Transport | 2009-11 | Yes | 165 | 245 | | 0 |
| Holmes Company of Jackson Inc. | 2012-05 | No | | | | |
| Honey Transport | 2011-09 | Yes | 4,475 | 4,295 | | 180 |
| Iowa Motor Truck | 2010-12 | Yes | 533 | 609 | | 0 |
| Iowa Motor Truck | 2012-10 | No [1] | | | | |
| Issac Transportation/Carlos Rodriguez | 2010-03 | No | | | | |
| J-Mar Enterprises | 2010-02 | Yes | 1,343 | 1,419 | | 0 |
| K & C Trucking | 2012-02 | No | | | | |
| K & C Trucking | 2012-11 | No | | | | |
| Kenan Advantage Group Inc. | 2011-10 | No | | | | |
| Laris Shelman & Sons Trucking | 2010-02 | No | | | | |
| MAINE'S PAPER & FOOD SERVICE | 2008-05 | No | | | | |

# Exhibit 8
## Sample Data Allegedly Relevant to Mr. Hazelwood Modified by a 20% Reduction for Eight Customers

| Customer | Period | Sample Item Allegedly Relevant to Mr. Hazelwood | Loss Attribution (Over)/Under | SVRS Reimbursements (Over)/Under | Assuming Attributed Losses for the Eight Customers Were Overstated by 20% (Over)/Under | Potential Overpayments (Loss Attribution - (Reimbursements less 20% if applicable, if not, SVRS Reimbursements)) |
|---|---|---|---|---|---|---|
| MAINE'S PAPER & FOOD SERVICE | 2008-09 | No | | | | |
| MAINE'S PAPER & FOOD SERVICE | 2008-10 | No | | | | |
| Major Transportation Services | 2011-12 | No | | | | |
| Midwest Coast Transport | 2010-05 | No | | | | |
| Midwest Coast Transport | 2010-11 | No | | | | |
| Midwest Logistics Inc. / IN | 2010-06 | No | | | | |
| Midwest Logistics Systems | 2012-12 | Yes | 6,310 | 6,432 | 5,048 | 1,262 |
| Mobility Network | 2011-06 | Yes | 5,065 | 3,178 | | 1,887 |
| MR Trucking | 2012-03 | No | | | | |
| New Line Transport LLC. | 2009-06 | No | | | | |
| Nick Strimbu Inc ATTN: William Strimbu | 2009-10 | No | | | | |
| Nick Strimbu Inc ATTN: William Strimbu | 2012-12 | No | | | | |
| Northwest Pallet | 2012-10 | No | | | | |
| Online Transport Inc | 2010-03 | No | | | | |
| Park Transportation | 2013-01 | No | | | | |
| Patriot Transport Inc | 2013-01 | No | | | | |
| Piedmont Express | 2008-11 | No | | | | |
| Pohl Transportation Inc | 2010-07 | Yes | 1,420 | 1,500 | | 0 |
| Pohl Transportation Inc | 2012-01 | Yes | 1,162 | 1,242 | | 0 |
| Pollywog Transport | 2012-05 | No | | | | |
| Pope Trucking | 2011-07 | No | | | | |
| Preferred Transport & | 2013-01 | No | | | | |
| Queen Transportation | 2010-04 | Yes | 1,247 | 1,231 | | 16 |
| Queen Transportation | 2010-10 | Yes | 1,482 | 1,506 | | 0 |
| R & R Trucking | 2012-11 | No | | | | |
| Refrigerated Express LC | 2012-10 | No | | | | |
| Regal Beloit Logistics LLC (Marathon) | 2011-11 | Yes | 243 | 1,179 | | 0 |
| Rose Acre Farms Inc | 2010-05 | No | | | | |
| Rose Acre Farms Inc | 2010-12 | No | | | | |
| Rose Acre Farms Inc | 2011-06 | No | | | | |
| Rose Acre Farms Inc | 2012-12 | No | | | | |
| RWH Trucking Inc/Southern Service | 2011-09 | No | | | | |
| Service Trucking Eustis, Florida | 2010-03 | No | | | | |
| Service Trucking Eustis, Florida | 2010-09 | No | | | | |
| Sharkey/Sysco/Shipper's Rental | 2010-10 | Yes | 17,126 | 14,170 | 13,701 | 3,425 |

