UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| v. ) | No. 3:16-CR-20 |
| ) | JUDGES COLLIER/GUYTON |
| MARK HAZELWOOD, ) | |
| Defendant. ) | |

**GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANT HAZELWOOD'S SENTENCING MEMORANDUM (Doc. 672), MOTION FOR DOWNWARD DEPARTURE (Doc. 673), AND MOTION FOR DOWNWARD VARIANCE (Doc. 671)**

The United States of America hereby responds in opposition to Defendant Hazelwood's sentencing memorandum, motion for downward departure, and motion for downward variance. (Docs. 672, 673, 671.) For the reasons that follow, and for those previously stated in the government's sentencing memorandum and motion for upward variance or departure, the United States maintains that the sentencing factors set forth in 18 U.S.C. § 3553(a) justify a sentence of 168 months' imprisonment and a fine of $750,000.

**I.  Following the parties' stipulation regarding loss, Hazelwood's advisory Guidelines total offense level is 33, resulting in a range of imprisonment of 135 to 168 months.**

Defendant Hazelwood has withdrawn his contentions related to alleged deficiencies with KraftCPAs' and Pilot Internal Audit's calculations and stipulated to a loss amount within the range set forth for U.S.S.G. § 2B1.1(b)(1)(J) and the resulting 18-level increase. Doc. 678-1. Three other Guidelines enhancements must be decided by the Court: a) 2-level increase for more than 10 victims; b) 2-level increase for obstruction-of-justice; and c) 4-level increase for Hazelwood's role in the offense. Hazelwood does not appear to contest the 2-level victim enhancement, and he identifies no legitimate basis for this Court not to impose the obstruction-of-justice and role enhancements set forth in the revised presentence report. Doc. 684.

A. <u>Evidence admitted at trial proves by a preponderance of the evidence that Hazelwood was an "organizer or leader" within the meaning of U.S.S.G. § 3B1.1(a)</u>.

Hazelwood contests the application of a 4-level role adjustment under U.S.S.G. § 3B1.1(a). Doc. 673 at 18-25. His position is without merit. Evidence admitted at trial proves by a preponderance of the evidence that Hazelwood was an organizer or leader of the criminal activity charged in the indictment. Gov. Ex. 902 proved that on February 18, 2008, Hazelwood approved Arnie Ralenkotter's fraud on customer Koleaseco. Evidence also showed that Stinnett submitted a trip report on August 12, 2010, that mentioned that he had "spent about an hour and a half going through [a customer's] optimizer. Two LARGE mistakes, our discount wasn't in correctly (*at least what they assume they receive manually*)." Gov. Ex. 606-B (emphasis added). A few days later, Hazelwood responded by email, "Awesome great job Jay getem." *Id*. On September 17, 2010, Hazelwood replied "nice" to an email from Mosher stating that "Manual Rebates – Should save approx. 350k on the august gallons." Gov. Ex. 606-C. Mosher testified that "350k" referred to "the amount we cheated . . . – I cheated out of trucking company customers that month." Doc. 358 at 8. Mosher credibly testified that Hazelwood would have necessarily understood that $350,000 was going to be fraudulently withheld from customers, because Mosher had periodic meetings with Hazelwood and others to discuss Mosher's customer profit and loss reports, during which Mosher brought "manual rebate" spreadsheets showing how much he was fraudulently cutting his customers' rebates each month. Doc. 356 at 158-61; *see also* Doc. 424 at 190 (Clark's testimony that "[i]n the P&L reviews I would tell [Hazelwood that customers are] not getting the deal they think they're getting"). Mosher said that, during one such meeting, when he said his commission cap prevented him from "profit[ing] from the fraud" and that he was thinking about ending his participation, Hazelwood replied, "[t]hat wouldn't be a very good idea." Doc. 356 at 162.

2

Hazelwood himself corroborated Mosher's testimony that Hazelwood encouraged the use of manual rebates to mislead Pilot's customers, as shown in a March 27, 2012 email chain. Gov. Ex. 2194. Freeman copied Hazelwood on an email stating that Pilot was "making .10 a gallon using [its] best price for this customer . . . [W]e better come to the understanding that .10-.12/gal may not keep us whole in this market space. . . [,]" and Hazelwood replied, "Rebate rebate masturbate make him feel special[.]" *Id*.

