UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:16-CR-20 |
| | ) | |
| MARK HAZELWOOD, | ) | Judge Collier |
| | ) | |
| Defendant. | ) | |

# M E M O R A N D U M

After a jury returns a guilty verdict, a defendant has a right to request the presiding judge

to set aside the jury's decision.  Fed. R. Crim. P. 33.  Rule 33 authorizes a judge to vacate the

judgment of conviction "and grant a new trial if the interest of justice so requires." *Id.* at 33(a).

Defendant Mark Hazelwood has filed such a motion (Doc. 566), which the United States (the

"Government") opposes (Doc 578).[1]

The time limit for a motion for a new trial is three years after the verdict if there is newly

discovered evidence.  Fed. R. Crim. P. 33(b)(1).   The time limit for a motion based on any other

reason is fourteen days.  *Id.* at (b)(2).  The jury found Defendant guilty on February 15, 2018.

(Doc. 484.)  Defendant thus had to file his motion by March 1, 2018, unless he based his motion

---

[1] On July 10, 2018, Defendant filed a motion for leave to file a supplemental brief in support of his new-trial motion.  (Doc 579.)  Defendant filed a brief in support of his second motion on July 16, 2018. (Doc. 587.)  The Government responded in opposition to the July 10 motion and the July 16 brief on July 17, 2018. (Doc. 594.)  On Saturday, July 21, 2018, Defendant filed a second supplemental brief in support of his motion for leave to file a supplemental brief in support of his motion for a new trial.  (Doc. 605.)  The Government responded in opposition on July 23, 2018.  (Doc. 608.)  Defendant filed a third supplemental brief on August 31, 2018.  (Doc. 656.)  The Government responded on September 6, 2018.  (Doc. 662.)  Last, on September 10, 2018, Defendant filed a motion for an evidentiary hearing and oral argument on his motion for new trial (Doc. 664), which the Government opposed on the next day (Doc. 665).

on newly discovered evidence. On June 11, 2018, realizing he had failed to comply with the fourteen-day limit, Defendant filed a motion for extension of time to file his motion for new trial. (Doc. 556.) His motion for new trial itself was not filed until June 25, 2018. (Doc. 566.) Both motions were filed well outside of the fourteen-day time limit.

Because Defendant has not shown excusable neglect to justify the late filing of his motion for a new trial, and because he has not alleged any newly discovered evidence that would take his motion out of the fourteen-day time limit, the Court will **DENY** Defendant's motion.

## I.    BACKGROUND

After a contentious, hard-fought, twenty-seven-day trial, the jury found Defendant, Codefendant Scott Wombold, and Codefendant Heather Jones guilty of certain charges in the Amended Superseding Indictment (the "Indictment"). (Doc. 484.) Defendant was found guilty on three counts: conspiracy, wire fraud, and witness tampering. The jury found him not guilty of a second wire-fraud count. Codefendant Karen Mann was found not guilty of the sole charge against her.[2] (*Id.*) The Court set Defendant's sentencing for August 22, 2018.[3] (Doc. 526.)

---

[2] Another four defendants charged in the Indictment had entered guilty pleas prior to trial. (*See* Docs. 204, 206, 208, 210.) Ten other defendants were named as coconspirators in separate charging documents. Eight coconspirators testified on behalf of the Government at trial.

[3] The Court invited briefing from all parties on a schedule for sentencing Defendant, his two convicted trial codefendants, and the fourteen other defendants who had pleaded guilty to related charges. (Doc. 498.) After considering the parties' input and that of the Probation Office, the Court concluded it would be most just and efficient for the three trial-convicted defendants to be sentenced first, followed by the fourteen pleading defendants. (Doc. 526.) The Court set sentencing hearings for Defendant, Wombold, and Jones for August 22, 2018. (*Id.*) Sentencing hearings for the other fourteen defendants were set in groups of three or four at a time through December 19, 2018. (*Id.*)

Throughout the case, each of the four defendants was represented by able, experienced, and well-respected attorneys.  At various times during the trial, somewhere between ten and fifteen defense lawyers were participating in the defense, with each defendant represented by multiple attorneys.  Defendant had selected as his counsel Russell Hardin, Jr. of the Houston, Texas law firm Rusty Hardin & Associates ("Hardin").  Hardin enjoys an impressive nationwide reputation as a criminal defense attorney, especially in white-collar criminal prosecutions.  One can only assume Defendant retained Hardin because of his sterling reputation.  Anthony Douglas Drumheller, Jennifer E. Brevorka, and Derek Hollingsworth, all of Rusty Hardin & Associates, assisted Hardin in the trial (collectively with Hardin or individually, "Trial Counsel").

Three months after the guilty verdict, on May 21, 2018, Defendant filed a motion to relieve Trial Counsel and substitute Bradley Henry of Breeding & Henry of Knoxville, Tennessee as his attorney.  (Doc. 533.)  Since that request, eight more attorneys have entered appearances on behalf of Hazelwood (collectively with Henry or individually, "Present Counsel").  (Docs. 534–39, 559, 560.)  Upon their appearance, Present Counsel affirmed that they would be prepared to maintain the August 23, 2018 sentencing date.  (Doc. 552, Ex A [Henry Affirmation]).

On May 25, 2018, Present Counsel filed a motion for leave to file a motion for new trial.  (Doc. 542.)  Defendant sought leave both to file his motion for new trial out of time and to file the motion within forty-five days of the Court's granting leave.  Recognizing that the fourteen-day deadline in which to file such a motion had long since passed, Defendant sought to rely upon the excusable-neglect exception of Rule 45(b)(1)(B) of the Federal Rules of Criminal Procedure.

In light of the fast approaching date for sentencing, the Court chose to act on the motion for leave without the benefit of a response from the Government and without making a decision on the merits of Defendant's excusable-neglect argument.  (Doc. 555 (setting date for filing of

motion without making a finding on timeliness or excusable neglect); *see also* Doc. 558 at 2 (expressly stating the Court had not yet made any findings on excusable neglect).) Instead, the Court chose to allow Defendant to include his arguments to excuse the untimeliness of the motion with his grounds for a new trial. The Court followed this procedure because the time necessary for the parties to complete their briefing on excusable neglect and for the Court to consider the question would have used up a meaningful amount of the limited time before sentencing. If the Court then decided Defendant had showed excusable neglect and should be permitted to file the motion, briefing and consideration of the motion in all likelihood would have extended beyond the sentencing date. By permitting simultaneous briefing on excusable neglect and the merits of Defendant's new-trial motion, the Court could have the new-trial motion already before it if it decided Defendant had shown excusable neglect. It is clear Defendant understood this, because he addressed excusable neglect in his motion for a new trial. (*See* Doc. 566 at 33–34.)

Count One of the Indictment charged Defendant and his seven codefendants with conspiring to commit mail fraud and wire fraud in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1341. (Doc. 182.) Each of the defendants had been an officer or employee of Pilot Travel Centers LLC ("Pilot"). The evidence at trial showed Pilot to be the largest seller of diesel fuel in the United States, supplying diesel fuel to over-the-road trucking companies and their vehicles through the large number of truck stops and convenience stores Pilot owns and operates across the United States and into Canada.[4] The Indictment alleged Defendant and his codefendants conspired to defraud Pilot's trucking-company customers by promising them discounts on diesel

---

[4] According to the Indictment, by the end of 2012, Pilot operated more than five hundred truck stops and sold more than five billion gallons of diesel fuel.

fuel but not giving them the full benefit of those discounts and by sending false reports to lull those customers into thinking they were getting what they had been promised. The Indictment charged that the conspirators described part of the scheme as "Manuel," referring to fraudulently reduced discounts given through manually calculated rebate checks. The jury found Defendant guilty on Count One. (Doc. 484.)

Counts Eight and Ten charged Defendant with two specific acts of wire fraud in violation of 18 U.S.C. § 1343. (Doc. 182.) These counts alleged Defendant sent two email messages on February 20, 2013 related to a possible expansion of the fraud to use a different base fuel price for customers identified as less sophisticated; the scheme was described as "A/B" or "Aunt Bea" pricing. The jury found Defendant guilty on Count Eight and not guilty on Count Ten. (Doc. 484.)

Count Fourteen charged Defendant with witness tampering on June 9, 2014, in violation of 18 U.S.C. § 1512(b)(3). (Doc. 182.) This count related to a telephone call between Defendant and his then-former assistant, Sherry Blake, after Defendant's employment with Pilot had terminated. While Defendant was still at Pilot, he required his sales staff to submit weekly "trip reports" to him through Ms. Blake. Some of these trip reports described allegedly fraudulent activity. Count Fourteen alleged that during the June 9, 2014 telephone call, Defendant told Ms. Blake that he knew she had told an investigator for his attorney that he had read trip reports, but he needed her to know that he had never read trip reports and had no way of responding to trip reports, when in fact he had both read and been able to respond to trip reports during his employment. The jury found Defendant guilty on Count Fourteen. (Doc. 484.)

Defendant has now made a total of five filings in support of his request for a new trial. His initial thirty-five page motion argues the following grounds: a miscarriage of justice and the

verdict's being against the weight of the evidence for each count of conviction; legal errors in the treatment of coconspirator guilty pleas; legal errors in the admission of Government Exhibits 529–31, which contained racist language by Defendant and his subordinates at an after-hours event; ineffective assistance of Trial Counsel in opening the door to Government Exhibits 529–31; and ineffective assistance of Trial Counsel in failing to investigate facts related to the Government's so-called bribery theory of witness tampering for Count Fourteen. (Doc. 566.)

Defendant's nine-page motion for leave to file a supplemental brief raises grounds of prosecutorial misconduct,[5] a miscarriage of justice, and ineffective assistance of Trial Counsel, all related to (i) evidence that plans for the A/B pricing scheme on which Count Eight was based had been discontinued before implementation and (ii) evidence of Pilot's right to change discounts without notice, Pilot's right to enforce gallon requirements against discount customers, and that some customers had not suffered any financial loss. (Doc. 579.)

