# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

| | | |
|---|---|---|
| **UNITED STATES,** | ) | **No. 3:16-CR-20** |
| *Plaintiff-Respondent,* | ) | |
| | ) | **Before U.S. District Court** |
| **v.** | ) | **Judge Curtis L. Collier** |
| | ) | |
| **MARK HAZELWOOD,** | ) | |
| *Defendant-Movant.* | ) | |
| | ) | |

## DEFENDANT MARK HAZELWOOD'S MOTION
## FOR RELEASE PENDING APPEAL

September 24, 2018

WALDEN MACHT & HARAN LLP

Jim Walden
Georgia Winston
1 Battery Park Plaza, 34th Floor
New York, NY 10004
Tel: (212) 335-2030
Fax: (212) 335-2040

BREEDING HENRY BAYSAN PC

Bradley L. Henry
900 S. Gay Street
Suite 1950
Knoxville, TN 37902
Tel: (865) 670-8535
Fax: (865) 670-8536

*Attorneys for Mark Hazelwood*

TABLE OF CONTENTS.......................................................**Error! Bookmark not defined.**

MOTION FOR RELEASE PENDING APPEAL ........................................................................ 1

ARGUMENT .................................................................................................................... 2

I. THERE IS NO BASIS TO DISTURB THE COURT'S RECENT FINDING, BY CLEAR AND CONVINCING EVIDENCE, THAT HAZELWOOD IS NEITHER A FLIGHT RISK NOR A DANGER TO THE COMMUNITY .................................................................................................................... 3

II. THE ADMISSION OF GOVERNMENT EXHIBITS 529–31 RAISES A SUBSTANTIAL ISSUE ON APPEAL THAT, IF SUCCESSFUL, WILL LIKELY RESULT IN A NEW TRIAL ON ALL COUNTS. ......... 4

    A. The Admission of the Racially and Sexually Charged Tapes Raises a Substantial Question, in Part Because No Controlling Precedent Forecloses a Challenge to their Admission. ................................................................................................ 4

    B. There Is a Substantial Question Whether the Recordings Must Be Analyzed as Evidence Subject to Rules 404 and 405. ................................................................. 6

    C. There Is a Substantial Question Whether the Recordings are Admissible under Rules 404 and 405. .............................................................................................. 10

    D. There Is a Substantial Issue on Appeal Whether Rule 403 Required Exclusion of the Recordings Because of the Risk of Unfair Prejudice. ........................................ 13

    E. The Court of Appeals Is Unlikely to Deem the Error Harmless. ................................ 15

III. ALTERNATIVELY, HAZELWOOD SHOULD BE ALLOWED AT LEAST SIXTY DAYS TO SELF-REPORT IF THE COURT IMPOSES A CUSTODIAL SENTENCE. ...................................................... 24

CONCLUSION ................................................................................................................ 24

CERTIFICATE OF SERVICE ................................................................................................ 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ayissi-Etoh v. Fannie Mae,*
    712 F.3d 572 (D.C. Cir. 2013) ........................................................................... 14

*Bergeron v. Great W. Cas. Co.,*
    No. 14-13, 2015 WL 3505091 (E.D. La. June 3, 2015) ....................................... 8

*In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.,*
    888 F.3d 753 (5th Cir. 2018) ............................................................................... 7

*Freeman v. Dal-Tile Corp.,*
    750 F.3d 413 (4th Cir. 2014) ............................................................................. 14

*Langford v. Rite Aid of Alabama, Inc.,*
    231 F.3d 1308 (11th Cir. 2000) ......................................................................... 21

*Melborn Ltd. v. Nat'l Marine Corp.,*
    No. 03-CV-70028, 2004 WL 5496217 (E.D. Mich. Aug. 20, 2004) .................... 8

*Paschal v. Flagstar Bank,*
    295 F.3d 565 (6th Cir. 2002) ............................................................................. 13

*Pena-Rodriguez v. Colorado,*
    137 S. Ct. 855 (2017) ........................................................................................... 5

*Robinson v. Runyon,*
    149 F.3d 507 (6th Cir. 1998) ............................................................................. 15

*Rodgers v. Western-Southern Life Ins. Co.,*
    12 F.3d 668 (7th Cir. 1993) ............................................................................... 14

*Spriggs v. Diamond Auto Glass,*
    242 F.3d 179 (4th Cir. 2001) ............................................................................. 14

*United States v. Benedetto,*
    571 F.2d 1246 (2d Cir. 1978) ............................................................................ 10

*United States v. Bistline,*
    605 F. App'x 529 (6th Cir. 2015) ...................................................................... 23

*United States v. Bowman,*
    302 F.3d 1228 (11th Cir. 2002) ......................................................................... 14

*United States v. Cardin*,
No. 1:11-CR-93 (E.D. Tenn., Apr. 11, 2013) ................................................... 24

*United States v. Chilingirian*,
280 F.3d 704 (6th Cir. 2002) ........................................................................... 2

*United States v. Clay*,
667 F.3d 689 (6th Cir. 2012) ........................................................................... 2

*United States v. DiSomma*,
951 F.2d 494 (2d Cir. 1991) ............................................................................ 4

*United States v. Dobson*,
No. 1:12-CR-42 (E.D. Tenn., May 29, 2014) ................................................. 24

*United States v. Dunn*,
805 F.2d 1275 (6th Cir. 1986) ......................................................................... 9

*United States v. Eaton*,
No. 1:12CR-11-JHM, 2013 WL 5328212 (W.D. Ky. Sept. 20, 2013) ............... 23

*United States v. Ebens*,
800 F.2d 1422 (6th Cir. 1986) ..................................................................... 5, 14

*United States v. Green*,
305 F.3d 422 (6th Cir. 2002) ......................................................................... 11

*United States v. Hereford*,
162 F. App'x 439 (6th Cir. 2006) .................................................................... 9

*United States v. Horton*,
847 F.2d 313 (6th Cir. 1988) ........................................................................... 9

*United States v. Johnson*,
No. 2:13-cr-94 (S.D. Ohio Sept. 4, 2014) ..................................................... 23

*United States v. Johnson*,
634 F.2d 735 (4th Cir. 1980) ......................................................................... 12

*United States v. LaVictor*,
848 F.3d 428 (6th Cir. 2017) ........................................................................... 6

*United States v. Lawson*,
535 F.3d 434 (6th Cir. 2008) ........................................................................... 6

