# UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Deborah S. Hunt
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  October 14, 2020

Mr. David John Debold
Gibson, Dunn & Crutcher
1050 Connecticut Avenue, N.W.
Suite 300
Washington, DC 20036

Mr. David Ruben Esquivel
Bass, Berry & Sims
150 Third Avenue, S., Suite 2800
Nashville, TN 37201

Mr. Francis M. Hamilton III
Mr. Brian Samuelson
Office of the U.S. Attorney
800 Market Street, Suite 211
Knoxville, TN 37902

Mr. Shon R. Hopwood
Mr. Kyle Praveen Singhal
Hopwood & Singhal
1701 Pennsylvania Avenue, N.W.
Suite 200
Washington, DC 20006

Ms. Crystal Dudding Irvine
Bass, Berry & Sims
100 Peabody Place, Suite 1300
Memphis, TN 38103

Mr. John E. Kelly Jr.
Bass, Berry & Sims
1201 Pennsylvania Avenue, N.W., Suite 300
Washington, DC 20004

Ms. Megan Brenneman Kiernan
Gibson, Dunn & Crutcher
1050 Connecticut Avenue, N.W.
Suite 300
Washington, DC 20036

Mr. Benjamin James Vernia
Vernia Law Firm
1455 Pennsylvania Avenue, N.W.
Suite 400
Washington, DC 20004

Re:  Case Nos. 18-6023/18-6101/18-6102, *USA v. Mark Hazelwood*
Originating Case No. : 3:16-cr-00020-1

Dear Counsel,

The court today announced its decision in the above-styled cases.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Mr. John L. Medearis

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0327p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

UNITED STATES OF AMERICA,

      *Plaintiff-Appellee,*

      *v.*

MARK HAZELWOOD (18-6023); HEATHER JONES
(18-6101); SCOTT WOMBOLD (18-6102),

      *Defendants-Appellants.*

Nos. 18-6023/6101/6102

————————————

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 3:16-cr-00020—Curtis L. Collier, District Judge.

Argued: February 6, 2020

Decided and Filed: October 14, 2020

Before: SUHRHEINRICH, DONALD, and MURPHY, Circuit Judges.

————————————

## COUNSEL

**ARGUED:** David Debold, GIBSON, DUNN & CRUTCHER, LLP, Washington, D.C., for Appellant in 18-6023. Benjamin J. Vernia, THE VERNIA LAW FIRM, Washington, D.C., for Appellant in 18-6101. David R. Esquivel, BASS, BERRY & SIMS PLC, Nashville, Tennessee, for Appellant in 18-6102. Francis M. Hamilton, III, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee. **ON BRIEF:** David Debold, Megan B. Kiernan, Henry C. Phillips, GIBSON, DUNN & CRUTCHER, LLP, Washington, D.C., Shon Hopwood, Kyle Singhal, LAW OFFICE OF SHON HOPWOOD PLLC, Washington, D.C., for Appellant in 18-6023. Benjamin J. Vernia, THE VERNIA LAW FIRM, Washington, D.C., for Appellant in 18-6101. John E. Kelly, BASS, BERRY & SIMS PLC, Washington, D.C., Christopher J. Climo, BASS, BERRY & SIMS PLC, Nashville, Tennessee, for Appellant in 18-6102. Francis M. Hamilton, III, Brian Samuelson, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee.

SUHRHEINRICH, J., delivered the opinion of the court in which MURPHY, J., joined. DONALD, J. (pp. 22–37), delivered a separate dissenting opinion.

————————————

## OPINION

————————————

SUHRHEINRICH, Circuit Judge.   In this wire fraud and mail fraud conspiracy case against employees of a multibillion-dollar gas company, Pilot Flying J (Pilot), the district court allowed the government to play audio recordings in which one of the defendants, Pilot President Mark Hazelwood, is heard using deeply offensive racist and misogynistic language.   The district court admitted the recordings on the theory that if the defendant was reckless enough to use language that could risk public outrage against the company, he was a "bad businessman," and as a bad businessman, he was also reckless enough to commit fraud.   This is vintage bad character evidence—and precisely the type of reasoning the Federal Rules of Evidence forbid.

The use of the audio recordings in this case jumped the rails of those rules.   First, none of the Rules of Evidence support the recordings' admissibility.   Second, and more importantly, even if somehow otherwise admissible, the recordings are a textbook violation of Rule 403, because the risk of unfair prejudice eviscerates any purported probative value.   For these reasons, we reverse the convictions of all three defendants.

## I.  BACKGROUND

*The Manual-Rebate Scheme.* Pilot Flying J (Pilot), headquartered in Knoxville, Tennessee, operates hundreds of truck stops nationwide and sells billions of gallons of diesel fuel annually to trucking companies.   The government charged more than a dozen employees in Pilot's direct-sales division, including Defendants-Appellants Hazelwood, Scott Wombold, and Heather Jones,[1] with conspiracy to defraud Pilot's trucking-company customers by falsely promising discounted fuel prices, and then secretly shorting those customers on the promised discounts through deceptive invoicing and rebate techniques.   The indictment alleges that

---

[1]A total of eighteen Pilot employees were charged.   Before Defendants proceeded to trial in late 2017, fourteen other Pilot employees and executives had already pleaded guilty to conspiring to commit wire or mail fraud.   Karen Mann, a regional account representative, was tried jointly with Defendants and was acquitted.

between February 2008 and April 2013 Hazelwood (who was Pilot's president and head of the direct-sales division) and Wombold (Pilot's vice-president of national accounts and manager of the direct-sales division) encouraged Pilot's direct-sales team to use the "manual rebate" technique,[2] and that Heather Jones (a regional account representative on the direct-sales team) created fraudulent backup data to prevent the trucking companies from catching on to the scheme. The government charged Appellants Hazelwood, Wombold, and Jones with conspiracy to commit wire fraud (18 U.S.C. § 1343) and mail fraud (§ 1341) ("Count One"), as well as several individual counts of wire fraud ("Counts Two through Ten"). In addition, Wombold was charged with lying to investigators (18 U.S.C. § 1001(a)(2)) ("Counts Eleven through Thirteen") and Hazelwood was charged with witness tampering (18 U.S.C. § 1512(b)(3)) ("Count Fourteen").

Several other Pilot employees—Karen Mann, John Freeman, Vicki Borden, John Spiewak, and Katy Bibee—were charged in the same indictment. Freeman, Borden, Spiewak, and Bibee all pleaded guilty to the conspiracy charge. Karen Mann went to trial with Defendants.

*The Government's Case and the Cross-Examination.* The jury trial lasted over twenty-seven days. The government called nearly thirty witnesses, including cooperating Pilot employees who pled guilty for their roles in the conspiracy. The government also presented emails among the alleged co-conspirators, and undercover audio recordings. This appeal arises primarily from the admission of three of those tapes, wherein Hazelwood can be heard using profanity, making racial slurs, and belittling women. As described below, the district court admitted those recordings based on a complicated rebuttal theory.

The government's first witness was Janet Welch, a direct-sales account representative who pleaded guilty to mail fraud for her involvement in the rebate scheme. She testified that Pilot's sales division tried to persuade interstate trucking companies to buy gas from Pilot as opposed to its competitors. One way to increase sales was by offering discounted fuel prices. However, selling fuel at a discount would reduce Pilot's profit margin, so some Pilot employees

---

[2]Under the manual-rebate scheme, customers initially paid the retail rate for fuel and, at the end of each month, received a rebate check for the difference between the retail price and the discounted rate. The rebate is "manual" in the sense that someone at Pilot calculates the amount of the rebate and sends the check to the customer.

looked for ways to offer significant discounts while secretly charging more.  One such method was the manual-rebate scheme.

On cross-examination, Hazelwood's lawyer asked Welch whether "based on [her] years [at Pilot]" she believed that Hazelwood would approve the manual-rebate scheme.  After the government objected, the court stated that the question "goes to character" and asked Hazelwood's attorney whether he "want[ed] to open up issues of character."  When Hazelwood's attorney declined, the court sustained the objection.  Later in the cross-examination, however, Hazelwood's attorney asked Welch about Hazelwood's "reputation as a manager and president within the company" and how she would rate him as a company president:

| | |
|---|---|
| Hazelwood's Counsel: | Okay. Were you -- did you become familiar, generally, without asking you what it is right now, did you generally become familiar with Mr. Hazelwood's reputation as a manager and president within the company? |
| Welch: | Yes, sir. |
| Hazelwood's Counsel: | Did you have great regard for him? |
| Welch: | Yes, sir. |
| Hazelwood's Counsel: | Did you consider him good, bad, indifferent?  How would you rate him as a CEO -- or president, rather? |
| Welch: | Excellent. |
| Hazelwood's Counsel: | How would you describe his attitude toward the customers? |
| Welch: | He had a great relationship with the customers. |

On the ninth day the government called Brian Mosher, who became a cooperating witness after pleading guilty to conspiracy to commit mail and wire fraud for his involvement in the manual-rebate scheme.  Mosher, the director of national accounts, was one of the company's most ambitious salesmen.  Mosher supervised Jones and reported to Wombold and Hazelwood.  On direct examination, Mosher testified that he cheated customers by reducing their discounts without telling them.  He further stated that Defendants Hazelwood and Wombold approved his use of the technique He also implicated Defendant Jones, who worked for him for five years, by

testifying that she agreed to manipulate pricing data to make the fraudulent rebates appear legitimate.

