## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE AT KNOXVILLE

UNITED STATES OF AMERICA,

Plaintiff,

v.

MARK HAZELWOOD, et al.,

Defendants.

No. 3:16-CR-20
(Collier/Guyton)

**Oral Argument Requested**

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MARK HAZELWOOD'S MOTION TO DISQUALIFY

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND .................................................................................... 2

    A.    The Trial ........................................................................................... 2

    B.    The Court's Rulings During Trial and Before Sentencing .................... 3

    C.    The Court's Rule 33 Decision ............................................................ 4

    D.    The Court's Unfounded Conclusions at Sentencing ............................. 5

    E.    The Court Reversed its Finding on Danger to the Community ............. 7

    F.    The Sixth Circuit Reversed Mr. Hazelwood's Conviction ................... 7

ARGUMENT ........................................................................................................ 8

II.    Recusal Is Required Under 28 U.S.C. § 455(a) .............................................. 8

    A.    Legal Standard .................................................................................. 8

    B.    The Court's Rulings After Being Exposed to the Recordings Create the
           Appearance of Bias, Warranting Recusal Under § 455(a) ................... 10

III.    Recusal Is Required Under 28 U.S.C. § 144 .................................................. 21

    A.    Legal Standard .................................................................................. 21

    B.    The Requirements of § 144 Have Been Met Here, Requiring Recusal ... 22

CONCLUSION ...................................................................................................... 24

CERTIFICATE OF SERVICE ................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Baker Group, L.C. v. Burlington N. & Santa Fe Ry. Co.*, 228 F.3d 883 (8th Cir. 2000)................ 8

*Bell v. Johnson*, 404 F.3d 997 (6th Cir. 2005).................................................................... 9, 16, 23

*Berger v. United States*, 255 U.S. 22 (1921)................................................................... 13, 14

*Chao v. USA Mining, Inc*., No. 04-cv-1, 2006 WL 2346279 (E.D. Tenn. Aug. 11, 2006)........... 23

*Fairley v. Andrews*, 423 F.Supp.2d 800 (N.D. Ill. 2006) ................................................ 19, 20

*In re Martinez-Catala*, 129 F.3d 213 (1st Cir. 1997) .............................................................. 23

*In re Nat'l Prescription Opiate Litig.*, No. 19-3935, 2019 WL 7482137 (6th Cir. Oct. 10, 2019)
............................................................................................................................................ 10

*In re Schools Asbestos Litig.*, 977 F.2d 764 (3d Cir. 1992)..................................................... 9

*In re United States*, 441 F.3d 44 (1st Cir. 2006) ............................................................. 9, 20

*In re United States*, 572 F.3d 301 (7th Cir. 2009) .................................................................. 19

*Kotteakos v. United States*, 328 U.S. 750 (1946)................................................................... 8

*Liljeberg v. Health Services Acquisition Corp.*, 486 U.S 847 (1988) ....................................... 9, 10

*Liteky v. United States*, 510 U.S. 540 (1994) ........................................................... passim

*Mims v. Shapp*, 541 F.2d 415 (3d Cir. 1976)........................................................... 21, 22, 24

*Nichols v. Alley*, 71 F.3d 347 (10th Cir. 1995) .................................................................. 13

*Parker v. Connors Steel Co.*, 855 F.2d 1510 (11th Cir. 1988) .................................................... 19

*Roberts v. Bailar*, 625 F.2d 125 (6th Cir. 1980).......................................................... passim

*Smith v. Berg*, 247 F.3d 532 (3d Cir. 2001) ........................................................................... 14

*United States v. Antar*, 53 F.3d 568 (3rd Cir. 1995)........................................................ 14, 16, 20

*United States v. Bibbins*, No. 06-CR-38, 2006 WL 2290466 (E.D. Tenn. Aug. 8, 2006)............. 23

*United States v. Bobo*, 323 F.Supp.2d 1238 (N.D. Ala. 2004) .................................................. 24

*United States v. Edwardo-Franco*, 885 F.2d 2002 (2d Cir. 1989) ................................................ 19

*United States v. Furst*, 886 F.2d 558 (3d Cir. 1989) ............................................................... 21

*United States v. Hazelwood*, 979 F.3d 398 (6th Cir. 2020) ............................................. 8, 10, 12

*United Steakes v. Jordan*, 49 F.3d 152 (5th Cir. 1995)......................................................... 13

*United States v. Story*, 716 F.2d 1088 (6th Cir. 1983).................................................. 24

*United States v. Sykes*, 7 F.3d 1331 (7th Cir. 1993) ........................................................... 24

*United States v. Thompson*, 483 F.2d 527 (3rd Cir. 1973) ..................................................... 15, 16

*United States v. Townsend*, 478 F.2d 1072 (3d Cir. 1973) ..................................... 21, 22

*United States v. Troxell*, 887 F.2d 830 (7th Cir. 1989) ................................................ 20

**Statutes**

28 U.S.C. § 144 .............................................................................................. passim

28 U.S.C. § 455 .............................................................................................. passim

**Other Authorities**

Federal Judicial Center, *Recusal: Analysis of Case Law Under 28 U.S.C. §§ 455 & 144* (2002) ....................................................... 9, 22

Flamm, Richard E., *History of and Problems with the Federal Judicial Disqualification Framework*, 58 Drake L. Rev. 751 (2010) ........................................ 9

H.R. Rep 93-1453, 1974 U.S.C.C.A.N. 6351 ................................................... 9

Mark Hazelwood respectfully submits this memorandum of law in support of his motion to disqualify pursuant to 28 U.S.C. §§ 144 and 455(a).

## <u>PRELIMINARY STATEMENT</u>

The Court should recuse for two independent reasons: (1) a reasonable person, if aware of all the relevant circumstances, might question the Court's impartiality, *see* 28 U.S.C. § 455(a); and (2) a timely and sufficient affidavit shows a personal bias against Mr. Hazelwood. 28 U.S.C. § 144.

At the first trial, the government asked the Court to allow it to play tape recordings (the "Recordings") that were highly prejudicial to Mr. Hazelwood. As the Sixth Circuit ruled, these Recordings had no place in this fraud prosecution: they were irrelevant, they tainted Mr. Hazelwood in the minds of the jurors and any other person exposed to them, and they increased the likelihood that someone passing on Mr. Hazelwood's fate would be swayed less by the facts and more by revulsion at the Recordings' content.

A presiding judge's exposure to the Recordings would, by itself, cause a reasonable person to question whether that judge could remain impartial at a retrial. A fair question about impartiality is especially evident given that an experienced judge admitted the Recordings despite a clear risk of undue prejudice and a clear lack of probative value. Moreover, the Court's statements about, and rulings against, Mr. Hazelwood after the introduction of the Recordings create an appearance of partiality, which stems from extrajudicial sources. Considering the various factors as a whole, the Court should recuse itself under § 455(a).

