UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>v.<br><br>MARK HAZELWOOD, et al.,<br><br>                    Defendants. | **DECLARATION OF JIM WALDEN**<br><br>No. 3:16-CR-20<br>(Collier/Guyton) |

Jim Walden, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury as follows:

1. As the Court knows, my firm, Walden Macht & Haran LLP, represents Mark Hazelwood in the above-captioned matter.

2. I offer this affidavit for three purposes: (a) to certify the good faith of Mr. Hazelwood's disqualification motion; (b) to apprise the Court of testimony given by Mr. Hazelwood's prior counsel in an unrelated proceeding; and (c) to further explicate paragraphs 97 through 107 of Mr. Hazelwood's affidavit, which concern the Court's prior white-collar cases.

**Good Faith Certification**

3. Mr. Hazelwood's Motion to Disqualify is brought in good faith.

4. Pursuant to 28 U.S.C. § 144, I hereby certify that Mark Hazelwood's affidavit in support of his motion to disqualify is made in good faith, as he has a well-founded belief and fear that the Court has a personal bias against him.

**Prior Counsel's Testimony**

5. On June 10, 2019, Mr. Hazelwood's prior counsel, Rusty Hardin, testified under oath

concerning certain events from the earlier criminal trial in this matter.

6. Excerpts from that testimony are attached hereto as Exhibit A and incorporated by reference.

7. During the testimony, Mr. Hardin answered questions about the government's decision to introduce prejudicial and irrelevant recordings of a late-night event at John Freeman's lake house on October 25, 2012 (the "Recordings").

8. In pertinent part, Mr. Hardin gave the following answers to questions put to him:

> Questioner 1: Did you use your best efforts to prevent [the Recordings] from coming into evidence?
>
> Answer: Yes. And we were always told by the government they didn't intend to introduce them.
>
> * * * * *
>
> Questioner 2: You testified in response to some questions from [Questioner 1] that the government essentially told you they were not going to admit [the Recordings], but that changed at a certain point.
>
> Answer: And I think they told Pilot that at one time, too, before the trial.
>
> Questioner 2: Got it. So just to be clear, at some point before the trial it's your understanding that the government said to Pilot, [the Recordings] -- I think the term you maybe used earlier, [the Recordings] are not going to see the light of day, and they told Pilot that at some point. Is that right?
>
> Answer: Uh-huh.
>
> Questioner 2: And then at some point either -- well, let me ask. Was it during the

> trial or before the trial that they made the same representation to you?

Answer: They made it to me multiple times before trial.

Questioner 2: That [the Recordings] will not see the light of day?

Answer: What I would liked to have heard -- had it heard -- said that way, I'm not sure it was quite that colorfully put, but we don't intend to use [the Recordings] or try to introduce them.

Questioner 2: But it was your understanding they had represented that. Is that right?

Answer: Yes.

Questioner 2: And when they changed, did that make you angry?

Answer: It made me angry when they moved to introduce them.

### The Court's Fixed Views of White-Collar Offenders

9. A review of the Court's prior white-collar cases demonstrates a distinct pattern of adopting stereotypes and generalizations about "typical" characteristics of white-collar defendants.

10. The Court displayed many of these stereotypes and generalizations during sentencing in *United States v. Cardin*, where the defendant was convicted of falsely mischaracterizing employee injuries to earn safety bonuses from a government entity. The Court said:

> **[C]ommon characteristics of white-collar offenders are: They come from a very, very good family; wholesome, productive, supportive, close families. They're educated. They all do well in school. They have graduated from high school. Many of them do well in college and graduate from college. They're successful in life. They do well in their jobs; in fact, they do so well, they're**

