# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MARK HAZELWOOD, et al.,<br><br>Defendants. | **AFFIDAVIT OF<br>MARK HAZELWOOD**<br><br>No. 3:16-CR-20<br>(Collier/Guyton) |

STATE OF FLORIDA )
                       ) ss.:
COUNTY OF SARASOTA )

Mark Hazelwood, being duly sworn, deposes and says:

1.      I submit this affidavit pursuant to 28 U.S.C. § 144, and in support of my Motion to Disqualify District Judge Curtis Collier (the "Court") pursuant to (a) 28 U.S.C. § 144, (b) 28 U.S.C. § 455(a), and (c) Local Rule 7.1(a).

2.      For the reasons set forth herein, I believe the Court has a personal bias and prejudice against me and in favor of the government, and that a reasonable and informed person (a) would conclude that the Court has such a bias and prejudice, and (b) might question the Court's impartiality.

3.      I make this affidavit in good faith, and without intending any disrespect to the Court.

4.      This affidavit has two parts.  First, I discuss examples of bias that the Court showed during the prior proceedings.  Second, I explain why the Court's bias against me stems

1

in part from its prior dealings with white-collar defendants and the predispositions it developed from those cases.

5.      I submit this Affidavit for the limited purpose of meeting the standard under 28 U.S.C. § 144, and otherwise supporting my recusal motion, and without waiving my Fifth Amendment privilege not to be a witness against myself or the protections of either the attorney-client or work-product privileges.

6.      I emphatically maintain my innocence, as I have since the beginning of this case.  Nothing in this affidavit should be read or understood as any admission of guilt.

7.      I know I have to be complete and truthful about the facts indicating that the Court is biased against me, with sufficient detail about that bias.

8.      I mean no disrespect to the Court by submitting this affidavit.  I am aware that the Court has had an impressive and extraordinary career that encompasses nearly 50 years of public service.  Nevertheless, I believe the Court is biased against me, and I would not submit this affidavit unless I thought it were necessary.

9.      For the reasons described below, the Court's bias stems both from the Court's exposure to inadmissible evidence and its predetermined stereotypes and generalizations about "white-collar" defendants.  The bias is serious, which becomes clear when looking at the Court's many rulings, all of which were adverse to me, including where the Court (a) made statements and rulings without evidence, (b) denied me rights to important information, (c) reversed itself, (d) unnecessarily constrained my liberty, (e) staked out positions on issues that will have to be litigated before any retrial, and (f) took on the role of advocate.

# I.    THE COURT'S BIAS IN PRIOR PROCEEDINGS

10.    The evidence of the Court's bias and prejudice against me comes, in part, from several decisions it made and explanations it gave after being exposed to prejudicial and irrelevant recordings of a late-night event at John Freeman's lake house on October 25, 2012 (the "Recordings"). The Court's adverse and inconsistent rulings came at every stage of the proceedings after it heard the Recordings, including: (a) during the remainder of the trial (the "Trial"); (b) in connection with my sentencing proceeding on September 26, 2018; (c) in connection with my motion for a new trial filed on June 25, 2018, and motions to supplement; and (d) in proceedings and motions related to the terms of my post-conviction release. I discuss each phase below.

## A.    TRIAL

11.    The Court knows the background for the introduction of the Recordings, but I will briefly set forth the relevant facts.

12.    The Recordings had nothing to do with the charges brought against me.

13.    The government had told my lawyers that it had no intention of seeking to admit the Recordings. My prior lawyer has confirmed as much, and my understanding is that the government said the same thing to Pilot Flying J ("Pilot"). Declaration of Jim Walden ("Walden Decl.") at ¶¶ 5–8 (incorporated herein by reference). But, as of December 5, 2017, the Trial was going badly for the government. So, the government reversed course and made a last-ditch effort to turn things around by asking the Court to admit the Recordings. And the Court granted the government's request.

3

14.     The government asked the Court to let the Recordings into evidence after the government said my prior lawyer was eliciting testimony that I have the character trait of "**sound business judgment**." Mem. in Supp. of Mot. 1, Dec. 5, 2017, ECF No. 372.

15.     My lawyer had asked Brian Mosher questions about my being a good businessman. I believe my lawyer was trying to show that it would have been stupid for me to engage in fraud because—if I had engaged in fraud—I would have been running the risk of destroying the company that I had helped build.

16.     Because the Recordings contained words that, if publicly exposed, could have created a backlash against me and Pilot, the government claimed the Recordings should be admitted into evidence to challenge my lawyer's suggestion that I was a good businessman.

17.     The government also offered another rationale for why it thought the Court should allow the government to introduce the Recordings: to show I did not have the character trait of "**authentic humanitarian good will toward the entire community of over-the-road truck drivers**." Mem. in Supp. of Mot. 1, Dec. 5, 2017, ECF No. 372. I guess because my lawyer had introduced evidence about all the good things I did for truck drivers, the government was trying to argue that I did not really care about truck drivers, even though the prejudicial words on the Recordings were not used to describe truck drivers.

18.     Because this argument was so far-fetched, the government eventually stopped trying to argue that the Recordings were relevant to my "authentic humanitarian good will toward the entire community of over-the-road truck drivers." But the Court never criticized the government for making such a ridiculous argument.

4

19.     My lawyer objected to the introduction of the Recordings on several grounds, including that he had not introduced character evidence and that the Recordings were overly prejudicial.  Trial Tr. 9:7–14:7, Dec. 7, 2017, ECF 375.

20.     In an oral opinion, the Court decided to admit the Recordings.  Trial Tr. 184:7–190:1, Dec. 7, 2017, ECF 374.  As I understand it, the Court did not accept the government's theory for why the Recordings should be admitted and came up with a different theory that allowed the government to introduce them.  Opening Appellant Br., No. 2018-CR-06023, ECF No. 31 at 17–18.

