**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE AT KNOXVILLE**

UNITED STATES OF AMERICA,

                          Plaintiff,

          v.

MARK HAZELWOOD, SCOTT WOMBOLD,
and HEATHER JONES,

                       Defendants.

No. 3:16-CR-20
(Collier/Guyton)

**Oral Argument Requested**

<u>**MEMORANDUM IN SUPPORT OF MOTION FOR CHANGE OF VENUE**</u>

## Table of Contents

FACTUAL BACKGROUND ................................................................................................ 3

I.   The East Tennessee Media Has Inundated the Public With Highly Inflammatory
Reporting ..................................................................................................................... 3

II.  The East Tennessee Public and Press
Have Already Tried and Convicted The Defendants. ................................................... 5

    A.   Pre-Trial ........................................................................................................... 5

    B.   Trial .................................................................................................................. 8

    C.   Post-Trial and Appeal ...................................................................................... 9

III. Prejudice Against the Defendants Is Widespread Throughout East Tennessee ........... 10

ARGUMENT ................................................................................................................... 10

I.   Prejudice Throughout East Tennessee Must Be Presumed ........................................ 12

    A.   The Publicity is Blatantly Prejudicial Against the Defendants. ....................... 13

    B.   The Media Attention Will Continue Through Retrial. ...................................... 20

    C.   The East Tennessee Community Has Been Directly Impacted and Influenced by Both
the Media Coverage and the Alleged Criminal Activity. ...................................... 21

    D.   East Tennessee Has a Relatively Small Jury Pool That Is Highly Susceptible to the
Impact of Prejudicial Local Media Coverage. ...................................................... 22

II.  *Other Districts are less Susceptible to the Impact of Prejudicial Local Media Coverage.* 23

CONCLUSION ................................................................................................................. 24

CERTIFICATE OF SERVICE ............................................................................................ 26

i

# Table of Authorities

**Cases**

*Beck v. Washington*, 369 U.S. 541 (1962) ................................................................. 16
*DeLisle v. Rivers*, 161 F.3d 370 (6th Cir. 1998) ................................................... 12, 16
*Estes v. State of Tex.*, 381 U.S. 532 (1965)........................................................... 11, 19
*Foley v. Parker*, 488 F.3d 377 (6th Cir. 2007) .............................................................. 12
*In re Murchison*, 349 U.S. 133 (1955)............................................................................ 2
*Irvin v. Dowd*, 366 U.S. 717 (1961)......................................................................... 11, 12
*Murphy v. Florida*, 421 U.S. 794 (1975) ........................................................... 11, 19, 20
*Patterson v. People of the State of Colorado, ex re. Attorney General, 205* U.S. 454 (1907) ..... 11
*Shepherd v. State of Fla.,* 341 U.S. 50 (1951) ............................................................... 16
*Skilling v. United States.*, 561 U.S. 358 (2010) ...................................... 13, 15, 20, 22
*United States v. Abdulmutallab*, No. 10–20005, 2011 WL 4343851 (E.D. Mich. Sept. 14, 2011) ........................................................................................................................ 13
*United States v. Abrahams*, 466 F. Supp. 552 (D. Mass. 1978) ................................. 14
*United States v. Casellas-Toro*, 807 F.3d 380 (1st Cir. 2015).................... 12, 13, 17, 22
*United States v. Ebens*, 654 F. Supp. 144 (E.D. Mich. 1987)...................................... 19
*United States v. Fumo,* 655 F.3d 288 (3d Cir.2011) .................................................... 20
*United States v. Ganias*, 755 F.3d 125 (2d Cir. 2014).................................................. 20
*United States v. Hazelwood*, 979 F.3d 398 (6th Cir. 2020) ............................... 2, 3, 15
*United States v. Hofstetter*, No. 3:15-CR-27, 2018 WL 813254 (E.D. Tenn. Feb. 9, 2018).. 11, 13
*United States v. Holder*, 399 F. Supp. 220 (D.S.D. 1975)............................................ 11
*United States v. Jamieson*, 427 F.3d 394 (6th Cir. 2005) ........................................... 15
*United States v. Marcello,* 280 F.Supp. 510 (E.D. La. 1968) ..................................... 11
*United States v. Mazzei*, 400 F. Supp. 17 (W.D. Pa. 1975) ........................................ 18
*United States v. Misla-Aldarondo,*478 F.3d 52 (1st Cir. 2007) ................................. 12
*United States v. Moody*, 762 F. Supp. 1485 (N.D. Ga. 1991)..................................... 17
*United States v. Moreno Morales,*815 F.2d 725 (1st Cir. 1987) ................................ 22
*United States v. Poulsen*, 655 F.3d 492 (6th Cir. 2011) ....................................... 12, 20
*United States v. Saya*, 980 F. Supp. 1157 (D. Haw. 1997)......................................... 19
*United States v. Tokars*, 839 F.Supp. 1578 (N.D. Ga. 1993)................................. 16, 19

**Rules**

Fed. R. Crim. P. 6(e).............................................................................................................. 6
Fed. R. Crim. P. 21(a)......................................................................................................... 11

Pursuant to Rule 21(a) of the Federal Rules of Criminal Procedure, Defendants Mark Hazelwood, Scott Wombold, and Heather Jones move for a change of venue from the Eastern District of Tennessee to Arkansas (either district), Missouri (either district), or the Western District of North Carolina.

With their earlier convictions now vacated, the Defendants seek the fair trial to which they are entitled. As described below, the high-decibel press coverage from the East Tennessee media—which we now know was intentionally stoked by the government—has poisoned the jury pool to the point that a fair trial in East Tennessee is impossible. Not only has the East Tennessee media long assumed—and promoted—the Defendants' guilt, but it has also consistently published false, biased, and inflammatory content, and exponentially amplified audio recordings that were so prejudicial as to warrant reversal.

The number of stories alone is startling: from 2013 through present, there were 2,663 media stories[1] published in Tennessee regarding the Defendants' case.[2] This exceeds, by at least 2,000 stories, the number of media stories in the neighboring jurisdictions of Arkansas, Missouri, and the Western District of North Carolina. *See* Declaration of David Ross ("Ross Decl."), Ex. 2 at 5–6. Specifically, the amount of media coverage in Tennessee (2,663) is 30 times greater than media coverage in Arkansas (87), 5.4 times greater than coverage in Missouri (495), and 4.9 times greater than coverage in the Western District of North Carolina (542). *Id.* The saturation of media coverage is even more startling when one considers that most of the articles were published in East Tennessee, which has a relatively small population.

