## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MARK HAZELWOOD,<br><br>Defendant. | No. 3:16-CR-20<br>Judge Curtis L. Collier<br>Magistrate Judge H. Bruce Guyton |

**MARK HAZELWOOD'S OPPOSITION TO GOVERNMENT MOTION TO MODIFY SCHEDULING ORDER**

Mark Hazelwood respectfully submits this response to a motion filed by the government—without notice to the defense—on June 17, 2021.[1] We oppose that motion because the government is seeking to misuse the Court's authority. Despite the innocuous relief the government claims to be seeking (amendment of the scheduling order), its aim is to influence a state court proceeding ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ between *Mr. Hazelwood and Pilot Flying J* ("Pilot"). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that the government does not want Mr. Hazelwood to see. It is ironic that—in a case seeking to hold Mr. Hazelwood accountable for allegedly withholding information from customers—the government has resorted to fighting tooth and nail to prevent Pilot from providing relevant information to Mr. Hazelwood. And it is disturbing that the government has submitted a motion to this Court that is misleadingly incomplete. This opposition sets the record straight.

## **RELEVANT FACTS**

There is much about the investigation and prosecution of this matter from which the Court was shielded in the earlier litigation.

In the simplest terms, the government's conduct was fundamentally unfair from the start. It co-opted Mr. Hazelwood's financial advisor against him as a confidential informant—without first acquiring any evidence of wrongdoing by Mr. Hazelwood—in violation of that advisor's fiduciary duties. It released the search warrant affidavit for Pilot's corporate headquarters only through a misleading and incomplete unsealing motion, in an attempt to poison the press against Pilot and its salesforce, and in favor of itself, in contravention of (among other rules) this district's rules on

---

[1] We submit this opposition without waiving any position with respect to recusal or venue.

extrajudicial statements.[2] It then procured Mr. Hazelwood's termination by disclosing inflammatory recordings (the "Recordings") to Pilot two full years before the government sought charges against Mr. Hazelwood. After it obtained those charges, it then outsourced its *Brady* obligations to Pilot, despite the obvious conflict that existed between Pilot and Mr. Hazelwood owing to his termination. Exercising that delegated authority, Pilot then buried and withheld many documents favorable to the defense.

As the Court likely knows, the employment dispute between Pilot and Mr. Hazelwood—which resulted from the government's wrongful action in procuring his termination—

For its part, Pilot had previously resolved its own liability with the government under a non-prosecution agreement (the "NPA"), which the government counterintuitively styled as a "Criminal Enforcement Agreement."[3] The NPA had its own cooperation requirements, obligating Pilot to

---

[2] *See* E.D. Tenn. Local R. 83.2(b) ("[I]t is the duty of the attorney . . . not to release or authorize the release of information or opinion which a reasonable person would expect to be disseminated by means of public communication, if there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice.").

[3] The Justice Manual, which contains rules and policies for the various U.S. Attorneys' Offices across the country, recognizes no such creature as a "criminal enforcement agreement." Indeed, the very essence of the NPA is that—if Pilot complied with its obligations thereunder—the government would *refrain from* enforcing the laws against it and exacting other penalties. *See*

produce documents and witnesses to the government at its request. Importantly, and relevantly (for reasons discussed below), the NPA does nothing to restrict Pilot's cooperation with Mr. Hazelwood, nor does it obligate Pilot to obtain any form of consent from the government before providing Mr. Hazelwood (or anyone else) with relevant information and documents. The NPA requires Pilot to produce information to the government, not to kowtow to its every whim.

Once we were engaged and began requesting documents and information from Pilot, we became concerned that the government would improperly seek to intrude on our defense strategy by directing Pilot—under the guise of the NPA's cooperation provisions—to produce *our* correspondence with, and *our* requests to, Pilot. Thus, we sought and received written assurances from the government that it would not intrude on our defense by forcing Pilot to disclose our requests, or the documents and information responsive to those requests, under the NPA. *See* Decl. of Jim Walden ("Walden Decl."), Ex. A.