# Exhibit 8
## Sample Data Allegedly Relevant to Mr. Hazelwood Modified by a 20% Reduction for Eight Customers

| Customer | Period | Sample Item Allegedly Relevant to Mr. Hazelwood | Loss Attribution (Over)/Under | SVRS Reimbursements (Over)/Under | Assuming Attributed Losses for the Eight Customers Were Overstated by 20% (Over)/Under | Potential Overpayments (Loss Attribution - (Reimbursements less 20% if applicable, if not, SVRS Reimbursements)) |
|---|---|---|---|---|---|---|
| Sharkey/Sysco/Shipper's Rental | 2012-12 | Yes | 33,321 | 36,027 | 26,657 | 6,664 |
| Silver Line Building Products | 2013-01 | No | | | | |
| Simbeck Inc | 2010-09 | No | | | | |
| Simbeck Inc | 2011-11 | No | | | | |
| Solid Group Inc. | 2011-10 | No | | | | |
| South East Express Inc | 2011-03 | No | | | | |
| Stan Koch & Sons | 2011-07 | No | | | | |
| Star Trans | 2009-10 | No | | | | |
| Store & Haul Inc | 2011-06 | No [1] | | | | |
| T H X Transport LLC | 2012-02 | No | | | | |
| T H X Transport LLC | 2012-12 | No | | | | |
| Tanks Alot LLC DBA | 2011-08 | No | | | | |
| Taylor Express Inc. | 2008-06 | No | | | | |
| Titan Transfer Inc | 2009-09 | No | | | | |
| Tld Logistics Services Inc | 2010-02 | No | | | | |
| Transport One | 2012-08 | No | | | | |
| TRANSTECH LOGISTICS | 2011-10 | No | | | | |
| Tri-Hi Transportation | 2010-04 | Yes | 3,443 | 3,517 | | 0 |
| Trio Trucking Inc | 2009-08 | Yes | 1,054 | 1,138 | | 0 |
| Truckmen Corporation | 2012-08 | No | | | | |
| Trucks Inc | 2011-10 | No | | | | |
| TTI Inc. | 2012-04 | Yes | (7) | 307 | | 0 |
| W E L Companies Inc | 2010-03 | No | | | | |
| W E L Companies Inc | 2010-11 | No | | | | |
| W E L Companies Inc | 2011-05 | No | | | | |
| Warren Transport | 2011-10 | Yes | (3,224) | (5,415) | | 2,191 |
| West Wisconsin/Leonards Express | 2010-12 | No | | | | |
| Wooster Motor Ways | 2012-08 | No | | | | |
| Wooster Motor Ways | 2012-11 | No | | | | |
| Your Town Transport Inc | 2012-11 | No | | | | |

Exhibit 8

## Sample Data Allegedly Relevant to Mr. Hazelwood Modified by a 20% Reduction for Eight Customers

| Customer | Period | Sample Item Allegedly Relevant to Mr. Hazelwood | Loss Attribution (Over)/Under | SVRS Reimbursements (Over)/Under | Assuming Attributed Losses for the Eight Customers Were Overstated by 20% (Over)/Under | Potential Overpayments (Loss Attribution - (Reimbursements less 20% if applicable, if not, SVRS Reimbursements)) |
|---|---|---|---|---|---|---|
| Average | | | $ 5,666 | | | $ 933 |
| Standard Deviation | | | 9,675 | | | 2,021 |
| Population Size | | | 2,309 | | | 2,309 |
| Sample Size | | | 39 | | | 39 |
| Coefficient of Variation [2] | | | 27.1% | | | 34.4% |

Notes

1. Even though this customer name is included in the Government's August 1, 2018 Notice of No Objection to the Presentence Investigation Report For Defendant Hazelwood, this particular month is not included

2. The Coefficient of Variance equals the Average times the Sample Size divided by the Standard Deviation adjusted by the Sample Size and Finite Population Correction Factor.