An October 25, 2012 audio recording captured Hazelwood approving a plan for Mosher to teach manual rebates to all direct sales staff during a sales meeting the following month. Gov. Ex. 509, 509-A. Mosher testified that he understood that Hazelwood wanted him to teach "Manual rebates, how to defraud trucking companies without their knowledge." Doc. 356 at 168. During Mosher's November 2012 presentation, he claimed that the fraudulent manual rebate practices were "an art, . . . a feel, it's do what you can. . . . [but] don't ever expose yourself." Gov. Ex. 514, 514-A. And Hazelwood used virtually identical language during his voluntary interview with federal agents on April 15, 2013, when he defined the term "manuel" as "the method of applying the art, of determining the discount for a customer." Doc. 445 at 152.

Hazelwood contends that the Court should rely on his Rule 33 submissions to conclude that Hazelwood did not intend to expand the fraud through the "Aunt Bea" scheme that arose out the February 18, 2013 Orlando meeting. Doc. 673 at 24-25. In reply, the government incorporates its responses to Hazelwood's Rule 33 motion and his various supplemental briefs to show that those arguments are without merit. *See* Docs. 578, 594, 608, and 662. Evidence admitted at trial shows by a preponderance that Hazelwood served as an organizer or leader when he explained how to select customers to target for his planned expansion of the scheme to defraud: "Customer A [] looks [in] every orifice you have, Customer B doesn't even know you have an orifice." Gov. Ex. 522, 522-A. Hazelwood continued to organize expansion of the

3

scheme when he said to Freeman, Mosher, Wombold, and Ralenkotter on February 18, 2013, "so, why don't we do this? Why don't we figure out everybody who's not watchin' his own cost-plus and who doesn't, … and let's make sure that we've got that list, okay? And then everybody that does watch, then we got that list." Gov. Ex. 523, 523-A. Accurately summing up what Hazelwood was directing his executives to do, Stinnett said, "Yeah, AKA, we're f**kin' 'em," which was immediately followed by approving laughter from multiple people in Hazelwood's presence. Gov. Ex. 522, 522-A.

The evidence further showed that, on February 20, 2013, when Hazelwood replied to Freeman's Orlando meeting summary by stating "Great recap" and then directing "lets get cost plus B plan going ASAP thanks," Hazelwood was referring to his "Aunt Bea" expansion of the scheme to defraud Pilot's customers. Gov. Ex. 2217. As Mosher, who was copied on that email chain, explained during trial, Hazelwood was directing that the existing fraud be "take[n] … to the next level." Doc. 358 at 44.

The evidence at trial revealed Hazelwood's significant decision-making authority, his participation in and encouragement of the conspiracy to defraud Pilot's customers, and his active role in attempting to expand the scheme. Those facts provide ample basis for this Court to find that Hazelwood was an "organizer or leader" within the meaning of U.S.S.G. 3B1.1(a).

  B. <u>The jury's guilty verdict on Count 14 conclusively establishes the propriety of the obstruction-of-justice enhancement</u>.

Hazelwood contends that the Court should consider his "Rule 33 motion with respect to the witness-tampering charge in determining whether an obstruction-of-justice enhancement is appropriate." Doc. 673 at 1 n.1. In reply, the government again incorporates its responses to Hazelwood's Rule 33 motion and his various supplemental briefs. *See* Docs. 578, 594, 608, and 662. Additionally, and in any event, this Court is prohibited from making factual findings

inconsistent with any finding necessarily implicit in the jury's guilty verdict. *E.g.*, *United States v. Slaton*, 801 F.3d 1308, 1319 n.7 (11th Cir. 2015) ("a court must find that a fact was proven by a preponderance of the evidence if the jury verdict establishes it was proven beyond a reasonable doubt."); *United States v. Bertling*, 611 F.3d 477, 481 (8th Cir. 2010) ("a district court errs as a matter of law if it imposes a sentence based on a finding that contradicts the jury's verdict") (internal alterations and citation omitted); *United States v. Hunt*, 521 F.3d 636, 649 (6th Cir. 2008) ("it would be improper for the judge in sentencing to rely on facts directly inconsistent with those found by the jury beyond a reasonable doubt. . . . [A] factual determination is necessarily clearly erroneous where a jury has previously found to the contrary beyond a reasonable doubt"); *United States v. Rivera*, 411 F.3d 864, 866 (7th Cir. 2005) ("it is both unnecessary and inappropriate for the judge to reexamine, and resolve in the defendant's favor, a factual issue that the jury has resolved in the prosecutor's favor beyond a reasonable doubt").