Defendant's eight-page supplemental brief raises grounds of prosecutorial misconduct, a miscarriage of justice, and ineffective assistance of Trial Counsel on Count Fourteen. (Doc. 587.) Each of these grounds relate to the date of an entry on Defendant's electronic calendar for Ms. Blake to be interviewed by investigators Pilot had hired, Steptoe & Johnson ("Steptoe"). Ms. Blake testified at trial that she told Defendant her interview would occur on June 11, 2014 and that she had put a June 11, 2014 entry on the paper calendar Defendant eventually took with him when

---

[5] The Court expects attorneys practicing before it, as officers of the Court, to adhere to the highest standards of ethics. The Court does not approve of counsel's casting aspersions on opposing counsel or making accusations of misconduct without a solid foundation. *In re Moncier*, 550 F. Supp. 2d 768, 800 n.43 (E.D. Tenn. 2008). After reviewing Defendant's several filings and the Government's responses, the Court sees no basis for accusing opposing counsel of prosecutorial misconduct.

he left his employment at Pilot.  Ms. Blake also testified that the interview actually occurred on June 11, 2014.  Defendant now submits that discovery shows the entry on Defendant's *electronic* calendar at Pilot was for June 9, 2014.  Because the conversation for which Defendant was convicted of witness tampering took place on the evening of June 9, 2014, Defendant argues the electronic calendar entry undermines the theory on which he was convicted.

Defendant's three-page second supplemental brief raises grounds of a miscarriage of justice and hints at grounds of prosecutorial misconduct based on a preliminary report from a forensic data analysis that Defendant only accessed nine trip reports on his iPad through Pilot's Dropbox application.  (Doc. 605.)

Defendant's four-page third supplemental brief raises grounds of a miscarriage of justice, prosecutorial misconduct, and ineffective assistance of counsel based on the audio recording introduced as Government Exhibit 522.  (Doc. 656.)

The Government's responses to each of Defendant's filings in support of a new trial have included an objection based on the untimeliness of Defendant's request for a new trial.  (Docs. 578, 594, 608, 662.)  The Government argues Defendant has not satisfied the "strict standard which is met only in extraordinary cases" for showing excusable neglect.  (Doc. 578 at 1 (quoting *Nicholson v. City of Warren*, 467 F.3d 525, 526 (6th Cir. 2006).)  The Government points out that Defendant has offered no justification for his delay of three months in hiring new counsel after the guilty verdict.  (*Id.* at 2.)  It also argues that because Defendant has not satisfied the standard for showing constitutionally ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1987), he has necessarily not established excusable neglect based on Trial Counsel's continuing representation through the time in which a motion for new trial could have been filed.

## II.     STANDARD OF REVIEW

### A.     Rule 33

A court may vacate a judgment and grant a defendant a new trial on the defendant's motion "if the interest of justice so requires." Fed. R. Crim. P. 33(a). The decision to order a new trial is committed to a court's sound discretion, which is subject to review for abuse. *United States v. Talley*, 164 F.3d 989, 1002 (6th Cir. 1999); *United States v. Davis,* 15 F.3d 526, 531 (6th Cir. 1994). In deciding whether a new trial is warranted, a court should primarily concern itself with whether the prior proceedings were fair for the accused. *Talley*, 164 F.3d at 1002. Motions for new trials are not favored and should only be granted with great caution and in extraordinary circumstances. *United States v. Garner*, 529 F.2d 962, 969 (6th Cir. 1976); *United States v. Hoffa*, 382 F.2d 856, 862 (6th Cir. 1967). A defendant bears the burden of proving a new trial should be granted. *United States v. Seago*, 930 F.2d 482, 488 (6th Cir. 1991).

A defendant who seeks a new trial on any grounds other than newly discovered evidence must file his motion no more than fourteen days after the jury returns a guilty verdict against that defendant. Fed. R. Crim. P. 33(b)(2).

Under Rule 33 a judge may permit a new trial if a verdict is against the "manifest weight" of the evidence. *United States v. Mallory*, No. 17-3537, -- F.3d --, 2018 WL 4130827, at *7 (6th Cir. Aug. 30, 2018) (citing *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007)). Unlike a motion under Rule 29, which calls for the judge to test the sufficiency of the evidence, a Rule 33 motion requires "the trial judge to take on the role of a thirteenth juror, weighing evidence and making credibility determinations firsthand to ensure there is not a miscarriage of justice." *Id.* (citing *Hughes,* 505 F.3d at 593). Rule 33 does not require the court to view the evidence in a light most favorable to the prosecution. *Id.*

## B.     Ineffective Assistance of Counsel

The two-prong test set out in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), governs claims of ineffective assistance of counsel.  To demonstrate a violation of the Sixth Amendment right to effective assistance of counsel, a defendant must show (1) "that his attorney's performance was deficient," and (2) "that the deficient performance prejudiced the defense."  *Huff v. United States*, 734 F.3d 600, 606 (6th Cir. 2013) (citing *Strickland*, 466 U.S. at 687).

The first prong requires a defendant to show his attorney's performance was deficient by demonstrating that counsel's "representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88.  Stated another way, the defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.* at 687.  The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms."  *Huff*, 734 F.3d at 606 (alterations in original) (quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)).  A reviewing court must be "highly deferential" to counsel's performance, because:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Maslonka v. Hoffner*, No. 17-1834, -- F.3d --, 2018 WL 3849370, at *6 (6th Cir. Aug. 14, 2018).

And a court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id*. at 690 (emphasis added).

Even if a defendant is successful in overcoming the strong presumption of reasonable conduct, he must still satisfy the second prong of the *Strickland* test, prejudice. Thus, a defendant must show not only that his counsel's representation was objectively unreasonable, but also that he was prejudiced by counsel's deficiency because there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *McPhearson v. United States*, 675 F.3d 553, 563 (6th Cir. 2012) (quoting *Strickland*, 466 U.S. at 694).

Although the *Strickland* Court emphasized that both prongs must be established for the defendant to meet his burden, it held there is no reason for a court deciding an ineffective-assistance claim to approach the inquiry in the same order or even to address both components of the inquiry. *Strickland*, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.*

III.    ANALYSIS

Defendant did not file his motion for new trial within fourteen days of the jury's guilty verdict. The Court will therefore first address whether Defendant has shown excusable neglect for his late filing. Although the Court does not find excusable neglect, the Court also addresses whether Defendant's motion is, in any case, ready to be adjudicated. The Court will then address, in the alternative, whether Defendant's motion for new trial based on ineffective assistance of

counsel would have merit if it had been timely filed. Finally, the Court will briefly address the flaws in some of Defendant's other arguments.

## A.      Timeliness of Defendant's Motion for New Trial

The fourteen-day deadline for filing a motion for new trial is a nonjurisdictional but inflexible claim-processing rule. *Eberhart v. United States*, 546 U.S. 12, 19 (2005). Because the time limit is not jurisdictional, it may be forfeited if the nonmoving party fails to object. *Id.* In the absence of forfeiture, however, such inflexible claim-processing rules "assure relief to a party properly raising them." *Id.*

The deadline in Rule 33(b)(2) must be read together with Rule 45(b), which governs extensions of time. *United States v. Munoz*, 605 F.3d 359, 367 (6th Cir. 2010). Specifically, "[w]hen an act must or may be done within a specified period, the court on its own may extend the time, or for good cause may do so on a party's motion made . . . after the time expires if the party failed to act because of excusable neglect." Fed. R. Crim. P. 45(b)(1)(B). The excusable neglect standard empowers courts, "where appropriate, to accept late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control." *Munoz*, 605 F.3d at 368 (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs.*, 507 U.S. 380, 388 (1993)). The determination of excusable neglect "is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Id.* (quoting *Pioneer Inv.*, 507 U.S. at 395).

The Court is to balance at least the following factors, set out by the Supreme Court in *Pioneer Investment*, to determine if excusable neglect caused a failure to act: "(1) the danger of prejudice to the nonmoving party, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, (4) whether the delay was within the reasonable control

of the moving party, and (5) whether the late-filing party acted in good faith." *Id.* (quoting *Nafziger v. McDermott Int'l, Inc.*, 467 F.3d 514, 522 (6th Cir. 2006)). The reason for the delay is the most important factor for the trial court to consider. *Id.* at 372 (citing *Lowry v. McDonnell Douglas Corp.*, 211 F.3d 457, 463 (8th Cir. 2000)). The reason for the delay and whether the delay was in the moving party's reasonable control may also be considered together as a single factor, which the Court does below. *See id.* at 368 n.5. Because the reason for a delay in filing is the most important factor for the Court to consider under *Pioneer*, the Court will address it first, along with an analysis of Defendant's reasonable control.

### 1. Reason for Delay and Reasonable Control of Defendant

Defendant has advanced several legal grounds to support his request for a new trial: ineffective assistance of counsel, a miscarriage of justice, the verdict's being against the weight of the evidence, legal errors by the Court, and prosecutorial misconduct. The reasons he offers for his delay in filing, however, relate only to ineffective assistance of counsel. (*See* Doc. 566 at 40–41,[6] Doc. 542 at 7–8 (arguing ineffective assistance of Trial Counsel excuses the lateness of Defendant's filing).) He offers no authority or argument to allow the Court to excuse his late filing on his other four theories. He does characterize *Munoz* as allowing an "untimely Rule 33 motion for new trial *including* claims of trial counsel's ineffective assistance" (Doc. 566 at 33 (emphasis added)); but the only claim asserted and allowed in *Munoz* was for ineffective assistance of counsel. *See Munoz*, 605 F.3d at 362. *Munoz*, therefore, does not supply the missing reason for

---

[6] The page numbers assigned by counsel in certain of Defendant's filings (Docs. 566, 579, 587, 656) and the page numbers assigned by CM/ECF differ because of the introductory matter Defendants included. The Court will refer to the CM/ECF page numbers in its citations to Documents 566, 579, 587 and 656.