*United States v. Mandoka*,
869 F.3d 448 (6th Cir. 2017) ......................................................................... 11

*United States v. Mendez-Ortiz,*
  810 F.2d 76 (6th Cir. 1986)..................................................................... 12

*United States v. Pollard,*
  778 F.2d 1177 (6th Cir. 1985)..................................................................... 4

*United States v. Roth,*
  642 F. Supp. 2d 796 (E.D. Tenn. 2009)..................................................... 5

*United States v. Smith,*
  793 F.2d 85 (3d Cir. 1986)........................................................................ 4

*United States v. Valera-Elizondo,*
  761 F.2d 1020 (5th Cir. 1985)................................................................... 4

*United States v. Weiner,*
  No. 92-1708, 1992 WL 180697 (1st Cir. July 31, 1992)........................... 3

*United States v. Zimny,*
  857 F.3d 97 (1st Cir. 2017)....................................................................... 4

*Vitalis v. Sun Constructors, Inc.,*
  481 F. App'x 718 (3d Cir. 2012)............................................................. 15

**Statutes**

18 U.S.C. § 3143(a).......................................................................................... 3

18 U.S.C. § 3143(b)................................................................................. *passim*

**Other Authorities**

1 McCormick on Evid. § 186 (7th ed.)............................................................ 10

23 Wright & Graham, Federal Practice & Procedure § 5273 (1980)....................... 8, 9

**Rules**

Fed. R. Evid. 401, 403, 404, 405............................................................. *passim*

Fed. R. Evid. 406............................................................................................. 9

**MOTION FOR RELEASE PENDING APPEAL**

Defendant Mark Hazelwood was convicted of mail and wire fraud conspiracy, one count of wire fraud, and witness tampering. Sentencing is scheduled for September 26, 2018. He is under home confinement and seeks continuation of his release, under 18 U.S.C. § 3143(b), pending the disposition of substantial issues on appeal. As explained below, at a minimum he should be allowed at least 60 days to self-report so that, if this motion is denied, he can seek the same relief in the Sixth Circuit.

On April 15, 2013, Mark Hazelwood's world was turned upside down. Since 1985, he had worked tirelessly for Pilot Flying J ("Pilot"), rising in the ranks from district manager to vice president to president, all while helping build Pilot from a regional operator of gas pumps to a leading provider of travel stops nationwide. *See* R. 520 at 18–20. Making Pilot flourish was Hazelwood's life and his passion. So on April 15, 2013, when the FBI raided Pilot's headquarters, exposing that a few of Pilot's more than 26,000 employees were withholding promised discounts from a small fraction of Pilot's customers, *see id.* at 68, Hazelwood dropped everything—rushing back into, and not away, from his office—to engage fully with the FBI's investigation. *See id.* at 7–9, 38.

The crux of the Government's case against Hazelwood was (a) direct testimony from a single cooperator, (b) a passing comment to Hazelwood from a second cooperator, to which that cooperator recalled no response from Hazelwood, (c) references to the fraud by various members of Pilot's sales team in a small handful of trip reports and emails, and (d) secret recordings in which Hazelwood promoted differential pricing for customers, a practice that many businesses employ legitimately. (These facts, relevant to whether error is harmless, are developed further below.)

Against this backdrop of scant evidence that Hazelwood was even aware of the charged offenses, the Government introduced three surreptitious recordings, GX 529–31, of an after-hours lake house gathering in which Hazelwood and others used the n-word and other incendiary language while listening to music with racially and sexually explicit lyrics. *See* R. 455 at 2–3. The admission of these recordings raises a substantial issue on appeal because no Rule of Evidence permitted the jury to hear this extremely prejudicial material. And, given the weak evidence to support guilt and the inflammatory nature of the recordings, if the court of appeals finds error, it likely would not deem it harmless. *See United States v. Clay*, 667 F.3d 689, 700 (6th Cir. 2012) ("Our focus is not with whether there was sufficient evidence on which the defendant could have been convicted without the evidence complained of, but rather the question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction. In particular, the admission of evidence of prior bad acts is 'harmless error' if the record evidence of guilt is overwhelming, eliminating any fair assurance that the conviction was substantially swayed by the error." (quotation marks, citations, and alterations omitted)).

## ARGUMENT

Hazelwood should remain on home confinement pending the disposition of substantial issues he will raise before the court of appeals. *See* 18 U.S.C. § 3143(b). Hazelwood has already established by clear and convincing evidence that he poses no flight risk or danger to the community. *See* 18 U.S.C. § 3143(b)(1)(A). Moreover, Hazelwood's appeal presents "a substantial question of law or fact" that, if successful, is "likely to result in reversal" or "an order for new trial." *United States v. Chilingirian*, 280 F.3d 704, 709 (6th Cir. 2002) (citing 18 U.S.C. § 3143(b)(1)(B)). Although Hazelwood intends to raise several issues on appeal, including (but not limited to) the recent denial of his Rule 33 Motion, this motion focuses on the erroneous

admission of the highly prejudicial tapes, an issue that, if successful, will likely lead to reversal and a new trial on all three counts of conviction.

**I. THERE IS NO BASIS TO DISTURB THE COURT'S RECENT FINDING, BY CLEAR AND CONVINCING EVIDENCE, THAT HAZELWOOD IS NEITHER A FLIGHT RISK NOR A DANGER TO THE COMMUNITY.**

This Court has already found by clear and convincing evidence that Hazelwood is neither a flight risk nor a danger to the community. R. 519 (Order). Nothing warrants a different result now.

Throughout this case, Hazelwood has complied with every condition of release. *See* R. 15 at 3. After the verdict, the Government nonetheless moved for detention, asserting flight risk. R. 497 at 2. Magistrate Judge Guyton disagreed, noting Hazelwood had "complied with all conditions of pretrial release, has no violations of his release conditions," "has appeared in Court when required," has no prior criminal history, has strong family and business ties, and owns property locally. *Id.* at 4. Magistrate Judge Guyton also found no evidence Hazelwood had "made preparations to flee." *Id.* As a result, he concluded that Hazelwood had established by "clear and convincing evidence" he is not likely to flee if released. *Id.* at 5.[1]

This Court fully adopted Magistrate Judge Guyton's detailed findings, which the Government did not contest. R. 519. Release pending appeal requires the identical findings, under the identical standard. *Compare*, 18 U.S.C. § 3143(a) (release pending sentencing), *with* 18 U.S.C. § 3143(b) (release pending appeal). Nothing has changed since the Court adopted these findings, and the

---

[1] The Government did not argue that Hazelwood was dangerous, so the Report and Recommendation did not directly address that issue. But when "no explicit finding was made as to dangerousness, the fact that defendant was released pending sentence necessarily entailed a finding that he was not likely to pose a danger." *United States v. Weiner*, No. 92-1708, 1992 WL 180697, at *1 (1st Cir. July 31, 1992). In any event, compliance with every condition for release, lack of criminal history, and conviction for only nonviolent offenses provide the requisite clear and convincing evidence.