On cross-examination, Hazelwood's attorney tried to expose flaws in Mosher's testimony. First, he attempted to reframe evidence that Hazelwood used profanity and endorsed aggressive sales tactics. To demonstrate a more supportive side of Hazelwood's management style, he showed Mosher a video of a presentation called "Mark the Driver," in which Hazelwood played the role of an average truck driver in order to teach Pilot employees to value the needs of their primary customers. He then asked Mosher whether the attitude shown in the Mark the Driver video was "inconsistent . . . with these manual rebate things, where the trucking companies were getting a different deal [than they were promised]." Mosher did not concede that point, answering that "one is a skit, and the other was how we conducted our rebates."

Later, Hazelwood's attorney asked Mosher a series of questions meant to show that Hazelwood was too good a businessman to engage in something as high-risk and low-reward as the manual-rebate scheme:

> Hazelwood's Counsel: Can you explain to me, Mr. Mosher, how it was to the advantage to the people at the top of Pilot to risk everything on an approach to customers that was such a small percentage of their overall business by lying to the customers and taking the chance that when customers found out, they would not only not deal with them but would go to competitors? Can you explain why you guys thought that it was a good approach to be doing this when it represented such a small percentage of your overall business?
>
> Mosher: I can't give you any reason why it was a good idea. I don't think it was a good idea.
>
> Hazelwood's Counsel: Okay. Would you agree . . . it's a dumb idea?
>
> Mosher: Yes.
>
> Hazelwood's Counsel: That totally aside from the issue of ethics and morality or good business dealings, if you want to continue to build and grow a company and make more and more money down the line, would you agree with me that it is incredibly stupid and dumb, from a business standpoint, to take a small portion

|                      |                                                                                                                                                                      |
|----------------------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                      | of your business and be lying to customers and taking the chance of everything coming down?                                                                           |
| Mosher:              | I agree.                                                                                                                                                              |
| Hazelwood's Counsel: | All right.  Now, would you agree that if you're [Pilot CEO] Jimmy Haslam and Mark Hazelwood, responsible for growing this business, it makes no sense, if you know they're doing it, to allow your people to continue to do it? |
| Mosher:              | I can agree.                                                                                                                                                          |
| Hazelwood's Counsel: | Would you agree with me that Jimmy Haslam was a good businessman?                                                                                                     |
| Mosher:              | For the most part, yes.                                                                                                                                               |
| Hazelwood's Counsel: | Would you agree that Mark Hazelwood was a good businessman?                                                                                                           |
| Mosher:              | Same answer.  For the most part, yes.                                                                                                                                 |
| Hazelwood's Counsel: | Would you agree that if you knew this was going on, allowing it is a dumb business decision?                                                                          |
| Mosher:              | It is [a] bad business decision, yes.                                                                                                                                 |

*The Recordings.*  After Hazelwood's cross-examination of Mosher, but before its redirect examination, the government filed a motion to introduce "rebuttal character evidence pursuant to Federal Rules of Evidence 404(a)(2)(A) and 405."  In that motion, the government sought to offer the inflammatory audio recordings that form the crux of this appeal, claiming that the recordings captured Hazelwood engaging in conduct incompatible with his defense theory that he would never do anything to jeopardize Pilot's reputation or success.

Those recordings were made undercover by Vince Greco, a member of Pilot's direct sales team who agreed to cooperate with federal agents in the investigation that led to the charges in this case.  On October 25, 2012, Greco attended a management meeting of Pilot executives at the lake house of co-conspirator John Freeman, vice president of sales.  During the meeting, some of the executives discussed the manual-rebate scheme.  Freeman decided that Mosher, reputed for his aggressive manual rebates, would lead a session on that topic the next month during the all-staff sales meeting.  Hazelwood was not present for these discussions.  Wombold was.  In the evening hours, after the business meeting had ended, the colleagues watched a football game on

television, drank alcohol, and spewed profanities about African Americans and women.[3]  This racist and chauvinist banter is captured on three recordings.  Hazelwood was present by then and prominently featured in these conversations.[4]

    The conversation about the game veered into the fact that the Oakland Raiders sold the most merchandise, while the Cleveland Browns sold the second to least.  Hazelwood proposed an explanation: "n****rs" bought a lot of Raiders apparel but wouldn't want to wear Browns gear (for a reason that he thought was obvious).  This was a problem for the Browns because, according to Hazelwood, "Cleveland, it ain't nothin' but n****rs."  As the night progressed and decorum continued to unravel, Hazelwood asked "[w]here's our 'Greasy N****r' song?"  He was surprised to find out that one of their coworkers had been "married to a n****r" because, in his view, "[y]ou can't trust those little n****r b**ches."  Freeman then played the "Greasy N****r" song.  The government transcribed the basic refrain for the jury:

> *It's enough to make a man throw up*
> *Sure is hard to figure*
> *How any decent girl could ever f**k*
> *A greasy n****r*

The entire song is audible on the third recording.  The lyrics are too repulsive to be repeated here.[5]

    In its motion the government claimed that the recordings rebutted Hazelwood's cross-examination of Mosher regarding Hazelwood's "character traits of sound business judgment and authentic humanitarian good will toward the entire community of over-the-road truck drivers."

    Hazelwood objected to the government's motion on three grounds: (1) that he had not introduced evidence of his character; (2) that, even if he had introduced character, the recordings bore no relation to the purported character traits; and (3) that even if they did, the probative value

---

[3]Neither Jones nor any other women attended the management meeting or socializing afterwards.

[4]The government modified the recordings to remove Wombold's voice.  However, the recordings included several speakers labeled "Unidentifiable Voice."

[5]*See N****r F****r* by David Allan Coe (*Underground Album*, 1982).

of the recordings was substantially outweighed by the danger of unfair prejudice in violation of Rule 403.

*The District Court's Ruling.* After an in-camera hearing, the district court concluded that the recordings would be admitted. Initially, the court appeared to reject the government's suggestion that the recordings could be admitted as rebuttal character evidence under Federal Rule of Evidence 404(a)(2)(A), because Rule 405 bars the government from introducing "extrinsic evidence" of specific instances of the defendant's conduct. Thus, even if the government could question Mosher about Hazelwood's offensive comments at the lake house, it could not introduce the recordings of those comments. Notwithstanding, the district court stated that "a reasonable person could look at this line of questioning as not necessarily or primarily character in nature," and under this perception, Hazelwood's "good businessman" argument was "merely 401 evidence" and was "fair game for counterevidence," with the only limitation being Rule 403.

Turning to Rule 403, the district court concluded that the risk of unfair prejudice to Hazelwood did not substantially outweigh the recordings' probative value. Although it acknowledged the danger of unfair prejudice likely to be caused by the "deeply offensive" language on the recordings, the district court reasoned that the recordings rebutted Hazelwood's argument that he was a "too good a businessman" and would not have "engaged in conduct that, if it became known, would bring the entire company down."

*The Limiting Instruction.* Before the government played the recordings for the jury, the district court gave a limiting instruction, which is excerpted in pertinent part below.

> [T]hese audio recordings are in response to certain evidence that has been elicited during cross-examination of witnesses by counsel for Mr. Hazelwood only.
>
> The government's questions, the witnesses' answers, and the audio recordings that you are about to hear should be used by you only for your consideration of whether Mr. Hazelwood was a good businessman and an excellent company president for Pilot Travel Centers and whether in those roles Mr. Hazelwood would engage in conduct that ran the risk of putting Pilot Travel Centers in jeopardy or, as the question was asked, taking the chance of everything coming down if that conduct was discovered, and risked that customers would not only

not deal with Pilot Travel Centers but would go to competitors.  Do not use this evidence for any other purpose.

. . . .

[T]his evidence does not go to any of the elements of the offenses with which Mr. Hazelwood is charged in the indictment, but, rather, it's offered to contradict other evidence you've already heard.  You cannot and must not use this evidence by itself to decide that Mr. Hazelwood is guilty of the offenses charged in the indictment.

. . . .

Additionally, you cannot and you must not consider this evidence at all with respect to Defendant[s] Scott Wombold, [and] Heather Jones . . . .

Each defendant objected to the adequacy of the limiting instruction.  The court overruled those objections, and the government proceeded to play the three excerpts for the jury.  The jury was also provided with transcripts so that they could read along as the recordings were played, although the slurs were not spelled out.

*The Written Ruling.*  The district court issued a written memorandum opinion after the recordings had been played for the jury (in response to Defendants' motions for reconsideration of its decision to admit the recordings).  The court clarified its earlier oral ruling, concluding that the recordings: (1) were, in fact, admissible under Rule 404(a)(2)(A) as rebuttal evidence to Hazelwood's "alleged character for sound business judgment" (the character-evidence analysis of Rule 404(a)), and (2) were relevant under Rule 401 even if Hazelwood's defense "was not character evidence at all, or was more than character evidence" (the simple relevance analysis of Rule 401).  The district court rejected Defendants' argument on reconsideration that the evidence was not relevant because it did not relate to any of the elements of the crimes Hazelwood was accused of:

By eliciting evidence that Defendant Hazelwood was too good a businessman and too good a company president to have participated in or tolerated the business risks inherent in discount fraud, Defendant Hazelwood has put these purported facts before the jury as a defense.  The Government's evidence is relevant for that reason:  it has some tendency to make these facts about Defendant Hazelwood less probable than they would be without the evidence, and Defendant Hazelwood has made these facts of consequence by bringing them into the case as part of his defense.  This is so whether Defendant Hazelwood's evidence is or is not characterized as character evidence.