This Motion should be granted regardless of whether the Court believes it *can* be impartial. Public perception of impartiality is as important as the reality. *See* David Laprad, "Fighting Eroding Respect for Courts," Hamilton County Herald, May 3, 2019 ("if people lose respect for the courts, then they also jeopardize the ability of the courts to function") (quoting the Honorable Curtis L. Collier. In fact, this Court has commented on the importance of public confidence in the perception

of judicial impartiality.  We can think of no better formulation than the Court's July 4, 2019 editorial in the *Chattanooga Free Times Press*:

> While judges have discretion in their rulings and in the interpretation of laws, they strive to abide by due process and precedent to promote an impartial judicial system of the people, by the people, and for the people.  In order for the federal courts' relationship with the citizenry to function, the courts must earn the public's faith and confidence in a fair court system.

The Honorable Curtis L. Collier and Travis McDonough, Editorial, *Celebrate the Fourth and Independent Judiciary*, CHATTANOOGA TIMES FREE PRESS, July 4, 2019.  These critically important principles help frame the relief we seek, as this motion represents a stark test of fairness and impartiality in an environment where confidence in the judiciary has already ebbed.

Because of our deep and abiding respect for the Court, we know it will review the record fairly and objectively and will recognize that implicit bias—operating subconsciously—affects us all, even if we do not perceive it.  If the Court recognizes that a reasonable person might question the Court's ability to be impartial, recusal is required.  *See* 28 U.S.C. § 455(a).  If the Court finds otherwise, we respectfully submit that recusal is required under 28 U.S.C. § 144, as Mr. Hazelwood's affidavit in support of recusal is both timely and sufficient.

## FACTUAL BACKGROUND[1]

### A.    The Trial

In 2013, the FBI raided headquarters of Pilot Flying J ("Pilot") on suspicion that some salespeople defrauded some customers out of small portions of their fuel discounts.  The government ultimately charged Mr. Hazelwood with wire and mail fraud conspiracy, wire fraud,

---

[1] Detailed facts are set forth in the Affidavit of Mark Hazelwood, which is incorporated herein by reference.

and obstruction of justice. *See* Superseding Indictment ¶¶ 30–31, 38, Oct 4, 2016, ECF No. 182. Mr. Hazelwood and three others went to trial. The jury acquitted one defendant (Karen Mann) outright and acquitted two other defendants (Heather Jones and Scott Wombold) on 10 of the 12 counts against them. Jury Verdict, Feb. 15, 2018, ECF No. 484. Mr. Hazelwood was convicted on three of the four counts against him. *Id.*

## B. The Court's Rulings During Trial and Before Sentencing

### 1. *Admitting Irrelevant and Prejudicial Recordings*

On November 9, 2017, the government unsuccessfully sought to introduce character evidence to attack Mr. Hazelwood's reputation for "industriousness." Trial Tr. 10:8–11, Nov. 9, 2017. The government then took the opportunity to describe another category of highly prejudicial and wholly irrelevant character evidence but did not seek a ruling on its admissibility. Trial Tr. 10:13–21. Although it justified its salacious description of the evidence by saying it "didn't want to surprise [the Court] when we bring it up later," the government never brought it up again. Trial Tr. 10:25–11:14.

Rather, on December 5, 2017, the government sought to introduce the highly prejudicial Recordings of Mr. Hazelwood making offensive but irrelevant statements. *See* Gov't Rebuttal Char. Evidence Mot., Dec 5, 2017, ECF No. 362. Given the November 9th ruling, the government had little reason to believe the Court would seriously entertain its motion. But regardless, the Recordings would be before the Court, just like the other prejudicial information the government had described on November 9.

Although the record supports a fair inference that the government sought to bait the Court (indeed, prior to trial, the government repeatedly confirmed to Mr. Hazelwood's counsel that it had no intention of trying to put the Recordings into evidence, *see* Declaration of Jim Walden ("Walden Decl.") at ¶¶ 5–8), it claimed that, under Rules 404(a)(2)(A) and 405, the Recordings

3

would rebut character evidence allegedly offered by the defense.  Gov't Mem. In Sup. of Mot., Dec 5, 2017, ECF No. 362.  The Court initially ruled, orally, that the Recordings were inadmissible under the government's theory because they were extrinsic evidence of character.  Trial Tr. 181:11–22, Dec. 7, 2017.  But the Court admitted them anyway under Rule 401—a theory the government had not advanced.  Trial Tr. 186:18–24, Dec. 7, 2017.  In its opinion a few weeks later denying defendants' motions to reconsider, the Court wrote that the Recordings were also admissible under both Rule 404(a) and 404(b), despite the Court's oral ruling.  Order 5, 9, Jan. 29, 2018, ECF No. 455.

### 2. *The Court Denied Mr. Hazelwood Access to Information Critical for Contesting Loss*

To calculate the loss attributable to Mr. Hazelwood for sentencing purposes, the government and the Probation Department relied on an analysis by KraftCPAs PLLC ("Kraft"). The loss amount was a staggering $23.7 million.  Affidavit of Mark Hazelwood ("Hazelwood Aff.") ¶ 34.  However, by the time of sentencing, Kraft had twice reduced the loss it attributed to Mr. Hazelwood, in part because Pilot's internal auditors had overpaid customers for business reasons.  *See generally* Wilner Expert Rep., Sept. 12, 2018, ECF 614-2.  Mr. Hazelwood sought access to the Kraft and Pilot work papers needed to show that the loss attribution was inaccurate. *See* R. 17(c) Mot. to Authorize Issuance of Subpoenas, Aug. 17, 2018, ECF No. 640.  Despite the government's reliance on Kraft's work, the Court denied Mr. Hazelwood's motion as a "fishing expedition," Order Denying R. 17(c) Mot. 3–5, Aug. 28, 2018, ECF No. 651, leaving him helpless to understand, let alone counter, the loss calculation.