3

> **put in positions of trust, that is, there is no one always looking over their shoulder, checking on what they're doing. Their work is trusted and assumed to be correct and reliable. They do well in their lives outside of the jobs. Many white-collar offenders hold positions of leadership in their churches, their community organizations, clubs, and other things. And they generally go on to establish good families themselves. They have long marriages. They have children that do very, very well. Their offenses are choices.**
>
> **One of the other groups that we have come in involve people from very poor circumstances, poor family circumstances, oftentimes without fathers in their lives. They do not do well at school, and they have very, very few choices in life. And it's not an excuse for them to commit crime, but it's understandable that because they have such constricted options, they turn to crime.**
>
> **The white-collar offenders, though, have a lot of choices and alternatives. They can do a lot of other things with their lives other than engage in the offense that led them to federal court.**
>
> **Another thing that we see with white-collar offenders is, their crimes are calculated. In many of the other types of offenders, we see crimes of opportunity, crimes without that much forethought, crimes without that much planning. White-collar crimes, though, they're almost always calculated.**
>
> **Another thing that we see in white-collar offenders that we don't see in others is that the crimes go on for quite a while. It's not a crime that takes place on one day, or a week, or a couple of weeks. The crimes continue for [qu]ite a length of time.**
>
> **And one of the common characteristics of white-collar criminals is that they are, in some degree, motivated by greed. It may not be that the motivation is to put money into their own pockets, but there's some type of monetary incentive there somewhere in the target.**

Sentencing Tr. 38:2–39:20, *U.S.* v. *Cardin*, No. 1:11-CR-93 (E.D. Tenn. Apr. 11, 2013), ECF. No. 90.

11. In other cases, the Court made it clear that it is because of some of these "good" attributes that society historically believed white-collar defendants were given lenient

4

sentences.  For example, in *United States v. Dobson*, the defendants were convicted after trial for a fraud scheme, which involved supplying down payments and mortgage payments for victims who agreed to buy over-valued properties.  The Court explained: "**And many commentators say it's because these defendants look like the judges who are sentencing them, they go to the same schools, they go to the same clubs, they have the same habits, so they received sentences that the public considered lenient**."  Sentencing Tr. 730:21–25, *U.S. v. Dobson, et al.*, No. 1:12-CR-42 (E.D. Tenn. May 29, 2014), ECF. No. 204.

12. The Court made a similar comment in *United States v. Brown*, which involved a doctor who diluted Botox injections administered to patients but billed Medicare for the full amounts.  The Court said: "**[The prosecutor] touched upon [sentencing disparity] when she said white collar defendants get much, much better treatment in court than people that do not have income and some stature in the community.  I think that most of us would feel that that's really not right, that just because someone is rich or just because someone is highly educated or someone has a prestigious position they really should not get a different sentence than someone who's middle class, someone who's poor. . . .  [T]he Court is to be very, very careful . . . [that it is] not rewarding someone just because they are in a higher economic or higher social status**."  Sentencing Tr. 38:21–39:7, *United States v. Brown*, 1:13-CR-107 (E.D. Tenn. Apr. 2, 2015), ECF No. 73.

13. Another case where the Court went on at length about "typical" traits in white-collar matters was *United States v. Carter*, which involved a person who embezzled from his church.  The Court remarked as follows:

a. "**This is a fraud offense. This is a white-collar crime. People sometimes say you get more money illegally by using the pen than from using a gun, and on top of that, if you do use a pen, you get a lighter sentence. White-collar crimes are generally crimes characterized by deceit, avarice, and greed**." Sentencing Tr. 71:11–16, *United States v. Carter*, No. 1:15-CR-36 (E.D. Tenn. Aug. 13, 2015), ECF No. 30.

b. "**Mr. Carter is well-educated. . . . He comes from a good, strong family. His parents are still alive, and their marriage is intact. . . . He was well compensated in [his] position. . . . He was active in civic and community affairs. . . . I have a number of letters written on [his] behalf. . . . This demonstrates to the Court that the defendant understood and applied the necessity of doing a good job, the necessity of self-control, the importance of delayed gratification, and that he could weigh the costs and benefits of decisions**." Sentencing Tr. 73:19–74:20.

c. "**He has a clean prior record. This is also typical in white-collar cases. In fact, if they did not have prior clean records, they could not have been in the position to commit the crime in the first place**." Sentencing Tr. 74:25–75:3.

d. "**Other than simple greed, there is no apparent reason for the defendant to have committed this crime. That is also true in most white-collar cases. Defendants have options. There are other things they could have done. But for whatever reason, they chose not to.**" Sentencing Tr. 75:19–23.

e. "**[Deterrence] is the most important factor in a white-collar case, and especially in a case such as this.**" Sentencing Tr. 76:20–21.

f. "**It is rare that white-collar defendants reoffend. I see nothing at all in Mr. Carter's background that suggests to the Court that he's likely to commit another offense in the future, especially an offense of this type**." Sentencing Tr. 78:1–5.