21.     This is an example of the Court tipping the balance in favor of the government.  I do not remember a single time during the Trial when the Court rejected a defense argument but then offered the defense a different argument that the Court could accept to support something the defense wanted.

22.     Then, on January 29, 2018, the Court issued a written opinion about the introduction of the Recordings.  *See* Order Denying Sealed Mot., Jan. 29, 2018, ECF 455.  In that written opinion, the Court revived the government's original theory.  Opening Appellant Br., No. 2018-CR-06023, ECF No. 31 at 18.  The Court seemed to be doing whatever it could to make sure the government was permitted to use the Recordings.

23.     After the introduction of the Recordings, the events showed that the Court now thought I was a racist and was determined to help the prosecution convict me.  The Court acknowledged that the Recordings were "deeply offensive," and contained "repeated use of racial epithets and offensive language concerning females."  Trial Tr. 183:17–184:22, Dec. 7, 2017, ECF 374.  The Court characterized the Recordings as possessing "extraordinarily offensive racist and sexual content."  Trial Tr. 183:24–184:1, Dec. 7, 2017, ECF 374.

5

24.     Playing the Recordings in Court was bad enough, but the Court also decided on March 7, 2018, to release them to the public.  *See* Order Granting Media Outlet's Req., Mar. 7, 2018, ECF 503.  To this day, the *Knoxville News Sentinel* frequently re-publishes a link to the Recordings when it runs an article about this case, most recently on December 30, 2020.

25.     The appeals court later reversed my conviction and that of my co-defendants, saying that the theories offered by both the Court and the government about the admissibility of the Recordings were "precisely the type of reasoning the Federal Rules of Evidence forbid."  Am. Op. 1, No. 2018-CR-06023, ECF No. 91-2.  The appeals court held that the Recordings were—as all the defense lawyers argued clearly—"vintage bad character evidence."  *Id.*  The appeals court further held, "the recordings are a textbook violation of Rule 403, because the risk of unfair prejudice eviscerates any purported probative value."  *Id.*  Even Heather Jones's conviction was reversed because of prejudice, and the Recordings had nothing to do with her.

26.     Two of the appellate judges, Judge Richard Suhrheinrich and Judge Eric Murphy, pushed back against the government at oral argument.  Judges Suhrheinrich and Murphy seemed pretty disappointed with the government for even trying to get the Recordings into evidence.  Judge Suhrheinrich challenged the government's claim that the evidence against me was overwhelming, and he even suggested that the government wanted to introduce the issue of race into the trial precisely because the government knew the evidence was *not* overwhelming.  Oral Argument at 39:13–39:44; 43:51–44:31, Feb. 6, 2020.  Judge Murphy said that the Recordings were a "prototypical example" of prejudice.  Oral Argument at 48:06–49:16.

27.     The Court's bias against me became more apparent in connection with my sentencing hearing.

## B.    SENTENCING

28.    The government and Probation Department (in the first presentence investigation report ("PSR")) calculated my "loss" figure at a staggering $23,789,936.  Presentence Inv. Rep. ¶ 48, Jul. 18, 2018, ECF No. 597.  The Probation Department explained in the PSR that it had used the loss amount calculated by KraftCPAs PLLC ("Kraft"), the certified public accounting and consulting firm hired by Pilot pursuant to the company's cooperation obligations under a Criminal Enforcement Agreement with the government.  Presentence Inv. Rep. ¶ 32.

29.    On August 7, 2018, my counsel requested that the Court approve subpoenas for records from Pilot and Kraft.  R. 17(c) Mot. to Authorize Issuance of Subpoenas, Aug. 17, 2018, ECF No. 640.  Since the government outsourced the job of loss calculation to Pilot, which undertook the work through Kraft, the subpoenas sought information as to how Pilot's internal auditors and Kraft reached their conclusions on loss calculation and attribution.  R. 17(c) Mot. 10–12.

30.    My lawyers needed this information to prepare for the sentencing hearing, as the loss amount was by far the largest factor in the recommended sentencing range.  *See* R. 17(c) Mot. 10–12.  By then, Kraft had already revised its earlier loss attributions to me twice—both times downward.  Kraft reduced its loss attributions at least in part to account for the fact that Pilot's internal auditors had made a tactical business decision to make overpayments to customers, including to customers who were not defrauded.  Wilner Expert Rep., Sept. 12, 2018. ECF 614-2 at 4.  In other words, Kraft basically admitted that its earlier calculations were inflated.  This made the need for the subpoenas even more important.

31.    The Court gave short shrift to our motion.  The Court referred to our motion as a "**fishing-expedition**" and denied the motion in its entirety.  Order Denying R. 17(c) Mot. 3–5, Aug. 28, 2018, ECF No. 651.  When my attorneys made a motion for the Court to reconsider its

7

decision, the Court denied the request once again, thereby ensuring that we would not have crucial information in time for the sentencing hearing. *See* Mot. for Consideration Sept. 5, 2008, ECF No. 660; Order Denying Mot. for R. Sept. 11, 2008, ECF No. 666.

32. The fact that Kraft had to revise its numbers downwardly twice was a major red flag. Since the government and the PSR relied on Kraft's final figures, I did not understand how we could be denied access to their analysis and workpapers.

33. When the Court denied my lawyers' request, I became convinced the Court would use the PSR's inflated loss amount regardless of the evidence (or lack of evidence) supporting it.

34. For someone facing a very long sentence, which would be based primarily on the loss calculation, this was terrifying. Without access to the complete picture, I felt I had no alternative other than to agree to a stipulation on loss with the government, even though I believed that loss amount was exaggerated. But the fact that the government stipulated to a loss figure of $3,500,001 to $5,000,000 (Notice of Filing Sept. 17, 2018, ECF No. 678-1)—rather than $23.7 million—was a very real indicator that my lawyers had a solid basis to request the Kraft information, and that even the government knew the Kraft numbers were highly suspect.