---

[1] "Media stories" include newspaper articles, online articles, news telecasts, and radio news.

[2] *See* David F. Ross PhD, *A Change of Venue Study Conducted in the Case of United States v. Mark Hazelwood, Scott Wombold, and Heather Jones* (May 4, 2021), annexed as Ex. 2 to the Ross Decl.

The Constitution affords every criminal defendant a *fair* trial before an *impartial* jury. The Supreme Court has recognized that our justice system "has always endeavored to prevent even the probability of unfairness." *In re Murchison*, 349 U.S. 133, 136 (1955). The fair administration of justice and the plain findings of prejudice by the Sixth Circuit compel a venue change. Simply put, a transfer of venue out of East Tennessee is necessary to afford a fair trial.

In making this important decision, we urge the Court to consider the impact of forcing the Defendants to stand trial in East Tennessee in light of circumstances leading to the toxic media environment, including the government's role in creating it. No reasonable person will believe the Defendants can be fairly tried here. Today, with the prominence of social media, no one could avoid the toxic coverage if they tried. It is difficult to imagine a more biased local media, and the coverage of inadmissible yet highly inflammatory recordings (which the largest local news outlet re-publishes with almost every single story about the case, no matter how trivial the developments) make it near impossible, as the Sixth Circuit found, "that anyone could scrub all traces clean from one's mind . . . ." *United States v. Hazelwood*, 979 F.3d 398, 415 (6th Cir. 2020).

This is why the media saturation figures below—including the astounding percentage of people who still are convinced of the Defendants' guilt, despite the passage of time from their first trial—is stunning. A decision to keep the trial in East Tennessee would impugn the integrity of the Court and harm the public's confidence in its fundamental fairness by giving the appearance that the presumption of innocence has been undermined. Given the high degree of public distrust in our democratic institutions of late, including the courts, we urge the Court to "double down" on fairness. *See* Declaration of Bradley Henry ("Henry Decl."), Ex. 1 ("[I]f people lose respect for the courts, then they also jeopardize the ability of the courts to function.") (quoting the Honorable Curtis L. Collier).

## FACTUAL BACKGROUND

### I.    THE  EAST  TENNESSEE  MEDIA  HAS  INUNDATED  THE  PUBLIC  WITH  HIGHLY INFLAMMATORY REPORTING.

Weeks into the Defendants' first trial—after an already sustained and overwhelmingly negative[3] media blitz—news broke that the Court would permit jurors to listen to the now infamous recordings (the "Recordings"), which were the basis for vacatur and remand by the Sixth Circuit.  Henry Decl., Exs. 2, 3.  On the Recordings—which elicit from "[n]early anyone…a negative opinion"—Mark Hazelwood used highly inflammatory language in a surreptitiously recorded after-hours gathering.  *Hazelwood*, 979 F.3d at 412.  The media's reporting—the nature and frequency of which is startling—fixated on the Recordings even though they had nothing to do with the charges against the Defendants.  In particular, the *Knoxville News Sentinel*, which enjoys broad readership in East Tennessee, has relentlessly linked to and quoted the Recordings, while continually maintaining that the Defendants must be guilty.

One early article hammered home the Court's thoughts on the Recordings: "If it became known the president of Pilot engaged in vile, despicable, inflammatory racial epithets…this could lead to boycotts and protests."  Henry Decl., Ex. 2 at 2.  The Court was quoted again: "Mr. Hazelwood's utterances are beyond the pale….Several subordinates of Mr. Hazelwood were present.  Mr. Hazelwood was in a position of authority over them."[4]  *Id*. at 2.  The article further paraphrased the Court, stating that "[Judge] Collier said Hazelwood and his subordinates also disparaged women in the secret recordings."  *Id*. at 2.

---

[3] No articles have been identified as reflecting positively on the Defendants.  *See* Ross Decl. ¶ 4.

[4] The Sixth Circuit recognized the dramatic spillover prejudice from Mr. Hazelwood's inflammatory language to the case against Mr. Wombold and Ms. Jones, reversing their convictions despite the Court's clear limiting instruction to the jury.  *See Hazelwood*, 979 F.3d at 413-15.

3

The Recordings were ultimately played in open court, resulting in a substantial increase in the already-prejudicial media coverage. Ever since, the East Tennessee press has trumpeted the Recordings when reporting on other, wholly unrelated aspects of the case. From the beginning of 2018 to present, in Tennessee, 51% of the articles reporting on the case mentioned the Recordings. Henry Decl. ¶ 5.

Making matters worse, the often-quoted, inflammatory Recordings themselves were released to the general public on March 8, 2018 over defense objections, including based on the effect on potential jurors at a retrial. Order, Mar. 7, 2018, ECF No. 503. The coverage was continuous. In 2018, for example, 213 of 451 articles allowed a reader to hear or read about the inflammatory evidence. Henry Decl. ¶ 4. Since then, the Recordings have been constantly available and frequently recirculated by the East Tennessee media and are often linked or embedded in unrelated reports about the case. *See, e.g.*, Henry Decl., Exs, 4, 5.

The media also frequently referenced the Recordings throughout the Defendants' appeal. Some news outlets continued to directly link to the Recordings or to reports describing them. *See* Henry Decl., Exs. 5, 6. Others provided quotes, transcriptions, or summaries of the recordings, including descriptions of both the fraud and the "crude, profane" Recordings. *See, e.g.*, Henry Decl., Ex. 7. Still others referred to, quoted, paraphrased, or described the Recordings in reporting on the appeal. *See, e.g.*, Henry Decl., Ex. 8. Media reports covering the appeal included prominent coverage of the Recordings throughout East Tennessee. *See, e.g.*, Henry Decl., Exs. 9, 10. Even after the Sixth Circuit reversed the Defendants' convictions because of the unfair prejudice the Recordings caused—and as recently as when this Court set a schedule for the retrial—of the 53 articles published, 50 of them (94%) included descriptions of the language and, in many instances, contained a link to the Recordings themselves. *See* Henry Decl. ¶ 5, Exs. 11, 12. And, as it has

4

all along, the *Knoxville News Sentinel* took the opportunity to mention the audio recordings in 100% of the articles it published after the reversal.  Henry Decl. ¶ 7.