Later, after our defense investigation was mature and we had discovered scores of exculpatory documents, we sought to engage cooperatively with the government, to demonstrate (a) why it could not win a retrial, (b) why the continued prosecution of Mr. Hazelwood was fundamentally unfair, and (c) how its own tactics were inconsistent with the high ideals that guide DOJ. Thus, after the Sixth Circuit remand, we offered the government something unique: a detailed presentation on the exculpatory evidence we found, which included both evidence of factual innocence and information animating our serious misgivings about the prosecution's tactics.

---

Justice Manual § 9-27.620, https://www.justice.gov/jm/jm-9-27000-principles-federal-prosecution#9-27.260 ("a federal prosecutor should not routinely or indiscriminately enter into non-prosecution agreements, which are, in essence, agreements not to enforce the law under particular conditions"). Thus, we believe the government used the misnomer "Criminal Enforcement Agreement"—based on its demonstrated sensitivity to negative press coverage—only to deflect public attention from the fact that it was, essentially, giving Pilot a pass on prosecution.

We set aside a full day for the presentation, which occurred on March 8, 2021 (the "March 8th Presentation"). Among other topics covered at the March 8th Presentation, which lasted approximately seven hours, we raised the employment-termination issue, *i.e.*, that (a) the government sought to induce Pilot to terminate Mr. Hazelwood and (b) such action could put the indictment in peril of dismissal. *See United States v. Stein*, 435 F. Supp. 2d 330, 363 (S.D.N.Y. 2006), *aff'd*, 541 F.3d 130 (2d Cir. 2008) ("The job of prosecutors is to make the government's best case to a jury and to let the jury decide guilt or innocence. Punishment is imposed by judges subject to statute. The imposition of economic punishment by prosecutors, before anyone has been found guilty of anything, is not a legitimate governmental interest—it is an abuse of power.").

Seeming to seek to defend its conduct, the Acting U.S. Attorney asked, in words to the effect of, "do you have the transmittal letter?" Lacking information about the transmittal letter to which he referred, we sought clarification. He explained that the government sent a letter to Pilot (the "Letter") when it conveyed the Recordings. He implied that the Letter would contextualize the disclosure of the Recordings to allay any concerns that the government sought Mr. Hazelwood's termination. The ensuing discussion led us to believe the government would produce the Letter. *See* Walden Decl. ¶¶ 3–6.

We surmise that, when the prosecutors went back to review the Letter (which it sent almost seven years earlier), they realized it contains something harmful to them or their position, because—despite bringing it to our attention—they refuse to produce it. We followed up to ask for its disclosure on April 16, 2021. *See* Walden Decl., Ex. B at 1. On May 4, 2021, the government responded that it "has no statutory or constitutional obligation" to produce the Letter. *See* Walden Decl., Ex. C at 1.

███████████████████████████████, we then sought the Letter from Pilot as well. Pilot has made its position clear: *Pilot has no objection to producing the Letter* ███████████, but will not produce the Letter because the government has specifically instructed Pilot not to produce the Letter, claiming it is protected by Rule 408 (as if that inculcated the Letter with immunity from production).

On May 19, 2021, we notified the prosecutors that Pilot had expressed willingness to produce the Letter so long as the prosecutors did not object. We asked whether the prosecutors had such an objection. *See* Walden Decl., Ex. D. The prosecutors responded the following day, declining to consent to Pilot's production of the Letter, and stating that the Letter is subject to Rule 408, again implicitly asserting a privilege against its production. *See id.*

On May 24, 2021, we sent a letter to the government, copied to Pilot's counsel, requesting that it reconsider its position. In support of that request, we provided a detailed analysis of rules and caselaw establishing that the Letter is not subject to any immunity from discovery notwithstanding the evidentiary limitations of Rule 408, which itself has exceptions. *See* Walden Decl., Ex. E.

When the government simply ignored our letter, we sent a follow-up email on June 3, 2021, asking whether it was willing to reconsider its position. In that email, we also asked the government to at least confirm that it would ***not*** take the position that Pilot would be in violation of the NPA by producing the Letter to us.[4] *See* Walden Decl., Ex. G.