# Exhibit 9

## Calculation of Overstatement Assuming Mr. Alexander's Accounting Calculations Are Accurate & Including a 20% Reduction for Eight Customers

| | | |
|---|---|---:|
| Estimated Average Sample Overstatement | (A) = Average Last Column of Exhibit 8 | 933 |
| Population Size | (B) | 2,309 |
| Sample Size | (C) | 39 |
| | | |
| Point Estimate of Overstatement | (D) = (A) * (B) | 2,153,517 |
| | | |
| Estimated Standard Deviation of Overstatement | (E) = Standard Deviation of Last Column of Exhibit 8 | 2,021 |
| Estimated Standard Error | (F) = SQRT [ {(B) / (C)} * {(B) - (C)} * (E) ^2 ] | 740,830 |
| | | |
| Degrees of Freedom | (G) = (C) -1 | 38 |
| t-value 95%, one-sided | (H) from Standard Tables | 1.6860 |
| | | |
| Least Advantageous 95% One-Sided Confidence Limit | (I) = (D) + (F) * (H) | 3,402,523 |
| | | |
| Precision | (J) = { (I) - (D) } / (D) | 58.0% |

| Customer | Period | Sample Item Allegedly Relevant to Mr. Hazelwood | Loss Attribution (Over)/Under | SVRS Reimbursements (Over)/Under | Assuming Attributed Losses for the Eight Customers Were Overstated by 30% (Over)/Under | Potential Overpayments (Loss Attribution - (Reimbursements less 30% if applicable, if not, SVRS Reimbursements)) |
|---|---|---|---|---|---|---|
| ABC Transportation Company | 2010-10 | No | | | | |
| All American Xpress Inc | 2010-08 | No | | | | |
| Altendorf | 2009-11 | No | | | | |
| Altendorf | 2010-08 | No | | | | |
| American Furniture Mfg Inc | 2011-04 | No | | | | |
| American Furniture Mfg Inc | 2012-01 | No | | | | |
| Andrus Transportation | 2011-11 | No | | | | |
| Ashley Distribution Services | 2011-05 | No | | | | |
| ATC Leasing Unimark Truck Trans | 2011-02 | No | | | | |
| B P Express Inc | 2011-10 | Yes | $ 4,001 | $ 4,001 | 2,801 | 1,200 |
| Beelman Truck Co | 2012-04 | Yes | 288 | 580 | | 0 |
| Bestway System/Total Transportation | 2010-04 | No | | | | |
| BIH | 2010-01 | No | | | | |
| Bison Transport | 2011-11 | Yes | 26,498 | 25,046 | 18,548 | 7,949 |
| Black Horse Carriers | 2010-12 | Yes | 6,862 | 6,933 | | 0 |
| Black Horse Carriers | 2012-03 | Yes | 1,603 | 1,676 | | 0 |
| B-T Inc (Part of Decker) | 2010-12 | Yes | 2,128 | 2,225 | 1,490 | 638 |
| B-T Inc (Part of Decker) | 2013-01 | Yes | 4,819 | 4,910 | 3,373 | 1,446 |
| Buchanan Hauling & Rigging Inc | 2012-01 | No | | | | |
| C & K Trucking | 2011-04 | Yes | 1,793 | 1,873 | | 0 |
| C & K Trucking | 2012-01 | Yes | 2,139 | 2,219 | | 0 |
| C D N Logistics Inc | 2008-09 | No [1] | | | | |
| C D N Logistics Inc | 2011-12 | Yes | 45,923 | 46,001 | 32,146 | 13,777 |
| California Overland | 2009-09 | No | | | | |
| Cedar Valley | 2008-12 | No | | | | |
| Central Transport, LLC (Fleet Fuel) | 2008-04 | Yes | 987 | 1,067 | | 0 |
| Central Transport, LLC (Fleet Fuel) | 2009-09 | Yes | 3,339 | 3,419 | | 0 |
| Centurion Auto Transport Inc. | 2009-09 | No | | | | |
| Chambers Transportation | 2011-01 | No | | | | |
| Chandler Trucking | 2011-06 | No | | | | |
| Chief Express LLC | 2011-09 | No | | | | |
| Commonwealth Express | 2011-10 | Yes | 7,046 | 6,985 | | 61 |
| Compass Funding Solutions | 2009-07 | Yes | 6,239 | 6,286 | | 0 |
| Compass Funding Solutions | 2012-12 | No [1] | | | | |