The jury convicted Hazelwood of witness tampering, finding that he knowingly and willfully used intimidation, threatened, or corruptly persuaded Sherry Blake, with the intent to hinder, delay, or prevent the communication to a federal official of information relating to the commission or possible commission of a federal fraud offense. *See* Doc. 513 at 80-81 (Jury Charge); Doc. 578 at 14-21 (Government's response summarizing evidence supporting Count 14). That determination requires application of the obstruction enhancement in this case. Indeed, the Sixth Circuit has vacated sentences and remanded for resentencing where a district court's factual findings were "at odds with the defendants' convictions." *United States v. Howley*, 707 F.3d 575, 582 (6th Cir. 2013).

5

**II.     None of Hazelwood's grounds for downward departure and/or variance have merit.**

Hazelwood maintains that the Court should grant him a downward departure and/or variance because, in his view, 1) the loss was diffuse and substantially overstates the seriousness of the crime; 2) the loss amount fails to account for other benefits received by trucking company customers; 3) Hazelwood did not act for personal gain; and 4) Hazelwood's charitable giving and community involvement is extraordinary.  Docs. 671, 673.  These grounds do not justify a below-Guidelines sentence.

>    A.    <u>No downward departure or variance is justified pursuant to Comment 20(C) to U.S.S.G. § 2B1.1, because the nature of the loss is not "diffuse," nor does the loss "substantially overstate" the seriousness of the offense</u>.

The Guidelines recognize that "a downward departure may be warranted" where the offense level "substantially overstates the seriousness of the offense."  U.S.S.G. § 2B1.1, cmt. 20(C).  It provides, as an example, "a securities fraud involving a fraudulent statement made publicly to the market" that "may produce an aggregate loss amount that is substantial but diffuse, with relatively small loss amounts suffered by a relatively large number of victims."  *Id*.  This case is unlike that example, and the combined effect of the 18-level loss enhancement and the 2-level victim enhancement does not "substantially overstate" the seriousness of the offense.

The fraudulent misrepresentations alleged in the indictment and proven at trial were not made to the trucking industry as a whole, but to carefully selected victims "from Pilot's pool of existing and prospective customers perceived to be unlikely to detect false pretenses, promises, and representations regarding Cost-Plus Discounts."  Doc. 182, Indictment at 13-14.  And the misrepresentations were designed for the purpose of "inducing, and attempting to induce, such identified trucking companies to choose to purchase, and to continue to purchase Pilot's diesel fuel by falsely and fraudulently promising and representing Cost-Plus Discounts."  *Id.*

Pilot's Direct Sales Manual proved why customers targeted by the scheme could be baited with false promises of cost-plus discounts:

> **SELLING PILOT**
> Start the sell by setting fuel into prospective. Labor and fuel are your largest costs, but labor is a fixed cost, and can only be controlled by increasing productivity.
>
> Fuel is a trucking company's <u>largest</u> variable cost. Fuel becomes the largest controllable cost whereby a limited network can save a company $.03 to $.08 per gallon depending on where they are buying. Fuel cost per mile will vary depending on price and miles per gallon. To get an estimate of the per mile cost for your customer divide the current price by miles per gallon (industry average is around 6 mpg). An average trucking company will purchase roughly 1,600 gallons per month per truck.

Gov. Ex. 302. Quite simply, "fuel is a trucking company's largest variable cost." *Id*. The evidence at trial showed that Hazelwood and his co-conspirators targeted unsophisticated and unsuspecting customers and exploited their need to save money on fuel expenses. For example, a July 11, 2008 trip report from Ralenkotter to Hazelwood described how and why he intended to falsely represent cost-plus discounts to two customers:

> Fuel optimizer not real bright, just met the newest bulbs[.] they seem slightly smarter. I will work up some aggressive prices to move TA gallons. Good thing is I don't actually need to change our billing[.] they do not reconcile with fuel dispatch . . . imagine that?
>
> [Competitor] TA recently in and of course offered "better of" pricing[.] I will need to do the same[.] too bad since this was .045 discount and we made a bunch of money. I will tell them cp .03 and put it in as .04 with a .04 discount. There is a good opportunity here to address some O/O gallons.