Defendant's failure to file on time on his other theories. The Court concludes that Defendant has offered no reason outside of his reasonable control for his failure to file a timely motion on his theories of a miscarriage of justice, the verdict's being against the weight of the evidence, legal errors by the Court, or prosecutorial misconduct.

The Court next turns to Defendant's reasons for failing to file his ineffective-assistance claims on time and whether that delay was in his reasonable control. First, the Court addresses whether Defendant's allegations of instances of ineffective assistance before and during his trial are a sufficient reason, outside of his reasonable control, to support a finding of excusable neglect under *Munoz*. Second, the Court addresses whether Trial Counsel's failure to consult with Defendant on whether to file a motion for new trial was itself constitutionally ineffective assistance of counsel and a sufficient reason to support a finding of excusable neglect.

> **a.    Ineffective Assistance of Counsel Before and During Trial as a Reason for Defendant's Delay in Filing**

Defendant argues the reason for his delay in filing "was the fault of his prior counsel, who decided unilaterally not to file the motion and would be disinclined to 'fall on his own sword'" for making multiple mistakes that constitute constitutionally ineffective assistance of counsel. (Doc. 566 at 34.)

A client is typically held responsible for the faults of his lawyer. *Pioneer*, 507 U.S. at 396–97. But this rule is "applied less stringently in the criminal context" than the civil context. *Munoz*, 605 F.3d at 369. In criminal cases, concern for a defendant's rights must sometimes take precedence over "the important public interests in judicial efficiency and finality" that support the general rule. *Id.* (quoting *Stutson v. United States*, 516 U.S. 193, 196 (1996)). Further, courts recognize that "an attorney . . . is unlikely to raise an ineffective-assistance claim against himself,"

in part because it may be hard even for a conscientious attorney to recognize his own serious errors at trial. *Id.* (quoting *Massaro v. United States*, 538 U.S. 500, 503 (2003), and *Billy-Eko v. United States*, 8 F.3d 111, 114 (2d Cir. 1993), *abrogated on other grounds by Massaro*, 538 U.S. at 504).

Moreover, where an attorney's conduct goes "beyond everyday mistakes into the realm of serious misconduct," the principles of agency law that typically make a client responsible for the actions of her freely chosen attorney lose their relevance. *Id.* at 370 (quoting *Downs v. McNeil*, 520 F.3d 1311, 1319–21 (11th Cir. 2008). Instead, the relevant principle becomes "the agency-law axiom that a principal is not bound by his agent's conduct where the agent 'is acting adversely to the principal's interests.'" *Id.* at 370–71 (quoting *Downs*, 520 F.3d at 1320–21). "[W]here an attorney refuses to fall on his own sword for his client, even though that is his client's last best hope . . . [there] is a paradigmatic case of adverse interests" that excuses a client from responsibility for his attorney's fault in failing to meet the deadline. *Id.* at 371 (citing *Manning v. Foster*, 224 F.3d 1129, 1134–35 (9th Cir. 2000)). In sum, *Munoz* teaches that continuing representation by the defense attorney who tried a case can constitute a valid reason for a delay in filing a Rule 33 motion and can show that the delay was not within the defendant's reasonable control. *See id.*

But there is a key difference between *Munoz* and Defendant's case. In *Munoz*, there was sufficient merit in the defendant's ineffective-assistance argument that the trial court granted the defendant's Rule 33 motion. The appellate court disagreed as to the merits of the defendant's motion, but there was at least room for reasonable debate. But if merely invoking "ineffective assistance of counsel" were enough to overcome the otherwise inflexible rule that motions for new trial must be filed within fourteen days, there would effectively be no time limit for such motions until the judge imposed sentence. The Court does not think this can be the case. The Court

concludes there must be at least some small measure of possible merit[7] in an ineffective-assistance-of-counsel argument to provide an acceptable reason for missing the deadline and to establish that the delay was not in the reasonable control of the defendant.

The Court has reviewed each of Defendant's arguments that Trial Counsel rendered constitutionally ineffective assistance to him before and during trial. The Court finds none of them to have even such a small amount of merit as would allow the Court to find excusable neglect for their late filing. Defendant therefore has not shown he had a sufficient reason for not filing within fourteen days of the verdict. Similarly, looking to whether the delay was in Defendant's reasonable control, Trial Counsel's failure to raise these essentially meritless arguments in a timely motion for new trial was not against Defendant's interests such that Defendant should be excused from responsibility for Trial Counsel's choice not to file them. The Court accordingly concludes that the reason for Defendant's delay in filing his motion for new trial, and whether the delay was in Defendant's reasonable control, both weigh against a finding of excusable neglect.

### b. Failure to Consult with Defendant on Motion for New Trial as Ineffective Assistance of Counsel

Defendant also asserts that Trial Counsel's failure to consult him on whether to file a motion for new trial was itself ineffective assistance of counsel that satisfies the standard for

---

[7] In *Munoz*, the court referred to the determination of excusable neglect as an "equitable one." *Munoz*, 605 F.3d at 368 (quoting *Pioneer*, 507 U.S. at 395). This necessarily allows for some degree of weighing and balancing. There is nothing in Defendant's case that compares with the facts cited in *Munoz* as justifying a finding of excusable neglect. Examples in *Munoz* included an attorney failing to file a notice of appeal after the client expressly asked him to, *id.* at 369 (citing *United States v. Clark*, 193 F.3d 845, 846–47 (5th Cir. 1999)), and an attorney leaving town and becoming completely inaccessible, *id.* at 369–70 (citing *United States v. McKenzie*, 99 F.3d 813, 816 (7th Cir. 1996)). Under *Pioneer*, the reason must be an egregious act or omission by the agent in opposition to the principal's interest. Here, at most, there is only slight evidence that any of the alleged incidents of ineffective assistance of counsel were adverse to Defendant's interests.

excusable neglect. (Doc. 566 at 33.) Defendant offers no legal authority to support this proposition. The Court is not aware of any obligation for an attorney to discuss with or obtain permission from the client on whether or not to file a motion for a new trial.

In his motion seeking permission to file his request for a new trial, Defendant made only a barebones argument to show ineffective assistance of counsel on these grounds. He devoted a mere three sentences to the issue: "Failure to discuss with Mr. Hazelwood the merits of, and possible bases for, a Rule 33 motion was a significant oversight by trial counsel. Counsel apparently determined that a Rule 33 motion would be 'futile,' but never shared that opinion with Mr. Hazelwood nor informed him of his rights in this regard at all. This was a significant failure." (Doc 542 at 7.). This falls far short of demonstrating that Trial Counsel's failure to discuss a Rule 33 motion with Defendant fell below an objective standard of reasonableness.

Whether to file a motion for a new trial is best viewed as trial management. "[T]rial management is the lawyer's province: Counsel provides his or her assistance by making decisions such as 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.'" *McCoy v. Louisiana*, 138 S. Ct. 1500, 1508 (2018) (quoting *Gonzalez v. United States*, 553 U.S. 242, 248 (2008). "Some decisions, however, are reserved for the client – notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and to forgo an appeal." *Id.*

> While these fundamental decisions must be made by a criminal defendant most of the decisions that arise in criminal cases are the prerogative of counsel. (Our adversarial system would break down if defense counsel were required to obtain the client's approval for every important move made during the course of the case.) Among the decisions that counsel is free to make unilaterally are the following: choosing the basic line of defense, moving to suppress evidence, delivering an opening statement and deciding what to say in the opening, objecting to the admission of evidence, cross-examining witnesses, offering evidence and calling defense witnesses, and deciding what to say in summation.

*Id.* at 1516 (Alito, J., dissenting).

The decision to move for a new trial does not involve a decision on how to plead, the right to a jury trial, whether to testify, or whether to appeal, all of which are decisions that must be made by a defendant.[8]  The decision to file a motion for a new trial thus is not relegated to the sole province of the defendant, and Trial Counsel's decision not to discuss with Defendant whether a new-trial motion should have been filed cannot have been ineffective assistance of counsel.  For Hazelwood to prevail on this ground he must demonstrate that the decision not to file the motion was itself ineffective assistance of counsel.

Present Counsel candidly concedes that Trial Counsel gave a strategic reason for the decision not to file a motion for new trial:

> Just today, we had our first call with Mr. Hardin. Because he had been on trial in another matter, we had previously been able to speak only to his associates. We asked him about his consideration of Rule 33. He informed us that his decision not to file such a motion was strategic, as he believed such a motion may give the Court the opportunity to "tighten" its analysis on the issue of the audio-recorded meeting. However, he acknowledged that he had no recollection of ever discussing the issue with Mr. Hazelwood, which is consistent with our client's recollection. He said he would have to talk with his staff to determine whether anyone else had a recollection of such a discussion with Mr. Hazelwood.

(Doc. 563 at 2.)  This explanation was not given under oath and was not made in a hearing before this Court.  Therefore, it is not clear whether it is even appropriate for the Court to consider this second-hand, unsworn statement.  However, Hardin's explanation appears to be a reasonable, professionally sound, and persuasive rationale for not filing the motion.  Not filing the motion

---

[8] Defendant has exercised the first three of those rights.  The Court assumes he will exercise the fourth after his sentencing.

served Defendant's best interest in that it left as stated at trial the Court's justification for the admission of the recordings of Defendant making offensive racial remarks.