Court's prior findings and release conditions should therefore remain undisturbed. *See United States v. Zimny*, 857 F.3d 97, 99 (1st Cir. 2017) (finding defendant had met the standard for release pending appeal because he had previously remained on bail and noting that nothing had happened since that time that "chang[ed] this calculus").

## II. THE ADMISSION OF GOVERNMENT EXHIBITS 529–31 RAISES A SUBSTANTIAL ISSUE ON APPEAL THAT, IF SUCCESSFUL, WILL LIKELY RESULT IN A NEW TRIAL ON ALL COUNTS.

The Court admitted Government Exhibits 529–31, where Hazelwood and others are heard using racially charged language and listening to racially and sexually explicit music. The Court acknowledged that this evidence did "not go to any of the elements of the offenses with which Mr. Hazelwood [wa]s charged"—rather, it was admitted for the jury to evaluate "whether Mr. Hazelwood was a good businessman and an excellent company president for Pilot Travel Centers and whether in those roles Mr. Hazelwood would engage in conduct that ran the risk of putting Pilot Travel Centers in jeopardy." R. 424 at 25–26. The admission of this evidence is a substantial issue on appeal that will, if successful, result in a new trial for Hazelwood on all counts.

### A. The Admission of the Racially and Sexually Charged Tapes Raises a Substantial Question, in Part Because No Controlling Precedent Forecloses a Challenge to their Admission.

A substantial appellate issue presents a "close question or one that could go either way." *United States v. Pollard*, 778 F.2d 1177, 1182 (6th Cir. 1985). A district court need not find that it committed reversible error for the issue to be substantial. *Id.* at 1181–82. A question will meet this threshold if it is "novel," or "has not been decided by controlling precedent." *See, e.g.*, *United States v. Valera-Elizondo*, 761 F.2d 1020, 1023 (5th Cir. 1985); *United States v. Smith*, 793 F.2d 85, 88 (3d Cir. 1986) (the issue should be significant "in addition to being novel, not governed by controlling precedent or fairly doubtful"); *United States v. DiSomma*, 951 F.2d 494, 497 (2d Cir.

1991); *see also United States v. Roth*, 642 F. Supp. 2d 796, 799 (E.D. Tenn. 2009) (granting release pending appeal for a defendant raising an issue that the Sixth Circuit had not previously decided).

The admissibility of Government Exhibits 529–31 is, at the very least, a close appellate question. Evidence of racial bias warrants close consideration because of its particularly inflammatory nature. Indeed, the Supreme Court has observed that "there is a sound basis to treat racial bias with added precaution," *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 859 (2017) (analyzing evidence of racial bias by members of a criminal jury). In a similar vein, in *United States v. Ebens*, the Sixth Circuit reversed a conviction where racially charged evidence was improperly admitted, adding that evidence of racial bias "could only have inflamed the jury rather than have enlightened it." *See* 800 F.2d 1422, 1434 (6th Cir. 1986) ("[N]early all citizens find themselves repelled by such blatantly racist remarks and resentful of the person claimed to have uttered them."), *abrogated on other grounds by Huddleston v. United States*, 485 U.S. 681 (1988).

The Court's admission of evidence warranting this "added precaution" presents substantial legal questions. As the Court recently observed, the evidence's admissibility was a "difficult issue" with "a number of countervailing factors" that required "significant time, research, and analysis." R. 701 at 26. The difficulty of the issue stems, in part, from the lack of controlling precedent allowing admission of the evidence. Indeed, the Court itself found a lack of clear precedent in determining whether the evidence here should even be analyzed as character evidence in the first place. *See* R. 374 at 178–79 (observing that "character and character traits as used in the rules do not lend themselves to an easy or precise definition" and noting lack of case law supporting the Court's formulation of character evidence); *id.* at 184 (finding it "plausible" that the evidence *was* character evidence, yet at the same time finding that "a reasonable person" could conclude otherwise). And, as explained below, for each Rule of Evidence that the Court considered when it

determined admissibility—Rules 401, 403, 404, and 405—no case has upheld admission of such incendiary materials in a criminal case, in no small part because of the issue's novelty.

Hazelwood's appeal will present a substantial question whether the tapes were inadmissible character evidence that should have been excluded under Rules 404 and 405, regardless of whether they are otherwise probative under Rule 401. And perhaps most importantly, even if the tapes had probative value, they should have been excluded under Rule 403, because that value was substantially outweighed by the danger of unfair prejudice to Hazelwood. Again, the Court need not agree with these arguments; it need only find the issues could go either way or are not resolved by controlling precedent.

### B. There Is a Substantial Question Whether the Recordings Must Be Analyzed as Evidence Subject to Rules 404 and 405.

The Court analyzed admissibility under three alternative grounds: (1) Rule 401, finding that the tapes were "relevant counterevidence" to Hazelwood's defense evidence; (2) Rule 404(a)(2), finding that the tapes were admissible as "rebuttal evidence as to Defendant Hazelwood's alleged character for sound business judgment;" and (3) Rule 404(b), finding that the tapes were admissible as "other acts" evidence used for a permissible purpose. R. 455 at 5, 8. This section explains why, first, the tapes were inadmissible under Rule 401, and second, even if Rule 401 did not itself prohibit their use, they were still subject to the requirements of Rule 404.

To be admissible under Rule 401, the evidence must "logically advanc[e] a material aspect of the proposing party's case." *United States v. LaVictor*, 848 F.3d 428, 442 (6th Cir. 2017). That is, ordinary non-character evidence is admissible under Rule 401 if it makes "a fact *that is of consequence* more or less probable than it would be without the evidence." *United States v. Lawson*, 535 F.3d 434, 442 (6th Cir. 2008) (emphasis added). "[T]he Rules of Evidence do not

simply evaporate when one party opens the door on an issue." *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 784 (5th Cir. 2018) (citation omitted) (reversing the admission of inflammatory evidence regarding race and nationality where the other party opened the door by eliciting testimony of a positive corporate culture).