Nor did the court agree that the evidence must be excluded because it was extrinsic evidence on a collateral issue: "The Government is not seeking to impeach Mr. Mosher as to his credibility or otherwise; it is seeking to respond to a defense raised by Defendant Hazelwood."

The district court also rejected Defendants' Rule 404(b) argument that the government had not advanced a purpose other than propensity.  The court found that the recordings involved a proper purpose under Rule 404(b):  "Given the defense Defendant Hazelwood has put forward to date, these acts are sufficiently analogous to the crimes charged to support the inference advanced by the Government: that Defendant Hazelwood was not, in fact, too good a businessman and company president for Pilot to engage in conduct, which, if it became known, would put Pilot at serious risk."

*The Verdicts.* The trial proceeded without either side returning to the offensive recordings or the issue of whether Hazelwood was a good businessman.  As part of the jury charge, the district court repeated the limiting instruction in similar terms.  The jury returned with a verdict after deliberating for five days.  The jury found each Defendant guilty of at least one count and not guilty of at least one count.  The jury found Hazelwood guilty of conspiracy to commit mail fraud and wire fraud as charged in Count One of the indictment, guilty of wire fraud as charged in Count Eight, not guilty of wire fraud as charged in Count Ten, and guilty of witness tampering.  The jury found Wombold not guilty of conspiracy to commit mail fraud and wire fraud as charged in Count One, guilty of wire fraud as charged in Count Two, not guilty of wire fraud as charged in Count Three, not guilty of wire fraud as charged in Count Four, and not guilty of making false statements to investigators as charged in Counts Eleven through Thirteen. The jury found Jones guilty of conspiracy to commit mail fraud and wire fraud as charged in Count One, not guilty of wire fraud as charged in Count Three, not guilty of wire fraud as charged in Count Four, not guilty of wire fraud as charged in Count Five, and not guilty of wire fraud as charged in Count Six.  Mann was acquitted of the single count on which she was charged.

## II. ANALYSIS

All three Defendants contend that their convictions should be overturned because the district court improperly admitted the offensive lake house recordings.[6]  They make the same basic arguments in support:  First, that each of the district court's three theories of threshold admissibility—under Rules 401, 404(a) and 404(b)—was incorrect as a matter of law.  Second, that the court abused its discretion under Rule 403 in failing to recognize that unfair prejudice of the tapes substantially outweighed any probative value in a fraud case.

We generally review evidentiary rulings for abuse of discretion.  *United States v. Jenkins*, 593 F.3d 480, 484 (6th Cir. 2010).  An abuse of discretion occurs when the district court relies on clearly erroneous facts, uses an erroneous legal standard, or improperly applies the law. *United States v. Barnes*, 822 F.3d 914, 923 (6th Cir. 2016).  There is some turmoil in this circuit when it comes to reviewing Rule 404(b) rulings.  *See United States v. LaVictor*, 848 F.3d 428, 444–45 (6th Cir. 2017).  Even under the more deferential abuse-of-discretion standard, reversal is required in this case.  *Cf. id.*

Before homing in on the legal particulars, we begin with two commonsense questions: Does the fact that Mark Hazelwood used utterly repulsive language in private make it more likely that he and his cohorts committed wire fraud?  No.  Does it make it more likely that a jury would convict?  Yes.  With this broad view of the recordings' probable real-life effect, we turn to the legal justifications offered for their admission.

*Rule 401.*  In its oral ruling the district court ruled that the recordings were "not necessarily or primarily character" evidence but were "merely [Rule] 401 [counter]evidence" admissible to rebut the testimony that Hazelwood was a good businessman.  The court reasoned that the recordings could rebut the inference that Hazelwood was too good a businessman to risk the company's reputation by committing wire and mail fraud.  The court held them admissible subject only to the weighing of Rule 403.

---

[6]Defendants raise other issues challenging their convictions and sentences.  Because we find the erroneous admission of the offensive recordings to be grounds for reversal as to all three Defendants, we do not reach the other objections.

This analysis is faulty on several fronts. First, and in many ways foremost, is the conclusion that the recordings were relevant. Rule 401 offers a test of relevance: "Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence[.]" Fed. R. Evid. 401(a). And, "the fact [must be] of consequence in determining the action." Fed. R. Evid. 401(b).

In a criminal case, a fact is "of consequence" if it makes it more or less likely that the defendant committed the charged conduct. Courts do not require that each piece of evidence directly prove or disprove an element of the offense. *See* 1 McCormick On Evid. § 185 (8th ed.) ("[S]ome evidence that is merely ancillary to evidence that bears directly on the issues may be admissible.") However, evidence must at least be "a step on one evidentiary route to the ultimate fact." *See Old Chief v. United States*, 519 U.S. 172, 179 (1997).

The recordings of Hazelwood's highly offensive comments fail to meet even the lenient "step on one evidentiary route" standard. As the district court instructed the jury, the recordings "do[] not go to any of the elements of the offenses with which Mr. Hazelwood is charged in the indictment." In other words, there is simply no "route" on which the recordings make it more likely that Hazelwood committed fraud.

Moreover, the recordings do not rebut Hazelwood's argument that he was a "good businessman." Having a bad set of personal beliefs did not make it more likely that Hazelwood made bad business decisions.[7] Take Henry Ford, for example. After creating a simple, reliable car that the average American worker could afford, the Model T, he developed the assembly line mode of production that revolutionized the automobile industry. Ford was also a rabid anti-Semite, publishing his views in his hometown newspaper, the Dearborn Independent, after purchasing the paper. Yet this character flaw did not impede Ford's acuity in industrial arenas or affect the success of Ford Motor Company. Like Ford, Hazelwood's personal views are despicable, but they do not correlate with his business judgment. Which raises another point:

---

[7]Hazelwood could have argued that he was a good manager with or without Mosher's opinion. For example, defense counsel could have asked: "How else could a good business manager run a company of this complexity?" The government could have used evidence of the crime to argue to the jury that Hazelwood was not a good manager but a thief.

Hazelwood did not make these comments in public; he made them after hours, during a private corporate retreat, with trusted corporate compadres. And, they certainly do not advance the evidentiary route to the ultimate fact, the commission of wire and mail fraud. Being a racist and a chauvinist did not make it more probable that Hazelwood would commit wire fraud. And eliciting testimony that it would be dumb to risk a company's reputation by committing fraud did not put bigotry or sexism in "issue."

Furthermore, Rule 401 is not a standalone rule. Rule 402 says that the general admissibility of relevant evidence must yield to other Rules. *See* Fed. R. Evid. 402 ("Relevant evidence is admissible unless . . . "these rules" "provide[] otherwise."). This includes Rules 404 and 405. The district court thus erred in treating Rule 401 as an independent basis for admissibility. Indeed, this court has held evidence of other acts for rebuttal purposes "must nonetheless be subjected to [a] Rule 404(b) inquiry." *United States v. Dunn*, 805 F.2d 1275, 1280 (6th Cir. 1986). As discussed below, the recordings were inadmissible under Rules 404 and 405.

*Rule 404(a).* The district court also admitted the recordings under Rule 404(a)(2)(A). Rule 404(a) states the general rule of excluding circumstantial use of character evidence. It is worth quoting here because its text forms the crux of this analysis. "Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a). Notwithstanding, in a criminal case, if the defendant decides to offer evidence of a "pertinent trait" "the prosecutor may offer evidence to rebut it[.]" Fed. R. Evid. 404(a)(2)(A). The district court reasoned that "Hazelwood had introduced evidence of his character for sound business judgment," and the recordings showed Hazelwood "participating in an activity, that, if made public, would risk" "bringing down the business."

Even if Hazelwood "opened the door" to a "pertinent" trait, that trait was his business acumen, not his seriously misguided personal beliefs. If "pertinent" to anything, the recordings illuminated Hazelwood's mindset, his attitudes towards African Americans and women. As discussed above, the recordings did not cast light on Hazelwood's business skills. Thus, they fail to rebut (in any meaningful way) the evidence actually offered by Hazelwood.

Nos. 18-6023/6101/6102        *United States v. Hazelwood, et al.*                Page 14

The recordings also did not comply with the form or the procedure required by Rules 404 and 405. Rule 405 limits the form of evidence that can be admitted under Rule 404(a). *See United States v. Roper*, 135 F.3d 430, 433 n.1 (6th Cir. 1998). Where, as in this case, character is not an "essential element" of a charge or defense, Rule 405 allows inquiry into prior acts *only* through testimony about a defendant's "reputation" or "opinion" to prove a person's character. *See* Fed. R. Evid. 405(a) ("When evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation or by testimony in the form of an opinion."). On cross-examination, a party may only inquire about "specific instances of the person's conduct," without introducing extrinsic evidence of that conduct. *See id.*; *see also United States v. Reese*, 568 F.2d 1246, 1251 (6th Cir. 1977) (noting that character evidence introduced by the defendant "could only have properly been rebutted by the testimony of other witnesses as to the bad reputation" of the defendant "unless [the defendant's] character or a trait thereof had been an essential element of the charge against [the defendant] or his defense thereto"). The recordings were extrinsic evidence that the government offered to prove specific instances of Hazelwood's conduct allegedly bearing on character. Playing the audiotapes, and providing the jury with the playbook,[8] violated Rule 405 two times over.