### C. The Court's Rule 33 Decision

On May 25, 2018, Mr. Hazelwood filed a motion for a new trial.  Rule 33 Mot. for New Trial, June 25, 2018, ECF No. 566.  The Court denied the motion as untimely.  Mem. 2, Sept. 21,

2018, ECF No. 701.  The Court then proceeded to make other findings "for the instruction of the parties in future stages of the case."  *Id*. at 37.  Among them, the Court rejected, without discovery or a hearing, arguments about *Brady* violations and hinted at sanctions for raising the issue.  *See id.* at 36; Hazelwood Aff. ¶ 65.  The Court also ignored exculpatory evidence concerning "trip reports" the government offered as a primary source of liability, which Mr. Hazelwood disputed ever reading.  Hazelwood Aff. ¶ 66–69.  In crediting the reports and finding—as the "thirteenth" juror—that Mr. Hazelwood read them, the Court offered an advisory opinion on an issue that will be litigated before the retrial, creating at least the appearance that the forthcoming defense motion will not get a fair hearing.  *See id.*  The Court also offered its view, which was unnecessary in light of the timeliness decision, that the trial evidence proved Mr. Hazelwood's guilt convincingly.

The defense did not invite this.  The timeliness decision should have concluded the issue, and the Court conceded that its analysis was "not necessary" to the disposition of the motion.  *Id.* at ¶ 69.  A reasonable person would see that the Court chose to volunteer this dicta, all of which was (1) adverse to Mr. Hazelwood, (2) dismissive of the motion and the issues raised therein, and (3) a clear signal that the Court will be closed-minded when those issues are raised before the retrial.

### D.     The Court's Unfounded Conclusions at Sentencing

At sentencing, the Court reached several conclusions that were not based on evidence in the record.

Economic expert Dr. Ben Wilner testified that the alleged losses from the fraud did not cause significant harm to the trucking-company victims because those losses were "de minimis."  *Id.* at ¶ 47.  To reach that conclusion, Dr. Wilner conducted analyses of the losses to individual trucking companies, comparing each company's annual revenues to the amount of loss alleged in the Kraft report.  *Id.* at ¶ 50.  Although the Court credited Dr. Wilner's testimony ("we can rely on

his testimony"), it denied Mr. Hazelwood's motion for a downward departure, claiming—incorrectly—that Dr. Wilner had relied on "averages" rather than conducting an individualized analysis of each victim's alleged loss.  *Id.* at ¶¶ 48–50.

To frame the "harm" Mr. Hazelwood caused, the Court then hypothesized about a young Pilot employee who was uncomfortable with the fraud yet succumbed to pressure to join the illegal conduct because she saw Mr. Hazelwood as a "role model" who approved of the scheme.  *Id.* at ¶ 43.  The Court described the resulting consequences to her—potential prison, impact on career and family.  *Id.*  But no such person existed.

The Court also—again without referring to any actual evidence—speculated about Mr. Hazelwood's motivations and level of involvement in the fraud.  The Court thus "surmise[d]" that "the motivation was hubris," and that Mr. Hazelwood "need[ed] to feed his ego."  *Id.* at ¶ 52.  It further stated that Mr. Hazelwood's "outsized ambition was the driving force" behind the fraud. *Id.*  It claimed that Mr. Hazelwood "improperly took it upon himself to parlay Pilot's name, reputation, brand, prestige, computational power, accounting and financial systems, and communication system, in furtherance of this unauthorized scheme," Sentencing Tr. 204:7–11; Hazelwood Aff. ¶ 51.  The Court punctuated its perspective by adding—again without reference to evidence—that "all roads lead to Mr. Hazelwood."  Sentencing Tr. 213:19–21; Hazelwood Aff. ¶ 51.

The Court also discounted Mr. Hazelwood's good works, concluding that they were "not uncommon in white-collar cases," and then analogized to Bernie Madoff, one of the worst white-collar criminals in history.  Sentencing Tr. 197:21–24, 198:8.  Although the Court said that it was not comparing Mr. Hazelwood to Madoff, it described at length how Madoff's life story was similar to Mr. Hazelwood's.  Hazelwood Aff. ¶¶ 38–41.

But the Court went even further. Some of the 165 letters submitted on Mr. Hazelwood's behalf were from Pilot's customers, and the defense argued that Mr. Hazelwood often helped Pilot's customers (including in ways that actually reduced fuel costs). Sentencing Tr. 5:23–6:2; Hazelwood Aff. ¶¶ 36, 104. The Court turned these unquestionably mitigating facts into aggravating factors, finding that Mr. Hazelwood's reputation "played a large role in the success of the scheme," that he "abused the trust of . . . the trucking industry," and "prey[ed on] the victims' false sense of security in him." Hazelwood Aff. ¶ 44. The Court reached this conclusion without any evidence in the record. In fact, the government did not call a single customer at trial or at sentencing, and never advanced the argument in its sentencing submissions. *Id.* at 45.

### E.    The Court Reversed its Finding on Danger to the Community

After sentencing, the Court found, by "clear and convincing evidence," that Mr. Hazelwood presented no danger to the community. *Id.* at ¶ 79. But it declined to release him pending appeal because it found no substantial likelihood of reversal. *Id.* The Sixth Circuit disagreed, directing the Court to set conditions of release. *Id.* at ¶ 80. The Court then determined—despite its previous finding and without any additional evidence—that Mr. Hazelwood presented a danger to the community because of potential recidivism, warranting his continued home confinement. *Id.* at ¶ 82. The Court reached this conclusion despite the Court's prior statements (in other cases) that white-collar offenders presented a low recidivism risk. *Id.* at ¶ 106.

The Court subsequently denied Mr. Hazelwood permission—despite his unwavering compliance with release conditions—to go to church or visit his lawyers' office, even when needed to prepare for the appellate proceedings. *Id.* at ¶¶ 76–77, 88, 90.

### F.    The Sixth Circuit Reversed Mr. Hazelwood's Conviction

The Sixth Circuit reversed Mr. Hazelwood's conviction, finding error in the admission of the Recordings. The Recordings were, the Sixth Circuit found, "vintage bad character evidence."

Admitting them was "precisely the type of reasoning the Federal Rules of Evidence forbid." *United States v. Hazelwood*, 979 F.3d 398, 402 (6th Cir. 2020).

The Sixth Circuit found the Recordings inadmissible under Rule 401 because they lacked relevance, and their admission was also a "textbook violation of Rule 403" that "eviscerate[d] any purported probative value." *Id.* The Panel observed that the "extraordinary risk of prejudice posed by the offensive recordings needs little explanation. Decent society roundly condemns the backward and intolerant views heard on the recordings. Nearly anyone would form a negative opinion of a person who holds (and heartily expresses) those views." *Id.* at 412. The prejudicial nature of the Recordings, the Panel concluded, would affect *anyone*. *Id.* at 415 ("we are 'left in grave doubt' that anyone could scrub all traces [of the Recordings] clean from one's mind") (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). The Panel rejected a finding of harmless error because the government's case was not "ironclad." *Id.*

## ARGUMENT[2]

## II. Recusal Is Required Under 28 U.S.C. § 455(a)

### A. Legal Standard

A judge must recuse himself from "any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Under § 455(a), actual bias need not be shown: "what matters is . . . its appearance." *Liteky v. United States*, 510 U.S. 540, 548 (1994).