14. Thus, the Court has repeatedly made clear that it believes every white-collar defendant has the same "good" and "bad" characteristics.

15. For example, the Court has said that white-collar defendants have the following specific "good traits," which suggests they are more blameworthy for engaging in crime:

6

      i. They come from good families;[1]

      ii. They are well-educated;[2]

      iii. They have had long-term success;[3]

      iv. They enjoy good reputations;[4]

      v. They are first-time offenders or have "clean records;"[5]

      vi. They have had many choices in life;[6]

---

[1] *See, e.g.*, *Carter* Sentencing Tr. 73:21–22 ("He comes from a good, strong family"); *Dobson* Sentencing Tr. 730:15–16 (noting that white-collar offenders "come from good families."); *Cardin* Sentencing Tr. 38:3–5 (noting that white-collar offenders "come from a very, very good family"); Sentencing Tr. 184:2, *United States v. Parkes,* 1:09-CR-38 (E.D. Tenn. Dec. 10, 2009), ECF. No. 112 (in connection with the defendant's conviction for bank fraud, noting that white-collar offenders are "family people").

[2] *See, e.g.*, *Brown* Sentencing Tr. 41:13–14 ("He's well educated. That's pretty common with white-collar defendants."); *Cardin* Sentencing Tr. 38:5–7 ("They're educated. They all do well in school."); *Parkes* Sentencing Tr. 183:12–13 ("[W]e see a person who is educated"); Sentencing Tr. 26:25, *United States v. Donesky, et al.*, 1:07-CR-132 (E.D. Tenn. May 1, 2008) ("They're highly educated"), ECF. No. 20.

[3] *See, e.g.*, *Cardin* Sentencing Tr. 38:7–8 ("They're successful in life"); Sentencing Tr. 38:20–21, *United States v. Dowlen*, No. 1:11-CR-5 (E.D. Tenn. Nov 3, 2011), ECF. No. 49 ("They have a substantial period of achievement"); *Parkes* Sentencing Tr. 183:13–14 ("[W]e see a person . . . who has many accomplishments in the person's life"); *Donesky* Sentencing Tr. 26:23–24 ("They're people who have done very, very well in life").

[4] *See, e.g.*, *Carter* Sentencing Tr. 74:22 ("He was well-respected in his community"); *Brown* Sentencing Tr. 41:14–15 ("[White-collar defendants] enjoy a good reputation"); *Dobson* Sentencing Tr. 730:17–18 ("[O]ftentimes they are widely respected in their communities[,] [a]nd that is the case here"); *Parkes* Sentencing Tr. 183:13–15 ("[W]e see a person . . . who is respected in the community").

[5] *See, e.g.*, *Carter* Sentencing Tr. 74:25–75:1 ("He has a clean prior record[,] [t]his is also typical in white-collar cases"); Sentencing Tr. 24:6–7, *United States v. Askew*, No. 1:02-CR-187 (E.D. Tenn. June 20, 2013), ECF No. 444 (in connection with a defendant convicted of defrauding a manufacturing company's pension fund, stating that, "[g]enerally people that are involved in these types of offenses are people with clean records"); *Dowlen* Sentencing Tr. 41:5–8 ("The argument that Mr. Dowlen is making about being a first[-time] offender . . . is the same argument that Bernie Madoff could make . . . ."); *Parkes* Sentencing Tr. 183:23–25 ("[D]efendants who commit these crimes . . . do not have prior records"); *Donesky* Sentencing Tr. 26:23 ("They're first [time] offenders").