35. At the sentencing hearing, one of my attorneys, Jim Walden, described my modest upbringing and the many good things that I have done in my personal life. Sentencing Tr. 152:24–153:21, 160:22–163:6, 163:20–165:12, 177:12–178:1, Sept. 26, 2018. Mr. Walden told the Court how I had "**decidedly humble beginnings, with few educational opportunities**." Sentencing Tr. 153:1–2. The Court heard how I had "**spent countless hours counseling friends, mentoring friends, ministering to friends, helping people in need, doing nice things for strangers**." Sentencing Tr. 161:20–22. Mr. Walden also told the Court how I had taken in and financially supported my son's friend and helped others who were struggling financially. Sentencing Tr.

8

162:6–23, 164:25–165:7.  He also described how tragedies in my personal life, such as the losses of my daughter, Jessie, and my niece, Emily, motivated me to help others.  Sentencing Tr. 163:20–164:24.

36.     The Court acknowledged my unwavering commitment to my family and my good deeds, as well as the more than 165 character letters submitted to the Court on my behalf. Sentencing Tr. 161:10–13, 192:10–23.

37.     After that acknowledgment, the Court completely discounted my devotion to family, humble beginnings, and good deeds, relying on biased generalities about white-collar defendants.  The Court stated that these types of characteristics were "**not uncommon in white-collar cases**."  Sentencing Tr. 197:21–24.

38.     Then, the Court made a wholly unfair, and lengthy, comparison between my life story and that of Bernie Madoff.  Sentencing Tr. 197:21–201:14.  The Court said it was **not** comparing me to Madoff, but, for **four** pages of the transcript, the Court did just that.  I never understood how the Court could say it was not comparing me to Madoff, but then go on at length to compare my circumstances to Madoff's.  I took it—and my family and friends in the gallery took it—as a direct comparison.  Some in the media did as well.[1]

39.     The Court stated that "**Mr. Madoff came from humble beginnings**," "**worked his way up**," and "**was innovative and impressive**."  Sentencing Tr. 198:14, 198:25–199:1.  It also stated that "**Mr. Madoff achieved a lot of prominence in his field**" and "**devoted himself to**

---

[1] "Judge Collier Sentences Former Pilot President Mark Hazelwood to 12 ½ Years in Federal Prison, THE CHATTANOOGAN, May 12, 2021.
https://www.chattanoogan.com/2018/9/26/376929/Judge-Collier-Sentences-Former-Pilot.aspx
("The judge said [there] were some similarities between Hazelwood and financier Bernie Madoff, who got a 150-year sentence.  He said both came from low circumstances and worked hard to build their companies.  He said others put faith in them due to their strong reputations.")

**charitable and philanthropic activities**." Sentencing Tr. 199:17–18, 200:6–7. The Court added that "**Mr. Madoff was a family man. . . . [who] was close to his brothers and sisters and his granddaughter**." Sentencing Tr. 200:23–201:2.

40. I hope the Court can imagine how strained and unfair this comparison was:

   a. Madoff graduated from college and even went to law school for a year; I only graduated high school.

   b. Madoff was the founder of his "investment" firm; I started at the bottom of the corporate ladder and worked my way up.

   c. Madoff created a Ponzi scheme with totally imaginary profits; I built a real company that started off as a small chain of truck stops and grew to a national company with over $30 billion of revenue.

   d. Madoff's scheme impacted tens of thousands of his clients in more than 100 countries; the charges brought against me involved a small fraction of Pilot's customers that did not receive a small amount of their non-contractual discounts.

   e. Madoff was the mastermind of a massive Ponzi scheme; the proof against me showed, at most, that other of Pilot's employees—not me—devised the allegedly fraudulent scheme and participated of their own accord.

   f. Madoff stole billions of dollars; I created programs that actually brought fuel prices down across the industry, *saving* hundreds of millions of dollars for trucking companies (including those I allegedly defrauded).

10

g.     Only a fraction of Madoff's victims ever got their money back; Pilot had so much wealth it easily paid back the customers allegedly defrauded, and even overpaid many of them.

h.     Madoff's conduct resulted in lost homes, lost jobs, bankruptcies, and even suicides; Pilot remains one of Knoxville's largest employers, and the alleged losses in this case were so small that they did not have a material impact on the trucking companies.

i.     Madoff was unquestionably guilty, as he pled guilty; I maintain my innocence, and the proof against me at trial was certainly "not ironclad," according to the appeals court.

41.     Even though I have maintained my innocence, the Court compared me to an admitted devil. This comparison makes sense only if seen through a biased lens: as a destroyer of worlds, a corrupter, a sociopath, a narcissist, a cheat. No aspect of the analogy was true or fair. None of it was based on any evidence at all; it must have been all about the Recordings.

42.     In addition to unfairly comparing me to Madoff, the Court concluded—without any evidence to support the conclusion—that I destroyed the lives of my alleged co-conspirators.

43.     The Court resorted to a description of a hypothetical young Pilot employee, whom I had supposedly corrupted. The Court stated, in part:

> **[T]he Court is not pointing to anyone in particular, but we can look at a young person who graduated from a local college, perhaps the University of Tennessee, and they got . . . their very, very first job, at Pilot. Once they get there, . . . they see that people are engaged in fraudulent activities. They're reluctant to engage in fraudulent activities. They weren't brought up that way. So they don't like what is going on. But their coworkers are engaged in those activities openly, and there's peer pressure. And the person is deciding what they should do. And they look and they see the role model, Mr. Hazelwood, and they look at**

> **their . . . coworkers, and they talk with their coworkers, and they find out that Mr. Hazelwood approves of this type of action. So they give in to the peer pressure and join the fraud. The choice they had was to quit and find another job, or to stay there and become compromised.**

Sentencing Tr. 217:1–18. The fact that the Court introduced this hypothetical person by saying the Court was "**not pointing to anyone in particular**" left me completely mystified. There was no evidence in the Trial, or anywhere else, to support the Court's suggestion that a young Pilot employee decided to join the alleged conspiracy because she or he saw that I, their role model, approved of fraudulent conduct. The Court invented a hypothetical young and vulnerable employee, imagined that this employee was peer-pressured to join the fraud, and justified giving me a lengthy sentence based on the hypothetical resulting harms.