## II.  THE EAST TENNESSEE PUBLIC AND PRESS HAVE ALREADY TRIED AND CONVICTED THE DEFENDANTS.

### A.  Pre-Trial

Every detail of this case has been vigorously covered by the East Tennessee media.  As early as June 18, 2013—years before the Defendants were indicted—the East Tennessee press began painting Pilot's sales force as guilty.  Henry Decl., Exs. 11–13.  The government helped perpetuate the prejudice by releasing and publishing—just three days after the raid—its affidavit in support of the search of Pilot's headquarters (the "Affidavit").  Order, Apr. 18, 2013, No. 3:13-MJ-2028, ECF No. 7.  Context for the government's decision to release the Affidavit is important.

On April 15, 2013, the government executed a search warrant at Pilot's headquarters in Knoxville, Tennessee.  Superseding Indictment ¶ 33, June 6, 2017, ECF No. 182.  This was headline news in Tennessee.  Pilot is among the most prominent corporations in Tennessee, and one of Knoxville's largest employers.  *See* Henry Decl., Ex. 14.  The Haslam family is among the most prominent, and wealthiest, families in Tennessee.  Bill Haslam was the Governor of Tennessee.  Accordingly, the search was, literally, front-page news.  In his book *Won't Back Down: The Journey from Small Town Tennessee to Presidentially Appointed United States Attorney*, the then-sitting U.S. Attorney, William C. Killian, described the context as follows:

> The Pilot Flying J Corporation was headquartered in Knoxville.  The Governor of Tennessee owned interest in this company, which was founded by his father.  The CEO was the Governor's brother, who happened to also be the owner of the Cleveland Browns . . . The Pilot Flying J Corporation controlled roughly 85% of the retail and wholesale diesel market in the United States. . . . This would be a high-profile case.

William C. Killian, *Won't Back Down: The Journey from Small Town Tennessee to Presidentially Appointed United States Attorney* 97–98 (2019). According to Mr. Killian, the search of Pilot's headquarters "created a media frenzy." *Id.* at 99.

Three days after the search, the government unsealed the Affidavit and provided it to the news media. Order, Apr. 18, 2013, ECF No. 7. No one had been charged with any crime yet. The Affidavit became part of the media frenzy, and inalterably changed the landscape. Among the reams of confidential investigative material and dozens of unredacted names of individuals (including many who were never even charged), the Affidavit also contains explicit and unambiguous grand jury information subject to Fed. R. Crim. P. 6(e). *See*, *e.g.*, Aff. in Support of Search Warrant Application ¶¶ 118, 125, Apr. 18, 2013, ECF No. 4.

In his book, Mr. Killian explained his untoward rationale for seeking to unseal and release the Affidavit, including the grand jury information contained therein: to influence media reporting about the investigation. Specifically, as Mr. Killian himself described:

> The next day [after the raid] in the Knoxville News Sentinel, there was a front-page article asking if the U.S. Attorney's Office did not have better things to do than suggest that the Pilot Flying J Corporation and some of its employees were committing acts of wrongdoing. The article suggested that we were wasting taxpayer money. Two days later, after discussing it with my team, we asked the court to unseal the 120-page affidavit that we had submitted in support of our request for the search warrant. *After all, the reasons to request the court to seal the affidavit no longer existed.*

Killian, *supra*, at 99 (emphasis added).[5]  Of course, contrary to Mr. Killian's assertion, the powerful rationale for keeping the Affidavit sealed still existed. Nevertheless, the unsealing and public distribution of the Affidavit had the desired effect, as dozens of articles covered its contents

---

[5] Mr. Killian goes on to write that, "the day after [the Affidavit] became public, the same reporter published another front-page article apologizing for his earlier statements." *Id.* at 99.

in detail, including articles claiming that Pilot targeted customers based on race. Henry Decl., Exs. 15, 16.

When the indictment came more than two years later, media coverage was unabated, with 1,349 articles published in Tennessee alone in 2013. Ross Decl., Ex. 2 at 9. In fact, when the Court unsealed the indictment against the Defendants, the *Knoxville News Sentinel* presented the allegations—at least with respect to the Defendants (and Mr. Hazelwood, in particular)—and mischaracterized the evidence in a highly prejudicial way:

> The prosecutors turned to a rare device in federal court—the "speaking" indictment, which lays out with specificity the alleged scheme and reveals sections of the government's evidence against each defendant.
>
> That evidence includes *emails and audio recordings in which Hazelwood and his alleged co-conspirators made no bones about their intent to deceive trucking companies less wise to the ways of fuel rebates*.

*See* Henry Decl., Ex. 17 (emphasis added). Another news outlet led by declaring that Mr. Hazelwood was the ringleader and that he personally benefitted from the scheme:

> With a planned expansion of an already massive fraud scheme, 2013 was shaping up to be a good year for Mark Hazelwood and an entire Pilot Flying J diesel sales division crew, according to federal court records unsealed Tuesday.
>
> "Guys, learn, ask, comprehend," Hazelwood told a team of direct sales staff who were being trained in the "art" of scamming unsophisticated trucking companies of promised rebates.

Henry Decl., Ex. 18. The same article led readers to believe there was no doubt the "entire sales division" was guilty, and it embellished the earlier article from the very same day in describing the speaking indictment: "Citing emails, secretly-recorded meetings and the trip reports, the pair of prosecutors detail not only a pervasive permissiveness of fuel rebate rip-off scheming among the entire sales division but a zeal for it." *Id.*

7

The media also began planting the greed-as-motive seed in the public's mind, citing Mr. Hazelwood's "guaranteed 3½ percent of Pilot's after-tax revenues each year." Henry Decl., Ex. 18. This same tactic would continue to expand during and after trial. Henry Decl., Ex. 19.