In a letter dated June 4, 2021, the government reiterated its position that it is under no constitutional or statutory obligation to produce the Letter, and again referred to Rule 408 (but without citing any authority for its implicit position that the Letter is immune from production). *See* Walden Decl., Ex. H. The government did not respond at all to the authorities we cited for the

---

[4] The NPA contains no authority for such a position anyway. *See generally* Walden Decl., Ex. F.

opposite conclusion: the Letter is discoverable. Instead, the government requested that we provide further explanation on two points: (a) why it was foreseeable to the government that disclosing the Recordings to Pilot in May 2014 would cause Pilot to terminate Mr. Hazelwood's employment and (b) why disclosure of the Letter is material to Mr. Hazelwood's defense. *Id.* at 2. But the government entirely ignored our request for confirmation that Pilot would not suffer any consequences under the NPA if Pilot were to produce the Letter to Mr. Hazelwood; thus, its silence confirmed the latent threat to Pilot. *See id.*

Three days later, on June 7, 2021, we responded to the government's request for further explanation. *See* Walden Decl., Ex. I. Specifically, we explained that it should have been obvious that disclosure of the highly inflammatory Recordings would result in Mr. Hazelwood's termination, and, to avoid any doubt, we cross-referenced a letter we had sent days earlier (on June 1), copying the government, which laid out in painstaking detail the basis for foreseeability (the prosecutors apparently overlooked the June 1 letter). We also explained that the Letter is material to preparing Mr. Hazelwood's defense and therefore must be produced under Rule 16, outlining the relevant caselaw in support of our position.

Because Pilot indicated it would comply with a court order to disclose the Letter, we then filed a motion for injunctive relief in Knox County Circuit Court, . We filed that application on June 10, 2021; it is still pending. The government knows all this because—in an effort to be completely transparent—we notified them of the suit, providing a copy of it shortly before filing, in light of their apparent position (frivolous as it is) that the Letter is immune from discovery because it is subject to Rule 408. *See* Walden Decl.,

Ex. J.  By implication, the government takes the same position here by invoking Rule 408, although it continues to maintain its silence as to why a rule of evidence delimits discoverability.

At an emergency hearing in state court on June 10, the plot twisted again.  The government sent a civil AUSA to appear, and she did ***not*** take the position the Letter was privileged or otherwise immune from discovery.  Rather, she took the position that the Letter is subject to the *Touhy* regulations (*see* 28 C.F.R. 16, Subpart B), which is a completely inapt and incredible position, since those regulations cover only production of documents from *employees or former employees of the Department of Justice*, not private parties such as Pilot.  *See* § 28 C.F.R. 16.22(a).  We have found no authority extending the *Touhy* regulations to production of documents from private parties.[5]

In a June 15, 2021 email, we asked the government to put its position on *Touhy* in writing, *see* Walden Decl., Ex. K, and (so far) it has declined to do so.  We also asked the government whether it had reconsidered its position considering our June 7th letter, which had responded to its request for further explanation.  *Id.*  Without responding to our June 7th letter or June 15th email, and without seeking a meet and confer, the government filed its motion to modify the scheduling order, *see* Mot., June 17, 2021, ECF No. 1026.

## ARGUMENT

Now, in light of the imminent disclosure of (what promises to be, in light of the government's bizarre efforts to shield it) an unflattering and potentially incriminating document[6]—the Letter—the

---

[5] These statements to the Knox County Circuit Court confirm the complete lack of cogent position from the government.  After a string of communications and citations to law supporting Mr. Hazelwood's right to the Letter that extended for weeks (as detailed above), the government raised a brand new and easily rebutted position before the state court—that the *Touhy* regulations somehow apply.  The government has been consistent in its refusal to produce the Letter, but it has been utterly inconsistent on *why* it may refuse to produce the Letter.