| Customer | Period | Sample Item Allegedly Relevant to Mr. Hazelwood | Loss Attribution (Over)/Under | SVRS Reimbursements (Over)/Under | Assuming Attributed Losses for the Eight Customers Were Overstated by 30% (Over)/Under | Potential Overpayments (Loss Attribution - (Reimbursements less 30% if applicable, if not, SVRS Reimbursements)) |
|---|---|---|---|---|---|---|
| Cooke Trucking | 2011-04 | No | | | | |
| CRT Transportation | 2012-03 | No | | | | |
| Decker | 2012-01 | Yes | 13,758 | 13,676 | 9,631 | 4,127 |
| Dick Lavy | 2011-07 | Yes | 4,636 | 5,586 | | 0 |
| Dillon Transportation | 2012-08 | No [1] | | | | |
| Doug Marquardt/Skyway Transportation | 2010-05 | No [1] | | | | |
| Doug Marquardt/Skyway Transportation | 2012-12 | No [1] | | | | |
| Dowell Transport | 2011-08 | No | | | | |
| Dutch Maid Logistics Inc | 2011-01 | No | | | | |
| Dutch Maid Logistics Inc | 2011-02 | No | | | | |
| Equity Transportation | 2011-10 | Yes | 5,420 | 5,234 | 3,794 | 1,626 |
| First Choice Logistics | 2012-10 | No [1] | | | | |
| G & P Trucking | 2008-08 | Yes | 5,633 | 5,713 | | 0 |
| Gdx Trucking Inc | 2011-01 | No | | | | |
| Grand Island Express | 2008-05 | Yes | 665 | 487 | | 178 |
| Grand Island Express | 2009-07 | Yes | 136 | 216 | | 0 |
| Gretna Enterprises LLC | 2009-08 | Yes | 1,196 | 1,277 | | 0 |
| H & M Trucking Inc | 2011-02 | No | | | | |
| Halvor Lines Inc | 2009-06 | No [1] | | | | |
| Heniff Transportation | 2008-12 | No | | | | |
| Hill Transportation Inc | 2008-08 | Yes | 709 | 789 | | 0 |
| Holland Transport | 2012-07 | No [1] | | | | |
| Holland Transport | 2009-11 | Yes | 165 | 245 | | 0 |
| Holmes Company of Jackson Inc. | 2012-05 | No | | | | |
| Honey Transport | 2011-09 | Yes | 4,475 | 4,295 | | 180 |
| Iowa Motor Truck | 2010-12 | Yes | 533 | 609 | | 0 |
| Iowa Motor Truck | 2012-10 | No [1] | | | | |
| Issac Transportation/Carlos Rodriguez | 2010-03 | No | | | | |
| J-Mar Enterprises | 2010-02 | Yes | 1,343 | 1,419 | | 0 |
| K & C Trucking | 2012-02 | No | | | | |
| K & C Trucking | 2012-11 | No | | | | |
| Kenan Advantage Group Inc. | 2011-10 | No | | | | |
| Laris Shelman & Sons Trucking | 2010-02 | No | | | | |
| MAINE'S PAPER & FOOD SERVICE | 2008-05 | No | | | | |