Gov. Ex. 1101. When asked during trial why he sent such a report to Hazelwood, who was then Pilot's vice president, Ralenkotter explained that "[w]ith some customers it was how we did business" and he wanted to "let [Hazelwood] know." Doc. 336 at 261. Ralenkotter was not alone in describing his fraudulent conduct in trip reports to Hazelwood. On October 8, 2009, Stinnett emailed a trip report for Hazelwood's review that contained this entry:

> I had a good meeting . . . . As normal, she cried the blues about fuel a little bit. She doesn't really understand fuel discounts much; I told her I would give her another half

7

of a cent. She will never know that isn't going to happen. Between the two companies, they are buying about 100K per month from us.

Gov. Ex. 611.

The government also introduced proof that unlike the "relatively small loss amounts" to individual investors in "securities fraud" crimes – the example supplied by the Guidelines Commentary – the harm to a victimized trucking company was by no means *de minimus*. For example, trial testimony and exhibits regarding Pilot customer Smith Transport unequivocally proved that Smith suffered $67,372.45 in financial harm in merely three months when cheated out of four cents per gallon of fuel. *See* Exs. 1207, 1208; Doc. 337 at 31-33. Defendant Hazelwood, through his portrayal of a truck driver in his Mark-the-Driver video, JDX 86, confirmed how devastating that kind of loss could be to a trucking company, since an individual truck driver earns "about 50 to 75,000 dollars a year." JDX 86 at 5:37. From Hazelwood's own admission, a $67,000 fraud loss every three months could have cost Smith four truck drivers each year—an injury suffered both by the company and the terminated employee-drivers. Similarly, a trip report excerpt from co-conspirator Stinnett leaves no doubt that, for many trucking companies attempting to struggle out of the grip of the Great Recession, the loss from the conspiracy's scheme to defraud would never be a diffuse harm:



Gov. Ex. 720.

Further evidence of the importance of promised fuel discounts to build customer loyalty is found in this email from customer Queen to conspirators Freeman, Bibee, and Radford:

> **From:** Mike Queen
> **To:** Katy Bibee
> **Cc:** John Freeman; Holly Radford
> **Sent:** Wed Jun 30 18:17:50 2010
> **Subject:** RE: Pilot and Flying J Complete Merger
>
> Congratulations on the merger….. You only get better!!
>
> Make no mistake about it…I'm sticking with PILOT!!
>
> John/Katy…you both went to bat for me… I have not forgotten it and I appreciate it…I gave you my word that we were going to grow and increase our fuel consumption. WE HAVE…. And we will continue as we grow and add additional equipment. We are adding 5 new tractors next week.

Gov. Ex. 719. Little did Mike Queen know that his company had already been victimized by the conspiracy's scheme to defraud. In a January 15, 2010 email, Bibee told Freeman that Queen's owner was "begging" for an "extra penny" in order to "renew his [letter of credit]," then added, "[t]his guy thinks we took him from [cost-plus] .03 to [cost-plus] .04 but really he is getting [cost-plus] .08." Gov. Ex. 715; Doc. 522 at 106-08. Freeman directed Bibee to "[t]ell him I said the extra .01 is fine" but "[d]on't change his deal." *Id*. Bibee then affirmatively misrepresented to Queen that it would receive a cost-plus .03 discount, although she knew that Queen would actually receive a discount that was five cents worse per gallon. Gov. Ex. 716; Doc. 522 at 107-09. When Stinnett and Radford were assigned to the Queen account in June 2010, Freeman warned them to be "careful" because "[h]e's not getting what he thinks." Gov. Ex. 717; *accord* Gov. Ex. 718 ("he's not getting what he thinks he is, we just need to sing from the same hymn book.") Stinnett and Radford concealed Queen's victimization until another Pilot employee