Despite stating that he "would welcome the opportunity to explain how" Hardin's statement affects the excusable-neglect standard, and despite acknowledging that the Court had not yet made its decision on excusable neglect (Doc. 563 at 2), Defendant chose not to buttress his argument in his motion for a new trial (Doc. 566). Instead, he adds only one sentence in support of his burden of demonstrating ineffective assistance: "Accordingly, we incorporate, by reference, the reasons articulated in the May 25, 2018, motion, and further respectfully state that the failure to file a timely motion was excusable because Hazelwood's prior counsel did not consult him before deciding not to move for a new trial." (Doc. 566 at 40.)

The record in this case is devoid of any basis on which to conclude Trial Counsel was deficient in failing to ask for a new trial. There is no argument nor evidence that trial counsel was ignorant of the law or that the decision to not file a motion for a new trial was based upon an erroneous or incomplete understanding of the facts. The Court notes that the attorneys for Codefendants Wombold and Jones did not file motions for new trial. This suggests that the failure to file such a motion is not the significant oversight alleged by new counsel. In fact, if it were otherwise, the great majority of criminal defense attorneys practicing before this Court would be guilty of ineffective assistance of counsel in not routinely requesting new trials. Trial Counsel was simply under no obligation to file a motion where it would be futile. *See United States v. Taylor*, No 1:98-CR-59, 2005 WL 2372037, at *11 (W.D. Mich. Sep. 27, 2005) (no ineffective assistance where counsel reasonably determined that filing a motion for new trial would be futile).

In conclusion, Defendant has provided no reason justifying the failure to file his motion for new trial on a timely basis. The Court turns next to the remaining factors for determining excusable neglect under *Pioneer*.

## 2. Danger of Prejudice to Government

The next factor is the danger of prejudice to the Government as the nonmoving party. The focus of this factor is "the potential prejudice stemming from having to retry the case after a delay, rather than merely from having to respond to a belated motion." *Munoz*, 605 F.3d at 371 n.6 (emphasis omitted). Defendant argues the Government will suffer no prejudice from the late filing of the motion because only three months had passed when he first sought leave to file and because his sentencing hearing has not yet occurred. (Doc. 542 at 6.) The Government does not make a specific argument regarding prejudice. This factor weighs in favor of a finding of excusable neglect.

## 3. Length of Delay and Potential Impact on Judicial Proceedings

Whether a delay is inordinate depends on the specific circumstances of a case. *See Munoz*, 605 F.3d at 372. Defendant argues any delay would have an insignificant impact on judicial proceedings, given that Defendant has not yet been sentenced and a presentence report had not yet been prepared when he sought leave to file his motion. (Doc. 542 at 7.) Defendant also notes that the trial was segmented over three months. The Government does not make a specific argument regarding the length of the delay or its potential impact on judicial proceedings.

The jury returned its guilty verdicts against Defendant on February 15, 2018. (Doc. 484.) Defendant's motion for new trial or request for extension of time to file was due on March 1, 2018. Fed. R. Crim. P. 33(b)(2). Defendant thus filed his motion for leave to file a motion for new trial almost three and a half months after the verdict, on May 25, 2018. (Doc. 542.)

Defendant's motion was also filed after the Court sought input on and developed a sentencing schedule for the seventeen defendants to be scheduled in these related cases, under which Defendant and his two trial-convicted codefendants were to be sentenced first. (Doc. 526.) This schedule promoted efficient and just sentencing for all of the defendants, considering both the possibility of departure motions under USSG § 5K1.1 and the need to follow a logical order to consider each defendant's specific role in offense conduct that was both complex and extended over time. Defendant in fact stated he did not object to being scheduled for the first sentencing hearing among these related cases.[9] (Doc. 506 at 1.) Defendant has since requested a four-month delay in his sentencing and received a one-month delay, with sentencings for the other defendants to follow. (Doc. 633.) If Defendant's motion for new trial had been filed in fourteen days of the verdict, neither the Court nor the other parties would have devoted time and resources to developing the sentencing schedule they did. The Court concludes the potential impact of Defendant's delay on judicial proceedings as to the sixteen other defendants to be sentenced in these related matters weighs slightly against a finding of excusable neglect.

Defendant also argues Defendant's presentence report had not yet been prepared when he first filed his motion for leave. (Doc. 542 at 7.) Preparation of a presentence report requires a significant investment of time by the Probation office. In a typical case, the process requires a minimum of fourteen weeks. A case as complex as this one may require additional time. Defendant's presentence report was therefore likely in preparation before he filed his motion for

---

[9] Defendant made this statement through Trial Counsel. Defendant has not raised an objection to the sentencing order through Present Counsel. Nor has he made any sort of allegation that this statement somehow constituted ineffective assistance of counsel.

leave. The Court does not, however, consider the state of preparation of Defendant's presentence report as adding significantly to the weight of this factor against a finding of excusable neglect.

### 4. Good Faith by Defendant

Defendant argues he has "a good faith basis" for bringing his motion for new trial. (Doc. 542 at 9.) Bad faith has been defined in this context as "[d]ishonesty of belief, purpose, or motive." *United States v. Elenniss*, -- F. App'x --, No. 17-3986, 2018 WL 1725068, at *5 (6th Cir. Apr. 9, 2018) (quoting *Bad Faith*, Black's Law Dictionary (10th ed. 2014)) (alteration in original). The Government does not argue to the contrary. Defendant's good faith weighs in favor of a finding of excusable neglect.

### 5. Balancing of Factors

Defendant has given no reason for his delay in asking for a new trial based on a miscarriage of justice, the verdict's being against the weight of the evidence, legal errors, or prosecutorial misconduct. The reason for the delay is the most important factor for the Court to consider in determining whether there has been excusable neglect. *Munoz*, 605 F.3d at 372. Lacking any showing on this factor, Defendant has failed to establish his excusable neglect in failing to file these portions of his request for a new trial within fourteen days of the verdict. The Court will therefore **DENY** as untimely Defendant's motion for a new trial based on a miscarriage of justice, the verdict's being against the weight of the evidence, legal errors, and prosecutorial misconduct.

The Court next turns to whether Defendant's delay in filing his ineffective-assistance arguments resulted from excusable neglect. The Court has found that the reason for Defendant's delay in asking for a new trial on ineffective assistance and whether that delay was in his reasonable control weigh against a finding of excusable neglect. The length of the delay and its potential impact on judicial proceedings as to the other defendants weigh slightly against a finding

of excusable neglect.  The lack of danger of prejudice to the Government and Defendant's good faith, on the other hand, both weigh towards a finding of excusable neglect.  Considering all of these factors, and placing the most importance on the reason for Defendant's delay, the Court finds Defendant's late filing did not result from excusable neglect.  The Court will therefore **DENY** as untimely Defendant's motion for a new trial based on ineffective assistance of counsel.

**B.      Readiness of Defendant's New-Trial Motion for Adjudication**

Defendant argues "there is no reason why [his] ineffective-assistance claims should be shelved for post-conviction review when counsel is prepared to litigate those claims now."  (Doc. 566 at 41.)  The Court is not so sure.

Defendant initially filed a motion for leave stating only that he anticipated arguing ineffective assistance of counsel based on Trial Counsel's opening the door to Government Exhibits 529–31.  (Doc. 542.)  Defendant then filed his motion on multiple theories and multiple grounds in addition to what he had anticipated in his motion for leave.  (Doc. 566.)  Defendant's initial motion was followed by four more motions or briefs pointing to evidence Present Counsel had just identified and adding completely new theories to his motion.  (Docs. 579, 587, 605, 656.)

In addition to Defendant's multiple requests to expand his motion, the Government's responses to many of Defendant's arguments, some of which are discussed below, demonstrate that Present Counsel may not yet have quite the familiarity with the matter needed to select and formulate Defendant's post-trial arguments.

Finally, to properly address many, if not all, of the claims raised, the Court would need to take evidence. This evidence might necessitate testimony from Trial Counsel and Defendant.[10] The Government would have a right to examine witnesses, including Trial Counsel and Defendant. The Government has, in fact, asked for the chance to explore Defendant's potential implicit waiver of attorney-client privilege as to the grounds for his ineffective-assistance argument. (Doc. 578 at 30.) Despite multiple subsequent filings, Defendant has not responded to this request. The Court expects it is not in Defendant's interest to allow the Government to question Trial Counsel or Defendant on these subjects before Defendant completes any direct appeal.

Thus, despite Defendant's representations, the Court concludes Defendant's arguments for a new trial are not as ready to be adjudicated as the interests of justice would require.

### C. Defendant's Motion for New Trial Based on Ineffective Assistance of Counsel

The Court recognizes that its decision in Section III(A)(1)(a) to reject Defendant's excusable-neglect argument based on the blatant weakness of his arguments as to ineffective-assistance during trial is somewhat novel. The Court therefore explains its reasoning on Defendant's specific ineffective-trial-assistance arguments below. The following analysis will also serve as the Court's alternative explanation of why, even if the lateness of Defendant's motion for new trial based on ineffective assistance of counsel were excused, Defendant would still not be entitled to a new trial based on ineffective assistance of counsel.

---

[10] As stated earlier with respect to Defendant's representation as to Trial Counsel's reason for not filing a motion for new trial, the Court may not be able to consider Defendant's recounting of Hardin's statement because it is not under oath and subject to cross examination.

### 1.     Opening the Door to Government Exhibits 529–31

Defendant's first ineffective-assistance argument is that Trial Counsel was constitutionally ineffective in opening the door to Government Exhibits 529–31, which he claims inflamed the jury against him and led to his conviction.  (Doc. 566 at 31–37.)

Defendant has not overcome the strong presumption that Trial Counsel's conduct in this regard was within the range of reasonable representation.  Trial Counsel conceived a well-designed, well-thought-out defense strategy that portrayed Defendant as a busy, brilliant, hardworking, high executive who cared deeply about the continued viability and success of Pilot. This strategy was unveiled in the opening statement and built upon throughout the trial through the cross examination of witnesses called by the government.  The defense introduced a lengthy video in which Defendant had a starring role.  Trial Counsel brought out that Defendant was instrumental in every significant undertaking and initiative of Pilot.  Trial Counsel brought out that Defendant was absent from his office often on Pilot business.  The inference to be drawn from this was that Defendant was too busy to pay attention to the fraudulent actions of many of his subordinates who were involved in the charged scheme and artifice to defraud.