Just because defense counsel elicited testimony that Hazelwood was a "good businessman," does not mean evidence potentially rebutting Hazelwood's business acumen was admissible—the evidence still had to "advance" a material part of the Government's case. The Court's "simple but imperfect" analogy of an alibi is instructive. *See* R. 455 at 7. Evidence refuting that a defendant was at location Y (the place of his alibi) *does* tend to prove part of an element of the offense (*i.e.*, that he was present at location X where the crime occurred), because it negates that the defendant was at the only other location where he claimed to have been. Here, though, attending a gathering where racially and sexually charged language was used does not advance a fact of consequence to any charged offense in the first place. In the alibi analogy, the prosecutor had to prove the defendant was at location X as a fact of consequence to the crime; here, the tapes prove no analogous fact of consequence that would permit their admission under Rule 401 alone.

Thus, the recordings could have been probative only of Hazelwood's character traits, such as whether he was reckless enough to "engage in conduct that ran the risk of putting Pilot Travel Centers in jeopardy." R. 424 at 25. And such character evidence would be admissible only if it satisfied Rules 404 and 405—which is exactly the basis upon which the Government sought to use the recordings. *See* R. 372 (United States' Motion to Inquire Into and Offer Evidence as Rebuttal Character Evidence Pursuant to Federal Rules of Evidence 404(a)(2)(A) and 405). As the Court itself recognized, the recordings did not tend to prove or disprove any element of a charged offense.

R. 424 at 25–26. Rather, the Government sought to use the recordings to prove what it contended was a character trait that made Hazelwood more likely to commit fraud.

The Court's instruction confirms that this was the way to analyze the tapes. The jury was told to consider the evidence only for whether "Hazelwood would engage in conduct that ran the risk of putting Pilot Travel Centers in jeopardy or . . . tak[e] the chance of everything coming down if that conduct was discovered, and risked that customers would not only not deal with Pilot Travel Centers but would go to competitors." R. 424 at 25. In other words, the Court instructed the jury to consider Hazelwood's proclivity for engaging in risky or reckless behaviors as a company president. One's propensity for recklessness is an element of his disposition—a character trait— as several courts have recognized. *Cf., e.g.*, *Bergeron v. Great W. Cas. Co.*, No. 14-13, 2015 WL 3505091, at *5 (E.D. La. June 3, 2015) ("The Court cannot conceive of any possible use for the evidence—nor has Plaintiff provided any—other than to show that Reeh has a propensity for reckless or negligent behavior. If used for this purpose, the evidence is clearly inadmissible under Rule 404(b)."); *Melborn Ltd. v. Nat'l Marine Corp.*, No. 03-CV-70028, 2004 WL 5496217, at *12 (E.D. Mich. Aug. 20, 2004) ("It would be inadmissible if offered simply to prove recklessness as a character trait and action in conformity with such a trait. Fed.R.Evid. 404(b)."); *see also* 23 Wright & Graham, Federal Practice & Procedure § 5273 (1980) ("[T]estimony that a driver is reckless is character . . . .").

In its Memorandum denying Hazelwood's Rule 33 Motion, the Court compared the evidence here to "demonstrating that a person with a great fear of knives would be unlikely to commit a murder with a knife," explaining that "[p]resenting evidence that on other occasions the person had used knives without difficulty would obviously be admissible in such a case." R. 701 at 45. But evidence pertaining to whether or not a person avoided using knives out of a specific fear of

them is evidence of habit under Rule 406, whereas the evidence of Hazelwood's lack of care is evidence of a character trait under Rules 404 and 405. As the Advisory Committee Notes to Rule 406 explain, "[c]haracter is a generalized description of one's disposition," such as a person's "character for care," whereas habit "describes one's regular response to a repeated specific situation." Fed. R. Evid. 406 advisory committee's note; *see also* Wright & Graham, *supra* § 5273 ("[T]estimony that a driver is reckless is character, while evidence that the driver for years had two martinis after work each day before driving home is habit.").

Because the evidence here was offered to show Hazelwood's character, that evidence must be analyzed through the framework of Rules 404 and 405, even if it also can be characterized as rebuttal evidence.[2] *See United States v. Dunn*, 805 F.2d 1275, 1280 (6th Cir. 1986). Indeed, as *Dunn* shows, the Sixth Circuit routinely analyzes the admissibility of such evidence—even when characterized as "rebuttal evidence"—under Rules 404 and 405, rather than allowing Rule 401 to circumvent that framework. *See id* at 1280 (holding "evidence [of other acts for rebuttal purposes] must nonetheless be subjected to Rule 404(b) inquiry in order to ensure that it is not used to show that, on the occasion in question, the accused 'acted in conformity therewith,' or to show the defendant's bad character or criminal propensity"); *see also, e.g.*, *United States v. Hereford*, 162 F. App'x 439, 445 (6th Cir. 2006) (analyzing under Rule 404(b) evidence of prior drug convictions to rebut defendant's argument that he bought drugs only for personal consumption in a drug distribution case); *United States v. Horton*, 847 F.2d 313, 325 (6th Cir. 1988) (analyzing under

---

[2]  The Government contended that Hazelwood's trial counsel opened the door to character issues through his questions to government witnesses. But regardless of whether Hazelwood's trial counsel's questions pertained to character traits, the tapes themselves were admitted solely to show propensity to act in accordance with a trait, *i.e.*, reckless or improper behavior that could have put the company at risk.

Rule 404(b) admission of evidence of prior fraud to rebut defendant's denial of wrongdoing in charged fraud). Here, the tapes did not tend to establish an element of a charged offense; they were instead offered to show that Hazelwood's character was in line with that of a fraudster. Just as in *Dunn*, *Hereford*, and *Horton*, it was error to hold that the tapes were independently admissible under Rule 401.

## C. There Is a Substantial Question Whether the Recordings are Admissible under Rules 404 and 405.

When the recordings are analyzed under Rules 404 and 405, as they must be, there is a substantial question whether their admission was error.