*Rule 404(b)*. The district court also ruled that the recordings were admissible as "other acts" evidence under Rule 404(b). Rule 404(b) is a "specialized but important application of the general rule excluding circumstantial use of character evidence." Fed. R. Evid. 404, advisory committee's note to 1972 proposed rules. Thus, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). The rules exclude evidence of character because "the risk that a jury will convict for crimes other than those charged—or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment—creates a prejudicial effect that outweighs ordinary relevance." *Old Chief*, 519 U.S. at 180–82 (quoting *United States v. Moccia*, 681 F.2d 61, 63 (1st Cir. 1982)).

---

[8]The transcripts were provided by the court. The effect on the jury cannot be appreciated unless read in full. For this reason, we have appended them to this opinion.

However, such evidence can be admitted for "another purpose," such as "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Importantly, the non-character purposes listed in the second subsection are not exceptions to the first subsection's rule against character reasoning. Accordingly, "[t]he threshold inquiry a court must make before admitting similar acts evidence under Rule 404(b) is whether that evidence is probative of a material issue other than character." *Huddleston v. United States*, 485 U.S. 681, 686 (1988). This court has articulated the following test: that evidence is admissible under Rule 404(b) only if "(1) the evidence is offered for an admissible purpose, (2) the purpose for which the evidence is offered is material or 'in issue,' and (3) the evidence is probative with regard to the purpose for which it is offered." *LaVictor*, 848 F.3d at 445–46.

The government contends that the recordings have a non-character use: proving that the risk to Pilot's reputation would not have deterred Hazelwood from committing fraud. By accepting that argument, the court invited the jury to conclude that if Hazelwood was willing to put Pilot at serious risk by using racist and misogynistic language, then he would be equally willing to put Pilot at risk by engaging in fraud. This is precisely the type of propensity evidence that Rule 404(b) prohibits—using another act (racist and misogynist language), to prove that Hazelwood had a character trait (recklessness), such that on a particular occasion he acted in accordance with that character trait (by committing fraud). In short, the recordings were not "offered for an admissible purpose," *LaVictor*, 848 F.3d at 445–46, because they were not "probative of a material issue other than character," *Huddleston*, 485 U.S. at 686.

The recordings are not probative of any of the issues in this case. Degrading African Americans and women during a private party is not probative of motive to conspire with others to defraud trucking companies of fuel discounts. And nothing in the record indicates that Hazelwood had a reason to expect that his comments would become public. Without that, the recordings have nothing to say about Hazelwood's concern for Pilot's reputation. If Hazelwood's motive had truly been in issue, proper rebuttal would have been testimony that Hazelwood stood to profit *despite* the risk to company reputation. Furthermore, Hazelwood's

primary defense was lack of knowledge, not lack of motive.[9]  He suggested that, as a busy executive, he was unaware of the fraudulent scheme.

Although the recordings were not probative of a material issue, they did make it more likely that the jury would convict Hazelwood because of his character.  The offensive language heard on the recordings was meant to depict a person whose scandalous personal beliefs transgress society's sense of morality and human decency.  For that reason, the inflammatory nature of Hazelwood's comments created a strong risk that the jury would convict him based on factors other than the charged conduct—in violation of Rule 404(b)(1)'s *raison d'être*.  The district court erred in admitting them under Rule 404(b).

*Rule 403.*  Last, but certainly not least, is the balancing test of Rule 403, which states that a court may exclude relevant evidence only if "its probative value is substantially outweighed by a danger of . . . unfair prejudice."  Fed. R. Evid. 403; *see also United States v. Asher*, 910 F.3d 854, 860 (6th Cir. 2018) (noting that "[t]he test is strongly weighted toward admission").  Setting aside the resounding conclusion that the recordings were not relevant to any fact "of consequence" in this action and therefore have no probative value (other than character), we turn to the risk of unfair prejudice, defined as the "undue tendency to suggest a decision based on improper considerations."  *Asher*, 910 F.3d at 861 (quoting *United States v. Bilderbeck*, 163 F.3d 971, 978 (6th Cir. 1999)).  This can happen when "the prior-act evidence so shocks the conscience that the jury may decide that the defendant is a bad person and deserves to be convicted, even if his guilt were unproven in the instant case, 'because a bad person deserves punishment.'"  *Id*. at 861–62 (quoting *Old Chief*, 519 U.S. at 181).  The jury therefore reaches a verdict based on emotions instead of evidence.  *Id.* at 861 (citing *Old Chief*, 519 U.S. at 180).  "Certainly, a jury is more likely to engage in this type of judgment when the prior-conduct evidence portrays the defendant as having committed an appalling act."  *Id.* at 862.

The extraordinary risk of prejudice posed by the offensive recordings needs little explanation.  Decent society roundly condemns the backward and intolerant views heard on the recordings.  Nearly anyone would form a negative opinion of a person who holds (and heartily

---

[9]Perhaps this explains why the government yoked this evidence to limited exchanges with two witnesses, Welch and Mosher.

expresses) those views.  For that reason, this court has not been shy about protecting the least desirable defendants from this form of evidence in the administration of criminal justice.  Take Ronald Ebens.  Ebens beat to death Vincent Chin, a United States citizen of Chinese descent, and was charged with interfering with Chin's civil rights on account of his race or national origin in violation of 18 U.S.C. § 245.  *United States v. Ebens*, 800 F.2d 1422, 1427 (6th Cir. 1986). Ebens admitted the physical facts but claimed that he was not motivated by Chin's race or national origin.  *Id.* at 1428.  The government introduced testimony about the defendant's use of the word "n****r" eight years prior to the crime being charged to show "that Ebens generally was possessed of a bigoted mind and that he therefore possessed the requisite intent."  *Id.* at 1432.  We found this evidence "highly prejudicial to the rights of defendant Ebens," observing that "[i]t does not take much imagination to understand how such grossly biased comments would be viewed by the jury," "for nearly all citizens find themselves repelled by such blatantly racist remarks and resentful of the person claimed to have uttered them."  *Id.* at 1434.[10]  Or consider *United States v. Tocco*, where we held that allowing the jury to hear recordings by a defendant's co-conspirators such as "I think you might win up here [in Detroit] with a n[****] trial, n[****] jury" was unfairly prejudicial.  200 F.3d 401, 420 (6th Cir. 2000).[11]

The nature and content of the recordings in this case eclipses the objectionable evidence in *Ebens* and *Tocco*.  The jury heard over eight minutes of recordings.  Hazelwood and his companions make absurdly offensive remarks about African Americans and women and laugh along to a wrenchingly racist and misogynistic tune that they called the "greasy n****r song." Hazelwood uses the word "n****r" no less than seven times,[12] variations on "f**k" fourteen times, and "b***h" three times.  Lest the jurors harbor any doubt of who was saying what, the

---

[10]We also reversed because the comments were directed at someone of a different race and were substantially remote in time from the crime.  *Ebens*, 800 F.2d at 1433.  Furthermore, the government had not proven that Ebens was the individual who had made the slur.  *Id.*

[11]In *Tocco*, we held that the district court did not commit reversible error in refusing to strike the tapes of the co-conspirators' comments because while "unfairly prejudicial, the "denigrating comments . . . were only a very minor portion of the total discussion on the tapes."  *Tocco*, 800 F.2d at 200. We "advis[ed]" that striking the objectionable portions would have been prudent.  *Id.*

[12]Then-Judge now-Justice Kavanaugh commented that "[n]o other word in the English language so powerfully or instantly calls to mind our country's long and brutal struggle to overcome racism and discrimination against African-Americans."  *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013) (Kavanaugh, J. concurring).

jurors were also allowed to read along while the tapes were played. The timing for playing the recordings did not help matters. The recordings were the first evidence the jurors heard after a month-long recess over the holidays. During that time the court's decision to admit the recordings generated "a lot of media coverage." And, ironically enough, the district court instructed the jury that, in deciding whether Hazelwood would engage in conduct likely to endanger Pilot, it should focus exclusively on the offensive nature of the recordings (but then somehow airbrush that image of Hazelwood when it came time to convict him).

The government endorses this paradoxical line of reasoning. It argues that "the offensive nature of Hazelwood's conduct is *why* the evidence has such high probative value, *i.e.*, because the conduct at issue was of such magnitude that, if discovered or known to the public at that time, it would likely have placed Pilot in jeopardy." But (again setting aside the fact that Hazelwood's conduct at the lake house meeting was not intended to be discovered by the public and was not known by the general public until this trial) the recordings, were also "of such magnitude" that the "reverberating clang" of Hazelwood's lurid, loathsome statements likely "drown[ed] out all weaker sounds" of the less interesting evidence of fraudulent fuel pricing. *See United States v. Stout*, 509 F.3d 796, 801 (6th Cir. 2007) (quoting *Shepard v. United States*, 290 U.S. 96, 104 (1933) (Justice Cardozo writing on common law evidentiary doctrine prior to the adoption of the Federal Rules of Evidence)).