---

[2] Although the Sixth Circuit denied Mr. Hazelwood's request to reassign the case on remand, it did not have before it a full recitation of the relevant facts, including the Court's rulings and statements, and it did not have Mr. Hazelwood's affidavit. Also, some of the rulings and statements identified in this motion post-dated the filing of Mr. Hazelwood's appeal. The Court of Appeals also did not consider the applicability of § 455 or § 144. In any event, an appellate court's rejection of a reassignment motion does not preclude the judge from recusing. *See Baker Group, L.C. v. Burlington N. & Santa Fe Ry. Co.*, 228 F.3d 883, 888 (8th Cir. 2000) ("we decline to exercise our discretion to direct that the case be assigned to a different judge on remand," but "[o]f course, that does not preclude the judge from deciding to recuse for any reason").

Until 1974, federal judges were considered to have a "duty to sit." That is no longer true. In 1974, Congress replaced the duty-to-sit doctrine with a "presumption of disqualification," such that any doubts about recusal should be resolved in favor of disqualification. *See* H.R. Rep 93-1453, 1974 U.S.C.C.A.N. 6351, 6355 (noting that "witnesses at the hearings were unanimously of the opinion that elimination of this 'duty to sit' would enhance public confidence in the impartiality of the judicial system."). That is now the law. *In re Schools Asbestos Litig.*, 977 F.2d 764, 784 (3d Cir. 1992); Federal Judicial Center, *Recusal: Analysis of Case Law Under 28 U.S.C. §§ 455 & 144*, at 2 (2002).

Thus, in weighing recusal, a trial judge must "step outside . . . himself and take the objective view of an informed outsider" to ensure that there is no actual or perceived bias. *See In re United States*, 441 F.3d 44, 67 (1st Cir. 2006) (noting that "objectivity, though sought, may be elusive"); *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S 847, 859–860, (1988) (explaining that the reasonable observer is one who knows the disqualifying facts). Reasonable doubts and close questions must be resolved in favor of recusal. *Roberts v. Bailar*, 625 F.2d 125, 129 (6th Cir. 1980). In short, the "duty to sit" cannot trump § 455 recusal.

Extrajudicial evidence is the most common indicator of a court's bias. *See, e.g.*, *Liteky*, 510 U.S. at 551. But "a source [of bias] outside judicial proceedings is not a *necessary* condition for 'bias or prejudice' recusal, since predispositions developed during the course of a trial will sometimes (albeit rarely) suffice." *Id.* at 554 (discussing § 455(a)). The Sixth Circuit has confirmed that, **"[c]ontrary to the suggestion of prior caselaw,** . . . the Supreme Court clarified that an extrajudicial source for a judge's opinion about a case or a party is neither necessary nor sufficient to require recusal. Instead, the presence of an extrajudicial source is merely a thumb on the scale in favor of finding [] an appearance of partiality under § 455(a) . . . ." *Bell v. Johnson*,

9

404 F.3d 997, 1005 (6th Cir. 2005) (emphasis added).  Thus, a combination of extrajudicial and other evidence of the Court's apparent bias makes the strongest case for recusal.[3]

The purpose of § 455(a) is "to promote public confidence in the integrity of the judicial process" and "to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible."  *Liljeberg*, 486 U.S. at 860, 865.  As noted above, we are well aware of the importance this Court places on public confidence in judicial integrity.  *See* The Honorable Curtis L. Collier, Op-Ed., *Giving Thanks for the Rule of Law*, CHATTANOOGA TIMES FREE PRESS, Nov. 24, 2020 ("[T]he Rule of Law is not self-perpetuating.  It requires those entrusted with positions of authority to not only enforce the law but also obey it.").  Here, the law commands recusal.

### B.    The Court's Rulings After Being Exposed to the Recordings Create the Appearance of Bias, Warranting Recusal Under § 455(a)

A reasonable person aware of all the relevant facts and circumstances would believe that, when the government put the Recordings before the Court, it created a taint that would be difficult to purge even under ideal circumstances.  The final sentence of the Sixth Circuit's decision explains why: "The . . . content of these recordings is so antithetical to the sensibilities of decent people, that we are 'left in grave doubt' that *anyone* could scrub all traces clean from one's mind regardless of the quantum of evidence presented."  *Hazelwood*, 979 F.3d at 415 (emphasis added).

---

[3] Unlike § 144, § 455 contains no explicit timeliness requirement.  28 U.S.C. § 455; *Roberts*, 625 F.2d at 128 n.8.  The Sixth Circuit has stated that "the timeliness of a motion to recuse is a factor meriting consideration," and that a recusal motion should be filed "at the earliest possible moment" after obtaining knowledge of the relevant facts, both to ensure that the district judge does not take any "inappropriate steps" before considering the merits of the motion and to protect against "the risk that a party is holding back a recusal application as a fall-back position in the event of adverse rulings on pending matters."  *See, e.g.*, *In re Nat'l Prescription Opiate Litig.*, No. 19-3935, 2019 WL 7482137, at *1 (6th Cir. Oct. 10, 2019).  Despite this, courts in the Sixth Circuit generally consider such motions on the merits when possible.  *See, e.g.*, *id.*  In any event, as discussed below, *see* § III.B.1, *supra*, this motion is timely.

Although the Court gave undoubtedly sincere assurances that the Recordings would not cause partiality, Order 16, Jan 29, 2018, ECF No. 455, a different analysis is now required. "Stepping out of itself," the Court must assess whether the record, taken as a whole, would lead a reasonable person to question the Court's ability to be impartial. For four reasons, set forth below, the record would cause a reasonable person to have such questions.

### 1. The Appearance of Partiality Stems from Two Extrajudicial Sources

Two "extrajudicial" sources create an appearance of partiality: (1) the Court's view of white-collar defendants generally, based on prior cases; and (2) the Court's improper exposure to the Recordings themselves.

Long before Mr. Hazelwood's case, the Court expressed decided views on "white-collar offenders" in other proceedings. In expressing these views, the Court often relied on stereotypes and generalization of "typical" characteristics of "white-collar offenders." Walden Decl. ¶¶ 9–16. The Court remarked on the perception that they are treated more leniently than other defendants. *Id.* at ¶¶ 11–12. The Court has made its view clear, in statements external to Mr. Hazelwood's case, that it holds specific and fixed views of white-collar defendants as a group: that, among other things, (1) their crimes are a "choice," unlike crimes of the impoverished, because of their many advantages and options (since they tend to "come from good families," are "highly educated," and hold "positions of trust"); (2) their crimes are "calculated," as opposed to crimes of opportunity; and (3) they are "motivated by greed." *Id.* at ¶¶ 9–16.