[6] *See, e.g.*, *Carter* Sentencing Tr. 75:22–23 (noting that white-collar defendants "have options[;] [t]here are other things they could have done"); *Cardin* Sentencing Tr. 39:1–2 ("The white-collar offenders . . . have a lot of choices and alternatives").

      vii. They have devoted their time to communities or churches;[7]

      viii. They are in positions of "trust;"[8] and,

      ix. They are at lower risk of committing future crimes;[9]

16. The Court has also made clear that it believes white-collar defendants all have specific "bad" traits:

      i. They are motivated by greed;[10]

      ii. Their crimes are "calculated" or well-thought-out;[11]

---

[7] *See, e.g.*, *Carter* Sentencing Tr. 73:17–74:2 ("As is true in most white-collar offenses . . . . [h]e was active in civic and community affairs"); *Dobson* Sentencing Tr. 730:11–13("[W]hite collar defendants . . . have a record of civic involvement"); *Dowlen* Sentencing Tr. 38:21–23 (noting that white-collar defendants "have devoted some of their time to community service and civic activities"); *Parkes* Sentencing Tr. 184:6–7 ("These [white-collar] defendants generally have community involvement"); *Donesky* Sentencing Tr. 26:21–27:1 ("Most [white-collar] defendants . . . . [have] made great contributions to society").

[8] *See, e.g.*, *Brown* Sentencing Tr. 42:4–5 ("[I]n almost all of the cases involving white-collar criminals we have some type of violation of trust."); *Cardin* Sentencing Tr. 38:9 (noting that white-collar offenders are "put in positions of trust"); *Dowlen* Sentencing Tr. 38:24–25 (noting that most white-collar offenses include "an abuse of trust").

[9] *See, e.g.*, *Carter* Sentencing Tr. 78:1–2 ("It is rare that white-collar defendants reoffend"); *Dobson* Sentencing Tr. 733:1–3 ("[I]n most instances it's unlikely the white-collar offender will ever commit this type of offense again"); *Cardin* Sentencing Tr. 40:12–14 ("With white-collar offenders, the Court rarely sees that rehabilitation or incapacitation are significant factors"); *Parkes* Sentencing Tr. 186:16–17 ("[R]arely will white-collar defendants reoffend").

[10] *See, e.g.*, *Carter* Sentencing Tr. 75:19–22 (noting that "most white-collar cases" involve "simple greed"); *Brown* Sentencing Tr. 43:1–2 ("[T]he last thing that is common in white collar criminals is greed"); *Cardin* Sentencing Tr. 39:16–18 ("[O]ne of the common characteristics of white-collar criminals is that they are, in some degree, motivated by greed"); *Donesky* Sentencing Tr. 25:25–26:2 (noting the defendants had "been given the absolute best our society has to offer" but committed crimes "out of greed").

[11] *See, e.g.*, *Brown* Sentencing Tr. 41:19 ("The crimes are calculated"); *Dobson* Sentencing Tr. 732:11–733:1 (noting that white-collar crimes are "calculated" and require "substantial planning"); *Cardin* Sentencing Tr. 39:5–6 (noting that white-collar crimes are "calculated"); *Dowlen* Sentencing Tr. 39:6–7 ("the offense is planned and thought out"); *Parkes* Sentencing Tr. 184:2–3 (noting that "[t]here's a lot of planning involved" in white-collar crimes).

8

    iii. Their crimes continue for a long period of time; and,[12]

    iv. They are worse than every other type of defendant at paying restitution and behaving on supervised release.[13]

Respectfully submitted this 14th day of May 2021.

Date: May 14, 2021

                                                                                                  Jim Walden

---

[12] *See, e.g.*, *Brown* Sentencing Tr. 41:23–25 ("Very, very often white collar criminals commit their crimes over a substantial period of time"); *Cardin* Sentencing Tr. 39:11–13 (noting that white-collar crimes "go on for quite a while"); *Parkes* Sentencing Tr. 184:3–4 (noting that white-collar crimes "generally take place over a fairly long time period").

[13] Revocation Hr'g Tr. 8:19–20, *United States v. Brock*, No. 1:06-CR-75 (E.D. Tenn. Dec. 15, 2011) ECF. No. 74 ("Of all defendants, including drug defendants, [white-collar defendants] do the worst on supervised release").