44. The Court's bias toward me also manifested itself when the Court was assessing evidence of my good character. It seemed as if the Court took everything good about me and twisted it into a reason to punish me more severely. For example, after acknowledging the many letters submitted from my friends and colleagues in the trucking industry, the Court said:

> **[The Court] can only conclude that Mr. Hazelwood's reputation in the trucking industry played a large role in the success of the scheme and artifice to defraud. Victim companies had a false sense of security because they knew they were dealing with Pilot and that behind Pilot was Mark Hazelwood . . . Mr. Hazelwood abused the trust that Pilot and the trucking industry had placed in him . . . He also abused the authority . . . he had earned . . . throughout the industry. In effect, Mr. Hazelwood used that authority and trust to further the scheme and artifice to defraud and to prey upon the victims' false sense of security in him and Pilot.**

Sentencing Tr. 206:17–207:5.

45. This conclusion that I "abused" my position of "trust" to lull customers into a false sense of security was stunning for at least five reasons:

a.  The government never advanced this theory in its sentencing submissions. Sentencing Mem., Sept. 12, 2018, ECF No. 669; Govt's Resp. to Hazelwood Sentencing Mem., Sept. 20, 2018, ECF No. 698.

b.  At the Trial, the government did not call a single customer to testify against me.

c.  At my sentencing, the government did not call a single customer to testify against me.

d.  Customers—who knew of my conviction—submitted letters on my behalf, giving many positive descriptions of my treatment of them over the years.

e.  Some customers submitted letters explaining that even though they had suffered losses, those losses did not have a materially negative impact on business operations. None of these customers said I had lulled them into a false sense of security. Letter from S. Gordon to J. Collier, ECF No. 704-3; Letter from R. Dobrasinovic to J. Collier, ECF No. 704-4; Letter from W. Lynch to J. Collier, ECF No. 704-7.

46.  In sum, there was literally no evidence to support the Court's conclusion.

47.  Not only did some customers submit letters stating that the losses suffered had no materially negative impact on their business operations, but economic expert Dr. Benjamin Wilner also testified that the amount of loss at issue for each customer was "**de minimis**." Sentencing Tr. 45:25–46:9, 51:20–25, 58:17–25. For example, Dr. Wilner testified that the loss to each company was analogous to someone who earned $130,000 in annual income losing $10 a year. Sentencing Tr. 56:21–57:13.

13

48.     The government offered very little to counter Dr. Wilner's testimony.  Thus, the Court found Dr. Wilner's unrebutted testimony "**true and reasonable**," and concluded, "**we can rely upon his testimony**."  Sentencing Tr. 143:2–13.  The Court also specifically accepted as "**legitimate and [] fair**" Dr. Wilner's expert opinion that trucking companies had "**suffered small losses . . . in such a manner that it should not affect their business decisions or create a significant harm in how their businesses were performed**."  Sentencing Tr. 143:7–13.

49.     Still, despite crediting Dr. Wilner's testimony, the Court denied my request for a downward departure.

50.     The Court stated that it was denying the departure motion in part because Dr. Wilner relied solely on averages for customer's losses.  Sentencing Tr. 143:14–23.  This was just not true.  In fact, for most of the customers on the government's (and the PSR's) loss list, Dr. Wilner compared each company's annual revenue to their alleged losses in the Kraft report.  Wilner Decl. 10–11, 25–26, ECF No. 703-1.  These comparisons showed that the alleged losses would not have had a material impact on the trucking companies.  Wilner Decl. 12–13, ECF No. 703-1. That the Court ignored Dr. Wilner's victim-by-victim analysis is further proof of the Court's bias against me.

51.     After making the Madoff analogy, introducing the hypothetical young Pilot employee, inventing a narrative that my reputation lulled customers into a more successful fraud scheme, and crediting but disregarding unrefuted expert testimony, the Court then made broad statements about its belief that I am guilty.  It claimed that I "**improperly took it upon myself to parlay Pilot's name, reputation, brand, prestige, computational power, accounting and financial systems, and communication system, in furtherance of this unauthorized scheme**." Sentencing Tr. 204:7–11.  The Court said, when it came to the fraud, "**all roads lead to Mr.**

14

Hazelwood." Sentencing Tr. 213:19–21. The Court also said I was "**the only person who was in a position to harness the power, brand, prestige, financial strength, and corporate infrastructure of Pilot Flying J to commit these crimes**."[2] Sentencing Tr. 213:21–24.

52.     The Court also reached unsupported conclusions about my motivations. The Court "**surmise[d]**" that "**the motivation was hubris**," and that I "**need[ed] to feed [my] ego**." Sentencing Tr. 207:9–11. The Court stated that my "**outsized ambition was the driving force**" behind my alleged involvement in the fraud. Sentencing Tr. 207:16–18. I was deemed to have a "**competitive nature**" which, combined with my other business interests, would make me "**much, much more [of a] risk**" to the public than a typical white-collar defendant. Sentencing Tr. 220:11–21. None of this was based on any evidence. In fact, the government never really offered any credible of evidence of my alleged motivation. The Court chose to paint on that blank canvas.

53.     The very fact that the Court went out of its way to use unfounded exaggeration and speculation to conclude that I was "**much, much more [of a] risk**" than other white-collar defendants shows, with certainty, that the Court cannot reasonably be expected to put its strong and unsupported views about me out of its mind. Sentencing Tr. 220:17–19.