Reminders of other defendants' guilty pleas and Pilot's criminal fines and civil settlements would become routine, all serving to imply that if the others admitted their guilt, the Defendants must be guilty as well. *See, e.g.*, Henry Decl., Exs. 20–22.[6]

### B. Trial

Local coverage of the trial itself was relentless, with over 800 published articles in 2017 and 2018. Ross Decl., Ex. 2 at 9. The East Tennessee public was given a front-row seat to the trial through the eyes of the journalists present. The East Tennessee media pushed the government's narrative that the defendants' motive was to "put extra profit money in their pockets." Henry Decl., Ex. 23. One reporter posted a video entitled "Former Pilot president's salary doubled during rebate scheme." Henry Decl., Ex. 19. The public readily adopted this greed-as-motive narrative despite the falsity of the claim.

Witness testimony received similarly comprehensive—yet slanted—coverage. For example, Janet Welch, a former Pilot senior sales representative, reportedly testified that "They (Jimmy Haslam and Mr. Hazelwood) knew everything that was going on." Henry Decl., Ex. 24. In a later article, a subheading asserted in bold that the "Buck stopped at Mark Hazelwood,"

---

[6] Even throughout trial, the press seldom missed the opportunity to remind the public of guilty pleas by certain co-defendants, repeatedly suggesting that the Defendants on trial must be guilty too. For example, in a November 21, 2017 article, one journalist wrote, "So far, 14 former Pilot Flying J executives and support staff have pleaded guilty to conspiracy to commit mail and wire fraud. Two others were granted immunity." Henry Decl., Ex. 24. Across social media, posts demonstrated with frightening consistency that the media embraced the narrative of the "felons" on trial. Henry Decl., Ex. 29.

8

quoting the government's star witness, Brian Mosher, who had recently entered a plea deal with the government. Henry Decl., Ex. 26.

Testimony pertaining to the witness tampering charge has also been pervasively circulated by the East Tennessee media. One article quoted the testimony of Sherry Blake, Mr. Hazelwood's former assistant, including a portion that should have never been admitted:

> "*I felt like I was being used,*" Blake said as her voice grew shaky and her eyes teary. "*I felt betrayed. I didn't believe (him)*."

Henry Decl., Exs. 27, 28.

### C. *Post-Trial and Appeal*

The media coverage remained biased after the conclusion of the first trial. One article started by addressing Mr. Hazelwood directly, stating "You're guilty. Accept your fate." Henry Decl., Ex. 30. An article breaking the news of Mr. Hazelwood's sentencing led by painting him as a two-faced fraud:

> He slipped between skins and lived two lives in one — the big-hearted businessman and *the corporate con artist*, the self-made man who talked to truckers like one of their own just *to pick their pockets at the pump and laugh behind their backs*.

Henry Decl., Ex. 31 (emphasis added). The same article referred to Mr. Hazelwood as a "president-turned-felon." *Id*. It also quoted the Court's assessment of Mr. Hazelwood's guilt and character: "'Mr. Hazelwood abused the trust of Pilot and the trust placed in him….The participants laughed and joked about it. They used extreme and offensive language….They talked openly of this criminal activity…. He violated the law on a constant and repeated basis for half a decade.'" *Id*. Not surprisingly, the public, having already been persuaded by the prejudicial reporting on the case, clearly agreed with the Court, the jury, and the media, as demonstrated by reams of social media postings. *See, e.g.*, Henry Decl., Ex. 32–34. A typical comment was: "**it's OK to be *a***

*fraud and bilker and a racist* **IF you are RICH apparently, justice in America**." Henry Decl., Ex. 35 at 3 (emphasis added).

### III. PREJUDICE AGAINST THE DEFENDANTS IS WIDESPREAD THROUGHOUT EAST TENNESSEE.

David Ross, PhD, a Professor of Psychology at the University of Tennessee at Chattanooga, who specializes in legal psychology, conducted a venue study across multiple federal districts—including the Eastern District of Tennessee—to measure the level of pretrial publicity and the effect on potential jurors in this case. *See generally* Ross Decl., Ex. 2.

Strikingly, two-and-a-half years after the verdict in this case, and because of the overwhelming media coverage, 29.9% of East Tennesseans think the Defendants are guilty. *See generally* Ross Decl., Ex. 2. at 5.[7] This far exceeds the percentages found in Arkansas (5.3%), Missouri (5%), and the Western District of North Carolina (5%). *Id*. These percentages show that the rate of case knowledge and bias against the Defendants in the Eastern District of Tennessee is six times greater than that seen in each of the other three states. There is no question that the media continues to strongly influence public opinion in East Tennessee against the Defendants.

## ARGUMENT

The Constitution requires this Court to transfer the retrial of this matter to another District. The Fifth and Sixth Amendments to the U.S. Constitution protect the rights of all criminal defendants and guarantee an impartial jury, a fair trial, and due process. These rights are, in part, "effectuated by impaneling a jury of impartial, 'indifferent' jurors who render a verdict based on

---

[7] The spread of prejudicial reporting throughout the Eastern District has been amplified by the long-standing practice (by media in the Chattanooga, Greenville, Tri-Cities, and other East Tennessee media markets) of sharing, re-publishing, linking to, re-directing, or citing to the same or substantially similar content as that originally reported by the Knoxville media, to which this case has been no exception. Henry Decl., Ex. 36–48.

evidence adduced at trial." *United States v. Hofstetter*, No. 3:15-CR-27, 2018 WL 813254, at *18 (E.D. Tenn. Feb. 9, 2018) (citing *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)). *See also Murphy v. Florida*, 421 U.S. 794, 799 (1975) (quoting *Irvin*, 366 U.S. at 722) ("The constitutional standard of fairness requires that a defendant have 'a panel of impartial, 'indifferent' jurors.'").

Rule 21(a) of the Federal Rules of Criminal Procedure gives legs to the Fifth and Sixth Amendments by providing "a procedural device for the defendant to waive his right to a trial in the place where the crime was committed in order to maximally protect his right to a fair and impartial hearing." *United States v. Holder*, 399 F. Supp. 220, 225 (D.S.D. 1975) (citing *United States v. Marcello*, 280 F.Supp. 510 (E.D. La. 1968), *aff'd* 423 F.2d 993 (5th Cir. 1970)). Rule 21(a) also places an additional duty on the Court to exercise its discretion in transferring venue due to prejudice, even in the absence of a constitutional mandate:

> Upon the defendant's motion, the court *must* transfer the proceeding against that defendant to *another district* if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.