[6] Some context here bears mention.  When the government disclosed the Recordings, settlement discussions with Pilot had been going on for at least a year, and the government had the Recordings

7

government invokes this Court's jurisdiction. Why? The dispute between Pilot and Mr. Hazelwood is not before this Court, nor could it be since that dispute ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, where the dispute is filed. The fact that the government waived, in writing, any right to control, or even inquire about, Pilot's disclosures to Mr. Hazelwood is among the many salient facts it conveniently omits from its application.

The lengths to which the government has gone to obstruct discovery of the Letter are truly extraordinary. The fact that the government first brought it to our attention in connection with our March 8th Presentation concerning unfair prosecutorial tactics demonstrates its relevance under both Rule 16 standards (material to the defense) and *Brady* (favorable to the defense). But, that question—whether the government should produce the Letter—is not now before the Court. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, ▓▓▓▓▓ which is being litigated efficiently in state court ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

---

all along without disclosing them to Pilot. It chose to disclose them for the first time very shortly after the NBA very publicly banned Donald Sterling, the former owner of the LA Clippers, for making racist remarks. If the government disclosed the Recordings to Pilot to force a faster settlement or more onerous terms, it would raise very concerning questions about that tactic, specifically, whether the government was hoping to leverage fear over public disclosure of the Recordings for its advantage. After all, the threat of suffering Sterling's fate—an intense public backlash, leading to banishment from the league and a forced sale of the team—would have terrified Pilot's CEO, James Haslam III: approximately 21 months earlier, he purchased the Cleveland Browns for more than $1 billion—one of the highest prices paid for an NFL franchise at the time. And such a fate was clearly foreseeable if fans, players, and the NFL learned that Haslam left Mr. Hazelwood in place *to run his company* after Haslam knew about the Recordings, which included disparaging remarks about Browns fans too. Thus, we believe the Letter will confirm two things, at a minimum: (a) assurances were given that the government would maintain the confidentiality of the Recordings as part of any settlement, and (b) language will show the government's self-consciousness about having procured Mr. Hazelwood's termination, and thus will show—in essence—consciousness of guilt. The government's panicked attempts to obstruct production of the Letter, citing non-applicable privileges and inapt regulations, provide further grist for that mill of inference.

And thus we come to the most disingenuous part of the government's motion. The government could have sought to remove the state court case to federal court, but apparently recognizes that would be a losing effort. The government could assert its rights (if it has any) in the state court proceeding—as it apparently first sought to do judging by the appearance of the civil AUSA at the emergency hearing. But the government must know that its only apparent defenses to Pilot's production (so-called "settlement privilege" and the inapt *Touhy* regulations) are without any merit. So, instead, it invokes this Court's jurisdiction. Perhaps, now realizing it should have never mentioned the Letter, the government hopes the Court will save it from itself. We hope—given the importance this Court places on impartiality and public confidence in the judiciary—it will look askance at the government's decision to choose to bring this issue to the Court in such odd circumstances.

No matter, the government does not ask the Court to resolve the dispute between Mr. Hazelwood and Pilot. Why? Because the government knows there is no basis for that—which is why it tries to put the onus *on Mr. Hazelwood* to invoke the Court's jurisdiction. *See* Mot. at 1, ECF No. 1026 ("so that *he* may present any related discovery disputes . . . to this Court"). Of course, if Mr. Hazelwood were to do so, the government would likely argue that he waived recusal by invoking the Court's jurisdiction on a discovery motion.[7]

But the government cites no authority for either (a) its implicit position that we must seek to obtain the Letter from the government, not Pilot,[8] or (b) the proposition that this Court is the

---

[7] In the government's recusal opposition, they made this very argument because Mr. Hazelwood made, *inter alia*, a pro forma motion for return of his fine. Opp'n at 5–6, ECF No. 1019. Obviously, Mr. Hazelwood disagrees with the premise that recusal has been or would be waived.