# Exhibit 10
## Sample Data Allegedly Relevant to Mr. Hazelwood Modified by a 30% Reduction for Eight Customers

| Customer | Period | Sample Item Allegedly Relevant to Mr. Hazelwood | Loss Attribution (Over)/Under | SVRS Reimbursements (Over)/Under | Assuming Attributed Losses for the Eight Customers Were Overstated by 30% (Over)/Under | Potential Overpayments (Loss Attribution - (Reimbursements less 30% if applicable, if not, SVRS Reimbursements)) |
|---|---|---|---|---|---|---|
| MAINE'S PAPER & FOOD SERVICE | 2008-09 | No | | | | |
| MAINE'S PAPER & FOOD SERVICE | 2008-10 | No | | | | |
| Major Transportation Services | 2011-12 | No | | | | |
| Midwest Coast Transport | 2010-05 | No | | | | |
| Midwest Coast Transport | 2010-11 | No | | | | |
| Midwest Logistics Inc. / IN | 2010-06 | No | | | | |
| Midwest Logistics Systems | 2012-12 | Yes | 6,310 | 6,432 | 4,417 | 1,893 |
| Mobility Network | 2011-06 | Yes | 5,065 | 3,178 | | 1,887 |
| MR Trucking | 2012-03 | No | | | | |
| New Line Transport LLC. | 2009-06 | No | | | | |
| Nick Strimbu Inc ATTN: William Strimbu | 2009-10 | No | | | | |
| Nick Strimbu Inc ATTN: William Strimbu | 2012-12 | No | | | | |
| Northwest Pallet | 2012-10 | No | | | | |
| Online Transport Inc | 2010-03 | No | | | | |
| Park Transportation | 2013-01 | No | | | | |
| Patriot Transport Inc | 2013-01 | No | | | | |
| Piedmont Express | 2008-11 | No | | | | |
| Pohl Transportation Inc | 2010-07 | Yes | 1,420 | 1,500 | | 0 |
| Pohl Transportation Inc | 2012-01 | Yes | 1,162 | 1,242 | | 0 |
| Pollywog Transport | 2012-05 | No | | | | |
| Pope Trucking | 2011-07 | No | | | | |
| Preferred Transport & | 2013-01 | No | | | | |
| Queen Transportation | 2010-04 | Yes | 1,247 | 1,231 | | 16 |
| Queen Transportation | 2010-10 | Yes | 1,482 | 1,506 | | 0 |
| R & R Trucking | 2012-11 | No | | | | |
| Refrigerated Express LC | 2012-10 | No | | | | |
| Regal Beloit Logistics LLC (Marathon) | 2011-11 | Yes | 243 | 1,179 | | 0 |
| Rose Acre Farms Inc | 2010-05 | No | | | | |
| Rose Acre Farms Inc | 2010-12 | No | | | | |
| Rose Acre Farms Inc | 2011-06 | No | | | | |
| Rose Acre Farms Inc | 2012-12 | No | | | | |
| RWH Trucking Inc/Southern Service | 2011-09 | No | | | | |
| Service Trucking Eustis, Florida | 2010-03 | No | | | | |
| Service Trucking Eustis, Florida | 2010-09 | No | | | | |
| Sharkey/Sysco/Shipper's Rental | 2010-10 | Yes | 17,126 | 14,170 | 11,989 | 5,138 |