9

accidentally told Queen the truth, as described in Gov. Exs. 521, 521-A.  But Pilot did not have to pay Queen the money that had been fraudulently withheld until the government's investigation became public in April 2013, because Stinnett had offered a fictitious explanation to discredit the other employee's truthful description of the discount as cost-plus .08; Stinnett continued to defraud Queen with an affirmatively false cost-plus discount representation until at least October 2012, as proven by email.  Gov. Ex. 724; Doc. 522 at 246-51.  The execution of the fraud against Queen cost that company at least $60,000 – hardly a small loss for a relatively small company.  *See* Gov. Ex. 727-A.  The government proved other non-diffuse loss to victimized customers at trial:  Amerifreight ($7041.97 - Gov. Ex. 1613-A); BP Express ($218,463.46 - Gov. Ex. 810-A); Halvor ($131,188.42 – Gov. Ex. 1712-A); JTL ($119,222.01 - Gov. Ex. 1522-A); and Ryder ($82,236.77 - Gov. Ex. 1826-A); *see also* Gov. Ex. 5001 – 5006.

In sum, the Court should reject Hazelwood's claims that the scheme's financial harm was diffuse, should deny his motions for downward departure or variance, and should find that the Guidelines properly reflect the seriousness of the offense.

      B.     <u>Hazelwood is not entitled to a downward departure or variance based on the "credits against loss" provisions set forth in Comment 3(E) to U.S.S.G. § 2B1.1.</u>

Hazelwood next claims that the Court should award him a downward departure or variance based on benefits that customers receive in addition to their promised discount – such as waived transaction fees, convenient access to private showers, etc.  He is mistaken.  The Court need only look to how Pilot treated Smith Transport once Smith Transport discovered it had been shorted .04 cents per gallon for three months in 2008.  As Gov. Ex. 1208 shows, Pilot did not charge Smith Transport any offset for transaction fees, the convenience of private showers, or any other benefit from fueling at Pilot truck stops:

10

**SMITH TRANSPORT - REBATE**
**Monthly Gallons Report**
**6/30/2008 to 10/5/2008**

Rebate Due - CP .02 vs. Cost Minus .02    $67,372.45

| Store No. | City | ST | Retail Avg. | Retail Less .041 Avg. | Cost Minus .02 Avg. | Gallons | Better of Price | RL .041 vs. Cost Minus .02 Rebate | Cost Plus .02 Avg. | Better of Price | Cost Plus .02 Rebate | Amount Due |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 369 | Birmingham | AL | $4.2735 | $4.2325 | $3.9360 | 9,911.40 | 3.9360 | $2,938.77 | $3.9760 | 3.9760 | $2,542.31 | $396.46 |
| 441 | Priceville | AL | $4.2569 | $4.2159 | $3.9545 | 590.10 | 3.9545 | $154.24 | $3.9945 | 3.9945 | $130.63 | $23.60 |
| 302 | Theodore | AL | $4.2492 | $4.2082 | $3.9935 | 148.00 | 3.9935 | $31.77 | $4.0335 | 4.0335 | $25.85 | $5.92 |
| 289 | Beloit | WI | $4.3161 | $4.2751 | $4.1082 | 5,005.50 | 4.1082 | $835.71 | $4.1482 | 4.1482 | $635.49 | $200.22 |
| 324 | Franksville | WI | $4.3196 | $4.2786 | $4.1072 | 63,260.70 | 4.1072 | $10,846.18 | $4.1472 | 4.1472 | $8,315.75 | $2,530.43 |
| 164 | Mauston | WI | $4.2766 | $4.2356 | $4.1195 | 1,479.60 | 4.1195 | $171.73 | $4.1595 | 4.1595 | $112.55 | $59.18 |
| 40 | Oak Creek | WI | $4.2986 | $4.2576 | $4.1072 | 2,045.70 | 4.1072 | $307.74 | $4.1472 | 4.1472 | $225.91 | $81.83 |
| 243 | Nitro | WV | $4.4586 | $4.4176 | $4.1234 | 24,584.90 | 4.1234 | $7,233.78 | $4.1634 | 4.1634 | $6,250.38 | $983.40 |
| | | | | | | 1,691,567.40 | | $433,401.39 | | | $366,028.94 | $67,372.45 |