There was nothing wrong with this strategy and it held promise of being effective and persuasive to the jury.[11]  Trial Counsel asked witnesses on cross-examination about Defendant's role in building Pilot, his love and concern for Pilot, and his tremendous abilities as a top executive. These questions culminated with Hardin asking two witnesses questions to the effect of whether

---

[11] Present Counsel has adopted the same strategy. "To conclude that Hazelwood—who by all evidence (a) was an extremely busy executive, … (b) was in the office at most two days every week."  (Doc. 566 at 11.)  "It is a bridge too far to convict a busy executive on the assumption that he systematically read nearly every one of a huge volume of trip reports."  (Doc 619 at Ex. A.) That Present Counsel has embraced the same strategy is a strong indication that it was not deficient.

Hazelwood as a good businessman and excellent company president for Pilot would engage in conduct that ran the risk of putting Pilot in jeopardy of having customers go to competitors and risking "everything coming down." The witnesses understandably had no answer. The clear implication for the jury was that a person with that level of dedication to Pilot would not engage in the charged scheme and artifice to defraud. So setting out on this path does not appear to be deficient attorney performance. On the contrary, it appeared to be very sound strategy based upon the evidence in the case and particulars about Defendant.

In addition, it was not unreasonable for Trial Counsel to think Government Exhibits 529–31 would be inadmissible. Trial Counsel in fact objected to the evidence repeatedly at trial. And in his motion for a new trial, Defendant himself argues the Court erred in admitting Government Exhibits 529–31. (Doc. 566 at 29–31.) It is difficult to fault Trial Counsel for concluding that the evidence was inadmissible when Present Counsel, with the benefit of hindsight, has come to the same conclusion.

Defendant also misses the mark in asserting that "the benefit of the questioning was slim" because "successful and skilled businesspeople sometimes commit crimes." (Doc. 566 at 36.) They certainly sometimes do. But the defense Trial Counsel was seeking to establish was still a powerful one in the context of the evidence at trial: that Defendant as an individual was too good a businessman and too good a company president for Pilot to have led or joined the discount-fraud scheme. (*See* Doc. 455 at 18 (discussing strength of this defense in context of jury's ability to follow limiting instruction on tapes).) Defendant thus underrates the potential benefit of the strategy Trial Counsel chose.

The Court gave this issue a great deal of consideration during the trial and is confident it ruled correctly. But granting the Government's motion to admit the evidence was never a foregone

conclusion. The Court invested significant time, research, and analysis into the question and had to consider a number of countervailing factors. (*See, e.g.*, Doc. 374 at 175–90; *see also* Doc. 455.) The Court cannot conclude Trial Counsel was constitutionally ineffective for failing to foresee the Court's decision on this difficult issue. On the contrary, at the time, Defendant had successfully persuaded the Court to reject the Government's earlier motion to introduce other rebuttal evidence. (*See* Doc. 338 [sealed].) This case is therefore distinct from *Wilson v. Mazzuca*, in which the trial court had explicitly warned counsel that two specific lines of questioning would lead to the introduction of specific damaging evidence. 570 F.3d 490, 504, 505 (2d Cir. 2009).

The Court would have to hear testimony from Trial Counsel, and perhaps also from Defendant, for there to be any possibility of finding Trial Counsel's representation to be deficient in this regard. Trial Counsel may have thought, just as Present Counsel argues, that even with Hardin's questions the Court would not allow admission of the evidence. It is difficult to conclude Trial Counsel was deficient in reaching the same conclusion as Present Counsel. It is also possible Trial Counsel felt so strongly about the favorable evidence that it was worth the risk of the counter evidence being admitted. The Court also considers it likely Defendant had considerable input into the strategy and its implementation.[12] The Court then may need to hear from Defendant also. But testimony by defendants and their attorneys prior to appeals may undermine the prospects for a successful appeal. For such reasons, ineffective assistance of counsel claims must generally await the conclusion of direct appeals.

---

[12] Trial Counsel's strategy bears a strong resemblance to some of Defendant's own statements in an August 23, 2018 news interview Defendant gave. "Former Pilot Flying J president speaks out for first time in five years," WVLT Knoxville, (Aug. 23, 2018, 6:56 p.m.), http://www.wvlt.tv/content/news/491568611.html. This interview is not evidence, however, and the Court does not weigh it in connection with the *Strickland* analysis.

Turning to the second prong of *Strickland*, Defendant has also not established a reasonable probability that he was prejudiced by the admission of the evidence and would not have been convicted without it. The recordings were striking, to be sure, but Defendant's assertion that the evidence "portrayed Hazelwood as the worst of racists" (Doc. 566 at 35) is overblown. Unhappily for humanity, using and tolerating racist epithets and requesting a song with racist lyrics is not as bad as racism can get.

The evidence did not have the prejudicial effect claimed by Present Counsel. The Court saw and heard all of the evidence throughout the twenty-seven days of trial. The introduction of evidence on Government Exhibits 529–31 took two witnesses less than two hours, from the Court's limiting instruction through the end of the testimony. The Court observed the jurors' demeanors throughout the trial, including the time surrounding the introduction of this evidence. It was apparent this was unpleasant for the jury, but the Court saw no indication the jurors were unduly affected by the evidence afterwards or were unable or unwilling to follow the Court's limiting instruction. The Court, of course, does not know what happened during deliberations. But if this evidence had inflamed the jury and overwhelmed its judgment, one would have expected a quick verdict finding Defendant guilty on all counts. This did not happen. The jury deliberated over several days. It found Defendant guilty on three counts and not guilty on a fourth. Defendant does not explain how a jury that was irrationally inflamed against him would have nevertheless decided to acquit him on one count. In short, while Government Exhibits 529–31 were striking, and while they were an effective counter to Defendant's good-businessman defense, the Court does not agree with Defendant that the racist nature of the recordings was the deciding factor in Defendant's trial.

Defendant has failed to show either deficient performance by Trial Counsel or prejudice under *Strickland*.

### 2. Bribery Theory of Witness Tampering

In his second ineffective-assistance claim, Defendant argues Trial Counsel failed to investigate the Government's so-called bribery theory of witness tampering. (Doc. 566 at 38–39.) But the Court agrees with the Government that the Government did not employ a bribery theory to begin with. (*See* Doc. 578 at 15–21, 33–34.) Evidence of Defendant's annual gifts to Ms. Blake explained the relationship between them and provided context for her testimony that the telephone call made her feel "that everything generous that Mark had done for [her] in the past was being called upon." (Doc. 457 at 168.) But it was Defendant's statements about trip reports during the June 9, 2014 telephone call that constituted the offense conduct, not any of his previous annual gifts to her. The failure to investigate a theory the Government did not employ does not fall outside reasonable performance under prevailing professional norms. *See Huff*, 734 F.3d at 606. There is also no reasonable probability that the failure to investigate an unused theory affected the outcome of the trial. *See McPhearson*, 675 F.3d at 563. Failing both prongs of the *Strickland* test, this argument does not show constitutionally ineffective representation.

It also seems obvious that Defendant would have known of all annual gifts and prior payments to Ms. Blake from himself or his wife. As with the course of action that led to the admission of Government Exhibits 529–31, the Court would likely need to hear testimony from Trial Counsel and Defendant regarding any alleged failure to investigate such payments.

### 3. Discontinuation of "A/B" Pricing Scheme

Defendant next argues Trial Counsel was ineffective in failing to introduce the recording of a conversation indicating that the "A/B" pricing scheme was discontinued before it was ever implemented. (Doc. 579 at 3–5, Doc. 586-1.) This argument demonstrates a misunderstanding of the charge in this case or perhaps a misleading shorthand. There was no freestanding "A/B"

pricing scheme. Rather, there was a scheme and artifice to defraud, and one part of that scheme and artifice to defraud was an effort to develop the "A/B" pricing scheme. The "A/B" pricing scheme was not a standalone crime charged in the Indictment. Since it was not a charged crime, no one could be found guilty of it.

Instead, what Defendant focuses on is merely a wire communication in furtherance of the charged scheme and artifice to defraud. A wire communication is the last element which must be proved in a wire-fraud offense. The wire communication supporting Count Eight is an email communication in which Defendant directs other participants to develop the A/B pricing plan. (*See* Doc. 182 at 53.) This plan is alleged in the Indictment as part of the scheme and artifice to defraud and to obtain money by means of false and fraudulent promises, representations, and pretenses. It is obvious that an instruction to other members of a fraudulent scheme about the scheme is in furtherance of the fraud. And given Defendant's role with Pilot, a directive coming from him to a subordinate would have had substantial force in keeping the subordinate in the scheme, emboldening the subordinate to continue, and reassuring the subordinate that he was doing what Defendant wished.

The wire-fraud statute merely requires that the wire communication be in furtherance of a scheme or artifice to defraud and to obtain money. It need not be an essential element of the scheme, as long as it is "incident to an essential element of the scheme." *Schmuck v. United States*, 489 U.S. 705, 710–11 (1989) (quoting *Pereira v. United States*, 347 U.S. 1, 8 (1954)). Nor is there any requirement that the wire communication concern a part of the scheme and artifice to defraud that is successful, that is old or already in effect, or that is fruitful. There is no requirement that the wire communication contain anything false or fraudulent, that it further a part of the scheme that is fruitful, or that the matter discussed be actually implemented. Even an innocent

communication will qualify so long as it furthers the scheme and artifice to defraud. *Id.* at 714–15 (citing *Parr v. United States*, 363 U.S. 370, 390 (1960) and *Carpenter v. United States,* 484 U.S. 19, 28 (1987). An innocent, truthful, routine, futile, even self-defeating, wire communication will suffice because "[t]he relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time, regardless of whether the mailing later, through hindsight, may prove to have been counterproductive." *Id.* at 715.