### 1. Extrinsic acts are not admissible evidence under Rule 404(a).

The recordings themselves are inadmissible under Rule 404(a), even if probative, because Rule 405 bars extrinsic evidence as proof under Rule 404—a fact this Court itself recognized in its oral ruling. *See* R. 374 at 181 ("[T]he prosecution is prohibited from introducing extrinsic evidence to prove the specific instance; it is limited to whatever the witness says. . . . So if this is character evidence we're dealing with here, then the underlying testimony and exhibits *cannot be introduced* into evidence." (emphasis added)). Even if the Government had the right, as it contended, to rebut evidence of Hazelwood's sound business judgment or "humanitarian goodwill toward truck drivers" under Rule 404(a), Rule 405(a) limited that proof to "testimony about the person's reputation" or "testimony in the form of an opinion" in rebuttal. *See* Fed. R. Evid. 405(a); *United States v. Benedetto*, 571 F.2d 1246 (2d Cir. 1978); 1 McCormick on Evid. § 186 (7th ed.). But the recordings are clearly neither testimony about Hazelwood's reputation in the community,

*United States v. Green*, 305 F.3d 422, 431 (6th Cir. 2002), nor testimony in the form of a person's opinion of Hazelwood, *see id*., and therefore could not be admitted under Rule 404(a).[3]

## 2. The recordings were inadmissible under Rule 404(b)

The recordings are also inadmissible evidence of "other acts" under Rule 404(b), as they have no probative purpose other than to show that Hazelwood acted in conformance with a character trait.

Rule 404(b) prohibits the use of "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Such evidence may be admissible only if used for some non-propensity purpose—such as to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. The recordings were not proffered for a non-propensity purpose; rather, the goal was to show Hazelwood had the type of character to commit a fraud that would endanger the company.[4] As the Court explained to the jury, the evidence was admitted so the jury could evaluate whether "Hazelwood would engage in conduct that ran the risk of putting Pilot Travel Centers in jeopardy." R. 424 at 25.

---

[3]  That limitation does not apply if one's "character or character trait" is "an essential element of a charge," Rule 405(b) (allowing proof of "specific instances"), but indisputably the tapes were not admitted under that theory. R. 372, 373.

[4]  Whether evidence was proffered for an admissible purpose is a legal question on appeal that is reviewed *de novo* as part of the abuse-of-discretion standard. *See United States v. Mandoka*, 869 F.3d 448, 456–57 (6th Cir. 2017) ("[R]eversal is only proper if the district court committed a legal error by admitting the prior acts evidence for an impermissible purpose.").

The decision in *United States v. Johnson*, 634 F.2d 735 (4th Cir. 1980), cited in this Court's ruling, would not produce a different result even if it was controlling precedent.[5] In *Johnson*, the defendant, a physician, argued that any errors in her tax records were inadvertent, "because she cared nothing for money and chose, instead, to devote her time to the demanding personal needs of her patients." *Id.* at 736. She supported this defense of inadvertence through her own testimony and through the support of "seven local witnesses—three physicians, a school board member, a public school teacher, a mortician, and a minister." *Id.* The government countered with proof the defendant had been personally involved in overstating her Medicaid billings. *Id.* at 736–37. The Fourth Circuit held this was a permissible counter to the "primary means of defense" offered by "a defendant in a criminal case by her own testimony and that of others." *id.* at 737.

That stands in sharp contrast to the situation here. Hazelwood's primary defense was the paucity of evidence connecting him to the fraud. As for the type of executive Hazelwood was, the Court notes that trial counsel placed primary emphasis on showing he was very busy. R. 701 at 24 ("The inference to be drawn" from trial counsel's defense strategy "was that Defendant was too busy to pay attention to the fraudulent actions of many of his subordinates who were involved in the charged scheme and artifice to defraud."). Moreover, unlike in *Johnson*, Hazelwood did not testify at trial or present any witnesses—let alone seven—in support of the defense theory purportedly rebutted by the recordings. More fundamentally, the evidence introduced in *Johnson* directly contradicted the defense argument that the defendant was uninvolved in her monetary

---

[5] The only time the Sixth Circuit has mentioned *Johnson* was in a single string cite, for the non-controversial proposition that "The list of permissible uses of evidence of other crimes or acts set forth in Rule 404(b) is neither exhaustive nor conclusive." *United States v. Mendez-Ortiz*, 810 F.2d 76, 79 (6th Cir. 1986). The absence of controlling Sixth Circuit precedent endorsing the "purpose" articulated in *Johnson* is yet further support that the question here is substantial.

affairs. Here, in contrast, the recordings do not directly contradict the notion that Hazelwood would hesitate to risk the company by cheating customers—rather, the evidence was offered to show a propensity for engaging in risky, anti-social behavior, such as using racist or sexist language. Such use of extrinsic evidence is plainly prohibited by Rule 404(b).

Again, this Court need not agree with Hazelwood's position; this Court need only recognize that the admissibility of the tapes is a substantial issue that could go either way or is not controlled by precedent. That requirement is met here.

### D. There Is a Substantial Issue on Appeal Whether Rule 403 Required Exclusion of the Recordings Because of the Risk of Unfair Prejudice.

Even if the Court of Appeals agrees that the recordings serve a purpose permitted under Rules 401, 404, or 405, there is still a substantial question whether their admission was foreclosed by Rule 403, which excludes evidence when the risk of unfair prejudice substantially outweighs the probative value. In a civil case, the Sixth Circuit deemed it "a close question" whether evidence of a loan officer's racism, which "was unfairly prejudicial," should have been excluded under Rule 403 in a Fair Housing Act discrimination suit against loan officer's bank. *Paschal v. Flagstar Bank*, 295 F.3d 565, 580 (6th Cir. 2002). Whatever probative value could be ascribed to the tapes used here was substantially outweighed by unfair prejudice. At the very least, there is "a close question," like in *Paschal*, which is all Hazelwood must show.

The risk of unfair prejudice springs from the incendiary substance of the recordings. Several courts have strongly cautioned about the risk of prejudice from injecting racial comments into a criminal trial unless particularly probative of the charged offenses. As noted earlier, the Sixth Circuit warned in *Ebens* that jurors are more likely to be "inflamed" than "enlightened" by such material because the near-universal reaction is to be "repelled by such blatantly racist remarks and

resentful of the person claimed to have uttered them." 800 F.2d at 1434. And in *United States v. Bowman*, the Eleventh Circuit found it a violation of Rule 403 to admit evidence of "limited probative value" that the racketeering defendant was the president of a motorcycle club with a whites-only policy. *United States v. Bowman*, 302 F.3d 1228, 1240 (11th Cir. 2002) (ultimately ruling the error harmless because proof of guilt "was overwhelming").