The prejudicial effect of these recordings to all three defendants is obvious. As to Hazelwood, the fear is that the jury would judge him for being a bigot rather than defrauding customers of fuel discounts. The potential "spillover effect" on Wombold and Jones is also clear—that's why the district court gave a limiting instruction. *See Bruton v. United States*, 391 U.S. 123, 135–36 (1968) (recognizing the unique risk of spillover prejudice that occurs when a jury is exposed to "powerfully incriminating" extrajudicial statements of a co-defendant "who stands accused side-by-side with the defendant" as part of a joint trial). Wombold was at the lake house for both the meeting and after party. The jury heard a recording from the daytime hours in which Wombold, Freeman, and Mosher planned the training session on manual rebates. Although the government scrubbed his voice from the evening recordings and listed certain individuals as "UNIDENTIFIABLE VOICE" on the transcripts, that didn't eliminate the risk that

the jury would judge him for silently endorsing the language by association or believing that he was the unidentified speaker. *See Gray v. Maryland*, 523 U.S. 185, 193 (1998).

Jones was also harmed by association. She worked directly for Mosher, who was heard on the recordings referring to the "Greasy N****r" song as "the best s**t [he had] ever heard." Before the government played the offensive recordings, Jones's attorney cross-examined Mosher at length with the goal of demonstrating that Jones reasonably believed that Mosher would not direct her to do something illegal. Mosher's (and Hazelwood's) offensive statements heard on the recordings impaired Jones's defense that she worked in a wholesome, family environment and thus reasonably trusted Mosher's instructions. The offensive recordings portray a disgraceful corporate culture from the top down. And because the manual-rebate scheme was framed as a broad conspiracy within the direct-sales division of the company, damage to Pilot was likely to reverberate against any direct-sales employee charged with participating in the scheme.

Additionally, we are not persuaded that the district court's limiting instruction eliminated the risk that the jury would misuse the offensive recordings. *See Asher*, 910 F.3d at 862 (stating that "sometimes evidence is so prejudicial that the risk of a jury's improper use of the evidence cannot be quashed by a judge's instructions"); *Jenkins*, 593 F.3d at 486 ("Even when properly instructed to consider the evidence only for some legitimate purpose—as the jury was instructed here—the danger is obvious that the jury will treat it as propensity evidence instead."). As noted above, the limiting instruction failed to clearly articulate any proper use of the recordings (because there was none), which only compounded the risk of misuse.[13]

The district court abused its discretion by declining to exclude the offensive recordings under Rule 403.

*Harmless Error.* Finally, we must evaluate the effect of the erroneously admitted evidence. "The admission of inadmissible prior-act evidence is harmless 'if the record evidence

---

[13]The district court also erred in failing to consider the availability of other means of proof. *See Asher*, 910 F.3d at 861 (citing *Old Chief*, 519 U.S. at 184). The government could have "rebutted" any suggestion that Hazelwood was a "good businessman" by asking Welch and Mosher about Hazelwood's reputation in the company and left it at that.

of guilt is overwhelming, eliminating any fair assurance that the conviction was substantially swayed by the error.'"  *Asher*, 910 F.3d at 863 (quoting *United States v. Brown*, 888 F.3d 829, 836–37 (6th Cir. 2018)).

To give the government its due, it crafted a convincing tale of fraud supported by record evidence.  Hazelwood directly supervised Pilot's direct-sales division, and eight of his subordinates testified that they were engaged in a scheme to defraud some of Pilot's customers.  Hazelwood and Mosher discussed the manual-rebate scheme at least three times.  Mosher showed Hazelwood spreadsheets setting out the additional profits generated from the fraud.  Hazelwood was kept apprised of the ongoing fraud through weekly trip reports.  Hazelwood joked about introducing a new hire to "a guy by the name of Manuel," which was the play on the words "manual rebate" that coconspirators used to refer to defrauding customers.

The jury heard that Wombold attended meetings with Hazelwood to review subordinates' profit and loss statements.  Mosher brought his manual-rebate spreadsheets to these meetings.  Wombold was present at the lake house meeting and helped select Mosher to teach the manual-rebate scheme at the upcoming all-staff meeting.  At that training session, Wombold told a new hire to "get [his] mind comfortable with" what Mosher was teaching.

And the jury heard that Jones repeatedly followed instructions from Mosher to fraudulently reduce rebates to customers.  During the November 2012 all-staff meeting, when Mosher explained the manual-rebate scheme, Jones commented: "And to the point of [the customers] not knowing, . . . very few of 'em actually ask for backup.  I would say less than 10%."

But the government's evidence was not ironclad.  Defendants presented evidence that the manual rebates were a legitimate sales tool, and that Pilot could legally change discounts under certain circumstances, such as when a customer failed to purchase a minimum agreed-upon fuel amount.  Thus, at least as to Hazelwood, many of the fraudulent invoices could have appeared legitimate, especially to a busy top-level executive who is not tasked with scrutinizing them.

There is also the split verdict as to all three defendants.  In addition to demonstrating the jury's valiant effort to properly perform its role as factfinder, it shows that the evidence was not

overwhelming.  Wombold was convicted on only one count of seven charged.  Jones was acquitted of four counts of wire fraud yet convicted on the conspiracy count.

Finally, we must play our part.  It is not our function to determine the defendants' guilt or innocence, or "speculate upon probable reconviction."  *Kotteakos v. United States*, 328 U.S. 750, 763 (1946).  Our proper role is to assess "what effect the error had or reasonably may be taken to have had upon the jury's decision.  The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting."  *Id.* at 764.  And,

> if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.  The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error.  It is rather, even so, whether the error itself had substantial influence.  If so, or if one is left in grave doubt, the conviction cannot stand.

*Id.* at 765.  That is this case.  The profoundly racist and sexist content of these recordings is so antithetical to the sensibilities of decent people, that we are "left in grave doubt" that anyone could scrub all traces clean from one's mind regardless of the quantum of evidence presented.  These convictions also cannot stand.

### III.

Accordingly, we reverse the convictions of Hazelwood, Wombold, and Jones and remand this matter for a new trial.

———————————

## DISSENT

———————————

BERNICE BOUIE DONALD, Circuit Judge, dissenting.  At issue here is the district court's admission of three recordings made on October 25, 2012, at the lake house of a Pilot sales employee.  The majority concludes that the district court abused its discretion in admitting the recordings because no Federal Rule of Evidence supports their admission and Rule 403 favors their exclusion given that the risk of unfair prejudice substantially outweighs any probative value of the evidence.  I disagree.

## I.

As an initial matter, it is useful for this Court to properly characterize the nature of the testimony elicited that serves as the government's basis for introducing the three recordings.  The testimony elicited concerning "good business judgment" was not testimony concerning morality or ethics; "good," here, is synonymous with "intelligent and sensible" from a business perspective, as opposed to stupid and dumb.  To demonstrate this point, one need look no further than the relevant record testimony.  On cross-examination, Hazelwood's counsel asked, "[c]an you explain why . . . it was a good approach to be doing th[e fraud scheme] when it represented such a small percentage of your overall business," to which the witness answered, "I can't give you any reason why it was a good idea.  I don't think it was a good idea."  Counsel further asked, "if you want to continue to build and grow a company and make more and more money down the line, would you agree with me that it is incredibly *stupid and dumb, from a business standpoint*, to take a small portion of your business and be lying to customers and taking the chance of everything coming down," to which the witness stated, "I agree."  Moreover, after eliciting witness testimony that Hazelwood, for the most part, was a good businessman, counsel for Hazelwood asked, "[w]ould you agree that if you knew this was going on, allowing it is a *dumb business decision*," to which the witness agreed.  Referencing the above and Webster's Dictionary, it is apparent that the testimony elicited parallels the inquiries posed and that "good," at least here, means intelligent and sensible, as opposed to stupid or dumb.  *Stupid*, Merriam-Webster,  https://www.merriam-webster.com/dictionary/stupid  (last accessed Sept. 8, 2020)

(noting that "stupid," as used here, is defined as "given to unintelligent decisions or acts," "lacking intelligence or reason," or "marked by or resulting from unreasoned thinking or acting" and is synonymous with "senseless, . . . unintelligent, [and] unsmart"); *Dumb*, Merriam-Webster, (last accessed Sept. 8, 2020) (noting that "dumb," as used here, is defined as "lacking intelligence" or "showing a lack of intelligence" and is synonymous with "stupid [or] dull").

## II.

We review a district court's evidentiary rulings for an abuse of discretion. *Paschal v. Flagstar Bank, FSB*, 295 F.3d 565, 576 (6th Cir. 2002). An abuse of discretion occurs when we are left with a "definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors" or "where [the trial court] improperly applies the law or uses an erroneous legal standard." *Huey v. Stine*, 230 F.3d 226, 228 (6th Cir. 2000) (quotation omitted) (first quoting *Balani v. INS*, 669 F.2d 1157, 1160 (6th Cir. 1982); then quoting *Gaston Drugs, Inc. v. Metro. Life Ins. Co.*, 823 F.2d 984, 988 (6th Cir. 1987)). "In reviewing the trial court's decision for an abuse of discretion, the appellate court must view the evidence in the light most favorable to its proponent, 'giving the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value.'" *United States v. Schrock*, 855 F.2d 327, 333 (6th Cir. 1988) (quoting 1 J. Weinstein & M. Berger, Weinstein's Evidence para. 403[03] (1982)).

## III.

## A.

I do not find that the district court abused its discretion in holding that the three recordings are relevant under Rule 401, favoring their admissibility. Fed. R. Evid. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Each piece of evidence presented need not directly prove or disprove an element of an offense; the evidence only need be "a step on one evidentiary route to the ultimate fact." *See Old Chief*, 519 U.S. at 179.