A reasonable person could conclude from these statements that the Court assigns more moral blame to white-collar defendants than, for example, drug dealers. That the Court inappropriately swept Mr. Hazelwood into this stereotype was obvious during the Court's lengthy

comparison, despite its inaptness, of Mr. Hazelwood to Bernie Madoff.[4]  *See* Hazelwood Aff. ¶¶ 38–41.  A reasonable person could believe that the government poisoned the well by conjuring an image that would be highly galling to the Court: a racist, white-collar offender.

These facts are important to the perception of partiality the government created by offering the Recordings into evidence.  By that time, the Court had already heard the government's salacious description of other character evidence it never sought to introduce.  Based on that, a reasonable observer would be apt to conclude the government was trying to taint the Court's thinking about Mr. Hazelwood when it offered the Recordings as evidence.  In fact, one member of the appellate panel questioned whether the government harbored precisely that intent: to characterize this white-collar defendant as a racist.

| | |
|---|---|
| Judge: | You're the guy putting the evidence in. |
| Prosecutor: | Yes sir. |
| Judge: | <u>You wanted those racial comments</u>.  Not the fact that the people talked and said we didn't like the rules or we think they're bad rules and laughing about it.  <u>You wanted those racial comments in, right</u>? |

Oral Argument at 33:19–44:00 (emphasis added).  The prosecutor side-stepped the Judge's question. *Id.*

The context of the Recordings' admission makes them an "extrajudicial" source, both in fact and effect.  The Recordings had nothing whatsoever to do with the offenses with which Mr. Hazelwood was charged.  As the Sixth Circuit held, they were clearly inadmissible, in part because they constituted a "textbook" violation of Rule 403, and they were not relevant. *Hazelwood*, 979

---

[4] That the Court said it was not making a "comparison," but went on to do just that for four pages of the transcript (Sentencing Tr. 197:21–201:14, Sept. 26, 2008, ECF No. 733) creates the appearance that the Court was not acting impartially.

F.3d at 402.  In other words, they never should have been put before the Court at all, especially given the government's repeated assurances to defense counsel that it would not seek to introduce them.  Walden Decl. ¶¶ 5–8.  The Recordings, wrongfully before the Court, are thus like the extrajudicial sources that have been held to require recusal.[5]  As the Supreme Court noted in *Liteky*, "[t]he words [bias or prejudice] connote a favorable or unfavorable disposition or opinion that is somehow wrongful or inappropriate, either because it is undeserved, or **because it rests upon knowledge that the subject ought not to possess** (for example, a criminal juror who has been biased or prejudiced by receipt of **inadmissible evidence concerning the defendant's prior criminal activities**) . . . ."  510 U.S. at 550 (emphasis added).  Likewise, here, the Court "ought not" have been exposed to the Recordings, both because the government assured defense counsel it would not seek their admission and because they were so plainly inadmissible.[6]

Although a judge is presumed to have a greater ability to remain impartial, *see, e.g., Berger v. United States*, 255 U.S. 22, 35–36 (1921), a reasonable person might conclude that exposure to such irrelevant and inflammatory evidence would have an impact—however subconsciously—on

---

[5] We have not found a case addressing this precise issue.  However, as courts have noted, the facts in recusal cases are, by their nature, *sui generis*.  *See, e.g.*, *Nichols v. Alley*, 71 F.3d 347, 351 (10th Cir. 1995) ("[C]ases within § 455(a) are extremely fact driven 'and must be judged on [their] unique facts and circumstances more than by comparison to situations considered in prior jurisprudence.'") (quoting *United States v. Jordan*, 49 F.3d 152, 157 (5th Cir. 1995)).  Indeed, although "federal judges do recuse themselves in many situations, a judge who does so rarely writes an opinion explaining why," while judges declining to disqualify themselves "often write lengthy opinions explaining their reasoning."  Richard E. Flamm, *History of and Problems with the Federal Judicial Disqualification Framework*, 58 Drake L. Rev. 751, 760 (2010).  The case law thus "tends to reflect 'an accumulating mound of reasons and precedents' for denying disqualification."  *Id.* at 761 (quoting J. Leubsdorf, *Theories of Judging and Judge Disqualification*, 62 N.Y.U. L. Rev. 237, 244–45 (1987)).

[6] A contrary ruling would create a perverse incentive for the government to "game" recusal.  For example, imagine a drug case, where the government sought to introduce instances of child molestation as "character" evidence.  Even if that evidence created actual bias in the presiding judge, the government could argue the bias was not from an extrajudicial source and oppose recusal on that basis alone.  Fundamental fairness requires a court to guard against such gamesmanship.

13

the judge as well. The fact that the Court was exposed to the Recordings through a motion in the proceeding does not warrant treating the effects any differently from if the Court had read about them in the newspaper. In fact, a reasonable observer would be *more* likely to conclude that the Court was adversely impacted by learning of the Recordings as it did, because the extent of the Court's exposure to them was even greater given the extensive litigation over their admission.

Even if the Court concludes that the alleged bias does not stem from extrajudicial sources, is nevertheless sufficiently severe to mandate recusal. Courts have found that disqualification is warranted where, as here, the court has indicated that it is predisposed to a particular sentence or outcome or is biased against a particular class of people. As the Supreme Court noted in *Liteky*, critical or hostile remarks toward a party will support disqualification "if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." 510 U.S. at 555.

In *Liteky*, the Supreme Court proffered the facts of *Berger* as one example of such a "high degree" of prejudice. *Liteky,* 510 U.S. at 555. In *Berger*, the district court judge made statements in an espionage case evidencing a prejudice against German-Americans, where the defendants were of German lineage. 255 U.S. at 28–29. The Supreme Court concluded that such views against a class of people mandated recusal. *Id*. at 36 (addressing a precursor to § 144, *see Liteky* at 549). Similarly, in *United States v. Antar*, the Third Circuit found that recusal was required where the judge had a fixed view of the proceedings from the beginning. 53 F.3d 568, 576 (3rd Cir. 1995), overruled on other grounds by *Smith v. Berg*, 247 F.3d 532 (3d Cir. 2001).

In short, reasonable questions of bias can come from the Court's *statements* or *rulings*. Here, as described below, bias is reasonably evident in both.

2.    *Statements Reflecting a Fixed View Mandate Recusal*

Recusal is warranted where a judge's statements show he holds a fixed view of a party or witness. In *Roberts*, the Sixth Circuit held that the district judge should have recused himself

because he expressed his views about a potential witness's character, so "the objective appearance of impartiality vanished." 625 F.2d at 129–30 (finding recusal necessary under § 455(a)).