54.     In Section II below, I give some examples of the Court's prior white-collar cases, as I believe this was the group of people to which the Court was comparing me unfavorably from the "future risk" perspective.

_____

[2] However, before closing arguments, the Court itself twice acknowledged that it could not recall any evidence that I was the one who devised or intended to devise the purported scheme. Trial Tr. 25:18–23, 27:19–23, Feb. 5, 2018. And, by claiming that all roads led to me, and that I was the *only* person capable of "harnessing" the power of Pilot to commit the fraud, the Court ignored Mosher's trial testimony—if believed—that Pilot's CEO, Jimmy Haslam, was aware of and approved the scheme. Trial Tr. 144:9–145:13, Nov. 28, 2017; Trial Tr. 6:15–19, 8:3–10:8, 24:5–17, 119:19–23, Dec. 6, 2017. To be clear, I am not trying to say Haslam was involved in any misconduct. I am only trying to point out the arbitrariness of the Court putting all the blame on me.

55.     In addition to the several ways the Court showed bias toward me during my sentencing, the bias and arbitrary treatment I received was made even more clear when the Court later sentenced other high-ranking people at Pilot, such as John Freeman and Brian Mosher.  My point here is not to take anything away from them, but to show that the Court was uniquely biased against me.

56.     For context, during the Trial, the jury was presented with evidence that Freeman originated the scheme, and that Mosher was the most prolific participant.[3]  Both were high up in the sales department, and Freeman was the VP of Sales between 2012 and 2013.

57.     Although the Court's view of the nature of the conspiracy and my alleged role in it caused the Court to dismiss anything good said about me, the Court did not do this to Freeman and Mosher.  With regard to Freeman and Mosher, the Court concluded, "**there is little likelihood these defendants will reoffend**."  Sentencing Tr. 53:11–14, Nov. 7, 2018.  The Court also spoke directly to them, assuring them, "**[Y]ou are not bad people.  Your conviction and your sentence has nothing to do with who you are as human beings**."  Sentencing Tr. 74:10–12, Nov. 7, 2018.

58.     Despite the absence of any evidence that I devised the purported scheme, the Court treated me much worse than the person who allegedly originated the scheme as well as the person who was alleged to have been the most prolific participant.

59.     My bottom line is this: the Court put all the responsibility on me not because the evidence required it, but because the Court was biased against me.

---

[3] To be clear, despite the fact that both Freeman and Mosher pled guilty, I believe neither was given access to the exculpatory evidence we have now uncovered.

16

### C. MOTION FOR A NEW TRIAL

60. After my conviction, my current counsel filed a motion for a new trial on June 25, 2018. *See* R. 33 Mot. for New Trial, ECF No. 566. My lawyers made many arguments as to why I was entitled to a new trial, even though my prior lawyer missed the deadline. To excuse the delay, my lawyers argued that my prior lawyer never even consulted me about the possibility of filing such a motion. R. 33 Mot. for New Trial, ECF No. 33. I understand that, in similar circumstances, other courts excused delay on that basis.

61. After being convicted, I wanted to know every possible option for fighting the unfair Trial and result. If I had learned that a motion for a new trial was an option, I would have asked my trial counsel to carefully review every aspect of the prosecution and Trial and to present to me the arguments that might support a motion. I believe that it was for me to decide whether to file a motion for a new trial and, if there were any risks, it was for me to decide whether the chances of success outweighed those risks. But I had no say in the decision because I did not even know it was an option.

62. Nevertheless, the Court denied my motion for a new trial as untimely. Mem. Denying Mot. for New Tr. 2, Sept. 21, 2018, ECF No. 701. In doing so, the Court stated that my prior trial counsel did not have an obligation to tell me, or consult with me, about a motion for a new trial. Mem. 15–19.

63. This was the Court's own argument: the government never argued in its response to our motion that my prior counsel had no need to consult with me on the subject. *See generally* Govt's Resp. in Opp'n to Def. Hazelwood's R. 33 Mot. for New Trial, July 9, 2018, ECF No. 578. So, as had become so familiar to me by this point, the Court was literally taking over the role as prosecutor by making the government's arguments for it.

17

64.     As described below, the Court did four other things that showed its bias against me (and in favor of the government) in connection with my new-trial motion:

65.     **First**: My lawyers accused the government of misconduct and, in response, the Court basically hinted at imposing sanctions against my lawyers. Mem. Denying Mot. for New Tr. 6 n.5. The misconduct alleged was serious, and I understand it even better today. Under the Constitution, the government is required to disclose exculpatory evidence to me. The government outsourced this important job to two of Pilot's law firms, despite knowing that I was in a major dispute with Pilot over my termination, which the government also caused. One of those law firms created a big database, apparently at the government's request. A bunch of exculpatory information was buried among almost 14 million documents, making it nearly impossible to find. I understand that other courts have sanctioned prosecutors in less egregious circumstances, but the Court instead actually criticized my lawyers for raising it and appeared to threaten sanctions, without even asking the government a question about whether it was true.

66.     **Second**: As part of the new-trial motion, my lawyers produced two forms of exculpatory evidence that supported my defense concerning trip reports and whether, in fact, I was reading them.

        a.      One form of evidence was a forensic analysis of my iPad, where approximately 16-months' worth of trip reports were stored in the Dropbox app. At the time of the new-trial motion, the preliminary results of the forensic analysis showed that nine trip reports were accessed via Dropbox on my iPad prior to April 15, 2013, none of which had any entries concerning alleged fraud. Mem. Denying Mot. for New Trial 7. In the time since we filed our motion, the final analysis has revealed that, in fact, I did

18

not access any of the reports, including the nine. In other words, it showed I was not reading trip reports during that time.

b.  Other exculpatory evidence undermined Sherry Blake's testimony that she was painstakingly providing me with trip reports each week. R. 33 Mot. for New Trial 12.