Fed. R. Crim. P. 21(a) (emphasis added). *See also United States v. Abrahams*, 466 F. Supp. 552, 556–58 (D. Mass. 1978) (transferring venue of mail and wire fraud trial due to prejudicial pretrial publicity).

Thus, if pretrial publicity "jeopardizes a defendant's right to a fair trial by an impartial jury," the defendant has a right to trial elsewhere. *Hofstetter*, 2018 WL 813254, at *18. "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Estes v. State of Tex.*, 381 U.S. 532, 551 (1965) (quoting *Patterson v. People of State of Colorado, ex rel. Attorney General*, 205 U.S. 454, 462 (1907) (Holmes, J.)).

"A change in venue can be warranted by presumptive or actual prejudice." *United States v. Poulsen*, 655 F.3d 492, 506 (6th Cir. 2011). Prejudice must be presumed "when a 'degree of inflammatory publicity ha[s] so saturated the community such as to make it virtually impossible to obtain an impartial jury.'" *United States v. Casellas-Toro*, 807 F.3d 380, 386 (1st Cir. 2015) (quoting *United States v. Misla-Aldarondo*, 478 F.3d 52, 58 (1st Cir. 2007)). "Presumptive prejudice from pretrial publicity occurs where an inflammatory, circus-like atmosphere pervades both the courthouse and the surrounding community." *Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007).

Transfer of venue is plainly necessary to prevent further prejudice to the Defendants. Prejudice against the Defendants, both as to their character and their status as former convicted criminals, is deeply rooted throughout East Tennessee. The prior guilty verdicts, coupled with the extreme and inflammatory media coverage (in which the Recordings have played a prominent role) make a finding of prejudice here inescapable.

## I. PREJUDICE THROUGHOUT EAST TENNESSEE MUST BE PRESUMED.

The East Tennessee media has subjected the Defendants to constant and vicious press coverage since April 2013. These attacks are certain to continue through retrial and certain to be amplified on social media in the relatively small East Tennessee region. This case involves far more than "mere prior knowledge of the existence of the case, or familiarity with the issues involved, or even some preexisting opinion as to the merits," and it therefore must give rise to a "presumption of jury taint." *DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998).

The Supreme Court has long recognized that prejudicial pretrial publicity can violate a defendant's due process rights. *See, e.g.*, *Irvin*, 366 U.S. at 725 (granting habeas corpus for prisoner when "a barrage of newspaper headlines, articles, cartoons and pictures was unleashed

12

against him during the six or seven months preceding his trial"); *Skilling v. U.S.*, 561 U.S. 358, 380 (2010) (convictions obtained in a trial with an "atmosphere utterly corrupted by press coverage" should be overturned).

The extensive and inflammatory media coverage of this matter makes it precisely the kind of "extreme case" that warrants a transfer of venue. As noted above, the government is largely to blame for this, given its decision to release the Affidavit—a move specifically intended to stoke favorable coverage for itself—and to seek introduction of the Recordings. What is more, the Defendants' retrial will take place in the wake of a successful appeal after a trial that resulted in their wrongful conviction, during which extremely damaging and irrelevant Recordings were admitted and widely publicized, further prejudicing the population of the entire Eastern District. It was on this very basis that Defendant Jones so strenuously objected to the public release of the Recordings. *See* Def. Jones' Continued Opp. to the Release of Specific Government Audio Recordings and Transcripts to the Media, Feb. 16, 2018, ECF No. 492 (objecting because of concerns about the jury pool in the event of a retrial). Here, the press coverage has made it impossible for the Defendants to receive a fair trial in this district, as evidenced by several factors recognized by other courts in determining whether prejudice must be presumed, which are addressed in detail below. *See Skilling*, 561 U.S. at 382–83 (outlining factor for venue changes based on pretrial publicity); *Casellas-Toro*, 807 F.3d at 386 (same); *Hofstetter*, 2018 WL 813254, at *19 (same); *United States v. Abdulmutallab*, No. 10–20005, 2011 WL 4343851, at *3 (E.D. Mich. Sept. 14, 2011) (same).

### A. The Publicity is Blatantly Prejudicial Against the Defendants.

The nature and content of the publicity is blatantly prejudicial because it: (1) is both inflammatory and irrelevant; (2) amounts to a campaign to convict; (3) is of such a high volume

as to imply that the Defendants are guilty; and (4) has already created and continues to create a carnival-like atmosphere.  For these reasons, a transfer of venue is necessary to ensure a fair trial.

      1.  <u>The majority of the prejudicial reporting is inflammatory and irrelevant.</u>

When the government disseminated the Affidavit with the specific intent to stoke coverage, it threw gas on a fire—and the government knew it.  That was the whole point.  Not only did the Affidavit's painstaking detail provide fodder for many articles essentially declaring everyone's guilt (including the Defendants'), but it also spurred many articles that unfairly mischaracterized evidence, made false conclusions, wrongly characterized the evidence as "confessions," or were otherwise highly prejudicial.  *See, e.g.*, Henry Decl., Ex. 31.  Even more, the Affidavit's release allowed some in the media to introduce the issue of race even before the Recordings saw daylight, by suggesting the Defendants were specifically targeting and exploiting Hispanic customers. Henry Decl., Ex. 15, 16.  This is plainly on the government's hands.

Then, during the first trial, news broke that jurors would hear the Recordings.  Henry Decl., Ex. 2.  When the Recordings were played for the jury in open court, they were also heard by the press, which proceeded to repeatedly quote the prejudicial contents.  Henry Decl., Exs. 6, 49. Later, the Court released the Recordings themselves over the objections of two of the Defendants. *See* Order, Mar. 7, 2018, ECF 503.  As a result, the Recordings have been transcribed, replayed, linked, and embedded in news reports by the local media *ad nauseum* ever since.  *See, e.g.*, Henry Decl., Ex. 6, 50.  In particular, 278 of 541 articles published since the trial have linked to the Recordings.  Henry Decl. ¶ 5.