[8] If we had not made efforts to obtain the Letter expeditiously from Pilot ███████████, the government likely would have argued that the defense had not used reasonable diligence to obtain it from other sources at its disposal.

appropriate forum to resolve the dispute between *Mr. Hazelwood and Pilot*, which was obviously precipitated only by Pilot's fear of governmental reprisal if it dares to produce the Letter. So, if the government is not asking the Court to resolve the dispute between Pilot and Mr. Hazelwood, why does the government seek to delay the deadline for the *Stein* motion in this application, rather than just asking the Court to resolve the dispute over the Letter? Because—strategically—its requested relief will eliminate the exigency of our state-court injunction application: the imminent deadline for our *Stein* motion in this Court. The government seeks a way to neutralize the state court proceeding as a means to block the Letter's production, hoping to prevail in this Court, where it has prevailed in prior discovery disputes, including when Mr. Hazelwood sought access to the Kraft and Pilot workpapers before sentencing. The government knows full well that ███████████ ███████████████████████████ production is a certainty since Pilot does not object to the Letter's production. In effect, the government is forum shopping as a last-ditch effort to obstruct the Letter from seeing the light of day.

This is unseemly and an abuse of process in this court. It is little wonder the government found no authority to bless its gamesmanship, since it cites none. To the contrary, courts have stated that "[p]reventing procedural gamesmanship" is an important "policy concern." *Am. Guarantee & Liab. Ins. Co. v. Norfolk S. Ry. Co.*, 278 F. Supp. 3d 1025, 1036 (E.D. Tenn. 2017) (addressing the Declaratory Judgment Act).

Put simply, this Court has no authority to resolve the dispute between Pilot and Mr. Hazelwood ███████████████████████████. The Letter is not immune from discovery, ███████ ███████████████████████████████████████. And, while we eventually may seek the Letter, draft versions of it, and other communications between the government and Pilot in the course of this proceeding (including, for example,

instructions the government gave Pilot when it delegated its *Brady* obligations), the government cites no authority for the proposition that this Court is the exclusive forum to obtain the Letter or other documents *from Pilot*. Obviously, ████████████ it is not. Indeed, the law is clear that federal courts should abstain from interference in state court issues such as this one. *Cf. Younger v. Harris*, 401 U.S. 37, 43 (1971) ("Since the beginning of this country's history Congress has, subject to few exceptions, manifested a desire to permit state courts to try state cases free from interference by federal courts."). Accordingly, we object to the government's attempt to have this Court enter an order that is devoid of substance, without any authority, and intended purely for its own tactical benefit in a separate proceeding.

## **CONCLUSION**

For the reasons set forth above, Mr. Hazelwood respectfully requests that the Court reject the government's application for the reasons set forth herein, including because (a) the Court should not allow its jurisdiction to be misused for gamesmanship and (b) the Court should not resolve substantive issues while recusal is still under consideration.

| | |
|---|---|
| /s/ Jim Walden | /s/ Bradley L. Henry |
| Jim Walden (Admitted *Pro Hac Vice*) | Bradley L. Henry (BPR # 025447) |
| Georgia Winston (Admitted *Pro Hac Vice*) | MICHELMAN & ROBINSON LLP |
| WALDEN MACHT & HARAN LLP | 800 3rd Avenue, 24th Floor |
| 250 Vesey Street, 27th Floor | New York, NY 10016 |
| New York, New York 10281 | (212) 730-7700 (T) |
| (212) 335-2030 | (212) 730-7725 (F) |
| jwalden@wmhlaw.com | bhenry@mrllp.com |
| gwinston@wmhlaw.com | |
| | |
| /s/ Nicholas J. Lewin | /s/ Robert M. Cary |
| Nicholas J. Lewin (Admitted *Pro Hac Vice*) | Robert M. Cary (Admitted *Pro Hac Vice*) |
| KRIEGER KIM & LEWIN LLP | WILLIAMS & CONNOLLY LLP |
| 500 Fifth Avenue, 34th Floor | 725 Twelfth Street, N.W. |
| New York, NY 10110 | Washington, D.C. 20005 |
| (212) 390-9559 | (202) 434-5175 |
| Nick.Lewin@KKLllp.com | rcary@wc.com |