# Exhibit 10
## Sample Data Allegedly Relevant to Mr. Hazelwood Modified by a 30% Reduction for Eight Customers

| Customer | Period | Sample Item Allegedly Relevant to Mr. Hazelwood | Loss Attribution (Over)/Under | SVRS Reimbursements (Over)/Under | Assuming Attributed Losses for the Eight Customers Were Overstated by 30% (Over)/Under | Potential Overpayments (Loss Attribution - (Reimbursements less 30% if applicable, if not, SVRS Reimbursements)) |
|---|---|---|---|---|---|---|
| Sharkey/Sysco/Shipper's Rental | 2012-12 | Yes | 33,321 | 36,027 | 23,325 | 9,996 |
| Silver Line Building Products | 2013-01 | No | | | | |
| Simbeck Inc | 2010-09 | No | | | | |
| Simbeck Inc | 2011-11 | No | | | | |
| Solid Group Inc. | 2011-10 | No | | | | |
| South East Express Inc | 2011-03 | No | | | | |
| Stan Koch & Sons | 2011-07 | No | | | | |
| Star Trans | 2009-10 | No | | | | |
| Store & Haul Inc | 2011-06 | No [1] | | | | |
| T H X Transport LLC | 2012-02 | No | | | | |
| T H X Transport LLC | 2012-12 | No | | | | |
| Tanks Alot LLC DBA | 2011-08 | No | | | | |
| Taylor Express Inc. | 2008-06 | No | | | | |
| Titan Transfer Inc | 2009-09 | No | | | | |
| Tld Logistics Services Inc | 2010-02 | No | | | | |
| Transport One | 2012-08 | No | | | | |
| TRANSTECH LOGISTICS | 2011-10 | No | | | | |
| Tri-Hi Transportation | 2010-04 | Yes | 3,443 | 3,517 | | 0 |
| Trio Trucking Inc | 2009-08 | Yes | 1,054 | 1,138 | | 0 |
| Truckmen Corporation | 2012-08 | No | | | | |
| Trucks Inc | 2011-10 | No | | | | |
| TTI Inc. | 2012-04 | Yes | (7) | 307 | | 0 |
| W E L Companies Inc | 2010-03 | No | | | | |
| W E L Companies Inc | 2010-11 | No | | | | |
| W E L Companies Inc | 2011-05 | No | | | | |
| Warren Transport | 2011-10 | Yes | (3,224) | (5,415) | | 2,191 |
| West Wisconsin/Leonards Express | 2010-12 | No | | | | |
| Wooster Motor Ways | 2012-08 | No | | | | |
| Wooster Motor Ways | 2012-11 | No | | | | |
| Your Town Transport Inc | 2012-11 | No | | | | |

Exhibit 10

## Sample Data Allegedly Relevant to Mr. Hazelwood Modified by a 30% Reduction for Eight Customers

| Customer | Period | Sample Item Allegedly Relevant to Mr. Hazelwood | Loss Attribution (Over)/Under | SVRS Reimbursements (Over)/Under | Assuming Attributed Losses for the Eight Customers Were Overstated by 30% (Over)/Under | Potential Overpayments (Loss Attribution - (Reimbursements less 30% if applicable, if not, SVRS Reimbursements)) |
|---|---|---|---|---|---|---|
| Average | | | $    5,666 | | | $    1,341 |
| Standard Deviation | | | 9,675 | | | 3,012 |
| Population Size | | | 2,309 | | | 2,309 |
| Sample Size | | | 39 | | | 39 |
| Coefficient of Variation [2] | | | 27.1% | | | 35.7% |

Notes

1.  Even though this customer name is included in the Government's August 1, 2018 Notice of No Objection to the Presentence Investigation Report For Defendant Hazelwood, this particular month is not included

2. The Coefficient of Variance equals the Average times the Sample Size divided by the Standard Deviation adjusted by the Sample Size and Finite Population Correction Factor.

# Exhibit 11

## Calculation of Overstatement Assuming Mr. Alexander's Accounting Calculations Are Accurate & Including a 30% Reduction for Eight Customers

| | | |
|---|---|---|
| Estimated Average Sample Overstatement | (A) = Average Last Column of Exhibit 10 | 1,341 |
| Population Size | (B) | 2,309 |
| Sample Size | (C) | 39 |
| | | |
| Point Estimate of Overstatement | (D) = (A) * (B) | 3,096,681 |
| | | |
| Estimated Standard Deviation of Overstatement | (E) = Standard Deviation of Last Column of Exhibit 10 | 3,012 |
| Estimated Standard Error | (F) = SQRT [ {(B) / (C)} * {(B) - (C)} * (E) ^2 ] | 1,104,293 |
| | | |
| Degrees of Freedom | (G) = (C) -1 | 38 |
| t-value 95%, one-sided | (H) from Standard Tables | 1.6860 |
| | | |
| Least Advantageous 95% One-Sided Confidence Limit | (I) = (D) + (F) * (H) | 4,958,469 |
| | | |
| Precision | (J) = { (I) - (D) } / (D) | 60.1% |