Gov. Ex. 1208. If Hazelwood's argument were correct, and the waived one-penny-per-gallon transaction fees constituted a credit to offset against loss, Pilot would have reduced Smith's *de facto* restitution payment by more than $16,000, because Smith had purchased more than 1.6 million gallons of diesel during the relevant time. That did not happen, and evidence at trial proved that that spreadsheet for Smith Transport's three-month loss was attached to the Pilot accounts payable check request below:

[Pilot check request form dated 10/15/08, Vendor # 21852, received by Accounts Payable OCT 15 2008, Check Request for Pilot Travel Centers X, Amount $67,373.45, Pay to Smith Trucking, Inc., Address P.O. Box 201, City Roaring Spring, State PA, Zip 16673]

*Id.*

11

The fact that Smith's *de facto* restitution payment included no offset for transaction fees is consistent with the Direct Sales Manual, which suggested that Pilot absorbed the transaction fees for direct-bill customers as a cost-of-doing-business expense. Sales representatives were warned to keep that cost in mind and monitor such customers so Pilot "still maintain[s] good margins."

> **DISCOUNTING WITH DIRECT BILL ACCOUNTS**
> It is very important to try and stay close to, or at, the standard rebate schedule when discounting to direct bill accounts. On direct bill, Pilot pays the customer's transaction fee on their Pilot purchases. In most cases, the customer is on the Comdata billing system, so on direct bill for every transaction Pilot pays Comdata a transaction fee. On an average fill of 100 gallons, it is equivalent to giving up another $.01 per gallon discount to be on the direct bill program with Pilot. Because of this, we need to be careful when discounting to a direct bill account so that we can still maintain good margins.

Gov. Ex. 302.

Consistent with the Direct Sales manual, direct-bill customers were told that their promised cost-plus discounts were "in addition to the zero transaction fees" at Pilot locations:

> Mr. John Mittermeier
> **Smith Transport Inc.**
> 331 East Closson Rd.
> Roaring Spring, PA 16673
>
> Dear John,
>
> As of recently, Smith's Transport's gallons with Pilot have been decreasing over the last several months. Therefore, Pilot Travel Centers has elected to modify you discounts in order to increase your purchases throughout our truck stop network.
>
> Effective July 1st, 2008, Pilot Travel Centers is pleased to support Smith Transport with the following discounts. These discounts are in addition to the zero transaction fees you receive at all of our 310 locations. Please keep these discounts confidential.
>
> | City, ST | Discount |
> | --- | --- |
> | ALL PILOT LOCATIONS | 'BETTER OF' COST MINUS $0.020 or RETAIL MINUS $0.041 |

Gov. Ex. 1204-A. Indeed, this letter reflects that the transaction-fee waiver, which as noted above in the Direct Sales manual was merely part and parcel of being a "direct bill" customer,

was insufficient to incentivize this customer to do business with Pilot. Accordingly, this customer was lured into purchasing more diesel fuel gallons from Pilot with the independent, albeit false, promise of a cost-minus .02 discount. Thus, Hazelwood's diesel fuel discount fraud scheme is entirely unlike the Ponzi scheme at issue in *United States v. Smith*, 749 F.3d 465 (6th Cir. 2014). In *Smith*, the defendants received "credit-against-loss" reduction for returns on investment, referred to as "royalties," because the "royalty" payments were exactly what the investors were fraudulently promised they would receive. *Id*. at 474, 485 (explaining that the schemers "frequently represented some [oil] wells as 'the greatest thing since sliced bread' and others as virtually certain to produce consistent streams of royalties" and concluding that the district court properly calculated loss by reducing the amount by "any royalties paid"). In this case, by contrast, trucking companies were not falsely promised they would receive waived transaction fees and access to private showers; they were falsely promised they would receive a certain cost-plus discount. In short, § 2B1.1's credits-against-loss provision does not justify a downward departure or variance, because the promise of a cost-plus discount was independent of other contractual obligations that Pilot had with some of its customers, including waived transaction fees for direct-bill customers, and independent of customer conveniences like private showers.