The wire communication alleged in Court Eight plainly suffices to satisfy this element of the offense. It was from one participant in the scheme and artifice to defraud to another. It concerned the scheme and artifice to defraud. It directed the other participant in continuing and expanding the scheme and artifice to defraud.

But the Government never attempted to prove that the scheme was actually implemented, nor did it need to do so. The actual implementation of a scheme to defraud is not an element of wire fraud, let alone an element of conspiracy to commit wire fraud. *See United States v. Faulkenberry*, 614 F.3d 573, 581 (6th Cir. 2010) (elements of wire fraud); *United States v. Rogers*, 769 F.3d 372, 379–80 (6th Cir. 2014) (elements of conspiracy to commit wire fraud). Thus, without even reaching the Government's responsive arguments that Defendant could not have introduced the recording because it would have been hearsay, and that Trial Counsel was aware of even more damaging evidence the Government could have introduced in rebuttal (Doc. 594 at 9–12, Doc. 601 at 19–29, 33–36), the Court finds no merit in Defendant's ineffective-assistance argument regarding the recording. As with Defendant's claims about a bribery theory of witness tampering, this argument fails both prongs of the *Strickland* test.

### 4.    Pilot's Right to Change Discounts and Pilot's Gallon Requirements

Defendant argues Trial Counsel was ineffective in failing to show the jury evidence of Pilot's right to change discounts without notice and to enforce gallon requirements against customers with discount deals.  (Doc. 579 at 4, 7–8.)  But the Government is correct that these very issues were repeatedly covered at trial, even if only one of the specific documents to which Defendant points was, in fact, admitted.  (Doc. 594 at 20–22.)  Looking just at the Government's first two witnesses, Trial Counsel cross-examined both of them on gallon requirements and the right to change deals without notice.   (Doc. 336 [Janet Welch] at 197–200; Doc. 337 [Arnie Ralenkotter] at 181–85).  This does not take into account Trial Counsel's cross examination of any of the Government's other witnesses; the cross examinations by codefendants; the evidence on gallon requirements or the lack thereof in the specific deals as to which the Government introduced evidence; or the parties' opening statements and closing arguments.  Pilot's policies regarding discount changes and gallon requirements, what percentage of deals in general had gallon requirements, whether the specific deals on which the Government introduced evidence had gallon requirements, the numerous legitimate reasons Pilot could change discounts, and whether those reasons applied to the specific deals on which the Government introduced evidence were all covered in detail at the trial.  Trial Counsel's representation did not "[fall] below an objective standard of reasonableness" by failing to defend on the grounds of Pilot's right to change discounts without notice or as to gallon requirements.  *See Strickland*, 466 U.S. at 688.

In addition, as the Government argues in its response (Doc. 594 at 13–20), the specific documents on which Defendant now relies would not have exculpated Defendant.   These documents dealt with timeframes other than those of the specific fraudulent activities proved at trial, or they did not establish actual monthly minimum requirements.

31

Finally, the Court must conclude that this argument is a red herring.  It is a federal crime for someone to devise or to participate in a scheme or artifice to defraud or to obtain money by means of false or fraudulent pretenses, representation, and promises and use wire communications in furtherance of the scheme.  18 U.S.C. § 1343.  Numerous witnesses testified at trial that they made false and fraudulent pretenses, representations, and promises to obtain money from trucking company customers.  The witnesses knew when these pretenses, representations, and promises were made that they were false and fraudulent.  No participant in the scheme testified that they had "unilaterally changed a discount" pursuant to Pilot's policies, but rather that they cheated, lied to, and misrepresented facts to their customers, both before they had obtained the victims' money and after they had obtained the victims' money. Witnesses under oath admitted on the stand to wire fraud and testified they had pleaded guilty to wire fraud, not to unilaterally changing discounts.  The jury was entitled to find them credible.

The Court does not recall a single witness testifying to changing a customer's rebate or fuel price pursuant to a Pilot policy of unilaterally changing a customer's rebate.  The Court also does not recall a single witness testifying to giving a customer a price in good faith, but then later for some reason changing that price, again in good faith.  On the contrary, the testimony was that the price given to customers initially was false and fraudulent, and there was never an intent to meet that price.  Pilot simply charged the customers whatever price the participants in the scheme and artifice to defraud had decided among themselves.  Trial Counsel and other defense counsel raised the issue of legitimate unilateral changes to discounts on cross-examination and argued this in their closing arguments.  The jury, as it was entitled to do, rejected the argument and the defense.  Pilot was a large company and the bulk of its business no doubt was legitimate.  But such instances were

not involved in this case.  Accordingly, the Court concludes this argument is a red herring designed to distract from the intentional fraudulent activity that was actually taking place at Pilot.

Because the documents Defendant cites and the arguments he makes do not exculpate him, Defendant has not shown prejudice.  Defendant's arguments on changing discounts and gallon requirements therefore fail under both prongs of *Strickland*.

### 5. Customers With No Financial Loss

Defendant next argues Trial Counsel was ineffective in not introducing evidence that some of the customers targeted by the scheme did not suffer a financial loss.  (Doc. 579 at 9–10.)  As the Government correctly responds (Doc. 594 at 15, 20), neither wire fraud nor conspiracy to commit wire fraud requires proof of success by the defendants or of financial loss to the targets. *See Faulkenberry*, 614 F.3d at 581; *Rogers*, 769 F.3d at 379–80.  Any effort to introduce such evidence at trial would have been objectionable and may have led to the evidence being excluded. Because the evidence would not have been relevant, it was not unreasonable for Trial Counsel not to attempt to introduce it.  And because the evidence would have made no legal difference at trial, there is no reasonable probability that the result of the trial would have been different if Trial Counsel had sought to introduce the evidence.  This argument therefore fails both prongs of *Strickland*.

### 6. Defendant's Electronic Calendar Entry

Defendant next returns to the witness-tampering charge to argue Trial Counsel was ineffective in failing to introduce the entry on Defendant's electronic calendar at Pilot showing her interview with Steptoe would be on June 9, 2014.  (Doc. 587.)

The Government's direct examination of Ms. Blake pursued a theory that Defendant intended to influence her while knowing she was reasonably likely to talk to federal investigators

because she had been interviewed before, they knew she had been Defendant's assistant, and the federal investigation was ongoing. (Doc. 523.) There was no mention of Ms. Blake's interview with Steptoe on direct examination. Trial Counsel's cross examination then elicited testimony about the scheduling of her Steptoe interview for June 11, 2014, implying that Defendant's intent in the June 9 call was directed not to Ms. Blake's possible future communications with federal law enforcement, but to her imminent interview with Steptoe. (*See also* Doc. 512 [Def.'s Closing Arg.] at 195–96 ("[Y]ou can't tell somebody your side of it ***before they talk to the private lawyers that are working for your former employer*** without the government coming by later and saying you were tampering with a witness? That is wrong.") (emphasis added).) Trial Counsel's strategic choice to mount the foregoing defense, rather than to undermine it by showing a contradiction between Ms. Blake's testimony about the interview date and the entry in the electronic calendar, does not fall below an objective standard of reasonableness under the first prong of *Strickland*.[13]

### 7.  Government Exhibits 522 and 522-A

Last, Defendant argues Trial Counsel was ineffective in allowing the Government to introduce a "doctored and materially incomplete transcript of a critical recording" in its proof on wire fraud and A/B pricing. (Doc. 656.) Defendant claims that a transcript, Government Exhibit 522-A, incorrectly showed a statement by coconspirator John Freeman as "And then [coconspirator] Jay [Stinnett] can get us set up to where we can have A and B buckets. Yeah, f***

---

[13] The Government then elicited testimony on redirect, and argued in closing, that Defendant would have been guilty of witness tampering whether he was thinking about direct communication from Ms. Blake to federal investigators or indirect communication that could have been conveyed by Steptoe. It is not "appalling" that the Government now expresses its belief that its original theory, which had nothing to do with Steptoe, is correct. (*See* Doc. 587 at 6.) Unlike presenting facts that are known to be false, a party may present alternative theories even while believing one of the two theories is the correct one.

'em, just give 'em what they want." (Doc. 662 at 7.) Defendant argues it should actually have read ". . . and then if Jay can get us set up to where we can have -A- and -B- buckets, we're not f****in' 'em, just givin' 'em what they want." (Doc. 657-1 at 2.) Defendant argues the missing "not" from Government Exhibit 522-A gives the statement the opposite meaning, changing it from incriminatory to exculpatory. Defendant also argues that both Government Exhibit 522-A and the recording it transcribed, Government Exhibit 522, should not have stopped with the follow-up statement by Stinnett, "Yeah, AKA, we're f***in' 'em," but should have continued for ten more seconds to include Defendant's and Freeman's statements that that would be a "fair deal." (Doc. 656 at 4.)

There is no reasonable probability that a change in Government Exhibit 522-A would have led to a different result for Defendant at trial. First and foremost, the Court instructed the jury on multiple occasions that transcripts are not evidence, and if there was a difference between what they heard and what they read, they had to rely on what they heard. Thus, regardless of what they read in Government Exhibit 522-A, the jury is presumed to have followed the Court's instructions and relied on what they heard. *See United States v. Harvey*, 653 F.3d 388, 396 (6th Cir. 2011) (jurors are presumed to follow instructions).