The use of the n-word in the recordings provides the strongest grounds for finding prejudice. *Cf. Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001) ("Far more than a 'mere offensive utterance,' the word 'n----r' is pure anathema to African-Americans. 'Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as "n----r" by a supervisor in the presence of his subordinates.'" (quoting *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993))); *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 422 (4th Cir. 2014) ("'[T]he word "n----r" is pure anathema to African-Americans,' *as it should be to everyone*." (citation omitted) (emphasis added)); *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013) (noting n-word is "probably the most offensive word in English" (citation omitted)). Use of the n-word cannot be condoned, but neither may it properly form the basis, even in any small part, for a federal fraud conviction.

This Court distinguished *Ebens* on its facts. R. 455 at 12–13. But the *holding* there need not control, especially in light of other persuasive authority such as *Bowman,* as well as the lack of contrary authority *upholding* the admission of evidence of this nature in a criminal case. The government points to no criminal case in which such evidence was admitted, and that is enough to show a close question or one lacking controlling precedent.

Moreover, the recordings in this case are far more prejudicial than the testimony in *Ebens* (which did not clearly implicate the defendant) or the whites-only policy in *Bowman* (which was an organizational policy, not an audio recording of Bowman himself using the n-word). As just noted, no court has ever upheld the admission of evidence as incendiary as these recordings in a criminal case, where a defendant's liberty is at stake, especially where the evidence has only the thinnest of possible probative value. By contrast, even when racially tinged evidence is admitted in civil cases, it is directly relevant to a claim of racial discrimination. *See, e.g.*, *Robinson v. Runyon*, 149 F.3d 507, 517 (6th Cir. 1998) (finding evidence of racist language admissible in Title VII discrimination case); *Vitalis v. Sun Constructors, Inc.*, 481 F. App'x 718, 724–25 (3d Cir. 2012) (affirming district court's exclusion of testimony concerning carpenter's racial epithets because there was no hostile-work-environment claim). But this was no civil-rights case, and the tapes bore the highest risk of unfair prejudice through repeated usage of the single most inflammatory word in the English language.

### E. The Court of Appeals Is Unlikely to Deem the Error Harmless.

Proof of Hazelwood's guilt was far from overwhelming. Some of the Government's cooperating witnesses assumed or inferred that he was knowledgeable about their own fraudulent conduct, and only one cooperator offered any direct testimony of his knowledge. Sorely lacking was direct evidence that Hazelwood even knew about the fraudulent pricing behavior, let alone took part in it. The much-touted manual rebate fraud affected, at most, less than one percent of Pilot's accounts, and Hazelwood's responsibilities covered all facets of the multibillion-dollar company's operations, not just sales. In contrast to the overwhelming evidence of guilt in *Bowman* that rendered harmless the admission of prejudicial indirect evidence of the defendant's racism, the evidence of Hazelwood's knowledge or involvement in the fraudulent pricing behavior was

meager. And there was nothing beyond the assumptions of his assistant, Sherry Blake, to support the witness-tampering charge; Hazelwood's words did not evince an intent to impede Blake's cooperation with the federal investigation of Pilot.

### 1. The Fraud Evidence Implicated Pilot Employees Other Than Hazelwood

The Government offered evidence that a small number of Pilot's sales team, other than Hazelwood, conspired to commit wire and mail fraud from 2008 to 2013. But that testimony did not implicate Hazelwood.

**Janet Welch**.  Welch testified to committing fraud with Arnold Ralenkotter and John Spiewak, but not with Hazelwood. Welch worked at Pilot's headquarters supporting salespeople like Spiewak, who worked for regional sales directors such as Ralenkotter, who worked under vice president Scott Wombold, who in turn reported to Hazelwood. Welch testified that: (1) for customers whom Pilot invoiced directly, she entered less favorable discounts into Pilot's billing system than what customers were told; (2) for customers to whom Pilot issued manual rebates, she sent rebate checks for less than what customers were owed; and (3) she entered false information into customer-facing pricing software to mislead customers into thinking that they were receiving discounts that they were not in fact receiving. R. 336 at 66–105. Welch made it clear that she always did so at the direction of Spiewak and Ralenkotter, but "never Hazelwood." *Id.* at 200. She testified she had only "assumed" Hazelwood knew she was giving customers lower-than-promised discounts, *see* R. 336, at 204–05, because she never directly told Hazelwood about the fraud. *Id.* at 214.

**Brian Mosher**. Mosher was the sole witness who testified about a direct communication with Hazelwood in which he claimed Hazelwood approved the fraud. He also testified to teaching

fraudulent practices, but without Hazelwood's involvement.[6] R. 356 at 104–18. Mosher said he conspired at a recorded October 2012 meeting (GX 503) with vice presidents Wombold and John Freeman—but not Hazelwood—to teach "the fraudulent reduction of trucking company discounts" to salespersons at an upcoming training session. R. 356 at 126–27. Welch testified that Hazelwood "was not in [the] training session." R. 336 at 190.

**Arnold Ralenkotter**. Ralenkotter, while also admitting to fraud, *see, e.g.*, R. 337 at 33 ("[w]e cheated them, we overbilled them"), noted that some "fraudulent conduct" might appear similar to simple "hard-edged business negotiation," *id.* at 182–83. He testified that Pilot was entitled to change a customer's promised discount when, for example, the customer had missed sales volume minimums or needed "ramp-up time" to meet them. *Id.* at 183. (Welch also confirmed that such changes were justified when a customer simply altered its volume. *See* R. 336 at 87.) Ralenkotter also testified that nobody had instructed him to engage in any of the conduct that was discussed during his testimony. *See* R. 337 at 132 (affirming that "everything the government has chosen to introduce through [him] was the result of [his] decision and [his] instruction to others or [him]self").

**Other Employees.** Still others testified to committing fraud at the direction of Pilot employees other than Hazelwood. Katy Bibee testified that she committed fraud with Freeman, not with Hazelwood. *See* R. 522 at 98–168. Holly Radford "assumed" that Hazelwood was aware of fraud by others but admitted that only her "sales reps" instructed her to cheat customers, and she was "never instructed to do that with any particular customer by Mark Hazelwood." R. 354 at 177.