The majority's analysis, however, does not appropriately embody and apply these legal rules. Instead, the majority states that the recordings are not relevant because they do not go to any elements of wire or mail fraud, as charged in the indictment, and do not rebut Hazelwood's argument that he was a "good businessman" since bad personal beliefs do not make it more likely that Hazelwood committed the charged offenses. The majority fails to fully realize, however, the intended and actual effect of the testimony elicited by Hazelwood's counsel, the government's mode of responding to that testimony, and ultimately the relevancy of the recordings. In short, the testimony elicited was counterevidence and a defense for Hazelwood to the allegations in the indictment. Defendant Hazelwood presented evidence that he was too good a businessman to participate in or acquiesce to the charged fraudulent scheme because the fraud posed little benefit to the company but great risk to Pilot's business. By putting such purported facts before the jury as a defense, Hazelwood made his business judgment a fact of consequence in determining the action.

This leads to the question of whether the recordings offered by the government are relevant to Hazelwood's good business judgment. The majority concludes they are not—that the recordings only show Hazelwood's "seriously misguided personal beliefs" and that "[h]aving a bad set of personal beliefs did not make it more likely that Hazelwood made bad business decisions, like committing wire or mail fraud." Even setting aside any conceptual and practical difficulties of the proposition that the recordings contain purely personal beliefs and that said personal beliefs, which attach to and follow a person, do not, or could not, surface and have bearing on the same person's business decisions, the majority unfairly characterizes the context of the lake house recordings and misses the government's means of countering the testimony elicited by Hazelwood.

The majority persuasively writes that Hazelwood's comments were not made "in public" but "after hours, during a private corporate treat, with trusted corporate compadres." The meeting, however, was no more private or personal than any other business meeting or retreat held open to a company or certain employees of a company; it certainly was not a vacation or event of pure leisure and recreation. Moreover, the presence of leisure, recreation, or other informalities or practices (like the use of profanity and the consumption of alcohol) does not

necessarily turn a business retreat into something more akin to a vacation. The record reflects that such informalities in the conducting of business were not unheard of within Pilot, particularly in meetings with upper management, as explicitly shown through the lake house meeting. Important here is that the company retreat was, in effect, a business meeting held at the lake house of a Pilot sales employee, attended by a number of direct sales employees only, and instituted for the express purpose of conducting a Pilot management meeting and planning a larger sales meeting and training. Despite the use of profanity and jokes, the consumption of alcohol, or the playing of music and sports entertainment, the attendees of the meeting conferred and otherwise communicated about Pilot's future training efforts, sensitivity training, human resources department, board, and the like, throughout. Moreover, Hazelwood was the company president while the other attendees were his subordinates, and, as the record reflects, Hazelwood's presence, statements, and actions served as significant indicia of acceptable conduct to these subordinates.

As noted by both the government and the district court, then, the government's argument is not that because Hazelwood holds racist or misogynist beliefs, he is the type to commit the fraudulent scheme alleged, *i.e.*, that because he makes bad personal decisions, he makes bad business decisions. The recordings were offered for a different reason. In the very least, if Hazelwood is willing to use racist, misogynistic, and otherwise inappropriate language when communicating with his subordinates at a company retreat held for the purpose of conducting business, as well as invite and condone the same statements and behavior by his subordinates, it makes the factual assertion elicited by Hazelwood that he was such a good businessman less probable. And if Hazelwood being a good businessman that would not put the company at great risk for little reward is relevant in that it tends to serve as one evidentiary step in concluding that he could not have committed the fraud, evidence that Hazelwood does not have the good business judgment purported, but bad business judgment, is relevant to rebutting that conclusion. Given that intelligence is not a character trait, it was reasonable for the district court to conclude that the evidence is not necessarily or primarily character evidence, and thus, was generally admissible as pure contradiction evidence. *United States v. Nixon*, 694 F.3d 623, 636 (6th Cir. 2012); *United States v. West*, 670 F.2d 675, 682 (7th Cir. 1982), *overruled on other grounds by*, *United States v. Green*, 258 F.3d 683 (7th Cir 2001).

B.

I also agree with the district court's alternative conclusion that, if the evidence was character evidence, it was admissible under Rule 404(a)(2). The majority, assuming business judgment is a character trait, contends the district court erred in admitting the recordings under Rule 404(a)(2)(A) because, "if Hazelwood 'opened the door' to a 'pertinent' trait, [it] was his business acumen, not his [] personal beliefs[,]" and the recordings "fail to rebut (in any meaningful way) the evidence" offered by Hazelwood. The majority further submits that the admission of the recordings did not comply with the form or the procedure required by Rules 404 and 405 because "character is not an 'essential element' of a charge or defense" here.

As noted by the majority, Rule 404 states that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1). The Rule, however, also provides exceptions for a defendant or victim in a criminal case. Specifically, "a defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it." Fed. R. Evid. 404(a)(2)(A). Rule 405 also concerns character evidence and states that "[w]hen a person's character or character trait is an essential element of a charge, claim, or defense, the character or trait may also be proved by relevant specific instances of the person's conduct." Fed. R. Evid. 405(b).

First, the evidence was offered in rebuttal of Hazelwood's pertinent trait of business judgment. As discussed in the above section concerning relevancy, it is improper to construe the recordings as only reflecting Hazelwood's personal beliefs. Hazelwood, as the company president, attended a business meeting held at the lake house of a Pilot sale employee, attended only by a number of direct sales employees that were Hazelwood's subordinates, as well as instituted for the express purpose of conducting a Pilot management meeting and planning a larger sales meeting and training. There is no clear demarcation demonstrating that the business meeting concluded during the time of the recordings, and the record reflects that Hazelwood's presence, statements, and actions served as significant indicia of appropriate conduct to Hazelwood's subordinates in attendance. Thus, these recordings reflect on and rebut Hazelwood's proffered good business judgment, an express allowance under Rule 404(a)(2)(A).

Regarding the majority's conclusion that the admission of specific instances of conduct here violated Rule 405 because the pertinent trait was not an essential element of a charge or defense, I disagree.  Again, as alluded to in the above sections concerning relevancy, Hazelwood elicited opinion testimony that he was too good of a businessman to risk the company by participating or acquiescing in such a high risk scheme for low rewards as alleged in the fraud. In short, Hazelwood argued that he could not have participated in the alleged wire and mail fraud because, as a good businessman, he would never possess the requisite intent to defraud required by a mail or wire fraud charge.  That is a defense to the charged fraudulent conduct, because intent, namely the intent to defraud, is an essential element of wire and mail fraud; specifically, Hazelwood effectively lodged a good-faith defense, which seeks to demonstrate a lack of the requisite intent.  *United States v. Louper-Morris*, 672 F.3d 539, 556 (8th Cir. 2012) ("Intent is an essential element of both wire fraud and mail fraud."); *United States v. Smith*, 13 F.3d 1421, 1425-26 (10th Cir. 1994) (noting a good-faith defense seeks to demonstrate a lack of the requisite intent required under the applicable law).  If the jury fully believed the testimony elicited by Hazelwood, no reasonable jury would convict Hazelwood of wire or mail fraud based on a finding that he possessed the requisite intent because Hazelwood, as a good businessman who only makes sound business decisions and would never risk the business with inappropriate practices or efforts, would always be operating in good-faith.  *United States v. French*, 748 F.3d 922, 938 (9th Cir. 2014) (noting that the good faith of a defendant is a complete defense to wire and mail fraud because good faith is inconsistent with the intent to defraud required by such offenses); *United States v. Clark*, 377 F. App'x 451, 460 (6th Cir. 2010) ("[I]n determining whether evidence of [Hazelwood]'s character was an 'essential element' of this defense, '[t]he relevant question should be: would proof . . . of the character trait by itself actually satisfy an element of the . . . defense?'") (quoting *United States v. Keiser*, 57 F.3d 847, 856 (9th Cir. 1995); *see also Smith*, 13 F.3d at 1425-26 ("[T]he essence of the defense is that the evidence presented by the defendant, if believed by the fact finder, would completely rebut evidence that he or she intended to defraud."); *cf. United States v. Wilhoite*, No. 16-6581, 2017 U.S. App. LEXIS 28003, at *7 (6th Cir. May 19, 2017).  Thus, if the government's evidence is character evidence, it was properly admitted under Rule 405, as it goes to an essential element of Hazelwood's defense.

### C.

I also find that the district court did not abuse its discretion when it alternatively ruled that the recordings were admissible under Rule 404(b). The majority takes issue with this basis, reasoning that the government's evidence was not offered for an admissible purpose but instead improperly invited the jury to rule based on propensity. According to the majority, the government's propensity evidence specifically aims to "us[e] another act (racist and misogynist language)[] to prove that Hazelwood had a character trait (recklessness), such that on a particular occasion he acted in accordance with that character trait (by committing fraud)." The majority, however, recharacterizes the purpose for which the evidence is offered, unfairly ignoring the proffered justification of the evidence and that evidence admitted under 404(b)(2) can often be construed as a propensity argument.