A reasonable observer would conclude that, based on its words—often severe, without basis in the record and, at times, even ignoring contrary record evidence—the Court appears to have a "fixed view" of Mr. Hazelwood. When customers indicated support for Mr. Hazelwood at sentencing, the Court concluded, despite not hearing from a single customer at trial or at sentencing, that their support, even *after* his conviction, was because he had duped them. Hazelwood Aff. ¶¶ 44–46. The Court hypothesized that Mr. Hazelwood had destroyed the career of an employee who participated in fraud because Mr. Hazelwood had approved it, despite the fact that no such person existed. *Id.* at ¶ 43. The Court said, concerning the fraud, that "all roads lead to Mr. Hazelwood," *id.* at ¶ 51, despite no evidence of this, and despite trial testimony that *Mr. Hazelwood's boss* was allegedly involved too. *Id.* at ¶ 51 n.2. The Court said, without supporting evidence, that Mr. Hazelwood was driven by "hubris" and "ego." *Id.* at ¶ 52. And it compared Mr. Hazelwood to Bernie Madoff—probably the worst white-collar criminal in history, whose crimes bore little resemblance to the crimes with which Mr. Hazelwood was charged. *Id.* at ¶¶ 38–41.

Indeed, courts have found that recusal is warranted where, as here, the court has indicated that it is predisposed to a particular sentence or outcome or is biased against a particular class of people. In *United States v. Thompson*, the district judge indicated that he had a policy of sentencing all selective service violators to 30 months in prison. The Third Circuit concluded that such a "fixed view" as to sentencing was inconsistent with the court's mandate and found that the judge's approach constituted a personal bias against the defendant as a member of a class of people charged with violating the selective service laws. 483 F.2d 527, 528–29 (3rd Cir. 1973). The court thus

found that the judge should have recused himself.[7]  *Id.*  Here, the Court has expressed "fixed" views as to white-collar defendants, and it applied those to Mr. Hazelwood at his sentencing, even though the record undermines many of the Court's points of comparison.  A reasonable person would thus conclude that the Court was biased against Mr. Hazelwood, necessitating recusal.

Fairness demands that the Court "step outside itself" and concede that these statements might give the reasonable person doubt that the Court can regain open-mindedness about Mr. Hazelwood's innocence—that the Court could not regain such neutrality and detachment (the hallmark of the federal judiciary) in light of the very strong (and all negative) views of Mr. Hazelwood it espoused, often times unnecessarily.  These statements, and those set forth in Mr. Hazelwood's affidavit, represent the kind of fixed view that mandates recusal.  *See Thompson*, 483 F.2d at 528–29; *Antar*, 53 F.3d at 576–77 (3d Cir. 1995) (recusal required where the judge was predisposed to ensuring restitution to the public for the defendant's "fraudulent activities").

### 3.    *Rulings Reflecting a Fixed View Mandate Recusal*

After the government exposed the Court to the Recordings, the Court made several rulings that, to a reasonable observer, could evidence a predisposition against Mr. Hazelwood and in favor of the government.  That is, the Court reversed course on prior findings it made in Mr. Hazelwood's favor, made findings unsubstantiated or in direct conflict with the record, and created new legal bases for ruling against Mr. Hazelwood when it found the government's bases to be insufficient.  *See, e.g.*, *Liteky*, 510 U.S. at 555 (a judge's rulings may be evidence of partiality).

The record reinforces a reasonable conclusion that the Court's initial assessment of the Recordings' admissibility reflected, at a minimum, judicial inconsistency and a determination to

---

[7] Although *Thompson* was decided under § 144, the same principles apply to whether there is an appearance of bias under § 455(a).  *See Bell*, 404 F.3d at 1004 n.7.

16

take on the role of advocate. The Court took on the role of advocate when it first ruled the Recordings admissible because it rejected the government's rationale and instead created a new one. The Court then acted inconsistently: after having found the Recordings inadmissible as character evidence under the government's theory, due to Rule 405's bar on extrinsic evidence, the Court reversed course in its later ruling by approving the government's rationale as well, with no acknowledgement of the reason Rule 405 barred the Recordings' admission.

This emerging pattern of unsupported adverse rulings against Mr. Hazelwood continued post-trial. When the Court denied the Rule 33 motion on timeliness grounds, it offered a gratuitous opinion about Mr. Hazelwood's guilt, "for the instruction of the parties in future stages of the case," which, the Court conceded, was "not necessary to the Court's disposition" of the motion. Hazelwood Aff. ¶ 69. The Court went on to explain, at length, how the evidence convinced the Court of Mr. Hazelwood's guilt, a conclusion standing in stark contrast to the Sixth Circuit's view of the evidence. It further grounded its ruling in the "novel" proposition that a lawyer need not consult with a client about the decision to forfeit a motion for new trial. Mem. 23, 37–42, Sept. 21, 2018, ECF No. 701. (We have not found authority for even an analogous proposition.)

Even more than reflecting a "fixed view" of Mr. Hazelwood's guilt, the Court took pains to needlessly stake out positions on issues that will need to be litigated before the retrial of this case. Three examples bear mention:

- Mr. Hazelwood proffered evidence to rebut the claim he had read the trip reports on which the government placed so much reliance as proof of guilt. The Court ignored the new exculpatory evidence and declared, "acting as the thirteenth juror," that it would conclude that Mr. Hazelwood read the reports. Hazelwood Aff. ¶ 67, 69.

- The Court dismissed out-of-hand serious *Brady* issues and rebuked counsel for raising them. *Id.* at ¶ 65.

- The Court ignored exculpatory evidence supporting a fair argument that Mr. Hazelwood was factually innocent of one of the theories tendered for his obstruction conviction. *Id.* at ¶¶ 66–69.

Having needlessly addressed these issues when the timeliness issue was dispositive, a reasonable person could believe the Court will not give these same arguments a fair hearing now.

The pattern continued at sentencing. The Court denied access to the Kraft workpapers (the basis for the government's loss calculation), *id.* at ¶¶ 29–33, denied a downward departure after misstating Dr. Wilner's testimony, *id.* at ¶¶ 49–50, and developed its own rationale, never tendered by the government, for why Mr. Hazelwood's good deeds toward customers was, in actuality, proof that he had abused their trust (even those customers who continued to support him after his conviction). *Id.* at ¶¶ 44–46.