67.  The Court did not even address this evidence in rejecting my motion for a new trial. Rather, the Court just relied on the trial record to conclude I did read the trip reports. Mem. Denying Mot. for New Trial 37-38. The Court reached this conclusion without any inquiry whatsoever into whether the government intentionally buried evidence showing that I was not reading trip reports.

68.  **Third**: The Court dismissed evidence that Blake was either lying or mistaken when she testified that I knew she had an interview with one of Pilot's law firms scheduled for June 11, 2014. Mem. Denying Mot. for New Trial 33-34. This evidence was extremely important, as one of the government's theories was that I called Blake on June 9, 2014, two days before the interview, to influence her to tell the law firm I was not reading trip reports. But the newly discovered evidence showed that the entry Blake created in my calendar showed that the interview was for June 9 not June 11; so, even assuming I had noticed the date of her interview in my calendar, the call on the evening of June 9 that she testified about would have been *after* the interview, not before. In short, contrary to the government's "alternative" theory, I could not have intended to influence her interview, it was literally impossible. The Court did not seem to be at all troubled by this; it refused to conduct a hearing, permit discovery, or even ask the government whether the government knew about the calendar entry. To me, the Court, again, seemed determined to side with the government.

19

69.      **Fourth**: While the Court denied the motion on timeliness grounds, it decided to reject my other arguments "**for the instruction of the parties in future stages of the case**," even though the Court acknowledged that "**addressing these claims is not necessary to the Court's disposition**." Mem. Denying Mot. for New Trial 37. In crediting the trip reports, and finding—as the "thirteenth" juror—that I read them, the Court offered an advisory opinion on an issue that will be litigated before the retrial, creating at least the appearance that my motions will not get a fair hearing. Mem. Denying Mot. for New Trial 41. The Court not only declared its view that my guilt had—without a doubt—been established by the evidence, but it also effectively warned me that at future stages of the case (such as a retrial), my arguments regarding the insufficiency of the evidence against me would have no hope of convincing the Court of my innocence. Mem. Denying Mot. for New Trial 37. The Court made clear that its belief that I was guilty is set in stone, no matter how badly the government acted or how much evidence was suppressed or withheld. Again, the Court did not need to do this. It had already rejected the motion on timeliness grounds. The Court just went out of its way to declare its certainty of my guilt. That was not fair, and the Court, which never explained why it chose this path, cannot take it back now.

### D.      CONDITIONS OF RELEASE

70.      On February 9, 2016, at the time of my indictment, Magistrate Judge H. Bruce Guyton granted me pretrial release. Order Setting Conditions of Release, Feb. 9, 2016, ECF No. 15.

71.      During the next two years, I vigilantly followed the terms of my pretrial release. As Magistrate Judge Guyton observed post-verdict, I "**complied with all conditions of pretrial release,**" "**[had] no violations of [my] release conditions,**" "**appeared in Court when required,**" and traveled extensively, always "**return[ing] as promised.**" Rep. and Recommendation 4, Feb. 21, 2018, ECF No. 497.

20

72. On the day of my jury verdict, February 15, 2018, I was entrusted to return to Knoxville from Chattanooga, unescorted, and spend the night in my home. The next day I traveled freely to the Knoxville courthouse for my bail hearing, knowing I might be detained.

73. At my detention hearing on February 16, 2018, the government conceded that I posed no danger to any person or to the community, but asked Magistrate Judge Guyton to detain me pending my sentencing because I presented a flight risk. Hearing Tr. 17:22–18:1, Feb. 16, 2018, ECF No. 525. Magistrate Judge Guyton rejected the government's detention motion, but imposed new restrictions of home confinement and location monitoring solely because of risk of flight. Rep. and Recommendation 1–3; Hearing Tr. 29:19–31:16. In doing so, he determined that, given my anticipated lengthy sentence, the new restrictions **"reasonably assured"** my presence at my sentencing **"and further proceedings in this case."** Order Setting Conditions of Release 2, Feb. 16, 2018, ECF No. 491; Rep. and Recommendation 1.

74. On the day of my detention hearing, after I learned the terms of my release, I returned freely to my residence, and my monitoring device was not activated for over seven hours. I did not try to flee, nor would I.

75. Under my more restrictive conditions, I continued to abide by the terms of my release and every directive of the Probation Department. For example, on June 15, 2018, I traveled to the courthouse to have the battery for my monitoring device changed, resulting in my device being turned off for an hour and a half. Probation trusted me not to flee. I had no intention to do so, and never have.

76. When I hired new lawyers in May of 2018, I sought permission to travel to New York City, where significant defense team resources are located, to meet with my new attorneys,

Case 3:16-cr-00020-CLC-HBG   Document 1010-3   Filed 05/14/21   Page 21 of 30   PageID #: 22840

assist in reviewing evidence, and hold meetings critical to my defense. Mot. Requesting Permission to Travel, May 25, 2018, ECF No. 541.

77.    The Court denied my request, seeing **"no violation of Mr. Hazelwood's due process right or his right to counsel where he has methods other than personal interstate travel to communicate with the counsel he chose to retain."** Order 2, May 29, 2018, ECF No. 544. In light of my history of compliance with court orders and pretrial services directives, this was yet another indication of the Court's bias against me.

78.    After my sentencing, the Court's denial of my request for release pending appeal revealed more of the Court's bias toward me.

79.    For context, when my lawyer asked for my release pending appeal, the Court made clear that it did not consider me to be a flight risk or a danger to the public:

> **The Court agrees that Mr. Hazelwood is not likely to flee. So the Court makes a finding that he's demonstrated by clear and convincing evidence that he's not a flight risk. <u>The Court also finds that the Court does not conclude that he is a threat to the safety of another person or the community. So the Court finds that the defendant has demonstrated that by clear and convincing evidence.</u>**

Sentencing Tr. 232:23–233:4 (emphasis added). Nevertheless, the Court denied my motion for release pending appeal because it **"could not see how [the admission of the Recordings into evidence] could result in a reversal."** Sentencing Tr. 233:13–21. The Court ordered my surrender to prison, and I appealed.