Considering the Sixth Circuit's clear ruling, the prejudicial nature of the Recordings requires little explanation and, as a result, the Court must presume it in resolving this motion. More, the character and content of the media that has been, and will continue to be, published

about the Defendants sets this case apart from virtually every other change of venue case. Although prior cases considered coverage that was pervasive and negative, those cases did not address anything like the "frenzy" here—the word used by then-U.S. Attorney Killian—including coverage with such personal and demeaning content and content wholly irrelevant to the issues of the case. The biased coverage—just like the jurors' own exposure to the Recordings—"make[s] it more likely that a jury would convict." *See Hazelwood*, 979 F.3d at 411; *see, e.g.*, *Skilling*, 561 U.S. at 384, n.2 (rejecting venue change because press coverage did *not* present the kind of "vivid and unforgettable information likely to produce prejudice"). The Sixth Circuit noted that the prejudicial nature of the tapes would have an effect on anyone, which would include potential jurors: "**The profoundly racist and sexist content of these recordings is so antithetical to the sensibilities of decent people, that we are 'left in grave doubt' that anyone could scrub all traces clean from one's mind regardless of the quantum of evidence presented**." (emphasis added) *Hazelwood*, 979 F.3d at 415.

Thus, the media's coverage of the Recordings is both extremely prejudicial and highly memorable, not that the East Tennessee media would ever let the public forget. These facts alone command a transfer of venue.

### 2. The nature of the publicity amounts to a campaign to convict the Defendants.

#### i. The media have long assumed the Defendants' guilt.

Courts often distinguish between, on the one hand, cases with coverage of "blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight," *Skilling*, 561 U.S. at 382, and, on the other hand, cases with a "fair and balanced portrayal of events," *United States v. Jamieson*, 427 F.3d at 412 (6th Cir. 2005). "[I]nvidious articles which would tend to arouse ill will and vindictiveness," such as those present here, are the

15

most troubling. *Beck v. Washington*, 369 U.S. 541 at 556 (1962). The Supreme Court has "emphasized the deleterious effect of pretrial publicity when that publicity has amounted to an 'out-of-court campaign to convict,' reflecting 'inflamed public sentiment,' such as when a defendant is persistently labeled in incendiary terms." *DeLisle,* 161 F.3d at 385 (quoting *Shepherd v. State of Fla.*, 341 U.S. 50, 52-53 (1951) (Jackson, J., concurring)). One can hardly imagine more incendiary terms than those used regularly by the press about the Defendants in this case, and about Mr. Hazelwood in particular.

As the government designed, by releasing the Affidavit, news coverage of this matter has, from the outset, been highly sensational, and the East Tennessee media are no doubt gearing up to promote yet another season of the Pilot Flying J Scandal, a hit series that first aired in 2013.[8] The nature of the media coverage in this case, especially in the regional media, has been, and continues to be, one-sided and sensational—highlighting both the public's interest in and its familiarity with the media's (and the government's) view of the facts. *See United States v. Tokars*, 839 F.Supp. 1578, 1583 (N.D. Ga. 1993) ("The significance of these bits of cynical humor is that they assume public awareness and acceptance of [the defendant's] guilt."). The memorable, dramatized stories, such as one involving an inflated *seventeen* guilty pleas, plus the Defendants' convictions, have been readily absorbed by the public. Henry Decl., Ex. 51. Alleged victims were goaded by the media's coverage into accepting that every allegation in the Affidavit and the indictment were true. In addition, the media reported on informant statements and secret recordings, FBI affidavits, search warrants, Pilot's Criminal Enforcement Agreement, civil settlements, and statements from alleged victims. *See, e.g.*, Henry Decl., Ex. 37, 41. Many of these same articles and broadcasts

---

[8] The *Knoxville News Sentinel* published a satirical article entitled "Pilot Flying J scandal renewed for second season," authored by Kevin Saylor, on June 6, 2013.

16

still remain freely available online via various news source websites and other platforms such as YouTube and Twitter.  Henry Decl. ¶ 10.

The Northern District of Georgia considered a media-saturated set of circumstances in *U.S. v. Moody*, 762 F. Supp. 1485 (N.D. Ga. 1991), which should guide the Court here.  There, the defendant had been indicted for the murders of a federal Judge and a civil rights attorney.  The local media became highly interested in the case, and one of the most widely read papers published a detailed summary of evidence against the defendant based on information from interviews and court documents.  *Id.* at 1488–89.  Upon the defendant's motion, the Court ordered a change of venue.  *Id*. at 1490.  In so ruling, the court said, "there has been inordinate, widespread, and prejudicial publicity concerning this case and . . . government agents have been responsible for much of it."  *Id.*  The Court also observed that a venue change to a larger community was warranted because sensational cases take on outsized significance in relatively smaller communities.  *Id*. (citations omitted).  The *Moody* court's reasoning applies forcefully here.

ii.    *Another East Tennessee jury is likely to prejudge guilt.*

There is a strong probability that another East Tennessee jury will prejudge  guilt by relying on the first verdict, especially considering the extensive reporting on that verdict.  A jury from the same pool can fairly be expected to assume their community members "got it right the first time."  *See Casellas-Toro*, 807 F.3d at 387 (A jury "may have difficulty disbelieving or forgetting the opinion of another *jury*, twelve fellow citizens, that a defendant is guilty in an intertwined, just-concluded case.") (emphasis in original).  This probability is magnified by the East Tennessee media's coverage making repeated pronouncements of guilt.  Indeed, a virtual avalanche of social-media postings—including in direct response to media articles—shows the East Tennessee jury

17

pool agrees with the outcome of the first trial. *See, e.g.*, Henry Decl., Ex. 32–34; *see also* Ross Decl., Ex. 2 at 23.

*United States v. Mazzei* is instructive. There, the defendant was a former Pennsylvania state senator, who had been convicted of extortion under the Hobbs Act. 400 F. Supp. 17 (W.D. Pa. 1975). After his conviction, he was called before a grand jury to testify under a grant of immunity; this testimony resulted in an indictment for perjury. *Id.* at 18. The Defendant subsequently moved for a change of venue based on the torrent of press coverage of the first trial— coverage that was far less intense and negative than the coverage of the Defendant's case here. *Id.* at 20. The court noted that the publicity extended throughout the state as "evident from the large file of newspaper accounts," and concluded that "the only effective transfer must be to a District Court in a state outside Pennsylvania." *Id.*

While *Mazzei*'s reasoning applies here, that case did not involve significant coverage of the presiding judge's stinging commentary at sentencing, which makes this case even worse. With respect to Mr. Hazelwood, the press included detailed coverage of the Court's pronouncements at sentencing about his guilt, including the Court's findings that he duped customers who continued to support him. Henry Decl., Ex. 52. With respect to Mr. Wombold, the coverage included articles emphasizing Judge Collier's admonition to Mr. Wombold: "'One solution was to just quit. But [Wombold] did not have the intestinal fortitude to take that step.'" Henry Decl., Ex. 53; *see also* Henry Decl., Ex. 54.