   C. <u>Although Hazelwood claims he was not motivated by personal gain, evidence admitted at trial proved otherwise</u>.

The indictment alleged that the goals of the conspiracy included "increas[ing] Pilot's market share of diesel fuel sales over its competitors [and] maximiz[ing] the conspirators' potential for profit- and commission-based compensation from trucking companies targeted by the conspiracy." Doc. 182 at 13. Hazelwood's compensation arrangement, which awarded him 3.5% of Pilot's net after tax profit, directly tied Pilot's market share of diesel fuel sales and the

13

profit generated from victimized customers to Hazelwood's personal gain.  Trial evidence proved that conspirators lied to customers for the express purpose of taking diesel purchases from competitors, as Ralenkotter described in the above-referenced trip report to Hazelwood. *See* Gov. Ex. 1101.  Trial evidence proved that scheme participants lied to customers to keep their business.  Doc. 522 at 110-11 (Bibee's testimony that she misrepresented cost-plus discounts to "get them to remain customers of Pilot").  Thus, deceptive conduct in furtherance of the scheme resulted in Pilot getting new business and retaining existing business – which directly increased Hazelwood's profit-sharing based compensation.  Hazelwood's argument that he did not substantially benefit from withheld rebates and discounts from defrauded customers overlooks the fact that Hazelwood reaped substantial financial benefit from the overall profit derived from customers who were baited, through false promises, into purchasing diesel fuel gallons from Pilot, rather than a competitor.

> D. <u>Hazelwood's charitable giving, however extensive, is not an appropriate basis for a downward variance considering his sizable income and net worth</u>.

Hazelwood seeks a variance based on his charitable contributions and community involvement.  Doc. 671 at 8-11.  Through the testimony of Caudene Whaley, the government proved at trial that Hazelwood's total compensation from Pilot between 2008 through 2012 exceeded 78 million dollars.  Doc. 429 at 19-23; Gov. Ex. 402-A.  Hazelwood has not demonstrated that his charitable contributions are extraordinary or unusual for a person of his income and net worth.  Moreover, where a defendant primarily contributes money, rather than time, energy, or personal skill, his charitable contributions function as a proxy for socio-economic status, which is not an appropriate basis for granting a lesser sentence. *E.g.*, *United States v. Tocco*, 200 F.3d 401, 434 (6th Cir. 2000) (vacating a below-Guidelines sentence and remanding for the district court to assess the extent and nature of the defendant's community

14

Case 3:16-cr-00020-CLC-HBG   Document 698   Filed 09/20/18   Page 14 of 16   PageID #: 19538

contributions). Furthermore, the government submits that the testimony that Hazelwood elicited on cross-examination regarding his "workaholic" nature and his travel schedule involving over "500 different air trips in one year," along with the hundreds of travel itineraries that Hazelwood offered in evidence for the period 2008 through 2013 will be difficult to reconcile with an assertion that Hazelwood devoted the extraordinary amount of time necessary to justify a downward variance for community involvement. *See* Doc. 336 at 219 (Welch on cross-examination agreeing that Hazelwood was a "workaholic"); Doc. 457 at 250 (Blake on cross-examination stating "it's possible" in response to question, "would you be surprised if sometimes in some years we find, like, 500 different air trips in one year?"; JDX 2386 through 2874 (Hazelwood's annual calendars and hundreds of travel itineraries during the period 2008 through 2013, offered in evidence by Hazelwood, indicating scarce time for community involvement). The United States submits that Hazelwood's request for a downward variance on this basis should be denied.

For all of these reasons, this Court should deny Hazelwood's motions for downward departure and variance and impose a sentence of 168 months' imprisonment and a $750,000 fine.

>
> Respectfully submitted,
>
> CHARLES E. ATCHLEY, JR.
> ATTORNEY FOR THE UNITED STATES
> ACTING UNDER AUTHORITY
> CONFERRED BY 28 U.S.C. § 515
>
> By: *s/ Francis M. Hamilton III*
> Francis M. Hamilton III
> David P. Lewen, Jr.
> Assistant United States Attorneys
> 800 Market Street, Suite 211
> Knoxville, Tennessee 37902
> (865) 545-4167

15

## CERTIFICATE OF SERVICE

      I hereby certify that on September 20, 2018, the foregoing response was filed electronically. Notice of its filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail and e-mail. Parties may access this filing through the Court's electronic filing system.

                                          *s/ Francis M. Hamilton III*
                                          Francis M. Hamilton III
                                          Assistant United States Attorney

16

Case 3:16-cr-00020-CLC-HBG   Document 698   Filed 09/20/18   Page 16 of 16   PageID #: 19540