Second, the language Defendant argues for is not actually exculpatory. The meaning of Freeman's statement—whether it includes "not" or not—is clear from the entirety of Government Exhibit 522 and coconspirator Brian Mosher's testimony that they were talking about cheating and lying to the customers (*see* Doc. 374 at 174). The conversation included Freeman's statements about needing to know how a customer wants to buy fuel and what the customer understands so Pilot can "take advantage of these things"; Mosher's statement that Pilot's "advantage is [the customers'] ignorance"; and Stinnett's statement "Yeah, AKA, we're f***in' 'em," to the laughter

of the group.  (*See* Gov't Ex. 522-A.)  Defendant insists that adding a negative to one vulgar term for cheating customers in the middle of this conversation negates any indication of fraudulent intent.  The Court disagrees.  Defendant's decidedly literal approach ignores both the statement's context and the obvious roles of sarcasm, braggadocio, and rationalization in Exhibit 522 and the coconspirators' way of speaking in general.

Defendant's claim that the next ten seconds of the conversation are exculpatory suffers from similar flaws.  There is no reasonable probability that the outcome at trial would have been different if the jury had heard Defendant's and Freeman's statements about a "fair deal" after what preceded it, including Defendant's leaving unchecked his subordinates' laughter over Stinnett's punch line that "AKA, we're f***in' 'em."  In the context of Exhibit 522 and the testimony as a whole, the "fair deal" statements serve rather to underscore the defendants' cavalier attitude towards truth and honest dealing with their customers.  As the Government points out, Defendant's references to David Owens in connection with the "fair deal," further negate any exculpatory meaning, when Defendant had previously discussed Owens in connection with dishonest pricing practices.  And surely Defendant cannot truly believe that having the jury hear Freeman echo that it was a fair deal would have been exculpatory, where evidence throughout the trial pointed to Freeman as one of the chief proponents of discount fraud.

Defendant's arguments on Government Exhibits 522 and 522-A do not satisfy the prejudice prong of *Strickland*.  As with each of Defendant's other ineffective-assistance arguments, Defendant has failed to show would be entitled to a new trial, even if his ineffective-assistance motion were considered to be timely.

### D.    Motion for New Trial on Grounds other than Ineffective Assistance

Defendant has not demonstrated excusable neglect for his late-filed motion for a new trial, so the motion must be denied. The Court therefore need not consider the various claims Defendant has raised in his arguments for a new trial. The Court will nevertheless address certain of Defendant's other arguments for the instruction of the parties in future stages of the case. Because addressing these claims is not necessary to the Court's disposition of Defendant's motion, the Court does not attempt to do so in a comprehensive manner. Nor does the Court's failure to address each of Defendant's grounds mean any unaddressed claims have merit.[14]

### 1. Insufficiency of the Evidence

It is unnecessary for the Court to restate the evidence introduced at trial in detail. Suffice it to say it showed that numerous employees in Pilot's Direct Sales Division were involved in a scheme and artifice to defraud and to obtain money from Pilot customers through false and fraudulent promises, premises, and representations. Employees intentionally lied to customers about what the customers would be paying for fuel, and lied to customers about what they would receive back from Pilot as rebates or discounts. These false and fraudulent statements were made for the purpose of securing new diesel fuel customers or maintaining present diesel fuel customers, as trucking customers were always looking for the lowest price for diesel fuel. Some of these lies were made directly to customers in personal contact. Others were made through emails or other communication. Still other lies were made through invoices, rebate amounts, and rebate checks.

The employees talked openly at Pilot about their efforts to defraud customers. Some engaged in braggadocio about their fraudulent activities. The fraud was taught at a sales meeting

---

[14] Some of Defendant's additional arguments rest on the same reasoning as his ineffective-assistance arguments, for example.

to a number of employees. The fraud was described in trip reports sent to Defendant.[15] Participants coordinated their actions and their false and fraudulent statements, representations, and pretenses to conceal earlier false statements to customers. Participants created and circulated spreadsheets to facilitate the scheme and artifice to defraud and to obtain the money of the trucking companies through false and fraudulent promises, premises, and representations. Participants in the fraudulent scheme benefitted financially because they earned commissions based upon the money made from trucking company customers.

The evidence also showed Defendant was a vice president and later president of Pilot. Some of the participants in the fraud reported directly to him. The other participants reported indirectly to him. Defendant shared financially in the money brought into Pilot through this fraudulent scheme and artifice to defraud.

### a. Concerted Activity

Concerted activity to engage in criminal activity, such as conspiracies or mail or wire frauds, is a greater societal threat than individual criminal activity because a group can do more

---

[15] Defendant argues there was scant evidence he read any of the trip reports. In fact, there was evidence he responded specifically to some of the trip reports containing information regarding the scheme and artifice to defraud. There was also much evidence he insisted upon his subordinates' completing and submitting their trip reports on a timely basis. Defendant's former assistant, Ms. Blake, testified that he demanded the trip reports and even wanted them when he was on vacation and out of town. She believed he read them. Even Trial Counsel had to concede Defendant's telephone statement to Ms. Blake that he never read them was incredible. In addition, coconspirators testified that they discussed the scheme and artifice to defraud with Defendant. No witness ever testified Defendant indicated any unawareness of the contents of the trip reports during these discussions. The coconspirators' willingness to include descriptions of fraudulent activity in trip reports itself demonstrates their confidence that Defendant knew and approved of the scheme. In the face of this evidence, the jury was entitled to conclude Defendant did read the trip reports and was thus aware of the fraudulent nature of the scheme and artifice to defraud that his subordinates detailed in the trip reports. The Court, acting as the thirteenth juror, would reach the same conclusion.

harm than could the members individually.  A "collective criminal agreement—[a] partnership in crime—presents a greater potential threat to the public than individual delicts. Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality." *Iannelli v. United States*, 420 U.S. 770, 778 (1975) (quoting *Callanan v. United States*, 364 U.S. 587, 593 (1961)).  Concerted criminal activity allows the criminal participants to achieve goals they could not achieve on their own.  "Group association for criminal purposes often, if not normally, makes possible the attainment of ends more complex than those which one criminal could accomplish. Nor is the danger of a conspiratorial group limited to the particular end toward which it has embarked."  *Id.* (quoting *Callanan*, 364 U.S. at 593).  In concerted criminal activity, often the participants have varying roles and responsibilities.  This aids in the efficiency and likely success of the criminal enterprise.  This means not all members will engage in the very same acts.  Often in concerted criminal activity there is a degree of hierarchy with those at the top performing more of a management role, while those lower down do the actual dirty work.  This does not make the higher-ups less culpable.  Given the level of control and management they exercise, in many case, this makes them more culpable.

### b.     Wire Fraud

Defendant was convicted on one count of wire fraud.  The wire fraud statute provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice," is guilty of an offense against the United

States. 18 U.S.C. § 1343. To convict Defendant, the Government had to prove the following: (1) Defendant "devised or willfully participated in a scheme to defraud"; (2) Defendant "used or caused to be used an interstate wire communication 'in furtherance of the scheme'"; and (3) Defendant "intended 'to deprive a victim of money or property.'" *Faulkenberry*, 614 F.3d at 581 (quoting *United States v. Prince*, 214 F.3d 740, 747–448 (6th Cir. 2000)).

The evidence of a scheme or artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, substantially as alleged in the Indictment, was considerable. Numerous members of the scheme testified to the scheme and to their involvement in it. Numerous exhibits admitted at trial, including secretly recorded conversations of Defendant and other participants, served to establish the existence of the scheme and artifice to defraud and to obtain money by false and fraudulent pretenses, representations, and promises.

Defendant spends some time attacking this evidence. The first argument is that there was no fraudulent scheme. Trial Counsel pushed this point heavily early on in the case through aggressive cross-examination of witnesses. In the face of so many witnesses testifying to the contrary and the abundant exhibits, the line of defense was largely abandoned.

Since the evidence of a scheme and artifice to defraud and to obtain money from trucking companies by means of false and fraudulent promises, representations, and pretenses was abundant, the next issue is the evidence of Defendant's participation in the scheme. Here again there was more than sufficient evidence for the jury to conclude that Defendant was a willing and knowing participant in the scheme. Two witnesses testified at trial that they had direct conversations with Defendant about the scheme and artifice to defraud and to obtain money by means of false and fraudulent pretenses. Mosher testified that Defendant instructed him to engage

40

in the scheme "as much as possible" at the end of 2007 and beginning of 2008. An email exhibit in early 2008 from Defendant to coconspirator Janet Welch approved of acts pursuant to the scheme. Another email introduced into evidence shows Defendant responding to a subordinate's statement that the price charged in that market may not keep them whole with "rebate rebate masturbate make him feel special." This direct communication with one of the other participants in the scheme and artifice to defraud, a subordinate, could be interpreted as a directive from Defendant to keep the customer happy, but to defraud the customer by making him think he would receive a rebate which both Defendant and the subordinate knew he would not receive. Defendant was captured in an audio recording approving a plan for another subordinate, Mosher, to teach the scheme and artifice to defraud to others in Direct Sales. Defendant also encouraged expansion of the scheme and artifice to defraud. And when Mosher said he should stop participating in manual-rebate fraud because it was no longer benefitting him financially because of commission caps, Defendant told him stopping would not be a "good idea."

The jury also had evidence of Defendant's position with Pilot and his oversight of Direct Sales. Considering how open the participants were about their fraudulent activities, how many people participated in the scheme and artifice to defraud, how they used Pilot resources such as emails, personnel, accounting, billing, and communication tools, how they openly and brazenly bragged about their fraudulent activities, and how they included in trip reports to Defendant details about their fraudulent activities, the jury was entitled to find that Defendant was a willing and knowing participant. There was no evidence that the participants took any pains to hide their activities from Defendant. In the Court's role as thirteenth juror, the Court agrees with the jury that Defendant was well aware of the fraudulent scheme. There is no evidence that in the face of abundant fraudulent activity taking place all around him, Defendant ever did anything to stop the

activity or to communicate that he was opposed to it. The Court finds no miscarriage of justice in the jury's guilty verdict on Count Eight.