---

[6] Although the government introduced a recording of Freeman telling Hazelwood that Mosher would teach a class on manual rebates, Freeman did not explain the content of that session to Hazelwood.

Lexie Holden had "no personal knowledge" that Hazelwood was even aware of the fraud. R. 445 at 201. Kevin Clark testified that he once mentioned to Hazelwood that a customer was not getting the negotiated rebate, but had no recollection of any response from Hazelwood. R. 424 at 189.

### 2. Evidence Specific to Hazelwood Was Underwhelming

The Government's evidence of Hazelwood's involvement in the conspiracy consisted primarily of other Pilot employees' trip reports and testimony from Brian Mosher, a cooperating witness who sought a sentence reduction for himself.

**Trip Reports**.  The crux of the Government's case was that Hazelwood must have been part of the conspiracy because fraud was alluded to in a small number of the many thousands of trip reports the sales team compiled. But the *proofs* showed otherwise: Hazelwood read just a tiny fraction of the reports; he gave only scant attention even to those to which he reacted; and the reports he read chronicled legitimate—not fraudulent—sales practices.

The Government's opening statement and closing arguments stressed the importance of the trip reports to its case against Hazelwood. *See, e.g.*, R. 333 at 44–45, R. 513 at 42–43; GX 606C, 606G. Hazelwood asked his employees to submit "trip reports every week" as proof they were "seeing more customers per week than even before[.]" *See* GX 601 (email from Mark Hazelwood) ("I will be monitoring this weekly."). This forced salespersons to document their work each week—much like punching a time clock at a factory. The reports for the period at issue numbered in the several thousands, and Hazelwood acknowledged only a half dozen, at most. (This is confirmed by evidence, referenced in Hazelwood's Rule 33 Motion, that he did not access trip reports even when they were readily accessible electronically. R. 605 at 2–3.) In fact, the evidence showed that Hazelwood could enforce this accountability without needing to read more than a fraction of the trip reports. R. 523 at 198–99.

This is unsurprising. By 2012, when Hazelwood was president, sales was just one of his countless responsibilities, including being in charge of real estate, development, mergers and acquisitions, and facilities revenue. *See* R. 520 at 20–25. While he oversaw sales—a major component of Pilot's day-to-day operations—and wanted every Pilot salesperson to work hard like he did, *see* R. 336 at 219–20, the evidence showed that, apart from sending an occasional glib response, Hazelwood only demanded that the trip reports be prepared. He did not scrutinize them. *See, e.g.*, *id.* at 251.

Even had the evidence instead showed that Hazelwood read a majority of these thousands of weekly trip reports sent to his assistant, the proof would still be wanting. Only a minute number of these reports reference fraudulent conduct, and even then only obliquely. For example, Welch testified that Ralenkotter had promised to sell gasoline to PI&I trucking company at "cost plus .03" (meaning three cents per gallon above cost) but directed Welch to enter it as "cost plus .04." R. 520 at 153–54; GX 1101, 1104, 1109. This was memorialized in a Ralenkotter trip report, which also contained entries for eight other customers, as: "I will tell them cp .03 and put it in as .04 with a .04 discount." GX 1101. There was no evidence that Hazelwood even saw this trip report, let alone knew a one-cent price differential was unjustified.

Hazelwood's responses to only a handful of trip reports prove he was not fully reading even the very few reports that he saw. His terse responses to trip reports with words of encouragement show he merely glanced at a small fraction of them without careful review. The Government primarily relied on just four trip reports to show that Hazelwood was reading them at all, but each undercuts its theory of guilt:

- A 2010 Mosher trip report, GX 606C, included, near the end of thirteen separate entries: "Manual Rebates - Should save approx. 350k on the august gallons." R. 356 at 158.

Hazelwood's entire response—to all thirteen entries—was "nice." Even assuming Hazelwood stopped to focus on the "350k" reference, nothing alerted him that Mosher intended to "save" money through fraud. Mosher was one of only two Pilot employees— out of thirteen who testified—who said he was sure Hazelwood was even aware of the fraud. (The other, Kevin Clark, thought Hazelwood knew about the rebate fraud, but could support it with no specifics. *See* R. 424 at 158, 181.)

- Hazelwood's entire response to a 2012 trip report, GX 606G, was, "Brian, great job, especially on Heartland. The Crete tech issues piss me off." None of the eleven entries in that report describes fraud, not even indirectly.

- Hazelwood's entire response to a June 2010 trip report from Jay Stinnett with sixteen separate innocuous entries, was "Great job," GX 606A, R. 578 at 8.

- Hazelwood's entire response to an August 2010 report from Stinnett, GX 606B (22 separate entries), was "Awesome great job Jay getem," R. 578 at 8.

These four cursory responses were the primary support for the Government's argument that Hazelwood read *all* of the thousands of trip reports that were sent to his assistant and thus must have understood indirect references to fraudulent conduct supposedly contained in *other* reports to which he never responded. But, if anything, all a jury could infer from Hazelwood's terse responses was that he was not even closely reading the small handful of trip reports to which he did respond—none of which called fraudulent pricing behavior to his attention, in any event.

**Other Email Correspondence and Statements**. Hazelwood's emails and statements presented at trial were also consistent with the management style of a busy company president unaware of the fraud. For example, the government relied on an email chain among various sales employees about a customer, to which Hazelwood sent the admittedly coarse reply, "Rebate,

rebate, masturbate, make him feel special." R. 424 at 223; GX 2194. Nothing in his response showed he read an oblique reference to fuel-discount manipulation further down in the correspondence.

Still other evidence cut against the proposition that Hazelwood was reading the emails that were forwarded to him. In one email chain, Ralenkotter directed Spiewak to lower a discount by two cents. R. 520 at 182. Welch forwarded the email chain to Hazelwood, requesting his approval. Hazelwood's entire response was, "How many gallons," *see* GX 902, even though the answer (100,000 gallons) would have been clear had he read the forwarded email chain.