Under Rule 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Notably, this list of permissible purposes is "illustrative, not exclusive," allowing for the admission of such evidence for other purposes not enumerated. *United States v. Johnson*, 634 F.2d 735, 737 (4th Cir. 1980); *see also United States v. Blankenship*, 775 F.2d 735, 739 (6th Cir. 1985). There are three parts to our inquiry under Rule 404(b): (1) "a preliminary determination as to whether sufficient evidence exists that the prior act occurred"; (2) "a determination as to whether the 'other act' is admissible for a proper purpose under Rule 404(b)"; and (3) a determination of "whether the 'other acts' evidence is more prejudicial than probative under Rule 403." *United States v. Mack*, 258 F.3d 548, 553 (6th Cir. 2001). Regarding the second requirement, past acts must be "substantially similar and reasonably near in time" to the offenses for which the defendant is being tried. *United States v. Carter*, 779 F.3d 623, 625 (6th Cir. 2015); *Mack*, 258 F.3d at 253-54; *see Blankenship*, 775 F.2d at 739. The past bad act "need not duplicate exactly the instant charge, but need only be sufficiently analogous to support an inference" consistent with the

purpose for which the evidence is being offered.  *See United States v. Benton*, 852 F.2d 1456, 1468 (6th Cir. 1988).

First, there is sufficient evidence in the record, through testimony and the recordings themselves, demonstrating that the statements and events depicted in the recordings, in fact, occurred.  No party suggests otherwise.

Second, the recordings are admissible for a proper purpose under Rule 404(b).  The majority improperly recharacterizes the purpose of the proffered evidence by reasoning that the evidence could only be construed as offered for a propensity purpose and is thus inadmissible. They ignore, however, that evidence admitted under Rule 404(b)(2) can often be characterized as having a propensity purpose.  *Mullen v. Princess Anne Volunteer Fire Co.*, 853 F.2d 1130, 1133 (4th Cir. 1988) ("The principle is well-established that prior acts and statements should be admitted where necessary to show state of mind.  This is the policy reflected in Fed. R. Evid. 404(b), under which evidence of prior bad acts which would otherwise be inadmissible may be introduced to show intent, motive, knowledge, and the like."); *Johnson*, 634 F.2d 737-38 ("[T]h[e] defendant may be considered in effect to have forfeited any protection that the first sentence of . . . Rule [404(b)] might otherwise have provided against the type of 'other act' evidence here challenged.").  That, however, is not the question before us.  We are concerned with whether the "other act" is admissible for some proper purpose.

I find that the evidence was, indeed, admitted for a proper purpose.  As found by the district court, submitted by the government, and discussed above, the recordings serve to "contradict[] and rebut[] facts of consequence upon which [Hazelwood] constructs his defense." Use of such evidence to rebut a defense is a proper purpose under Rule 404(b)(2).  For example, in *United States v. Johnson*, a tax evasion case, extrinsic evidence of a defendant doctor's overstated Medicaid billings were properly admitted under Rule 404(b) to rebut the defendant's defense depicting that she lacked the state of mind requisite to guilt of the offense charged.  634 F.2d at 736-37.  The court, emphasizing the delicacy of the discretionary rulings the Rule's administration may require, reasoned that despite Rule 404(b)'s prohibition on admitting evidence of "other acts" for propensity purposes, such evidence is properly admitted where the acts are "critical to proof on a dispositive issue related to a defendant's state of mind."  *Id.* at

737-38 ("Particularly where, as here, a defendant in a criminal case by h[is] own testimony and that of others has deliberately sought as the primary means of defense to depict herself as one whose essential philosophy and habitual conduct in life is completely at odds with the possession of a state of mind requisite to guilt of the offense charged, that defendant may be considered in effect to have forfeited any protection that the first sentence of the Rule might otherwise have provided against the type of 'other act' evidence here challenged.").

The same reasoning, then, applies here. Again, Defendant Hazelwood, through the testimony of others, "sought as a primary means of defense to depict h[im]self as one whose essential [business judgment, being so good,] is completely at odds with the possession of a state of mind requisite to guilt of" wire or mail fraud. In response, the government sought to introduce extrinsic evidence of recordings rebutting the proffered defense by showing Hazelwood engaging in and promoting racist, sexist, and otherwise inappropriate talk and entertainment as well as allowing and encouraging his subordinates to do the same, all at and during a company meeting where business decisions and perspective were had.

Moreover, the acts depicted in the recordings are "substantially similar and reasonably near in time to the offenses for which Hazelwood is being tried." The acts are substantially similar because both the fraud scheme and the recordings depict "bad or unintelligent business decisions" that, if made, put Pilot's business publicly at risk. Although the majority contends that the recordings are not probative of any of the issues in this case because nothing indicates that Hazelwood had reason to expect that his comments would become public, and thus, nothing in the recordings speaks to Hazelwood's concern for Pilot's reputation, that is not true. As an illustration, one need only compare the fraudulent scheme alleged to that depicted in the lake house recordings. The fraudulent scheme, as alleged, was not a scheme to which Pilot's customers or the public were made privy; instead, only some of the employees at Pilot were aware of the scheme, and if the customers and public were to learn of the scheme, it would not be through Pilot's use of its formal channels of notice. Moreover, the scheme was something that, if made public, which was a risk given that the practice was known by and adopted by multiple Pilot employees and had an effect in the public sphere, would jeopardize Pilot's business because of the egregiousness of the scheme and its effects.

The same may be said about the lake house recordings.  The practices and judgment reflected in the recordings were not something that Pilot's customers and the public were made aware of; only some of the employees possessed knowledge of as much, and if said practices and judgment were to be discovered by the public, it would not be through Pilot's use of formal channels of notice.  Even more, just like the fraudulent scheme, Hazelwood and Pilot had no reason to doubt the serious risk that the public would become aware of the recordings and their content, as the recordings reflect Hazelwood, the President of Pilot, and his subordinates, systematically adopting and condoning egregious business practices and perspectives extending from the top to the bottom of Pilot's sales department and corporate structure.  Neither the majority nor Hazelwood can justly contend that such facts were not at risk of becoming public.  Not only does Pilot serve a business function to the public (including truckers) that cannot be conceptually or practically divorced from its business judgment (and any risks flowing therefrom) in conducting that business, but mere knowledge by a number of Pilot employees posed a sufficient risk to the company that the information would be made public.  Indeed, the commonplace whistleblower claim concerns an employee who calls out their employer's bad business judgment, practices, or the like.  And given the apparent egregiousness of the recordings, it is no leap to conclude that the disclosure of such to the public here risked Pilot's business just like the fraud scheme.  Indeed, if the government did not seek to introduce an egregious act that risked bringing the company down if discovered, similar to the risk posed by the alleged fraud, the evidence would be less relevant and more likely subject to exclusion.

Further, the recordings are reasonably near in time to the alleged mail and wire fraud.  Most notably, the recordings were made during the span of the conspiracy and, in fact, on the same day as other conversations admitted as proof of the conspiracy below (without regard to whether those conversations occurred before or after Hazelwood's arrival to the lake house).

Third, the danger of unfair prejudice does not bar admission of the evidence under Rule 403, as detailed below.

### D.

Lastly, I do not find that the district court abused its discretion in determining that the recordings were admissible after application of Rule 403's balancing test, as the probative value of the evidence is not substantially outweighed by the risk of unfair prejudice.  The majority, however, disagrees with the district court's determination.  After submitting that the recordings pose zero relevance here, a point already refuted, the majority concludes that any relevance is substantially outweighed by the risk of unfair prejudice since no person can avoid forming a negative opinion of a person who holds and heartily expresses such views.  The majority cites case law and further justifies its position by asserting that the nature and content of the recordings—racism, misogyny, and otherwise inappropriate statements heard echoed for centuries now—likely overpowered the "less interesting evidence of [a multimillion-dollar] fraudulent fuel pricing" scheme by a multibillion-dollar company operating throughout North America.  In short, the majority appears to suggest that the evidence presents an undue risk that the jury will reach a verdict based on emotions rather than evidence and that the risk substantially outweighs any probative value of the evidence.

Regardless of the relevancy of evidence, any evidence may be excluded under Rule 403 "if its probative value is substantially outweighed by a danger of . . . unfair prejudice."  Fed. R. Evid. 403.  Given that virtually all evidence is prejudicial in the sense that it prejudices the party against whom it is admitted, the Rule 403 inquiry assesses the risk of *unfair* prejudice—that is, to consider the "undue tendency to suggest a decision based on improper considerations."  *Asher*, 910 F.3d at 861 (quoting *Bilderbeck*, 163 F.3d at 978); *United States v. Dumas*, No. 87-1337, 1987 U.S. App. LEXIS 16905, at *6 (6th Cir. Dec. 30, 1987); *see also United States v. Archuleta*, 737 F.3d 1287, 1293 (10th Cir. 2013).  This can happen when, for example, "the prior-act evidence so shocks the conscience that the jury may decide that the defendant is a bad person and deserves to be convicted, even if his guilt were unproven in the instant case, 'because a bad person deserves punishment.'"  *Asher*, 910 F.3d at 861-62 (quoting *Old Chief*, 519 U.S. at 181).  In determining whether to exclude on grounds of unfair prejudice, "consideration should be given to the probable effectiveness or lack of effectiveness of a limiting instruction."  Fed. R. Evid. 403, advisory committee's note.  "The availability of other means of proof may also be an

appropriate factor." *Id.*  Ultimately, Rule 403 strongly favors the admission of evidence and affords the district court very broad discretion in making the determination. *Asher*, 910 F.3d at 860 (noting that "[t]he test is strongly weighted toward admission"); *United States v. Hawkins*, 969 F.2d 169, 174 (6th Cir. 1992).