Likewise, after sentencing, the Court denied Mr. Hazelwood the ability to exercise outside his home, worship in Church, or visit his attorneys' offices despite (1) his unblemished record of compliance with release conditions, and (2) the government's consent to some of these small dispensations. *Id.* at ¶¶ 76, 88, 89, 90. And, in a decision that prolonged Mr. Hazelwood's house arrest, the Court reversed itself within two months to declare him a danger for the first time in a three-year-long case, despite the government's contrary stance and despite the Sixth Circuit's determination that a "substantial" appellate issue existed—which would dampen anyone's motivation to flee or reoffend. *Id.* at ¶¶ 78–85.

At every stage after being exposed to the Recordings, the Court's rulings gave the appearance it was taking on the role of advocate, the antithesis of impartiality. By creating new

bases never posited by the government to rule against Mr. Hazelwood on important issues, and by ignoring the government's position (on such things as release conditions) to take a harsher stance against Mr. Hazelwood, the Court gave the appearance of being a partial advocate. A reasonable observer would question whether the Court's exposure to the Recordings caused it to harbor at least an implicit bias against Mr. Hazelwood. Courts have found recusal warranted where a judge appears to act as an advocate. *See*, *e.g.*, *In re United States*, 572 F.3d 301, 312 (7th Cir. 2009).

### 4. *The Combination of Factors Mandate Recusal*

Courts have found that, even when individual facts are insufficient for recusal, the cumulative effect can justify recusal. *See United States v. Edwardo-Franco*, 885 F.2d 2002 (2d Cir. 1989) (finding that there were enough questionable rulings and incidents in the case to support a claim of apparent bias); *Parker v. Connors Steel Co.*, 855 F.2d 1510 (11th Cir. 1988) (declining to opine on whether the facts, taken alone, would mandate disqualification, but concluding that the facts "taken together" raised the appearance of impropriety and partiality, requiring recusal); *Fairley v. Andrews*, 423 F.Supp.2d 800 (N.D. Ill. 2006) (concluding that, although none of the court's individual statements warranted recusal, "all of this Court's statements and interactions with Defendants . . . taken together, may give pause to a non-legal observer," warranting recusal).

Here, the totality of circumstances would lead a reasonable person to question the Court's impartiality. The circumstances described above combine to display an unmistakable appearance of partiality against Mr. Hazelwood. Indeed, other courts have recused themselves in less extreme circumstances.

In *Fairley*, the defendants argued that the judge was required to recuse himself under § 455(a) based on various rulings against them, as well as certain statements the judge made. The defendants argued that the fact that the judge granted the plaintiffs' request to take extra depositions, granted plaintiffs' subpoena requests while denying defendants', and denied

defendants' request to serve an additional interrogatory after initially indicating he would grant it, among other things, created an appearance of bias. 423 F.Supp.2d at 808–815. The defendants also argued that certain of the judge's comments—including a statement (made outside the presence of the jury) about actions the judge would take "if" there was a verdict in the plaintiffs' favor and admonishments of defense counsel made during a settlement conference—further demonstrated the need for recusal. *Id*. at 813–16. In considering the defendants' motion for recusal, the court carefully reviewed and explained each of its challenged rulings and statements and concluded that it was not actually biased against the defendants. Nevertheless, it concluded that the court's statements and interactions, "taken together, may give pause to a non-legal observer, not versed in the ways of the courtroom." *Id*. at 821. The court recused itself "out of utmost caution for the judicial system as a whole because 'if a judge proceeds in a case when there is (only) an appearance of impropriety in his doing so, the injury is to the judicial system as a whole . . .'" *Id.* (quoting *United States v. Troxell*, 887 F.2d 830, 833 (7th Cir. 1989)).

*Fairley* was a civil case, and the stakes are much higher here. Assuming the Court concludes, as the *Fairley* court did, that it is not actually biased, the appearance of partiality is unavoidable. *See, e.g.*, *In re U.S.*, 441 F.3d 44 (finding that the appearance of bias is "what matters"); *see also Antar*, 53 F.3d at 576 (the "focus must be on the reaction of the reasonable observer. If there is an appearance of partiality, that ends the matter.").

A reasonable person might conclude that the Court's reaction to the Recordings, and its conflicting explanations for their admission, is a sign of partiality. The fact that the Sixth Circuit has ruled, in blunt terms, that the Recordings were plainly irrelevant and highly prejudicial—in fact, a case of "textbook" prejudice—makes the sign even clearer. After all, the Court is highly experienced with the Federal Rules of Evidence and has, undoubtedly, ruled on 404(b) motions

many times. The additional factors noted above, and in Mr. Hazelwood's affidavit, punctuate the serious questions about impartiality or the appearance of it.

### III. Recusal Is Required Under 28 U.S.C. § 144

Recusal is separately required under § 144.

#### A. Legal Standard

A judge must recuse himself when a party "makes and files a timely and sufficient affidavit that [the presiding judge] has a personal bias or prejudice either against him or in favor of any adverse party." 28 U.S.C. § 144. In considering such an application, "it is the duty of the judge to pass only on the legal sufficiency of the facts alleged to ascertain whether they support a charge of bias or prejudice. Neither the truth of the allegations nor the good faith of the pleader may be questioned, regardless of the judge's personal knowledge to the contrary." *Mims v. Shapp*, 541 F.2d 415, 417 (3d Cir. 1976); *see also United States v. Furst*, 886 F.2d 558, 583 (3d Cir. 1989) ("where the basic underlying facts as set forth in the affidavit supporting a recusal application are not in dispute, the district court should not minutely examine the movant's characterization of them, and weigh the court's memory of what happened against that of the affiant."). If the affidavit is legally sufficient and timely, the court must "proceed no further" and recuse itself. *See* 28 U.S.C. § 144.

The test for legal sufficiency is "whether, assuming the truth of the facts alleged, a reasonable person would conclude" that a personal bias exists. *Mims*, 541 F.2d at 417. If the affidavit supporting the motion gives "fair support to the charge of a bent of mind that may prevent or impede impartiality of judgment," disqualification is warranted. *United States v. Townsend*, 478 F.2d 1072, 1073–74 (3d Cir. 1973). Thus, even in cases where courts disagree with the facts alleged in a § 144 affidavit and disagree with the allegation of bias, they are required to recuse themselves provided that the alleged facts—taken as true, as they must be—would lead a

reasonable person to conclude that the court was biased against a party. *Mims*, 541 F.2d at 417; *Townsend*, 478 F.2d at 1073–74. In other words, to deny this motion, the Court would have to find that it would be *unreasonable* for an informed layperson to conclude bias based on the proffered facts.

As with § 455(a), although bias is more commonly found if it stems from an "extrajudicial source," the Supreme Court has recognized that an extrajudicial source is not required to establish "disqualifying bias or prejudice" under § 144. *Liteky*, 510 U.S. at 551. Rather, a "favorable or unfavorable predisposition can also deserve to be characterized as 'bias' or 'prejudice' because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment." *Id*.

**B.     The Requirements of § 144 Have Been Met Here, Requiring Recusal**

Mr. Hazelwood's affidavit is both timely and sufficient within the meaning of § 144.

1.     *The Affidavit is Timely*

Section 144 contains a timing requirement that can no longer be applied in the manner Congress provided. The statute mandates filing "no less than 10 days" after the start of the Court's term. But terms were abolished in 1963. To give effect to congressional intent, courts now require reasonable promptness in filing recusal motions under § 144. *See* Federal Judicial Center, *Recusal: Analysis of Case Law Under 28 U.S.C. §§ 455 & 144*, at 50 (2002) (citing cases).

Here, in addition to the Court's improper exposure to the Recordings, Mr. Hazelwood's bases for seeking recusal are reflected largely in a series of the Court's post-trial decisions, including those related to the denial of a new trial, his sentencing, and post-sentencing requests for release. Mr. Hazelwood filed a timely notice of appeal after sentencing. Notice of Appeal, Sept. 27, 2018, ECF No. 716. When the case was on appeal, Mr. Hazelwood requested reassignment based on some of the circumstances addressed herein, which was the proper procedure to press the

issue. Brief for Appellant at 87–94, *United States v. Hazelwood*, (6th Cir. 2019) (No. 18-CR-6023), ECF No. 31. Although, in its original decision, the Sixth Circuit did not address the reassignment request, Op., Oct. 14, 2020, ECF No. 953, it subsequently amended its opinion on October 29, 2020, to deny it. Corrected Order, Jan. 4, 2021, ECF No. 979. Now, this motion comes before any substantive activity on remand. Immediately after the government submitted a proposed joint scheduling order on April 19, 2021, Mr. Hazelwood notified the Court of his intention to seek recusal and offered to brief the issue even before the proposed due date for other pretrial motions. Def.'s Mem. Regarding Clarification of Scheduling, Apr. 20, 2021, ECF No. 1003. The Court accepted that suggestion in its first scheduling order, which the Court filed on April 27, 2021. Scheduling Order, Apr. 27, 2021, ECF No. 1004. The Court has made no substantive rulings in connection with the retrial. In short, the application is timely.

2.      *The Affidavit Is Sufficient*

As the Court has previously held, and as courts acknowledge, facts in an affidavit filed under § 144 "must be accepted as true." *Chao v. USA Mining, Inc.*, No. 04-cv-1, 2006 WL 2346279, at \*2 (E.D. Tenn. Aug. 11, 2006); *United States v. Bibbins*, No. 06-CR-38, 2006 WL 2290466, at \*1 (E.D. Tenn. Aug. 8, 2006). The nature of the bias must be "personal" rather than "judicial." When applying this standard, the Court has previously held that an affidavit will not suffice if it alleges bias based exclusively on the Court's actions during judicial proceedings. *Chao*, 2006 WL 2346279, at \*3; *Bibbins*, 2006 WL 2290466, at \*2. This is not the current state of the law. Rather, as the Sixth Circuit ruled in *Bell*, "an extrajudicial source for a judge's opinion about a case or a party is [not] necessary [] to require recusal." 404 F.3d at 1004 n.7, 1005 (citing *Liteky*, 510 U.S. at 548) (indicating that the diminished weight of the extrajudicial source rule under § 455 applies equally under § 144). But courts will not require recusal based on "insufficient" grounds: affidavits must make a "firm showing," *In re Martinez-Catala*, 129 F.3d

23

213, 218 (1st Cir. 1997), the facts must be "sufficiently definite and particular," *United States v. Sykes*, 7 F.3d 1331, 1339 (7th Cir. 1993), and must be of a nature to "convince a reasonable person that a bias exists," *id.*; *see also Mims*, 541 F.2d at 417; *United States v. Story*, 716 F.2d 1088, 1090 (6th Cir. 1983). If an affidavit does not cite an extrajudicial source, the facts at issue must present a serious question of bias. *See Liteky*, 510 U.S. at 548–51 (indicating that movants need not prove an extrajudicial source for purposes of a motion to disqualify under § 144).

For the reasons described above and in the Hazelwood Affidavit, a reasonable person would conclude that the Court is personally biased against Mr. Hazelwood. As explained above, the bias stems from an extrajudicial source. Even if the Court disagrees, the facts alleged are serious enough to suffice for a finding of bias. While we regret the need to bring this motion, we are confident that its bases are sound.

## CONCLUSION[8]

As set forth above, Mr. Hazelwood respectfully requests recusal.

---

[8] We note that, for various reasons, the retrial will focus much more on members of the Haslam family than in the original trial. Since remand, we have discovered connections between the Court and Governor Haslam: for example, on October 28, 2014, Governor Haslam was the keynote speaker at an Urban League of Greater Chattanooga's "Opportunity Day" breakfast at which the Court was honored, and at which Governor Haslam and the Court were photographed together, and, on January 12, 2012, Governor Haslam and the Court attended a ceremony together, at which the Court administered the oath of office to Debra C. Poplin as Clerk of the District Court for the Eastern District of Tennessee, for whom Governor Haslam apparently served as a reference. We respectfully request that the Court consider whether any relationship or connection between the Court and Governor Haslam merits recusal. We also request that the Court disclose any other relationships or connections to the parties, witnesses, and entities in this case. *See United States v. Bobo*, 323 F.Supp.2d 1238, 1239–40 (N.D. Ala. 2004) (in the interests of "candor and fairness to the [] defendants," the court voluntarily disclosed its distant familial relationship to the then-sitting governor, as well as the court's attendance at a private political function for that governor two years prior). While the court in *Bobo* determined that recusal was not required, it recused itself anyway, "for the purposes of ensuring equal justice under the law and sustaining public confidence in the integrity and impartiality of the judicial branch." *Id.* at 1243.

24

/s/ Jim Walden
_____
Jim Walden
Georgia Winston
WALDEN MACHT & HARAN LLP
250 Vesey Street, 27th Floor
New York, New York 10281
(212) 335-2030
jwalden@wmhlaw.com
gwinston@wmhlaw.com

/s/ Bradley L. Henry
_____
Bradley L. Henry (BPR # 025447)
MICHELMAN & ROBINSON LLP
800 3rd Avenue, 24th Floor
New York, NY 10016
(212) 730-7700 (T)
(212) 730-7725 (F)
bhenry@mrllp.com

/s/ Robert M. Cary
_____
Robert M. Cary
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5175
rcary@wc.com
(Pending admission *pro hac vice*)

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed electronically on May 14, 2021. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

By:    /s/ Bradley L. Henry
       _____
       Bradley L. Henry