80.    On November 13, 2018, the Sixth Circuit found that my appeal *did* raise a substantial question likely to result in reversal, and ordered my release on bail pending appeal, subject to conditions that this Court deemed necessary. Order, Nov. 13, 2018, ECF No. 787.

81.    On November 15, 2018, my lawyers again filed for release from home confinement. Mot. to Set Terms of Release, Nov. 15, 2018, ECF No. 784. On November 16, 2018, the

22

government stated its position that the Court should maintain all existing conditions of my release, including home confinement restriction.  Response to Mot. to Set Terms of Release 3, Nov. 16, 2018, ECF No. 786.  It did not ask for, or identify any new grounds supporting, a finding of danger to the community.  *See generally* Resp. to Mot. 1–3.

82.     On November 20, 2018—less than two months after finding I did *not* pose a danger to the community—the Court reached *the exact opposite* conclusion, finding that I posed a danger of committing a crime and that I needed to stay locked in my home.  Order 2, Nov. 20, 2018, ECF No. 791 ("During Defendant's sentencing hearing, the Court observed that there was a need for Defendant's sentence to protect the public, because the Court concluded there was a risk Defendant would reoffend, that is, commit further white-collar crimes.  Relaxing the current conditions of release would therefore not be in the interest of justice.").  Again, the Court decided on a ground that even the government did not proffer.

83.     As I understood the Court's position, the Court believed that, because I have several businesses, including two in the trucking industry, there was a risk that I might defraud my clients.  Sentencing Tr. 219:25–220:21.  The Court gave no explanation for why it thought forcing me to remain in my home would minimize the supposed risk of me defrauding my current clients.  I was obviously conducting my businesses from home, as I had no alternative.

84.     It seemed as if the Court wanted to keep me locked in my house as punishment while my appeal was pending.  Neither I nor my lawyers have ever been able to come up with an alternative explanation.

85.     What was worse is that the Court never explained why it changed its mind.  I had not violated my release terms.  No customer had complained.  The government did not request it or identify new concerns.  Pretrial Services did not request it or identify new concerns.  Literally,

23

the only changed circumstance was the appeals court's determination that my appeal raised a substantial question likely to result in reversal. The fact that the appeals court saw the Recordings as a "substantial" issue for appeal should have caused the Court to give me the benefit of the doubt, especially since it already said I was not a flight risk or danger to the community.

86.     After the Court's order, as I had done before, I scrupulously met and exceeded the Court's expectations of me. For example, when my equipment locator malfunctioned, which happened a number of times, I promptly and proactively notified my Probation Officer and cooperated in efforts to restore it. Sentencing Tr. 229:2–10.

87.     However, almost any other time I sought a small extra amount of liberty—which I believe my compliance deserved—the Court swatted it down.

88.     On July 25, 2019, after nearly one and a half years in home confinement, I sought permission from the Court to leave my home on Sundays to attend church. Revised Consent Mot. Req'g Modification of Terms of Release 7–9, July 25, 2019, ECF No. 889. The *government consented to modifying my release in a negotiation that included concessions from me*. Revised Consent Mot. Req'g Modification of Terms of Release 1. Nonetheless, the Court denied my request to regularly attend church services, citing my ability **"to engage in any form of worship [I] may desire from [my] home."** Order 2, July 29, 2019, ECF No. 891. To me, one of the most important aspects of worship is worshipping in the church itself, something I was deprived of for nearly three years, despite my consistent exemplary behavior while under home confinement.

89.     On the same date, I sought permission from the Court, also with the government's consent, to leave my home for three hours, two days a week, to exercise. Revised Consent Mot. Req'g Modification of Terms of Release 8, July 25, 2019, ECF No. 889. The Court denied my request. Order 2, July 29, 2019, ECF No. 891.

24

90.     On January 23, 2020, the Court again denied my request to travel to New York City to assist my attorneys in hearing preparation and moot-court exercises for my appeal.  Order, Jan. 23, 2020, ECF No. 915.  The Court's consistent refusal to allow me to meet with my attorneys in New York is yet another way in which it has exhibited its bias against me.

91.     On October 14, 2020, the Sixth Circuit reversed my convictions and remanded my case for a new trial.  Op. and J., Oct. 14, 2020, ECF No. 953.  At this point, I had been under home confinement for nearly 1,000 days.

92.     On October 17, 2020, I filed a motion to get released from home confinement, which would restore me to the release terms before my conviction.  Mot. To Modify Conditions of Release Oct. 17, 2020, ECF No. 954.  In light of everything, that would have only been fair.  Still, on October 30, 2020, the government asked the Court to keep me locked in my home while the government thought about asking the appellate court for a rehearing, as if that had anything to do with any incentive to flee.  Resp. to Mot. To Reset Terms of Release Oct. 30, 2020, ECF No. 955.

93.     The Court ignored my motion.  By ignoring it, the Court avoided having to explain its rationale for keeping me locked in my house.  By this point, any fair person could see I was not going to flee.  The Court had already said as much.  So, I remained in home confinement even though my convictions had been reversed and I was again presumed innocent of the charges against me.  In light of my unblemished track record and the record on appeal, the only explanation for why the Court ignored my motion is the Court's bias against me and bias in favor of the government.  I never saw the Court just ignore a motion before.

94.     Effectively, the Court chose to leave me confined to my home for another 86 days, while the government used every single day it had to decide whether to seek further appeal.  On

November 30, 2020, the government filed a request with the appellate court for panel rehearing, not full court review, and that request merely repeated points from the dissenting opinion that the majority had rejected. *See generally* Appellee's Pet. For Panel Rehearing, Nov. 30, 2020, ECF No. 93.

95.     On December 30, 2020, the appellate court denied the government's petition for rehearing, and, later that day, my lawyers filed another motion, renewing my request for release. Hazelwood's Supp. Mot. to Modify Conditions of Release, Dec. 30, 2020, ECF No. 976.  The Court let that motion sit for another two weeks.  Finally, on January 11, 2021, the Court released me from my home, nearly three months after the Sixth Circuit reversed my convictions.  Order Granting Mot. to Modify Conditions of Release, Jan. 11, 2021, ECF No. 984.

96.     I believe the Court's refusal to entertain freeing me as soon as I regained the presumption of innocence was due to its persistent bias against me.

## II.     THE COURT'S VIEWS ON "WHITE-COLLAR" OFFENDERS

97.     I have reviewed various materials about the Court's handling of previous white-collar cases.  Based on that review, I have a better understanding about one of the reasons the Court treated me so harshly and unfairly.

98.     A review of the Court's decisions shows a clear pattern, which is described more fully in Mr. Walden's declaration at paragraphs 9–16 (incorporated herein by reference). Statements made during white-collar sentencings show that the Court has long-held and firmly entrenched views of "white-collar defendants," which include unfair stereotypes and generalizations.

99.     I do not think it is fair to sentence people by putting them into categories and assuming that everyone in those categories is exactly the same, has had the exact same life experiences, and does everything for the exact same reasons.  I understand that a number of courts

26

have said as much in connection with non-white-collar cases, where judges have also sometimes unfairly made assumptions and resorted to stereotypes.

100.     Given the similarity between the language in these prior cases and the language the Court used to describe me and my alleged offenses, it is apparent that, in addition to its bias stemming from the Recordings, the Court drew on these stereotypes to my detriment, even where the language did not fit the facts of my case. I believe the Court's generalities and stereotypes of white-collar defendants resulted in harsher and unfair treatment of me. The fact that the Court resorted to them is crystal clear in light of the comparison to Madoff. But the fact that the Court holds a greater dislike for white-collar defendants is also clear from comments such as (a) "**all roads lead to Mr. Hazelwood**," when the government's proof showed nothing of the kind, and (b) that my alleged offense was based on "**hubris**" or misplaced competitiveness, again without any foundation for those conclusions. Sentencing Tr. 213:19–21, 207:9–11.

101.     Even the Court's unsubstantiated conclusion, which I discuss in paragraphs 44–46 above—that I ingratiated myself with customers and abused their "trust" to make the fraud succeed, baseless as it is in my case—is a reflection of all the times the Court decried abuses of "trust" in past cases. Walden Decl. ¶ 15(viii). The Court simply invented a way to make it apply in my case, facts and evidence aside.

102.     The Court's stereotyping did not only impact sentencing. The fact that the Court repeatedly assumed the role of prosecutor—basing decisions on grounds the government did not offer, making findings the government did not request, reversing itself to my detriment without explanation, making findings without any basis in the record—reflects the Court's concern about white-collar defendants getting preferential treatment. Walden Decl. ¶¶ 11–12.

103.    And at sentencing, I believe it is because of these stereotypes that my "good" traits got ignored (or even turned against me) because they are "typical" for white-collar defendants, even though, in my case, they are genuine, authentic, and show I am an empathetic and religious person who tries to do good in the world, and not in a way that seeks credit.

104.    The Court washed away any meaning or significance to my good deeds by dismissing them as "typical," and this was the same tack the Court took with the good I did for customers.  Unlike Madoff, I actually did good and important things for trucking companies, including saving them a tremendous amount of money through innovative programs.  Letter from R. Ramey to J. Collier, ECF No. 672-1 at 41.  Not only did the Court disregard that, but it also used it against me, saying that the "trust" I earned made the fraud more successful.  Sentencing Tr. 206:17–207:5.  If that were true, why would all the same people stand up for me at my sentencing?  The Court never explained that reasoning.

105.    So, the Court's stereotypes proved too much, but also proved too little.  The simple truth is that I did not have the "typical" white-collar experience that the Court has described so many times before.  I never went to college, I am divorced from my first wife, and I did not have any sort of fiduciary duty to customers.  That did not stop the Court from comparing me to Madoff, just as the Court did to a defendant in another case.  Walden Decl. ¶ 15(v) n.5.

106.    But, ironically, despite the Court's repeated statements that white-collar defendants were less likely to be recidivists, (Walden Decl. ¶ 15(ix)), the Court did not give me the benefit of that stereotype, since it found I was "**much, much more [of a] risk**."  Sentencing Tr. 220:17–21.  Certainly, it is hard to see how I could be more of a recidivism risk than the guy who cheated

28

pensioners, the guy who stole from his church, or the guy who defrauded and embezzled from a bank for more than five years.[4]

107.    Based on everything, it is crystal clear that the Court believes to its core that I am guilty, a fundamentally bad person, and a corrupting influence.  None of that is true.  If the government could prove my guilt, I would get my due punishment.  But the government's case should be tested before a neutral and detached Court—a Court that has not already made up its mind and that is more committed to protecting my constitutional rights than anything else.

### III.    CONCLUSION

108.    I firmly declare my innocence of the charges leveled against me, as I have since day one of this case.

109.    My convictions were reversed.  I again enjoy the presumption of innocence.

110.    I deserve to have a judge who has not already judged me, clearly believing I am a "typical" white-collar defendant, and a racist one at that.

111.    I deserve a judge who will protect my rights and hold the government to its constitutional and statutory duties and burden of proof.

112.    I believe the Court has already concluded my guilt, cannot be fair, and is biased against me and in favor of the government.

113.    I respectfully request that the Court recuse itself.

---

[4] *See* Walden Decl. ¶¶ 13, 15(i) n.1, 15(v) n.5.

MARK HAZELWOOD

Sworn to before me this
3rd day of May 2021



Notary Public

SHERMAN YOUNG, II
MY COMMISSION # GG356607
EXPIRES: August 06, 2023