Another Eastern District jury is extremely unlikely to go against the earlier determination of its peers, which is readily available to and already largely consumed by many prospective jury-pool members, especially when bolstered by the Court's statements supporting the verdict. As a result, the only remaining option to ensure a fair trial by a truly impartial jury is to move the case

elsewhere. *See United States v. Ebens*, 654 F. Supp. 144, 145 (E.D. Mich. 1987) (transferring

case from E.D. Mich. to S.D. Ohio, after remand, noting concentration of prejudicial publicity that

occurred throughout Michigan and northern Ohio and stating that while the "court denied

defendant's motion for a change of venue prior to his 1984 trial, it is compelled to grant the

renewed motion under the circumstances surrounding this second trial"); *United States v. Saya*,

980 F. Supp. 1157, 1159 (D. Haw. 1997) (transferring case out of Hawaii because "[t]rial in

another venue will most likely receive little publicity"). The Court cannot "unring the bell" in this

District.

3.   The volume of press alone is prejudicial and indicative of guilt.

The immense volume of reporting on this case has "emphasized [its] notorious character,"

setting it "apart in the public mind as an extraordinary case." *Estes*, 381 U.S. at 538. Alone, the

"extraordinary volume of [highly negative] coverage" would support the inference that widespread

bias could prevent a fair trial. *United States  v. Tokars*, 839 F. Supp. at 1582. As of May 2021,

2,663 reports focusing on the Defendants and this case have been published in Tennessee. Ross

Decl., Ex. 2 at 9. The amount of media coverage in Tennessee is 30 times greater than coverage

in Arkansas (87), 5.4 times greater than coverage in Missouri (495), and 4.9 times greater than

coverage in the Western District of North Carolina (542). *Id.*

4.   Trial anywhere in the Eastern District will result in a carnival-like atmosphere.

Just as it did during the first trial, intense media coverage will continue in this upcoming

proceeding, creating the same risk for a second time. Yet, criminal defendants are entitled to

"solemnity and sobriety" in preparing and presenting their case. *Murphy*, 421 U.S. at 799. Retrial

of this matter in East Tennessee will achieve the opposite aim, resulting in intrusions by the press

and inflammatory publicity of the kind deemed presumptively prejudicial by the Supreme Court

in *Estes*.  It would inevitably regenerate the same "circus-like atmosphere" again pervading "both the courthouse and surrounding community." *Poulsen*, 655 F.3d at 507.  The East Tennessee press have already made it abundantly clear that the priority is to "accommodate the public appetite for carnival."  *Murphy*, 421 U.S. at 799.  Indeed, ongoing reports of the Defendants' appeal and upcoming retrial make it clear the media will return to similar tactics employed for the first trial.  And now, the media has the Defendants' convictions and the Court's sentencing orders added to their arsenal.  More, the media has shown no willingness to let go of its fascination with the Recordings.  For example, the *Knoxville News Sentinel* reported in January 2021, that "the jury heard secret recordings of Hazelwood using racial slurs and profanely criticizing his board of directors and his boss's football team and fans.  Hazelwood later apologized for his language." Henry Decl., Ex. 10.  And, as already noted, the *Knox News Sentinel* also re-publishes the Recordings in almost every article it runs—as it did as recently as December 30, 2020.  No basis exists to believe it will stop, and courts have acknowledged that—in light of the proliferation of the internet, smart phones, and social media—it is harder to assure jury compliance with instructions.  *See, e.g.*, *United States v. Fumo*, 655 F.3d 288, 332 (3d Cir.2011) (Nygaard, J., concurring in part, dissenting in part) ("the Internet . . . [has] simply made it quicker and easier to engage more privately in juror misconduct, compromise the secrecy of their deliberations, and abase the sanctity of the decision-making process."); *United States v. Ganias*, 755 F.3d 125, 132 (2d Cir. 2014) ("vigilance on the part of trial judges is warranted to address the risks associated with jurors' use of social media").

### B.  The Media Attention Will Continue Through Retrial.

The passage of time has not at all reduced the "decibel level of media attention." *Skilling*, 561 U.S. at 383.  Media coverage remains incessant.  The East Tennessee media has gone so far

as to make jokes at Mr. Hazelwood's expense after trial, using quips such as "the lifestyle of the rich and infamous." Henry Decl., Ex. 55. Another recent article directs readers to "Hazelwood's racist, drunken rant" and links to an earlier article that embeds and extensively quotes from the recordings, entitled *Unsealed records reveal graphic details of ex-Pilot Flying J execs' repugnant football party*. Henry Decl., Ex. 50. This article also features audio of the Recordings and identifies Mr. Hazelwood as the "primary voice you can hear" on the "secretly recorded audio." Henry Decl. ¶ 8.

Even now, prejudicial and irrelevant reports from years ago are continually stirred up. The infamous Recordings continue to be linked and embedded in stories related to Mr. Hazelwood's appeal and retrial. Henry Decl. ¶ 9.

### C. *The East Tennessee Community Has Been Directly Impacted and Influenced by Both the Media Coverage and the Alleged Criminal Activity.*

The East Tennessee community has long been directly impacted and influenced by both the media coverage and the alleged criminal activity as illustrated by (1) *voir dire* testimony, and (2) Pilot's heavy involvement in the East Tennessee community. For these reasons, there is little chance of finding a truly impartial jury anywhere in East Tennessee.

The FBI investigation of Pilot and related civil and criminal cases have directly affected East Tennessee communities. Pilot Flying J is one of East Tennessee's biggest companies and a leading employer regionally. Henry Decl., Ex. 14. Employees, along with their families and friends, have directly perceived the impact of this case. In addition, Knoxville and surrounding East Tennessee communities have long benefitted from the substantial philanthropic activity of Pilot and its ownership. Henry Decl., Exs. 56–58. This is not a case with one defendant and a handful of directly impacted individuals, but instead involves an entire region connected to Pilot as a major employer and benefactor.

21

### D. East Tennessee Has a Relatively Small Jury Pool That Is Highly Susceptible to the Impact of Prejudicial Local Media Coverage.

As evidenced by its history, East Tennessee is a separate and singular community. The region is politically, culturally, and geographically distinct from not only Middle and West Tennessee, but also the surrounding states.[9] East Tennessee is particularly susceptible to the impact of prejudicial local media coverage because of the small jury pool and limited number of—often shared—news sources.

In deciding whether to presume prejudice, courts consider both the population and composition of a jury pool. For example, the *Skilling* trial took place in Houston, which had over 4.5 million eligible jurors. 561 U.S. at 382. Given the large jury pool, the Supreme Court concluded that the pretrial publicity in *Skilling* was far less prejudicial than the publicity in *Rideau*, which was tried in a jurisdiction with a population of approximately 150,000. *Id.* In *Casellas-Toro*, the First Circuit emphasized that the district court had acknowledged that, although populated by more than 3 million people, "Puerto Rico is 'a compact, insular community' that is 'highly susceptible to the impact of local media.'" 807 F.3d at 386 (quoting *United States v. Moreno Morales*, 815 F.2d 725, 734 (1st Cir. 1987)).

Much like Puerto Rico, East Tennessee communities are "compact" and "insular." All divisions of the Eastern District are similar in size and demographic composition, and a substantial amount of the population commutes from one division to another every day.[10] The Knoxville Division is the largest at just over 1.1 million, and both the Chattanooga and Greenville Divisions

---

[9] *See* https://tennesseehistory.org/grand-divisions/, last accessed April 13, 2020.
[10] www.tn.gov/workforce/tennessee-economic-data-/commute-patterns/commuter-data-county.html, last accessed August 15, 2019.

22

are under 700,000.[11]  Knoxville is the sixtieth ranked media market according to Nielsen's 2019 Market Area Rankings with only 500,000 television viewing homes.[12]  Chattanooga is even further down the list at eighty-third with viewership of less than 400,000 homes.  *Id*.  Not surprisingly, news sources in East Tennessee communities are limited.  Moreover, the East Tennessee media have consistently been observed sharing much of the same content throughout this case.  Henry Decl., Ex. 36–48.  Thus, a transfer within the Eastern District would be unhelpful.

For each of the foregoing reasons, prejudice should be presumed throughout the Eastern District of Tennessee such that retrial at any division therein would be inherently unfair.

## II. *OTHER DISTRICTS ARE LESS SUSCEPTIBLE TO THE IMPACT OF PREJUDICIAL LOCAL MEDIA COVERAGE.*

The pretrial publicity in East Tennessee, by volume and type, far exceeds the coverage in other areas of the country where the Defendants have at least a fair opportunity at an impartial jury. Specifically, the amount of media coverage in Tennessee (2,663) is 30 times greater than what appeared in Arkansas (87), 5.4 times greater than what appeared in Missouri (495), and 4.9 times greater than what appeared in the Western District of North Carolina (542).  *See* Ross Decl., Ex. 2 at 9.  These numbers are reflective of the amount of media coverage throughout the country: in every other potential venue, media coverage is far less than in Tennessee generally, and East Tennessee particularly.  Not surprisingly, the pre-trial bias for guilt that media coverage creates is significantly greater in East Tennessee (29.9%), and Tennessee generally (MDTN: 19.6%; WDTN: 10.8%), than in any other state—Arkansas (5.3%), Missouri (5%), and the Western District of North Carolina (5%).  *See* Ross Decl., Ex. 2 at 27.  These percentages show that the rate

---

[11] United States Census Bureau, https://www.census.gov/quickfacts/fact/table/US/PST045219 (last visited May 14, 2021).
[12] *See* Nielsen DMA Rankings 2019, https://mediatracks.com/resources/nielsen-dma-rankings-2019/ last accessed August 15, 2019.

of case knowledge and bias against the Defendants in the Eastern District of Tennessee is six times greater than that seen in each of the other three states. There is no question that the media continues to strongly influence public opinion in East Tennessee.

## CONCLUSION

For the reasons set forth above, the Defendants respectfully request a change in venue from the Eastern District of Tennessee to Arkansas (either district), Missouri (either district), or the Western District of North Carolina.


/s/ Jim Walden
Jim Walden
Georgia Winston
WALDEN MACHT & HARAN LLP
250 Vesey Street, 27th Floor
New York, New York 10281
(212) 335-2030
jwalden@wmhlaw.com
gwinston@wmhlaw.com


/s/ Robert M. Cary
Robert M. Cary
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5175
rcary@wc.com
**Attorneys for Defendant Mark Hazelwood**
(Pending admission *pro hac vice*)

/s/ Bradley L. Henry
Bradley L. Henry (BPR # 025447)
MICHELMAN & ROBINSON LLP
800 3rd Avenue, 24th Floor
New York, NY 10016
(212) 730- 7700 (T)
(212) 730-7725 (F)
bhenry@mrllp.com

24

/s/ John E. Kelly
John E. Kelly (Admitted *Pro Hac Vice*)
David Esquivel (BPR # 021459)
Danielle Irvine (BPR # 035192)
(866) 572-6728 (fax)
Jacquelyn Papish (Admitted *Pro Hac Vice*)
Knoxville, TN 37902
Michael Tackeff (BPR # 036953)
BASS, BERRY & SIMS, PLC
150 Third Avenue South, Suite 2800
Nashville, Tennessee 37201
Tel: (615) 742-6200
Fax: (615) 742-6293
jkelly@bassberry.com

**Attorneys for Defendant Scott Wombold**

/s/ Benjamin S. Vernia
Benjamin J. Vernia
Andrew Murray 035423
The Vernia Law Firm
1455 Pennsylvania Avenue, N.W.
Suite 40
Washington D.C. 20005
(202) 349-4053 (telephone)
amurray@vernialaw.com

Cullen Wojcik
Whitt Cooper Hedrick & Wojcik
607 Market Street, Suite 1100
wojcik@knoxdefense.com

**Attorneys for Defendant Heather Jones**

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed electronically on May 14, 2021. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

By:    _/s/ Bradley L. Henry_
         Bradley L. Henry