### c. Conspiracy

Defendant argues the evidence to support has conviction on the conspiracy to commit wire fraud and mail fraud alleged in Count One was insufficient. The elements of this offense are that (1) two or more people conspired or agreed to commit wire fraud or mail fraud, and (2) Defendant knowingly and voluntarily joined the conspiracy. *See Rogers*, 769 F.3d at 379–80.

Because the conspiracy alleged in the Indictment and proven at trial involved concerted activity, much of what the Court said in the preceding section with respect to the substantive wire fraud count, Count Eight, applies here as well. The evidence was more than sufficient to allow the jury to find Defendant guilty on this count. The court finds no miscarriage of justice in the jury's guilty verdict on Count One. As the thirteenth juror, the Court agrees with the jury's decision.

### 2. Legal Rulings

Defendant argues the Court committed reversible error in its legal rulings.

### a. Guilty Pleas

Defendant argues that coconspirator Arnold Ralenkotter's guilty plea was used to establish the existence of the charged conspiracy. Defendant also argues the Court improperly made statements in front of the jury regarding plea agreements and conspiracy law.

No error was committed in allowing the introduction of the plea agreements of various witnesses. No defendant objected to the introduction of the plea agreements or to the government's questions regarding the plea agreements. The law allows the introduction of plea agreements. A plea agreement clarifies for the jury exactly what the understanding is between the witness and the Government and explicitly states what consideration the witness receives, if any, for testifying.

During their opening statements, defense counsel, including Hardin, told the jury it would hear that some Pilot employees did mislead customers. Counsel for codefendant Wombold stated that these cooperating defendants were "bad actors who took advantage of smaller regional accounts and cheated these customers." (Doc. 520 at 60.) It was obvious from the outset of trial that the credibility of coconspirators would be attacked by the defendants on trial. Admission of plea agreements of cooperating witnesses is proper to assist the jury in assessing the credibility of the witnesses. *United States v. Carson*, 560 F.3d 566, 574–75 (6th Cir. 2009). The Court properly instructed the jury on the proper use of the plea agreements and the evidence of the coconspirators' guilty pleas.

The Court's explanation regarding conspiracy law in connection with the guilty pleas was also appropriate. Defense counsel asked lay witnesses questions the answers to which ran the risk of confusing the jury early in the trial on complicated legal matters of agreement and conspiracy. For example, some counsel asked questions of witnesses that suggested that if the witness did not know every person involved in the conspiracy, then those not named could not be conspirators. This obviously is a serious misstatement of the law. The Court's instructions on conspiracy law were intended to preempt any misunderstanding on the part of the jury about the intricacies of conspiracy law. Some of the questions from defense counsel also suggested that cooperators who had pleaded guilty were not actually guilty of the crime to which they had plead. Hardin, for example, in responding to a Government objection told the Court he wanted to ask the question because it would help the jury decide "whether or not these people who are saying they were in a conspiracy actually were as defined by the law." (Doc. 337 at 113:8–10.) It is appropriate for a trial judge to provide clear statements of the law to the jury to avoid the possibility of the jury making decisions based on misunderstandings of the law.

Present Counsel also seems to be making the remarkable argument that it was improper for the jury to know that the cooperators had pleaded guilty to conspiracy. But that was exactly what their convictions were for. It is hard for the Court to conceive of how the trial could have proceeded with witnesses testifying they had pleaded guilty to some offense but the jury not be allowed to know what the offense was. It is also hard for the Court to conceive of how the jury could determine the impact of the plea agreements on the witnesses' credibility when they would have had no knowledge of the crimes for which the witnesses had been convicted.

In addition, it is difficult for the Court to see any harm to Defendant from these questions or the Court's instructions. As the evidence of the conspiracy grew to the point at which it was untenable to argue there was no conspiracy, Defendant wisely focused not on trying to demonstrate there was no conspiracy, but rather that he had not joined the conspiracy. Defendant in effect conceded there was in fact a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, promises, and representation, and a conspiracy to do so, but that he did not willingly and knowing join and participate in them. Defendant then sought to capitalize on the guilty pleas of the cooperating witnesses by arguing they all had motives to lie about Defendant's involvement.

Finally, the Court's final instructions on this subject were taken from the Sixth Circuit Pattern Jury Instructions and were proper. *See* 6th Cir. Pattern Jury Instructions 7.07, 7.08.

There was no miscarriage of justice in the Court's admission of coconspirators' plea agreements or in its instructions on the law.

### b. Government Exhibits 529–31

In addition to arguing Trial Counsel was constitutionally ineffective in opening the door to Government Exhibits 529–31, Defendant argues the Court erred in admitting the exhibits into evidence. Having addressed the former argument above, the Court addresses the latter here.

The Court provided a detailed ruling from the bench during trial (Doc. 374 at 175–90) and also a written opinion later explaining the Court's decision (Doc. 455). Defendant is incorrect in trying to characterize this evidence exclusively as character or other acts evidence. Evidence elicited by Trial Counsel to the effect that Defendant was an astute businessman could be construed as character evidence. But the evidence elicited by Trial Counsel went much further than just general characteristics, opinion evidence, or reputation evidence. Because the Court is given to examples and analogies, it will give another on this issue. Trial Counsel's strategy was akin to demonstrating that a person with a great fear of knives would be unlikely to commit a murder with a knife. Presenting evidence that on other occasions the person had used knives without difficulty would obviously be admissible in such a case. That counter evidence would not be character evidence or other acts evidence. It would merely be counter evidence. And just as it would be proper for the jury to consider the defense's evidence of the person's phobia concerning knives, it would also be proper for the jury to consider the evidence of the person's comfort with knives.

When Defendant presented evidence that because of his concern for Pilot and his astuteness as a businessman he would not participate in the charged scheme and artifice to defraud, the Government was entitled to respond. But how could it do so? The most direct way would be by introducing evidence that in fact Hazelwood had engaged in conduct that ran the risk of driving customers away and bringing the company down. Such evidence existed in the form of a recording of Defendant talking with a group of his subordinates in racially charged language and requesting,

45

listening to, and singing along with a racially charged song. The recording captures Defendant's voice, so there can be no dispute that the evidence is reliable and dependable. The recording is also directly relevant to the question whether Defendant would engage in conduct that could be detrimental to Pilot. The defendant was at a work function. Multiple subordinates were in attendance. They could have revealed what had taken place at any time and for any one of several reasons. They could have left Pilot and gone to a competitor, or they could have lost out on a promotion and become disenchanted, or they could have gotten fired and become bitter, or they could have been out on the town and gotten drunk and talked about it, or gotten in trouble and revealed it to governmental authorities. It does not require an abundance of imagination to discern what would have happened to Pilot had that happened. Looking at contemporaneous example such as Papa John's, Paula Deen, and the Los Angeles Clippers, we have instructive examples. Looking back further, we have the Marge Schott example with the Cincinnati Reds professional baseball team.

The evidence was used for a very limited purpose, just to rebut the evidence elicited by Defendant. The Government did not elaborate on the evidence or use it improperly. The evidence only occupied a very short part of the case. According to the Government, the evidence consumed only eight minutes and 37 seconds, out of a trial that consumed twenty-seven court days. The Court also invited the parties to provide input on a limiting instruction and solicited their thoughts on the timing of such an instruction. After considering the parties' input, the Court gave a clear limiting instruction. And there were still several weeks of trial after the admission of the evidence, so any lingering effect of the evidence could reasonably have been expected to dissipate.

Defendant argues the Court did not assess whether a narrower alternative existed to the admission of the evidence. Defendant did not suggest to the Court any narrower alternatives nor

offer any stipulation.  Nor did he offer to withdraw or disavow the questions that led to admission of the evidence.  Defendant cannot claim the Court erred in failing to assess an alternative Defendant never presented to it.

It was not improper for the jury to consider the evidence.  The jury still had before it the answers to the questions of whether Hazelwood with his business acumen and concern for Pilot would engage in the scheme and artifice to defraud as alleged in the Indictment.  It had to consider that evidence in deciding whether Defendant was guilty or not guilty.  In considering this evidence, the jury could also consider the Government's counter evidence.  The jury was entitled to acquit if it accepted the defense.  The jury was also entitled to reject that defense, including on the grounds that Defendant had in fact engaged in conduct in the work environment that would, if it had become known, have risked running customers away and taking the company down.

Finally, the jury was instructed more than once on the proper use to make of this evidence. We must presume juries follow the instructions they receive.  *See Harvey*, 653 F.3d at 396.

## IV.    CONCLUSION

Defendant has made no showing of excusable neglect as to the lateness of his motion for new trial on the grounds of a miscarriage of justice, the verdict's being against the weight of the evidence, legal errors by the Court, or prosecutorial misconduct.   Defendant's showing as to ineffective assistance of counsel is also not sufficient to satisfy the standard for excusable neglect. In the alternative, even considering the merits of Defendant's motion on ineffective assistance of counsel, the Court concludes Defendant has not shown a new trial is in the interest of justice.  The trial was fair to Defendant, and a new trial is not warranted.  The Court will therefore **DENY**

Defendant's motion for new trial (Doc. 566) and his motion for leave to file a supplemental brief in support of his motion for new trial (Doc. 579).[16]

**AN APPROPRIATE ORDER WILL ENTER.**

_/s/_____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**

---

[16] Defendant's motion for leave to file a supplemental brief and his three supplemental briefs each outline the parameters of the grounds or evidence on which Defendant wishes to rely and request leave to present those matters more fully. The Court has considered the grounds Defendant has outlined as part of his motion for new trial. Because Defendant's five filings, taken together, do not show timeliness and do not show Defendant is entitled to relief on the grounds presented or outlined, the Court will deny both motions.