As for statements by Hazelwood, the Government notes that he promoted "A/B" pricing, in which hard-bargaining "A" customers would get better pricing than the less-demanding "B" customers. *See, e.g.*, R. 358 at 40–41. Mosher testified that *he* understood A/B pricing to mean that "B" customers would be cheated. *Id.* And the Government repeatedly invoked testimony that Hazelwood said, "Customer A, Customer B. Customer A looks—looks [in] every orifice you have. Customer B doesn't even know you have an orifice." R. 358 at 40. But the Government did not show this was anything but a colorful description of the lawful practice of differential pricing, in which savvy customers who aggressively bargain for a better deal are rewarded for their efforts. *See Langford v. Rite Aid of Alabama, Inc.*, 231 F.3d 1308, 1314 (11th Cir. 2000) ("Differential pricing alone is not a fraudulent practice."). Viewed in this light, Hazelwood's promotion of A/B pricing at a February 2013 meeting of Pilot personnel in Orlando was entirely legitimate. *See* R. 358 at 50–51, GX 2218–19 (Hazelwood: "Great recap lets [sic] get cost plus B plan going ASAP thanks"; Freeman: "Just met with Joe. Opportunity is there."; Hazelwood: "Awesome").

The same is true of the term "Manuel" (or "Man-well"), which, according to Mosher, some Pilot employees used in speaking of "the fraudulent reduction of trucking company discounts" for

some customers. R. 356 at 126 (referring to manipulation of amounts for those receiving rebate checks rather than invoice discounts). Mosher testified to the belief that Hazelwood had fraud in mind when he said he did not want to "stop manual rebates." *Id.* at 162. Here again, there was no evidence, beyond Mosher's self-serving supposition, that Hazelwood *himself* used those words to refer to fraudulent conduct, nor that Hazelwood even knew others were using the term in that way. The Court's Rule 33 Memorandum notes that Mosher and others testified to instances of changing discounts fraudulently, R. 701 at 32, but the testimony also made clear that even the alteration of manual rebates was routine and justified in other cases. R. 336 at 199; R. 337 at 183; R. 522 at 164. The jury could have inferred that Hazelwood had the latter (permissible) instances in mind when he echoed the phrase "Manuel," meaning he was encouraging his sales team to continue offering legitimate rebates to attract customers to Pilot who did not want, or qualify for, direct invoicing. The jury could thus have inferred that the fraud was limited to wrongdoers like Mosher.

### 3. Proof on the Witness Tampering Charge Was Also Equivocal

Even the proof for the witness tampering count showed behavior consistent with a frustrated and innocent company president. The Government relied on a conversation with Blake filled with "pleasantries," R. 523 at 168, where Hazelwood, with his world crashing down, got something off his chest that would understandably upset Blake: he had not read the trip reports that Blake had worked so hard over the years to compile. He followed his statement with, "Do you understand?" R. 523 at 168. The Government argued that, far from simply trying to alert Blake not to *assume* a fact of which she lacked knowledge (*i.e.*, that he read the reports she gave him), Hazelwood corruptly sought to persuade Blake to tell investigators that she knew all along that he had never read the trip reports. R. 511 at 180. But the evidence was consistent with the simple, truthful

statement that Hazelwood was not generally reading materials Blake spent countless hours preparing over many years. R. 523 at 157–62.

### 4. Given that Evidence of Guilt Was Far from Overwhelming, a New Trial Is Likely Should Hazelwood Prevail on the Inadmissibility of the Recordings

Taking this lack of evidence together with the complex and often confusing nature of the remainder of the proofs, the jury was highly susceptible to the inflammatory and unfairly prejudicial recordings introduced against Hazelwood late in the trial. If the court of appeals agrees with Hazelwood that the recordings were admitted in error, it is therefore unlikely to deem the error harmless. In that event, release pending appeal is warranted. *See* 18 U.S.C. § 3143(b)(1)(B)(ii) (test is whether a substantial question of fact or law is "likely" to result in "an order for a new trial").

Granting Hazelwood's motion would conform with rulings on similar motions in other cases. *See, e.g.*, *United States v. Bistline*, 605 F. App'x 529, 531 (6th Cir. 2015) (child-pornography defendant with one-year sentence permitted to remain free on bond pending third government appeal even though court of appeals had twice reversed noncustodial sentences as unreasonably low); *United States v. Johnson*, No. 2:13-cr-94 (S.D. Ohio Sept. 4, 2014) (tax-fraud defendant permitted to remain free on bond pending appeal); *United States v. Eaton*, No. 1:12CR-11-JHM, 2013 WL 5328212 (W.D. Ky. Sept. 20, 2013) (witness-tampering defendant permitted to remain on bond pending appeal where defendant had "complied with the conditions governing his pretrial release" and where the sentencing court had "previously determined that Defendant did not pose a risk of flight or a danger to community"). Continued release is warranted under 18 U.S.C. § 3143(b).

### III. ALTERNATIVELY, HAZELWOOD SHOULD BE ALLOWED AT LEAST SIXTY DAYS TO SELF-REPORT IF THE COURT IMPOSES A CUSTODIAL SENTENCE.

If this Court denies release pending appeal and imposes a custodial sentence, Hazelwood respectfully requests that he have at least sixty days to self-report, as the Court permitted the defendants in *United States v. Dobson*, No. 1:12-CR-42 (E.D. Tenn., May 29, 2014), and *United States v. Cardin*, No. 1:11-CR-93 (E.D. Tenn., Apr. 11, 2013). Hazelwood would thereby be able to seek release pending appeal in the Sixth Circuit and receive a ruling prior to a report date.

### CONCLUSION

For the foregoing reasons, this Court should grant Hazelwood's motion for release pending appeal under 18 U.S.C. § 3143(b). Alternatively, this Court should permit Hazelwood at least sixty days to self-report for any custodial sentence.

Dated: September 24, 2018

Respectfully submitted,

/s/ Jim Walden
Jim Walden
Georgia Winston
WALDEN MACHT & HARAN LLP
1 Battery Park Plaza, 34th Floor
New York, NY 10004
(212) 335-2030- Telephone
(212) 335-2040- Facsimile
jwalden@wmhlaw.com
gwinston@wmhlaw.com
***Attorneys for Defendant Hazelwood***

/s/ Bradley L. Henry
Bradley L. Henry (BPR # 025447)
BREEDING HENRY BAYSAN PC
900 South Gay Street, Suite 1950
Knoxville, Tennessee 37902
(865) 670-8535- Telephone
(865) 670-8536- Facsimile
brad@breedinglaw.com
***Attorneys for Defendant Hazelwood***

**CERTIFICATE OF SERVICE**

I certify that the forgoing document was electronically filed on September 24, 2018, Notice of this filing was sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

_____ s/ Bradley L. Henry _____