It is not in contention that such grossly biased comments as depicted in the recordings present a risk of unfair prejudice, given the emotionally charged nature of the evidence. *Ebens*, 800 F.2d at 1433-34; *Mullen*, 853 F.2d at 1134.  That, however, does not mean that racist and sexist comments by a defendant should usually be excluded under Rule 403, as courts routinely admit such evidence. *United States v. Cottman*, 807 F. App'x 204, 216 (4th Cir. 2020) (discussing cases); *Mullen*, 853 F.2d at 1134 ("The emotional content of evidence, however, can 'require exclusion only in those instances where the trial judge believes that there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence.'" (quoting *Morgan v. Foretich*, 846 F.2d 941, 945 (4th Cir. 1988))).  The majority's citation to case law to show otherwise is inapposite.  The majority first cites *United States v. Ebens*, where the defendant beat a person of Chinese descent to death and was charged with a civil rights violation.  800 F.2d at 1425.  The government introduced testimony that, eight or nine years earlier, a man with the same first name, hair color, and approximate height as the defendant had used racial slurs to an African American man and pressured the man to leave a bar. *Id.* at 1432-33.  Although the district court admitted evidence of this prior bad act, the appeals court reversed based on a finding that the testimony was too remote in time from the crime of conviction, the prior alleged racism was against a different race, and the identification of the defendant as the man who uttered the slurs was too indefinite to be probative. *Id.* at 1433-34.  Notably, the evidence was not subject to exclusion merely based on the offensiveness of the language, as the majority suggests.  Indeed, any inherent offensiveness of the language was not a significant concern to the court as evidenced by its statement that, apart from the closeness in time and similarity issues, there was a strong case for admission.  The majority tries to bolster the same point with *United States v. Tocco*, 200 F.3d 401 (6th Cir. 2000).  However, the portion of *Tocco* cited does not even concern, or at least properly effectuate, the Rule 403 analysis for purposes of determining the admissibility of similar evidence, as there is no discussion of whether the evidence's probative

value is substantially outweighed by unfair prejudice. Thus, the majority's contention that the inherent offensiveness of that contained in the recordings renders it inadmissible under Rule 403 is without merit.

Given that the recordings are not *per se* inadmissible and are probative here (as discussed in the above sections concerning the relevancy and purpose of the evidence), we must compare the value of the evidence to the risk of unfair prejudice presented by it.

Although admittedly a close question, I am not left with the "definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors" or "where [the trial court] improperly applies the law or uses an erroneous legal standard." *Huey*, 230 F.3d at 228 (quotation omitted) (first quoting *Balani*, 669 F.2d at 1160; then quoting *Gaston Drugs, Inc.*, 823 F.2d at 988). This is particularly true in light of the fact that "[i]n reviewing the trial court's decision for an abuse of discretion, [we] must view the evidence in the light most favorable to its proponent, 'giving the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value.'" *Schrock*, 855 F.2d at 333 (quoting 1 Weinstein & Berger para 403[03]).

To show that any probative value of the evidence here is substantially outweighed by the risk of unfair prejudice, the majority cites *United States v. Stout* for the proposition that where a prior bad act is more lurid or interesting than the charged offense, the evidence is unfairly prejudicial. 509 F.3d 796. The majority contends *Stout* is relevant and controls here. Although *Stout* may be distinguishable, as a child pornography case, and the validity of the proposition espoused therein in conflict with existing precedent, *see Stout*, 509 F.3d at 801-02; *id.* at 806-07 (McKeague, J. dissenting) (countering the majority's "more lurid or interesting" argument and highlighting its conflict with existing precedent), the factual underlying assertion that the contents of the recordings are more offensive than the fraud scheme, if not inaccurate, is subject to reasonable disagreement. Racism, misogyny, and bigotry are not new, but centuries old, and unfortunately, common in the conscious or unconscious minds of the masses. To say that such dispositions are more lurid or interesting than a multimillion-dollar fraud scheme instituted and condoned by the executives of a national, multibillion-dollar trucking company, at least in today's time, is questionable. Given the societal prevalence of that depicted in the recordings,

the weight of the prejudicial effect of admitting the recordings, then, is also questionable.  *See Wilson v. Aliceville*, 779 F.2d 631, 635 n.3 (11th Cir. 1986) ("If the term is indeed a part of everyday parlance . . . , we wonder how its use can be so prejudicial as to warrant its exclusion.").  Certainly, this Court cannot determine that the same demands a finding that the district court abused its discretion and that reversal of the evidentiary decision is required.

We may also consider the availability of other means of proof in considering Rule 403's balancing inquiry.  Appellants do not argue on appeal that there are other means of proof, as a substitute to the recordings, that the government could have used here.  The majority suggests, however, that the government could have rebutted any suggestion that Hazelwood was a "good businessman" by asking the very opinion witnesses that testified Hazelwood was a "good businessman" to testify as to Hazelwood's reputation in the company.  That, however, makes no sense.  Apart from inviting an objection for such questions being asked and answered or inviting cumulative evidence, the government already knew the witnesses' answers to such questions and those answers were inconsistent with the government's theory of the case.

It bears noting, as to this factor, that it "is well-established that prior acts and statements should be admitted where necessary to show state of mind."  *Mullen*, 853 F.2d at 1133; *see* Fed. R. Evid. 404(b); *see also United States v. Beahm*, 664 F.2d 414, 417 (4th Cir. 1981) (holding that the potential importance of evidence showing state of mind is properly weighed in the Rule 403 balance).  Even more, when considering requisite mental states, the Supreme Court notes that "there will seldom be 'eyewitness' testimony as to . . . mental process[es]."  *Mullen*, 853 F.2d at 1133 (quoting *USPS Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983) (stating as much in a case lodging discrimination claims against an employer, where the employer's requisite state of mind was relevant); *see Tucker v. Palmer*, 541 F.3d 652, 660 (6th Cir. 2008) (noting the difficulty of proving a defendant's state of mind).  The recordings were offered, and by all reasonable appearances necessary, to rebut the defense lodged by Hazelwood that he lacked the requisite state of mind to have committed the charged offenses.  The whole of this factor, then, favors admission.

The district court's use of a limiting instruction also favors a finding of admissibility of the recordings.  Highlighting the jury's responsibilities in the case, the district court instructed

the jury that the recordings and the government's related questions were in response to evidence elicited during the cross-examination of witnesses by counsel for Hazelwood only and were pertinent only to whether Hazelwood "was a good businessman and an excellent company president [] and whether, in those roles, [he] would engage in conduct that risked" the company. The court reiterated that the evidence does not go to any elements of the offense but was rebuttal evidence to other evidence presented. The court also instructed the jury to not use the evidence by itself to decide that Hazelwood is guilty of the offenses charged and to "not use th[e] evidence for any other purpose," including "not [to] consider th[e] evidence at all with respect to Defendant[s] Scott Wombold [and] Heather Jones," as the evidence "pertains only to . . . Hazelwood.[1]

Finally, it is worth noting that the jury returned a verdict in favor of each Defendant, favoring admission of the evidence here. "If the unfairly prejudicial effect of the . . . evidence had been substantial, the jury would have likely found against Defendants on all the claims," especially if, as the majority suggests, no jury member could avoid being unduly influenced by the recordings. *Paschal*, 295 F.3d at 580-81. The jury, of course, did not find as much, instead finding that each Defendant was not guilty of at least one or more of the charged offenses. This factor, then, favors admissibility of the evidence.

"Jury trials are not antiseptic events, and in [certain cases], upsetting facts may well emerge." The Court's job, under the highly-deferential standard of review applicable here, is to "view the evidence in the light most favorable to its proponent, 'giving the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value.'" *United States v. Schrock*, 855 F.2d 327, 333 (6th Cir. 1988) (quoting 1 Weinstein & Berger para. 403[03]); *see also Cavin v. Mich. Dep't of Corr.*, 927 F.3d 455, 461 (6th Cir. 2019). Doing so here does not result in a "definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors" or "where [the trial court] improperly applies the law or uses an erroneous legal standard." *Huey*, 230 F.3d

---

[1]The instruction as to Defendants Wombold and Jones was particularly strong here. If juries cannot follow an instruction to "not [to] consider th[e] evidence at all with respect to [these] Defendant[s]," because the evidence "pertains only to . . . Hazelwood," it is hard to see how such evidence, at least in a criminal conspiracy case such as this one, could ever serve as evidence in the lawsuit.

at 228 (quotation omitted) (first quoting *Balani*, 669 F.2d at 1160; then quoting *Gaston Drugs, Inc.*, 823 F.2d at 988).  Although the circumstance here may present a close call, one that even reasonable minds could disagree on, that fact does not require reversal.  *See Innovation Ventures, LLC v. N2G Distrib.*, 763 F.3d 524, 544 (6th Cir. 2014).  What matters here is that the evidence was relevant, as rebuttal evidence; properly admitted in substance and form, even if it is character evidence or risks findings based on propensity; and the probative value of the evidence is not substantially outweighed by the risk of unfair prejudice.  For these reasons, I dissent.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Nos. 18-6023/6101/6102

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

    v.

MARK HAZELWOOD (18-6023); HEATHER JONES (18-6101); SCOTT WOMBOLD (18-6102),

    Defendants - Appellants.

**FILED**
Oct 14, 2020
DEBORAH S. HUNT, Clerk

Before:  SUHRHEINRICH, DONALD, and MURPHY, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the convictions of Mark Hazelwood, Heather Jones, and Scott Wombold are REVERSED, and the case is REMANDED to the district court for a new trial.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk